## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Afiniti, Ltd.,[1]<br><br>      Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 24-12539 (LSS) |

**VERIFIED PETITION AND MOTION
UNDER CHAPTER 15 FOR (I) RECOGNITION OF
A FOREIGN MAIN PROCEEDING, (II) RECOGNITION
OF JPL APPOINTMENT ORDER, (III) RECOGNITION OF
SANCTION ORDER, (IV) APPROVAL OF FREE AND CLEAR
TRANSFER OF ASSETS, (V) APPROVAL OF THE PROCEDURE GOVERNING
THE CLOSING OF THIS CHAPTER 15 CASE, AND (VI) RELATED RELIEF**

Afiniti, Ltd., in its capacity as the duly authorized foreign representative (the "**Foreign Representative**") appointed by the Supreme Court of Bermuda, Companies (Winding Up) Commercial Court (the "**Bermuda Court**") to represent the above-captioned debtor (the "**Debtor**"), which is the subject of a "light touch"[2] provisional liquidation proceeding in the Bermuda Court entitled *In the Matter of Afiniti Ltd. (Provisional Liquidators Appointed for Restructuring Purpose*s*) and In the Matter of the Companies Act 1981* (2024: No. 265) (the "**Bermuda Proceeding**"), submits this verified petition (the "**Verified Petition**" and together with the *Chapter 15 Petition for Recognition of a Foreign Proceeding* [Docket No. 1] (the "**Chapter 15 Petition**"), the "**Petition**").

---

[1]  The Debtor's registration number is 45859. The location of the Debtor's registered office is Crawford House, 50 Cedar Avenue, Hamilton, Pembroke, HM 11, Bermuda.

[2]  "Light touch" refers to the provisional liquidators having certain limited powers as set forth in the order of the Bermuda Court appointing the provisional liquidators.  As discussed in paragraph 24 below, in a light touch provisional liquidation, the Debtor's existing board remains in place like a debtor in possession in chapter 11, with the joint provisional liquidators providing a supervisory role to ensure creditors' interests are considered.

In support of the Petition, the Foreign Representative submits the declarations of C. Christian R. Luthi (the "**Luthi Declaration**") and Hassan Afzal (the "**Afzal Declaration**") (together, the "**Declarations**"), both of which have been filed contemporaneously herewith and are incorporated herein by reference.  In further support of the relief requested herein, the Foreign Representative represents as follows:

**RELIEF REQUESTED**

1.     The Foreign Representative respectfully requests the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), pursuant to sections 105(a), 363, 1504, 1507, 1509, 1515, 1517, 1520 and 1521 of title 11 of the United States Code (the "**Bankruptcy Code**"):

   a.     finding that (i) the Debtor is eligible to be a "debtor" under chapter 15 of the Bankruptcy Code, (ii) the Bermuda Proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code, or, alternatively a "foreign nonmain proceeding" within the meaning of section 1502 of the Bankruptcy Code, (iii) the Foreign Representative satisfies the requirements of a "foreign representative" under section 101(24) of the Bankruptcy Code, and (iv) the Verified Petition was properly filed and meets the requirements of section 1515 of the Bankruptcy Code;

   b.     granting recognition of the Bermuda Proceeding as a "foreign main proceeding" under sections 1517 and 1520 of the Bankruptcy Code;

   c.     pursuant to section 1521(a), (i) staying the commencement or continuation of proceedings concerning the Debtor's assets, rights, obligations or liabilities, to the extent not stayed automatically under section 1520(a); (ii) staying all parties from executing against, interfering with or otherwise disposing of the Debtor's assets, to the extent not stayed automatically under section 1520; (iii) providing that the JPL Appointment Order and the Sanction Order (each as defined below) issued by the Bermuda Court are recognized, granted comity, and entitled to full force and effect in accordance with their terms, and that such terms shall be binding and fully enforceable in the United States; and (iv) entrusting the Foreign Representative with the administration or realization of all of the Debtor's assets that are located within the territorial jurisdiction of the United States, including prosecution of any causes of action belonging to the Debtor;

  d.  granting all relief afforded to foreign main proceedings under section 1520;

  e.  granting recognition and enforcement of the JPL Appointment Order and the Sanction Order in the United States under sections 1517, 1520 and 1521 of the Bankruptcy Code and giving full force and effect, and granting comity in the United States to such orders, including allowing the Foreign Representative and its expressly authorized representatives and agents to take actions necessary to consummate the Proposed Restructuring (as defined below) contemplated by the Sanction Order;

  f.  without limiting the immediately preceding relief, authorizing, pursuant to sections 363 and 1520(a)(2) the transfer (the "**Transfer**") by the JPLs (as defined below) of the Debtor's right, title, and interest in and to the assets *within the territorial jurisdiction of the United States which are being transferred under* (x) the Stock and Asset Transfer Agreement (the "**SATA**") by and between the Debtor and Afiniti AI Holdings, LLC, a Cayman Islands limited liability company and wholly owned subsidiary of the Debtor ("**Holdco**"), in substantially the form attached hereto as **Exhibit D**, and (y) the Securities Transfer Agreement (the "**STA**," and, together with the SATA, the "**Transfer Agreements**") between the Debtor and Afiniti Newco Holdings, LLC, a Delaware limited liability company and new holding company to be majority-owned by the Debtor's Secured Lenders ("**Newco**," and together with Holdco, the "**Acquirors**"), in substantially the form attached hereto as **Exhibit E** (collectively, the "**Transferred U.S. Assets**"), ultimately to Newco free and clear of all claims, liabilities, and encumbrances, except as otherwise provided in the Transfer Agreements and the Sanction Order;

  g.  waiving the 14-day stay of effectiveness of the Proposed Order; and

  h.  granting related relief.

  2.  The Foreign Representative also respectfully requests the entry of an order, substantially in the form attached hereto as **Exhibit B** (the "**Proposed Final Decree**"), upon the filing of a notice of the closing of the Proposed Restructuring (as defined below) (such closing, "**Transfer Closing**"), closing this chapter 15 case and deeming this Verified Petition to be the final report required by the Foreign Representative under Rule 5009(c) of the Federal Rules of Bankruptcy Procedure.[3]

---

[3] The Motion does not seek provisional relief. However, the Foreign Representative reserves all rights to seek provisional relief pursuant to section 1519 of the Bankruptcy Code to protect the Debtor and its assets.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. The Foreign Representative properly commenced this chapter 15 case pursuant to sections 1504 and 1509 of the Bankruptcy Code by filing a petition for recognition of the Bermuda Proceeding under section 1515 of the Bankruptcy Code [Docket No. 1].

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Foreign Representative consents to the entry of a final order by the Court in connection with this Verified Petition to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5.      Venue is proper before the Court pursuant to 28 U.S.C. § 1410, as the Debtor's principal assets in the United States are located in Delaware.

## BACKGROUND

### I.      The Debtor and its Capital Structure

6.      The Debtor is an exempted company incorporated in Bermuda.  The Debtor is the ultimate holding company of 32 companies in the business of applied predictive artificial intelligence (collectively, the "**Companies**").  Among other offerings, the Companies' main product is a patented technology for use in customer service contact centers that optimally pairs customers with contact center agents based on machine learning algorithms that seek to achieve optimal results for each customer.  The Companies' technology is used globally in the healthcare,

telecommunications, travel, hospitality, insurance, and banking industries and across multiple customer experience channels.

7.      The Debtor and its United States operating subsidiary, Afiniti, Inc., are parties to that certain Term Loan Credit Agreement, dated June 13, 2019, between and among the Debtor, Afiniti, Inc., as borrower, the guarantors party thereto, VCP Capital Markets, LLC, as the administrative agent and collateral agent (the "**Term Loan Agent**"), and each lender from time-to-time party thereto (the "**Secured Lenders**") (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**").

8.      The liabilities under the Credit Agreement consist of several tranches of funding through various amendments to the Credit Agreement.  The liabilities from such fundings are summarized below:

| Credit Agreement | Original Maturity Date | Principal Balance |
|---|---|---|
| 2019 Credit Agreement | June 13, 2024 | USD 125,000,000 |
| May 2020 Amendment | June 13, 2024 | USD 25,000,000 |
| November 2020 Amendment | November 17, 2025 | USD 100,000,000 |
| December 2020 Amendment | November 17, 2025 | USD 50,000,000 |
| March 2021 Amendment | November 17, 2025 | USD 40,000,000 |
| May 2021 Amendment | November 17, 2025 | USD 75,000,000 |
| March 2022 Amendment | March 7, 2027 | USD 41,250,000 |
| **Total Principal Balance** | | **USD 456,250,000** |
| **Total Interest Paid in Kind (as of September 30, 2024)[4]** | | **USD 65,786,864** |
| **Total Funded Secured Debt Obligations** | | **USD 522,036,864** |

---

[4]    Interest continues to accrue.

In addition to the term loan obligations under the Credit Agreement, as of September 30, 2024, the Debtor has approximately $58.5 million of liabilities.

9.      The Debtor's liabilities therefore total approximately $580.5 million of which approximately $522 million is the Secured Lenders' term loans. The Debtor has no other secured or unsecured funded debt, apart from the term loans held by the Secured Lenders.

**II.     Events Leading to the Proposed Restructuring**

10.      The Companies were initially successful; however, they took on significant debt to fuel growth, which ultimately became unsustainable. Although favorable market conditions enabled the Companies to secure debt in 2020 and 2021 (despite negative cash flows) the tightening of debt markets in 2022 in conjunction with rising interest rates made this debt difficult to service as time went on. Despite the Companies reducing their costs in 2021 and beginning to generate positive cash flows, the Companies' debt remained too high in relation to their revenue.

11.      In late 2022, the release of ChatGPT shifted client focus toward generative AI, negatively impacting the Companies' business as clients prioritized generative AI spending over optimizing contact centers with the Companies' solutions. This, combined with their "pay-for-performance" model reliant on a few large clients, led to revenue volatility and heightened vulnerability due to their debt load. In 2024, revenues dropped significantly as the Companies faced industry headwinds of client-imposed constraints on call routing and reallocation of customer budgets toward generative AI. The Debtor, a guarantor of the Companies' debt, faced further challenges from reputational damage following the resignation of founder Muhammad Ziaullah Chishti amid sexual misconduct allegations, as well as ongoing legal disputes in Bermuda and the U.S. between the Debtor and Mr. Chishti.

12.      On January 29, 2023, the Board of Directors (the "**Board**") of the Debtor formed a transaction committee, whose purpose was to (a) assist the Board in fulfilling its responsibilities

relating to the Debtor's long-term strategic plan and strategies, (b) oversee the review and evaluation of any potential strategic transactions, (c) if deemed desirable, oversee the negotiation of the terms and conditions of one or more strategic transactions on behalf of the Debtor, and (d) recommend any appropriate strategic transaction to the Board for review and approval.

13.    In November 2023, the Debtor engaged an investment bank to solicit interest in refinancing proposals, or, as an alternative, some other form of strategic transaction such as a further equity raise. This process involved the bank contacting 87 third parties, consisting of strategic partners and financial investors on behalf of the Debtor. *See* Afzal Declaration ¶ 24.  Of those parties, 61 executed nondisclosure agreements and received diligence about the Debtor. *See* Afzal Declaration ¶ 24.  Ultimately, the Debtor received only one complete proposal for a senior debt refinancing of that portion of the debt under the Credit Agreement that had an upcoming maturity date. This proposal was ultimately unworkable because, among other things, the new lender would have required the Secured Lenders to take a subordinated position of their remaining debt in the capital structure, which was not acceptable to the Secured Lenders.  *See* Afzal Declaration ¶ 24.  Accordingly, the Debtor engaged in negotiations with the Secured Lenders to pursue a viable restructuring path.

### III.    The Valuation Report

14.    On July 25, 2024, the Debtor engaged Teneo Financial Advisory Ltd. ("**Teneo FA**") to conduct a valuation of the Companies and an alternative analysis to consider both a possible accelerated sale process and a liquidation of the Companies' assets.  On September 3, 2024, Teneo FA issued a report (the "**Valuation Report**"), which applies a discounted cash flow analysis to ascertain the enterprise value of the Companies on a debt-free, cash-free, going concern basis.  Thresh Declaration ¶ 47.  In determining the aggregate total enterprise value (the "**Enterprise Value**") of the Companies, Teneo FA used both income and market approach

valuation methods.   Thresh Declaration ¶ 49.   Based on these valuation approaches and the financial forecasts provided as part of the Companies' business plan, Teneo FA concluded that the Enterprise Value range for the Companies was between $275 million and $350 million on a going concern basis (not pursuant to the Proposed Restructuring). Thresh Declaration ¶ 50.

15.     Teneo FA also considered the potential value that might be received for the Companies in a distressed sale process.  Based on, among other things, Teneo FA's assumption of a shortened sale timeframe of approximately four months and the likely need for additional funding to support such sale process, and applying an indicative discount for distress (of 30% to 50%) to the going-concern Enterprise Value of the Companies as of the valuation date, Teneo FA concluded that the potential gross proceeds available to the Secured Lenders was in the range of $150.3 million to $218.8 million.  *See Affidavit of Charles Thresh*, attached hereto as **Exhibit G** (the **"Thresh Declaration"**), ¶ 52.

16.     Finally, Teneo FA evaluated the potential outcomes of a liquidation of the Companies.  Under the liquidation scenario, Teneo FA assumed that a sale of the businesses would be completed through an accelerated sale process or, absent an ability to sell the businesses, a liquidation of the assets on a break-up basis under a shortened timeframe and tight liquidity.  Based on these assumptions, and after applying an estimated rate of realization to the net book value, Teneo FA concluded that asset realization after the deduction of costs would be between $36.9 million and $148.9 million, and therefore significantly less than the lower end of the $275 million Enterprise Value of the Companies.  Thresh Declaration ¶ 53.

## IV.     The Transfer Pursuant to the Proposed Restructuring

17.     On September 17, 2024, the Debtor, its subsidiaries that are party to the Credit Agreement, and the Secured Lenders entered into a restructuring support agreement (as amended,

supplemented, or modified from time to time, the "**RSA**"), a copy of which is attached to the Afzal Declaration as **Exhibit 2**.

18.    The RSA governs the terms of and process for implementing a transaction whereby, a newly formed company, Newco (which the Secured Lenders will own a majority of the equity units at closing on a pro forma basis), would acquire substantially all of the Debtor's assets (including, directly or indirectly, the shares of substantially all of the subsidiaries of the Debtor, including the Debtor's U.S. subsidiaries) in exchange for, among other things, the Debtor being released from its guarantee of the Secured Lenders' term loans, which loans will be restructured to extend their maturity and improve the remaining Companies' free cash flow, and the assumption of certain of the Debtor's liabilities as more fully set forth in the Transfer Agreements (the "**Proposed Restructuring**").  The net result, if effected, is that ownership of the Companies (other than the Debtor's Bermuda incorporated subsidiaries) will be transferred to Newco.

19.    The Transfer of substantially all of the Debtor's assets, including the Transferred U.S. Assets, will be effectuated pursuant to the Transfer Agreements.  Specifically, pursuant to the SATA, the Debtor will transfer all of its assets, other than its ownership interest in its U.S. subsidiary, Afiniti, Inc. and the Debtor's Bermuda subsidiaries, to Holdco.[5]  Following the Debtor's transfers to Holdco, pursuant to the STA, the Debtor will transfer its ownership interest in Afiniti, Inc. and Holdco to Newco.  The Transferred U.S. Assets primarily consist of (i) the Debtor's equity shares in Afiniti, Inc. (a direct U.S. subsidiary); (ii) certain material contracts with the Debtor, including customer contracts, that are governed by U.S. law;[6] and (iii) certain patents

---

[5]    Holdco will then transfer its intellectual property to its Irish subsidiary, Afiniti AI Limited.

[6]    No request is being made at this time under section 365 of the Bankruptcy Code to assume and assign any executory contracts or unexpired leases.  Rather, any customer contracts transferred will be done in accordance with the terms of the applicable contract.

and trademarks.  The assets of Afiniti, Inc. will not be transferred elsewhere under the Proposed

Restructuring and will remain with Afiniti, Inc.

20.     The transfers pursuant to the Transfer Agreements are requested to be free and clear

of all liens, claims, charges and other encumbrances of any kind or nature, except for any Permitted

Encumbrance (as defined below) under the Transfer Agreements and all liens, claims, and charges

in existence and in favor of the Collateral Agent and Administrative Agent (each as defined in the

Credit Agreement), on behalf of the Secured Lenders.  Indeed, the proposed Sanction Order

expressly includes a finding that "as a result of the [t]ransactions, it is intended by all parties thereto

that the disposition and transfer of any and all assets pursuant to and in accordance with the SATA

and STA . . . shall be free and clear of all liens, claims, charges and other encumbrances . . . save

for the charge created in favour of the Term Loan Agent or the Secured Lenders under the Credit

Agreement, pursuant to the Debenture."  *See* Sanction Order Clause 10.

21.     At the Transfer Closing, Newco, Afiniti, Inc., all the other subsidiary guarantors

under the existing Credit Agreement, and the Secured Lenders will execute a further amendment

to the Credit Agreement (the "**Amended Credit Agreement**").  The Amended Credit Agreement

will result in (i) a new senior first lien secured tranche of debt in the principal amount of

approximately $225 million, subject to potential increases for accrued interest; and (ii) a new junior

secured convertible tranche of debt in the initial principal aggregate amount of approximately

$298.7 million, subject to potential increases from the rights offering and potential increases for

accrued interest where interest can be paid-in-kind to provide sufficient liquidity.  Crucially, the

Amended Credit Agreement will be secured by substantially all of the assets of Newco, Holdco,

and each of the guarantors under the Credit Agreement (other than the Debtor) that will continue

to be guarantors following consummation of the Transfer, with economic terms that better correspond to the current performance of the business, hence capacity to service the debt.

## V.    **The Bermuda Proceeding**

22.    The Debtor and the Secured Lenders agreed that it was appropriate for the proposed restructuring to be implemented by a "light touch" joint provisional liquidation in Bermuda in which the Bermuda Court appoints independent joint provisional liquidators, acting with Court sanction.

23.    As a first step in implementing the Proposed Restructuring, on September 18, 2024, the Debtor commenced the Bermuda Proceeding by filing with the Bermuda Court a winding-up petition, a true and correct copy of which is attached as **Exhibit 3** to the Afzal Declaration (the "**Winding-Up Petition**").  The Winding-Up Petition sought the appointment of Mike Morrison and Charles Thresh as the Debtor's joint and several provisional liquidators with "light-touch" powers for restructuring purposes (the "**JPLs**").

24.    On September 19, 2024, the Bermuda Court entered an order appointing the JPLs as such, a true and correct copy of which is attached as **Exhibit 4** to the Afzal Declaration (the "**JPL Appointment Order**").  The JPL Appointment Order mandated that the JPLs are to, among other things, monitor and consult with the existing board of directors of the Debtor, and provide a written report to the Bermuda Court. *See* JPL Appointment Order ¶¶ 1(h)-(i).  As such, while the Debtor's existing board remains in place like a debtor-in-possession under the Bankruptcy Code, the JPLs will provide a supervisory role and in that capacity ensure that creditors' interests are considered.  Importantly, the JPL Appointment Order also appointed the Debtor as its own duly-authorized Foreign Representative and specifically authorized it to seek recognition of the Bermuda Proceeding under chapter 15 of the Bankruptcy Code.  JPL Appointment Order, ¶ 1(g).

25.     On September 19, 2024, the Debtor and JPLs entered into a protocol agreement to ensure the efficient and expeditious administration of the Bermuda Proceeding and to avoid duplication of efforts between the Debtor and the JPLs.

26.     On October 2, 2024, the JPLs filed and served a summons in the Bermuda Proceeding seeking entry of an order, among other things, sanctioning and approving the Transfer Agreements and the Transfer pursuant to the terms of the Transfer Agreements free and clear of all liens, claims, charges and other encumbrances of any kind or nature whatsoever (other than (i) as specified in the Transfer Agreements and (ii) the liens, claims, charges and other encumbrances in favor of the Term Loan Agent on behalf of the Secured Lenders) to the extent of the Bermuda Court's jurisdiction over such assets, and authorizing and directing the JPLs to undertake all necessary steps and actions in furtherance of the Transfer (the **"Sanction Order"**), a copy of which is attached as **Exhibit F** hereto.  A preliminary hearing for the Bermuda Court to consider entry of the Sanction Order took place on October 23, 2024.  At the hearing, in light of certain opposition and a request for adjournment by Mr. Chishti, the Bermuda Court scheduled a further, substantive hearing with respect to the proposed Sanction Order for November 6-7, 2024.[7] If and when the Bermuda Court enters such order, the Foreign Representative will promptly file a copy thereof on the docket of this chapter 15 case.

## VI.     The Benefits of the Proposed Restructuring to Stakeholders

27.     The Debtor and the JPLs have made a duly-informed and well-considered determination that the Proposed Restructuring will maximize returns for the Debtor's stakeholders.

---

[7]  On October 31, 2024, in light of the failure to obtain entry of the Sanction Order by October 24, 2024, the Term Loan Agent (on behalf of the Secured Lenders) sent a letter to the Debtor's subsidiary Afiniti, Inc. informing it that the maturity of the Term Loans for Afiniti, Inc. and the other non-Debtor loan parties occurred on October 24, 2024 and that such parties were in default (the maturity with respect to the Debtor's guarantee occurred on September 18, 2024, with the commencement of the Bermuda Proceeding).

As noted above, Teneo FA's Valuation Report informed those determinations with its conclusion that the Proposed Restructuring provides significantly greater potential realizable value compared to the possible alternative options, including an accelerated sale or liquidation process.  This is especially true given the Teneo FA's conclusion that the value of the Companies is less than the amount of debt owed to the Secured Lenders as evidenced by the Enterprise Value for the Companies being only $275 million to $350 million.

28.     Furthermore, the reality is that in an alternative distressed sale or liquidation scenario, most of the Debtor's ordinary course trade creditors, vendors, and customers would fare much worse. As a result of the Proposed Restructuring, among other things, the Secured Lenders have agreed that substantially all liabilities of ordinary course trade creditors and certain vendors will be assumed by Newco, resulting in a tangible benefit to such unsecured creditors.  And the Debtor's customers will continue to receive uninterrupted services through Newco post-restructuring.

29.     Finally, it is all but certain that the Debtor's existing equity holders would not receive the same level of value they may be eligible to receive in the Proposed Restructuring in any other form of restructuring.

30.     As described in the Afzal Declaration, the Debtor's existing equity holders who meet certain eligibility requirements and who have not prosecuted any claims against the Companies, will be entitled to participate, after the Transfer Closing, on a voluntary basis, in a rights offering, subject to the terms of the RSA and Backstop Agreement (as defined below and attached as an exhibit to the RSA).  Those participating in this rights offering, among other things, will need to provide fresh capital for their subscription and provide releases to the Companies, the Secured Lenders, and certain other parties in consideration of being included in the rights offering.

In addition, after the Transfer Closing, the Debtor's current holders of preferred stock who meet certain eligibility requirements, who have not prosecuted any claims against the Companies will be provided certain shares of Class B Units and certain Warrant Units (as each term is defined in the RSA) in Newco in consideration of releases provided by such holders to the Companies, the Secured Lenders, and certain other parties, and subject to the terms of the Newco LLC Agreement (as defined in the RSA).[8]

## VII.   The Urgency of Consummating the Proposed Restructuring as Soon as Possible

31.     As explained in the Afzal Declaration, a prompt closing is necessary and in the best interests of the Debtor and its stakeholders, as the Debtor has constrained liquidity and is not expected to receive additional funding until the occurrence of the Transfer Closing.   Afzal Declaration ¶ 54.  Further, based on current forecasts, the Companies are operating at the minimum level of required liquidity, and the failure to consummate the Proposed Restructuring as soon as possible can result in irreparable harm.   Prolonging the consummation of the Proposed Restructuring will cause uncertainty with respect to the Debtor's business, making it increasingly difficult to attract new customers and retain the employment of key employees while the Debtor is under Bermuda Court supervision.  Afzal Declaration ¶ 54.  Moreover, if the Debtor does not obtain entry of the Proposed Order on or before November 25, 2024, the Secured Lenders have a right to terminate the RSA and exercise their rights and remedies against their collateral, resulting in the Debtor's unsecured creditors and equity holders receiving nothing.  Accordingly, the Foreign Representative respectfully submits that it is critical that the Court approve the relief requested as soon as possible.

---

[8]   The Secured Lenders are not obliged to make any offer to certain existing equity holders (including in relation to the rights offering) but are choosing to do so in consideration for, among other things, releases from those equity holders to the Companies, the Secured Lenders, and certain other parties.  Accordingly, equity holders who are in a continuing dispute with the Companies are not eligible for any such offer.

32.    Additional detail regarding the Debtor, its business, and the Proposed Restructuring is set forth in the Afzal Declaration.

### BASIS FOR RELIEF

**I.**    **The Debtor Is Eligible to Be a "Debtor" Under Chapter 15 of the Bankruptcy Code**

33.    The Debtor qualifies as a "debtor" as that term is defined in section 1502(a)(1) of title 11 of the United States Code (the "**Bankruptcy Code**") because it is an "entity," which includes corporations.  *See* 11 U.S.C. §§ 101(15) (definition of "entity," which includes a "person") and 101(41) (definition of "person," which includes a "corporation").  The Debtor is an exempted company with limited liability incorporated under the laws of Bermuda.  *See* Afzal Declaration ¶ 6.

34.    To the extent section 109(a) applies in a chapter 15 case, the debtor-eligibility requirements are satisfied here because the Debtor has property in the United States.  Courts have adopted a broad interpretation of "property" under section 109(a) of the Bankruptcy Code and have found that even a nominal amount of property in the United States satisfies the requirements of section 109(a).  *See, e.g.*, *In re Global Ocean Carriers Ltd.*, 251 B.R. 31 (Bankr. D. Del. 2000) (holding that approximately $10,000 in a bank account and the unearned portions of retainers provided to local counsel constituted a sufficient property interest for chapter 15 purposes).  Effectively, if a debtor has any property in the United States, section 109(a) of the Bankruptcy Code is satisfied.

35.    Here, the Debtor has property in and connections to the United States and Delaware, including the Debtor's 100% equity interests in its wholly owned subsidiary Afiniti, Inc., which is incorporated in Delaware and is a significant operating company.  *See* Afzal Declaration ¶ 43. "Courts have historically held that stock is located in the state that created the corporation." *In re Silicon Valley Innovation Co.*, 2012 WL 3778853, at *3 (Bankr. N.D. Cal. Aug. 30, 2012)

("Moreover, Delaware law provides that for 'purposes of title, action, attachment, garnishment and jurisdiction of all courts held in this State, but not for the purpose of taxation, the situs of the ownership of the capital stock of all corporations existing under the laws of this State ... shall be regarded as in this State.' DEL. CODE ANN. tit. 8, § 169.").  Additionally, the Debtor meets the flexible threshold for having property in the United States as required under section 109(a) because it owns (1) the funds in a retainer account for Young Conaway (the Debtor's local bankruptcy counsel), which funds are held in a Delaware bank account, (2) the funds in a retainer account for Latham & Watkins, LLP, which funds are held in a U.S. bank account, and (3) the funds in three bank accounts at JPMorgan Chase Bank, N.A., which accounts are located in New York.  *See* Afzal Declaration ¶ 43.  Accordingly, the Debtor is eligible to be a chapter 15 debtor.

## II.     **The Bermuda Proceeding Is a Foreign Main Proceeding**

36.     The Bermuda Proceeding is entitled to recognition as a foreign main proceeding under chapter 15 of the Bankruptcy Code.  Section 1517(a) of the Bankruptcy Code provides that, subject to section 1506 of the Bankruptcy Code, a court "shall" enter an order granting recognition of a foreign proceeding if:

> (1)    such foreign proceeding is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code;
>
> (2)    the foreign representative applying for recognition is a person or body; and
>
> (3)    the petition meets the requirements of section 1515 of the Bankruptcy Code.

11 U.S.C. § 1517(a); *see* H.R. Rep.  No. 109-31, pt. 1, at 113 (2005) ("The decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings . . . [t]he requirements of this section... are all that must be fulfilled to attain recognition.").  Section 1517(b) of the Bankruptcy Code provides that a foreign proceeding "shall be recognized .

. . (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1).  Here, all of the requirements for recognition of the Bermuda Proceeding as a foreign main proceeding are satisfied.

A.     **The Bermuda Proceeding Constitutes a "Foreign Proceeding"**

37.     The Bermuda Proceeding is a "foreign proceeding" under chapter 15 of the Bankruptcy Code.  Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).  Based on this definition, courts have held that a "foreign proceeding" is one:

a.     in which acts and formalities are set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;

b.     that has either a judicial or an administrative character;

c.     that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

d.     that is located in a foreign country;

e.     that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.     in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

g.     that is for the purpose of reorganization or liquidation.

*See In re ABC Learning Ctrs Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013); *In re Irish Bank Resolution Corp. (In Special Liquidation)*, No. 13-12159 (CSS), 2014 Bankr. LEXIS 1990, at *39-40 (Bankr. D. Del. Apr. 30, 2014).

38.     The Bermuda Proceeding is a foreign proceeding under this framework:

a.    It was commenced pursuant to the Bermuda Companies Act of 1981, which provides the legislative framework in Bermuda for insolvency and the adjustment of debt of companies.  And Bermuda law, in general, is based upon the common law principle of precedent.  *See* Luthi Declaration, ¶ 14.

b.    It has a judicial character, as it is conducted under the supervision of the Supreme Court of Bermuda.  *See* Luthi Declaration, ¶ 24.

c.    It is collective in nature as the provisional liquidators in the Bermuda Proceeding are overseeing and preserving the assets of the Debtor for the benefit of creditors and is required to act in an evenhanded fashion between creditors or groups of creditors (i.e., for the benefit of the Debtor's creditor body as a whole and not just a single creditor or group of creditors).  *See* Luthi Declaration, ¶ 26.

d.    It is located in a foreign country, Bermuda.  *See* Luthi Declaration, ¶ 27.

e.    It was commenced pursuant to the Bermuda Companies Act of 1981, which provides the legislative framework in Bermuda for insolvency and the adjustment of debt of companies.  *See* Luthi Declaration, ¶ 23.

f.    The Debtor's assets and affairs are subject to the Bermuda Court's supervision.  *See* Luthi Declaration, ¶ 29.

g.    The purpose of the Bermuda Proceeding is to liquidate the Debtor through a centralized process and to resolve claims to the extent necessary and issue distributions to creditors in the order of their priority solely to the extent of available assets.  *See* Luthi Declaration, ¶ 20.

39.    Many courts have held that liquidation proceedings in Bermuda are "foreign proceedings."  *See*, *e.g.*, *In re Culligan Ltd.,* 2021 WL 2787926 (Bankr. S.D.N.Y. July 2, 2021) (recognizing Bermuda provisional liquidation as a foreign proceeding); *In re Digicel Grp. One Ltd.*, No. 20-11207 (SCC) (Bankr. S.D.N.Y. June 17, 2020) [ECF No. 29] (same); *In re PDV Ins. Co., Ltd.*, No. 18-12216 (MEW) (Bankr. S.D.N.Y. Aug. 30, 2018) [ECF No. 11] (same); *In re Gerova Fin. Grp., Ltd.,* No. 12-13641 (MEW) (Bankr. S.D.N.Y. Oct 11, 2012) [ECF No. 29] (same); *In re Millennium Glob. Emerging Credit Master Fund, et al.*, No. 11-13171 (ALG) (Bankr. S.D.N.Y. Sept. 19, 2011) [ECF No. 47] (same); *In re Inverness Distrib. Ltd. f/k/a Morgan Creek Int'l Ltd.*, No. 11-12106 (SCC) (Bankr. S.D.N.Y. June 1, 2011) [ECF No. 31] (same).

### B.    The Bermuda Proceeding Is a "Foreign Main Proceeding"

40.    The Bermuda Proceeding also qualifies as a "foreign main proceeding," which is defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4).  The relevant time period to determine the location of a debtor's "center of main interests" ("**COMI**") is the date on which the chapter 15 petition is filed.  *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013).

41.    While the Bankruptcy Code does not expressly define COMI, it provides that, in the absence of evidence to the contrary, a debtor's registered office is presumed to be its COMI.  *See* 11 U.S.C. § 1516(c); *see also In re Gerova Fin.  Grp., Ltd.*, 482 B.R. 86, 91 (Bankr. S.D.N.Y. 2012); *In re Tri-Continental Exch.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006) ("In effect, the registered office . . . is evidence that is probative of, and that may in the absence of other evidence be accepted as proxy for, 'center of main interest.'").  Here, the Debtor's registered office is located in Bermuda.  *See* Afzal Declaration, ¶ 48.  Accordingly, the Debtor is entitled to the statutory presumption that its COMI is located in Bermuda.

42.    In addition, courts consider the following factors relevant to the determination of a debtor's COMI:

> the location of the debtor's headquarters; the location of those who actually manage the debtor...; the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 654 (Bankr. S.D.N.Y. 2016) (internal citations omitted); *see In re Fairfield Sentry Ltd.*, 714 F.3d at 130 ("Among other factors that may be considered [in determining COMI] are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes."); *In re Avanti Communs. Grp. plc*, 582 B.R.

603, 614 (Bankr. S.D.N.Y. 2018) (concluding that the UK constituted the debtor's "center of main interests" where "the Debtor is incorporated in the UK and its registered offices and headquarters are in London.").

43.      Courts should consider the activities of liquidators and provisional liquidators in their analyses of the location of those who actually manage the debtor. *In re Olinda Star Ltd.*, 614 B.R. 28, 41 (Bankr. S.D.N.Y. 2020); *see also In re Ocean Rig UDW Inc.*, 570 B.R. at 706 (finding debtors' COMI in the Cayman Islands to be "the site where their business [had been] run" by Cayman joint provisional liquidators pursuant to a protocol with the directors); *In re Fairfield Sentry Ltd.*, 2011 U.S. Dist. LEXIS 105770, at *20 (Sept. 16, 2011) (*Fairfield Sentry I*) (finding COMI in the BVI where BVI liquidators had been "directing and coordinating" the debtor's affairs since their appointment); *In re Betcorp Ltd.*, 400 B.R. 266, 292 (Bankr. D. Nev. 2009) (finding COMI in Australia where "[t]he location of those that manage Betcorp—the liquidators" were located); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 418 (Bankr. S.D.N.Y. 2014) (finding COMI in the Cayman Islands where Cayman joint provisional liquidators had "centralized the administration of the Debtor's affairs and its restructuring in the Cayman Islands").

44.      Under the relevant criteria, the Debtor's COMI is located in Bermuda.  The Debtor's registered office is located in Bermuda; the Debtor maintains a physical premise in Bermuda (Andrew's Place, 5th Floor, 51 Church Street, Hamilton, Pembroke, HM 12, Bermuda); the Debtor is party to litigation in Bermuda; the Debtor has historically conducted strategic and operational meetings in Bermuda (including various board meetings); the Debtor has employees who reside in Bermuda; the JPLs (who monitor and consult with the Debtor's board and are responsible for overseeing and implementing the Proposed Restructuring) are located in Bermuda; and the JPLs (who have Bermuda counsel) have directed creditors and other interested parties to

correspond with them using their Bermuda contact details.  *See* Afzal Declaration, ¶ 48; Luthi Declaration, ¶ 28.

45.    Accordingly, the Debtor's COMI in Bermuda is well known and readily ascertainable by third parties.  *See In re Fairfield Sentry Ltd.*, 714 F.3d at 130 ("The relevant principle [to determine a debtor's COMI] is that COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties...."); *In re OAS S.A.*, 533 B.R. 83, 103 (Bankr. S.D.N.Y. 2015) (the chapter 15 debtor's COMI was readily ascertainable as Brazil, among other reasons, because note purchasers understood that their investment was in a Brazil-based business and expected to receive payment from cash generated by a Brazilian entity).  As the Bermuda Proceeding is pending in the jurisdiction of the Debtor's COMI, the Bermuda Proceeding should be recognized as a foreign main proceeding.

## III.    In the Alternative, the Bermuda Proceeding is a Foreign Nonmain Proceeding

46.    Although as set forth above, the Debtor submits that the Bermuda Proceeding is a foreign main proceeding, if this Court finds otherwise, in the alternative, the Bermuda Proceeding is a foreign nonmain proceeding.  Courts will recognize a foreign proceeding as a "foreign nonmain proceeding" if "the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending." 11 U.S.C. § 1517(b)(2).  Section 1502(2) defines "[e]stablishment" as "any place of operations where the debtor carries out a nontransitory economic activity[,]" *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 70 (Bankr. S.D.N.Y. 2011), aff'd 474 B.R. 88 (S.D.N.Y. 2012) ("Millennium Glob. I"), and courts have required proof of more than a "mail-drop presence." *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 277 (Bankr. S.D.N.Y. 2019) ("Constellation Recognition Decision"); 11 U.S.C. § 1502(2).  At least one court has—noting the "paucity of U.S. authority" on the subject—favorably cited a "persuasive" English law holding that the presence of an asset and minimal

management or organization can suffice to create an establishment. *See Millennium Glob. I*, 458 B.R. at 84-85.

47.     As with COMI, whether the debtor has an "establishment" in a country must be determined at the time of filing the chapter 15 petition. *See Beveridge v. Vidunas (In re O'Reilly)*, 598 B.R. 784, 803 (Bankr. W.D. Pa. 2019) (adopting *Fairfield Sentry* and *Ran* findings that "the presumptive date from which [a c]ourt is to ascertain [a] debtor's center of main interests and/or establishment is the date the [c]hapter 15 petition was filed"). Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." *Millennium Glob. I*, 458 B.R. at 85.  A showing of impact of the debtor's activities on the foreign jurisdiction involves a "showing of a local effect on the marketplace," *In re Creative Fin., Ltd. (In Liquidation)*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016), evidenced by, among other things, engagement of "local counsel and commitment of capital to local banks." *Millennium Glob. I*, 458 B.R. at 86-67.  At least one court has also found that the presence of liquidators is relevant to the determination of whether a debtor has an establishment in that location.  *See*, *e.g.*, *Millenium Glob. I*, 458 B.R. at 86 (finding that Bermuda proceedings should be recognized as foreign main proceedings or, in the alternative, foreign nonmain proceedings, after considering, among other factors, the fact that the liquidators are subject to the control of the court in Bermuda); *Millenium Glob. II*, 474 B.R. at 94 (affirming *Millenium Glob. I* and noting, inter alia, that "Bermuda is where the liquidation proceedings are taking place, under the supervision of the Bermuda court").

48.     In this case, Bermuda is not merely a letterbox jurisdiction for the Debtor.  For all the reasons set forth above in paragraph 44, the Debtor has an "establishment" in Bermuda.

Denying recognition of the Debtor's Bermuda Proceeding as either a foreign main or nonmain proceeding would leave the Debtor without access to U.S. courts. Without the relief requested herein, the Debtor will not have an effective means of protecting its assets in the U.S. or many of its creditors with significant contacts to the U.S. Such a result would be at odds with the purpose of chapter 15 of the Bankruptcy Code—to engender cooperation among foreign courts with respect to restructuring and insolvency proceedings. *See Millennium Glob. I*, 458 B.R. at 69, 81-82.

**IV.**   **The Foreign Representative Satisfies the Requirements of "Foreign Representative" Under Section 101(24) of the Bankruptcy Code**

49.    For recognition under chapter 15, a foreign proceeding must also have a foreign representative. *See* 11 U.S.C. § 1517(a)(2). Section 101(24) of the Bankruptcy Code states:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

50.    The Foreign Representative (the Debtor itself) satisfies that definition. The Foreign Representative is a corporate entity (satisfying the definition of "person") and was expressly authorized by the Bermuda Court to act as a foreign representative. *See In re Ace Track Co., Ltd.*, 556 B.R. 887, 914 (Bankr. N.D. Ill. 2016) ("Nothing prevents a foreign court from authorizing a debtor in a foreign proceeding to act as its own foreign representative.") (collecting authorities and examples); *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 603, 612 (Bankr. S.D.N.Y. 2017) (debtor could act as foreign representative because "the term 'person' includes a corporation" and the foreign court had authorized the debtor to act as foreign representative); *In re NextPoint Financial Inc.,* Case No. 23-10983 (Bank. D. Del.) (TMH) (Docket No. 54) (Aug. 16, 2023) (approving debtor entity as foreign representative); *see* Afzal Declaration ¶ 45.

## V.   The Petition Was Properly Filed and Satisfied the Requirements of Section 1515 and Bankruptcy Rule 1007(a)(4)

51.     The Foreign Representative duly and properly commenced this chapter 15 case in accordance with sections 1504 and 1509 of the Bankruptcy Code, which require the filing of a petition for recognition under section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. §§ 1504, 1509(a).   In accordance with section 1515(b)(1) of the Bankruptcy Code, the Foreign Representative attached to the Chapter 15 Petition a certified copy of the JPL Appointment Order. In accordance with section 1515(c) of the Bankruptcy Code, the Foreign Representative also submitted a declaration attached to the Petition containing a statement identifying the Bermuda Proceeding as the only known pending "foreign proceeding" with respect to the Debtor. Accordingly, the requirements of section 1515 have been satisfied.

52.     The Foreign Representative also has satisfied the additional filing requirements set forth in Bankruptcy Rule 1007(a)(4), which requires the filing of (i) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1 and (ii) the names and addresses of all persons or bodies authorized to administer the foreign proceedings of the Debtor, all parties to litigation pending in the United States in which the Debtor is a party at the time of filing the Petition, and all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code.

## VI.   Recognition and Enforcement of Both the JPL Appointment Order and the Sanction Order Supports the General Principles of Comity and Is in the Best Interests of Creditors and Equity Holders

53.     The Court should recognize and enforce the JPL Appointment Order and the Sanction Order and authorize and entrust the Foreign Representative to administer, realize and distribute the Debtor's assets within the territorial jurisdiction of the United States, in accordance

with the Transfer Agreements and the RSA, pursuant to sections 1521(a) and (b), 1507 and 105 of the Bankruptcy Code.

54.     Pursuant to section 1521(a) of the Bankruptcy Code, upon recognition of a foreign proceeding, "where necessary to effectuate the purpose of [chapter 15 of the Bankruptcy Code] and to protect the assets of the debtor or the interests of creditors, the court may, at the request of the foreign representative, grant any appropriate relief."  Such relief may include "entrusting the administration or realization of all or a part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative . . . provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." *See* 11 U.S.C. § 1521(a)(5). Further, pursuant to section 1521(b) of the Bankruptcy Code, "[u]pon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part for the debtor's assets located in the United States to the foreign representative or another person , , , provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." 11 U.S.C. § 1521(b).

55.     In determining whether to recognize and enforce a foreign judgment, courts consider general principles of comity.  *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 698 (*citing Hilton v. Guyot*, 159 U.S. 113, 166 (1895); *Pariente v. Scott Meredith Literary Agency, Inc.*, 771 F. Supp. 609, 615 (S.D.N.Y. 1991)).  In *Hilton v. Guyot*, the Supreme Court held that if the foreign court provides "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is

sitting," the foreign judgment should be enforced and not "tried afresh." *Hilton*, 159 U.S. at 202-03.

56.     "Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *In re Atlas Shipping A/S*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009) (citations omitted); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico S.A.*, 412 F.3d 418, 424 (2d Cir. 2005) ("[D]eference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and ... do not contravene the laws or public policy of the United States."); *Universal Cas. & Sur.  Co. v. Gee (In re Gee)*, 53 B.R. 891, 902, 904 (Bankr. S.D.N.Y. 1985) (noting that if the bankruptcy court is satisfied with the procedural fairness of the foreign proceeding, it "should not sit as an appellate court over the foreign proceedings.").

57.     "[P]rinciples of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of [provisions in foreign court orders], even if those provisions could not be entered in a plenary chapter 11 case." *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 696.  The "relief granted in [a] foreign proceeding and the relief available in a U.S. proceeding need not be identical[,]" and U.S. bankruptcy courts are "not required to make an independent determination about the propriety of individual acts of a foreign court." *Id.* at 697 (*citing In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 391 (Bankr. S.D.N.Y. 2004)).  Rather, "[a]s long as the manner in which the scheme acquired statutory effect comports with our notions of procedural fairness, comity should be extended to it." *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 238 B.R. 25, 56–61 (Bankr. S.D.N.Y. 1999), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002) (citations omitted).

58.     The relief requested under section 1521 is founded on the Congressional mandate to cooperate with foreign courts and representatives in foreign proceedings.  *See* 11 U.S.C. § 1521(a) ("Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or foreign representative, either director or through the trustee.").  Such relief is appropriate, under section 1521 of the Bankruptcy Code, because it is necessary to ensure the success of the Bermuda Proceeding.  The Court may grant such relief, however, "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

59.     The Bermuda Proceeding meets the standard for extending comity.  As an initial matter, Bermuda is a territory of the United Kingdom and it shares with the United States common-law traditions and fundamental principles of law.  *In re Olinda Star Ltd*., 614 B.R. at 44 (finding that the "United States and [the British Virgin Islands, another territory of the United Kingdom], share common-law traditions and fundamental principles of law, including an emphasis on procedural fairness").

60.     Second, as made clear above, there is insufficient value in the Debtor to pay the Secured Lenders in full, which in turn necessarily means that unsecured creditors and shareholders would not be entitled to a recovery.  However, as part of the Proposed Restructuring, and pursuant to the Transfer Agreements, the liabilities of certain ordinary course creditors and trade vendors will be assumed by Newco, customers will continue to receive services from Newco, numerous jobs will be preserved, and after the Transfer Closing, certain eligible existing equity holders of the Debtor will receive the opportunity to participate in a rights offering, and preferred eligible existing equity holders will receive equity units and warrants in Newco in exchange for providing

certain releases and not opposing the Proposed Restructuring. None of the foregoing, other than a recovery to the Secured Lenders, would occur without the Proposed Restructuring.

61.    Third, adequate and reasonable notice of the Proposed Restructuring has been provided to parties in interest in the Bermuda Proceeding and this chapter 15 case. On October 2, 2024, the Foreign Representative's service and noticing agent, Kroll Restructuring Administration LLC (the "**Noticing Agent**") provided notice of the Transfer and the date of the sanction hearing in the Bermuda Proceeding to all known creditors, holders of equity interests, and counterparties to contracts with the Debtor (collectively, "**Parties in Interest**"). The Debtor also published notice of the Bermuda Proceeding in the USA Today, Irish Times, and The Daily Telegraph on October 8, 2024 and The Royal Gazette on October 7, 2024. In addition, all Parties in Interest are being served with notice of the Petition, which will be demonstrated in a forthcoming declaration from the Noticing Agent. Accordingly, with respect to the Sanction Order, all creditors will have had a full and fair opportunity to be heard in the Bermuda Proceeding under a sophisticated insolvency regime before an impartial court in accordance with fundamental standards of due process. With respect to the recognition of the JPL Appointment Order, while it was requested and made *ex parte*, it is functionally similar to a voluntary chapter 11 petition, in that it can be filed without notice and does not (in and of itself) affect any stakeholder's substantive rights—so there are no due process concerns or any conflicts with U.S. public policy.

62.    Finally, the JPLs, who are implementing the Proposed Restructuring and executing the definitive documents to effectuate the Proposed Restructuring, are independent officers of the Bermuda Court and must report to and be subject to the Bermuda Court. Accordingly, it is clear that the interests of creditors and other parties in interest are adequately protected through the Proposed Restructuring process.

**VII.** **The Court Should Authorize the Transfer Under Section 363 of the Bankruptcy Code, Free and Clear of Liens, Claims, and Encumbrances[9]**

63.     Because the Transfer includes the "Transferred U.S. Assets" which are those assets of the Debtor that are within the territorial jurisdiction of the United States, the Foreign Representative seeks this Court's approval of the Transfer, solely with respect to such Transferred U.S. Assets, pursuant to section 363 of the Bankruptcy Code.   Section 1520(a)(2) of the Bankruptcy Code provides that section 363 applies "to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the section would apply to property of the estate." 11 U.S.C. §1520(a)(2).  Section 363(b)(1) provides, in relevant part, that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in this Circuit, and in other districts, have required that the decision to sell or otherwise transfer assets outside the ordinary course of business be based upon the sale proponent's sound business judgment.  *See In re Goli Nutrition Inc.*, 2024 WL 1748460 *5-6 (Bankr. D. Del. April 23, 2024) (LSS); *In re Elpida Memory, Inc.* 2012 WL 6090194 (Bankr. D. Del. Nov. 20, 2012) (CSS); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991); *see also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Myers v. Martin (In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996).

64.     The "sound business judgment" test requires consideration of four factors in evaluating a proposed disposition of property outside the ordinary course of business. These factors are (a) that a "sound business purpose" justifies the disposition of assets outside the

---

[9]     A table highlighting the provisions required to be highlighted pursuant to Local Rule 6004-1(b)(iv), most of which are not applicable here, is attached hereto as **Exhibit C.**

ordinary course of business, (b) that adequate and reasonable notice has been provided to interested

persons, (c) that the trustee or debtor in possession has obtained a fair and reasonable price, and

(d) that the purchaser has acted in good faith. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176

(D. Del. 1991). Courts have concluded that a secured creditor's forgiveness of debt is a fair proxy

for the value of the relevant collateral (absent extenuating circumstances like collusion). *See, e.g.*,

*In re SubMicron Sys. Corp.*, 432 F.3d 448, 460 (3d Cir. 2006).

65.    As provided below, the Transfer of the Transferred U.S. Assets is an exercise of

the sound business judgment of the Debtor and satisfies all four conditions set forth in *Abbotts*

*Dairies*.

(a)    First, sound business purposes justify the Transfer of the Transferred U.S. Assets. The independent JPLs believe, and the Foreign Representative agrees,[10] that the Transfer presents the best opportunity for the Debtor to maximize its value for its stakeholders. The Debtor and its subsidiary loan parties are unable to address the matured and payable Term Loans absent the proposed Transfer. The alternative to the Transfer would be a foreclosure by the Secured Lenders or outright liquidation, which would result in recoveries of substantially less than the value attributed to the Debtor's business in the context of the Transfer, including, the preservation of numerous jobs, the assumption of a majority of ordinary course trade payables, and the assumption of various vendor agreements.

(b)    Second, as provided above, adequate and reasonable notice of the proposed Transfer has been provided to parties in interest in the Bermuda Proceeding and this chapter 15 case.

(c)    Third, the Transfer is fair and reasonable. As set forth above, there is no reasonable alternative refinancing solution available. The Debtor's efforts to solicit alternative refinancing through an independent third-party after engaging a banker and running a thorough marketing process (contacting 87 third parties) were unsuccessful, largely because of developments in the artificial intelligence space and a view that the Debtor's senior secured debt may have exceeded the projected value of the Companies. Moreover, the consideration received by the Debtor in connection with such Transfer—namely, a release from more than $500 million of guarantee liability—represents fair value for the relevant assets to be transferred pursuant to the Transfer. Also, as described above, an accelerated sale process was found by Teneo FA to be unlikely to yield the same level of returns for creditors as the

---

[10] See Afzal Declaration, ¶ 50.

Proposed Restructuring. Accordingly, better or alternative terms do not exist, and the Proposed Restructuring is the best way to maximize the returns of the Debtor's relevant stakeholders.

(d)     Fourth, as discussed more fully below, the negotiation process undertaken with respect to the Transfer Agreements satisfies the good faith requirement. The Debtor and Secured Lenders were advised by sophisticated, independent advisors and counsel and negotiated the Transfer at arm's-length and in good faith. Afzal Declaration, ¶ 53.

66.     Pursuant to section 363(f) of the Bankruptcy Code, this Court should authorize the Transfer of the Transferred U.S. Assets free and clear of any and all security interests, claims, encumbrances, charges, or liens (excluding (a) any permitted encumbrances, easements, and restrictive covenants expressly set forth in the Transfer Agreements (the "**Permitted Encumbrances**") and (b) all liens, claims, or encumbrances in existence and in favor of the Term Loan Agent on behalf of the Secured Lenders) (collectively, the "**Interests**").

67.     Under section 363(f) of the Bankruptcy Code, a trustee or a debtor in possession may sell or otherwise transfer all or any part of a debtor's property free and clear of any and all liens, claims, encumbrances, and other interests in such property if (a) such a sale or transfer is permitted under applicable non-bankruptcy law, (b) the party asserting such a lien, claim, or interest consents to such sale or transfer, (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property, (d) the interest is the subject of a bona fide dispute, or (e) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. *See* 11 U.S.C. § 363(f).

68.     Here, the Transferred U.S. Assets are being transferred to the Secured Lenders (through their ownership in Newco) subject to the first priority liens of the Secured Lenders. With respect to any other creditors that may assert an interest in the Transferred U.S. Assets, the Foreign Representative submits that at least one of the subsections of section 363(f) applies to such

creditors, and, in most cases, more than one of such subsections is satisfied. The Foreign Representative will demonstrate the satisfaction of section 363(f) in response to any specific objections thereto, as applicable.

69.     Furthermore, it is well established that a bankruptcy court has the power under section 363(f) to approve the disposition of a debtor's assets free and clear of successor liability claims against the debtor.  *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f) of the Bankruptcy Code); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).  Therefore, the Foreign Representative respectfully requests that this Court authorize the Transfer of the Transferred U.S. Assets to the Acquirors free and clear of claims based on any theories of successor liability.  In this way, the Acquirors will obtain increased certainty concerning the Transfer and consequences thereof.

70.     A transfer of the Transferred U.S. Assets other than one free and clear of all Interests, would yield substantially less value for the Debtor and its creditors than the Transfer because the Secured Lenders, in their capacities as the prospective majority owners of Newco, would not otherwise have been willing to release the entirety of the guaranty against the Debtor. Therefore, a transfer free and clear of all Interests is in the best interests of the Debtor, its creditors, and other parties in interest in this chapter 15 case.  Accordingly, the Foreign Representative submits that the transfer of the Transferred U.S. Assets satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code and that the relief requested herein is an appropriate exercise of this Court's authority under section 363 and chapter 15 of the Bankruptcy Code.

**VIII.**   **The Court Should Afford the Acquirors All Protections of a Good Faith Acquiror**

71.     In addition to the relief requested above, the Foreign Representative requests that the Acquirors receive the protections set forth in sections 363(m) and (n) of the Bankruptcy Code. Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that has purchased or leased property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," courts have stated that "the phrase encompasses one who purchases 'in good faith' and for 'value.'"  *In re Abbotts Dairies of Pa.*, 788 F.2d at 147.  Courts have held that in order to demonstrate a lack of good faith, a party would have to show "fraud or collusion between the purchaser and [seller] or an attempt to take grossly unfair advantage [of other potential Acquirors.]"  *Id*.

72.     The Transfer Agreements were negotiated among sophisticated parties, with independent separate counsels, without fraud or collusion, in good faith, and from an arm's-length bargaining position.  Further, the Debtor, the JPLs, Newco, and Holdco did not enter into the Transfer Agreements for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtor under the Bankruptcy Code or otherwise.  Afzal Declaration ¶ 53. To the Foreign Representative's knowledge, no party has engaged in any conduct that would cause or permit the Transfer to be set aside under section 363(n) of the Bankruptcy Code.  Afzal Declaration ¶ 53.  Accordingly, the Foreign Representative seeks a finding that, with respect to the Transferred U.S. Assets, the Acquirors are good faith Acquirors under section 363(m) of the Bankruptcy Code and have not violated section 363(n) of the Bankruptcy Code.

## IX.  <u>Certain Additional Relief Is Both Necessary and Appropriate and Should be Granted</u>

73.     Upon recognition of the Bermuda Proceeding, whether as foreign main or foreign nonmain proceeding, this Court is empowered to grant "any appropriate relief" pursuant to Bankruptcy Code section 1521(a), where such relief is necessary to effectuate the purpose of chapter 15 and to protect the debtor's assets or the interests of the debtor's creditors. 11 U.S.C. § 1521(a).  Relief under section 1521(a) is available only if the interests of the creditors and other interested entities, including the debtor and interested parties located outside of the United States, are sufficiently protected. *See* 11 U.S.C. § 1522(a); *In re Rede Energia S.A.*, 515 B.R. 69, 94 (Bankr. S.D.N.Y. 2014*); In re CGG S.A.*, 579 B.R. 716, 720 (Bankr. S.D.N.Y. 2017); *see also In re Sphinx Ltd.*, 351 B.R. at 113 (noting that in enacting section 1522(a), "Congress directed the court to focus on the interests of all creditors and other interested parties, not just those of U.S. parties.") (emphasis in original).  Moreover, if the Court recognizes the Bermuda Proceeding as a foreign nonmain proceeding, relief under Bankruptcy Code section 1521 is available where the Court is satisfied that the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding. 11 U.S.C. § 1521(c).

74.     Pursuant to section 1521(a), the Foreign Representative requests that this Court enter an order granting additional necessary relief including, without limitation: (i) staying the commencement or continuation of proceedings concerning the Debtor's assets, rights, obligations or liabilities, to the extent not stayed automatically under section 1520(a); (ii) staying all parties from executing against, interfering with or otherwise disposing of the Debtor's assets, to the extent not stayed automatically under section 1520; (iii) providing that the JPL Appointment Order and Sanction Order are recognized, granted comity, and entitled to full force and effect in accordance with its terms, and that such terms shall be binding and fully enforceable in the United States; and

(iv) entrusting the Foreign Representative with the administration or realization of all of the Debtor's assets that are located within the territorial jurisdiction of the United States, including prosecution of any causes of action belonging to the Debtor that are not transferred to the Acquirors. 11 U.S.C. § 1521(a).

75.    The relief requested by the Foreign Representative under section 1521(a) is necessary and appropriate to assist the Bermuda Court, the Foreign Representative and the JPLs in carrying out the effective administration of the Bermuda Proceeding, particularly if the Court recognizes the Bermuda Proceeding as a foreign nonmain proceeding.  In such case, without the relief provided for in section 1521(a), the Bermuda Court would not be able to ensure the fair and efficient administration of the Bermuda Proceeding in a manner that protects and maximizes the value of the Debtor's assets, nor would the Foreign Representative be able to protect and maximize, without interference, the value of the Debtor's assets in the United States for the benefit of the Debtor's creditors and other stakeholders.  This relief is necessary to effectuate the purpose of chapter 15.

## X.    Waiver of the Stay Is Appropriate in Light of the Circumstances

76.    The Foreign Representative respectfully requests that the Court cause the Proposed Order to become effective immediately upon entry, notwithstanding the 14-day stay of effectiveness of the order imposed by operation of the Bankruptcy Code or the Bankruptcy Rules. Such a waiver is appropriate in these circumstances to ensure the Debtor will be able to consummate the Proposed Restructuring as soon as possible, to avoid any further disruption to the business and bring much-needed liquidity and certainty to the Companies. *See* Afzal Declaration, ¶ 54.

**XI.**     **Final Report and Case Closure**

77.     Section 1517(d) of the Bankruptcy Code provides that "[a] case under . . . [Chapter 15] may be closed in the manner prescribed under section 350." 11 U.S.C. § 1517(d).  Pursuant to section 350 of the Bankruptcy Code, a bankruptcy case may be closed "[a]fter an estate is fully administered." 11 U.S.C. § 350(a).  "The purpose of section 350 is to expedite disposition of the case and ensure fair treatment of all interested parties." *In re Lupatech S.A.*, 611 B.R. 496, 503 (Bankr. S.D.N.Y. 2020) (closing chapter 15 case pursuant to order granting full force and effect to foreign court orders) (citations omitted).  As an "estate" is not created in a chapter 15 case, "fully administered" in this context means, at a minimum, there are no outstanding motions, contested matters or adversary proceedings. *Id.* (citations omitted).

78.     Bankruptcy Rule 5009(c) provides that a foreign representative shall "file a final report when the purpose of the representative's appearance in the court is completed.  The report shall describe the nature and results of the representative's activities in the court." Fed. R. Bankr. P. 5009(c).  If there is no objection by the United States trustee or a party in interest within 30 days, the estate is presumed to have been fully administered and may be closed.  See Rule 5009(c); Rule 5009-2(b) of the Local Rules; *In re Ginsberg*, 164 B.R. 870, 873 (Bankr. S.D.N.Y. 1994).  "The intended meaning of section 1517(d) of the Bankruptcy Code and Bankruptcy Rule 5009(c) is clear: once the need for a chapter 15 case no longer exists and the purpose of the representative's appearance in the U.S. court is completed, the case may be closed." *In re Lupatech S.A.*, 611 B.R. at 503.

79.     In accordance with the provisions of Bankruptcy Rule 5009(c), this Verified Petition describes the Foreign Representative's activities in this chapter 15 case and contains all necessary details for a final report.  Other than this Verified Petition, there are no outstanding motions, contested matters or adversary proceedings in this chapter 15 case.  Therefore, as soon as

the Proposed Order is entered by this Court and becomes final and non-appealable and the Transfer

Closing has occurred, the requirements of section 350(a) of the Bankruptcy Code will be

satisfied.[11]

80.     In these circumstances, prompt closure of this case will reduce costs and relieve the

burden on this Court.  Accordingly, the Foreign Representative respectfully requests that the Court

(i) reduce the applicable 30-day notice period set forth in Bankruptcy Rule 5009(c) and Rule 5009-

2 of the Local Rules to consider the Final Report in connection with this Verified Petition, and (ii)

upon the Foreign Representative filing a notice of the Transfer Closing, enter the Proposed Final

Decree, closing the chapter 15 case.

## <u>NOTICE</u>

81.     Notice of this Petition will be provided to: (a) the United States Trustee for the

District of Delaware; (b) the Term Loan Agent; (c) all known creditors and equityholders of the

Debtor; (d) all parties that have filed a notice of appearance in this chapter 15 case; and (e) to the

extent not duplicative of the foregoing, all parties required to be given notice under Bankruptcy

Rule 2002(q)(1) of which the Foreign Representative is aware.  The Foreign Representative

submits that no other or further notice of this Petition is necessary or required.

*[Remainder of Page Intentionally Left Blank]*

---

[11]   Upon the occurrence of the Transfer Closing, the Foreign Representative will file a notice with the Court advising
all parties in interest in this chapter 15 case that the Proposed Order has been entered and has become final and
non-appealable and that the Transfer Closing has occurred.

**WHEREFORE**, the Foreign Representative respectfully requests entry of orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and such other and further relief as is just and proper.

Dated:  November 4, 2024                Respectfully submitted,

Wilmington, Delaware          */s/ Kara Hammond Coyle*
                                      **YOUNG CONAWAY STARGATT &TAYLOR, LLP**
                                      Michael R. Nestor (No. 3526)
                                      Kara Hammond Coyle (No. 4410)
                                      Rebecca Lamb (No. 7223)
                                      Rodney Square, 1000 North King Street
                                      Wilmington, DE 19801
                                      Telephone:  (302) 571-6600
                                      Email:   mnestor@ycst.com
                                               kcoyle@ycst.com
                                               rlamb@ycst.com

                                      – and –

                                      George Davis (*pro hac vice* pending)
                                      David Hammerman (*pro hac vice* pending)
                                      Meghana Vunnamadala (*pro hac vice* pending)
                                      **LATHAM & WATKINS LLP**
                                      1271 Avenue of the Americas
                                      New York, NY 10020
                                      Telephone: (212) 906-1200
                                      Email:   george.davis@lw.com
                                               david.hammerman@lw.com
                                               meghana.vunnamadala@lw.com

                                      – and –

                                      Jason B. Gott (*pro hac vice* pending)
                                      Jonathan Gordon (*pro hac vice* pending)
                                      **LATHAM & WATKINS LLP**
                                      330 North Wabash Avenue, Suite 2800
                                      Chicago, IL 60611
                                      Telephone: (312) 876-7700
                                      Email:   jason.gott@lw.com
                                               jonathan.gordon@lw.com

                                      *Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Afiniti, Ltd.,[1] | Case No. 24-12539 (LSS) |
| Debtor in a Foreign Proceeding. | |

## STATEMENT OF VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Hassan Afzal, hereby declare as follows under penalty of perjury:

1.  I am the Chief Executive Officer of Afiniti, Ltd., the Debtor and the authorized foreign representative of the Debtor.  I am authorized to file this Petition and to commence and act in this chapter 15 case.

2.  I have read the Petition and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

3.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated:  November 4, 2024              */s/ Hassan Afzal*
Washington, D.C.                      Hassan Afzal
                                      Afiniti, Ltd.

---

[1]  The Debtor's registration number is 45859. The location of the Debtor's registered office is Crawford House, 50 Cedar Avenue, Hamilton, Pembroke, HM 11, Bermuda.

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Afiniti, Ltd.,[1] | Case No. 24-12539 (LSS) |
| Debtor in a Foreign Proceeding. | |

**ORDER GRANTING (I) RECOGNITION OF A**
**FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF JPL**
**APPOINTMENT ORDER, (III) RECOGNITION OF SANCTION ORDER,**
**(IV) APPROVAL OF FREE AND CLEAR TRANSFER OF**
**ASSETS, (V) APPROVAL OF THE PROCEDURE GOVERNING**
**THE CLOSING OF THIS CHAPTER 15 CASE, AND (VI) RELATED RELIEF**

Upon the Chapter 15 Petition[2] and the *Verified Petition and Motion Under Chapter 15 for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of JPL Appointment Order, (III) Recognition of Sanction Order, (IV) Approval of Free and Clear Transfer of Assets, (V) Approval of the Procedure Governing the Closing of this Chapter 15 Case, and (VI) Related Relief* [Docket No. _____ ] (the "**Motion**") of Afiniti, Ltd., as the foreign representative (the "**Foreign Representative**") duly authorized by the Bermuda Court for Afiniti, Ltd. (the "**Debtor**"), which is the subject of a "light touch" provisional liquidation proceeding entitled *In the Matter of Afiniti Ltd. (Provisional Liquidators Appointed for Restructuring Purpo*se*s) and In the Matter of the Companies Act 1981*, pending before the Supreme Court of Bermuda (the "**Bermuda Court**"), Companies (Winding Up) Commercial Court, 2024: No. 265 (the "**Bermuda Proceeding**"), and upon the record of this case and the hearing held on _____, 2024 (the "**Hearing**") on the Motion and this Court's review and consideration of the Motion, and the

---

[1] The Debtor's registration number is 45859. The location of the Debtor's registered office is Crawford House, 50 Cedar Avenue, Hamilton, Pembroke, HM 11, Bermuda.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Declarations; and the Court having found and determined that the relief sought by the Motion is consistent with the purposes of chapter 15 of the Bankruptcy Code and is in the best interests of the Debtor and its creditors; and after due deliberation and sufficient cause appearing therefor; and for the reasons stated on the record at the Hearing;

### IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and section 1501 of the Bankruptcy Code.

B.    The consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P), and this Court may enter a final order consistent with Article III of the United States Constitution.

C.    Venue is proper before this Court pursuant to 28 U.S.C. § 1410(1).

D.    Good, sufficient, appropriate, and timely notice of the filing of the Motion and the Hearing has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1012(b) and 2002(q) and the *Order Scheduling Hearing on Chapter 15 Petition and Related Relief and Specifying Form and Manner of Service of Notice* [Docket No. _____ ] to (i) the United States Trustee for the District of Delaware; (ii) all known creditors and equity holders of the Debtor; (iii) all parties that have filed a notice of appearance in this chapter 15 case; and (iv) to the extent not duplicative, all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Foreign Representative is aware.  In light of the nature of the relief requested and prior orders of this Court, no other or further notice is required.

---

[3]  The findings and conclusions set forth herein and on the record of the Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

E.      No objections or responses were filed that have not been overruled, withdrawn, or otherwise resolved.

F.      The Debtor has property located in this District, and therefore, the Debtor is "eligible" to be a debtor in this chapter 15 case pursuant to sections 109 and 1501 of the Bankruptcy Code.

G.      The Bermuda Proceeding is a "foreign proceeding" as such term is defined in section 101(23) of the Bankruptcy Code.

H.      The Bermuda Proceeding is pending in Bermuda, which is where the Debtor has its "center of main interests" as referred to in section 1517(b)(1) of the Bankruptcy Code.  As such, the Bermuda Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code, is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code and is entitled to all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code including, under section 363 of the Bankruptcy Code.

I.      The JPLs have recommended the Proposed Restructuring, including the Transfer in accordance with the Transfer Agreements.  The Acquirors are able and have agreed to assume and perform the obligations of the Debtor in accordance with the Transfer Agreements, and it is appropriate that the Transferred U.S. Assets, be transferred, assigned, and vested in the Acquirors.

J.      The consideration provided by the Acquirors for the Transferred U.S. Assets is the highest or otherwise best offer and will provide a greater recovery than would be provided by any other available alternative.

K.      The Transfer provides fair consideration and reasonably equivalent value for the Transferred U.S. Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the

Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, and the laws of the United States, any state, territory, possession thereof, or the District of Columbia.

L.　　No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Transfer.

M.　　Time is of the essence in consummating the Transfer.  To maximize the value of the Transferred U.S. Assets, it is essential that the Transfer occur promptly.  Accordingly, there is cause to waive the stay that would otherwise be applicable under the Bankruptcy Code, Bankruptcy Rules, or Local Rules.

N.　　The negotiations between the Debtor, the JPLs and the Acquirors over the terms of the Transfer Agreements were conducted at arm's-length, fairly, in good faith, and without collusion, and reflect the sound business judgment of the Debtor, the Debtor's board of directors, the JPLs, and the Foreign Representative.  Therefore, the Acquirors have acted in good faith within the meaning of section 363(m) of the Bankruptcy Code, and neither the Debtor, the JPLs, nor the Acquirors engaged in any conduct that would cause or permit the Transfer Agreements or the consummation of the Transfer to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

O.　　The Transfer Agreements were not entered into for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtor under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia.

P.　　The Foreign Representative is a "person" as such term is defined in section 101(41) of the Bankruptcy Code and has been duly appointed and designated as the "foreign representative" of the Debtor as such term is defined in section 101(24) of the Bankruptcy Code.

Q.      This chapter 15 case was properly commenced pursuant to sections 1504 and 1509 of the Bankruptcy Code, and the Motion satisfies the requirements of section 1515 of the Bankruptcy Code.

R.      The relief granted herein is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 363, 1504, 1507, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code and will not cause hardship to any party in interest.  To the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Foreign Representative, the Debtor, its creditors, and other parties in interest.

S.      The relief granted herein is necessary to effectuate the purposes and objectives of chapter 15 of the Bankruptcy Code and to protect the Debtor and the interests of its creditors and all parties in interest.

T.      In accordance with section 1507(b) of the Bankruptcy Code, the relief granted herein will reasonably assure: (i) the just treatment of all holders of claims against or interests in the Debtor's property; (ii) the protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the Bermuda Proceeding; (iii) the prevention of preferential or fraudulent dispositions of property of the Debtor; and (iv) the distribution of proceeds of the Debtor's property substantially in accordance with the order prescribed in the Bankruptcy Code.

U.      The Foreign Representative has demonstrated that the relief requested with respect to entrustment of the debtor's assets under section 1521(a)(5) is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States and warranted pursuant to section 1521(a)(5) of the Bankruptcy Code;

V.     All creditors and other parties in interest, including the Debtor, are sufficiently protected in the grant of the relief ordered hereby in compliance with section 1522(a) of the Bankruptcy Code.

W.     The Debtor may transfer the Transferred U.S. Assets free and clear of any and all security interests, claims, encumbrances, charges, or liens (excluding (x) any permitted encumbrances, easements, and restrictive covenants expressly set forth in the Transfer Agreements and (y) all liens, claims, or encumbrances in existence and in favor of the Term Loan Agent on behalf of the Secured Lenders) (collectively, the "**Interests**"), because, with respect to each creditor asserting an Interest, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Interests who did not object or who withdrew their objections to the Transfer or the Motion are deemed to have consented to the Motion and Transfer pursuant to section 363(f)(2) of the Bankruptcy Code.

X.     The Acquirors would not have entered into the Transfer Agreements and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its creditors, and other parties in interest, including employees, if either: (i) the transfer of the Transferred U.S. Assets to the Acquirors was not free and clear of all Interests; or (ii) the Acquirors would, or in the future could, be liable for any of such Interests or any claims against the Debtor based upon successor or vicarious liability or otherwise.

Y.     A transfer of the Transferred U.S. Assets other than one free and clear of all Interests, would yield substantially less value than the Transfer; thus, the Transfer free and clear of all Interests, in addition to all of the relief provided herein, is in the best interests of the Debtor, its creditors, and other parties in interest.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

## Chapter 15 Recognition

1.      The Petition is granted.

2.      The Motion and the relief requested therein is granted.

3.      Any objections or responses to the Petition or the relief requested therein that have not been withdrawn or resolved are overruled with prejudice.

4.      The Bermuda Proceeding is recognized as a "foreign main proceeding" under sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

5.      The Foreign Representative is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the Bermuda Proceeding.

6.      All relief and protection afforded to a foreign main proceeding under section 1520 of the Bankruptcy Code is hereby granted to the Bermuda Proceeding, the Debtor, and the Debtor's assets located in the United States, as applicable, including, without limitation, the application of the automatic stay under section 362 of the Bankruptcy Code to the Debtor and its property located in the territorial jurisdiction of the United States.

7.      The Foreign Representative is entrusted with the administration or realization of all of the Debtor's assets within the territorial jurisdiction of the United States, as set forth in section 1521(a)(5) of the Bankruptcy Code.

8.      Except as to the Acquirors or their designees, with respect to the Transfer, to the extent not already provided in 11 U.S.C. § 1520, all creditors and other persons are hereby enjoined from (i) disposing or otherwise taking any action against the Debtor or any property of the Debtor located within the territorial jurisdiction of the United States; and (ii) taking or continuing any act to obtain possession of or exercise control over, such property.

9.      To the extent not already provided in 11 U.S.C. § 1520, all persons are hereby enjoined from commencing any suit, action or proceeding in the territorial jurisdiction of the United States to resolve any dispute arising out of the Bermuda Proceeding or Bermuda law.

10.      Under section 1520(a)(2) of the Bankruptcy Code, sections 363, 549, and 552 apply to the transfer of an interest of the Debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate.  Under section 1520(a)(3), unless the Court orders otherwise, the Foreign Representative is further authorized to operate and may exercise the powers of a trustee under, and to the extent provided by, section 363.

11.      The Sanction Order, attached hereto as <u>Annex 1</u>, is recognized, granted comity, and entitled to full force and effect in accordance with its terms, and such terms shall be binding and fully enforceable in the United States.

12.      The JPL Appointment Order, attached hereto as <u>Annex 2</u>, is recognized, granted comity, and entitled to full force and effect in accordance with its terms, and such terms shall be binding and fully enforceable in the United States.

13.      The transfer and assignment of the Transferred U.S. Assets (*i.e.*, the Debtor's assets (including, without limitation, the Debtor's equity shares in Afiniti, Inc., the Debtor's U.S. subsidiary) located in the United States) pursuant to the terms of the Transfer Agreements is approved and authorized.

### <u>Transfer of Assets Free and Clear</u>

14.      Except as otherwise provided in the Transfer Agreements and/or this Order, pursuant to sections 105(a), 363, 1520, and 1521 of the Bankruptcy Code, upon the closing of the Transfer (the "**Transfer Closing**") and solely as it pertains to the Transferred U.S. Assets: (a) the

Transferred U.S. Assets shall be transferred or otherwise conveyed to the Acquirors free and clear of all Interests; (b) no holder of an Interest against the Debtor shall interfere with the Acquirors' title to or use and enjoyment of the Transferred U.S. Assets based on or related to such Interests; and (c) the Transfer Agreements, the Transfer, and any instruments contemplated thereby shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtor or any successor thereof.  All persons or entities holding Interests in, to, or against the Transferred U.S. Assets are forever barred from asserting such Interests against the Acquirors, their affiliates, successors, and assigns, and current affiliates, officers, directors, employees, managers, partners, members, financial advisors, attorneys, agents, and representatives or such Transferred U.S. Assets after the Transfer Closing.

15.     Except as otherwise provided in the Transfer Agreements, any and all of the Transferred U.S. Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier, or employee of the Debtor shall be transferred to the Acquirors free and clear of all Interests, and, upon request of the Acquirors, all such persons or entities are directed to surrender possession of such Transferred U.S. Assets to the Acquirors at the Transfer Closing.

16.     The Acquirors are not and shall not be deemed, as a result of any action taken in connection with the Transfer or the Acquirors' post-closing use or operation of the Transferred U.S. Assets or otherwise, to: (a) be a successor to the Debtor; (b) have, *de facto* or otherwise, merged or consolidated with or into the Debtor; (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor; (d) have a common identity of incorporators, directors, members, or equity holders with the Debtor; or (e) holding themselves out to the public as a continuation of the Debtor.  Except as set forth in Transfer Agreements, the transfer of the

Transferred U.S. Assets to the Acquirors under the Transfer Agreements and this Order shall not result in the Acquirors having any liability or responsibility whatsoever for any Interest (and with respect to Permitted Encumbrances, only to the extent set forth in the applicable Transfer Agreement) against the Debtor.  Without limiting the generality of the foregoing, except as otherwise provided in the Transfer Agreements, this Order, and/or any other order of the Bermuda Court, the conveyance of the Debtor's rights, title, and interest in the Transferred U.S. Assets to the Acquirors under the Transfer Agreements shall not result in the Acquirors having any liability or responsibility whatsoever under any theory of alter ego, successor liability, veil piercing, continuity of enterprise, mere continuation, product line, de facto merger or substantial continuity, whether known or unknown.

17.    The entry of this Order: (a) is and shall be effective as a determination that, upon the Transfer Closing, except as expressly provided in the Transfer Agreements or this Order, all Interests existing as to the Transferred U.S. Assets prior to the Transfer Closing, have been released, extinguished, expunged, and discharged as against such Transferred U.S. Assets; and (b) shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Acquirors are the assignees of such Transferred U.S. Assets free and clear of all Interests.

18.     Each and every federal, state, and local governmental agency or department is authorized to accept any and all documents and instruments necessary and appropriate to consummate the transaction contemplated by the Transfer Agreements.

19.     Except with respect to enforcing the terms of the Transfer Agreements or this Order, absent a stay pending appeal, no person shall take any action to prevent or enjoin or otherwise interfere with consummation of the transactions contemplated in or by the Transfer Agreements.

20.     Effective as of the Transfer Closing, this Order shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Transferred U.S. Assets.

21.     The Acquirors, as Acquirors in good faith within the meaning of section 363(m) of the Bankruptcy Code, shall be entitled to all of the protections of section 363(m) of the Bankruptcy Code.  The reversal or modification on appeal of the authorization provided herein to consummate the Transfer as it pertains to the Debtor's assets (including the Debtor's equity in its subsidiaries) located in the territorial jurisdiction of the United States shall not affect the validity of such Transfer unless, prior to the Transfer Closing, such authorization is duly stayed pending appeal. Neither the Transfer Agreements nor the Transfer may be avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of the Bankruptcy Code.

22.     The terms and provisions of the Transfer Agreements and this Order shall be binding on the Foreign Representative (in its capacity as such and as the Debtor), the Acquirors, the creditors of the Debtor, its estate, all holders of equity interests in the Debtor, all holders of any claim(s), whether known or unknown, against the Debtor, and all other parties in interest, and any successors of the Debtor, the Acquirors, and the Debtor's creditors, including any trustee(s),

examiner(s), or receiver(s) appointed in these cases or under any chapter of the Bankruptcy Code or any other law, and all such terms and provisions shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor, its creditors, or any trustee(s), examiner(s), or receiver(s).  This Order shall inure to the benefit of the Foreign Representative and the Acquirors and their respective successors and assigns.

23.    Subject to the terms and conditions of the Transfer Agreements, provisions of the Transfer Agreements and any related agreements may be waived, modified, amended, or supplemented by agreement among the Debtor and the Acquirors in a writing signed by the Debtor and the Acquirors without further action or order of this Court.

24.    The failure to include any particular provision of the Transfer Agreements, or any related agreements in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of this Court that the Transfer Agreements, and any related agreements, with such amendments thereto as may be made by the parties in accordance with the Transfer Agreements be approved and authorized in their entirety.

25.    To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Transferred U.S. Assets sold, transferred, or conveyed to the Acquirors on account of the filing or pendency of this chapter 15 case or the consummation of the Transfer.

26.    Any laws regarding bulk sales, or similar laws, are not applicable to the transfer of the Transferred U.S. Assets.

27.    Nothing in this Order shall be deemed to waive, release, extinguish, or estop the Foreign Representative from asserting, or otherwise impair or diminish, any right (including,

without limitation, any right of recoupment), claim, cause of action, defense, offset, or counterclaim in respect of any asset that is not a Transferred Asset.

### Process for Final Decree

28.     The Motion shall serve as the Foreign Representative's Final Report.  Following the Transfer Closing, the Foreign Representative shall file a notice of the Transfer Closing with the Court.  Following the filing of such notice, the Court may enter the Proposed Final Decree (attached as **Exhibit B** to the Motion), closing the chapter 15 case, without any further notice or hearing.

### Additional Provisions

29.     The Foreign Representative is authorized and empowered to, and may in its discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order and the Sanction Order.

30.     No action taken by the Foreign Representative or its agents, representatives, advisors, or counsel, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Bermuda Proceeding, the documents contemplated thereunder, this Order, this chapter 15 case, any further order for additional relief in this chapter 15 case, or any adversary proceedings in connection therewith, will be deemed to constitute a waiver of the immunity afforded such persons under sections 306 or 1510 of the Bankruptcy Code.

31.     No party shall incur any liability for following the terms of this Order (whether by acting or refraining from acting), except in the case of the party's own gross negligence or willful misconduct.

32.     Nothing herein shall modify the exclusive right of the Bermuda Court to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the JPL Appointment Order or the Sanction Order, or out of any action to be taken or omitted to be taken

under the JPL Appointment Order or the Sanction Order, or in connection with the administration of the Bermuda Proceeding.

33.     Notwithstanding anything to the contrary in this Order, including, without limitation, paragraphs 8, 14, 15, 16, and 17 of this Order, nothing herein shall limit, restrict, or modify any of the secured claims, liens, encumbrances, or charges of the Term Loan Agent, or the Secured Lenders against any of the assets transferred under the Transfer Agreements or their rights under any of the existing debt documents, including, for the avoidance of doubt, and without limitation, the Credit Agreement, the guarantee agreements relating thereto, the Amended Credit Agreement, or any related guarantee, pledge, or security agreement, or similar related agreement, other than as expressly set forth in the Transfer Agreements, or, following the Transfer Closing, the release of the Debtor's guarantee and the applicable release of deed.

34.     Nothing in this Order shall require the Acquirors to seek relief from this Court after the Transfer Closing to enforce any of their rights or remedies under the Transfer Agreements or any other transfer-related document.

35.     The Foreign Representative and its agents are authorized to serve or provide any notices required under the Bankruptcy Rules or Local Rules.

36.     Notwithstanding any provision in the Bankruptcy Code or the Bankruptcy Rules to the contrary, including, but not limited to Bankruptcy Rules 1018, 6004(h), 7062 and 9014, (a) this Order shall be effective immediately and enforceable upon its entry, (b) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order and (c) this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

37.     This Court shall retain jurisdiction with respect to the implementation, enforcement, amendment, or modification of this Order.

38.     The provisions of this Order are nonseverable and mutually dependent.

## **<u>Annex 1</u>**

**Sanction Order**

*[to come, once entered]*

## Annex 2

**JPL Appointment Order**

**IN THE SUPREME COURT OF BERMUDA**

**COMPANIES (WINDING UP)**

**COMMERCIAL COURT**

**2024: No.** *265*

**IN THE MATTER OF A COMPANY**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**ORDER**

---

**UPON HEARING COUNSEL** for Afiniti Ltd. (the "**Company**")

**AND UPON READING** the Petition filed herein and the Affidavit of Mohammed Khaishgi dated 18 September 2024

**IT IS HEREBY ORDERED** as follows:

1.     That Michael Morrison and Charles Thresh of Teneo (Bermuda) Ltd. are hereby appointed joint provisional liquidators ("**JPLs**") of the Company with the following powers:

    (a)     to review the financial position of the Company;

    (b)     to monitor the continuation of the business of the Company by the existing board of directors of the Company (the "**Board**");

    (c)     to consult with the creditors of the Company in determining the most appropriate manner to realise value for the benefit of the creditors;

    (d)     to take such steps as they deem appropriate to sell, transfer and/or with respect to the disposition of the assets of the Company;

(e)     to take such steps as they deem appropriate with respect to any settlements, compromises or arrangements (including seeking such sanction as the JPLs may consider necessary or desirable in the circumstances);

(f)     to sign off on and execute agreements (including any documents to facilitate the any sale or transfer), pleadings, or any other document (with such court sanction as the JPLs may consider appropriate in the circumstances) on behalf of the Company;

(g)     if deemed necessary and/or appropriate by the JPLs, to apply to any foreign court (wherever situated) for recognition of their appointment or in connection with any other proceedings to take advantage of any insolvency or bankruptcy protections that such foreign law, procedures or proceedings may provide to the Company. Without prejudice to the foregoing, the Company acting through the Board shall be the Company's authorised foreign representative for the purpose of the UNCITRAL Model Law and Chapter 15, Title 11 of the United States Code;

(h)     the JPLs shall be entitled to receive advance materials, receive advance notice of, and, at the expense of the Company, attend all Board meetings and such meetings of management as the JPLs request and shall be consulted prior to:

    (i)     the sale, transfer, or other disposition of any business, operation, subsidiary, division or other significant asset of the Company;

    (ii)    the incurrence of indebtedness or borrowing of money, whether pursuant to agreements with suppliers or pursuant to loan arrangements with financing institutions, and the granting of security in respect of the same, and the guaranteeing of such indebtedness or borrowings of affiliates;

    (iii)   the Board seeking leave to continue or take any steps in any proceedings to which the Company is a party.

(i)     to provide a written report to this Court from time to time and as this Court may otherwise request;

(j)     to retain and employ barristers, attorneys, and solicitors, and such other agents and professional persons as the JPLs deems fit, in Bermuda and elsewhere as the

JPLs deems appropriate for the purpose of advising and assisting in the execution of their powers;

(k)  to render and pay invoices out of the assets of the Company for the JPLs' own remuneration at their usual and customary rates (and this shall include all costs, charges and expenses of their attorneys and all other agents, managers, accountants and other persons that the JPLs may employ), subject to such arrangements as agreed or as may be agreed with the Company (or with the approval of the Court) in the context of the overall restructuring process;

(l)  if deemed necessary, and in the interests of the creditors of the Company, to seek the assistance of any other courts as may be considered appropriate;

(m)  to set up, maintain, and control bank accounts (whether jointly with the Company or otherwise) at any bank or financial institutions situated in Bermuda or elsewhere as appropriate, in their own names or in the name of the Company, and accept deposits into and pay monies into such accounts for the purpose of meeting the payment of the fees and expenses of the JPLs, including all costs, charges and expenses of their attorneys and all other agents, managers, accountants and other persons that the JPLs may employ, in each case, subject to the appropriate procedures being agreed with the Company (acting reasonably) as to how fees shall be determined;

(n)  subject to the Company's power at 1(g) above to act as the Company's authorised foreign representative for the purposes stated therein, to seek recognition of the provisional liquidation or the appointment of the JPLs in any jurisdiction the JPLs consider necessary, or both, together which such other relief the JPLs may consider necessary for the proper exercise of their functions within those jurisdictions and to make applications to the court(s) of such jurisdiction for that purpose; and

(o)  to do all things incidental to the exercise of the foregoing powers.

2.  Payments in the ordinary course of business and payments to professional advisors of the Company, the JPLs, and Secured Lenders (as defined in the Petition and including Allen Overy Shearman Sterling US LLP, Appleby (Bermuda) Limited, Akin Gump Strauss Hauer

Feld, LLP and Kirkland & Ellis LLP) and any related fees, disbursements and other charges of other counsel, including local counsel, consultants and service companies, shall not be avoided by virtue of section 166 of the Companies Act 1981. No other payments or dispositions of the Company's property shall be made or effected without the direct or indirect approval of the JPLs but no such payment or other disposition made or effected by or with the authority or approval of the JPLs in carrying out their duties and functions and in the exercise of their powers under this Order shall be avoided by virtue of the provisions of section 166 of the Companies Act 1981.

3.      In the event that a winding-up order is made against the Company, any fees and expenses of the JPLs, including all costs, charges and expenses of their attorneys and all other agents, managers, accountants, and other persons the JPLs may employ, which are payable in accordance with the terms of the orders which may be made by this Court, and which are outstanding at the date of the winding-up order, shall be treated as fees and expenses properly incurred in preserving, realising or getting in the assets of the Company for the purposes of Rule 140 of the Companies (Winding-Up) Rules 1982.

4.      Save as are specifically set out herein:

(a)     the JPLs shall be responsible for the realisation of the value of the Company's assets but shall have no general or additional powers or duties with respect to the day to day running of the Company;

(b)     prior to any winding-up order being made, the JPLs shall have no duties with respect to the books and records of the Company, although they may receive from the Board such Company books and records as they may request; and

(c)     save for those powers granted to the JPLs by this order, and the Protocol Agreement agreed to as between the Company, its Authorised Managers (as defined therein), and the JPLs, the Board shall continue to manage the Company's affairs in all respects and exercise the powers conferred upon it by the Company's Memorandum of Association and Bye-laws, provided always that, should the JPLs consider at any time that the Board is not acting in the best interests of the Company and its creditors, the JPLs shall have the power to report same to this Court and seek such directions from this Court as appropriate.

5.      Leave is hereby granted pursuant to section 167(4) of the Companies Act 1981 to permit case 2024: 112 to proceed.

6.      The Company shall provide the JPLs with such information as the JPLs deem necessary to properly to discharge their functions under this Order and as an officer of this Court.

7.      The JPLs shall be at liberty to submit to the Registrar of the Supreme Court of Bermuda bills of costs for taxation for all costs, charges, and expenses of those persons or firms employed by them, with such taxation to be on an attorney and own client basis with respect to attorneys and on an equivalent basis for all managers, accountants, and other persons.

8.      The powers of the JPLs may be exercised jointly and severally.

9.      The JPLs shall not be required to give security for their appointment.

10.     The Petitioner's costs of this application shall be taxed and paid out of the assets of the Company on a solicitor and own client basis.

Dated this      19      day of September 2024

_____
CHIEF JUSTICE/PUISNE JUDGE

**IN THE SUPREME COURT OF BERMUDA**

**COMPANIES (WINDING UP)**

**COMMERCIAL COURT**

**2024: No.** 265

**IN THE MATTER OF A COMPANY**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**ORDER**

---



**CONYERS DILL & PEARMAN LIMITED**
**Barristers & Attorneys**
**Clarendon House**
**2 Church Street, Hamilton**
**BERMUDA**

**RXW/gm/401937/25003675**



## Exhibit B

**Proposed Final Decree**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Afiniti, Ltd.,[1] | Case No. 24-12539 (LSS) |
| Debtor in a Foreign Proceeding. | |

<u>**ORDER CLOSING CHAPTER 15 CASE**</u>

Pursuant to the *Order Granting (I) Recognition of Foreign Main Proceeding, (II) Recognition of JPL Appointment Order, (III) Recognition of Sanction Order, (IV) Approval of Free and Clear Transfer of Assets, (V) Approval of the Procedure Governing the Closing of this Chapter 15 Case, and (VI) Related Relief* [Docket No. [ ● ]] (the "**Recognition Order**"), following a motion for such order [Docket No. [ ● ]] (the "**Motion**")[2] by Afiniti, Ltd., as the foreign representative (the "**Foreign Representative**") duly authorized by the Bermuda Court for Afiniti, Ltd. (the "**Debtor**"), which is the subject of a provisional liquidation proceeding entitled *In the Matter of Afiniti Ltd. (Provisional Liquidators Appointed for Restructuring Purpos*es*) and In the Matter of the Companies Act 1981*, pending before the Supreme Court of Bermuda (the "**Bermuda Court**"), Companies (Winding Up) Commercial Court, 2024: No. 265 (the "**Bermuda Proceeding**"), and upon the Foreign Representative's filing of a notice of the date of the Transfer Closing (the "**Notice of Transfer Closing and Full Administration**"); and due and sufficient notice of the Motion having been given; and no objections or responses to the Motion having been filed; and it appearing that the relief requested in the Motion is in the best interest of the Debtor

---

[1] The Debtor's registration number is 45859. The location of the Debtor's registered office is Crawford House, 50 Cedar Avenue, Hamilton, Pembroke, HM 11, Bermuda.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

and other parties in interest in this chapter 15 case; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.    This Court has jurisdiction over this case under 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 1501, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

B.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(P).

C.    Venue is proper in this District pursuant to 28 U.S.C. § 1410.

D.    The Motion, as supplemented by the *Notice of Transfer Closing and Full Administration*, filed on [ ● ], 2024, and all of the papers submitted in support of the Motion, satisfies the requirement of Bankruptcy Rule 5009(c), and the Motion satisfies the requirement of a written motion for decree closing the case under Local Rule 5009-2.

E.    Pursuant to Rule 9006(c) of the Federal Rules of Bankruptcy Procedure cause exists to shorten the notice period set forth in Rule 5009(c) for the Final Report and that due and sufficient notice of the Final Report and Motion was given, which notice is adequate for all purposes, and no other or further notice need be given. No objection was filed to the Final Report.

F.    The Bermuda Proceeding, the JPL Appointment Order, and the Sanction Order have been recognized and given full force and effect in the United States pursuant to the Recognition Order.

G.    The Transfer Closing occurred on [ ● ], 2024.

---

[3] The findings and conclusions set forth herein and on the record of the Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

H.      This chapter 15 case has been fully administered.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

1.      In accordance with sections 350(a) and 1517(d) of the Bankruptcy Code, Bankruptcy Rule 5009(c) and Local Rule 5009-2(a), the above-captioned case is closed effective immediately as of the date of entry of this Order.  The Clerk of the Court is hereby respectfully directed to close the above-captioned case.

2.      This Order is without prejudice to the right of the Foreign Representative to seek an order reopening this chapter 15 case under section 350(b) of the Bankruptcy Code or Local Rule 5009-2(a).

3.      All orders entered by this Court in this chapter 15 case, including the Recognition Order, shall continue to be in full force and effect and survive entry of this Order.

4.      There will be no distribution on account of any claims in this chapter 15 case, and any proofs of claim filed in this chapter 15 case will be of no force and effect.

5.      This Court shall retain jurisdiction with respect to the implementation enforcement, amendment or modification of this Order, the Recognition Order, and any other request for additional relief in or related to the chapter 15 case.

**Exhibit C**

**Local Rule 6004-1 Table**

In accordance with Local Rule 6004-1, set forth below are certain provisions in the Transfer

Agreements, the Sanction Order, and/or the Proposed Order:

| Highlighted Provision | Description | Location |
|---|---|---|
| Transfer to Insider | Not Applicable. | Not Applicable. |
| Management Agreements | Not Applicable. | Not Applicable. |
| Releases | Upon closing, the Debtor will generally release NewCo, HoldCo, the Term Loan Agent, and each Secured Lender, in each case, together with their Affiliates and their and their Affiliates' related parties, as well as the Debtor's directors and officers in existence as of the date of the RSA, in each case from any claims relating to the Debtor, subject to customary carveouts for fraud, gross negligence, and willful misconduct. | Release of Claims Agreement, Exhibit D to STA. |
| Private Transfer / No Competitive Bidding | The Transfer is a private transfer. The Transfer Agreements will not be subject to higher and better offers at a public auction subject to procedures established by this Court. The Debtor solicited interest for other potential transactions prior to agreeing to the Proposed Restructuring with the Secured Lenders and did not receive any better actionable offers. | Not Applicable. |
| Closing and Other Deadlines | The RSA has the following milestones: (i) entry of the Proposed Order by November 25, 2024 and (ii) closing by November 30, 2024, subject to certain potential limited extensions. | RSA, §§ 6(x)(F) & (G). |
| Good Faith Deposit | Not Applicable. | Not Applicable. |
| Interim Agreements with the Acquiror | Not Applicable (other than RSA). | Not Applicable. |
| Use of Proceeds | Not Applicable. | Not Applicable. |
| Tax Exemption | Not Applicable. | Not Applicable. |
| Record Retention | Not Applicable. | Not Applicable. |

| Highlighted Provision | Description | Location |
|---|---|---|
| Transfer of Avoidance Actions | The Debtor is generally transferring to Newco all rights to causes of action. | SATA, § 2.02(a)(xii). |
| Requested Findings as to Successor Liability | Yes; the Foreign Representative is requesting such findings. | Proposed Order, ¶ 16. |
| Transfer Free and Clear | Yes; the Foreign Representative is requesting such relief. | Sanction Order, ¶ 8; Proposed Order, ¶¶ 14-15. |
| Credit Bid | Not Applicable. | Not Applicable. |
| Relief from Bankruptcy Rule 6004(h) | Yes; the Foreign Representative is requesting such relief. | Proposed Order, ¶ 35. |

## Exhibit D

### SATA

*Agreed Form*

———————————

STOCK AND ASSET TRANSFER AGREEMENT[1]

———————————

Between

AFINITI, LTD. (in provisional liquidation)

and

the JOINT PROVISIONAL LIQUIDATORS

and

AFINITI AI HOLDINGS LLC

Dated as of [●], 2024

---

[1]    THIS DOCUMENT IS FOR DISCUSSION PURPOSES ONLY AND SHALL NOT CREATE A LEGALLY BINDING OR ENFORCEABLE OFFER OR AGREEMENT UNLESS AND UNTIL FULLY EXECUTED.

## <u>TABLE OF CONTENTS</u>

**Page**

### ARTICLE I

### DEFINITIONS

SECTION 1.01 Certain Defined Terms ............................................................................2
SECTION 1.02 Definitions ...............................................................................................9
SECTION 1.03 Interpretation and Rules of Construction .................................................10

### ARTICLE II

### PURCHASE AND SALE

SECTION 2.01 Transfer and Acquisition of the Shares ....................................................11
SECTION 2.02 Transfer and Acquisition of Assets ..........................................................11
SECTION 2.03 Assumption and Exclusion of Liabilities .................................................15
SECTION 2.04 Consideration............................................................................................17
SECTION 2.05 Closing......................................................................................................17
SECTION 2.06 Closing Deliveries by Parent ...................................................................17
SECTION 2.07 Closing Deliveries by Holdco...................................................................18
SECTION 2.08 Assignment of Certain Transferred Assets...............................................18

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF PARENT

SECTION 3.01 Organization, Authority and Qualification of Parent ................................19
SECTION 3.02 Ownership of Shares.................................................................................19
SECTION 3.03 Organization, Authority and Qualification of the Acquired Companies....19
SECTION 3.04 Capitalization of Transferred Companies; Acquired Subsidiaries ............20
SECTION 3.05 No Conflict ...............................................................................................20
SECTION 3.06 Governmental Consents and Approvals ...................................................21
SECTION 3.07 Financial Information ...............................................................................21
SECTION 3.08 Absence of Undisclosed Material Liabilities ...........................................21
SECTION 3.09 Conduct in the Ordinary Course...............................................................21
SECTION 3.10 Litigation ..................................................................................................23
SECTION 3.11 Compliance with Laws; Permits...............................................................23
SECTION 3.12 Environmental Matters .............................................................................23
SECTION 3.13 Intellectual Property; Information Technology .........................................23
SECTION 3.14 Data Privacy .............................................................................................26
SECTION 3.15 Real Property ............................................................................................27
SECTION 3.16 Assets; Sufficiency ...................................................................................27
SECTION 3.17 Employee Benefit Plans............................................................................28
SECTION 3.18 Labor and Employment Matters ...............................................................30

i

SECTION 3.19 Taxes.................................................................................................30
SECTION 3.20 Material Contracts ............................................................................31
SECTION 3.21 Brokers .............................................................................................33
SECTION 3.22 Disclaimer of Parent ........................................................................33

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF HOLDCO

SECTION 4.01 Organization and Authority of Holdco................................................34
SECTION 4.02 No Conflict .........................................................................................34
SECTION 4.03 Governmental Consents and Approvals ............................................35
SECTION 4.04 Investment Purpose ..........................................................................35
SECTION 4.05 Brokers ..............................................................................................35

## ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01 Third Party Consents .........................................................................35
SECTION 5.02 IP Transfer .........................................................................................36
SECTION 5.03 Bulk Transfer Laws ...........................................................................38
SECTION 5.04 Business Assets and Liabilities .........................................................38
SECTION 5.05 No Successor Liability .......................................................................38
SECTION 5.06 Attorney-Client Privilege ..................................................................38
SECTION 5.07 IT Assets; Data Centers.....................................................................39
SECTION 5.08 Survival...............................................................................................39

## ARTICLE VI

## EMPLOYEE MATTERS

SECTION 6.01 Transferred Employees........................................................................39
SECTION 6.02 Notices.................................................................................................39
SECTION 6.03 No Third Party Beneficiaries...............................................................39

## ARTICLE VII

## TAX MATTERS

SECTION 7.01 Conveyance Taxes................................................................................40
SECTION 7.02 Miscellaneous .....................................................................................40

## ARTICLE VIII

## GENERAL PROVISIONS

SECTION 8.01 Expenses ..............................................................................................40

SECTION 8.02 Notices ..........................................................................................................40
SECTION 8.03 Public Announcements ................................................................................42
SECTION 8.04 Severability ..................................................................................................43
SECTION 8.05 Entire Agreement .......................................................................................43
SECTION 8.06 Assignment ..................................................................................................43
SECTION 8.07 Amendment ..................................................................................................43
SECTION 8.08 Waiver ..........................................................................................................43
SECTION 8.09 No Third Party Beneficiaries ......................................................................43
SECTION 8.10 Currency ......................................................................................................43
SECTION 8.11 Governing Law ............................................................................................43
SECTION 8.12 Waiver of Jury Trial ....................................................................................44
SECTION 8.13 Specific Performance ..................................................................................44
SECTION 8.14 Counterparts.................................................................................................44
SECTION 8.15 Liability of Provisional Liquidators ..........................................................45
SECTION 8.16 Acknowledgments, Exclusions, Limitations and Agreements. ..................46

EXHIBITS

A-1          Form of Assignment and Assumption Agreement (Holdco)

A-2          Form of Assignment and Assumption Agreement (IP Purchaser)

B-1          Form of Bill of Sale (Holdco)

B-2          Form of Bill of Sale (IP Purchaser)

C-1          Form of IP Assignment Agreement (Holdco)

C-2          Form of IP Assignment Agreement (IP Purchaser)

D           Form of Loan Note Instrument

SCHEDULES

1.01            Parent's Knowledge

2.02(a)(vii)        Assigned Contracts

2.02(a)(xii)        Transferred Causes of Action

2.02(a)(xvii)       Other Transferred Assets

2.02(b)(vii)        Excluded Contracts

2.02(b)(ix)         Other Excluded Assets

2.03(a)(v)         Business Employee Liabilities

2.03(a)(vi)         Excluded Accounts Payable Liabilities

2.03(a)(ix)         Other Assumed Liabilities

3.04            Transferred Companies

3.15(b)          Assignment of Leases

5.01            Third Party Consents

5.07            Certain Leases

8.16            Limitation of Provisional Liquidator Liability

THIS STOCK AND ASSET TRANSFER AGREEMENT (this "Agreement"), dated as of [●], 2024, is made by and between

(1) Afiniti, Ltd., a Bermuda exempted company in provisional liquidation acting by its joint provisional liquidators, whose registered office is 19 Par-la-Ville Road, Third Floor, Hamilton, HM 11, Bermuda ("Parent"),

(2) Mike Morrison and Charles Thresh of Teneo (Bermuda) Ltd. (and including any successors appointed by the Bermuda Court, the "Provisional Liquidators"), acting jointly and severally, and

(3) Afiniti AI Holdings LLC, a Cayman Islands limited liability company and a wholly owned subsidiary of Parent ("Holdco"). Parent and Holdco are referred to herein as the "Parties".

WHEREAS, Parent owns the percentage of the issued and outstanding shares of capital stock or other equity interests set forth on Schedule 3.04 (the "Shares") of each of the non-U.S. direct subsidiaries of Parent set forth on Schedule 3.04 (each, a "Transferred Company");

WHEREAS, Parent is a holding company that owns, directly and indirectly, the Acquired Companies (as hereinafter defined);

WHEREAS, Parent, through the Acquired Companies, is engaged in the business of developing and providing proprietary enterprise behavioral pairing services that pair contact center customers and agents using data analytics and artificial intelligence to determine the optimal behavioral fits between callers and agents in order to drive business outcomes, and related infrastructure and professional services (the "Business");

WHEREAS, by an Order made by the Supreme Court of Bermuda on September [●], 2024, Parent is in provisional liquidation (the "Provisional Liquidation") under the supervision of the Supreme Court of Bermuda (the "Bermuda Court");

WHEREAS, Parent wishes to transfer to Holdco, and Holdco wishes to acquire from Parent, the Shares and the Transferred Assets (as hereinafter defined), and in connection therewith Holdco is willing to assume from Parent all of the Assumed Liabilities (as hereinafter defined), all upon the terms and subject to the conditions set forth herein; and

WHEREAS, upon an application made by the Provisional Liquidators on October [●], 2024, the Bermuda Court has approved and sanctioned *inter alia* Parent's entry into this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Parent and Holdco hereby agree as follows:

1

# ARTICLE I

# DEFINITIONS

SECTION 1.01 <u>Certain Defined Terms</u>.  For purposes of this Agreement:

"<u>Action</u>" means any action, suit, arbitration, litigation, formal investigation or proceeding before or by any Governmental Authority.

"<u>Acquired Companies</u>" means the Transferred Companies and the Acquired Subsidiaries.

"<u>Acquired Subsidiary</u>" means a Subsidiary of a Transferred Company.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"<u>Afiniti, Inc.</u>" means Afiniti, Inc., a Delaware corporation.

"<u>Agent</u>" means VCP Capital Markets LLC, in its capacity as administrative agent and collateral agent under the Credit Agreement.

"<u>Ancillary Agreements</u>" means the Assignments of Leases, the Bill of Sale, the Assignment and Assumption Agreement to be entered into by the Parties and the IP Assignment Agreement to be entered into by the Parties.

"<u>Assigned Leases</u>" means the leases relating to the Assigned Leased Real Property described on <u>Schedule 3.15(b)</u>, which shall be assigned at the Closing by Parent to Holdco.

"<u>Assignment of Lease</u>" means each Assignment of Lease to be executed by Parent at the Closing with respect to each Assigned Lease.

"<u>Assignment and Assumption Agreement</u>" means the Assignment and Assumption Agreement to be executed by Holdco and Parent at the Closing, substantially in the form of <u>Exhibit A-1</u>, or by the IP Purchaser and Holdco following the Closing, substantially in the form of <u>Exhibit A-2</u>.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Benefit Plan</u>" means any "employee benefit plan" (as defined in Section 3(3) of ERISA), whether written or unwritten and whether or not subject to ERISA, all bonus, stock option, stock purchase, restricted stock, restricted stock unit, phantom stock, stock appreciation right, incentive, deferred compensation, performance award, retiree medical or life insurance, supplemental retirement, severance or other material benefit plans, programs or arrangements, and all employment, termination, severance, change of control, retention or other contracts or

agreements with or for the benefit of any current or former employee or independent contractor or any dependent or beneficiary thereof.

"Bermuda Proceeding" has the meaning set forth in the Restructuring Support Agreement.

"Bill of Sale" means the Bill of Sale to be executed by Holdco and Parent at the Closing, substantially in the form of Exhibit B-1, or by the IP Purchaser and Holdco following the Closing, substantially in the form of Exhibit B-2.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York.

"Business Employee" means any current or former (a) employee of an Acquired Company or (b) employee of Parent who provides all or substantially all of his or her services to the Business.

"Business Intellectual Property" means the Owned Intellectual Property, Transferred Intellectual Property and all Intellectual Property licensed to Parent pursuant to a Transferred IP Agreement or to an Acquired Company pursuant to a Company IP Agreement.

"Business IT Assets" means all (a) Transferred IT Assets, (b) IT Assets owned by any of the Acquired Companies and (c) IT Assets licensed to Parent pursuant to a Contract included in the Transferred Assets or licensed to an Acquired Company.

"Cash" means cash and cash equivalents (including marketable securities and short-term investments).

"Chapter 15 Case" has the meaning set forth in the Restructuring Support Agreement.

"Code" means the Internal Revenue Code of 1986, as amended through the date hereof.

"Company IP Agreements" means all (a) Contracts that license or otherwise grant a permission to use Intellectual Property of an Acquired Company to any Person and (b) Contracts that license or otherwise grant a permission to use Intellectual Property of any Person to an Acquired Company.

"Company Plan" means a Benefit Plan sponsored or maintained by the Acquired Companies, or in the case of a Benefit Plan that is a Contract, to which an Acquired Company is a party.

"Contract" means any contract, agreement, license, sublicense, lease, sublease, commitment, or sales or purchase order.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the

3

possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Conveyance Taxes" means all sales, documentary, use, value added, transfer, stamp, stock transfer, registration, and real property transfer or gains and similar Taxes.

"Credit Agreement" means the existing term loan credit agreement, dated as of June 13, 2019 (as amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of July 11, 2019, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4, 2020, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of November 17, 2020, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of December 29, 2020, that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of March 9, 2021, that certain Amendment No. 6 to Term Loan Credit Agreement, dated as of March 12, 2021, that certain Amendment No. 7 to Term Loan Credit Agreement, dated as of May 17, 2021, that certain Amendment No. 8 to Term Loan Credit Agreement, dated as of March 7, 2022, that certain Amendment No. 9 to Term Loan Credit Agreement, dated as of June 13, 2024, that certain Amendment No. 10 to Term Loan Credit Agreement, dated as of July 29, 2024, that certain Amendment No. 11 to Term Loan Credit Agreement, dated as of August 14, 2024, that certain Amendment No. 12 to Term Loan Credit Agreement, dated as of September 12, 2024), among Afiniti, as borrower, Parent, as parent guarantor, the lenders from time to time party thereto, and the Agent, as amended by that certain Amendment No. 13 to Term Loan Credit Agreement, dated as of [●], 2024, among Afiniti, Newco, as restructuring second lien co-borrower, the other guarantor parties thereto, and the Agent, as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Disclosure Schedule" means the Disclosure Schedule attached hereto, dated as of the date hereof, delivered by Parent to Holdco in connection with this Agreement.

"Encumbrance" means any security interest, pledge, hypothecation, charge, mortgage, lien, license or encumbrance.

"Enforceability Exceptions" means (a) any applicable bankruptcy, insolvency (including Laws relating to fraudulent transfers), reorganization, moratorium or other similar Laws affecting creditors' rights generally and (b) general principles of equity (regardless of whether considered in a proceeding at law or in equity).

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, consent decree or judgment, in each case in effect as of the date hereof, relating to pollution or protection of the environment.

"Environmental Permits" means any permit, approval, identification number, license and other authorization required under or issued pursuant to any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended through the date hereof.

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs.

"Governmental Authority" means any federal, national, state, local or other government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Indebtedness" means, as of any time, without duplication, as applied to any Person:  (a) the principal of and accrued and unpaid interest in respect of (i) indebtedness of such Person for money borrowed or indebtedness issued or incurred in substitution or exchange for indebtedness for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments the payment of which such Person is responsible or liable; (b) all obligations of such Person (i) under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities), (ii) under any interest rate, currency, commodity or other hedging, swap, forward or option agreement, (iii) under any performance bond, banker's acceptance or letter of credit, but only to the extent drawn or called prior to the Closing and (iv) for all capitalized lease obligations as determined in accordance with GAAP; (c) all obligations of the type referred to in clauses (a) and (b) of any Person the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (d) for clauses (a) through (c), any termination fees, prepayment penalties, change of control, "breakage" cost or similar payments (but excluding, for the avoidance of doubt, any cash collateral required in respect of any performance bond, banker's acceptance or letter of credit) associated with the repayments of the items set forth in clauses (a) through (c) on the Closing Date to the extent paid on the Closing Date.

"Intellectual Property" means all intellectual property in any jurisdiction throughout the world, including the following: (a) patents and patent applications, (b) Trademarks;  (c) copyrights, including copyrights in software;  (d) registrations and applications for registration of any of the foregoing under subclauses (a) – (c) of this definition; (e) trade secrets and rights in know how, formulae, methods, techniques, processes, and confidential and proprietary information; and (f) all rights in any of the foregoing provided by international conventions and treaties, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto, including all rights of priority and renewals, all claims for damages and injunctive or other relief for past, present and future infringement, dilution, misappropriation, unlawful imitation or other violation, misuse, conflict or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages or injunctive or other relief.

"Intent-to-Use Trademark Application" means any intent-to-use Trademark application filed in the United States Patent and Trademark Office for which a "statement of use" or an "amendment to allege use" has not yet been filed and accepted.

"IP Assignment Agreement" means the Intellectual Property Assignment Agreement to be executed by Holdco and Parent at the Closing, substantially in the form of Exhibit C-1, or by the IP Purchaser and Holdco following the Closing, substantially in the form of Exhibit C-2.

"IRS" means the Internal Revenue Service of the United States.

"IT Assets" means Software, computers, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment.

"JPL Party" means the Provisional Liquidators, their present firms, directors, partners, and employees and any legal entity or partnership affiliated with the Provisional Liquidators using the name "Teneo", and the directors, partners, employees, shareholders and officers of any such entity or partnership.

"Law" means any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Leased Real Property" means (a) the real property leased by Parent, as tenant, that is Related to the Business (the "Assigned Leased Real Property"), all of which is described on Schedule 3.15(b), and (b) the real property leased by the Acquired Companies, in each case, as tenant, and in the case of (a) and (b), together with all buildings and other structures, facilities or improvements currently or hereafter located thereon (and fixtures attached or appurtenant thereto), as the case may be, and all easements, licenses, rights and appurtenances relating to the foregoing.

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including those arising under any Law, Action or Governmental Order and those arising under any Contract.

"Material Adverse Effect" means any event, circumstance, change, effect, development or condition that, individually or considered together with all other events, circumstances, changes, effects, developments and conditions, has had or would reasonably be expected to have a material adverse effect on (i) the business, results of operations, assets or financial condition of the Business, taken as a whole; (ii) the ability of the Parties to perform their obligations under this Agreement; or (iii) the ability of Parent to consummate the Restructuring, but, in each case, the commencement and existence of the Bermuda Proceeding or the Chapter 15 Case, and any event, circumstance, or condition directly in relation thereto (including the litigation and/or determination of any matters arising therein) shall not be deemed to constitute or be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect.

"Open Source Software" means all Software that is distributed as "free software," "open source software," "shareware" or under a similar licensing or distribution model, including Software licensed, provided, or distributed under any open source license, including any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Foundation (as promulgated by the Free Software Foundation) or any Software that contains or is derived from any such Software.

"ordinary course of business" or any similar expression means in the ordinary course of the applicable Person's business consistent with past practice, taking into account the fact that insolvency proceedings, or preparation therefor, have commenced.

"Owned Intellectual Property" means all Intellectual Property owned by an Acquired Company.

"Parent's Knowledge", "Knowledge of Parent" or similar terms used in this Agreement mean the actual knowledge of the Persons listed in Schedule 1.01 as of the date of this Agreement.

"Parent Plan" means a Benefit Plan sponsored or maintained by Parent, or in the case of a Benefit Plan that is a Contract, to which Parent is a party (other than a Company Plan).

"Permitted Encumbrances" means "Permitted Encumbrances" and "Permitted Liens", in each case, as defined in the Credit Agreement.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Personal Data" means any information that identifies an individual Person, including any information that is defined as "personal data", "personally identifiable information", "personal information", "protected health information" or "sensitive personal information" under any applicable Law.

"Provisional Liquidation Expense" means any amounts properly payable as an expense of the provisional liquidation of Parent.

"Real Property" means all land, buildings, improvements and fixtures erected thereon and all appurtenances related thereto.

"Recognition Motion" means the motion to be filed with the Bankruptcy Court in the Chapter 15 Case seeking (i) recognition of the Bermuda Proceeding and the Restructuring and (ii) recognition of the Sanction Order and enforcement of its terms.

"Recognition Order" means an order approving the Recognition Motion.

"Registered" means issued by, registered or filed with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"Regulations" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

"Related to the Business" means used or held for use by Parent in, or related to, or arising from, the Business.

"Restructuring" means a restructuring transaction as set forth in the non-binding term sheet attached to the Restructuring Support Agreement, executed on September 17, 2024, by and among Parent, Afiniti, Inc., the guarantors listed on Schedule 1 attached thereto, the Agent, and the lenders from time to time party thereto (including any schedules, annexes and exhibits attached thereto, each as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and the terms of the Restructuring Support Agreement) (the "Restructuring Support Agreement"), and as modified by and as more fully set forth in the Restructuring Support Agreement and in the Definitive Documents (as defined therein).

"Sanction" means individually or collectively, as the context requires, the approval, authorization, confirmation, consent, and/or endorsement of the Restructuring by the Bermuda Court.

"Sanction Order" means an order of the Bermuda Court that, among other things, approves the actions of the Provisional Liquidators in furtherance of the Restructuring.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Software" means software, computer programs, computer applications and code, including source code and object code, and all documentation relating to any of the foregoing.

"Subsidiary" means, with respect to a party hereto, any corporation, partnership, limited liability company or other entity, whether incorporated or unincorporated, of which (a) such party or any other Subsidiary of such party is a managing member or general partner; (b) at least a majority of the securities or other equity interests having by their terms ordinary voting power to elect a majority of the directors or others performing similar functions with respect to such entity is directly or indirectly owned or controlled by such party or by any one or more of such party's Subsidiaries, or by such party and one or more of its Subsidiaries; or (c) at least a majority of the equity securities or other equity interests is directly or indirectly owned or controlled by such party or by any one or more of such party's Subsidiaries, or by such party and one or more of its Subsidiaries.

"Tax" or "Taxes" means any and all taxes of any kind, as well as other similar duties or levies (together with any and all interest, penalties, and additions to tax imposed with respect thereto), imposed by any Taxing Authority.

"Taxing Authority" means any Governmental Authority that is responsible for the administration or imposition of any Tax (including any Conveyance Tax).

"Tax Returns" means any and all returns, reports and forms (including elections, claims for refund, declarations, amendments, schedules, information returns and statements, and schedules and attachments thereto) filed or required to be filed with a Taxing Authority with respect to Taxes.

"Trademarks" means trademarks, service marks, trade names, trade dress, domain names and any other identifier of source or origin, together with the goodwill associated therewith.

"Transferred Intellectual Property" means any Intellectual Property owned by Parent and Related to the Business.

"Transferred IP Agreements" means all (i) Contracts that are Related to the Business that license or otherwise grant a permission to use Intellectual Property of Parent to any Person, and (ii) Contracts that are Related to the Business that license or otherwise grant a permission to use Intellectual Property of any Person to Parent.

"WARN ACT" means the Worker Adjustment and Retraining Notification Act of 1988, as amended through the date hereof.

SECTION 1.02 Definitions.   The following terms have the meanings set forth in the Sections set forth below:

| Definition | Location |
|---|---|
| "Acquired Company Assets" | 3.16(a) |
| "Agreement" | Preamble |
| "AI Tools" | 3.13(j) |
| "Assets" | 3.16(a) |
| "Assigned Contracts" | 2.02(a)(vii) |
| "Assumed Liabilities" | 2.03(a) |
| "Assumed IP Liabilities" | 5.02(b) |
| "Bermuda Court" | Recitals |
| "Business" | Recitals |
| "Business Registered Intellectual Property" | 3.13(a) |
| "Business Software" | 3.13(i) |
| "Closing" | 2.05 |
| "Closing Date" | 2.05 |
| "Data Protection Requirements" | 3.14(a) |
| "Excluded Assets" | 2.02(b) |
| "Excluded Bermuda Subsidiaries" | 2.03(b)(vii) |
| "Excluded Liabilities" | 2.03(b) |
| "Financial Statements" | 3.07 |
| "Holdco" | Preamble |
| "IP Proceeds" | 2.02(a)(ix) |
| "IP Purchaser" | 5.02(a) |
| "Loan Note Instrument" | 5.02(d) |

"Material Contracts" ....................................................... 3.20(a)
"Newco" .......................................................................... 7.02(a)
"Parent" .......................................................................... Preamble
"Parties" .......................................................................... Preamble
"Permits" ......................................................................... 3.11
"Pre-Closing Privileges" ................................................. 2.02(a)(xv)
"Privileged Materials" .................................................... 2.02(a)(xv)
"Provisional Liquidation" ............................................... Recitals
"Provisional Liquidators" ............................................... Preamble
"Restructuring Support Agreement" ................................ 1.01
"Retained Cash" .............................................................. 2.03(b)(i)
"Shares" .......................................................................... Recitals
"Subsequent Transfer" .................................................... 7.02(b)
"Transferred Assets" ....................................................... 2.02(a)
"Transferred Company" ................................................... Recitals
"Transferred IP Assets" ................................................... 5.02(a)
"Transferred IT Assets" ................................................... 2.02(a)(vi)
"Transferred Employee" .................................................. 6.01
"Transferred Records" ..................................................... 2.02(a)(xiv)

SECTION 1.03 Interpretation and Rules of Construction.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)    the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement; the term "as of the date hereof", when used in this Agreement, means as of the date of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)    references to a Person are also to its successors and permitted assigns;

(h)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day, the period shall end on the immediately following Business Day; and

(i)     the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01 Transfer and Acquisition of the Shares.

(a)     Upon the terms and subject to the conditions of this Agreement, at the Closing, Parent shall assign, transfer, convey and deliver to Holdco, and Holdco shall acquire from Parent, all of Parent's right, title, and interest in and to the Shares.  The transfer of the Shares shall be free and clear of all Encumbrances other than (i) those arising under applicable securities Laws or (ii) those created by the Agent, including any and all claims pursuant to any successor liability or successor-in-interest theory.

SECTION 2.02 Transfer and Acquisition of Assets.

(a)     Upon the terms and subject to the conditions of this Agreement, at the Closing, Parent shall assign, transfer, convey and deliver to Holdco, and Holdco shall acquire from Parent, all of Parent's right, title and interest in and to the following assets (the "Transferred Assets"):

(i)     all Cash of Parent in excess of the Retained Cash;

(ii)     all bank accounts and lockboxes of Parent used in the Business;

(iii)     all accounts receivable and other claims for money or other obligations (including such receivables and claims owed by an Acquired Company) due to Parent and Related to the Business, other than that certain loan receivable or any other intercompany receivables owed by Afiniti, Inc. to Parent, which shall be assigned to Newco in the Subsequent Transfer;

(iv)     all pre-paid expenses, deposits (including security deposits), advances, prepayments, prepaid assets and refunds of Parent and Related to the Business;

(v)     all of Parent's right, title and interest in and to the furniture, supplies and office equipment located at any of the Leased Real Properties relating to the Assigned Leases;

(vi)     all of Parent's right, title and interest in and to the personal computers and laptops for the Transferred Employees, any other IT Assets

Related to the Business (the "Transferred IT Assets") and all other tangible personal property Related to the Business;

(vii)    subject to Section 5.01, all rights of Parent under any Contracts listed or described on Schedule 2.02(a)(vii)[2] (the "Assigned Contracts");

(viii)    subject to Section 5.01, all rights of Parent under the Transferred IP Agreements;

(ix)    (A) all of Parent's right, title and interest in and to the Transferred Intellectual Property, and (B) all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and any supporting obligations (collectively, the "IP Proceeds"), relating to any Transferred Intellectual Property;

(x)    all Permits, including the Permits set forth on Section 3.11 of the Disclosure Schedule (in each case to the extent transferable without the consent of any Governmental Authority);

(xi)    all rights under warranties, indemnities, and all similar rights against third parties to the extent Related to the Business, any Transferred Assets or the Assumed Liabilities; provided, however, that Transferred Assets shall not include (and the Excluded Assets shall include) any claims and causes of action against any third party arising under Contract or applicable Law under Contracts that are not Assigned Contracts, even if such claims or causes of action arise from Contracts Related to the Business;

(xii)    all causes of action, claims, demands, rights and privileges against third parties, whether liquidated or unliquidated, fixed or contingent, choate or inchoate that relate to events, breaches or violations (whether sounding in tort or not) occurring on or prior to the Closing Date which are Related to the Business or which relate to any Transferred Assets or the Assumed Liabilities, including causes of action, claims, demands, rights and privileges which Parent may have under any insurance contracts or policies insuring the Business, any Transferred Assets or the Assumed Liabilities, and including that cause of action, claim, demand, right and privilege listed or described on Schedule 2.02(a)(xii)[3];

(xiii)    all Company Plan assets held by Parent;

(xiv)    all books of account and copies of all Tax Returns (and supporting workpapers and other records) in Parent's possession or control, invoices, shipping records, supplier lists, correspondence and other documents, records and files of Parent and, in each case, Related to the Business or involving or related to

---

[2]    **Note to Draft**:  Final list of Assigned Contracts to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

[3]    **Note to Draft**: Schedule to consist of the US Trade Secret Action identified on Schedule 3.10.

the Transferred Employees, the Transferred Assets (including involving or related to the Transferred IT Assets) or the Assumed Liabilities, including all editorial, sales, promotion, market research, readership research, sales media kits, royalty and other files Related to the Business or involving or related to the Transferred Employees, the Transferred Assets or the Assumed Liabilities (the "Transferred Records"); provided that Parent may redact any information from such Transferred Records not Related to the Business or involving or related to the Transferred Employees, the Transferred Assets or the Assumed Liabilities prior to the delivery of such Transferred Records to Holdco and may retain a copy of any Transferred Records relating to Tax, accounting or legal matters or otherwise required to be retained pursuant to applicable Law;

(xv)    any and all attorney-client privileges, work product protections, mediation privileges, common-interest privileges, expectations of client confidences or any other similar privileges or protections of Parent or any Acquired Company or any of its applicable directors and officers to the extent related to Parent, the Business any Acquired Company or any Transferred Assets prior to the closing of the transactions contemplated herein (the "Pre-Closing Privileges") and all books and records and other documents of Parent or any Acquired Company containing any advice or communication that is subject to any Pre-Closing Privilege (collectively, the "Privileged Materials");

(xvi)    any and all rights pursuant to any settlement agreements;

(xvii) any other right, property or asset of Parent that is listed or described on Schedule 2.02(a)(xvii); and

(xviii) any other right, property or asset of Parent not specifically identified as an Excluded Asset in clauses (i) through (ix) of Section 2.02(b) that is designated by Holdco in writing prior to the Closing.

(b)    Notwithstanding anything in Section 2.02(a) to the contrary, Parent shall not convey, assign, transfer or deliver, or cause to be conveyed, assigned, transferred or delivered, to Holdco, and Holdco shall not acquire, and the Transferred Assets shall not include, Parent's right, title and interest to any assets of Parent not expressly included in the Transferred Assets or pursuant to the sale, transfer and delivery of the Shares subject to the terms of this Agreement (the "Excluded Assets"), including:

(i)    all Cash of Parent in an amount necessary to satisfy the Excluded Liabilities approved in writing by the Agent for payment prior to Closing (the "Retained Cash")[4];

---

[4]    **Note to Draft**: Amount of cash to be retained by Parent to satisfy Excluded Liabilities and liquidate Parent (and local advisory costs related thereto) to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

(ii)    all rights of Parent under that certain loan receivable or any other intercompany receivables owed by Afiniti, Inc. to Parent, which shall be assigned to Newco in the Subsequent Transfer;

(iii)    the company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of Parent, as well as any other records or materials relating to Parent and not Related to the Business or involving or related to the Transferred Employees, the Transferred Assets or the Assumed Liabilities;

(iv)    all current and prior insurance policies of Parent, including current and prior director and officer insurance policies of Parent, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and all rights to receive refunds of premiums paid with respect thereto, which shall be assigned to Newco or one or more Subsidiaries designated by Newco in the Subsequent Transfer;

(v)    all claims, defenses, causes of action, choses in action, rights of recovery for reimbursement, contribution, refunds, indemnity or other similar payment recoverable by Parent from or against any third party to the extent relating to any other Excluded Asset or any Excluded Liability; provided that if Holdco or any Acquired Company becomes subject to any Action or Liability in respect of any Excluded Asset or Excluded Liability following the Closing, all claims, defenses, causes of action, choses in action, rights of recovery for reimbursement, contribution, refunds, indemnity or other similar payment recoverable by Parent from or against any third party to the extent relating to such Excluded Asset or Excluded Liability shall be transferred to Holdco as Transferred Assets;

(vi)    all of the issued and outstanding shares of capital stock of AFCF, Ltd., a Bermuda exempted company limited by shares, and Afiniti Holdco, Ltd., a Bermuda exempted company limited by shares (collectively, the "Excluded Bermuda Subsidiaries") and of Afiniti, Inc.;

(vii)    all rights of Parent under any Contract to which Parent is a party that (A) is not an Assigned Contract or (B) is an Assigned Contract but is not assignable pursuant to the terms thereof or as a matter of applicable Law, and specifically those Contracts listed on Schedule 2.02(b)(vii);

(viii)    all Parent Plans and assets thereof; and

(ix)    any other right, property or asset that is listed or described on Schedule 2.02(b)(ix).

(c)    The transfer of title to the Transferred Assets shall be free and clear of all Encumbrances other than those of the Agent, including any and all claims pursuant to any successor liability or successor-in-interest theory.

14

SECTION 2.03 <u>Assumption and Exclusion of Liabilities</u>.

(a)      Holdco shall assume no Liabilities of Parent, except the Liabilities expressly set forth in this <u>Section 2.03(a)</u> (collectively, the "<u>Assumed Liabilities</u>"), which Holdco shall, on the terms and subject to the conditions of this Agreement, assume at the Closing, and thereafter pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto:

(i)      all Liabilities arising from or in respect of the ownership or use of any Transferred Asset after the Closing;

(ii)      all Liabilities of Parent arising under the Assigned Contracts and the Transferred IP Agreements;

(iii)      all Liabilities of Parent arising under the Assigned Leases;

(iv)      all Liabilities arising from the employment of the Transferred Employees after the Closing;

(v)      all Liabilities set forth on <u>Schedule 2.03(a)(v)</u> for severance, termination and other payments to Business Employees;

(vi)      all accounts payable of Parent incurred in the ordinary course of business to suppliers and vendors of goods and services and outstanding as of the Closing Date, excluding (i) any intercompany payables owed by Parent to an Acquired Company or any other Subsidiary of Parent, and (ii) any accounts payable listed on <u>Schedule 2.03(a)(vi)</u>[5];

(vii)      all purchase orders for goods or services incurred in the ordinary course of business prior to the Closing;

(viii)      all Taxes to the extent relating to the ownership or use of the Transferred Assets or the operation of the Business after the Closing; and

(ix)      all other Liabilities set forth on <u>Schedule 2.03(a)(ix)</u>.[6]

(b)      Except as specifically set forth in <u>Section 2.03(a)</u>, Holdco will not assume or be liable for any Liabilities of Parent of any nature whatsoever, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise (other than the Assumed Liabilities), including the following (other than the Assumed Liabilities) (collectively, the "<u>Excluded Liabilities</u>"):

---

[5]      <u>**Note to Draft**</u>: To include fees to directors, Wilmer fees and other specified excluded AP to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

[6]      <u>**Note to Draft**</u>: Final list of Other Assumed Liabilities to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

(i)      all Liabilities to the extent relating to the Excluded Assets;

(ii)      all Liabilities of Parent arising under any Contract to which Parent is a party that is not an Assigned Contract, including under any indemnification agreements with any current or former director or officer of Parent;

(iii)      all Liabilities arising from or in respect of any Transferred Asset or the operation of the Business arising prior to the Closing and not expressly assumed pursuant to this Agreement;

(iv)      all accounts payable not assumed pursuant to Section 2.03(a)(vi); and all purchase orders not assumed pursuant to Section 2.03(a)(vii);

(v)      all intercompany payables, liabilities and obligations owed by Parent to an Acquired Company or any other Subsidiary of Parent;

(vi)      all Indebtedness of Parent;

(vii)      all Liabilities arising from or in respect of any Action, whether or not relating to or arising from the conduct of the Business, pending or threatened against the Business or the Transferred Assets, including any indemnity obligations related to such Liabilities;

(viii)      all Liabilities with respect to Parent Plans;

(ix)      all Liabilities with respect to employees of Parent (except with respect to Liabilities arising from the employment of the Transferred Employees arising after the Closing or as set forth on Schedule 2.03(a)(v)), including all Liabilities in respect of transaction bonus and retention bonus agreements and in respect of employment-related claims, including allegations of wrongful termination, discrimination, workplace harassment and retaliation;

(x)      Parent's obligations under this Agreement and each Ancillary Agreement;

(xi)      any Liabilities to any equity holder of Parent or arising from or in respect of any equity interests of Parent or the right to acquire or the issuance of any equity interests of Parent;

(xii)      all other Liabilities set forth on Schedule 2.03(b)(xii); and

(xiii)      any other Liabilities of Parent not expressly assumed by Holdco pursuant to Section 2.03(a) above.[7]

---

[7]      **Note to Draft**:  Final list of Other Excluded Liabilities to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

The Parties acknowledge that the agreements contained in this <u>Section 2.03(b)</u> are an integral part of the transactions contemplated by this Agreement and that Holdco would not have entered into this Agreement if it had been required to assume any of the Liabilities of Parent that are Excluded Liabilities.

SECTION 2.04 <u>Consideration</u>.   In consideration for Parent entering into this Agreement and the Ancillary Agreements with Holdco and consummating the transactions contemplated hereby and thereby, including the sale of the Shares and the Transferred Assets to Holdco, Holdco shall issue to Parent [____] additional membership interests of Holdco and shall assume the Assumed Liabilities.

SECTION 2.05 <u>Closing</u>.  Subject to the terms and conditions of this Agreement and subject to the satisfaction (or waiver) of the conditions precedent set forth in and pursuant to the terms of Section 15 of the Restructuring Support Agreement, other than those conditions that are to be satisfied (or waived) on the Closing Date, the transfer and acquisition of the Shares and the Transferred Assets and the assumption of the Assumed Liabilities and the other transactions contemplated by this Agreement shall take place at a closing (the "<u>Closing</u>") to be held remotely via the exchange of documents and signatures on the date hereof (the day on which the Closing takes place being the "<u>Closing Date</u>").

SECTION 2.06 <u>Closing Deliveries by Parent</u>.  At the Closing, Parent shall deliver or cause to be delivered to Holdco:

(a)     evidence of the transfer, reasonably satisfactory to Holdco, of the Shares to Holdco;

(b)     a duly executed counterpart to the Bill of Sale to be entered into between Holdco and Parent substantially in the form of <u>Exhibit B-1</u>;

(c)     a duly executed counterpart to the Assignment and Assumption Agreement to be entered into between Holdco and Parent substantially in the form of <u>Exhibit A-1</u>;

(d)     a duly executed counterpart to each Assignment of Lease;

(e)     a duly executed counterpart to the IP Assignment Agreement to be entered into between Holdco and Parent substantially in the form of <u>Exhibit C-1</u>;

(f)     evidence of a Sanction Order from the Bermuda Court;

(g)     evidence of entry of the Recognition Order by the Bankruptcy Court; and

(h)     all such other documents, agreements, instruments, writings and certificates as Holdco may reasonably request as are necessary for Parent to satisfy its obligations hereunder.

SECTION 2.07 <u>Closing Deliveries by Holdco</u>.  At the Closing, Holdco shall deliver or cause to be delivered to Parent:

(a)    evidence of the issuance, reasonably satisfactory to Parent, of the issuance to Parent of [____] additional membership interests of Holdco;

(b)    a duly executed counterpart to the Bill of Sale;

(c)    a duly executed counterpart to the Assignment and Assumption Agreement to be entered into between Holdco and Parent substantially in the form of <u>Exhibit A-1</u>;

(d)    a duly executed counterpart to each Assignment of Lease;

(e)    a duly executed counterpart to the IP Assignment Agreement to be entered into between Holdco and Parent substantially in the form of <u>Exhibit C-1</u>; and

(f)    all such other documents, agreements, instruments, writings and certificates as Parent may reasonably request as are necessary for Holdco to satisfy its obligations hereunder.

SECTION 2.08 <u>Assignment of Certain Transferred Assets</u>.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the consent, approval or authorization of a third party, would constitute a breach or other contravention thereof or would in any way adversely affect the rights of Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, thereto or thereunder. If any such consent, approval or authorization is not obtained prior to the Closing Date, or if an attempted transfer or assignment thereof would be ineffective or would adversely affect the rights of Parent thereto or thereunder so that Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, would not in fact receive all such rights following the Closing, Parent and Holdco shall, or, following the transactions contemplated by <u>Section 5.02</u>, Holdco shall cause the IP Purchaser to, other than with respect to consents, approvals and authorizations subject to <u>Section 5.01</u>, cooperate in a mutually agreeable arrangement under which Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, would obtain the benefits and assume the obligations and bear the economic burdens associated with such Transferred Asset in accordance with this Agreement, or under which Parent would enforce for the benefit of Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, at Holdco's or the IP Purchaser's, as applicable, cost and expense, any and all of its rights against a third party associated with such Transferred Asset, and Parent would promptly pay to Holdco or the IP Purchaser, as applicable, all monies received by it in respect of any such Transferred Asset.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF PARENT

Parent hereby represents and warrants to Holdco as of the date hereof, subject to such exceptions as are disclosed in the Disclosure Schedule, as follows:

SECTION 3.01 <u>Organization, Authority and Qualification of Parent</u>.  Parent is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to enter into this Agreement and each Ancillary Agreement to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, and the Provisional Liquidators have the corporate power and authority, subject to the Sanction Order, to execute and deliver, and Parent has the power to perform, this Agreement and each Ancillary Agreement and to consummate the transactions contemplated hereby and thereby.  Parent is duly licensed or qualified to do business and is in good standing (to the extent such concepts are recognized under applicable Law) in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing (x) would not have a Material Adverse Effect or (y) would not be reasonably expected to prevent or materially delay the ability of Parent to perform its obligations under this Agreement or any of the Ancillary Agreements to which it is a party.  The execution and delivery of this Agreement and each Ancillary Agreement to which it is a party by Parent, the performance by Parent of its obligations hereunder and thereunder and the consummation by Parent of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Parent.  This Agreement has been, and upon their execution each of the Ancillary Agreements to which it is a party shall have been, duly executed and delivered by Parent, and (assuming due authorization, execution and delivery by Holdco) this Agreement constitutes, and upon their execution each of the Ancillary Agreements to which it is a party shall constitute, legal, valid and binding obligations of Parent, enforceable against Parent in accordance with their respective terms, subject to the Enforceability Exceptions.

SECTION 3.02 <u>Ownership of Shares</u>.    The Shares are owned of record and beneficially by Parent free and clear of all Encumbrances (other than Permitted Encumbrances).  Upon the Closing, Holdco will own all of the Shares free and clear of all Encumbrances (other than Permitted Encumbrances).  Parent has no direct Subsidiaries other than the Transferred Companies, Afiniti, Inc. and the Excluded Bermuda Subsidiaries.

SECTION 3.03 <u>Organization, Authority and Qualification of the Acquired Companies</u>.  Each of the Acquired Companies is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted.  Each of the Acquired Companies is duly licensed or qualified to do business and is in good standing (to the extent such concepts are recognized under applicable Law) in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary,

19

except to the extent that the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect.

SECTION 3.04 <u>Capitalization of Transferred Companies; Acquired Subsidiaries</u>.

(a)    <u>Schedule 3.04</u> sets forth, for each Transferred Company, (i) its jurisdiction of formation, (ii) the number and type of issued equity interests, and (iii) the holders of such equity interests.  All of the Shares are validly issued, fully paid and nonassessable and were not issued in violation of any preemptive rights.  The Shares, and in the case of Transferred Companies that are not wholly owned by Parent, the equity interests of such Transferred Companies owned by another Transferred Company as reflected on <u>Schedule 3.04</u>, constitute all of the issued and outstanding equity interests of the Transferred Companies. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Shares or the equity interests of the Transferred Companies owned by another Transferred Company or obligating either Parent or any Transferred Companies to issue or sell any shares of capital stock of, or any other equity interest in, any Transferred Company.

(b)    <u>Section 3.04(b)</u> of the Disclosure Schedule sets forth, for each Acquired Subsidiary, (i) its jurisdiction of formation, (ii) the number and type of issued equity interests, and (iii) the holders of such equity interests.  All equity interests in the Acquired Subsidiaries are owned, directly or indirectly, by a Transferred Company free and clear of all Encumbrances, have been duly authorized and validly issued, and none of such equity interests has been issued in violation of any preemptive rights.  There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the equity interest in any Acquired Subsidiary or obligating Parent, any Transferred Company or any Acquired Subsidiary to issue or sell any equity interest in any of the Acquired Subsidiaries.

SECTION 3.05 <u>No Conflict</u>.  Assuming the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in <u>Section 3.06</u>, the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is a party by Parent do not and will not (a) violate, conflict with, or result in the breach of any provision of the Governing Documents of Parent or any of the Acquired Companies, (b) violate any Law or Governmental Order applicable to Parent or any of the Acquired Companies in any material respect, (c) except as set forth on <u>Section 3.05(c)</u> of the Disclosure Schedule, violate, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, acceleration or cancellation of, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on the Shares or any of the Transferred Assets pursuant to any Material Contract to which Parent or any Acquired Company is a party or by which any of the Transferred Assets or the Shares or businesses of the Acquired Companies is bound or affected in any material respect, or (d) exceed or fall outside of the powers or authority of the Provisional Liquidators; except, with respect to clause (c) for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, reasonably be expected to materially impact the operation of the Business.

SECTION 3.06 <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance of this Agreement by Parent and each Ancillary Agreement to which it is a party does not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Authority, except (a) as described in <u>Section 3.06</u> of the Disclosure Schedule, or (b) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not reasonably be expected to materially impact the operation of the Business.

SECTION 3.07 <u>Financial Information</u>.

(a)     True and complete copies of (i) the unaudited balance sheet of the Business as of June 30, 2024 and the related unaudited statements of income and cash flows of the Business for the twelve months then-ended, and (ii) the audited balance sheet of the Business as of June 30, 2023, June 30, 2022 and June 30, 2021, and the related audited statements of income and cash flows of the Business for the fiscal years then-ended (collectively, the "<u>Financial Statements</u>") have been made available by Parent to Holdco.

(b)     The Financial Statements (i) were prepared in accordance with the books of account and other financial records of Parent (except as may be indicated in the notes thereto), (ii) present fairly in all material respects the financial condition and results of operations of the Business as of the dates thereof or for the periods covered thereby and (iii) were prepared in accordance with GAAP applied on a basis consistent with the past practices of Parent (except for the absence of footnotes in unaudited interim financial statements).

SECTION 3.08 <u>Absence of Undisclosed Material Liabilities</u>.  As of the date hereof, the Business does not have any Liabilities of a nature required to be reflected on a balance sheet prepared in accordance with GAAP, other than Liabilities (a) reflected or reserved against on the Financial Statements (including the notes thereto), (b) set forth in the Disclosure Schedule or (c) incurred since June 30, 2024 in the ordinary course of business of the Business.

SECTION 3.09 <u>Conduct in the Ordinary Course</u>.  Since December 31, 2023 and through the date hereof, except as described in <u>Section 3.09</u> of the Disclosure Schedule or as required by applicable Law or the terms of any Contract, the Acquired Companies and, to the extent Related to the Business, Parent have not:

(a)     (i) issued or sold any capital stock, notes, bonds or other securities of the Acquired Companies (or any option, warrant or right to acquire the same), (ii) redeemed any of the capital stock of the Acquired Companies, or (iii) declared, made or paid any dividends or distributions to the holders of capital stock of the Acquired Companies;

(b)     except as would not be material to the operation of the Business, sold, leased, transferred, licensed or otherwise disposed of (other than the sale of inventory or the grant of non-exclusive licenses in connection therewith, in the ordinary course consistent with past practice), or abandoned, permitted to lapse or failed to maintain, or permitted or allowed to be subjected to any Encumbrance (other than Permitted Encumbrances), any of the Assets (whether tangible or intangible) or any other asset or property of the Business that would

constitute a Transferred Asset or an Acquired Company Asset but for the conduct described in this clause;

(c)    amended or restated the Governing Documents of any of the Acquired Companies;

(d)    incurred any Indebtedness (other than any Indebtedness between any Acquired Company and any other Acquired Company);

(e)    delayed payment of any account payable or other Liability of the Business beyond its due date or the date when such Liability would have been paid in the ordinary course of business consistent with past practice;

(f)    except with respect to the current and prior director and officer insurance policies of Parent, entered into, extended, materially amended, cancelled or terminated any Material Contract or any agreement which, if entered into prior to the date hereof, would be a Material Contract other than customer or supplier contracts in the ordinary course of business consistent with past practice or in connection with obtaining a required consent as contemplated hereto that does not require a Party or an Acquired Company to pay any remuneration or commit to pay any remuneration to any Person to which a Party or Acquired Company is not contractually obligated to pay pursuant to a separate contractual obligation with such Person;

(g)    (A) except for the compensation figures indicated on Section 3.18(a) of the Disclosure Schedule (which shall not be required to indicate changes to such figures between December 31, 2023 and the date of such schedule), granted or agreed to grant or paid or agreed to pay, directly or indirectly, any material increase or material new commitments and with respect to the wages, salary, bonus, commissions, retirement benefits, transaction bonus, retention bonus, severance, tax gross-up or equalization or other compensation or benefits of, or grant any equity-based compensation to, any Business Employee or independent contractor, (B) enter into, adopt or establish any new material Parent Plan or any new material Company Plan or collective bargaining agreement or (C) transferred or otherwise altered or amended any Benefit Plan such that it became a Company Plan;

(h)    changed any method of accounting or accounting practice or policy used by Parent (in each case, Related to the Business) or any of the Acquired Companies, other than such changes required by GAAP;

(i)    paid or discharged, entered into any settlement with respect to, or waived or compromised, any Action;

(j)    transferred or assigned any asset from an Acquired Company to Parent, transferred or assigned any Liability from Parent to an Acquired Company, or otherwise caused an Acquired Company to assume any Liability of Parent;

(k)    made any material Tax election inconsistent with past practice or changed or revoked any material Tax election, changed any material Tax accounting method, filed any material amended Tax Return, settled or compromised any audit or other proceeding relating to a material amount of Tax, entered into any closing agreement, extended the statute of limitations

period for the assessment or collection of any Tax, or surrendered any right to claim a material Tax refund; or

(l)    agreed to take any of the actions specified in this <u>Section 3.09</u>, except as contemplated by this Agreement and the Ancillary Agreements.

SECTION 3.10 <u>Litigation</u>.  As of the date hereof, there is no Action by or against (a) any of the Acquired Companies or (b) Parent to the extent Related to the Business, in each case pending before any Governmental Authority that would be material to the Business.

SECTION 3.11 <u>Compliance with Laws; Permits</u>.  Except as would not be material to the Business, Parent and the Acquired Companies have conducted within the prior two year period and continue to conduct the Business in accordance with all Laws and Governmental Orders applicable to Parent and Acquired Companies with respect to the Business and none of Parent or the Acquired Companies is in violation of any such Law or Governmental Order. Parent and the Acquired Companies hold all licenses, permits, authorizations, orders and approvals from, and have made all filings, applications and registrations with, each Governmental Authority (collectively, the "<u>Permits</u>") necessary for the operation of the Business as it is conducted as of the date hereof in all material respects.  Parent and the Acquired Companies have conducted and continue to conduct the Business pursuant to and in compliance in all material respects with the terms of all such Permits.  <u>Section 3.11</u> of the Disclosure Schedule sets forth each Permit material to the operation of the Business as it is conducted as of the date hereof.

SECTION 3.12 <u>Environmental Matters</u>.  Except as would not have a Material Adverse Effect, (a) Parent, to the extent Related to the Business, and the Acquired Companies are in compliance with all applicable Environmental Laws and have obtained and are in compliance with all Environmental Permits, and (b) there are no written claims pursuant to any Environmental Law pending or, to Parent's Knowledge, threatened, against Parent, to the extent Related to the Business, or the Acquired Companies.

SECTION 3.13 <u>Intellectual Property; Information Technology</u>.

(a)    <u>Section 3.13(a)</u> of the Disclosure Schedule sets forth a true and complete list of all Registered Owned Intellectual Property and Registered Transferred Intellectual Property (collectively, the "<u>Business Registered Intellectual Property</u>") as of the date of this Agreement, such list specifying for each item of Intellectual Property, as applicable, the jurisdictions in which such item has been registered or registrations for such item have been applied for, owner(s), application or registration date, application or registration number and status, and, for domain names, the applicable domain name registrar.  Each item of Business Registered Intellectual Property is subsisting, and, to the Knowledge of Parent, valid and enforceable.  With respect to each item of Registered Owned Intellectual Property, an Acquired Company is the exclusive owner of such Intellectual Property, free and clear of any Encumbrances (other than Permitted Encumbrances).  With respect to each item of Registered Transferred Intellectual Property, Parent is the exclusive owner of such Intellectual Property, free and clear of any Encumbrances (other than Permitted Encumbrances).

(b)     The Business Intellectual Property constitutes all Intellectual Property, owned or licensed, or purported to be owned or licensed, by Parent and the Acquired Companies that is necessary and sufficient to enable Holdco and the Acquired Companies, immediately following the Closing, to conduct the Business substantially in the same manner as conducted by Parent and the Acquired Companies as of immediately prior to the Closing.  Subject to receipt of any necessary third party consents and approvals set forth on Section 3.06 of the Disclosure Schedule, immediately after the Closing, the Acquired Companies and Holdco, taken collectively, will own or have the valid right to use in the operation of the Business all of the Business Intellectual Property, and to receive all IP Proceeds related thereto, on terms and conditions the same in all material respects as those in effect prior to the Closing.  Except as would not be material to the Business, within the two years prior to the date hereof, none of Parent or the Acquired Companies has received any written claim from any Person challenging its rights in, ownership of, or the validity or enforceability of, the Owned Intellectual Property, or the Transferred Intellectual Property or any of the IP Proceeds related to either of the foregoing.

(c)     To the Knowledge of Parent, except as would not be material to the Business, no Person is engaging in any activity that infringes, misappropriates or otherwise violates, or in the two years prior to the date hereof has infringed, misappropriated or otherwise violated, any Owned Intellectual Property or Transferred Intellectual Property. Except as would not be material to the Business, neither the conduct of the Business nor the operation of the Acquired Companies infringes, misappropriates or otherwise violates, or has in the two years prior to the date hereof infringed, misappropriated or otherwise violated, the Intellectual Property of any Person.  In the two years prior to the date hereof, none of Parent or the Acquired Companies has received any written notice alleging that the conduct of the Business or the operation of the Acquired Companies has infringed, misappropriated or otherwise violated the Intellectual Property of any Person.

(d)     As of the date of this Agreement, there is no Action initiated by any other Person pending or, to the Knowledge of Parent, threatened in writing against Parent or the Acquired Companies concerning the matters described in Section 3.13(c); provided that any Action that has been initiated but with respect to which process or other comparable notice has not been served on or delivered to such parties shall be deemed to be "threatened" rather than "pending."

(e)     To the Knowledge of Parent, except as would not be material to the Business, (i) Parent and the Acquired Companies have used commercially reasonable efforts (including efforts to enter into written, valid and binding confidentiality and nondisclosure agreements with all founders, officers, employees, consultants and contractors of such entity with access to any trade secrets), unless such Persons are otherwise subject to legal or enforceable ethical obligations to maintain the confidentiality of such trade secrets) to protect and maintain the confidentiality of, and proprietary rights in, all the trade secrets and other material confidential information, including source code in Software, that is, in each case, part of the Business Intellectual Property or the other Transferred Assets or Acquired Company Assets, and, (ii) to the Knowledge of Parent, there has been no unauthorized access to or use or disclosure of any of the foregoing.

(f)     No current or former founder, officer, employee, consultant or contractor of an Acquired Company or Parent holds any right, title or interest, in whole or in part, in or to any Owned Intellectual Property, Transferred Intellectual Property, or IP Proceeds related to either of the foregoing other than a non-exclusive license to use such Intellectual Property for the purpose of performing services for or on behalf of the Business. Other than Parent, Afiniti, Inc. and its Subsidiaries or any other Acquired Company, no Person has any rights in or to the IP Proceeds related to the Transferred Intellectual Property or the Owned Intellectual Property. Except as would not be material to the Business, each current and former officer, employee, consultant and contractor of an Acquired Company, and each current and former officer, employee, consultant and contractor of Parent, to the extent such Person developed or created Intellectual Property by or on behalf of the Business, or otherwise within the scope of the engagement of such Person with the Acquired Company or Parent, and Related to the Business, has executed a written agreement with an Acquired Company or Parent, as applicable, that validly assigns to such entity all right, title and interest in such Intellectual Property, except to the extent ownership of such Intellectual Property is vested in Parent or the Acquired Company by operation of Law. To the Knowledge of Parent, none of the parties to the agreements that are subject to the previous sentence are in material breach thereof.

(g)     Except as would not be material to the Business, the Business IT Assets (i) operate and perform and have been maintained, in each case, in accordance with their documentation and functional specifications and otherwise as required for the conduct of the Business as currently conducted and as currently proposed to be conducted; (ii) have not malfunctioned or failed in any respect (including in a way that has resulted in a disruption to the Business); and (iii) do not contain any viruses, worms, Trojan horse, bugs, faults, vulnerabilities or any other code designed or intended to (A) significantly disrupt or adversely affect the functionality of the Business IT Assets or (B) assist any Person to access any Business IT Assets without authorization.  Except as would not be material to the Business, to the Knowledge of Parent, there has been no unauthorized access to, or unauthorized use, modification, deletion, disclosure, or other misuse of, any Business IT Assets (or information stored or contained therein or transmitted thereby). The Acquired Companies and, with respect to the Business, Parent, take and have taken all commercially reasonable steps to protect and preserve the confidentiality, integrity and security of the Business IT Assets (and all confidential information stored or contained therein or transmitted thereby, including such information of third parties that is held in connection with the Business).

(h)     The Business IT Assets constitute all IT Assets necessary and sufficient to enable Holdco and the Acquired Companies, immediately following the Closing, to conduct the Business substantially in the same manner as conducted by Parent and the Acquired Companies as of immediately prior to the Closing.  Subject to receipt of necessary third party consents and approvals set forth on <u>Section 3.06</u> of the Disclosure Schedule, immediately after the Closing, the Acquired Companies and Holdco will own or have the valid right to use in the operation of the Business all of the Business IT Assets, on terms and conditions the same in all material respects as those in effect prior to the Closing.

(i)     Neither the Acquired Companies nor the Business are in material breach of any terms or conditions of any relevant licenses of Open Source Software.  No Software included in the Owned Intellectual Property or Transferred Intellectual Property and used or held

for use in connection with the Business ("Business Software") incorporates, is integrated with, or links to any Open Source Software in such a manner that, taking into account the current conduct of the Acquired Companies and the Business, requires the distribution of any material proprietary source code for any Business Software under the terms of a license to such Open Source Software. None of Parent or the Acquired Companies has received any such written claim from any Person. No source code of any Business Software has been disclosed to any Person, other than to employees or service providers of Parent or an Acquired Company in the ordinary course of the Business for the purpose of conducting the Business, and none of the source code for any Business Software is subject to any escrow or other disclosure obligations.

(j)      The Acquired Companies have and, with respect to the Business, Parent, has used commercially reasonable efforts to (i) ensure that all AI Tools are used in compliance with the applicable license terms, consents, agreements and Laws in all material respects; (ii) not include Personal Data, trade secrets or material confidential or proprietary information in the Transferred Intellectual Property or Owned Intellectual Property, or such similar information that is owned by any third Person that is under any obligation of confidentiality by the Acquired Companies or Parent, in any prompts or inputs into any AI Tools, except in cases where such AI Tools do not use such information, prompts or inputs (other than in aggregated and anonymized form) to train the machine learning or algorithm of such tools or improve the services related to such tools; and (iii) not use AI Tools to develop any material Business Intellectual Property that the Acquired Companies or Parent intends to maintain as proprietary in a manner that would materially affect the Acquired Companies' or Parent's ownership or rights therein. For purposes thereof, "AI Tools" means generative artificial intelligence technology or similar tools capable of automatically producing various types of content (such as source code, text, images, audio and synthetic data) based on user-supplied prompts.

SECTION 3.14 Data Privacy.

(a)      The Acquired Companies and, with respect to the Business, Parent (i) are in material compliance in all respects with all applicable Laws as well as material applicable contractual obligations binding on the Acquired Companies or Parent, as applicable, and external policies, in each case to the extent relating to privacy, data protection and the collection, retention, protection, transfer, use and processing of Personal Data ("Data Protection Requirements") and (ii) have maintained commercially reasonable policies, procedures, and security safeguards (including organizational, physical, administrative and technical safeguards) regarding data privacy and security designed to protect Personal Data, controlled by or on behalf of the Acquired Companies or, with respect to the Business, Parent against loss, damage, unauthorized access, unauthorized use, breaches, and cybersecurity incidents.

(b)      To the Knowledge of Parent, there has been no material loss of, damage to, unauthorized access to, or unauthorized use, or misuse of, any personal information in the possession or control of Parent Related to the Business and the Acquired Companies. Neither the Acquired Companies, nor, with respect to the Business, Parent has (i) been subject to any actual, pending, or, to the Knowledge of Parent, threatened investigations, notices or requests from any Governmental Authority in relation to their data processing or cybersecurity activities or (ii) received any actual, pending, or, to the Knowledge of Parent, threatened written claims from any Person or Governmental Authorities alleging breach of any Data Protection Requirement. The

processing of Personal Data relating to the Business is carried out, in all material respects, in accordance with all Data Protection Requirements and, where applicable, with appropriate safeguards for such transfer. To the Knowledge of Parent, the execution, delivery and performance by Parent of this Agreement and the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement by Parent will not violate any Data Protection Requirements.

SECTION 3.15 Real Property.

(a)       Parent does not own any Real Property Related to the Business.

(b)       Section 3.15(b) of the Disclosure Schedule sets forth the street address of each Leased Real Property and the identity of the lessor, lessee and current occupant (if different from lessee) of each Leased Real Property. Assuming good fee title vested in the applicable lessor, to Parent's Knowledge, such lessee has a valid and binding leasehold or servitude interest in each Leased Real Property, free and clear of all Encumbrances other than Permitted Encumbrances.

(c)       There has not been any sublease or assignment entered into by Parent or any of the Acquired Companies in respect of the leases relating to the Leased Real Property.

SECTION 3.16 Assets; Sufficiency.

(a)       Each of the Acquired Companies owns, leases, licenses or has the legal right to use all the material properties and assets of such Acquired Company reflected on each of the Financial Statements or acquired since the date of the Financial Statements (collectively, the "Acquired Company Assets" and, together with the Transferred Assets, the "Assets"), except for any Acquired Company Assets that have been sold or otherwise disposed of since the date of such Financial Statement and disclosed on Section 3.09 of the Disclosure Schedule. Parent owns, leases, licenses or has the legal right to use all the Transferred Assets reflected on each of the Financial Statements or acquired since the date of the Financial Statements, except for any Transferred Assets that have been sold or otherwise disposed of since the date of such Financial Statement and disclosed on Section 3.09 of the Disclosure Schedule. The Assets are not subject to any Encumbrances other than Permitted Encumbrances. Following the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement, subject to receipt of necessary third party consents and approvals, including those set forth on Section 3.06 of the Disclosure Schedule, Holdco or an Acquired Company will own, with good and valid title, or lease, under valid and subsisting leases, or have legal right or license to use, or otherwise acquire, the Assets, free and clear of any Encumbrances, other than Permitted Encumbrances.

(b)       The Assets are adequate in all material respects to conduct the Business as currently conducted; provided, however, that nothing in this Section 3.16(b) shall be deemed to constitute a representation or warranty as to the adequacy of the amounts of working capital (or the availability of the same) or as to the sufficiency of any assets of the type included in the definition "Excluded Assets".

SECTION 3.17 Employee Benefit Plans.

(a)    Plans and Plan Documents.   Section 3.17(a) of the Disclosure Schedule correctly and completely lists the material Parent Plans and the material Company Plans and identifies each as either a Parent Plan or a Company Plan.  With respect to each material Parent Plan and material Company Plan that is in writing, Parent has made available to Holdco a current, true and complete copy of such Parent Plan and Company Plan and all amendments thereto (or, to the extent no such copy exists, an accurate description).  No Parent Plan or Company Plan provides benefits to any individual who is not a Business Employee or current or former independent contractor of Parent or an Acquired Company or the dependents or other beneficiaries of a Business Employee or such an independent contractor.

(b)    Plan Compliance.  Each Parent Plan and Company Plan is and has been operated in all material respects in accordance with its terms and the requirements of all applicable Laws and has been properly approved by Parent or an Acquired Company, as applicable.  Each of Parent and the Acquired Companies, as applicable, has performed in all material respects the obligations required to be performed by it under, is not in material default under or in material violation of, and Parent has no Knowledge of, any material default or violation by any party to, any Parent Plan or Company Plan.  No Action is pending or threatened with respect to any Parent Plan or Company Plan (other than claims for benefits in the ordinary course).

(c)    Qualification of Certain Plans.  Each Parent Plan and Company Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS with respect to the most recent applicable determination letter filing period or has timely applied to the IRS for such a letter or is the subject of a favorable IRS opinion or advisory letter.

(d)    Pension Plans.  Neither Parent nor any of the Acquired Companies (nor any predecessor of any such entity) sponsors, maintains, administers or contributes to, or has any obligation or liability with respect to, or has in the past six years sponsored, maintained or contributed to, or had any obligation or liability with respect to, (i) any "employee pension benefit plan" that is subject to Title IV of ERISA, (ii) any "multiemployer plan", as defined in Section 3(37) of ERISA, (iii) any "multiple employer plan" as described in Section 413(c) of the Code or (iv) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA).

(e)    Section 409A.  No Business Employee is entitled to receive any Tax gross-up, indemnity or reimbursement from Parent or the Acquired Companies for any Tax incurred by such Business Employee, including under Section 409A or Section 4999 of the Code. Each Parent Plan and Company Plan, and any award thereunder, that is or forms part of a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code is in a form and has been operated and administered in compliance with all applicable requirements of Section 409A of the Code in all material respects.

(f)    Post-Employment Health and Life Insurance Benefits.  Neither Parent nor any of the Acquired Companies has any current or anticipated material liability in respect of, and

no Parent Plan or Company Plan provides or promises, any post-employment, health or life insurance benefits to any current or former Business Employee except (i) as required under Section 4980B of the Code or any other Law, (ii) in connection with severance benefits, or (iii) through the end of the month in which a termination of employment occurs.

(g)    Transaction Payments; Section 280G.    Neither the execution of this Agreement nor the consummation of the transactions contemplated under this Agreement shall (either alone or in conjunction with the termination of employment or service of any Business Employee following, or in connection with, the transactions contemplated hereby): (i) entitle any Person to severance pay or benefits or any increase in severance pay or benefits upon any termination of employment or service; accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, or increase the amount payable or trigger any other obligation pursuant to, any Parent Plan or Company Plan; or (ii) limit or restrict the right of the Acquired Companies or Holdco to merge, amend or terminate any Company Plan. The consummation of the transactions contemplated by this Agreement will not cause any amounts payable under the Company Plans or Parent Plans to fail to be deductible for U.S. federal income tax purposes by virtue of Section 280G of the Code.

(h)    No Undisclosed Plans.    Neither Parent nor any Acquired Company has any commitment (i) to create, incur liability with respect to or cause to exist any other material compensation, benefit, fringe benefit or other plan, program, arrangement or agreement or to enter into any material contract or agreement to provide compensation or benefits to any individual, in each case other than as required by the terms of Parent Plans and the Company Plans as in effect as of the date hereof or (ii) to materially modify, change or terminate any material Parent Plan or materially modify, change or terminate any material Company Plan, other than a modification, change or termination required by applicable Law.

(i)    Non-U.S. Plans.    With respect to each Parent Plan and Company Plan that is maintained outside of the United States or that provides benefits outside of the United States: (i) the fair market value of the assets of each funded Parent Plan and Company Plan, the liability of each insurer for any Parent Plan and Company Plan funded through insurance or the book reserve established for any Parent Plan and Company Plan, together with any accrued contributions, is sufficient in all material respects to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Parent Plan and Company Plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such Parent Plan and Company Plan, and no transaction contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit obligations; (ii) from and after the Closing, the Acquired Companies shall receive the full benefit of any such funds, accruals or reserves under each Company Plan; and (iii) each Parent Plan and Company Plan required to be registered with applicable Governmental Authority has been registered and has been maintained in good standing in all material respects.

(j)    Indemnification Agreements.    No Acquired Company is a party to any Benefit Plan or Contract that would require such Acquired Company to provide any indemnification, contribution, advancement or reimbursement of expenses or similar rights to any current or former director or officer of Parent with respect to such Person's role at Parent.

SECTION 3.18 <u>Labor and Employment Matters</u>.

(a)       <u>Business Employees</u>.  <u>Section 3.18(a)</u> of the Disclosure Schedule contains a list effective as of not more than five (5) days prior to the date hereof of all of the current Business Employees by name, title, years of service, location, employing entity and annual base cash compensation (including annual base salary and annual target bonus), except to the extent that such information may not be disclosed under applicable data privacy and protection Laws.

(b)       <u>Collective Bargaining</u>.  There are no collective bargaining agreements that cover any of the Business Employees to which Parent or any Acquired Company is a party, and there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit relating to any Business Employee.  There is no strike, work stoppage or lockout pending, or threatened, by or with respect to any Business Employees.

(c)       <u>Compliance with Laws</u>.  Parent and the Acquired Companies are and have been in compliance in all material respects with all Laws related to the employment of labor, including those related to wages, hours, worker classification, occupational safety and health and collective bargaining.  No Liability for termination notice or severance has been incurred with respect to any Business Employees under the WARN Act prior to the date hereof.  No Action is pending or threatened with respect to any Business Employee.  Except as set forth in <u>Section 3.18(c)</u> of the Disclosure Schedule, no notice with respect to the transactions contemplated hereby is required to be provided to any Business Employee for any purpose.

(d)       <u>Complaints of Sexual Harassment</u>.  Except as disclosed to counsel for the Agent in writing prior to the date of the Restructuring Support Agreement, there is no, and for the past six years, there has not been any, litigation pending or threatened against Parent or any Acquired Company, in each case, involving allegations of sexual harassment, sex-based discrimination or sexual misconduct.   Parent and the Acquired Companies have taken appropriate action with respect to any allegations of sex-based discrimination, sexual harassment, sexual misconduct or breach of any policy of Parent or the Acquired Companies relating to the foregoing, in each case (i) involving any current or former officer or director in relation to his or her work at Parent or the Acquired Companies and (ii) in accordance with any written policies related thereto.

SECTION 3.19 <u>Taxes</u>.

(a)       <u>Tax Returns</u>.  All income and other material Tax Returns required to have been filed with respect to the Acquired Companies and the Transferred Assets have been timely filed (taking into account any extension of time to file granted or obtained) and such Tax Returns have been true, correct and complete in all material respects.  All income and other material Taxes of the Acquired Companies (whether or not shown on any Tax Return as owing) have been paid or will be timely paid.

(b)       <u>Tax Audits</u>.  No examination or audit of any Tax Return of any of the Acquired Companies by any Taxing Authority is currently in progress, and to the Knowledge of Parent, no such examination or audit has been threatened in writing.

(c)     Tax Allocation Agreements.  None of the Acquired Companies is a party to any Tax allocation or Tax sharing agreement (other than an agreement the principal subject matter of which is not Taxes) with any Person (other than Parent and other than any such agreement solely between or among the Acquired Companies), and after the Closing Date, none of the Acquired Companies will be bound by any such agreement or similar arrangement entered into prior to the Closing Date or will have any unsatisfied liability thereunder for any amounts due in respect of periods prior to the Closing Date.

(d)     Consolidated Groups.  None of the Acquired Companies (i) has been a member of a consolidated, combined, unitary, or affiliated Tax group (other than a group each of the members of which is an Acquired Company) or (ii) has any actual or potential liability for Taxes of another Person (other than other Acquired Companies) by reason of having been a member of a consolidated, combined, unitary, or affiliated Tax group, by operation of Law, as a transferee or successor, or by contract.

(e)     Waiver of Statute of Limitations.  None of the Acquired Companies has (i) waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to any material Tax assessment or deficiency or (ii) made or entered into any material consent or agreement as to Taxes that will remain in effect following the Closing Date.

(f)     Section 355.  Within the past 2 years, none of the Acquired Companies has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under Section 355(a) of the Code (or any other similar provision of state, local, or foreign Law).

(g)     Encumbrances.  There are no Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the Transferred Assets or any of the Acquired Company Assets.

(h)     Listed Transactions, etc.  Neither Parent nor any of the Acquired Companies have: (i) participated in any "listed transaction" as defined in Section 6707A(c)(2) of the Code or the Regulations promulgated thereunder (or any similar provision of state, local or non-U.S. Law), (ii) consummated or participated in any transaction which was or is a "tax shelter" transaction, as defined in Section 6662 or Section 6111 of the Code or the Regulations promulgated thereunder (or any similar provision of state, local or non-U.S. Law), or (iii) participated or engaged in any other transaction that is subject to similar disclosure requirements pursuant to a corresponding or similar provision of state, local or non-U.S. Tax Law.

SECTION 3.20 Material Contracts.

(a)     Section 3.20(a) of the Disclosure Schedule sets forth each of the following Contracts (other than Parent Plans and Company Plans) to which (i) an Acquired Company is a party or (ii) Parent is a party (but only to the extent such Contract is Related to the Business and, subject to obtaining the consents set forth in Section 3.20(b) of the Disclosure Schedule, would be transferred to Holdco hereunder), in each case of clauses (i) and (ii), in effect as of the date of this Agreement (such Contracts being "Material Contracts"):

(i)      any Contract for the purchase of materials, supplies, goods, services, equipment or other assets (other than purchase orders) providing for annual payments in excess of $750,000 and is not cancelable without penalty or further payment and without more than 120 days' notice;

(ii)      any Contract concerning the establishment or operation of a corporate or commercial partnership or joint venture (other than any Contract related to any Excluded Assets);

(iii)      all Contracts restricting the right of Parent or any of the Acquired Companies to compete with any Person;

(iv)      any Contract entered into within the one-year period prior to the date hereof relating to the acquisition or disposition (whether by merger, sale of stock, sale of assets or otherwise) of any material business, corporation, partnership, association, joint venture or other business organization, or any division, operating unit or product line of the Business with respect to which there remains outstanding obligations on the part of Parent or any Acquired Company;

(v)      all Company IP Agreements, other than, (A) in the case of Contracts granting a license to use Intellectual Property of any Person to an Acquired Company, (1) agreements with employees or independent contractors entered into in the ordinary course of business, (2) Open Source Software licenses and Software licenses that govern the use of non-customized Software that is commercially available to the public generally, (3) licenses that are implied by or incidental to the sale or purchase of products or services in the ordinary course of business, (4) confidentiality or non-disclosure agreements entered into in the ordinary course of business, (5) any agreement between or among Afiniti, Inc. or any of its Subsidiaries on one hand and any of the Acquired Companies on the other hand, and (6) any agreement between or among Parent, the Excluded Bermuda Subsidiaries or any Subsidiary of the Excluded Bermuda Subsidiaries on one hand and Afiniti, Inc. or any of its Subsidiaries or any Acquired Company on the other hand, and, (B) in the case of Contracts granting a license to use the Owned Intellectual Property to any Person, (1) confidentiality or non-disclosure agreements entered into in the ordinary course of business, (2) agreements with employees or contractors, entered into in the ordinary course of business, (3) non-exclusive licenses in customer agreements entered into in the ordinary course of business, and (4) non-exclusive licenses granted to receive the benefit of services from third party service providers entered into in the ordinary course of business;

(vi)      all Transferred IP Agreements, other than, (A) in the case of Contracts granting a license to use Intellectual Property of any Person to an Acquired Company, (1) agreements with employees or independent contractors entered into in the ordinary course of business, (2) Open Source Software licenses and Software licenses that govern the use of non-customized Software that is commercially available to the public generally, (3) licenses that are implied by or incidental to the sale or purchase of products or services in the ordinary course of

business, and (4) confidentiality or non-disclosure agreements entered into in the ordinary course of business, and, (B) in the case of Contracts granting a license to use the Owned Intellectual Property to any Person, (1) confidentiality or non-disclosure agreements entered into in the ordinary course of business, (2) agreements with employees or contractors, entered into in the ordinary course of business, (3) non-exclusive licenses in customer agreements entered into in the ordinary course of business, and (4) non-exclusive licenses granted to receive the benefit of services from third party service providers entered into in the ordinary course of business;

       (vii)    all Contracts relating to Indebtedness of any of the Acquired Companies;

       (viii)   all Contracts with any Governmental Authority involving total annual payments in excess of $750,000; and

       (ix)    all other Contracts that are material to the Business taken as a whole.

       (b)    Each Material Contract (i) is valid and binding on Parent or the Acquired Company, as applicable, party thereto, and, to the Knowledge of Parent, the counterparties thereto, and is in full force and effect and (ii) upon consummation of the transactions contemplated by this Agreement, except to the extent that any consents set forth in Section 3.05(c) of the Disclosure Schedule are not obtained, shall continue in full force and effect in accordance with its terms as of the date hereof.  Parent or the Acquired Company, as applicable, party thereto is not in material breach of, or material default under, any Material Contract to which it is a party and, as of the date hereof, to the Knowledge of Parent, no counterparty thereto is in material breach of, or material default under, any Material Contract.

       SECTION 3.21 <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or the Ancillary Agreements based upon arrangements made by or on behalf of Parent or any Acquired Company.

       SECTION 3.22 <u>Disclaimer of Parent</u>.  EXCEPT AS SET FORTH IN THIS <u>ARTICLE III</u>, THE TRANSFERRED ASSETS ARE BEING SOLD ON AN "AS IS" BASIS AS OF THE CLOSING IN THEIR CONDITION AS OF CLOSING WITH "ALL FAULTS" AND NONE OF PARENT OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PROVISIONAL LIQUIDATORS) MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE ACQUIRED COMPANIES, THE BUSINESS, THE SHARES, ANY OF THE ASSETS OR ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING WITH RESPECT TO (I) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, (II) THE OPERATION OF THE BUSINESS BY HOLDCO AFTER THE CLOSING, (III) THE PROBABLE SUCCESS OR PROFITABILITY OF THE BUSINESS AFTER THE CLOSING, (IV) ANY FINANCIAL

PROJECTION OR FORECAST RELATING TO PARENT OR THE BUSINESS, (V) ANY OTHER INFORMATION MADE AVAILABLE TO HOLDCO, ITS AFFILIATES AND ITS AND THEIR RESPECTIVE REPRESENTATIVES, OR (VI) AS TO ANY OTHER MATTER OR THING. ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED.   NONE OF PARENT OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PROVISIONAL LIQUIDATORS) WILL HAVE OR BE SUBJECT TO ANY LIABILITY OR INDEMNIFICATION OBLIGATION TO HOLDCO OR TO ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO HOLDCO, ITS AFFILIATES OR REPRESENTATIVES OF, OR HOLDCO'S USE OF, ANY INFORMATION RELATING TO THE BUSINESS AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO HOLDCO, WHETHER ORALLY OR IN WRITING, IN CERTAIN "DATA ROOMS," MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF HOLDCO OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF HOLDCO

Holdco hereby represents and warrants to Parent as follows:

SECTION 4.01 <u>Organization and Authority of Holdco</u>.  Holdco is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to enter into this Agreement and each Ancillary Agreement to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Holdco is duly licensed or qualified to do business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not materially and adversely affect the ability of Holdco to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and each Ancillary Agreement to which it is a party.  The execution and delivery by Holdco of this Agreement and each Ancillary Agreement to which it is a party, the performance by Holdco of its obligations hereunder and thereunder and the consummation by Holdco of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Holdco.  This Agreement has been, and upon their execution each Ancillary Agreement to which Holdco is a party shall have been, duly executed and delivered by Holdco, and (assuming due authorization, execution and delivery by Parent) this Agreement constitutes, and upon their execution each Ancillary Agreement to which Holdco is a party shall constitute, legal, valid and binding obligations of Holdco, enforceable against Holdco in accordance with their respective terms, subject to the Enforceability Exceptions.

SECTION 4.02 <u>No Conflict</u>.  Assuming the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in <u>Section 4.03</u>,

34

the execution, delivery and performance by Holdco of this Agreement and the Ancillary Agreements to which it is a party do not and will not (a) violate or result in the breach of any provision of its organizational documents, (b) violate any Law or Governmental Order applicable to Holdco or its respective assets, properties or businesses or (c) result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, permit, franchise or other instrument or arrangement to which Holdco is a party, except, in the case of clauses (b) and (c), as would not materially and adversely affect the ability of Holdco to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is a party.

SECTION 4.03 <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance by Holdco of this Agreement and each Ancillary Agreement to which Holdco is a party do not and will not require any consent, approval, authorization or other order of, action by, filing with, or notification to, any Governmental Authority, except (a) as described in <u>Section 4.03</u> of the Disclosure Schedule, or (b) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by Holdco of the transactions contemplated by this Agreement and each Ancillary Agreement to which Holdco is a party.

SECTION 4.04 <u>Investment Purpose</u>.  Holdco is acquiring the Shares solely for the purpose of investment and not with a view to, or for offer or sale in connection with, any distribution thereof other than in compliance with all applicable Laws, including United States federal securities laws.  Holdco agrees that the Shares may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and any applicable state or foreign securities Laws, except pursuant to an exemption from such registration under the Securities Act and such Laws.  Holdco is able to bear the economic risk of holding the Shares for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

SECTION 4.05 <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Holdco.

# ARTICLE V

# ADDITIONAL AGREEMENTS

SECTION 5.01 <u>Third Party Consents</u>.

(a)    Holdco and Parent shall use commercially reasonable efforts to obtain the consents, approvals and authorizations set forth on <u>Schedule 5.01</u>; <u>provided</u> that no Party or Acquired Company shall be required to compensate any third party, commence or participate in

litigation or offer or grant any accommodation (financial or otherwise) to any third party to obtain any such consent or approval; provided, further, (i) that the obtaining of any such consents shall not be deemed to be conditions to the obligations of the Parties to consummate the transactions contemplated hereby and (ii) in no event shall any Party or Acquired Company be obligated to pay any remuneration or commit to pay any remuneration to any Person to which a Party or Acquired Company is not contractually obligated to pay pursuant to a separate contractual obligation with such Person in connection therewith.

(b)      Notwithstanding anything to the contrary in this Agreement, if any Transferred Asset or Assumed Liability is not able to be transferred to Holdco or, following the transactions contemplated by Section 5.02, the IP Purchaser, as applicable, except with the consent of any third party and such consent has not been obtained by the Closing Date, (i) the transfer of such Transferred Asset or Assumed Liability shall not be effective as of the Closing Date, but rather such Transferred Asset or Assumed Liability shall be transferred to Holdco or, following the transactions contemplated by Section 5.02, the IP Purchaser, as applicable, only upon such time as such consent has been obtained, (ii) each Party shall, and shall cause its Affiliates to, use reasonable best efforts and cooperate with the other Party to obtain such consent as soon as practicable after the Closing Date, and (iii) to the extent permitted under any relevant underlying Contract, Parent shall deliver or remit to Holdco or, following the transactions contemplated by Section 5.02, the IP Purchaser, as applicable, all economic benefit of such Transferred Asset or Assumed Liability and Holdco shall perform the obligations relating to such Transferred Asset or Assumed Liability until such time as such Transferred Asset or Assumed Liability may be assigned to Holdco or, following the transactions contemplated by Section 5.02, the IP Purchaser, as applicable, pursuant to the foregoing clause (i).

SECTION 5.02 IP Transfer.

(a)      Immediately following the Closing and prior to the Subsequent Transfer, Holdco shall, and Parent shall cause Holdco to, assign, transfer, convey and deliver to Afiniti AI Limited, an Irish private limited company (the "IP Purchaser"), and Holdco shall cause the IP Purchaser to acquire from Holdco, all of Holdco's right, title and interest in and to the following assets (the "Transferred IP Assets"):

(i)      all rights of Holdco under the Transferred IP Agreements and under the Assigned Contracts listed or described on Part 2 of Schedule 2.02(a)(vii) under the heading "Other Transferred Agreements";

(ii)      all of Holdco's right, title and interest in and to the Transferred Intellectual Property (but excluding Intent-to-Use Trademark Applications), if any; and

(iii)      all accounts receivable and other claims for money or other obligations (including such receivables and claims owed by an Acquired Company) due to Holdco related to the Transferred Intellectual Property, all IP Proceeds relating to such Transferred Intellectual Property and the Transferred IP Agreements.

(b)     Immediately following the Closing, the IP Purchaser shall, and Holdco and Parent shall cause the IP Purchaser to, assume, and thereafter pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto (collectively, the "Assumed IP Liabilities"):

(i)     all Liabilities arising from or in respect of any Transferred Intellectual Property and all IP Proceeds relating to such Transferred Intellectual Property, arising after the Closing; and

(ii)     all Liabilities of Holdco arising under the Transferred IP Agreements and under the Assigned Contracts listed or described on Part 2 of Schedule 2.02(a)(vii) under the heading "Other Transferred Agreements" assumed by the IP Purchaser.

(c)     To effect the foregoing transactions, Holdco and the IP Purchaser shall execute and deliver duly executed counterparts to the IP Assignment Agreement to be entered into between the IP Purchaser and Holdco substantially in the form of Exhibit C-2, the Assignment and Assumption Agreement to be entered into between the IP Purchaser and Holdco substantially in the form of Exhibit A-2 and the Bill of Sale to be entered into between the IP Purchaser and Holdco substantially in the form of Exhibit B-2, effecting the assignment and assumption by the IP Purchaser of the Transferred IP Agreements and the Assigned Contracts listed or described on Part 2 of Schedule 2.02(a)(vii) under the heading "Other Transferred Agreements" and the Assumed IP Liabilities.

(d)     In consideration for Holdco transferring, conveying and delivering the Transferred IP Assets to IP Purchaser, the IP Purchaser shall issue to Holdco a promissory note (the "Loan Note Instrument"), substantially in the form of Exhibit D in the amount set forth therein.

(e)     As part of the consideration for the Loan Note Instrument, upon the filing and acceptance of a "statement of use" or an "amendment to allege us" with respect to any Intent-to-Use Trademark Application, Holdco shall assign such Trademark application and the underlying Trademark to IP Purchaser, and IP Purchaser shall assume all Liabilities arising therefrom or in respect thereof arising after the Closing. To effect the foregoing, Parent, Holdco and IP Purchaser shall comply with the obligations set forth in this Section 5.02 with respect to such Trademark (as if such Trademark were Transferred Intellectual Property).

(f)     Parent and Holdco shall, and Holdco shall cause the IP Purchaser to, cooperate in good faith in making any necessary filings with Governmental Authorities to effectuate and reflect the transfer of the Transferred Intellectual Property and all IP Proceeds relating to such Transferred Intellectual Property from Parent to Holdco contemplated by Section 2.02(a)(ix) and the transfer of the Transferred Intellectual Property and all IP Proceeds relating to such Transferred Intellectual Property from Holdco to the IP Purchaser contemplated by Section 5.02(a)(ii).

SECTION 5.03 <u>Bulk Transfer Laws</u>.  Holdco hereby waives compliance by Parent with any applicable bulk sale or bulk transfer laws of any jurisdiction in connection with the sale and transfer of the Transferred Assets to Holdco.

SECTION 5.04 <u>Business Assets and Liabilities</u>.

(a)     If, after the Closing Date, Parent receives any funds that are the property of Holdco or its Affiliates, Parent shall remit any such funds promptly to Holdco or such Affiliate.  If, after the Closing Date, Holdco or its Affiliates receive any funds that are the property of Parent, Holdco shall, or shall cause the applicable Affiliate to, remit any such funds promptly to Parent.

(b)     If, after the Closing Date, Parent or Holdco identifies any Transferred Asset that was not previously assigned or otherwise transferred by Parent to Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, then Parent shall promptly assign and transfer the applicable Transferred Asset to Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, for no additional consideration, subject to the terms and conditions of this Agreement.

(c)     If, after the Closing Date, Parent or Holdco identifies any Excluded Asset that was transferred to Holdco on or after the Closing Date, Holdco shall promptly assign and transfer such Excluded Asset to Parent for no consideration.

SECTION 5.05 <u>No Successor Liability</u>. Holdco shall not be deemed, as a result of any action taken in connection with the transfer or disposition of any assets transferred pursuant hereto, to: (1) be a successor (or other similarly situated party) to Parent, other than with respect to the Assumed Liabilities and any obligations arising under the Assigned Contracts from and after the Closing Date as expressly set forth in this Agreement; or (2) have, de facto or otherwise, merged with or into Parent.   Holdco is not acquiring or assuming any liability, warranty or other obligations of Parent, except as expressly set forth herein.

SECTION 5.06 <u>Attorney-Client Privilege</u>.  Parent intends to transfer, and shall not assert, any Pre-Closing Privileges after the Closing, it being the intention of the parties hereto that all rights to such Pre-Closing Privileges, and all rights to waive or otherwise control such Pre-Closing Privileges, shall be transferred to Holdco, and shall not remain with or be used by Parent. Notwithstanding the foregoing, in the event that a dispute arises between Parent on the one hand and a third party other than Holdco on the other, Parent shall assert the Pre-Closing Privileges on behalf of Holdco to prevent disclosure of the Privileged Materials to such third party; provided, however, that such privilege may be waived only with the prior written consent of Holdco.

SECTION 5.07 <u>IT Assets; Data Centers</u>. Following the date hereof, Parent shall not terminate the lease agreements set forth on <u>Section 5.07</u> of the Disclosure Schedule[8] without the prior written consent of Holdco (such consent not to be unreasonably withheld, conditioned or delayed), in order to allow for the timely removal of certain Transferred Assets from such locations.

SECTION 5.08 <u>Survival</u>.  None of the representations or warranties set forth in this Agreement or any Ancillary Agreement hereto shall survive the Closing.  No Party or any of its respective Affiliates shall have any Liability with respect to any representation or warranty from and after the time that such representation or warranty ceases to survive hereunder (<u>provided</u> that the foregoing shall not limit any for claim of fraud).

## ARTICLE VI

## EMPLOYEE MATTERS

SECTION 6.01 <u>Transferred Employees</u>.  In the case of an individual who is a current Business Employee as of immediately prior to Closing and is not then employed by an Acquired Company (each, a "<u>Transferred Employee</u>"), prior to the Closing Date, Holdco or Parent shall cause the transfer of the employment of such Business Employees to Holdco or an Acquired Company, or as otherwise agreed between the Parties, effective immediately prior to the Closing; <u>provided</u> that Holdco shall not assume any Liabilities with respect to the employment of such Transferred Employees by Parent prior to the Closing (including any Liabilities in respect of transaction bonus and retention bonus agreements), and shall not be required to assume any Contract between Parent and any Transferred Employee.

SECTION 6.02 <u>Notices</u>.  Parent and Holdco and their respective Affiliates shall cooperate in good faith to determine whether any information, consultation and notification may be required under any worker notification Laws applicable to any Business Employees or employee representative bodies (if any) arising in connection with the transactions contemplated by this Agreement and shall honor their respective obligations resulting therefrom.  Parent shall retain or assume all obligations and Liabilities for the provision of notice or payment in lieu of notice or any applicable penalties with respect to Business Employees who were employed by Parent under such worker notification Laws arising as a result of actions taken by Parent on or prior to the Closing.

SECTION 6.03 <u>No Third Party Beneficiaries</u>.  Nothing expressed or implied in this Agreement confers upon any of the Business Employees or any other Person any additional rights or remedies, including any additional right to employment, or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement. Notwithstanding anything herein to the contrary, no provision of this Agreement is intended to, or does, constitute the establishment or adoption of, or amendment to, any Benefit Plan of Parent, an Acquired Company or Holdco, and no person participating in any such Benefit Plan maintained by Parent, an Acquired Company or Holdco shall have any claim or cause of action,

---

[8]     **Note to Draft**: To include the data center lease and office lease in Bermuda.

under ERISA or otherwise, in respect of any provision of this Agreement as it relates to any such Benefit Plan or otherwise.

## ARTICLE VII

## TAX MATTERS

SECTION 7.01 <u>Conveyance Taxes</u>.  Parent shall be liable for, shall hold Holdco and the Acquired Companies harmless against, and agrees to pay any and all Conveyance Taxes, including value added Taxes, that may be imposed upon, or payable or collectible or incurred in connection with this Agreement and the transactions contemplated hereby.  Holdco and Parent agree to cooperate in the execution and delivery of all instruments and certificates necessary to enable Holdco to comply with any pre-Closing filing requirements, including value added Tax invoices.

SECTION 7.02 <u>Miscellaneous</u>.

(a)     For purposes of this <u>Article VII</u>, all references to Holdco, Parent, Affiliates and the Acquired Companies shall include successors.

(b)     Notwithstanding any provision in this Agreement to the contrary, the covenants and agreements of the Parties contained in this <u>Article VII</u> shall survive the Closing and shall remain in full force until the earlier to occur of (i) the expiration of the applicable statutes of limitations for the Taxes in question (taking into account any extensions or waivers thereof) and (ii) the completion of the liquidation of Parent.

For U.S. federal, and applicable state and local, income tax purposes, the transactions contemplated by this Agreement, taken together with the contemplated transfer of the issued and outstanding shares of capital stock or other equity interests in Holdco to Afiniti Newco Holdings LLC ("<u>Newco</u>"), which is an Affiliate of VCP Capital Markets LLC, after the Closing on the Closing Date (the "<u>Subsequent Transfer</u>"), shall be treated as a purchase and sale of the Shares and the Transferred Assets described in Section 1001 of the Code, except as otherwise required by applicable Law.

## ARTICLE VIII

## GENERAL PROVISIONS

SECTION 8.01 <u>Expenses</u>.  Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

SECTION 8.02 <u>Notices</u>.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return

receipt requested), or by email (upon confirmation of receipt) to the respective Parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 8.02</u>):

    (a)    if to Parent:

Afiniti, Ltd. (in provisional liquidation)
1701 Pennsylvania Ave. NW, Suite 600
Washington, DC 20006
Attention:   Sam Logan (sam.logan@afiniti.com)
            legal@afiniti.com

and

Afiniti, Ltd. (in provisional liquidation)
Teneo (Bermuda) Ltd.
19 Par-la-Ville Road,
Third Floor, Hamilton,
HM 11, Bermuda
Attention:  Mike Morrison (mike.morrison@teneo.com)
            Charles Thresh (charles.thresh@teneo.com)

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:   George Davis (george.davis@lw.com)
            David Hammerman (david.hammerman@lw.com)
            Meghana Vunnamadala (meghana.vunnamadala@lw.com)

and

Latham & Watkins LLP
330 North Wabash, Suite 2800
Chicago, IL 60611
Attention:  Jason Gott (jason.gott@lw.com)
            Jonathan Gordon (jonathan.gordon@lw.com)

    (b)    if to Holdco:

Afiniti AI Holdings LLC
c/o Afiniti, Ltd.
1701 Pennsylvania Ave. NW, Suite 600
Washington, DC 20006
Attention:   Sam Logan (sam.logan@afiniti.com)
            legal@afiniti.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:   George Davis (george.davis@lw.com)
                    David Hammerman (david.hammerman@lw.com)
                    Meghana Vunnamadala (meghana.vunnamadala@lw.com)

and

Latham & Watkins LLP
330 North Wabash, Suite 2800
Chicago, IL 60611
Attention:  Jason Gott (jason.gott@lw.com)
                    Jonathan Gordon (jonathan.gordon@lw.com)

(c)        and in each case a copy (which shall not constitute notice) shall be sent to:

Afiniti Newco Holdings LLC
c/o VCP CAPITAL MARKETS, LLC
Four Embarcadero Center, 20th Floor
San Francisco, CA 94111
Attention:   David Flannery (dflannery@vistacreditpartners.com)

and

Allen Overy Shearman Sterling US LLP
599 Lexington Avenue
New York, NY  10022
Attention:  Mark Shapiro (Mark.Shapiro@AOShearman.com)
                    Michael Dorf (MDorf@AOShearman.com)
                    Frank Oliver (Frank.Oliver@AOShearman.com)


SECTION 8.03 Public Announcements.  Neither Party shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated by this Agreement or otherwise communicate with any news media without the prior written consent of the other Party unless otherwise required by Law or applicable stock exchange regulation, and, to the extent practicable, the Parties shall cooperate as to the timing and contents of any such press release, public announcement or communication; provided, however, that the prior written consent of the other Party shall not be required hereunder with respect to any press release, public announcement or communication that is substantially similar to a press release, public announcement or communication previously issued with the prior written consent of such other Party.

SECTION 8.04 <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

SECTION 8.05 <u>Entire Agreement</u>.  This Agreement and the Ancillary Agreements constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, between Parent and Holdco with respect to the subject matter hereof and thereof.

SECTION 8.06 <u>Assignment</u>.  This Agreement may not be assigned by operation of law or otherwise without the express written consent of Parent and Holdco (which consent may be granted or withheld in the sole discretion of Parent or Holdco), as the case may be.

SECTION 8.07 <u>Amendment</u>.  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, Parent and Holdco or (b) by a waiver in accordance with <u>Section 8.08</u>.

SECTION 8.08 <u>Waiver</u>.  Either Party may (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered or made available by the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of either Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

SECTION 8.09 <u>No Third Party Beneficiaries</u>.  Save in respect of the limitation of the liability of the Provisional Liquidators under <u>Section 8.15</u>, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

SECTION 8.10 <u>Currency</u>.  Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

SECTION 8.11 <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  All Actions arising out of or

relating to this Agreement shall be heard and determined exclusively in any New York federal court sitting in the Borough of Manhattan of The City of New York; provided, however, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of The City of New York.  Consistent with the preceding sentence, each of the Parties hereby (a) submits to the exclusive jurisdiction of any federal or state court sitting in the Borough of Manhattan of The City of New York for the purpose of any Action arising out of or relating to this Agreement brought by either Party; (b) agrees that service of process will be validly effected by sending notice in accordance with Section 8.02; and (c) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above named courts.

SECTION 8.12 Waiver of Jury Trial.  EACH OF THE PARTIES HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH OF THE PARTIES HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.12.

SECTION 8.13 Specific Performance.  The Parties acknowledge and agree that the Parties will be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached and that any non-performance or breach of this Agreement by any Party could not be adequately compensated by monetary damages alone and that the Parties would not have any adequate remedy at law.  Accordingly, in addition to any other right or remedy to which any Party may be entitled, at law or in equity (including monetary damages), such Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to seek temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement without posting any bond or other undertaking.  Without limiting the generality of the foregoing, the Parties agree that Parent shall be entitled to enforce specifically Holdco's obligation to consummate the transactions contemplated by this Agreement (including the obligation to consummate the Closing).  The Parties agree that they will not contest the appropriateness of specific performance as a remedy.

SECTION 8.14 Counterparts.  This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in

"pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

SECTION 8.15 <u>Liability of Provisional Liquidators</u>.

(a)     The Provisional Liquidators were appointed by the Bermuda Court to manage Parent's affairs, business, and properties as agents and without personal liability. Additionally, neither the Provisional Liquidators, nor any agent, advisor, representative, Affiliate, employee, partner, servant, trustee, attorney, or other person acting on behalf of, or otherwise related to or affiliated with the Provisional Liquidators shall have any personal liability (save in respect of fraud or dishonesty) directly or indirectly, under or in connection with: (i) this Agreement or the Ancillary Agreements or by virtue of, this Agreement or the Ancillary Agreements or any agreement made or entered into under or pursuant to the provisions of this Agreement; (ii) in relation to any related matter or claim howsoever, whenever, and wherever arising, and whether such claim be formulated in contract, restitution, tort or by reference to any other remedy or right, and in whatever jurisdiction or forum; (iii) by reason of their acting in the capacity as agents of Parent; (iv) whether or not acting as agents of Parent, by reason of their acting in the name and on behalf of Parent; (v) in respect of any transfer or assignment made pursuant to this Agreement; or (vi) any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

(b)     The Provisional Liquidators have entered into this Agreement in their personal capacities solely for the purpose of obtaining the benefit of the provisions in their favor.

(c)     Neither the Provisional Liquidators nor their firm, staff, agents or employees shall be liable in respect of any deed or document executed with a view to, or for the purpose of putting this Agreement into effect, whether or not such deed or document so provides in its terms and the Provisional Liquidators shall be entitled at any time to have any such deeds or documents amended at any time to include an exclusion of personal liability on the terms as set out in <u>Section 8.15(a)</u>.

(d)     Any instrument or deed of transfer in respect of the transfer of the Shares and the Transferred Assets provided by Parent to Holdco shall contain no new liabilities on the part of Holdco and shall include a complete exclusion of personal liability on the part of the Provisional Liquidators.

(e)     The Provisional Liquidators' obligations under this Agreement shall absolutely cease upon termination of their appointment or vacation of their office as provisional liquidators of Parent.

SECTION 8.16 <u>Acknowledgments, Exclusions, Limitations and Agreements</u>. It is agreed that, other than in the case of fraud or dishonesty, the acknowledgements, exclusions, limitations and agreements which are set out in <u>Schedule 8.16</u> to this Agreement shall take effect as if set out in full in this clause and take effect in favor of the Provisional Liquidators, and subject to <u>Section 8.15(e)</u>, shall remain in full force and effect after Closing.

*[Remainder of Page Intentionally Left Blank.]*

IN WITNESS WHEREOF, Parent, the Provisional Liquidators, acting as agents without personal liability, and Holdco have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

PARENT:

AFINITI, LTD., a Bermuda exempted company in provisional liquidation acting by its joint provisional liquidators Mike Morrison and Charles Thresh of Teneo (Bermuda) Ltd.

By: _____

    Name:

    Title:

PROVISIONAL LIQUIDATORS by [●], one of the joint Provisional Liquidators, signing without personal liability

By: _____

    Name:

    Title:

HOLDCO:

AFINITI AI HOLDINGS LLC

By: _____

    Name:

    Title:

Exhibit A-1

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT (HOLDCO)

<u>Exhibit A-2</u>

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT (IP PURCHASER)

Exhibit B-1

FORM OF BILL OF SALE (HOLDCO)

Exhibit B-2

FORM OF BILL OF SALE (IP PURCHASER)

Exhibit C-1

FORM OF IP ASSIGNMENT AGREEMENT (HOLDCO)

Exhibit C-2

FORM OF IP ASSIGNMENT AGREEMENT (IP PURCHASER)

Exhibit D

FORM OF LOAN NOTE INSTRUMENT

**Schedule 8.16**

**Acknowledgements, Exclusions, Limitations and Agreements as regards to the Provisional Liquidator**

1.      Holdco agrees that the terms and conditions of this Agreement and the exclusions and limitations contained in it are fair and reasonable having regard to the following:

   a.   that this is a sale by a company in provisional liquidation in circumstances where the Provisional Liquidators' knowledge of the Shares and Transferred Assets is necessarily limited and it is usual that no representations and warranties are given by or on behalf of the Provisional Liquidators in their capacities as provisional liquidators (other than that the Provisional Liquidators warrant that they have the power to sell the Shares and Transferred Assets for and on behalf of Parent);

   b.   Parent is in provisional liquidation and faces the constraints of selling necessarily imposed on it in that circumstance;

   c.   that it has relied solely on the basis of the representations, warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in <u>Section 8.15</u>) and on the opinions of itself and its professional advisers concerning the Shares and Transferred Assets and their quality, condition, description, fitness and/or suitability for any purpose;

   d.   that it has agreed to purchase the Shares and Transferred Assets for a consideration which takes into account the risk to Holdco represented by the Parties' belief that the said exclusions and limitations are or would be recognized by the courts; and

   e.   that it and its representatives and advisers have been given every opportunity to examine and inspect all relevant documents relating to the Shares and Transferred Assets and is aware of the need to rely on such opportunity by reason of the absence of warranties by or on behalf of the Provisional Liquidators in their capacities as provisional liquidators (other than that the Provisional Liquidators warrant that they have the power to sell the Shares and Transferred Assets for and on behalf of Parent).

2.      Holdco acknowledges that it has entered into this Agreement solely on the basis of the representations, warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in <u>Section 8.15</u>), and it has not entered into this Agreement on the basis of or in reliance upon any representations, agreements, statements, warranties or replies to specific enquiries (whether oral or written) made or given or alleged to have been made or given by the Provisional Liquidators in their capacities as provisional liquidators or their representatives (whether that party is a Party to this Agreement or not, other than Parent) at any time (other than that the Provisional Liquidators warrant that

they have the power to sell the Shares and Transferred Assets for and on behalf of Parent).

3.      Notwithstanding any other provision of this Agreement, the Provisional Liquidators shall be required to reimburse Holdco for any liability discharged by Holdco where that liability constitutes a provable debt in Parent's provisional liquidation. Nothing in this Agreement shall require the Provisional Liquidators to discharge a liability as a Provisional Liquidation Expense that would otherwise be an unsecured claim in Parent's provisional liquidation. Any claim of Holdco, or of any Person claiming through Holdco, against the assets of Parent shall not take effect otherwise than as an unsecured claim, nor shall any claim against the Provisional Liquidators be considered a Provisional Liquidation Expense.

4.      The exclusions in this Schedule shall:

   a.  not limit the covenants and agreements of Parent in this Agreement, including the representations and warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in <u>Section 8.15</u>);

   b.  operate as waivers of any claims against the Provisional Liquidators in tort and restitution as well as under the law of contract or under applicable legislation or regulations;

   c.  continue notwithstanding completion of this Agreement in whole or in part;

   d.  continue notwithstanding the Provisional Liquidators ceasing to act as provisional liquidators of Parent; and

   e.  be in addition to any relief available to the Provisional Liquidators.

5.      Nothing in this Agreement shall:

   a.  operate to restrict or affect in any way any right of the Provisional Liquidators to cease to act as provisional liquidators of Parent; or

   b.  require the Provisional Liquidators to discharge in whole or in part any liability of Parent outstanding at the time of the Provisional Liquidators' appointment as provisional liquidators of Parent or which would not otherwise be payable as a Provisional Liquidation Expense.

6.      Holdco hereby agrees and accepts that:

   a.  any claim surviving after the Closing Date against any JPL Party, or any of them or their firms or their partners, employees, agents, advisers or representatives shall, in any event and in addition to the above exclusions of liability of the Provisional Liquidators, be irrevocably waived unless made in writing by notice to Parent or the JPL Party, as appropriate, not later than the date on which the

Provisional Liquidators cease to hold office as provisional liquidators of Parent; and

b.   without prejudice to all and any other provision of this Agreement, any claim of it, or of any Person claiming through, under or in relation to it, shall not in any circumstances exceed the consideration payable hereunder.

**<u>Exhibit E</u>**

**STA**

*Agreed Form*

---------------------------

# SECURITIES TRANSFER AGREEMENT[1]

---------------------------

Between

AFINITI, LTD. (in provisional liquidation)

and

the JOINT PROVISIONAL LIQUIDATORS

and

AFINITI NEWCO HOLDINGS LLC

Dated as of [●], 2024

---

[1] THIS DOCUMENT IS FOR DISCUSSION PURPOSES ONLY AND SHALL NOT CREATE A LEGALLY BINDING OR ENFORCEABLE OFFER OR AGREEMENT UNLESS AND UNTIL FULLY EXECUTED.

## <u>TABLE OF CONTENTS</u>

**Page**

### ARTICLE I

### DEFINITIONS

SECTION 1.01 Certain Defined Terms.................................................................2
SECTION 1.02 Definitions....................................................................................9
SECTION 1.03 Interpretation and Rules of Construction ..................................10

### ARTICLE II

### PURCHASE AND SALE

SECTION 2.01 Transfer and Acquisition of the Securities and Insurance Policies;
      Assignment of Intercompany Receivables .......................................11
SECTION 2.02 Consideration .............................................................................11
SECTION 2.03 Closing .......................................................................................11
SECTION 2.04 Closing Deliveries by Parent.....................................................12
SECTION 2.05 Closing Deliveries by Newco ....................................................12

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF PARENT

SECTION 3.01 Organization, Authority and Qualification of Parent..................13
SECTION 3.02 Ownership of the Securities .......................................................14
SECTION 3.03 Organization, Authority and Qualification of the Acquired Companies ...........14
SECTION 3.04 Capitalization of Transferred Companies; Acquired Subsidiaries......................14
SECTION 3.05 No Conflict..................................................................................15
SECTION 3.06 Governmental Consents and Approvals.....................................15
SECTION 3.07 Financial Information..................................................................15
SECTION 3.08 Absence of Undisclosed Material Liabilities .............................16
SECTION 3.09 Conduct in the Ordinary Course ...............................................16
SECTION 3.10 Litigation....................................................................................17
SECTION 3.11 Compliance with Laws; Permits ...............................................17
SECTION 3.12 Environmental Matters...............................................................17
SECTION 3.13 Intellectual Property; Information Technology..........................18
SECTION 3.14 Data Privacy...............................................................................20
SECTION 3.15 Real Property..............................................................................21
SECTION 3.16 Assets; Sufficiency....................................................................21
SECTION 3.17 Employee Benefit Plans .............................................................22
SECTION 3.18 Labor and Employment Matters ................................................24
SECTION 3.19 Taxes ..........................................................................................24
SECTION 3.20 Material Contracts......................................................................25

SECTION 3.21 Intercompany Receivables ........................................................................26
SECTION 3.22 Brokers .....................................................................................................27
SECTION 3.23 Disclaimer of Parent.................................................................................27

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF NEWCO

SECTION 4.01 Organization and Authority of Newco.......................................................27
SECTION 4.02 No Conflict................................................................................................28
SECTION 4.03 Governmental Consents and Approvals....................................................28
SECTION 4.04 Investment Purpose ..................................................................................28
SECTION 4.05 Brokers .....................................................................................................29
SECTION 4.06 Independent Investigation; Parent's Representations ..............................29

ARTICLE V

ADDITIONAL AGREEMENTS

SECTION 5.01 Third Party Consents................................................................................29
SECTION 5.02 Wrong Pockets .........................................................................................29
SECTION 5.03 Restrictive Covenants ..............................................................................29
SECTION 5.04 Release from Parent Credit Support Instruments.....................................30
SECTION 5.05 "Afiniti" Name.........................................................................................30
SECTION 5.06 No Successor Liability .............................................................................31
SECTION 5.07 Survival ....................................................................................................31

ARTICLE VI

EMPLOYEE MATTERS

SECTION 6.01 Notices .....................................................................................................31
SECTION 6.02 No Third Party Beneficiaries ..................................................................31

ARTICLE VII

TAX MATTERS

SECTION 7.01 Conveyance Taxes ...................................................................................31
SECTION 7.02 Miscellaneous..........................................................................................32

ARTICLE VIII

GENERAL PROVISIONS

SECTION 8.01 Expenses...................................................................................................32
SECTION 8.02 Notices .....................................................................................................32
SECTION 8.03 Public Announcements ............................................................................33

SECTION 8.04 Severability ...................................................................................................34
SECTION 8.05 Entire Agreement ..........................................................................................34
SECTION 8.06 Assignment....................................................................................................34
SECTION 8.07 Amendment....................................................................................................34
SECTION 8.08 Waiver............................................................................................................34
SECTION 8.09 No Third Party Beneficiaries ........................................................................34
SECTION 8.10 Currency.........................................................................................................35
SECTION 8.11 Governing Law ..............................................................................................35
SECTION 8.12 Waiver of Jury Trial.......................................................................................35
SECTION 8.13 Specific Performance .....................................................................................35
SECTION 8.14 Counterparts ...................................................................................................36
SECTION 8.15 Liability of Provisional Liquidators...............................................................36
SECTION 8.16 Acknowledgments, Exclusions, Limitations and Agreements............................36

EXHIBITS

A                Assumption Agreement

B                Release of Guarantor

C                Bermuda Deed of Release

D                Release of Claims Agreement


SCHEDULES

1.01            Parent's Knowledge

5.01            Third Party Consents

8.16            Limitation of Provisional Liquidator Liability

THIS SECURITIES TRANSFER AGREEMENT (this "Agreement"), dated as of [●], 2024, is made by and between

(1) Afiniti, Ltd., a Bermuda exempted company in provisional liquidation acting by its joint provisional liquidators, whose registered office is 19 Par-la-Ville Road, Third Floor, Hamilton, HM 11, Bermuda ("Parent"),

(2) Mike Morrison and Charles Thresh of Teneo (Bermuda) Ltd. (and including any successors appointed by the Bermuda Court, the "Provisional Liquidators"), acting jointly and severally, and

(3) Afiniti Newco Holdings LLC, a Delaware limited liability company ("Newco"). Parent and Newco are referred to herein as the "Parties".

WHEREAS, Parent owns (i) all of the issued and outstanding shares of capital stock (the "Company Shares") of Afiniti, Inc., a Delaware corporation and a wholly owned subsidiary of Parent (the "Company"), and (ii) all of the issued and outstanding membership interests (the "Holdco Interests" and, together with the Company Shares and the intercompany receivable owed to Parent by the Company, if any, the "Securities") of Afiniti AI Holdings LLC, a Cayman Islands limited liability company and a wholly owned subsidiary of Parent ("Holdco");

WHEREAS, Parent is a holding company that owns, directly and indirectly, the Acquired Companies (as hereinafter defined);

WHEREAS, Parent, through the Acquired Companies, is engaged in the business of developing and providing proprietary enterprise behavioral pairing services that pair contact center customers and agents using data analytics and artificial intelligence to determine the optimal behavioral fits between callers and agents in order to drive business outcomes, and related infrastructure and professional services (the "Business");

WHEREAS, by an Order made by the Supreme Court of Bermuda on September [●] 2024, Parent is in provisional liquidation (the "Provisional Liquidation") under the supervision of the Supreme Court of Bermuda (the "Bermuda Court");

WHEREAS, Parent has completed the transfer of substantially all of its assets and all of the issued and outstanding capital stock or other equity interests of all of its non-U.S. direct subsidiaries (other than the shares of Parent's subsidiaries organized under the laws of Bermuda) to Holdco, pursuant to the Stock and Asset Transfer Agreement (as hereinafter defined) (the "Asset Transfer");

WHEREAS, as of immediately prior to the Closing the sole member of Newco is Vista Credit GP Holdco, LLC, an Affiliate of and acting on behalf of VCP Capital Markets, LLC (the "Agent"), the administrative agent and collateral agent under the Credit Agreement (as hereinafter defined);

WHEREAS, upon an application made by the Provisional Liquidators on October [●] 2024, the Bermuda Court has approved and sanctioned *inter alia* Parent's entry into this Agreement; and

WHEREAS, Parent wishes to transfer to Newco, and Newco wishes to acquire from Parent, the Securities, all upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Parent and Newco hereby agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01 <u>Certain Defined Terms</u>.  For purposes of this Agreement:

"<u>Action</u>" means any action, suit, arbitration, litigation, formal investigation or proceeding before or by any Governmental Authority.

"<u>Acquired Companies</u>" means the Transferred Companies and the Acquired Subsidiaries.

"<u>Acquired Subsidiary</u>" means a Subsidiary of a Transferred Company.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"<u>Ancillary Agreements</u>" means the Assumption Agreement, the Release of Guarantor, the Bermuda Deed of Release and the Release of Claims Agreement.

"<u>Assumption Agreement</u>" means the Assumption Agreement to be executed by Newco and Parent at the Closing, substantially in the form of <u>Exhibit A</u>.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Benefit Plan</u>" means any "employee benefit plan" (as defined in Section 3(3) of ERISA), whether written or unwritten and whether or not subject to ERISA, all bonus, stock option, stock purchase, restricted stock, restricted stock unit, phantom stock, stock appreciation right, incentive, deferred compensation, performance award, retiree medical or life insurance, supplemental retirement, severance or other material benefit plans, programs or arrangements, and all employment, termination, severance, change of control, retention or other contracts or agreements with or for the benefit of any current or former employee or independent contractor or any dependent or beneficiary thereof.

"Bermuda Debenture" means the Bermuda law debenture, dated as of June 13, 2019, by Parent and the Agent, in favor of the Agent in its capacity as administrative agent under the Credit Agreement, as the same may be modified, amended, or supplemented from time to time.

"Bermuda Deed of Release" means the Deed of Release to be executed by Parent and the Agent at the Closing, substantially in the form of Exhibit C.

"Bermuda Proceeding" has the meaning set forth in the Restructuring Support Agreement.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York.

"Business Employee" means any current or former employee of an Acquired Company.

"Business Intellectual Property" means the Owned Intellectual Property and all Intellectual Property licensed to an Acquired Company pursuant to a Company IP Agreement.

"Business IT Assets" means all (a) IT Assets owned by any of the Acquired Companies and (b) IT Assets licensed to an Acquired Company.

"Chapter 15 Case" has the meaning set forth in the Restructuring Support Agreement.

"Code" means the Internal Revenue Code of 1986, as amended through the date hereof.

"Company IP Agreements" means all (a) Contracts that license or otherwise grant a permission to use Intellectual Property of an Acquired Company to any Person and (b) Contracts that license or otherwise grant a permission to use Intellectual Property of any Person to an Acquired Company.

"Company Plan" means a Benefit Plan sponsored or maintained by the Acquired Companies, or in the case of a Benefit Plan that is a Contract, to which an Acquired Company is a party.

"Contract" means any contract, agreement, license, sublicense, lease, sublease, commitment, or sales or purchase order.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Conveyance Taxes" means all sales, documentary, use, value added, transfer, stamp, stock transfer, registration, and real property transfer or gains and similar Taxes.

"Credit Agreement" means the existing term loan credit agreement, dated as of June 13, 2019 (as amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of July 11, 2019, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4, 2020, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of November 17, 2020, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of December 29, 2020, that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of March 9, 2021, that certain Amendment No. 6 to Term Loan Credit Agreement, dated as of March 12, 2021, that certain Amendment No. 7 to Term Loan Credit Agreement, dated as of May 17, 2021, that certain Amendment No. 8 to Term Loan Credit Agreement, dated as of March 7, 2022, that certain Amendment No. 9 to Term Loan Credit Agreement, dated as of June 13, 2024, that certain Amendment No. 10 to Term Loan Credit Agreement, dated as of July 29, 2024, that certain Amendment No. 11 to Term Loan Credit Agreement, dated as of August 14, 2024, that certain Amendment No. 12 to Term Loan Credit Agreement, dated as of September 12, 2024), among the Company, as borrower, Parent, as parent guarantor, the lenders from time to time party thereto, and the Agent, as amended by that certain Amendment No. 13 to Term Loan Credit Agreement, dated as of [●], 2024, among the Company, Afiniti Newco Holdings LLC, as restructuring second lien co-borrower, the other guarantor parties thereto, and the Agent, as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Disclosure Schedule" means the Disclosure Schedule attached hereto, dated as of the date hereof, delivered by Parent to Newco in connection with this Agreement.

"Encumbrance" means any security interest, pledge, hypothecation, charge, mortgage, lien, license or encumbrance.

"Enforceability Exceptions" means (a) any applicable bankruptcy, insolvency (including Laws relating to fraudulent transfers), reorganization, moratorium or other similar Laws affecting creditors' rights generally and (b) general principles of equity (regardless of whether considered in a proceeding at law or in equity).

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, consent decree or judgment, in each case in effect as of the date hereof, relating to pollution or protection of the environment.

"Environmental Permits" means any permit, approval, identification number, license and other authorization required under or issued pursuant to any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended through the date hereof.

"Excluded Bermuda Subsidiaries" means AFCF, Ltd., a Bermuda exempted company limited by shares, and Afiniti Holdco, Ltd., a Bermuda exempted company limited by shares.

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs.

"Governmental Authority" means any federal, national, state, local or other government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Guaranty" means the Guaranty, dated as of June 13, 2019, by Parent, the Company and the subsidiary guarantors party thereto in favor of the Agent, in its capacity as administrative agent under the Credit Agreement, as the same may be modified, amended, or supplemented from time to time.

"Indebtedness" means, as of any time, without duplication, as applied to any Person:  (a) the principal of and accrued and unpaid interest in respect of (i) indebtedness of such Person for money borrowed or indebtedness issued or incurred in substitution or exchange for indebtedness for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments the payment of which such Person is responsible or liable; (b) all obligations of such Person (i) under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities), (ii) under any interest rate, currency, commodity or other hedging, swap, forward or option agreement, (iii) under any performance bond, banker's acceptance or letter of credit, but only to the extent drawn or called prior to the Closing and (iv) for all capitalized lease obligations as determined in accordance with GAAP; (c) all obligations of the type referred to in clauses (a) and (b) of any Person the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (d) for clauses (a) through (c), any termination fees, prepayment penalties, change of control, "breakage" cost or similar payments (but excluding, for the avoidance of doubt, any cash collateral required in respect of any performance bond, banker's acceptance or letter of credit) associated with the repayments of the items set forth in clauses (a) through (c) on the Closing Date to the extent paid on the Closing Date.

"Insurance Policies" means all current and prior insurance policies of Parent that are identified in writing by Parent prior to the date of this Agreement, excluding current and prior director and officer insurance policies, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and all rights to receive refunds of premiums paid with respect thereto.

"Intellectual Property" means all intellectual property in any jurisdiction throughout the world, including the following: (a) patents and patent applications, (b) Trademarks; (c) copyrights, including copyrights in software; (d) registrations and applications for registration of any of the foregoing under subclauses (a) – (c) of this definition; (e) trade

secrets and rights in know how, formulae, methods, techniques, processes, and confidential and proprietary information; and (f) all rights in any of the foregoing provided by international conventions and treaties, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto, including all rights of priority and renewals, all claims for damages and injunctive or other relief for past, present and future infringement, dilution, misappropriation, unlawful imitation or other violation, misuse, conflict or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages or injunctive or other relief.

"Intercompany Agreements" means any Contract, or arrangement or commitment, including any credit or funding agreement, facility or other arrangement, receivable, payable, claim, demand, right, loan, in each case, between or among Parent, the Excluded Bermuda Subsidiaries or any Subsidiary of the Excluded Bermuda Subsidiaries on one hand and the Company or any Acquired Company, on the other hand, excluding the Stock and Asset Purchase Agreement.

"IP Proceeds" means, collectively, all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and any supporting obligations relating to any Intellectual Property.

"IRS" means the Internal Revenue Service of the United States.

"IT Assets" means Software, computers, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment, and all documentation associated with the foregoing.

"JPL Party" means the Provisional Liquidators, their present firms, directors, partners, and employees and any legal entity or partnership affiliated with the Provisional Liquidators using the name "Teneo", and the directors, partners, employees, shareholders and officers of any such entity or partnership.

"Law" means any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Leased Real Property" means the real property leased by the Acquired Companies as tenant, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon (and fixtures attached or appurtenant thereto), as the case may be, and all easements, licenses, rights and appurtenances relating to the foregoing.

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including those arising under any Law, Action or Governmental Order and those arising under any Contract.

"Material Adverse Effect" means any event, circumstance, change, effect, development or condition that, individually or considered together with all other events, circumstances, changes, effects, developments and conditions, has had or would reasonably be

expected to have a material adverse effect on (i) the business, results of operations, assets or financial condition of the Business, taken as a whole; (ii) the ability of the Parties to perform their obligations under this Agreement; or (iii) the ability of Parent to consummate the Restructuring, but, in each case, the commencement and existence of the Bermuda Proceeding or the Chapter 15 Case, and any event, circumstance, or condition directly in relation thereto (including the litigation and/or determination of any matters arising therein) shall not be deemed to constitute or be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect.

"Open Source Software" means all Software that is distributed as "free software," "open source software," "shareware" or under a similar licensing or distribution model, including Software licensed, provided, or distributed under any open source license, including any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Foundation (as promulgated by the Free Software Foundation) or any Software that contains or is derived from any such Software.

"ordinary course of business" or any similar expression means in the ordinary course of the applicable Person's business consistent with past practice, taking into account the fact that insolvency proceedings, or preparation therefor, have commenced.

"Owned Intellectual Property" means all Intellectual Property owned by an Acquired Company.

"Parent Credit Support Instruments" means any guaranty, any keepwell, bonding arrangements, net worth maintenance agreement, letter of credit, reimbursement obligation, letter of comfort or other instrument imposing any obligations on Parent with respect to the Acquired Companies or otherwise for the benefit of the Acquired Companies.

"Parent's Knowledge", "Knowledge of Parent" or similar terms used in this Agreement mean the actual knowledge of the Persons listed in Schedule 1.01 as of the date of this Agreement.

"Parent Plan" means a Benefit Plan sponsored or maintained by Parent, or in the case of a Benefit Plan that is a Contract, to which Parent is a party (other than Company Plan).

"Permitted Encumbrances" means "Permitted Encumbrances" and "Permitted Liens", in each case, as defined in the Credit Agreement.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Personal Data" means any information that identifies an individual Person, including, any information that is defined as "personal data", "personally identifiable information", "personal information", "protected health information" or "sensitive personal information" under any applicable Law.

"<u>Provisional Liquidation Expense</u>" means any amounts properly payable as an expense of the provisional liquidation of Parent.

"<u>Real Property</u>" means all land, buildings, improvements and fixtures erected thereon and all appurtenances related thereto.

"<u>Recognition Motion</u>" means the motion to be filed with the Bankruptcy Court in the Chapter 15 Case seeking (i) recognition of the Bermuda Proceeding and the Restructuring and (ii) recognition of the Sanction Order and enforcement of its terms.

"<u>Recognition Order</u>" means an order approving the Recognition Motion.

"<u>Registered</u>" means issued by, registered or filed with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"<u>Regulations</u>" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

"<u>Related to the Business</u>" means used or held for use by Parent in, or related to, or arising from, the Business.

"<u>Release of Claims Agreement</u>" means the Release of Claims Agreement to be executed by Parent, the Lenders, the Company, the guarantors party to the Credit Agreement, and the Agent at the Closing, substantially in the form of <u>Exhibit D</u>.

"<u>Release of Guarantor</u>" means the Release of Guarantor to be executed by Parent and the Agent at the Closing, substantially in the form of <u>Exhibit B</u>.

"<u>Restructuring</u>" means a restructuring transaction as set forth in the non-binding term sheet attached to the Restructuring Support Agreement, executed on September 17, 2024, by and among Parent, the Company, the guarantors listed on Schedule 1 attached thereto, the Agent, and the lenders from time to time party thereto (including any schedules, annexes and exhibits attached thereto, each as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and the terms of the Restructuring Support Agreement) (the "<u>Restructuring Support Agreement</u>"), and as modified by and as more fully set forth in the Restructuring Support Agreement and in the Definitive Documents (as defined therein).

"<u>Sanction</u>" means individually or collectively, as the context requires, the approval, authorization, confirmation, consent, and/or endorsement of the Restructuring by the Bermuda Court.

"<u>Sanction Order</u>" means an order of the Bermuda Court that, among other things, approves the actions of the Provisional Liquidators in furtherance of the Restructuring.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Software" means software, computer programs, computer applications and code, including source code and object code, and all documentation relating to any of the foregoing.

"Stock and Asset Transfer Agreement" means the Stock and Asset Transfer Agreement, dated as of [●], 2024, between Parent and Holdco.

"Subsidiary" means, with respect to a party hereto, any corporation, partnership, limited liability company or other entity, whether incorporated or unincorporated, of which (a) such party or any other Subsidiary of such party is a managing member or general partner; (b) at least a majority of the securities or other equity interests having by their terms ordinary voting power to elect a majority of the directors or others performing similar functions with respect to such entity is directly or indirectly owned or controlled by such party or by any one or more of such party's Subsidiaries, or by such party and one or more of its Subsidiaries or (c) at least a majority of the equity securities or other equity interests is directly or indirectly owned or controlled by such party or by any one or more of such party's Subsidiaries, or by such party and one or more of its Subsidiaries.

"Tax" or "Taxes" means any and all taxes of any kind, as well as other similar duties or levies (together with any and all interest, penalties, and additions to tax imposed with respect thereto), imposed by any Taxing Authority.

"Taxing Authority" means any Governmental Authority that is responsible for the administration or imposition of any Tax (including any Conveyance Tax).

"Tax Returns" means any and all returns, reports and forms (including elections, claims for refund, declarations, amendments, schedules, information returns and statements, and schedules and attachments thereto) filed or required to be filed with a Taxing Authority with respect to Taxes.

"Trademarks" means trademarks, service marks, trade names, trade dress, domain names and any other identifier of source or origin, together with the goodwill associated therewith.

"Transferred Companies" means the Company and Holdco.

"WARN ACT" means the Worker Adjustment and Retraining Notification Act of 1988, as amended through the date hereof.

SECTION 1.02 Definitions.  The following terms have the meanings set forth in the Sections set forth below:

| Definition | Location |
| --- | --- |
| "Acquired Company Assets" | 3.16(a) |
| "Afiniti Marks" | 5.05 |
| "Agent" | Recitals |
| "Agreement" | Preamble |
| "AI Tools" | 3.13(j) |

9

"Asset Transfer"  ............................................................  Recitals
"Bermuda Court" ............................................................  Recitals
"Business".......................................................................  Recitals
"Business Software" .......................................................  3.13(i)
"Closing" .........................................................................  2.03
"Closing Date".................................................................  2.03
"Company" ......................................................................  Recitals
"Company Shares"...........................................................  Recitals
"Data Protection Requirements".....................................  3.14(a)
"Financial Statements" ...................................................  3.07
"Holdco" ..........................................................................  Preamble
"Holdco Interests"...........................................................  Recitals
"IP Transfer"....................................................................  Recitals
"Lenders" .........................................................................  2.02
"Material Contracts" .......................................................  3.20(a)
"Newco"............................................................................  Preamble
"Newco Group" ...............................................................  5.04
"Parent"............................................................................  Preamble
"Parties" ...........................................................................  Preamble
"Permits"..........................................................................  3.11
"Provisional Liquidation" ...............................................  Recitals
"Provisional Liquidators" ...............................................  Recitals
"Securities".......................................................................  Recitals

SECTION 1.03 <u>Interpretation and Rules of Construction</u>.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)    the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement; the term "as of the date hereof", when used in this Agreement, means as of the date of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)     the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)     references to a Person are also to its successors and permitted assigns;

(h)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day, the period shall end on the immediately following Business Day; and

(i)     the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01 <u>Transfer and Acquisition of the Securities and Insurance Policies; Assignment of Intercompany Receivables</u>.  Upon the terms and subject to the conditions of this Agreement, at the Closing, (a) Parent shall assign, transfer, convey and deliver to Newco, and Newco shall acquire from Parent, all of Parent's right, title and interest in and to the Securities, (b) Parent shall assign, transfer, convey and deliver to Newco or a Subsidiary designated by Newco, and Newco shall, or shall cause such Subsidiary designated by Newco to, acquire from Parent, all of Parent's right, title and interest in and to the Insurance Policies, and (c) Parent shall assign all of its rights under (i) that certain loan receivable owed by the Company to Parent, and (ii) any other intercompany receivables owed by the Company to Parent, to Newco, and Newco shall assume all such rights.  The transfer of the Securities shall be free and clear of all Encumbrances other than (A) those arising under applicable securities Laws or (B) those of the Agent, including any and all claims pursuant to any successor liability or successor-in-interest theory.

SECTION 2.02 <u>Consideration</u>.  In consideration for Parent entering into this Agreement and the Ancillary Agreements with Newco and consummating the transactions contemplated hereby and thereby, the consideration for the Securities shall be the release by the Agent, an Affiliate of the Sole Member, in its capacity as administrative agent under the Credit Agreement, on behalf of the lenders under the Credit Agreement (collectively, the "<u>Lenders</u>"), of any and all liabilities and other obligations of Parent under the Guaranty and the Bermuda Debenture.

SECTION 2.03 <u>Closing</u>.  Subject to the terms and conditions of this Agreement and subject to the satisfaction (or waiver) of the conditions precedent set forth in and pursuant to the terms of Section 15 of the Restructuring Support Agreement, other than those conditions that are to be satisfied (or waived) on the Closing Date, the transfer and acquisition of the Securities and the other transactions contemplated by this Agreement shall take place at a closing (the "<u>Closing</u>") to be held remotely via the exchange of documents and signatures on the date hereof (the day on which the Closing takes place being the "<u>Closing Date</u>").

SECTION 2.04 <u>Closing Deliveries by Parent</u>.  At the Closing, Parent shall deliver or cause to be delivered to Newco:

(a)     evidence of the transfer, reasonably satisfactory to Newco, of the Securities to Newco;

(b)     a duly executed counterpart to the Assumption Agreement substantially in the form of <u>Exhibit A</u>;

(c)     a duly executed counterpart to the Release of Guarantor substantially in the form of <u>Exhibit B</u>;

(d)     a duly executed counterpart to the Bermuda Deed of Release substantially in the form of <u>Exhibit C</u>;

(e)     duly executed counterparts to the Release of Claims Agreement, duly executed by Parent, the Company and the guarantors party to the Credit Agreement substantially in the form of <u>Exhibit D</u>;

(f)     a certificate of the Company, dated as of the Closing Date, complying with the provisions of Treasury Regulations Section 1.1445-2(c)(3) accompanied by a notice to be provided to the U.S. Internal Revenue Service in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2);

(g)     evidence of the termination, reasonably satisfactory to Newco, of each of the Intercompany Agreements, except for those Intercompany Agreements set forth on <u>Section 2.04(g)</u> of the Disclosure Schedule;

(h)     evidence of the completion of the Closing of the Asset Transfer followed by the IP Transfer, each in form and substance reasonably satisfactory to Newco;

(i)     all endorsements and other documentation required by the applicable insurance carriers or brokers under the Insurance Policies to reflect the transfer by Parent to Newco or the applicable Subsidiary of such Insurance Policies;

(j)     all such other documents, agreements, instruments, writings and certificates as Newco may reasonably request as are necessary for Parent to satisfy its obligations hereunder;

(k)     evidence of a Sanction Order from the Bermuda Court; and

(l)     evidence of entry of the Recognition Order by the Bankruptcy Court.

SECTION 2.05 <u>Closing Deliveries by Newco</u>.  At the Closing, Newco shall deliver or cause to be delivered to Parent:

(a)     a duly executed counterpart to the Assumption Agreement substantially in the form of <u>Exhibit A</u>;

(b)      a counterpart to the Release of Guarantor, duly executed by the Agent, in its capacity as administrative agent under the Credit Agreement, on behalf of the Lenders substantially in the form of Exhibit B;

(c)      a counterpart to the Bermuda Deed of Release, duly executed by the Agent, in its capacity as chargee under the Bermuda Debenture substantially in the form of Exhibit C;

(d)      counterparts to the Release of Claims Agreement, duly executed by the Agent, in its capacity as administrative agent under the Credit Agreement, and by the Lenders substantially in the form of Exhibit D;

(e)      all endorsements and other documentation required by the applicable insurance carriers or brokers under the Insurance Policies to reflect the transfer by Parent to Newco or the applicable Subsidiary of such Insurance Policies; and

(f)      all such other documents, agreements, instruments, writings and certificates as Parent may reasonably request as are necessary for Newco to satisfy its obligations hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF PARENT

Parent hereby represents and warrants to Newco as of the date hereof, subject to such exceptions as are disclosed in the Disclosure Schedule, as follows:

SECTION 3.01 Organization, Authority and Qualification of Parent.  Parent is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to enter into this Agreement and each Ancillary Agreement to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, and the Provisional Liquidators have the corporate power and authority, subject to the Sanction Order, to execute and deliver, and Parent has the power to perform, this Agreement and each Ancillary Agreement and to consummate the transactions contemplated hereby and thereby.  Parent is duly licensed or qualified to do business and is in good standing (to the extent such concepts are recognized under applicable Law) in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing (x) would not have a Material Adverse Effect or (y) would not be reasonably expected to prevent or materially delay the ability of Parent to perform its obligations under this Agreement or any of the Ancillary Agreements to which it is a party.  The execution and delivery of this Agreement and each Ancillary Agreement to which it is a party by Parent, the performance by Parent of its obligations hereunder and thereunder and the consummation by Parent of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Parent.  This Agreement has been, and upon their execution each of the Ancillary Agreements to which it is a party shall have been, duly executed and delivered by Parent, and (assuming due authorization, execution and

delivery by Newco) this Agreement constitutes, and upon their execution each of the Ancillary Agreements to which it is a party shall constitute, legal, valid and binding obligations of Parent, enforceable against Parent in accordance with their respective terms, subject to the Enforceability Exceptions.

SECTION 3.02 <u>Ownership of the Securities</u>.  The Securities are owned of record and beneficially by Parent free and clear of all Encumbrances (other than Permitted Encumbrances).  Upon the Closing, Newco will own all of the Securities free and clear of all Encumbrances, other than Encumbrances created by Newco or as may result from any facts or circumstances relating solely to Newco or its Affiliates.

SECTION 3.03 <u>Organization, Authority and Qualification of the Acquired Companies</u>.  Each of the Acquired Companies is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted.  Each of the Acquired Companies is duly licensed or qualified to do business and is in good standing (to the extent such concepts are recognized under applicable Law) in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect.

SECTION 3.04 <u>Capitalization of Transferred Companies; Acquired Subsidiaries</u>.

(a)    The authorized capital stock of the Company consists of [●] shares of common stock, $[●] par value per share.  All of the Company Shares are validly issued, fully paid and nonassessable and were not issued in violation of any preemptive rights.  The Company Shares constitute all of the issued and outstanding capital stock of the Company. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Company Shares or obligating either Parent or the Company to issue or sell any shares of capital stock of, or any other equity interest in, the Company.

(b)    All of the Holdco Interests are validly issued, fully paid and nonassessable and were not issued in violation of any preemptive rights.  The Holdco Interests constitute all of the issued and outstanding membership interests of Holdco. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Holdco Interests or obligating either Parent or Holdco to issue or sell any membership interests of, or any other equity interest in, Holdco.

(c)    Parent has no direct Subsidiaries other than the Transferred Companies and subsidiaries organized under the laws of Bermuda.  <u>Section 3.04(c)</u> of the Disclosure Schedule sets forth, for each Acquired Subsidiary, (i) its jurisdiction of formation, (ii) the number and type of issued equity interests, and (iii) the holders of such equity interests.  All equity interests in the Acquired Subsidiaries are owned, directly or indirectly, by a Transferred Company free and clear of all Encumbrances, have been duly authorized and validly issued, and none of such equity interests has been issued in violation of any preemptive rights.  There are no

14

options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the equity interest in any Acquired Subsidiary or obligating Parent, any Transferred Company or any Acquired Subsidiary to issue or sell any equity interest in any of the Acquired Subsidiaries.

SECTION 3.05 <u>No Conflict</u>.  Assuming the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in <u>Section 3.06</u>, the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is a party by Parent do not and will not (a) violate, conflict with, or result in the breach of any provision of the Governing Documents of Parent or any of the Acquired Companies, (b) violate any Law or Governmental Order applicable to Parent or any of the Acquired Companies in any material respect (c) except as set forth on <u>Section 3.05(c)</u> of the Disclosure Schedule, violate, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, acceleration or cancellation of, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on the Securities or any of the Acquired Company Assets pursuant to any Material Contract to which Parent or any Acquired Company is a party or by which any of the Securities, the Acquired Company Assets or the businesses of the Acquired Companies is bound or affected in any material respect, or (d) exceed or fall outside of the powers or authority of the Provisional Liquidators; except, with respect to clause (c) for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, reasonably be expected to materially impact the operation of the Business.

SECTION 3.06 <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance of this Agreement by Parent and each Ancillary Agreement to which it is a party does not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Authority, except (a) as described in <u>Section 3.06</u> of the Disclosure Schedule, or (b) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not reasonably be expected to materially impact the operation of the Business.

SECTION 3.07 <u>Financial Information</u>.

(a)    True and complete copies of (i) the unaudited balance sheet of the Business as of June 30, 2024 and the related unaudited statements of income and cash flows of the Business for the twelve months then-ended, and (ii) the audited balance sheet of the Business as of June 30, 2023, June 30, 2022 and June 30, 2021, and the related audited statements of income and cash flows of the Business for the fiscal years then-ended (collectively, the "<u>Financial Statements</u>") have been made available by Parent to Newco.

(b)    The Financial Statements (i) were prepared in accordance with the books of account and other financial records of Parent (except as may be indicated in the notes thereto), (ii) present fairly in all material respects the financial condition and results of operations of the Business as of the dates thereof or for the periods covered thereby and (iii) were prepared in accordance with GAAP applied on a basis consistent with the past practices of Parent (except for the absence of footnotes in unaudited interim financial statements).

SECTION 3.08 <u>Absence of Undisclosed Material Liabilities</u>.  As of the date hereof, the Business does not have any Liabilities of a nature required to be reflected on a balance sheet prepared in accordance with GAAP, other than Liabilities (a) reflected or reserved against on the Financial Statements (including the notes thereto), (b) set forth in the Disclosure Schedule or (c) incurred since June 30, 2024 in the ordinary course of business of the Business.

SECTION 3.09 <u>Conduct in the Ordinary Course</u>.  Since December 31, 2023 and through the date hereof, except as described in <u>Section 3.09</u> of the Disclosure Schedule or as required by applicable Law or the terms of any Contract, the Acquired Companies and, to the extent Related to the Business, Parent have not:

(a)     (i) issued or sold any capital stock, notes, bonds or other securities of the Acquired Companies (or any option, warrant or other right to acquire the same), (ii) redeemed any of the capital stock of the Acquired Companies, or (iii) declared, made or paid any dividends or distributions to the holders of capital stock of the Acquired Companies;

(b)     except as would not be material to the operation of the Business, sold, leased, transferred, licensed or otherwise disposed of (other than the sale of inventory or the grant of non-exclusive licenses in connection therewith, in the ordinary course consistent with past practice), or abandoned, permitted to lapse or failed to maintain, or permitted or allowed to be subjected to any Encumbrance (other than Permitted Encumbrances), any Acquired Company Asset (whether tangible or intangible) or any other asset or property of the Business that would constitute an Acquired Company Asset but for the conduct described in this clause;

(c)     amended or restated the Governing Documents of any of the Acquired Companies;

(d)     incurred any Indebtedness (other than any Indebtedness between any Acquired Company and any other Acquired Company);

(e)     delayed payment of any account payable or other Liability of the Business beyond its due date or the date when such Liability would have been paid in the ordinary course of business consistent with past practice;

(f)     except with respect to the current and prior director and officer insurance policies of Parent, entered into, extended, materially amended, cancelled or terminated any Material Contract or any agreement which, if entered into prior to the date hereof, would be a Material Contract other than customer or supplier contracts in the ordinary course of business consistent with past practice or in connection with obtaining a required consent as contemplated hereto that does not require a Party or an Acquired Company to pay any remuneration or commit to pay any remuneration to any Person to which a Party or Acquired Company is not contractually obligated to pay pursuant to a separate contractual obligation with such Person;

(g)     (A) except for the compensation figures indicated on <u>Section 3.18(a)</u> of the Disclosure Schedule (which shall not be required to indicate changes to such figures between December 31, 2023 and the date of such schedule), granted or agreed to grant or paid or agreed to pay, directly or indirectly, any material increase or material new commitments with respect to the wages, salary, bonus, commissions, retirement benefits, transaction bonus, retention bonus,

severance, tax gross-up or equalization or other compensation or benefits of, or grant any equity-based compensation to, any Business Employee or independent contractor, (B) enter into, adopt or establish any new material Parent Plan or any new material Company Plan or collective bargaining agreement or (C) transferred or otherwise altered or amended any Benefit Plan such that it became a Company Plan;

(h)    changed any method of accounting or accounting practice or policy used by Parent (in each case, Related to the Business) or any of the Acquired Companies, other than such changes required by GAAP;

(i)    paid or discharged, entered into any settlement with respect to, or waived or compromised, any Action;

(j)    transferred or assigned any asset from an Acquired Company to Parent, transferred or assigned any Liability from Parent to an Acquired Company, or otherwise caused an Acquired Company to assume any Liability of Parent;

(k)    made any material Tax election inconsistent with past practice or changed or revoked any material Tax election, changed any material Tax accounting method, filed any material amended Tax Return, settled or compromised any audit or other proceeding relating to a material amount of Tax, entered into any closing agreement, extended the statute of limitations period for the assessment or collection of any Tax, or surrendered any right to claim a material Tax refund; or

(l)    agreed to take any of the actions specified in this Section 3.09, except as contemplated by this Agreement and the Ancillary Agreements.

SECTION 3.10 Litigation.   As of the date hereof, there is no Action by or against any of the Acquired Companies pending before any Governmental Authority that would be material to the Acquired Companies when taken as a whole.

SECTION 3.11 Compliance with Laws; Permits.   Except as would not be material to the Business, Parent and the Acquired Companies have conducted within the prior two year period and continue to conduct the Business in accordance with all Laws and Governmental Orders applicable to Parent and Acquired Companies with respect to the Business and none of Parent or the Acquired Companies is in violation of any such Law or Governmental Order. Parent and the Acquired Companies hold all licenses, permits, authorizations, orders and approvals from, and have made all filings, applications and registrations with, each Governmental Authority (collectively, the "Permits") necessary for the operation of the Business as it is conducted as of the date hereof in all material respects.   Parent and the Acquired Companies have conducted and continue to conduct the Business pursuant to and in compliance in all material respects with the terms of all such Permits.   Section 3.11 of the Disclosure Schedule sets forth each Permit material to the operation of the Business as it is conducted as of the date hereof.

SECTION 3.12 Environmental Matters.   Except as would not have a Material Adverse Effect, (a) Parent, to the extent Related to the Business, and the Acquired Companies are in compliance with all applicable Environmental Laws and have obtained and are in

17

compliance with all Environmental Permits, and (b) there are no written claims pursuant to any Environmental Law pending or, to Parent's Knowledge, threatened, against Parent, to the extent Related to the Business, or the Acquired Companies.

SECTION 3.13 <u>Intellectual Property; Information Technology</u>.

(a)    <u>Section 3.13(a)</u> of the Disclosure Schedule sets forth a true and complete list of all Registered Owned Intellectual Property as of the date of this Agreement, such list specifying for each item of Intellectual Property, as applicable, the jurisdictions in which such item has been registered or registrations for such item have been applied for, owner(s), application or registration date, application or registration number and status, and, for domain names, the applicable domain name registrar.  Each item of Registered Owned Intellectual Property is subsisting, and, to the Knowledge of Parent, valid and enforceable.  With respect to each item of Registered Owned Intellectual Property, an Acquired Company is the exclusive owner of such Intellectual Property, free and clear of any Encumbrances (other than Permitted Encumbrances).

(b)    The Business Intellectual Property constitutes all Intellectual Property owned or licensed, or purported to be owned or licensed, by Parent and the Acquired Companies that is necessary and sufficient to enable Newco and the Acquired Companies, immediately following the Closing, to conduct the Business substantially in the same manner as conducted by Parent and the Acquired Companies as of immediately prior to the Closing. Subject to receipt of any necessary third party consents and approvals set forth on <u>Section 3.06</u> of the Disclosure Schedule, immediately after the Closing, the Acquired Companies and Newco, taken collectively, will own or have the valid right to use in the operation of the Business all of the Business Intellectual Property, and to receive all IP Proceeds related thereto, on terms and conditions the same in all material respects as those in effect prior to the Closing.  Except as would not be material to the Business, within the two years prior to the date hereof, none of Parent or the Acquired Companies has received any written claim from any Person challenging its rights in, ownership of, or the validity or enforceability of, the Business Intellectual Property or any of the IP Proceeds related thereto.

(c)    To the Knowledge of Parent, except as would not be material to the Business, no Person is engaging in any activity that infringes, misappropriates or otherwise violates, or in the two years prior to the date hereof has infringed, misappropriated or otherwise violated, any Owned Intellectual Property.  Except as would not be material to the Business, neither the conduct of the Business nor the operation of the Acquired Companies infringes, misappropriates or otherwise violates, or has in the two years prior to the date hereof infringed, misappropriated or otherwise violated, the Intellectual Property of any Person.  In the two years prior to the date hereof, none of Parent or the Acquired Companies has received any written notice alleging that the conduct of the Business or the operation of the Acquired Companies has infringed, misappropriated or otherwise violated the Intellectual Property of any Person.

(d)    As of the date of this Agreement, there is no Action initiated by any other Person pending or, to the Knowledge of Parent, threatened in writing against Parent or the Acquired Companies concerning the matters described in <u>Section 3.13(c)</u>; provided that any Action that has been initiated but with respect to which process or other comparable notice has

not been served on or delivered to such parties shall be deemed to be "threatened" rather than "pending."

(e)     To the Knowledge of Parent, except as would not be material to the Business, (i) Parent and the Acquired Companies have used commercially reasonable efforts (including efforts to enter into written, valid and binding confidentiality and nondisclosure agreements with all founders, officers, employees, consultants and contractors of such entity with access to any trade secrets), unless such Persons are otherwise subject to legal or enforceable ethical obligations to maintain the confidentiality of such trade secrets to protect and maintain the confidentiality of, and proprietary rights in, all the trade secrets and other material confidential information, including source code in Software, that is, in each case, part of the Business Intellectual Property or the other Acquired Company Assets, and (ii) to the Knowledge of Parent, there has been no unauthorized access to or use or disclosure of any of the foregoing.

(f)     No current or former founder, officer, employee, consultant or contractor of an Acquired Company or Parent holds any right, title or interest, in whole or in part, in or to any Owned Intellectual Property, or IP Proceeds related thereto, other than a non-exclusive license to use such Intellectual Property for the purpose of performing services for or on behalf of the Business. Other than Parent or an Acquired Company, no Person has any rights in or to the IP Proceeds related to the Owned Intellectual Property.  Except as would not be material to the Business, each current and former officer, employee, consultant and contractor of an Acquired Company, and each current and former officer, employee, consultant and contractor of Parent, to the extent such Person developed or created Intellectual Property by or on behalf of the Business, or otherwise within the scope of the engagement of such Person with the Acquired Company or Parent, and Related to the Business, has executed a written agreement with an Acquired Company or Parent, as applicable, that validly assigns to such entity all right, title and interest in such Intellectual Property, except to the extent ownership of such Intellectual Property is vested in Parent or the Acquired Company by operation of Law.  To the Knowledge of Parent, none of the parties to the agreements that are subject to the previous sentence are in material breach thereof.

(g)     Except as would not be material to the Business, the Business IT Assets (i) operate and perform and have been maintained, in each case, in accordance with their documentation and functional specifications and otherwise as required for the conduct of the Business as currently conducted and as currently proposed to be conducted; (ii) have not malfunctioned or failed in any respect (including in a way that has resulted in a disruption to the Business); and (iii) do not contain any viruses, worms, Trojan horse, bugs, faults, vulnerabilities or any other code designed or intended to (A) significantly disrupt or adversely affect the functionality of the Business IT Assets or (B) assist any Person to access any Business IT Assets without authorization.  Except as would not be material to the Business, to the Knowledge of Parent, there has been no unauthorized access to, or unauthorized use, modification, deletion, disclosure, or other misuse of, any Business IT Assets (or information stored or contained therein or transmitted thereby). The Acquired Companies and, with respect to the Business, Parent, take and have taken all commercially reasonable steps to protect and preserve the confidentiality, integrity and security of the Business IT Assets (and all confidential information stored or contained therein or transmitted thereby, including such information of third parties that is held in connection with the Business).

(h)     The Business IT Assets constitute all IT Assets necessary and sufficient to enable Newco and the Acquired Companies, immediately following the Closing, to conduct the Business substantially in the same manner as conducted by Parent and the Acquired Companies as of immediately prior to the Closing.  Subject to receipt of necessary third party consents and approvals set forth on <u>Section 3.06</u> of the Disclosure Schedule, immediately after the Closing, the Acquired Companies and Newco will own or have the valid right to use in the operation of the Business all of the Business IT Assets, on terms and conditions the same in all material respects as those in effect prior to the Closing.

(i)     Neither the Acquired Companies nor the Business are in material breach of any terms or conditions of any relevant licenses of Open Source Software.  No Software included in the Owned Intellectual Property and used or held for use in connection with the Business ("<u>Business Software</u>") incorporates, is integrated with, or links to any Open Source Software in such a manner that, taking into account the current conduct of the Acquired Companies and the Business, requires the distribution of any material proprietary source code for any Business Software under the terms of a license to such Open Source Software.  None of Parent or the Acquired Companies has received any such written claim from any Person.  No source code of any Business Software has been disclosed to any Person, other than to employees or service providers of Parent or an Acquired Company in the ordinary course of the Business for the purpose of conducting the Business, and none of the source code for any Business Software is subject to any escrow or other disclosure obligations.

(j)     The Acquired Companies have and, with respect to the Business, Parent has used commercially reasonable efforts to (i) ensure that all AI Tools are used in compliance with the applicable license terms, consents, agreements and Laws in all material respects; (ii) not include Personal Data, trade secrets or material confidential or proprietary information in the Owned Intellectual Property, or such similar information that is owned by any third Person that is under any obligation of confidentiality by the Acquired Companies or Parent, in any prompts or inputs into any AI Tools, except in cases where such AI Tools do not use such information, prompts or inputs (other than in aggregated and anonymized form) to train the machine learning or algorithm of such tools or improve the services related to such tools; and (iii) not use AI Tools to develop any material Business Intellectual Property that the Acquired Companies or Parent intends to maintain as proprietary in a manner that would materially affect the Acquired Companies' or Parent's ownership or rights therein.  For purposes thereof, "<u>AI Tools</u>" means generative artificial intelligence technology or similar tools capable of automatically producing various types of content (such as source code, text, images, audio and synthetic data) based on user-supplied prompts.

SECTION 3.14 <u>Data Privacy</u>.

(a)     The Acquired Companies and, with respect to the Business, Parent (i) are in material compliance in all respects with all applicable Laws as well as material applicable contractual obligations binding on the Acquired Companies or Parent, as applicable, and external policies, in each case to the extent relating to privacy, data protection and the collection, retention, protection, transfer, use and processing of Personal Data ("<u>Data Protection Requirements</u>") and (ii) have maintained commercially reasonable policies, procedures, and security safeguards (including organizational, physical, administrative and technical safeguards)

regarding data privacy and security designed to protect Personal Data, controlled by or on behalf of the Acquired Companies or, with respect to the Business, Parent against loss, damage, unauthorized access, unauthorized use, breaches, and cybersecurity incidents.

(b)     To the Knowledge of Parent, there has been no material loss of, damage to, unauthorized access to, or unauthorized use, or misuse of, any personal information in the possession or control of Parent Related to the Business and the Acquired Companies. Neither the Acquired Companies, nor, with respect to the Business, Parent has (i) been subject to any actual, pending, or, to the Knowledge of Parent, threatened investigations, notices or requests from any Governmental Authority in relation to their data processing or cybersecurity activities or (ii) received any actual, pending, or, to the Knowledge of Parent, threatened written claims from any Person or Governmental Authorities alleging breach of any Data Protection Requirement. The processing of Personal Data relating to the Business is carried out, in all material respects, in accordance with all Data Protection Requirements and, where applicable, with appropriate safeguards for such transfer. To the Knowledge of Parent, the execution, delivery and performance by Parent of this Agreement and the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement by Parent will not violate any Data Protection Requirements.

SECTION 3.15 Real Property.

(a)     The Acquired Companies do not own any Real Property.

(b)     Section 3.15(b) of the Disclosure Schedule sets forth the street address of each Leased Real Property and the identity of the lessor, lessee and current occupant (if different from lessee) of each Leased Real Property. Assuming good fee title vested in the applicable lessor, to Parent's Knowledge, such lessee has a valid and binding leasehold or servitude interest in each Leased Real Property, free and clear of all Encumbrances other than Permitted Encumbrances.

(c)     There has not been any sublease or assignment entered into by Parent or any of the Acquired Companies in respect of the leases relating to the Leased Real Property.

SECTION 3.16 Assets; Sufficiency.

(a)     Each of the Acquired Companies owns, leases, licenses or has the legal right to use all the material properties and assets of such Acquired Company reflected on each of the Financial Statements or acquired since the date of the Financial Statements (collectively, the "Acquired Company Assets"), except for any Acquired Company Assets that have been sold or otherwise disposed of since the date of such Financial Statement and disclosed on Section 3.09 of the Disclosure Schedule. Parent owns, leases, licenses or has the legal right to use all the Acquired Company Assets, except for any Acquired Company Assets that have been sold or otherwise disposed of since the date of such Financial Statement and disclosed on Section 3.09 of the Disclosure Schedule. The Acquired Company Assets are not subject to any Encumbrances other than Permitted Encumbrances. Following the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement, subject to receipt of necessary third party consents and approvals, including

those set forth on Section 3.06 of the Disclosure Schedule, Newco or an Acquired Company will own, with good and valid title, or lease, under valid and subsisting leases, or have legal right or license to use, or otherwise acquire, the Acquired Company Assets, free and clear of any Encumbrances, other than Permitted Encumbrances.

(b)     The Acquired Company Assets are adequate in all material respects to conduct the Business as currently conducted; provided, however, that nothing in this Section 3.16(b) shall be deemed to constitute a representation or warranty as to the adequacy of the amounts of working capital (or the availability of the same) of the Acquired Companies.

SECTION 3.17 Employee Benefit Plans.

(a)     Plans and Plan Documents.  Section 3.17(a) of the Disclosure Schedule correctly and completely lists the material Parent Plans and the material Company Plans and identifies each as either a Parent Plan or a Company Plan.  With respect to each material Parent Plan and material Company Plan that is in writing, Parent has made available to Newco a current, true and complete copy of such Parent Plan and Company Plan and all amendments thereto (or, to the extent no such copy exists, an accurate description).  No Parent Plan or Company Plan provides benefits to any individual who is not a Business Employee or current or former independent contractor of Parent or an Acquired Company or the dependents or other beneficiaries of a Business Employee or such an independent contractor.

(b)     Plan Compliance.  Each Parent Plan and Company Plan is and has been operated in all material respects in accordance with its terms and the requirements of all applicable Laws and has been properly approved by Parent or an Acquired Company, as applicable.  Each of Parent and the Acquired Companies, as applicable, has performed in all material respects the obligations required to be performed by it under, is not in material default under or in material violation of, and Parent has no Knowledge of, any material default or violation by any party to, any Parent Plan or Company Plan.  No Action is pending or threatened with respect to any Parent Plan or Company Plan (other than claims for benefits in the ordinary course).

(c)     Qualification of Certain Plans.  Each Parent Plan and Company Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS with respect to the most recent applicable determination letter filing period or has timely applied to the IRS for such a letter or is the subject of a favorable IRS opinion or advisory letter.

(d)     Pension Plans.  Neither Parent nor any of the Acquired Companies (nor any predecessor of any such entity) sponsors, maintains, administers or contributes to, or has any obligation or liability with respect to, or has in the past six years sponsored, maintained or contributed to, or had any obligation or liability with respect to, (i) any "employee pension benefit plan" that is subject to Title IV of ERISA, (ii) any "multiemployer plan", as defined in Section 3(37) of ERISA, (iii) any "multiple employer plan" as described in Section 413(c) of the Code or (iv) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA).

(e) <u>Section 409A</u>.  No Business Employee is entitled to receive any Tax gross-up, indemnity or reimbursement from Parent or the Acquired Companies for any Tax incurred by such Business Employee, including under Section 409A or Section 4999 of the Code. Each Parent Plan and Company Plan, and any award thereunder, that is or forms part of a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code is in a form and has been operated and administered in compliance with all applicable requirements of Section 409A of the Code in all material respects.

(f) <u>Post-Employment Health and Life Insurance Benefits</u>.  Neither Parent nor any of the Acquired Companies has any current or anticipated material liability in respect of, and no Parent Plan or Company Plan provides or promises, any post-employment, health or life insurance benefits to any current or former Business Employee except (i) as required under Section 4980B of the Code or any other Law, (ii) in connection with severance benefits, or (iii) through the end of the month in which a termination of employment occurs.

(g) <u>Transaction Payments; Section 280G</u>.  Neither the execution of this Agreement nor the consummation of the transactions contemplated under this Agreement shall (either alone or in conjunction with the termination of employment or service of any Business Employee following, or in connection with, the transactions contemplated hereby): (i) entitle any Person to severance pay or benefits or any increase in severance pay or benefits upon any termination of employment or service; accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, or increase the amount payable or trigger any other obligation pursuant to, any Parent Plan or Company Plan; or (ii) limit or restrict the right of the Acquired Companies or Newco to merge, amend or terminate any Company Plan. The consummation of the transactions contemplated by this Agreement will not cause any amounts payable under the Company Plans or Parent Plans to fail to be deductible for U.S. federal income tax purposes by virtue of Section 280G of the Code.

(h) <u>No Undisclosed Plans</u>.  Neither Parent nor any Acquired Company has any commitment (i) to create, incur liability with respect to or cause to exist any other material compensation, benefit, fringe benefit or other plan, program, arrangement or agreement or to enter into any material contract or agreement to provide compensation or benefits to any individual, in each case other than as required by the terms of Parent Plans and the Company Plans as in effect as of the date hereof or (ii) to materially modify, change or terminate any material Parent Plan or materially modify, change or terminate any material Company Plan, other than a modification, change or termination required by applicable Law.

(i) <u>Non-U.S. Plans</u>.  With respect to each Parent Plan and Company Plan that is maintained outside of the United States or that provides benefits outside of the United States: (i) the fair market value of the assets of each funded Parent Plan and Company Plan, the liability of each insurer for any Parent Plan and Company Plan funded through insurance or the book reserve established for any Parent Plan and Company Plan, together with any accrued contributions, is sufficient in all material respects to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Parent Plan and Company Plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such Parent Plan and Company Plan, and no transaction contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit

obligations; (ii) from and after the Closing, the Acquired Companies shall receive the full benefit of any such funds, accruals or reserves under each Company Plan; and (iii) each Parent Plan and Company Plan required to be registered with applicable Governmental Authority has been registered and has been maintained in good standing in all material respects.

(j)      Indemnification Agreements.   No Acquired Company is a party to any Benefit Plan or Contract that would require such Acquired Company to provide any indemnification, contribution, advancement or reimbursement of expenses or similar rights to any current or former director or officer of Parent with respect to such Person's role at Parent.

SECTION 3.18 Labor and Employment Matters.

(a)      Business Employees.   Section 3.18(a) of the Disclosure Schedule contains a list effective as of not more than five (5) days prior to the date hereof of all of the current Business Employees by name, title, years of service, location, employing entity and annual base cash compensation (including annual base salary and annual target bonus), except to the extent that such information may not be disclosed under applicable data privacy and protection Laws.

(b)      Collective Bargaining.   There are no collective bargaining agreements that cover any of the Business Employees to which Parent or any Acquired Company is a party, and there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit relating to any Business Employee.  There is no strike, work stoppage or lockout pending, or threatened, by or with respect to any Business Employees.

(c)      Compliance with Laws.   Parent and the Acquired Companies are and have been in compliance in all material respects with all Laws related to the employment of labor, including those related to wages, hours, worker classification, occupational safety and health and collective bargaining.   No Liability for termination notice or severance has been incurred with respect to any Business Employees under the WARN Act prior to the date hereof. No Action is pending or threatened with respect to any Business Employee.  Except as set forth in Section 3.18(c) of the Disclosure Schedule, no notice with respect to the transactions contemplated hereby is required to be provided to any Business Employee for any purpose.

(d)      Complaints of Sexual Harassment.   Except as disclosed to counsel for the Agent in writing prior to the date of the Restructuring Support Agreement, there is no, and for the past six years, there has not been any, litigation pending or threatened against Parent or any Acquired Company, in each case, involving allegations of sexual harassment, sex-based discrimination or sexual misconduct. Parent and the Acquired Companies have taken appropriate action with respect to any allegations of sex-based discrimination, sexual harassment, sexual misconduct or breach of any policy of Parent or the Acquired Companies relating to the foregoing, in each case (i) involving any current or former officer or director in relation to his or her work at Parent or the Acquired Companies and (ii) in accordance with any written policies related thereto.

SECTION 3.19 Taxes.

(a)      Tax Returns.   All income and other material Tax Returns required to have been filed with respect to the Acquired Companies have been timely filed (taking into account

24

any extension of time to file granted or obtained) and such Tax Returns have been true, correct and complete in all material respects.  All income and other material Taxes of the Acquired Companies (whether or not shown on any Tax Return as owing) have been paid or will be timely paid.

(b)    Tax Audits.  No examination or audit of any Tax Return of any of the Acquired Companies by any Taxing Authority is currently in progress, and to the Knowledge of Parent, no such examination or audit has been threatened in writing.

(c)    Tax Allocation Agreements.  None of the Acquired Companies is a party to any Tax allocation or Tax sharing agreement (other than an agreement the principal subject matter of which is not Taxes) with any Person (other than Parent and other than any such agreement solely between or among the Acquired Companies), and after the Closing Date, none of the Acquired Companies will be bound by any such agreement or similar arrangement entered into prior to the Closing Date or will have any unsatisfied liability thereunder for any amounts due in respect of periods prior to the Closing Date.

(d)    Consolidated Groups.  None of the Acquired Companies (i) has been a member of a consolidated, combined, unitary, or affiliated Tax group (other than a group each of the members of which is an Acquired Company) or (ii) has any actual or potential liability for Taxes of another Person (other than other Acquired Companies) by reason of having been a member of a consolidated, combined, unitary, or affiliated Tax group, by operation of Law, as a transferee or successor, or by contract.

(e)    Waiver of Statute of Limitations.  None of the Acquired Companies has (i) waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to any material Tax assessment or deficiency or (ii) made or entered into any material consent or agreement as to Taxes that will remain in effect following the Closing Date.

(f)    Section 355.  Within the past 2 years, none of the Acquired Companies has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under Section 355(a) of the Code (or any other similar provision of state, local, or foreign Law).

(g)    Encumbrances.  There are no Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the Acquired Company Assets.

(h)    Listed Transactions, etc.  Neither Parent nor any of the Acquired Companies have: (i) participated in any "listed transaction" as defined in Section 6707A(c)(2) of the Code or the Regulations promulgated thereunder (or any similar provision of state, local or non-U.S. Law), (ii) consummated or participated in any transaction which was or is a "tax shelter" transaction, as defined in Section 6662 or Section 6111 of the Code or the Regulations promulgated thereunder (or any similar provision of state, local or non-U.S. Law), or (iii) participated or engaged in any other transaction that is subject to similar disclosure requirements pursuant to a corresponding or similar provision of state, local or non-U.S. Tax Law.

SECTION 3.20 Material Contracts.

(a)    Section 3.20(a) of the Disclosure Schedule sets forth each of the following Contracts (other than Parent Plans and Company Plans) to which an Acquired Company is a party (but only to the extent such Contract is Related to the Business), in effect as of the date of this Agreement (such Contracts being "Material Contracts"):

(i)    any Contract for the purchase of materials, supplies, goods, services, equipment or other assets (other than purchase orders) providing for annual payments in excess of $750,000 and is not cancelable without penalty or further payment and without more than 120 days' notice;

(ii)    any Contract concerning the establishment or operation of a corporate or commercial partnership or joint venture;

(iii)    all Contracts restricting the right of Parent or any of the Acquired Companies to compete with any Person;

(iv)    any Contract entered into within the one-year period prior to the date hereof relating to the acquisition or disposition (whether by merger, sale of stock, sale of assets or otherwise) of any material business, corporation, partnership, association, joint venture or other business organization, or any division, operating unit or product line of the Business with respect to which there remains outstanding obligations on the part of Parent or any Acquired Company;

(v)    all Company IP Agreements;

(vi)    all Contracts relating to Indebtedness of any of the Acquired Companies;

(vii)    all Contracts with any Governmental Authority involving total annual payments in excess of $750,000; and

(viii)    all other Contracts (other than Intercompany Agreements) that are material to the Business taken as a whole.

(b)    Each Material Contract (i) is valid and binding on Parent or the Acquired Company, as applicable, party thereto, and, to the Knowledge of Parent, the counterparties thereto, and is in full force and effect and (ii) upon consummation of the transactions contemplated by this Agreement, except to the extent that any consents set forth in Section 3.05(c) of the Disclosure Schedule are not obtained, shall continue in full force and effect in accordance with its terms as of the date hereof.  Parent or the Acquired Company, as applicable, party thereto is not in material breach of, or material default under, any Material Contract to which it is a party and, as of the date hereof, to the Knowledge of Parent, no counterparty thereto is in material breach of, or material default under, any Material Contract.

SECTION 3.21 Intercompany Receivables.  As of five (5) days before the date hereof, (i) the principal and accrued and unpaid interest under that certain loan receivable owed by the Company to Parent is $[•], and (ii) the principal and accrued and unpaid interest under any other intercompany receivables from the Company to Parent is $[•]; *provided, however*, that the

only change to such balances between such date and the date of this Agreement shall be the accrual of interest in the ordinary course of business.

SECTION 3.22 <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or the Ancillary Agreements based upon arrangements made by or on behalf of Parent or any Acquired Company.

SECTION 3.23 <u>Disclaimer of Parent</u>.  NONE OF PARENT OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PROVISIONAL LIQUIDATORS) MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE ACQUIRED COMPANIES, THE BUSINESS, THE SECURITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING WITH RESPECT TO (I) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, (II) THE OPERATION OF THE BUSINESS BY NEWCO AFTER THE CLOSING, (III) THE PROBABLE SUCCESS OR PROFITABILITY OF THE BUSINESS AFTER THE CLOSING, (IV) ANY FINANCIAL PROJECTION OR FORECAST RELATING TO PARENT OR THE BUSINESS, (V) ANY OTHER INFORMATION MADE AVAILABLE TO NEWCO, ITS AFFILIATES AND ITS AND THEIR RESPECTIVE REPRESENTATIVES, OR (VI) AS TO ANY OTHER MATTER OR THING. ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED.  NONE OF PARENT OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PROVISIONAL LIQUIDATORS) WILL HAVE OR BE SUBJECT TO ANY LIABILITY OR INDEMNIFICATION OBLIGATION TO NEWCO OR TO ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO NEWCO, ITS AFFILIATES OR REPRESENTATIVES OF, OR NEWCO'S USE OF, ANY INFORMATION RELATING TO THE BUSINESS AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO NEWCO, WHETHER ORALLY OR IN WRITING, IN CERTAIN "DATA ROOMS," MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF NEWCO OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF NEWCO

Newco hereby represents and warrants to Parent as follows:

SECTION 4.01 <u>Organization and Authority of Newco</u>.  Newco is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to enter into this Agreement and each Ancillary Agreement to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Newco is duly licensed or qualified to do

business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not materially and adversely affect the ability of Newco to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and each Ancillary Agreement to which it is a party.  The execution and delivery by Newco of this Agreement and each Ancillary Agreement to which it is a party, the performance by Newco of its obligations hereunder and thereunder and the consummation by Newco of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Newco.  This Agreement has been, and upon their execution each Ancillary Agreement to which Newco is a party shall have been, duly executed and delivered by Newco, and (assuming due authorization, execution and delivery by Parent) this Agreement constitutes, and upon their execution each Ancillary Agreement to which Newco is a party shall constitute, legal, valid and binding obligations of Newco, enforceable against Newco in accordance with their respective terms, subject to the Enforceability Exceptions.

SECTION 4.02 <u>No Conflict</u>.  Assuming the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in <u>Section 4.03</u>, the execution, delivery and performance by Newco of this Agreement and the Ancillary Agreements to which it is a party do not and will not (a) violate or result in the breach of any provision of its organizational documents, (b) violate any Law or Governmental Order applicable to Newco or its respective assets, properties or businesses or (c) result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, permit, franchise or other instrument or arrangement to which Newco is a party, except, in the case of clauses (b) and (c), as would not materially and adversely affect the ability of Newco to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is a party.

SECTION 4.03 <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance by Newco of this Agreement and each Ancillary Agreement to which Newco is a party do not and will not require any consent, approval, authorization or other order of, action by, filing with, or notification to, any Governmental Authority, except (a) as described in <u>Section 4.03</u> of the Disclosure Schedule, or (b) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by Newco of the transactions contemplated by this Agreement and each Ancillary Agreement to which Newco is a party.

SECTION 4.04 <u>Investment Purpose</u>.  Newco is acquiring the Securities solely for the purpose of investment and not with a view to, or for offer or sale in connection with, any distribution thereof other than in compliance with all applicable Laws, including United States federal securities laws.  Newco agrees that the Securities may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and any applicable state or foreign securities Laws, except pursuant to an exemption from

such registration under the Securities Act and such Laws.  Newco is able to bear the economic risk of holding the Securities for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

SECTION 4.05 <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Newco.

SECTION 4.06 <u>Independent Investigation; Parent's Representations</u>. Newco has conducted its own independent investigation, review and analysis of the business, operations, assets (including Contracts), liabilities, results of operations, financial condition, technology and prospects of the Business, which investigation, review and analysis was undertaken by Newco and its Affiliates and representatives. In entering into this Agreement, Newco acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of Parent or its representatives (except the specific representations and warranties of Parent set forth in <u>Article III</u>). Newco hereby agrees and acknowledges that other than the representations and warranties made in <u>Article III</u>, none of Parent or any of its officers, directors, employees or representatives make or have made any representation or warranty, express or implied, at law or in equity, with respect to the Securities, the Acquired Company Assets or the Business.

## ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01 <u>Third Party Consents</u>. Newco and Parent shall use commercially reasonable efforts to obtain the consents, approvals and authorizations set forth on <u>Schedule 5.01</u>; <u>provided</u> that no Party or Acquired Company shall be required to compensate any third party, commence or participate in litigation or offer or grant any accommodation (financial or otherwise) to any third party to obtain any such consent or approval; <u>provided</u>, <u>further</u>, (i) that the obtaining of any such consents shall not be deemed to be conditions to the obligations of the Parties to consummate the transactions contemplated hereby and (ii) in no event shall any Party or Acquired Company be obligated to pay any remuneration or commit to pay any remuneration to any Person to which a Party or Acquired Company is not contractually obligated to pay pursuant to a separate contractual obligation with such Person in connection therewith.

SECTION 5.02 <u>Wrong Pockets</u>.  If, after the Closing Date, Parent receives any funds that are the property of Newco or its Affiliates, Parent shall remit any such funds promptly to Newco or such Affiliate.  If, after the Closing Date, Newco or its Affiliates receive any funds that are the property of Parent, Newco shall, or shall cause the applicable Affiliate to, remit any such funds promptly to Parent.

SECTION 5.03 <u>Restrictive Covenants</u>.

(a)     <u>Employee Non-Solicit</u>.  During the period commencing on the Closing Date and ending on the earlier to occur of the first anniversary of the Closing Date and the

completion of the liquidation of Parent, Parent shall not, directly or indirectly, solicit any employees of the Business to leave the employ of Newco or its Affiliates.

(b)     Non-Competition.  During the period commencing on the Closing Date and ending on the earlier to occur of the second anniversary of the Closing Date and the completion of the liquidation of Parent, without the express prior written consent of Newco, Parent agrees not to, directly or indirectly, own, control, manage, operate or participate in, any business or entity that engages in the Business.

SECTION 5.04 Release from Parent Credit Support Instruments.  At or prior to the Closing, Newco shall, and shall cause its Affiliates (collectively, the "Newco Group") to, take or cause to be taken all actions necessary to secure the unconditional release of Parent from Parent Credit Support Instruments, including effecting such release by providing guarantees or other credit support, and Newco shall, and shall cause its Affiliates to, be substituted in all respects therefor, so that the applicable member of Newco Group shall be solely responsible for the obligations of such Parent Credit Support Instruments; provided, however, that any such release or substitution must be effected pursuant to documentation reasonably satisfactory in form and substance to Parent.  Without limiting Newco's undertaking in the foregoing sentence, to the extent that Parent has performance obligations under any Parent Credit Support Instrument after the Closing, (a) Newco shall not permit any member of Newco Group (including the Acquired Companies) to renew or extend the term of, increase its obligations under, or transfer to a third party, any such Parent Credit Support Instrument, and (b) Newco shall, or shall cause a member of Newco Group to, (i) perform such obligations on behalf of Parent and (ii) otherwise take such action as requested by Parent so as to put Parent in the same position as if Newco, or such member of Newco Group, had performed or was performing such obligations.  All costs and expenses incurred in connection with the release or substitution of Parent Credit Support Instruments shall be borne by Newco.  In the event that any Parent Credit Support Instrument has not been terminated and that Parent has not been released as of the Closing Date, Parent shall be permitted to terminate such Parent Credit Support Instrument as promptly as practicable; provided that such termination does not result in termination or a material change to the Contract to which such Parent Credit Support Instrument applies, except in connection with the end of any primary or renewal term of any such Contract or Parent Credit Support Instrument.  From and after the Closing, Newco shall indemnify Parent for any and all Losses arising from, or relating to, Parent Credit Support Instruments.

SECTION 5.05 "Afiniti" Name.  Parent shall (i) except as permitted in this paragraph, from and after Closing, cease and discontinue any and all trademark uses of the word "Afiniti" and any name that is a variation or derivative of, or confusingly similar to, the word "Afiniti" (the foregoing, the "Afiniti Marks"); and (ii) within one hundred and twenty (120) days after Closing or such longer period as needed to complete the wind down and liquidation of Parent, change the name of Parent to a name that does not include any of the Afiniti Marks make all necessary filings, and cause all applicable Governmental Authorities, to change all applications, registrations and filings, including corporate names, fictitious name filings, "doing business as" filings, seals and certificates of Parent, such that they will not include any of the Afiniti Marks.  Parent shall be permitted, for a period of one hundred and twenty (120) days after Closing or such longer period as needed to complete the wind down and liquidation of Parent, to use the Afiniti Marks solely as Parent's corporate name in connection with filings with a

Governmental Authority, including Tax filings and court filings, in each case, in connection with the liquidation of Parent; provided, that, for the avoidance of doubt, Parent shall not use the Afiniti Marks for any trademark uses including conduct as a trade or business or granting licenses or other permissions to use to any third parties.

SECTION 5.06 <u>No Successor Liability</u>. Newco shall not be deemed, as a result of any action taken in connection with the transfer or disposition of any assets transferred pursuant hereto, to: (1) be a successor (or other similarly situated party) to Parent from and after the Closing Date as expressly set forth in this Agreement; or (2) have, de facto or otherwise, merged with or into Parent.  Newco is not acquiring or assuming any liability, warranty or other obligations of Parent, except as expressly set forth herein.

SECTION 5.07 <u>Survival</u>. None of the representations or warranties set forth in this Agreement or any Ancillary Agreement hereto shall survive the Closing. No Party or any of its respective Affiliates shall have any Liability with respect to any representation or warranty from and after the time that such representation or warranty ceases to survive hereunder (provided that the foregoing shall not limit any for claim of fraud).

## ARTICLE VI

## EMPLOYEE MATTERS

SECTION 6.01 <u>Notices</u>.  Parent and Newco and their respective Affiliates shall cooperate in good faith to determine whether any information, consultation and notification may be required under any worker notification Laws applicable to any Business Employees or employee representative bodies (if any) arising in connection with the transactions contemplated by this Agreement and shall honor their respective obligations resulting therefrom.

SECTION 6.02 <u>No Third Party Beneficiaries</u>.  Nothing expressed or implied in this Agreement confers upon any of the Business Employees or any other Person any additional rights or remedies, including any additional right to employment, or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement. Notwithstanding anything herein to the contrary, no provision of this Agreement is intended to, or does, constitute the establishment or adoption of, or amendment to, any Benefit Plan of Parent, an Acquired Company or Newco, and no person participating in any such Benefit Plan maintained by Parent, an Acquired Company or Newco shall have any claim or cause of action, under ERISA or otherwise, in respect of any provision of this Agreement as it relates to any such Benefit Plan or otherwise.

## ARTICLE VII

## TAX MATTERS

SECTION 7.01 <u>Conveyance Taxes</u>.  Parent shall be liable for, shall hold Newco and the Acquired Companies harmless against, and agrees to pay any and all Conveyance Taxes, including value added Taxes, that may be imposed upon, or payable or collectible or incurred in

connection with this Agreement and the transactions contemplated hereby. Newco and Parent agree to cooperate in the execution and delivery of all instruments and certificates necessary to enable Newco to comply with any pre-Closing filing requirements, including value added Tax invoices.

SECTION 7.02 Miscellaneous.

(a)    For purposes of this Article VII, all references to Newco, Parent, Affiliates and the Acquired Companies shall include successors.

(b)    Notwithstanding any provision in this Agreement to the contrary, the covenants and agreements of the Parties contained in this Article VII shall survive the Closing and shall remain in full force until the earlier to occur of (i) the expiration of the applicable statutes of limitations for the Taxes in question (taking into account any extensions or waivers thereof) and (ii) the completion of the liquidation of Parent.

## ARTICLE VIII

## GENERAL PROVISIONS

SECTION 8.01 Expenses.   Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

SECTION 8.02 Notices.   All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return receipt requested), or by email (upon confirmation of receipt) to the respective Parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

(a)    if to Parent:

Afiniti, Ltd. (in provisional liquidation)
1701 Pennsylvania Ave. NW,
Suite 600 Washington, DC 20006
Attention:   Sam Logan (sam.logan@afiniti.com)
               legal@afiniti.com

and

Afiniti Ltd. (in provisional liquidation)
Teneo (Bermuda) Ltd.
19 Par-la-Ville Road,
Third Floor, Hamilton,

HM 11, Bermuda
Attention:  Mike Morrison (mike.morrison@teneo.com)
                   Charles Thresh (charles.thresh@teneo.com)

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:   George Davis (george.davis@lw.com)
                   David Hammerman (david.hammerman@lw.com)
                   Meghana Vunnamadala (meghana.vunnamadala@lw.com)

and

Latham & Watkins LLP
330 North Wabash, Suite 2800
Chicago, IL 60611
Attention:  Jason Gott (jason.gott@lw.com)
                   Jonathan Gordon (jonathan.gordon@lw.com)

(b)        if to Newco:

Afiniti Newco Holdings LLC
c/o VCP CAPITAL MARKETS, LLC
Four Embarcadero Center, 20th Floor
San Francisco, CA 94111
Attention: David Flannery (dflannery@vistacreditpartners.com)

with a copy (which shall not constitute notice) to:

Allen Overy Shearman Sterling US LLP
599 Lexington Avenue
New York, NY  10022
Attention:   Mark Shapiro (Mark.Shapiro@AOShearman.com)
                   Michael Dorf (MDorf@AOShearman.com)
                   Frank Oliver (Frank.Oliver@AOShearman.com)


SECTION 8.03 <u>Public Announcements</u>.  Neither Party shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated by this Agreement or otherwise communicate with any news media without the prior written consent of the other Party unless otherwise required by Law or applicable stock exchange regulation, and, to the extent practicable, the Parties shall cooperate as to the timing

and contents of any such press release, public announcement or communication; provided, however, that the prior written consent of the other Party shall not be required hereunder with respect to any press release, public announcement or communication that is substantially similar to a press release, public announcement or communication previously issued with the prior written consent of such other Party.

      SECTION 8.04 Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

      SECTION 8.05 Entire Agreement.  This Agreement, the Stock and Asset Transfer Agreement and the Ancillary Agreements constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, between Parent and Newco with respect to the subject matter hereof and thereof.

      SECTION 8.06 Assignment.  This Agreement may not be assigned by operation of law or otherwise without the express written consent of Parent and Newco (which consent may be granted or withheld in the sole discretion of Parent or Newco), as the case may be.

      SECTION 8.07 Amendment.  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, Parent and Newco or (b) by a waiver in accordance with Section 8.08.

      SECTION 8.08 Waiver.  Either Party may (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered or made available by the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of either Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

      SECTION 8.09 No Third Party Beneficiaries.  Save in respect of the limitation of the liability of the Provisional Liquidators under Section 8.15, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

SECTION 8.10 <u>Currency</u>.   Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

SECTION 8.11 <u>Governing Law</u>.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.   All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any New York federal court sitting in the Borough of Manhattan of The City of New York; <u>provided</u>, <u>however</u>, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of The City of New York.   Consistent with the preceding sentence, each of the Parties hereby (a) submits to the exclusive jurisdiction of any federal or state court sitting in the Borough of Manhattan of The City of New York for the purpose of any Action arising out of or relating to this Agreement brought by either Party; (b) agrees that service of process will be validly effected by sending notice in accordance with <u>Section 8.02</u>; and (c) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above named courts.

SECTION 8.12 <u>Waiver of Jury Trial</u>.   EACH OF THE PARTIES HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.   EACH OF THE PARTIES HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.12</u>.

SECTION 8.13 <u>Specific Performance</u>.   The Parties acknowledge and agree that the Parties will be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached and that any non-performance or breach of this Agreement by any Party could not be adequately compensated by monetary damages alone and that the Parties would not have any adequate remedy at law.   Accordingly, in addition to any other right or remedy to which any Party may be entitled, at law or in equity (including monetary damages), such Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to seek temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement without posting any bond or other undertaking.   Without limiting the generality of the foregoing, the Parties agree that Parent shall be entitled to enforce specifically Newco's obligation to consummate the transactions contemplated by this Agreement (including the

obligation to consummate the Closing).  The Parties agree that they will not contest the appropriateness of specific performance as a remedy.

SECTION 8.14 <u>Counterparts</u>.  This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in "pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

SECTION 8.15 <u>Liability of Provisional Liquidators</u>.

(a)    The Provisional Liquidators were appointed by the Bermuda Court to manage Parent's affairs, business, and properties as agents and without personal liability. Additionally, neither the Provisional Liquidators, nor any agent, advisor, representative, Affiliate, employee, partner, servant, trustee, attorney, or other person acting on behalf of, or otherwise related to or affiliated with the Provisional Liquidators shall have any personal liability (save in respect of fraud or dishonesty) directly or indirectly, under or in connection with: (i) this Agreement or the Ancillary Agreements or by virtue of, this Agreement or the Ancillary Agreements or any agreement made or entered into under or pursuant to the provisions of this Agreement; (ii) in relation to any related matter or claim howsoever, whenever, and wherever arising, and whether such claim be formulated in contract, restitution, tort or by reference to any other remedy or right, and in whatever jurisdiction or forum; (iii) by reason of their acting in the capacity as agents of Parent; (iv) whether or not acting as agents of Parent, by reason of their acting in the name and on behalf of Parent; (v) in respect of any transfer or assignment made pursuant to this Agreement; or (vi) any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

(b)    The Provisional Liquidators have entered into this Agreement in their personal capacities solely for the purpose of obtaining the benefit of the provisions in their favor.

(c)    Neither the Provisional Liquidators nor their firm, staff, agents or employees shall be liable in respect of any deed or document executed with a view to, or for the purpose of putting this Agreement into effect, whether or not such deed or document so provides in its terms and the Provisional Liquidators shall be entitled at any time to have any such deeds or documents amended at any time to include an exclusion of personal liability on the terms as set out in <u>Section 8.15(a)</u>.

(d)    Any instrument or deed of transfer in respect of the transfer of the Securities provided by Parent to Newco shall contain no new liabilities on the part of Newco and shall include a complete exclusion of personal liability on the part of the Provisional Liquidators.

(e)    The Provisional Liquidators' obligations under this Agreement shall absolutely cease upon termination of their appointment or vacation of their office as provisional liquidators of Parent.

SECTION 8.16 <u>Acknowledgments, Exclusions, Limitations and Agreements</u>. It is agreed that, other than in the case of fraud or dishonesty, the acknowledgements, exclusions, limitations and agreements which are set out in <u>Schedule 8.16</u> to this Agreement shall take effect

as if set out in full in this clause and take effect in favor of the Provisional Liquidators and subject to <u>Section 8.15(e)</u>, shall remain in full force and effect after Closing.

*[Remainder of Page Intentionally Left Blank.]*

IN WITNESS WHEREOF, Parent, the Provisional Liquidators, acting as agents without personal liability, and Newco have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

PARENT:

AFINITI, LTD., a Bermuda exempted company in provisional liquidation acting by its joint provisional liquidators Mike Morrison and Charles Thresh of Teneo (Bermuda) Ltd.

By: _____

Name:

Title:

PROVISIONAL LIQUIDATORS by [●], one of the joint Provisional Liquidators, signing without personal liability

By: _____

Name:

Title:

NEWCO:

AFINITI NEWCO HOLDINGS LLC

By: _____

Name:

Title:

Exhibit A

FORM OF ASSUMPTION AGREEMENT

<u>Exhibit B</u>

FORM OF RELEASE OF GUARANTOR

Exhibit C

FORM OF BERMUDA DEED OF RELEASE

## Exhibit D

FORM OF RELEASE OF CLAIMS AGREEMENT

*Agreed Form*

## RELEASE OF CLAIMS AGREEMENT

This Release of Claims Agreement (this "<u>Agreement</u>") is entered into as of [●], 2024, by and among (i) the parties listed as "Lenders" on the signature pages hereto (the "<u>Lenders</u>") solely in their capacity as lenders under the Term Loan Credit Agreement, dated as of June 13, 2019 (as amended, modified, supplemented from time to time, the "<u>Credit Agreement</u>"); (ii) Afiniti, Ltd. (the "<u>Company</u>"); (iii) each direct and indirect subsidiary of the Company, including, for the avoidance of doubt, the guarantors under the Credit Agreement (other than the Company) (each, a "<u>Company Subsidiary</u>," and collectively, the "<u>Company Subsidiaries</u>" and, together with the Company, the "<u>Companies</u>"); (iv) VCP Capital Markets, LLC, solely in its capacity as administrative agent and collateral agent under the Credit Agreement (the "<u>Term Loan Agent</u>"); (v) each officer or manager of the Company set forth on <u>Schedule 1</u> hereto (each, an "<u>Officer</u>" and, collectively, the "<u>Officers</u>"); (vi) each director of the board of the Company set forth on <u>Schedule 2</u> hereto (each, a "<u>Parent Director</u>" and, collectively, the "<u>Parent Directors</u>"); and (vii) Michael Morrison and Charles Thresh, each of Teneo (Bermuda) Ltd., in their capacity as joint provisional liquidators of the Company (and including any successors appointed by the Bermuda Court, the "<u>Joint Provisional Liquidators</u>"), on behalf of themselves as joint provisional liquidators and, to the extent applicable, the Company (in provisional liquidation). Each of the Lenders, Companies, Term Loan Agent, Officers, and Parent Directors is referred to herein as a "<u>Party</u>," and collectively, the "<u>Parties</u>." Capitalized terms not otherwise defined herein shall have the meanings given to them in the Restructuring Support Agreement, dated September 17, 2024 (as modified, amended or supplemented from time to time in accordance with its terms, the "<u>RSA</u>"). The "<u>RSA Effective Date</u>" shall mean the date that the RSA becomes effective pursuant to its terms and conditions.

WHEREAS, by an Order made by the Supreme Court of Bermuda on September [●] 2024, the Company was in provisional liquidation under the supervision of the Supreme Court of Bermuda (the "<u>Bermuda Court</u>");

WHEREAS, concurrently with the execution of this Agreement, certain of the Parties, among others, are entering into various definitive documents pursuant to which such Parties, and others, will consummate a restructuring transaction through, among other things, the following: (i) a proceeding in the Supreme Court of Bermuda with respect to the appointment of light-touch provisional liquidators for the Company and the approval of transfers by the Company pursuant to (a) the Stock and Asset Transfer Agreement and (b) the Securities Transfer Agreement, all of which were sanctioned by the Supreme Court of Bermuda; (ii) a recognition proceeding under chapter 15 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware; and (iii) the entry into and/or amendment of certain debt documents, all on the terms set forth in the RSA (collectively, along with all other related acts, events, and documents, the "<u>Restructuring</u>"); and

WHEREAS, as a condition precedent to the closing of the Restructuring, the Parties have agreed to exchange the releases and enter into such further agreements on the terms set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants, obligations, and releases set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      This Agreement shall become effective (the "<u>Agreement Effective Date</u>") when each of the following conditions have occurred: (i) this Agreement has been executed by all of the Parties; (ii) a copy of the fully-executed Agreement has been delivered to each of the Parties, <u>provided</u> that delivery to the Term Loan Agent shall constitute delivery to the Lenders, and <u>provided</u> <u>further</u>, that, the failure of any individual officer or board director of the Company to sign this Agreement shall not affect the Agreement's validity as to each other Party but this Agreement shall not be effective as to such officer or board director of the Company until such officer or board director signs this Agreement; (iii) all conditions to Closing set forth in the RSA and all Definitive Documents have been satisfied or waived in accordance with their terms; and (iv) the Closing Date has occurred.  This Agreement may be executed in counterparts, with electronic signatures being deemed originals.

2.      For purposes of this Agreement, the term "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, <u>provided</u> that the foregoing shall exclude all present and former common and preferred shareholders of the Company; and the term "Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

3.      Subject in all respects to Section 9 below, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Closing Date, the Companies hereby irrevocably waive, release, and discharge Afiniti Newco Holdings LLC ("<u>Newco</u>"), Afiniti AI Holdings LLC ("<u>HoldCo</u>"), the Term Loan Agent, and each Lender, in each case, together with their Affiliates and their and their Affiliates' respective officers, board directors, members, managers, partners, employees, agents, representatives, owners, financial advisors, legal advisors, shareholders, and predecessors in interest, solely in such capacities (collectively, the "<u>Lender Releasees</u>") from and against, any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action the Companies have, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against the Lender Releasees with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies; <u>provided</u> that references to financial advisors, tax advisors, and legal advisors in this Section 3 shall include only those that provided services in furtherance and support of the Restructuring, including, for the avoidance of doubt, any services related to the Definitive Documents and RSA.

4.      Subject in all respects to Sections 9 and 10 below, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Agreement Effective Date,

      a.  the Company hereby irrevocably waives, releases, and discharges the Company Subsidiaries, in each case, together with (i) their respective officers, board

directors, members, managers, partners, employees, solely in such capacities and solely if such Person was serving in such capacity on the RSA Effective Date (and not terminated for cause by any of the Companies prior to the Agreement Effective Date)*,* and (ii) their respective financial advisors, tax advisors, and legal advisors (the "Subsidiary Releasees") from and against, any and all claims, charges, claims for relief, demands, suits, actions, proceedings or causes of action which the Company has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against the Subsidiary Releasees with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies; and

b.  each Company Subsidiary hereby irrevocably waives, releases, and discharges (i) its officers, board directors, members, managers, and partners, solely in such capacities and solely if such Person was serving in such capacity on the RSA Effective Date (or such former board directors as set forth on Schedule 3 with respect to an applicable Company Subsidiary, in their capacities as such) (and not terminated for cause by any of the Companies prior to the Agreement Effective Date)*,* and (ii) its financial advisors, tax advisors, and legal advisors from and against, any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which the Company Subsidiary has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against such Persons with respect to any action or inaction of such Person on or prior to the Agreement Effective Date taken in good faith relating to the Restructuring; and

provided that references to financial advisors, tax advisors, and legal advisors in this Section 4 shall include only those that provided services in furtherance and support of the Restructuring, including, for the avoidance of doubt, any services related to the Definitive Documents and RSA.

5.      Subject in all respects to Sections 6, 9 and 10, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Agreement Effective Date, the Companies, the Lenders, and the Term Loan Agent (collectively, the "Party Releasors"), hereby irrevocably waive, release, and discharge (i) each Parent Director that is in office as of the RSA Effective Date and (ii) the Company's financial advisors, tax advisors, and legal advisors, in each case from and against any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which each Party Releasor has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against each Parent Director, with respect to any event, matter, claim, occurrence,

damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies; provided that (i) no Parent Director shall be released from (a) any act or omission that constitutes fraud, gross negligence, or willful misconduct; (b) unless otherwise agreed to by the applicable Parties in writing (x) money borrowed from or owed to any of the Companies as set forth in any of the books and records of the Companies, or (y) any obligations owed by such Parent Director to the Companies pursuant to any agreement with the Companies prior to the Closing Date; and (ii) each such Parent Director has provided a mutual release to each of the Party Releasors and Lender Releasees through the Agreement Effective Date as set forth in Section 6 hereof as a signatory to this Agreement; provided further that references to financial advisors, tax advisors, and legal advisors in this Section 5 shall include only those that provided services in furtherance and support of the Restructuring, including, for the avoidance of doubt, any services related to the Definitive Documents and RSA.

6.      Subject in all respects to Sections 5 and 9, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Closing Date, each Parent Director hereby irrevocably waives, releases, and discharges the Party Releasors and the Lender Releasees, from and against any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which each Parent Director has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against each Party Releasor and Lender Releasee, with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies; provided no Party Releasor or Lender Releasee shall be released from any act or omission that constitutes fraud, gross negligence, or willful misconduct. Except as otherwise expressly agreed to in writing between the applicable parties after the date of this Agreement, this Agreement shall not alter, waive or amend (i) any of the rights or obligations of the Company to pay each Parent Director monthly board director fees (in amounts consistent with ordinary course and past practices and prorated for any partial month served prior to the Agreement Effective Date) that are accrued and unpaid as of the Agreement Effective Date; (ii) any rights of each Parent Director to seek and receive payment from or indemnification against any of the Company's insurance carriers or any rights as beneficiaries of any of the Company's insurance policies in existence at any time, including without limitation, any policies that the Company shall have terminated or placed into "run-off" (collectively, the "Policies"); and (iii) any rights of each Parent Director to seek and receive payment from or indemnification against Newco pursuant to any indemnification agreements entered into between Newco and such Parent Director.

7.      Subject in all respects to Sections 8, 9 and 10, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Agreement Effective Date, the Company, Lenders, and Term Loan Agent hereby irrevocably waive, release, and discharge each Officer that is employed by the Company as of the RSA Effective Date, from and against any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which the Company, Lenders, and Term Loan Agent has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or

unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against such Officer, with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies; provided that such Officer (i) shall have provided a mutual release to the Company, the Lenders, and the Term Loan Agent through the Agreement Effective Date as set forth in Section [8] hereof as a signatory to this Agreement; and (ii) shall not be released from (A) any act or omission that constitutes fraud, gross negligence, or willful misconduct, (B) money borrowed from or owed to any of the Companies as set forth in its books and records, or (C) any obligations owed by the Officer to any of the Companies pursuant to a written agreement prior to the Closing Date.

8.     Subject in all respects to Sections 7 and 9, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Agreement Effective Date, each Officer hereby irrevocably waives, releases, and discharges the Company, the Lenders, the Term Loan Agent, and the Lender Releasees from and against any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which such Officer has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against the Company, Lenders, Term Loan Agent, and Lender Releasees with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies. Except as otherwise expressly agreed to in writing between the applicable parties after the date of this Agreement, this Agreement shall not alter, waive or amend (i) any of the rights or obligations of the Officer under any employment agreements with any of the Companies; (ii) any rights of each Officer to seek and receive payment from or indemnification against any of the Company's insurance carriers or any rights as beneficiaries of any of the Company's insurance policies in existence at any time, including without limitation, any policies that the Company shall have terminated or placed into "run-off" (collectively, the "Policies"); and (iii) any rights of each Officer to seek and receive payment from or indemnification against Newco pursuant to any indemnification agreements entered into between Newco and such Officer.

9.     Notwithstanding anything to the contrary herein, this Agreement shall not alter, waive or amend (i) any of the rights or obligations granted to or imposed upon any party to the RSA or any agreement or other document referred to in or entered into in connection with the RSA, including the Backstop Commitment Agreement, the Newco LLC Agreement, the Securities Transfer Agreement, the Stock and Asset Transfer Agreement, the Amendment or any other Term Loan Credit Documents (including all Term Loan Indebtedness) or any other Definitive Document or (ii) the ability of any Party to enforce any rights or obligations arising under this Agreement; provided that (i) no board director, officer, manager, manager, partner, or employee of any of the Companies shall be released hereunder (a) for any act or omission that constitutes fraud, gross negligence, or willful misconduct; (b) unless otherwise agreed to by the applicable Parties in writing, (x) money borrowed from or owed to any of the Companies as set forth in the books and records of any of the Companies or (y) any obligations owed by such director, officer or employee to any of the Companies pursuant to written agreement; and (ii) to the extent any loans, promissory notes or other obligations of any board director, officer or employee to any of the Companies

constitute assets of the Company or any Company Subsidiary, this Agreement does not release such loans, promissory notes or other obligations or any liens or other encumbrances in favor of the Term Loan Agent or Lenders.

10.     Notwithstanding anything to the contrary in this Agreement or any Definitive Document, no release shall be provided to any officer, board director or employee of the Companies that has been terminated with Cause (as defined in any employment or service agreement with the applicable board director, officer or employee) by any of the Companies prior to the Closing Date.  For the avoidance of doubt, this Agreement does not alter the ability of any Party or Company Subsidiary to terminate any person for cause or the consequences of such a termination (including the forfeiture of any rights to severance payments or benefits), nor does it waive any rights of a Company Subsidiary to bring a claim with respect to an officer's or board director's conduct that is not related to the Restructuring or with respect to an employee's conduct (excluding officers) for any reason.  Further, notwithstanding anything to the contrary in this Agreement, none of the releases provided in this Agreement shall extend to (i) TRG Pakistan Ltd. ("TRGP"), including any current and former directors of TRGP solely in their capacities as directors of TRGP, or (ii) Muhammad Ziaullah Khan Chishti, Qinhe (Hainan) Intelligent Technology Ltd., Isbei Ltd., Isbei (Hainan) Technology Co., Ltd., Isbei AI (Private) Ltd., or Sarah Pobereskin.

11.     Each releasor hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), understands, acknowledges and agrees that, subject to the exceptions set forth herein, the releases set forth herein are full and final general releases of all claims herein released as specified herein that could have been asserted in any legal or equitable proceeding against the applicable Person getting specific releases as specifically set forth herein.  Each releasor hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim purported to be released hereby as to the Person getting specific releases from such releasor (including the matters covered by above), or commencing, instituting or causing to be commenced any action, suit or proceeding of any kind, against any the Person the releasor specifically released hereunder, based upon any claim purported to be released by it, in its capacity as releasor hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), hereby (including the matters covered above).  Each releasor hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), further agrees that in the event it should bring a claim purported to be released by it seeking damages against any such applicable releasee, this Agreement shall serve as a complete defense to such claims.

12.     Each Person providing a release hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), subject to the exceptions set forth in this Agreement, hereby expressly waives any rights it may have with respect to unknown claims.  In connection with such waiver and relinquishment, each such releasor acknowledges that it is aware that, after executing this Agreement, such entity or their attorneys or agents may discover claims or facts in addition to, or different from, those which they now know or believe exist with respect to the subject matter of this Agreement (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have

agreed to release), but that it is such Person's intention hereby to fully, finally, and forever settle and release all of the claims, matters, disputes, differences, whether known or unknown, suspected or unsuspected, that arose on or prior to the date of this Agreement and which arise out of or relate directly to any of the released matters.  Each Person providing a release hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), subject to the exceptions set forth above, hereby irrevocably and forever waives and relinquishes any and all rights or benefits that such Person has or may have had or in the future may have arising under California Civil Code section 1542 ("Section 1542") or any analogous provision of law of any other jurisdiction with respect to the releases they have granted hereunder. Each such releasor (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release) understands that Section 1542 provides that:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

13.    Each of the Companies acknowledges and agrees that (i) the transfer of all of the issued and outstanding shares of capital stock of Borrower and (ii) all of the issued and outstanding membership interests of HoldCo from the Company to Newco pursuant to the Securities Transfer Agreement was made voluntarily by the Company for the consideration specified in the Securities Transfer Agreement.

14.    The Joint Provisional Liquidators act as agents for the Company and neither they nor their firm, staff, agents, employees or representatives shall incur any personal liability in any circumstances whatsoever (i) under, or by virtue of, this Agreement; (ii) in relation to any related matter or claim howsoever, whenever, and wherever arising, and whether such claim be formulated in contract, restitution, tort or by reference to any other remedy or right, and in whatever jurisdiction or forum; (iii) by reason of their acting in the capacity as agents of the Company; (iv) whether or not acting as agents of the Company, by reason of their acting in the name and on behalf of the Company; or (v) in respect of any transfer, assignment or other documents made or entered into and delivered pursuant to this Agreement.

15.    The Joint Provisional Liquidators have entered into this Agreement in their personal capacities solely for the purpose of obtaining the benefit of the provisions in their favor.

16.    Neither the Joint Provisional Liquidators nor their firm, staff, agents or employees shall be liable in respect of any deed or document executed with a view to, or for the purpose of putting this Agreement into effect, whether or not such deed or document so provides in its terms.

17.    The Joint Provisional Liquidators' obligations under this Agreement shall absolutely cease upon termination of their appointment or vacation of their office as joint provisional liquidators, or subsequently as permanent liquidators, of the Company; *provided* that, the foregoing shall not affect or otherwise impair any other Parties' agreements by or among each other as provided herein.

18.     This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes any other oral or written agreements between such Person regarding the subject matter hereof; provided, that, for the avoidance of doubt, nothing herein shall impact that certain Release of Guarantor effective as of the date hereof, that certain Deed of Release effective as of the date hereof, or any separate release agreement entered into in connection with the Term Loan Documents or the Newco LLC Agreement.

19.     Each Party represents and warrants that (i) it has all requisite power and authority to enter into this Agreement and (ii) it has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each such Party and constitutes the legal, valid and binding agreement of each such Party, enforceable in accordance with its terms. The terms of this Agreement have been negotiated in good faith by the parties hereto.  The provisions of this Agreement shall not be construed adverse to any party as "drafter" in the event of a contention of ambiguity in this Agreement, and the Parties hereto waive any statute or rule of law to such effect.

20.     Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  The use of "include" or "including" is without limitation, whether stated or not.  The term "or" is not necessarily exclusive.

21.     This Agreement is for the sole benefit of the Parties hereto, the Joint Provisional Liquidators, and their respective permitted assigns and nothing herein expressed or implied, shall give or be construed to give any person, other than such Persons signatory hereto and such permitted assigns, any legal or equitable rights hereunder; provided, that any Person receiving a release hereunder shall be an express third-party beneficiary of this Agreement with full rights of enforcement as if a Person signatory hereto.

22.     None of the terms or provisions of this Agreement may be amended, supplemented, or otherwise modified except by a written instrument executed by each affected releasing Party and each affected released Party with respect to such waiver, release, or discharge, in each instance, as applicable.  No waiver or amendment of any of the terms or provisions of this Agreement shall be binding against any Party hereto that is affected by such waiver or amendment unless such waiver or amendment is in a writing signed by such Party.

23.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  All actions, suits, arbitrations, litigations, formal investigations or proceeding before or by any governmental authority (collectively, "Actions") arising out of or relating to this Agreement shall be heard and determined exclusively in any New York federal court sitting in the Borough of Manhattan of The City of New York; provided, however, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of The City of New York.  Consistent with the preceding sentence, each of the Parties hereby (a) submits to the exclusive jurisdiction of any federal or state court sitting in the Borough of Manhattan of The City of New York for the purpose of any Action arising out of or relating to this Agreement brought by either Party; (b) agrees that service of process on any Party will be validly effected by

sending notice to the address(es) of such Party or Parties set forth on the signature pages hereto; (c) irrevocably waives, and agrees not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above named courts; and (d) WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUCH CLAIM, SUIT, ACTION OR PROCEEDING.

[*Signature Pages for the Companies, Lenders, Term Loan Agent, Officers, and Parent Directors Omitted*]

## **Schedule 1**

### **Officers**

1.  Hassan Afzal – Chief Executive Officer

2.  Thomas Inskip – President

3.  J. Michael Myshrall – Chief Financial Officer

4.  Samuel E. Logan, Jr. – Chief Legal Officer, Assistant Secretary

5.  Rebecca Clare Vernon – Deputy General Counsel, Assistant Secretary

6.  John Birrer – Chief Administrative Officer, Chief People Officer

## **Schedule 2**

**Parent Directors**

1.  Hassan Afzal

2.  Hasnain Aslam

3.  Jose Maria Aznar

4.  Martha Bejar

5.  Lawrence Babbio, Jr.

6.  Mohammed Khaishgi

7.  John Leone

8.  Abdul Hafeez Shaikh

9.  John Snow

## <u>Schedule 3</u>

**Afiniti AI Limited**

1. Gareth O'Neill (Afiniti AI Limited)

2. Tom Inskip (Afiniti AI Limited)

3. Sam Logan (Afiniti AI Limited)

**Schedule 8.16**

**Acknowledgements, Exclusions, Limitations and Agreements as regards to the Provisional Liquidator**

1.      Newco agrees that the terms and conditions of this Agreement and the exclusions and limitations contained in it are fair and reasonable having regard to the following:

    a.   that this is a sale by a company in provisional liquidation in circumstances where the Provisional Liquidators' knowledge of the Securities is necessarily limited and it is usual that no representations and warranties are given by or on behalf of the Provisional Liquidators in their capacities as provisional liquidators (other than that the Provisional Liquidators warrant that they have the power to sell the Securities for and on behalf of Parent);

    b.   Parent is in provisional liquidation and faces the constraints of selling necessarily imposed on it in that circumstance;

    c.   that it has relied solely on the basis of the representations, warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in <u>Section 8.15</u>) and on the opinions of itself and its professional advisers concerning the Securities and their quality, condition, description, fitness and/or suitability for any purpose;

    d.   that it has agreed to purchase the Securities for a consideration which takes into account the risk to Newco represented by the Parties' belief that the said exclusions and limitations are or would be recognized by the courts; and

    e.   that it and its representatives and advisers have been given every opportunity to examine and inspect all relevant documents relating to the Securities and is aware of the need to rely on such opportunity by reason of the absence of warranties by or on behalf of the Provisional Liquidators in their capacities as provisional liquidators (other than that the Provisional Liquidators warrant that they have the power to sell the Securities for and on behalf of Parent).

2.      Newco acknowledges that it has entered into this Agreement solely on the basis of the representations, warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in <u>Section 8.15</u>), and it has not entered into this Agreement on the basis of or in reliance upon any representations, agreements, statements, warranties or replies to specific enquiries (whether oral or written) made or given or alleged to have been made or given by the Provisional Liquidators in their capacities as provisional liquidators or their representatives (whether that party is a Party to this Agreement or not, other than Parent) at any time (other than that the Provisional Liquidators warrant that they have the power to sell the Securities for and on behalf of Parent).

3.    Notwithstanding any other provision of this Agreement, the Provisional Liquidators shall be required to reimburse Newco for any liability discharged by Newco where that liability constitutes a provable debt in Parent's provisional liquidation. Nothing in this Agreement shall require the Provisional Liquidators to discharge a liability as a Provisional Liquidation Expense that would otherwise be an unsecured claim in Parent's provisional liquidation. Any claim of Newco, or of any Person claiming through Newco, against the assets of Parent shall not take effect otherwise than as an unsecured claim, nor shall any claim against the Provisional Liquidators be considered a Provisional Liquidation Expense.

4.    The exclusions in this Schedule shall:

a.  not limit the covenants and agreements of Parent in this Agreement, including the representations and warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in <u>Section 8.15</u>);

b.  operate as waivers of any claims against the Provisional Liquidators in tort and restitution as well as under the law of contract or under applicable legislation or regulations;

c.  continue notwithstanding completion of this Agreement in whole or in part;

d.  continue notwithstanding the Provisional Liquidators ceasing to act as provisional liquidators of Parent; and

e.  be in addition to any relief available to the Provisional Liquidators.

5.    Nothing in this Agreement shall:

a.  operate to restrict or affect in any way any right of the Provisional Liquidators to cease to act as provisional liquidators of Parent; or

b.  require the Provisional Liquidators to discharge in whole or in part any liability of Parent outstanding at the time of the Provisional Liquidators' appointment as provisional liquidators of Parent or which would not otherwise be payable as a Provisional Liquidation Expense.

6.    Newco hereby agrees and accepts that:

a.  any claim surviving after the Closing Date against any JPL Party, or any of them or their firms or their partners, employees, agents, advisers or representatives shall, in any event and in addition to the above exclusions of liability of the Provisional Liquidators, be irrevocably waived unless made in writing by notice to Parent or the JPL Party, as appropriate, not later than the date on which the Provisional Liquidators cease to hold office as provisional liquidators of Parent; and

b.  without prejudice to all and any other provision of this Agreement, any claim of it, or of any Person claiming through, under or in relation to it, shall not in any circumstances exceed the consideration payable hereunder.

**<u>Exhibit F</u>**

**Proposed Sanction Order**

**IN THE SUPREME COURT OF BERMUDA**

**(COMMERCIAL COURT)**

**COMPANIES (WINDING UP)**

**2024: No. 265**

**IN THE MATTER OF AFINITI, LTD. (JOINT PROVISIONAL LIQUIDATORS APPOINTED FOR RESTRUCTURING PURPOSES)**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**DRAFT ORDER**

---

**UPON** the application by Charles Thresh and Michael Morrison of Teneo (Bermuda) Ltd., acting as the joint provisional liquidators (the "**JPLs**") of Afiniti, Ltd. (joint provisional liquidators appointed for restructuring purposes) (the "**Company**"), by *inter partes* summons filed on 25 September 2024 (the "**Sanction Application**")

**AND UPON READING** the Affidavit of Charles Thresh sworn on 25 September 2024 and the exhibits thereto ("**Thresh 1**") sworn on behalf of the JPLs

**AND UPON HEARING** Counsel for the JPLs, Counsel for the Company and Counsel for VCP Capital Markets, LLC, in its capacity as collateral agent and administrative agent (the "**Term Loan Agent**") under a Term Loan Credit Agreement, dated 13 June 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Afiniti, Inc., the Company, the other guarantors party thereto, the Term Loan Agent and each lender from time to time party thereto (the "**Secured Lenders**")

**AND WHEREAS** the Company granted under a Debenture dated 13 June 2019 (the "**Debenture**") to the Term Loan Agent, for the Secured Lenders under the Credit Agreement, a fixed and floating charge over substantially all of its assets

**AND WHEREAS** the Company is in financial distress and insolvent, as set out in Thresh 1, and (a) the Company and (b) the Term Loan Agent and the Secured Lenders (the Term Loan Agent and Secured Lenders together, the "**Secured Parties**") have agreed a compromise or

arrangement in the form of a restructuring to be structured and implemented as part of the Transactions (as defined below), and in aid of the same the Company has entered, together with Afiniti, Inc. and their respective subsidiaries, and the Secured Parties, into a Restructuring Support Agreement dated 17 September 2024 (as amended, modified or supplemented, the "**RSA**")

**AND WHEREAS** the proposed restructuring will include several integrated transactions (together, representing the restructuring, the "**Transactions**"), which are more fully defined at paragraph 4 of Thresh 1, as part of the broader proposed restructuring, as defined and explained in detail in paragraph 34 of Thresh 1

**AND UPON** the Court being satisfied that, in facilitating the Transactions, the JPLs will not be acting in breach of their duties

**AND BY CONSENT** of the Company and the Secured Parties

**IT IS HEREBY ORDERED** that:

1.   The JPLs' entry into the Transactions is sanctioned and approved pursuant to sections 175(1)(e) and 175(2)(a) of the Companies Act 1981.

2.   Pursuant to section 176(3) of the Companies Act 1981, the JPLs are authorised to undertake all necessary steps and actions in furtherance of the Transactions.

3.   In relation to paragraph 1 of this Order, the transaction documents in substantially the same form as referred to and set out in Schedule "A" annexed to this Order are approved and the disposition and transfer of any and all assets pursuant to and in accordance with the SATA and STA shall be free and clear of all liens, claims, charges and other encumbrances (including, without limitation, under any contract, corporate document, or applicable Bermuda law) of any kind or nature whatsoever to the extent the Court has jurisdiction over such assets, and no such lien, claim, charge or encumbrance may be asserted against either Holdco or Newco or any of their respective assets to the full extent of Bermuda law.

4.   For the avoidance of doubt, no steps required or undertaken, or both, to implement the Transactions shall be avoided by virtue of section 166 of the Companies Act 1981.

30969265.8.M7796.A04375

5.      The JPLs' and the Company's costs of this application shall be paid out of the assets of the Company as fees and expenses properly incurred in preserving, realizing or getting in the assets under Rule 140 of the Companies (Winding-Up) Rules 1982.


**DATED** this       day of              2024


_____
     **The Hon. Chief Justice/Puisne Judge**

**IN THE SUPREME COURT OF BERMUDA**

**(COMMERCIAL COURT)**

**COMPANIES (WINDING UP)**

**2024: No. 265**

**IN THE MATTER OF AFINITI, LTD. IN PROVISIONSAL LIQUIDATION FOR RESTRUCTURING PURPOSES)**


**AND IN THE MATTER OF THE COMPANIES ACT 1981**

_____

**ORDER**

_____



**Walkers (Bermuda) Limited**
**Park Place**
**55 Par-La-Ville Road**
**Third Floor**
**Hamilton HM 11**
**Bermuda**
**Tel: 441 242 1500**
**Ref: KT/SW/DL/A04375**

**SCHEDULE A**
**TRANSACTION DOCUMENTS**

6.      The Stock and Asset Transfer Agreement by and between the Company and Holdco (as defined therein) and in substantially the form exhibited to <u>Exhibit CT-1</u> of Thresh 1 (the **"SATA"**), including without limitation:

   (a)      the disposition and transfer of the assets, including, without limitation, the intellectual property assets of the Company to Afiniti AI Holdings, LLC, a Cayman Islands limited liability company and wholly owned subsidiary of the Company (**"Holdco"**), and the assumption and assignment and/or transfer of the specified contracts of the Company to Holdco; and

   (b)      the disposition and transfer, immediately thereafter, of the rights, title, and interests in the Transferred IP Assets (as defined in the SATA) from Holdco to Afiniti AI Limited, an Irish private limited company (**"IP Purchaser"**), and the assumption by IP Purchaser of Assumed IP Liabilities (as defined in the SATA), in each case pursuant to, and in accordance with, the terms of the SATA.

7.      The Securities Transfer Agreement (the **"STA"**) between the Company and Afiniti Newco Holdings, LLC, a Delaware limited liability company (**"Newco"**), an entity formed and controlled by an affiliate of the Term Loan Agent, in substantially the form exhibited to <u>Exhibit CT-1</u> of Thresh 1, including without limitation, the disposition and transfer of all of the issued and outstanding shares of capital stock of Afiniti, Inc., a Delaware corporation (the **"USCo Shares"**), and all of the issued and outstanding membership interests of Holdco (the **"Holdco Interests"** and, together with the USCo Shares, the **"Securities"**) as part of the compromise of the Company's primary obligation under its guarantee of the liabilities owed to the Secured Lenders under the Credit Agreement.

8.      The release of claims, matters, disputes, and differences, whether known or unknown, suspected or unsuspected, in the manner and to the extent provided in the Release of Claims Agreement, exhibited to <u>Exhibit CT-1</u> of Thresh 1.

9.      The Amended Credit Agreement, being an amendment of the Credit Agreement dated 13 June 2019, among the Company, Afiniti, Inc., as borrower, the guarantors party thereto, the Term Loan Agent, and each lender from time to time party thereto (as may be

amended, restated, amended and restated, supplemented or otherwise modified from time to time), exhibited to <u>Exhibit CT-1</u> of Thresh 1, and related documents.

30969265.8.M7796.A04375

## Exhibit G

**Thresh Declaration**

Filed on behalf of:  **The JPLs**
Deponent's Name:  **Charles Thresh**
Affidavit No.:  **1**
Date sworn:  **2 October 2024**
Exhibit:  **CT-1**

**IN THE SUPREME COURT OF BERMUDA**

**COMPANIES (WINDING UP)**

**COMMERCIAL COURT**

**2024: No. 265**

**IN THE MATTER OF AFINITI LTD. (PROVISIONAL LIQUIDATORS APPOINTED FOR RESTRUCTURING PURPOSES)**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

———————————————————

**FIRST AFFIDAVIT OF CHARLES THRESH**

———————————————————

I, **CHARLES THRESH**, of Teneo (Bermuda) Limited ("**Teneo Bermuda**") of Third Floor, 19 Par-la-Ville Road, Hamilton, HM 11, Bermuda, **MAKE OATH** and **SAY** as follows:

1.      I am one of the joint provisional liquidators of Afiniti Ltd. (provisional liquidators appointed for restructuring purposes) (the "**Company**"). By an order of this Court dated 19 September 2024 (the "**Appointment Order**"), Michael Morrison, also of Teneo Bermuda and I were appointed as Joint Provisional Liquidators ("**JPLs**") with light touch powers. I am duly authorized to make this affidavit on behalf of the JPLs.

2.      I make this affidavit based in part on my own knowledge and in part on the contents of records provided to me. To the best of my knowledge, information and belief, the contents of this affidavit are true and correct. Nothing in this affidavit is intended to waive privilege.

3.      There is now produced and shown to me marked with the letters **"CT-1"** a tabbed and paginated bundle of true-copy documents to which I refer in this affidavit. Page references in this affidavit are to **"CT-1"** unless otherwise noted herein.

### I.      Overview

4.      I make this affidavit in support of the application of the JPLs of the Company ("**Sanction Application**") seeking sanction of:

(a)      the transactions evidenced by the documents listed below:

(i)     a Stock and Asset Transfer Agreement ("**SATA**") between the Company, the JPLs, and Afiniti AI Holdings LLC ("**Holdco**");

(ii)    a Securities Transfer Agreement ("**STA**") between the Company, the JPLs, and Afiniti Newco Holdings, LLC ("**Newco**");

(iii)   a Release of Guarantor Agreement between the Company and VCP Capital Markets, LLC as administrative agent and collateral agent under the Credit Agreement (as defined below) (the "**Term Loan Agent**"), on behalf of the Secured Lenders (as defined below);

(iv)    a Release of Claims Agreement by and among the Company, the Company's subsidiaries, the Secured Lenders (as defined below), the Term Loan Agent, the JPLs, and certain directors, officers, and managers of the Company and the Company's subsidiaries; and

(v)     the amendment of the Term Loan Credit Agreement dated 13 June 2019, between the Company, Afiniti, Inc., as borrower, the guarantors party thereto, the Term Loan Agent, and each lender from time-to-time party thereto (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**")

(each of (i) to (v) a "**Transaction**" and, collectively, the "**Transactions**");

(b)     the JPLs' exercise of their powers to make a compromise and arrangement between the Company and the Secured Lenders, under section 175(1)(e) of the Companies Act 1981, as amended (the "**Companies Act**"), as comprised in the Transactions; and

(c)     the JPLs' exercise of their sale power under section 175(2)(a) of the Companies Act, to the extent that the Transactions involve an exercise of the JPLs' sale power.

5.     The Sanction Application is a step within the broader proposed restructuring of the Company's indebtedness (further defined below).

6.     A draft order setting out the relief sought on the Sanction Application is at **pages 800 to 807 of CT-1**.

7.     In making the Sanction Application and preparing this affidavit in support, the JPLs, and our team at Teneo Bermuda were given access to documents and information we requested from the Company. I reviewed, among other things:

(a)     the documents filed by the Company in support of the application for the Appointment Order, including the Petition and the Affidavit of Mohammed Khaishgi and Exhibit MK-1 (the "**Khaishgi Affidavit**");[1]

(b)     the valuation report dated 3 September 2024 (**"Valuation Report"**) prepared by Teneo Financial Advisory Ltd. ("**Teneo FA**"). A copy of the valuation report is at **Tab "A"**, pages **1 to 66 of Exhibit CT-1**;

(c)     the Restructuring Support Agreement existing as between the Company, Afiniti, Inc., the Guarantors (as defined therein and listed in Schedule 1, thereto), the Term Loan Agent, and the Additional Lenders (as defined therein) dated 17 September 2024 (as amended, modified, or supplemented from time to time, including by that Amendment No. 1 dated 2 October 2024, the "**RSA**").[2] A redacted copy of the initial RSA is at **Tab "B" pages 67 to 750 of Exhibit CT-1** and a copy of the RSA amendment is at **Tab "M", pages 817 to 868 of Exhibit CT-1**; and

(d)     proposed final versions of the commercial documents to be executed by the JPLs (on behalf of the Company), the Secured Lenders (as defined below), and additional commercial parties, as set forth therein, copies of which were Exhibited to the RSA (as amended) and can be located at **Tab "B"**, **pages 157 to 750, and Tab "M", pages 824 to 868 of Exhibit CT-1** (collectively, the "**Definitive Documents**").[3]

8.     Having considered the information available to the JPLs and the circumstances in which the Company finds itself, and for the reasons set out in more detail below, the JPLs have formed the opinion that the Proposed Restructuring (as defined below) is in the best interests of the Company's Creditors, as discussed in this affidavit.

---

[1]   I am advised that at the hearing on 19 September 2024 the Court granted the Company's application for the Court file to be sealed.

[2]   Amendment No. 1 amends the RSA to expand the definition of "Eligible Holders", extend certain deadlines, and amend certain of the Definitive Documents, as set forth therein.

[3]   Definitive Documents has the meaning given to it in the RSA.

## II.    Background to the Proposed Restructuring

9.    This section provides a high-level background to the Proposed Restructuring as I understand it from my review of, among other things, the Petition, the Valuation Report, the RSA (and amendments thereto), and the Definitive Documents.

10.    The Company is an exempted company incorporated under the Companies Act on 12 October 2011. It is the ultimate holding company of 32 companies which collectively do business as "Afiniti". Those companies are listed in Figure 1, which I understand from the Company's counsel and believe to be true shows the current structure of the 32 Afiniti companies which I collectively refer to herein as the "Companies":



*Figure 1*

11.    The Companies are in the business of applied predictive artificial intelligence. The Companies' main product offering is a patented technology for use in customer service contact centres that optimally pairs customers with contact centre agents based on machine learning algorithms seeking and predicting optimal outcomes. The Companies' technology is used globally in the healthcare, telecommunications, travel, hospitality, insurance, and banking industries and across multiple customer experience channels.

12.    The Companies were initially successful; however, they took on significant debt to fuel growth, which ultimately became unsustainable. Although favorable market conditions enabled the Companies to secure debt in 2020 and 2021 (despite negative cash flows) the tightening of debt markets in 2022 in conjunction with rising interest rates made this debt difficult to service as time went on. Despite the Companies reducing their costs in 2021 and beginning to generate positive cash flows, the Companies' debt remained too high in relation to their revenue.

13.    In late 2022, the release of ChatGPT shifted client interest toward generative AI, which impacted the Companies' business as clients prioritized spending on generative AI rather than optimizing their contact centers with the Companies' solutions. The Companies' "pay-for-performance" model, dependent on a small number of large clients, led to high revenue volatility and made the Company particularly vulnerable due to their debt load. In addition, during 2023 valuations for software companies significantly declined.

14.    In financial year 2024, the Companies' revenues dropped significantly, primarily due to changes from its top two clients, who accounted for 65% of the Companies' total revenues. One client imposed constraints on the Companies' algorithm that limited the Companies' performance, while the other reallocated its budget and renegotiated its engagement with the Companies.

15.    The Companies' financial difficulties described above impacted the Company's financial situation as the Company is guarantor of the Companies' indebtedness and has limited revenue generating activity outside of the Companies' business. The Company's financial situation was further worsened by issues surrounding its founder, former chairman, and former chief executive officer, Muhammad Ziaullah Chishti ("**Mr Chishti**"), who resigned in November 2021 following allegations of sexual misconduct. The fallout required the Company to manage reputational damage while maintaining client relationships and cutting costs. Additionally, the Company and its direct subsidiary Afiniti, Inc. have faced legal challenges which resulted in lawsuits with Mr Chishti. I understand some of these proceedings are ongoing in Bermuda and the United States.

16.    I understand from the Company that its management attempted to address these challenges through a debt and equity raise in early 2024.

17.    As set out in greater detail in the Valuation Report at **Tab "A"**, **pages 1 to 66 of CT-1**, in July 2024 the Company's management also prepared and implemented an operational

reorganization and cost reduction plan to further address its cash flow, focusing on workforce reductions in the global service delivery ("**GSD**") function and back-office areas to reduce its cost based by approximately 24% (USD 17 million) in the GSD function and save an additional USD 9 million in back-office costs in financial year 2025.

18.    The Company's share capital is divided as follows:

| Category | Number Outstanding |
|---|---|
| Common Shares | 24,699,310 |
| Class A Preference Shares | 5,180,031 |
| Class B Preference Shares | 1,595,593 |
| Class C Preference Shares | 9,767,592 |
| Class D Preference Shares | 0 (redeemed) |
| Class E Preference Shares | 1,919,792 |

19.    The Company's equity structure reflects how it raised incremental capital from new investors over time. I understand from the Company that when a fundraising "round" was conducted, the Company's most recent investors would typically invest in a new alphabetical preference share class that was senior to all previous share classes. This means that, as a general principle, Class E preference shares are the most senior in right of a distribution to the Company on a winding-up, whereas the common shares are the most junior.

20.    In addition to equity capital, the Companies have raised debt financing. The Company and its United States operating subsidiary, Afiniti, Inc., are parties to the Credit Agreement. The Company (as well as several, but not all, of its other subsidiaries) guaranteed repayment of all sums loaned under the Credit Agreement and granted fixed and floating security for these sums over substantially all of their assets. The lenders comprise a syndicate. The Term Loan Agent is the Administrative Agent and Collateral Agent for the Finance Parties.[4] In this affidavit, I refer to the syndicated lenders under the Credit Agreement as the "Secured Lenders".

---

[4]    "Finance Parties" means each lender party from time-to-time party to the Credit Agreement, each Agent party thereto, and each Indemnitee (as defined in the Credit Agreement) and their respective successors and assigns.

21.    Afiniti, Inc. borrowed the initial term loan under the Credit Agreement in the aggregate principal amount of USD 125 million (the "**First Term Loan**"). Pursuant to an amendment to the Credit Agreement, Afiniti Inc. borrowed an additional incremental amount of USD 25 million (together with the First Term Loan, the "**Initial Term Loans**").

22.    Pursuant to various amendments to the Credit Agreement executed between November 2020 and March 2022, Afiniti, Inc. borrowed additional term loans in the combined principal amount of USD 306.25 million (collectively the "**Incremental Term Loans**" and, together with the Initial Term Loans, the "**Term Loans**").

23.    Interest on the Term Loans historically accrued at a range of 7.25% to 10.25% payable in cash and 1% to 6% payable in kind, each paid quarterly. I understand that as of the date of swearing, interest accrues at 10.25% payable in cash (approximately USD 13 million per quarter) and 1% payable in kind (approximately USD 1.3 million per quarter). All interest obligations have been paid to date. The Term Loans' total balance (including any interest paid in kind) is approximately USD 508.74 million, summarized as follows:

| Credit Agreement | Original Maturity Date | Principal Balance |
|---|---|---|
| 2019 Credit Agreement | June 13, 2024 | USD 125,000,000 |
| May 2020 Amendment | June 13, 2024 | USD 25,000,000 |
| November 2020 Amendment | November 17, 2025 | USD 100,000,000 |
| December 2020 Amendment | November 17, 2025 | USD 50,000,000 |
| March 2021 Amendment | November 17, 2025 | USD 40,000,000 |
| May 2021 Amendment | November 17, 2025 | USD 75,000,000 |
| March 2022 Amendment | March 7, 2027 | USD 41,250,000 |
| **Total Principal Balance** | | **USD 456,250,000** |
| **Total Interest Paid in Kind (as of 8 July 24)[5]** | | **USD 52,494,859.71** |

---

[5]    I understand from my review of the Definitive Documents that Interest continues to accrue.

| Total Funded Debt Obligations | USD 508,744,859.71 |
|---|---|

24.     In addition to the Term Loans, the Company has the following material liabilities:[6]

| Liability Type | Amount (Millions) |
|---|---|
| Trade payable / accrued liabilities | USD 18.2 |
| ASC 842 Lease Liabilities | USD 9.7 |
| Liberty Equipment Financing | USD 8.8 |
| Partnership Fee | USD 4.1 |
| Wingspire Equipment Financing | USD 2.3 |
| Deferred Tax Liability | USD 1.9 |
| Deferred Revenue | USD 1.7 |
| Related Party Payable | USD 1.7 |
| Other liabilities | USD 7.5 |
| **Total** | **USD 55.9** |

25.     The Company's liabilities therefore total approximately USD 565m of which approximately USD 509m is secured.

26.     On 29 January 2023, the Board of Directors (the "**Board**") formed a transaction committee, whose purpose was, I understand, to (a) assist the Board in fulfilling its responsibilities relating to the Company's long-term strategic plan and strategies, (b) oversee the review and evaluation of any potential strategic transactions, (c) if deemed desirable, oversee the negotiation of the terms and conditions of one or more strategic transactions on behalf of the Company, and (d) recommend any appropriate strategic transaction to the Board for review and approval (the "**Transaction Committee**").

---

[6]     I understand that the Company has not reserved for the contingent claims of Mr. Chishti which he has asserted amount to at least USD 45 million over a two year period. This is because the Company regards his claims as without merit, and that, in a liquidation context, he would in any event be a contingent unsecured creditor and "out of the money" based on the Valuation Report.

27. I understand from the Company and paragraph 13 of the Petition, that in November 2023, the Company engaged an investment bank to solicit interest in refinancing proposals, or, as an alternative, some other form of strategic transaction such as a further equity raise. This process involved the bank contacting 87 third parties, consisting of strategic partners and financial investors on behalf of the Company. Of those parties, I understand and believe it to be true that 61 executed nondisclosure agreements and received diligence about the Company. Ultimately, the Company received only one complete proposal for a senior debt refinancing of the maturing portion of the debt. This proposal was ultimately unworkable because, among other things, the new lender would have required the Secured Lenders to take a subordinated position for their remaining debt in the capital structure which I understand was not acceptable to the Secured Lenders.

28. As a result, I understand from the Company and believe it to be true, that the only workable refinancing option would have been to pay back the entire debt facility, which the sole proposal did not address.

29. In addition, I understand the Company did not receive any complete proposals for an equity or subordinated debt financing, primarily because the reduction in industry valuation multiples meant that the Company's debt overwhelmed the Company's enterprise value. Based on the investment bank's outreach and feedback, there was insufficient interest in investing in the Company because of, among other things:

    (a) the Company's heavy leverage and debt obligations;

    (b) the competitive landscape, intensified by the rise of generative AI;

    (c) the Company's customer concentration and decline in revenues;

    (d) the reputational and financial consequences of Mr Chishti's actions and the ongoing litigation with him; and

    (e) a general economic slowdown, which has reduced consumer spending and tightened budgets for many of the Company's customers (including through decreased investments in customer service infrastructure).

30. Accordingly, in the circumstances, I understand the Board felt that the only realistic option available to the Company consisted of negotiating with the Company's existing lenders.

### III.    The Proposed Restructuring

#### A.   Steps Leading to the Appointment of the JPLs and the Sanction Application

31.    The Board has determined the Company is insolvent on both a cash-flow and balance-sheet basis. I understand from the Company and believe it to be true that, after its unsuccessful refinancing efforts, the Company began discussing restructuring its debts with the Secured Lenders in or around March 2024.

32.    The discussions with the Secured Lenders resulted in an agreed restructuring term sheet dated 7 June 2024. A copy of that term sheet is contained in the RSA which is at **Tab "B"**, **pages 133 to 156 of Exhibit CT-1**.

33.    In connection therewith, the Secured Lenders under the Initial Term Loans extended the 13 June 2024 maturity date to 29 July 2024 pursuant to Amendment No. 9 to the Credit Agreement (and again to 12 September 2024 pursuant to Amendment No. 10 to the Credit Agreement),[7] so that that the parties could continue their discussions and documentation efforts. Absent these maturity extensions, I understand the Company would have been in default upon the maturity of the Initial Term Loans because of the Company's inability to repay them in full.

34.    During this time, the parties negotiated terms of a proposed restructuring. The terms of the restructuring agreed between the Company and the Secured Lenders (the "**Proposed Restructuring**") are, in summary, as follows:

(a)    the Company will first transfer substantially all of its assets (which are all secured by charges in favour of the Secured Lenders), other than the Company's ownership interest in Afiniti, Inc. and the Company's Bermuda subsidiaries to Holdco, pursuant to the SATA, and Holdco will immediately transfer certain of these assets (including all of the intellectual property assets) to Afiniti AI Limited;

(b)    immediately following the transfers to Holdco and Afiniti AI Limited described above, the Company will transfer all of its ownership interest in Afiniti, Inc. and Holdco to Newco, an entity formed and initially owned by the Term Loan Agent

---

[7]    On 12 September 2024, pursuant to Amendment No. 12 to the Credit Agreement, the Secured Lenders further extended such maturity date to 15 October 2024

(acting through a representative), pursuant to the STA, resulting in Newco owning, directly and indirectly, the shares of each transferred subsidiary;

(c)     Newco, Afiniti Inc., all the other subsidiary guarantors under the existing Credit Agreement, and the Secured Lenders will execute a further amendment to the Credit Agreement (the "**Amended Credit Agreement**");

(d)     the Amended Credit Agreement will result in (i) a new senior first lien secured tranche of debt in the principal amount of approximately USD 225 million, subject to potential increases for accrued interest (the "**New 1L Tranche**"); and (ii) a new junior secured convertible tranche of debt in the initial principal aggregate amount of approximately USD 298.7 million, subject to potential increases from the rights offering described in the following paragraph and potential increases for accrued interest (the "**Convertible 2L Tranche**") where interest can be paid-in-kind to provide sufficient liquidity. Crucially, the Amended Credit Agreement will be secured by substantially all of the assets of Newco, Holdco, and each of the guarantors under the current Credit Agreement (other than Afiniti, Ltd) that will continue to be guarantors following consummation of the Transactions, with economic terms that better correspond to the current performance of the business, hence capacity to service the debt;

(e)     the Company's existing equity holders who are "Eligible Holders" (as defined in the RSA) and who have not prosecuted any claims against the Companies, will be entitled to participate, on a voluntary basis, in a rights offering, pursuant to which existing equity holders may subscribe for up to USD 25 million (inclusive of USD 10 million of the Backstop 2L Loans referred to in paragraph 37) of the Convertible 2L Tranche, subject to the terms of the RSA and Backstop Agreement. Those participating in this rights offering, among other things, will need to provide fresh capital for their subscription and provide releases to the Companies, the Secured Lenders, and certain other parties in consideration of being include in this rights offering;

(f)     the Company's existing holders of preferred stock who are "Eligible Holders" (as defined in the RSA), who have not prosecuted any claims against the Companies will be provided certain shares of Class B Units and certain Warrant Units in Newco in consideration of releases provided by such holders to the Companies, the

Secured Lenders, and certain other parties, and subject to the terms of the Newco LLC Agreement (as defined below); and[8]

(g)     following the consummation of the above transactions, the majority of the equity interests in Newco will be owned by the Secured Lenders.

35.     The Company and the Secured Lenders have agreed it is appropriate for the Proposed Restructuring to be implemented by the JPLs, acting with Court sanction because:

(a)     the Proposed Restructuring has garnered the unanimous support of the Secured Lenders;

(b)     based on the Valuation Report, the Company's unsecured creditors and shareholders are out of the money;

(c)     although implementation via a scheme of arrangement was considered, it was considered that it would be too long and too expensive of a process, especially given that it was not necessary to convene statutory meetings to bind any hold-out Secured Lenders in view of the unanimous consent amongst them; and

(d)     because the Proposed Restructuring amounts to a *"compromise or arrangement"* for the purposes of section 175(1)(e) of the Companies Act and is therefore capable of sanction by this Court.

36.     In these circumstances, on 17 September 2024, the Company and the Secured Lenders executed the RSA, which governs the Proposed Restructuring. A redacted copy of the RSA is located at **Tab "B"**, **pages 67 to 750 of Exhibit CT-1**. Certain of its key terms can be summarised as follows:

(a)     Section 4: Confirms that the Definitive Documents are incorporated into the RSA by reference though they may be modified from the form in which they are exhibited to the RSA prior to execution, subject to certain terms and conditions.

(b)     Section 5: The Supporting Parties (as defined therein) agree to use commercially reasonable efforts to (i) support the Proposed Restructuring for a certain time

---

[8]   The Secured Lenders are not obliged to make any offer to certain existing equity holders (including in relation to the rights offering) but are choosing to do so in consideration for, inter alia, releases from those equity holders to the Companies, Secured Lenders and certain other parties. Accordingly, the Secured Lenders do not intend that equity holders who are in a continuing dispute with the Companies shall be eligible for any such offer.

period, and (ii) not to interfere, or encourage other people to interfere, with the Transactions.

(c) <u>Section 6</u>: The Company agrees to use commercially reasonable efforts to effect the Transactions, including obtaining the Sanction Order and the Recognition Order (as defined below) within certain prescribed time periods (set out below).

(d) <u>Section 8</u>: Provides that the Supporting Parties (as defined therein) shall not transfer any claim against or interest in the Company during the Support Period (as defined therein), provided that claims may be transferred subject to the transferee signing a joinder.

(e) <u>Section 9</u>: Prescribes how the RSA shall be terminated.

(f) <u>Section 10</u>: Contains each parties' respective representations and warranties.

(g) <u>Section 15</u>: Contains the conditions precedent to the closing of the Transaction.

37. On 17 September 2024, The Resource Group International, Ltd. (collectively with certain of its affiliates, "**TRG**"), one of the Company's current shareholders, executed a backstop commitment agreement (as amended, modified, or supplemented from time to time, including by that Amendment No. 1 dated 2 October 2024, the "**Backstop Agreement**") pursuant to which it has agreed to backstop a rights offering in advance in an amount of USD 15 million of the Convertible 2L Tranche (the "**Backstop 2L Loans**"). The purpose of the Backstop Agreement is to ensure that additional capital is raised to bolster the Company's liquidity, which, in part, is intended to assist with effecting the Transactions. A copy of the initial Backstop Agreement is at **Tab "B"**, **pages 695 to 735 of Exhibit CT-1** and a copy of the amendment is at **Tab "M"**, **pages 865 to 868 of Exhibit CT-1**. It provides:

(a) that if the rights offering results in existing equity holders subscribing to an amount of Convertible 2L Tranche in excess of USD 10 million, such excess amount of Backstop 2L Loans shall be resold by TRG to such rights offering subscribers other than TRG (or in the event such equity interest holders are not "Eligible Assignees", as defined in the Amended Credit Agreement, such excess amounts of Backstop 2L Loans shall be assigned by TRG to the Company and Newco for cancellation by the Term Loan Agent and an equivalent principal amount of notes having terms

substantially similar to the Convertible 2L Tranche shall be issued by the Company and Newco to such rights offering subscribers) along with a corresponding number of Class A-1 Units; and

(b)     that in no event shall the amount of Backstop 2L Loans resold to rights offering subscribers or assigned to the Company and Newco exceed USD 5 million aggregate principal amount.

38.     On 18 September 2024, the Company filed a Petition for its own winding up based on its insolvency, and at the same time applied to the Court by *ex parte* summons for the appointment of myself and Mr Morrison as JPLs.

39.     On 19 September 2024, the Court duly made the Appointment Order for the purposes of effecting the Proposed Restructuring. The Appointment Order includes powers to, *inter alia*:

(a)     review the Company's financial position;

(b)     to monitor the continuation of the business of the Company by the existing Board;

(c)     to consult with the creditors of the Company in determining the most appropriate manner to realise value for the benefit of the creditors;

(d)     to take such steps as they deem appropriate to sell, transfer, and/or with respect to the disposition of the assets of the Company;

(e)     to take such steps as they deem appropriate with respect to any settlements, compromises or arrangements (including seeking such sanction as the JPLs may consider necessary or desirable in the circumstances);

(f)     sign off on and execute agreements (including any documents to facilitate the any sale or transfer), pleadings, or any other document (with such court sanction as the JPLs may consider appropriate in the circumstances) on behalf of the Company;

(g)     if deemed necessary and/or appropriate by the JPLs, to apply to any foreign court (wherever situated) for recognition of their appointment or in connection with any other proceedings to take advantage of any insolvency or bankruptcy protections

that such foreign law, procedures, or proceedings may provide to the Company. Without prejudice to the foregoing, the Company acting through the Board shall be the Company's authorised foreign representative for the purpose of the UNCITRAL Model Law and Chapter 15, Title 11 of the United States Code;

(h)   to provide a written report to the Court from time to time and as this Court may otherwise request;

(i)   to render and pay invoices out of the assets of the Company for the JPLs' own remuneration at their usual and customary rates (and this shall include all costs, charges and expenses of their attorneys and all other agents, managers, accountants and other persons that the JPLs may employ), subject to such arrangements as agreed or as may be agreed with the Company (or with the approval of the Court) in the context of the overall restructuring process; and

(j)   to set up, maintain, and control bank accounts (whether jointly with the Company or otherwise) at any bank or financial institutions situated in Bermuda or elsewhere as appropriate, in their own names or in the name of the Company for the purpose of meeting the payment of the fees and expenses of the JPLs (subject to the appropriate procedures being agreed with the Company acting reasonably as to how fees shall be determined).

40.   A copy of the Appointment Order is at **Tab "C"**, **pages 751 to 756 of CT-1**.

41.   Accordingly, on 2 October 2024, the JPLs filed the Sanction Application seeking Court sanction of the Proposed Restructuring (the "**Sanction Order**"). Pursuant to section 6(x) of the RSA, the Sanction Order needs to be obtained on or before 25 October 2024.

42.   Save for those powers granted to the JPLs by the Appointment Order and the Protocol Agreement existing as between the Company and the JPLs, the Board shall continue to manage the Company's affairs in all respects and exercise the powers conferred upon it by the Company's Memorandum of Association and Bye-laws, provided always that, should the JPLs consider at any time that the Board is not acting in the best interests of the Company and its creditors, the JPLs shall have the power to report same to this Court and seek such directions from this Court as appropriate.

B. <u>Post Sanctioning Steps</u>

43.    As I understand it from the documentation and information received from the Company, it is anticipated that the Proposed Restructuring, should it be sanctioned by this Court, will subsequently unfold as follows:

(a)    Prior to the hearing on the Sanction Application, the Company intends to file a petition and related pleadings (the "**Chapter 15 Pleadings**") in the U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**"), under Chapter 15 of Title 11 of the United States Bankruptcy Code, asking the U.S. Bankruptcy Court to enter an order recognizing and enforcing the Sanction Order (the "**Recognition Order**"). Section 6(x)(E) of the RSA requires that the filing in the U.S. Bankruptcy Court take place on or before 29 October 2024 and Section 6(x)(F) of the RSA requires that the Recognition Order be issued on or before 25 November 2024. Although the Company intends to file the Chapter 15 Pleadings prior to the hearing on the Sanction Application, the hearing before the U.S. Bankruptcy Court to recognize and enforce the Sanction Order will only occur if this Court sanctions the Transactions. I understand from the Secured Lenders that, in the absence of the Recognition Order, the Proposed Restructuring will not proceed.

(b)    Following the entry of both the Sanction Order and the Recognition Order and the satisfaction of all other closing conditions

(i)    the Company will first transfer substantially all of its assets (which are all secured by liens in favour of the Secured Lenders), other than the Company's ownership interest in Afiniti, Inc. and the Company's Bermuda subsidiaries, to Holdco pursuant to the SATA, and Holdco will immediately transfer certain of these assets (including all of the intellectual property assets) to Afiniti AI Limited. A copy of the SATA in substantially final form is attached to the RSA at **Tab "B"**, **pages 556 to 618 of Exhibit CT-1** (as amended at **Tab "M", by pages 840 to 854**);

(ii)    immediately following the transfers to Holdco and Afiniti AI Limited described in paragraph 34, the Company will transfer all of its ownership interest in Afiniti, Inc. and Holdco to Newco, an entity newly formed and initially owned by the Term Loan Agent (acting through a representative),

pursuant to the STA, resulting in Newco owning, directly and indirectly, the shares of each transferred subsidiary. A copy of the STA in substantially final form is attached to the RSA at **Tab "B"**, **pages 619 to 694 of Exhibit CT-1** (as amended at **Tab "M"**, by **pages 855 to 862**);[9]

(iii)   Newco, Afiniti, Inc., along with all subsidiary guarantors under the existing Credit Agreement, and the Secured Lenders will execute the Amended Credit Agreement. A copy of the Amended Credit Agreement in substantially final form is attached to the RSA at **pages 157 to 364 of Exhibit CT-1 (**as amended at **Tab "M"**, by **pages 825 to 826)**;

(iv)   the Amended Credit Agreement will result in:

(1)   the New 1L Tranche, i.e. the new senior first lien secured tranche of debt in the principal amount of approximately USD 225 million, subject to potential increases for accrued interest; and

(2)   the Convertible 2L Tranche, i.e. the new junior secured convertible tranche of debt in the principal aggregate amount of approximately USD 298.7 million, subject to potential increases from the rights offering described in the following paragraph (v) and potential increases for accrued interest, where interest can be paid-in-kind to provide sufficient liquidity.

As noted above, the Amended Credit Agreement will be secured against substantially all of the assets of Newco and the assets of each other guarantor, with economic terms that better correspond to the current performance of the business. Schedule "A" to this Affidavit contains a comparison between the existing debt structure and proposed debt structure;

(v)   subject to the terms of the RSA and the Backstop Agreement (as amended), the Company's existing equity holders who are "Eligible Holders" (as defined in the RSA), and who have not prosecuted any claims against any of the Companies will be entitled to participate, on a voluntary

---

[9]   The schedules to the SATA and STA are not included in the filing because they contain personal and commercially sensitive information and are not relevant to the application in front of the Court.

basis, in a rights offering, pursuant to which such existing equity holders may subscribe for up to USD 25 million (inclusive of USD 10 million of the Backstop 2L Loans referred to in paragraph 37 of the Convertible 2L Tranche). Those participating in this offering will need to, among other things, provide fresh capital for their subscription and provide releases to the Companies, the Secured Lenders, and certain other parties in consideration of being included in this rights offering;

(vi)     as described in more detail below, but subject to the terms of the Newco LLC Agreement (as defined below), the Company's existing holders of preferred stock who are "Eligible Holders" (as defined in the RSA) who have not prosecuted any claims against any of the Companies will be provided certain Class B Units and certain Warrant Units in Newco in consideration of releases provided by such holders to the Companies, the Secured Lenders, and certain other parties; and

(vii)    following the consummation of the above transactions, the majority of the equity interests in Newco will be owned by the Secured Lenders.

(c)     All limited liability company interests in Newco will be denominated in the following units (the "**Newco Units**"):

| Class | Description |
|-------|-------------|
| **Class A-1** | *Pre*-conversion units for the convertible lenders (voting-only (1 vote per unit); no economics) |
| **Class A-2** | *Post*-conversion units for the convertible lenders (voting (2 votes per unit) and economics) |
| **Class B** | Units for non-lenders, such as existing preferred holders and backstop / rights offering participants (voting (1 vote per unit) and economics) |
| **Class C** | Non-voting interests expected to be allocated by Newco over time to certain members of management pursuant to a future management incentive plan |

| **Warrant Units** | Units for non-lenders, such as existing preferred holders and backstop / rights offering participants (non-voting; economics once certain minimum return thresholds for the convertible lenders are satisfied) |
|---|---|

(d)     The Newco Units will carry the rights, privileges, and burdens in Newco as outlined in the amended and restated limited liability company operating agreement of Newco (the "**Newco LLC Agreement**"),[10] and, where applicable, the Delaware Limited Liability Company Act.

(e)     Each Secured Lender will receive its *pro rata* share of (i) the New 1L Tranche; (ii) the Convertible 2L Tranche; and (iii) Class A-1 Units, representing in aggregate 75% of the voting Newco Units prior to dilution through the purchase of additional Convertible 2L Tranche under the Backstop Agreement and dilution by the management incentive plan ("**MIP**") and the Warrant Units and prior to conversion of such Convertible 2L Tranche;

(f)     The Class A-1 Units are voting-only units issued to the Secured Lenders under the Convertible 2L Tranche to provide the same number of votes as the Class A-2 Units issuable upon conversion of the Convertible 2L Tranche. Upon conversion of any loan under the Convertible 2L Tranche, such lender's Class A-1 Units will be cancelled and replaced with an equivalent number of Class A-2 Units, which will have both economic and voting rights;

(g)     The Class B Units will initially comprise 25% (prior to any dilution) of the aggregate capital of Newco. The Class B Units will be allocated as follows:

(i)     40% of the Class B Units to TRG as consideration for its backstop commitment;

(ii)     20% of the Class B Units to any participants in the rights offering on the basis of 4% of the Class B Units for every USD 5 million subscribed for in the rights offering, with any such Class B Units not allocated to rights

---

[10]     The Class A-1 Units, Class A-2 Units, Class B Units, Class C Units, and Warrant Units are each defined in the Newco LLC Agreement, and such definition is incorporated herein by reference. The form of the Newco LLC Agreement is attached to the RSA as Exhibit F.

offering subscribers being added to the amount allocated to the Company' current preferred interest holders pursuant to clause (iii); and

(iii)    40% of the Class B Units to the Company's current preferred interest holders.

(h)    The Warrant Units will initially comprise 10% of the aggregate capital of Newco once the minimum return thresholds for the convertible lenders are satisfied. The Warrant Units, will be allocated as follows:

(i)    40% of the Warrant Units to TRG as consideration for its backstop commitment;

(ii)    20% of the Warrant Units to any participants in the rights offering on the basis of 4% of the Warrant Units for every USD 5 million subscribed for in the rights offering, with any such Warrant Units not allocated to rights offering subscribers being added to the amount allocated to the Company' current preferred interest holders pursuant to clause (iii); and

(iii)    40% of the Warrant Units to the Company's current preferred interest holders.

(i)    The Class B Units and Warrant Units will be issued on an out-of-the-money basis and will only represent future option value rather than any intrinsic value at the date the restructuring is consummated. This portion of the consideration is being issued to the out-of-the money existing holders of preferred stock of the Company who are "Eligible Holders" (as defined in the RSA) who have not prosecuted any claims against any of the Companies and in consideration of releases provided by such holders to each of the Companies, the Secured Lenders, and certain other parties. It is a commercial arrangement that has been negotiated on an arm's length basis between the Secured Lenders and the Company and is designed to maximize shareholder support for the Proposed Restructuring.

(j)    The Warrant Units are non-voting, and will expire and be cancelled and extinguished on the seventh anniversary of the Newco LLC Agreement without any further action, and holders of Warrant Units shall only be entitled to receive distributions in connection with:

(i)     a sale or merger involving (1) Newco or (2) substantially all of its assets, or both;

(ii)     an IPO;

(iii)     the sale, lease, transfer, exclusive license, or other disposition by Newco or any subsidiary of Newco of a material amount of assets outside the ordinary course of business;

(iv)     the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of Newco; or

(v)     the incurrence of certain indebtedness, in each case only after certain minimum return thresholds for the convertible lenders are satisfied.

(k)     The non-voting Class C Units are expected to be allocated by Newco over time for issuance under a future MIP for nominated members of the management team in the amount of up to 15% of all issued and outstanding Newco Units on a fully diluted basis.

(l)     Newco will have a new board of managers. The initial board of managers of Newco will be comprised of nine managers:

(i)     three managers designated by the Secured Lenders;

(ii)     three independent managers designated by the Secured Lenders;

(iii)     two managers designated by TRG (assuming it fulfils, and continues to hold Newco Units representing, USD 10 million of its backstop commitment); and

(iv)     the Chief Executive Officer of the Companies.

(m)     Holdco will not assume any of the liabilities of the Company, except for those liabilities that are specifically and expressly assumed as set forth in the SATA. The liabilities of Afiniti, Inc. and its subsidiaries and the subsidiaries directly and indirectly transferred to Holdco will remain liabilities of those entities.

(n)     Following the implementation of the Proposed Restructuring, the Company will seek an order for its own winding up.

44.     If the Transactions are sanctioned by the Court, myself and Mr Morrison, as JPLs, intend to execute the Definitive Documents as necessary on behalf of the Company using the powers granted to us by the Appointment Order and the Sanction Order. The Secured Lenders will also execute certain of the Definitive Documents, to give them the benefit of the releases and consents contained therein, including under the Bermuda law governed "all asset" debenture that currently encumbers the Company's assets and which would otherwise prevent the proposed transfer by the JPLs. A copy of that debenture is located at **Tab "D"**, **pages 757 to 777 of Exhibit CT-1**.

### IV.     The Valuation Report

45.     On 25 July 2024, the Company retained Teneo FA to prepare a valuation and relevant alternative analysis report with respect to Afiniti Limited as at 12 August 2024 (the "**Valuation Date**"). The Valuation Report is at **Tab "A"**, **pages 1 to 66 of Exhibit CT-1**.

46.     Teneo FA is a separate legal entity from Teneo Bermuda, and Teneo Bermuda was not involved in the preparation of the Valuation Report. In their capacity as proposed JPLs, the JPLs and members of the Teneo Bermuda team reviewed the Valuation Report to understand the valuation approach, assumptions, and conclusions.

47.     In preparing the Valuation Report, I understand Teneo FA primarily applied a discounted cash flow analysis to ascertain the Enterprise Value of the Companies on a debt-free, cash-free going concern basis. In so doing they relied on the Companies' business plan, which Teneo FA understood to accurately reflect the Companies' operations: **Tab "A", page 5 of Exhibit CT-1**.

48.     In accordance with the terms of the engagement, the definition of value was to be consistent with a form of "fair market value", which is defined by the International Valuation Standards as:

> *estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer and a willing seller in an arm's length transaction, after proper marketing and where the parties had each acted knowledgeably, prudently and without compulsion".*

49.    In determining the aggregate total Enterprise Value of the Companies, Teneo FA used both income and market approach valuation methods: **Tab "A"**, **page 14 of Exhibit CT-1**.

50.    Based on these valuation approaches and the financial forecasts provided in the Company's management's business plan, and as shown in Figure 2, Teneo FA concluded that the Enterprise Value range for the Companies was between <u>USD 275 and USD 350 million</u> on a going concern, pre-Proposed Restructuring basis as at the valuation date: **Tab "A", page 17 of Exhibit CT-1**.



Figure 2

51.    The Valuation Report also considered certain alternatives to the Proposed Restructuring: namely:

(a)    an accelerated sales process of the business; or, alternatively, and in the event an accelerated sale was not possible,

(b)    a liquidation of the Companies' assets,

along with the indicative gross proceeds that would likely be available under these relevant alternative scenarios: **Tab "A", page 19 of Exhibit CT-1**.

52.   Under the accelerated sales process, based on the shortened timeframe of approximately four months to sale and with the potential need for additional funding to provide a sufficient runway for an accelerated M&A process, and by applying an indicative discount for distress (of 30% to 50%) to the going-concern Enterprise Value of the Companies as of the Valuation Date, Teneo FA concluded that the potential gross proceedings payable to the Secured Creditors was in the range of <u>USD 150.3 million to USD 218.8 million</u>: **Tab "A", page 21 of Exhibit CT-1**.

53.   Under the liquidation process, it is likely that a sale of the businesses would be completed through an accelerated M&A process or, absent an ability to sell the business, a liquidation of the assets on a break-up basis under a shortened timeframe and tight liquidity. Based on these assumptions, and after applying an estimated rate of realisation to the net book value, Teneo FA concluded that asset realization after the deduction of costs would be between <u>USD 36.9 million and USD 148.9 million</u>, and therefore significantly less than the lower end of the <u>USD 275 million</u> Enterprise Value of the Companies: **Tab "A", page 27 of Exhibit CT-1**.

54.   In the circumstances, Teneo FA concluded that the Enterprise Value of the Companies on a going concern basis resulting from the Proposed Restructuring provided the greatest recovery when compared with the potential realizable value under available alternative options of an accelerated sales process or the liquidation of the Companies' assets: **Tab "A", page 29 of Exhibit CT-1**.

55.   Having:

(a)   reviewed the Valuation Report and the assumptions contained therein; and

(b)   considered the Company's efforts in November 2023 and thereafter to solicit interest from the market in refinancing proposals or other forms of strategic transactions,

the JPLs are satisfied the Proposed Restructuring is in the best interest of the Company's creditors as the Company is insolvent on both a cashflow and balance sheet basis and cannot continue as a going concern.

**V. Impact of the Proposed Restructuring on the Company's Unsecured and Trade Creditors**

A. Trade Creditors

56. I understand from the Company and believe it to be true that liabilities of ordinary course trade creditors and certain other vendors are generally to be assumed by Newco and therefore the Proposed Restructuring will not have any adverse effect on such creditors and vendors.

B. Shareholders

57. As set out above, the Class B Units and Warrant Units are being issued on an out-of-the-money basis to (a) the Company's preferred shareholders and (b) the Company's preferred and common shareholders to the extent they participate in the rights offering, in each case subject to the terms of the rights offering documents and to the extent such shareholders are "Eligible Holders" (as defined in the RSA) who have not prosecuted any claims against any of the Companies, in consideration of releases provided by such holders to the Companies, the Secured Lenders, and certain other parties.

58. Given that this is a commercial arrangement and is designed to maximize shareholder support for the Proposed Restructuring and raise additional capital for Newco, I am satisfied that its offering has not adversely impacted the Company's creditors.[11]

C. Unsecured Creditors

59. As set out in the Valuation Report, the value breaks with the Company's Secured Creditors. It follows that the Company's unsecured creditors are 'out of the money'. This is so regardless of whether the Company proceeds with the Proposed Restructuring, an accelerated sales process, or a liquidation.

60. This is particularly important as I understand that Mr Chishti alleges to be owed approximately USD 45 million (the "**Chishti Liability**") under a Deed of Indemnification existing as between the Company and Mr Chishti (the "**Indemnity**") dated 1 January 2020. A copy of the Indemnity is at **Tab "E"**, **pages 778 to 790 of Exhibit CT-1**.

---

[11] The rights offering is being offered by the Secured Lenders to encourage maximum shareholder support for the Transaction. It is not being funded by the Company, and therefore does not adversely affect the monies available to the Company's creditors. It will not be offered to those shareholders in dispute with any one or more of the Companies.

61.    On 25 September 2024, Mr Chishti's counsel, Cox Hallett Wilkinson Limited, wrote to the JPLs alleging that at least some of his claims against the Company attract super-priority status in respect of any liquidation of the Company (the "**25 September Chishti Letter**"). Specifically, the 25 September Chishti Letter suggested that the continuation of Action No. 2024: 112 obliged the JPLs to ensure the Company maintained sufficient reserves to settle any costs or damages awards flowing from the same. A copy of this letter is at **Tab "K"**, **pages 808 to 814 of Exhibit CT-1.**

62.    On 1 October 2024, I was advised by the Company's counsel and believe it to be true that the Court handed down judgment in Action No 2024: 112 (see [2024] SC (Bda) 52 Civ.) in which the Company was successful, and costs were ordered against Mr Chishti (subject to him filing an application to be heard on the issue). I also understand that the USD 100,000 currently being held in Court on cross-undertaking shall be released to the Company if no application by Mr Chishti is made on the subject of costs.

63.    Also contained in the 25 September Chishti Letter, was Mr Chishti's position that section 9 of the Indemnity requires the Company to require any successor who acquires all, or substantially all, of the Company's business to assume the Indemnity.

64.    Whether Mr Chishti's assertions in the 25 September Chishti Letter are legally correct are a matter of construction and the application of applicable contractual and insolvency law principles that are more appropriately left for the JPLs' counsel to address in legal submissions.

65.    As I understand it, the Chishti Liability is contingent upon him successfully enforcing his rights under the Indemnity. Given the Company's current liabilities, and the Enterprise Value of the Companies, it is apparent that even if Mr Chishti succeeds with his claim, the Chishti Liability will still be unsecured and therefore he would not be liable to receive any distribution out of the assets of the Company on its liquidation. It follows on this approach that the existence of the potential Chishti Liability would not change the JPLs' opinion that the Proposed Restructuring is in the best interest of the Company's creditors.

66.    On 30 September 2024, the JPLs, through counsel, responded to the 25 September Chishti Letter, advising him of the JPLs' intention to file the Sanction Application the week of 1 October 2024 per his request that he receive advanced notice of any filing. In so doing, the JPLs expressly reserved their position in respect of the substance of the 25

September Chishti Letter. A copy of the JPLs' responding letter is at **Tab "L"**, **pages 815 to 816 of Exhibit CT-1.**

    D.   <u>Indemnification Obligations</u>

67.    I understand that the Company's Bye-laws along with separate contracts entered into between the Company and the directors and certain officers of the Company provided certain rights of indemnification ("**Indemnification Obligations**"). Any indemnification claims are unsecured contingent claims and so out of the money, and the Proposed Restructuring does not provide that Newco will assume those Indemnification Obligations. I also understand there is Directors' and Officers' insurance coverage available for claims made against the beneficiaries of the Indemnification Obligations in connection with their service as directors and officers of the Company.

68.    I further understand that the terms of those contracts provide that the Company must require any successor or assignee to assume the Indemnification Obligations, or alternatively that the Company cause either (a) the purchaser of substantially all of its business and/or assets or (b) one of its subsidiaries to assume the Indemnification Obligations.

69.    While I will leave Counsel for the JPLs to address the Court on this issue, I understand that in the circumstances of this case, where the Company is insolvent, the Company cannot force a third party to assume the Indemnification Obligations. This is so even if that third party is one of the Company's subsidiaries. I further understand that the Secured Lenders have expressly excluded from assumption all Indemnification Obligations of the Company in the transfer agreements and the Secured Lenders are unwilling to support the Proposed Restructuring if Newco, Holdco, or any of their respective subsidiaries (after closing the Transactions underlying the Proposed Restructuring) is exposed to the Indemnified Obligations. Therefore, the Proposed Restructuring would not take place, which, in turn, would prevent the JPLs from being able to realise the Company's assets in a maximally efficient way, as we are statutorily obliged to do.

## VI. **Notice of the JPLs' Appointment**

70.    I understand from the Company that it has concerns about confidentiality given that its client base is highly concentrated, and the loss of a customer can have a disproportionate impact on revenue.

71.   To assist the Company with ensuring the Company's shareholders, known creditors, and certain of its vendors and customers (collectively, the "**Stakeholders**") received the necessary information about the Proposed Restructuring required under all applicable laws and regulations, the Company engaged communication specialists (the "**Communications Specialists**").

72.   In addition to the Communications Specialists, the Company also engaged Kroll Restructuring Administration LLC ("**Kroll**") to act as the Company's service agent and to assist with the dissemination of the Initial Notice Materials and the Sanction Application Notice (as those terms are defined below).

73.   The JPLs have liaised directly and through the JPLs' counsel, Walkers (Bermuda) Limited, with both Kroll and the Communications Specialists. As detailed below, the Stakeholders have received sufficient notice of these proceedings.

74.   On 20 September 2024, the Company's Stakeholders received:

(a)   a letter from the Company notifying them of the appointment of JPLs over the Company and providing a high-level overview of the Proposed Restructuring and how it will impact them. Copies of these letters (one of which was directed at the Company's shareholders and the other of which was directed at the Company's other stakeholders) are located at **Tabs "F" and "G" at pages 791 to 795 respectively of Exhibit CT-1**; and

(b)   a notice of the JPLs' appointment. A copy of this notice is located at **Tabs "F" and "G" at pages 793 and 795 respectively of Exhibit CT-1**,

(collectively, the "**Initial Notice Materials**").

75.   On 23 September 2024, the Company's investor relations department disseminated a further communication describing the Proposed Restructuring to all shareholders. A copy of the communication is located at **Tab "H"**, **pages 796 to 798 of Exhibit CT-1**;

76.   In addition to the Initial Notice Materials the Company also took out an advertisement with the Royal Gazette, in Bermuda which appeared online and in print on or around 25 September 2024, as required under Bermuda law. A copy of that advertisement is at **Tab "I"**, **page 799 of Exhibit CT-1**.

77.     On or before 4 October 2024, the JPLs intend to send a subsequent notice to the Stakeholders advising them of the Sanction Application (the "**Sanction Application Notice**"). The Sanction Application Notice states, *inter alia*:

(a)     a description of the relief being sought pursuant to the Sanction Application;

(b)     the date the Sanction Application was to be heard;

(c)     that parties would have the opportunity to appear and raise objections within the Bermuda proceedings;

(d)     the location for the hearing of the Sanction Application should they wish to appear;

(e)     how additional information can be obtained; and

(f)     the email address where Stakeholders could contact the JPLs to make any inquiries and access the relevant court materials.

**VII.     Urgency**

78.     Prompt entry of the Sanction Order on 23 October 2024 is critical to the Proposed Restructuring so that the Company can then obtain entry of the Recognition Order from the U.S. Bankruptcy Court and then, in turn, close the Transactions as soon as possible (following satisfaction of any remaining conditions).  A prompt closing is necessary and in the best interests of the Company, as the Company has constrained liquidity and is not expected to receive additional funding until closing.

79.     Furthermore, a prolonged provisional liquidation will cause uncertainty with the Company's business, which will make it increasingly difficult to attract new customers and to retain the employment of key employees while the Company is under Court supervision.

80.     Moreover, if the Sanction Order is not entered by 25 October 2024 (or is not otherwise promptly granted), the Secured Lenders have a termination right under the RSA and could potentially walk away from the Proposed Restructuring and exercise other remedies against their collateral. If the Secured Lenders exercise other remedies against their collateral, it is likely that the Company's unsecured creditors and equity holders will be either significantly worse off or will receive nothing, as opposed to the benefits

contemplated by the Proposed Restructuring to certain creditors and eligible equity holders.

### VIII.        Conclusion

81.    To the greatest extent possible, the Proposed Restructuring will minimize the impact of the Company's financial distress on the Company's existing customers, certain vendors and employees, and, most importantly, ordinary course trade creditors. Further, it has no negative impact on unsecured creditors or shareholders, as the Valuation Report demonstrates that value clearly breaks within the level of debt owed to Secured Creditors, and as such, neither an accelerated sale nor a liquidation would produce any different result for unsecured creditors or shareholders.

82.    In the circumstances, the JPLs are satisfied that the Proposed Restructuring offers the best alternative to liquidation, and that it would be appropriate for the Court to exercise its powers to sanction the Transactions. To the extent that any part of the implementation of the Transactions or the Definitive Documents requires the JPLs to exercise their powers of sale and transfer granted under the Appointment Order, such as in relation to the transfers under the SATA and STA, which are an intrinsic part of the Transactions, the JPLs are of the view that it would be appropriate to exercise these powers for the same reasons that form the basis for seeking sanction of the Proposed Restructuring; namely, that such an exercise of power is in the best interest of creditors.

83.    Given the foregoing, the JPLs respectfully request that this Honourable Court make this order in the terms sought in the Draft Order at **Tab "J"**, **pages 800 to 807 of Exhibit CT-1.**

| | |
|---|---|
| **SWORN** by the said | ) |
| Charles Thresh | ) |
| in the City of Hamilton | ) |
| in the Islands of Bermuda | ) |
| 2nd day October 2024 | ) |
| **BEFORE ME:** | |

_____
**COMMISSIONER FOR OATHS**

**MARCUS SYMONDS**
**Commissioner for Oaths**
Dated: 2 October 2024
**Carey Olsen Bermuda Limited**
**Rosebank Centre, 5th Floor**
**11 Bermudiana Road**
**Pembroke, HM 08, BERMUDA**
**+1 (441) 542-4500**

**Schedule "A"**

| Current Debt Structure | | Proposed Debt Structure | |
|---|---|---|---|
| **Debt** | **Amount (USD)** | **Debt** | **Amount (USD)** |
| 2019 Credit Agreement | 125,000,000 | Principal amount for the new junior second lien secured convertible tranche | 285,000,000 |
| May 2020 Amendment | 25,000,000 | New senior first lien secured tranche | 225,000,000 |
| November 2020 Amendment | 100,000,000 | Potential exit funding | 25,000,000 |
| December 2020 Amendment | 50,000,000 | Backstop commitment (junior second lien secured convertible tranche) | 15,000,000 |
| March 2021 Amendments | 40,000,000 | | |
| May 2021 Amendment | 75,000,000 | | |
| March 2022 Amendment | 41,250,000 | | |
| **Total Principal Balance** | **456,250,000** | | |
| **Total Interest Paid in Kind (8 July 24)** | **52,494,859.71** | | |
| **Total** | **508,744,859.71** | **Total** | **550,000,000** |

IN THE SUPREME COURT OF BERMUDA
COMPANIES (WINDING UP)
COMMERCIAL COURT
2024: No.

IN THE MATTER OF AFINITI LTD. (PROVISIONAL
LIQUIDATORS APPOINTED FOR RESTRUCTURING
PURPOSES)

AND IN THE MATTER OF THE COMPANIES ACT 1981

---

**AFFIDAVIT OF CHARLES THRESH**

---





**Walkers (Bermuda) Limited**
Park Place
55 Par-La-Ville Road
Third Floor
Hamilton HM 11
Bermuda
Tel: 441 242 1500
Ref: KT/SW/DL/A04375



SUPREME COURT BERMUDA
2024 OCT -2 PM 3: 26