**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Afiniti, Ltd.,[1] | Case No. 24-12539 (LSS) |
| Debtor in a Foreign Proceeding. | |

**DECLARATION OF HASSAN AFZAL**
**IN SUPPORT OF VERIFIED PETITION AND MOTION**
**UNDER CHAPTER 15 FOR (I) RECOGNITION OF A FOREIGN MAIN**
**PROCEEDING, (II) RECOGNITION OF JPL APPOINTMENT ORDER, (III)**
**RECOGNITION OF SANCTION ORDER, (IV) APPROVAL OF FREE AND CLEAR**
**TRANSFER OF ASSETS, (V) APPROVAL OF THE PROCEDURE GOVERNING**
**THE CLOSING OF THIS CHAPTER 15 CASE, AND (VI) RELATED RELIEF**

I, Hassan Afzal, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

**INTRODUCTION**

1.      I am the Chief Executive Officer of Afiniti, Ltd. (the "**Debtor**") and am duly authorized by its Board of Directors (the "**Board**") to swear this declaration on behalf of the Debtor.  The Debtor is a holding company for the 'Afiniti' business, operated through 32 entities (collectively with the Debtor, the "**Companies**").  A structure chart, showing the Debtor as well as its direct and indirect subsidiaries, is attached as **Exhibit 1** hereto.  The business of the Companies is in applied predictive artificial intelligence.

2.      I am over the age of eighteen and, except as otherwise indicated, all facts set forth in this declaration (this "**Declaration**") are based upon my personal knowledge, my opinion based upon my experience and knowledge of the Debtor and my review of relevant documents or

---

[1]    The Debtor's registration number is 45859. The location of the Debtor's registered office is Crawford House, 50 Cedar Avenue, Hamilton, Pembroke, HM 11, Bermuda.

information supplied to me.  If I were called upon to testify, I could and would testify competently

to the facts set forth herein.  Where the matters stated in this Declaration are statements of fact that

are within my personal knowledge, they are true.  Where the matters stated in this Declaration that

are statements of fact are not within my personal knowledge, they are derived, as appropriate, from

information supplied to me by or on behalf of the Debtor and are true to the best of my knowledge,

information and belief.

3.      The Debtor filed its (i) *Chapter 15 Petition for Recognition of a Foreign
Proceeding* (the "**Chapter 15 Petition**") on November 3, 2024 and (ii) *Verified Petition and
Motion Under Chapter 15 for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of
JPL Appointment Order, (III) Recognition of Sanction Order, (IV) Approval of Free and Clear
Transfer of Assets, (V) Approval of the Procedure Governing the Closing of this Chapter 15 Case,
and (VI) Related Relief* contemporaneously herewith (the "**Recognition Motion**").[2]  I submit this
Declaration in support of the Chapter 15 Petition and the Recognition Motion.

### PERSONAL BACKGROUND AND QUALIFICATIONS

4.      I am the Chief Executive Officer of the Debtor and its U.S. subsidiary Afiniti, Inc.,

a position I have held since 2023.  I joined the Debtor since its inception in 2008, and held the

position of Chief Technology Officer until my promotion to Chief Executive Officer.  I serve on

the board of multiple of the Debtor's subsidiaries.  I hold a Bachelor of Science in Electrical

Engineering from the University of Virginia and a Master of Science in Computer and Information

Systems from the University of Pennsylvania.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Recognition Motion.

5.      I became Chief Executive Officer at a challenging time for the Debtor, with approximately nine months remaining for the maturity of nearly $200 million in debt, with an industry valuation backdrop where revenue multiples had halved over the prior 18 months, and with a material reduction in revenues in the spring of 2023 from the Debtor's top two clients. During my leadership of the Debtor, I have focused on diversifying its product portfolio and on its partnerships to distribute and monetize those products, as I believe the key to predictable and growing revenues for the Debtor consist of a different go-to-market strategy.

## THE COMPANY, THE FOREIGN PROCEEDING, AND THE PROPOSED RESTRUCTURING

### A.      The Company

6.      The Debtor is an exempted company incorporated under the Companies Act 1981 on October 12, 2011 under its original name, Satmap International Holding, Ltd.  The Debtor's registration number is 45859 and its registered office is at Crawford House, 50 Cedar Avenue, Hamilton, Pembroke, HM 11, Bermuda.

7.      The operating subsidiaries of the Companies provide applied predictive artificial intelligence and related infrastructure and professional services.  The main product offering is a patented technology for use in customer service contact centers that optimally pairs customers with contact centre agents based on machine learning based algorithms that seek to predict optimal outcomes.  The technology is used globally in the healthcare, telecommunications, travel, hospitality, insurance, and banking industries and across multiple customer experience channels.

8.      The Debtor's share capital is divided as follows:

| Category | Number Outstanding |
|---|---|
| Common Shares | 24,699,310 |
| Class A Preference Shares | 5,180,031 |
| Class B Preference Shares | 1,595,593 |
| Class C Preference Shares | 9,767,592 |
| Class D Preference Shares | 0 (redeemed) |
| Class E Preference Shares | 1,919,792 |

9.      The Debtor's equity structure reflects how, over time, it has raised incremental capital from new investors.  So, for example, when a fundraising "round" was conducted, the Debtor's most recent investors would typically invest in a new alphabetical preference share class that was senior to all previous share classes.  This means that, as a general principle, Class E preference shares are the most senior in right of a distribution to the Debtor on a winding-up, whereas the common shares are the most junior.

10.      In addition to equity capital, the Companies have raised debt financing.  The Debtor and its U.S. operating subsidiary, Afiniti, Inc., are parties to a first lien secured credit agreement dated June 13, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**").  The Debtor (as well as several, but not all, of its other subsidiaries) guaranteed repayment of all sums loaned under the Credit Agreement and granted fixed and floating security for the same over substantially all of its assets.  The lenders comprise a syndicate.  The administrative agent and collateral agent is VCP Capital Markets, LLC.  I will refer to the syndicated lenders under the Credit Agreement as the "**Secured Lenders**".

11.     Afiniti, Inc. borrowed the initial term loan under the Credit Agreement in the aggregate principal amount of $125.0 million (the "**First Term Loan**").   Pursuant to an amendment to the Credit Agreement, Afiniti, Inc. borrowed an additional incremental amount of $25.0 million (together with the First Term Loan, the "**Initial Term Loans**").   Pursuant to various amendments to the Credit Agreement executed between November 2020 and March 2022, Afiniti, Inc. borrowed additional term loans in the combined principal amount of $306.25 million (collectively the "**Incremental Term Loans**" and, together with the Initial Term Loans, the "**Term Loans**").

12.     Interest on the Term Loans historically accrued at a range of 7.25% to 10.25% payable in cash and 1% to 6% payable in kind, each paid quarterly.   Until the signing of the RSA, interest accrued at 10.25% payable in cash (approximately $13 million per quarter) and 1.00% payable in kind (approximately $1.3 million per quarter).   In accordance with the terms of the RSA, from the signing of the RSA to the date the Bermuda Proceeding was filed, interest accrued at the same rate but was payable in kind on each interest payment date and added to the existing term loans under the Credit Agreement.   Since the commencement of the Bermuda Proceeding, interest accrues at 12.25%, which is the default rate under the Credit Agreement, until the closing of the Proposed Restructuring, at which time all accrued but unpaid interest will be exchanged on a pro rata basis for an additional amount of New 1L Tranche and 2L Convertible Tranche equal to the accrued and unpaid amount of such interest through the closing date of the Proposed Restructuring.   If the closing does not occur, all accrued interest will be due in cash immediately. All interest obligations have been paid to date.   The Term Loans' total balance (including any interest paid in kind) is approximately $522.04 million, summarized as follows:

| Credit Agreement | Original Maturity Date | Principal Balance |
|---|---|---|
| 2019 Credit Agreement | June 13, 2024 | $125,000,000.00 |
| May 2020 Amendment | June 13, 2024 | $25,000,000.00 |
| November 2020 Amendment | November 17, 2025 | $100,000,000.00 |
| December 2020 Amendment | November 17, 2025 | $50,000,000.00 |
| March 2021 Amendments | November 17, 2025 | $40,000,000.00 |
| May 2021 Amendment | November 17, 2025 | $75,000,000.00 |
| March 2022 Amendment | March 7, 2027 | $41,250,000.00 |
| **Total Principal Balance** | | **$456,250,000.00** |
| **Total Interest Paid in Kind (as of September 30, 2024)** | | **$65,786,864.00** |
| **Total Funded Secured Debt Obligations** | | **$522,036,864.00** |

13.     In addition to the Term Loans, as of September 30, 2024, the Debtor has approximately $58.5 million of liabilities.

14.     On January 29, 2023, the Board formed a transaction committee to (i) assist the Board in fulfilling its responsibilities relating to the Debtor's long-term strategic plan and strategies, (ii) oversee the review and evaluation of any potential strategic transactions, (iii) if deemed desirable, oversee the negotiation of the terms and conditions of one or more strategic transactions on behalf of the Debtor, and (iv) recommend any appropriate strategic transaction to the Board for review and approval.

**B.     The Financial Position of the Debtor**

15.     The Debtor is in financial distress for a variety of reasons.

16.    First, the Debtor had previously experienced significant success and incurred substantial—and ultimately unsustainable—debt obligations to invest and grow the business, which necessitated considerable cash outflows for debt servicing.  The Debtor was able to incur debt in 2020 and 2021 even though it had significantly negative cash flows because the debt markets were especially liquid during a period of low interest rates and lenders were extending credit to loss-making borrowers on the basis of recurring revenues.  Starting in early 2022, however, with the changes in the interest rate environment, the debt markets tightened dramatically and lenders turned their focus toward a more traditional cash flow basis.  While the Debtor reduced its cost base in late 2021 and started to generate positive cash flows, the debt level incurred was and remains simply too high in light of its revenue sources (due to client concentration) and performance.  Further, in parallel with (and partly because of) the tightening of the interest rate environment, valuations for software companies started to decline, with valuation multiples by 2023 having halved from their late 2021 levels.

17.    Second, in late 2022, the artificial intelligence ("**AI**") industry underwent a significant inflection point with the release of ChatGPT; client interest in AI shifted almost overnight to "generative" AI that involved the generation of content using large language models, rather than the use of AI to predict outcomes as provided by the Debtor.  Accordingly, large enterprise clients prioritized their AI-related customer care spend on generative AI initiatives rather than optimizing their contact center estates, leading in some cases to a de-prioritization of the Debtor within their corporate initiatives.

18.    The Debtor's business model from its inception consisted of a "pay for performance" model with a small number of large enterprise clients, where the Debtor received revenues based upon the incremental Afiniti-driven enhancement in its clients' contact center

performance.  Accordingly, the Debtor has had high client concentration, as well as high revenue volatility, which made its capital structure highly vulnerable given the amount of debt that it carried.

19.     The Companies' revenues have also materially declined for fiscal year 2024 as compared to fiscal year 2023 as certain clients imposed constraints to distribute calls according to their own internal routing protocols, which tends to restrict the Companies' performance and therefore revenues, while another client has re-channeled its budget towards other internal initiatives.  To date, even with the relaxation of some of these routing constraints, the Companies have continued to be negatively affected—particularly in light of the Companies' ongoing liquidity stress, cost-cutting efforts, and restructuring discussions.  For example, the Companies missed their revenue projections for the first quarter of fiscal year 2025 and have lowered their projections for the remainder of the fiscal year.

20.     Third, the Debtor's financial situation was and remains further exacerbated by events surrounding its founder and former chairman and chief executive, Muhammad Ziaullah Chishti.  In November 2021, Chishti resigned from the Debtor following revelations of an arbitration award against him for sexual misconduct against a former employee.  The media fallout was widespread and the Debtor had to thoughtfully navigate the immediate period following the revelations to maintain its key client relationships while cutting its costs to extend its cash runway.  Also, the Debtor and Afiniti, Inc. have alleged before the U.S. District Court for the District of Columbia that, shortly after his departure, Chishti misappropriated trade secrets of the Debtor and launched an unlawful competing enterprise with the Debtor (the "**Trade Secret Action**").

21.     Chishti has since advanced claims against the Debtor for advanced payment and indemnification of certain expenses he is said to have incurred in the Trade Secret Action and

various other litigation matters involving himself and third parties in the United States and elsewhere, including defamation actions brought by Chishti against his sexual misconduct accuser. The asserted basis for Chishti's indemnification and advancement claims against the Debtor, which the Debtor has disputed and continues to dispute, is a Bermuda-law Deed of Indemnification ("**Deed**") between Chishti and the Debtor dated January 1, 2020.  Chishti's advancement and indemnification claims are the subject of at least six different sets of proceedings in Bermuda.  All this litigation has resulted in significant legal expenses, further impacting the Debtor's liquidity.

**C.    Unsuccessful Refinancing Efforts**

22.    The Initial Term Loans were originally scheduled to mature on June 13, 2024.  As is common with credit agreements, a failure to repay the Initial Term Loans at their scheduled maturity would have precipitated a cross-default on the other Term Loans and would have caused them to become repayable on demand.

23.    Accordingly, the Debtor explored a number of strategic transactions with the aim of repaying in full the Initial Term Loans.  Chief amongst these transactions was a refinancing of part or all of the Term Loans by one or more new lenders in the form of new senior or subordinated debt.  The Debtor was also open to an equity investment to repay the maturing tranche of the loan; however, the decline in industry multiples meant that the Debtor's debt was crowding out any equity value.  In November 2023, the Debtor engaged an investment bank to run a process to solicit interest in refinancing proposals, or, as an alternative, some other form of strategic transaction such as a further equity raise or a sale.

24.    On behalf of the Debtor, the bank contacted 87 third parties, consisting of strategic partners and financial investors.  Of those parties, 61 executed nondisclosure agreements and received diligence about the Debtor.  Ultimately, the Debtor received only one complete proposal for a senior debt refinancing of that portion of the debt under the Credit Agreement that had an

upcoming maturity date.  This proposal was ultimately unworkable because, among other things, the new lender would have required the Secured Lenders to take a subordinated position of their remaining debt in the capital structure, which I understand was not acceptable to the Secured Lenders.

25.      As a result, the only workable refinancing option would have been to pay back the entire debt facility, which the proposal did not address.  The Debtor did not receive any complete proposals for an equity or subordinated debt financing, primarily because the reduction in industry valuation multiples meant that the Debtor's debt overwhelmed the Debtor's enterprise value. Based on the investment bank's outreach and feedback, there was insufficient interest in investing in the Debtor because of (i) the Debtor's heavy leverage and debt obligations, (ii) the competitive landscape, intensified by the rise of generative AI, (iii) the Debtor's customer concentration and decline in revenues, (iv) the reputational and financial consequences of Chishti's actions and the ongoing litigation with him, and (v) a general economic slowdown, which has reduced consumer spending and tightened budgets for many of the Debtor's customers (including through decreased investments in customer service infrastructure).

26.      Accordingly, (i) the only workable option on the table consisted of negotiating with the Debtor's existing lenders and (ii) the Board has determined that the Debtor is insolvent on both a cash-flow and balance-sheet basis.

27.      The Board considered that, as matters stand, the Debtor's guarantee of the term loans under the Credit Agreement has matured, is currently in default, and the full amount of the Debtor's guarantee is due and payable.  Absent the implementation of the restructuring described below, the Debtor will be unable to repay the outstanding Term Loans or continue to service the approximately $13 million in quarterly interest payments on the Term Loans.  The Debtor is

therefore insolvent on a cash-flow basis. As set out at paragraphs 14 and 16 above, the Debtor-guaranteed Term Loans total $522.04 million and total liabilities are approximately $580.5 million (inclusive of the Term Loans). Based on a valuation performed by valuation experts retained by the Debtor, the value of the Companies on a going concern basis (see below at paragraph 37) is approximately $275-350 million. The Debtor is therefore insolvent on a balance-sheet basis as well.

**D.    Proposed Restructuring with Secured Lenders**

31.    In light of, and in parallel with, the ultimately unsuccessful refinancing efforts, in or around March 2024, the Debtor began discussing with the Secured Lenders possible solutions to address the June 13, 2024, maturity date and providing diligence to them to facilitate those discussions. The Debtor's aim was a consensual solution that would maximize value for the Debtor's stakeholders. The considered solutions ranged from a simple "amend and extend" transaction to more comprehensive solutions such as a debt-to-equity swap/recapitalization of the Companies.

32.    Ultimately, given the current state of the business, the future capital requirements of the operating subsidiaries of the Companies and more general market conditions (including elevated interest rates), the discussions with the Secured Lenders resulted in the restructuring detailed below. In essence, it became clear that a comprehensive recapitalization of the Companies' debt and equity was necessary given that the fundamentals of the underlying business had declined to the point where it was no longer sustainable for the Companies to continue as a going concern with their current debt service and repayment obligations. Indeed, the Debtor was unable to repay the Initial Term Loans upon their June 13, 2024 maturity date and would have defaulted under the Credit Agreement absent an agreed solution with the Secured Lenders.

33.     The discussions with the Secured Lenders resulted in an agreed restructuring term sheet dated June 7, 2024.  In connection therewith, the Secured Lenders under the Initial Term Loans extended the June 13, 2024 maturity date to July 29, 2024 and again to September 12, 2024, and then again to provide time for the filing of the provisional liquidation in Bermuda, so that the parties could continue their discussions and documentation efforts.  Absent these maturity extensions, the Debtor would have been in default upon the maturity of the Initial Term Loans as a result of the Debtor's inability to repay them in full.

34.     The Debtor and the Secured Lenders utilized the time provided by the maturity extensions to continue negotiations toward an agreed restructuring.  These negotiations and efforts culminated in the Debtor, its subsidiaries that are party to the Credit Agreement, and the Secured Lenders entering into the Restructuring Support Agreement dated September 17, 2024 (as amended, modified, or supplemented from time to time, including by that Amendment No. 1 dated October 2, 2024, the "**RSA**"), which governs the Debtor's proposed restructuring (the "**Proposed Restructuring**").  A copy of the RSA (including Amendment No. 1) is attached hereto as **Exhibit 2**.

35.     The principal terms of the Proposed Restructuring are, in summary, as follows:

    a)  The Debtor will first transfer substantially all of its assets (which are all secured by liens of the Secured Lenders), other than its ownership interest in its U.S. subsidiary, Afiniti, Inc., and the Debtor's Bermuda subsidiaries to a newly formed wholly owned Cayman Islands limited liability company, Afiniti AI Holdings LLC ("**Holdco**"), pursuant to the SATA, and Holdco will immediately transfer certain of these assets (including all of the intellectual property assets) to the Debtor's Irish subsidiary, Afiniti AI Limited;

    b)  immediately following the transfers to Holdco and Afiniti AI Limited described above, the Debtor will transfer all of its ownership interest in Afiniti, Inc. and Holdco to Afiniti Newco Holdings LLC ("**Newco**"), an entity formed and initially owned by the Term Loan Agent (as defined in the RSA), acting through a representative, pursuant to the STA, resulting in Newco owning, directly and indirectly, the shares of each transferred subsidiary;

c)  Newco, Afiniti, Inc, all the other subsidiary guarantors under the existing Credit Agreement, and the Secured Lenders will execute a further amendment to the Credit Agreement (the "**Amended Credit Agreement**");

d)  the Amended Credit Agreement will result in (i) a new senior first lien secured tranche of debt in the principal amount of approximately $225 million, subject to potential increases for accrued interest (the "**New 1L Tranche**"); and (ii) a new junior secured convertible tranche of debt in the initial principal aggregate amount of approximately $298.7 million, subject to potential increases from the rights offering described in the following paragraph and potential increases for accrued interest (the "**Convertible 2L Tranche**") where interest can be paid-in-kind to provide sufficient liquidity.  Crucially, the Amended Credit Agreement will be secured by substantially all of the assets of Newco, Holdco, and each of the guarantors under the Debtor's current Credit Agreement (other than the Debtor) that will continue to be guarantors following consummation of the Proposed Restructuring, with economic terms that better correspond to the current performance of the business, hence capacity to service the debt;

e)  the Debtor's existing equity holders who meet certain eligibility requirements and who have not prosecuted any claims against the Companies, will be entitled to participate, after the closing of the Transfer, on a voluntary basis, in a rights offering, pursuant to which such existing equity holders may subscribe for up to $25 million (inclusive of $10 million being backstopped by certain current equity holders of the Debtor and/or their affiliates) of the Convertible 2L Tranche, subject to the terms of the RSA and Backstop Agreement (as defined below and attached as an exhibit to the RSA).  Those participating in this rights offering, among other things, will need to provide fresh capital for their subscription and provide releases to the Companies, the Secured Lenders, and certain other parties in consideration of being included in the rights offering;

f)  after the closing of the Transfer, the Debtor's current holders of preferred stock who meet certain eligibility requirements, who have not prosecuted any claims against the Companies will be provided certain shares of Class B Units and certain Warrant Units (as each term is defined in the RSA) in Newco in consideration of releases provided by such holders to the Companies, the Secured Lenders, and certain other parties, and subject to the terms of the Newco LLC Agreement (as defined in the RSA);[3]

---

[3]  The Secured Lenders are not obliged to make any offer to certain existing equity holders (including in relation to the rights offering) but are choosing to do so in consideration for, among other things, releases from those equity holders to the Companies, the Secured Lenders, and certain other parties.  Accordingly, equity holders who are in a continuing dispute with the Companies are not eligible for any such offer.

g) following the consummation of the above transactions, the majority of the equity interests in Newco will be owned by the Secured Lenders;[4] and

h) following the implementation of the Proposed Restructuring, the Debtor will seek an order from the Bermuda Court for its own winding up.

36.    In addition, prior to the filing of the provisional liquidation, The Resource Group International, Ltd. ("**TRG**") executed a backstop agreement (as amended, supplemented, or modified from time to time, the "**Backstop Agreement**") pursuant to which it has agreed to backstop the rights offering in advance in an amount of $15 million (the "**Backstop 2L Loans**"), which, subject to the conditions thereto, will provide up to $15 million of needed liquidity upon completion of the Proposed Restructuring; provided that if the rights offering results in existing equity holders (other than TRG) subscribing to an amount of Convertible 2L Tranche in excess of $10 million, such Backstop 2L Loans shall be resold to such rights offering subscribers along with a corresponding number of Class A-1 Units (or in the event such subscribing equity interest holders are not "**Eligible Assignees**," as defined in the Amended Credit Agreement, such Backstop 2L Loans shall be assigned to the Debtor and Newco for cancellation by the Agent and an equivalent principal amount of notes shall be issued by the Debtor and Newco to such rights offering subscribers); and provided, further, that in no event shall the amount of Backstop 2L Loans resold or assigned to the Debtor and Newco exceed $5 million aggregate principal amount.

37.    In connection with the Proposed Restructuring, the Debtor instructed Teneo Financial Advisory Ltd. ("**Teneo FA**") to perform a valuation exercise to determine whether, on a theoretical liquidation, the assets of the Debtor would be sufficient to satisfy its creditors in full. The valuation was conducted by a team at Teneo FA that is, I understand, separate and independent from the JPLs.   Their valuation report confirms that the value of the Debtor's liabilities

---

[4]    The Newco limited liability company agreement is attached as Exhibit F to the RSA.

substantially exceed the realizable value of its assets.  The report also demonstrates that the enterprise value of the Debtor (approximately $275-350 million) is less than the amount of debt owed to the Secured Lenders.  This means that unsecured creditors have no economic interest in the Debtor and all shares (preferred and common) have no current value.

38.     The current intention is for the Proposed Restructuring (if approved) to be implemented by the JPLs executing all necessary documents on behalf of the Debtor with the powers granted by the Bermuda Court.  To the extent necessary or desirable, the Debtor may also execute certain documents, including the Release of Claims Agreement (which is Exhibit D to the STA (Exhibit H to the RSA)).  It is anticipated that the Secured Lenders will also execute certain of the Definitive Documents, to give them the benefit of the releases and consents contained therein, including under the Bermuda law governed "all asset" debenture that currently encumbers the Debtor's assets and which would otherwise prevent the proposed transfer by the JPLs (defined below).

**E.     Bermuda Proceeding**

39.     On September 18, 2024, the Debtor commenced a provisional liquidation proceeding under Part XIII of the Companies Act 1981 (the "**Bermuda Companies Act**") by filing with the Supreme Court of Bermuda (the "**Bermuda Court**") a winding-up petition ("**Winding-Up Petition**") and a summons ("**Appointment Summons**") which sought the appointment of Mike Morrison and Charles Thresh as the Debtor's joint and several "light-touch" provisional liquidators for restructuring purposes (the "**JPLs**").  The proceeding is entitled *In the Matter of Afiniti Ltd. (Provisional Liquidators Appointed for Restructuring Purposes)* Companies (Winding Up) Commercial Court, 2024: No. 265 (the "**Bermuda Proceeding**").  A copy of the Winding-Up Petition is attached as **<u>Exhibit 3</u>** hereto.

40.     On September 19, 2024, the Bermuda Court heard the Appointment Summons and entered an order appointing the JPLs as such, a copy of which is attached as **Exhibit 4** hereto (the "**JPL Appointment Order**").  The Winding-Up Petition remains pending.

41.     On September 19, 2024, the Debtor and JPLs entered into a protocol agreement to ensure the efficient and expeditious administration of the Bermuda Proceeding and to avoid duplication of efforts between the Debtor and the JPLs.

42.     On October 2, 2024, the JPLs filed and served a summons in the Bermuda Proceeding seeking entry of an order, among other things, sanctioning and approving the Transfer Agreements and the Transfer pursuant to the terms of the Transfer Agreements free and clear of all liens, claims, charges and other encumbrances of any kind or nature whatsoever (other than (i) as specified in the Transfer Agreements and (ii) the liens, claims, charges and other encumbrances in favor of the Term Loan Agent on behalf of the Secured Lenders) to the extent of the Bermuda Court's jurisdiction over such assets, and authorizing and directing the JPLs to undertake all necessary steps and actions in furtherance of the Transfer (the "**Sanction Order**").  A true and correct copy of the proposed Sanction Order is attached as **Exhibit 5** to this Declaration.  On October 23, 2024, the Bermuda Court held a preliminary hearing to consider entry of the Sanction Order.  At the hearing, in light of opposition and a request for adjournment by Mr. Chishti, the Bermuda Court scheduled a further, substantive hearing with respect to the proposed Sanction Order for November 6-7, 2024.[5]

---

[5]     On October 31, 2024, in light of the failure to obtain entry of the Sanction Order by October 24, 2024, the Term Loan Agent (on behalf of the Secured Lenders) sent a letter to the Debtor's subsidiary Afiniti, Inc. informing it that the maturity of the Term Loans for Afiniti, Inc. and the other non-Debtor loan parties occurred on October 24, 2024 and that such parties were in default (the maturity with respect to the Debtor's guarantee occurred on September 18, 2024, with the commencement of the Bermuda Proceeding).

**F.      Chapter 15 Eligibility**

43.      I have been advised that section 109(a) of the Bankruptcy Code potentially requires a chapter 15 debtor to have property in the United States.  Here, the Debtor has property in and connections to the United States and Delaware, including the Debtor's 100% equity interests in its wholly owned subsidiary Afiniti, Inc., which is incorporated in Delaware.  Additionally, the Debtor owns (i) the funds in a retainer account for Young Conaway (the Debtor's local bankruptcy counsel), which funds I understand are held in a Delaware bank account, (ii) the funds in a retainer account for Latham & Watkins, LLP, which funds I understand are held in a United States bank account, and (iii) the funds in three bank accounts at JPMorgan Chase Bank, N.A., which accounts are located in New York.  Accordingly, I believe the Debtor is eligible to be a chapter 15 debtor.

**G.      Recognition of Foreign Main Proceeding**

44.      I have been advised that, in order to qualify for recognition under chapter 15, the Petition must meet certain requirements.  In particular, it must be brought by a "foreign representative" of a "foreign proceeding" that is pending before a "foreign court," all as defined in the Bankruptcy Code.

45.      I am aware of the definition of "foreign representative" as defined in section 101(24) of the Bankruptcy, and I believe the Debtor qualifies as such.  The Debtor is a corporate entity, and as such, fits within the definition of "person" as defined in the Bankruptcy Code and was authorized by the Bermuda Court to serve as the foreign representative for purposes of this chapter 15 case.

46.      I am aware of the definition of "foreign court" as defined in section 1502(3) of the Bankruptcy Code, and I believe the Bermuda Court qualifies as such.

47.      I am aware of the definition of "foreign proceeding" as defined in section 101(23) of the Bankruptcy Code, and I believe the Bermuda Proceeding qualifies as such because I

understand it is a provisional liquidation proceeding pursuant to Bermuda law under the supervision of the Bermuda Court for the benefit of all the Debtor's creditors and parties in interest.

48.     I am also aware that section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is "pending in the country where the debtor has the center of its main interests" (i.e., 'COMI'). I believe the Debtor's COMI is located in Bermuda because: the Debtor was formed in Bermuda; the Debtor's registered office is located in Bermuda; the Debtor maintains a physical premise in Bermuda (Andrew's Place, 5th Floor, 51 Church Street, Hamilton, Pembroke, HM 12, Bermuda); the Debtor is party to litigation in Bermuda; the Debtor has historically conducted strategic and operational meetings in Bermuda (including various board meetings); the Debtor has employees who reside in Bermuda; the JPLs—who now act with limited powers to oversee and implement the Proposed Restructuring—are located in Bermuda; and the JPLs (who have Bermuda counsel) have directed creditors and other interested parties to correspond with them using their Bermuda contact details.

## H.    Approval of Free and Clear Transfer of Assets

49.     I am aware that the Debtor is seeking relief under section 363 of the Bankruptcy Code with respect to the transfer (the "**Transfer**") by the JPLs of the Debtor's right, title, and interest in and to the assets within the territorial jurisdiction of the United States pursuant to the terms of the Transfer Agreements to Newco free and clear of all claims, liabilities, and encumbrances, except as otherwise provided in the Transfer Agreements. I believe such relief is appropriate.

50.     First, sound business purposes justify the Transfer. I believe, and I understand the independent JPLs agree, that the Transfer presents the best opportunity for the Debtor to maximize its value for its stakeholders. The Debtor and its subsidiary loan parties are unable to address the

matured and payable Term Loans absent the proposed Transfer.  The alternative to the Transfer would be a foreclosure by the Secured Lenders or outright liquidation, which would result in recoveries of substantially less than the value attributed to the Debtor's business in the context of the Transfer, including, the preservation of numerous jobs, the assumption of a majority of ordinary course trade payables, and the assumption of various vendor agreements.

51.     Second, adequate and reasonable notice of the proposed Transfer has been and will be provided to interested persons, both in the Bermuda Proceeding and here.  On October 2, 2024, the Debtor's service and noticing agent, Kroll Restructuring Administration LLC provided notice of, among other things, the Transfer and the date of the Sanction hearing in the Bermuda Proceeding to all known creditors, holders of equity interests, and counterparties to leases and contracts with the Debtor (collectively, "**Parties in Interest**").  The Debtor also published notice of the Bermuda Proceeding in the USA Today, Irish Times, and The Daily Telegraph, on October 8, 2024 and The Royal Gazette on October 7, 2024.  Further, all Parties in Interest are being served with notice of the Verified Petition and Recognition Motion, and the Debtor will similarly be publishing notice in the USA Today, Irish Times, The Daily Telegraph, and The Royal Gazette.

52.     Third, the Transfer is fair and reasonable.  As set forth above in paragraphs 23-27, prior to filing the Petition, the Debtor engaged an investment bank to run a process soliciting interest in refinancing proposals, or, as an alternative, some other form of strategic transaction such as a further equity raise or sale.  Such process was ultimately unsuccessful and the only realistic option was to engage with the Secured Lenders, a path that ultimately led to this proceeding.  Further, as provided in paragraph 37, the valuation conducted by Teneo FA confirms that the Debtor's secured debt substantially exceeds the realizable value of its assets and the Transfer, as opposed to a liquidation, will provide various stakeholders with the opportunity to

receive value that otherwise would not have been possible.  The consideration received by the Debtor in connection with such Transfer—namely, a release from more than $500 million of guarantee liability—represents fair value for the relevant assets to be transferred pursuant to the Transfer and in connection with the Proposed Restructuring.

53.     Fourth, the negotiation process undertaken with respect to the Transfer and the Proposed Restructuring was conducted in good faith.  The Debtor and Secured Lenders were advised by sophisticated, independent advisors and counsel and negotiated the Transfer at arm's-length and in good faith.  Teneo FA performed a valuation exercise, separate and independent of the JPLs, which demonstrates that the enterprise value is less than the amount of debt owed to the Secured Lenders, and the JPLs, who support and will help implement the Proposed Restructuring, are independent officers appointed by the Bermuda Court.  I have been actively involved in the diligence and negotiations that led to execution of the RSA and believe that all parties involved have acted in good faith in the negotiations in all respects relating to the Proposed Restructuring. I further believe that the Secured Lenders are not insiders or affiliates of the Debtor and I am aware of no common identity between the Debtor and the Secured Lenders or their affiliates.  The Debtor was free to negotiate an alternative restructuring transaction prior to entering into the RSA, and the Debtor in fact pursued such path, as described in paragraph 24, which ultimately did not succeed.  The Proposed Restructuring and the related definitive documents were extensively negotiated by the parties and agreed to by the parties in good faith, without any collusion, fraud, or attempt to take unfair advantage of any party, including any potential acquiror.

54.     I understand that a condition precedent to the consummation of the Transfer and Proposed Restructuring is that the Debtor obtain approval from the Bankruptcy Court of the relief sought in the Recognition Motion.  I believe that the Transfer and the Proposed Restructuring are

in the best interests of all stakeholders, and absent the relief requested in the Recognition Motion, the Debtor and its stakeholders will likely suffer irreparable and substantial harm due to the inability to consummate the Transfer and Proposed Restructuring in a manner that will allow the Debtor to maximize recoveries for creditors and other stakeholders.  Lastly, I believe the relief requested pursuant to the Recognition Motion should be approved as soon as possible and without any delay to avoid any disruption to the business and bring much-needed liquidity and certainty to the Companies.  Based on current forecasts, the Companies are operating at the minimum level of required liquidity, and the failure to consummate the Proposed Restructuring as soon as possible can result in irreparable harm.  Prolonging the consummation of the Proposed Restructuring will cause uncertainty with respect to the Debtor's business, making it increasingly difficult to attract new customers and retain the employment of key employees while the Debtor is under Bermuda Court supervision.  Accordingly, I believe that the Debtor must consummate the Proposed Restructuring without delay and as soon as possible.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 4th day of November 2024
Washington, D.C.

*/s/ Hassan Afzal*
Hassan Afzal
Chief Executive Officer, Afiniti, Ltd.

**Exhibit 1**

**Org Chart**



CONFIDENTIAL
Afiniti Structure Chart

Corporate Org Chart
As of July 16, 2024

**<u>Exhibit 2</u>**

**RSA**

*Execution Version*

## <u>RESTRUCTURING SUPPORT AGREEMENT</u>

**September 17, 2024**

*THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF ANY RESTRUCTURING PLAN, SCHEME OF ARRANGEMENT, OR ANY EQUIVALENTS WITHIN THE MEANING OF ANY APPLICABLE SECURITIES OR INSOLVENCY LAWS. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES AND INSOLVENCY LAWS. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.*

*THIS RESTRUCTURING SUPPORT AGREEMENT IS FOR DISCUSSION PURPOSES ONLY AND DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT IN ALL RESPECTS TO THE COMPLETION OF DEFINITIVE DOCUMENTS REFLECTING THE TERMS AND CONDITIONS SET FORTH IN THIS RESTRUCTURING SUPPORT AGREEMENT. THE CLOSING OF ANY SUCH TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE CONSENT RIGHTS OF THE PARTIES SET FORTH HEREIN AND THEREIN.*

*THIS RESTRUCTURING SUPPORT AGREEMENT IS CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY THIRD PARTY OTHER THAN AS SET FORTH HEREIN.*

This RESTRUCTURING SUPPORT AGREEMENT (together with all exhibits, schedules, annexes and attachments hereto, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of September 17, 2024, is entered into by and among the following parties:[1] (i) Afiniti, Ltd. ("***Afiniti***"); (ii) Afiniti, Inc. (the "***Borrower***"); (iii) the Guarantors (as defined below) listed on **Schedule 1** attached hereto (together with Afiniti, the Borrower, and their respective direct and indirect subsidiaries, the "***Company***");[2] and (iv) the Term Loan Agent (defined below), the undersigned Term Loan Lenders (defined below) and such additional lenders ("***Additional Lenders***") who become party hereto from time to time pursuant to a Joinder Agreement in the form attached hereto as **Exhibit A** (the Term Loan Agent together with the Term Loan Lenders and any and all Additional Lenders, the "***Supporting Parties***" and, together with the "***Company Parties***,"[3] the "***Parties***").[4]

**WHEREAS**, the Parties have in good faith and at arm's length negotiated and agreed to the terms of a restructuring transaction as set forth in the non-binding term sheet attached hereto as **Exhibit B** (including any schedules, annexes and exhibits attached thereto, each as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "***Term Sheet***") and as modified by and as more fully set forth herein and in the Definitive Documents (collectively, the "***Restructuring***"). The Restructuring is intended to be consummated through, among other things, (i) a Bermuda proceeding with respect to the appointment of light-touch provisional liquidators and the approval of transfers by Afiniti pursuant to (a) the Stock and Asset Transfer Agreement (as defined below) and (b) the Securities Transfer Agreement (as defined below) (together with any application, petition or proceeding arising therein or connected thereto, the "***Bermuda Proceeding***") in the Supreme Court of Bermuda (the "***Bermuda Court***"); (ii) a recognition proceeding under chapter 15 of title 11 of the United States Code (the "***Bankruptcy Code***") (together with any application, petition or proceeding arising therein or connected thereto, the "***Chapter 15 Case***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"); and (iii) the entry into and/or amendment of certain debt documents, all on the terms set forth in this Agreement.

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in this Agreement.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 hereof.

[2] As used herein, "Company" means either (i) any entity comprising the Company or (ii) collectively, all Companies, as the context requires.

[3] As used herein, "Company Parties" means the Company entities that are signatories to this Agreement, on behalf of themselves and their respective direct and indirect subsidiaries. For the avoidance of doubt, references to "Company Parties" includes, as the context requires, taking actions to cause such respective direct and indirect subsidiaries to take or refrain from taking all actions and agreements set forth herein.

[4] For the avoidance of doubt, the term "Parties" or "Party" as and when used in this Agreement refers to the individual signatories to this Agreement and not the Supporting Parties as a whole.

2

sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. **Certain Definitions**.

"*2L Convertible Tranche*" means the new junior second lien secured convertible tranche in the principal aggregate amount of $298,744,859.71, as such amount may be increased with respect to any accrued paid in kind interest, which is documented in the Amendment.

"*Agreement Effective Date*" means the date that all of the conditions precedent set forth in Section 15(a) are satisfied or waived in accordance therewith.

"*Amendment*" means the Amendment to the Term Loan Credit Agreement in substantially the form attached hereto as **Exhibit C**.

"*Appleby*" means Appleby (Bermuda) Limited.

"*AOS*" means Allen Overy Shearman Sterling US LLP (together with Allen Overy Shearman Sterling LLP and each of its subsidiaries and the other partnerships, corporations, undertakings and entities which are authorized to practice using a name which includes "Allen Overy Shearman Sterling" or "A&O Shearman").

"*Backstop Commitment*" means the Backstop Parties' commitment (i) to purchase from Newco and Afiniti, Inc. $15,000,000 aggregate principal amount of 2L Convertible Tranche loans at the Closing, and (ii) to receive from Newco a number of Class A-1 Units equal to the number of Class A-2 Units issuable upon conversion of the 2L Convertible Tranche loans purchased by the Backstop Parties pursuant to the Backstop Commitment Agreement; *provided*, that in the event the amount subscribed for in the Rights Offering by Rights Offering Subscribers exceeds $10,000,000 aggregate principal amount of 2L Convertible Tranche loans, such 2L Convertible Tranche loans in excess of $10,000,000 aggregate principal amount shall be resold to Rights Offering Subscribers (or, in the event such Rights Offering Subscribers are not Eligible Assignees, such 2L Convertible Tranche loans shall be assigned to Afiniti, Inc. and Newco for cancellation by the Term Loan Agent and an equivalent principal amount of Equivalent Notes shall be issued by Afiniti, Inc. and Newco to such Rights Offering Subscribers) along with a corresponding number of Class A-1 Units; *provided*, that in no event shall the amount of 2L Convertible Tranche loans so resold to Rights Offering Subscribers or assigned to Afiniti, Inc. and Newco exceed $5,000,000.

"*Backstop Commitment Agreement*" means the agreement memorializing the Backstop Commitment in substantially the form attached hereto as **Exhibit I**.

"*Backstop Parties*" means TRG or its affiliates or related funds, solely in their respective capacities as Backstop Parties under the Backstop Commitment Agreement.

"*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in United States Bankruptcy Rule 9006(a)), on which commercial banks are open for commercial business with the public in New York City, New York.

"***Claim***" means any claim, as defined in section 101(5) of the Bankruptcy Code. Except where otherwise provided in context, "Claim" refers to such a claim against the Company.

"***Class A-1 Units***" has the meaning set forth in the Newco LLC Agreement.

"***Class A-2 Units***" has the meaning set forth in the Newco LLC Agreement.

"***Class B Units***" has the meaning set forth in the Newco LLC Agreement.

"***Closing***" means the closing of the Restructuring, including the amendments to the Term Loan Credit Documents necessary with respect to the New Exit Loans becoming effective and all other conditions precedent to the Closing Date having been satisfied or waived in accordance with the terms hereof.

"***Closing Date***" means the date on which the Closing occurs.

"***Conveyance Taxes***" means all sales, documentary, use, value added, transfer, stamp, stock transfer, registration and similar Taxes.

"***Definitive Documents***" means, with respect to the Restructuring, all material documents (including any related Bankruptcy Court or Bermuda Court or other judicial or regulatory orders, agreements, schedules, pleadings, motions, filings, or exhibits) that are contemplated by this Agreement or that are otherwise necessary or desirable to implement the Restructuring, including (as applicable), in substantially the form attached hereto, subject to <u>Section 4(a)</u> below, including: (i) the Amendment attached hereto as **<u>Exhibit C</u>**; (ii) any other material documents related to the New Exit Loans, including the security documents, guarantees and any related agreements attached hereto as **<u>Exhibit D</u>** and the agreement among lenders / intercreditor agreement attached hereto as **<u>Exhibit E</u>**; (iii) the Newco LLC Agreement, attached hereto as **<u>Exhibit F</u>**; (iv) the Securities Transfer Agreement, attached hereto as **<u>Exhibit G</u>**, and any agreement attached thereto (when attached); (v) the Stock and Asset Transfer Agreement, attached hereto as **<u>Exhibit H</u>**, and any agreement attached thereto (when attached); (vi) the Backstop Commitment Agreement, attached hereto as **<u>Exhibit I</u>**, and any agreement attached thereto as an annex; (vii) the Indemnity Agreement, attached hereto as **<u>Exhibit K</u>**; (viii) the Sanction Order; (ix) the Recognition Motion; and (x) the Recognition Order.

"***Eligible Assignees***" has the meaning set forth in the Term Loan Credit Agreement.

"***Eligible Holder***" means any holder of equity interests in Afiniti that certifies that it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act); or (iii) a non-U.S. person under Regulation S under the Securities Act that is located outside of the U.S. (within the meaning of Regulation S under the Securities Act).

"***Equivalent Notes***" means promissory notes issued by Afiniti, Inc. and Newco having terms substantially similar to the 2L Convertible Tranche loans issued to Rights Offering Subscribers who are not Eligible Assignees, which Equivalent Notes shall be convertible at the option of the Rights Offering Subscribers into fully paid, non-assessable Class A-2 Units of the Company; <u>provided</u>, <u>however</u>, that for every Equivalent Note issued in excess of $10,000,000

aggregate principal amount, an equivalent principal amount of 2L Convertible Tranche loans shall be assigned to Afiniti, Inc. and Newco for cancellation by the Term Loan Agent.

"*Exclusivity Letter*" means that letter agreement dated June 7, 2024 and entered into between Afiniti, the Term Loan Agent, and certain of the Term Loan Lenders, as may be amended from time to time.

"*Final Order*" means, as applicable, an order or judgment of a court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, however that the possibility that a motion under Rule 60 of the United States Federal Rules of Civil Procedure or any comparable rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

"*Forbearance Period*" has the meaning set forth in <u>Section 4(b)</u> of this Agreement.

"*Foreign Investment Clearances*" means the fact that all consents from the Governmental Authorities mandatory under any applicable Foreign Investment Law (or requested by the relevant Governmental Authority) and necessary for the consummation of the Restructuring contemplated hereby in respect of foreign investment control requirements shall have been obtained or the applicable waiting periods (and any extension thereof) shall have expired or terminated; *provided* that, for the avoidance of doubt, it is acknowledged that a Foreign Investment Clearance shall be deemed obtained even if subject to the implementation of certain commitments from one or more of the Supporting Parties.

"*Foreign Investment Filings*" means all necessary filings with any competent Governmental Authority in order to obtain all of the Foreign Investment Clearances.

"*Foreign Investment Laws*" means applicable foreign direct investment rules in the relevant jurisdiction.

"*Governmental Authority*" means any domestic, national, foreign or supranational court or other judicial authority or governmental, administrative, arbitral or regulatory body, department, agency, commission, bureau or other authority (including any industry or other self-regulating body), including for the avoidance of any doubt, the governmental authorities as having jurisdiction with respect to the Foreign Investment Clearances.

"*Guarantors*" has the meaning set forth in the Term Loan Credit Agreement.

"*HoldCo*" means Afiniti AI Holdings LLC, a limited liability company to be organized under the laws of the Cayman Islands which (i) prior to the commencement of the Bermuda

Proceedings or as soon as reasonably practicable thereafter, will be formed by Afiniti and be a wholly owned direct subsidiary of Afiniti and (ii) following the Closing, will be a wholly owned direct subsidiary of Newco.

"*Indemnity Agreement*" means the indemnification agreement in the form attached hereto as **Exhibit K**.

"*Initial CFF*" has the meaning set forth in Section 6(xv).

"*Intellectual Property*" means all intellectual property in any jurisdiction throughout the world, including the following: (i) patents and patent applications; (ii) trademarks, service marks, trade names, trade dress, domain names and any other identifier of source of origin, together with the goodwill associated therewith; (iii) copyrights, including copyrights in software; (iv) registrations and applications for registration of any of the foregoing under subclauses (i) – (iii) of this definition; (v) trade secrets and rights in know how, formulae, methods, techniques, processes, and confidential and proprietary information; and (vi) all rights to sue and recover damages and other relief at Law or in equity for any past, present or future infringement, misappropriation or other violation of the foregoing rights.

"*Interest*" means an equity interest, including the common stock, preferred stock, limited liability company interests, partnership interests, and any other equity, ownership, beneficial or profits interests of any of Afiniti, any other Company or their respective affiliates, and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, partnership interests, or other equity, ownership, beneficial or profits interests of any of Afiniti, any other Company or their respective affiliates, and any equity appreciation right, phantom unit, profit appreciation right or participation right with respect to any of the foregoing (whether or not arising under or in connection with any employment agreement), in each case other than Newco Equity.

"*Joinder Agreement*" means the form of joinder agreement attached hereto as **Exhibit A**.

"*Joint Provisional Liquidators*" means Michael Morrison and Charles Thresh, each of Teneo (Bermuda) Ltd. and any successors appointed by the Bermuda Court.

"*Latham*" means Latham & Watkins LLP.

"*Law*" means, collectively, all applicable international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directives, licenses, authorizations and permits of any Governmental Authority.

"*Material Adverse Effect*" means any event, circumstance or condition that has had or could reasonably be expected to have a materially adverse effect on (i) the business, assets, results of operations, prospects or financial condition of the Company; (ii) the ability of the Company to perform its obligations under this Agreement; or (iii) the ability of the Company to consummate the Restructuring, but, in each case, the commencement and existence of the Bermuda Proceeding

or the Chapter 15 Case, and any event, circumstance, or condition directly in relation thereto (including, but not limited to, the litigation and/or determination of any matters arising therein), shall not be deemed to constitute or be taken into account in determining whether there has been a Material Adverse Effect.

"*Milestones*" has the meaning set forth in Section 6(x).

"*New 1L Tranche*" means the new senior first lien secured tranche in the principal amount outstanding of $225 million, as such amount may be increased with respect to any accrued paid in kind interest, under the Term Loan Credit Agreement, which is documented in the Amendment.

"*New Exit Loans*" means the loans under the 2L Convertible Tranche and the New 1L Tranche.

"*Newco*" means Afiniti Newco Holdings LLC, a newly formed Delaware limited liability company.

"*Newco Equity*" means collectively, Class A-1 Units, Class A-2 Units, Class B Units, Class C Units (as defined in the Newco LLC Agreement) and Warrant Units.

"*Newco LLC Agreement*" means the Amended and Restated Limited Liability Company Operating Agreement of Newco that each holder of Newco Equity shall be required to enter into with Newco that is in substantially the form attached hereto as **Exhibit F**.

"*Outside Date*" means November 30, 2024, as may be extended in writing by the Company Parties and the Required Supporting Parties to a date no longer than 30 days from such date and, after such 30-day period, as may be extended in writing by the Company Parties and each of the Supporting Parties.

"*Person*" means an individual, firm, corporation (including any non-profit corporation), partnership, limited partnership, limited liability company, joint venture, association, trust, Governmental Authority, or other entity or organization.

"*Prohibited Transaction*" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of all or any material portion of assets, financing (debt or equity), scheme, plan proposal, recapitalization, or restructuring of the Company (other than the Restructuring) or any other transaction of similar effect, or that would preclude or delay the Restructuring, in each case, without the consent of the Required Supporting Parties.

"*Recognition Motion*" means the motion to be filed with the Bankruptcy Court in the Chapter 15 Case seeking (i) recognition of the Bermuda Proceeding and the Restructuring and (ii) recognition of the Sanction Order and enforcement of its terms.

"*Recognition Order*" means an order approving the Recognition Motion.

"*Representatives*" means, with respect to any Person, such Person's affiliates and its and their directors, officers, members, partners, managers, employees, agents, investment bankers,

attorneys, accountants, advisors, investment advisors, managed accounts or funds, management companies, fund advisors, fund investors, lenders to funds, advisory board members, professionals and other representatives, in each case, solely in their capacities as such.

"***Required Supporting Parties***" means, as of any date of determination, the Supporting Parties hereto holding more than 50% of the principal amount of Term Loan Indebtedness held by the Supporting Parties signatory hereto in the aggregate.

"***Restructuring Default(s)***" has the meaning set forth in <u>Section 4(b)</u> of this Agreement.

"***Rights Offering***" means the offering to be conducted by Afiniti, Inc. and Newco following the Closing Date to Eligible Holders of equity interests in Afiniti as of the record date for such offering, whereby each such Eligible Holder will have the non-transferrable right to subscribe to (i) up to $25,000,000 aggregate principal amount of 2L Convertible Tranche loans (inclusive of $10,000,000 aggregate principal amount of the Backstop Commitment) (or, in the event such Eligible Holders are not Eligible Assignees, Equivalent Notes) and (ii) a number of Class A-1 Units equal to the number of Class A-2 Units issuable upon conversion of the 2L Convertible Tranche loans subscribed for in such offering, to be made pursuant to this Agreement and the Backstop Commitment Agreement.

"***Rights Offering Subscribers***" means the Eligible Holders who purchase 2L Convertible Tranche loans or Equivalent Notes and Class A-1 Units through the Rights Offering.

"***Sanction***" means individually or collectively, as the context requires, the approval, authorization, confirmation, consent, and/or endorsement of the Restructuring by the Bermuda Court.

"***Sanction Order***" means an order of the Bermuda Court that, among other things, approves the Restructuring, including the actions of the joint provisional liquidators in furtherance of the Restructuring, the transfer and disposition of substantially all of the assets of Afiniti (other than the shares of the Borrower and the shares of subsidiaries of Afiniti organized under the laws of Bermuda) to HoldCo pursuant to the Stock and Asset Transfer Agreement, and the sale and disposition of the shares of the Borrower and HoldCo to Newco pursuant to the Securities Transfer Agreement, in each case, as directed by the Term Loan Agent, free and clear of all liens, claims and encumbrances (except the liens and encumbrances in existence in favor of the Collateral Agent (as defined in the Term Loan Credit Agreement), for the benefit of the Term Loan Lenders).

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Securities Transfer Agreement***" means that certain Securities Transfer Agreement to be entered into by and between Afiniti and Newco in substantially the form attached hereto as **Exhibit H**.

"***Stock and Asset Transfer Agreement***" means that certain Stock and Asset Transfer Agreement to be entered into by and between Afiniti and HoldCo in substantially the form attached hereto as **Exhibit G**.

"***Support Period***" means, with respect to any Party, the period commencing on the later of (i) the Agreement Effective Date and (ii) the date such Party becomes party hereto, and ending on either (A) the date on which this Agreement is terminated by or with respect to such Party in accordance with Section 9 hereof or (B) the Closing Date.

"***Taxes***" has the meaning set forth in the Term Loan Credit Agreement.

"***Term Loans***" means the Term Loans, as defined in the Term Loan Credit Agreement.

"***Term Loan Agent***" means VCP Capital Markets, LLC, in its capacity as administrative agent and collateral agent under the Term Loan Credit Documents or, as applicable, any successors, assignees or delegees thereof (including any applicable intercreditor agreements).

"***Term Loan Claim***" means any Claim held by the Term Loan Agent, any Term Loan Lender or any other Secured Party (as defined in the Term Loan Credit Documents) arising under, derived from or based upon the Term Loan Credit Documents, including Claims for all principal amounts outstanding and accrued and unpaid interest, fees, expenses, costs, indemnification and other amounts arising under or related to the Term Loan Credit Documents.

"***Term Loan Credit Agreement***" means that certain Term Loan Credit Agreement, dated as of June 13, 2019, among Afiniti, Borrower, the Guarantors, the Term Loan Agent, and each lender from time to time party thereto (as modified, amended, or supplemented from time to time).

"***Term Loan Credit Documents***" means the Term Loan Credit Agreement together with all other related documents, instruments, and agreements (including all Loan Documents (as defined in the Term Loan Credit Agreement)), in each case as supplemented, amended, restated, or otherwise modified from time to time.

"***Term Loan Indebtedness***" means the indebtedness of the Company outstanding as of such applicable date under the Term Loan Credit Documents, including the Term Loans and accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accounts', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, in each case pursuant to the terms of the Term Loan Credit Agreement, and all other Senior Credit Obligations (as defined in the Term Loan Credit Agreement).

"***Term Loan Lenders***" means the lenders party to the Term Loan Credit Agreement.

"***Transaction Expenses***" has the meaning set forth in Section 30 hereof.

"***TRG***" means The Resource Group International Ltd.

"***Warrant Units***" has the meaning set forth in the Newco LLC Agreement.

2.    **Rules of Construction.**

a.    In the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender.

b.    Unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified or replaced from time to time in accordance with the terms of this Agreement; provided, however, that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the Agreement Effective Date, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the Agreement Effective Date.

c.    Each reference in this Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import shall mean and be a reference to this Agreement and shall include all exhibits hereto.

d.    Capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form.

e.    Unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement.

f.    References to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company laws.

g.    The use of "include" or "including" is without limitation, whether stated or not.

h.    The term "or" is not necessarily exclusive.

i.    Any actions required to be taken or require a Party to refrain from any action includes both direct and indirect actions.

j.    The provisions of United States Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

k.    Captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement.

3.    **Foreign Proceedings.**  Where the provisions of this Agreement, the Term Sheet, and the Restructuring refer or apply to (a) the Chapter 15 Case, the Bankruptcy Court, or events, circumstances, or procedures in the United States (the "*US Process*") or (b) the Bermuda Proceeding, the Bermuda Court, or events, circumstances, or procedures in Bermuda (the "*Bermuda Process*"), those provisions relating to one process shall be deemed to apply or refer

equally to the other process (the "***Other Process***") (and if necessary and applicable, this Agreement will be deemed to include corresponding provisions relating to the Other Process) to ensure that the rights and obligations of the Parties under this Agreement apply equally to the US Process and the Bermuda Process, to the fullest extent necessary in order to implement the Restructuring in accordance with the terms, spirit, and intent of this Agreement and the Term Sheet.

4.   **Definitive Documents; Forbearance; Waiver; Rights Offering; Issuance of Interests; Indemnities**

a.   Definitive Documents.

(i)   Each of the Definitive Documents (as they may be modified, amended, or supplemented in accordance with this Agreement) shall be consistent with this Agreement and, except as expressly set forth in a Definitive Document, otherwise acceptable to Afiniti and the Required Supporting Parties. Each Definitive Document (as each may be amended, modified or supplemented in accordance with this Agreement) is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Definitive Documents. For the avoidance of doubt, the Sanction Order and the Recognition Order must be acceptable in all respects to the Required Supporting Parties.

(ii)   Notwithstanding anything to the contrary herein, (x) the Term Loan Agent (on behalf of the Term Loan Lenders), Afiniti, and Newco may add any and all exhibits and schedules to the Securities Transfer Agreement to the extent mutually agreed among the parties except as otherwise provided in the form of such agreement attached hereto as Exhibit H, and (y) the Term Loan Agent (on behalf of the Term Loan Lenders), Afiniti and HoldCo may add any and all exhibits and schedules to and the Stock and Asset Transfer Agreement to the extent mutually agreed among the parties except as otherwise provided in the form of such agreement attached hereto as Exhibit G, in each case, no later than the date on which the application to the Bermuda Court seeking Sanction is filed, and Afiniti and Newco, or Afiniti and HoldCo, as applicable, shall add such exhibits and schedules as so directed by the Term Loan Agent. Notwithstanding the foregoing, prior to Closing, the Term Loan Agent (on behalf of the Term Loan Lenders) may, in its sole discretion, (A) direct the removal or addition of any agreement from the list of transferred agreements set forth on such exhibits or the schedules to the Stock and Asset Transfer Agreement, direct the removal or addition of any right, property or asset to the list of transferred assets under the Stock and Asset Transferred Agreement in accordance with the terms of the Stock and Asset Transfer Agreement, direct the removal or addition of any assumed or excluded liability from the list of assumed or excluded liabilities set forth on the such exhibits or schedules to the Stock and Asset Transfer Agreement, in which case, such exhibit or schedule shall be deemed amended and restated by such modification and Afiniti and Holdco shall take all actions necessary to effect such modifications and (B) add any and all exhibits and schedules to the Amendment and/or Term Loan Credit Agreement to the extent mutually agreed among the parties.

b.     Forbearance.  The Supporting Parties hereby agree to forbear from taking any action or exercising any right or remedy permitted to be taken or exercised by them under the Term Loan Credit Agreement or the other Term Loan Credit Documents, with respect to any potential or actual Default (as defined in the Term Loan Credit Agreement) or Event of Default (as defined in the Term Loan Credit Agreement) arising under Section 8.01 of the Term Loan Credit Agreement as a result of any action taken that is necessary to implement or consummate the Restructuring, and/or any other Defaults (as defined in the Term Loan Credit Agreement) or Events of Default (as defined in the Term Loan Credit Agreement) in effect prior to the Agreement Effective Date (each a "***Restructuring Default***", and collectively the "***Restructuring Defaults***"), commencing on the Agreement Effective Date and ending upon the termination of this Agreement (the "***Forbearance Period***").   Subject to Section 4(c) (Waiver) below, the Company Parties acknowledge and agree that (i) the Supporting Parties are not waiving any Defaults (as defined in the Term Loan Credit Agreement) or Events of Default (as defined in the Term Loan Credit Agreement), including any Restructuring Event of Default, but are agreeing to forbear from exercising their rights and remedies with respect solely to such Restructuring Default during the Forbearance Period; (ii) immediately upon expiration of the Forbearance Period, the Supporting Parties shall have all of their rights and remedies with respect to the Restructuring Defaults to the same extent, and with the same force and effect, as if the Forbearance Period had not occurred; (iii) the Company Parties will not assert, and the Company Parties hereby forever waive any right to assert, that the Supporting Parties are obligated in any way to continue beyond the Forbearance Period to forbear from enforcing any of their rights or remedies or that the Supporting Parties are not entitled to act on any Restructuring Default after the termination of the Forbearance Period as if such Restructuring Default had just occurred and the Forbearance Period had never existed; and (iv) the Supporting Parties have not made any representations as to what actions, if any, they will take after the termination of the Forbearance Period and the Supporting Parties do hereby specifically reserve any and all rights and remedies they have with respect to any Restructuring Default that may occur.

c.     Waiver.  Notwithstanding Section 4(b) (Forbearance) above, upon and subject only to the occurrence of the Closing Date, the Supporting Parties irrevocably waive any Restructuring Default.  The foregoing waiver is a limited waiver and it shall be limited precisely as written and shall not be in any event deemed or otherwise construed, except as expressly provided herein, (i) to be a waiver or amendment of any term or provision of the Term Loan Credit Agreement or any of the other Term Loan Documents, any Default (as defined in the Term Loan Credit Agreement) or Event of Default (as defined in the Term Loan Credit Agreement), other than a Restructuring Default, or any term or provision of any other agreement, instrument or document that gives rise to a Supporting Party's Claims and Interests or (ii) to prejudice any right or remedy that Supporting Parties may have at any time under or in connection with the Term Loan Credit Agreement or the other Term Loan Credit Documents.  Except as specifically set forth herein, the Supporting Parties hereby reserve their rights under the Term Loan Credit Agreement and the other Term Loan Credit Documents and applicable law in respect of any Defaults (as defined in the Term Loan Credit Agreement) and Events of Default (as defined in the Term Loan Credit Agreement) and future breaches of the Term Loan Credit Agreement.

d.     Rights Offering.  Following the Closing, Afiniti, Inc. and Newco shall conduct the Rights Offering as required pursuant to this Agreement and the Backstop Commitment Agreement.  The Rights Offering shall be conducted pursuant to the exemption from registration

provided by Section 4(a)(2) of the Securities Act or another available exemption and shall only be offered to those holders of equity interests in Afiniti as of the record date for such offering that are Eligible Holders and that agree to the terms of the Rights Offering as set forth in this Agreement and the Backstop Commitment Agreement, including irrevocably releasing Afiniti (including its current directors and officers), Newco, the Term Loan Agent and each Term Loan Lender pursuant and subject to the release included in the Newco LLC Agreement, and having not prosecuted any Claims against the Company or any subsidiaries or affiliates of the Company (other than filing in the Bermuda Proceeding any evidence of borrowed money by or funded indebtedness of Afiniti) or instructed or encouraged any other Person to do the same.  Notwithstanding anything herein to the contrary, all Eligible Holders who participate in the Rights Offering in accordance with its terms and this Agreement and who are not Eligible Assignees, will receive, in lieu of 2L Convertible Tranche notes evidencing the 2L Convertible Tranche loans, Equivalent Notes. Afiniti shall provide Afiniti, Inc. and Newco with copies of the stock or equity record books of Afiniti and such other books and records of Afiniti as shall be reasonably requested by Afiniti, Inc. and Newco in connection with the Rights Offering.

       e.      <u>Issuance of Interests</u>.  On the Closing Date, Newco will authorize the five classes of Newco Equity, inclusive of the Warrant Units, of which the Class B Units and Warrant Units shall be available for issuance to Backstop Parties, Rights Offering Subscribers and current holders of preferred equity interests in Afiniti that are Eligible Holders.  The offering and issuance of such Newco Equity shall be conducted pursuant to the exemption from registration provided by Section 4(a)(2) of the Securities Act or another available exemption.  The Class B Units and Warrant Units will be allocated in accordance with the Newco LLC Agreement.  In order for each Backstop Party, Rights Offering Subscriber and current holder of preferred equity interests in Afiniti to be allocated Class B Units and Warrant Units in accordance with the Term Sheet and the Newco LLC Agreement, such Persons must be Eligible Holders and agree to the terms set forth in the Newco LLC Agreement, including (i) irrevocably releasing Afiniti (including its current directors and officers), Newco, the Term Loan Agent, each Term Loan Lender pursuant and subject to the release included in the Newco LLC Agreement, (ii) having not prosecuted any Claims against the Company or any subsidiaries or affiliates of the Company (other than filing in the Bermuda Proceeding any evidence of borrowed money by or funded indebtedness of Afiniti) or instructed or encouraged any other Person to do the same, and (iii) acknowledging and agreeing that (A) no Class B Units and Warrant Units shall be issued to such Person, and such Person shall not be included in the Rights Offering as a Rights Offering Subscriber, if the representation and warranty in the immediately preceding Section 4(e)(ii) is not accurate and (B) the distribution of Class B Units and Warrant Units to such Eligible Holder is being made freely and voluntarily by Newco in consideration of such releases.

       f.      <u>Indemnities</u>.  On the Closing Date, the Supporting Parties shall cause Newco to enter into the Indemnity Agreement.

     **5.**      **<u>Agreements of the Supporting Parties</u>.**  During the Support Period, subject to the terms and conditions hereof, and except as agreed in writing by Afiniti and the Required Supporting Parties, each Supporting Party agrees, severally and not jointly, solely as long as it remains the legal owner, beneficial owner, and/or investment advisor or manager of or with power

and/or authority to bind any Claims held by it, or in the case of the Term Loan Agent solely as long as it remains in its capacity as such, that it shall use commercially reasonable efforts:

        (i)      to support the Restructuring as contemplated by this Agreement;

        (ii)      to support, and not to object to or otherwise oppose or interfere with (or instruct or encourage any other Person to interfere with or oppose), any hearing before the Bermuda Court or the Bankruptcy Court in connection with the implementation of the Restructuring in the Bermuda Proceeding and the Chapter 15 Case, including, the Recognition Motion, granting of the Sanction Order by the Bermuda Court and entry of the Recognition Order by the Bankruptcy Court, in each case, as contemplated by this Agreement;

        (iii)      to provide such consents under the Term Loan Credit Documents, or any notices, orders, instructions or directions to the Term Loan Agent, that are reasonably required to effectuate the consummation of the Restructuring in accordance with and subject to the terms of this Agreement and the other Definitive Documents (in each case without limiting or superseding any consent rights herein or in any such Definitive Documents);

        (iv)      to take such commercially reasonable actions as may be reasonably necessary to support, implement, and consummate the Restructuring and to otherwise carry out the purposes and intent of this Agreement, in accordance with and subject to the Definitive Documents, including (as applicable) in connection with, to the extent applicable: (A), voting (or causing to be voted) all Claims owned or held by such Supporting Parties and exercising any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate), in each case (x) in favor of any material matter requiring approval to the extent necessary to implement the Restructuring and (y) against any Prohibited Transaction and (B) obtaining such governmental, regulatory, licensing, Bankruptcy Court, Bermuda Court, or other approvals necessary to implement or consummate the Restructuring, and to cooperate with any reasonable efforts undertaken by the Company Parties with respect to obtaining any required regulatory or third-party approvals in connection with the Restructuring; provided, that the Company will reimburse such Supporting Parties for any out-of-pocket costs and expenses incurred in connection with any and all of the foregoing;

        (v)      not to take any action (or instruct or encourage any other Person to take any action) that is materially inconsistent with, or omit to take any action required by, this Agreement or the Restructuring, including the Chapter 15 Case, the Bermuda Proceeding, or any of the other Definitive Documents, in each case, as contemplated by this Agreement;

        (vi)      except as otherwise permitted herein, not to file any pleading motion, petition, declaration, supporting exhibit or Definitive Document with the Bankruptcy Court or the Bermuda Court or any other court (including any modifications or amendments thereof) that is materially inconsistent with this Agreement or other Definitive Documents (or instruct or encourage any other Person to do the same);

        (vii)      not to (or instruct or encourage any other Person to) solicit, support, encourage, propose, file, or take any action to initiate or implement any Prohibited Transaction

with respect to the Company, other than at the request, or with the consent, of the Company and the Required Supporting Parties;

(viii)    not to directly or indirectly prosecute any Claims against the Company or any subsidiaries or affiliates of the Company (or instruct or encourage any other Person to do the same), other than (A) as otherwise permitted herein, (B) with respect to filing any evidence of indebtedness or guarantees in connection with the Term Loan Indebtedness or Transaction Expenses in the Bermuda Proceeding or Chapter 15 Case, (C) any Claims based on or in response to the Company's breach of this Agreement, or (D) if the Required Supporting Parties disagree with or do not support any action (or inaction) of the Joint Provisional Liquidators or any representative of the Company or the Joint Provisional Liquidators in the Chapter 15 Case;

(ix)    to cooperate with each other and the Company in good faith in connection with the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents;

(x)    to negotiate in good faith upon the reasonable request of the Required Supporting Parties and the Company regarding any requested modifications of the Restructuring that improve the tax efficiency of the Restructuring (to the extent such modifications can be implemented without any material adverse effect on the Restructuring);

(xi)    to negotiate with the Company in good faith regarding potential modifications or alternatives in the event of any material impediment to the Restructuring that may arise; provided, that, notwithstanding the foregoing, the Supporting Parties are not obligated to negotiate or agree to any terms that adversely impact their economic or legal terms, rights or recoveries;

(xii)    not to transfer its Claims to any other Person except as provided in this Agreement;

(xiii)    not to (or instruct or encourage any other Person to) object to, impede, or take (or direct or encourage any agents, any official or unofficial committee, or any other Person to object to, impede, or take) any action to unreasonably interfere with or postpone the acceptance, consummation, or implementation of this Agreement, the Restructuring, the Chapter 15 Case, the Bermuda Proceeding, and any applicable Definitive Documents; and

(xiv)    (A) not to (or instruct or encourage any other Person to) exercise rights or remedies under any Term Loan Credit Document in a manner that is inconsistent with this Agreement and the Restructuring and (B) not to (or instruct or encourage any other Person to) authorize, encourage, or direct the Term Loan Agent or Term Loan Lenders or any other applicable agent, trustee or other representative acting on behalf of all or any portion of the Term Loan Lenders to exercise rights or remedies under any Term Loan Credit Documents in a manner that is inconsistent with this Agreement and the Restructuring; provided, however, that nothing in this clause (xiv) shall require the Supporting Parties to waive any Default (as defined in the Term Loan Credit Agreement) or Event of Default (as defined in the Term Loan Credit Agreement) or any of the Term Loan Indebtedness or release or terminate any of the Liens (as defined in the Term Loan

Credit Agreement) on any of the Collateral (as defined in the Term Loan Credit Agreement), other than as expressly contemplated under this Agreement.

Nothing in this Agreement shall prohibit any Supporting Party from (1) appearing as a party-in-interest in any matter arising in the Bermuda Proceeding or Chapter 15 Case or any other proceeding relating to the Company; (2) exercising or enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or contesting whether any matter, fact or thing is a breach of, or is inconsistent with, this Agreement, including the Definitive Documents; (3) effecting a Transfer (as defined below) or purchasing, selling, or entering into transactions with respect to Claims or Interests, subject to compliance with Section 8 below; (4) asserting or raising any right, remedy or objection not prohibited under or inconsistent with this Agreement in connection with the Restructuring; (5) taking any action that is required by applicable law or declining to take any action that is prohibited by applicable law; (6) retaining the benefit of any applicable legal professional privilege; (7) making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like; (8) taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence or priority of its Claims against or Interests in the Company or any lien or security interest securing such Claims (including the filing of a proof of claim against the Company); (9) taking any action that is not inconsistent with this Agreement; or (10) consulting with any other Supporting Party, the Company or other parties in interest in the Bermuda Proceeding or Chapter 15 Case.  Nothing herein shall require the Term Loan Lenders to modify or amend the Term Loan Credit Agreement except as expressly set forth herein and nothing shall require the Term Loan Lenders to provide any additional capital, loans or investments to Afiniti or Newco (or HoldCo), or any of their respective subsidiaries.  Except as expressly provided in this Agreement, nothing contained herein shall (A) constitute a waiver or amendment of any term or provision of the Term Loan Credit Agreement (including any claims for accrued and unpaid interest under the Term Loan), or any of the other Term Loan Credit Documents, any Default (as defined in the Term Loan Credit Agreement) or Event of Default (as defined in the Term Loan Credit Agreement), or any term or provision of any other agreement, instrument or document that gives rise to a Supporting Party's Claims and Interests or (B) release any Lien (as defined in the Term Loan Credit Agreement) on any of the Collateral (as defined in the Term Loan Credit Agreement) created (or purported to be created) under any of the Term Loan Credit Documents. Other than as expressly set forth in this Agreement, no Supporting Party shall be required to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in material expenses, liabilities or other obligations to such Supporting Party.

6.      **Agreements of the Company**.  During the Support Period, subject to the terms and conditions hereof, and except as agreed in writing by the Required Supporting Parties, each entity comprising the Company, jointly and severally, agrees that it shall:

(i)      use commercially reasonable efforts to support and implement, and not interfere with (or instruct or encourage any other Person to interfere with or oppose), the Restructuring in accordance with the terms and conditions set forth herein, including, to support, and not interfere with (or instruct or encourage any other Person to interfere with or oppose), any hearing before the Bermuda Court or the Bankruptcy Court in connection with the implementation

of the Restructuring in the Bermuda Proceeding and the Chapter 15 Case, including, the Recognition Motion, granting of the Sanction Order by the Bermuda Court, and entry of the Recognition Order, in each case, as contemplated by this Agreement;

(ii)    use commercially reasonable efforts to take any and all actions necessary or reasonably requested by the Required Supporting Parties to consummate the Restructuring and satisfy any conditions thereto, in accordance with the terms hereof and to the extent materially consistent with this Agreement, to refrain from taking any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring contemplated by this Agreement;

(iii)    use commercially reasonable efforts to ensure, and to work with the Joint Provisional Liquidators to ensure, that proper notice (and such other form and/or manner of notice as reasonably requested by the Term Loan Agent) is provided to parties in interest of all motions, pleadings, notices, and orders filed by the Company in the Bermuda Proceeding and the Chapter 15 Case; and with respect to the application for court sanction pursuant to s. 175 of the Companies Act, the Company will use commercially reasonable efforts to ensure that the Joint Provisional Liquidators provide direct notice to all known creditors and equity holders within the last three years by sending a copy of the Summons filed at the Bermuda Supreme Court Registry and a notification letter that is acceptable to the Term Loan Agent to their last known e-mail or mailing address documented in the company's records and publishing notice of the Summons in national newspapers or such other method(s) as agreed with the Joint Provisional Liquidators and the Term Loan Agent;

(iv)    use commercially reasonable efforts to support and take all actions necessary to facilitate the solicitation, confirmation, approval, and consummation of the Restructuring and the transactions contemplated thereby, including the commencement of the Bermuda Proceeding and the Chapter 15 Case as soon as reasonably practicable, and obtaining of the Sanction Order and the Recognition Order, all as contemplated by this Agreement;

(v)    cooperate with each other and the Required Supporting Parties in good faith in connection with the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of each of the Definitive Documents;

(vi)    to (A) use commercially reasonable efforts to satisfy all conditions precedent to the Amendment, (B) prepare and deliver to AOS and Appleby drafts of all Definitive Documents not otherwise attached hereto and any drafts of motions, pleadings, declarations, exhibits, and proposed orders related thereto (each of which shall contain terms and conditions consistent with the terms of this Agreement), and afford the such counsel a reasonable opportunity to review and comment at least two Business Days or as soon as reasonably practicable prior to any filing thereof, and to the extent practicable, (1) consider any such comments in good faith and consistent with their obligations under this Agreement and (2) be in substance reasonably acceptable to the Required Supporting Parties, and (C) undertake any perfection steps required under the Definitive Documentation; *provided however*, that the obligations in this <u>Section 6(vi)</u> shall in no way alter or diminish any right expressly provided to a Supporting Party or its respective advisors under this Agreement to review, comment on and/or consent to the form and/or substance of any document;

17

(vii)    unless otherwise agreed in writing by the Term Loan Agent, (A) until the Bermuda Proceeding is filed, accrue interest in accordance with the provisions of the Term Loan Credit Agreement, which interest shall be paid in kind on each Interest Payment Date (as defined in the Term Loan Credit Agreement) (i.e., accrue from the latest Interest Payment Date to the day of filing the Bermuda Proceeding) and be added to the existing Term Loans under the Term Loan Credit Agreement and (B) from and after the commencement of the Bermuda Proceeding, (x) accrue interest at the Default Rate under the Term Loan Credit Agreement until the closing of the Restructuring, at which time all accrued but unpaid interest shall be exchanged on a pro rata basis for an additional amount of New 1L Tranche and 2L Convertible Tranche equal to the accrued and unpaid amount of such interest through the Closing Date, or (y) if this Agreement is terminated in accordance with its terms or otherwise expires prior to any Closing, immediately pay in cash such accrued interest set forth in (A) and (B) of this paragraph;

(viii)    take such action as may be reasonably necessary or reasonably requested by the Term Loan Agent and/or the Required Supporting Parties to carry out the purposes and intent of this Agreement, including obtaining all governmental, regulatory, licensing, Bankruptcy Court, Bermuda Court or other approvals (including any necessary or appropriate third-party consents) necessary to consummate the Restructuring, including:

(A) to promptly cooperate with the Supporting Parties and provide each other all necessary information required by the Supporting Parties or the Company, as the case may be (and their advisors), for the purposes of preparing and submitting the Foreign Investment Filings required to obtain the Foreign Investment Clearances as soon as possible after the date hereof; *provided* that the Company shall use commercially reasonable efforts to allow the disclosure of such information (or as much of it as reasonably possible) in a manner that does not result in a violation of attorney-client privilege;

(B) to promptly cooperate with the Supporting Parties and provide each other all necessary information that may be required by a Governmental Authority for the purpose of the Foreign Investment Filings or is necessary to respond to questions raised by such Governmental Authorities; *provided* that the Company shall use commercially reasonable efforts to allow the disclosure of such information (or as much of it as reasonably possible) in a manner that does not result in a violation of attorney-client privilege; and

(C) as the case may be, sign joint filings to be submitted pursuant Foreign Investment Laws;

(ix)    not (or instruct, encourage or cooperate with any other Person to) seek or solicit, support, encourage, propose, file (or instruct or direct their respective Representatives to seek or solicit, support, encourage, propose or file), or engage in any

discussions or negotiations with respect to any Prohibited Transaction other than as set forth in <u>Section 11</u> hereof;

(x)     achieve each of the following milestones (the "***Milestones***") on or before each of the following dates:

(A) commencement of the Bermuda Proceeding by filing a winding up petition and an application to appoint provisional liquidators on or before September 19, 2024;

(B) obtaining of an order from the Bermuda Court appointing provisional liquidators on or before September 20, 2024 (or the soonest date thereafter that is convenient to the Bermuda Court);

(C) filing of an application to obtain Sanction of the Restructuring by the Bermuda Court on or before September 24, 2024;

(D) obtaining of the Sanction Order on or before October 25, 2024 (or the soonest date thereafter that is convenient to the Bermuda Court);

(E) filing of the Recognition Motion in the Chapter 15 Case on or before October 29, 2024;

(F) obtaining entry of the Recognition Order by the Bankruptcy Court on or before November 25, 2024; and

(G) occurrence of the Closing no later than the Outside Date.

(xi)     use commercially reasonable efforts to work with the Required Supporting Parties in good faith to optimize the tax structure and efficiency of the Restructuring;

(xii)     timely file a formal objection, in form and substance acceptable to the Required Supporting Parties, to any motion or other pleading filed with the Bankruptcy Court or the Bermuda Court by a third party seeking the entry of an order or ruling of the applicable Court (A) dismissing or staying the effectiveness of any Bermuda Proceeding or Chapter 15 Case; (B) seeking approval of a Prohibited Transaction; (C) for relief that is inconsistent with this Agreement in any material respect or that would, or would reasonably be expect to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring; or (D) permitting or seeking any distribution or recovery in respect of any Claims against the Company (other than the Claims under the Term Loan Credit Agreement) or any equity interests after consultation with AOS and Appleby;

(xiii)     if requested by the Term Loan Agent or the Required Supporting Parties, timely file a formal objection, in form and substance acceptable to the Required Supporting Parties, to any motion or other pleading filed with the Bankruptcy Court or the Bermuda Court by

a third party seeking the entry of an order or ruling of the applicable Court seeking any distribution or recovery to any unsecured creditor or shareholder (other than the Term Loan Lenders);

(xiv)   upon reasonable request of the Required Supporting Parties, promptly inform (in no event later than two (2) Business Days from receipt of such request) the respective advisors and counsel to the Required Supporting Parties and AOS as to: (A) the material business and financial (including liquidity) performance of the Company; (B) the status and progress of the Restructuring, including progress in relation to the negotiations of any Definitive Documents not in substantially final form attached hereto; and (C) the status of obtaining any necessary or desirable authorizations (including any consents) from any Supporting Party, competent judicial body, Governmental Authority, or any stock exchange; *provided*, that the Company shall use commercially reasonable efforts to allow the disclosure of such information (or as much of it as reasonably possible) in a manner that does not result in a violation of attorney-client privilege;

(xv)   during the Support Period, (A) deliver to the Required Supporting Parties on the Agreement Effective Date a 13-week cash flow forecast in form annexed hereto as **Exhibit J** (the "***Initial CFF***"), which shall be in form and substance reasonably satisfactory to the Required Supporting Lenders and shall set forth at a minimum (1) on a line-item basis, the Company's consolidated (x) receipts and (y) expenditures for each weekly period, (2) net cash flow for each weekly period, and (3) cash and securities balances for each weekly period (reported as at the close of business every other Friday) with respect to the 13-week period commencing with September 9, 2024 and (B) by no later than 4:00 p.m. (Eastern time) on (1) every other Thursday after the Agreement Effective Date, deliver an updated cash flow forecast in substantially the form as set forth in the Initial CFF, which shall be in form and substance reasonably satisfactory to the Required Supporting Lenders, that updates and supplements the 13-week cash flow forecast covering the 13-week period that commences with the Saturday of the immediately following week (each cash flow forecast prepared in accordance with the foregoing, a "***Forecast***") and (2) every Thursday after the Agreement Effective Date, deliver an updated list of bank accounts and securities accounts setting forth the cash balances and securities, as applicable, for each such account for each weekly period (reported as at the close of business every Friday) as of such date with respect to the 13-week period (a "***Bank Account List***"); *provided* that such Bank Account List may be included in the Forecast.

(xvi)   during the Support Period (A) deliver to the Required Supporting Parties by 4:00 p.m. (Eastern time) every other Thursday after the Agreement Effective Date, a line-by-line variance report (in form and substance acceptable to the Required Supporting Parties, a "***Variance Report***") setting forth, in reasonable detail (x) any differences between actual receipts and disbursements for each line item for the two weeks versus the projected receipts and disbursements for such two weeks set forth in the immediately prior Forecast and (y) any differences between actual net cash flows (to be calculated in a manner reasonably satisfactory to the Required Supporting Parties) for the period from the immediately prior Forecast to the report date and projected net cash flows set forth for such period, (B) with respect to each Variance Report that contains any difference between the applicable forecasted and actual amounts set forth in such Variance Report in excess of 10% (each, a "***Material Variance***"), a detailed explanation prepared by management with respect to each such Material Variance, and (C) a report setting forth the cash and securities balances and as at the end of the applicable two calendar week period;

(xvii)  deliver to the Required Supporting Parties unaudited consolidated monthly financials, prepared in a manner consistent with the manner in which quarterly financials are required to be prepared pursuant to the Term Loan Credit Agreement not later than forty-five (45) calendar days after the applicable month-end;

(xviii) upon request by the Required Supporting Parties (which may be initiated by AOS), host a weekly conference call at a time to be agreed between the Company and the Required Supporting Parties following the delivery of cash flow forecast for such period;

(xix)  (A) operate the business of the Company in the ordinary course of business in a manner that is consistent with this Agreement, past practices, and in compliance with applicable law (taking into account the Restructuring and the pendency of the Bermuda Proceeding and Chapter 15 Case); (B) except to the extent expressly set forth in the Agreement, perform in all material respects all obligations required to be performed by the Company under any material contract, lease, license, or agreement to which such Company is bound; (C) maintain its respective books and records on a basis consistent with prior practice; (D) maintain all insurance policies, suitable replacements therefor, in full force and effect; (E) use commercially reasonable efforts to preserve intact its business organizations and relationships with third parties (including creditors, lessors, licensors, suppliers, vendors, customers and other Persons having material business relations with it); and (F) subject to Section 6(xxxv), retain the services of its officers and other key employees (other than where termination of such services is voluntary, for cause or related to a reduction in force that has been discussed in advance with the Term Loan Agent prior to the occurrence thereof and the Term Loan Agent has not objected thereto);

(xx)  provide the Required Supporting Parties (through their advisors or directly) with reasonable access to the Company's management and advisors, including in person management meetings, at such times as may be reasonably requested by the Required Supporting Parties;

(xxi)  provide the Required Supporting Parties and AOS such information as reasonably necessary to evaluate the Company's contracts and unexpired leases as requested by the Required Supporting Parties and, to the extent applicable, any material information relating to material ongoing discussions and negotiations related thereto;

(xxii)  inform the Required Supporting Parties and AOS within no more than two Business Days after the Chief Executive Officer, Chief Financial Officer, Chief Legal Officer, Chief Transformation Officer, and President, and any executive officer of the Company that reports directly to any of the foregoing, becoming aware of:  (A) any matter or circumstance which they know, or reasonably expect is likely, to be a material impediment to the implementation or consummation of the Restructuring; (B) any notice of commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any Person in respect of the Company; (C) any breach or alleged breach or default by the Company in any respect of any of its obligations, representations, warranties or covenants of this Agreement; (D) any representation or statement made or deemed to be made by them under this Agreement that is or proves to have been incorrect or misleading in any material respect when made or deemed to be made; (E) receipt of any notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring; (F) receipt of any notice,

including from any Person, of any material proceeding commenced or of any material complaints, litigations, investigations, or hearings, or, to the knowledge of the Company, threatened in writing against the Company, relating to or involving the Company (or any communications regarding the same that may be contemplated or threatened); (G) any Material Adverse Effect; (H) except to the extent expressly set forth in the Agreement, any breach or default under any material contract, lease, license, or agreement to which the Company is bound (subject to any applicable cure periods; and, with respect to breaches or defaults by non-Company counterparties, to the extent known by the Company); and (I) the happening or existence (or lack thereof) of any event, change, effect, occurrence, development, circumstance, condition, result, state or fact or change of fact that shall have made any of the conditions precedent set forth in Section 15 incapable of being satisfied prior to the Outside Date; provided, however, that the Company shall have no obligation to furnish any information that the Company reasonably believes would be expected to result in the waiver of any attorney-client privilege, attorney work product or other related legal privilege; provided, further, that the Company shall use commercially reasonable efforts to allow the disclosure of such information (or as much of it as reasonably possible) in a manner that does not result in a loss of attorney-client privilege, attorney work product or other related legal privilege;

(xxiii)  to the extent applicable, take such reasonable actions to make any Governmental Authority and other third party notifications or filings or obtain any waivers, authorizations and consents that are reasonably necessary, required or desirable (in the reasonable opinion of the Required Supporting Parties for the consummation of any part of the Restructuring);

(xxiv)  actively oppose and object to the efforts of any Person seeking to object to, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring (including, if applicable, the filing of timely filed objections or written responses), including opposing and objecting to any motion, application, pleading or proceeding filed by another party with the Bankruptcy Court or the Bermuda Court or any other court challenging (or seeking standing to challenge) the amount, validity, enforceability, extent, perfection, or priority of, or seeking avoidance or subordination of, any Claim held by any Supporting Party against the Company or any liens or security interests securing such Claim;

(xxv)  except for non-exclusive licenses granted to customers or service providers in the ordinary course of business consistent with past practice, not to sell, lease, license, sublicense, modify, terminate, waive, abandon, permit to lapse, transfer, or dispose of any assets of the Company;

(xxvi)  use commercially reasonable efforts not to fail to take any action reasonably necessary to maintain, enforce or protect, any Intellectual Property of the Company, except as set forth on Schedule 2 attached hereto, agreed to in writing by the Required Supporting Parties;

(xxvii) maintain good standing (or a normal status or its equivalent) under the laws of the jurisdiction or state in which the Company are incorporated or organized (other than as a result of the Bermuda Proceeding and/or the Chapter 15 Case); provided that to the extent a Company entity is not in good standing (or a normal status or its equivalent), it shall take commercially reasonable steps to become in good standing (or a normal status or its equivalent) as soon as reasonably practicable;

(xxviii)not take any action or support any action (or instruct or encourage any Person to take any action or support any action) that is materially inconsistent with, or that would reasonably be expected to prevent, interfere with, delay, or impede the consummation of the Restructuring, or omit to take any material action required by, this Agreement, the Restructuring, the Chapter 15 Case, the Bermuda Proceeding, or any of the other Definitive Documents, including not seeking to enjoin, limit or restrict the termination of this Agreement by the Required Supporting Parties in accordance with the terms of this Agreement;

(xxix)  not file or support another party in filing with the Bankruptcy Court or the Bermuda Court or any other court a motion, application, pleading, or proceeding (A) challenging the amount, validity, enforceability, extent, perfection, or priority of, or seeking avoidance or subordination of, any Claim held by any Supporting Party (in its capacity as such) against the Company or any liens or security interests securing such Claim, or (B) asserting (or seeking standing to assert) any purported Claims or causes of action against any of the Supporting Parties (in their capacity as such), or take or support any corporate action for the purpose of authorizing any of the foregoing;

(xxx)   not consummate any merger, consolidation, disposition, asset sale, equity sale, acquisition, investment, incurrence, guarantee or assumption of indebtedness, or other similar transaction or take any other material action, in each case, outside the ordinary course of business consistent with past practice with a third party other than the Restructuring; provided that nothing in this Agreement shall:  (A) impair or waive the rights of the Company Parties to assert or raise any objection, or take any position, permitted under this Agreement in connection with the Restructuring, (B) prevent the Company Parties from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, or (C) prevent the Company Parties from complying with all local laws;

(xxxi)   not make any dividends or other distributions with respect to any Interests or repurchase any Interests;

(xxxii) not authorize, create or issue any additional Interests, other than as expressly provided in the Definitive Documents;

(xxxiii) not pledge or grant any liens or encumbrances on any Interests or assets of the Company other than those existing as of the Agreement Effective Date (and so long as such liens are not in violation of the Term Loan Credit Agreement);

(xxxiv)not incur or commit to incur any capital expenditures except as approved in writing by the Required Supporting Parties;

(xxxv) not (A) grant or agree to grant or pay or agree to pay, directly or indirectly, any increase or new commitments with respect to the wages, salary, bonus, commissions, retirement benefits, severance, tax gross-up or equalization or other compensation or benefits of, or grant any equity-based compensation to, any board director, board manager, or officer, employee or independent contractor of the Company; provided the Company may grant or agree to grant new commitments (consistent with the ordinary course of business and past practices of the Company) to hourly and non-managerial, non-executive employees or independent

contractors with respect to wages, salaries and benefits (excluding bonuses or incentives (other than ordinary course annual bonuses), tax gross-up or equalization, or granting any equity based compensation or benefits) up to an aggregate annual compensation of $150,000 per such employee or independent contractor and, with respect to any severance, up to one month's base salary per such employee provided such severance is consistent with ordinary course of business and past practices and is in exchange for a release of the Company), (B) hire executives, (C) enter into, adopt or establish any new compensation or benefit plan or arrangements or collective bargaining agreement, and (D) pay any bonuses, retention payments or similar payments to any officers, board directors, board managers or employees, in each case, except as set forth on Schedule 3 hereto or agreed to in writing by the Company and the Term Loan Agent;

(xxxvi) not amend or modify in any material respect any contract or agreement to expand the scope of services provided by the counterparty thereunder or materially increase the fees, expenses or other amounts payable by the Company thereunder other than in the ordinary course of business consistent with past practice;

(xxxvii) not (A) enter into any material contract other than (1) in the ordinary course of business consistent with past practice or (2) to renew or replace any material contract that has expired or terminated in accordance with its terms, or (B) (1) materially modify, materially amend, extend, or terminate (other than in the ordinary course of business consistent with past practice) any material contract or (2) waive, release, or assign any material rights or material claims thereunder, in each case, other than in the ordinary course of business consistent with past practice;

(xxxviii) not make any loans, advances or capital contributions to, or investments in, any other Person;

(xxxix) not make any change in financial accounting policies, practices, principles or procedures, except as required by generally accepted accounting principles or applicable law;

(xl) not (A) make, change or revoke any material tax election; (B) adopt or change any tax accounting period or material method of tax accounting; (C) amend any material tax return; (D) file any material tax return that is materially inconsistent with a previously filed tax return of the same type for a prior taxable period (taking into account any amendments prior to the date hereof), in each case of the foregoing clauses (A) through (D), unless (x) otherwise required by applicable laws and (y) described in a written notice delivered to the Term Loan Agent not fewer than five (5) Business Days in advance; (E) settle or compromise any material liability for taxes or any tax audit, claim or other proceeding relating to a material amount of taxes; (F) enter into any "closing agreement" within the meaning of Section 7121 of the Internal Revenue Code (or any similar provision of state, local or non-U.S. law); (G) surrender any right to claim a material refund of taxes; or (H) agree to an extension or waiver of the statute of limitations with respect to a material amount of taxes;

(xli) not enter into any transactions or contracts with any affiliate; *provided* that the Company may enter into transactions or contracts with any Subsidiary (as defined in the Term Loan Agreement) subject to the terms of the Term Loan Agreement in the ordinary course

of business consistent with past practice and otherwise in compliance with the terms of the Term Loan Agreement and this Agreement, and such transactions or contracts are not inconsistent with the Restructuring;

(xlii)    if the Company or its Representatives receive an unsolicited proposal or offer with respect to a Prohibited Transaction or an unsolicited inquiry, proposal, or offer that would reasonably be expected to lead to a Prohibited Transaction, promptly after the receipt of such proposal or expression of interest, but in any event within 48 hours of receipt, notify the Required Supporting Parties and AOS of the receipt thereof, with such notice to include the material terms and conditions thereof, including the identity of any Person or group of Persons involved, and promptly (and in any event within 48 hours after) notify the Required Supporting Parties and AOS of any material amendments to the material terms and conditions of any such proposal or offer, and the Company agrees that it will not enter into any agreement with any Person which directly or indirectly prohibits the Company from providing any information to the Required Supporting Parties and AOS in accordance as set forth in this paragraph; provided, that the Company shall enter into a confidentiality agreement with the Person or group of Persons from whom it receives such proposal or offer on terms that are no less restrictive in the aggregate than the terms contained in the confidentiality provision of the Term Loan Credit Agreement (except for the Company to comply with its obligations under this Agreement) and provide the Term Loan Agent with any information furnished or made available to such other Person or group of Persons that the Term Loan Agent was not previously provided;

(xliii)    (A) without the consent of the Required Supporting Parties, not commence any litigation, arbitration or mediation regarding any material Claim, dispute, controversy, cause of action, proceeding, appeal, determination or investigation (if the failure to do so would cause the statute of limitations to expire or would materially adversely affect the Restructuring, promptly inform the Required Supporting Parties of the foregoing); and (B) promptly inform the Required Supporting Parties in writing of any decision that commencing any of the foregoing would be, in its opinion, in the best interests of the Company and the rationale underlying such opinion;

(xliv)    (A) without the consent of the Required Supporting Parties, not enter into any settlement (proposed or otherwise) outside the ordinary course of business of any material Claim, litigation, dispute, controversy, cause of action, proceeding, appeal, determination or investigation; and (B) promptly inform the Required Supporting Parties in writing of any and all such proposed settlements and the rationale supporting such proposed settlements;

(xlv)    promptly (but no later than one day after knowledge thereof) provide notice to the Required Supporting Parties of any breach by the Company of this Section 6; and

(xlvi)    prior to the commencement of the Bermuda Proceedings or as soon as reasonably practicable thereafter, Afiniti will have formed HoldCo as a limited liability company organized under the laws of the Cayman Islands in form and substance acceptable to the Required Supporting Parties.

7.     **[Reserved]**.

8.     <u>**Transfer of Claims**</u>.

<u>Transfers</u>.

(i)     During the Support Period, subject to the terms of this Agreement, each Supporting Party that holds any Claim against or Interest in the Company agrees, solely with respect to itself, that it shall not sell, pledge, assign, transfer, permit the participation in, grant any proxies, or otherwise dispose of (each, a "***Transfer***," <u>provided</u>, <u>however</u>, that any pledge, lien, security interest, or other encumbrance in favor of a bank or broker dealer at which a Supporting Party maintains an account, where such bank or broker dealer holds a security interest in or other encumbrances over property in the account generally shall not be deemed a "Transfer" for any purposes hereunder) any ownership (including any beneficial ownership) in its Claims, or any option thereon or any right or interest therein (including by granting any proxies or depositing any interests in such Claims into a voting trust or by entering into a voting agreement with respect to such Claims), unless (A) the intended transferee is another Supporting Party, or (B) the intended transferee is permitted under the Term Loan Credit Agreement and executes and delivers to counsel to the Company and AOS a Joinder Agreement before, or substantially contemporaneously with, the time such Transfer is effective (it being understood that any Transfer shall not be effective as against Afiniti until notification of such Transfer and a copy of the executed Joinder Agreement (as applicable) is received by counsel to the Company and AOS, in each case, on the terms set forth herein) (such transfer, a "***Permitted Transfer***" and such party to such Permitted Transfer, a "***Permitted Transferee***").  Upon satisfaction of the foregoing requirements in this <u>Section 8</u>, (X) the Permitted Transferee shall be deemed to be a Supporting Party hereunder and, for the avoidance of doubt, a Permitted Transferee is bound as a Supporting Party under this Agreement with respect to any and all Claims and Interests, whether held at the time such Permitted Transferee becomes a Party or later acquired by such Permitted Transferee and is deemed to make all of the representations and warranties of a Supporting Party set forth in this Agreement and be entitled to the applicable rights of a Supporting Party hereunder, and (Y) the transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to the Transfer) under this Agreement to the extent of such transferred rights and obligations;

(ii)     This Agreement shall in no way be construed to preclude any Supporting Party from acquiring additional Claims against or Interests in Afiniti (or the Company); <u>provided</u> that any acquired Claims shall automatically and immediately upon acquisition by a Supporting Party be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given);

(iii)     This <u>Section 8</u> shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Supporting Party to Transfer any Claims or Interests or otherwise to violate legal privilege or contractual obligations to a third party;

(iv)     Any Transfer made in violation of this <u>Section 8</u> shall be void *ab initio*; and

26

(v)     A Supporting Party that Transfers all right, title, or interest in a Company Claim/Interest in accordance with the terms of this <u>Section 8</u> shall (A) be deemed to relinquish its rights and be released from its obligations under this Agreement and (B) not be liable to any Party to this Agreement for the failure of the Permitted Transferee to comply with the terms and conditions of this Agreement.

9.     **<u>Termination of Agreement.</u>**

a.     <u>Supporting Party Termination Events</u>.  This Agreement may be terminated by the Required Supporting Parties (as to all Supporting Parties), by the delivery to the other Parties of a written notice in accordance with <u>Section 25</u> hereof, upon the occurrence and continuation of any of the following events (each, a "***Supporting Party Termination Event***"), unless waived by the Required Supporting Parties:

(i)     the material breach by the Company of (A) any affirmative or negative covenant contained in this Agreement or (B) any other material obligations set forth in this Agreement, in each case, which breach remains uncured (to the extent curable) for a period of five (5) Business Days following the Company's receipt of any notice pursuant to <u>Section 25</u> hereof (and any action by either or both of the Joint Provisional Liquidators to cause such material breach shall not excuse the Company from such breach);

(ii)     any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or, if required to be true on an ongoing basis, shall have become untrue in any material respect, and such breach remains uncured (to the extent curable) for a period of five (5) Business Days following the Company's receipt of any notice pursuant to <u>Section 25</u> hereof;

(iii)     the Company files or either or both of the Joint Provisional Liquidators file any motion, pleading, or related document with the Bankruptcy Court or the Bermuda Court, or take any position at any hearing, that is inconsistent with this Agreement, the Restructuring or the Definitive Documents (in each case, with respect to the Definitive Documents, solely to the extent that the terminating Supporting Party(s) have consent rights over such Definitive Document), including any order that the Term Loan Agent notifies the Company is inconsistent with any order required by the Term Loan Lenders, and such motion, pleading, or related document has not been withdrawn within five (5) Business Days (or by the time of any scheduled hearing on such motion, pleading, or document) of the Company receiving written notice in accordance with <u>Section 25</u> hereof that such motion, pleading, or related document is inconsistent with this Agreement;

(iv)     (A) any Definitive Document filed by the Company, or any related order entered by the Bankruptcy Court in the Chapter 15 Case or the Bermuda Court in the Bermuda Proceeding, in each case, is inconsistent with this Agreement, including the Supporting Parties' consent rights under this Agreement (in each case implicating a Definitive Document, solely to the extent that the terminating Supporting Party or Supporting Parties have consent rights over such Definitive Document), or is otherwise not in accordance with this Agreement in any material respect, (B) any of the terms or conditions of any of the Definitive Documents are waived, amended, supplemented, or otherwise modified in any material respect with respect to the

Supporting Parties' rights under this Agreement, in a manner inconsistent with this Agreement, without the prior written consent of the Required Supporting Parties, which remains uncured for five (5) Business Days after the receipt by such Company of written notice delivered in accordance herewith, or (C) if the Backstop Parties party to the Backstop Commitment Agreement breach or default under the Backstop Commitment Agreement, subject to any cure period provided for therein;

(v)    the issuance by any Governmental Authority of any ruling, judgment, or order enjoining the consummation of any material portion of the Restructuring or rendering illegal the Restructuring or any material portion thereof, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of the Company or (B) in all other circumstances, such ruling, judgment, or order has not been reversed or vacated within ten (10) Business Days after such issuance (unless same can be reasonably remedied by the Company subject to the satisfaction of the Required Supporting Parties);

(vi)    the Company or either or both Joint Provisional Liquidators (A) publicly announces its intention not to support the Restructuring, (B) files a motion with the Bankruptcy Court or the Bermuda Court seeking the approval of a Prohibited Transaction, or (C) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document executed by the Company) or publicly announces its intent to pursue a Prohibited Transaction;

(vii)    the Bankruptcy Court or Bermuda Court (or other court of competent jurisdiction) enters an order (A) dismissing the Bermuda Proceeding or the Chapter 15 Case or (B) the effect of which would (1) render the Restructuring incapable of consummation on the terms set forth in this Agreement or (2) delay the Restructuring to a date after the Outside Date, or (C) that would, or would reasonably be expected to, prevent achievement of any of the Milestones on the dates set forth herein or the consummation of the Restructuring;

(viii)    (A) the Bermuda Court enters an order denying Sanction of the Restructuring; (B) such order is made on terms materially inconsistent with those contemplated by the Restructuring; (C) such order sought by the Company or either or both of the Joint Provisional Liquidators is materially inconsistent with the terms of this Agreement in the Bermuda Proceeding or the Chapter 15 Case; or (D) such order is reversed, stayed, dismissed, vacated, modified or amended, in each case, in a manner materially inconsistent with this Agreement without the written consent of the Required Supporting Parties;

(ix)    the Bankruptcy Court or Bermuda Court (or other court of competent jurisdiction) invalidates, disallows or recharacterizes, as applicable, the Term Loan Claims or any of the liens or encumbrances that secure (or purport to secure) the Term Loan Claims;

(x)    the Company threatens or takes, or either or both of the Joint Provisional Liquidators take, any action to invalidate, disallow, subordinate, recharacterize or limit, as applicable, the Term Loan Claims or any lien or encumbrance that secures (or purports to secure) the Term Loan Claims;

(xi)    failure of the Company to timely pay any and all accrued interest in accordance with the terms of the Term Loan Credit Agreement and Section 6(vii) of this Agreement;

(xii)    except as set forth in Section 4(b) above, the occurrence of a Default or Event of Default (as such terms are defined in the Term Loan Credit Agreement) under the Term Loan Credit Agreement that is not cured or otherwise waived in accordance with the terms of the Term Loan Credit Agreement;

(xiii)    the happening or existence (or lack thereof) of any event, change, effect, occurrence, development, circumstance, condition, result, state of fact or change of fact that shall have made any of the conditions precedent set forth in Section 15 below, solely as such conditions precedent apply to the Supporting Parties, incapable of being satisfied prior to the Outside Date;

(xiv)    failure of any of the Milestones to be achieved on or before the dates set forth therein;

(xv)    the Company (A) grants or agrees to grant or pays or agrees to pay, directly or indirectly, any increase or new commitments with respect to the wages, salary, bonus, commissions, retirement benefits, severance, tax gross-up or equalization or other compensation or benefits of, or grant any equity-based compensation to, any board director, board manager, or officer, employee or independent contractor of the Company (excluding the Company granting or agreeing to grant new commitments (consistent with the ordinary course of business and past practices of the Company) to hourly and non-managerial, non-executive employees or independent contractors with respect to wages, salaries and benefits (excluding bonuses or incentives (other than ordinary course annual bonuses), tax gross-up or equalization, or granting any equity based compensation or benefits) up to an aggregate annual compensation of $150,000 per such employee or independent contractor and, with respect to any severance, up to one month's base salary per such employee provided such severance is consistent with ordinary course of business and past practices and is in exchange for a release of the Company), (B) hires executives, (C) enters into, adopts or establishes any new compensation or benefit plan or arrangements or collective bargaining agreement, or (D) pays any bonuses, retention payments or similar payments to any officers, board directors, board managers, employees or independent contractors in each case except as set forth on Schedule 3 hereto or agreed to in writing by the Company and the Term Loan Agent;

(xvi)    any court of competent jurisdiction has entered a judgment or order declaring this Agreement to be unenforceable;

(xvii)    the Transaction Expenses are not timely paid in accordance with this Agreement or the reimbursement letter between Afiniti and AOS is terminated by Afiniti or breached by Afiniti and such failure to timely pay or breach by Afiniti is not cured within five (5) Business Days after the Company's receipt of any written notice pursuant to Section 25 hereof;

(xviii)    the occurrence of a Material Adverse Effect; or

29

(xix)    the Company Parties terminate this Agreement in accordance with Section 9(b) hereof.

Notwithstanding the foregoing, this Agreement may not be terminated as to the Supporting Party on account of any Supporting Party Termination Event that is caused by any Supporting Party.

b.    Company Termination Events.  This Agreement may be terminated as to all Parties (subject to applicable cure periods set forth below) by the Company Parties, as applicable, by the delivery to the Term Loan Agent and AOS, on behalf of the Required Supporting Parties, of a written notice in accordance with Section 25 hereof, upon the occurrence and continuation of any of the following events (each, a "*Company Termination Event*"), unless waived by the Company Parties:

(i)    the breach in any material respect by Supporting Parties that would result in non-breaching Supporting Parties holding less than 75% in outstanding principal amount of Term Loan Indebtedness, with respect to any of the affirmative or negative covenants contained in this Agreement or any other material obligations of such breaching Supporting Parties set forth in this Agreement and which breach remains uncured for a period of five (5) Business Days after the receipt by the applicable Supporting Party and AOS pursuant to Section 25 hereof from the Company of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach; provided that the Company Parties may, at their option, terminate this Agreement solely as to any Supporting Party that breaches, in any material respect, its affirmative or negative covenants contained in this Agreement or any other obligations of such breaching Supporting Party set forth in this Agreement (to the extent the breach remains uncured for a period of five (5) Business Days after receipt by the applicable Supporting Party from the Company (with a copy to AOS) of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach), whether or not such breach would entitle the Company Parties to terminate this Agreement with respect to all Supporting Parties in accordance with this Section 9(b)(i);

(ii)    any representation or warranty in this Agreement made by any Supporting Parties shall have been untrue in any material respect when made or, if required to be true on an ongoing basis, shall have become untrue in any material respect, and such breach (a) results in non-breaching Supporting Parties holding less than 75% in outstanding principal amount of Term Loan Indebtedness and (b) remains uncured (to the extent curable) for a period of five (5) Business Days following the applicable Supporting Party's receipt of any notice from the Company and AOS pursuant to Section 25 hereof; provided that the Company Parties may, at their option, terminate this Agreement solely as to any Supporting Party that makes any representation or warranty in this Agreement that shall have been untrue in any material respect when made or, if required to be true on an ongoing basis, shall have become untrue in any material respect, and such breach remains uncured (to the extent curable) for a period of five (5) Business Days after receipt by the applicable Supporting Party from the Company of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach, whether or not such breach would entitle the Company Parties to terminate this Agreement with respect to all Supporting Parties in accordance with this Section 9(b)(ii);

(iii)    a Fiduciary Duty Termination (defined below);

(iv)    any Supporting Party files any motion, pleading, or related document with the Bankruptcy Court or the Bermuda Court or any other court that is inconsistent with this Agreement, the Restructuring, the Chapter 15 Case, the Bermuda Proceeding, or the other Definitive Documents and such motion, pleading, or related document has not been withdrawn within five (5) Business Days (or by the time of any scheduled hearing on such motion, pleading, or document) of the Supporting Party receiving written notice in accordance with Section 25 hereof that such motion, pleading, or related document is inconsistent with this Agreement;

(v)    the Supporting Parties terminate this Agreement in accordance with Section 9(a) hereof;

(vi)    the issuance by any Governmental Authority of any ruling, judgment, or order enjoining the consummation of any material portion of the Restructuring or rendering illegal the Restructuring or any material portion thereof unless, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment, or order has not been stayed, reversed or vacated within ten (10) Business Days after such issuance (unless same can be reasonably remedied by the Company subject to the satisfaction of the Required Supporting Parties);

(vii)    the Bankruptcy Court or Bermuda Court (or other court of competent jurisdiction) enters an order over an objection by the Company pursued in good faith (A) dismissing the Bermuda Proceeding or the Chapter 15 Case or (B) the effect of which would (1) render the Restructuring incapable of consummation on the terms set forth in this Agreement or (2) delay the Restructuring to a date after the Outside Date;

(viii)    the Bermuda Court enters an order denying Sanction (or refuses to make a Sanction Order) of the Restructuring or such order is made on terms inconsistent with those contemplated by the Restructuring or sought by the Company in the Bermuda Proceeding;

(ix)    the Bankruptcy Court enters an order denying recognition of the Bermuda Proceeding and the Restructuring;

(x)    failure of any of the Milestones to be achieved on or before the dates set forth herein; or

(xi)    any court of competent jurisdiction has entered a judgment or order declaring this Agreement to be unenforceable.

Notwithstanding the foregoing, this Agreement may not be terminated as to the Company on account of a Company Termination Event that is caused by the Company.

c.    <u>Mutual Termination</u>.  This Agreement may be terminated in writing by mutual agreement of: (i) Afiniti, (ii) the Term Loan Agent, and (iii) the Required Supporting Parties.

d.    <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice upon (A) the Closing or (B) 11:59 p.m. (prevailing Eastern Time) on the Outside Date.

e.    <u>Effect of Termination</u>.  Upon a termination of this Agreement in accordance with this <u>Section 9</u> as to a Party, this Agreement shall forthwith become null and void and of no further force or effect as to any Party, and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions that it would have been entitled to take had it not entered into this Agreement; <u>provided</u> that, notwithstanding any Transfer of any Claims against or Interests in the Company in accordance with <u>Section 8</u> hereof or the termination of this Agreement pursuant to this <u>Section 9</u>, (i) the agreements and obligations of the Parties set forth in Sections 2, 9, 12, 13, 17, 19, 20 through and including 31 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; and (ii) in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder that arose prior to the date of such termination or any obligations hereunder that expressly survive termination of this Agreement.  If terminated before the Closing Date, (A) any and all consents, agreements, undertakings, waivers, forbearances, votes, or ballots tendered by the Parties before such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by any of the Parties in connection with the Bermuda Proceeding or the Chapter 15 Case and (B) the failure to pay any and all accrued interest (including at the Default Rate (as defined in the Term Loan Credit Agreement)) under the Term Loan Credit Agreement on or prior to the termination of this Agreement before the Closing Date shall be an automatic Event of Default under the Term Loan Credit Agreement; <u>provided</u>, for the avoidance of doubt, in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder that arose prior to the date of such termination or any obligations hereunder that expressly survive termination of this Agreement.  Notwithstanding anything to the contrary herein, any of the Termination Events may be waived (on a permanent, temporary or limited basis, as set forth in such waiver) as specifically set forth in this <u>Section 9</u>, in which case the Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties hereto shall be restored, in each of the foregoing cases, subject to the terms and conditions of any such waiver.

**10.    <u>Representations and Warranties.</u>**

a.    The Company and each Supporting Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Supporting Party becomes a party hereto):

(i)    (A) such Party (x) is validly existing and, to the extent applicable, is in good standing under the laws of its jurisdiction of incorporation or organization (other than Afiniti AI Technologies Europe S.R.L. and as otherwise communicated to the Term Loan Agent) and (y) has all requisite corporate, partnership, limited liability company, governmental, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and

perform its obligations contemplated hereunder (other than, in the case of Afiniti, after the commencement of the Bermuda Proceeding, any required approvals or authorizations of the Bankruptcy Court and of the Bermuda Court); and (B) the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, governmental, or other similar action on its part (other than, in the case of Afiniti, after the commencement of the Bermuda Proceeding, any required approvals or authorizations of the Bankruptcy Court and of the Bermuda Court);

(ii)     the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it, its charter, its constitution, or its bylaws (or other similar governing documents) in any material respect; (B) conflict with, result in a breach of, or constitute a default under any material contractual obligation to which it is a party in any material respect (provided, however, that with respect to Afiniti, it is understood that commencing the Chapter 15 Case and the Bermuda Proceeding may result in a breach of or constitute a default under such obligations); or (C) result in the creation of any lien or other encumbrance on any of such Party's Claims and interests, except for any encumbrance created by this Agreement;

(iii)     the execution, delivery, and performance by such Party of this Agreement does not and will not require any registration or filing with, consent, or approval of, or notice to, or other action, with or by, any Governmental Authority except such registrations or filings, consents, approvals, notices, or other actions as may be necessary and/or required by the Bankruptcy Court, the Bermuda Court, or this Agreement, including any applicable Definitive Documents, or under any applicable Foreign Investment Law;

(iv)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(v)     such Party (A) is a sophisticated party with respect to the subject matter of this Agreement and the transactions contemplated hereby; (B) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision; and (C) acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress;

(vi)     such Party is not aware of the occurrence of any event, change, effect, occurrence, development, circumstance, condition, result, state of fact or change of fact that, due to any fiduciary or similar duty to any other Person, would prevent it from taking any action required of it under this Agreement;

(vii)     such Party is not currently engaged in any discussions, negotiations or other arrangements with respect to any Prohibited Transaction; and

(viii)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

b.        Each Supporting Party (other than the Term Loan Agent), severally (and not jointly), represents and warrants to the Company Parties that, as of the date hereof (or as of the date such Supporting Party becomes a party hereto), such Supporting Party: (A) is or, after taking into account the settlement of any pending assignments or trades of Claims, will be the beneficial owner of (or investment manager, advisor, or subadvisor to one or more beneficial owners of) the aggregate outstanding principal amount of Claims (which, for the avoidance of doubt, shall exclude any interest, prepayment premium or other premium) set forth besides its name on its signature page hereto (or below its name on the signature page of a Joinder Agreement for any Supporting Party that becomes a Party hereto after the date hereof) and that such Claims represent all Claims of which it is the beneficial owner (or investment manager, advisor, or subadvisor to one or more beneficial owners); (B) has or, after taking into account the settlement of any pending assignments or trades of Claims, will have, with respect to the beneficial owners of such Claims (as may be set forth on a schedule to such Supporting Party's signature page hereto), (I) sole investment or voting discretion (including any such discretion delegated to its investment advisor) with respect to such Claims, (II) full power and authority to vote on and consent to matters concerning such Claims, or to exchange, assign, and transfer such Claims, and (III) full power and authority to bind or act on the behalf of, such beneficial owners; and (C) such Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, that would prevent in any way such Supporting Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

It is understood and agreed that the representations and warranties made by a Supporting Party (other than the Term Loan Agent) that is an investment manager of a beneficial owner of Claims and interests are made with respect to, and on behalf of, such beneficial owner and not such investment manager, and, if applicable, are made severally (and not jointly) with respect to the investment funds, accounts and other investment vehicles managed by such investment manager.

**11.    <u>Company Fiduciary Duties.</u>**  Notwithstanding anything to the contrary in this Agreement, nothing herein shall require any director, board of directors, board of managers, special committee, manager, officer, or similar governing body of the Company, after consultation with the Company's external counsel, to take or refrain from taking any action inconsistent with his, her or its fiduciary duties to the Company (including terminating this Agreement) so long as such action is not in breach of <u>Sections 6(ix), 6(xii)</u> and <u>6(xlii)</u> hereof and, if there is not a breach of any such Sections, any such action or inaction shall not be deemed to constitute a breach of this Agreement; *provided* that, if the Company or applicable governing body thereof decides, in the exercise of its fiduciary duties acting in good faith after consultation with its external counsel, (i) to enter into any definitive agreement regarding any Prohibited Transaction or (ii) that proceeding with the Restructuring would be inconsistent with the exercise of its fiduciary duties under applicable law, the Company shall give written notice (with email being sufficient) to the Term Loan Agent and AOS within 48 hours of such determination being made (a "***Fiduciary Duty Termination***").

**12.    No Additional Fiduciary Duties.**    Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Company or the Supporting Parties, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party or its affiliated entities, that such entities did not have prior to the execution of this Agreement.

**13.    Attorney-Client Privilege.**    The Parties' entry into this Agreement is not and shall not be deemed to be a waiver of any Party's attorney-client privilege, attorney work product or other related legal privilege; *provided*, that the Company shall use commercially reasonable efforts to allow the disclosure of such information (or as much of it as reasonably possible) in a manner that does not result in a loss of attorney-client privilege, attorney work product or other related legal privilege.  Notwithstanding anything to the contrary herein, nothing herein shall obligate any Party to take any action that such Party reasonably believes would result in the waiver of any such privileges and protections.

**14.    Filings and Public Statements.**    The Company and each Supporting Party agrees that it shall not issue, and it shall cause its respective Representatives not to issue, any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the Company and the Required Supporting Parties, except as such release or announcement may be required by law, in which case the Party required to make the release or announcement shall allow the other such Parties reasonable time to comment on such release or announcement in advance of such issuance and shall incorporate any such reasonable comments in good faith.  Without limiting the foregoing, the Company shall (a) submit to AOS and such other counsel as a Supporting Party may request drafts of any press releases, filings with the Bankruptcy Court, or filings with the Bermuda Court that disclose the material business and financial performance of the Company, Materially Adverse Events concerning the Company, the entry by the Company into any material definitive agreement or the status and progress of the Restructuring at least two Business Days or as soon as reasonably practicable prior to making any such disclosure; (b) afford such counsel a reasonable opportunity under the circumstances to comment on any such documents and disclosures that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement; and (c) consider such comments in good faith.  Notwithstanding anything to the contrary herein, the Company shall not include the name of any Supporting Party or its holdings in a press release or any other public filing without the express written consent (email being sufficient) of such Supporting Party (or its counsel), unless such disclosure is required by applicable law.  Except as required by law or otherwise permitted under the terms of any other agreement between the Company, on the one hand, and any Supporting Party, as applicable, on the other hand, the Company shall not disclose (including via a filing with the Bankruptcy Court or the Bermuda Court) to any Person (including other Supporting Parties) other than the Company and the Company's advisors, the identity of and principal amount or percentage of the Company Claims/Interests or any other securities of or Claims against the Company held by any Supporting Party, in each case, without such Supporting Party's prior written consent; *provided* that (i) if such disclosure is required by law or otherwise reasonably necessary to enforce this Agreement,

subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Supporting Party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (including by way of a protective order) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Company Claims/Interests held by all the Supporting Parties collectively. Any public filing of this Agreement, with the Bankruptcy Court, the Bermuda Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Supporting Party (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court or Bermuda Court, in each case, under seal) or with respect to each Supporting Party for itself, such Party's express written consent (email being sufficient). Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement or the confidentiality provisions in the Term Loan Credit Agreement between the Company and any Supporting Party.

15. **Conditions Precedent**.

a. The Agreement Effective Date will occur on the date that each of the following conditions is satisfied or waived in accordance with the terms hereof:

(i) counterpart signature pages to this Agreement shall have been executed and delivered to each of Latham and AOS by (A) each of the entities comprising the Company Parties, (B) the Term Loan Agent, and (C) Term Loan Lenders holding 100% in outstanding principal amount of the Term Loan Indebtedness;

(ii) the amendment to the Term Loan Credit Agreement providing that a voluntary insolvency filing or the Bermuda Proceeding is not an automatic acceleration of the debt, which amendment is annexed hereto as **Exhibit C**, (A) shall have been executed and/or delivered by each Person required to execute and/or deliver the same, and (B) shall be in full force and effect;

(iii) the Initial CFF has been delivered to the Required Supporting Parties;

(iv) the Term Loan Credit Agreement and documentary conditions precedent to the Amendment, including all promissory notes, guarantees, collateral and security documents, certificates, documents and agreements required to be executed and/or delivered pursuant to the terms thereof shall be in agreed form, acceptable to the Required Supporting Parties;

(v) all of the representations and warranties contained in this Agreement shall be true and correct in all material respects as of the Agreement Effective Date as if made as of the Agreement Effective Date (other than representations and warranties made as of an earlier date, which shall have been true and correct in all material respects as of such earlier date); and

(vi) the Transaction Expenses incurred prior the Agreement Effective Date shall have been paid in accordance with Section 30.

b. The obligations of the Parties to effect the Closing (excluding the consummation of any portion of the Restructuring that is intended to be consummated prior to the Closing Date) will be subject to the following conditions:

(i)  the Bermuda Court shall have granted the Sanction Order and, unless waived by the Supporting Parties, such Order shall have become a Final Order and shall not have been the subject of any application for leave to appeal within 14 days of the date of such Order being entered or shall otherwise be non-appealable;

(ii) the Bankruptcy Court shall have entered the Recognition Order and such Order shall have become a Final Order;

(iii) each holder of 2L Convertible Tranche loans shall have executed and delivered the Newco LLC Agreement as a Class A Member (as defined in the Newco LLC Agreement);

(iv) the Parties agree that the offer, issuance and delivery of the 2L Convertible Tranche shall be exempt from the registration and prospectus delivery requirements of the Securities Act and all other applicable laws, and no proceeding shall be pending or threatened by any Governmental Authority that alleges that any such offer, issuance and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act;

(v) this Agreement shall not have been terminated by the Required Supporting Parties (as to all Supporting Parties) or the Company Parties in accordance with its terms, and there shall not be continuing any cure period with respect to any event, occurrence or condition that would permit the applicable Party(ies) to terminate this Agreement in accordance with its terms;

(vi)  the reasonable and documented fees and expenses of Latham and Conyers, as co-counsel to the Company, and one local Delaware counsel incurred as of the Closing shall have been paid;

(vii) the reasonable and documented fees and expenses of the Joint Provisional Liquidators as set forth in and subject to the terms and conditions of the letter agreements, each dated July 25, 2024, between Afiniti and Teneo Financial Advisory Limited and Teneo (Bermuda) Limited, respectively, shall have been paid; and

(viii)   all documents, certificates, and agreements necessary to implement the Restructuring (including, without limitation, each of the Definitive Documents, as applicable) shall have been executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental Entities in accordance with applicable Laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Closing Date).

c. The obligations of the Supporting Parties to effect the Closing (excluding the consummation of any portion of the Restructuring that is intended to be consummated prior to the Closing Date) also will be subject to the following conditions:

(i) all of the representations and warranties contained in this Agreement shall be true and correct in all material respects as of the Closing Date as if made as of the Agreement Effective Date (other than representations and warranties made as of an earlier date, which shall have been true and correct in all material respects as of such earlier date);

(ii) the Parties shall have complied in all material respects with all applicable covenants and obligations in any Definitive Documentation applicable to each such Party, including, but not limited to, the Company, including Afiniti, to satisfy the conditions to which the obligations of Newco and the Supporting Parties to perform their respective obligations under the Securities Transfer Agreement are subject, is in a manner reasonably satisfactory to the Required Supporting Parties;

(iii) the closing of the transactions contemplated by the Stock and Asset Transfer Agreement shall have occurred in a manner reasonably satisfactory to the Required Supporting Parties;

(iv) each Definitive Document shall be (A) in form and substance acceptable to the Required Supporting Parties, (B) in full force and effect, and (C) not subject to unfulfilled conditions or contingencies;

(v) [reserved];

(vi) each of the Foreign Investment Clearances shall have been duly obtained and shall be in full force and effect. For the avoidance of doubt, to the extent that any new or amended Foreign Investment Law becomes effective before the Closing Date, and such laws, rules or regulations apply to the contemplated Restructuring, all mandatory and suspensory approvals as are legally required, or in the reasonable opinion of the Term Loan Agent advisable, pursuant to such new or amended Foreign Investment Law to permit the Restructuring to occur shall have been duly obtained and shall be in full force and effect;

(vii) the Term Loan Credit Agreement and conditions precedent to the Amendment, including, all promissory notes, guarantees, collateral and security documents, certificates, documents and agreements required to be executed and/or delivered pursuant to the terms thereof, (A) shall have been executed and/or delivered by each Person required to execute and/or deliver the same, and (B) shall be in full force and effect;

(viii) all liens and security interests in the Collateral (as defined in the Term Loan Credit Agreement) under the Term Loan Credit Documents to secure the Term Loan Indebtedness shall have been duly and validly created and perfected on the Collateral in a manner that is acceptable to the Required Supporting Parties and such

38

liens shall be valid liens on and security interests in the Collateral senior to all other liens on and security interests in the Collateral; provided, however, that certain deliverables in connection with Newco shall, to the extent agreed in accordance with the Amendment, be required on a post-Closing basis; provided, further, that any assets transferred to Newco or HoldCo or any of their respective subsidiaries shall be free and clear of any Liens (as defined in the Term Loan Credit Agreement), claims or other encumbrances other than with respect to Permitted Encumbrances (as defined in the Term Loan Credit Agreement) unless otherwise agreed by the Required Supporting Parties;

(ix) each Backstop Party, Rights Offering Subscriber and each Eligible Holder of preferred equity interests in Afiniti (in each case, to the extent receiving Class B Units and Warrant Units) shall have executed and delivered the Newco LLC Agreement as a Class B Member (as defined in the Newco LLC Agreement) and as a Warrant Member (as defined in the Newco LLC Agreement), with the allocation of Class B Units and Warrant Units determined as set forth in the Term Sheet, including (A) irrevocably releasing Afiniti (including its current directors and officers), Newco, the Term Loan Agent and each Term Loan Lender pursuant to the release included in the Newco LLC Agreement, (B) having not prosecuted any Claims against the Company or any subsidiaries or affiliates of the Company (other than filing in the Bermuda Proceeding any evidence of borrowed money by or funded indebtedness of Afiniti) or instructed or encouraged any other Person to do the same, and (C) acknowledging and agreeing that the distribution of Class B Units and Warrant Units to such Party is being made voluntarily by Newco in consideration of such release;

(x)  HoldCo shall (A) be classified as an association taxable as a corporation for U.S. federal income tax purposes and (B) have entered into, with Afiniti, as its sole member, organizational documents to be prepared by counsel to the Required Supporting Parties;

(xi) [reserved]

(xii)    Newco and each applicable subsidiary of Newco (after giving effect to closing) has, or will have immediately following Closing, employment agreements with those members of senior management team of such companies that are acceptable to the Term Loan Agent;

(xiii)    Afiniti and/or any of its subsidiaries shall not have made or have any contractual obligation to make a payment or grant or provide any compensation or benefit to any officer, director or employee that is payable on or after the Closing or effectiveness of the Restructuring, except as set forth on Schedule 3 attached hereto or agreed to in writing by the Term Loan Agent;

(xiv)    Afiniti shall have applied to the Bermuda Court for a compulsory winding up order in respect of Afiniti and the appointment of the Joint Provisional Liquidators on a "full powers" liquidator basis;

(xv)    no temporary restraining order, preliminary or permanent injunction, judgment or other order preventing the consummation of a material portion of the Restructuring shall have been entered, issued, rendered or made, nor shall any proceeding seeking any of the foregoing be commenced, pending or threatened;

(xvi)    (A) no reimbursement letter between the Company and an Advisor shall have been terminated (other than by the Advisor) and (B) all Transaction Expenses shall have been paid in full, in cash, in accordance with such letter or this Agreement, as applicable;

(xvii)    all documents, certificates, and agreements necessary to implement the Restructuring (including, without limitation, each of the Definitive Documents, as applicable) shall have been executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental Entities in accordance with applicable Laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Closing Date);

(xviii)    there is no ruling, judgment or order issued by any Governmental Authority making illegal, enjoining or otherwise preventing or prohibiting the consummation of the Restructuring; and

(xix)    all actions necessary to implement the Restructuring shall have been effected, all approvals, consents, notifications and filings necessary from (1) Governmental Authorities and (2) those counterparties to be set forth on Schedule 5.01 of the Stock and Asset Transfer Agreement (provided, that, prior to Closing, the Term Loan Agent may add (A) counterparties and (B) other approvals, consents, notifications and filings, in each case, that it reasonably believes are material to the Company's business) shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Transaction.

Any of the conditions (i) in Section 15(b) may be waived with the consent of the Company Parties and the Required Supporting Parties and (ii) in Section 15(c) may be waived by the Required Supporting Parties.  No Supporting Party shall be obligated to consummate the Restructuring unless and until all of the conditions precedent to consummation of the Closing as set forth in Sections 15(b) and 15(c) have been satisfied or waived by the applicable parties in accordance with this Agreement on or contemporaneous with Closing.  For the avoidance of doubt and notwithstanding any other provision in this Agreement, none of the Supporting Parties shall be required to offer or agree to any undertakings, remedy proposal, either structural or behavioral, conditions or divestment required for the purpose of obtaining the Foreign Investment.

**16.    Effectiveness.**  This Agreement shall become effective and binding on the Parties on the Agreement Effective Date, and not before such date.  This Agreement shall be effective

from the Agreement Effective Date until validly terminated pursuant to the terms of this Agreement. To the extent that a Supporting Party holds, as of the date hereof or at any time thereafter, multiple Claims, such Supporting Party shall be deemed to have executed this Agreement in respect of all of its Claims, whenever acquired or owned.

**17.    Amendments and Waivers.**

a.      This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 17. Any proposed modification, amendment, or supplement that does not comply with this Section 17 shall be ineffective and void *ab initio*. Unless otherwise explicitly set forth in this Agreement, all waivers must comply with this Section 17. All notices must be given in accordance with Section 25.

b.      During the Support Period, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except in a writing signed by the Company Parties and the Required Supporting Parties; *provided, however* that (i) any modification or amendment or supplement to, this Section 17 or the definition of Required Supporting Parties, shall require the written consent of all of the Supporting Parties and the Company Parties; and (ii) if any such amendment, supplement, modification or waiver would adversely affect any of the rights or obligations (as applicable) of any Term Loan Lender (in its capacity as a holder of Term Loan Claims) set forth in this Agreement in a manner that is different or disproportionate in any material respect from the effect on the rights or obligations (as applicable) of the Required Supporting Parties (in their capacity as holders of Term Loan Claims) set forth in this Agreement (other than in proportion to the amount of such Term Loan Claims), such amendment, modification, waiver or supplement shall also require the written consent of such affected Supporting Party;

c.      (A) A Supporting Party Termination Event may not be waived except in a writing signed by the Required Supporting Parties and (B) a Company Termination Event may only be waived in a writing signed by the Company Parties;

d.      (i) Any Party may waive its own obligations as they pertain to such Party in any provision in Sections 15(a) and 15(b) in a writing signed by the applicable Party and (ii) the Required Supporting Parties may waive any provision in Section 15(c) in a writing signed by the Required Supporting Parties;

e.      Amendments to any Definitive Documents following the effectiveness thereof shall be governed as set forth in such Definitive Documents; and

f.      Any consent or waiver required to be provided pursuant to this Section 17 may be provided in the form of an email and delivered by email from counsel.

**18.    Tax Cooperation; Conveyance Taxes.** Prior to the Closing Date, each of the Company and the Supporting Parties shall provide each other with such cooperation and information in the applicable Party's possession as they or their representatives reasonably may request with respect to the structure of the Restructuring or otherwise in connection with the Restructuring. Afiniti shall pay any and all Conveyance Taxes resulting from the Restructuring.

The Company and the Supporting Parties agree to cooperate in the execution and delivery of all instruments and certificates necessary to enable the Company to comply with any filing requirements with respect to such Conveyance Taxes.

19. **Governing Law; Jurisdiction; Waiver of Jury Trial.**

a.     This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of New York, without giving effect to the conflicts of law principles thereof.

b.     Each of the Parties irrevocably agrees that, for so long as the Chapter 15 Case or Bermuda Proceeding are pending, any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in the Bankruptcy Court or the Bermuda Court (as applicable), and each of the Parties hereby irrevocably submits to the jurisdiction of the Bermuda Court or the Bankruptcy Court (as applicable) for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding.  Otherwise, each of the Parties agrees that any such legal action, suit, or proceeding shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any such court as described herein.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Subject to the foregoing, each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any proceeding arising out of or relating to this Agreement, (A) any Claim that it is not personally subject to the jurisdiction of the courts as described herein for any reason, (B) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise), and (C) that (x) the proceeding in any such court is brought in an inconvenient forum, (y) the venue of such proceeding is improper, or (z) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

c.     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

20.    **Specific Performance/Remedies.**

a.    The Parties agree that irreparable damage (for which monetary damages, even if available, would not be an adequate remedy) would occur if any provision of this Agreement were not performed in accordance with the terms hereof or was otherwise breached and that the Parties shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the performance of the terms and provisions hereof (in each case, without the necessity of posting any bond or other security and without proof of actual damages), in addition to any other remedy to which they are entitled at law or in equity. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other Party has an adequate remedy at law or that any award of an injunction, specific performance or other equitable relief is not an appropriate remedy for any reason at law or in equity. No right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law, or in equity.

b.    Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover on the basis of anything in this Agreement, any punitive, special, indirect or consequential damages or damages for lost profits, in each case against any other Party to this Agreement.

21.    **Headings.** The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

22.    **No Third-Party Beneficiaries; Successors and Assigns; Severability; Several Obligations.** This Agreement is intended to bind and inure solely to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, and administrators and, save for such other Persons expressly stated or referred to herein, no other Person shall be a third-party beneficiary hereof; provided that nothing contained in this Section 22 shall be deemed to permit Transfers of interests in any Claims other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations, and obligations of the Parties are, in all respects, several and neither joint nor joint and several. For the avoidance of doubt, except as explicitly stated in this Agreement as to the Company, the obligations arising out of this Agreement are several and not joint with respect to each Supporting Party, in accordance with its proportionate interest hereunder, and the Parties agree not to proceed against any Supporting Party for the obligations of another.

23.     **Prior Negotiations; Entire Agreement.**    Except for any reimbursement letter between the Company and any of the Advisors, this Agreement, including the exhibits hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof.

24.     **Counterparts; Email Consent.**    This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.    Execution copies of this Agreement may be delivered by facsimile, electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.    Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

25.     **Notices.**    All notices and other communications from any Party hereunder shall be in writing and given by electronic mail (as set forth in Section 24 above), certified mail (return receipt requested), or courier to, and shall be deemed effective when actually received by, the addresses set forth below each Party's signature to this Agreement (if any), as the case may be.

26.     **Reservation of Rights; No Admission.**

a.     Nothing contained herein shall limit the ability of any Party to consult with other Parties.    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, defense, and interests, including its claims against any of the other Parties (or their respective affiliates) or any liens or security interests it may have on or in any assets of the Company, or its full participation in any bankruptcy case filed by the Company.    The Company acknowledges and agrees that the Term Loan Lenders hereby reserve all rights, powers and remedies under the Term Loan Credit Agreement, the other Loan Documents and applicable law in connection with any violation or noncompliance by the Company with the terms of the Term Loan Credit Agreement or any of the other Loan Documents.

b.     Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, defenses, and interests, including its claims against any of the other Parties (or their respective affiliates) or its full participation in the Bermuda Proceeding, the Chapter 15 Case or any bankruptcy case filed by the Company or any of its affiliates.    This Agreement is part of an integrated and non-severable proposed settlement of matters that could otherwise be the subject of litigation among the Parties.    If the Restructuring is not consummated, or if this Agreement is terminated as to all Parties for any reason, the Parties fully reserve any and all of their rights.    If this Agreement is terminated as to any Party or group individually, such Party or group fully reserves any and all of their rights.    Pursuant to Rule 408 of the United States Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.    This Agreement shall in no event

44

be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

27. **Confidentiality**. The Parties agree not to disclose the terms of this Agreement, or the specific terms of the Restructuring, directly or indirectly, to any other Person, except (a) to such party's affiliates or such party's or its affiliates' Representatives, officers, directors, employees, attorneys, accountants and advisors on a confidential and need-to-know basis, (b) as required by applicable law or by compulsory legal process under order of a court of competent jurisdiction (in which case such Party agrees to inform the other Parties promptly thereof, to the extent permitted by applicable law), (c) in accordance with Section 14 hereof, or (d) as consented to by the Company and the Required Supporting Parties; *provided* notwithstanding the foregoing or anything herein to the contrary, nothing herein shall preclude any Supporting Party's ability to transfer any Claims or Interests. Notwithstanding anything to the contrary herein, if there are any inconsistencies between this Section 27 and Section 10.07 (Confidentiality) of the Term Loan Credit Agreement, the terms of the Term Loan Credit Agreement shall control; *provided* that, the Supporting Parties may disclose the terms of this Agreement or the specific terms of the Restructuring, directly or indirectly, to its or its affiliates' Representatives.

28. **Relationship Among the Supporting Parties**. It is understood and agreed that no Supporting Party has any fiduciary duty, duty of trust or confidence in any kind or form with any other Supporting Party, the Company, or any other stakeholder of the Company and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Supporting Party may trade in the Claims and Interests of the Company without the consent of the Company or any other Supporting Party, subject to applicable securities laws, the terms of this Agreement, and any Confidentiality Agreement entered into with the Company; provided that no Supporting Party shall have any responsibility for any such trading by any other Person by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Supporting Parties shall in any way affect or negate this understanding and agreement.

29. **Representation by Counsel; Adequate Information**. Each Party acknowledges for the benefit of the other Parties and their respective advisors that it, or its advisors, has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal or tax counsel shall have no application and is expressly waived. Each Supporting Party hereby further confirms for the benefit of the other Parties and their respective advisors that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company, and without reliance on any statement of any other Party (or such other Party's financial, legal or other professional advisors), other than such express representations and warranties of the Company set forth in this Agreement.

30. **Fees and Expenses.** Whether or not the transactions contemplated by this Agreement are consummated, the Company agrees, on a joint and several basis, to pay in cash or

reimburse all reasonable and documented out-of-pocket fees, costs and expenses (including, without limitation, the fees, disbursements and other charges of AOS, Appleby (Bermuda) Limited, Akin Gump Strauss Hauer Feld, LLP and Kirkland & Ellis and any related fees, disbursements and other charges of other counsel, including local counsels, consultants and service companies (collectively, the "***Advisors***")), that have to date and will be incurred by any Supporting Party in connection with the Restructuring, including, the negotiation, formulation, preparation, execution, delivery, implementation and consummation of this Agreement, the Definitive Documents, and the transactions contemplated thereby, or any amendments, waivers, consents, supplements or other modifications to any of the foregoing, both before and after the date of this Agreement (collectively, the "***Transaction Expenses***").  The Transaction Expenses shall become due and payable (whether or not the Restructuring shall be completed) as follows (i) all accrued and unpaid Transaction Expenses, incurred up to (and including) the Agreement Effective Date, shall be paid in full in cash on the Agreement Effective Date subject to receipt by the Company of an invoice for such Transaction Expenses within two (2) Business Days prior to the Agreement Effective Date; (ii) from and after the Agreement Effective Date (or from such period previously invoiced by the Advisor) to the Closing, all accrued and unpaid Transaction Expenses shall be paid in full in cash by the Company on a continuing basis promptly (but in any event within two (2) Business Days of the Company's receipt of an invoice from the applicable Advisor) and no later than the Business Day prior to commencement of the Bermuda Proceeding against receipt of an invoice; (iii) on the Closing Date, if any, all accrued and unpaid Transaction Expenses incurred up to (and including) the Closing shall be paid in full in cash by the Company no later than the Closing Date against receipt of invoices; and (iv) upon termination of this Agreement with respect to any Party, all accrued and unpaid Transaction Expenses incurred up to (and including) the date of such termination shall be paid in full in cash promptly (but in any event within five (5) Business Days) in full in cash, against receipt of an invoice; <u>provided</u>, that nothing herein shall affect or limit any obligations of the Company to pay Transaction Expenses pursuant to the Term Loan Credit Agreement.  For the avoidance of doubt, the timing for payment of the Transaction Expenses shall not be affected by any validation applications which the Company may be required to make following commencement of the Bermuda Proceeding.  The obligations of the Company under this <u>Section 30</u> shall survive the termination of this Agreement solely as to Transaction Expenses incurred on or before termination of this Agreement.

     **31.**   <u>**Conflicts.**</u>   In the event of any conflict among the terms and provisions of this Agreement or any Definitive Document, on the one hand, and the Exclusivity Letter or the Term Sheet, on the other, the terms and provisions of this Agreement or the applicable Definitive Document shall control.  In the event of any conflict among the terms and provisions of this Agreement and the applicable Definitive Document, the terms and provisions of the applicable Definitive Document shall control.

     **IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers or other authorized persons, solely in their respective capacity as officers or other authorized persons of the undersigned and not in any other capacity, as of the date first set forth above.

<center>[*Signature pages omitted*]</center>

<center>46</center>

**<u>Exhibit A</u>**

**Joinder Agreement**

The undersigned hereby acknowledges that it (a) has reviewed and understands the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***Agreement***")[1] dated as of [ ● ], 2024 by and among (i) Afiniti, Ltd., (ii) the subsidiaries of Afiniti, Ltd. party thereto, and (iii) the Supporting Parties party thereto and (b) agrees to be bound as a Supporting Party by the terms and conditions thereof binding on the Supporting Party with respect to all Claims and any Interests held by the undersigned.

The undersigned hereby makes the representations and warranties of the Supporting Parties set forth in the Agreement to each other Party, effective as of the date hereof, and such representations and warranties relating to holdings of Claims in Section 10.b(A) of the Agreement shall be made equally applicable *mutatis mutandis* to holdings of Interests in Afiniti.

This joinder agreement shall be governed by the governing law set forth in the Agreement.

[*signature page to follow*]

---

[1]    Capitalized but undefined terms herein shall have the meanings ascribed to them in the Agreement.

Date: _____

**[SUPPORTING PARTY]**, as a Supporting Party


_____
Name:
Title:

<u>Notice Address</u>:




Attention:
Email:




    **The above-signed Supporting Party is the beneficial owner of (or investment manager, advisor, or subadvisor to one or more beneficial owners of) the aggregate outstanding principal amount of Claims set forth below:**

**<u>Term Loan Claims</u>**

Aggregate Principal Amount
of Term Loan Claims:                    $_____

**<u>Exhibit B</u>**

**Term Sheet**

## <u>Summary of Principal Terms of Proposed Restructuring</u>

*This non-binding Summary of Principal Terms of Proposed Restructuring (the "<u>Term Sheet</u>") summarizes certain principal terms and conditions proposed by Vista Credit Partners ("<u>VCP</u>" and, together with any one or more of its affiliates, "<u>Vista</u>") upon which certain lenders (the "<u>Lenders</u>") party to that certain existing term loan credit agreement (as amended, amended and restated, and supplemented, the "<u>Existing Credit Agreement</u>")[1] among Afiniti, Inc., as Borrower ("<u>Afiniti US</u>"), Afiniti, Ltd., as parent guarantor (<u>Afiniti Parent</u>," together with its direct and indirect subsidiaries, "<u>Afiniti</u>"), the guarantors from time to time party thereto, and VCP Capital Markets LLC, as administrative agent and collateral agent (the "<u>Administrative Agent</u>") would enter into in connection with a comprehensive restructuring of Afiniti (the "<u>Restructuring</u>").* ***This Term Sheet has been prepared for discussion purposes only and is non-binding but shall serve as the basis for further discussions and negotiations regarding the definitive agreements described herein****.*

This Term Sheet is not intended to describe or include all of the terms and conditions of the transaction being discussed between the Afiniti Parent and the Lenders or to set forth the definitive contractual language of any provisions summarized below and is not binding on any party. This Term Sheet is neither an offer to accept the transactions described herein nor an implied or express offer or commitment to consummate the proposed transactions described herein, forbear from exercising rights or remedies or waive any defaults. Any such transaction is subject to satisfactory legal and financial due diligence, internal credit approvals and definitive documentation. All terms are subject to modification based on our continuing assessment of the facts and circumstances. The information contained herein is made available on a confidential basis.

The Restructuring is intended to be executed in reliance upon exemptions from the registration requirements of the Securities Act of 1933, as amended, and Afiniti will take all steps reasonably necessary, including limiting the eligibility to participate in the Restructuring and the convertibility or exercisability of any loans or securities issued in connection therewith to eligible investors, to ensure that no such registration will be required in connection with the Restructuring or in connection with the convertibility or exercisability of any loans or securities issued in connection therewith. In addition, ownership of any class of equity securities of Newco (defined below) will be restricted as necessary to ensure that Newco (defined below) does not need to register such class under the Securities Exchange Act of 1934, as amended.

**THIS TERM SHEET IS FOR SETTLEMENT DISCUSSION PURPOSES ONLY AND SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE. UNTIL PUBLICLY DISCLOSED WITH THE PRIOR WRITTEN CONSENT OF THE PARTIES, THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY PERSON OTHER THAN VCP, AFINITI PARENT, AND THEIR RESPECTIVE PROFESSIONAL ADVISORS.**

---

[1]    Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Existing Credit Agreement.

<u>PRINCIPAL TERMS OF THE RESTRUCTURING</u>

| **Restructuring Process**[2] | |
|---|---|
| **Scheme of Arrangement** | The Restructuring is currently contemplated to be implemented through the sanction of a scheme of arrangement (the "<u>Scheme</u>") pursuant to Section 99 of the Bermuda Companies Act 1981 (the "<u>Act</u>") between Afiniti Parent and certain of its creditors. Simultaneous with the Scheme, the Company shall apply for court-appointed "light-touch" joint provisional liquidators ("<u>JPLs</u>") under Bermuda's light-touch provisional liquidator regime. The JPLs shall be retained by Afiniti Parent with the prior approval of the Lenders.

The Scheme will result in, among other things: (i) the transfer of substantially all of Afiniti Parent's assets (including, without limitation, its shares or other equity interests in directly owned subsidiaries[3]) to a newly formed Delaware limited liability company or limited partnership ("<u>Newco</u>") or a wholly owned subsidiary of Newco; (ii) the execution of an amended and restated senior secured term loan agreement (the "<u>Amended Credit Agreement</u>") between Afiniti US, as borrower, the Lenders that are party to the Existing Credit Agreement, and all subsidiary guarantors, which will (a) result in a principal amount outstanding under a new senior first lien secured tranche of $225 million and modifications of certain terms and conditions (the "<u>New 1L Tranche</u>") and (b) provide for a new junior second lien secured convertible tranche in the principal aggregate amount of $285 million in exchange for an equal reduction of the secured obligations under the Existing Credit Agreement (the "<u>2L Convertible Tranche</u>");[4] and (iii) the treatment of existing equity interests as provided for in this Term Sheet. All accrued and unpaid interest under the Existing Credit Agreement will be treated as outstanding principal under the Existing Credit Agreement.

The principal terms of the New 1L Tranche are annexed hereto as **<u>Annex 1</u>**.

The principal terms of the 2L Convertible Tranche are annexed hereto as **<u>Annex 2</u>**. |
| **Potential Exit Financing** | In connection with consummation of the Scheme, and on advance notice to Afiniti, the Lenders (or certain of them) may elect for up to 30 days after the closing of the Restructuring to provide new funding to Afiniti under incremental loans in an amount of up to $25,000,000 (the "<u>Exit Financing</u>"). Any Lender that so elects will be permitted to select whether such funding will be made as loans in either the New 1L Tranche or the 2L Convertible Tranche. A 2.5% in-kind fee shall be payable to any Lender providing Exit Financing. The Exit Financings shall be on identical terms as the terms in the New 1L Tranche or the 2L Convertible Tranche, as the case may be. The Company shall be obligated to borrow such funds to the extent the Lenders shall elect to provide such new funding as set forth above. |

---

[2] Legal implementation mechanics (such as scheme / chapter 15 / winddown) subject to further discussion and analysis.
[3] See note 5 below regarding jurisdiction in which Newco is formed.
[4] The total aggregate estimated outstanding amount, including accrued PIK interest, is approximately $510 million.

| | |
|---|---|
| **Chapter 15 Proceeding** | To effectuate the Scheme in the United States, Afiniti will simultaneously seek approval of the pending proceedings in Bermuda as a foreign main proceeding under Chapter 15 of the Bankruptcy Code (the "<u>Chapter 15</u>") in United States Bankruptcy Court for the Southern District of New York. |
| **The Restructuring Support Agreement (the "<u>RSA</u>")** | Afiniti Parent and the Lenders representing at least 75% in amount and more than a majority in number of the term loans under the Existing Credit Agreement (the "<u>Supporting Lenders</u>") will negotiate and execute the RSA memorializing the terms and conditions for the Restructuring, including certain material terms set forth in this Term Sheet. The RSA will include the obligation of the Lenders party thereto to vote in favor of the Scheme, subject to the terms and conditions thereof. |
| **Pre-Filing Amendment** | Prior to filing the Scheme or Chapter 15, Afiniti and the Required Lenders would amend the insolvency event of default in the Existing Credit Agreement to provide that a voluntary insolvency filing or the proposal of the Scheme is NOT an automatic acceleration of the debt but instead is treated like other Events of Default, which require Required Lender consent to accelerate. The purpose of this is to avoid the entire outstanding amount from becoming due and payable under the Existing Credit Agreement. In addition, following agreement to the terms set forth in this Term Sheet between the Required Lenders and Afiniti and no later than June 13, 2024, either (i) the maturity date of the initial tranche A term loans under the Existing Credit Agreement (June 13, 2024) will be extended 45 days or (ii) a forbearance agreement mutually acceptable to the Required Lenders and Afiniti will be entered into by such parties.

Notwithstanding the foregoing, signatories to the RSA may be required to acknowledge Afiniti Parent's insolvency on the same basis as shareholders under "Treatment of Existing Equity Interests."[5]

The "Exclusivity Letter" means that certain exclusivity letter agreement among the Borrower, the Parent, and Vista Credit Partners, L.P. (each as defined in the Existing Credit Agreement), dated June [ ], 2024, that sets out terms and conditions with respect to an exclusivity period relating to a proposed transaction between the parties thereto. |
| **Timeline** | Estimated time to complete Bermuda Scheme:  90 days from filing. Estimated time to complete Chapter 15: 90-120 days |
| **Newco** | The Scheme will provide for the formation of Newco and the transfer of substantially all of Afiniti Parent's assets to Newco (including, without limitation, equity interests in all direct and indirect subsidiaries) or a wholly owned subsidiary of Newco.

Newco will be formed as a limited liability company or limited partnership in Delaware,[6] which will be governed by a limited liability company agreement |

---

[5] NTD: there may be other pre-filing amendments recommended by Bermuda counsel.

[6] The decision to form Newco under the laws of Delaware, as opposed to a suitable offshore jurisdiction, remains subject to confirmation by VCP Tax and Afiniti Tax based on ongoing tax diligence and tax analysis by VCP, Afiniti, and their advisors.  Nevertheless, interpretation of the Newco LLC Agreement would be governed by Delaware law and the parties would consent to New York or Delaware courts or arbitrators as the forum for any dispute. It is proposed that Newco will be classified as a partnership for U.S. tax purposes.

| | |
|---|---|
| | or limited partnership agreement (the "<u>Newco LLC Agreement</u>") as may be satisfactory to the Lenders, including with respect to tax treatment of Afiniti entities in U.S. and non-U.S. jurisdictions and the expected tax consequences for the Lenders and their owners.  This Term Sheet has been prepared on the assumption that Newco will be formed as a limited liability company. |
| **Newco Interests** | On the effective date of the Restructuring (the "<u>Restructuring Effective Date</u>"), Newco will authorize four classes of equity membership interests: Class A-1 Newco Interests (voting with 2 votes for every unit and no economic rights); Class A-2 Newco Interests (voting with 2 votes for every unit); Class B Newco Interests (voting with one vote for every unit); and Class C Newco Interests (non-voting) (collectively, the "<u>Newco Interests</u>"). On the Restructuring Effective Date, the Class A-1 Newco Interests and Class B Newco Interests will be distributed in accordance with this Term Sheet, and all existing equity interests in Afiniti Parent will be cancelled unless otherwise agreed in the definitive documentation.<br><br>Class A-1 Newco Interests may not be sold, disposed of, or transferred in any manner separate from the 2L Convertible Tranche loans with which such shares shall be issued. |
| **Board of Managers** | The initial board of managers of Newco (the "<u>Board</u>") shall be comprised of 9 managers:<br><br>• The existing Lenders under the 2L Convertible Tranche shall have the right to designate 3 managers and 3 independent managers.<br>• Upon the purchase by The Resource Group International, Ltd. ("***TRG***") or any affiliates or funds thereof of at least $10 million face amount of the 2L Convertible Tranche pursuant to the Backstop Commitment (defined below), TRG (but, for the avoidance of doubt, not any of its affiliates or funds) shall have the right to designate 2 managers, which right shall continue so long as TRG shall continue to own not less than $10 million face amount of the 2L Convertible Tranche or the equity equivalent thereof (in any form of equity).<br>• The CEO shall also serve as a manager of Newco.<br><br>All holders of voting Newco Interests shall agree to elect such designated managers to the Board. For all matters submitted to the Board, approval of an action by the Board will generally require a vote of a majority of the managers; *provided* that certain actions will require the approval of the holders of a majority of the Class A Newco Interests, including a sale of Newco or all or substantially all of its assets, a qualified public offering, distributions to interest holders, authorization and issuance of new common or preferred interests or units, redemption of units, dissolution and winding up of Newco. |
| **Releases** | The Scheme shall include releases by the Lenders and Afiniti of Afiniti's board members, officers, and advisors and such other releases as agreed to by the Lenders and Afiniti. |

| | |
|---|---|
| **Management Employment Agreement** | The Lenders' restructuring proposal is conditioned on the retention of the Afiniti's management team, which may include the execution of amendments to employment agreements and/or extensions thereof on or prior to the Restructuring Effective Date, provided that all existing rights to indemnification for the current managers, directors and officers will be assumed or otherwise established substantially identically under any new or amended agreements. |
| **Management Incentive Plan** | The Restructuring contemplates that non-voting Class C Newco Interests will be reserved for issuance under a management incentive plan ("MIP") for nominated members of the management team in the amount of up to 15% of all issued and outstanding Newco Interests on a fully diluted basis.  Granting, vesting, acceleration and other terms applicable to any future awards, to be determined in accordance with customary market practice for plans of this nature.  Class C Newco Interests issued pursuant to the MIP are intended to constitute a "profits interest" within the meaning of applicable Internal Revenue Service regulations. |
| **Wind Down of Afiniti Parent** | Following sanction of the Scheme, and as soon as reasonably practicable, Afiniti Parent shall apply to the court for an order winding-up the company and the appointment of the JPLs on a "full powers' liquidator basis.  All officers shall resign from Afiniti Parent following such order. |
| **Treatment of Existing Lender Claims** | Each Lender (regardless of the existing Tranche) under the Existing Credit Agreement shall receive its *pro rata* share of (i) the New 1L Tranche (on terms set forth in Annex 1), (ii) the 2L Convertible Tranche (on terms set forth in Annex 2), which can be converted into Class A-2 Newco Interests in accordance with the provisions of the 2L Convertible Tranche, and (iii) Class A-1 Newco Interests (issued prior to any Class A-1 Newco Interests issued under the Rights Offering) representing (in the aggregate, with respect to all Lenders) 75% of the voting Newco Interests. |
| **Treatment of Unsecured Creditor Claims (Trade and Vendor Claims)** | Claims of trade and vendors incurred in the ordinary course of business will be assumed by Newco, and, subject to the completion of due diligence by the Lenders, the Lenders may require certain unsecured claims, including litigation claims, receive different treatment under the Scheme. |
| **Treatment of Existing Equity Interests** | Upon consummation of the Scheme, subject to the conditions set forth below, the equity interest holders of Parent (the "Interest Holders") will receive:<br><br>• Class B Newco Interests representing 25% of the Newco Interests (subject to dilution by the Rights Offering and the MIP);<br>• Subject to dilution by the Rights Offering and the MIP, warrants exercisable into Class B Newco Interests with an expiration date 7 years after their issuance, equal to (x) 5% of the fully diluted Newco Interests at a total enterprise value at which the Lenders receive 2.0x MOIC and (y) an additional 5% of the fully diluted Newco Interests at a total enterprise value of at which the Lenders receive 2.5x MOIC (together, the "Warrants"). The Warrants may be exercised only upon a change of control transaction or qualified initial public offering; and<br>• the non-transferable right to subscribe to up to $25 million of the 2L Convertible Tranche pursuant to the rights offering (the "Rights Offering"), which will be backstopped by TRG as described below.<br><br>The Class B Newco Interests shall be allocated as follows and otherwise in a manner agreed to between the Lenders and the Company, subject to any |

applicable law (the following, the "<u>Class B Categories</u>"):

- 10% to TRG as consideration for its $15 million Backstop Commitment (the "<u>First Category</u>");
- 5% in the aggregate to Interest Holders that participate in the Rights Offering, allocated pro rata on a fractional basis (i.e., 1% for every $5 million) (the "<u>Second Category</u>");
- 10% in the aggregate to Afiniti's preferred Interest Holders, allocated pro-rata across all such preferred Interest Holders in line with their original preferred equity subscription amount (i.e., their total Preferred Interest shares multiplied by the subscription price per share);[7] *provided* that such aggregate amount shall be increased by any unallocated Newco Interests in the Second Category (the "<u>Third Category</u>").

The Warrants shall be allocated across the three Class B Categories pro-rata in line with each category's percentage allocation of Class B Newco Equity Interests, and otherwise in a manner agreed to between the Lenders and the Company.

- Within the First Category, the Warrants shall be allocated to TRG.
- Within the Second Category, the Warrants shall be allocated pro-rata in line with the amounts each Interest Holder actually funds in connection with the Rights Offering.
- Within the Third Category, the Warrants shall be allocated pro-rata across all such preferred Interest Holders in line with their original preferred equity subscription amount (i.e., their total Preferred Interest shares multiplied by the subscription price per share).

The Warrants shall be non-transferable, but shall be "stapled" to (and transfer with) the Interest Holder's Class B Newco Interests.

The rights to participate in the Rights Offering shall be allocated on a basis to be agreed upon by the Company and the Lenders, and such allocation may include a distribution of some portion of the rights to Parent's common shareholders.

The Company and shareholders, agreed to between the Lenders and the Company prior to the filing of the Scheme and the Joint Provisional Liquidation, shall acknowledge in writing that the Company is insolvent under Bermuda Law, and that the distribution to existing equity interests is a gift from the Lenders. Such acknowledgement shall be supported by an independent valuation if the Company, in consultation with the Lenders, determine such valuation is necessary and/or advisable for consummation of the Restructuring.

Additional Newco Interest Holder rights are provided in **Annex 3** attached hereto.

---

[7] Since the distribution to preferred Interest Holders is a gift from the Lenders, the allocation is pro rata across all preferred classes and not in order of absolute priority.

| | |
|---|---|
| **Rights Offering** | Prior to the completion of the Scheme, and subject to dilution by the MIP, Interest Holders will have the non-transferrable right to subscribe to up to $25 million of their pro rata share (as agreed to between the Company and the Lenders) of the 2L Convertible Tranche (the "<u>Rights Offering Cap</u>") for a period of 10 days prior to the Restructuring Effective Date (the "<u>Subscription Period</u>"), which, to the extent subscribed, can be converted into Class A-2 Newco Interests in accordance with the provisions of the 2L Convertible Tranche.  To the extent any Interest Holder shall not subscribe for its pro rata share, the other Interest Holders may subscribe based on their remaining pro rata shares for the remaining portion. The amount of Class A-2 Newco Interests into which the 2L Convertible Tranche subscribed for in the Rights Offering are convertible shall be up to approximately 6.6% of the fully diluted Newco Interests (subject to dilution by the MIP).  The number of shares of Class A-2 Newco Interests that the 2L Convertible Tranche purchased in the Rights Offering shall be convertible into, shall not dilute the number of shares of Class A-1/A-2 Newco Interests that the 2L Convertible Tranche shall be convertible into that shall be issued to the Lenders under the Scheme.<br><br>In connection with any subscription by any Interest Holder, such Interest Holder shall receive a number of Class A-1 Newco Interests equal to the number of Class A-2 Newco Interests issuable upon conversion of the 2L Convertible Tranche subscribed for by such Interest Holder (the "<u>Rights Offering Shares</u>").<br><br>Interest Holders can subscribe during the Subscription Period for their pro rata share up to the Rights Offering Cap, provided that each subscription must be made in minimum increments of $1,000,000. |
| **Backstop of Rights Offering** | TRG or affiliates or funds thereof (collectively, the "<u>Backstop Parties</u>") will agree to purchase up to $15,000,000 of 2L Convertible Tranche Loans that shall not have been purchased in the Rights Offering immediately following the end of the Subscription Period (the "<u>Backstop</u>"), with each Backstop Party severally (but not jointly) entering into a commitment to purchase its share of such unsubscribed 2L Convertible Tranche the day after the end of the Rights Offering Subscription Period (the "<u>Backstop Commitment</u>"). In addition to the binding Backstop Commitment, to the extent the Rights Offering will not be fully subscribed following completion of the Backstop, the Backstop Parties shall have the right (but not the obligation) to purchase such unfunded amounts on a pro rata basis.<br><br>The Class A-1/Class A-2 Shares which such 2L Convertible Tranche may be converted into will dilute the fully diluted Class B Newco Interests and the fully diluted Class A-1/ A-2 Newco Interests on a pro rata basis.<br><br>TRG will have the opportunity to exchange the 2L Convertible Tranche that TRG shall have purchased pursuant to the Backstop for Class B Newco Interests distributed to other Interest Holders for a period of 180 days after the completion of the Backstop without being required to obtain approval from the Company or Board, subject to applicable loan minimums set forth in the loan agreement and compliance with relevant KYC and securities laws.<br><br>The Backstop Parties shall execute an agreement setting forth the terms and conditions of the Rights Offering and Backstop that is consistent with this Term Sheet and satisfactory to Vista and its affiliates (the "<u>Backstop Rights</u> |

| | |
|---|---|
| | Purchase Agreement"). <br><br> In the event the Backstop Commitment is called upon and such funding and purchase does not occur by TRG, no related fees shall be paid. |
| **Series of 2L Convertible Loans** | The Scheme will provide for different series of 2L Convertible Loans depending on the outcome of the number of 2L Convertible Loans that are subscribed for in the Rights Offering by existing Interest Holders or purchased by the Backstop Parties pursuant to the Backstop, but each series of the 2L Convertible Loans shall in other respects have substantially the same terms. |

**Annex 1**

Principal Terms of the New 1L Tranche

| Term | Description |
|---|---|
| **Principal Amount** | $225 million |
| **Coupon** | At the Borrower's option: (I) Floating rate SOFR + 7.5% per annum; interest payable and compounding quarterly at (x) Floating rate SOFR + 4.0% per annum payable in cash and (y) 3.50% per annum payable in PIK or (II) Floating rate SOFR + 7.0% per annum; interest payable and compounding quarterly in cash only. Each option shall be subject to a 4.0% floor with respect to floating rate SOFR. |
| **Upfront Fee** | 4% payable in kind in New 1L Loans. |
| **Borrower** | Afiniti, Inc. |
| **Lenders** | Current Lenders under the Existing Credit Agreement (based on their *pro rata* share of the Existing Term Loans) |
| **Collateral Agent and Administrative Agent** | VCP Capital Markets, LLC |
| **Guarantors** | Newco; AETL S.A.R.L.; Afiniti Europe Technologies, Ltd or as otherwise agreed between the Borrower and the Required Lenders. |
| **Collateral** | The Amended and Restated Senior Secured Term Loan shall be secured by a senior first-priority lien in substantially all of Newco's assets and the assets of Newco's direct and indirect subsidiaries (including a pledge on the equity of all of Newco's direct and indirect subsidiaries). |
| **Maturity** | 3 years from Restructuring Effective Date. |
| **Incremental Facilities** | Remove the Incremental Facilities set forth in Section 2.11(a). |
| **Restrictive Covenants[8]** | Standard covenants that shall be satisfactory to the Lenders; provided that the following covenants shall be modified from the Existing Credit Agreement as set forth below:[9]<br><br>• Indebtedness (Section 7.01 of the Existing Credit Agreement[10])<br><br>    o Remove the following negative covenant baskets, (i) Section 7.01(l), (ii) Section 7.01(q), (iii) and Section 7.01(u).<br><br>    o Modify the following negative covenant baskets, (i) Section 7.01(c) and (d) [shall be limited to Indebtedness of the Loan Parties], (ii) Section 7.01(e) shall be limited to (x) arrangements in place on the Restructuring Effective Date (and identified on a schedule) plus (y) additional amounts not to exceed $30,000,000 at any time outstanding, (iii) Section |

---

[8] NTD: discuss feasibility of tax restructuring being effected in connection with closing.

[9] NTD: Covenants regarding intercompany transactions subject to further negotiation in connection with definitive documents.

[10] NTD: All section references refer to the Existing Credit Agreement.

7.01(k) shall be reduced to $2 million and (iv) Section 7.01(s) shall be limited to (x) arrangements in place on the Restructuring Effective Date (and identified on a schedule) and (y) additional arrangements in an amount not to exceed $10,000,000.

- Liens (Section 7.02 of the Existing Credit Agreement)

    o Remove the following negative covenant baskets, (i) Section 7.02(d) and (ii) Section 7.02(o).

    o Modify the following negative covenant baskets, (i) Section 7.02(g) modify to limit to only the Liens effective as of the Restructuring Effective Date [and (ii) Section 7.02(s) consistent with Indebtedness basket in Section 7.01(c) limit to only Loan Parties].

- Fundamental Changes and Asset Sales (Section 7.03 of the Existing Credit Agreement)

    o Remove the following negative covenant baskets, (i) Section 7.03(a)(iii) other than arrangements in place on the Restructuring Effective Date (and identified on a schedule) and (ii) 7.03(a)(xvii).

    o Modify the following negative covenant baskets, (i) Section 7.03(a)(i)(y) revise so the determination is made by the Required Lenders (other than with respect to dispositions contemplated as of the Restructuring Effective Date and identified on a schedule), (ii) Section 7.03(a)(v)(B) to (x) add "with respect to ongoing business expenses" after the words "ordinary course of business" and (y) add that no material assets may be disposed of pursuant to this section, (iii) Section 7.03(a)(v)(D) shall be modified to (x) reduce the basket size to $1,000,000 per year and (y) add a no Event of Default proviso, Section 7.03(a)(vii) shall be modified to add a basket of $10,000,000 and (iv) Section 7.03(a)(xv) shall be modified such that (x) FMV determination is made by Board of Directors for any transaction or series of related transactions in excess of $1 million and (y) the basket amount is reduced to $20,000,000.

- Investments (Section 7.04 of the Existing Credit Agreement)

    o Remove the following negative covenant baskets, (i) Section 7.04(b), (ii) Section 7.04(k), (iii) Section 7.04(o) (iv) Section 7.04(p), (v) Section 7.04(u) and (vi) Section 7.04(w).

    o Modify the following negative covenant baskets, [(i) Section 7.04(d) to limit to only Investments in Loan Parties,] (ii) Section 7.04(v) to limit to only Investments in Loan Parties and (iii) Section 7.04(i)(x) shall be reduced to $2 million.

- Transactions with Affiliates (Section 7.05 of the Existing Credit Agreement) and subject to the provisions set forth below relating to the Affiliate Transactions.

  o Remove the following negative covenant baskets, (i) 7.05(h), (ii) 7.05(n), (iii) 7.05(p) and (iv) the $10,000,000 threshold at the end of Section 7.05

  o Modify the following negative covenant basket, (i) 7.05(m) the determination to be made by the Required Lenders (other than (x) transactions contemplated as of the Restructuring Effective Date and identified on a schedule and (y) transactions otherwise permitted under Article VII).

- Restricted Payments (Section 7.06 of the Existing Credit Agreement)

  o Remove the following negative covenant baskets, (i) Section 7.06(h), (ii) Section 7.06(i), (iii) Section 7.06(j) and (iv) Section 7.06(k).

  o Modify the following negative covenant baskets, (i) Section 7.06(a)(ii) to limit to only Loan Parties, (ii) 7.06(b) shall require that such repurchases are approved by the Board of Directors, (iii) Section 7.06(e) limit to items in place as of the Restructuring Effective Date and (iv) Section 7.06(f) shall require that such Restricted Payments are approved by the Board of Directors and modify the pro forma Liquidity amount included in Section 7.06(f)(ii) to be no less than $25,000,000.

- Junior Debt Payments (Section 7.07 of the Existing Credit Agreement)

  o Remove the following negative covenant baskets, (i) Section 7.07(b)(i), (ii) Section 7.07(b)(ii) and (iii) Section 7.07(b)(iii)(z).

- Sale Leasebacks (Section 7.08 of the Existing Credit Agreement)

  o Remove the following negative covenant baskets, (i) Sections 7.08(a), (b) and (c), but modify basket to permit arrangements in place on the Restructuring Effective Date (including Wingspire).

- Financial Covenants (Section 7.10 of the Existing Credit Agreement)[11]

  o Modify the financial covenants to be covenants set based on (i) minimum Liquidity and (ii) total leverage with an EBITDA based component, in which all levels and corresponding definitions shall be as mutually agreed and based on the financial information provided.

---

[11] NTD: Please confirm what changes are envisaged.

|  | |
|---|---|
|  | • Definitions<br><br>    o Remove the following definitions and all related definitions and references, (i) "Available Amount" (ii) "Discretionary Amount" and (iii) "Permitted Restructuring Transaction".<br><br>    o Modify the definition of "Intercompany Services Agreements" to remove the materiality qualifiers and existing Intercompany Services Agreements subject to under review. |
| **Information Covenants** | Generally consistent with the Existing Credit Agreement; provided that the following covenants shall be modified from the Existing Credit Agreement as set forth below:<br><br>• Financial Statements and Other Information (Section 6.01 of the Existing Credit Agreement)<br><br>    o Modify the following Financial Statement delivery requirements: (i) Section 6.01(a) shall be modified so that delivery of such financial statements shall be due within (a) 180 days after the end of the first Fiscal Year of the Parent post-closing[12] and (b) 120 days after the end of each Fiscal Year of the Parent thereafter and (ii) add a new requirement to provide 13-week cash flow forecast statements, in a form to be agreed and in substance reasonably satisfactory to the Required Lenders, (x) until the Restructuring Effective Date, every 2 weeks and (y) after the Restructuring Effective Date, monthly.<br><br>• Notices of Material Events (Section 6.02 of the Existing Credit Agreement)<br><br>    o Modify Section 6.02(b) to change the existing dollar threshold to a threshold to be agreed |
| **Amendments/Waiver** | Generally consistent with the Existing Credit Agreement |
| **Affiliate Transactions** | Standard affiliate transactions provision (terms no less favorable than those which could be obtained in comparable arm's-length transactions etc.); provided that such provision limiting affiliate transactions shall exclude (i) any transactions occurring after an event of default, including, any credit bidding transaction, sale transaction in chapter 11, or similar proceeding; and (ii) any material contracts or transactions involving services with Vista Valuation Creation Team ("VCT") or any other affiliates of Vista entered into on an arms'-length basis on market terms and approved by a majority of the independent managers on the Board. |
| **Events of Default** | Generally consistent with the Existing Credit Agreement, provided that the following shall be modified:<br><br>• Non-payment of (i) any principal, with no grace period, (ii) non-payment of interest and fees subject to a three Business Day grace |

[12] NTD: 180 days after the end of FY25 (July 1, 2024 – June 30, 2025).

| | |
|---|---|
| | period; and<br><br>• Unsatisfied judgments against Borrower in excess of $10 million.<br><br>Any other de minimis thresholds or grace periods to apply to the events of default to be agreed upon. |
| **Prepayments** | • Prior to first year anniversary: 103%<br><br>• After first year anniversary, but prior to second year anniversary: 101%<br><br>• After second year anniversary, but prior to maturity: at par |
| **Conditions Precedent** | Usual and customary for restructurings of this type, including, but not limited to:<br><br>• Satisfactory completion of all due diligence<br><br>• Execution and delivery of revised Loan Documents and Delaware limited liability agreement;<br><br>• Entry into a subordination agreement between the New 1L Tranche and the 2L Convertible Tranche, in form and substance reasonably satisfactory to the Required Lenders.<br><br>• Execution and delivery of customary organizational documents, certificates and legal opinions;<br><br>• Completion of applicable KYC requirements;<br><br>• Execution of the Backstop Rights Purchase Agreement by the Backstop Parties and the payment of any fees thereunder;<br><br>• Receipt of all necessary approvals, including completion of the Scheme and entry of Chapter 15 recognition order; and<br><br>Payment of all fees and expenses, including all legal expenses of United States, Bermuda, Delaware, United Kingdom and Wales and Luxembourg lender counsel. |
| **Governing Law and Forum** | New York |

**Annex 2**

Principal Terms of 2L Convertible Tranche

| Term | Description |
|---|---|
| **Principal Amount** | $285 million |
| **Coupon** | Fixed 16.0% interest per annum. Interest shall be payable quarterly with a full PIK option. |
| **Upfront Fee** | 4% of the principal amount of 2L Convertible Tranche payable in kind in 2L Convertible Tranche to each existing Lender that shall on the closing date receive 2L Convertible Tranche and to each Backstop Party that shall purchase 2L Convertible Tranche under the Backstop Rights Purchase Agreement |
| **Borrower** | Afiniti, Inc. |
| **Lenders** | Current Lenders under the Existing Credit Agreement (based on their *pro rata* share of the Existing Term Loans) |
| **Administrative Agent** | VCP Capital Markets, LLC |
| **Guarantors** | Same Guarantors as New 1L Tranche |
| **Collateral** | A second priority security interest in the same Collateral securing the New 1L Tranche. |
| **Intercreditor Agreement** | Customary for financings of this type to outline lien priorities. |
| **Maturity** | 7 years from Restructuring Effective Date |
| **Incremental Facilities** | Consistent with New 1L Tranche |
| **Restrictive Covenants** | Consistent with New 1L Tranche |
| **Information Covenants** | Consistent with New 1L Tranche |
| **Amendment/Waivers** | Consistent with New 1L Tranche |
| **Events of Default** | Consistent with New 1L Tranche |
| **Prepayments and Prepayment Premium** | Customary for financings of this type and all voluntary and mandatory prepayments, provided that any prepayment shall be made at the greater of (i) the principal amount of the 2L Convertible Tranche outstanding plus any and all accrued interest and fees; or (ii) the multiple on invested capital ("MOIC") as set forth below.<br><br>At the applicable date of prepayment, an amount equal to:<br><br>• Through the 2-year anniversary, a MOIC of 1.5x; |

|  | |
|---|---|
| | • Through the 4-year anniversary, a MOIC of 1.75x; <br><br> • Through the 6-year anniversary, a MOIC of 2.25x; and <br><br> • A MOIC of 2.5x thereafter. <br><br> The MOIC shall be calculated on the (i) the principal amount of the loans provided pursuant to the 2L Convertible Tranche (the "<u>Convertible Loans</u>") as of the date of the Restructuring *minus* (ii) the sum of (x) interest paid in cash on the Convertible Loans following the Restructuring (y) any premiums paid in cash on the Convertible Loans following the Restructuring and (z) any prepayments or repayments paid in cash on the Convertible Loans following the Restructuring. |
| **Conditions Precedent** | Consistent with New 1L Tranche |
| **Conversion** | Each Lender under the 2L Convertible Tranche may, at its option, convert the lesser of (i) any portion in excess of $5 million of the principal amount of its Loan under the 2L Convertible Tranche (including any accrued and unpaid interest through the date of the conversion) and (ii) all of the principal amount of the Loans under the 2L Convertible Tranche (including any accrued and unpaid interest through the date of the conversion) held by the Lender and its affiliates, in each case at any time prior to the Maturity Date into Class A-2 Newco Interests. The amount of the 2L Convertible Tranche (principal and interest) that is converted by a Lender shall be valued at a MOIC of 2.5x such that if all of the principal and interest of the 2L Convertible Tranche is converted, the Lenders in the aggregate shall be entitled to receive 75% of the Newco Interests (prior to dilution by the MIP) in exchange therefor. For each Class A-2 Newco Interest issued upon conversion of the 2L Convertible Tranche, one Class A-1 Newco Interest held by such converting Lender shall be cancelled and extinguished. |
| **Voting Rights** | On the Restructuring Effective Date, the Lenders under the 2L Convertible Tranche shall have full voting rights in the Class A-1 Newco Interests issued to such Lenders with voting rights equal to 2:1 for every Class B Newco Interest. <br><br> Upon conversion of any Loan under the 2L Convertible Tranche, such converting Lender shall have full voting rights in the Class A-2 Newco Interests issued to such converting Lender upon conversion with voting rights equal to 2:1 for every Class B Newco Interest. <br><br> As a result of the cancellation of one Class A-1 Newco Interest held by such converting Lender for each Class A-2 Newco Interest issued upon conversion of the 2L Convertible Tranche, the converting Lender shall have the same number of votes before and after such conversion. <br><br> The Class A-1 Newco Interests and Class A-2 Newco Interests (collectively, the "<u>Class A Newco Interests</u>") shall vote as a single class on all matters. |

| | |
|---|---|
| **Governance** | The Newco organizational documents shall be consistent with this Term Sheet and shall include terms and conditions that are usual and customary for organizational documents of reorganized debtors, including customary protections for shareholders against disproportionately adverse amendments. |
| **2L Lender ROFR** | If any existing Lender that is a holder of the 2L Convertible Tranche seeks to sell or transfer their Loan (a "Sold Loan") to an unaffiliated third party (a "ROFR Sale"):<br>• Such holder of the 2L Convertible Tranche must give notice to the Agent, and such notice must include the amount to be sold and the cash purchase price.<br>• The Agent will have 5 business days to send a notice of sale ("ROFR Notice") to VCP, which shall have a right to purchase the Sold Loan within 5 business days by sending the Agent an irrevocable notice of purchase on the same terms as set forth in the ROFR Notice, and each sale of the Sold Loan shall close promptly thereafter.<br>If any existing lender that is a holder of the 2L Convertible Tranche has converted their Loan (in whole or in part) into Class A-2 Interests and pursues a sale of the Class A-2 Newco Interests (the "Sold Interest"):<br>• Such holder of the Class A-2 Interests must give notice to the Agent, and such notice must include the amount to be sold and the cash purchase price.<br>• The Agent will have 5 business days to send a ROFR Notice to VCP which shall have a right to purchase the Sold Interest within 5 business days by sending the Agent an irrevocable notice of purchase, and each sale of the Sold Interest shall close promptly thereafter.<br>• The ROFR set forth herein shall not be applicable to any 2L Convertible Tranche held at any time by any party that has purchased 2L Convertible Tranche through the Rights Offering. |
| **Transfer Restrictions** | Transfers in the 2L Convertible Tranche that are less than $3.0 million cannot be made without the written consent of the Administrative Agent. |
| **Tax Treatment** | [The question whether the 2L Convertible Tranche will be treated as debt or equity for U.S. tax purposes remains under consideration] |
| **Governing Law and Forum** | New York |

**Annex 3**

Rights of Newco Interest Holders

| Term | Description |
|---|---|
| **Pre-Emptive Rights** | If Newco issues additional Newco Interests or rights to acquire Newco Interests (other than (i) all Newco Interests issued pursuant to the Scheme, including Newco Interests in respect of Warrants and Newco Interests issued upon conversion of the 2L Convertible Tranche, and (ii) Newco Interests issued other than for cash pursuant to customary exclusions from pre-emptive rights, including pursuant to the MIP or other compensatory arrangements, as consideration for acquisitions, and pursuant to commercial transactions) following the completion of the Scheme (and not in relation to implementation of the Scheme) (each, a "Subsequent Issuance"), each holder of Newco Interests (each, a "Newco Interest Holder") will be entitled to purchase a pro rata percentage of the Subsequent Issuance equal to such Newco Interest Holder's ownership of Newco Interests (assuming conversion of the 2L Convertible Tranche) prior to such Subsequent Issuance ("Participation Portion"). <br><br> If any Newco Interest Holder does not accept the offer or accepts a portion of the Participation Portion only, Newco will notify the other Newco Interest Holders who have elected to purchase their entire Participation Portion (each, a "Fully Participating Buyer") of any remaining unsubscribed portion of the Subsequent Issuance and each Fully Participating Buyer will be entitled to elect to purchase all or any portion of such unsubscribed portion. <br><br> Additional details that are customary to pre-emptive rights shall be set forth in the limited liability company agreement of Newco to be entered into in connection with the consummation of the Scheme. |
| **Information Rights** | Each Newco Interest Holder holding at least 1.0% of the Newco Interests (assuming conversion of the 2L Convertible Tranche) (each, a "Major Investor") shall be entitled to receive from Newco (i) quarterly unaudited financial statements within 60 days of the end of each fiscal quarter and annual unaudited financial statements within 180 days of the end of each fiscal year, and (ii) following the end of each fiscal year, an up-to-date anonymous capitalization table for Newco. All information provided pursuant to such rights will be subject to confidentiality obligations that will be included in the Newco LLC Agreement. |
| **Drag-Along** | (1) If VCP elects to consummate or cause the Company to consummate a sale of all or substantially all of the Newco Interests or all or substantially all of Newco's assets in a single or series of related transactions (a "Newco Sale") in response to an offer or proposal received from a third-party strategic buyer operating in any industry or line of business (a "Strategic Buyer") (such transaction, an "Inbound Strategic Sale Transaction"): <br> • VCP and/or the Company shall deliver a written notice (a "Drag-Along Notice") to each Newco Interest Holder (collectively, the "Drag-Along Holders"), which will include, among other things, the identity of the buyer or the fact that the buyer is a Strategic Buyer |

and the fact that the proposed transaction constitutes an Inbound Strategic Sale Transaction, and each Drag-Along Holder will be required to[13] (i) if the Inbound Strategic Sale Transaction is structured as a merger or similar transaction, vote in favor of such Inbound Strategic Sale Transaction, (ii) execute and deliver all related documentation and take such other action in support of such Inbound Strategic Sale Transaction as shall reasonably be requested by VCP or the Company in order to carry out such Inbound Strategic Sale Transaction, including, without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, any associated indemnity agreement, or escrow agreement, any associated voting, support, or joinder agreement, consent, waiver, governmental filing, and any similar or related documents; and (iii) transfer in such Inbound Strategic Sale Transaction all of their Newco Interests.

- The consummation of an Inbound Strategic Sale Transaction shall be conditioned on the Board first receiving a fairness opinion from a nationally recognized investment banking firm that is independent of VCP and the Company selected by a vote of a majority of the members of the Board.

(2) If VCP elects to (a) consummate or cause the Company to consummate a Newco Sale in response to an offer or proposal received from a third-party that is not a Strategic Buyer (such transaction, a "Non-Strategic Sale Transaction"), or (b) solicit or cause the Company to solicit offers or proposals from any potential buyer for a Newco Sale (such solicitation, a "Company Sale Process"):

- VCP and/or the Company shall deliver a written notice to each Newco Interest Holder regarding such Non-Strategic Sale Transaction or Company Sale Process, as applicable, which will include, in the case of a Non-Strategic Sale Transaction, the price such buyer has agreed to pay for the Newco Interests and/or assets;
- In the case of a Non-Strategic Sale Transaction, if the holders of more than 50% of the of the Class B Newco Interests(the "Class B Majority") vote to oppose such Non-Strategic Sale Transaction, then the Class B Majority shall have the right to request that the Board engage professionals to conduct a separate sale and marketing process, which shall last no less than 3 months from the date of the notice referred to above (the "Sale Period");
- In the case of a Company Sale Process, the Class B Majority shall have the right to request that the Board engage professionals to conduct such solicitation of offers or proposals, and that such process shall last for the Sale Period;
- During the Sale Period, Newco will provide to any financing sources considering a bona fide acquisition proposal the same information provided to the prospective purchaser in the proposed Non-Strategic Sale Transaction or to prospective bidders in the Company Sale

---

[13] LLC agreement to include a power of attorney whereby each holder grants a POA to VCP to take the actions required to be taken by Drag-Along Holders if any Drag-Along Holder refuses or fails to do so.

| | Process, subject to the same confidentiality restrictions; |
|---|---|
| | • During the Sale Period, the Board will be obligated to review and consider any bona fide acquisition proposals that the Board determines in good faith are likely to result in a transaction more favorable to the Newco Interest Holders from a financial point of view (taking into account closing conditions and financing commitments) than the Non-Strategic Sale Transaction or other offers or proposals received in the Company Sale Process;<br>• Following the Sale Period, VCP shall be entitled to agree to enter or cause the Company to enter into any Newco Sale approved by VCP and drag all other Newco Interest Holders pursuant to the provisions of paragraph (1).<br>• Notwithstanding the foregoing, in the event that the 2L Convertible Tranche shall be in default or any remedies have been commenced, or the Company shall become the subject of an insolvency proceeding, none of the requirements set forth in this paragraph (2) shall be applicable and a Drag-Along Notice may be delivered and shall be enforceable with respect to any Newco Sale pursuant to paragraph (1) as if such transaction were a Strategic Sale Transaction without satisfying any of the provisions set forth in this paragraph (2). |
| **Tag-Along** | Before any holder of Newco Interests may sell such holder's Newco Interests, such holder will give the other holders of Newco Interests an opportunity to participate in such sale on a basis proportionate to the amount of Newco Interests held by the selling holder. |
| **Affiliate Transactions** | Any material service agreements or other material transactions involving Newco on the one hand and VCP (or its affiliates, including VCT) on the other hand shall be approved by a majority of the independent managers on the Board and shall be on arm's length terms; provided that such agreements or other transactions limiting affiliate transactions shall exclude (i) any transactions occurring after an event of default, including, any credit bidding transaction, sale transaction in chapter 11, or similar proceeding; and (ii) any material contracts or transactions involving services with Vista Valuation Creation Team ("VCT") or any other affiliates of Vista entered into on an arms'-length basis on market terms and approved by a majority of the independent managers on the Board. |
| **Governance / Fiduciary Duty** | The Newco LLC Agreement or other constituent documents of Newco shall include disclaimers and waivers of any fiduciary duty (other than the duty of loyalty) that any member of the Board, Newco Interest Holder or other controlling person may otherwise have towards Newco or any Newco Interest Holder under Delaware law.  The NewCo LLC Agreement and other organizational documents shall include customary protections for shareholders against disproportionately adverse amendments. |
| **Bankruptcy Filing** | Approval to file for bankruptcy shall require the affirmative vote of 5 of the 9 managers, including the affirmative vote of at least two of the three independent managers. |
| **Additional Equity Transfer Restrictions** | As part of the Newco LLC Agreement or other constituent documents, each holder of Class B Newco Interests and Warrants shall not:<br>• incur any liens against their Newco Interests or warrants; |

|  | • enter into any swap agreements or other derivative transactions with respect to their Newco Interests or warrants; and<br>• transfer any Class B Newco Interests or Warrants.<br><br>Provided, however, that the following transfers shall be permitted without consent of the Board:<br>• transfers of Newco Interests or Warrants to a Qualified Affiliate; and<br>• transfers, with notice to the Company, to any other Newco Interest Holder or holder of 2L Convertible Tranche.<br><br>All other transfers must be approved in writing by the Board and any transfer by a Holder of Class B Newco Interests that is in breach of these transfer restrictions shall be null and void. |
|---|---|
| **Distributions** | Outstanding Class A-2 Newco Interests, Class B Newco Interests, and Class C Newco Interests (subject to terms of the MIP) to share ratably on a per Newco economic interest basis and in any distributions in the Company. Class A-1 Newco Interests do not have the right to receive any distributions. |
| **Governing Law and Forum** | Delaware |

**<u>Illustrative Examples of Economic and Voting Rights Pursuant to the Term Sheet</u>**

1. **$25M Rights Offering – Incremental Convertible Second Lien**
   a. The below economic and voting percentages assumes the $25M Rights Offering is fully subscribed by the existing eligible shareholders.

### NEW WARRANTS - UNEXERCISED

#### INITIAL DISTRIBUTION UNDER THE SCHEME

| | At Closing | Fully Diluted |
|---|---|---|
| **Class A** | **75.0%** | **63.8%** |
| 2L Conversion | 75.0% | 63.8% |
| TRG - Backstop 2L | - | - |
| Rights Offering - 2L | - | - |
| **Class B** | **25.0%** | **21.3%** |
| TRG - Backstop Fee | - | - |
| Rights Offering Participants | - | - |
| Existing Preferred Holders | 25.0% | 21.3% |
| **Class B Warrants** | **-** | **-** |
| TRG | - | - |
| Rights Offering | - | - |
| Existing Preferred Holders | - | - |
| **Class C** | **-** | **15.0%** |
| MIP | | 15.0% |
| **Total** | **100.0%** | **100.0%** |

#### $25M RIGHTS OFFERING 2L - ECONOMIC OWNERSHIP

| | At Closing | Fully Diluted |
|---|---|---|
| **Class A** | **81.6%** | **69.3%** |
| 2L Conversion | 75.0% | 63.8% |
| TRG - Backstop 2L | - | - |
| Rights Offering - 2L | 6.6% | 5.6% |
| **Class B** | **18.4%** | **15.7%** |
| TRG - Backstop Fee | - | - |
| Rights Offering Participants | 3.7% | 3.1% |
| Existing Preferred Holders | 14.7% | 12.5% |
| **Class B Warrants** | **-** | **-** |
| TRG | - | - |
| Rights Offering | - | - |
| Existing Preferred Holders | - | - |
| **Class C** | **-** | **15.0%** |
| MIP | | 15.0% |
| **Total** | **100.0%** | **100.0%** |

#### INITIAL DISTRIBUTION UNDER THE SCHEME - VOTING

| | At Closing | Fully Diluted |
|---|---|---|
| **Class A** | **85.7%** | **85.7%** |
| 2L Conversion | 85.7% | 85.7% |
| TRG - Backstop 2L | - | - |
| Rights Offering - 2L | - | - |
| **Class B** | **14.3%** | **14.3%** |
| TRG - Backstop Fee | 5.7% | 5.7% |
| Rights Offering Participants | - | - |
| Existing Preferred Holders | 8.6% | 8.6% |
| **Class B Warrants** | **-** | **-** |
| TRG | - | - |
| Rights Offering | - | - |
| Existing Preferred Holders | - | - |
| **Class C** | **-** | **-** |
| MIP | | |
| **Total** | **100.0%** | **100.0%** |

#### $25M RIGHTS OFFERING 2L - VOTING

| | At Closing | Fully Diluted |
|---|---|---|
| **Class A** | **89.9%** | **89.9%** |
| 2L Conversion | 82.6% | 82.6% |
| TRG - Backstop 2L | - | - |
| Rights Offering - 2L | 7.2% | 7.2% |
| **Class B** | **10.1%** | **10.1%** |
| TRG - Backstop Fee | - | - |
| Rights Offering Participants | 2.0% | 2.0% |
| Existing Preferred Holders | 8.1% | 8.1% |
| **Class B Warrants** | **-** | **-** |
| TRG | - | - |
| Rights Offering | - | - |
| Existing Preferred Holders | - | - |
| **Class C** | **-** | **-** |
| MIP | | - |
| **Total** | **100.0%** | **100.0%** |

### NEW WARRANTS - EXERCISED

#### INITIAL DISTRIBUTION UNDER THE SCHEME

| | At Closing | Fully Diluted |
|---|---|---|
| **Class A** | **75.0%** | **56.3%** |
| 2L Conversion | 75.0% | 56.3% |
| TRG - Backstop 2L | - | - |
| Rights Offering - 2L | - | - |
| **Class B** | **25.0%** | **18.8%** |
| TRG - Backstop Fee | 10.0% | 7.5% |
| Rights Offering Participants | - | - |
| Existing Preferred Holders | 15.0% | 11.3% |
| **Class B Warrants** | **-** | **10.0%** |
| TRG | - | 4.0% |
| Rights Offering | - | - |
| Existing Preferred Holders | - | 6.0% |
| **Class C** | **-** | **15.0%** |
| MIP | | 15.0% |
| **Total** | **100.0%** | **100.0%** |

#### $25M RIGHTS OFFERING 2L - ECONOMIC OWNERSHIP

| | At Closing | Fully Diluted |
|---|---|---|
| **Class A** | **81.6%** | **61.2%** |
| 2L Conversion | 75.0% | 56.3% |
| TRG - Backstop 2L | - | - |
| Rights Offering - 2L | 6.6% | 4.9% |
| **Class B** | **18.4%** | **13.8%** |
| TRG - Backstop Fee | - | - |
| Rights Offering Participants | 3.7% | 2.8% |
| Existing Preferred Holders | 14.7% | 11.1% |
| **Class B Warrants** | **-** | **10.0%** |
| TRG | - | - |
| Rights Offering | - | 2.0% |
| Existing Preferred Holders | - | 8.0% |
| **Class C** | **-** | **15.0%** |
| MIP | | 15.0% |
| **Total** | **100.0%** | **100.0%** |

**2.  $15M Backstop ($15M TRG) - Incremental Convertible Second Lien**
   a.  The below scenario assumes the $15M Backstop of Rights Offering is fully funded, with no subscription to the Rights Offering by existing eligible shareholders.

| NEW WARRANTS - UNEXERCISED | | |
|---|---|---|

| $15M TRG BACKSTOP - ECONOMIC OWNERSHIP | | |
|---|---|---|
| | At Closing | Fully Diluted |
| **Class A** | **75.9%** | **64.6%** |
| 2L Conversion | 72.2% | 61.3% |
| TRG - Backstop 2L | 3.8% | 3.2% |
| Rights Offering - 2L | - | - |
| **Class B** | **24.1%** | **20.4%** |
| TRG - Backstop Fee | 9.6% | 8.2% |
| Rights Offering Participants | - | - |
| Existing Preferred Holders | 14.4% | 12.3% |
| **Class B Warrants** | **-** | **-** |
| TRG | - | - |
| Rights Offering | - | - |
| Existing Preferred Holders | - | - |
| **Class C** | **-** | **15.0%** |
| MIP | | 15.0% |
| **Total** | **100.0%** | **100.0%** |

| NEW WARRANTS - EXERCISED | | |
|---|---|---|

| $15M TRG BACKSTOP - ECONOMIC OWNERSHIP | | |
|---|---|---|
| | At Closing | Fully Diluted |
| **Class A** | **75.9%** | **57.0%** |
| 2L Conversion | 72.2% | 54.1% |
| TRG - Backstop 2L | 3.8% | 2.8% |
| Rights Offering - 2L | - | - |
| **Class B** | **24.1%** | **18.0%** |
| TRG - Backstop Fee | 9.6% | 7.2% |
| Rights Offering Participants | - | - |
| Existing Preferred Holders | 14.4% | 10.8% |
| **Class B Warrants** | **-** | **10.0%** |
| TRG | - | 4.0% |
| Rights Offering | - | - |
| Existing Preferred Holders | - | 6.0% |
| **Class C** | **-** | **15.0%** |
| MIP | | 15.0% |
| **Total** | **100.0%** | **100.0%** |

| $15M TRG BACKSTOP - VOTING | | |
|---|---|---|
| | At Closing | Fully Diluted |
| **Class A** | **86.3%** | **86.3%** |
| 2L Conversion | 82.0% | 82.0% |
| TRG - Backstop 2L | 4.3% | 4.3% |
| Rights Offering - 2L | - | - |
| **Class B** | **13.7%** | **13.7%** |
| TRG - Backstop Fee | 5.5% | 5.5% |
| Rights Offering Participants | - | - |
| Existing Preferred Holders | 8.2% | 8.2% |
| **Class B Warrants** | **-** | **-** |
| TRG | - | - |
| Rights Offering | - | - |
| Existing Preferred Holders | - | - |
| **Class C** | **-** | **-** |
| MIP | | - |
| **Total** | **100.0%** | **100.0%** |

3. **$10M Rights offering Subscription + $15M TRG Backstop - Incremental Convertible Second Lien**
   a. The below scenario assumes $10M is raised via the Rights Offering, with the remaining $15M of the Backstop of Rights Offering funded.

**NEW WARRANTS - UNEXERCISED**

| $10M RO \| $15M TRG BACKSTOP - ECONOMIC OWNERSHIP | At Closing | Fully Diluted |
|---|---|---|
| **Class A** | **78.5%** | **66.7%** |
| 2L Conversion | 72.2% | 61.3% |
| TRG - Backstop 2L | 3.8% | 3.2% |
| Rights Offering - 2L | 2.5% | 2.2% |
| **Class B** | **21.5%** | **18.3%** |
| TRG - Backstop Fee | 8.6% | 7.3% |
| Rights Offering Participants | 2.0% | 1.7% |
| Existing Preferred Holders | 10.9% | 9.3% |
| **Class B Warrants** | **-** | **-** |
| TRG | - | - |
| Rights Offering | - | - |
| Existing Preferred Holders | - | - |
| **Class C** | **-** | **15.0%** |
| MIP | | 15.0% |
| **Total** | **100.0%** | **100.0%** |

**NEW WARRANTS - EXERCISED**

| $10M RO \| $15M TRG BACKSTOP - ECONOMIC OWNERSHIP | At Closing | Fully Diluted |
|---|---|---|
| **Class A** | **78.5%** | **58.9%** |
| 2L Conversion | 72.2% | 54.1% |
| TRG - Backstop 2L | 3.8% | 2.8% |
| Rights Offering - 2L | 2.5% | 1.9% |
| **Class B** | **21.5%** | **16.1%** |
| TRG - Backstop Fee | 8.6% | 6.5% |
| Rights Offering Participants | 2.0% | 1.5% |
| Existing Preferred Holders | 10.9% | 8.2% |
| **Class B Warrants** | **-** | **10.0%** |
| TRG | - | 4.0% |
| Rights Offering | - | 0.9% |
| Existing Preferred Holders | - | 5.1% |
| **Class C** | **-** | **15.0%** |
| MIP | | 15.0% |
| **Total** | **100.0%** | **100.0%** |

| $10M RO \| $15M TRG BACKSTOP - VOTING | At Closing | Fully Diluted |
|---|---|---|
| **Class A** | **87.9%** | **87.9%** |
| 2L Conversion | 80.9% | 80.9% |
| TRG - Backstop 2L | 4.3% | 4.3% |
| Rights Offering - 2L | 2.8% | 2.8% |
| **Class B** | **12.1%** | **12.1%** |
| TRG - Backstop Fee | 4.8% | 4.8% |
| Rights Offering Participants | 1.1% | 1.1% |
| Existing Preferred Holders | 6.1% | 6.1% |
| **Class B Warrants** | **-** | **-** |
| TRG | - | - |
| Rights Offering | - | - |
| Existing Preferred Holders | - | - |
| **Class C** | **-** | **-** |
| MIP | | - |
| **Total** | **100.0%** | **100.0%** |

**<u>Exhibit C</u>**

**Term Loan Credit Agreement Amendment**

*Agreed Form*

---

### AMENDMENT NO. 13 TO TERM LOAN CREDIT AGREEMENT

dated as of

[   ], 2024,

among

AFINITI, LTD. (in provisional liquidation),
as Parent,

MICHAEL MORRISON AND CHARLES THRESH,
as Joint Provisional Liquidators of AFINITI, LTD.

AFINITI, INC.,
as Borrower,

AFINITI NEWCO HOLDINGS LLC,
as NewCo,

the Guarantors party hereto,

the Lenders party hereto

and

VCP CAPITAL MARKETS, LLC,
as Administrative Agent and Collateral Agent

---

## AMENDMENT NO. 13 TO TERM LOAN CREDIT AGREEMENT

This AMENDMENT NO. 13 TO TERM LOAN CREDIT AGREEMENT, dated as of [  ], 2024 (this "<u>Agreement</u>"), by and among Afiniti, Inc., a Delaware corporation (the "<u>Borrower</u>"), Afiniti, Ltd. (in provisional liquidation), a Bermuda exempted company in provisional liquidation acting by its joint provisional liquidators Michael Morrison and Charles Thresh of Teneo (Bermuda) Ltd., in their capacity as joint provisional liquidators of Parent (the "<u>Joint Provisional Liquidators</u>)", acting jointly and severally, whose registered office is 19 Par-la-Ville Road, Third Floor, Hamilton, HM 11, Bermuda (the "<u>Parent</u>"), Afiniti Newco Holdings LLC, a Delaware limited liability company ("<u>NewCo</u>"), the other Guarantors party hereto, VCP Capital Markets, LLC, as the Administrative Agent and the Collateral Agent (in such capacity, the "<u>Administrative Agent</u>"), under the Credit Agreement referred to below, and each Lender party hereto, including for the avoidance of doubt, any Lender which is not a party to the Credit Agreement prior to this Agreement but has a Restructuring Term Loan Commitment (the "<u>Lenders</u>").  Capitalized terms used but not defined herein shall have the meaning provided in the Amended Credit Agreement (as defined below) or the Restructuring Support Agreement (as defined below), as applicable.

### RECITALS:

**WHEREAS**, reference is made to the Term Loan Credit Agreement, dated as of June 13, 2019 (as amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of July 11, 2019, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4, 2020, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of November 17, 2020, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of December 29, 2020, that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of March 9, 2021, that certain Amendment No. 6 to Term Loan Credit Agreement, dated as of March 12, 2021, that certain Amendment No. 7 to Term Loan Credit Agreement, dated as of May 17, 2021, that certain Amendment No. 8 to Term Loan Credit Agreement, dated as of March 7, 2022, that certain Amendment No. 9 to Term Loan Credit Agreement, dated as of June 13, 2024, that certain Amendment No. 10 to Term Loan Credit Agreement, dated as of July 29, 2024, that certain Amendment No. 11 to Term Loan Credit Agreement, dated as of August 14, 2024, that certain Amendment No. 12 to Term Loan Credit Agreement, dated as of September 12, 2024 and as may be further amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "<u>Credit Agreement</u>" and as amended and restated by this Agreement, the "<u>Amended Credit Agreement</u>"), among the Borrower, the Parent (in provisional liquidation), the Lenders from time to time party thereto and the Administrative Agent;

**WHEREAS**, the Parent, the Borrower, the Guarantors, the Joint Provisional Liquidators and the Lenders party to the Credit Agreement have agreed to enter into the Restructuring Support Agreement dated as of September [  ], 2024 (the "<u>Restructuring Support Agreement</u>").  Any transactions implementing the agreed restructuring set out in the Restructuring Support Agreement, and any court proceedings, before either the Bermuda Supreme Court (the "<u>Bermuda Court</u>") or the U.S. Bankruptcy Court arising out of, in connection with or in furtherance of the Restructuring Support Agreement and/or the first clause hereto are hereby collectively referred to as the "<u>Restructuring</u>"; and

**WHEREAS,** the Borrower has requested that the Administrative Agent and the Lenders amend and restate the Existing Credit Agreement to amend the existing Term Loans (as defined in the Credit Agreement prior to the Amendment No. 13 Effective Date) into (a) a

senior first lien secured tranche in an amount equal to $[225,000,000][1] and (b) a junior second lien secured convertible tranche in an amount equal to $[298,744,859.71] and make other substantive amendments to the Credit Agreement, as provided for on the terms set forth in Exhibit A hereto, all on the terms and conditions provided herein;

**WHEREAS,** the Borrower has requested and the Administrative Agent and the Lenders have agreed that the Borrower shall incur $15,000,000 of new Restructuring Second Lien Term Loans under the Backstop Commitment;

**WHEREAS**, the Parent (a) has commenced a provisional liquidation proceeding in Bermuda, (b) will be released pursuant to the Release of Guarantor (as defined below) and (c) hereby acknowledges that NewCo will, effective as of the Amendment No. 13 Effective Date, replace the Parent as the new parent company;

**NOW, THEREFORE,** in consideration of the foregoing and for other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    <u>Credit Agreement Amendments</u>.

(a)    Effective as of the Amendment No. 13 Effective Date, the Credit Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example:    ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example:    <u>**double-underlined text**</u>) as set forth in the pages of the Credit Agreement attached as Annex A hereto.

(b)    New Schedules 7.01(e), 7.01(s), 7.02(g), 7.03(a), 7.05(m) and 7.08 are hereby inserted into the Credit Agreement in the form attached as Annex B hereto and incorporated herein by reference.

(c)    Schedules 1.01(a), 1.01(b), 2.01, 5,12, 5.15, 7.01, 7.02, 7.04 and 7.05 of the Credit Agreement are hereby amended and restated in the form attached as Annex C hereto.

(d)    New Exhibit L (*Form of Agreement Among Lenders/Intercreditor Agreement*), Exhibit M (*Form of First Lien Cash/PIK Election Notice*) and Exhibit N (*Form of Second Lien Cash/PIK Election Notice*) is hereby inserted into the Credit Agreement in the form attached as Annex D hereto and incorporated herein by reference.

(e)    <u>Exhibit D</u> of the Credit Agreement is hereby amended and restated in the form attached as Annex E hereto.

2.    **Effective Date Conditions**.  This Agreement will become effective on the date (the "<u>Amendment No. 13 Effective Date</u>") on which each of the following conditions has

---

[1] NTD: Amounts subject to increase due to the PIK interest accrued from the signing for the RSA to the Amendment No. 13 Effective Date.

been satisfied (or waived by the Required Lenders) in accordance with the terms therein:

(a)    (*Loan Documents*) the Administrative Agent (or its counsel) shall have received duly executed counterparts of each party thereto of:

   (i)    this Agreement;

   (ii)    the Term Notes (to the extent requested);

   (iii)    the NewCo Guaranty Supplement ("<u>NewCo Guaranty Supplement</u>");

   (iv)    the HoldCo Guaranty Supplement ("<u>HoldCo Guaranty Supplement</u>");

   (v)    the NewCo Security Agreement, in form and substance as set out in Exhibit G ("<u>NewCo Security Agreement</u>");

   (vi)    the Cayman Islands Security Documents;

   (vii)    the Agreement Among Lenders/Intercreditor Agreement;

   (viii)    the Joinder to Intercompany Subordination Agreement executed by NewCo and HoldCo;

   (ix)    the English law governed supplemental guarantee and debenture to be entered into between the Original English Loan Party and the Collateral Agent;

   (x)    the English law governed share charge to be entered into between HoldCo and the Collateral Agent;

   (xi)    the Irish Supplemental Debenture together with all deliverables required thereunder;

   (xii)    the Irish Share Charge together with all deliverables required thereunder;

   (xiii)    the Irish Deed of Release in connection with the release of the Parent from the existing Irish share charge dated December 23, 2020;

   (xiv)    a Perfection Certificate executed by each Loan Party;

   (xv)    [reserved];

   (xvi)    a release of the Parent from the Guaranty Agreement, executed by the Administrative Agent and the Parent ("<u>Release of Guarantor</u>"); and

   (xvii)    any other Loan Document, as applicable, in each case, duly executed.

(b)    (*NewCo LLC Agreement*) the Administrative Agent shall have received, in form and substance reasonably satisfactory to the Administrative Agent, the limited liability company agreement of NewCo;

4

(c)  (*Financing Statements*) appropriate financing statements (Form UCC-1 or such other financing statements or similar notices as shall be required by local Law) authenticated and authorized for filing under the UCC of each jurisdiction in which the filing of a financing statement may be required, or reasonably requested by the Collateral Agent, to perfect by filing under the UCC the security interests created by the Collateral Documents given by NewCo and HoldCo;

(d)  (*Lien Searches*) the results of recent lien searches in each of the jurisdictions in which UCC financing statements or other filings or recordations have been made to evidence or perfect security interests in assets of the Loan Parties and such searches shall reveal no Liens on any of the assets of the Loan Parties or otherwise on the Collateral;

(e)  (*Certificated securities*) all additional Pledged Securities consisting of certificated securities (to the extent such certificated securities exist on the Amendment No. 13 Effective Date and have not been pledged prior to the Amendment No. 13 Effective Date), which Pledged Securities shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Collateral Agent;

(f)  (*Other filings and recordings*) all other filings and recordings of or with respect to the Collateral Documents and of all other actions in each case to the extent required by such Collateral Documents on or prior to the Amendment No. 13 Effective Date, including, in the case of the Original Irish Loan Party, if applicable, a completed Irish Companies Registration Office registration template in agreed form for each Irish Security Document required to be registered in the Irish Companies Registration Office prepared by legal advisers to the Administrative Agent and approved and verified by the Original Irish Loan Party's legal advisers;

(g)  (*Sanction Order*) the Bermuda Court shall have entered the order approving the Restructuring;

(h)  (*Restructuring*) Each step of the Restructuring which, by its nature, is capable of being consummated on or prior to the Amendment No. 13 Effective Date shall have been consummated, other than the filing of tax elections that may have retroactive effect as from a date on or prior to the Amendment No. 13 Effective Date though filed thereafter;

(i)  (*No proceeding etc.*) Other than proceedings out of or in connection with the Restructuring, there shall be no action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of the Parent, NewCo or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of the Parent, NewCo or any of its Subsidiaries, threatened or contemplated against the Parent, NewCo or any of its Subsidiaries or any property of the Parent, NewCo or any of its Subsidiaries that relate to the Loan Documents or the

transactions contemplated thereby, in any case, that could reasonably be expected to result in a Material Adverse Effect;

(j)    (*No Default*) no Default or Event of Default shall exist on the Amendment No. 13 Effective Date immediately before or after giving effect to the effectiveness of this Agreement;

(k)    (*Representations and warranties*) the representations and warranties of each Loan Party contained in this Agreement and each other Loan Document, shall be true and correct in all material respects (or, if such representation or warranty is subject to a materiality or Material Adverse Effect qualification, in all respects) on and as of the Amendment No. 13 Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (or, if such representation or warranty is subject to a materiality or Material Adverse Effect qualification, in all respects) as of such earlier date;

(l)    (*Organization Documents; good standing; secretary certificates*) the Administrative Agent shall have received:  (i) a copy of the Organization Documents, including all amendments thereto, of each Loan Party, and certified as of a recent date by the Secretary of State or other applicable Governmental Authority of its respective jurisdiction of organization to the extent applicable; (ii) (except in relation to any English Loan Party) a certificate as to the good standing (or comparable status) of each Loan Party from such Secretary of State or other applicable Governmental Authority of its respective jurisdiction of organization or registration, as of a recent date, in the case of any Guarantor registered in the Cayman Islands within 30 days of the date hereof, or in respect of a Guarantor incorporated in Luxembourg an excerpt from the Registre de Commerce et des Sociétés, Luxembourg (the "Luxembourg Companies Register") and a certificate of non-inscription of a judicial decision (*certificat de non-inscription d'une decision judiciaire ou de dissolution administrative sans liquidation*) issued by the Insolvability Registry (*Registre de l'insolvabilité* or REGINSOL) available for consultation on the website (www.lbr.lu) of the manager of the Luxembourg Companies Register dated no earlier than one Business Day prior to the Amendment No. 13 Effective Date; (iii) a certificate of the Secretary or Assistant Secretary or other applicable Responsible Officer of each Loan Party dated the Amendment No. 13 Effective Date and certifying (A) that, in the case of the Borrower and any Guarantor (excluding HoldCo), the Organization Documents of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing or comparable status from its jurisdiction of organization furnished pursuant to clause (ii) above or in the case of the HoldCo since the date of the relevant Organization Documents and remains in full force and effect; (B) that attached thereto is a true and complete copy of the Organization Documents as in effect on the Amendment No. 13 Effective Date, (C) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors (or equivalent governing body) of such Loan Party authorizing the execution, delivery and performance of this Agreement and the Amended Credit Agreement and related documents, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and are the only

resolutions authorizing the execution, delivery and performance of this Agreement and the Amended Credit Agreement and related documents; (D) as to the incumbency and specimen signature of each Responsible Officer executing this Agreement and related documents and (E) in respect of a Guarantor incorporated in Luxembourg (1) a negative certificate issued by the Luxembourg trade and companies register dated no earlier than one Business Day prior to the Amendment No. 13 Effective Date, (2) an up to date copy of its shareholder register and (3) confirming that guaranteeing or securing, as appropriate, the Aggregate Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded; (iv) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary or other applicable Responsible Officer executing the certificate pursuant to clause (iii) above; (v) in the case of the Original English Loan Party: (A) a copy of a resolution signed by all holders of the issued shares in the Original English Loan Party, approving the terms of, and the transactions contemplated by the Agreement and any other document delivered in connection herewith to which the Original English Loan Party is a party; and (B) either a certificate of an authorized signatory of the Original English Loan Party certifying that (1) each Loan Party has complied on time with any notice it has received pursuant to Part 21A of the Companies Act 2006 from the Original English Loan Party and no "warning notice" or "restrictions notice" (in each case as defined in Schedule 1B of the Companies Act 2006) has been issued in respect of its shares, together with a copy of the PSC Register (within the meaning of section 790C(10) of the Companies Act 2006) for the Original English Loan Party, which, is certified by an authorized signatory of Original English Loan Party to be correct, complete and not amended or superseded as at a date no earlier than the Amendment No. 13 Effective Date or (2) the Original English Loan Party is not required to comply with Part 21A of the Companies Act 2006, (vi) in the case of the Original Irish Loan Party, a certificate that it is in compliance with sections 82, 238 and 239 of the Irish Companies Act 2014; (vii) in the case of the Original Irish Loan Party, the tax number of that Original Irish Loan Party; and (viii) in the case of HoldCo a copy of the register of members, register of officers, register of managers, register of security interests over limited liability company interests and register of mortgages and charges..

(m)     (*Legal Opinions*) the Administrative Agent and its counsel shall have received duly executed copies of the favorable written opinion of: (1) Latham & Watkins LLP, U.S. counsel to the Loan Parties, (2) Allen Overy Shearman Sterling LLP, English counsel to the Administrative Agent, (3) Maples and Calder (Luxembourg), Luxembourg counsel to the Loan Parties, (4) Mason Hayes & Curran LLP, Irish counsel to the Administrative Agent, in the case of each of (1) to (4) above, with respect to the Amendment and the Amended Credit Agreement, (5) Appleby (Bermuda) Limited, as Bermuda counsel to the Administrative Agent with respect to the Bermuda Collateral Documents and (6) Conyers Dill & Pearman LLP, as Cayman Islands counsel to the Loan Parties with respect to the Cayman Islands Security Documents and HoldCo and in each case in form and substance reasonably satisfactory to the Administrative Agent, dated as of the Amendment No. 13 Effective Date (and each Loan Party

hereby instructs such counsel to deliver such opinions to the Agents and the Lenders);

(n)    (*PIK Upfront Fee*) the Borrower shall have paid (a) in kind in the form of Restructuring First Lien Term Loans on behalf of each Lender, an upfront fee equal to $[  ], representing 4.00% of the Restructuring First Lien Term Loans held by such Lender and (b) in kind in the form of Restructuring Second Lien Term Loans on behalf of each Lender, an upfront fee equal to $[  ], representing 4.00% of the Restructuring Second Lien Term Loans held by such Lender;

(o)    (*Other Documents*) the Administrative Agent shall have received such other statements, certificates, documents and/or approvals as the Administrative Agent may request (acting at the direction of the Lenders), where there is a reasonable basis for such request, to evidence satisfaction of the applicable conditions set forth in this section;

(p)    (*Costs and Expenses*) the Borrower shall have paid in full at least one (1) Business Day prior to the Amendment No. 13 Effective Date, all accrued costs and expenses (including legal fees and expenses) due and payable to the Administrative Agent and the Lenders shall have been paid to the extent an invoice therefor was presented at least one (1) Business Days prior to the Amendment No. 13 Effective Date (or such later date as the Borrower may agree) including, and without limitation, reasonable and documented out-of-pocket fees, costs and expenses of Allen Overy Shearman Sterling US LLP (together with Allen Overy Shearman Sterling LLP and each of its subsidiaries and the other partnerships, corporations, undertakings and entities which are authorized to practice using a name which includes "Allen Overy Shearman Sterling" or "A&O Shearman"), as lead counsel to the Lenders, Appleby (Bermuda) Limited, as Bermuda counsel to the Lenders, Mason Hayes & Curran LLP, as Irish counsel to the Lenders, Maples and Calder (Cayman) LLP, as Cayman Islands counsel to the Lenders and Akin Gump Strauss Hauer Feld, LLP, as previous counsel to the Administrative Agent;

(q)    (*KYC*) the Administrative Agent shall have received not less than three (3) Business Days prior to the Amendment No. 13 Effective Date all documentation and other information required under Anti-Terrorism Laws and applicable "know-your-customer" and anti-money laundering Laws, including, without limitation, a duly executed W-9 (or other applicable tax form) of the Borrower;

(r)    [reserved];

(s)    (*Annual Budget*) the Administrative Agent shall have received a copy of the annual budget of NewCo for the Fiscal Year ending June 30, 2025; and

(t)    (*Process Agent*) a process agent letter appointing a nominated entity to act on behalf of HoldCo as agent for service of process in relation to (1) any proceeding before the Irish courts in connection with the Irish Share Charge and (2) any proceeding before the Cayman Islands courts in connection with the Cayman Islands Security Documents, together with evidence that such agent has duly accepted its appointment.

3.  **Representations and Warranties**.  By its execution of this Agreement, each of the Loan Parties hereby represents and warrants that:

    (a)    each of the Loan Parties has all requisite corporate, limited liability company, or other organizational power and authority to execute, deliver and perform its obligations under this Agreement;

    (b)    the execution, delivery and performance by each of the Loan Parties of this Agreement (x) have been duly authorized by all necessary corporate, partnership, limited liability company or other organizational action, and (y) do not and will not (i) contravene the terms of any of such party's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien (other than Permitted Liens) under, any Contractual Obligation to which the Loan Parties are a party or any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject except in the case of this clause (ii) any such conflict, breach or contravention that would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect or (iii) violate any Law, except in any case for such violations that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

    (c)    this Agreement has been duly executed and delivered by each of the Loan Parties, and this Agreement constitutes a legal, valid and binding obligation of such party, enforceable against each of the Loan Parties in accordance with its terms, except (i) as such enforceability may be limited by applicable bankruptcy, insolvency, examinership, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and (ii) that rights of acceleration and the availability of equitable remedies may be limited by equitable principles of general applicability (regardless of whether enforcement is sought by proceedings in equity or at law);

    (d)    no Default or Event of Default is continuing as of the date hereof after giving effect to the provisions of this Agreement; and

    (e)    all of the representations and warranties set forth in the Credit Agreement and the other Loan Documents, each as amended hereby, are true and correct in all material respects (or, with respect to any representation or warranty that is itself modified or qualified by materiality or a "Material Adverse Effect" standard, such representation or warranty shall be true and correct in all respects) on and as of the date hereof, as if made on the date hereof, except to the extent any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such date.

4.  **Ratification, Reaffirmation of Liability and Confirmation of Security Interest**. The Loan Parties, as debtors, grantors, pledgors, guarantors, assignors or in other similar capacities in which such parties grant liens, pledge or security interests in their properties or otherwise act as accommodation parties or guarantors, as the case may be, under the Loan Documents, hereby (i) ratify and reaffirm all of their respective obligations and liabilities under the Credit Agreement and the other Loan Documents, as applicable, (ii) ratify and reaffirm their grants of Liens on or security interests in the

Collateral pursuant to a Loan Documents to which they are a party, as security for the Senior Credit Obligations under the Credit Agreement, (iii) confirms and agrees that such Liens and security interests extends to the obligations of the Loan Parties under the Amended Credit Agreement and (iv) confirms and agrees that such Liens and security interests shall continue in full force and effect during the term of the Amended Credit Agreement, and shall continue to secure the Senior Credit Obligations (including, without limitation, all additional Senior Credit Obligations hereafter arising or incurred pursuant to this Agreement), in each case, on and subject to the terms and conditions set forth in the Amended Credit Agreement and the other Loan Documents.

5. **Post-Closing Covenant.** On the Amendment No. 13 Effective Date, or such longer period as the Administrative Agent shall agree in its reasonable discretion, the Borrower shall deliver, or cause to be delivered, to the Administrative Agent, (i) the register of mortgages and charges of HoldCo noting the entry into the English Share Charge, the Irish Share Charge and the Cayman Islands Debenture by HoldCo, (ii) the register of security interests over limited liability company interests of HoldCo noting the security granted by the Cayman Islands LLC Security Agreement and (iii) on or before October 31, 2024, the Administrative Agent will have received satisfactory evidence that the annual returns of the Original Irish Loan Party are up to date[2].

6. **Acknowledgement of Rights; Release of Claims**.   Each Loan Party hereby acknowledges that: (a) it has no defenses, claims or set-offs to the enforcement by any Lender or the Administrative Agent of Loan Parties' liabilities, obligations and agreements on the date hereof; (b) to its knowledge, each Lender and the Administrative Agent has fully performed all undertakings and obligations owed to it as of the date hereof; and (c) except to the limited extent expressly set forth in this Agreement, no Lender or Administrative Agent waives, diminishes or limits any term or condition contained in the Credit Agreement or any of the other Loan Documents.   Each Loan Party hereby waives, releases, remises and forever discharges the Lenders and the Administrative Agent, their agents, employees, officers, directors, predecessors, attorneys and all others acting or purporting to act on behalf of or at the direction of the Lenders and Administrative Agent ("Releases") from any and all claims, suits, actions, investigations, proceedings or demands, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law of any kind or character, known or unknown, which the Borrower or any other Loan Party ever had or now has against the any of the Releasees which relates, directly or indirectly, to the Loans or the Loan Documents or any acts or omissions of the Releasees in respect of the Loans or the Loan Documents and arising from any event occurring on or prior to the Amendment No. 13 Effective Date.   Without limiting the generality of the foregoing, each Loan Party waives and affirmatively agrees not to contest: (a) the right of the Administrative Agent and each Lender to exercise its rights and remedies under the Credit Agreement, this Agreement or the other Loan Documents, or (b) any provision of this Agreement.

7. **Acknowledgement of Obligations**.  Each Loan Party hereby acknowledges, confirms and agrees that as of the close of business on [___], 2024, the Borrower is indebted to the Lenders in respect of the Loans in the principal amount of $[   ].  Each Loan Party hereby acknowledges, confirms and agrees that all such Loans, together with interest

---

[2] NTD: Subject to further discussion.

accrued and accruing thereon, and all fees, costs, expenses and other charges now or hereafter payable by the Borrower to the Administrative Agent and Lenders, are unconditionally owing by the Borrower to the Administrative Agent and Lenders, as applicable, without offset, defense or counterclaim of any kind, nature or description whatsoever.

8.  **Tax Treatment**.  Notwithstanding anything to the contrary herein, in any Loan Document or in any Organization Document of any Loan Party, the Restructuring Second Lien Term Loans (and the corresponding voting Class A-1 Units in NewCo) held by any Lender will be treated, as from the Amendment No. 13 Effective Date, for U.S. federal and applicable state and local income tax purposes as set forth in the NewCo LLC Agreement. The parties hereto agree to prepare and file all U.S. federal and applicable state and local income tax returns and reports consistently with such treatment, unless otherwise required by a determination within the meaning of Section 1313(a) of the Code or an analogous provision of state or local law.

9.  **Amendment, Modification and Waiver**.  This Agreement may not be amended, modified or waived except as permitted by Section 10.01 of the Credit Agreement.

10. **Integration; No Novation**.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall not constitute a novation of any amount owing under the Credit Agreement and all amounts owing in respect of principal, interest, fees and other amounts pursuant to the Credit Agreement and the other Loan Documents shall, to the extent not paid or exchanged on or prior to the Amendment No. 13 Effective Date, continue to be owing under the Credit Agreement or such other Loan Documents until paid in accordance therewith.

11. **Severability**.  The provisions of Section 10.12 of the Credit Agreement are hereby incorporated by reference, mutatis mutandis, as if originally made a part hereof.

12. **GOVERNING LAW; JURISDICTION; SERVICE OF PROCESS; WAIVER OF JURY TRIAL**.  THE PROVISIONS OF SECTION 10.13 OF THE CREDIT AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE, MUTATIS MUTANDIS, AS IF ORIGINALLY MADE A PART HEREOF.

13. **Counterparts**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement by telecopier or electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

14. **Loan Document**.  On and after the Amendment No. 13 Effective Date, this Agreement shall constitute a "Loan Document" for all purposes of the Amended Credit Agreement and the other Loan Documents (it being understood that for the avoidance of doubt this

Agreement may be amended or waived by the parties hereto solely as set forth in Section 9 above).

15. **Pre-Amendment No. 13 Effective Date Consents**.  Each undersigned Consenting Lender consents to the Restructuring, including the (x) execution and delivery of that certain Stock and Asset Transfer Agreement, dated as of [  ], 2024, between Parent and HoldCo, and the consummation of the transactions contemplated thereby and (y) transfer of Intellectual Property from HoldCo to the Original Irish Loan Party.

16. **Amendment No. 13 Effective Date Consents and Direction to Agent**.  Each undersigned Consenting Lender (i) hereby directs the Agent to execute (x) this Agreement and (y) the Release of Guarantor, (ii) acknowledges and agrees that the Agent has executed this Agreement and the Release of Guarantor in reliance of the direction set forth in clause (i) and (iii) consents to the Restructuring, including the execution and delivery of certain Securities Transfer Agreement, dated as of the date hereof, between Parent and NewCo, and the consummation of the transactions contemplated thereby.

17. **Costs and Expenses**.  The Borrower hereby reconfirms its obligations pursuant to Section 10.04 of the Credit Agreement to pay and reimburse the Administrative Agent for all reasonable costs and expenses (including, without limitation, reasonable and documented out-of-pocket fees, charges and disbursements of counsel) incurred in connection with the negotiation, preparation, execution and delivery of this Agreement.

18. **Further Assurances**.  The Borrower and each other Loan Party agrees to take all further actions and execute all further documents as the Agent or the Lenders may from time to time reasonably request to carry out the transactions contemplated by this Agreement and the other Loan Documents executed and delivered in connection herewith.

19. **Liability of Joint Provisional Liquidators.** The Joint Provisional Liquidators were appointed by the Bermuda Court to manage the Parent's affairs, business, and properties as agents and without personal liability. Additionally, neither the Joint Provisional Liquidators, nor any agent, advisor, representative, Affiliate, employee, partner, servant, trustee, attorney, or other person acting on behalf of, or otherwise related to or affiliated with the Joint Provisional Liquidators shall have any personal liability (save in respect of fraud or dishonesty) directly or indirectly, under or in connection with: (a) this Agreement (b) any agreement made or entered into under or pursuant to the provisions of this Agreement, or (c) any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

[Signature Pages Omitted]

ANNEX A

Credit Agreement

[Attached]

*[Different first page setting changed from off in original to on in modified.].*

*Agreed Form*

---

# TERM LOAN CREDIT AGREEMENT[1]

### dated as of June 13, 2019

### among

### AFINITI, INC.,
**as Restructuring First Lien Borrower and Restructuring Second Lien Co-Borrower,**

### AFINITI, LTD. (in provisional liquidation)
### as Parent,

### (as succeeded by AFINITI NEWCO HOLDINGS LLC
### as NewCo and Restructuring Second Lien Co-Borrower),

### THE LENDERS FROM TIME TO TIME PARTY HERETO,

### VCP CAPITAL MARKETS, LLC,
### as Administrative Agent and Collateral Agent,

---

[1] This marked version is marked against the Term Loan Credit Agreement, dated as of June 13, 2019, Amendment No. 1 to Term Loan Credit Agreement, dated as of July 11, 2019, and Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4, 2020 and shows changes made pursuant to Amendment No. 3 to Term Loan Credit Agreement, dated as of November 17, 2020, Amendment No. 4 to Term Loan and Credit Agreement, dated as of December 29, 2020, Amendment No. 5 to Term Loan and Credit Agreement, dated as of March 9, 2021, Amendment No. 6 to Term Loan and Credit Agreement, dated as of March 12, 2021, Amendment No. 7 to Term Loan Credit Agreement, dated as of May 17, 2021, Amendment No. 8 to Term Loan Credit Agreement, dated as of March 7, 2022, Amendment No. 9 to Term Loan Credit Agreement, dated as of June 13, 2024, Amendment No. 10 to Term Loan Credit Agreement, dated as of July 29, 2024, Amendment No. 11 to Term Loan Credit Agreement, dated as of August 14, 2024 and Amendment No. 12 to Term Loan Credit Agreement, dated as of September 12, 2024.

**Table of Contents**

Page

ARTICLE I.

DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms ............................................................................................. 1
Section 1.02    Other Interpretative Provisions .................................................................. ~~43~~48
Section 1.03    Accounting Terms and Determinations ....................................................... ~~44~~49
Section 1.04    Rounding ..................................................................................................... ~~45~~50
Section 1.05    Times of Day ............................................................................................... ~~45~~50
Section 1.06    Classes of Borrowings ................................................................................ ~~46~~50
Section 1.07    Divisions ..................................................................................................... ~~46~~50
Section 1.08    ~~Equity Contribution Principles~~ [Reserved] .......................................... ~~46~~ 51
Section 1.09    Guarantee Limitations: Ireland. . ................................................................ 51
Section 1.10    Irish Terms. ................................................................................................. 51
Section 1.11    Interest Rates. .............................................................................................. 51
Section 1.12    Guarantee Limitations: England and Wales.. ............................................ 51
Section 1.13    Co-Borrowers. ............................................................................................. 51

ARTICLE II.

THE CREDIT FACILITIES

Section 2.01    Commitments To Lend ................................................................................ ~~46~~52
Section 2.02    Notice of Borrowings ................................................................................. ~~50~~56
Section 2.03    Funding of Loans ........................................................................................ ~~50~~57
Section 2.04    Evidence of Loans ...................................................................................... ~~51~~58
Section 2.05    Interest ........................................................................................................ ~~52~~58
Section 2.06    Prepayments ................................................................................................ ~~53~~60
Section 2.07    Fees ............................................................................................................. ~~56~~63
Section 2.08    Pro ~~rata~~Rata Treatment ............................................................................. ~~56~~63
Section 2.09    Sharing of Payments by Lenders ................................................................ ~~56~~63
Section 2.10    Payments Generally; Administrative Agent's Clawback ........................... ~~57~~64
Section 2.11    Increase in Commitments ........................................................................... ~~58~~65
Section 2.12    Defaulting Lenders ..................................................................................... ~~61~~66
Section 2.13    Refinancing Facilities. ................................................................................ ~~62~~67
Section 2.14    Amend and Extend Transactions. ............................................................... ~~64~~69
Section 2.15    Conversion or Restructuring Second Lien Term Loans. ............................ 70
Section 2.16    Tax Treatment. ............................................................................................ 72
Section 2.17    Benchmark Replacement. ........................................................................... 72
Section 2.18    Indemnity.. .................................................................................................. 73
Section 2.19    Conversion and Continuation Options. ...................................................... 74
Section 2.20    Limitations on SOFR Tranches.. ................................................................ 74
Section 2.21    Inability to Determine Interest Rate. ......................................................... 74
Section 2.22    Repayment of Loans ................................................................................... 75

ARTICLE III.

TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01    Taxes ................................................................................................. ~~65~~75
Section 3.02    Increased Costs and Reduced Return; Capital Adequacy .................... ~~68~~79
Section 3.03    Mitigation Obligations; Replacement of Lenders ............................... ~~69~~80
Section 3.04    Survival ............................................................................................. ~~70~~81

ARTICLE IV.

CONDITIONS PRECEDENT TO BORROWINGS

Section 4.01    Conditions to Initial Borrowings ....................................................... ~~70~~81
Section 4.02    Conditions to Borrowings .................................................................. ~~73~~84

ARTICLE V.

REPRESENTATIONS AND WARRANTIES

Section 5.01    Existence, Qualification and Power .................................................... ~~74~~84
Section 5.02    Authorization; No Contravention ....................................................... ~~74~~85
Section 5.03    Governmental Authorization; Other Consents. ................................... ~~74~~85
Section 5.04    Binding Effect .................................................................................... ~~75~~85
Section 5.05    Financial Condition; No Material Adverse Effect ............................... ~~75~~85
Section 5.06    Litigation ............................................................................................ ~~75~~85
Section 5.07    Ownership of Property, Liens ............................................................. ~~75~~85
Section 5.08    Environmental Matters ....................................................................... ~~76~~86
Section 5.09    Insurance ............................................................................................ ~~76~~87
Section 5.10    Taxes .................................................................................................. ~~76~~87
Section 5.11    ERISA; Foreign Pension Plans; Employee Benefit Arrangements ...... ~~77~~87
Section 5.12    Subsidiaries; Equity Interests ............................................................ ~~78~~88
Section 5.13    Margin Regulations; Investment Company Act .................................. ~~78~~88
Section 5.14    Compliance with Law ........................................................................ ~~78~~89
Section 5.15    Intellectual Property .......................................................................... ~~79~~89
Section 5.16    Use of Proceeds ................................................................................. ~~80~~90
Section 5.17    Solvency ............................................................................................ ~~80~~90
Section 5.18    Collateral Documents ........................................................................ ~~80~~90
Section 5.19    Senior Indebtedness .......................................................................... ~~81~~92
Section 5.20    Sanctions ........................................................................................... ~~81~~92
Section 5.21    Anti-Corruption Laws ........................................................................ ~~82~~92
Section 5.22    Labor Relations .................................................................................. ~~82~~93
Section 5.23    Accuracy of Information ..................................................................... ~~82~~93

ARTICLE VI.

AFFIRMATIVE COVENANTS

Section 6.01    Financial Statements and Other Information ...................................... ~~82~~93

Section 6.02    Notices of Material Events .......................................................... ~~84~~95
Section 6.03    Existence; Conduct of Business ................................................. ~~84~~95
Section 6.04    Payment of Tax Obligations ...................................................... ~~84~~95
Section 6.05    Maintenance of Properties; Insurance ...................................... ~~84~~96
Section 6.06    Meeting Materials; Quarterly Calls .......................................... ~~85~~96
Section 6.07    Compliance with Laws ............................................................... ~~85~~96
Section 6.08    Use of Proceeds .......................................................................... ~~86~~97
Section 6.09    Subsidiary Guarantors; Pledges; Additional Collateral; Further Assurances .... ~~86~~97
Section 6.10    Compliance with Environmental Laws ...................................... ~~87~~98
Section 6.11    Post-Closing Obligations ........................................................... ~~87~~98
Section 6.12    Mortgaged Properties ................................................................. ~~87~~98

ARTICLE VII.

NEGATIVE COVENANTS

Section 7.01    Indebtedness ................................................................................ ~~87~~98
Section 7.02    Liens ............................................................................................. ~~91~~101
Section 7.03    Fundamental Changes and Asset Sales ..................................... ~~93~~103
Section 7.04    Investments, Loans, Advances, Guarantees and Acquisitions .... ~~95~~106
Section 7.05    Transactions with Affiliates ..................................................... ~~98~~108
Section 7.06    Restricted Payments ................................................................... ~~99~~109
Section 7.07    Amendments to Subordinated Indebtedness Documents or Organization Documents; Junior Debt Payments .... ~~101~~110
Section 7.08    Sale/Leaseback Transactions ..................................................... ~~101~~110
Section 7.09    Sanctions; Anti-Corruption Laws ............................................. ~~102~~110
Section 7.10    Financial Covenants ................................................................... ~~102~~111
Section 7.11    Holdings Covenant... .................................................................. 112

ARTICLE VIII.

EVENTS OF DEFAULT

Section 8.01    Events of Default ........................................................................ ~~103~~112
Section 8.02    Acceleration; Remedies ............................................................. ~~105~~114
Section 8.03    Allocation of Payments After Event of Default ..................... ~~106~~115
Section 8.04    Cure Right. .................................................................................. ~~107~~117

ARTICLE IX.

AGENCY PROVISIONS

Section 9.01    Appointment and Authority ....................................................... ~~109~~118
Section 9.02    Rights as a Lender ...................................................................... ~~109~~118
Section 9.03    Exculpatory Provisions .............................................................. ~~109~~118
Section 9.04    Reliance by Agents ..................................................................... ~~110~~119
Section 9.05    Delegation of Duties .................................................................. ~~110~~120
Section 9.06    Indemnification of Agents ......................................................... ~~110~~120
Section 9.07    Resignation of Agents ................................................................ ~~111~~120
Section 9.08    Non-Reliance on Agents and Other Lenders ........................... ~~111~~121

Section 9.09    No Other Duties, etc. ........................................................ ~~112~~121
Section 9.10    Administrative Agent May File Proofs of Claim .................. ~~112~~121
Section 9.11    Collateral and Guaranty Matters ........................................ ~~112~~122
Section 9.12    Certain ERISA Matters ....................................................... ~~113~~123
Section 9.13    Collateral Agent as Security Trustee of English Security Documents. ........... ~~114~~124

ARTICLE X.

MISCELLANEOUS

Section 10.01    Amendments, etc. ............................................................ ~~118~~127
Section 10.02    Notices .......................................................................... ~~120~~129
Section 10.03    No Waiver; Cumulative Remedies .................................... ~~123~~132
Section 10.04    Expenses; Indemnity; Damage Waiver. ............................ ~~123~~133
Section 10.05    Payments Set Aside ....................................................... ~~125~~135
Section 10.06    Successors and Assigns ................................................. ~~126~~135
Section 10.07    Treatment of Certain Information; Confidentiality ............ ~~129~~139
Section 10.08    Right of Setoff .............................................................. ~~130~~140
Section 10.09    Interest Rate Limitation ................................................. ~~130~~140
Section 10.10    Counterparts; Integration; Effectiveness ......................... ~~130~~140
Section 10.11    Survival of Agreement ................................................... ~~131~~140
Section 10.12    Severability ................................................................... ~~131~~141
Section 10.13    Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial ............ ~~131~~141
Section 10.14    No Advisory or Fiduciary Responsibility ......................... ~~132~~142

**Schedules:**

Schedule 1.01(a)      -      Permitted Receivables Parties
Schedule 1.01(b)      -      Intercompany Services Agreements
~~Schedule 1.01(c)~~      ~~-~~      ~~Permitted Restructuring Transactions~~
Schedule 2.01      -      Lenders and Commitments
Schedule 5.12      -      Subsidiaries
Schedule 5.15      -      Intellectual Property
Schedule 6.11      -      Post-Closing Obligations
Schedule 7.01      -      Existing Indebtedness
Schedule 7.01(e)      -      Restructuring Existing Indebtedness
Schedule 7.01(s)      -      Restructuring Existing Indebtedness – Factorable Receivables
Schedule 7.02      -      Existing Liens
Schedule 7.02(g)      -      Restructuring Existing Liens
Schedule 7.03(a)      -      Restructuring Fundamental Changes and Asset Sales
Schedule 7.04      -      Investments
Schedule 7.05      -      Affiliate Transactions
Schedule 7.05(m)      -      Restructuring Affiliate Transactions
Schedule 7.08      -      Restructuring Sale/Leaseback Transactions
Schedule 10.02      -      Administrative Agent's Office
Schedule 10.06      -      Eligible Assignees

**Exhibits:**

Exhibit A      -      Form of Notice of Borrowing
Exhibit B      -      Form of Term Note
Exhibit C      -      Form of Assignment and Assumption
Exhibit D      -      Form of Compliance Certificate
Exhibit E      -      Form of Guaranty Agreement
Exhibits F-1 – F-4      -      Forms of U.S. Tax Compliance Certificates
Exhibit G      -      Form of Security Agreement
Exhibit H      -      Form of Perfection Certificate
Exhibit I      -      Form of Solvency Certificate
Exhibit J      -      Form of Prepayment Notice
Exhibit K      -      Form of Intercompany Subordination Agreement
Exhibit L      -      Form of Agreement Among Lenders/Intercreditor Agreement
Exhibit M      -      Form of First Lien Cash/PIK Election Notice
Exhibit N      -      Form of Second Lien Cash/PIK Election Notice

*Agreed Form*

<u>TERM LOAN CREDIT AGREEMENT</u>

This Term Loan Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), is entered into as of June 13, 2019, by and among Afiniti, Inc., a Delaware corporation (the "<u>Restructuring First Lien Borrower" and "Restructuring Second Lien US </u>Borrower"), Afiniti Ltd. <u>(in provisional liquidation)</u>, a Bermuda exempted company, as Parent (as defined below) <u>(as succeeded by Afiniti Newco Holdings LLC, a Delaware limited liability company ("NewCo" or the "Restructuring Second Lien Borrower" and together with the Restructuring Second Lien US Borrower, the "Restructuring Second Lien Co-Borrowers"))</u>, the Lenders (as hereinafter defined) from time to time party hereto and VCP Capital Markets, LLC, as the Administrative Agent and the Collateral Agent.

PRELIMINARY STATEMENTS:

WHEREAS, the Lenders have agreed to extend certain credit facilities to the Borrower <u>(as defined below)</u>, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I.

## DEFINITIONS AND ACCOUNTING TERMS

<u>**Section 1.01**</u>    <u>Defined Terms</u>.  As used in this Agreement, the following terms have the meanings set forth below:

~~"Acquisition Consideration" means the sum of the cash purchase price for any Permitted Acquisition payable at or prior to the closing date of such Permitted Acquisition and any purchase price adjustment, royalty, earnout, contingent payment, any other deferred payment of a similar nature or any other agreements to make any payment the amount of which is, or the terms of payment of which are, in any respect subject to or contingent upon the revenues, income, cash flow or profits (or the like) of any Person or business or any purchase price paid with Equity Interests or Equity Equivalents (other than Disqualified Capital Stock) in the Parent *plus* the aggregate principal amount of Indebtedness that is of the type described in clauses (a), (b), (e), and clause (i) (to the extent relating to any such clause (a), (b) or (e), but without duplication) and clause (k) of the definition of "Indebtedness" hereunder assumed by the Parent or a Subsidiary of the Parent in connection with such Permitted Acquisition.~~

<u>"ABR" means, for any day, a fluctuating rate per annum equal to the highest of: (a) the Federal Funds Rate plus 1/2 of 1.00%; (b) the Prime Rate; and (c) Term SOFR for a one-month tenor in effect on such day plus 1.00%. Any change in the ABR due to a change in the Federal Funds Rate, the Prime Rate or Term SOFR will be effective on the effective date of such change in the Federal Funds Rate, the Prime Rate or Term SOFR, as the case may be; provided that, in no event shall the ABR be less than 3.00%.</u>

<u>"ABR Loans" means Loans, the rate of interest applicable to which is based upon the ABR.</u>

<u>"ABR Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".</u>

"Additional Credit Extension Amendment" means an amendment to this Agreement (which may, at the option of the Administrative Agent and the Borrower, be in the form of an amendment and restatement of this Agreement) providing for any (i) Tranche A Facilities pursuant to Section 2.01(c), (ii) Incremental ~~Facilities~~Facility pursuant to Section 2.11~~,~~ and/or (iii) Extended Loans pursuant to Section 2.14, which shall be, in each case, consistent with the applicable provisions of this Agreement and otherwise reasonably satisfactory to the Administrative Agent.  Each Additional Credit Extension Amendment shall be executed by the Administrative Agent, the Loan Parties and the other parties specified in Section 2.01(c), ~~2.11~~ or 2.14, as applicable, of this Agreement (but not any other Lender not specified in Section 2.01(c), ~~2.11~~ or 2.14, as applicable, of this Agreement), but shall not effect any amendments that would require the consent of each affected Lender or all Lenders pursuant to Section 10.01(b).  Any Additional Credit Extension Amendment may include conditions for delivery of (i) solely with respect to Incremental ~~Facilities~~Facility incurred pursuant to Section 2.11 or Extended Loans incurred pursuant to Section 2.14, opinions of counsel and other documentation consistent with the applicable conditions in Section 4.01 and (ii) certificates confirming satisfaction of conditions consistent with the applicable portions of Section 4.02.

"Additional Term Commitment" has the meaning set forth in the Amendment No. 2.  The aggregate amount of the Additional Term Commitment as of the Amendment No. 2 Effective Date shall not exceed the Additional Term Committed Amount.

"Additional Term Commitment Percentage" means, for each Lender, the percentage of the aggregate Additional Term Commitments represented by such Lender's Additional Term Commitment at such time and identified as its Additional Term Commitment Percentage on Schedule 2.01, as such percentage may be modified in connection with any Assignment and Assumption made in accordance with the provisions of Section 10.06(b).

"Additional Term Committed Amount" means $25,000,000.

"Additional Term Lender" has the meaning set forth in the Amendment No. 2.

"Additional Term Loan" means the additional Term Loans made by the Additional Term Lenders to the Borrower on the Additional Term Loan Funding Date pursuant to Section 2.01(a).

"Additional Term Loan Funding Date" means May 7, 2020.

~~"Additional Term Loan Funding Date Warrant" means each Warrant to Purchase Shares, dated as of the Additional Term Loan Funding Date, issued by the Parent to each Additional Term Lender or Affiliate of an Additional Term Lender, as applicable, that is a party thereto, in form and substance reasonably satisfactory to the Additional Term Lenders (the execution of such Additional Term Loan Funding Date Warrant by the applicable Additional Term Lender or Affiliate thereof being evidence of such satisfaction), representing in the aggregate for all Additional Term Loan Funding Date Warrants the right to purchase 67,788 common shares of the Parent.~~

"Adjusted LTM Recurring Revenue" means, with respect to any Test Period, (a) Consolidated Recurring Revenue during such period, minus, (b) to the extent included in Consolidated Recurring Revenue in clause (a) above, any Consolidated Revenue during such period attributable to Lost Clients, plus (c) the difference of (x) Annualized Revenue with respect to any New Client Contracts minus (y) to the extent included in Consolidated Recurring Revenue in clause (a) above, any Consolidated Recurring Revenue attributable to such New Client Contracts during such period (solely if and to the extent such Consolidated Revenue is a positive number).

"Adjusted LTM Recurring Revenue Ratio" means, as of any date of determination, the ratio of (a) Indebtedness outstanding under the Loan Documents, as of such date to (b) Adjusted LTM Recurring Revenue as of the end of the most recently completed Fiscal Quarter.

"Administrative Agent" means VCP Capital Markets, LLC, in its capacity as administrative agent for the Finance Parties under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address as set forth in Section 10.02(a) and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"AETL" means AETL, a private limited company (*société à responsabilité limitée*) incorporated and organized under the laws of the Grand Duchy of Luxembourg, having its registered office at 9-11<ins>3</ins>, rue de Louvigny<ins>la Moselle</ins>, L-1946 Luxembourg<ins>6757 Grevenmacher</ins>, Grand-Duchy of Luxembourg, and registered with the Luxembourg Register of Trade and Companies under number B201.698<ins>B201698</ins>.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Afiniti Service" means the Parent's<ins>NewCo's</ins> and its Subsidiaries' proprietary enterprise behavioral pairing (EBP) service that uses real-time in-queue contact center agent data to pair contact center callers<ins>customers</ins> and agents by analyzing customer and agent behavior using big data analytics and artificial intelligence-based algorithms<ins>intelligence</ins> to determine the optimal behavioral fits between callers and agent<ins>agents</ins> in order to drive business outcomes such as improved sales conversion rates and customer satisfaction metrics<ins>, and related infrastructure and professional services</ins>.

<ins>"Agent Related Persons" means each Agent, together with its Related Parties.</ins>

"Agents" means, collectively, the Administrative Agent, the Collateral Agent and any successors and assigns in such capacity.

<del>"Agent Related Persons" means each Agent, together with its Related Parties.</del>

"Aggregate Commitments" means, at any date, the Commitments of all the Lenders.

"Agreement" has the meaning specified in the preamble.

<ins>"Agreement Among Lenders/Intercreditor Agreement" means that certain Agreement Among Lenders/Intercreditor Agreement, dated as of the Amendment No. 13 Effective Date, by and among the Restructuring First Lien Term Loan Lenders, the Restructuring Second Lien Term Loan Lenders and the Borrower, in each case, as of the Amendment No. 13 Effective Date and each other entity that becomes party thereto, as amended from time to time in accordance with the terms therein.</ins>

"AHYDO Payment" means any mandatory prepayment or redemption pursuant to the terms of any Indebtedness that is intended or designed to cause such Indebtedness not to be treated as an

~~"applicable high yield discount obligation" within the meaning of Section 163(i) of the Code.~~

~~"All-in Yield" as to any Term Loans, Incremental Term Loans or Tranche A Term Loans, the yield payable to all Lenders providing such Term Loans, Incremental Term Loans or Tranche A Term Loans, as applicable, whether in the form of interest rate, margin, original issue discount, up-front fees, rate floors or otherwise; provided, that original issue discount and up front fees shall be equated to interest rate assuming a 4-year life to maturity (or, if less, the life of such Term Loans, Incremental Term Loans or Tranche A Term Loans) and the All-in Yield shall not include arrangement or commitment fees payable to the Administrative Agent and not generally to Lenders providing such Term Loans, Incremental Term Loans or Tranche A Term Loans.~~

"Amendment No. 2" means that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4, 2020, by and among the Borrower, the Parent, the Administrative Agent and each Lender party thereto.

"Amendment No. 2 Effective Date" has the meaning specified in Amendment No. 2.

"Amendment No. 3" means that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of November 17, 2020, by and among the Borrower, the Parent, the Administrative Agent and each Lender party thereto.

"Amendment No. 3 Effective Date" has the meaning specified in Amendment No. 3.

"Amendment No. 5" means that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of March 9, 2021, by and among the Borrower, the Parent, the Administrative Agent and each Lender party thereto.

~~"Amendment No. 3 Effective Date" has the meaning specified in Amendment No. 3.~~

"Amendment No. 5 Effective Date" has the meaning specified in Amendment No. 5.

"Amendment No. 8" means that certain Amendment No. 8 to Term Loan Credit Agreement, dated as of the Amendment No. 8 Effective Date, among the Borrower, the Parent, the Agent, the Amendment No. 8 Incremental Term Lenders and the other Lenders party thereto.

"Amendment No. 8 Effective Date" has the meaning set forth in Amendment No. 8.

"Amendment No. 8 Incremental Term Lenders" means the "Incremental Term Lenders" that are party to Amendment No. 8, and their successors and assigns.

~~"Amendment No. 8 Incremental Term Loan Commitment Percentage" means, for each Lender, the percentage of the aggregate Amendment No. 8 Incremental Term Loan Commitments represented by such Lender's Amendment No. 8 Incremental Term Loan Commitment at such time and identified as its Amendment No. 8 Incremental Term Loan Commitment Percentage in Amendment No. 8, as such percentage may be modified in connection with any Assignment and Assumption made in accordance with the provisions of Section 10.06(b).~~

~~"Amendment No. 8 Incremental Term Loan Commitments" means the several commitments of the Amendment No. 8 Incremental Term Lenders to fund such Lenders' pro rata share of the Amendment No. 8 Incremental Term Loans in accordance with, and subject to, the terms and conditions of this Agreement and Amendment No. 8.~~

"Amendment No. 8 Incremental Term Loans" means the "Incremental Term Loans" funded on the Amendment No. 8 Effective Date pursuant to Amendment No. 8.

~~"Amendment No. 8 Incremental Term Loan Warrant" means each Warrant to Purchase Shares, dated as of the Amendment No. 8 Effective Date, issued by the Parent pursuant to Amendment No. 8 representing in the aggregate the right to purchase 20,543 common shares of the Parent.~~

"Amendment No. 9" means that certain Amendment No. 9 to Term Loan Credit Agreement, dated as of the Amendment No. 9 Effective Date, among the Borrower, the Parent, the Agent, and the Term ~~Loan~~ Lenders party hereto.

"Amendment No. 9 Effective Date" has the meaning set forth in Amendment No. 9.

"Amendment No. 10" means that certain Amendment No. 10 to Term Loan Credit Agreement, dated as of the Amendment No. 10 Effective Date, among the Borrower, the Parent, the Agent, and the Term Lenders party hereto.

"Amendment No. 10 Effective Date" has the meaning set forth in Amendment No. 10.

"Amendment No. 11" means that certain Amendment No. 11 to Term Loan Credit Agreement, dated as of the Amendment No. 11 Effective Date, among the Borrower, as the Parent, the Agent, and the Term Lenders party hereto.

"Amendment No. 11 Effective Date" has the meaning set forth in Amendment No. 11.

"Amendment No. 12" means that certain Amendment No. 12 to Term Loan Credit Agreement, dated as of the Amendment No. 12 Effective Date, among the Borrower, the Parent, the Agent, and the Term Lenders party hereto.

"Amendment No. 12 Effective Date" has the meaning set forth in Amendment No. 12.

"Amendment No. 13" means that certain Amendment No. 13 to Term Loan Credit Agreement, dated as of the Amendment No. 13 Effective Date, among the Borrower, the Parent, NewCo, the Agent, and the Term Lenders party hereto.

"Amendment No. 13 Effective Date" has the meaning set forth in Amendment No. 13.

"Annualized Revenue" means, with respect to any New Client Contract and any period, the amount which is equal to (CR / #) * 365, where:

"CR" means Consolidated Revenue of ~~the Parent~~NewCo and its Consolidated Subsidiaries as shown on the financial statements delivered with respect to such period pursuant to Section 6.01 attributable to such New Client Contract (it being understood and agreed that CR shall be deemed to be 0 to the extent such Consolidated Revenue during such period is a negative number); and

"#" means the number of days elapsed between the first date that services were provided pursuant to such New Client Contract and the last day of such period.

"Anti-Corruption Laws" has the meaning specified in Section 5.21.

"Applicable Percentage" means, with respect to any Lender at any time for each Class of

Loans, the percentage of the Aggregate Commitments represented by such Lender's Term Commitment Percentage, ~~Tranche A Term Loan Commitment Percentage~~ or Incremental Term Loan Commitment Percentage, as applicable, at such time, in each case subject to adjustment as provided in Section 2.01(c) ~~or Section 2.11~~; provided that if the Commitments of each Lender to make Loans have been terminated pursuant to Section 8.02 or if the Aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender of each Class is set forth opposite the name of such Lender on Schedule 2.01 under the caption "Term Commitment Percentage" or ~~"Initial Tranche A Term Loan Commitment Percentage" or~~ in the Assignment and Assumption, ~~Additional Credit Extension Amendment~~ or Refinancing Amendment pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Prepayment" has the meaning specified in Section 2.06(f).

"Appointee" has the meaning specified in Section 9.13(a).

"Approved Fund" means any Fund that is administered, advised or managed by (i) a Lender, (ii) an Affiliate of a Lender or (iii) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"ASC" means Accounting Standards Codification.

"Asset Disposition" means any Disposition (or series of related Dispositions) of any assets by ~~the Parent~~NewCo or any of its Subsidiaries, excluding any Disposition by way of Casualty or Condemnation.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b) and/or the definition of "Eligible Assignee"), and accepted by the Administrative Agent, substantially in the form of Exhibit C or any other form approved by the Administrative Agent and the Borrower.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.17(e).

"Backstop Commitment" means the commitment by certain holders of equity interests in the Parent to purchase (i) $15,000,000 of Restructuring Second Lien Term Loans, and (ii) a number of Class A-1 Units equal to the number of Class A-2 Units issuable upon conversion of the Restructuring Second Lien Term Loans purchased pursuant to the terms of that certain Backstop Commitment Agreement dated as of September [  ], 2024, among the Restructuring Second Lien Co-Borrowers and such holders, up to $5,000,000 of which Restructuring Second Lien Term Loans may be resold to Rights Offering Subscribers or assigned pursuant to the Rights Offering (with an issuance of a corresponding amount of Equivalent Notes) along with a corresponding number of Class A-1 Units in accordance with the Backstop Commitment Agreement.

~~"Available Amount" means, at any date, an amount equal to:~~

(a) the sum of (without duplication and subject to the Equity Contribution Principles):

(i) the Net Cash Proceeds received on or after December 31, 2018 (to the extent such Net Cash Proceeds have not been applied for any Restricted Payment prior to the Closing Date) and on or prior to such date from any issuance of Class E Preference Shares by the Parent (other than to a Subsidiary of the Parent), in each case, designated by the Borrower pursuant to Section 1.08 to be used to increase the Available Amount;

(ii) the Net Cash Proceeds received after the Closing Date and on or prior to such date from any issuance of Qualified Capital Stock by the Parent (other than to a Subsidiary of the Parent), in each case, designated by the Borrower pursuant to Section 1.08 to be used to increase the Available Amount;

(iii) the Net Cash Proceeds received after the Closing Date and on or prior to such date by the Parent, the Borrower or any Subsidiary from the issuance (other than to the Parent or any Subsidiary of the Parent) of convertible or exchangeable debt obligations that have been converted into or exchanged for Qualified Capital Stock of the Parent, in each case, designated by the Borrower pursuant to Section 1.08 to be used to increase the Available Amount;

(iv) 25% of the Net Cash Proceeds received after the Closing Date and on or prior to such date by the Parent, the Borrower or any Subsidiary from the exercise of stock options, warrants or similar rights with respect to Qualified Capital Stock of the Parent, in each case, designated by the Borrower pursuant to Section 1.08 to be used to increase the Available Amount;

(v) the Net Cash Proceeds received by the Parent, the Borrower or any Subsidiary from the sale of the Equity Interests of any minority Investments (other than any such sale to the Parent, the Borrower or a Subsidiary);

(vi) any dividend or other distribution received in respect of minority Investments;

(vii) any interest, returns of principal, repayments and similar payments received in respect of any minority Investments;

(viii) any unused Rejected Amount accrued since after the Closing Date; and

(ix) to the extent not duplicative of any other provision herein, the proceeds of sales of Investments made utilizing the Available Amount basket under 7.04(p) (in an amount not to exceed the original amount of such Investment); *minus*

(b) the amount of any usage of such Available Amount pursuant to Section 7.04(p), Section 7.06(h) and Section 7.07(b)(i), in each case prior to such date.

"Available Amount Conditions" means, prior to and after giving effect to any usage of the Available Amount, (a) no Event of Default shall have occurred and be continuing, and (b) (x) in the case of Section 7.06(h), the Adjusted LTM Recurring Revenue Ratio, as of the end of the most recently completed Test Period, shall be less than or equal to 2.00:1.00 on a Pro Forma Basis, (y) in the case of Section 7.07(b)(i), the Adjusted LTM Recurring Revenue Ratio, as of the end of the most recently

~~completed Test Period, shall be less than or equal to 2.00:1.00 on a Pro Forma Basis, and (z) in the case of Section 7.04(p), the Adjusted LTM Recurring Revenue Ratio, as of the end of the most recently completed Test Period, shall be less than or equal to 2.00:1.00 on a Pro Forma Basis."~~

"Bankruptcy Code" means Title 11 of the United States Code, as now and hereafter in effect, or any successor statute.

"Bankruptcy Law" means the Bankruptcy Code and all other liquidation, receivership, moratorium, conservatorship, assignment for the benefit of creditors, insolvency, examinership or similar federal, state or foreign law for the relief of debtors.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.17(a).

"Benchmark Replacement" means with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)  Daily Simple SOFR; or

(b) the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)  in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)  in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)  a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)  a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)  a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.18 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with

Section 2.18.

"Benefit Plan" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Bermuda Collateral Documents" means the Bermuda Deed of Confirmation.

"Bermuda Deed of Confirmation" means the Bermuda law deed of confirmation dated on or about the Amendment No. 13 Effective Date, entered into between the Parent and the Collateral Agent for the benefit of itself and each of the Finance Parties, in respect of the Bermuda Security Document.

"Bermuda Security Document" means that certain Bermuda law debenture, dated on or about the Closing Date, entered into between the Parent and the Collateral Agent.

"Blocked Person" has the meaning specified in Section 7.09.

"Board of Directors" means, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the sole manager or the board of managers or managing member, of such Person, (iii) in the case of any partnership, the board of directors of the general partner of such Person and (iv) in any other case, the functional equivalent of the foregoing.

"Bona Fide Debt Fund" shall mean any bona fide debt fund, investment vehicle, regulated banking entity or non-regulated lending entity that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans or bonds and/or similar extensions of credit in the ordinary course of business.

"Borrower" has the meaning specified in the preamble.means (i) with respect to the Restructuring First Lien Term Loans, the Restructuring First Lien Borrower, (ii) with respect to the Restructuring Second Lien Term Loans, the Restructuring Second Lien Co-Borrowers, and (iii) with respect to any additional Loans or Commitments pursuant to Section 2.13 or 2.14, the borrower specified in the Additional Credit Extension Amendment or Refinancing Amendment, as applicable, related thereto. Any reference to Borrower shall mean the Restructuring First Lien Borrower unless context shall otherwise require.

"Borrower Materials" has the meaning specified in Section 10.02.

"Borrowing" has the meaning specified in Section 1.06.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located; provided that with respect to notices and determinations in connection with, and payments of principal and interest on, SOFR Loans, such day is also a day for trading by and between banks in US dollar deposits.

"Capital Lease" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) property (whether real, personal or mixed) by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a finance lease on the balance sheet of such Person; provided that any lease or other arrangement that, under GAAP as in effect on the Closing Date, would not be required to be accounted for as a capital lease shall not constitute a "Capital

Lease" hereunder.

"Capital Lease Obligations" means, with respect to any Person, the obligations (and corresponding amounts) of such Person as lessee under Capital Leases, that, as of any time of determination, shall be treated as a finance lease and reflected as a liability on a balance sheet of such Person (excluding the footnotes thereto) prepared in accordance with GAAP.

"Cash Equivalents" means:

(a)    direct obligations of, or obligations the principal and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within two hundred and seventy (270) days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, demand deposits, banker's acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500,000,000 in the case of U.S. banks and $250,000,000 (or the Dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(d)    fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clauses (a) and (c) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)    marketable short-term money market and similar liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(f)    Investments with average maturities of twelve (12) months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(g)    investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (f) above;

(h)    in the case of ~~the Parent~~NewCo or any Subsidiary, other short-term investments that are analogous to the foregoing, are of comparable credit quality and are customarily used by companies in the jurisdiction of organization of ~~the Parent~~NewCo or such Subsidiary, as the case may be, for cash management purposes; and

(i)    investments consistent with ~~the Parent's~~NewCo's or the Borrower's investment policy as in effect on the Closing Date, as provided in writing to the Administrative Agent on or prior to the Closing Date.

~~"Cash Margin" has the meaning specified in Section 2.05(a)(i).~~

"Cash/PIK Election Date" means for any Interest Payment Date, the date that is at least three (3) Business Days (or such shorter period reasonably acceptable to the Administrative Agent) prior to such Interest Payment Date.

"Casualty" means any casualty, damage, destruction or other similar loss with respect to real or personal property or improvements.

"Casualty Event" means any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any Condemnation or other taking (including by any Governmental Authority) of, any property of the Borrower or any of its Subsidiaries. "Casualty Event" shall include but not be limited to any taking of all or any part of any real property of any Person or any part thereof, in or by Condemnation or other eminent domain proceedings pursuant to any requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any real property of any Person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"Cayman Islands Security Documents" means the Cayman Islands LLC Security Agreement and the Cayman Islands Debenture.

"Cayman Islands Debenture" means that certain Cayman Islands law debenture, dated on or about the Amendment No. 13 Effective Date, entered into between HoldCo and the Collateral Agent.

"Cayman Islands LLC Security Agreement" means that certain Cayman Islands law security agreement over limited liability company interests, dated on or about the Amendment No. 13 Effective Date, entered into between NewCo and the Collateral Agent.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code any shares of which are treated as owned directly or indirectly by a United States Shareholder (within the meaning of Section 951(b) of the Code) as measured for purposes of Section 958(a) of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any applicable law, rule, regulation or treaty, (b) any change in any applicable law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case, pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued.

~~"Change of Control" means the earliest to occur of:~~

~~(a)       at any time prior to the consummation of a Qualifying Listing, any Person (together with all its Affiliates) other than the Permitted Holders shall own and control, directly or indirectly, beneficially and of record, all of the voting and economic rights associated with more than fifty percent (50%) of all classes of the issued and outstanding Equity Interests of~~

12

~~Parent (determined on a fully diluted basis), unless the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise, to elect or designate for election at least a majority of the board of directors of the Parent,~~

~~(b)        at any time upon or after the consummation of a Qualifying Listing, (1) any Person (other than the Permitted Holders) or (2) Persons (other than the Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), becomes the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 of the Exchange Act), directly or indirectly, of the Equity Interests representing more than fifty percent (50%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Parent and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of the Parent beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders; or~~

~~(c)        the Parent~~ <u>"Change of Control" means NewCo</u> (or any of its successors) shall cease to own 100% of the outstanding stock of the Borrower, directly or indirectly.

"<u>Charged Property</u>" has the meaning specified in <u>Section 9.13(a)</u>.

"<u>Class</u>" has the meaning specified in <u>Section 1.06</u>.

~~"Class D Transactions" means any redemption, repurchase, tender, acquisition, cancellation, termination or other retirement of all or any portion of the outstanding Class D Preference Shares of the Parent in one or more transactions.~~

<u>"Class A-1 Units" has the meaning set forth in the NewCo LLC Agreement.</u>

<u>"Class A-2 Units" has the meaning set forth in the NewCo LLC Agreement.</u>

"<u>Closing Date</u>" means June 13, 2019.

"<u>Closing Date Refinancing</u>" means the repayment and termination in full of that certain Amended and Restated Loan and Security Agreement, dated as of June 29, 2018 (the "<u>Existing Credit Agreement</u>" <u>and such facility, the "Existing Credit Facility"</u>), by and among the Borrower, the lenders party thereto and Ocean II PLO, LLC, a California limited liability company, as administrative agent for lenders.

~~"Closing Date Warrant" means each Warrant to Purchase Shares, dated as of the Closing Date, issued by the Parent to each Lender that is a party thereto.~~

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>" means all of the property, which includes Mortgaged Property and all other property of whatever kind and nature, which is subject or is purported to be subject to the Liens granted by any of the Collateral Documents.

"<u>Collateral Agent</u>" means VCP Capital Markets, LLC, in its capacity as collateral agent for the Finance Parties under the Loan Documents, its successor or successors in such capacity.

"<u>Collateral Documents</u>" means, collectively, the Security Agreement, each English Security Document, each Bermuda Security Document, each Luxembourg Document, <u>each Irish Security Document, each Cayman Islands Security Document,</u> the Mortgages, any additional pledges, security

agreements, patent, trademark and/or copyright filings or mortgages or deeds of trust required to be delivered by a Loan Party pursuant to the Loan Documents and any instruments of assignment or other similar instruments or agreements executed pursuant to the foregoing.

"Commitment" means with respect to each Lender, its Restructuring Term Loan Commitment, or Incremental Term Loan Commitment, Tranche A Term Loan Commitments and any other commitment to extend credit as the context may require and as and to the extent applicable, in each case as set forth on Schedule 2.01 or in the applicable Assignment and Assumption, Additional Credit Extension Amendment or Refinancing Amendment pursuant to which such Lender becomes a party hereto, as applicable, as its Commitment of the applicable Class, as any such amount may be adjusted from time to time in accordance with this Agreement.

"Communications" has the meaning specified in Section 10.02(d).

"Competitor" means any entity that provides Software, services, or other products that are (i) commercially similar to the Afiniti Service or (ii) marketed as being commercially similar to the Afiniti Service.

"Compliance Certificate" means a certificate, duly executed by a Responsible Officer, appropriately completed and substantially in the form of Exhibit D.

"Condemnation" means any taking or expropriation by a Governmental Authority of property or assets, or any part thereof or interest therein, for public or quasi-public use under the power of eminent domain, by reason of any public improvement or condemnation or in any other manner.

"Condemnation Award" means all proceeds of any Condemnation or transfer in lieu thereof.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), the definition of "U.S. Government Securities Business Day," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Consolidated EBITDA" means, with reference to any period, Consolidated Net Income for such period *plus*, without duplication and to the extent deducted (and not otherwise added back) or (in the case of clause (ix) below) not included in determining Consolidated Net Income for such period, the sum of (i) Consolidated Interest Expense, (ii) expense for Taxes paid or accrued (including in respect of repatriated funds and any future taxes or other levies which replace or are intended to be in lieu of such taxes and any penalties and interest related to such taxes or arising from tax examinations), (iii) depreciation, (iv) amortization (including amortization of deferred financing fees or costs), (v) non-cash

expenses or losses, (vi) non-cash expenses related to stock based compensation, (vii) any non-recurring charges, costs, fees and expenses directly incurred or paid directly as a result of discontinued operations (other than such charges, costs, fees and expenses to the extent constituting losses arising from such discontinued operations), (viii) any loss resulting from a change in accounting principles during such period to the extent included in Consolidated Net Income, (ix) any Transaction Costs incurred during such period, (x) proceeds of business interruption insurance, (xi) non-recurring acquisition or restructuring related charges, expenses and reserves ~~(which, for the avoidance of doubt, shall include~~, retention, severance, contract termination costs, integration costs and costs to consolidate facilities and relocate employees and other shutdown costs ~~and, solely in connection with the calculation of the financial covenant set forth in Section 7.10(b) for the Test Period ending June 30, 2024, legal expenses of the Administrative Agent and the Collateral Agent and their respective Affiliates);~~ provided that, the aggregate total amount of all such charges, expenses ~~and reserves (excluding, solely in connection with the calculation of the financial covenant set forth in Section 7.10(b) for the Test Period ending June 30, 2024, legal expenses of the Administrative Agent and the Collateral Agent and their respective Affiliates),~~ reserves, retention and severance incurred after the Amendment No. 13 Effective Date that may be added back under this clause (xi) shall not exceed ~~20~~25% of Consolidated EBITDA for the relevant Test Period prior to giving effect to such addbacks~~, and (~~ (in each case, other than Transaction Costs), (xii) non-recurring charges, costs, fees and expenses in connection with any public or private issuance of Equity Interests by ~~the Parent~~NewCo, and (xiii) the amount of board of director fees and expenses and any management, monitoring, consulting, transaction, advisory and other fees (including transaction and termination fees) and indemnities and expenses paid or accrued in such period *minus*, without duplication and to the extent included (and not otherwise deducted) in determining Consolidated Net Income for such period, the sum of (~~4~~1) interest income (to the extent not netted against interest expense in the calculation of Consolidated Interest Expense), (2) income tax credits and refunds (to the extent not netted from Tax expense), (3) any cash payments made during such period in respect of items described in clause (v) above subsequent to the applicable Test Period in which the relevant non-cash expenses or losses were incurred, (4) any non-recurring income or gains directly as a result of discontinued operations, (5) any gain relating to amounts paid in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income for such period and (6) any gain resulting from a change in accounting principles during such period to the extent included in Consolidated Net Income, each as determined for ~~the Parent~~NewCo and its Subsidiaries in accordance with GAAP on a consolidated basis.  For the purposes of calculating Consolidated EBITDA for any Test Period as of any date ~~(I)~~ if at any time during such Test Period or after the end of such Test Period but prior to such date, ~~the Parent~~NewCo or any Subsidiary shall have made any Disposition, the Consolidated EBITDA for such Test Period shall be reduced by an amount equal to the Consolidated EBITDA (if positive) attributable to the property that is the subject of such Disposition or to such conversion for such Test Period or increased by an amount equal to the Consolidated EBITDA (if negative) attributable thereto for such Test Period ~~and (II) if during such Test Period or after the end of such Test Period but prior to such date, the Parent or any Subsidiary shall have consummated a Permitted Acquisition, Consolidated EBITDA for such Test Period shall be calculated as if such Permitted Acquisition were consummated on the first day of such Test Period~~.~~.~~

"Consolidated Funded Debt" means, as of any date of determination, the aggregate amount (without duplication) of all Funded Debt of the Borrower and its Subsidiaries as of such date, determined on a consolidated basis in accordance with GAAP.

"Consolidated Interest Expense" means, with reference to any period, the interest expense (including without limitation interest expense under Capital Lease Obligations that is treated as interest in accordance with GAAP) of ~~the Parent~~NewCo and its Subsidiaries calculated on a consolidated basis for such period with respect to all outstanding Indebtedness of ~~the Parent~~NewCo and its Subsidiaries allocable to such period in accordance with GAAP (including, without limitation, all

commissions, discounts and other fees and charges owed with respect to letters of credit and banker's acceptance financing and net costs and benefits under interest rate Swap Agreements to the extent such net costs and benefits are allocable to such period in accordance with GAAP.  In the event that ~~the Parent~~NewCo or any Subsidiary shall have completed a Disposition ~~or a Permitted Acquisition~~ since the beginning of the relevant period, Consolidated Interest Expense shall be determined for such period on a *pro forma* basis as if such Disposition ~~or Permitted Acquisition~~, and any related incurrence or repayment of Indebtedness, had occurred at the beginning of such period.

"Consolidated Net Income" means, with reference to any period, the net income (or loss) of ~~the Parent~~NewCo and its Subsidiaries calculated in accordance with GAAP on a consolidated basis (without duplication) for such period; *provided* that there shall be excluded any income (or loss) of any Person other than ~~the Parent~~NewCo or a Subsidiary, but any such income so excluded may be included in such period to the extent of any cash dividends or distributions actually paid in the relevant period to ~~the Parent or any Wholly-Owned~~NewCo or any Wholly Owned Subsidiary of ~~the Parent~~NewCo.

"Consolidated Non-Recurring Revenue" means, for any period of determination, revenue that is contractually one time in nature.  For the avoidance of doubt, Consolidated Non-Recurring Revenue shall not include revenues tied to payments for performance or variable fee revenues.

"Consolidated Recurring Revenue" means, for any period of determination, Consolidated Revenue based on customer and/or partner contracts, less any Consolidated Non-Recurring Revenue.

"Consolidated Revenue" means, for any period of determination, the total consolidated revenues of ~~Parent~~NewCo and its Consolidated Subsidiaries as shown on the financial statements most recently delivered pursuant to Section 6.01.

"Consolidated Subsidiary" means with respect to any Person at any date any Subsidiary of such Person or other entity the accounts of which would be consolidated with those of such Person in its consolidated financial statements if such statements were prepared as of such date in accordance with GAAP.

"Consolidated Total Assets" means, as of the date of any determination thereof, total assets of ~~the Parent~~NewCo and its Subsidiaries calculated in accordance with GAAP on a consolidated basis as of the end of the most recently completed Test Period.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Conversion Consideration" has the meaning specified in Section 2.15.

"Conversion Price" has the meaning specified in Section 2.15(e).

"Copyright Security Agreement" means the Copyright Security Agreement, dated as of the Closing Date, substantially in the form of Exhibit IV to the Security Agreement.

"Copyrights" means any and all rights in any works of authorship, including (i) copyrights and moral rights, (ii) copyright registrations and recordings and renewals thereof and all

applications in connection therewith, (iii) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (iv) the right to sue for past, present, and future infringements thereof and (v) all of the Borrower's and each other Loan Party's rights corresponding thereto throughout the world.

"Credit Agreement Refinancing Indebtedness" means any Permitted Pari Passu Refinancing Debt, Permitted Junior Refinancing Debt, or Permitted Unsecured Refinancing Debt, whether incurred pursuant to a Refinancing Amendment or otherwise, in each case, issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Term Loans) in exchange for, or to extend, renew, replace or refinance, in whole or part, existing Term Loans ("Refinanced Debt"); *provided* that (a) such exchanging, extending, renewing, replacing or refinancing Indebtedness (the "Refinancing Debt") is in an original aggregate principal amount not greater than the aggregate principal amount of the Refinanced Debt (plus any premium, original issue discount, accrued interest and fees and expenses incurred in connection with such exchange, extension, renewal, replacement or refinancing), (b) such Refinancing Debt does not mature earlier than or have a Weighted Average Life to Maturity shorter than, the Refinanced Debt, (c) such Refinancing Debt shall not be incurred or guaranteed by any entity that is not a Loan Party, (d) in the case of any secured Refinancing Debt, such Refinancing Debt is not secured by any assets not securing the Senior Credit Obligations (other than cash collateral required to be provided due to a Defaulting Lender), (e) if such Refinancing Debt does not constitute Loans under this Agreement, such Refinancing Debt is subject to an intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and the Borrower, (f) such Refinancing Debt shall not contain any mandatory redemption or prepayment provisions (other than amortization provisions and the mandatory prepayment provisions as set forth in Section 2.06(b) (solely with respect to any Permitted Pari Passu Refinancing Debt) or other customary asset sale, casualty event and change of control offers or events of default) that could result in prepayments of such Indebtedness prior to the Maturity Date of the applicable Refinanced Debt and (~~f~~g) the terms and conditions of such Refinancing Debt (except as otherwise set forth in clause (b) or pricing, interest rate margins, rate floors, discounts, fees, premiums and prepayment or redemption provisions) are substantially identical to, or not materially more favorable (when taken as a whole) to the lenders or holders providing such Refinancing Debt than the terms of the Refinanced Debt except for covenants or other provisions applicable only to periods after the Maturity Date with respect to the Term Loans (provided that a certificate of a Responsible Officer delivered to the Administrative Agent at least ten (10) Business Days prior to the incurrence of such Refinancing Debt, together with a reasonably detailed description of the material terms and conditions of such Refinancing Debt or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this clause (f) shall be conclusive evidence that such terms and conditions satisfy such requirement unless the Administrative Agent notifies the Borrower within such ten (10) Business Day period that it disagrees in its reasonable discretion with such determination (including a reasonably detailed description of the basis upon which it disagrees)); provided that such Refinancing Debt may contain additional or more restrictive financial covenants than the Refinanced Debt so long as such covenants are added for the benefit of the Lenders hereunder; and (~~g~~h) such Refinanced Debt shall be repaid, defeased or satisfied and discharged, and all accrued interest, fees and premiums (if any) in connection therewith shall be repaid with the Net Cash Proceeds of such Refinancing Debt, substantially concurrently with the issuance or incurrence of such Refinancing Debt.

"Credit Exposure" means, as applied to each Lender and with respect to each Class of its Commitments and/or Loans:

(a)    at any time prior to the termination of the Commitments of the Lenders in respect of such Class, the sum, as applicable, of (A) the Term Commitment Percentage of such

Lender multiplied by the Term Committed Amount of such Class *plus* (B) the ~~Incremental Term Loan Commitment Percentage of the relevant Class of such Lender multiplied by the total Incremental Term Loan Commitments of such Class *plus* (C) the~~ Tranche A Term Loan Commitment Percentage of the relevant class of such Lender multiplied by the total Tranche A Term Loan Commitments of such Class~~; and~~ *plus* (C) the Restructuring First Lien Term Loan Commitment Percentage of such Lender multiplied by the Restructuring First Lien Term Loan Commitments of such class *plus* (D) the Restructuring Second Lien Term Loan Commitment Percentage of such Lender multiplied by the Restructuring Second Lien Term Loan Commitments of such class *plus* (E) the Incremental Term Loan Commitment Percentage of the relevant Class of such Lender multiplied by the total Incremental Term Loan Commitments of such Class; and

(b)        at any time after the termination of the Commitments of the Lenders in respect of such Class, the sum of the outstanding Loans of such Lender of such Class.

"Cure Amount" has the meaning set forth in Section 8.04(a).

"Cure Expiration Date" has the meaning set forth in Section 8.04(a)(i).

"Daily Simple SOFR" means for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"December Quarter Meeting" has the meaning set forth in Section 6.06(a).

"Default" means any condition or event that constitutes an Event of Default or that, with the giving of notice, the passage of applicable grace periods, or both, would be an Event of Default.

"Default Rate" means (i) in the case of overdue principal amounts, an interest rate *per annum* that is equal to the rate that would otherwise be applicable thereto *plus* 2.00% and (ii) in the case of any overdue interest payable on any Loan or any overdue fee or other amount payable hereunder, an interest rate *per annum* equal to the rate then applicable to overdue principal amounts *plus* 2.00%, in each case, with respect to foregoing clauses (i) and (ii), from the date such amount was due until such overdue amount is paid in full (after as well as before judgment).

"Defaulting Lender" means, subject to Section 2.12(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations hereunder, (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, after the date of this Agreement, (i) become the subject of a proceeding under any Bankruptcy Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, examiner, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets,

including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.12(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"Delegate" has the meaning specified in Section 9.13(a).

"Designated Jurisdiction" means any country, region or territory to the extent that such country, region or territory itself is the target of any Sanction.

"Discharge of Senior Credit Obligations" means (i) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not a claim for such interest is, or would be, allowed in such Insolvency or Liquidation Proceeding) and premium (including Prepayment Premium) on all Indebtedness outstanding under the Loan Documents and termination of all commitments to lend or otherwise extend credit under the Loan Documents and (ii) payment in full in cash of all other Senior Credit Obligations under the Loan Documents that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (including legal fees and other expenses, costs or charges accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not a claim for such fees, expenses, costs or charges is, or would be, allowed in such Insolvency or Liquidation Proceeding), other than any contingent indemnification obligations under the Loan Documents in respect of which no claim or demand for payment has been made at such time.

"Discretionary Amount" means, as of any date of determination, subject to the Equity Contribution Principles, an amount not to exceed (i) $40,000,000, plus (ii) without duplication, (a) the Net Cash Proceeds received on or after December 31, 2018 (to the extent such Net Cash Proceeds have not been applied for any Restricted Payment prior to the Closing Date) and on or prior to such date from any issuance of Class E Preference Shares by the Parent (other than to a Subsidiary of the Parent), (b) the Net Cash Proceeds received after the Closing Date and on or prior to such date from any issuance of any Qualified Capital Stock by the Parent (other than to a Subsidiary of the Parent) and (c) the Net Cash Proceeds received after the Closing Date and on or prior to such date by the Parent, the Borrower or any Subsidiary from the issuance (other than to the Parent or a Subsidiary of the Parent) of convertible or exchangeable debt obligations that have been converted into or exchanged for Qualified Capital Stock of the Parent; provided that (x) such Net Cash Proceeds are designated by the Borrower pursuant to Section 1.08 to increase the Discretionary Amount, and (y) the aggregate amount of such Net Cash Proceeds that may be designated and included in the calculation of Discretionary Amount shall not exceed $100,000,000; provided further that the aggregate amount of Net Cash Proceeds that may be designated and included in the calculation of Discretionary Amount pursuant to clause (y) shall be unlimited to the extent that (1) the Parent issues any Qualified Capital Stock at a price which implies an enterprise valuation of the Parent and its Subsidiaries, taken as a whole, of $4,000,000,000 or greater, (2) the Loan Parties hold at least $75,000,000 in the aggregate of cash, Cash Equivalents and receivables financing facilities with respect to Factorable Receivables, in each case calculated on a Pro Forma Basis after giving effect to any use of the Discretionary Amount, and (3) as of the end of the most recently completed Test Period prior to the applicable date of determination, either (A) the Adjusted LTM

~~Recurring Revenue Ratio for such Test Period is less than or equal to 1.50:1.00 or (B) the Consolidated EBITDA for such Test Period is no less than $45,000,000.~~

"Disposition" means, with respect to any Person, a sale, transfer, lease, exclusive license or other disposition of any asset (other than cash and Cash Equivalents) of such Person (including (i) any such transaction effected by way of merger or consolidation, (ii) any issuance of any Equity Interests in a Subsidiary of such Person, other than any issuance or sale to such Person or a Subsidiary of such Person and (iii) any allocation of assets among newly divided limited liability companies in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws), including but not limited to, Section 18-217 of the Delaware Limited Liability Company Act). "Dispose" and "Disposed", as to any asset subject to the Disposition, shall have meanings correlative to the foregoing.

"Disqualified Capital Stock" means any Equity Interest of any Person that is not Qualified Capital Stock.

"Disqualified Institutions" means any Person that is (a) designated by the Borrower, by written notice delivered to the Administrative Agent on or prior to the Closing Date, as a disqualified institution, (b) a Competitor or (c) an Affiliate of any Person referred to in clause (a) or (b) above; provided, however, Disqualified Institutions shall (A) exclude any Person that the Borrower has designated as no longer being a Disqualified Institution by written notice delivered to the Administrative Agent from time to time and (B) include any Person that is added as a Disqualified Institution under clause (a) hereof, pursuant to a written supplement to the list of Disqualified Institutions, that is delivered by the Borrower after the Closing Date to the Administrative Agent, if such supplemented list is approved by the Administrative Agent (which approval shall not be unreasonably withheld or delayed). Such supplement shall become effective immediately upon approval by the Administrative Agent (which approval shall not be unreasonably withheld or delayed), but shall not apply retroactively to disqualify any Persons that have previously acquired an assignment or participation interest in the Loans and/or Commitments as permitted herein. In no event shall a Bona Fide Debt Fund be a Disqualified Institution unless such Bona Fide Debt Fund is identified under clause (a) or (b) above. Notwithstanding anything to the contrary contained in this Agreement, the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions.

"Dollars" and "$" means, lawful money of the United States.

"Domestic Subsidiary" means, with respect to any Person, any Subsidiary that is organized under the laws of a jurisdiction in the United States, any State thereof or the District of Columbia.

~~"Election Period" has the meaning set forth in Section 2.11(a).~~

"Eligible Assignee" means (i) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund and (iv) any other bank, business development company, finance company or other financial institution that provides loans and any fund that invests in loans in the ordinary course of its business and any other entity (other than a natural person), solely for Restructuring First Lien Term Loans, that is an "accredited investor" (as defined in Regulation D of the Securities Act) and, solely for Restructuring Second Lien Term Loans, that certifies that it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act), or (C) a non-U.S. person under Regulation S under the Securities Act that is located outside of the U.S. (within the meaning of Regulation S under the Securities

Act), subject to, solely in the case of this clause (iv) the consents required under Section 10.06(b)(i). Notwithstanding the foregoing, "Eligible Assignee" shall not include ~~the Parent~~NewCo or any of its Subsidiaries.

"Employee Benefit Arrangements" means in any jurisdiction the material benefit schemes or arrangements in respect of any employees or past employees operated, maintained or contributed to by ~~the Parent~~NewCo or any of its Subsidiaries or in which ~~the Parent~~NewCo or any of its Subsidiaries participates and which provide benefits on ill-health, injury, death or voluntary withdrawal from or termination of employment, including termination indemnity payments and life assurance and post-retirement medical benefits, other than Plans or Foreign Pension Plans.

"English Deed of Release" means that certain English law deed of release, dated on or about the Closing Date, pursuant to which any and all of the existing Liens created by the Original English Loan Party are fully and unconditionally released.

"English Guarantee and Debenture" means ~~that certain~~(i) the English law governed guarantee and debenture, dated on or about the Closing Date, entered into between the Original English Loan Party and the Collateral Agent for the benefit of itself and each of the Finance Parties~~.~~; and (ii) the English law governed supplemental guarantee and debenture, dated on or about the Amendment No. 13 Effective Date, entered into between the Original English Loan Party and the Collateral Agent for the benefit of itself and each of the Finance Parties.

"English Loan Party" means the Original English Loan Party and any other Loan Party incorporated under the laws of England and Wales.

"English Security Documents" means the English Guarantee and Debenture, the English Share Charge and each other security document or other instrument or documents, heretofore or hereafter executed by: (i) any English Loan Party and delivered to the Collateral Agent granting a Lien on any property of any English Loan Party for the benefit of the Finance Parties, or (ii) by any other Loan Party and delivered to the Collateral Agent, granting a Lien over any shares it owns in any company incorporated under the laws of England and Wales, in each case to secure the obligations of any Loan Party under any of the Loan Documents.

"English Share Charge" means that certain English law share charge entered into by ~~the Parent~~HoldCo, pursuant to which ~~the Parent~~HoldCo grants a Lien over the shares it owns in Afiniti Europe Technologies Limited, in ~~favour~~favor of the Collateral Agent, for the benefit of itself and each of the Finance Parties.

"Environment" means ambient air, indoor air, surface water, groundwater, land and subsurface strata and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means all Laws, Environmental Permits or governmental restrictions relating to pollution or the protection of the Environment, including those relating to the generation, use, transportation, distribution, storage, treatment, disposal, presence, Release or threat of Release of any Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise, of ~~the Parent~~NewCo or any of its Subsidiaries resulting from or based on (i) violation of any Environmental Law, (ii) the generation, use, handling, transportation, storage or treatment of any Hazardous Material, (iii) exposure to any Hazardous Material, (iv) the presence, Release or threatened Release of any Hazardous Material into the Environment or (v) any contract or agreement pursuant to which liability is

assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"Equivalent Notes" means, promissory notes issued by the Borrowers having terms substantially similar to the Restructuring Second Lien Term Loans issued to Rights Offering Subscribers who are not Eligible Assignees hereunder.

"Equity Equivalents" means with respect to any Person any rights, warrants, options, convertible securities, exchangeable securities, indebtedness or other rights, in each case exercisable for or convertible or exchangeable into, directly or indirectly, Equity Interests of such Person or securities exercisable for or convertible or exchangeable into Equity Interests of such Person, whether at the time of issuance or upon the passage of time or the occurrence of some future event, but excluding any Indebtedness convertible into Equity Interests.

"Equity Contribution Principles" has the meaning specified in Section 1.08.

"Equity Interests" means all shares of capital stock, partnership interests (whether general or limited), limited liability company membership interests, beneficial interests in a trust and any other interest or participation that confers on a Person the right to receive a share of profits or losses, or distributions of assets, of an issuing Person, but excluding any Indebtedness convertible into such Equity Interests.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulation promulgated thereunder.

"ERISA Affiliate" means each entity that together with the ParentNewCo or any of its Subsidiaries, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means, with respect to any Plan:

(a)    a reportable event as defined in Section 4043 of ERISA and the regulations issued under such Section with respect to a Plan, excluding, however, such events as to which the PBGC by regulation has waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of such event;

(b)    the requirements of Section 4043(b) of ERISA apply with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of any Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following thirty (30) days;

(c)    the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Plan (whether or not waived in accordance with Section 412 of the Code), the application for a minimum funding waiver under Section 302(c) of ERISA with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer

Plan, the determination that any Plan is, or is reasonably expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code);

(d)      (A) the incurrence of any material liability by ~~the Parent~~NewCo or any of its Subsidiaries pursuant to Title I of ERISA or to the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in Section 3 of ERISA), or the occurrence or existence of any event, transaction or condition that could reasonably be expected to result in the incurrence of any such liability by ~~the Parent~~NewCo or any of its Subsidiaries pursuant to Title I of ERISA or to such penalty or excise tax provisions of the Code; or (B) the incurrence of any material liability by ~~the Parent~~NewCo or any of its Subsidiaries or an ERISA Affiliate pursuant to Title IV of ERISA (other than for PBGC premiums due but not delinquent) or the occurrence or existence of any event, transaction or condition that could reasonably be expected to result in the incurrence of any such material liability or imposition of any lien on any of the rights, properties or assets of ~~the Parent~~NewCo or any of its Subsidiaries or any ERISA Affiliate pursuant to Title IV of ERISA or to Section 412 of the Code;

(e)      the provision by the administrator of any Plan of a notice pursuant to Section 4041(a)(2) of ERISA (or the reasonable expectation of such provision of notice) of intent to terminate such Plan in a distress termination described in Section 4041(c) of ERISA, the institution by the PBGC of proceedings to terminate any Plan or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of a Plan by the PBGC, or the appointment of a trustee by the PBGC to administer any Plan;

(f)      the withdrawal of ~~the Parent~~NewCo or any of its Subsidiaries or ERISA Affiliates in a complete or partial withdrawal (within the meaning of Section 4203 and 4205 of ERISA) from any Multiemployer Plan if it would reasonably be expected to result in liability therefor, or the receipt by ~~the Parent~~NewCo or any of its Subsidiaries or ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or is in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA;

(g)      the imposition of liability (or the reasonable expectation thereof) on ~~the Parent~~NewCo or any of its Subsidiaries or ERISA Affiliates pursuant to Section 4062, 4063, 4064 or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA;

(h)      the assertion of a material claim (other than routine claims for benefits) against any Plan (other than a Multiemployer Plan) or the assets thereof, or against ~~the Parent~~NewCo or any of its Subsidiaries in connection with any Plan;

(i)      the receipt by ~~the Parent~~NewCo or any of its Subsidiaries from the United States Internal Revenue Service of notice of (x) the failure of any Plan (or any Employee Benefit Arrangement intended to be qualified under Section 401(a) of the Code) to qualify under Section 401 (a) of the Code, or (y) the failure of any trust forming part of any Plan or Employee Benefit Arrangement to qualify for exemption from taxation under Section 501(a) of the Code (excluding, for purposes of this clause (ix), plan document or operational failures that are eligible for correction under the Employee Plans Compliance Resolution System and are corrected pursuant thereto); and

(j)        the establishment or amendment by ~~the Parent~~NewCo or any of its Subsidiaries of any Welfare Plan that provides post-employment welfare benefits in a manner that would reasonably be expected to result in a Material Adverse Effect, other than as may be required under applicable law.

"Event of Default" has the meaning specified in Section 8.01.

"Excess Equivalent Notes" has the meaning specified in Section 10.06(h).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Communications" has the meaning specified in Section 10.02(d).

"Excluded Property" means (i) any owned real estate with a book value of less than $3,000,000 as of the Closing, or if acquired after the Closing Date, as of the date of such acquisition, (ii) other fee simple owned real estate if in the reasonable judgment of the Collateral Agent and the Borrower, the costs and burdens of obtaining a Mortgage thereon outweigh the benefits to the Lenders of the security to be afforded thereby and (iii) "Excluded Collateral" as defined in the Security Agreement.

"Excluded Subsidiary" means (a) any Immaterial Subsidiary, (b) any Subsidiary that is prohibited by any Law or by any Contractual Obligation existing on the Closing Date from Guaranteeing the Senior Credit Obligations or any Subsidiary that would require consent, approval, license or authorization of any Governmental Authority in order to Guarantee the Senior Credit Obligations unless such consent, approval, license or authorization has been received~~,~~ and (c) any captive insurance company ~~and (d) subject to the limitations on acquisitions of non-Guarantors contained in the definition of Permitted Acquisition, any Subsidiary acquired pursuant to a Permitted Acquisition to the extent that (x) such Subsidiary is an obligor in respect of secured Indebtedness permitted to be incurred or to exist pursuant to the Loan Documents and (y) such secured Indebtedness was not incurred by such Subsidiary in contemplation of such Permitted Acquisition to the extent the terms of such secured Indebtedness prohibit such Subsidiary from becoming a Guarantor~~.  Notwithstanding anything to the contrary herein, as of any date of determination, and on the ~~Closing~~Amendment No. 13 Effective Date or on the first day of any Fiscal Quarter thereafter, no Excluded Subsidiary shall (a) have revenue or assets (each as determined in accordance with GAAP and excluding intercompany receivables or other balances payable to the applicable Subsidiary) in an amount greater than 5.0% individually or ~~15.0~~10.0% in the aggregate of all Excluded Subsidiaries of Consolidated Revenue or Consolidated Total Assets (each as determined in accordance with GAAP) of ~~the Parent~~NewCo and its Subsidiaries for the twelve month period ended on the most recently completed Fiscal Quarter, in the case of revenues, or as of the end of the most recently completed Fiscal Quarter, in the case of assets, or (b) own material Intellectual Property.

"Excluded Tax Subsidiary" means (a) any direct or indirect Foreign Subsidiary (of the Restructuring First Lien Borrower and (b) any direct or indirect Foreign Subsidiary other than any Foreign Subsidiary organized under the laws of a Specified Jurisdiction~~), (b) any direct or indirect Domestic Subsidiary of a CFC and (c) any Subsidiary that is organized in the United States that holds no material assets other than Equity Interests of one or more CFCs~~.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case,

24

(i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 3.03) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such ~~Lender's~~Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(f) and (g) and (d) any withholding Taxes imposed under FATCA.

~~"Exclusivity Letter" means that certain Exclusivity Agreement among the Borrower, the Parent, and VCP Capital Markets, LLC, dated June 7, 2024.~~

"Existing Credit Agreement" has the meaning specified in the definition of "Closing Date Refinancing".

"Existing Credit ~~Agreement~~Facility" has the meaning specified in the definition of "Closing Date Refinancing".

"Existing Term Loans" means, the Initial Term Loans and the Additional Term Loans, as applicable.

"Extended Loans" means any Term Loans the maturity of which shall have been extended pursuant to Section 2.14.

"Extension" has the meaning set forth in Section 2.14(a).

"Extension Offer" has the meaning set forth in Section 2.14(a).

"Factorable Receivables" means accounts receivable or other rights to future payment(s) of ~~the Parent~~NewCo and its Subsidiaries that relate to services previously performed by ~~the Parent~~NewCo or any of its Subsidiaries.

"FASB" means Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Rate" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or if such rate is not published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; provided that, if such rate is below zero, such rate shall be deemed to be 0.00%.

"Fee Letter" means the Fee Letter, dated as of June 13, 2019, among the Borrower and the Administrative Agent.

"Finance Party" means each Lender, each Agent and each Indemnitee and their respective successors and assigns, and "Finance Parties" means any two or more of them, collectively.

"Financial Officer" means the chief financial officer, principal accounting officer, senior vice president of finance, treasurer or controller of the Borrower.

"First Incremental Tranche A Term Loan Commitments" has the meaning set forth in Section 2.01(c)(ii).

"First Incremental Tranche A Term Loans" has the meaning set forth in Section 2.01(c)(ii).

~~"First Incremental Tranche A Term Loan Warrant" means each Warrant to Purchase Shares, dated as of the First Tranche A Incremental Facility Effective Date, issued by the Parent to each Lender funding First Incremental Tranche A Term Loans on the First Tranche A Incremental Facility Effective Date, in form and substance substantially consistent with the Initial Tranche A Term Loan Warrants, with such additional changes as may be agreed between the Parent and such Lenders; provided that, (i) the First Incremental Tranche A Term Loan Warrants received by the Lenders funding First Incremental Tranche A Term Loans shall in the aggregate represent 24,901 common shares of the Parent, as such amount may be reduced pursuant to Section 2.01(e), and (ii) each Lender funding First Incremental Tranche A Term Loans on the First Tranche A Incremental Facility Effective Date shall receive a pro rata portion of the aggregate right to purchase common shares based on an aggregate principal amount of First Incremental Tranche A Term Loans funded on the First Tranche A Incremental Facility Effective Date.~~

"First Tranche A Incremental Facility" has the meaning set forth in Section 2.01(c)(ii).

"First Tranche A Incremental Facility Effective Date" means the date on which the conditions described in Section 2.01(c)(iv) are satisfied and the Additional Credit Extension Amendment with respect to First Tranche A Incremental Facility is made effective.

"First Lien Applicable Margin" means (i) 7.00% per annum in the case of SOFR Loans, *provided*, that if the Borrower elects the First Lien Cash/PIK Option in accordance with Section 2.05(a)(i), the First Lien Applicable Margin will be increased such that the Margin Cash Component in respect of such SOFR Loans shall be 4.00% and the Margin PIK Component shall be 3.50%; and (ii) 6.00% per annum in the case of ABR Loans; *provided*, that if the Borrower elects the First Lien Cash/PIK Option in accordance with Section 2.05(a)(i), the First Lien Applicable Margin will be increased such that the Margin Cash Component in respect of such ABR Loans shall be 3.00% and the Margin PIK Component shall be 3.50%.

"First Lien Cash Option" has the meaning specified in Section 2.05(a)(i).

"First Lien Cash/PIK Election Notice" has the meaning specified in Section 2.05(a)(i).

"First Lien Cash/PIK Option" has the meaning specified in Section 2.05(a)(i).

"Fiscal Quarter" means any of the quarterly accounting periods of the Loan Parties ending on March 31, June 30, September 30 and December 31 of each year.

"Fiscal Year" means any of the annual accounting periods of the Loan Parties ending on June 30 of each year.

"Floor" means 4.00% per annum.

"Foreign Benefit Event" means, with respect to any Foreign Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable Law or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make the required contributions or payments, under any applicable Law, on or before the due date for such contributions or payments, (c) the receipt of a notice by a Governmental Authority relating to the intention to terminate any such Foreign Pension Plan, or alleging the insolvency of any such Foreign Pension Plan, (d) the incurrence of any liability by the ParentNewCo or any Subsidiary under applicable Law on account of the complete or partial termination of such Foreign Pension Plan or the complete or partial withdrawal of any participating employer therein or (e) the occurrence of any transaction that is prohibited under any applicable Law and that would reasonably be expected to result in the incurrence of any liability by the ParentNewCo or any of the Subsidiaries, or the imposition on the ParentNewCo or any of the Subsidiaries of any fine, excise tax or penalty resulting from any noncompliance with any applicable Laws.

"Foreign Casualty Event" has the meaning set forth in Section 2.06(g).

"Foreign Disposition" has the meaning set forth in Section 2.06(g).

"Foreign Lender" means any Lender that is not a U.S. Person.

"Foreign Pension Plan" means any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States by the ParentNewCo or any Subsidiary primarily for the benefit of employees of the ParentNewCo or any Subsidiary residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code; provided that, for the avoidance of doubt, any governmental plan or program requiring the mandatory payment of social insurance taxes or similar contributions to a governmental fund with respect to the wages of an employee will not be considered a "Foreign Pension Plan".

"Foreign Casualty Event" has the meaning set forth in Section 2.06(g).

"Foreign Disposition" has the meaning set forth in Section 2.06(g).

"Foreign Subsidiary" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States, any State thereof or the District of Columbia.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funded Debt" means, with respect to any Person, all Indebtedness of such Person of the types described in clauses (a) through (c), (e), (h), (i) and, solely with respect to letters of credit, bankers' acceptances and similar facilities that have been drawn but not yet reimbursed, clauses (f) and (g) of the definition of "Indebtedness" to the extent reflected as a liability on the balance sheet in accordance with GAAP.

"GAAP" means, subject to Section 1.03(b), United States generally accepted accounting principles as in effect as of the date of determination thereof.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the lesser of (i) the stated or determinable amount of the primary payment obligation in respect of which such Guarantee is made and (ii) the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guarantee, unless such primary payment obligation and the maximum amount for which such guaranteeing Person may be liable are not stated or determinable, in which case the amount of the Guarantee shall be such guaranteeing Person's maximum reasonably possible liability in respect thereof as reasonably determined by the Borrower in good faith.

"Guarantor" means collectively, (A) ~~the Parent,~~ with respect to the Restructuring First Lien Term Loans, NewCo, (B) each Subsidiary party to the Guaranty Agreement as of the Closing Date, (C) each Subsidiary of ~~the Parent~~ NewCo (except, subject to Section 6.09(e), any Excluded Subsidiary and any Excluded Tax Subsidiary) and (D) each Subsidiary of ~~the Parent~~ NewCo that becomes a party to the Guaranty Agreement or other guaranty agreement after the Closing Date required pursuant to Section 6.09, and "Guarantors" means any two or more of them.

"Guaranty Agreement" means the Guaranty, substantially in the form of Exhibit E hereto, dated as of the Closing Date, by the Parent, the Borrower and the Subsidiary Guarantors in favor of the Administrative Agent, as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof and of this Agreement.

"Hazardous Materials" means all materials, chemicals, substances, wastes, pollutants, contaminants, compounds, mixtures and constituents in any form, including petroleum or petroleum products, asbestos or asbestos-containing materials, polychlorinated biphenyls or radon gas, regulated pursuant to, or which can give rise to liability under, any Environmental Law.

"HoldCo" means Afiniti AI Holdings LLC, a Cayman Islands limited liability company.

"HoldCo Contributions" means the Parent's transfer of certain assets to a newly formed, wholly owned direct Subsidiary of the Parent classified as an association taxable as a corporation for U.S. federal income tax purposes, and such Subsidiary's assumption of certain liabilities of the Parent, on or before the Amendment No. 13 Effective Date, as contemplated by the Restructuring Support Agreement.

"HM Land Registry" has the meaning specified in Section 9.13(a).

"Immaterial Subsidiary" means a Subsidiary of the ParentNewCo that is not a Loan Party that has been designated in writing to the Administrative Agent on the ClosingAmendment No. 13 Effective Date or on the first day of any Fiscal Quarter thereafter and that does not, at any date of determination, (a) have total assets greater than 5.0% of the Consolidated Total Assets as of the end of the most recently ended Fiscal Quarter for which financial statements have been delivered or required to be delivered, (b) have gross revenue for the most recently ended four Fiscal Quarters for which financial statements have been delivered that is greater than 5.0% of the Consolidated Revenue for such period; provided that, for the avoidance of doubt, the total assets and gross revenue of the applicable Subsidiary shall exclude intercompany receivables and other balances payable to such Subsidiary; provided further that, if at any time the aggregate amount of Consolidated Total Assets as of the end of Parent'sNewCo's most recently ended Fiscal Quarter represented by all Immaterial Subsidiaries would, but for this proviso, exceed 5.0% of Consolidated Total Assets of ParentNewCo and its Subsidiaries as of such date, or the gross revenues represented by all Immaterial Subsidiaries would, but for this proviso, exceed 5.00% of the total gross revenues of ParentNewCo and its Subsidiaries, on a consolidated basis, in each case as of the end of Parent'sNewCo's most recently ended Fiscal Quarter, then the Borrower shall designate sufficient Immaterial Subsidiaries to no longer constitute Immaterial Subsidiaries so as to eliminate such excess, and each such designated Subsidiary shall thereupon cease to be an Immaterial Subsidiary (or, if the Borrower shall make no such designation by the next date of delivery of financial statements pursuant to Section 6.16.01(a) or 6.16.01(b), one or more of such Immaterial Subsidiaries selected in descending order based on their respective contributions to the Consolidated Total Assets of ParentNewCo and its Subsidiaries shall cease to be considered to be Immaterial Subsidiaries until such excess is eliminated) and any such Subsidiary (if not otherwise an Excluded Subsidiary) shall be required to comply with Section 6.09 within the time periods set forth therein.

"Increase Effective Date" has the meaning set forth in Section 2.11(a).

"Incremental FacilitiesFacility" has the meaning set forth in Section 2.11(a).

"Incremental Term Loan Commitment Percentage" means, for each Lender, the percentage of the aggregate Incremental Term Loan Commitments represented by such Lender's Incremental Term Loan Commitment at such time and identified as its Incremental Term Loan Commitment Percentage in any applicable Additional Credit Extension Amendment, as such percentage may be modified in connection with any Assignment and Assumption made in accordance with the provisions of Section 10.06(b). For the avoidance of doubt, the Incremental Term Loan Commitment Percentage shall include the Amendment No. 8 Incremental Term Loan Commitment Percentage.

"Incremental Term Loan Commitments" has the meaning set forth in Section 2.11(a).

"Incremental Term Loans" has the meaning set forth in Section 2.11(a).

"Incremental Tranche A Term Loan Commitments" means the First Incremental Tranche A Term Loan Commitments and the Second Incremental Tranche A Term Loan Commitments.

~~"Incremental Tranche A Term Loans" means the First Incremental Tranche A Term Loans and the Second Incremental Tranche A Term Loans.~~

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person (excluding trade accounts payable and accrued expenses arising in the ordinary course of business and licenses in the ordinary course of business), (d) all obligations of such Person in respect of the deferred purchase price of property or services (but excluding (i) trade accounts, accrued expense payable incurred in the ordinary course of business and licenses in the ordinary course of business, (ii) payroll liabilities and deferred compensation and other payments in respect of services as employees, and (iii) any purchase price or other post-closing balance sheet adjustment, royalty, earnout, contingent payment or deferred payment of a similar nature incurred in connection with an acquisition or Disposition), (e) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (excluding obligations in respect of the Wingspire Finance Agreement and the Liberty Finance Agreements), (f) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and surety bonds, (g) all obligations, contingent or otherwise, of such Person in respect of banker's acceptances, (h) all Indebtedness (excluding prepaid interest) of others secured by any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed; provided that, if such Person has not assumed or otherwise become liable in respect of such Indebtedness, such obligations shall be deemed to be in an amount equal to the lesser of (i) the unpaid amount of such Indebtedness and (ii) fair market value of such property at the time of determination (in the Borrower's good faith estimate), (i) all Guarantees by such Person of Indebtedness of others, (j) net obligations under any Swap Agreement and (k) all Disqualified Capital Stock.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Initial Term Commitment" means, with respect to any Lender, the commitment of such Lender to make an Initial Term Loan on the Closing Date in a principal amount equal to such Lender's Initial Term Commitment Percentage of the Initial Term Committed Amount.

"Initial Term Commitment Percentage" means, for each Lender, the percentage of the aggregate Initial Term Commitments represented by such Lender's Initial Term Commitment at such time and identified as its Initial Term Commitment Percentage on Schedule 2.01 prior to the Amendment No. 13 Effective Date, as such percentage may be modified in connection with any Assignment and Assumption made in accordance with the provisions of Section 10.06(b).

"Initial Term Committed Amount" means $125,000,000.

~~"Initial Term Lender" means each Lender identified on Schedule 2.01 as having an~~

~~Initial Term Commitment.~~

"Initial Term Loans" means the term loans made by the Term Lenders to the Borrower pursuant to Section 2.01(a).

"Initial Tranche A Facility" means the borrowing of Initial Tranche A Term Loans in an amount equal to the Initial Tranche A Term Loan Commitment.

"Initial Tranche A Facility Effective Date" means the Amendment No. 3 Effective Date.

"Initial Tranche A Term Lender" has the meaning set forth in the Amendment No. 3.

"Initial Tranche A Term Loan Commitment" has the meaning set forth in Amendment No. 3. The aggregate amount of the Initial Tranche A Term Loan Commitment as of the Amendment No. 3 Effective Date shall not exceed $100,000,000.

~~"Initial Tranche A Term Loan Commitment Percentage" means, for each Lender, the percentage of the aggregate Initial Tranche A Term Loan Commitments represented by such Initial Tranche A Term Loan Commitments at such time and identified as its Initial Tranche A Term Loan Commitments on Schedule 2.01, as such percentage may be modified in connection with any Assignment and Assumption made in accordance with the provisions of Section 10.06(b).~~

~~"Initial Tranche A Term Loan Warrant" means each Warrant to Purchase Shares, dated as of the Initial Tranche A Facility Effective Date, issued by the Parent to each Lender funding Initial Incremental Tranche A Term Loans, in form and substance reasonably satisfactory to such Lenders (the execution of such Initial Tranche A Term Loan Warrant by such Lenders being evidence of such satisfaction), representing in the aggregate the right to purchase 49,802 common shares of the Parent.~~

"Initial Tranche A Term Loans" has the meaning set forth in Amendment No. 3.

"Insolvency or Liquidation Proceeding" means (i) any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other Bankruptcy Law with respect to any Loan Party, (ii) any other voluntary or involuntary insolvency, examinership, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Loan Party or with respect to a material portion of their respective assets, (iii) any liquidation, dissolution, examinership, reorganization or winding up of any Loan Party whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (iv) any assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Loan Party.

"Insurance Proceeds" means all insurance proceeds (other than business interruption insurance proceeds), damages, awards, claims and rights of action with respect to any Casualty.

"Intellectual Property" means any and all Patents, Copyrights, Trademarks, trade secrets, know-how, business methods, inventions (whether or not patentable), algorithms, Software, processes, product designs, industrial designs, blueprints, drawings, data, customer and vendor/supplier lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights, including all intangible rights, therein and all applications for registration, registrations, extensions, and renewals thereof.

"Intellectual Property Security Agreements" means, collectively, the Copyright Security Agreement, the Patent Security Agreement and the Trademark Security Agreement.

"Intercompany Subordination Agreement" means the Intercompany Subordination Agreement, substantially in the form of Exhibit K hereto, dated as of the Closing Date, among the Administrative Agent, the Parent and each of its Subsidiaries, as the same may be amended, modified or supplemented from time to time.

"Intercompany Services Agreement" means any (i) intercompany services agreements, transfer pricing agreements or similar agreements set forth on Schedule 1.01(b), in each case, as in effect as of the Closing Date, (ii) any amendments to the documents referred to in the foregoing clause (i); provided that such Intercompany Services Agreements may not be amended, restated, supplemented or otherwise modified after the Closing Date in any manner ~~materially~~ adverse to the Administrative Agent and the other Secured Parties, and (iii) such additional Intercompany Services Agreements entered into in the ordinary course of business; provided that, in the case of this clause (iii), such Intercompany Services Agreements are not ~~materially~~ less favorable to any Loan Party that is party thereto relative to the terms of the agreements specified in clause (i) above.

"Intercreditor Agreement" means each intercreditor agreement referred to herein entered into in connection with the incurrence, assumption or acquisition of any Indebtedness permitted hereunder, in each case, in form and substance satisfactory to the Administrative Agent and the Agreement Amongst Lenders/Intercreditor Agreement shall deemed to be an Intercreditor Agreement.

"Interest Payment Date" means (i) with respect to any Restructuring First Lien Term Loan which is a ABR Loan and/or any Restructuring Second Lien Term Loan, the fifth Business Day of each January, April, July and October (commencing ~~July 5, 2019) and~~ October 7, 2024), (ii) with respect to any Restructuring First Lien Term Loan which is a SOFR Loan, the fifth Business Day ending after any Interest Period and (iii) the Maturity Date for Loans of the applicable Class.

"Interest Period" means as to the Restructuring First Lien Term Loans, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Restructuring First Lien Term Loan and ending on first fiscal quarter following the Amendment No. 13 Effective Date; and (b) thereafter, each period commencing on the last day of the immediately preceding Interest Period applicable to such Restructuring First Lien Term Loan and ending three (3) months thereafter; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

1.    if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

2.    the Borrower may not select an Interest Period that would extend beyond the Restructuring First Lien Term Loans Maturity Date;

3.    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

4.    the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Restructuring First Lien Term Loan during an Interest Period for such Loan.

"Interest Rate" has the meaning specified in Section 2.05(a)(i).

"Investment" means, any transaction to (i) purchase, hold or acquire (including pursuant to any merger or consolidation with any Person that was not a Wholly Owned Subsidiary prior to such merger) any Equity Interest, evidences of Indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person or (ii) purchase or otherwise acquire (in one transaction or a series of transactions) substantially all the assets of any Person or any assets of any other Person constituting a business unit, division or line of business of such Person.

"Irish Debenture" means that certain Irish law mortgage debenture, originally dated 23 December 2020, entered into between the Original Irish Loan Party and the Collateral Agent for the benefit of itself and each of the Finance Parties.

"Irish Supplemental Debenture" means the Irish law supplemental debenture dated on or about the Amendment No. 13 Effective Date, entered into between the Original Irish Loan Party and the Collateral Agent for the benefit of itself and each of the Finance Parties.

"Irish Loan Party" means the Original Irish Loan Party and any other Loan Party incorporated under the laws of Ireland.

"Irish Security Documents" means the Irish Debenture, the Irish Share Charge, the Irish Supplemental Debenture and each other security document or other instrument or documents, heretofore or hereafter executed by: (i) any Irish Loan Party and delivered to the Collateral Agent granting a Lien on any property of any Irish Loan Party for the benefit of the Finance Parties, or (ii) by any other Loan Party and delivered to the Collateral Agent, granting a Lien over any shares it owns in any company incorporated under the laws of Ireland, in each case to secure the obligations of any Loan Party under any of the Loan Documents.

"Irish Share Charge" means that certain Irish law share charge dated on or about the Amendment No. 13 Effective Date, entered into by HoldCo and the Collateral Agent for the benefit of itself and each of the Finance Parties, pursuant to which HoldCo grants a Lien over the shares it owns in the Original Irish Loan Party.

"Junior Debt Payment" means (i) any payment to redeem, purchase, prepay, retire, defease or otherwise acquire for value prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment any Indebtedness that is unsecured, subordinated, or secured by junior liens, or set aside any funds for such purpose, ~~except any payment, purchase, prepayment, retirement, defeasance or acquisition of such Indebtedness in connection with a refinancing of such Indebtedness with Permitted Refinancing Indebtedness thereof,~~ (ii) any cash interest payment in respect of any Indebtedness that is unsecured, subordinated or secured by junior liens, and (iii) any payment in violation of any subordination terms of the documentation governing such Indebtedness that is unsecured, subordinated or secured by junior liens, in each case, other than payments in respect of the Restructuring Second Lien Term Loans.

"Latest Maturity Date" means, at any date of determination, the latest maturity or termination date applicable to any Loan or Commitment hereunder at such time, in each case as extended in accordance with this Agreement from time to time.

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental

Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directives, licenses, authorizations and permits of any Governmental Authority.

"Lease" means each agreement pursuant to which a Loan Party holds an interest in any Leased Real Property.

"Leased Real Property" means each real property or physical location occupied or used by a Loan Party or with respect to which a Loan Party holds a leasehold interest, license or similar interest allowing the applicable Loan Party to use and/or enjoy such real property.

"Lender" means a Term Lender and each Eligible Assignee that becomes a Lender pursuant to Section 10.06(b) and their respective permitted successors.

"Lending Office" means with respect to any Lender, the "Lending Office" of such Lender (or of an Affiliate of such Lender) designated in such Lender's Administrative Questionnaire or in any applicable Assignment and Assumption pursuant to which such Lender became a Lender hereunder or such other office of such Lender (or of an Affiliate of such Lender) as such Lender may from time to time specify to the Administrative Agent and the Borrower as the office by which its Loans are to be made and maintained.

"Liberty Finance Agreements" means collectively, (i) that certain Equipment Finance Agreement, dated as of March 31, 2022 (as amended from time to time in accordance with its terms), by and between Afiniti, Inc. and Liberty Commercial Finance LLC, and (ii) that certain Equipment Finance Agreement, dated as of April 1, 2022 (as amended from time to time in accordance with its terms), by and between Afiniti, Inc. and Liberty Commercial Finance LLC; provided that the aggregate principal amount outstanding do not exceed $20,000,000.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, easement, right-of-way or other encumbrance on title, lien (statutory or otherwise), charge, restriction or other security interest, preference or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, and any financing lease having substantially the same economic effect as any of the foregoing); provided that any operating lease or license, and any filing of a UCC financing statement or similar filing that is a protective lease filing in respect of an operating lease and any filings with a Governmental Authority in respect of any license do not constitute Liens.

"Liquidity" means the aggregate amount of Borrower's and each Guarantor's Unrestricted Cash.

"Loan" means a Term Loan, an Restructuring Term Loan, Incremental Term Loan, a Tranche A Term Loan or any credit facility permitted under this Agreement created pursuant to an Additional Credit Extension Amendment or a Refinancing Amendment (or a portion thereof), individually or collectively as appropriate; provided that, if any such loan or loans (or portions thereof) are combined or subdivided pursuant to a Notice of Extension/Conversion, the term "Loan" shall refer to the combined principal amount resulting from such combination or to each of the separate principal amounts resulting from such subdivision, as the case may be.

"Loan Documents" means this Agreement, the Term Notes, the Guaranty Agreement, the Collateral Documents, the Agreement Among Lenders/Intercreditor Agreement, any Intercreditor Agreement, the Intercompany Subordination Agreement, the Fee Letter, each Additional Credit Extension Amendment, each Refinancing Amendment and any other document or instrument designated

by the Borrower and the Administrative Agent as a "Loan Document," collectively, in each case as the same may be amended, modified or supplemented from time to time, and all other related agreements and documents executed by a Loan Party in favor of, and delivered to, any Finance Party in connection with or pursuant to any of the foregoing.

"Loan Parties" means the Borrower, HoldCo and the Guarantors, and "Loan Party" means any of the foregoing.

"Lost Clients" means as of any date of determination, any customer and/or partner of the ParentNewCo and its Consolidated Subsidiaries with respect to which (i) no customer or partner contract or similar agreement (including any statements of work or master service agreements) is then in effect between such customer or partner and any of the ParentNewCo or any of its Consolidated Subsidiaries, (ii) no server, appliance or other hardware (to the extent required or applicable to the services of the ParentNewCo or any of its Consolidated Subsidiaries) used or designated for use with the services of the ParentNewCo or any of its Consolidated Subsidiaries is then installed with such customer or partner, and (iii) none of ParentNewCo nor any of its Consolidated Subsidiaries has received any revenues from or issued any invoices to such customer or partner during the most recent Fiscal Quarter for which financial statements shall have been (or were required to be) delivered in accordance with Section 6.01(b).

"Luxembourg Document" means (i) the share pledge agreement dated 8 August 2019 whereby a first ranking pledge (*gage*) iswas granted over the shares of AETL and made between (a) the Original English Loan Party, as pledgor, (b) the Collateral Agent as pledgee, and (c) AETL as company and (ii) the account pledge agreement dated 8 August 2019 whereby a first ranking pledge (*gage*) iswas granted over any bank account opened in Luxembourg with J.P. Morgan Bank Luxembourg S.A. and made between AETL as pledgor and the Collateral Agent as pledgee[19], both governed by the Luxembourg law of 5 August 2005 on financial collateral arrangements, as amended.

"Margin Cash Component" means the portion of the First Lien Applicable Margin which may only be paid in cash.

"Margin PIK Component" means the portion of the First Lien Applicable Margin which shall be paid in kind in accordance with Section 2.05(a).

"Margin Stock" means "margin stock" as such term is defined in Regulation U.

"Material Adverse Effect" means any event, circumstance or condition that has had or could reasonably be expected to have a materially adverse effect on (i) the business, assets, results of operations, or financial condition of the ParentNewCo and its Subsidiaries, taken as a whole, (ii) the rights and remedies available to the Lenders or the Collateral Agent under any Loan Document, (iii) the ability of the Borrower or any other Loan Party to perform its respective obligations under any Loan Document to which it is a party, or (div) the legality, validity, binding effect or enforceability against the Borrower or any other Loan Party of any Loan Document to which it is a party.

"Material Indebtedness" means Indebtedness (other than the Loans) or obligations in respect of one or more Swap Agreements, of any one or more of the ParentNewCo and its Subsidiaries in an aggregate principal amount exceeding the Threshold Amount. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the ParentNewCo or any Subsidiary in respect of any Swap Agreement at any time shall be the termination value (giving effect to any netting agreements) that the ParentNewCo or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material Subsidiary" means, as of any date of determination, any direct or indirect Subsidiary of ~~the Parent~~NewCo that is not an Immaterial Subsidiary.

"Maturity Date" means (i) with respect to the ~~Parent's Guarantee under the Guaranty Agreement of the Term Loans, the earlier of (a) the filing by the Parent or any provisional liquidator(s) of a provisional liquidation for Parent in the Supreme Court of Bermuda or any other court of competent jurisdiction; and (b) five Business Days after termination of the Exclusivity Letter by VCP Capital Markets, LLC, for breach of the Exclusivity Letter by the Loan Parties; (ii) with respect to the obligations of the Loan Parties under the Term Loan, other than the Parent, the earlier of (a) October 15, 2024 and (b) five Business Days after termination of the Exclusivity Letter by VCP Capital Markets, LLC, for breach of the Exclusivity Letter by the Loan Parties; provided that, notwithstanding anything to the contrary herein, if the Loan Parties do not file a petition or application in the Supreme Court of Bermuda seeking to appoint provisional liquidators for the winding up of the Parent, in form and substance acceptable to the Required Lenders, on or before September 19, 2024, the Maturity Date with respect to the Term Loans shall mean September 20, 2024, unless extended by the written consent of the Lenders; (iii) with respect to Tranche A Term Loans, the fifth~~Restructuring First Lien Term Loans, the third anniversary of the Amendment No. ~~3~~13 Effective Date (or if such day is not a Business Day, the next succeeding Business Day)~~,~~; (iv~~ii) with respect to ~~Amendment No. 8 Incremental~~Restructuring Second Lien Term Loans, the ~~fifth~~seventh anniversary of the Amendment No. ~~8~~13 Effective Date~~; and (v~~ (or if such day is not a Business Day, the next succeeding Business Day), (iii) with respect to any additional Loans or Commitments pursuant to Section ~~2.11,~~ 2.13 or 2.14, the maturity date specified in the Additional Credit Extension Amendment or Refinancing Amendment, as applicable, related thereto; provided, however, that, in each case ~~(with respect to (i) through (v) of this paragraph)~~, if such date is not a Business Day, the Maturity Date shall be the next ~~succeeding~~preceding Business Day.

~~"Maximum Adjusted LTM Recurring Revenue Ratio" means, as of any date of determination, the ratio of (a) the sum of (i) the Term Committed Amount, plus (ii) the Initial Tranche A Term Loan Commitment, plus (iii) the aggregate amount of Tranche A Incremental Facilities incurred on or prior to such date of determination, plus (iv) the aggregate amount of Incremental Facilities incurred on or prior to such date of determination, plus (v) the cumulative amount of PIK Margin accrued since the Closing Date, to (b) the Minimum Adjusted LTM Recurring Revenue as of the end of the most recently completed Fiscal Quarter.  For the avoidance of doubt, the aggregate amount determined under the foregoing clause (a) shall not be reduced by any prepayment of Loans pursuant to Sections 2.06 or 8.04.~~

"Maximum Rate" has the meaning specified in Section 10.09.

"~~Minimum Adjusted LTM Recurring Revenue~~Maximum Total Leverage Ratio" has the meaning specified in Section 7.10(b).

"MOIC" means, for any Restructuring Second Lien Term Loans repaid or prepaid (other than scheduled principal payments or repayment on the Maturity Date), an amount equal to the aggregate principal amount of such Restructuring Second Lien Term Loans outstanding as of the Amendment No. 13 Effective Date.

"Moody's" means Moody's Investors Service, Inc., a Delaware corporation, and its successors.

"Mortgage" means each mortgage, deed of trust or other agreement that conveys or evidences a Lien in favor of the Collateral Agent, for the benefit of the Collateral Agent and the Finance Parties, on the Mortgaged Property in form and substance reasonably acceptable to the Collateral Agent,

including any amendment, restatement, amendment and restatement, modification or supplement thereto.

"Mortgage Policies" has the meaning specified in clause (b) of the definition of Mortgaged Property Requirements.

"Mortgaged Property" means each fee interest in any real property located in the U.S. (other than Excluded Property), if any, owned or acquired on or after the Closing Date by any Loan Party.

"Mortgaged Property Requirements" means in the case of any owned real estate that is not Excluded Property, the requirement that Borrower provide the Administrative Agent and the Collateral Agent with a Mortgage encumbering each such real property, together with:

(a)    evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices that the Administrative Agent and the Collateral Agent may deem necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Administrative Agent or the Collateral Agent (as appropriate) for the benefit of the Lenders and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner satisfactory to the Administrative Agent and the Collateral Agent;

(b)    fully paid American Land Title Association Lender's Extended Coverage title insurance policies or the equivalent or other form available in each applicable jurisdiction issued by a nationally recognized title insurance company (the "Mortgage Policies") in form and substance, with customary endorsements and in amount, acceptable to the Administrative Agent and the Collateral Agent (not to exceed the value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Administrative Agent and the Collateral Agent, insuring the Mortgages to be valid subsisting Liens on the property described therein, free and clear of all other Liens except for Permitted Encumbrances (provided, however that the Mortgage Policies shall not be subject to any matter described in clause (b) of the Permitted Encumbrances definition provided herein) and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Administrative Agent and the Collateral Agent may reasonably request;

(c)    opinions of local counsel for the Loan Parties in jurisdictions in which the real properties are located, with respect to the enforceability and perfection of the Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent;

(d)    American Land Title Association/National Society for Professional Surveyors surveys for each such Mortgaged Property for which all fees and charges have been paid for by Borrower, or existing surveys together with no change affidavits, in each case certified to the Administrative Agent, the Collateral Agent and the title insurance company (sufficient for the title insurance company issuing a Mortgage Policy to remove the standard survey exception and issue standard survey related endorsements, and otherwise reasonably satisfactory to the Administrative Agent and the Collateral Agent);

(e)    any consents, estoppels, agreements and confirmations of third parties relating to such Mortgages or such Mortgaged Properties reasonably deemed necessary or advisable by the

Administrative Agent and the Collateral Agent, in each case, to the extent requested by Administrative Agent and the Collateral Agent;

(f)    in respect of real property located in the United States, flood insurance determination certificates for each such Mortgaged Properties, and if any improvements located on a Mortgaged Property are located in an area determined by the Federal Emergency Management Agency to have special flood hazards, evidence of flood insurance covering such Mortgaged Property in appropriate amount (or as may be required under applicable Law, including Regulation H of the Board of Governors);

(g)    to the extent requested by Administrative Agent and the Collateral Agent, customary zoning reports for each such Mortgaged Property;

(h)    to the extent requested by Administrative Agent and the Collateral Agent, appraisals with respect to each such Mortgaged Property; and

(i)    such other evidence and all other actions that the Administrative Agent may reasonably deem necessary or desirable in order to create valid, perfected and subsisting first priority Liens on the property described in the Mortgages have been taken.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"Net Cash Proceeds" means,

(a)    with respect to any Asset Disposition, Casualty or Condemnation, (x) the gross amount of all cash proceeds (including cash Insurance Proceeds and cash Condemnation Awards in the case of any Casualty or Condemnation) actually paid to or actually received by ~~the Parent~~NewCo or any of its Subsidiaries in respect of such Asset Disposition, Casualty or Condemnation (including any cash proceeds received as proceeds of any disposition of non-cash proceeds of any Asset Disposition, Casualty or Condemnation as and when received), less (y) the sum of (1) the amount, if any, of all customary fees, legal fees, accounting fees, brokerage fees, commissions, costs and other expenses that are incurred in connection with such Asset Disposition, Casualty or Condemnation and are payable by ~~the Parent~~NewCo or any of its Subsidiaries, but only to the extent not already deducted in arriving at the amount referred to in this clause (ia)~~(A)~~ ~~above~~, (2) Taxes paid or reasonably estimated to be payable in connection therewith (including Taxes imposed on the distribution or repatriation of any such Net Cash Proceeds), (3) in the case of any Disposition by, or Condemnation or Casualty affecting, a non-Wholly Owned Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (3)) attributable to minority interests and not available for distribution to or for the account of ~~the Parent~~NewCo or a Wholly Owned Subsidiary as a result thereof, (4) appropriate amounts that must be set aside as a reserve in accordance with GAAP against any indemnities, liabilities (contingent or otherwise) associated with such Asset Disposition, Casualty or Condemnation, (5) if applicable, the principal amount of any Indebtedness secured by a Permitted Lien that has been repaid or refinanced in accordance with its terms with the proceeds of such Asset Disposition, Casualty or Condemnation, (6) any payments to be made by ~~the Parent~~NewCo or any of its Subsidiaries as agreed between ~~the Parent~~NewCo or such Subsidiary and the purchaser of any assets subject to an Asset Disposition, Casualty or Condemnation in connection therewith and (7) any portion of such proceeds deposited in an escrow account or other appropriate amounts that must be set aside as a reserve in accordance with GAAP against any indemnities, liabilities (contingent or otherwise)

associated with such Asset Disposition, Casualty or Condemnation;

(b)     with respect to (i) any issuance of Equity Interests of ~~the Parent~~NewCo or any Subsidiary, (ii) issuance of convertible or exchangeable debt obligations that are convertible into or exchangeable for Equity Interests of ~~the Parent~~NewCo or any Subsidiary or (iii) any exercise of stock options, warrants or similar rights with respect to Equity Interests of ~~the Parent~~NewCo or any Subsidiary (each, an "Equity Issuance"), the excess of (x) the sum of the cash and Cash Equivalents received by ~~the Parent~~NewCo or any Subsidiary in connection with such Equity Issuance over (y) all underwriting discounts incurred by ~~the Parent~~NewCo or such Subsidiary, all Taxes paid or reasonably estimated to be paid and all customary fees, legal fees, accounting fees and other expenses, in each case, in connection with such Equity Issuance; and

(c)     with respect to the incurrence or issuance of any Indebtedness by ~~the Parent~~NewCo or any of its Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such transaction by ~~the Parent~~NewCo or such Subsidiary over (ii) the underwriting discounts and commissions, and other customary fees, legal fees, accounting fees and other expenses, in each case, incurred by ~~the Parent~~NewCo or such Subsidiary in connection therewith.

"New Client Contracts" means, as of any date of determination, customer and/or partner contracts or similar agreements (including any statements of work or master service agreements) entered into by and among ~~the Parent~~NewCo or any of its Consolidated Subsidiaries and any customer or partner during the twelve-month period prior to such date, in each case, to the extent (i) such customer and/or partner contract or similar agreement shall have been in effect at all times during the period beginning on the date such customer and/or partner contract or similar agreement was entered into and the date of such determination, (ii) a server, appliance or other hardware used or designated for use with the services of ~~the Parent~~NewCo or any of its Consolidated Subsidiaries (to the extent required or applicable to the services of ~~the Parent~~NewCo or any of its Subsidiaries) shall have been installed with such customer or partner during such period and (iii) ~~the Parent~~NewCo or any of its Consolidated Subsidiaries shall have received revenues from or issued invoices to such customer or partner during the most recent Fiscal Quarter for which financial statements shall have been (or were required to be) delivered in accordance with Section 6.01(b).

"New Loan Party" has the meaning specified in Section 6.09(a).

~~"New Parent" has the meaning specified in Schedule 1.01(c).~~

"NewCo LLC Agreement" means the Amended and Restated Limited Liability Company Operating Agreement of NewCo, dated on or about the Amendment No. 13 Effective Date, as amended from time to time.

"Non-Consenting Lender" means any Lender that does not approve any amendment, modification, waiver or consent that (a) requires the approval of all affected Lenders, or all the Lenders with respect to a certain Class of Loans, in accordance with the terms of Section 10.01 and (b) has been approved by the Required Lenders.

~~"Non-U.S. Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.~~

"Notice of Borrowing" means a request by the Borrower for a Borrowing, substantially in the form of Exhibit A hereto.

"OFAC" means the U.S. Treasury Department Office of Foreign Assets Control.

"Organization Documents" means (i) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-United States jurisdiction); (ii) with respect to any limited liability company, the certificate or articles of formation, registration or organization and operating agreement or limited liability company agreement (or equivalent or comparable constitutive documents with respect to any non-United States jurisdiction); and (iii) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization (or equivalent or comparable constitutive documents with respect to any non-United States jurisdiction) and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Original English Loan Party" means Afiniti Europe Technologies Limited, a private limited company incorporated in England and Wales with company number 08587686.

"Original Irish Loan Party" means Afiniti AI Limited, a private company limited by shares incorporated in Ireland with company number 678734.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.03).

"Owned Real Property" means each parcel of real property, together with all improvements located thereon, owned in fee simple by a Loan Party.

"Parent" means Afiniti, Ltd. (in provisional liquidation), a Bermuda exempted company, or any New Parent pursuant to a Permitted Restructuring Transaction, as the context may require.

"Parent Liquidation" has the meaning specified in Section 6.01(a).

"Participant" has the meaning specified in Section 10.06(d).

"Participant Register" has the meaning specified in Section 10.06(d).

"Patent Security Agreement" means the Patent Security Agreement, dated as of the Closing Date, substantially in the form of Exhibit II to the Security Agreement.

"Patents" means issued patents and patent applications, including (i) all continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and invention disclosures, improvements and enhancements related thereto, (ii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (iii) the right to sue for past, present, and future infringements thereof and (iv) all of each Loan Party's rights corresponding thereto throughout the world.

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any entity succeeding to any or all of its functions under ERISA.

"Perfection Certificate" means with respect to any Loan Party a certificate, substantially in the form of Exhibit H to this Agreement, completed and supplemented with the schedules and attachments contemplated thereby and duly executed on behalf of such Loan Party by a Responsible Officer of such Loan Party.

"Permitted Acquisition" means the purchase or other acquisition by the Parent or any Subsidiary of Equity Interests representing more than 50.1% of the interest in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division or line of business of) any Person, in a single transaction or a series of related transactions if (a) (i) in the case of any purchase or other acquisition of Equity Interests in a Person, such Person (including each Subsidiary of such Person), upon the consummation of such purchase or acquisition, will be a Subsidiary (including as a result of a merger or consolidation between the Parent or any Subsidiary and such Person, with, in the case of a merger or consolidation involving the Borrower, the Borrower being the surviving entity) or (ii) in the case of any purchase or other acquisition of other assets, such assets will be owned by the Parent or a Wholly Owned Subsidiary; (b) the business of such Person, or the business conducted with such assets, as the case may be, constitutes a business permitted by Section 7.03(b); and (c) at the time of and immediately after giving effect (including *pro forma* effect) to any such purchase or other acquisition, (i) no Event of Default shall have occurred and be continuing, (ii) the Adjusted LTM Recurring Revenue Ratio as of the end of the most recently completed Test Period shall not exceed 2.00:1.00, and (iii) the Borrower shall have delivered to the Administrative Agent a certificate of a Financial Officer, certifying that all the requirements set forth in this definition have been satisfied, or will be satisfied upon consummation of the purchase or other acquisition, with respect to such purchase or other acquisition. Notwithstanding anything in the contrary contained in clause (a)(i) above, the aggregate amount of Acquisition Consideration paid by the Parent or any Subsidiary for all Permitted Acquisitions of Subsidiaries that do not become Loan Parties shall not exceed the greater of (x) $15,000,000 and (y) solely to the extent the Consolidated EBITDA for such Test Period is no less than $15,000,000, 8.50% of Adjusted LTM Recurring Revenue as of the end of the most recently completed Fiscal Quarter.

"Perfection Requirement" means (i) registration of certain of the Irish Security Documents with the Irish Companies Registration Office within 21 days of their execution and payment of associated fees; (ii) notification must be given to the Irish Collector General within 21 days of the creation of certain of the Irish Security Documents pursuant to section 1001 of the Taxes Consolidation Act 1997 (Ireland) (as amended); and (iii) it will be necessary to record any security over trade marks created by the Irish Loan Party in the appropriate register of trade marks.

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Permitted Encumbrances" means:

(a)    Liens imposed by law for Taxes that are not yet due and payable or are being contested in compliance with Section 6.04;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers' and other like Liens imposed by Law, arising in the ordinary course of business and securing obligations that are not overdue by more than sixty (60) days or are being contested in good faith by appropriate proceedings;

(c)    pledges and deposits made or Liens imposed (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations or employment laws or to secure other public, statutory or regulatory obligations and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of ~~the Parent~~NewCo or any Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (c)(i) above;

(d)    pledges and deposits made or Liens imposed (i) to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of ~~the Parent~~NewCo or any Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (d)(i) above;

(e)    (x) Liens in respect of judgments, orders or decrees that do not constitute an Event of Default under Section 8.01(j) or securing appeal or surety bonds related to such judgments, orders or decrees and (y) notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and not constituting an Event of Default under Section 8.01(j);

(f)    (i) Liens, encumbrances and other matters disclosed on the Mortgage Policies and surveys delivered and approved by the Administrative Agent in connection with Mortgages delivered hereunder, and (ii) easements, zoning restrictions, rights-of-way, restrictions on use and other encumbrances on real estate and defects and irregularities in the title thereto, or any other matter of record, landlord's or lessor's Liens under leases to which any Loan Party or Subsidiary is a party, and other Liens, in each case, none of which in the opinion of the respective Loan Party or Subsidiary interferes materially with the use of real estate of the Loan Parties taken as a whole in the ordinary conduct of business, which encumbrances, defects and Liens do not individually or in the aggregate have a Material Adverse Effect on the use, occupancy (if applicable) or value of the property subject thereto; and

(g)    banker's liens, rights of setoff or similar rights and remedies as to deposit accounts or other funds maintained with depository institutions; provided that such deposit accounts or funds are not established or deposited for the purpose of providing collateral for any Indebtedness.

~~"Permitted Holders" means (i) The Resource Group, Limited, (ii) AFOS LLC (McKinsey), (iii) GAM Star Technology c/o GAM Fund Management Limited, (iv) Ten95 Partners LLC, (v) G3 Investment Partners, (vi) Stratim Capital, (vii) NTT, (viii) Zia Chishti, Phil Davis, Tom Inskip, Zac Hudson, Hassan Afzal, John Birrer, Ittai Kan, Chris Farmer, Michel Portenier, Caroline Mehta and Jason Knott, and (ix) the members of the Board of Directors of Parent as of the Closing Date.~~

"Permitted Junior Priority Refinancing Debt" means any secured Indebtedness incurred

by the Borrower in the form of one or more series of junior lien secured notes or junior lien secured loans; *provided* that (i) such Indebtedness is secured by the Collateral on a junior lien, subordinated basis to the Senior Credit Obligations and the obligations in respect of any Permitted Pari Passu Refinancing Debt, (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, (iii) the security agreements relating to such Indebtedness are substantially the same as the Collateral Documents (with such differences as are reasonably satisfactory to the Administrative Agent) and (iv) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to one or more intercreditor agreements in form and substance reasonably acceptable to the Administrative Agent and the Borrower.

"Permitted Liens" has the meaning assigned to such term in Section 7.02.

"Permitted Pari Passu Refinancing Debt" means any secured Indebtedness incurred by the Borrower in the form of Loans under this Agreement or one or more series of senior secured notes or senior secured loans; *provided* that (i) such Indebtedness is secured by the Collateral on a pari passu basis (but, in the case of any series of secured notes, without regard to the control of remedies) with the Senior Credit Obligations, (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, (iii) the security agreements relating to such Indebtedness are substantially the same as the Collateral Documents (with such differences as are reasonably satisfactory to the Administrative Agent) and (iv) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to one or more intercreditor agreements in form and substance reasonably acceptable to the Administrative Agent and the Borrower.

"Permitted Receivables Party" means any Person set forth on Schedule 1.01 and any other customer of ~~the Parent~~NewCo or any of its Affiliates reasonably acceptable to the Required Lenders. For the avoidance of doubt, each Person and customer described in the foregoing sentence, together with any Affiliates of such Person or customer, shall collectively constitute a single Permitted Receivables Party.

~~"Permitted Refinancing Indebtedness" means any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance") other Indebtedness; provided that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so refinanced (plus unpaid accrued interest and premium (including tender, extension or Prepayment Premium) thereon, any committed or undrawn amounts and underwriting and original issue discounts, fees, commissions and expenses associated with such Permitted Refinancing Indebtedness), (b) the final maturity date of such Permitted Refinancing Indebtedness is no earlier than the maturity date of the Indebtedness being Refinanced (it being understood that, in each case, any provision requiring prepayment or an offer to purchase such Indebtedness as a result of a change of control or asset sale shall not violate the foregoing restriction), (c) if the Indebtedness (including any Guarantee thereof) being Refinanced is by its terms subordinated to the Senior Credit Obligations, such Permitted Refinancing Indebtedness (including any Guarantee thereof) shall be subordinated to the Senior Credit Obligations to the same extent on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being Refinanced, taken as a whole (as determined in good faith by the Board of Directors of the Borrower), (d) no Permitted Refinancing Indebtedness shall have obligors or contingent obligors that were not obligors or contingent obligors (or that would not have been required to become obligors or contingent obligors) in respect of the Indebtedness being Refinanced, and (e) if the Indebtedness being Refinanced is secured, such Permitted Refinancing Indebtedness may be secured on terms no less favorable, taken as a whole, to the Loan Parties than those contained in the documentation (including any intercreditor agreement) governing the Indebtedness being Refinanced (reasonably determined in good faith by the~~

43

~~Board of Directors of the Borrower).~~

~~"Permitted Restructuring Transactions" means any transaction or series of transactions substantially consistent with the transactions described on Schedule 1.01(e).~~

"Permitted Unsecured Refinancing Debt" means any Indebtedness incurred by the Borrower in the form of one or more series of senior unsecured notes or senior unsecured loans; *provided* that (i) such Indebtedness is not secured by any property or assets of any Loan Party or any Subsidiary, and (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

~~"PIK Election" has the meaning specified in Section 2.05(a)(ii).~~

~~"PIK Margin" has the meaning specified in Section 2.05(a)(i).~~

"Plan" means an employee pension benefit plan which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code maintained by or contributed to by ~~the Parent~~NewCo or any of its Subsidiaries or any ERISA Affiliate, other than a Multiemployer Plan or a Foreign Pension Plan.

"Platform" has the meaning specified in Section 10.02.

"Pledged Securities" means "Pledged Securities" as defined in the Security Agreement.

"Prepayment Notice" has the meaning set forth in the Section 2.06(d).

"Prepayment Premium" means, Restructuring First Lien Term Loan Prepayment Premium or Restructuring Second Lien Term Loans Prepayment Premium (as the context requires).

"Prepayment Waterfall Direction" has the meaning set forth in the Section 2.06(e).

~~"Prepayment Waterfall" has the meaning set forth in the Section 2.06(e).~~

~~"Prepayment Premium" means, (i) with respect to any voluntary prepayment of Term Loans, (x) prior to the first (1st) anniversary of the Closing Date, 3.00% of the principal amount of such Term Loans being prepaid, (y) on or after the first (1st) anniversary of the Closing Date and prior to the second (2nd) anniversary of the Closing Date, 1.50% of the principal amount of such Term Loans being prepaid and (z) on or after the second (2nd) anniversary of the Closing Date, none; (ii) subject to Section 2.06(d), with respect to any voluntary prepayment of Tranche A Term Loans, (x) prior to the first (1st) anniversary of the Amendment No. 3 Effective Date, 3.00% of the principal amount of the Tranche A Term Loans being prepaid, (y) on or after the first (1st) anniversary of the Amendment No. 3 Effective Date and prior to the second (2nd) anniversary of the Amendment No. 3 Effective Date, 1.50% of the principal amount of the Tranche A Term Loans being prepaid and (z) on or after the second (2nd) anniversary of the Amendment No. 3 Effective Date, none; and (iii) subject to Section 2.06(d), with respect to any voluntary prepayment of Amendment No. 8 Incremental Term Loans, (x) prior to the first (1st) anniversary of the Amendment No. 8 Effective Date, 3.00% of the principal amount of the Amendment No. 8 Incremental Term Loans being prepaid, (y) on or after the first (1st) anniversary of the Amendment No. 8 Effective Date and prior to the second (2nd) anniversary of the Amendment No. 8 Effective Date, 1.50% of the principal amount of the Amendment No. 8 Incremental Term Loans being prepaid and (z) on or after the second (2nd) anniversary of the Amendment No. 8 Effective Date, none.~~

44

~~Notwithstanding the foregoing, with respect to the Tranche A Term Loans and Amendment No. 8 Incremental Term Loans, no Prepayment Premium shall be payable in connection with any prepayment of the Tranche A Term Loans or Amendment No. 8 Incremental Term Loans if such prepayment is made substantially concurrently with a Change of Control or consummation of a Qualifying Listing.~~

"Prepayment Threshold" has the meaning specified in Section 2.06(b)(i).

"Prepayment Waterfall" has the meaning set forth in the Section 2.06(e).

"Prime Rate" means the rate of interest per annum published from time to time in the money rates section of the Wall Street Journal or any successor publication thereto as the "prime rate" then in effect; provided that if such rate of interest, as set forth from time to time in the money rates section of the Wall Street Journal, becomes unavailable for any reason as determined by the Administrative Agent, the "Prime Rate" shall mean the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as reasonably determined by the Administrative Agent); each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Pro Forma Basis" has the meaning assigned to such term in Section 1.03(c).

"Pro rata Share" has the meaning assigned to such term in Section 8.03(b).

"PTE" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Qualified Capital Stock" means Equity Interests that do not include a cumulative cash dividend (other than dividends that are solely payable as and when declared by the Board of Directors of ~~the Parent~~NewCo or the Borrower, as applicable) and are not mandatorily redeemable by ~~the Parent~~NewCo or any of its Subsidiaries or redeemable at the option of the holder of such Equity Interests, in each case prior to the 91st day following the Latest Maturity Date; provided, however, that an Equity Interest in any Person that is issued to any employee or to any plan for the benefit of employees or by any such plan to such employees shall constitute Qualified Capital Stock notwithstanding any obligation of ~~the Parent~~NewCo or any Subsidiary to repurchase such Equity Interest in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

~~"Qualifying Listing" means an initial public offering, direct listing, acquisition of the Borrower or the Parent via a special purpose acquisition company ("SPAC"), reverse merger, or similar mechanism designed to achieve a public listing on a public market or exchange, (a) that results in the successful application and admission of all or any of the shares of Borrower or Parent, or securities representing such shares (including American depositary receipts, American depositary shares and/or other instruments) to the Official List of the Financial Conduct Authority or on the AIM market operated by the London Stock Exchange plc, the Nasdaq National Stock Market of the Nasdaq Stock Market Inc., the New York Stock Exchange, or to any other appointed stock market or exchange (as designated as such by the Minister of Finance pursuant to the Bermuda Companies Act 1981); and (b) which values the shares to be sold or listed by the issuer in connection with such listing at, in aggregate, $15,000,000 or more, but excluding for the purposes of such valuation any shares issued or subscribed at the time of or in connection with the Qualifying Listing.~~

"Real Property" means any Leased Real Property, any Owned Real Property, and all Leased Real Property and Owned Real Property, collectively, as applicable.

"Recipient" means (a) the Administrative Agent and (b) any Lender.

"Refinance" has the meaning set forth in the definition of "Permitted Refinancing Indebtedness". "Refinanced" and "Refinancing" shall have meanings correlative to the foregoing.

"Refinanced Debt" has the meaning specified in the definition of Credit Agreement Refinancing Indebtedness.

"Refinancing Amendment" means an amendment to this Agreement in form and substance reasonably satisfactory to the Administrative Agent executed by each of (a) the Loan Parties, (b) the Administrative Agent and (c) each Lender that agrees to provide any portion of the Credit Agreement Refinancing Indebtedness being incurred pursuant thereto, in accordance with Section 2.13, but shall not effect any amendments that would require the consent of each affected Lender or all Lenders pursuant to Section 10.01(b).

"Refinancing Debt" has the meaning specified in the definition of Credit Agreement Refinancing Indebtedness.

"Refinancing Lender" means, at any time, any bank, financial institution or other institutional lender or investor (other than any such bank, financial institution or other institutional lender or investor that is a Lender at such time) that agrees to provide any portion of Credit Agreement Refinancing Indebtedness pursuant to a Refinancing Amendment in accordance with Section 2.13, *provided* that each Refinancing Lender shall be subject to the approval of the Borrower in consultation with the Administrative Agent.

"Refinancing Election Period" has the meaning set forth in Section 2.13(b).

"Refinancing Loans" has the meaning specified in Section 2.13(a).

"Register" has the meaning specified in Section 10.06(c).

"Regulation T, U or X" means Regulation T, U or X, respectively, of the Board of Governors of the Federal Reserve System as amended, or any successor regulation.

"Reinvestment Funds" means, with respect to any Net Cash Proceeds of Insurance Proceeds, or any Condemnation Award or any Asset Disposition in respect of the single event or series of related events giving rise thereto, that portion of such funds expected to be reinvested (or to which the ParentNewCo or any Subsidiary expects to enter into a binding commitment for any such reinvestment) (which investment may include the repair, restoration or replacement of the applicable assets thereof) within twelve (12) months after the occurrence of the Casualty, or Condemnation or Asset Disposition giving rise thereto (or if some or all of such Net Cash Proceeds are scheduled to be received at a later date than the date of such occurrence, within twelve (12) months following the receipt of such Net Cash Proceeds) in assets or other property (including Equity Interests) useful in the business of the ParentNewCo and its Subsidiaries; provided that such Net Cash Proceeds shall be held in a deposit account subject to a Deposit Account Control Agreement (as defined in the Security Agreement); provided further that, if any such Net Cash Proceeds are not actually so reinvested within the applicable twelve-month period, such unreinvested portion shall no longer constitute Reinvestment Funds and shall be applied on the last day of such period as a mandatory prepayment as provided in Section 2.06(b)(i).

"Rejected Amount" has the meaning specified in Section 2.06(f).

"Rejection Deadline" has the meaning set forth in Section 2.06(f).

"Rejection Notice" has the meaning specified in Section 2.06(f).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, trustees, directors, officers, employees and agents of such Person and of such Person's Affiliates.

"Release" means any spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the Environment or within, upon, or from or into any building, structure, facility or fixture.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Representative" has the meaning specified in Section 10.07.

"Required Lenders" means, at any time of determination, (i) if the aggregate Credit Exposure of VCP constitutes at least 33.33% of the aggregate Credit Exposure of all Lenders, VCP, and (ii) if the aggregate Credit Exposure of VCP constitutes less than 33.33% of the aggregate Credit Exposure of all Lenders, Lenders whose aggregate Credit Exposure constitutes more than 50% of the Credit Exposure of all or a particular Class of Lenders at such time, as applicable; provided, however, that if any Lender shall be a Defaulting Lender at such time then there shall be excluded from the determination of Required Lenders such Lender and its Credit Exposure at such time; provided, further, that, with respect to any Lender that is a Vista Investor, the Credit Exposure of such Lender shall be deemed to be held by, and the Credit Exposure of such Lender shall be voted by, Vista Credit Partners, L.P. or its Affiliates.

"Responsible Officer" means the chief executive officer, manager, member, authorized signatory, chief financial officer, treasurer, manager (gérant) or controller of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means (i) any dividend or other distribution (whether in cash, securities or other property), direct or indirect, on account of any class of Equity Interests or Equity Equivalents of the ParentNewCo or any Subsidiary, now or hereafter outstanding and (ii) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the repurchase, redemption, retirement, acquisition, cancellation, termination or similar payment, purchase or other acquisition for value, direct or indirect, of any class of Equity Interests or Equity Equivalents of the ParentNewCo or any Subsidiary, now or hereafter outstanding.

"Restructuring" means, collectively, (i) the Restructuring Support Agreement, (ii) any transactions implementing the agreed restructuring set out in the Restructuring Support Agreement, including the HoldCo Contributions, and (iii) any court proceedings, before either the Bermuda Supreme

Court or the U.S. Bankruptcy Court arising out of, in connection with or in furtherance of (i) and/or (ii).

"Restructuring First Lien Term Loan Commitment" means, the several commitments of the Restructuring First Lien Term Loan Lenders to provide such Lenders' pro rata share of the Restructuring First Lien Term Loans in accordance with, and subject to, the terms and conditions of this Agreement and Amendment No. 13.

"Restructuring First Lien Term Loan Commitment Percentage" means, for each Restructuring First Lien Term Loan Lender, the percentage of the aggregate Restructuring First Lien Term Loan Commitments represented by such Lender's Restructuring First Lien Term Loans at such time and identified by its Restructuring First Lien Term Loan Commitment Percentage in Amendment No. 13, as such percentage may be modified in connection with any Assignment and Assumption made in accordance with the provisions of Section 10.06(b).

"Restructuring First Lien Term Loan Lenders" means the "Restructuring First Lien Term Loan Lenders" that are party to Amendment No. 13, and their successors and assigns.

"Restructuring First Lien Term Loan Prepayment Premium" means, (i) with respect to any prepayment or repayment of the Restructuring First Lien Term Loans (including as a result of any mandatory prepayments, voluntary prepayments, payments made following acceleration of the Restructuring First Lien Term Loans or after an Event of Default, and whether made pursuant to any proceeding under any debtor relief law, whether or not a claim for such premiums are allowed in such proceeding), (x) prior to the first (1st) anniversary of the Amendment No. 13 Effective Date, 3.00% of the principal amount of such Restructuring First Lien Term Loans being prepaid, (y) on or after the first (1st) anniversary of the Amendment No. 13 Effective Date and prior to the second (2nd) anniversary of the Amendment No. 13 Effective Date, 1.00% of the principal amount of such Restructuring First Lien Term Loans being prepaid and (z) on or after the second (2nd) anniversary of the Amendment No. 13 Effective Date, none.

"Restructuring First Lien Term Loans" means the Existing Term Loans, as amended by Amendment No. 13 and set forth on Annex C to the Amendment No. 13. The principal amount of the Restructuring First Lien Term Loans on the Amendment No. 13 Effective Date is $225,000,000.

"Restructuring Second Lien Term Loan Commitment" means, the several commitments of the Restructuring Second Lien Term Loan Lenders to provide such Lenders' pro rata share of the Restructuring Second Lien Term Loans in accordance with, and subject to, the terms and conditions of this Agreement and Amendment No. 13.

"Restructuring Second Lien Term Loan Commitment Percentage" means, for each Restructuring Second Lien Term Loan Lender, the percentage of the aggregate Restructuring Second Lien Term Loan Commitments represented by such Lender's Restructuring Second Lien Term Loans at such time and identified by its Restructuring Second Lien Term Loan Commitment Percentage in Amendment No. 13, as such percentage may be modified in connection with any Assignment and Assumption made in accordance with the provisions of Section 10.06(b).

"Restructuring Second Lien Term Loan Lenders" means the "Restructuring Second Lien Term Loan Lenders" that are party to Amendment No. 13, and their successors and assigns.

"Restructuring Second Lien Term Loan Prepayment Premium" means in connection with any prepayment or repayment of the Restructuring Second Lien Term Loans (including as a result of any mandatory prepayments, voluntary prepayments, payments made following acceleration of the

Restructuring Second Lien Term Loans or after an Event of Default, and whether made pursuant to any proceeding under any debtor relief law, whether or not a claim for such premiums are allowed in such proceeding) an amount equal to the greater of (i) the principal amount of the Restructuring Second Lien Term Loans plus any and all accrued interest and fees outstanding at such time and (ii)(a) if made on or prior to the second anniversary of the Amendment No. 13 Effective Date, an amount equal to (A) the MOIC multiplied by 1.50 minus (B) the aggregate amount of all interest payments, any premiums and any repayments or prepayment of principal, in each case, received in cash by the Lenders in respect of such Restructuring Second Lien Term Loans since the Amendment No. 13 Effective Date through and including the applicable date of calculation pursuant to the terms of this Agreement, (b) if made after the second anniversary of the Amendment No. 13 Effective Date and on or prior to the fourth anniversary of the Amendment No. 13 Effective Date, an amount equal to (A) the MOIC multiplied by 1.75 minus (B) the aggregate amount of all interest payments, any premiums and any repayments or prepayment of principal, in each case, received in cash by the Lenders in respect of such Restructuring Second Lien Term Loans since the Amendment No. 13 Effective Date through and including the applicable date of calculation pursuant to the terms of this Agreement, (c) if made after the fourth anniversary of the Amendment No. 13 Effective Date and on or prior to the sixth anniversary of the Amendment No. 13 Effective Date, an amount equal to (A) the MOIC multiplied by 2.25 minus (B) the aggregate amount of all interest payments, any premiums and any repayments or prepayment of principal, in each case, received in cash by the Lenders in respect of such Restructuring Second Lien Term Loans since the Amendment No. 13 Effective Date through and including the applicable date of calculation pursuant to the terms of this Agreement and (d) if made after the sixth anniversary of the Amendment No. 13 Effective Date, an amount equal to (A) the MOIC multiplied by 2.50 minus (B) the aggregate amount of all interest payments, any premiums and any repayments or prepayment of principal, in each case, received in cash by the Lenders in respect of such Restructuring Second Lien Term Loans since the Amendment No. 13 Effective Date through and including the applicable date of calculation pursuant to the terms of this Agreement.

"Restructuring Second Lien Term Loans" means the Existing Term Loans, as amended by Amendment No. 13, and the Restructuring Second Lien Term Loans provided pursuant to the Backstop Commitment as set forth on Annex C to the Amendment No. 13. The principal amount of the Restructuring Second Lien Term Loans on the Amendment No. 13 Effective Date is $[298,744,859.71].

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of September [ ], 2024, by and between the Lenders, the Parent, the Restructuring First Lien Borrower and the other Guarantors.

"Restructuring Term Loan Commitment" means the Restructuring First Lien Term Loan Commitment and Restructuring Second Lien Term Loan Commitment.

"Restructuring Term Loans" means the Restructuring First Lien Term Loans and Restructuring Second Lien Term Loans.

"Retained Disposition Proceeds" has the meaning specified in Section 2.06(b)(i).

"Rights" has the meaning specified in Section 9.13(i).

"Rights Offering" means the offering to be conducted following the Amendment No. 13 Effective Date to Eligible Holders (as defined in the NewCo LLC Agreement) of equity interests in the Parent who are otherwise entitled to participate in such offering pursuant to the Restructuring Support Agreement, the Backstop Commitment and the NewCo LLC Agreement as of the record date for such offering of (i) up to $25,000,000 aggregate principal amount of Restructuring Second Lien Term Loans

(inclusive of $10,000,000 aggregate principal amount of the Backstop Commitment) (or, in the event such holders are not Eligible Assignees, Equivalent Notes) and (ii) a number of Class A-1 Units equal to the number of Class A-2 Units issuable upon conversion of the Restructuring Second Lien Term Loans or Equivalent Notes subscribed for in such offering.

"Rights Offering Subscribers" means the holders of equity interests in the Parent who purchase Restructuring Second Lien Term Loans or Equivalent Notes and Class A-1 Units through the Rights Offering.

"S&P" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc., a New York corporation, and its successors.

"Sale/Leaseback Transaction" means any direct or indirect arrangement with any Person or to which any such Person is a party providing for the leasing to the ParentNewCo or any of its Subsidiaries of any property, whether owned by the ParentNewCo or any of its Subsidiaries as of the Closing Date or later acquired, which has been or is to be sold or transferred by the ParentNewCo or any of its Subsidiaries to such Person from whom funds have been, or are to be, advanced by such Person on the security of such property; provided, however, that any transaction permitted by Sections 7.01(e) or 7.02(e) shall be deemed not to be a Sale/Leaseback Transaction.

"Sanction" means any international economic or financial sanctions or trade embargoes administered or enforced from time to time by (a) the United States Government (including, without limitation, those administered by OFAC, the U.S. Department of State, and the U.S. Department of Commerce), (b) the United Nations Security Council, (c) the European Union (including, without limitation, those administered by the EU Council or EU Commission, when acting in furtherance of the EU's Common and Foreign Security Policy), (d) the United Kingdom (including, without limitation, those administered by Her Majesty's Treasury ("HMT") and the Department of Business, Innovation and Skills), (e) the government of Bermuda and (f) other similar authorities in other jurisdictions.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Second Incremental Tranche A Draw DateLien Cash Option" has the meaning set forthspecified in Section 2.012.05(ea)(iiiii).

"Second Incremental Tranche A Term Loan CommitmentsLien Cash/PIK Election Notice" has the meaning set forthspecified in Section 2.012.05(ea)(ii).

"Second Incremental Tranche A Term Loan Warrant" means each Warrant to Purchase Shares, dated as of the applicable Second Incremental Tranche A Draw Date, issued by the Parent to each Lender funding Second Incremental Tranche A Term Loans on such Second Incremental Tranche A Draw Date, in form and substance substantially consistent with the Initial Tranche A Term Loan Warrant, with such additional changes as may be agreed between the Parent and such Lenders; provided that, (i) the Second Incremental Tranche A Term Loan Warrants received by the Lenders funding Second Incremental Tranche A Term Loans shall in the aggregate represent 37,352 common shares of the Parent as of the applicable Second Incremental Tranche A Draw Date, as such amount may be increased pursuant to Section 2.01(c), and (ii) each Lender funding Second Incremental Tranche A Term Loans on such applicable Second Incremental Tranche A Draw Date shall receive a pro rata portion of the aggregate right to purchase common shares based on an aggregate principal amount of Second Incremental Tranche A Term Loans permitted to be incurred pursuant to Section 2.01(c).

50

"Second Incremental Tranche A Term Loans" has the meaning set forth in Section 2.01(c)(ii).

"Second ~~Tranche A Incremental Facility~~Lien PIK Option" has the meaning ~~set forth~~specified in Section ~~2.01~~2.05(~~c~~a)(ii).

"Second Tranche A Incremental Facility Effective Date" means each date on which the conditions described in Section 2.01(c)(iv) are satisfied and the Additional Credit Extension Amendment with respect to the Second Tranche A Incremental Facility is made effective.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" means, as context shall require, either (i) the Security Agreement, substantially in the form of Exhibit G hereto, dated as of the Closing Date, among the Borrower, the other grantors party thereto from time to time, and the Collateral Agent, as the same may be amended, modified or supplemented from time to time, or (ii) the Security Agreement, substantially in the form of Exhibit G hereto, dated as of the Amendment No. 13 Effective Date, between NewCo and the Collateral Agent, as the same may be amended, modified or supplemented from time to time.

"Senior Credit Obligations" means, with respect to each Loan Party, without duplication:

(a)     in the case of the Borrower, all principal of and interest (including, without limitation, any interest which accrues after the commencement of any proceeding under any Insolvency or Liquidation Proceeding with respect to the Borrower, whether or not allowed or allowable as a claim in any such proceeding) on any Loan under, or any Term Note issued pursuant to, this Agreement or any other Loan Document;

(b)     all fees, premium (including Prepayment Premium), expenses, indemnification obligations and other amounts of whatever nature now or hereafter payable by such Loan Party (including, without limitation, any amounts which accrue after the commencement of any proceeding under any Insolvency or Liquidation Proceeding with respect to such Loan Party, whether or not allowed or allowable as a claim in any such proceeding) pursuant to this Agreement or any other Loan Document;

(c)     all expenses of the Agents as to which one or more of the Agents have a right to reimbursement by such Loan Party under Section 10.04(a) of this Agreement or under any other similar provision of any other Loan Document, including, without limitation, any and all sums advanced by the Collateral Agent to preserve the Collateral or preserve its security interests in the Collateral to the extent permitted under any Loan Document or applicable Law;

(d)     all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement by such Loan Party under Section 10.04(b) of this Agreement or under any other similar provision of any other Loan Document; and

(e)     in the case of the Borrower and each Guarantor, all amounts now or hereafter payable by the Borrower or such Guarantor and all other obligations or liabilities now existing or hereafter arising or incurred (including, without limitation, any amounts which accrue after the commencement of any proceeding under any Insolvency or Liquidation Proceeding with respect to the Borrower or such Guarantor, whether or not allowed or allowable as a claim in any such

proceeding) on the part of such Guarantor pursuant to this Agreement, the Guaranty Agreement or any other Loan Document;

together, in each case of the foregoing, with all renewals, modifications, consolidations or extensions thereof. Unless otherwise specified, all references herein to "the Senior Credit Obligations" guaranteed or to be guaranteed by a Loan Party shall refer to the Senior Credit Obligations other than those with respect to which such Loan Party is the borrower.

"Senior Representative" means, with respect to any series of Indebtedness permitted by this Agreement to be secured on the Collateral on a pari passu or junior or subordinated basis, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"SOFR": means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator": means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Loan": means Loans bearing interest based upon Term SOFR.

"SOFR Tranche" means the collective reference to the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Software" means computer programs and applications, operating systems, applications, firmware and other codes (whether or not copyrightable), including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof.

"Solvent" means, with respect to the Parent NewCo and its Subsidiaries (on a consolidated basis) as of a particular date, that on such date (i) the fair value of the assets of the Parent NewCo and its Subsidiaries, on a consolidated basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of the Parent NewCo and its Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) the Parent NewCo and its Subsidiaries, on a consolidated basis, will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured; and (iv) the Parent NewCo and its Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital.

"Specified Jurisdiction" means a collective reference to (i) the United States of America or a political subdivision thereof, (ii) Bermuda, (iii) the United Kingdom and, (iv) Luxembourg, (v) Ireland and (vi) the Cayman Islands.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which (i) if a corporation, more than 50% of the total voting power of stock entitled (other than stock or such other ownership interest having such power only by reason of the happening of a contingency) to vote in the election of directors, managers or

52

trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability company, association or business entity other than a corporation, more than 50% of the partnership or other similar ownership interests thereof (other than stock or such other ownership interest having such power only by reason of the happening of a contingency) is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof; provided, for the avoidance of doubt, that no Person that is a non-profit corporation, foundation or similar entity shall be a Subsidiary of any Person that is a member of such non-profit corporation, foundation or similar entity.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of ~~the Parent~~NewCo.

"Subsidiary Guarantor" means each Subsidiary that is party to the Guaranty Agreement or other guaranty agreement pursuant to which it Guarantees the Senior Credit Obligations.

"Swap Agreement" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement and (ii) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Synthetic Lease" means, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of real or personal property, or a combination thereof, (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee is deemed to own the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"Synthetic Lease Obligations" means, as to any Person, an amount equal to the capitalized amount of the remaining lease payments under any Synthetic Lease (determined, in the case of a Synthetic Lease providing for an option to purchase the leased property, as if such purchase were required at the end of the term thereof) that would appear on a balance sheet of such Person prepared in accordance with GAAP if such payment obligations were accounted for as Capital Lease Obligations.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Commitment" means, the Initial Term Commitment and the Additional Term Commitment, as applicable.

"Term Commitment Percentage" means, for each Lender, such Lender's Initial Term Commitment Percentage and Additional Term Commitment Percentage, as applicable.

"Term Committed Amount" means, the Initial Term Committed Amount and the Additional Term Committed Amount, as applicable.

"Term Lender" means any ~~Initial~~Restructuring First Lien Term ~~Loan~~ Lender, ~~any Additional~~Restructuring Second Lien Term Loan Lender, ~~any Tranche A Term Lender, any Amendment No. 8 Incremental Lender~~, or any other Lender that becomes a party hereto pursuant to Section 2.01(c)~~, Section 2.11~~, Section 2.13 or Section 2.14, and each Eligible Assignee that becomes a Lender pursuant to Section 10.06(b) and their respective permitted successors.

"Term Loans" means~~,~~ the ~~Initial~~Restructuring Term Loans ~~and the Additional Term Loans, as applicable~~.

"Term Note" means a promissory note, substantially in the form of Exhibit B hereto, evidencing the obligation of the Borrower to repay outstanding Loans, as such note may be amended, modified or supplemented from time to time, and "Term Notes" means all such Term Notes, collectively.

"Term SOFR" means:

(a)  for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate (as defined below) for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day,

(b)  for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day; and

(c)  notwithstanding the foregoing, if Term SOFR shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Administrator": means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative

Agent in its reasonable discretion).

"Term SOFR Reference Rate": means the forward-looking term rate based on SOFR.

"Test Period" means, at any date of determination, the period of four consecutive Fiscal Quarters of ~~the Parent~~NewCo then last ended for which financial statements have been delivered or were required to be delivered pursuant to Section 6.01(a) or 6.01(b), as applicable.

"Threshold Amount" means $~~20,000,000~~10,000,000.

"Total Leverage Ratio" means, with respect to any Test Period, the ratio of (a) (i) Consolidated Funded Debt (excluding the Senior Credit Obligations in respect of any Restructuring Second Lien Term Loans) as of the last day of such Test Period *minus* (ii) Unrestricted Cash as of such date, up to a maximum of $5,000,000 to (b) Consolidated EBITDA of the Borrower and its Subsidiaries for such Test Period.

"Trademark Security Agreement" means the Trademark Security Agreement, dated as of the Closing Date, substantially in the form of Exhibit III to the Security Agreement.

"Trademarks" means any and all trademarks, trade dress, logos, slogans, business and trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, and other indicia of origin, including (i) all renewals and extensions thereof, (ii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, (iv) the goodwill of each Loan Party's business symbolized by the foregoing or connected therewith and (v) all of each Loan Party's rights corresponding thereto throughout the world.

"Tranche A Facility" means the Initial Tranche A Facility and each Tranche A Incremental Facility.

"Tranche A Facility Effective Date" means the Initial Tranche A Facility Effective Date or any Tranche A Incremental Facility Effective Date, as applicable.

"Tranche A Incremental Facility" means the First Tranche A Incremental Facility and Second Tranche A Incremental Facility.

"Tranche A Incremental Facility Effective Date" means the First Tranche A Incremental Facility Effective Date or the Second Tranche A Incremental Facility Effective Date, as applicable.

~~"Tranche A Term Lender" shall mean each Lender who makes or holds a Tranche A Term Loan.~~

~~"Tranche A Term Loans" shall mean the Initial Tranche A Term Loans and/or any Incremental Tranche A Term Loans.~~

~~"Tranche A Term Loan Commitments" means the Initial Tranche A Term Loan Commitment and/or any Incremental Tranche A Term Loan Commitments, as applicable.~~

"Tranche A Term Loan Commitment Percentage" means, for each Lender, the percentage of the aggregate Tranche A Term Loan Commitments represented by such Lender's Tranche

A Term Loan Commitment at such time and identified as its Tranche A Term Loan Commitment Percentage on Schedule 2.01, as such percentage may be modified in connection with any Additional Credit Extension Amendment or any Assignment and Assumption made in accordance with the provisions of Section 10.06(b).

"Transaction Costs" means all fees, costs and expenses, including charges, costs, fees and expenses in accordance with GAAP associated with the termination and/or extinguishment of the Existing Credit Facility (including, without limitation, payment of prepayment and other fees and expenses), incurred or payable by the Parent, NewCo or any Subsidiary in connection with the transactions contemplated hereby, including the Transactions. (including, for the avoidance of doubt, (x) any payments in respect of any transaction bonuses or deferred compensation in effect on or prior to the Amendment No. 13 Effective Date and (y) any charges, expenses and reserves, retention and severance incurred on or prior to the Amendment No. 13 Effective Date, contract termination costs, integration costs and costs to consolidate facilities and relocate employees and other shutdown costs, litigation and settlement costs, in each case, related to the Restructuring).

"Transactions" means (i) the consummation of the Closing Date Refinancing, (ii) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the borrowing of the Initial Term Loans hereunder on the Closing Date, and (iii) the payment of the Transaction Costs and (iv) the consummation of Amendment No. 13, the Restructuring and transaction relating thereto.

"UCC" means the Uniform Commercial Code of the State of New York or of any other state the Laws of which are required to be applied in connection with the perfection or priority of security interests in any collateral.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unfunded Liabilities" means, except as otherwise provided in Section 5.11(a)(i)(B), (i) with respect to each Plan, the amount (if any) by which the present value of all nonforfeitable benefits under each Plan exceeds the current value of such Plan's assets allocable to such benefits, all determined in accordance with the respective most recent valuations for such Plan using applicable PBGC plan termination actuarial assumptions (the terms "present value" and "current value" shall have the same meanings specified in Section 3 of ERISA) and (ii) with respect to each Foreign Pension Plan, the amount (if any) by which the present value of all nonforfeitable benefits under each Foreign Pension Plan exceeds the current value of such Foreign Pension Plan's assets allocable to such benefits, all determined in accordance with the respective most recent valuations for such Plan using the most recent actuarial assumptions and methods being used by the Foreign Pension Plan's actuaries for financial reporting under applicable accounting and reporting standards.

"United States" or "U.S." means the United States of America, including each of the States and the District of Columbia, but excluding its territories and possessions.

"Unrestricted Cash" means cash and Cash Equivalents of the ParentNewCo and the Guarantors, other than cash and Cash Equivalents listed as "Restricted" (or any like caption) on the balance sheet of any such Person, maintained in accounts subject to a Deposit Account Control Agreement (as defined in the Security Agreement) or equivalent local-law requirement with respect to any accounts in a non-U.S. jurisdiction.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b)

a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(f)(ii)(D).

"VCP" means Vista Credit Partners, L.P., its Affiliates, related funds and managed accounts.

"Vista Investor" means any limited partner or other investor in Vista Credit Partners, L.P. or an Affiliate thereof.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (A) the amount of each then remaining installment (without giving effect to any prepayments of installments on such date), sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (B) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"Welfare Plan" means a "welfare plan" as such term is defined in Section 3(1) of ERISA.

"Wholly Owned" means, with respect to any Subsidiary of any Person at any date, that all of the shares of capital stock or other ownership interests of such Subsidiary (other than director's qualifying shares) are at the time directly or indirectly owned by such Person.

"Withholding Agent" means ~~the Borrower~~any Loan Party and the Administrative Agent.

"Wingspire Finance Agreement" means that certain Equipment Finance Agreement, dated as of August 31, 2023 (as amended from time to time in accordance with its terms), by and between Afiniti, Inc. and Wingspire Equipment Finance LLC; provided that the aggregate principal amount outstanding do not exceed $10,000,000.

**Section 1.02** Other Interpretative Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

i) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words

"herein," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

ii)       In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

iii)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)      Capitalized terms used but not defined herein shall have the meaning given to them in the Restructuring Support Agreement.

**Section 1.03**      Accounting Terms and Determinations.

(a)      Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein, in any other Loan Document or as disclosed to the Administrative Agent. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) FASB 141R or ASC 805 (or any other financial accounting standard having a similar result or effect) or (ii) any election under ASC 825 — Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of NewCo, the Borrower or any Subsidiary at "fair value" as defined therein.

(b)      Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either (x) the Borrower or (y) the Administrative Agent or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders documents as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding any provision of GAAP that would require lease obligations that would have previously been characterized as operating leases to be classified and accounted for as capital leases, finance leases or otherwise reflected on the Loan Parties' consolidated balance sheet, for

the purposes of determining compliance with any covenant contained herein, such obligations shall be treated in the same manner as operating leases are treated as of the Closing Date and the foregoing reconciliation shall not be required. It is understood and agreed that, commencing on the Closing Date, for all fiscal periods commencing on or after January 1, 2018, the impact of FASB ASC 606 and FASB ASC 340-40 on revenue recognition and amortization of associated costs and expenses shall be given effect for all purposes under this Agreement and the foregoing reconciliation shall not be required.

(c)      Pro Forma Calculations.  All *pro forma* computations required to be made in this Agreement and in any other Loan Document giving effect to any Disposition, ~~Permitted Acquisition,~~ other Investment permitted hereunder, any merger and acquisition permitted hereunder, redemption or repayment of Indebtedness or issuance, incurrence or assumption of Indebtedness shall be calculated after giving *pro forma* effect thereto immediately after giving effect to such acquisition, disposition, Investment, designation, redemption or repayment of Indebtedness, or issuance, incurrence or assumption of Indebtedness (and to any other such transaction consummated since the first day of the period for which such *pro forma* computation is being made and on or prior to the date of such computation) as if such transaction (and any other such transactions) had occurred on the first day of the applicable Test Period, and, to the extent applicable, the historical earnings and cash flows associated with the assets acquired or disposed of, any related repayment, redemption, incurrence or reduction of Indebtedness (each such calculation, calculated on a "Pro Forma Basis").  If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Swap Agreement applicable to such Indebtedness).

(d)      Foreign Currency Calculations. For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar equivalent of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased. The principal amount of any Indebtedness incurred to extend, replace, refund, refinance, renew or defease other Indebtedness, if incurred in a different currency from the Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance.

**Section 1.04**      Rounding.  Any financial ratios required to be maintained by ~~the Parent~~NewCo or any of its Subsidiaries pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**Section 1.05**      Times of Day.  Unless otherwise specified, all references herein to

times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.06    Classes of Borrowings.  The term "Borrowing" denotes the aggregation of Loans of one or more Lenders made to the Borrower pursuant to Article II, any Additional Credit Extension Amendment or any Refinancing Amendment, on the same date, all of which Loans are of the same Class (subject to Article III).  Loans hereunder are distinguished by "Class."  The "Class" of a Loan (or of a Commitment to make such a Loan or of a Borrowing comprised of such Loans) refers to whether such Loan is an Initial Term Loan, an Additional Term Loan, an Incremental Term Loan, a ~~Tranche A~~Restructuring Term Loan, a Restructuring First Lien Term Loan, a Restructuring Second Lien Term Loan, a Refinancing Loan or an Extended Loan.

Section 1.07    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws), including but not limited to the Delaware Limited Liability Company Act: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.08    ~~Equity Contribution Principles~~[Reserved]

~~.  For all purposes under the Loan Documents, to the extent any Net Cash Proceeds from any transaction described in clauses (i) through (iv) of the definition of Available Amount are used or included in determining the Available Amount, the Discretionary Amount or the availability under any basket, including, but not limited to, Section 7.06(f), following the use of any such Available Amount, Discretionary Amount or any such basket in any Fiscal Quarter, concurrently with the delivery of the financial statements required to be delivered pursuant to Section 6.01(b) with respect to such Fiscal Quarter, the Borrower shall deliver to the Administrative Agent a certificate from a Responsible Officer of the Borrower describing in reasonable detail such Net Cash Proceeds and designating such Net Cash Proceeds as having been used or included in the calculation of the Available Amount, Discretionary Amount or any basket in the Credit Agreement; provided that, for the avoidance of doubt, such Net Cash Proceeds shall be designated without duplication with any other Net Cash Proceeds so designated pursuant to this Section 1.08; provided further, that any Net Cash Proceeds from the exercise of stock options, warrants or similar rights with respect to Qualified Capital Stock of the Parent may only be designated to increase  the Available Amount pursuant to clause (iv) of the definition thereof and not to increase the Available Amount pursuant to any other clause, the Discretionary Amount or the amount of any other basket (the requirements set forth in this Section 1.08, collectively, the "Equity Contribution Principles").~~

Section 1.09    Guarantee Limitations: Ireland. Notwithstanding anything to the contrary contained in this Agreement, the guarantees, obligations, liabilities and undertakings under this Agreement of any Irish Loan Party shall be deemed not to be undertaken or incurred to the extent that the same would: (a) constitute unlawful financial assistance prohibited by Section 82 of the Irish Companies Act 2014; or (b) constitute a breach of Section 239 of the Irish Companies Act 2014. For the avoidance of any doubt, to the extent that such guarantees, obligations, liabilities and undertakings have been validated by a summary approval procedure in accordance with the Irish Companies Act 2014, they shall neither constitute unlawful financial assistance under Section 82 nor a breach of Section 239 of the Irish Companies Act 2014.

**Section 1.10**    Irish Terms. In each Loan Document, where it relates to an Irish Loan Party, Irish Law or a document governed by Irish law, a reference to:

(a) "inability to pay its debts" (or any analogous wording) includes inability to pay its debts within the meaning of Section 509(3) or Section 570 of the Irish Companies Act 2014; and

(b) an "examiner" has the meaning given to that term in section 508 of the Irish Companies Act and "examinership" shall be construed in accordance with the Irish Companies Act 2014.

**Section 1.11**    Interest Rates. The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to any reference rate referred to herein or with respect to any rate (including, for the avoidance of doubt, the selection of such rate and any related spread or other adjustment) that is an alternative or replacement for or successor to any such rate (including, without limitation, any Benchmark Replacement) (or any component of any of the foregoing) or the effect of any of the foregoing, or of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions or other activities that affect any reference rate referred to herein, or any alternative, successor or replacement rate (including, without limitation, any Benchmark Replacement) (or any component of any of the foregoing) or any related spread or other adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any reference rate referred to herein or any alternative, successor or replacement rate (including, without limitation, any Benchmark Replacement) (or any component of any of the foregoing), in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or other action or omission related to or affecting the selection, determination, or calculation of any rate (or component thereof) provided by any such information source or service.

**Section 1.12**    Guarantee Limitations: England and Wales.  Notwithstanding anything to the contrary contained in this Agreement, the guarantees under the Guaranty Agreement of any English Loan Party do not apply to any liability to the extent that it would result in such guarantees constituting unlawful financial assistance within the meaning of Section 678 of the Companies Act 2006.

**Section 1.13**    Co-Borrowers.

(a)    Each of the Restructuring Second Lien Co-Borrowers accepts joint and several liability hereunder with respect to all Senior Credit Obligations arising in connection with the Restructuring Second Lien Term Loans in consideration of the financial accommodation provided or to be provided by the Administrative Agent and the Restructuring Second Lien Term Loan Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each Restructuring Second Lien Co-Borrower and in consideration of the undertakings of each Restructuring Second Lien Co-Borrower to accept joint and several liability for the obligations of each other such person.

(b)    Each Restructuring Second Lien Co-Borrower shall be jointly and severally liable for the Senior Credit Obligations arising in connection with the Restructuring Second Lien Term Loans, regardless of which Restructuring Second Lien Co-Borrower actually receives or is allocated the Restructuring Second Lien Term Loans hereunder or the amount of the corresponding Senior Credit Obligations received or the manner in which the Administrative Agent or any Restructuring Second Lien

Term Loan Lender accounts for the Senior Credit Obligations arising in connection with the Restructuring Second Lien Term Loans on its books and records. Each Restructuring Second Lien Co-Borrower's obligations with respect to Restructuring Second Lien Term Loans made or allocated to it, and each Restructuring Second Lien Co-Borrower's obligations arising as a result of the joint and several liability of such Restructuring Second Lien Co-Borrower hereunder, with respect to Restructuring Second Lien Term Loans made to and other Senior Credit Obligations owing by the Restructuring Second Lien Co-Borrowers hereunder, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each Restructuring Second Lien Co-Borrower.

(c)    Upon the occurrence and during the continuation of any Event of Default, the Administrative Agent and the Restructuring Second Lien Term Lenders may proceed directly and at once, without notice, against any Restructuring Second Lien Co-Borrower to collect and recover the full amount, or any portion of, the Senior Credit Obligations arising in connection with the Restructuring Second Lien Term Loans, without first proceeding against the other Restructuring Second Lien Co-Borrower or any other person, or against any security or collateral for the Senior Credit Obligations arising in connection with the Restructuring Second Lien Term Loans. Each Restructuring Second Lien Co-Borrower waives all suretyship defenses and consents and agrees that the Administrative Agent and the Restructuring Second Lien Term Loan Lenders shall be under no obligation to marshal any assets in favor of any Restructuring Second Lien Co-Borrower or against or in payment of any or all of the Senior Credit Obligations arising in connection with the Restructuring Second Lien Term Loans.

(d)    The Restructuring Second Lien US Borrower shall act under this Agreement and the other Loan Documents as the agent, attorney-in-fact and legal representative of the Restructuring Second Lien Co-Borrowers for all purposes, including receiving account statements, giving and receiving all notices and consents hereunder or under any other Loan Documents, taking all other actions (including in respect of compliance with covenants and certificates) and communications to such Restructuring Second Lien Co-Borrowers from the Administrative Agent or any Restructuring Second Lien Term Loan Lender. The Administrative Agent and the Restructuring Second Lien Term Loan Lenders may rely, and shall be fully protected in relying, on any certificate, report, information or any notice or communication made or given by the Restructuring Second Lien US Borrower, whether in its own name or on behalf of the Restructuring Second Lien Co-Borrowers, and neither the Administrative Agent nor any Restructuring Second Lien Term Loan Lender shall have any obligation to make any inquiry or request any confirmation from or on behalf of the Restructuring Second Lien Co-Borrowers as to the binding effect on it of any such notice or request.

## ARTICLE II.

## THE CREDIT FACILITIES

Section 2.01    Commitments To Lend.

(a)    Initial Term Loans.  Subject solely to the terms and conditions set forth herein, each Term Lender severally agrees to make an Initial Term Loan to the Borrower in Dollars on the Closing Date in a principal amount equal to its Initial Term Commitment.  The Borrowing on the Closing Date shall be made from the several Term Lenders ratably in proportion to their respective Initial Term Commitments.  The Initial Term Commitments are not revolving in nature, and amounts repaid or prepaid prior to the Maturity Date may not be reborrowed.  The Initial Term Commitments shall terminate automatically immediately after the making of the Initial Term Loans on the Closing Date (and for the avoidance of doubt, any Initial Term Commitments not funded on the Closing Date will be terminated).

(b)    <u>Additional Term Loans</u>.  Subject solely to the terms and conditions set forth herein and after the occurrence of the Amendment No. 2 Effective Date, each Additional Term Lender severally agrees to make an Additional Term Loan to the Borrower in Dollars on the Additional Term Loan Funding Date in a principal amount equal to its Additional Term Commitment.  The Borrowing on the Additional Term Loan Funding Date shall be made from the Additional Term Lenders ratably in proportion to their respective Additional Term Commitments. The Additional Term Commitments are not revolving in nature, and amounts repaid or prepaid prior to the Maturity Date may not be reborrowed.  Additional Term Commitments shall terminate automatically immediately after the making of Additional Term Loans on the Additional Term Loan Funding Date.

(c)    <u>Tranche A Term Loans</u>.

(i)    <u>Initial Tranche A Term Loans</u>.  Subject solely to the terms and conditions set forth herein, on the Initial Tranche A ~~Term Loan~~<u>Facility</u> Effective Date, each Initial Tranche A Term Lender severally agrees to make an Initial Tranche A Term Loan to the Borrower in Dollars in a principal amount equal to its Initial Tranche A Term Loan Commitment. The Borrowing of the Initial Tranche A Term Loans shall be made from the Initial Tranche A Term Lenders ratably in proportion to their respective Initial Tranche A Term Loan Commitments.

(ii)    <u>First Incremental Tranche A Term Loans</u>.

(A)    Subject solely to the terms and conditions set forth herein, on the Amendment No. 3 Effective Date, the Borrower submits (and shall be deemed to have submitted) an irrevocable request to add an incremental term loan facility in an aggregate principal amount not to exceed $50,000,000 (subject to adjustment pursuant to clause (D) below, the "<u>First Tranche A Incremental Facility</u>", the commitments thereunder, the "<u>First Incremental Tranche A Term Loan Commitments</u>" and the loans pursuant thereto, the " <u>First Incremental Tranche A Term Loans</u>").

(B)    VCP shall use its reasonable best efforts to obtain First Incremental Tranche A Term Loan Commitments, on or prior to the date that is 45 days following the Amendment No. 3 Effective Date, from (i) VCP, (ii) Vista Investors, or (iii) other prospective lenders that are mutually agreeable to the Administrative Agent and the Borrower, in each case, in their sole discretion; <u>provided</u> that, the Borrower shall be deemed to have consented to any such prospective lender unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after the Borrower has received notice of VCP's proposed selection of such prospective lender.

(C)    If, on or prior to the forty-fifth (45th) day following the Amendment No. 3 Effective Date, VCP provides a written notice (including via electronic mail) to the Borrower that it has obtained any First Incremental Tranche A Term Loan Commitments, the Borrower shall borrow First Incremental Tranche A Term Loans from the applicable lenders in an aggregate principal amount equal to such First Incremental Tranche A Term Loan Commitments obtained by VCP pursuant to an Additional Credit Extension

Amendment within ten (10) Business Days of such notice from VCP (or such other time period as agreed by VCP and the Borrower).

(D)    Notwithstanding anything to the contrary herein, in the event VCP is unable to obtain First Incremental Tranche A Term Loan Commitments in an aggregate principal amount of $50,000,000 on or prior to the forty-fifth (45th) day following the Amendment No. 3 Effective Date, (i) any portion of the First Tranche A Incremental Facility that VCP fails to make available to the Borrower within 45 days following the Amendment No. 3 Effective Date shall be automatically reallocated to increase the maximum aggregate principal amount of the Second Tranche A Incremental Facility, and (ii) the aggregate amount of common shares to be purchased pursuant to the First Incremental Tranche A Term Loan Warrants shall be proportionately reduced and reallocated to the Second Incremental Tranche A Term Loan Warrants.

(iii)    Second Incremental Tranche A Term Loans.

(A)    Subject solely to the terms and conditions set forth herein, on any Business Day following the date that is one hundred and eighty (180) days following the Amendment No. 3 Effective Date, or such longer period as agreed by the Administrative Agent in its reasonable discretion (so long as the Borrower shall have delivered a Notice of Borrowing with respect to all First Incremental Tranche A Term Loans made available by VCP shall have been funded to the Borrower), the Borrower may by written notice to the Administrative Agent submit an irrevocable request to add incremental term loan facilities up to an aggregate principal amount of $75,000,000 (subject to adjustment pursuant to Section 2.01(c)(ii)(D), collectively, the "Second Tranche A Incremental Facility", the commitments thereunder, the "Second Incremental Tranche A Term Loan Commitments" and the loans pursuant thereto, the " Second Incremental Tranche A Term Loans").

(B)    The Second Incremental Tranche A Term Loans shall be provided by prospective lenders selected by the Borrower in consultation with VCP to provide such Second Incremental Tranche A Term Loans and to become a Lender pursuant to an Additional Credit Extension Amendment.

(C)    Subject solely to the terms and conditions set forth herein, following any Second Tranche A Incremental Facility Effective Date, the Borrower may, by written notice to the Administrative Agent, borrow all or a portion of the Second Incremental Tranche A Term Loans up to an amount equal to the Second Incremental Tranche A Term Loan Commitments available to the Borrower in one or more Borrowings (each date of such Borrowing, a "Second Incremental Tranche A Draw Date"). Each Borrowing of Second Incremental Tranche A Term Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof.

(iv)    Each Tranche A Facility shall become effective, as of the applicable Tranche A Facility Effective Date; provided that:

(A)    each of the applicable conditions set forth in Section 4.02 shall be satisfied;

(B)    no Default or Event of Default shall have occurred and be continuing or would result from the incurrence of such Tranche A Facility on the applicable Tranche A Facility Effective Date;

(C)    the Borrower shall be in compliance with the then applicable financial covenants set forth in Section 7.10 hereof both as of the end of the most recently ended Fiscal Quarter prior to the applicable Tranche A Facility Effective Date and immediately after giving effect to the making of the applicable Tranche A Term Loans on a Pro Forma Basis; and

(D)    the Borrower shall deliver or cause to be delivered to the Administrative Agent a certificate of a Responsible Officer, dated as of the applicable Tranche A Facility Effective Date, certifying as to compliance with this Section 2.01(c)(iv).

(v)    With respect to each borrowing of Incremental Tranche A Term Loans, the terms and provisions of such Tranche A Incremental Facility shall be identical to those of the Initial Tranche A Term Loans borrowed on the Initial Tranche A Facility Effective Date, and the Initial Tranche A Term Loans and the Tranche A Incremental Term Loans shall all constitute one Class for purposes of this Agreement.

(vi)    Each Tranche A ~~Term Loan~~ Facility shall each be effected by an Additional Credit Extension Amendment executed by the Borrower, the Administrative Agent and each Lender providing such Tranche A Term Loan Commitments or making such Tranche A Term Loans in form and substance satisfactory to each of them.  Such Additional Credit Extension Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to effect the provisions of this Section 2.01(c), including amendments as deemed necessary by the Administrative Agent in its reasonable judgment, to maintain the "fungibility" of any such Tranche A Term Loans with any tranche of then-outstanding Tranche A Term Loans hereunder so long as such amendments are not, in the reasonable opinion of the Administrative Agent, materially adverse to the Lenders.  In addition, unless otherwise specifically provided herein or in the applicable Additional Credit Extension Amendment, all references in Loan Documents to Loans, Term Loans and Tranche A Term Loans shall be deemed, unless the context otherwise requires, to include references to the Tranche A Term Loans set forth in such Additional Credit Extension Amendment.

(vii)    On the applicable Tranche A Facility Effective Date or Second Incremental Tranche A Draw Date, subject to the satisfaction of the applicable foregoing terms and conditions, each Lender holding Tranche A Term Loan Commitments to be funded on such Tranche A Facility Effective Date or Second Incremental Tranche A Draw Date pursuant to the applicable Additional Credit Extension Amendment shall make a Tranche A Term Loan to the Borrower in an amount equal to its Tranche A Term Loan Commitment.  The Tranche A Term Loan Commitments shall automatically terminate upon the making of the corresponding Tranche A Term Loans and, if any such Tranche A Term Loan Commitments are not drawn on the date that such Tranche A Term Loan Commitments are required to be drawn pursuant to the applicable Additional

Credit Extension Amendment, the undrawn amount thereof shall automatically terminate.

(viii)    The Loans and Commitments established pursuant to this paragraph shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Guaranty Agreement and security interests created by the Collateral Documents. The Loan Parties shall take any actions reasonably required by the Administrative Agent to ensure that the Lien and security interests granted by the Collateral Documents continue to be perfected under the UCC or otherwise after giving effect to the establishment of any such Class of Loans or any such new Commitments, including, without limitation, delivery to the Administrative Agent of reaffirmation agreements and/or such amendments to the Collateral Documents as may be reasonably required by the Administrative Agent in order to ensure that the Lenders under the Tranche A Incremental Facilities are provided the benefits of the applicable Loan Documents; <u>provided</u>, that in no event shall any Loan Party, or its counsel, be required to deliver any legal opinions pursuant to this clause (viii).

(ix)    The Tranche A Term Loan Commitments are not revolving in nature, and amounts repaid or prepaid prior to the Maturity Date may not be reborrowed. The Tranche A Term Loan Commitments shall terminate automatically immediately after the making of the applicable Tranche A Term Loans on the applicable Tranche A Facility Effective Date.

(x)    This <u>Section 2.01(c)</u> shall supersede any provisions in Section 10.01 to the contrary.

(d)    Restructuring Term Loans. On the Amendment No. 13 Effective Date, each Existing Term Loan has been amended into either a Restructuring First Lien Term Loan or Restructuring Second Lien Term Loan on a pro rata basis determined as of the principal amount of the Existing Term Loans directly prior to the Amendment No. 13 Effective Date and as set forth on Annex C to the Amendment No. 13.

(e)    Backstop Restructuring Term Loans. On the Amendment No. 13 Effective Date, subject solely to the terms and conditions set forth herein, in the Backstop Commitment Agreement and in the Amendment No. 13, each Lender who has provided the Backstop Commitment severally agrees to make a Restructuring Second Lien Term Loan to the Borrower in Dollars on the Amendment No. 13 Effective Date in a principal amount equal to its Backstop Commitment. The Backstop Commitments are not revolving in nature, and amounts repaid or prepaid prior to the Maturity Date may not be reborrowed. The Backstop Commitment shall terminate automatically immediately after the making of the Restructuring Second Lien Term Loans on the Amendment No. 13 Effective Date (and for the avoidance of doubt, any Backstop Commitment not funded on the Amendment No. 13 Effective Date will be terminated).

**Section 2.02**    Notice of Borrowings.

(a)    The Borrower shall give the Administrative Agent a Notice of Borrowing substantially in the form of <u>Exhibit A</u> not later than (1) 12:00 P.M. on the first (1st) Business Day before the proposed Borrowing of the Initial Term Loans, (2) 12:00 P.M. on the first (1st) Business Day before the proposed Borrowing of Additional Term Loans, (3) 12:00 P.M. on the first (1st) Business Day before the proposed Borrowing of Initial Tranche A Term Loans, (4)

12:00 P.M. on the first (1st) Business Day before the proposed Borrowing of First Incremental Tranche A Term Loans, and (5) 2:00 P.M. on the first (1st) Business Day before any proposed Borrowing of Second Incremental Tranche A Term Loans, specifying:

(i)       the date of such Borrowing, which shall be a Business Day;

(ii)      the aggregate amount of such Borrowing;

(iii)     the Class of the Loans comprising such Borrowing; and

(iv)     the location (which must be in the United States) and number of the Borrower's account, to which funds are to be disbursed, which shall comply with the requirements of Section 2.03.

**Section 2.03**       Funding of Loans.

(a)      *Funding of Loans*.  Not later than 1:00 P.M. on the date of each Borrowing, each Lender participating therein shall make available its share of such Borrowing, in Federal or other immediately available funds, to the Administrative Agent at the Administrative Agent's Office. Unless the Administrative Agent or any Lender determines that any applicable condition specified in Article IV has not been satisfied, and upon receipt of all requested funds, the Administrative Agent shall make the funds so received available to the Borrower in like funds as received by the Administrative Agent either by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower in the applicable Notice of Borrowing, or, if a Borrowing shall not occur on such date because any condition precedent herein shall not have been met, promptly return the amounts received from the Lenders in like funds, without interest.

(b)      *Funding by the Administrative Agent in Anticipation of Amounts Due from the Lenders*.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available to the Administrative Agent on the date of such Borrowing in accordance with clause (b) above, and the Administrative Agent may, in reliance upon such assumption, but is not required to, make available to the Borrower on such date a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower but excluding the date of payment to the Administrative Agent at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (ii) in the case of a payment to be made by the Borrower, the interest rate applicable thereto pursuant to Section 2.05.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.  A notice of the Administrative Agent to a Lender or the Borrower

with respect to any amount owing under this <u>clause (b)</u> shall be conclusive, absent manifest error.

**Section 2.04**    <u>Evidence of Loans</u>.

(a)    <u>*Lender and Administrative Agent Accounts; Term Notes*</u>.  The Borrowings made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Borrowings made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Senior Credit Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Term Note, as applicable, in each case, substantially in the form of <u>Exhibit B</u>, payable to the order of such Lender for the account of its Lending Office in an amount equal to the aggregate unpaid principal amount of such Lender's Loans, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender having a Term Note shall record the date, amount and Class of each Loan made by it and the date and amount of each payment of principal made by the Borrower with respect thereto, and may, if such Lender so elects in connection with any transfer or enforcement of any Term Note, endorse on the reverse side or on the schedule, if any, forming a part thereof appropriate notations to evidence the foregoing information with respect to each outstanding Loan evidenced thereby; <u>provided</u> that the failure of any Lender to make any such recordation or endorsement or any error in any such recordation or endorsement shall not affect the obligations of the Borrower hereunder or under any such Term Note.  Each Lender is hereby irrevocably authorized by the Borrower so to endorse its Term Note and to attach to and make a part of its Term Note a continuation of any such schedule as and when required.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

**Section 2.05**    <u>Interest</u>.

(a)    <u>*Rate Options Applicable to Restructuring Term Loans*</u>.

(i)    Subject to the provisions of clauses (a)(ii) and (b) below, each Loan shall bear interest on the outstanding principal amount at a rate *per annum* (the "Interest Rate") equal to (1) from the Closing Date to the Additional Term Loan Funding Date, 11.25%; *provided* that (A) the portion of the Interest Rate payable in cash (the "Cash Margin") shall be 10.25% and (B) the portion of the Interest Rate payable in kind, and compounded and added to the outstanding principal amount on each Interest Payment Date (in each case, the "PIK Margin") shall be 1.00%, and (2) on and after the Additional Term Loan Funding Date, 13.25%; *provided* that (A) the Cash Margin thereof shall be 10.25% and (B) the PIK Margin thereof shall be 3.00%; *provided further* that, with respect to the PIK Margin set forth in clause (2)(B) above (x) commencing with the first day of the month immediately following the first three-month period in which the Consolidated EBITDA for such three-month period is a positive number (the "Consolidated EBITDA Condition"), the Interest Rate then in effect shall be reduced by 1.00% by reducing the PIK Margin thereof by 1.00% and (y) commencing with the first

~~day of the fiscal month immediately following the first two-month period in which the Consolidated Revenue for such two-month period exceeds $18,000,000 (the "Revenue Condition"), the Interest Rate then in effect shall be reduced by 1.00% by reducing the PIK Margin thereof by 1.00%. The Administrative Agent and the Lenders acknowledge that (i) the Revenue Condition was satisfied as of August 1, 2020 and (ii) the Consolidated EBITDA Condition was satisfied as of September 1, 2020.~~

(i)    Restructuring First Lien Term Loans.  The Restructuring First Lien Term Loans are (A) SOFR Loans that shall bear interest on the outstanding principal amount thereof for each day during each Interest Period with respect thereto at a rate per annum equal to Term SOFR plus the First Lien Applicable Margin, and/or (B) ABR Loans that shall bear interest at a rate per annum equal to the ABR plus the First Lien Applicable Margin.  The Borrower shall, by delivering a written notice substantially in the form of Exhibit M (a "First Lien Cash/PIK Election Notice") to the Administrative Agent on or prior to the Cash/PIK Election Date by 3:00 p.m. New York City time, elect whether interest payments for such Interest Payment Date shall be (i) paid in cash (such election, the "First Lien Cash Option") or (ii) paid partially in cash and partially paid in kind (such election, the "First Lien Cash/PIK Option"); provided that if the Borrower fails to deliver a First Lien Cash/PIK Election Notice by the Cash/PIK Election Date, the Borrower shall be deemed to have elected the First Lien Cash Option for the applicable Interest Payment Date.    The Administrative Agent shall promptly notify each Restructuring First Lien Term Loan Lender of the Borrower's election. If the Borrower elects the First Lien Cash Option, all interest payments with respect to the Loans shall be paid in cash on the applicable Interest Payment Date in accordance with Section 2.05(c). If the Borrower elects the First Lien Cash/PIK Option for any Interest Payment Date, all accrued and unpaid interest with respect to the Loans shall be paid in cash on the applicable Interest Payment Date in accordance with Section 2.05(c), except that the portion of the interest accruing pursuant to the Margin PIK Component of the First Lien Applicable Margin (the "PIK Interest") shall be paid in kind on such Interest Payment Date in accordance with Section 2.05(c). In computing interest on the Restructuring First Lien Term Loans, the date of the making of such Restructuring First Lien Term Loan or the first day of an Interest Period applicable to such Restructuring First Lien Term Loan or, with respect to the Restructuring First Lien Term Loan, the last Interest Payment Date with respect to such Restructuring First Lien Term Loan or, with respect to a ABR Loan being converted from a SOFR Loan, the date of conversion of such SOFR Loan to such ABR Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to an ABR Loan being converted to a SOFR Loan, the date of conversion of such ABR Loan to such SOFR Loan, as the case may be, shall be excluded.

(ii)    ~~The Borrower may elect, for the remainder of Fiscal Quarter ending December 31, 2020 and for up to eight (8) Fiscal Quarters beginning and ending after the Amendment No. 3 Effective Date to the Latest Maturity Date, to reduce the Cash Margin and increase the PIK Margin during such Fiscal Quarter (each, a "PIK Election") as set forth herein:~~Restructuring Second Lien Term Loans.  Each Restructuring Second Lien Term Loan shall bear interest on the outstanding principal amount at a rate *per annum* equal to 16.00%. The Borrower shall, by delivering a written notice substantially in the form of Exhibit N (a "Second Lien Cash/PIK Election Notice") to the Administrative Agent on or prior to the Cash/PIK Election Date by 3:00 p.m. New York City time, elect whether interest payments for such Interest Payment Date shall be (i) paid in cash (such election, the "Second Lien Cash Option") or (ii) paid in kind (such election, the "Second

69

Lien PIK Option"); provided that if the Borrower fails to deliver a Second Lien Cash/PIK Election Notice by the Cash/PIK Election Date, the Borrower shall be deemed to have elected the Second Lien PIK Option for the applicable Interest Payment Date. The Administrative Agent shall promptly notify each Restructuring Second Lien Term Loan Lender of the Borrower's election. If the Borrower elects the Second Lien Cash Option, all interest payments with respect to the Loans shall be paid in cash on the applicable Interest Payment Date in accordance with Section 2.05(c). If the Borrower elects the Second Lien PIK Option for any Interest Payment Date, the interest accruing shall be paid in kind on such Interest Payment Date in accordance with Section 2.05(c).

(A)    with respect to the remainder of the Fiscal Quarter ending December 31, 2020 and each of the first four Fiscal Quarters thereafter for which the Borrower makes a PIK Election, (1) the Cash Margin shall be reduced to 7.25% *per annum* and (2) the remaining portion of the Interest Rate then in effect (after giving effect to any decrease in the PIK Margin pursuant to Section 2.05(a)) shall consist of PIK Margin for each such Fiscal Quarter, and

(B)    with respect to each of the fifth through eighth Fiscal Quarters following the Fiscal Quarter ending December 31, 2020 for which the Borrower makes a PIK Election, the Interest Rate then in effect shall be increased by 0.50% per annum; provided that (1) the Cash Margin applicable to such Interest Rate shall be reduced to 7.25% *per annum* and (2) the remaining portion of the Interest Rate then in effect (after giving effect to any decrease in the PIK Margin pursuant to Section 2.05(a)) shall consist of PIK Margin for each such Fiscal Quarter.

(C)    If the Borrower elects to make a PIK Election with respect to any Fiscal Quarter, it shall give notice of such PIK Election to the Administrative Agent at least six (6) Business Days prior to the beginning of such Fiscal Quarter; provided, that the Administrative Agent and the Lenders hereby acknowledge that notice of a PIK Election with respect to the Fiscal Quarter ending December 31, 2020 has been automatically deemed to have been made pursuant to the terms of this Agreement in effect prior to the Amendment No. 3 Effective Date. If the Borrower makes a PIK Election with respect to any Fiscal Quarter, including, for the avoidance of doubt, the PIK Election for Fiscal Quarter ending December 31, 2020 pursuant to this Section 2.05(a)(ii)(C), it shall automatically be deemed to have made a PIK Election in each successive Fiscal Quarter until the earlier of (A) the Borrower gives notice to the Administrative Agent of its cancellation of the PIK Election (which notice shall be given to the Administrative Agent at least five (5) Business Days prior to the beginning of the Fiscal Quarter for which the Borrower wishes to cancel such PIK Election) and (B) the end of the eighth (8) Fiscal Quarter pursuant to which the Borrower has made a PIK Election.

(b)    *Additional Interest*.  If any Loan or interest thereon or any fee described in Section 2.07 or any other amount is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such overdue amount shall thereafter bear interest at the Default Rate to the full extent permitted by applicable Laws.

(c)    *Interest Payments*.  Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.

Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Insolvency or Liquidation Proceeding.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand; provided that the portion of the interest representing the PIK Interest shall be paid in kind (in lieu of cash) by increasing the outstanding principal balance of the Loans by the amount of such PIK Interest on each Interest Payment Date.

(d)    *Computation of Interest and Fees.* With respect to the Restructuring First Lien Term Loans, (i) Interest and fees payable pursuant hereto shall be calculated on the basis of a three hundred sixty (360) day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of Term SOFR. Any change in the interest rate on a Loan resulting from a change in the applicable ABR or Term SOFR shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate. Subject to Section 2.05(b), interest shall accrue on the outstanding principal amount of each Loan from and including the date that each such Loan is made to but excluding the date that such outstanding principal amount is paid.

(e)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.

**Section 2.06**    Prepayments.

(a)    *Voluntary Prepayment of Loans.*    The Borrower shall have the right to voluntarily prepay Loans in whole or in part from time to time, so long as, contemporaneously with the prepayment of such Loans, the Borrower pays to the Administrative Agent (for the ratable benefit of the Lenders), a Loan prepayment fee equal to any applicable Prepayment Premium of the aggregate amount of the Loans so prepaid; provided that each partial prepayment of Loans shall be in a minimum principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. All prepayments pursuant to this Section 2.06(a) shall be applied, subject to Section 2.06(e), (x) as among the different Classes of Loans, on a pro rata basis and (y) with respect to a specific Class of Loans, pro rata among Lenders based on their outstanding Loans of such Class at the time of such prepayment.

(b)    *Mandatory Prepayments.*

(i)    *Asset Dispositions, Casualties and Condemnations, etc.*  Within ten (10) Business Days after receipt by the ParentNewCo or any of its Subsidiaries of Net Cash Proceeds from any Asset Disposition (other than any Asset Disposition permitted under Section 7.03, but including Asset Dispositions made pursuant to Section 7.03(a)(ix), (x) and (xv)), Casualty or Condemnation (excluding Net Cash Proceeds to the extent and so long as they constitute Reinvestment Funds) by the ParentNewCo or any Subsidiary, the Borrower shall prepay (or cause to be prepaid) the Loans in an aggregate amount equal to 100% of the Net Cash Proceeds of such Asset Disposition, Casualty or Condemnation; provided that no such prepayment caused by the receipt of Net Cash Proceeds from any Asset Disposition shall be required to the extent that the sum of such Net Cash Proceeds

with respect to such Asset Disposition does not exceed $2,000,000 (the "Prepayment Threshold") (it being understood and agreed that a prepayment shall only be required of such amount in excess of the Prepayment Threshold (the amount below the Prepayment Threshold that is not required to be so prepaid, the "Retained Disposition Proceeds"); provided that if the aggregate amount of the Retained Disposition Proceeds exceeds $10,000,000, the Borrower shall apply 100% of the Net Cash Proceeds of any Asset Disposition without regard to the Prepayment Threshold; provided that in the event of any such prepayment of Loans made after the Closing Date, NewCo shall pay to the Lenders with respect to such Loans the applicable Prepayment Premium.

(ii)    *Debt*.  If, after the Closing Date, any Indebtedness shall be incurred by the Parent NewCo or any of its Subsidiaries, other than any Indebtedness permitted to be incurred under Section 7.01 (other than Permitted Unsecured Refinancing Debt, Permitted Pari Passu Refinancing Debt or Permitted Junior Priority Refinancing Debt), the Borrower shall prepay (or cause to be prepaid) the Loans in an amount equal to 100% of the Net Cash Proceeds of such Indebtedness on the date of such incurrence; provided that in the event of any such prepayment of Loans made after the Closing Date, the Parent NewCo shall pay to the Lenders with respect to such Loans the applicable Prepayment Premium.

(iii)    *Equivalent Notes*.  If, after the Closing Date, any Equivalent Notes are issued to Rights Offering Subscribers who are not Eligible Assignees hereunder in excess of $10,000,000 less the principal amount of Incremental Term Loans incurred, the Borrower shall prepay (or cause to be prepaid) Restructuring Second Lien Term Loans in an amount equal to 100% of the principal amount of such Equivalent Notes on the date of such incurrence; provided that, the assignment of Restructuring Second Lien Term Loans pursuant to Section 10.06(h) shall satisfy this mandatory prepayment; provided further that, in the event of any such prepayment, NewCo shall not be required to pay to the Lenders with respect to such Loans any applicable Prepayment Premium.

(iii iv)    *Application of Mandatory Prepayments*.  All amounts required to be paid pursuant to this Section 2.06(b) shall be applied subject to Section 2.06(e), (x) as among the different Classes of Loans, on a pro rata basis and (y) with respect to a specific Class of Loans, pro rata among the Lenders based on their outstanding Loans at the time of such prepayment.

(iv v)    *Payments Cumulative*.  Except as otherwise expressly provided in this Section 2.06, payments required under any subsection or clause of this Section 2.06 are in addition to payments made or required under any other subsection or clause of this Section 2.06.

(c)    *Notice of Mandatory Prepayment Events*.  The Borrower shall deliver to the Administrative Agent by 11:00 A.M. at least three (3) Business Days' prior written, email, or telecopy notice of each and every prepayment required under Section 2.06(b), including the estimated amount of Net Cash Proceeds expected to be received therefrom.

(d)    *Notices of Prepayments*.  The Borrower shall notify the Administrative Agent in writing, by 11:00 A.M., at least five (5) Business Day prior to the date of each voluntary prepayment.  Each notice of prepayment shall be substantially in the form of Exhibit J (but such notice may be conditioned upon the receipt of the proceeds of or the effectiveness of other Indebtedness or the occurrence of one or more other transactions) and shall specify the

prepayment date and the principal amount to be prepaid.  The Administrative Agent will promptly notify in writing (each, a "<u>Prepayment Notice</u>") each Lender of its receipt of each such notice, and of the amount of such Lender's pro rata share, if any, thereof.  To the extent any Term Loans remain outstanding as of the date of any such Prepayment Notice, within three (3) Business Days of receiving such Prepayment Notice (or such later date reasonably acceptable to the Administrative Agent), the Lenders constituting the Required Lenders may elect by written notice (a "<u>Prepayment Waterfall Direction</u>") to the Administrative Agent (and the Administrative Agent shall promptly notify the Borrower of any such election) to apply all of the proceeds of such prepayment to (i) first, the Senior Credit Obligations consisting of the Term Loans, and (ii) second, subject to the following sentence, the Senior Credit Obligations consisting of the Tranche A Term Loans and Amendment No. 8 Incremental Term Loans (the "<u>Term Loan Prepayment Waterfall</u>").  Subject to any application of the Term Loan Prepayment Waterfall, to the extent any Tranche A Term Loans remain outstanding as of the date of any such Prepayment Notice, within three (3) Business Days of receiving such Prepayment Notice (or such later date reasonably acceptable to the Administrative Agent), the Lenders constituting the Required Lenders may elect by a Prepayment Waterfall Direction to the Administrative Agent (and the Administrative Agent shall promptly notify the Borrower of any such election) to apply all of the proceeds of such prepayment to (i) first, the Senior Credit Obligations consisting of the Tranche A Term Loans, and (ii) second, the Senior Credit Obligations consisting of the Amendment No. 8 Incremental Term Loans (the "<u>Tranche A Term Loan Prepayment Waterfall</u>" and together with the Term Loan Prepayment Waterfall, each, a "<u>Prepayment Waterfall</u>").  To the extent any Term Loans ~~or Tranche A Term Loans, as applicable,~~ remain outstanding as of the date of any such Prepayment Notice, if the Lenders constituting the Required Lenders do not elect to apply such prepayment proceeds in accordance with the applicable Prepayment Waterfall, all Loans prepaid pursuant to such prepayment shall be subject to the Prepayment Premium, if any, applicable at such time to the Term Loans ~~or Tranche A Term Loans, as applicable~~.  All prepayments of Loans under this <u>Section 2.06</u> shall be accompanied by accrued interest on the principal amount being prepaid to the date of payment.

(e)    *Application of Prepayment Proceeds*.  Each prepayment of Loans pursuant to Section 2.06(a) or Section 2.06(b) shall be applied ratably to each Class of Loans (based upon the then outstanding principal amounts of the respective Classes of Loans); provided, that (i) any prepayment of Term Loans with the proceeds of Credit Agreement Refinancing Indebtedness shall be applied solely to the Term Loans, as applicable, and (ii) in the event the Administrative Agent shall have received any Prepayment Waterfall Direction from the Lenders constituting the Required Lenders in accordance with Section 2.06(d), the proceeds of such prepayment shall be applied in accordance with the applicable Prepayment Waterfall. <u>For purposes of determining the amount of accrued interest or fee, any payment received by the Administrative Agent after 2:00 p.m. New York City time may, in the Administrative Agent's discretion be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment hereunder (other than payments on the SOFR Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day for the purpose of any such payment. If any payment on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day for the purpose of any such payment unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.</u>

(f)    *Rejected Payments*.  In the event of any proposed prepayment of any Loans of any Lender pursuant to Section 2.06(b)(i) (an "Applicable Prepayment"), such Lender may reject all, but not less than all, of its pro rata share of such Applicable Prepayment by written notice (each, a "Rejection Notice") to the Administrative Agent no later than 5:00 P.M. (New York time) two (2) Business Days prior to the prepayment date (the "Rejection Deadline"). If a Lender fails to deliver a Rejection Notice to the Administrative Agent at or prior to the Rejection Deadline, such Lender will be deemed to have accepted its share of the Applicable Prepayment. The aggregate portion of such prepayment that is rejected by Lenders pursuant to Rejection Notices shall be referred to as the "Rejected Amount."  The Rejected Amount may be used by the Borrower in any manner not prohibited by the Loan Documents.

(g)    *Foreign Subsidiary Proceeds*.  Notwithstanding any other provisions of this Section 2.06, (i) to the extent that any of or all the Net Cash Proceeds of any Disposition by a Foreign Subsidiary that is a Subsidiary ("Foreign Disposition"), the Net Cash Proceeds of any Casualty or Condemnation from a Foreign Subsidiary that is a Subsidiary (a "Foreign Casualty Event") are prohibited, restricted or delayed by applicable local law or applicable organizational documents from being repatriated to the United States, the portion of such Net Cash Proceeds so affected will not be required to be applied to repay Loans at the times provided in this Section 2.06 but may be retained by the applicable Foreign Subsidiary or used for working capital purposes so long, but only so long, as the applicable local law or applicable organizational documents will not permit or otherwise restricts or delays repatriation to the United States (the Borrower hereby agreeing to use commercially reasonable efforts to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions under applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds is permitted or the restriction or delay is eliminated under the applicable local law or the applicable organizational documents, such repatriation will be promptly effected and an amount equal to such repatriated Net Cash Proceeds will be promptly (and in any event not later than ten (10) Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to this Section 2.06 to the extent provided herein and (ii) to the extent that the Borrower has reasonably determined that repatriation of any of or all the Net Cash Proceeds of any Foreign Disposition or any Foreign Casualty Event attributable to Foreign Subsidiaries would have materially adverse tax consequences with respect to such Net Cash Proceeds, such Net Cash Proceeds so affected will not be required to be applied to repay Loans at the times provided in this Section 2.06 but may be retained by the applicable Foreign Subsidiary.

**Section 2.07**    Fees.

(a)    The Borrower shall pay to each Lender on the Closing Date, for its respective account, an upfront fee equal to 1.125% of the amount of the Term Commitments held by such Lender on the Closing Date.

(b)    [Reserved].

(c)    The Borrower shall pay to the Administrative Agent and the Lender, as applicable, such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent or such Lender, as applicable).

**Section 2.08**    Pro rataRata Treatment.   Except to the extent otherwise provided

herein, each Borrowing, each payment or prepayment of principal of or interest on any Loan, each payment of fees (other than administrative fees retained by the Agents for their own account), shall be allocated pro rata among the relevant Lenders in accordance with the respective Term Commitment Percentages, ~~Incremental Term Loan Commitment Percentage and~~ Tranche A Term Loan Commitment Percentage, Incremental Term Loan Commitment Percentage, Restructuring First Lien Term Loan Commitment Percentage and Restructuring Second Lien Term Loan Commitment Percentage, as applicable, of such Lenders (or, if the Commitments of such Lenders have expired or been terminated, in accordance with the respective principal amounts of the outstanding Loans of the applicable Class and Participation Interests of such Lenders); provided that, in the event any amount paid to any Lender pursuant to the foregoing is rescinded or must otherwise be returned by the Administrative Agent, each Lender shall, upon the request of the Administrative Agent, repay to the Administrative Agent the amount so paid to such Lender, with interest for the period commencing on the date such payment is returned by the Administrative Agent until the date the Administrative Agent receives such repayment at a rate *per annum* equal to the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 2.09    Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (i) notify the Administrative Agent of such fact and (ii) purchase (for cash at face value) participation in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing thereon; provided that:

(a)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)    the provisions of this Section shall not be construed to apply to (x) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to ~~the Parent~~NewCo or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

Section 2.10    Payments Generally; Administrative Agent's Clawback.

(a)    *Payments by the Borrower*.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Each payment of principal of and interest on Loans and fees hereunder shall be paid not later than 3:00 P.M. on the date when due, in Dollars and in Federal or other funds immediately available to the Administrative Agent at

the account designated by it by notice to the Borrower.  Payments received after 3:00 P.M. may in the Administrative Agent's discretion be deemed to have been received on the next Business Day, and any applicable interest or fee shall continue to accrue.  The Administrative Agent may, in its sole discretion, distribute such payment to the applicable Lenders on the date of receipt thereof or on the immediately succeeding Business Day.  Whenever any payment hereunder shall be due on a day which is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day (and such extension of time shall be reflected in computing interest or fees, as the case may be).  If the date for any payment of principal is extended by operation of Law or otherwise, interest thereon shall be payable for such extended time.

(b)    *Presumption by the Administrative Agent*.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the applicable Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith, and may, in reliance upon such assumption, distribute to the applicable Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the applicable Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to but excluding the date of payment to the Administrative Agent at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.  A notice of the Administrative Agent to any Lender with respect to any amount owing under this clause (b) shall be conclusive, absent manifest error.

(c)    *Failure to Satisfy Conditions Precedent*.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds promptly (in like funds as received from such Lender) to such Lender without interest.

(d)    *Obligations of Lenders Several*.  The obligations of the Lenders hereunder to make Loans are several and not joint.  The failure of any Lender to make a Loan required to be made by it as part of any Borrowing hereunder shall not relieve any other Lender of its obligation, if any, hereunder to make any Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on such date of Borrowing.

(e)    *Funding Source*.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)    ~~*Computations*.  All computations of interest for Loans shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  Interest shall accrue on each Loan for the day on which Loan is made (or converted or continued), and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made (or continued or converted) shall, subject to clause (a) above, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.~~

**Section 2.11**    Increase in Commitments.

(a)    *Request for Increase in Commitments*.

(i)    ~~Subject to Section 2.11(a)(ii)~~Pursuant to the terms, and solely in connection with, the Rights Offering, the Borrower may by written notice to the Administrative Agent request to add one ~~or more~~ incremental term loan ~~facilities~~facility hereunder (~~each,~~ an "Incremental Facility"; the commitments thereunder are referred to as "Incremental Term Loan Commitments"~~and;~~ loans pursuant thereto "Incremental Term Loans"~~;~~") and the date on which the Borrower proposes that the Incremental ~~Facilities are collectively referred to as "Incremental Facilities~~Facility shall be effective (the "Increase Effective Date")~~;~~ provided that the total aggregate amount for ~~all~~such Incremental ~~Facilities~~Facility shall not (as of any date of incurrence thereof) exceed ~~(x) $~~125,000,000, ~~plus (y) an amount equal to the sum of all voluntary prepayments of Term Loans made pursuant to Section 2.06(a), with the Borrower electing whether such Incremental Facility has been incurred (in whole or in part) under clauses (x) and/or (y) in its sole discretion. Each Class of Incremental Facility incurred under this Section 2.11 shall be in an aggregate~~10,000,000 less the principal amount ~~that is not less than $5,000,000~~of any Equivalent Notes issued.

~~(ii)    At the time of sending such notice, the Borrower (in consultation with the Administrative Agent) shall specify (1) the time period (such period, the "Election Period") within which VCP is requested to respond (which Election Period shall in no event be less than ten (10) Business Days from the date of delivery of such notice to VCP), (2) the principal amount and proposed maturity date, (3) the interest rate, margin, interest rate floor, original issue discount, arrangement fees, structuring fees, commitment fees, upfront fees, call protection, exit fees and other similar fees, but, for the avoidance of doubt not the terms of any warrants issued in connection therewith, (4) any financial maintenance covenant applicable to the requested Incremental Facility and (5) the date (each, an "Increase Effective Date") on which the Borrower proposes that the Incremental Facility shall be effective, and the Administrative Agent shall promptly thereafter notify VCP of the Borrower's request for such Incremental Facility and the Election Period during which VCP is requested to respond to the Borrower's request; provided that if such notice indicates that it is conditioned upon the occurrence of a specified event, such notice may be revoked if such event does not occur prior to the requested funding date. VCP shall not be obligated to increase its Commitment or to participate in any Incremental Term Loan and VCP's determination to increase its Commitment or to participate in any Incremental Term Loan shall be in VCP's sole and absolute discretion. To the extent VCP has not responded by the end of such Election Period, VCP shall be deemed to have declined to increase its Commitment. If VCP elects to increase its Commitment or participate in any Incremental Term Loan, it may select one or more of its Affiliates or Approved Funds (which Affiliates or Approved Funds, for the avoidance of doubt, shall not include any Disqualified Institution) to provide a portion of such Incremental Term Loan Commitments or Incremental Term Loans. To the extent VCP does not agree to provide an Incremental Term Loan on terms set forth in the Borrower's request, the Borrower may invite (x) any other existing Lender or (y) any prospective lender that satisfies the criteria of being an "Eligible Assignee" and is reasonably satisfactory to the Administrative Agent to provide such Incremental Term Loans on the same terms offered to VCP and to become a Lender pursuant to an Additional Credit Extension Amendment in connection with the proposed Incremental Term Loan (provided that any such Additional Credit Extension Amendment for the purpose of providing all or any portion of any such Incremental Term Loan shall not require the consent of any other Lender (including any other "Lender" that party to any~~

77

~~other Additional Credit Extension Amendment to provide all or part of such Incremental Term Loan). For the avoidance of doubt, no Incremental Term Loans may be incurred without first making an offer to VCP to provide such Incremental Term Loans in accordance with the procedures set forth above.~~

(b)      _Conditions_.  The Incremental ~~Facilities~~Facility shall become effective, as of such Increase Effective Date; <u>provided</u> that:  each of the conditions set forth in Section 4.02 and the documentation with respect to the Rights Offering shall be satisfied.

(i)      ~~each of the conditions set forth in~~ ~~Section 4.02~~ ~~shall be satisfied;~~

(ii)      ~~no Event of Default shall have occurred and be continuing or would result from the incurrence of such Incremental Facilities on the Increase Effective Date;~~

(iii)      ~~the Borrower shall be in compliance with the then applicable financial covenants set forth in Section 7.10 hereof both as of the end of the most recently ended Fiscal Quarter prior to the Increase Effective Date and immediately after giving effect to the making of the Incremental Term Loan on a Pro Forma Basis; _provided_ that, the Adjusted LTM Leverage Ratio as of the end of the most recently completed Test Period shall not exceed 2.00:1.00 on a Pro Forma Basis; and~~

(iv)      ~~the Borrower shall deliver or cause to be delivered to the Administrative Agent a certificate of a Responsible Officer, dated as of the Increase Effective Date, certifying as to compliance with this Section 2.11.~~

(c)      _Terms of Incremental Facilities_.  The terms and provisions of the Incremental ~~Facilities~~Facility shall be made <u>on the same terms and</u> pursuant to the same documentation as the ~~Loans, and shall have materially the same representations, covenants and events of default as the Loans, except as may be mutually agreed among the Borrower and the Administrative Agent (not to be unreasonably withheld or delayed); _provided_, in any case, that:~~<u>Restructuring Second Lien Term Loans and shall be fungible with the outstanding Restructuring Second Lien Term Loans hereunder.</u>

(i)      ~~(A) the Incremental Facilities shall rank _pari passu_ with the Loans hereunder, (B) shall not be secured by any assets not constituting Collateral, (C) shall rank _pari passu_ in right of security with the Loans and (D) shall not be guaranteed by any Person that is not a Guarantor;~~

(ii)      ~~(A) the Weighted Average Life to Maturity of any Incremental Term Loans shall be no shorter than the Weighted Average Life to Maturity of the Loans, and (B) the maturity date of Incremental Term Loans shall not be earlier than the Maturity Date; and~~

(iii)      ~~to the extent the All-in-Yield applicable to the Incremental Term Loan is higher than the All-in-Yield applicable to the then existing Loans (without giving effect to any Default Rate) by more than 0.50%, this Agreement shall be amended to increase the Applicable Margin applicable to the then existing Loans to the extent necessary so that the All-in-Yield on such Incremental Term Loan is no more than 0.50% greater than the All-in-Yield on the then existing Loans;~~

(iv)     any Incremental Term Loans, for purposes of repayments and prepayments, shall be treated in any event no more favorably than the then existing Loans and shall share ratably or less than ratably in any mandatory prepayments hereunder;

(v)     to the extent that any financial maintenance covenant is added for the benefit of any Incremental Facility, any amendment adding such Incremental Facility shall be subject to the consent of the Administrative Agent unless such financial maintenance covenant is also added for the benefit of the then existing Loans; and

(vi)     to the extent the negative covenants or the events of default (in each case, together with any defined terms referenced therein) applicable to any Incremental Term Loans is more restrictive or onerous on any Loan Party than any comparable terms applicable to the then-existing Term Loans, any amendment adding such Incremental Facility shall be subject to the consent of the Administrative Agent unless such comparable terms are amended to conform to such more restrictive or onerous terms in the Incremental Term Loans.

(d)     *Additional Credit Extension Amendment*.  The Incremental Term Loan Commitments shall be effected by an Additional Credit Extension Amendment executed by the Borrower, the Administrative Agent and each Lender making such Incremental Term Loan Commitment in form and substance satisfactory to each of them.  Such Additional Credit Extension Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to effect the provisions of this Section 2.11, including amendments as deemed necessary by the Administrative Agent in its reasonable judgment, to maintain the "fungibility" of any such Incremental Term Loans with ~~any tranche of then outstanding~~the outstanding Restructuring Second Lien Term Loans hereunder so long as such amendments are not, in the reasonable opinion of the Administrative Agent, materially adverse to the Lenders.  In addition, unless otherwise specifically provided herein or in the applicable Additional Credit Extension Amendment, all references in Loan Documents to Loans shall be deemed, unless the context otherwise requires, to include references to Incremental Term Loans and unless otherwise specifically provided herein.

(e)     *Making of New Term Loans; Expiration of Incremental Term Loan Commitments*.  On any Increase Effective Date on which an Incremental Facility is effective, subject to the satisfaction of the foregoing terms and conditions, each Lender holding Incremental Term Commitments shall make an Incremental Term Loan to the Borrower in an amount equal to its Incremental Term Commitment.  The Incremental Term Loan Commitments of any Class shall automatically terminate upon the making of the Incremental Term Loans of such Class and, if any such Incremental Term Loan Commitment is not drawn on the date that such Incremental Term Loan Commitment is required to be drawn pursuant to the applicable Additional Credit Extension Amendment, the undrawn amount thereof shall automatically terminate.

(f)     *Equal and Ratable Benefit*.  The Restructuring Second Lien Term Loans and Commitments established pursuant to this paragraph shall constitute Restructuring Second Lien Term Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Guaranty Agreement and security interests created by the Collateral Documents.  The Loan Parties shall take any actions reasonably required by the Administrative Agent to ensure and/or demonstrate that the Lien and security interests granted by the Collateral Documents continue to be perfected under the UCC or otherwise after giving effect to the establishment of any such Class of Loans or any such new

Commitments, including, without limitation, delivery to the Administrative Agent of (i) customary board resolutions and officer's certificates substantially consistent with those delivered on the ~~Closing~~Amendment No. 13 Effective Date (conformed as appropriate) and in any event, reasonably satisfactory to the Administrative Agent and (ii) reaffirmation agreements and/or such amendments to the Collateral Documents as may be reasonably requested by the Administrative Agent in order to ensure that the Restructuring Second Lien Term Loan Lenders under the Incremental Facilities are provided the benefits of the applicable Loan Documents.

(g)    This Section 2.11 shall supersede any provisions in Section 10.01 to the contrary.

**Section 2.12**    Defaulting Lenders.

(a)    *Adjustments*.    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    *Waivers and Amendments*.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(ii)    *Reallocation of Payments*.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise or received by the Administrative Agent from such Defaulting Lender pursuant to Section 10.08) shall be applied at such time or times as may be determined by the Administrative Agent as follows:

FIRST, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder;

SECOND, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent;

THIRD, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement;

FOURTH, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement;

FIFTH, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and

SIXTH, to such Defaulting Lender or as otherwise directed by a court of competent

jurisdiction;

provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)    *Defaulting Lender Cure*.  If the Borrower and the Administrative Agent agree in writing that a Defaulting Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to Section 2.12), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

**Section 2.13**    Refinancing Facilities.

(a)    At any time after the Amendment No. 313 Effective Date, the Borrower may obtain, from any Lender or any Refinancing Lender, Credit Agreement Refinancing Indebtedness in the form of additional Loans under this Agreement in respect of all or any portion of any Term Loans then outstanding under this Agreement ("Refinancing Loans") pursuant to a Refinancing Amendment; provided that, notwithstanding anything to the contrary herein, each Lender of the applicable Term Loans shall be offered an opportunity to participate in such Refinancing Loans on a pro rata basis and on the same terms and conditions as each other Lender or a Refinancing Lender of such Refinancing Loans pursuant to procedures set forth in clause (b) or as otherwise established by the Borrower and reasonably acceptable to the Borrower.  The effectiveness of any Refinancing Amendment establishing Credit Agreement Refinancing Indebtedness shall be subject to the satisfaction on the date thereof of each of the conditions set forth in Section 4.02 and, to the extent reasonably requested by the Administrative Agent, receipt by the Administrative Agent of legal opinions, board resolutions, officers' certificates and/or reaffirmation agreements consistent with those delivered on the Closing Date under Section 4.01 (other than changes to such legal opinions resulting from a change in law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent).  Any Credit Agreement Refinancing Indebtedness incurred under this Section 2.13 shall be in an aggregate principal amount that is not less than $10,000,000 and an integral multiple of $5,000,000 in excess thereof or, in each case, if less, the entire principal amount of the Term Loans then outstanding (in each case unless the Borrower and the Administrative Agent otherwise agree).

(b)    The Borrower shall provide written notice of any proposed incurrence of Refinancing Loans to the Administrative Agent, on behalf of each Lender of the applicable Term

Loans (each, a "Refinanced Lender"), which notice shall specify (1) the time period (such period, the "Refinancing Election Period") within which such Refinanced Lender is requested to respond (which Refinancing Election Period shall in no event be less than ten (10) Business Days from the date of delivery of such notice to the Administrative Agent), (2) the principal amount of Term Loans being refinanced with Refinancing Loans, (3) the proposed maturity date of such Refinancing Loans, (4) the interest rate, margin, interest rate floor, original issue discount, arrangement fees, structuring fees, commitment fees, upfront fees, call protection, exit fees and other similar fees, but, for the avoidance of doubt not the terms of any warrants issued in connection with such Refinancing Loans, (5) any financial maintenance covenant applicable to such Refinancing Loans and (6) the date (each, an "Refinancing Loans Borrowing Date") on which the Borrower proposes to borrow such Refinancing Loans, and the Administrative Agent shall promptly thereafter notify each such Refinanced Lender of the applicable Term Loans of the Borrower's proposed incurrence of Refinancing Loans and the Refinancing Election Period during which such Refinanced Lender is requested to respond to the Borrower's proposal; provided that if such notice indicates that it is conditioned upon the occurrence of a specified event, such notice may be revoked if such event does not occur prior to the requested funding date. No Refinanced Lender shall be obligated to participate in such Refinancing Loans and such Refinanced Lender's determination to participate shall be in such Refinanced Lender's sole and absolute discretion. To the extent any Refinanced Lender has not responded by the end of such Refinancing Election Period, such Refinanced Lender shall be deemed to have declined to participate in such Refinancing Loans. To the extent any Refinanced Lender does not agree to participate in any Refinancing Loans on terms set forth in the Borrower's request, the Borrower may invite any Refinancing Lender to provide such Refinancing Loans on the same terms offered such Refinanced Lender and to become a Lender pursuant to a Refinancing Amendment in connection with the proposed Refinancing Loans.

(c)        The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Refinancing Amendment. Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment establishing Credit Agreement Refinancing Indebtedness, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Credit Agreement Refinancing Indebtedness incurred pursuant thereto. Each of the parties hereto hereby agrees that this Agreement and the other Loan Documents may be amended pursuant to a Refinancing Amendment, without the consent of any other Lenders, to the extent (but only to the extent) necessary to (i) reflect the existence and terms of the Credit Agreement Refinancing Indebtedness incurred pursuant thereto and (ii) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.13.

(d)        This Section 2.13 shall supersede any provisions in Section 2.10 or Section 10.01 to the contrary.

**Section 2.14**        Amend and Extend Transactions.

(a)        The Borrower may, by written notice to the Administrative Agent from time to time, request an extension (each, an "Extension") of the maturity date of the Term Loans to the extended maturity date specified in such notice. Such notice shall (i) set forth the amount of the Term Loans that will be subject to the Extension (which shall be in a minimum amount of $25,000,000 or, if less, the entire principal amount thereof then outstanding), (ii) set forth the date on which such Extension is requested to become effective (which shall be not less than ten (10) Business Days nor more than sixty (60) days after the date of such Extension notice (or such

longer or shorter periods as the Administrative Agent shall agree in its sole discretion)) and (iii) identify the relevant Term Loans to which such Extension relates. Each Lender of the applicable Term Loans shall be offered (an "Extension Offer") an opportunity to participate in such Extension on a pro rata basis and on the same terms and conditions as each other Lender of such Term Loans pursuant to procedures established by, or reasonably acceptable to, the Administrative Agent and the Borrower. If the aggregate principal amount of the Term Loans in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans subject to the Extension Offer as set forth in the Extension notice, then such Term Loans shall be extended ratably up to the maximum amount based on the respective principal amounts with respect to which such Lenders have accepted such Extension Offer.

(b)    The following shall be conditions precedent to the effectiveness of any Extension: (i) the conditions set forth in Sections 4.02(b) and (c) shall be satisfied (as if the references therein to Credit Extension were replaced with Extension) and (ii) the terms of such Extended Loans shall comply with paragraph (c) of this Section 2.14.

(c)    The terms of each Extension shall be determined by the Borrower and the applicable extending Lenders and set forth in an Additional Credit Extension Amendment; provided that (i) the final maturity date of any Extended Loan shall be no earlier than the Maturity Date, (ii) the Weighted Average Life to Maturity of the Extended Loans shall be no shorter than the remaining Weighted Average Life to Maturity of the existing Loans, (iii) the Extended Loans will rank *pari passu* in right of payment and with respect to security with the existing Loans and the borrower and the guarantors of the Extended Loans shall be the same as the Loan Parties with respect to the existing Loans, (iv) the interest rate margin, rate floors, fees, original issue discount and premium applicable to any Extended Loans shall be determined by the Borrower and the applicable extending Lenders, (v) the Extended Loans may participate on a pro rata or less than pro rata (but not greater than pro rata) basis in voluntary or mandatory prepayments with the other Term Loans being extended and (vi) the terms of the Extended Loans shall be substantially identical to the terms set forth herein with respect to the Term Loans being extended (except as set forth in clauses (i) through (v) above).

(d)    In connection with any Extension, the Borrower, the Administrative Agent and each applicable extending Lender shall execute and deliver to the Administrative Agent an Additional Credit Extension Amendment and such other documentation as the Administrative Agent shall reasonably specify to evidence the Extension. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension. Any Additional Credit Extension Amendment may, without the consent of any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to implement the terms of any such Extension, including any amendments necessary to establish Extended Loans as a new Class or tranche of Loans, and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Class or tranche (including to preserve the pro rata treatment of the extended and non-extended Classes or tranches), in each case on terms consistent with this Section 2.14.

(e)    This Section 2.14 shall supersede any provision in Section 2.10 or Section 10.01 to the contrary.

**Section 2.15**      Conversion of Restructuring Second Lien Term Loans.

(a)      At any time prior to the Maturity Date, a Term Lender's portion of its Restructuring Second Lien Term Loans shall be convertible, at the option of the Term Lender thereunder, in whole or in part, into fully paid, non-assessable Class A-2 Units, with the rights, privileges and restrictions set forth in the NewCo LLC Agreement, in accordance with this Section 2.15.

(b)      Each Term Lender under the Restructuring Second Lien Term Loans may elect to convert (i) any portion of the Restructuring Second Lien Term Loans in excess of $5,000,000 held by such Lender and its Affiliates (including any accrued and unpaid interest thereon through the date of the conversion), or (ii) if $5,000,000 or less, 100% of the then-outstanding principal amount of the Restructuring Second Lien Term Loans held by such Lender and its Affiliates (including any accrued and unpaid interest thereon through the date of the conversion), into a number of Class A-2 Units calculated in accordance with Section 2.15(e) (such number of Class A-2 Units, subject to adjustment as provided in this Section 2.15, the "Conversion Consideration").  For each Class A-2 Unit issued upon conversion, one Class A-1 Unit held by such converting Lender shall be cancelled and extinguished.

(c)      *Procedure for Conversion.*  In order to convert a Restructuring Second Lien Term Loan, the Term Lender thereunder shall give written notice to the Administrative Agent notifying the Administrative Agent of its election to convert and shall make the representations set forth in Section 2.15(g). The Administrative Agent will promptly thereafter provide such Term Lender with written communication describing the key terms of such conversion, including the number of Class A-2 Units issuable to such Term Lender. Upon conversion of a Restructuring Second Lien Term Loan, the Term Lender thereunder will deliver the original Note to the Administrative Agent for cancellation or reduction (as applicable), and will execute and deliver to the Administrative Agent a counterpart signature page to the NewCo LLC Agreement to the extent the Term Lender is not already a party thereto in its capacity as a holder of Class A-1 Units.

(d)      *Fractional Units.*  Upon the conversion of a Restructuring Second Lien Term Loan pursuant to the terms of this Section 2.15, in lieu of any fractional units to which the Term Lender would otherwise be entitled, the Administrative Agent shall pay the Term Lender cash equal to such fraction multiplied by the then-current fair market value of a Class A-2 Unit as determined by the Board of Directors of NewCo.

(e)      *Conversion Consideration.*  Upon the conversion of a Restructuring Second Lien Term Loan pursuant to the terms of this Section 2.15, the number of Class A-2 Units deliverable to a converting Term Lender shall equal the quotient obtained by dividing (i) the amount of the Restructuring Second Lien Term Loan to be converted by such Term Lender (inclusive of any accrued and unpaid interest through the date of the conversion), by (ii) the Initial Contribution Amount (as defined in the NewCo LLC Agreement) of the Class A-2 Units issuable upon conversion of such Restructuring Second Lien Term Loan determined in accordance with the NewCo LLC Agreement (such dollar amount, the "Conversion Price").

(f)      *Adjustments to Conversion Price.*  If NewCo at any time prior to the Maturity Date: (i) subdivides (by any stock split, stock dividend, recapitalization or otherwise) its outstanding Class A-2 Units  into a greater number of Class A-2 Units, (ii) combines (by combination, reverse stock split or otherwise) its outstanding Class A-2 Units into a smaller number of Class A-2 Units, (iii) pays a dividend on its Class A-2 Units payable in Class A-2

Units or otherwise makes a distribution on any class of capital stock that is payable in Class A-2 Units, then in each such case the Conversion Price used in connection with a conversion shall be proportionally adjusted by NewCo in good faith as necessary.

(g)   *Representations of Term Lender.*   A converting Term Lender shall make the following representations and warranties to NewCo as of each date of conversion:

(i)   It (A) is either (I) a qualified institutional buyer as defined in Rule 144A promulgated under the Securities Act, (II) not a U.S. person (as defined in Regulation S promulgated under the Securities Act) and outside the United States, or (III) an institutional accredited investor (as defined in Rule 501(a)(1), (3) or (7) of Regulation D promulgated under the Securities Act), (B) acknowledges that the Conversion Consideration to be acquired by it will have been acquired for investment for its own account, not as a nominee or agent, and not with a view to distribution or resale of any part thereof, and it has no present intention of selling, granting any participation in, or otherwise distributing the same, (C) does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to the Conversion Consideration, (D) has not been formed for the specific purpose of acquiring the Conversion Consideration, (E) understands that the Conversion Consideration has not been, and is not contemplated to be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of its representations as expressed herein, and that the Conversion Consideration will be "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, it must hold the Conversion Consideration indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available, (F) understands that no public market now exists for the Conversion Consideration, that no Person has made any assurances that a public market will ever exist for the Conversion Consideration, and that NewCo will have no obligation to register or qualify such securities except as set forth in the NewCo LLC Agreement, and (G) is not acquiring the Conversion Consideration as a result of any advertisement, article, notice or other communication regarding such securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(ii)   It is aware of NewCo's business affairs and financial condition and has received or has had full access to all the information it considers necessary or appropriate to make an informed investment decision with respect to the acquisition of the Conversion Consideration.  It further has had an opportunity to ask questions and receive answers from NewCo regarding the terms and conditions of the Conversion Consideration and to obtain additional information (to the extent NewCo possesses such information or could acquire it without unreasonable effort or expense) necessary to verify any information furnished to such recipient or to which such recipient has access.

(iii)   Such recipient understands that the acquisition of the Conversion Consideration involves substantial risk.  Such recipient has experience as an investor in securities of companies at a similar stage of development to NewCo; has such knowledge and experience in financial or business matters that such recipient is capable of

evaluating the merits and risks of its investment in the Conversion Consideration; and can bear the economic risk of its investment in the Conversion Consideration.

**Section 2.16** **Tax Treatment.** Notwithstanding anything to the contrary herein, in any Loan Document or in any Organization Document of any Loan Party, the Restructuring Second Lien Term Loans (and the corresponding voting Class A-1 Units in NewCo) held by any Lender will be treated, as from the Amendment No. 13 Effective Date, for U.S. federal and applicable state and local income tax purposes as set forth in the NewCo LLC Agreement. The parties hereto agree to prepare and file all U.S. federal and applicable state and local income tax returns and reports consistently with such treatment, unless otherwise required by a determination within the meaning of Section 1313(a) of the Code or an analogous provision of state or local law.

**Section 2.17** **Benchmark Replacement.**

(a)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Restructuring First Lien Term Loan Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Restructuring First Lien Term Loan Lenders comprising the Required Lenders.

(b)    Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Restructuring First Lien Term Loan Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes.  The Administrative Agent will promptly notify the Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.17(d).  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Restructuring First Lien Term Loan Lender (or group of Restructuring First Lien Term Loan Lenders) pursuant to this Section 2.17, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from

86

any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.17.

(d)    *Unavailability of Tenor of Benchmark.* Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable, non-representative, non-compliant or non-aligned tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    *Benchmark Unavailability Period.* Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Loan of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

**Section 2.18    Indemnity.**  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) a default by the Borrower in making a borrowing of, conversion into or continuation of SOFR Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) a default by the Borrower in making any prepayment of or conversion from SOFR Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement, or (c) for any reason, the making of a prepayment of SOFR Loans on a day that is not the last day of an Interest Period with respect thereto. Such losses and expenses shall be equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, reduced, converted or continued, for the period from the date of such prepayment or of such failure to borrow, reduce, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, reduce, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest or other return for such Loans provided for herein (excluding, however, the First Lien Applicable Margin included therein, if any), over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks. A certificate as

to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the Discharge of Obligations.

**Section 2.19    Conversion and Continuation Options.**

(a)    The Borrower may elect from time to time to convert SOFR Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice in a Notice of Conversion/Continuation of such election no later than 2:00 p.m. New York City time on the Business Day preceding the proposed conversion date; provided that any such conversion of SOFR Loans shall be made three (3) Business Days prior to the last day of the then current Interest Period. The Borrower may elect from time to time to convert ABR Loans to SOFR Loans by giving the Administrative Agent prior irrevocable notice in a Notice of Conversion/Continuation of such election no later than 2:00 p.m. New York City time three (3) Business Days prior to the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor); provided that no ABR Loan may be converted into a SOFR Loan when any Event of Default has occurred and is continuing. Upon receipt of any such notice, the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)    Any SOFR Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice in a Notice of Conversion/Continuation to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.01, of the length of the next Interest Period to be applicable to such Loans; provided that in the event the Borrower fails to give any required notice as described above in this paragraph or specify an Interest Period for any SOFR Loan in the applicable Notice of Conversion/Continuation, the Borrower shall be deemed to have selected an Interest Period with the same interest period as the maturing SOFR Loan; provided, further that no SOFR Loan may be continued as such when any Event of Default has occurred and is continuing and such Loans shall be automatically converted to ABR loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

**Section 2.20    Limitations on SOFR Tranches.** Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of SOFR Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the SOFR Loans comprising each SOFR Tranche shall be equal to $1,000,000 or a whole multiple of $250,000 in excess thereof, and (b) no more than four (4) SOFR Tranches shall be outstanding at any one time.

**Section 2.21    Inability to Determine Interest Rate.** Subject to Section 2.17, (a) if the Administrative Agent or the Required Lenders reasonably determine that for any reason in connection with any request for a SOFR Loan or a conversion to or continuation thereof that Term SOFR cannot be determined pursuant to the definition thereof; or (b) Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Restructuring First Lien Term Loan Lenders of funding such Restructuring First Lien Term Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent, then the Administrative Agent shall give notice thereof to the Borrower and the Restructuring First Lien Term Loan Lenders by facsimile transmission or e-mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Restructuring First Lien Term Loan Lenders that the circumstances giving rise to such notice no longer exist, (i) any Notice of Conversion/Continuation that requests the conversion of any ABR Loans to SOFR Loans shall be ineffective, and any SOFR Loan shall be

converted to an ABR Loan on the last day of the Interest Period applicable thereto and (ii) if any Notice of Borrowing requests a SOFR Loan, such Loan shall be made as an ABR Loan.

**Section 2.22**    Repayment of Loans. To the extent not previously paid, all Loans shall be due and payable on the Maturity Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

# ARTICLE III.

# TAXES, YIELD PROTECTION AND ILLEGALITY

**Section 3.01**    Taxes.

(a)    *Payments Free of Taxes*.    Any and all payments by or on account of any obligation of ~~the Borrower~~any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.    If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the ~~Borrower~~applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    *Payment of Other Taxes by the ~~Borrower~~Loan Parties*.    The ~~Borrower~~Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    *Evidence of Payments*.    As soon as practicable after any payment of Taxes by the ~~Borrower~~Loan Party to a Governmental Authority pursuant to this Section, ~~the Borrower~~such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)    *Indemnification by the ~~Borrower~~Loan Parties*.    The ~~Borrower~~Loan Parties shall indemnify each Recipient, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.    A reasonably detailed certificate as to the amount of such payment or liability delivered to the ~~Borrower~~applicable Loan Party by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    *Indemnification by the Lenders.*    Each Lender shall severally indemnify the

Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that ~~the Borrower~~any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the ~~Borrower~~Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.06(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)    *Status of Lenders*.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (f)(ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time

thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI or IRS Form W-8EXP;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-8EXP, a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

For purposes of this Section 3.01(f) and Section 3.01(g), each reference to the Borrower shall be deemed to include the Restructuring First Lien Borrower, the Restructuring Second Lien Co-Borrowers and all other borrowers referenced in clause (iii) of the definition of "Borrower".

(g)      *Status of Administrative Agent*. On or before the date any Agent becomes a party to this Agreement, such Agent shall provide to the Borrower two duly properly completed and duly signed copies of the documentation prescribed in clause (i) or (ii) below, as applicable (together with all required attachments thereto): (i) IRS Form W-9 or any successor thereto, or (ii) (A) with respect to payments received for its own account, IRS Form W-8ECI or any successor thereto, and (B) with respect to payments received on account of any Lender, a U.S. branch withholding certificate on IRS Form W-8IMY or any successor thereto evidencing its agreement with the Borrower to be treated as a U.S. Person for U.S. federal withholding purposes.  At any time thereafter, any Agent shall provide updated documentation previously provided (or a successor form thereto) when any documentation previously delivered has expired or become obsolete or invalid or otherwise upon the reasonable request of the Borrower or promptly notify the Borrower of its legal ineligibility to do so. The Administrative Agent hereby represents and warrants to the Loan Parties that it is a "U.S. person" and a "financial institution" and that it will comply with its "obligation to withhold," each within the meaning of Treasury Regulations Section 1.1441-1(b)(2)(ii).

(gh)      *Treatment of Certain Refunds*.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the

relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g̶h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g̶h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h̶i)     *Survival*.     Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**Section 3.02**     Increased Costs and Reduced Return; Capital Adequacy.

(a)     *Capital Requirements*.     If any Lender determines that any Change in Law affecting such Lender, any of its applicable Lending Offices or its holding company regarding capital and liquidity requirements has or would have the effect of reducing the rate of return on capital for such Lender or its holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or its holding company would have achieved but for such Change in Law (taking into consideration such Lender's or its holding company's policies with respect to capital and liquidity adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or its holding company or its holding company for any such reduction suffered.

(b)     *Certificates for Reimbursement*.     A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in clause (a) or (b) above and delivered to the Borrower, shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate promptly (but in any event within ten (10) Business Days) after receipt thereof.

(c)     *Delay in Requests*.     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180 day period referred to above shall be extended to include the period of retroactive effect thereof).

(d)     *Illegality*. If any Lender determines that any applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender to make, maintain or fund SOFR Loans or to determine or charge interest rates based upon Term SOFR, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then,

on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue SOFR Loans or to convert ABR Loans to SOFR Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall, upon written demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans of such Lender to ABR Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such SOFR Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**Section 3.03**      Mitigation Obligations; Replacement of Lenders.

(a)      *Designation of a Different Lending Office*.  If at any time (i) any Lender requires the Borrower to pay additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or (ii) any Lender requests compensation under Section 3.02, then such Lender shall, at the request of the Borrower, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (A) would eliminate or reduce amounts payable pursuant to Section 3.01 or Section 3.02, as the case may be, in the future, and (B) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      *Replacement of Lenders*. If at any time (i) the Borrower is required to pay additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (ii) any Lender requests compensation under Section 3.02, (iii) any Lender is a Defaulting Lender or (iv) any Lender is a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to the Administrative Agent and such Lender, replace such Lender by causing such Lender (and such Lender shall be obligated) to assign pursuant to Section 10.06(b) all of its rights and obligations under this Agreement and the other Loan Documents to one or more Eligible Assignees; provided that:

(i)      neither the Administrative Agent nor any Lender shall have any obligation to find a replacement assignee;

(ii)      such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents, from the applicable assignee (to the extent of such outstanding principal, funded participations and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)      in the case of any such assignment resulting from payments required to be made pursuant to Section 3.01 or a claim for compensation under Section 3.02, such assignment will result in a reduction in such payments or compensation thereafter;

(iv)      such assignment does not conflict with applicable Law; and

AMERICAS/2024214501.1AMERICAS/2024274802.21

(v)        in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall be deemed to have consented to the applicable amendment, waiver or consent.

In connection with any such assignment contemplated by this Section, if any such Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption pursuant to Section 10.06(b) reflecting such assignment within two (2) Business Days of the date on which the applicable assignee executes and delivers such Assignment and Assumption to such Lender, then such Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of such Lender, whereupon such assignment shall become effective upon payment to such Lender of all amounts owing to such Lender under clause (B) or (C) above (which amounts shall be calculated by the Administrative Agent and shall be conclusive absent manifest error) and compliance with the other applicable requirements pursuant to Section 10.06(b). A Lender shall not be required to make any such assignment if, prior to the Borrower contacting any potential replacement Lenders, the circumstances entitling the Borrower to replace such Lender cease to apply.

Section 3.04        Survival. All of the Borrower's obligations under this Article III shall survive termination of the Commitments and repayment of all other Senior Credit Obligations hereunder.

## ARTICLE IV.

## CONDITIONS PRECEDENT TO BORROWINGS

Section 4.01        Conditions to Initial Borrowings. Subject in each case to Section 6.11, the obligation of each Lender to make any Borrowings hereunder on the Closing Date is subject to the satisfaction or waiver of the following conditions precedent, in each case on or prior to the Closing Date:

(a)        *Executed Documents*. Receipt by the Administrative Agent (or its counsel) of duly executed counterparts from each party thereto of: (i) the Credit Agreement, (ii) the Term Notes (to the extent requested), (iii) the Guaranty Agreement, (iv) the Security Agreement, (v) the Intellectual Property Security Agreements, (vi) the Warrants, (vii) the Intercompany Subordination Agreement and (viii) an appropriate Notice of Borrowing, and (x) any other Loan Document, as applicable, in each case, duly executed and completed, by the time specified in, and otherwise as permitted by, Section 2.02, in respect of the Initial Term Loans to be made hereunder.

(b)        *Organization Documents*. The Administrative Agent shall have received: (i) a copy of the Organization Documents, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State or other applicable Governmental Authority of its respective jurisdiction of organization to the extent applicable; (ii) a certificate as to the good standing (or comparable status) of each Loan Party from such Secretary of State or other applicable Governmental Authority of its respective jurisdiction of organization, as of a recent date; (iii) a certificate of the Secretary or Assistant Secretary or other applicable Responsible Officer of each Loan Party dated the Closing Date and certifying (A) that, in the case of the Borrower and any Guarantor, the Organization Documents of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing or comparable status from its jurisdiction of organization furnished pursuant to clause (ii) above and remains in full force and effect; (B) that attached thereto is a true and complete copy of the Organization Documents as in effect on the Closing Date, (C) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors (or equivalent governing body) of such Loan Party authorizing the execution, delivery and performance of the Loan

95

Documents to which it is to be a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and are the only resolutions authorizing the execution, delivery and performance of the Loan Documents; and (D) as to the incumbency and specimen signature of each Responsible Officer executing any Loan Document; and (iv) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary or other applicable Responsible Officer executing the certificate pursuant to clause (iii) above.

(c)      *Officer's Certificate*.  The Administrative Agent shall have received a certificate, signed by a Responsible Officer of the Borrower on behalf of each Loan Party, confirming compliance with the conditions precedent set forth in Sections 4.01 (i) and (j).

(d)      *Consummation of the Closing Date Refinancing*.  The Closing Date Refinancing shall have been consummated.

(e)      *Perfection of Personal Property Security Interests and Pledges; Search Reports*. The Collateral Agent shall have received:

(i)      a Perfection Certificate executed by each Loan Party;

(ii)      appropriate financing statements (Form UCC-1 or such other financing statements or similar notices as shall be required by local Law) authenticated and authorized for filing under the UCC of each jurisdiction in which the filing of a financing statement may be required, or reasonably requested by the Collateral Agent, to perfect by filing under the UCC the security interests created by the Collateral Documents;

(iii)      all of the Pledged Securities consisting of certificated securities (to the extent such certificated securities exist on the Closing Date), which Pledged Securities shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Collateral Agent; and

(iv)      all other filings and recordings of or with respect to the Collateral Documents and of all other actions in each case to the extent required by such Collateral Documents on or prior to the Closing Date.

(f)      *Solvency Certificate*.  ~~The Parent~~NewCo shall have delivered or caused to be delivered to the Administrative Agent a solvency certificate from a Financial Officer of ~~the Parent~~NewCo, substantially in the form of Exhibit I hereto, setting forth the conclusions that, after giving effect to the consummation of the Transactions contemplated herein, ~~the Parent~~NewCo and its Subsidiaries (on a consolidated basis) are Solvent.

(g)      *Financial Statements*.  The Administrative Agent shall have received (A) (x) audited consolidated balance sheets and related statements of income, changes in equity and cash flows of the Parent and its Consolidated Subsidiaries for the Fiscal Years ended June 30, 2016 and June 30, 2017 and (y) an unaudited consolidated balance sheet and related statement of income, change in equity and cash flows of the Parent and its Consolidated Subsidiaries for the Fiscal Year ended June 30, 2018 and (B) unaudited consolidated balance sheets and related statements of income, changes in equity and cash flows of the Parent and its Consolidated Subsidiaries for each subsequent Fiscal Quarter following the last Fiscal Year for which financial

statements have been delivered pursuant to <u>clause (A)</u> above ended at least forty-five (45) days before the Closing Date.

(h)  *Payment of Fees*.  All accrued costs, fees and expenses (including the legal fees and expenses and the fees and expenses of any other advisors) and other compensation due and payable to the Agents and the Lenders shall have been paid, to the extent an invoice therefor was presented at least two (2) Business Days prior to the Closing Date (or such later date as the Borrower may agree).

(i)  *Representations and Warranties*.  The representations and warranties of the Borrower and the other Loan Parties contained in <u>Article V</u> of this Agreement shall be true and correct in all material respects (except for representations and warranties that are already qualified by materiality, which representations and warranties shall be true and correct in all respects after giving effect to such materiality qualification) on the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct on the basis set forth above as of such earlier date.

(j)  *No Default*.  No Default or Event of Default shall exist or would result from the Borrowing on the Closing Date.

(k)  *Material Adverse Effect*.  There shall not have occurred any event, change, occurrence or effect that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(l)  *Approvals*.  All (i) registrations with, consents and approvals of, and notices to, and other actions to, with or by, any Governmental Authority, (ii) approvals and consents of any Person under any Contractual Obligation of Parent or any of its Subsidiaries and (iii) licenses, franchises and permits, in each case, that are required for the performance by the Loan Parties of their respective obligations under, and the consummation of the transactions contemplated by, the Loan Documents shall have been obtained and shall be in full force and effect.

(m)  *Know-Your-Customer, etc*.  The Administrative Agent shall have received not less than three (3) Business Days prior to the Closing Date all documentation and other information required under Anti-Terrorism Laws and applicable "know-your-customer" and anti-money laundering Laws, including, without limitation, a duly executed W-9 (or other applicable tax form) of the Borrower.

(n)  *Existing Indebtedness*.  The Closing Date Refinancing shall have occurred, or substantially simultaneously with the Closing Date shall occur, and all outstanding Indebtedness under the Existing Credit Agreement shall have been, or substantially simultaneously with the Closing Date shall be, repaid in full, and all commitments thereunder to lend or make other extensions of credit shall have been terminated.  The Administrative Agent shall have received customary payoff letters and all documents or instruments necessary to release all Liens securing the Indebtedness under the Existing Credit Agreement or other obligations of Parent and its Subsidiaries thereunder (including, without limitation, the English Deed of Release).

(o)  *Opinions of Counsel*.  The Administrative Agent and its counsel shall have received duly executed copies of the favorable written opinion of: (1) Wilmer Cutler Pickering Hale and Dorr LLP, U.S. counsel to the Loan Parties, and (2) Appleby, Bermuda counsel to the Administrative Agent, in each case, in form and substance reasonably satisfactory to the Administrative Agent, dated as of the Closing Date (and each Loan Party hereby instructs such

counsel to deliver such opinions to the Agents and the Lenders). Such legal opinions shall cover such matters incidental to the transactions contemplated by this Agreement and the other Loan Documents as the Administrative Agent may reasonably require.

(p)    _Litigation_.  There shall be no action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of the Parent or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of the Parent or any of its Subsidiaries, threatened or contemplated against the Parent or any of its Subsidiaries or any property of the Parent or any of its Subsidiaries that relate to the Loan Documents or the transactions contemplated thereby, or that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

The documents referred to in this Section 4.01 shall be delivered to the Administrative Agent no later than the Closing Date.  The certificates referred to in this Section 4.01 shall each be dated the Closing Date.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, or waived each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**Section 4.02**    Conditions to Borrowings after the Closing Date.  The obligation of any Lender to make a Loan on the occasion of any Borrowing to be made after the Closing Date, is subject to the satisfaction or waiver of the following conditions:

(a)    _Notice_.  The Borrower shall have delivered to the Administrative Agent, an appropriate Notice of Borrowing, duly executed and completed, by the time specified in, and otherwise as permitted by, Section 2.02.  The delivery of each Notice of Borrowing shall constitute a representation and warranty by the Loan Parties of the correctness of the matters specified in clauses (b) and (c) below.

(b)    _Representations and Warranties_.  The representations and warranties of the Borrower and the other Loan Parties contained in Article V of this Agreement shall be true and correct in all material respects (except for representations and warranties that are already qualified by materiality, which representations and warranties shall be true and correct in all respects after giving effect to such materiality qualification) on the date of such Borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct on the basis set forth above as of such earlier date.

(c)    _No Default_.  No Default or Event of Default shall exist or would result from such proposed Borrowing or from the application of the proceeds thereof.

(d)    _Additional Term Loan Funding Date Warrants_.  Solely with respect to the making of the Additional Term Loans on the Additional Term Loan Funding Date, receipt by the Administrative Agent (or its counsel) of duly executed counterparts from each party thereto the Additional Term Loan Funding Date Warrants.

(e) ~~*Initial Tranche A Term Loan Warrant*.  Solely with respect to the making of the Initial Tranche A Term Loans on the Initial Tranche A Facility Effective Date, receipt by the Administrative Agent (or its counsel) of duly executed counterparts from each party to the Initial Tranche A Term Loan Warrants.~~

(f) ~~*First Incremental Tranche A Term Loan Warrant*.  Solely with respect to the making of First Incremental Tranche A Term Loans on each First Tranche A Incremental Facility Effective Date, receipt by the Administrative Agent (or its counsel) of duly executed counterparts from each party to the applicable First Incremental Tranche A Term Loan Warrants.~~

(g) ~~*Second Incremental Tranche A Term Loan Warrant*.  Solely with respect to the making of Second Incremental Tranche A Term Loans on each Second Incremental Tranche A Draw Date, receipt by the Administrative Agent (or its counsel) of duly executed counterparts from each party to the applicable Second Incremental Tranche A Term Loan Warrant.~~

(h) ~~*Amendment No. 8 Incremental Term Loan Warrant*. Solely with respect to the making of Amendment No. 8 Incremental Term Loans on the Amendment No. 8 Effective Date, receipt by the Administrative Agent (or its counsel) of duly executed counterparts from each party to the applicable Amendment No. 8 Incremental Term Loan Warrant, which shall be promptly delivered by the Administrative Agent to each applicable holder thereof.~~

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders that on and as of the Closing Date after giving effect to the making of the Loans and the other financial accommodations on the Closing Date, and on and as of any other date required by Section 4.02:

**Section 5.01**    Existence, Qualification and Power.  Each Loan Party (i) is duly organized, registered or formed, validly existing and in good standing (to the extent such concept exists in the relevant jurisdiction) under the Laws of the jurisdiction of its incorporation, registration or organization, (ii) has all requisite corporate, limited liability company or other organizational power and authority and all requisite governmental licenses, authorizations, consents and approvals to (A) own its assets and carry on its business as presently conducted except to the extent that failure to possess such governmental licenses, authorizations, consents and approvals would not reasonably be expected to have a Material Adverse Effect and (B) execute, deliver and perform its obligations under the Loan Documents to which it is a party and (iii) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

**Section 5.02**    Authorization; No Contravention.    The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party (x) have been duly authorized by all necessary corporate, partnership, limited liability company or other organizational action, and (y) do not and will not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien (other than Permitted Liens) under, any Contractual Obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject except in the case of this clause (ii) any such conflict, breach or contravention that would not reasonably be expected individually or in the aggregate to have a Material

Adverse Effect or (iii) violate any Law, except in any case for such violations that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

> **Section 5.03**    <u>Governmental Authorization; Other Consents</u>.    Except for (i) filings necessary to perfect the Liens in favor of the Collateral Agent in the Collateral, (ii) consents, authorizations, notices, approvals and exemptions that have been obtained prior to or as of the Closing Date and (iii) consents, authorizations, notices, approvals and exemptions, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document to which it is a party.

> **Section 5.04**    <u>Binding Effect</u>.    This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except (i) as such enforceability may be limited by applicable bankruptcy, insolvency, examinership, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and (ii) that rights of acceleration and the availability of equitable remedies may be limited by equitable principles of general applicability (regardless of whether enforcement is sought by proceedings in equity or at law).

> **Section 5.05**    <u>Financial Condition; No Material Adverse Effect</u>.

> (a)    *Financial Statements*.    The financial statements most recently provided pursuant to Section 4.01(g), and <u>Section 6.01(a)</u> or <u>(b)</u>, as applicable, present fairly, in all material respects, the financial position and results of operations and cash flows of ~~the Parent~~NewCo and its Consolidated Subsidiaries, as of such dates and for such periods in accordance with GAAP, subject, in the case of financial statements provided pursuant to <u>Section 6.01(a)</u>, to the absence of footnotes and normal year-end adjustments.

> (b)    *Material Adverse Change*.    Since ~~June 30, 2018~~<u>the Closing Date</u>, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

> **Section 5.06**    <u>Litigation</u>.    There are no actions, suits or legal, equitable, arbitration or administrative proceedings pending or, to the knowledge of the Borrower, investigations against or actions, suits or legal, equitable, arbitration or administrative proceedings <u>(other than proceedings arising out of the Restructuring)</u> threatened in writing against, or affecting ~~the Parent~~<u>NewCo</u> or any of its Subsidiaries, in any case, that could reasonably be expected to result in a Material Adverse Effect.

> **Section 5.07**    <u>Ownership of Property, Liens</u>.

> (a)    *Generally*.    Each Loan Party has good and marketable fee simple title to, valid leasehold interests in, or valid licenses in, all its property material to its business and Owned Real Property, free and clear of all Liens, except for Permitted Liens.  The property of the Loan Parties, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear and damage by casualty excepted) and (ii) constitutes all the property which is required for the business and operations of Loan Parties as presently conducted.

(b)     *Real Property*.

(i)     Schedule 2(c) to the Perfection Certificate dated the Closing Date contains a true and complete list as of the Closing Date of all Owned Real Property with a book value over $1,500,000.

(ii)     No Loan Party has received any written notice of any condemnation, eminent domain or similar proceedings affecting any Owned Real Property.

(iii)     Each applicable Loan Party has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Owned Real Property owned by such Loan Party;

(iv)     With respect to each Lease:  (1) the applicable Loan Party is in peaceful possession of the Leased Real Property covered by such Lease, (2) the applicable Loan Party has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property covered by such Lease (or any portion thereof) or assigned, mortgaged, pledged or otherwise transferred its interest in such Lease, in each case other than to ~~the Parent~~NewCo or a Subsidiary outside of those sublets, licenses or grants allowed and as appropriate approved under the terms of the Lease, (3) there are no currently existing defaults on the part of the applicable Loan Party or, to Borrower's knowledge, on the part of the lessor under such Lease beyond any applicable notice and cure periods as stipulated in the Lease, (4)  such Lease is in full force and effect, enforceable against the parties thereto in accordance with its terms, and is a complete statement of the agreement of the parties with respect to the leasing, license or similar arrangement of the Leased Real Property described therein by the parties thereto, and (5) there is no outstanding dispute between the parties to such Lease.

**Section 5.08**     Environmental Matters.  Except for any matters which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect:

(a)     Each of ~~the Parent~~NewCo and its Subsidiaries are in compliance with applicable Environmental Law;

(b)     Each of ~~the Parent~~NewCo and its Subsidiaries has obtained, or has applied in a timely manner for, all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law;

(c)     There has been no Release or, to the knowledge of any of ~~the Parent~~NewCo or any of its Subsidiaries, threatened Release of Hazardous Material on, at, under or from any real property or facility presently or, to the knowledge of ~~the Parent~~NewCo and any of its Subsidiaries, formerly owned, leased or operated by ~~the Parent~~NewCo or any of its Subsidiaries or their predecessors in interest that could reasonably be expected to result in Environmental Liability; and

(d)     There is no Environmental Liability pending or, to the knowledge of any of ~~the Parent~~NewCo or any of its Subsidiaries, threatened against any of ~~the Parent~~NewCo or any of its Subsidiaries.

**Section 5.09**     Insurance.  The properties of ~~the Parent~~NewCo and each of its Subsidiaries are insured with insurance companies that the Borrower believes are financially sound and

reputable that are not Affiliates of the Borrower, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are prudent in the reasonable business judgment of the Borrower's officers and consistent in all material respects with practices of companies engaged in the same or similar business.  All insurance maintained by ~~the Parent~~NewCo and its Subsidiaries is in full force and effect, all premiums have been duly paid, none of ~~the Parent~~NewCo and its Subsidiaries has received notice of violation or cancellation thereof, and there exists no default under any requirement of such insurance.

**Section 5.10**     Taxes.  ~~The Parent~~NewCo and each of its Subsidiaries have each timely filed, or caused to be filed, all federal, state, provincial, local and foreign Tax returns required to be filed, and paid all Taxes owing by it (including in their capacity as a withholding agent), whether or not shown on any such Tax returns, except (a) Taxes the validity or the amount of which are being contested in good faith by appropriate proceedings and for which ~~the Parent~~NewCo or such Subsidiary, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP~~,~~ and (b) to the extent that the failure to so file or so pay could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  Neither ~~the Parent~~NewCo nor any of its Subsidiaries knows of any pending investigation, Tax audit or deficiencies of ~~the Parent~~NewCo or any of its Subsidiaries by any taxing authority that are reasonably likely to result in a Material Adverse Effect or proposed Tax assessments against ~~the Parent~~NewCo or any of its Subsidiaries that would, individually or in the aggregate, if made, result in a Material Adverse Effect.

**Section 5.11**     ERISA; Foreign Pension Plans; Employee Benefit Arrangements.

(a)     *ERISA*.

(i)     Except as would not reasonably be expected to have a Material Adverse Effect, there are no material Unfunded Liabilities (A) with respect to ~~the Parent~~NewCo or any of its Subsidiaries and (B) with respect to any ERISA Affiliate; provided that for purposes of this Section 5.11(a)(i)(B) only, Unfunded Liabilities means the amount (if any) by which the projected benefit obligation exceeds the value of the plan's assets as of its last valuation date using the actuarial assumptions and methods being used by the plan's actuaries for making such determination.

(ii)     Each Plan and Employee Benefit Arrangement, other than a Multiemployer Plan, complies in all respects with the applicable requirements of ERISA and the Code (including pursuant to any applicable correction procedures under applicable Law, as appropriate), and ~~the Parent~~NewCo and each of its Subsidiaries complies in all respects with the applicable requirements of ERISA and the Code with respect to all Multiemployer Plans to which it contributes, except, in each case, to the extent that the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

(iii)     Except as would not reasonably be expected to have a Material Adverse Effect, no ERISA Event has occurred or is reasonably expected to occur with respect to any Plan.

(iv)     Neither ~~the Parent~~NewCo nor any of its Subsidiaries: (A) is or has been within the last six years a party to any Multiemployer Plan; or (B) has completely or partially withdrawn from any Multiemployer Plan except, in each case, that would not reasonably be expected to have a Material Adverse Effect.

(v)    Neither ~~the Parent~~NewCo nor any of its Subsidiaries has any contingent liability with respect to any postretirement benefit under a Welfare Plan that could reasonably be expected to have a Material Adverse Effect.

(b)    *Foreign Pension Plans*.  Each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities except to the extent that the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.  Neither ~~the Parent~~NewCo nor any of its Subsidiaries has incurred any obligation in an amount that would reasonably be expected to have a Material Adverse Effect in connection with the termination of or withdrawal from any Foreign Pension Plan.

(c)    *Employee Benefit Arrangements*.

(i)    All liabilities under the Employee Benefit Arrangements are (A) funded to at least the minimum level required by Law or, if higher, to the level required by the terms governing the Employee Benefit Arrangements, (B) insured with a reputable insurance company, (C) provided for or recognized in the financial statements most recently delivered to the Administrative Agent pursuant to Section 6.01 hereof or (D) estimated in the formal notes to the financial statements most recently delivered to the Administrative Agent pursuant to Section 6.01 hereof, where any such failure to fund, insure, provide for, recognize or estimate the liabilities arising under such arrangements could reasonably be expected to have a Material Adverse Effect.

(ii)    There are no circumstances which may give rise to a liability in relation to the Employee Benefit Arrangements which are not funded, insured, provided for, recognized or estimated in the manner described in clause (i) above and which could reasonably be expected to have a Material Adverse Effect.

(iii)    ~~The Parent~~NewCo and each of its Subsidiaries is in compliance with all applicable Laws, trust documentation and contracts relating to the Employee Benefit Arrangements (including pursuant to any applicable procedures under applicable Law, as appropriate), except as would not reasonably be expected to have a Material Adverse Effect.

**Section 5.12**    Subsidiaries; Equity Interests.  Schedule 5.12 sets forth a complete and accurate list as of the Closing Date of all Subsidiaries of ~~the Parent~~NewCo, the jurisdiction of formation of each such Subsidiary and whether each such Subsidiary is a Guarantor.  The Perfection Certificate sets forth as of the Closing Date the number and percentage of outstanding shares of each class of Equity Interests of each such Subsidiary owned directly by each Loan Party.  All the outstanding Equity Interests of the Borrower are owned by ~~the Parent~~NewCo.  All the outstanding Equity Interests of each Subsidiary of the Borrower are validly issued, fully paid and non-assessable (to the extent applicable and except as may arise under mandatory, nonwaivable provisions of applicable law) and were not issued in violation of the preemptive rights of any shareholder and, as of the Closing Date, those owned by the Loan Parties directly are free and clear of all Liens.  Other than as set forth in the Perfection Certificate, as of the Closing Date, no Subsidiary has outstanding any Equity Equivalents nor does any such Person have outstanding any rights to subscribe for or to purchase or any options for the purchase of, or any agreements providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its Equity Interests.

**Section 5.13**      Margin Regulations; Investment Company Act.

(a)      Neither ~~the Parent~~NewCo nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.  No part of the proceeds of the Loans will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock in violation of Regulation T, U or X.  None of the transactions contemplated by this Agreement (including the direct or indirect use of the proceeds of the Loans) will violate or result in a violation of the Securities Act, the Exchange Act or Regulation T, U or X.

(b)      None of the Loan Parties is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended.

**Section 5.14**      Compliance with Law.  Each of ~~the Parent~~NewCo and its Subsidiaries is in material compliance with all requirements of Law applicable to it or to its properties~~, except for any such failure to comply which could not reasonably be expected to cause a Material Adverse Effect~~.  To the knowledge of the Loan Parties, neither ~~the Parent~~NewCo nor any of its Subsidiaries nor any of their respective material properties or assets is in default in any material respect with respect to any judgment, writ, injunction, decree or order of any court or other Governmental Authority ~~which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  As of the Closing.~~ As of the Amendment No. 13 Effective Date, neither ~~the Parent~~NewCo nor any of its Subsidiaries has received any written communication from any Governmental Authority that alleges that any of ~~the Parent~~NewCo or any of its Subsidiaries is not in compliance in any material respect with any Law~~,~~ except for allegations that have been satisfactorily resolved and are no longer outstanding or which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.15**      Intellectual Property.

(a)      Schedule 5.15(a)(i) sets forth a true, correct and complete list of ~~the Parent~~NewCo and its Subsidiaries' (i) owned Intellectual Property that is the subject of a registration, issued patent, and/or pending application ("Registered IP"); (ii) owned Intellectual Property that is material to the conduct of their respective businesses but not included in Registered IP; and (iii) agreements and licenses under which ~~Parent~~NewCo or any Subsidiary licenses material Intellectual Property from third parties (other than commercially-available licenses for non-customized and over-the-counter software with annual fee of less than $1,000,000 and open-source software that is commercially available to the public) (collectively, "IP Licenses") (each item in subsection (i)-(iii), collectively, "Material IP").  All required filings and maintenance/renewal fees related to the Registered IP have been timely filed with and paid to the relevant governmental authorities and authorized registrars and all Registered IP is valid, subsisting, and, if registered/issued, enforceable.  ~~Parent~~NewCo and its Subsidiaries are in material compliance with the IP Licenses, all of which are in full force and effect.  To the knowledge of the Loan Parties, ~~Parent~~NewCo or its Subsidiaries own or have the right to use all the Intellectual Property necessary to continue to conduct its business as now conducted and, except as set forth in Schedule 5.15(a)(ii), the Material IP is all the Intellectual Property that is necessary for the conduct of ~~Parent~~NewCo and each of its Subsidiaries' business as currently conducted.

(b)      ~~Parent~~NewCo or one of its Subsidiaries is the sole and exclusive owner of all the Material IP and, to the knowledge of the Loan Parties, has the valid and enforceable right to use all other Intellectual Property that is used in or necessary for the conduct of their business as currently conducted, in each case, free and clear of all Liens except for Permitted Liens.  To the

104

knowledge of the Loan Parties, ~~Parent~~NewCo and each of its Subsidiaries conducts its business without infringement or violation of any Intellectual Property of any other Person.  There are no actions (including any oppositions, interferences or re-examinations) settled, pending or, to the Loan Parties' knowledge, threatened (including in the form of offers to obtain a license), and there have not been any such actions: (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any third party by ~~the Parent~~NewCo of any of its Subsidiaries (ii) challenging the validity, enforceability, registrability or ownership of any Material IP, or (iii) by ~~Parent~~NewCo or any of its Subsidiaries alleging any infringement, misappropriation, dilution or violation by any person of any Material IP.   Neither ~~the Parent~~NewCo nor any of its Subsidiaries has received any written notice or claim, or, to the knowledge of the Loan Parties, oral notice or claim, challenging or questioning ~~the Parent~~NewCo or its Subsidiaries' ownership in any Intellectual Property (or written notice of any claim challenging or questioning the ownership in any licensed Intellectual Property of the owner thereof) or suggesting that any third party has any claim of legal or beneficial ownership with respect thereto nor, to the Loan Parties' knowledge, is there a reasonable basis for any such claim.

(c)    None of the Loan Parties is a party to, nor is bound by, any agreement that restricts the grant of a security interest in any of the Intellectual Property in favor of Administrative Agent or the Lenders or otherwise limits or restricts ~~the Parent~~NewCo or its Subsidiaries' ability to use, assign, and/or commercially exploit any Material IP other than pursuant to agreements among ~~Parent~~NewCo and its Subsidiaries as set forth in Schedule 5.15(c).  The consummation of the transactions contemplated in this Agreement shall not result in the restriction, limitation, loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other person in respect of, ~~Parent~~NewCo or its Subsidiaries' right to own, use or hold for use any Intellectual Property as owned by, material to, and/or used or held for use in the conduct of their respective businesses.

(d)    To the knowledge of the Loan Parties, no Software included in Material IP is, or contains or is derived from any source code that is, in whole or in part, subject to the provisions of any license to software that is made generally available to the public without requiring payment of fees or royalties that would operate to (i) undermine a claim of ownership to such software that is purported to be proprietary to ~~Parent~~NewCo or any of its Subsidiaries, or (ii) condition the use or distribution of any such software or portion thereof on (A) the disclosure, licensing, or distribution of any source code for any portion of such software, (B) the granting to licensees of the right to reverse engineer or make derivative works or other modifications to such software or portions thereof, or (C) the licensing or otherwise distributing or making available of any such software for no fee or charge or for a nominal or otherwise limited fee or charge.

(e)    ~~Parent~~NewCo and its Subsidiaries have taken all the necessary steps to ensure that all confidential business information, personally identifiable information, trade secrets and know-how are protected from unauthorized access and/or use.  There has not been any breach or unauthorized access to any of the foregoing confidential information.

**Section 5.16**    Use of Proceeds.  The proceeds of (a) the Initial Term Loans funded on the Closing Date were used by the Parent or its Subsidiaries on the Closing Date to consummate the Transactions, (b) the Additional Term Loans ~~and Incremental Term Loans will be~~were used by the Parent after the Closing Date, to provide for ongoing working capital requirements of the Parent and its Subsidiaries, (c) the Tranche A Term Loans ~~will be~~were used by the Parent to consummate the Class D Transactions and, (d) any Loans (including Initial Term Loans, the Additional Term Loans ~~and,~~ Tranche A Term Loans, Incremental Term Loans and Restructuring Term Loans) may be used for general

~~AMERICAS/2024214501.1~~AMERICAS/2024274802.21

corporate purposes, including ~~Permitted Acquisitions,~~ Investments and Restricted Payments hereunder. For the avoidance of doubt, no amount advanced or to be advanced under any Loan have been or will be used for the purpose of acquiring shares in any Irish Loan Party and/or any direct or indirect parent company of any Irish Loan Party.

**Section 5.17**      Solvency.   On the ~~Closing~~Amendment No. 13 Effective Date, ~~the Parent~~NewCo and its Subsidiaries (on a consolidated basis) are Solvent.

**Section 5.18**      Collateral Documents.

(a)      *Article 9 Collateral*.  The Security Agreement, when executed and delivered, is effective to create in favor of the Collateral Agent, for the benefit of the Finance Parties, a legal, valid and enforceable security interest in the Collateral described therein and, when financing statements in appropriate form are filed in the applicable filing offices and the Pledged Securities (to the extent such Pledged Securities are represented by certificated securities and to the extent such certificated securities exist) are delivered to the Collateral Agent, the Security Agreement shall constitute a fully perfected Lien on all right, title and interest of the grantors thereunder in such of the Collateral in which a security interest can be created under Article 9 of the UCC and can be perfected under Article 9 of the UCC by filing or by possession thereof, in each case prior and superior in right to any other Person, other than with respect to Permitted Liens, and except for (i) certain items of Collateral with respect to which such Lien may be perfected only by possession thereof where the failure of the Collateral Agent to have possession thereof is expressly permitted pursuant to the Security Agreement and (ii) certain items of Collateral located in or otherwise subject to foreign law where the grant of a Lien or priority and perfection thereof in accordance with the UCC may not be recognized or enforceable.

(b)      Each of the Mortgages delivered after the Closing Date will be, upon execution, effective to create in favor of the Administrative Agent, for the benefit of the Finance Parties, a legal, valid and enforceable Lien on the Mortgaged Properties described therein and proceeds thereof, and when the Mortgages are filed in the offices for the applicable jurisdictions in which the Mortgaged Properties are located, each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Properties and the proceeds thereof, as security for the Senior Credit Obligations, in each case prior and superior in right to any other Person

(c)      *Status of Liens*.  The Collateral Agent, for the benefit of the Finance Parties, has the Liens provided for in the Collateral Documents and, subject to the filing by the Collateral Agent of continuation statements to the extent required by the UCC and to the qualifications and limitations set forth in clauses (a) and (b) above, the Collateral Documents are sufficient to constitute valid and continuing liens of record and first priority perfected security interests in all the Collateral (other than Permitted Liens) referred to therein, except (i) as priority may be affected by Permitted Liens as a result of the Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral Documents, (ii) for certain items of Collateral located in or otherwise subject to foreign law where the grant of a Lien or priority and perfection thereof in accordance with the UCC may not be recognized or enforceable and (iii) exceptions to perfection set forth in the Collateral Documents.

(d)      *English Security Documents*. Subject to the Legal Reservations (as that term is defined in the English Guarantee and Debenture), each English Security Document creates the Liens which it purports to create in favor of the Collateral Agent (and, as applicable, the Finance

Parties) and those security interests are legal, valid and enforceable security interests under the laws of England and Wales over each of the assets described therein and the proceeds thereof. The shares which are subject to the English Security Documents are fully paid and not subject to any option to purchase or similar rights. The constitutional documents of the company whose shares are subject to any English Security Document do not and could not restrict or inhibit any transfer of those shares on creation or on enforcement of that English Security Document. As at the Closing Date, it is not necessary that the Loan Documents to which an English Loan Party is a party be filed, recorded or enrolled with any court or other authority in those jurisdictions or that any stamp, registration, notarial or similar taxes or fees be paid on or in relation to such Loan Documents or the transactions contemplated by such Loan Documents except registration of particulars of each Collateral Document creating any Liens granted by an English Loan Party at the Registrar of Companies in England and Wales pursuant to section 859A of the Companies Act and payment of associated fees, which registrations, filings, taxes and fees will be made and paid within the applicable time periods after the date of the relevant English Security Documents.

(e)    *Irish Security Documents*. Subject to the Legal Reservations (as that term is defined in the Irish Debenture) and Perfection Requirements in respect of an Irish Loan Party, each Irish Security Document creates the Liens which it purports to create in favor of the Collateral Agent (and, as applicable, the Finance Parties) and those security interests are legal, valid and enforceable security interests under the laws of Ireland over each of the assets described therein and the proceeds thereof. The shares which are subject to the Irish Security Documents are fully paid and not subject to any option to purchase or similar rights. The constitutional documents of the company whose shares are subject to any Irish Security Document do not and could not restrict or inhibit any transfer of those shares on creation or on enforcement of that Irish Security Document. As at the Amendment No. 13 Effective Date, subject to the Legal Reservations (as defined in the Irish Debenture) and Perfection Requirements, it is not necessary that the Loan Documents to which an Irish Loan Party is a party be filed, recorded or enrolled with any court or other authority in those jurisdictions or that any stamp, registration, notarial or similar taxes or fees be paid on or in relation to such Loan Documents or the transactions contemplated by such Loan Documents.

(f)    *Cayman Islands Security Documents*. Each Cayman Islands Security Document creates the Liens which it purports to create in favor of the Collateral Agent (and, as applicable, the Finance Parties) and those security interests are legal, valid and enforceable security interests under the laws of the Cayman Islands over each of the assets described therein and the proceeds thereof. The limited liability company interests which are subject to the Cayman Islands Security Documents are fully paid and not subject to any option to purchase or similar rights. The constitutional documents of the company whose limited liability company interests are subject to any Cayman Islands Security Document do not and could not restrict or inhibit any transfer of those limited liability company interests on creation or on enforcement of that Cayman Islands Security Document.

**Section 5.19**    Senior Indebtedness. The Senior Credit Obligations constitute "Senior Indebtedness" (or any comparable term) under and as defined in the documentation governing Indebtedness that is unsecured, subordinated, or secured by junior liens.

**Section 5.20**    Sanctions. (a) Neither the ParentNewCo, nor any of its Subsidiaries, nor, to the knowledge of the Borrower, any director, officer, or employee of the ParentNewCo or any of its Subsidiaries, is an individual or entity that is (i) currently the subject of any Sanctions or (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, and (b) neither the ParentNewCo, any Subsidiary nor, to the

knowledge of ~~the Parent~~NewCo, any director or officer of ~~the Parent~~NewCo or any of its Subsidiaries, is organized or resident in a Designated Jurisdiction, unless otherwise licensed by OFAC or the U.S. Department of State or otherwise authorized under applicable Law. ~~The Parent~~NewCo and its Subsidiaries are in compliance in all material respects with the provisions of the U.S. Bank Secrecy Act and Patriot Act.

**Section 5.21**    Anti-Corruption Laws.  ~~The Parent~~NewCo and its Subsidiaries have instituted and maintained policies and procedures designed to promote and achieve compliance in all material respects with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other applicable anti-corruption legislation in other jurisdictions ("Anti-Corruption Laws"). ~~The Parent~~NewCo and its Subsidiaries, and, to the knowledge of the Borrower, the directors, officers and employees of the foregoing (in their capacities as such) are in compliance in all material respects with the Anti-Corruption Laws.

**Section 5.22**    Labor Relations.  There are no grievances, disputes or controversies with any union or other organization of ~~the Parent's~~NewCo's or any Subsidiary's employees, or, to the Borrower's knowledge, any threatened strikes, work stoppages or demands for collective bargaining, except, in each case, as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 5.23**    Accuracy of Information.  No statement or information (other than projections and other forward looking information and information of a general economic or industry nature) contained in (i) this Agreement or any other Loan Document, or (ii) (x) any other document available as of the ~~Closing~~Amendment No. 13 Effective Date to the Administrative Agent, on behalf of each Lender, via access to the online data site specified to the Administrative Agent by the Borrower, (y) any certificate delivered pursuant to this Agreement or (z) any other document required to be delivered pursuant to Sections 6.01(a), (b), (c) or (e), which, in the case of each of clauses (i) and (ii), was furnished by or on behalf of any Loan Party to any Finance Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, and, in the case of clause (ii), was not subsequently corrected in writing prior to the date of any making of this representation, in each case of clauses (i) and (ii) taken as a whole, contained as of the date of such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading in any material respect. The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Finance Parties that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

**ARTICLE VI.**

**AFFIRMATIVE COVENANTS**

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, ~~the Parent~~NewCo and the Borrower covenants and agrees with the Lenders that:

**Section 6.01**    Financial Statements and Other Information.  ~~The Parent~~NewCo will furnish to the Administrative Agent, on behalf of each Lender:

~~AMERICAS/2024214501.1~~AMERICAS/2024274802.21

(a)    ~~(i) with respect to the Fiscal Year ending June 30, 2018, within sixty (60) days after the Closing Date, and (ii)~~(i) beginning with the Fiscal Year ending June 30, ~~2019,~~2026, within one hundred twenty (120) days after the end of each Fiscal Year of NewCo, (ii) subject to clause (iii) below, beginning with the Fiscal Year ending June 30, 2025, within one hundred eighty (180) days after the end of each Fiscal Year of the Parent or NewCo, as applicable, and (iii) with respect to the Fiscal Year ending June 30, 2024, on or prior to the later of (x) December 27, 2024 and (y) if the Parent has commenced a provisional liquidation proceeding in Bermuda (the "Parent Liquidation") prior to the date set forth in the preceding clause (ii)(x), one hundred eighty (180) days after the Parent commences such Parent Liquidation, an audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows for the Parent and its Consolidated Subsidiaries as of the end of and for such Fiscal Year (provided that, in the case of the financial statements for the Fiscal Year ending June 30, 2025, at the Borrower's option (x) such audit may be on a predecessor/successor basis, (y) with respect to the Parent and its Consolidated Subsidiaries, such audit may cover only the period from July 1, 2024 to the date of commencement of the Parent Liquidation and (z) for any periods thereafter, may relate to any successor of the Parent and the Consolidated Subsidiaries of such successor), setting forth, in ~~each~~the case of financial statements commencing for the Fiscal Year ending June 30, 2026, in comparative form the figures for the previous Fiscal Year, and accompanied by management's discussion and analysis of such financial statements, if any, with such audited balance sheet and related consolidated financial statements reported on by independent public accountants reasonably acceptable to the Required Lenders (provided that any top 100 U.S. public accounting firm as reflected in the Accounting Today rankings shall be deemed acceptable to the Required Lenders) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Parent ~~and its~~or NewCo, as applicable, and their respective Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)    within forty five (45) days after the end of each of the four Fiscal Quarters of each Fiscal Year of ~~the Parent~~NewCo, a consolidated balance sheet and related statements of income or operations and cash flows for ~~the Parent~~NewCo and its Consolidated Subsidiaries as of the end of and for such Fiscal Quarter and the then elapsed portion of the Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of ~~the Parent~~NewCo and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    within forty five (45) days after the end of each month of ~~the Parent~~NewCo, a report showing the Consolidated Revenue, gross profit, Consolidated EBITDA, Consolidated Net Income, cash balance and debt balance, in each case, of ~~the Parent~~NewCo and its Consolidated Subsidiaries as of the end of and for such month and the then elapsed portion of the Fiscal Year, prepared in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, and subject to quarterly adjustments associated with new accounting pronouncements and stock/warrant valuations;

(d)    concurrently with any delivery of financial statements under clause (a) or (b) above, commencing with the Fiscal Quarter ending ~~June 30, 2019~~[December 31, 2024] (subject to clause (iii) below), a Compliance Certificate of a Financial Officer of ~~the Parent~~NewCo with respect to clauses (a) and (b), (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the material details thereof and any material remedial action taken or

109

proposed to be taken with respect thereto, (ii) solely with respect to any Compliance Certificate delivered in connection with any delivery of financial statements under clause (a) above, supplementing the schedules to the Perfection Certificate with any updates since the later of the Closing Date or the date of the last delivery of a Compliance Certificate in connection with any prior delivery of financial statements under clause (a) above, ~~and~~ (iii) solely with respect to any Compliance Certificate delivered in connection with any delivery of financial statements under clause (b) above, commencing with the Fiscal Quarter ending [December 31, ~~2020~~2024], listing all Factorable Receivables outstanding as of the last day of such Fiscal Quarter that have been discounted, sold or otherwise financed, including the outstanding amount of such Factorable Receivables and the Permitted Receivables Parties owing such Factorable Receivables and (iv) setting forth reasonably detailed calculations of Consolidated EBITDA and compliance with the Financial Covenants for the applicable Fiscal Quarter;

(e)      within ninety (90) days after the end of each Fiscal Year of ~~the Parent~~NewCo, commencing with the Fiscal Year ending June 30, ~~2019~~2026, a copy of the annual budget of ~~the Parent~~NewCo for the Fiscal Year then in progress, to the extent approved by the Board of Directors of ~~the Parent~~NewCo; and

(f)      promptly upon an ERISA Event that is reasonably likely to result in material liability for ~~the Parent~~NewCo or upon request by the Administrative Agent, the most recently prepared actuarial reports in relation to the Employee Benefit Arrangements for the time being operated by ~~the Parent~~NewCo or any of its Subsidiaries which are prepared in order to comply with the then current statutory or auditing requirements within the relevant jurisdiction. Promptly upon request by the Administrative Agent, ~~the Parent~~NewCo shall also furnish the Administrative Agent with such additional information concerning any Plan, Foreign Pension Plan or Employee Benefit Arrangement as may be reasonably requested, including, but not limited to, with respect to any Plans, copies of each annual report/return (Form 5500 series), as well as all schedules and attachments thereto required to be filed with the Department of Labor and/or the Internal Revenue Service pursuant to ERISA and the Code, respectively, for each "plan year" (within the meaning of Section 3(39) of ERISA)~~.~~; and

(g)      within two Business Days after the final Business Day of each month from and after the Amendment No. 13 Effective Date, a cash flow forecast statement for the thirteen-week period beginning with the first day of the week immediately following such week (in a form to be agreed and in substance reasonably satisfactory to the Required Lenders).

**Section 6.02**      <u>Notices of Material Events</u>.  The Borrower will, upon knowledge thereof by a Responsible Officer, furnish to the Administrative Agent prompt written notice of the following:

(a)      the occurrence of any Default;

(b)      the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against ~~the Parent~~NewCo or any of its Subsidiaries (including, without limitation, any settlement or proposed settlement or judgment) (x) in which the amount of damages claimed exceeds $~~15,000,000~~5,000,000 (or its equivalent in another currency or currencies) or more, or which could otherwise reasonably be expected to have a Material Adverse Effect, (y) in which injunctive or similar relief is sought and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect, or (z) in

110

which the relief sought is an injunction or other stay of the performance of this Agreement or any Loan Document;

(c)    the occurrence of any ERISA Event or Foreign Benefit Event that, alone or together with any other ERISA Events or Foreign Benefit Events that have occurred, could reasonably be expected to result in a Material Adverse Effect; and

(d)    any other development that results in, or would reasonably be expected to have a Material Adverse Effect.

**Section 6.03**    Existence; Conduct of Business.  ~~The Parent~~NewCo will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations and intellectual property rights used or held for use for the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; except in each case (x) to the extent (other than with respect to the preservation of the existence of ~~the Parent~~NewCo and the Borrower) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (y) pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article VII.

**Section 6.04**    Payment of Tax Obligations.  ~~The Parent~~NewCo will, and will cause each of its Subsidiaries to, pay its Tax liabilities, that, if not paid, would reasonably be expected to result in a Material Adverse Effect, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, and (b) ~~the Parent~~NewCo or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

**Section 6.05**    Maintenance of Properties; Insurance.  ~~The Parent~~NewCo will, and will cause each of its Subsidiaries to, (a) keep and maintain all property material to the conduct of its business, including the Mortgaged Property, in good working order and condition, ordinary wear and tear excepted, except if the failure to so keep and maintain would not reasonably be expected to have a Material Adverse Effect and (b) maintain with carriers that ~~the Parent~~NewCo believes are financially sound and reputable (i) insurance in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are prudent in the reasonable business judgment of ~~the Parent's~~NewCo's officers and (ii) all insurance required pursuant to the Mortgages; provided that, notwithstanding the foregoing, in no event shall ~~the Parent~~NewCo or any Subsidiary be required to obtain or maintain insurance that is more restrictive than its normal course of practice (it being understood that if any Mortgaged Property is in a flood hazard area, such evidence of flood insurance shall be in such amounts and in such form as reasonably acceptable to the Administrative Agent or Collateral Agent, as applicable).  Each such policy of insurance shall as appropriate, (i) name the Collateral Agent as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a mortgagee/lender loss payable clause or endorsement that names the Collateral Agent as the mortgagee/lender's loss payee thereunder.

**Section 6.06**    Meeting Materials; Quarterly Calls.

(a)    The Borrower will (i) within ~~thirty~~sixty (~~30~~60) days following the meeting of the Board of Directors of ~~the Parent~~NewCo to review the Fiscal Quarter ending in December of each calendar year (the "December Quarter Meeting"), deliver to the Administrative Agent the materials presented to the Board of Directors of ~~the Parent~~NewCo in connection with the December Quarter Meeting; provided, that the Administrative Agent shall not, and shall not be

authorized to, disclose such materials to any Lender other than, solely to the extent that VCP holds any Loans, Vista Credit Partners, L.P. and its Affiliates, those Lenders that qualify as a "Major Investor" (as defined in the NewCo LLC Agreement), and (ii) within the timeframe set forth in Section 6.01(e), deliver to the Administrative Agent all budgets required to be delivered pursuant to Section 6.01(e) and any materials showing direct build-up to information contained in the budget and presented at a meeting of the Board of Directors of the ParentNewCo, in each case of the above clauses (i) and (ii), it being understood and agreed that the Borrower may exclude any such information or material that is reasonably necessary to preserve attorney/client privilege and may redact any portion of such information that references discussion about the Lenders or the Administrative Agent.

(b)    At a date to be mutually agreed upon between the Administrative Agent and the Borrower occurring on or prior to the 30th day after the date the financial statements or are required to be delivered pursuant to Section 6.01(b) (beginning with the Fiscal Quarter ending June 30, 2019), the Borrower will, at the written request of the Administrative Agent, hold a conference call or teleconference with the Administrative Agent and, solely to the extent that VCP holds any Loans, Vista Credit Partners, L.P. or any of its Affiliates any Lenders that qualify as a "Major Investor" (as defined in the NewCo LLC Agreement), and review the financial results of the ParentNewCo and its Consolidated Subsidiaries for the previous Fiscal Quarter and the annual budget presented for the current Fiscal Year, if applicable. Notwithstanding anything to the contrary, none of the Administrative Agent or Vista Credit Partners, L.P. or any of its Affiliatesany such Lender shall invite any other Person to attend any such conference call or teleconference.

(c)    For the avoidance of doubt, any information provided to Administrative Agent or any Lender pursuant to this Section 6.06 shall be subject to the confidentiality agreement in Section 10.07 of this Agreement.

**Section 6.07**    Compliance with Laws(a)    . The ParentNewCo will, and will cause each Subsidiary of the foregoing, to materially comply with all material laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, in each case except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

**Section 6.08**    Use of Proceeds.  The Borrower has or will use the proceeds of the Loans solely for the purposes set forth in Section 5.16.  No part of the proceeds of any Loan have or will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board of Governors of the Federal Reserve System, including Regulations T, U and X.

**Section 6.09**    Subsidiary Guarantors; Pledges; Additional Collateral; Further Assurances.

(a)    Within the time periods specified in clause (d) of this Section 6.09 and subject to clause (e) of this Section 6.09, after (i) any Person becomes a Subsidiary that is not an Excluded Subsidiary or an Excluded Tax Subsidiary, (ii) any Excluded Subsidiary that is not an Excluded Tax Subsidiary ceases to be an Excluded Subsidiary or (iii) an Excluded Tax Subsidiary that is not an Excluded Subsidiary ceases to be an Excluded Tax Subsidiary (each, a "New Loan Party"), in each case, the Borrower shall promptly provide the Administrative Agent with written notice thereof and shall cause each such New Loan Party to deliver to the Administrative Agent (x) a guaranty or a joinder to the Guaranty Agreement in form and substance reasonably satisfactory to the Administrative Agent, guaranteeing the Loan Parties' obligations under the

Loan Documents and (y) a joinder to all applicable Collateral Documents then in existence, in each case as specified by, and in form and substance reasonably satisfactory to, the Administrative Agent, securing payment of all the Senior Credit Obligations of such New Loan Party under the Loan Documents, accompanied by appropriate corporate resolutions and other corporate documentation as may be reasonably requested by, and in form and substance reasonably satisfactory to, the Administrative Agent and its counsel.

(b)      The Borrower will, and will cause each other Loan Party to, execute and deliver, or cause to be executed and delivered, to the Administrative Agent such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents), which may be required by law or which the Administrative Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created by the Collateral Documents, all at the expense of the Borrower.

(c)      If any asset constituting Collateral is acquired by a Loan Party after the Closing Date (other than Excluded Property and assets constituting Collateral under the Collateral Documents that become subject to the Lien in favor of the Collateral Agent upon acquisition thereof), the Borrower will notify the Administrative Agent thereof, and, if requested by the Administrative Agent, the Borrower will cause such Collateral to be subject to a Lien securing the Senior Credit Obligations and will take, and cause the other Loan Parties to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in clause (b) above, all at the expense of the Borrower; provided that, with respect to Equity Interests, such actions will be limited to those specified in clause (b) above.

(d)      Notwithstanding the foregoing, with respect to (x) any property (other than Excluded Property), including Mortgaged Property, owned on or acquired after the Closing Date, the Loan Parties shall have one hundred twenty (120) days after the Closing Date or date of acquisition thereof as applicable, or (y) any New Loan Party, the Loan Parties shall have ninety (90) days after the date such Person becomes a New Loan Party (or in each case, such later date as may be agreed upon by the Administrative Agent in the exercise of its reasonable discretion with respect thereto), in each case of the foregoing, to take the actions required by this Section.

(e)      Notwithstanding the foregoing, from time to time, the Borrower may, in its sole discretion, elect to cause (i) any Subsidiary that is an Excluded Subsidiary or an Excluded Tax Subsidiary or (ii) any Person that becomes a Subsidiary that is an Excluded Subsidiary or an Excluded Tax Subsidiary to become a New Loan Party by providing the Administrative Agent with written notice thereof and causing each such New Loan Party to deliver to the Administrative Agent (x) a guaranty or a joinder to the Guaranty Agreement in form and substance reasonably satisfactory to the Administrative Agent, guaranteeing the Loan Parties' obligations under the Loan Documents and (y) a joinder to all applicable Collateral Documents then in existence and/or similar foreign law pledge and security documentation, if applicable, in each case as specified by, and in form and substance reasonably satisfactory to, the Administrative Agent, securing payment of all the Senior Credit Obligations of such New Loan Party under the Loan Documents, accompanied by appropriate corporate resolutions and other corporate documentation as may be reasonably requested by, and in form and substance reasonably satisfactory to, the Administrative Agent and its counsel.

Section 6.10      Compliance with Environmental Laws.  Each of the Loan Parties and

Subsidiaries will comply, and use commercially reasonable efforts to cause all lessees and other Persons occupying real property of any Loan Party to comply, with all Environmental Laws and Environmental Permits applicable to its operations, real property and facilities; obtain and renew all material Environmental Permits applicable to its operations, real property and facilities; and conduct all investigations, response and other corrective actions to address the Release or threat of Release of Hazardous Materials to the extent required by, and in accordance with, Environmental Laws, except in each case for any such failure which would not be reasonably expected to have a Material Adverse Effect; provided that no Loan Party or Subsidiary shall be required to undertake any such action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 6.11    Post-Closing Obligations.  Each of the Loan Parties shall deliver to the Administrative Agent the documents set forth on Schedule 6.11, within the time limits specified on such Schedule or such later date agreed by the Administrative Agent in its sole discretion.

Section 6.12    Mortgaged Properties.  Within one hundred twenty (120) days after the Closing Date, Borrower shall satisfy (and/or complete, as applicable) the Mortgaged Property Requirements with respect to all Mortgaged Properties owned by a Loan Party as of the Closing Date.  If at any time after the Closing Date a Loan Party shall directly or indirectly purchase or otherwise acquire any interest in real property that does not constitute Excluded Property, then (i) Borrower shall promptly notify Administrative Agent in writing of such acquisition, and (ii) Borrower shall satisfy (and/or complete, as applicable) the Mortgaged Property Requirements with respect to each such newly acquired Mortgaged Property within one hundred twenty (120) days of acquiring the same.

## ARTICLE VII.

## NEGATIVE COVENANTS

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, each of ~~the Parent~~NewCo and the Borrower covenants and agrees with the Lenders that:

Section 7.01    Indebtedness.  ~~The Parent~~NewCo will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(a)    the Senior Credit Obligations;

(b)    Indebtedness existing on the ~~Closing~~Amendment No. 13 Effective Date and set forth in Schedule 7.01;

(c)    Indebtedness of ~~the Parent~~NewCo to any Subsidiary and of any Subsidiary to ~~the Parent~~NewCo or any other Subsidiary, in each case, subject to the Intercompany Subordination Agreement; provided that Indebtedness of any Subsidiary that is not a Loan Party to any Loan Party shall be ~~subject to, and shall comply with, clause (i) of the proviso set forth in Section 7.04(d);~~limited to Indebtedness (i) in place as of the Amendment No. 13 Effective Date or (ii) that has been approved by the Board of Directors.

(d)    Guarantees by ~~the Parent~~NewCo or any Subsidiary of Indebtedness or other obligations of (i) ~~the Parent~~NewCo or (ii) any Subsidiary in each case permitted under this Agreement; provided that, in the case of clause (ii), ~~the aggregate amount of~~ Indebtedness and other payment obligations (other than in respect of any overdrafts and related liabilities arising in

the ordinary course of business from treasury, depository and cash management services or in connection with any automated clearing-house transfer of funds) of Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party shall ~~only be permitted (if permitted) under clause (i) of the proviso set forth in Section 7.04(d)~~be limited to Indebtedness (i) in place as of the Amendment No. 13 Effective Date or (ii) that has been approved by the Board of Directors;

(e)    Indebtedness of ~~the Parent~~NewCo or any Subsidiary incurred to finance the acquisition, construction, repair, improvement or installation of any fixed or capital assets, real property, software and/or ancillary assets reasonably related to the foregoing, including Capital Lease Obligations, Synthetic Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such property or assets or secured by a Lien on any such property or assets prior to the acquisition thereof~~, and any Permitted Refinancing Indebtedness in respect thereof; provided that the aggregate principal amount of Indebtedness permitted by this clause (e) shall not exceed $50,000,000~~; *provided* such Indebtedness is limited to (x) those arrangements that are in place as of the Amendment No. 13 Effective Date and identified on Schedule 7.01(e) and (y) such additional arrangements constituting Indebtedness not to exceed $30,000,000 at any time outstanding;

(f)    Indebtedness of ~~the Parent~~NewCo or any Subsidiary as an account party in respect of trade letters of credit in the ordinary course of business and other unsecured Indebtedness to trade creditors in the ordinary course of business;

(g)    Indebtedness owed in respect of netting services, business credit card programs, overdraft protection and other treasury, depository and cash management services or incurred in connection with any automated clearing-house transfers of funds or any cash pooling arrangement, and to the extent constituting Indebtedness, obligations arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business;

(h)    Indebtedness under bid bonds, performance bonds, surety bonds and similar obligations, in each case, incurred by ~~the Parent~~NewCo or any of its Subsidiaries in the ordinary course of business, including guarantees or obligations with respect to letters of credit supporting such bid bonds, performance bonds, surety bonds and similar obligations, and other Indebtedness in respect of surety bonds and similar instruments incurred to the extent necessary to stay judgments that do not constitute an Event of Default under Section 8.01(j);

(i)    Indebtedness of ~~the Parent~~NewCo or any Subsidiary in respect of Swap Agreements entered into in the ordinary course of business and not for speculative purposes (i) to hedge or mitigate risks to which ~~the Parent~~NewCo or any Subsidiary has actual exposure (other than those in respect of Equity Interests of ~~the Parent~~NewCo or any Subsidiary) or (ii) in order to cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment or any currency exposure of ~~the Parent~~NewCo or any Subsidiary;

(j)    ~~[reserved]~~Indebtedness with respect to the Equivalent Notes in an aggregate principal amount not to exceed $15,000,000 at the time of issuance less any Incremental Term Loans incurred;

(k)    Guarantees of Indebtedness of directors, officers, employees, consultants, agents and advisors of ~~the Parent~~NewCo or any of its Subsidiaries in respect of expenses of such Persons in connection with relocations and other ordinary course of business purposes, if the

aggregate amount of Indebtedness so Guaranteed, when added to the aggregate amount of unreimbursed payments theretofore made in respect of such Guarantees and the amount of loans and advances then outstanding under Section 7.04(i), shall not at any time exceed ~~the greater of (x)~~ $2,000,000 ~~and (y) solely to the extent the Consolidated EBITDA for such Test Period is no less than $15,000,000, 1.21% of Adjusted LTM Recurring Revenue as of the end of the most recently completed Fiscal Quarter~~;

(l)    ~~unsecured Indebtedness arising from agreements providing for indemnification, adjustment of purchase price, earnouts or similar obligations, or from guaranties, surety bonds or performance bonds securing the performance of the Parent or any of its Subsidiaries pursuant to such agreements, in connection with Permitted Acquisitions or permitted Dispositions;~~[Reserved];

(m)    unsecured Indebtedness arising from customary indemnification arrangements in contracts, agreements, or instruments entered into in the ordinary course of business, including underwriting agreements in connection with financing activities, and indemnification in favor of officers and directors;

(n)    Indebtedness representing installment insurance premiums owing in the ordinary course of business or representing financing of insurance premiums in the ordinary course of business;

(o)    unsecured Indebtedness representing deferred compensation, severance, pension, health and welfare retirement benefits or the equivalent to current and former employees of ~~the Parent~~NewCo and its Subsidiaries established in the exercise of the ~~Parent's~~NewCo's reasonable business judgment or existing on the Closing Date;

(p)    unsecured Indebtedness arising out of judgments not constituting an Event of Default;

(q)    ~~Indebtedness of any Person that becomes a Subsidiary (or of any Person not previously a Subsidiary that is merged or consolidated with or into a Subsidiary in a transaction permitted hereunder) after the Closing Date, or Indebtedness of any Person that is assumed by any Subsidiary in connection with an acquisition of assets by such Subsidiary in a Permitted Acquisition or other Investment permitted hereunder, and any refinancing, renewal, extension or replacement in respect thereof; provided that (A) such Indebtedness exists at the time such Person becomes a Subsidiary (or is so merged or consolidated) or such assets are acquired and is not created in contemplation of or in connection with such Person becoming a Subsidiary (or such merger or consolidation) or such assets being acquired, (B) neither the Parent nor any Subsidiary (other than such Person or the Subsidiary with which such Person is merged or consolidated or that so assumes such Person's Indebtedness) shall Guarantee or otherwise become liable for the payment of such Indebtedness, (C) the aggregate amount of all Indebtedness incurred and/or assumed under this clause (q) shall not exceed the greater of (x) $15,000,000 and (y) solely to the extent the Consolidated EBITDA for such Test Period is no less than $15,000,000, 8.50% of Adjusted LTM Recurring Revenue as of the end of the most recently completed Fiscal Quarter, and (D) both immediately prior to and after giving effect to such Indebtedness (on a Pro Forma Basis in accordance with Section 1.03(c)), the Adjusted LTM Recurring Revenue Ratio as of the end of the most recently completed Fiscal Quarter for which financial statements have been delivered pursuant to Section 6.01(b) shall not exceed 2.00:1.00;~~[Reserved];

(r)     Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business;

(s)     Indebtedness arising in connection with the sale or assignment of, or financing with respect to, Factorable Receivables pursuant to a Disposition permitted under Section 7.03(a)(vii); *provided* that such Indebtedness shall 2) be limited recourse to the Loan Parties, other than customary indemnification and repurchase obligations and purchase price adjustment or similar obligations arising in the ordinary course of business, 3) be pursuant to terms and conditions that are not less favorable to ~~the Parent~~NewCo or such Subsidiary than it would obtain on an arm's-length basis from a Person that is not an Affiliate (as determined in good faith by the Board of Directors of ~~the Parent~~NewCo), and 4) solely with respect to Factorable Receivables that have a determinable amount as of the date of such sale, assignment or financing, have an advance rate with respect to such Factorable Receivables of no less than 80%; *provided* such Indebtedness is limited to (x) those arrangements that are in place as of the Amendment No. 13 Effective Date and identified on Schedule 7.01(s) and (y) such additional arrangements constituting Indebtedness not to exceed $10,000,000 at any time;

(t)     Indebtedness incurred outside of this Agreement consisting of letters of credit, bank guarantees and foreign lines of credit in an aggregate principal amount at any time outstanding not to exceed the greater of (x) $10,000,000 and (y) solely to the extent the Consolidated EBITDA for such Test Period is no less than $15,000,000, 5.46% of Adjusted LTM Recurring Revenue;

(u)     ~~Unsecured Indebtedness that is subordinated in right of payment of the Parent and its Subsidiaries owed to the Parent or any Subsidiary of the Parent; provided that, the aggregate amount of Indebtedness and other payment obligations of a Loan Party owing to any Subsidiary that is not a Loan Party shall be permitted under clause (i) of the proviso set forth in Section 7.04(d);~~[Reserved];

(v)     other Indebtedness of ~~the Parent~~NewCo and its Subsidiaries in an aggregate outstanding principal amount not in excess of the greater of (x) $10,000,000 and (y) solely to the extent the Consolidated EBITDA for such Test Period is no less than $15,000,000, 5.46% of Adjusted LTM Recurring Revenue;

(w)     Permitted Unsecured Refinancing Debt ~~and any Permitted Refinancing Indebtedness in respect thereof~~;

(x)     Permitted Pari Passu Refinancing Debt ~~and any Permitted Refinancing Indebtedness in respect thereof~~; and

(y)     Permitted Junior Priority Refinancing Debt ~~and any Permitted Refinancing Indebtedness in respect thereof~~.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.01.  The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of ~~the Parent~~NewCo dated such date prepared in accordance with GAAP.

**Section 7.02**     Liens.  ~~The Parent~~NewCo will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter

117

acquired by it, except the following (collectively, "Permitted Liens"):

    (a)     Liens created pursuant to any Loan Document;

    (b)     Permitted Encumbrances;

    (c)     any Lien on any property or asset of ~~the Parent~~NewCo or any Subsidiary existing on the ~~Closing~~Amendment No. 13 Effective Date and set forth in Schedule 7.02 and any modifications, renewals and extensions thereof and any Lien granted as a replacement or substitute therefor; provided that (i) such replacement or substitute Lien shall not apply to any other property or asset of ~~the Parent~~NewCo or any Subsidiary other than improvements thereon or proceeds from the disposition of such property or asset and (ii) such replacement or substitute Lien shall secure only those obligations which it secures on the ~~Closing Date and any Permitted Refinancing Indebtedness in respect thereof~~Amendment No. 13 Effective Date;

    (d)     ~~any Lien existing on any property or asset prior to the acquisition thereof by the Parent or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary (or of any Person not previously a Subsidiary that is merged or consolidated with or into a Subsidiary in a transaction permitted hereunder) after the Closing Date prior to the time such Person becomes a Subsidiary (or such merger or consolidation occurs) and any modifications, replacements, renewals or extensions thereof, in each case, other than Liens on the Equity Interests of a Person that becomes a Subsidiary; provided that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary (or such merger or consolidation), as the case may be, (ii) such Lien shall not apply to any other property or assets of the Parent or any Subsidiary (other than, in the case of any such merger or consolidation, the assets of any Subsidiary without significant assets that was formed solely for the purpose of effecting such acquisition) and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary (or is so merged or consolidated), as the case may be, and any refinancing, extensions, renewals or replacements thereof that do not increase the outstanding principal amount thereof;~~Liens with respect to the Equivalent Notes, provided that (i) such Liens secure Indebtedness permitted by Section 7.01(j) and (ii) such Liens shall rank _pari passu_ in right of security with the Restructuring Second Lien Term Loans;

    (e)     Liens on fixed or capital assets, real property, software and/or ancillary assets reasonably related to the foregoing acquired, constructed, improved or installed by ~~the Parent~~NewCo or any Subsidiary; provided that (i) such Liens secure Indebtedness permitted by Section 7.01(e) and obligations relating thereto not constituting Indebtedness in respect thereof, (ii) such Liens are created substantially simultaneously with the acquisition, construction, improvement or installation of such property or assets, (iii) the amount of Indebtedness secured thereby does not exceed the fair market value of such acquired property or assets and (iv) such Liens shall not apply to any other property or assets of ~~the Parent~~NewCo or any Subsidiary other than improvements thereon or proceeds from the disposition of such property or assets; provided further that in the event Indebtedness under Section 7.01(e) is owed to any Person with respect to financing under a single credit facility of more than one purchase of any such property or assets, such Liens may secure all such purchase money obligations and may apply to all such property and assets financed by such Person under such credit facility;

    (f)     (i) Dispositions of assets not prohibited by Section 7.03 and in connection therewith, customary rights and restrictions contained in agreements relating to such Dispositions

pending the completion thereof, or in the case of a license, during the term thereof and (ii) any option or other agreement to Dispose of any asset not prohibited by Section 7.03;

(g)    in the case of (A) any Subsidiary that is not a wholly-owned Subsidiary or (B) the Equity Interests in any Person that is not a Subsidiary, any encumbrance or restriction, including any put and call arrangements, related to Equity Interests in such Subsidiary or such other Person set forth in the ~~Organizational~~Organization Documents of such Subsidiary or such other Person or any related joint venture, shareholders' or similar agreement that are effective as of the Amendment No. 13 Effective Date and identified on Schedule 7.02(g);

(h)    any interest or title of a lessor under any lease or sublease entered into by ~~the Parent~~NewCo or any Subsidiary in the ordinary course of business and other statutory and common law landlords' liens under leases;

(i)    any interest or title of a licensor under any license or sublicense entered into by ~~the Parent~~NewCo or any Subsidiary as a licensee or sublicensee (A) existing on the Closing Date or (B) in the ordinary course of its business;

(j)    licenses, sublicenses, leases or subleases granted to other Persons permitted under Section 7.03;

(k)    Liens on 5) earnest money deposits of cash or Cash Equivalents made, or escrow or similar arrangements entered into, in connection with any ~~Permitted Acquisition or other~~ Investment permitted pursuant to Section 7.04 and 6) cash deposits and cash collateralization of letters of credit in connection with any Indebtedness permitted pursuant to Section 7.01(t);

(l)    Liens in the nature of the right of setoff in favor of counterparties to purchase orders or other contractual agreements with the Loan Parties in the ordinary course of business;

(m)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods by or to ~~the Parent~~NewCo or any Subsidiary and entered into by ~~the Parent~~NewCo or any Subsidiary in the ordinary course of business;

(n)    Liens (i) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business and (ii) on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of banker's acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or such other goods in the ordinary course of business;

~~(o)    Liens on the assets and equity interests of non-Guarantor Foreign Subsidiaries that secure only Indebtedness or other obligations of such non-Guarantor Foreign Subsidiaries permitted hereunder;~~

(o)    [Reserved];

(p)    Liens on insurance policies and the proceeds thereof securing Indebtedness permitted by Section 7.01(n);

(q)    Liens (i) of a collection bank arising under Section 4-208 of the UCC (or other applicable Law) on the items in the course of collection, (ii) of a deposit bank in connection with

any cash pooling arrangement and (iii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(r)     Liens arising from UCC financing statements or similar filings (i) made as a precautionary measure in respect of operating leases entered into by ~~the Parent~~NewCo or any of its Subsidiaries, or (ii) made to evidence or perfect the sale or assignment of Factorable Receivables pursuant to a Disposition permitted under this Agreement;

(s)     Liens in favor of Borrower or any Guarantor securing Indebtedness permitted under Section 7.01(c).

(t)     Liens arising in connection with the sale or assignment of, or financing with respect to, Factorable Receivables, securing Indebtedness permitted under Section 7.01(s);

(u)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 7.04;

(v)     Liens (i) on cash and Cash Equivalents arising in connection with the defeasance, discharge or redemption of Indebtedness and (ii) in favor of a trustee in an indenture relating to any Indebtedness to the extent such Liens secure only customary compensation and reimbursement obligations of such trustee; and

(w)     Assignments of insurance or condemnation proceeds relating to any property provided to landlords (or their mortgagees) pursuant to the terms of any lease of such property.

**Section 7.03**     Fundamental Changes and Asset Sales.

(a)     ~~The Parent~~NewCo will not, and will not permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or Dispose of (in one transaction or in a series of transactions) its assets (including pursuant to a Sale/Leaseback Transaction), or any of the Equity Interests of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except:

(i)     (x) any Person may merge into or consolidate with ~~the Parent~~NewCo in a transaction in which ~~the Parent~~NewCo is the surviving corporation and (y) any Subsidiary may liquidate, dissolve or wind up its affairs so long as ~~the Borrower determines~~(A) such arrangements are existing as of the Amendment No. 13 Effective Date and identified on Schedule 7.03(a) or (B) the Required Lenders determine in good faith that such liquidation, dissolution or winding up is in the best interest of ~~the Parent~~NewCo and its Subsidiaries and is not materially disadvantageous to the Lenders;

(ii)     any (x) Person (other than the Borrower) may merge into or consolidate with any Subsidiary in a transaction in which the surviving entity is such Subsidiary (provided that any such merger or consolidation involving a Subsidiary Guarantor must result in the surviving entity remaining or becoming a Subsidiary Guarantor) and any (y) non-Loan Party may merge into or consolidate with ~~the Parent~~NewCo or any Subsidiary of ~~the Parent~~NewCo (provided that any such merger or consolidation involving a Subsidiary Guarantor must result in the surviving entity remaining or becoming a Subsidiary Guarantor);

(iii)    any Subsidiary (other than the Borrower) may merge into or consolidate with any Person in a transaction permitted under clause (xiii) hereunder in which the surviving entity is not a Subsidiary and is limited to arrangements in place on the Amendment No. 13 Effective Date and identified on Schedule 7.03(a);

(iv)    any Subsidiary (other than the Borrower) may Dispose of any or all of its assets (upon voluntary liquidation, dissolution or otherwise) to the ParentNewCo or any other Subsidiary (except that a Loan Party may only Dispose of its assets under this clause (a)(iv) to the Borrower or another Loan Party);

(v)    sales, transfers and other Dispositions of (A) inventory in the ordinary course of business, (B) used, worn out, obsolete, unnecessary or surplus property, and equipment, and cash and Cash Equivalents in the ordinary course of business with respect to ongoing business expenses; provided that no material assets (determined in the reasonable judgment of the Borrower) may be Disposed of pursuant to this clause (B), (C) the assignment, cancellation, abandonment or other Disposition of Intellectual Property that is, in the reasonable judgment of the Borrower, no longer economically practicable to maintain, or no longer of any material commercial value for the ParentNewCo and the Subsidiaries, taken as a whole, and (D) assets for the purposes of charitable contributions or similar gifts with an aggregate fair market value not to exceed $5,000,0001,000,000 in any Fiscal Year provided no Default or Event of Default shall exist or would result from such sale, transfer or Disposition;

(vi)    Dispositions (including Equity Interests of Subsidiaries) or licenses to the ParentNewCo or any Subsidiary; provided that (i) any such Disposition or license made by a Loan Party to a Subsidiary that is not a Loan Party shall be made in compliance with Section 7.04 (and, for the avoidance of doubt, no Loan Party may exclusively license or Dispose of any Intellectual Property that has any material commercial value for the ParentNewCo and the Subsidiaries, taken as a whole, to any Subsidiary that is not a Loan Party) and (ii) Equity Interests of a Loan Party may not be transferred to a Subsidiary that is not a Loan Party;

(vii)    Dispositions or the discount, sale or other financing of Factorable Receivables owing by up to six (6) Permitted Receivables Parties outstanding at any time; provided that such Disposition, discount or sale shall (x) be pursuant to terms and conditions that are not less favorable to the ParentNewCo or such Subsidiary than it would obtain on an arm's-length basis from a Person that is not an Affiliate (as determined in good faith by the Board of Directors of the ParentNewCo), and (y) solely with respect to Factorable Receivables that have a determinable amount as of the date of such sale, discount or other financing, have an advance rate with respect to such Factorable Receivables of no less than 80%; provided that the aggregate amount of Dispositions permitted by this clause (vii) shall not exceed $10,000,000.

(viii)    leases, subleases, licenses or sublicenses of property to other Persons in the ordinary course of business not materially interfering with the business of the ParentNewCo and the Subsidiaries taken as a whole;

(ix)    dispositions of property as a result of a Casualty Event involving such property or any disposition of real property to a Governmental Authority as a result of a Condemnation of such real property;

AMERICAS/2024214501.1AMERICAS/2024274802.21

(x)  Dispositions of investments in joint ventures, to the extent required by, or made pursuant to buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(xi)  Dispositions of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business;

(xii)  the surrender, waiver or settlement of contractual rights or claims and litigation claims in the ordinary course of business;

(xiii)  Dispositions of Equity Interests in any Subsidiary acquired in connection with a Permitted Acquisitionan Investment, in each case pursuant to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or the exercise of warrants, options or other securities convertible into or exchangeable for the Equity Interests of such Subsidiary, so long as such rights, plans, warrants, options or other securities were not entered into or issued in connection with or in contemplation of such Person becoming a Subsidiary;

(xiv)  Transactions permitted under Section 7.02, 7.04 and 7.06, in each case, solely to the extent constituting Dispositions hereunder;

(xv)  other Dispositions of assets or Equity Interests; provided that (i) the consideration received for such assets or Equity Interests shall be in an amount at least equal to the fair market value thereof (determined by a Responsible Officer orthe Board of Directors, for any Disposition in reliance on this Section 7.03(a)(xv) of assets in one transaction with Net Cash Proceeds in excess of $5,000,0001,000,000 or a series of related transactions with Net Cash Proceeds in excess of $10,000,0001,000,000, in each case, in good faith by the Board of Directors of the ParentNewCo) and no less than 75% thereof shall be paid in cash or Cash Equivalents, (ii) the Net Cash Proceeds of such Dispositions do not exceed an aggregate amount of the greater of (x) $20,000,000 and (y) solely to the extent the Consolidated EBITDA for such Test Period is no less than $15,000,000, 10.93% of Adjusted LTM Recurring Revenue as of the end of the most recently completed Fiscal Quarter in any calendar year and (iii) no Event of Default shall have occurred or be continuing or result therefrom; and

(xvi)  Dispositions of fixed or capital assets, software and related property in connection with Indebtedness permitted under Section 7.01 for the purpose of financing such assets and related property or a lease of such assets by the Borrower or any Subsidiary as a lessee or debtor; and.

(xvii)  Permitted Restructuring Transactions to the extent constituting Dispositions.

(b)  The ParentNewCo will not, and will not permit any of its Subsidiaries to engage to any material extent in any business other than businesses of the type conducted by the ParentNewCo and its Subsidiaries on the date of execution of this Agreement and businesses reasonably related, complementary, incidental, or ancillary thereto or similar or complementary thereto or reasonable extensions thereof.

(c)  The ParentNewCo will not, nor will it permit any of its Subsidiaries to, change its Fiscal Year from the basis in effect on the Closing Date; provided, however, that the Loan

Parties and Subsidiaries may, upon written notice to the Administrative Agent, change their respective Fiscal Years to any other Fiscal Year reasonably acceptable to the Administrative Agent, in which case, at the request of the Administrative Agent, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in Fiscal Year.

Notwithstanding anything to the contrary herein or in any other Loan Document, without the prior written consent of the Administrative Agent and the Required Lenders (not to be unreasonably withheld or delayed), no material Intellectual Property owned by any Loan Party may be sold, contributed, exclusively licensed, assigned or otherwise transferred or Disposed by any Loan Party to any Subsidiary that is not a Loan Party.

**Section 7.04**    Investments, Loans, Advances, Guarantees and Acquisitions.    ~~The Parent~~NewCo will not, and will not permit any of its Subsidiaries to, make any Investment except:

(a)    cash (including deposit accounts) and Cash Equivalents;

(b)    ~~Permitted Acquisitions~~[Reserved];

(c)    Investments by the Parent and its Subsidiaries existing on the ~~Closing~~Amendment No. 13 Effective Date or made by the Parent and its Subsidiaries pursuant to legally binding written contracts in existence on the ~~Closing~~Amendment No. 13 Effective Date, and in each case set forth on Schedule 7.04, and any modification, conversion, replacement, reinvestment, renewal or extension thereof to the extent not involving any additional net Investment; provided that the amount of the original Investment is not increased except as otherwise permitted by this Section 7.04;

(d)    Investments made by ~~the Parent~~NewCo in or to any Subsidiary and made by any Subsidiary in or to ~~the Parent~~NewCo or another Subsidiary and Guarantees by ~~the Parent~~NewCo or any Subsidiary of obligations of any Subsidiary; provided that (i) in the case of any Investment under this clause (d) by a Loan Party in a Subsidiary which is not a Loan Party made after the Closing Date or constituting a Guarantee of obligations of any Subsidiary that is not a Loan Party made after the Closing Date, such Investment shall ~~not exceed, together with the aggregate amount of all other Investments (including Guarantees) made pursuant to this clause (d), the greater of (x) $25,000,000 and (y) solely to the extent the Consolidated EBITDA for such Test Period is no less than $15,000,000, 3.04% of Adjusted LTM Recurring Revenue as of the end of the most recently completed Fiscal Quarter at the time made~~be (a) limited to Investments in place as of the Amendment No. 13 Effective Date or (b) approved by the Board of Directors and (ii) in the case of any intercompany Indebtedness, each such item of intercompany Indebtedness shall be evidenced by the Intercompany Subordination Agreement;

(e)    7) Guarantees permitted by Section 7.01; (1) Guarantees by (A) any Loan Party of operating leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case, entered into by any Subsidiary in the ordinary course of business and (B) any Subsidiary that is not a Loan Party of operating leases (other than Capital Lease Obligations) or of obligations that do not constitute Indebtedness, in each case, entered into by any Subsidiary that is not a Loan Party in the ordinary course of business; and (iii) Guarantees incurred in respect of customary indemnification and purchase price adjustment obligations of any Loan Party or Subsidiary incurred in the ordinary course of business in connection with Dispositions or ~~Acquisitions~~acquisitions permitted by this Agreement;

(f)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and other Investments received in connection with the bankruptcy or reorganization of, or settlement, satisfaction or partial satisfaction of delinquent accounts or disputes with, customers and suppliers in the ordinary course of business;

(g)    Investments made as a result of the receipt of non-cash consideration from a Disposition, of any asset in compliance with Section 7.03;

(h)    Investments in the form of Swap Agreements entered into (i) to hedge or mitigate risks to which the ParentNewCo or any Subsidiary has actual exposure (other than those in respect of Equity Interests of the ParentNewCo or any Subsidiary) or (ii) in order to cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment or any currency exposure of the ParentNewCo or any Subsidiary, in each case, in the ordinary course of business (it being understood and agreed that Swap Agreements in connection with any interest rate or foreign currency swap or exchange transaction is in the ordinary course of business) and not for speculative purposes;

(i)     (x) payroll, travel, relocation, entertainment and other advances, notes or loans to directors, officers, consultants and employees of the ParentNewCo or any Subsidiary that are made in the ordinary course of business so long as the aggregate amount of all such Investments made after the Closing Date shall not exceed $4,000,0002,000,000 at any time outstanding and (y) advances, notes or loans to directors, officers and employees in connection with the exercise of director, officer, employee or consultant stock options in the ordinary course of business, so long as no cash is actually paid pursuant to such advances, notes or loans;

(j)    extensions of trade credit in the ordinary course of business and other Investments in respect of advances to customers or suppliers, prepaid expenses, negotiable instruments held for collection or lease, utility, workers' compensation and performance and other similar deposits provided to third parties in the ordinary course of business;

(k)    Investments (including acquisitions) to the extent the consideration paid therefor consists of Equity Interests or Equity Equivalents (other than Disqualified Capital Stock) of the Parent or the proceeds of the issuance thereof;[Reserved];

(l)    Investments of any Person in existence at the time such Person becomes a Subsidiary; provided such Investment was not made in connection with or anticipation of such Person becoming a Subsidiary and any modification, replacement, renewal or extension thereof;

(m)    [reserved];

(n)    Investments consisting of Permitted Liens, Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(o)    any other Investment so long as the aggregate amount of all such Investments made after the Closing Date does not exceed the greater of (x) $4,000,000 or (y) solely to the extent the Consolidated EBITDA for such Test Period is no less than $15,000,000, 2.43% of

~~Adjusted LTM Recurring Revenue as of the end of the most recently completed Fiscal Quarter at the time made;~~

(o)    [Reserved];

(p)    ~~the Parent and its Subsidiaries may make additional Investments using the Available Amount so long as the Available Amount Conditions have been met~~[Reserved];

(q)    deposit and securities accounts maintained with banks and other financial institutions in the ordinary course of business;

(r)    Investments constituting non-cash consideration received by ~~the Parent~~NewCo or any Subsidiary in connection with Dispositions (to the extent permitted hereby) and Casualty Events;

(s)    Investments arising from the consummation of customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(t)    Investments consisting of Restricted Payments permitted under Section 7.06;

(u)    ~~Permitted Restructuring Transactions to the extent constituting Investments~~[Reserved]; and

(v)    intercompany Investments in Loan Parties made pursuant to Intercompany Services Agreements made in the ordinary course of business~~; and~~.

~~(w)    Investments (other than Investments in cash, cash equivalents and other current assets) not to exceed the Discretionary Amount in the aggregate for all such Investments made pursuant to this clause (w); provided that (i) such Investments do not otherwise constitute a Restricted Payment, a Junior Debt Payment or incurrence of Indebtedness, (ii) to the extent such Investment involves an Affiliate, such Investment shall be in compliance with Section 7.05, (iii) to the extent such Investment constitutes a Disposition, such Investment must comply with Section 7.03, (iv) to the extent such Investment is made from a Loan Party to a Subsidiary of Parent that is not a Loan Party, such Investment must be made pursuant to Section 7.04(d), (v) the Adjusted LTM Recurring Revenue Ratio, on a Pro Forma Basis, immediately following the consummation of such Investment shall not be greater than the Adjusted LTM Recurring Revenue Ratio immediately prior to the consummation of such Investment, and (vi) no Default or Event of Default has occurred and is continuing or would arise after giving effect to such Investment.~~

For purposes of covenant compliance with this Section 7.04, the amount of any Investment shall be the aggregate investment at the time such Investment is made, without adjustment for subsequent increases or decreases in the value of such Investment or accrued and unpaid interest or dividends thereon, less all dividends or other distributions or any other amount paid, repaid, returned, distributed or otherwise received in cash in respect of such Investment. ~~For the avoidance of doubt, if an Investment would be permitted under any provision of this Section 7.04 (other than Section 7.04(b)) and as a Permitted Acquisition, such Investment need not satisfy the requirements otherwise applicable to Permitted Acquisitions unless such Investment is consummated in reliance on Section 7.04(b).~~

Notwithstanding anything to the contrary herein or in any other Loan Document, without the prior written consent of the Administrative Agent and the Required Lenders (not to be unreasonably withheld or delayed), no material Intellectual Property owned by any Loan Party may be sold, contributed, exclusively licensed, assigned or otherwise transferred by any Loan Party to any Subsidiary that is not a Loan Party.

**Section 7.05**      <u>Transactions with Affiliates</u>.  ~~The Parent~~NewCo will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates (other than ~~the Parent~~NewCo or any Subsidiary), except (a) transactions that are on terms and conditions not materially less favorable to ~~the Parent~~NewCo or such Subsidiary than it would obtain on an arm's-length basis from a Person that is not an Affiliate, (b) any Restricted Payment permitted by <u>Section 7.06</u>, (c) customary fees paid and indemnifications provided to directors of ~~the Parent~~NewCo and its Subsidiaries, (d) compensation (including bonus and severance arrangements) and indemnification of, and other employment agreements and arrangements, employee benefit plans, and stock incentive plans with, directors, officers, consultants and employees of ~~the Parent~~NewCo or any Subsidiary of ~~the Parent~~NewCo entered in the ordinary course of business (including management and employee benefit plans or agreements, subscription agreements or similar agreements pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with present or former employees, officers or directors and stock option or incentive plans and other compensation arrangements), (e) Investments permitted by <u>Section 7.04</u>, (f) leases or subleases of property in the ordinary course of business not materially interfering with the business of ~~the Parent~~NewCo and the Subsidiaries taken as a whole, (g) transactions between or among ~~the Parent~~NewCo and its Subsidiaries not otherwise prohibited hereunder, (h) ~~the payment of fees, expenses and indemnities and other payments pursuant to, and the transactions pursuant to, the agreements set forth on Schedule 7.05 (as such agreements are in effect on the Closing Date, together with any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect),~~[reserved], (i) the granting of registration and other customary rights in connection with the issuance of Equity Interests by ~~the Parent~~NewCo or the Borrower not otherwise prohibited by the Loan Documents and the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided in connection therewith, (j) transactions pursuant to agreements in existence or contemplated on the ~~Closing~~Amendment No. 13 Effective Date and set forth on <u>Schedule 7.05</u> or any amendment, modification or supplement thereto or restatement, refinancing or replacement thereof to the extent such an amendment, modification, supplement, restatement, refinancing or replacement is not adverse to the Lenders in any material respect; provided, that, for the avoidance of doubt, the assignment by ~~the Parent~~NewCo or any Subsidiary to ~~the Parent~~NewCo or any other Subsidiary of the rights and obligations under any such agreement shall not be deemed to be adverse to the Lenders in any material respect, (k) issuances of Equity Interests by ~~the Parent~~NewCo, (l) the formation and maintenance of any consolidated group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business, (m) transactions undertaken in good faith (as <u>determined by the Required Lenders), other than with respect to transactions (A) contemplated as of the Amendment No. 13 Effective Date and identified on Schedule 7.05(m) or (B) otherwise permitted under Article VII, as</u> certified by a Responsible Officer of the Borrower~~)~~, for the purpose of improving the consolidated tax efficiency of ~~the Parent~~NewCo and its Subsidiaries and not for the purpose of circumventing any covenant set forth in this Agreement, (n) ~~the Class D Transactions,~~[reserved], (o) the forgiveness or other cancellation of any advances, notes or loans to directors, officers and employees pursuant to <u>Section 7.04(i)(y)</u>, (p) ~~Dispositions permitted by Section 7.03(a)(v)(D), and (q) Permitted Restructuring Transactions~~[reserved], <u>(q) any transactions occurring after an Event of Default, including, any credit bidding transaction, sale transaction in chapter 11, or similar proceeding, and (r) any material contracts or transactions involving services with Vista Valuation Creation Team or any other affiliates of VCP entered into on an arms'-length basis on market terms and approved by a majority of the independent managers on the</u>

Board of Directors. Notwithstanding anything to the contrary herein, with respect to any such transaction or series of related transactions with an Affiliate (other than transactions that are solely between or among ~~the Parent~~NewCo and the Subsidiaries) ~~and involving aggregate payments or consideration in excess of $10,000,000, the Parent~~, NewCo shall deliver to the Administrative Agent a resolution adopted by the majority of the disinterested members of the board of directors or other governing body of ~~Parent~~NewCo approving such transaction.

Section 7.06    Restricted Payments. ~~The Parent~~NewCo will not, and will not permit any of its Subsidiaries to, declare or make, directly or indirectly, any Restricted Payment, except:

(a)    ~~the Parent may~~ (i) NewCo may declare and pay dividends and (ii) each Loan Party may make other Restricted Payments with respect to its Equity Interests payable solely in additional Equity Interests of the ~~Parent~~Loan Parties (other than Disqualified Capital Stock);

(b)    ~~the Parent~~subject to approval by the Board of Directors, NewCo and any Subsidiaries may repurchase (i) Equity Interests upon the exercise of any purchase or conversion option in respect of Equity Equivalents if such Equity Interests represent a portion of the exercise price thereof and (ii) Equity Interests from any current or former officer, director, employee or consultant (or their current or former spouses, estates, estate planning vehicles and family members) or other holder of Equity Interests to comply with Tax withholding obligations relating to Taxes payable by such Person upon the grant or award of such Equity Interests (or upon vesting thereof);

(c)    ~~the Parent~~NewCo and any Subsidiaries may make cash payments in lieu of the issuance of fractional shares in connection with the exercise or conversion of Equity Equivalents or convertible Indebtedness;

(d)    Subsidiaries may declare and pay dividends or make other distributions to Persons that own Equity Interests in such Subsidiaries; provided that in the case of a dividend or other distribution by a non-Wholly Owned Subsidiary, such dividends or distributions shall be made ratably with respect to their Equity Interests;

(e)    ~~the Parent~~NewCo and any Subsidiaries may make Restricted Payments pursuant to and in accordance with stock incentive plans or other employee benefit plans and related equity agreements for directors, officers, employees or consultants of ~~the Parent~~NewCo and its Subsidiaries, provided that such Restricted Payments are limited to such plans and agreements in place as of the Amendment No. 13 Effective Date or other plans and agreements otherwise approved by the Board of Directors;

(f)    so long as no Default or Event of Default has occurred and is continuing or would arise after giving effect thereto~~, (i) the Parent~~ and such Restricted Payments are approved by the Board of Directors, (i) NewCo and any Subsidiaries may purchase Equity Interests from present or former officers, directors, consultants or employees (or their current or former spouses, estates, estate planning vehicles and family members) of ~~the Parent~~NewCo or any Subsidiary upon the death, disability, retirement or termination of employment or service of such officer, director, consultant or employee, in an aggregate amount not exceeding $10,000,000 in any Fiscal Year of ~~the Parent~~NewCo, with any unused amount in any immediately preceding Fiscal Year being carried over to the immediately subsequent Fiscal Year to increase the basket in such Fiscal Year, plus, the proceeds received by ~~the Parent~~NewCo or any Subsidiary of any key man life insurance, (ii) ~~subject to the Equity Contribution Principles, the Parent~~NewCo may repurchase any Equity Interests of ~~the Parent~~NewCo in connection with any exchange offer,

127

tender offer, private repurchase or similar transaction with (1) the Net Cash Proceeds received on or after December 31, 2018 (to the extent such Net Cash Proceeds have not been applied for any Restricted Payment prior to the Closing Date) and on or prior to such date from any issuance of Class E Preference Shares by the Parent (other than to a Subsidiary of the Parent), (2) the Net Cash Proceeds received after the Closing Date and on or prior to such date from any issuance of any Qualified Capital Stock by ~~the Parent~~NewCo (other than to a Subsidiary of ~~the Parent~~NewCo), and (3) the Net Cash Proceeds received after the Closing Date and on or prior to such date by ~~the Parent~~NewCo or any Subsidiary from the issuance (other than to ~~the Parent~~NewCo or any Subsidiary of ~~the Parent~~NewCo) of convertible or exchangeable debt obligations that have been converted into or exchanged for Qualified Capital Stock of ~~the Parent~~NewCo; _provided_, that, in the case of this subclause (3), any such convertible or exchangeable debt obligations shall be subordinated in right of payment to the Senior Credit Obligations and no regularly scheduled cash payments with respect to such convertible or exchangeable debt obligations shall be required prior to the Maturity Date with respect to such convertible or exchangeable debt obligations; _provided further_ that, in the case of any repurchases pursuant to this clause (ii), after giving effect to such repurchase, the pro forma Liquidity shall be no less than $~~6,000,000~~25,000,000, and (iii) ~~the Parent~~NewCo may repurchase Equity Interests from shareholders (including in connection with any exercise of a right of first refusal), so long as substantially concurrently with such repurchase, such repurchased Equity Interests are sold in exchange for cash or Cash Equivalents at the same or a greater price to any Person (other than to a Subsidiary of ~~the Parent~~NewCo) and the proceeds of such sale are promptly returned to ~~the Parent~~NewCo; _provided_, for the avoidance of doubt, that nothing herein shall be construed to prevent or limit the ability of ~~Parent~~NewCo or any Subsidiary from cancelling any unvested Equity Interests pursuant to an agreement with any employee, officer, director, or consultant, upon termination of service or other cancellation event under such agreement; _and_

(g)    redemptions, repurchases, retirements or other acquisitions of Equity Interests in ~~the Parent~~NewCo or any of the Subsidiaries deemed to occur upon exercise of stock options or warrants or similar rights if such Equity Interests represent a portion of the exercise price of, or tax withholdings with respect to, such options or warrants or similar rights~~;~~.

~~(h)    the Parent and its Subsidiaries may make additional Restricted Payments using the Available Amount so long as the Available Amount Conditions have been met;~~

~~(i)    the Parent may use the proceeds of the Tranche A Term Loans to make Restricted Payments in connection with the Class D Transactions;~~

~~(j)    other Restricted Payments of the Parent and its Subsidiaries in an aggregate amount not to exceed $10,000,000 (minus any amount of Junior Debt Payments made pursuant to Section 7.07(b)(ii)), _provided_ that, at the time of the declaration of such Restricted Payment, (A) no Event of Default exists or would result from such Restricted Payment and (B) the Adjusted LTM Recurring Revenue Ratio, on a Pro Forma Basis, as of the end of the most recently completed Test Period shall not exceed 1.50:1.00; and~~

~~(k)    the Parent and its Subsidiaries may make Restricted Payments to the extent required to consummate a Permitted Restructuring Transaction.~~

**Section 7.07**    <u>Amendments to Subordinated Indebtedness Documents or Organization Documents; Junior Debt Payments</u>.

(a)    (i) Neither ~~the Parent~~NewCo nor any Subsidiary will amend, modify or waive any of its rights under any agreement or instrument governing or evidencing any Indebtedness that is unsecured, subordinated, or secured by junior liens or unsecured Indebtedness to the extent such amendment, modification or waiver, taken as a whole, would reasonably be expected in the good faith judgment of the Borrower to be adverse in any material respect to the Lenders~~; provided, however, that no amendment, modification or waiver in respect of Indebtedness that is unsecured, subordinated, or secured by junior liens in connection with the incurrence of Permitted Refinancing Indebtedness in respect of the relevant Indebtedness that is unsecured, subordinated, or secured by junior liens shall be prohibited under this Section 7.07(a) if the terms of such amendment, modification or waiver would be permitted either (x) pursuant to the definition of "Permitted Refinancing Indebtedness" or (y) such Indebtedness as modified would be permitted to be incurred at the time of such modification pursuant to Section 7.01~~ and (ii) neither ~~the Parent~~NewCo nor any Subsidiary will amend or otherwise modify any of their Organization Documents to the extent such amendment or modification, taken as a whole, would reasonably be expected to be adverse in any material respect to the Lenders~~, except for any amendment or modification of the Organization Documents of the Parent or any Subsidiary to the extent required to consummate a Permitted Restructuring Transaction~~.

(b)    Neither ~~the Parent~~NewCo nor any of its Subsidiaries will make any Junior Debt Payment, except ~~the Parent~~NewCo and its Subsidiaries may make Junior Debt Payments, subject to any applicable Intercreditor Agreements:

(i)    ~~using the Available Amount so long as the Available Amount Conditions have been met~~[reserved];

(ii)    ~~other Junior Debt Payments of the Parent and its Subsidiaries in an aggregate amount not to exceed $10,000,000 (minus any amount of Restricted Payments made pursuant to Section 7.06(j)), provided that, at the time of such Junior Debt Payment, (A) no Event of Default exists or would result from such Junior Debt Payment and (B) the Adjusted LTM Recurring Revenue Ratio, on a Pro Forma Basis, as of the end of the most recently completed Test Period shall not exceed 1.50:1.00; or~~[reserved]

(iii)    ~~(x)~~ regularly scheduled interest payments as and when due in respect of any Indebtedness permitted under this Agreement that is unsecured, subordinated or secured by junior lien~~, (y) AHYDO Payments and (z) any conversion of such Indebtedness into Equity Interests, if such payments are not then prohibited by the subordination provisions thereof~~.

**Section 7.08    Sale/Leaseback Transactions.**    None of ~~the Parent~~NewCo or any Subsidiary will enter into any Sale/Leaseback Transaction unless ~~(a) the sale or transfer of the property thereunder is permitted by Section 7.03, (b) any Capital Lease Obligations and Synthetic Lease Obligations arising in connection therewith are permitted by Section 7.01 and (c) any Liens arising in connection therewith (including Liens deemed to arise in connection with any such Capital Lease Obligations and Synthetic Lease Obligations) are permitted by Section 7.02.~~in place on the Amendment No. 13 Effective Date and identified on Schedule 7.08.

**Section 7.09    Sanctions; Anti-Corruption Laws.**    None of ~~the Parent~~NewCo or any Subsidiary will (a) use the proceeds of any Loan to fund any activities or business of or with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that, in each case, will result in a violation by any individual or entity (including any individual or entity participating in the transaction, whether as Lender, Agent or

otherwise) of Sanctions (or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity in violation of the foregoing) or the Anti-Corruption Laws, or in any other manner that will result in a violation by any party to any Loan Document (including any Lender, Agent or otherwise) of Sanctions, or (b) conduct, deal in or engage in or permit any Affiliate or agent of any Loan Party within its control to conduct, deal in or engage in any of the following activities (unless otherwise authorized by applicable laws): (i) conduct any business or engage in any transaction or dealing with any person blocked pursuant to Executive Order No. 13224 (a "Blocked Person"), including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person; (~~b~~ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; (~~c~~iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or the Patriot Act.

**Section 7.10**    Financial Covenants.

(a)    Minimum Liquidity.  The Loan Parties shall maintain Liquidity as of the end of any Fiscal Quarter, beginning with the first Fiscal Quarter ~~ending December 31, 2019~~after the Amendment No. 13 Effective Date, of not less than $5,000,000~~; provided, however, that this requirement shall automatically terminate if the Consolidated EBITDA is equal to or greater than $5,000,000 in two consecutive Fiscal Quarters~~.

(b)    ~~Minimum Adjusted LTM Recurring Revenue; Maximum Adjusted LTM Recurring Revenue~~Total Leverage Ratio.  The Borrower shall not permit ~~Adjusted LTM Recurring Revenue~~the Total Leverage Ratio for any Test Period indicated below, beginning with the Fiscal Quarter ending [December 31, ~~2019~~2024], to be ~~less than~~above the correlative amount indicated below (the "~~Minimum Adjusted LTM Recurring Revenue"); provided that the Borrower shall be deemed to have satisfied this clause (b) with respect to any Test Period if (x) the Borrower is in compliance with the Minimum Adjusted LTM Recurring Revenue for such Test Period, (y) the Adjusted LTM Recurring Revenue Ratio for such Test Period does not exceed the Maximum Adjusted LTM Recurring Revenue Ratio, or (z) Consolidated EBITDA for the four consecutive Fiscal Quarter period ended as of the end of any applicable Fiscal Quarter is greater than or equal to (1) $30,000,000 for the Fiscal Quarters ending on or prior to September 30, 2021 or (2) $40,000,000 for any Fiscal Quarters ending thereafter:~~Maximum Total Leverage Ratio"):

| Fiscal Quarters Ending | ~~Minimum Adjusted LTM Recurring Revenue~~Maximum Total Leverage Ratio |
|---|---|
| December 31, ~~2020~~2024 | ~~$107,800,000~~9.25:1.00 |
| March 31, ~~2021~~2025 | ~~$124,600,000~~ 9.25:1.00 |
| June 30, ~~2021~~2025 | ~~$141,400,000~~ 6.75:1.00 |
| September 30, ~~2021~~2025 | ~~$158,200,000~~ 6.00:1.00 |
| December 31, ~~2021~~2025 | ~~$175,000,000~~ 5.50:1.00 |
| March 31, ~~2022~~2026 | ~~$178,500,000~~ 5.50:1.00 |

| | |
|---|---|
| June 30, ~~2022~~2026 | ~~$182,000,000~~ 5.25:1.00 |
| September 30, ~~2022~~2026 | ~~$185,500,000~~5.25:1.00 |
| December 31, ~~2022~~2026 | ~~$189,000,000~~ 5.25:1.00 |
| March 31, ~~2023~~2027 | ~~$192,780,000~~ 5.25:1.00 |
| June 30, ~~2023~~2027 | ~~$196,560,000~~ 5.25:1.00 |
| September 30, ~~2023~~2027 | ~~$200,340,000~~ 5.25:1.00 |
| ~~December 31, 2023~~ | ~~$204,120,000~~ |
| ~~March 31, 2024~~ | ~~$208,202,400~~ |
| ~~June 30, 2024~~ | ~~$212,284,800~~ |
| ~~September 30, 2024~~ | ~~$216,367,200~~ |
| ~~December 31, 2024~~ | ~~$220,449,600~~ |
| ~~March 31, 2025~~ | ~~$224,858,600~~ |
| ~~June 30, 2025~~ | ~~$229,267,600~~ |
| ~~September 30, 2025~~ | ~~$233,676,600~~ |

**Section**                      **7.11**
Holdings Covenant. HoldCo shall not engage in any operating or business activities or own any assets; provided that the following, and activities incidental thereto, shall be permitted in any event: (a) its ownership of the Equity Interests of its Subsidiaries and activities incidental thereto, (b) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (c) the performance of its obligations with respect to the Loan Documents, (d) the performance of guarantees of Indebtedness of any of its Subsidiaries to the extent such Indebtedness is permitted by Section 7.01; provided that to the extent Section 7.01 contains any limitations on the terms of such Indebtedness, any such guarantee must also comply with such terms, unless otherwise agreed by the Administrative Agent in writing, (e) payment of dividends and making contributions to the capital of its Subsidiaries, (f) participating in tax, accounting and other administrative matters as a member of the consolidated group of NewCo, (g) holding any cash incidental to any activities permitted under this Section 7.11, and (h) providing indemnification, compensation and employment-based awards and incentives to officers, managers and directors.

## ARTICLE VIII.

## EVENTS OF DEFAULT

Section 8.01    Events of Default.  An Event of Default shall exist upon the occurrence of any of the following specified events or conditions (each, an "Event of Default"):

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise~~, and such failure shall continue unremedied for a period of two (2) Business Days~~;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Section 8.01) payable under this

Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of ~~five~~three (~~5~~3) Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of the Borrower or any other Loan Party in or in connection with this Agreement or any other Loan Document, or in any certificate furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 6.02(a), 6.03 (with respect to the Borrower's existence), 6.08 or 6.09 or in Article VII;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clause (a), (b) or (d) of this Section 8.01) or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after the earlier of (x) a notice thereof from the Administrative Agent to the Borrower or (y) upon obtaining knowledge of such Default by the Borrower;

(f)    any Loan Party or any Material Subsidiary shall default (x) in the payment of principal of or interest on any Material Indebtedness (after giving effect to all applicable grace periods and delivery of all required notices) or (y) in the observance or performance of any agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto (after giving effect to all applicable grace periods and delivery of all required notices), in each case of foregoing clauses (x) and (y), which default continues for the period of time that would enable or permit the holder or holders of such Material Indebtedness or any trustee or agent on its or their behalf to cause such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (f) shall not apply (i) to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the definitive documents in respect of such Indebtedness and (ii) with respect to any Material Indebtedness consisting of Swap Agreements, termination events or equivalent events pursuant to the terms of such Swap Agreements and not as a result of any default thereunder by ~~the Parent~~NewCo or any of its Subsidiaries;

(g)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, composition, assignment, arrangement, moratorium of any indebtedness, reorganization, winding up, dissolution or other relief in respect of ~~the Parent~~NewCo or any Material Subsidiary or its debts, or of a substantial part of its assets, under any Bankruptcy Law now or hereafter in effect or (ii) the appointment of a receiver, liquidator, trustee, custodian, sequestrator, examiner, conservator or similar official for ~~the Parent~~NewCo or any Material Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)    ~~the Parent~~NewCo or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization compromise, composition, assignment, arrangement with any creditor or other relief under any Bankruptcy Law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section 8.01, (iii) apply for or

consent to the appointment of a receiver, liquidator, examiner, trustee, custodian, sequestrator, conservator or similar official for ~~the Parent~~NewCo or any Material Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(i)    ~~the Parent~~NewCo or any Material Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(j)    one or more final judgments for the payment of money in an aggregate amount in excess of the Threshold Amount shall be rendered against ~~the Parent~~NewCo, any Subsidiary or any combination thereof and the same shall remain unpaid, unstayed and undischarged for a period of sixty (60) consecutive days after such judgment becomes final during which execution shall not be effectively stayed; <u>provided</u> that any such amount shall be calculated after deducting from the sum so payable any amount of such judgment or order that is covered by (x) a valid and binding policy of insurance in favor of ~~the Parent~~NewCo or such Subsidiary (but only if the applicable insurer shall have been advised of such judgment and of the intent of ~~the Parent~~NewCo or such Subsidiary to make a claim in respect of any amount payable by it in connection therewith and such insurer shall not have disputed coverage) or (y) any third-party indemnification obligation;

(k)    an ERISA Event or Foreign Benefit Event shall have occurred that, when taken together with all other ERISA Events or Foreign Benefit Event that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(l)    a Change of Control shall occur;

(m)    any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms or ~~the Parent~~NewCo or any Subsidiary shall contest in writing the enforceability of any material provision of any Loan Document or shall deny in writing it has any or further liability or obligation under any Loan Document; or

(n)    any Collateral Document shall for any reason fail to create a valid and perfected first priority security interest in any material portion of the Collateral purported to be covered thereby (and to the extent required thereby and subject to any Permitted Liens).

**Section 8.02**    Acceleration; Remedies.    Upon the occurrence of and during the continuation of an Event of Default, the Administrative Agent (or the Collateral Agent, as applicable) shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)    *Termination of Commitments*.    Declare the Commitments terminated whereupon the Commitments shall be immediately terminated.

(b)    *Acceleration of Loans*.    Declare the unpaid principal of and any accrued interest in respect of all Loans any and all other indebtedness or obligations of any and every kind (other than contingent indemnification obligations) owing by a Loan Party to any of the Lenders hereunder to be due whereupon the same shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties.

(c)    *Enforcement of Rights*.  Enforce any and all rights and interests created and existing under the Loan Documents, including, without limitation, all rights and remedies existing under the Loan Documents, all rights and remedies against a Guarantor and all rights of setoff.

(d)    *Enforcement Rights Vested Solely in Administrative Agent and Collateral Agent*. The Lenders agree that this Agreement may be enforced only by the action of the Administrative Agent, acting upon the instructions of the Required Lenders, and, with respect to the Collateral, the Collateral Agent, and that no other Finance Party shall have any right individually to seek to enforce any Loan Document or to realize upon the security to be granted hereby.

Notwithstanding the foregoing, if an Event of Default specified in Section 8.01(g), (h) or (i) shall occur, then the Commitments shall automatically terminate, all Loans, all accrued interest in respect thereof and all accrued and unpaid fees and other indebtedness or obligations owing to the Lenders hereunder and under the other Loan Documents shall immediately become due and payable, as aforesaid shall automatically become effective, in each case without the giving of any notice or other action by the Administrative Agent or the Lenders, which notice or other action is expressly waived by the Loan Parties (such termination and acceleration, "Automatic Termination and Acceleration"); provided that solely with respect to a joint provisional liquidation proceeding in Bermuda filed by the Parent and/or the filing by Parent of a Chapter 15 case in the United States in connection with such joint provisional liquidation proceeding, there shall be no Automatic Termination and Acceleration..

It is understood and agreed that if the Loans are accelerated or otherwise become due prior to the Maturity Date, including without limitation as a result of any Event of Default set forth in Sections 8.01(g), (h) or (i) (including the acceleration of claims by operation of law), the Prepayment Premium that would have been payable if the Loans were voluntarily prepaid pursuant to Section 2.06(a) on such date of acceleration will also automatically be due and payable and shall constitute part of the Senior Credit Obligations in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof. Any such Prepayment Premium payable shall be presumed to be the liquidated damages sustained by each Lender as the result of the early prepayment and each of the Loan Parties agrees that it is reasonable under the circumstances currently existing. Each of the Loan Parties expressly waives (to the fullest extent it may lawfully do so) the provisions of any present or future statute or law that prohibits or may prohibit the collection of the foregoing amounts in connection with any such acceleration, any rescission of such acceleration or the commencement of any Insolvency or Liquidation Proceeding. Each of the Loan Parties expressly agrees (to the fullest extent it may lawfully do so) that: (A) the Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay such Prepayment Premium; and (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. Each of the Loan Parties expressly acknowledges that its agreement to pay such Prepayment Premium to the Lenders as herein described is a material inducement to Lenders to enter into this Agreement.

**Section 8.03**    Allocation of Payments After Event of Default.

(a)    *Priority of Distributions*.  The Borrower hereby irrevocably waives the right to direct the application of any and all payments in respect of their Senior Credit Obligations and any proceeds of Collateral after the occurrence and during the continuance of an Event of Default and agrees that, notwithstanding the provisions of Sections 2.06(b) and 2.10, after the exercise of

remedies provided for in <u>Section 8.02</u> (or after the Loans have automatically become immediately due and payable), all amounts collected or received on account of any Senior Credit Obligations shall, subject to the provisions of <u>Section 2.12</u>, be applied by the Administrative Agent in the following order:

FIRST, to pay interest on and then principal of any portion of the Loans that the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower;

SECOND, to the payment of all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented attorneys' fees) of the Administrative Agent or the Collateral Agent then due and payable and under any Loan Document in connection with enforcing the rights of the Finance Parties under the Loan Documents, including all expenses of sale or other realization of or in respect of the Collateral, and all advances incurred or made by the Collateral Agent in connection therewith, and any other obligations owing to the Collateral Agent in respect of sums advanced by the Collateral Agent to preserve the Collateral or to preserve its security interest in the Collateral;

THIRD, to the payment of all reasonable and documented out-of-pocket costs and expenses of each of the Lenders in connection with enforcing its rights under the Loan Documents or otherwise with respect to the Senior Credit Obligations owing to such Lender;

FOURTH, to the payment of all of the Senior Credit Obligations attributable to the Restructuring First Lien Term Loans consisting of accrued fees and interest;

FIFTH, to the payment of all of the Senior Credit Obligations attributable to the Restructuring First Lien Term Loans consisting of unpaid principal of the Loans;

SIXTH, except as set forth in clauses <u>FIRST</u> through <u>FOURTH</u> above, to the payment of the outstanding Senior Credit Obligations attributable to the Restructuring First Lien Term Loans owing to any Finance Party, pro rata, as set forth below, with an amount equal to the Senior Credit Obligations attributable to the Restructuring First Lien Term Loans being paid to the Collateral Agent (in the case of Senior Credit Obligations attributable to the Restructuring First Lien Term Loans owing to the Collateral Agent) or to the Administrative Agent (in the case of all other Senior Credit Obligations attributable to the Restructuring First Lien Term Loans) for the account of the Restructuring First Lien Term Loan Lenders or any Agent, with the Collateral Agent, each Restructuring First Lien Term Loan Lender and the Agents receiving an amount equal to its outstanding Senior Credit Obligations attributable to the Restructuring First Lien Term Loans, or, if the proceeds are insufficient to pay in full all Senior Credit Obligations attributable to the Restructuring First Lien Term Loans, its Pro rata Share of the amount remaining to be distributed; ~~and~~

SEVENTH, to the payment of all of the Senior Credit Obligations attributable to the Restructuring Second Lien Term Loans consisting of accrued fees and interest;

EIGHTH, to the payment of all of the Senior Credit Obligations attributable to the Restructuring Second Lien Term Loans consisting of unpaid principal of the Loans;

NINTH, except as set forth in clauses FIRST, SECOND, THIRD and SEVENTH above, to the payment of the outstanding Senior Credit Obligations attributable to the Restructuring Second Lien Term Loans owing to any Finance Party, pro rata, as set forth below, with an

amount equal to the Senior Credit Obligations attributable to the Restructuring Second Lien Term Loans being paid to the Collateral Agent (in the case of Senior Credit Obligations attributable to the Restructuring Second Lien Term Loans owing to the Collateral Agent) or to the Administrative Agent (in the case of all other Senior Credit Obligations attributable to the Restructuring Second Lien Term Loans) for the account of the Restructuring Second Lien Term Loan Lenders or any Agent, with the Collateral Agent, each Restructuring Second Lien Term Loan Lender and the Agents receiving an amount equal to its outstanding Senior Credit Obligations attributable to the Restructuring Second Lien Term Loans, or, if the proceeds are insufficient to pay in full all Senior Credit Obligations attributable to the Restructuring Second Lien Term Loans, its Pro rata Share of the amount remaining to be distributed; and

SIXTH TENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category and (ii) each of the Finance Parties shall receive an amount equal to its Pro rata Share of amounts available to be applied pursuant to clauses THIRD, FOURTH, FIFTH and, SIXTH, SEVENTH, EIGHTH and NINTH above.

(b)     *Pro rata Treatment*.  For purposes of this Section 8.03, "Pro rata Share" means, when calculating a Finance Party's portion of any distribution or amount, that amount (expressed as a percentage) equal to a fraction the numerator of which is the then unpaid amount of such Finance Party's Senior Credit Obligations attributable to the applicable Class and the denominator of which is the then-outstanding amount of all Senior Credit Obligations attributable to the applicable Class.  If any payment to any Finance Party of its Pro rata Share of any distribution would result in overpayment to such Finance Party, such excess amount shall instead be distributed in respect of the unpaid Senior Credit Obligations of the other Finance Parties, with each Finance Party whose Senior Credit Obligations have not been paid in full to receive an amount equal to such excess amount multiplied by a fraction the numerator of which is the unpaid Senior Credit Obligations of such Finance Party and the denominator of which is the unpaid Senior Credit Obligations of all Finance Parties entitled to such distribution. For the avoidance of doubt, all Senior Credit Obligations attributable to the Restructuring First Lien Term Loans shall be repaid prior to any payments being made in satisfaction of the Senior Credit Obligations attributable to the Restructuring Second Lien Term Loans.

(c)     *Reliance by Collateral Agent*.  For purposes of applying payments received in accordance with this Section 8.03, the Collateral Agent shall be entitled to rely upon the Administrative Agent (which the Administrative Agent and the Finance Parties agree (or shall agree) to provide upon request of the Collateral Agent) of the outstanding Senior Credit Obligations owed to the Agents or the Lenders, as the case may be.

**Section 8.04     Cure Right.**

(a)     Notwithstanding anything to the contrary contained in Section 8.01, for the purpose of determining whether an Event of Default under Section 7.10(b) has occurred, the Borrower may apply any portion of the Net Cash Proceeds from any issuance of Equity Interests or Equity Equivalents of the Parent NewCo or of any cash contribution to the equity capital of the Parent NewCo (or from any other contribution to capital or sale or issuance of any other Equity Interests on terms reasonably acceptable to the Administrative Agent (at the direction of the Required Lenders)), in each case, that is contributed as cash equity from the Parent NewCo to the Borrower (the "Cure Amount") to prepay (for the avoidance of doubt, without the payment of

any Prepayment Premium) any outstanding Loans such that after giving effect to the prepayment of such Loans, the pro forma ~~Adjusted LTM Recurring Revenue Ratio~~Consolidated EBITDA would be no greater than the amount required to meet the Maximum ~~Adjusted LTM Recurring Revenue~~Total Leverage Ratio for the applicable fiscal quarter; *provided* that:

(i)    such amounts to be designated are actually received and so applied by the Borrower (i) after the last day of the applicable Fiscal Quarter and (ii) on and prior to the forty-fifth (45th) Business Day after the date on which financial statements are delivered or required to be delivered with respect to such applicable Fiscal Quarter (the "Cure Expiration Date");

(ii)    such amounts to be designated do not exceed the maximum aggregate amount necessary to cure any Event of Default under Section 7.10(b) as of such date by causing the ~~Adjusted LTM Recurring Revenue~~Total Leverage Ratio to be ~~no greater than~~above the applicable Maximum ~~Adjusted LTM Recurring Revenue Ratio~~Total Leverage Ratio for the applicable fiscal quarter;

(iii)    the Borrower shall have provided written notice to the Administrative Agent on the date such amounts are designated as a "Cure Amount"; and

(iv)    subject to Section 2.06(e), all prepayments pursuant to this Section 8.04(a) shall be applied (x) as among the different Classes of Loans, on a pro rata basis and (y) with respect to a specific Class of Loans, pro rata among the Lenders based on their outstanding Loans of such Class at the time of such prepayment.

(b)    The parties hereby acknowledge that this Section 8.04 may not be relied on for purposes of calculating any financial ratios other than as applicable to Section 7.10(b) (and may not be included for purposes of determining the availability or amount permitted pursuant to any other covenant, including any baskets), and may not result in any adjustment to any amounts (including the amount of Indebtedness notwithstanding the fact that Loans have been prepaid) or increase in cash for any other purpose under this Agreement with respect to any Fiscal Quarter; provided, however, that, following any exercise of the cure right under this Section 8.04, if the Borrower is in compliance with Section 7.10(b) as of the end of three (3) consecutive Fiscal Quarters thereafter, the Cure Amount shall be taken into account in the determination of the amount of Indebtedness for any purpose under this Agreement following the date on which financial statements are delivered with respect to the third Fiscal Quarter of such three (3) Fiscal Quarter period.  Notwithstanding anything to the contrary contained in Section 8.01, (A) upon receipt and application of the relevant Cure Amount by the Borrower in an amount necessary to cure any Event of Default under Section 7.10(b), Section 7.10(b) will be deemed satisfied and complied with as of the end of the relevant Fiscal Quarter with the same effect as though there had been no failure to comply with Section 7.10(b) and any Event of Default under Section 7.10(b) (and any other Default as a result thereof) will be deemed not to have occurred for purposes of the Loan Documents as of the date such relevant Cure Amount is received and applied, and (B) from and after the date that the Borrower delivers a written notice to the Administrative Agent that it intends to exercise its cure right under this Section 8.04 neither the Administrative Agent nor any Lender may exercise any rights or remedies under Section 8.04 (or under any other Loan Document) on the basis of any actual or purported Event of Default under Section 7.10(b) (and any other Default as a result thereof) until and unless the Cure Expiration Date has occurred without the Cure Amount having been received and applied.

(c)    The cure right set forth in Section 8.04(a) may only be exercised (i) during the

~~AMERICAS/2024214501.1~~AMERICAS/2024274802.21

first eight (8) Fiscal Quarters ending after the Amendment No. 3 Effective Date and (ii) only two times during the first eight (8) Fiscal Quarters ending after the Amendment No. 3 Effective Date; provided that, in each period of four (4) consecutive Fiscal Quarters, there shall be no more than one (1) Fiscal Quarter in which the cure right set forth in <u>Section 8.04(a)</u> is exercised.

## ARTICLE IX.

## AGENCY PROVISIONS

**Section 9.01**    <u>Appointment and Authority</u>.  Each of the Lenders hereby irrevocably appoints Vista Credit Partners to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each of the Lenders hereby irrevocably appoints Vista Credit Partners, to act on its behalf as the Collateral Agent hereunder and under the other Loan Documents and authorizes the Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to the Collateral Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and none of the Borrower or any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

**Section 9.02**    <u>Rights as a Lender</u>.  Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with ~~the Parent~~NewCo or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

**Section 9.03**    <u>Exculpatory Provisions</u>.  Each Agent, each in its capacity as such, shall not have any obligations, duties or responsibilities under this Agreement but shall be entitled to all benefits of this <u>Article IX</u>.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, none of the Agents:

(a)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number of percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); <u>provided</u> that such Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Bankruptcy Law or that may

affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Bankruptcy Law; and

(c)      shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity.

No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Article VIII and Section 10.01) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default unless and until notice describing such Default is given to such Agent by the Borrower or a Lender and stating that such notice is a "notice of default."

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term us used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

Section 9.04      Reliance by Agents.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.05      Delegation of Duties.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their

respective activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.06   Indemnification of Agents.   Whether or not the transactions contemplated hereby are consummated, each Lender shall indemnify upon demand each Agent Related Person (to the extent not reimbursed by or on behalf of the Borrower and without limiting the obligations of any Loan Party to do so) on a pro rata basis (determined as of the time that the applicable payment is sought based on each Lender's ratable share at such time) and hold harmless each Agent Related Person against any and all Indemnified Liabilities incurred by it; provided that no Lender shall be liable for payment to any Agent Related Person of any portion of such Indemnified Liabilities to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such Agent Related Person's own gross negligence or willful misconduct (and no action taken in accordance with the directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section).  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by the Administrative Agent in connection with preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights and responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such costs or expenses by or on behalf of the Borrower.

Section 9.07   Resignation of Agents.  Each Agent may at any time give notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with, so long as no Event of Default has occurred or is continuing, the consent of the Borrower (such consent not to be unreasonably withheld or delayed), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, with, so long as no Event of Default has occurred or is continuing, the consent of the Borrower (such consent not to be unreasonably withheld or delayed), appoint a successor Agent meeting the qualifications set forth above; provided that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold as nominee such collateral security until such time as a successor Collateral Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through an Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section 9.07.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) (and for the avoidance of doubt, any successor Collateral Agent shall be deemed to have actual knowledge of any Swap Agreements outstanding at such time), Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.07).  The fees payable by the Borrower to a successor Agent shall be the

same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and <u>Section 10.04</u> shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

Section 9.08    <u>Non-Reliance on Agents and Other Lenders</u>.    Each Lender acknowledges that it has, independently and without reliance upon any Agent Related Person or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has reviewed each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof and each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.09    <u>No Other Duties, etc</u>.  Anything herein to the contrary notwithstanding, none of the Agents shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, the Collateral Agent or a Lender hereunder.

Section 9.10    <u>Administrative Agent May File Proofs of Claim</u>.    In case of the pendency of any receivership, insolvency, examinership, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent  (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Senior Credit Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Section 2.07</u> and <u>10.04</u>) allowed in such judicial proceeding;

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)    and any custodian, receiver, examiner, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Section 2.07</u> and <u>10.04</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to

authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Senior Credit Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

For the avoidance of doubt, where any Lender votes, or authorizes the Administrative Agent to vote, in respect of the claim of any Lender in any of the proceedings described in this Section 9.10, the vote of each Lender shall count as one individual vote for numerosity purposes regardless of whether any Lenders are under the common Control of any Person or Persons.

**Section 9.11**    Collateral and Guaranty Matters.  Each Lender agrees that any action taken by the Administrative Agent, the Collateral Agent or the Required Lenders (or, where required by the express terms of this Agreement, a greater or lesser proportion of the Lenders) in accordance with the provisions of this Agreement or of the other Loan Documents, and the exercise by the Administrative Agent, the Collateral Agent or Required Lenders (or, where so required, such greater or lesser proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  Without limiting the generality of the foregoing, the Lenders irrevocably authorize the Administrative Agent and Collateral Agent, at its option and in its discretion to (and the Administrative Agent and Collateral Agent each agrees with the Borrower that it shall):

(a)    release any Lien on any property granted to or held by the Administrative Agent and Collateral Agent under any Loan Document (A) upon Discharge of Senior Credit Obligations, (B) that is sold, transferred, disposed or to be sold, transferred, disposed as part of or in connection with any Disposition (other than any sale to a Loan Party) permitted hereunder, (C) subject to Section 10.01, if approved, authorized or ratified in writing by the Required Lenders or (D) to the extent such property is owned by a Guarantor upon the release of such Guarantor from its obligations under its Guaranty pursuant to clause (iii) below;

(b)    subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (c) or (d) of the definition of Permitted Encumbrances or Section 7.02 (e), (j), (m), (p), and (q)(iii);

(c)    release any Guarantor from its obligations under the Guaranty Agreement if such Person becomes an Excluded Subsidiary or an Excluded Tax Subsidiary as a result of a transaction or occurrence permitted hereunder; and

(d)    enter into non-disturbance and similar agreements in connection with the licensing of intellectual property and lease of real property permitted pursuant to the terms of this Agreement.

Upon request by the Administrative Agent at any time the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty Agreement pursuant to this Section 9.11.

In each case as specified in this Section 9.11, the applicable Agent shall (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request (i) to evidence the release or subordination of such item of Collateral from the assignment and security interest granted

under the Collateral Documents, (ii) to enter into non-disturbance or similar agreements in connection with the licensing of intellectual property or (iii) to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.11 and in form and substance reasonably acceptable to such Agent.

The Administrative Agent is authorized to enter into any Intercreditor Agreement, other intercreditor agreement, collateral trust or similar agreement contemplated hereby with respect to any Indebtedness (i) that is (A) required or permitted to be subordinated hereunder and/or (B) secured by Liens ranking senior, pari passu or junior to the Liens securing the Senior Credit Obligations and which contemplates an intercreditor, subordination or collateral trust agreement (any such other intercreditor agreement, an "Additional Agreement") and the Finance Parties party hereto acknowledge that any Additional Agreement is binding upon them. Each Finance Party hereto (a) agrees that it will be bound by, and will not take any action contrary to, the provisions of any Additional Agreement and (b) authorizes and instructs the Administrative Agent to enter into any Additional Agreement and to subject the Liens on the Collateral securing the Senior Credit Obligations to the provisions thereof.  The foregoing provisions are intended as an inducement to the Finance Parties to extend credit to the Borrower, and the Finance Parties are intended third-party beneficiaries of such provisions and the provisions of any Additional Agreement.

**Section 9.12**      Certain ERISA Matters.

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans or the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans and the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans and the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are

satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) such Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans and the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

**Section 9.13**    <u>Collateral Agent as Security Trustee of English Security Documents</u>.

For purposes of any Liens or Collateral created under the English Security Documents, the following additional provisions shall apply, in addition to the provisions set out in Article IX (*Agency Provisions*) or otherwise provided for hereunder.

(a)    In this <u>Section 9.13</u>, the following expressions have the following meanings:

"<u>Appointee</u>" means any receiver, administrator, examiner or other insolvency officer appointed in respect of any Loan Party or its assets.

"<u>Charged Property</u>" means the assets of any English Loan Party subject to a security interest under the English Security Documents.

"<u>Delegate</u>" means any delegate, agent, attorney or co-trustee appointed by the Collateral Agent (in its capacity as security trustee).

"<u>HM Land Registry</u>" means ~~Her~~His Majesty's Land Registry.

(b)    The Finance Parties appoint the Collateral Agent to hold the security interests constituted by the English Security Documents on trust for the Finance Parties on the terms of the Loan Documents and the Collateral Agent accepts that appointment.

(c)    The Collateral Agent, its subsidiaries and associated companies may each retain for its own account and benefit any fee, remuneration and profits paid to it in connection with (i) its activities under the Loan Documents; and (ii) its engagement in any kind of banking or other business with any Loan Party.

(d)    [reserved]

(e)     The Collateral Agent shall have no duties or obligations to any other Person except for those which are expressly specified in the English Security Documents and applicable Loan Documents or mandatorily required by applicable law.

(f)     The Collateral Agent may appoint one or more Delegates on such terms (which may include the power to sub-delegate) and subject to such conditions as it thinks fit, to exercise and perform all or any of the duties, rights, powers and discretions vested in it by the English Security Documents and shall not be obliged to supervise any Delegate or be responsible to any person for any loss incurred by reason of any act, omission, misconduct or default on the part of any Delegate.

(g)     The Collateral Agent may (whether for the purpose of complying with any law or regulation of any overseas jurisdiction, or for any other reason) appoint (and subsequently remove) any person to act jointly with the Collateral Agent either as a separate trustee or as a co-trustee on such terms and subject to such conditions as the Collateral Agent thinks fit and with such of the duties, rights, powers and discretions vested in the Collateral Agent by the English Security Documents as may be conferred by the instrument of appointment of that person.

(h)     The Collateral Agent shall notify the Lenders of the appointment of each Appointee (other than a Delegate).

(i)     The Collateral Agent may pay reasonable remuneration to any Delegate or Appointee, together with any costs and expenses (including legal fees) reasonably incurred by the Delegate or Appointee in connection with its appointment.  All such remuneration, costs and expenses shall be treated, for the purposes of this Agreement and the Fee Letter, as paid or incurred by the Collateral Agent.

(j)     Each Delegate and each Appointee shall have every benefit, right, power and discretion and the benefit of every exculpation (together "Rights") of the Collateral Agent (in its capacity as security trustee) under the English Security Documents, and each reference to the Collateral Agent (where the context requires that such reference is to the Collateral Agent in its capacity as security trustee) in the provisions of the English Security Documents which confer Rights shall be deemed to include a reference to each Delegate and each Appointee.

(k)     Each Finance Party confirms its approval of the English Security Documents and authorizes and instructs the Collateral Agent: (i) to execute and deliver the English Security Documents; (ii) to exercise the rights, powers and discretions given to the Collateral Agent (in its capacity as security trustee) under or in connection with the English Security Documents together with any other incidental rights, powers and discretions; and (iii) to give any authorizations and confirmations to be given by the Collateral Agent (in its capacity as security trustee) on behalf of the Finance Parties under the English Security Documents.

(l)     The Collateral Agent may accept without inquiry the title (if any) which any person may have to the Charged Property.

(m)     Each other Finance Party confirms that it does not wish to be registered as a joint proprietor of any security interest constituted by an English Security Document and accordingly authorizes: (a) the Collateral Agent to hold such security interest in its sole name (or in the name of any Delegate) as trustee for the Finance Parties; and (b) the HM Land Registry (or other relevant registry) to register the Collateral Agent (or any Delegate or Appointee) as a sole proprietor of such security interest.

(n)      Except to the extent that an English Security Document otherwise requires, any moneys which the Collateral Agent receives under or pursuant to an English Security Document may be: (a) invested in any investments which the Collateral Agent selects and which are authorized by applicable law; or (b) placed on deposit at any bank or institution (including the Collateral Agent) on terms that the Collateral Agent thinks fit, in each case in the name or under the control of the Collateral Agent, and the Collateral Agent shall hold those moneys, together with any accrued income (net of any applicable Tax) to the order of the Lenders, and shall pay them to the Lenders on demand.

(o)      On a disposal of any of the Charged Property which is permitted under the Loan Documents, the Collateral Agent shall (at the cost of the Loan Parties) execute any release of the English Security Documents or other claim over that Charged Property and issue any certificates of non-crystallisation of floating charges that may be required or take any other action that the Collateral Agent considers desirable.

(p)      The Collateral Agent shall not be liable for:

(i)      any defect in or failure of the title (if any) which any person may have to any assets over which security is intended to be created by an English Security Document;

(ii)      any loss resulting from the investment or deposit at any bank of moneys which it invests or deposits in a manner permitted by the Loan Documents;

(iii)      the exercise of, or the failure to exercise, any right, power or discretion given to it by or in connection with any Loan Document or any other agreement, arrangement or document entered into, or executed in anticipation of, under or in connection with, any Loan Document; or

(iv)      any shortfall which arises on enforcing an English Security Document.

(q)      The Collateral Agent shall not be obligated to:

(i)      obtain any authorization or environmental permit in respect of any of the Charged Property or an English Security Document;

(ii)      hold in its own possession an English Security Document, title deed or other document relating to the Charged Property or an English Security Document;

(iii)      perfect, protect, register, make any filing or give any notice in respect of an English Security Document (or the order of ranking of an English Security Document), unless that failure arises directly from its own gross negligence or willful misconduct; or

(iv)      require any further assurances in relation to an English Security Document.

(r)      In respect of any English Security Document, the Collateral Agent shall not be obligated to: (i) insure, or require any other person to insure, the Charged Property; or (ii) make any enquiry or conduct any investigation into the legality, validity, effectiveness, adequacy or enforceability of any insurance existing over such Charged Property.

(s)      In respect of any English Security Document, the Collateral Agent shall not have any obligation or duty to any person for any loss suffered as a result of: (i) the lack or inadequacy of any insurance; or (ii) the failure of the Collateral Agent to notify the insurers of any material fact relating to the risk assumed by them, or of any other information of any kind, unless Required Lenders have

146

requested it to do so in writing and the Collateral Agent has failed to do so within fourteen (14) days after receipt of that request.

(t)    Every appointment of a successor Collateral Agent under an English Security Document shall be by deed.

(u)    Section 1 of the Trustee Act 2000 (UK) shall not apply to the duty of the Collateral Agent in relation to the trusts constituted by this Agreement.

(v)    In the case of any conflict between the provisions of this Agreement and those of the Trustee Act 1925 (UK) or the Trustee Act 2000 (UK), the provisions of this Agreement shall prevail to the extent allowed by law, and shall constitute a restriction or exclusion for the purposes of the Trustee Act 2000 (UK).

(w)    The rights, powers and discretions conferred upon the Collateral Agent by this Agreement shall be supplemental to the Trustee Act 1925 (UK) and the Trustee Act 2000 (UK) and in addition to any which may be vested in the Collateral Agent by any other Loan Document by general law or otherwise.

(x)    The perpetuity period under the rule against perpetuities if applicable to this Agreement and any English Security Document shall be 125 years from the date of this Agreement.

## ARTICLE X.

## MISCELLANEOUS

**Section 10.01**    Amendments, etc.

(a)    *Amendments Generally*.    Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders or such other number or percentage of the Lenders as may be specified herein) and the Borrower (with a copy of all such amendments provided to the Administrative Agent), and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that the Administrative Agent and the Borrower may, without the consent of the other Lenders, amend, modify or supplement this Agreement and any other Loan Document in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause any such Loan Document to be consistent with this Agreement and the other Loan Documents; and provided further that if the Administrative Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any ambiguity, omission, typographical error, defect or inconsistency of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the Administrative Agent (acting in its sole discretion) and the Borrower or any other relevant Loan Party shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document.

(b)    *Amendments and Waivers Pertinent to Affected Lenders*.    Notwithstanding

clause (a) above, no amendment, waiver or consent shall:

(i)        extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, mandatory prepayment or mandatory reduction of any Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(ii)        postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest (other than Default interest), fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby;

(iii)        reduce or forgive the principal of, or the rate of interest or any premium specified herein (including the Prepayment Premium) on, any Loan or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; provided, however, that only the consent of the Required Lenders will be required to amend the definition of "Default Rate";

(iv)        other than to the extent required to make the Lenders under Incremental ~~Term Loans, Incremental Tranche A~~ Term Loans, Refinancing Loans or Extended Loans, share, or, at their option, not share, in pro rata payments, change Section 2.08, Section 2.09 or Section 8.03 in a manner that would alter the pro rata sharing of payments or the order of payment required thereby without the written consent of each Lender directly affected thereby;

(v)        except in connection with the implementation of any Incremental ~~Term Loans, Incremental Term Loan Commitments, Incremental Tranche A Term Loan Commitments, Incremental Tranche A~~ Term Loans, Refinancing Loans or Extended Loans, change any provision of this Section 10.01 or the definition of "Applicable Percentage" or "Required Lenders" or any other provision hereof specifying the percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender which is a Lender of the applicable Class so specified;

(vi)        permit the assignment or delegation by the Borrower of any of its rights or obligations under any Loan Document, without the written consent of each Lender;

(vii)        subordinate the Senior Credit Obligations by contract to any other obligation without the written consent of each Lender;

(viii)        (a) release all or substantially all of the value of the Guaranty Agreement without the written consent of each Lender (provided that the Administrative Agent may, without the consent of any Lender, release any Guarantor (or all or substantially all of the assets of a Guarantor) that is sold or transferred (other than to any Loan Party) in compliance with Section 7.03 or released in compliance with Section 9.11) or (b) release the Borrower from the Guaranty Agreement without the written consent of each Lender;

(ix)        release all or substantially all of the Collateral securing the Senior Credit

Obligations hereunder without the written consent of each Lender (<u>provided</u> that the Collateral Agent may, without consent from any other Lender, release any Collateral that is sold or transferred by a Loan Party (other than to any other Loan Party) in compliance with <u>Section 7.03</u> or released in compliance with <u>Section 9.11</u>);

(x)    impose any greater restrictions on the ability of the Lenders of any Class to assign any of their respective rights or obligations hereunder without the written consent of each Lender of such Class; and

(xi)    adversely affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document, without the prior written consent of the Administrative Agent.

Notwithstanding anything to the contrary contained in this <u>Section 10.01</u>, (i) this Agreement and the other Loan Documents may be amended, modified or supplemented with the consent of the Administrative Agent and/or the Collateral Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment is delivered in order to effectuate any amendment, modification or supplement pursuant to the proviso of <u>Section 10.01(a)</u> and (ii) subject to clause (i) of the definition of "Required Lenders," any amendment or waiver that by its terms affects the rights or duties of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) will require only the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto if such Class of Lenders were the only Class of Lenders; provided that, with respect to; provided that, for purposes of determining the Required Lenders, the Credit Exposure of any Lender that is a Vista Investor shall be deemed to be held by, and the Credit Exposure of such Lender shall be voted by, VCP.

Each Lender and each holder of a Term Note shall be bound by any waiver, amendment or modification authorized by this <u>Section 10.01</u> regardless of whether its Term Note shall have been marked to make reference therein, and any consent by any Lender or holder of a Term Note pursuant to this <u>Section 10.01</u> shall bind any Person subsequently acquiring a Term Note from it, whether or not such Term Note shall have been so marked.

Notwithstanding the foregoing, no Lender consent is required to effect any amendment or supplement to any Intercreditor Agreement (i) that is for the purpose of adding the holders of holders of Indebtedness secured by Liens on the Collateral that are *pari passu* with the Liens on the Collateral securing the Senior Credit Obligations and permitted hereunder or the holders of Indebtedness secured by Liens on the Collateral that are junior to the Liens on the Collateral securing the Senior Credit Obligations, in each case, as parties thereto, as expressly contemplated by the terms of such Intercreditor Agreement (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and provided, that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by such Intercreditor Agreement).

Notwithstanding anything to the contrary in this <u>Section 10.01</u>, any Additional Credit Extension Amendment or Refinancing Amendment shall be effective in accordance with the terms specifically provided in <u>Sections 2.01</u>, ~~2.11,~~ <u>2.13</u> or <u>2.14</u>, as applicable.

**Section 10.02**    <u>Notices</u>.

(a)    *Generally*.  Except in the case of notices and other communications expressly

permitted to be given by telephone (and except as provided in <u>clause (b)</u> below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)    if to the Borrower or any Loan Party, to the Borrower at:

Afiniti, Inc.
1701 Pennsylvania Ave. NW
Suite 600
Washington, DC 20006
Attn: Chief Financial Officer with a copy to General Counsel
Fax: N/A
Email: legal@afiniti.com

with a copy to (which shall not constitute notice)

LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Attention: Nicole Fanjul
Telephone: 1.212.906.1712
Email: nicole.fanjul@lw.com
~~WILMER CUTLER PICKERING HALE AND DORR LLP~~
~~1875 Pennsylvania Avenue NW~~
~~Washington, DC 20006~~
~~Attn: Justin Ochs, Stephanie Evans~~
~~Fax: (202) 663-6363~~
~~Email: justin.ochs@wilmerhale.com; stephanie.evans@wilmerhale.com~~
and

LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Attention:  Jason Gott
Telephone:  1.312.876.7678
Email:  jason.gott@lw.com

(ii)    if to the Administrative Agent or the Collateral Agent, at:

VCP CAPITAL MARKETS, LLC
Four Embarcadero Center, 20th Floor
San Francisco, CA 94111
Attention: David Flannery
Fax: 415-765-6666
Email: dflannery@vistacreditpartners.com

with a copy to (which shall not constitute notice)

~~AMERICAS/2024214501.1~~AMERICAS/2024274802.21

~~AKIN GUMP STRAUSS HAUER & FELD LLP~~
~~One Bryant Park~~ALLEN OVERY SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, New York ~~10036~~10022
Attn: ~~Frederick Lee, Daniel Fisher~~Mark Shapiro, Frank Oliver
~~Fax: (212) 872-1002~~
Email: ~~flee@akingump.com;~~
~~dfisher@akingump~~Mark.Shapiro@AOShearman.com;
Frank.Oliver@AOshearman.com

(iii)    if to a Lender, to it at its address (or its telecopier number, electronic email address or telephone number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in clause (b) below shall be effective as provided in said clause (b).

(b)    *Electronic Communications*.  Notices and other communications to the Agents and the Lenders hereunder may (subject to Section 10.02(d)) be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent, the Collateral Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it (including as set forth in Section 10.02(d)); provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    *Change of Address, etc*.  Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(d)    *Posting*.  Each Loan Party hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document,

including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new Borrowing or other extension of credit, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications, collectively, the "Communications"; such excluded communications the "Excluded Communications"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at ~~VistaAgency@cortlandglobal.com and tabernethy@vistacreditpartners.com~~ VistaAgency@cortlandglobal.com and tabernethy@vistacreditpartners.com, or at such other e-mail address(es) provided to the Borrower from time to time or in such other form, including hard copy delivery thereof, as the Administrative Agent shall require. In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document or in such other form, including hard copy delivery thereof, as the Administrative Agent shall require. Nothing in this Section 10.02 shall prejudice the right of the Agents, any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as any such Agent shall require. Excluded Communications shall be delivered to the Administrative Agent by facsimile communication or as the Administrative Agent shall direct.

The Communications required to be delivered pursuant to Section 6.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i), in the case of financial statements and Communications referred to in Sections 6.01(a), (b) and (c) and Section 6.02 on which such financial statements and/or appropriate disclosures are publicly available as posted on the Electronic Data Gathering, Analysis and Retrieval system (EDGAR) or any successor filing system of the SEC, (ii) Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet; or (iii) on which such documents are posted on the Borrower's behalf on an Internet or Intranet website, if any, to which the Administrative Agent has access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) upon written request by the Administrative Agent, the Borrower shall deliver copies (which may be electronic) of such documents to the Administrative Agent until a written request to cease delivering copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent (and each Lender if there is at the time no incumbent Administrative Agent) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e. soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents. Furthermore, if any financial statement, certificate or other information required to be delivered pursuant to Section 6.01 shall be required to be delivered on any date that is not a Business Day, such financial statement, certificate or other information may be delivered to the Administrative Agent on the next succeeding Business Day after such date.

To the extent consented to by the Administrative Agent in writing from time to time, the Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents; provided that the Borrower shall also deliver to the Administrative Agent an executed original of each Compliance Certificate required to be delivered

hereunder.

Each Loan Party further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on a Platform. The Platform is provided "as is" and "as available." The Agents do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties have any liability to the Loan Parties, any Lender or any other Person for damages of any kind, including direct or indirect, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through the Internet, except to the extent the liability of such Person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Person's gross negligence, bad faith or willful misconduct. Additionally, in no event shall the Administrative Agent or any of its Related Parties have any liability to the Loan Parties, any Lender or any other Person for any special, incidental or consequential damages.

The Borrower hereby acknowledges that the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform").

**Section 10.03**    No Waiver; Cumulative Remedies. No failure by any Lender or by the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

**Section 10.04**    Expenses; Indemnity; Damage Waiver.

(a)    *Costs and Expenses*. The Loan Parties, jointly and severally, agree to pay (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent and the Collateral Agent and their respective Affiliates (including the reasonable and documented out-of-pocket fees, charges and disbursements of one counsel for the Administrative Agent and/or the Collateral Agent and any local counsel reasonably necessary) in connection with the closing of the Loans provided for herein, the preparation, negotiation, execution, and delivery of this Agreement and the other Loan Documents or, with respect to the Administrative Agent and Collateral Agent, any administration, amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including in connection with post-closing searches to confirm that filings and recordations have been properly made and including any costs and expenses of the service provider referred to in Section 9.03, and its protection of its rights and remedies (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.04, or (B) in connection with the Loans made hereunder, including all such reasonable out-of-pocket expenses incurred during any legal proceeding, including any Insolvency or Liquidation Proceeding, and including in connection with the enforcement or protection of their rights, any workout, restructuring or negotiations in respect of such Loans, and (ii) all reasonable and documented out of pocket expenses incurred by

the Administrative Agent, the Collateral Agent or any Lender (including the reasonable and documented fees, charges and disbursements of counsel for the Administrative Agent, the Collateral Agent or any Lender), in connection with the enforcement or protection of its rights and remedies (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.04, or (B) in connection with the Loans made issued hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any legal proceeding, including any proceeding under any Bankruptcy Law, and including in connection with any workout, restructuring or negotiations in respect of such Loans; provided, however, that (x) the Borrower will not be required to pay the fees and expenses of more than one lead counsel to the Administrative Agent, the Collateral Agent or any Lender (plus one local counsel in each applicable local jurisdiction and one specialty counsel in each applicable specialty) and, in the case of an actual or potential conflict of interest, one additional counsel per affected party in connection with the enforcement or protection of its rights and remedies and (y) (A) the Borrower shall reimburse legal expenses of the Administrative Agent and the Collateral Agent and their respective Affiliates in connection with the closing of the Loans provided for herein (including the post-closing obligations set forth in Section 6.11) and the preparation, negotiation, execution, and delivery of this Agreement and the other Loan Documents in an amount not to exceed $375,000.

(b)     *Indemnification by Borrower*.  The Loan Parties, jointly and severally, shall indemnify the Administrative Agent (and any sub-agent thereof), the Collateral Agent (and any sub-agent thereof), and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs (including settlement costs), disbursements and out-of-pocket fees and expenses (including the fees, charges and disbursements of counsel) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof, or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby, thereby, or related thereto or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release or threatened Release of Hazardous Materials on, at, under or from any property owned, leased or operated by the Parent NewCo or any of its Subsidiaries at any time, or any Environmental Liability related in any way to the Parent NewCo or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence, bad faith, material breach or willful misconduct of such Indemnitee or a Related Party thereof, or (y) disputes solely among Indemnitees not involving any act or omission of any Loan Party or any of their respective Related Parties (other than a dispute against the Administrative Agent or Collateral Agent in their capacities as such); provided, further, that the Loan Parties shall not be required to reimburse the legal fees and expenses of more than one counsel (in addition to one special counsel in each specialty area, up to one local counsel in each applicable local jurisdiction and any additional counsel for an

Indemnified Party reasonably deemed appropriate by virtue of potential conflicts of interests incurred in connection with investigating, defending or preparing to defend any such action, suit, proceeding (including any inquiry or investigation) or claim (whether or not any Agent, any Lender or any other such Indemnified Party is a party to any action or proceeding out of which any such expenses arise)). This Section 10.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, or liabilities arising from any non-Tax claim.

(c)       *Waiver of Consequential Damages, Etc*.  To the full extent permitted by applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, and each of the Agents and each Lender agrees not to assert or permit any of their respective Subsidiaries to assert any claim against ~~the Parent~~NewCo or any of its Subsidiaries or any of their respective directors, officers, employees, attorneys, agents or advisors, on any theory of liability, for special, indirect, consequential (including, without limitation, any loss of profits, business or anticipated savings) or punitive damages (in each case, as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof (for the avoidance of doubt, nothing in this Section 10.04(c) shall limit any Indemnitee's right to indemnification provisions for third party claims as set forth in Section 10.04(b)).   No Indemnitee referred to in clause (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnitee is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnitee's gross negligence, bad faith or willful misconduct.

(d)       *Payments*.  All amounts due under this Section shall be payable not later than thirty (30) days after receipt of invoice in reasonable detail of such amounts.

(e)       *Survival*.  The agreements in this Section shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Senior Credit Obligations.

Section 10.05    Payments Set Aside.  To the extent permitted by applicable law, to the extent that any payment by or on behalf of the Borrower or any other Loan Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Insolvency or Liquidation Proceeding or otherwise, then (i) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (ii) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate *per annum* equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (ii) of the preceding sentence shall survive the payment in full of the Senior Credit Obligations and the termination of this Agreement.

**Section 10.06**     Successors and Assigns.

(a)     *Successors and Assigns Generally*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of clause (b) below, (ii) by way of participation in accordance with the provisions of clause (d) below or (iii) by way of pledge or assignment of a security interest subject to the restrictions of clause (f) below (and any other attempted assignment or transfer by the Borrower or any Lender shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in clause (d) below and, to the extent expressly contemplated hereby, the other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     *Assignments by Lenders*.  Any Lender may at any time assign to one or more Eligible Assignees (which Eligible Assignees, for the avoidance of doubt, shall not include any Disqualified Institution), all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitments and the Loans at the time owing to it; provided, however, that:

(i)     each of the Administrative Agent and the Borrower shall consent (such consent not to be unreasonably withheld or delayed), unless (x) an Event of Default has occurred and is continuing at the time of such assignment, (y) such assignment is to a Lender, an Affiliate of a Lender, an Approved Fund or (z) pursuant to clause (g) below; provided that, the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after the Borrower has received notice thereof; provided further, that the Borrower shall be deemed to have consented to any such assignment made to an Eligible Assignee (other than any Disqualified Institution) listed on Schedule 10.06 within 90 days of the Closing Date; provided further, that the Administrative Agent consent shall not be required with respect to assignments of Restructuring Second Lien Term Loans in excess of $3,000,000;

(ii)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lenders' rights and obligations under this Agreement with respect to the class of Loans or the class of Commitment assigned;

(iii)     No such assignment shall be made to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (iv); and

(iv)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative

Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs~~.~~:

(v)     The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment**.** The assignee, if it is not a Lender, shall deliver to the Administrative Agent any such administrative questionnaire as the Administrative Agent may request together with organizational documents, other information requested by the Administrative Agent that may be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act~~.~~; and

(vi)    In connection with any assignment of rights and obligations of any Restructuring Second Lien Term Loan (other than Restructuring Second Lien Term Loans originally issued pursuant to the Rights Offering or the Backstop Commitment, including any Equivalent Notes), other than to an Affiliate of the assigning Lender, (x) such assigning Lender shall provide written notice of such assignment to the Administrative Agent ten Business Days prior the expected completion of such assignment and such written notice shall include the amount of the Restructuring Second Lien Term Loans proposed to be assigned, the cash purchase price of such assignment and any other material terms with respect to such assignment (the "ROFR Notice"), (y) following the receipt of such ROFR Notice the Administrative Agent shall within five Business Days provide written notice to VCP of such proposed assignment with the same details as provided to the Administrative Agent in the ROFR Notice and (z) upon the receipt of such written notice from the Administrative Agent, VCP shall, at its sole option, have five Business Days to send to the Administrative Agent an irrevocable written notice of purchase with respect such assignment on the same terms as set forth in the ROFR Notice and the assignment shall be completed with VCP within a reasonable amount of time.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) below, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.02, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement

that does not comply with this clause (b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (d) below.

(c)     _Register_.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The Register shall record each transfer of the Loans to a transferee upon written notification by the registered owner of such transfer; provided, however, that failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments in respect of any Loan.  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender.  The Register shall be available for inspection by the Borrower, the Collateral Agent and, with respect to its own interest only, any other Lender, at any reasonable time and from time to time upon reasonable prior written notice.

(d)     _Participations_.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent sell participations to any Person (other than a natural Person, the Borrower or any of its Subsidiaries, or any Disqualified Institution; provided, however, that, participations may be sold to Disqualified Institutions unless a list of Disqualified Institutions has been made available to all Lenders by or on behalf of the Borrower) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clauses (i), (ii) or (iii) of Section 10.01(b) that directly affects such Participant.  Subject to clause (e) below, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 or 3.02 (subject to the requirements and limitations of such Sections) to the same extent as if it were a Lender (but, with respect to any particular Participant, to no greater extent than the Lender that sold the participation to such Participant) and had acquired its interest by assignment pursuant to clause (b) above; provided that such Participant agrees to be subject to the provisions of Section 3.03 as if it were an assignee under clause (b) above.  To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender (but, with respect to any particular Participant, to no greater extent than the Lender that sold the participation to such Participant); provided such Participant agrees to be subject to Section 2.09 as though it were a Lender.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each

Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Borrowings or other obligations under any Loan Document) except to the extent that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any such Commitment, Borrowing or other obligation is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations (and, in each case, any amended or successor versions).  The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

No participation shall be or shall be deemed to be a discharge, rescission, extinguishment or substitution of any outstanding Loan and any Loan subject to a participation shall continue to be the same obligation and not a new obligation.

(e)    *Limitations on Participant Rights*.  A Participant shall not be entitled to receive any greater payment under Sections 3.01 or 3.02 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(f)    *Electronic Execution of Assignments*.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(g)    *Certain Pledges*.  Any Lender that is an Affiliate of the Agent may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and in connection with such pledge, such Lender may assign all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitments and the Loans, to the holders of such pledge.

(h)    *Equivalent Notes Assignment*.  Pursuant to the Backstop Commitment Agreement, if (i) Restructuring Second Lien Term Loans have not been assigned pursuant to the Rights Offering in an amount of at least $5,000,000, (ii) Equivalent Notes have been incurred by the Borrower and (iii) the Rights Offering has raised proceeds of at least $10,000,000 (the "Excess Equivalent Notes"), the purchasers of Restructuring Second Lien Term Loans pursuant to the Backstop Commitment shall be required to assign to the Borrowers Restructuring Second Lien Term Loans in the amount of the Excess Equivalent Notes (up to $5,000,000) incurred by the Borrower less any Restructuring Second Lien Term Loans assigned pursuant to the Rights Offering and such Restructuring Second Lien Term Loans shall be immediately cancelled by the Administrative Agent. Any assignment pursuant to the Rights Offering shall be made without needing to comply with any other requirement set forth in this Section 10.06.

**Section 10.07**    Treatment of Certain Information; Confidentiality.  Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that

Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors, managing members or managers, counsel, accountants and other representatives (collectively, "Representatives") solely in connection with the transactions contemplated hereby (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority or regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners) (in which case, the Administrative Agent or such Lender, as applicable, shall use reasonable efforts to notify the Borrower prior to such disclosure to the extent practicable and legally permitted to do so), (c) to the extent required by applicable Laws or by any subpoena or similar legal process, (d) to any other party hereto (it being understood and agreed that the materials provided pursuant to Section 6.06(a)(i) may not be shared by the Administrative Agent and/or Vista Credit Partners, L.P. or any Affiliate thereof to any other party hereto), (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) to any state, federal or foreign authority or examiner regulating any Lender, (g) (i) any rating agency, and (ii) except with respect to the materials provided pursuant to Section 6.06(a)(i), subject to an agreement containing provisions substantially the same as those of this Section 10.07, to (x) any assignee of or Participant (other than any Disqualified Institution; provided, however, that, participations may be sold to Disqualified Institutions unless a list of Disqualified Institutions has been made available to all Lenders by or on behalf of the Borrower) in (or their Representatives, it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), or any prospective assignee of or Participant in (or their Representatives, it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) any of its rights or obligations under this Agreement or (y) any actual or prospective counterparty (or its Representatives, it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) to any swap or derivative transaction relating to the Borrower and its obligations, (h) with the consent of the Borrower or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section and not in breach of any agreement binding on any Person (to the knowledge of such Person) or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower.  For purposes of this Section, "Information" means all information received from or on behalf of ~~the Parent~~NewCo or any of its Subsidiaries relating to ~~the Parent~~NewCo or any of its Subsidiaries or any of their respective businesses or Affiliates, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by ~~the Parent~~NewCo or any of its Subsidiaries.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

            **Section 10.08**    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the full extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the then due and owing obligations of the Borrower or such Loan Party, as applicable, now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document or (x) such obligations may

be contingent or unmatured or (y) are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.12 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Senior Credit Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

       **Section 10.09**    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof and (iii) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Senior Credit Obligations hereunder.

       **Section 10.10**    Counterparts; Integration; Effectiveness.    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof; provided that, notwithstanding anything contained herein, the Fee Letter shall survive the Closing Date.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

       **Section 10.11**    Survival of Agreement.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents or any Lender may have had notice or knowledge of any Default, Event of Default, or incorrect representation or warranty at the time of any Borrowing, and shall continue in full force and effect until the Discharge of Senior Credit Obligations.  The provisions of Sections 2.10, 3.01, 3.02, 10.04, and Sections 10.10 through 10.14 shall survive and remain in full force and effect regardless of the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

**Section 10.12**    _Severability_.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Bankruptcy Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**Section 10.13**    Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial.

(a)    _Governing Law_.  This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein), and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the Law of the State of New York. For the avoidance of doubt, the tax treatment set forth in Section 2.16 shall not have any impact or effect on the security interests and liens granted by any of the Collateral Documents.

(b)    _Submission to Jurisdiction_.  Each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the full extent permitted by applicable Law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)    _Waiver of Venue_.  Each party hereby irrevocably and unconditionally waives, to the full extent permitted by applicable Laws, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 10.13(b).  Each of the parties hereto hereby irrevocably waives, to the full extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    _Service of Process_.  Each party hereto irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than telecopier) in Section 10.02.  Nothing in this Agreement or any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by applicable Laws.

(e)    _Waiver of Jury Trial_.  Each party hereby waives, to the full extent permitted by

applicable Laws, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement, any other Loan Document or the transactions contemplated hereby (whether based on contract, tort or any other theory). Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this <u>Section 10.13</u>.

        **Section 10.14**   <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby, the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (i) the credit facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower and its Affiliates, on the one hand, and the Administrative Agent, the Collateral Agent and the Lenders, on the other hand, and the Borrower is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the Administrative Agent and the Collateral Agent are and have been acting solely as a principal and are not the agent or fiduciary for the Borrower or any of its Affiliates, stockholders, creditors or employees or any other Person; (iii) neither the Administrative Agent, the Collateral Agent has not assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether the Administrative Agent or the Collateral Agent has advised or is currently advising the Borrower or any of its Affiliates on other matters) and neither the Administrative Agent nor the Collateral Agent has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Administrative Agent and the Collateral Agent and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and neither the Administrative Agent nor the Collateral Agent has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Administrative Agent and the Collateral Agent have not provided and will not provide any legal, accounting, regulatory or Tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Borrower has consulted its own legal, accounting, regulatory and Tax advisors to the extent it has deemed appropriate.  The Borrower hereby waives and releases, to the full extent permitted by law, any claims that it may have against the Administrative Agent and the Collateral Agent with respect to any breach or alleged breach of agency or fiduciary duty.

        **[*Signature Pages Intentionally Omitted*]**

ANNEX B

Schedules 7.01(e), 7.01(s), 7.02(g), 7.03(a), 7.05(m) and 7.08

[Attached]

ANNEX C

Schedules 1.01(a), 1.01(b), 2.01, 5,12, 5.15, 7.01, 7.02, 7.04 and 7.05

[Attached]

**Schedule 2.01**

**Lenders and Commitments**

[On file with the Administrative Agent]

ANNEX D

Exhibit L (Form of Agreement Among Lenders/Intercreditor Agreement)

[Attached]

Exhibit M (Form of First Lien Cash/PIK Election Notice)

[Attached]

Exhibit N (Form of Second Lien Cash/PIK Election Notice)

[Attached]

ANNEX E

Exhibit D (Form of Compliance Certificate)

[Attached]

**<u>Exhibit D</u>**

**Term Loan Credit Agreement Amendment Security Related Documents**

*Agreed Form*

**SECURITY AGREEMENT**

**dated as of [  ], 2024**

**among**

**AFINITI NEWCO HOLDINGS LLC,**

**THE GRANTORS FROM TIME TO TIME PARTY HERETO**

**and**

**VCP CAPITAL MARKETS, LLC,**
**as Collateral Agent**

**TABLE OF CONTENTS**

**Page**

ARTICLE I

DEFINITIONS

Section 1.01    Credit Agreement................................................................................ 1
Section 1.02    Other Defined Terms ......................................................................... 1

ARTICLE II

PLEDGE OF SECURITIES

Section 2.01    Pledge ................................................................................................ 6
Section 2.02    Delivery of the Pledged Securities..................................................... 6
Section 2.03    Representations, Warranties and Covenants Relating to Pledged Collateral...................... 7
Section 2.04    Certification of Limited Liability Company and Limited Partnership Interests ............... 8
Section 2.05    Registration in Nominee Name; Denominations ................................. 8
Section 2.06    Voting Rights; Dividends and Interest................................................ 8

ARTICLE III

SECURITY INTERESTS IN PERSONAL PROPERTY

Section 3.01    Security Interest ............................................................................... 10
Section 3.02    Representations and Warranties Relating to Article 9 Collateral ..................... 11
Section 3.03    Covenants.......................................................................................... 13

ARTICLE IV

REMEDIES

Section 4.01    Remedies Upon Default .................................................................... 15
Section 4.02    Application of Proceeds .................................................................... 16

ARTICLE V

SUBORDINATION

Section 5.01    Subordination.................................................................................... 17

ARTICLE VI

MISCELLANEOUS

Section 6.01    Notices .............................................................................................. 17
Section 6.02    Waivers; Amendment ....................................................................... 17
Section 6.03    Collateral Agent's Fees and Expenses; Indemnification ................... 18
Section 6.04    Successors and Assigns .................................................................... 18

Section 6.05    Survival of Agreement ........................................................................... 18
Section 6.06    Counterparts; Effectiveness; Several Agreement ................................... 18
Section 6.07    Severability ............................................................................................ 18
Section 6.08    Governing Law; Jurisdiction; Venue; Waiver of Jury Trial; Consent to Service of
               Process ................................................................................................... 19
Section 6.09    Headings ................................................................................................. 19
Section 6.10    Termination or Release .......................................................................... 19
Section 6.11    Additional Grantors ............................................................................... 19
Section 6.12    Collateral Agent Appointed Attorney-in-Fact ...................................... 20
Section 6.13    General Authority of the Collateral Agent ............................................. 21
Section 6.14    Reasonable Care ..................................................................................... 21
Section 6.15    Reinstatement ........................................................................................ 21
Section 6.16    Miscellaneous ........................................................................................ 21

*Schedules*
Schedule I        Subsidiary Parties
Schedule II       Pledged Equity and Pledged Debt
Schedule III      Commercial Tort Claims
Schedule IV       Intellectual Property

*Exhibits*
Exhibit I         Form of Perfection Certificate
Exhibit II        Form of Patent Security Agreement
Exhibit III       Form of Trademark Security Agreement
Exhibit IV        Form of Copyright Security Agreement

# SECURITY AGREEMENT

This **SECURITY AGREEMENT** (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), is entered into as of [  ], 2024, by and among the Grantors (as defined below) and VCP Capital Markets, LLC, as Collateral Agent for the Secured Parties (in such capacity, the "**Collateral Agent**").

Reference is made to that certain Term Loan Credit Agreement, dated as of June 13, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Afiniti, Inc., a Delaware corporation (the "**Borrower**"), Afiniti Ltd., a Bermuda exempted company (the "**Parent**") (as succeeded by Afiniti Newco Holdings LLC, a Delaware limited liability company ("**NewCo**")), VCP Capital Markets, LLC, as Administrative Agent and Collateral Agent, and each lender from time to time party thereto (collectively, the "**Lenders**" and individually, a "**Lender**"). The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement. The obligations of the Lenders to extend such credit are conditioned upon, among other things, the execution and delivery of this Agreement. The Guarantors are affiliates of the Borrower, will derive substantial direct and indirect benefits from the extension of credit to the Borrower pursuant to the Credit Agreement and are willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit.

Now, therefore, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and with the intent to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I

### Definitions

Section 1.01    Credit Agreement.

(a)    Capitalized terms used in this Agreement and not otherwise defined herein have the respective meanings assigned thereto in the Credit Agreement. Unless otherwise defined in this Agreement or the Credit Agreement, terms defined in Article 8 or Article 9 of the UCC are used in this Agreement as such terms are so defined in Article 8 or Article 9 of the UCC.

(b)    The interpretative provisions of Section 1.02 of the Credit Agreement also apply to this Agreement.

Section 1.02    Other Defined Terms. As used in this Agreement, the following terms have the respective meanings specified below:

"**Account Debtor**" means any Person who is or who may become obligated to any Grantor under, with respect to or on account of an Account.

"**Agreement**" has the meaning specified in the preamble.

"**Article 9 Collateral**" has the meaning assigned to such term in Section 3.01(a).

"**Borrower**" has the meaning assigned to such term in the recitals of this Agreement.

"**Collateral**" means the Article 9 Collateral and the Pledged Collateral but shall in no event include any Excluded Collateral.

"**Collateral Account**" means any Controlled Deposit Account or Controlled Securities Account.

"**Collateral Agent**" has the meaning assigned to such term in the recitals of this Agreement.

"**Commercial Tort Claims**" has the meaning specified in Article 9 of the UCC except that it shall only apply to claims asserted in judicial proceedings.

"**Control Agreement**" means any Deposit Account Control Agreement or Securities Account Control Agreement or any other control agreement delivered in connection with this Agreement.

"**Controlled Deposit Account**" means a deposit account (i) that is subject to a Deposit Account Control Agreement or (ii) as to which the Collateral Agent is the Depositary Bank's "customer" (as defined in Section 4-104 of the UCC).

"**Controlled Securities Account**" means a securities account that (i) is maintained in the name of a Grantor at an office of a Securities Intermediary and (ii) together with all financial assets credited thereto and all related security entitlements, is subject to a Securities Account Control Agreement.

"**Copyright License**" means any contract or agreement, written or oral, now or hereafter in effect, granting any right to any third party under any Copyright now owned or hereafter acquired by any Grantor or that such Grantor otherwise has the right to license, or granting any right to any Grantor under any Copyright now owned or hereafter acquired by any third party, and all rights of such Grantor under any such contract or agreement, and including those copyright licenses under which any Grantor is a licensee listed on <u>Schedule IV</u> hereto.

"**Copyrights**" means any and all rights in any works of authorship, including (i) copyrights and moral rights, (ii) copyright registrations and recordings and renewals thereof and all applications in connection therewith, (iii) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (iv) the right to sue for past, present, and future infringements thereof and (v) all of each Grantor's rights corresponding thereto throughout the world, including, in the case of any Grantor, the Copyrights set forth next to its name on <u>Schedule IV</u> hereto.

"**Credit Agreement**" has the meaning assigned to such term in the recitals of this Agreement.

"**Deposit Account Control Agreement**" means, with respect to a deposit account of a Grantor, a Deposit Account Control Agreement in such form reasonably acceptable to the Collateral Agent among such Grantor, the Collateral Agent and the relevant Depositary Bank.

"**Depositary Bank**" means a bank at which a deposit account of any Grantor is maintained.

"**Excluded Collateral**" means, collectively, (i) Excluded Property, (ii) vehicles and other assets subject to certificates of title, (iii) Letter-of-Credit Rights and Commercial Tort Claims with a value, in each case, less than $1,000,000, (iv) any lease, license, contract or other agreement or any property subject to a purchase money security interest or similar arrangement or where the granting of a security interest in any assets would be prohibited by contract, applicable Law or regulation or the Organization Documents of any non-Wholly Owned Subsidiary (in each case, only to the extent that such contractual provisions are not rendered ineffective by applicable law or otherwise unenforceable), in each case, to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement, purchase money financing, Capital Lease or a similar arrangement or create a right of termination in favor of any other party thereto (other than the Borrower or a Guarantor) after giving effect to the applicable anti-assignment provisions of the UCC, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition, (v) governmental licenses, permits or state and local franchises, charters, and authorizations and any other property and assets to the extent the Collateral Agent may not validly possess a security interest therein under applicable Laws (including without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest therein would require the consent, approval, license or authorization of a Governmental Authority, other than to the extent such prohibition or limitation is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition, (vi) any intent-to-use Trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use Trademark application under applicable federal Law, (vii) Exempt Accounts (other than accounts described in clauses (c) and (d) of the definition thereof), (viii) except as otherwise determined by the Borrower in its sole discretion, the issued and outstanding voting capital stock of any first-tier Excluded Tax Subsidiary that is a CFC in excess of 65% of such voting capital stock and 100% of the non-voting stock of any such Excluded Tax Subsidiary and (ix) those assets as to which the Collateral Agent and the Borrower agree in writing shall be excluded where the costs and burdens of obtaining a security interest therein or perfection thereof outweigh the benefit to the Lenders of the security to be afforded thereby; provided, however, "Excluded Collateral" shall not, with respect to clauses (i) through (ix) above, include any proceeds, substitutions or replacements of Excluded Collateral (unless such proceeds, substitutions or replacements would constitute Excluded Collateral).

"**Exempt Accounts**" means (a) accounts used solely for payroll and payroll taxes, (b) trust and other employee benefit accounts (including accounts for taxes required to be collected, remitted, or withheld) (which contain, with respect to the foregoing clauses (a) and (b), only such funds as are reasonably necessary to meet the Loan Parties' and their Subsidiaries' actual payroll or payroll tax and employee benefit obligations), (c) petty cash and other accounts so long as the amounts on deposit in such accounts do not exceed $500,000 in the aggregate at any one time, (d) zero balance accounts, (e) trust accounts and escrow accounts that contain segregated funds held or received on behalf of any Loan Parties' clients or customers (not including NewCo or any of its Subsidiaries or any other Affiliate), including, without limitation, accounts holding amounts received in connection with customer and client deposits in the ordinary course of business, in each case to, the extent such accounts do not contain funds used or to be used for any other purpose and (f) accounts exclusively holding funds and other property pledged as collateral to secure letters of credit, bank guarantees or similar instruments pursuant to Section 7.02 of the Credit Agreement.

"**Grantors**" means (a) the Borrower, (b) each other Subsidiary of NewCo that is required pursuant to the Credit Agreement to become a party to this Agreement as of the Closing Date and (c) each Subsidiary of NewCo that becomes a party to this Agreement as a Grantor after the Closing Date.

"**Intellectual Property**" means, with respect to any Grantor, all intellectual property and intangible rights now owned or hereafter acquired by any such Grantor, including all Patents, Copyrights, Trademarks, trade secrets, know-how, business methods, inventions (whether or not patentable), algorithms, Software, processes, product designs, industrial designs, blueprints, drawings, data, customer and vendor/supplier lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights, including all intangible rights, therein and all applications for registration, registrations, extensions, and renewals thereof.

"**Intellectual Property Security Agreements**" means the short-form Patent Security Agreement, short-form Trademark Security Agreement, and short-form Copyright Security Agreement, each substantially in the form attached hereto as Exhibits II, III and IV, respectively.

"**License**" means any Patent License, Trademark License, Copyright License or other Intellectual Property license or sublicense agreement, whether written or oral, to which any Grantor is a party, together with any and all (i) renewals, extensions, supplements and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder or with respect thereto including damages and payments for past, present or future infringements or violations thereof, and (iii) rights to sue for past, present and future violations thereof, including those Licenses under which any Grantor is a licensee listed on Schedule IV hereto.

"**Patent License**" means any written agreement, now or hereafter in effect, granting to any third party any right to make, use or sell any invention on which a Patent, now owned or hereafter acquired by any Grantor or that any Grantor otherwise has the right to license, is in existence, or granting to any Grantor any right to make, use or sell any invention on which a Patent, now owned or hereafter acquired by any third party, is in existence, and all rights of any Grantor under any such agreement, and including those exclusive patent licenses under which any Grantor is a licensee listed on Schedule IV hereto.

"**Patents**" means issued patents and patent applications, including (i) all continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and invention disclosures, improvements and enhancements related thereto, (ii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (iii) the right to sue for past, present, and future infringements thereof and (iv) all of each Grantor's rights corresponding thereto throughout the world, including, in the case of any Grantor, the Patents set forth next to its name on Schedule IV hereto.

"**Perfection Certificate**" means with respect to any Loan Party a certificate, substantially in the form of Exhibit I to this Agreement, completed and supplemented with the schedules and attachments contemplated thereby and duly executed on behalf of such Loan Party by a Responsible Officer of such Loan Party.

"**Pledged Collateral**" has the meaning assigned to such term in Section 2.01(vi).

"**Pledged Debt**" has the meaning assigned to such term in Section 2.01(ii).

"**Pledged Equity**" has the meaning assigned to such term in Section 2.01(i).

"**Pledged Securities**" means the Pledged Equity and Pledged Debt.

"**Secured Obligations**" means (a) with respect to the Borrower, the "Senior Credit Obligations" (as defined in the Credit Agreement) and (b) with respect to all other Grantors, the "Guaranteed Obligations" (as defined in the Guaranty Agreement).

"**Secured Parties**" means the "Finance Parties" (as defined in the Credit Agreement).

"**Securities Account Control Agreement**" means, with respect to a securities account of a Grantor, a Securities Account Control Agreement in such form reasonably acceptable to the Collateral Agent among the relevant Securities Intermediary, such Grantor and the Collateral Agent.

"**Security Interest**" has the meaning assigned to such term in Section 3.01(a).

"**Securities Intermediary**" means a clearing corporation or a Person, including, without limitation, a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity.

"**Software**" means computer programs and applications, operating systems, applications, firmware and other codes (whether or not copyrightable), including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof

"**Subsidiary Parties**" means (a) the Subsidiaries of NewCo identified on Schedule I and (b) each other Subsidiary of NewCo that becomes a party to this Agreement as a Subsidiary Party after the Closing Date.

"**Trademark License**" means any written agreement, now or hereafter in effect, granting to any third party any right to use any trademark now or hereafter owned by any Grantor or that any Grantor otherwise has the right to license, or granting to any Grantor any right to use any trademark now or hereafter owned by any third party, and all rights of any Grantor under any such agreement, and including those exclusive trademark licenses under which any Grantor is a licensee listed on Schedule IV hereto.

"**Trademarks**" means any and all trademarks, trade dress, logos, slogans, business and trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, and other indicia of origin, including (i) all renewals and extensions thereof, (ii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, (iv) the goodwill of each Grantor's business symbolized by the foregoing or connected therewith and (v) all of each Grantor's rights corresponding thereto throughout the world, including, in the case of any Grantor, the Trademarks set forth next to its name on Schedule IV hereto.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of the security interest in any Collateral or availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority or availability of such remedy, as the case may be.

"**USCO**" means the United States Copyright Office.

"**USPTO**" means the United States Patent and Trademark Office.

## ARTICLE II

## Pledge of Securities

Section 2.01     Pledge.  As security for the payment or performance, as the case may be, in full of the Secured Obligations, including the Guarantees, each of the Grantors hereby pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in all of such Grantors' right, title and interest in, to and under (in each case, as applicable):

(i)     all Equity Interests held by it (including the Equity Interests that are listed on Schedule II) and any other Equity Interests obtained in the future by such Grantor and the certificates and any other instruments, if any, representing all such Equity Interests (collectively, the "**Pledged Equity**") of any Subsidiary;

(ii)     (A) the debt securities owned by it (including the debt securities listed opposite the name of such Grantor on Schedule II), (B) any debt securities obtained in the future by such Grantor and (C) the promissory notes and any other instruments evidencing such debt securities (the "**Pledged Debt**");

(iii)     all other property that may be delivered to and held by the Collateral Agent pursuant to the terms of this Section 2.01;

(iv)     subject to Section 2.06, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the securities referred to in clauses (i) and (ii) above;

(v)     subject to Section 2.06, all rights and privileges of such Grantor with respect to the securities and other property referred to in clauses (i), (ii), (iii) and (iv) above; and

(vi)     all proceeds of any of the foregoing (the items referred to in clauses (i) through (v) above being collectively referred to as the "**Pledged Collateral**").

Notwithstanding the foregoing, no pledge or security interest is or will be granted pursuant hereto in, and "Pledged Collateral" shall not include any right, title or interest of any Grantor in any Excluded Collateral.

Section 2.02     Delivery of the Pledged Securities.

(a)     Other than as specified in Section 4.01 of the Credit Agreement, each Grantor agrees no later than within the time periods set forth in Sections 6.09 or 6.11 of the Credit Agreement, as applicable, to deliver or cause to be delivered to the Collateral Agent, for the benefit of the Secured Parties, any and all Pledged Equity to the extent certificated, and any and all promissory notes or other instruments representing Pledged Debt in excess of $1,000,000.

-6-

(b)    Upon delivery to the Collateral Agent as required by clause (a) above, any Pledged Securities shall be accompanied by stock or security powers (or allonge or note powers, as applicable) duly executed in blank or, to the extent reasonably satisfactory to the Collateral Agent, other instruments of transfer.  Each delivery of Pledged Securities shall be accompanied by a schedule describing the securities, which schedule shall be deemed to supplement Schedule II, and made a part hereof; provided that the failure to supplement Schedule II shall not affect the validity of such pledge of such Pledged Security.  Each schedule so delivered shall supplement any prior schedules so delivered (except, in each case, if and to the extent the Grantor so delivering delivers to the Collateral Agent such schedule accompanied by written notice signed by an authorized officer of such Grantor, stating that (i) such schedule is intended to replace or correct (as opposed to supplement) any prior schedule, and (ii) the reasons underlying or giving rise to such replacement or correction, as the case may be).

Section 2.03    Representations, Warranties and Covenants Relating to Pledged Collateral.  Each Grantor represents, warrants, on and as of the Closing Date and after giving effect to the making of the Loans and the other financial accommodations on the Closing Date and on and as of each date required by Section 4.02 of the Credit Agreement, and covenants to and with the Collateral Agent, for the benefit of the Secured Parties, until the Commitments have been terminated and the principal of and interest on each Loan and all fees payable under the Credit Agreement have been paid in full, that:

(a)    subject to the provisions of Section 4.01 of the Credit Agreement, all certificates, instruments or promissory notes, if any, representing or evidencing the Pledged Securities in existence on the date hereof and required to be delivered pursuant to Section 2.02 have been delivered to the Collateral Agent accompanied by stock or security powers (or allonge or note powers, as applicable) duly executed in blank or, to the extent reasonably satisfactory to the Collateral Agent, other instruments of transfer (it being understood that on any date of determination for purposes of this Section 2.03(a), with respect to Pledged Securities acquired after the date hereof, this Section 2.03(a) shall only include such Pledged Securities that is required to have been delivered pursuant to Section 2.02 and on or prior to the end of the applicable time periods set forth in Sections 6.09 or 6.11 of the Credit Agreement, as applicable);

(b)    as of the date hereof, Schedule II includes all Pledged Equity required to be delivered by such Grantor hereunder pursuant to Section 2.02;

(c)    such Grantor (i) is and, subject to any Dispositions made in compliance with the Credit Agreement, will continue to be, the direct owner, beneficially and of record, of the Pledged Equity indicated opposite such Grantor's name on Schedule II, (ii) holds the same free and clear of all Liens, other than Liens created by the Collateral Documents and Liens permitted by Section 7.02 of the Credit Agreement, and (iii) will make no assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral, other than Dispositions permitted by the Credit Agreement or Liens permitted by Section 7.02 of the Credit Agreement;

(d)    the execution and performance by the Grantors of this Agreement, including without limitation, the pledge of Collateral hereunder, are within each Grantor's corporate, limited liability company or limited partnership power, as applicable, and have been duly authorized by all necessary corporate, limited liability company or limited partnership action or other organizational action, as applicable;

(e)    no consent or approval of any Governmental Authority, any securities exchange or any other Person was or is necessary to the validity or perfection of the pledge effected hereby, except for (i) filings and registrations necessary to perfect the Liens on the Collateral granted by

the Grantors in favor of the Secured Parties, (ii) requirements imposed by securities laws generally and (iii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given, or made or to be in full force and effect pursuant to any of the Loan Documents) or are as specifically disclosed in the Credit Agreement or schedules thereto; and

(f)        by virtue of the execution and delivery by each Grantor of this Agreement, the proper filing of UCC-1 Financing Statements by the Collateral Agent and delivery of the Pledged Securities required to be delivered pursuant to Section 2.02 to, and continued possession by, the Collateral Agent in the State of New York, the Collateral Agent for the benefit of the Secured Parties (i) subject to Permitted Liens, has a legal, valid and perfected first priority Lien upon and security interest in such Pledged Securities as security for the payment and performance of the Secured Obligations and (ii) will have Control of such Pledged Securities required to be delivered pursuant to Section 2.02 (it being understood and agreed that no representation is being made as to the laws of any foreign jurisdiction).

Subject to the terms of this Agreement and to the extent permitted by applicable Law, each Grantor hereby agrees that following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default, it will comply with instructions of the Collateral Agent with respect to the Equity Interests in such Grantor that constitute Pledged Equity hereunder that are not certificated without further consent by the applicable owner or holder of such Equity Interests.

Section 2.04    Certification of Limited Liability Company and Limited Partnership Interests. No interest in any limited liability company or limited partnership controlled by any Grantor that constitutes Pledged Equity shall be represented by a certificate unless such certificate shall be delivered to the Collateral Agent in accordance with Section 2.02 above. To the extent an interest in any limited liability company or limited partnership controlled by any Grantor and pledged under Section 2.01 is certificated or becomes certificated, (i) each such certificate shall be delivered to the Collateral Agent, pursuant to and to the extent required by Section 2.02(a) and (ii) such Grantor shall fulfill all other requirements under Section 2.02 applicable in respect thereof.

Section 2.05    Registration in Nominee Name; Denominations. Following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default, (a) the Collateral Agent, on behalf of the Secured Parties, shall have the right to hold the Pledged Securities in its own name as pledgee, the name of its nominee (as pledgee or as sub-agent) or the name of the applicable Grantor, endorsed or assigned in blank or in favor of the Collateral Agent and each Grantor will promptly give to the Collateral Agent copies of any notices or other communications received by it with respect to Pledged Equity registered in the name of such Grantor and (b) the Collateral Agent shall have the right to exchange the certificates representing Pledged Equity for certificates of smaller or larger denominations for any purpose consistent with this Agreement, to the extent permitted by the documentation governing such Pledged Securities.

Section 2.06    Voting Rights; Dividends and Interest.

(a)        Prior to the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default:

(i)        Each Grantor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof;

(ii)    The Collateral Agent shall promptly (after reasonable advance notice) execute and deliver to each Grantor, or cause to be executed and delivered to such Grantor, all such proxies, powers of attorney and other instruments as such Grantor may reasonably request in writing for the purpose of enabling such Grantor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above, in each case, as shall be specified in such request and be in form and substance reasonably satisfactory to the Collateral Agent; and

(iii)    Each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Securities to the extent and only to the extent that such dividends, interest, principal and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions of the Credit Agreement and the other Loan Documents; *provided* that any non-cash dividends, interest, principal or other distributions that would constitute Pledged Equity or Pledged Debt, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral, and, if received by any Grantor, shall be, to the extent required pursuant to Section 2.02, forthwith delivered to the Collateral Agent in the same form as so received (with any necessary endorsement reasonably requested by the Collateral Agent).  So long as no Event of Default has occurred and is continuing, the Collateral Agent shall promptly deliver to each Grantor (at the expense of such Grantor) any Pledged Securities in its possession if requested to be delivered to the issuer thereof in connection with any exchange or redemption of such Pledged Securities permitted by the Credit Agreement.

(b)    Following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default, all rights of any Grantor to dividends, interest, principal or other distributions that such Grantor is authorized to receive pursuant to paragraph (a)(iii) of this Section 2.06 at the Collateral Agent's option (expressed in writing to the Borrower) shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions.  All dividends, interest, principal or other distributions received by any Grantor contrary to the provisions of this Section 2.06(b) shall be forthwith delivered to the Collateral Agent upon demand in the same form as so received (with any necessary endorsement reasonably requested by the Collateral Agent).  Any and all money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this paragraph (b) shall be retained by the Collateral Agent in an account to be established by the Collateral Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 4.02.  After all Events of Default have been cured or waived in accordance with Section 10.01 of the Credit Agreement (or to the extent the Secured Obligations have been accelerated, after the Collateral Agent, at the direction of the Required Lenders, has rescinded or revoked such notice of acceleration), the Collateral Agent shall promptly repay to each Grantor (without interest) all dividends, interest, principal or other distributions that such Grantor would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) of this Section 2.06 and that remain in such account.

(c)    Following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default, all rights of any Grantor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 2.06, and the obligations of the Collateral Agent under paragraph (a)(ii) of this Section 2.06, shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers; provided that,

-9-

unless otherwise directed by the Required Lenders, the Collateral Agent shall have the right from time to time following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default to permit the Grantors to exercise such rights.  After all Events of Default have been cured or waived in accordance with Section 10.01 of the Credit Agreement (or to the extent the Secured Obligations have been accelerated, after the Collateral Agent, at the direction of the Required Lenders, has rescinded or revoked such notice of acceleration), each Grantor shall have the exclusive right to exercise the voting and/or consensual rights and powers that such Grantor would otherwise be entitled to exercise pursuant to the terms of paragraph (a)(i) above, and the obligations of the Collateral Agent under paragraph (a)(ii) of this Section 2.06 shall be reinstated.

## ARTICLE III

### Security Interests in Personal Property

Section 3.01    Security Interest.

(a)    As security for the payment or performance, as the case may be, in full of the Secured Obligations, including the Guarantees, each Grantor hereby pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "**Security Interest**") in, all right, title or interest in, to or under any and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "**Article 9 Collateral**"):

(i)    all Accounts;

(ii)    all Chattel Paper;

(iii)    all Documents;

(iv)    all Equipment;

(v)    all General Intangibles;

(vi)    all Goods;

(vii)    all Instruments;

(viii)    all Inventory;

(ix)    all Investment Property;

(x)    all Letter-of-Credit Rights;

(xi)    all Money (including cash), Cash Equivalents and Deposit Accounts;

(xii)    all Intellectual Property and all worldwide rights, title, and interest related thereto, including all Licenses;

(xiii)    all Commercial Tort Claims (including Commercial Tort Claims listed on Schedule III);

(xiv)    all books and records pertaining to the Collateral; and

(xv)    to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all Supporting Obligations, Security Entitlements, collateral security and guarantees given by any Person with respect to any of the foregoing;

provided that, notwithstanding anything to the contrary in this Agreement, no security interest is or will be granted pursuant hereto in, and "Article 9 Collateral" shall not include any right, title or interest of any Grantor in any Excluded Collateral.  Notwithstanding anything to the contrary herein, no Grantor shall be required to take any action with respect to perfection of: (i) any Excluded Collateral, (ii) any Exempt Accounts, (iii) any Letter-of-Credit Rights and Commercial Tort Claims with a value, in each case, less than $1,000,000 and (iv) any Collateral located outside of the Specified Jurisdictions.

(b)    Each Grantor hereby irrevocably authorizes the Collateral Agent for the benefit of the Secured Parties at any time and from time to time (after prior review by the Borrower) to file in any relevant jurisdiction any financing statements or continuation statements with respect to the Article 9 Collateral or any part thereof and amendments thereto that (i) describe the collateral covered thereby in any manner that the Administrative Agent or Collateral Agent reasonably determines is necessary or advisable to ensure the perfection of the security interest in the Article 9 Collateral granted under this Agreement including indicating the Collateral as all assets or all personal property of such Grantor or words of similar effect and (ii) contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment, including whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor.  Each Grantor agrees to provide such information to the Collateral Agent promptly upon any reasonable request.

(c)    The Security Interest is granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Article 9 Collateral.

(d)    Each Grantor hereby further authorizes the Collateral Agent (after prior review by the Borrower) to file with the USPTO, the USCO or any foreign intellectual or industrial property government office in a Specified Jurisdiction (or any successor office) such documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest in any Specified Jurisdiction registered and applied for Intellectual Property of each Grantor in which a security interest has been granted by each Grantor, without the signature of any Grantor, and naming any Grantor or the Grantor as debtors and the Collateral Agent as secured party.

Section 3.02    Representations and Warranties Relating to Article 9 Collateral.  Each Grantor represents and warrants to the Collateral Agent and the Secured Parties that:

(a)    Subject to Liens permitted by Section 7.02 of the Credit Agreement, such Grantor has good and valid rights in and title to the Article 9 Collateral with respect to which it has purported to grant a Security Interest hereunder and has full power and authority to grant to the Collateral Agent the Security Interest in such Article 9 Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other Person other than (i) any consent or approval that has been obtained prior to the date hereof (except to the extent not required to be obtained, taken, given, or made or to be in full force and effect pursuant to any of the Loan Documents (including Section 5.03 of the Credit Agreement)) or (ii) any consent or approval specifically disclosed in the Credit Agreement or schedules thereto.  The Article 9

Collateral is owned by the Grantors free and clear of any Lien, except as expressly permitted pursuant to Section 7.02 of the Credit Agreement.

(b)        Subject to the final sentence of <u>Section 3.01(a)</u>, the Security Interest constitutes (i) a legal and valid security interest in all the Article 9 Collateral securing the payment and performance of the Secured Obligations, (ii) subject to the filings described in <u>Section 3.01(b)</u>, a perfected security interest in all Article 9 Collateral in which a security interest may be perfected by filing, recording or registering a financing statement in the United States (or any political subdivision thereof) pursuant to the UCC, (iii) a security interest that shall be perfected in all Article 9 Collateral (other than with respect to any Copyright that is not material to the business of the Grantors, taken as a whole) in which a security interest may be perfected upon the receipt and recording of the relevant Intellectual Property Security Agreements with the United States Patent and Trademark Office and the United States Copyright Office, as applicable, within the three month period (commencing as of the date hereof) pursuant to 35 U.S.C. § 261 or 15 U.S.C. § 1060 or the one month period (commencing as of the date hereof) pursuant to 17 U.S.C. § 205, (iv) a security interest with respect to any deposit account (other than Exempt Accounts) that will be perfected upon the execution of Deposit Account Control Agreements, (v) a security interest in Letter-of-Credit Rights that are not supporting obligations of Collateral, to the extent such Letter-of-Credit Rights constitute Collateral, that will be perfected upon the execution of a Contract granting control to the Collateral Agent over such Letter-of-Credit Rights, and (vi) a security interest electronic chattel paper that will be perfected upon the completion of all steps necessary to grant control to the Collateral Agent over such electronic chattel paper.  The Security Interest is and shall be prior to any other Lien on any of the Article 9 Collateral, other than (i) any non-consensual Lien that is expressly permitted pursuant to Section 7.02 of the Credit Agreement and has priority as a matter of law and (ii) any other Lien that is expressly permitted pursuant to Section 7.02 of the Credit Agreement.  With respect to any Intellectual Property owned or registered in a non-U.S. jurisdiction other than a Specified Jurisdiction that requires action under the law of such non-U.S. jurisdiction to perfect a security interest therein, such Grantor shall not be required to comply with the applicable provision of this Agreement to cause such security interest to be perfected.

(c)        The Perfection Certificate has been duly prepared, completed and executed and the information set forth therein is correct and complete in all material respects as of the Closing Date.

(d)        Each Grantor represents and warrants that, subject to the time periods set forth in Sections 6.09 and 6.11, as applicable, of the Credit Agreement, short-form Intellectual Property Security Agreements substantially in the form attached hereto as <u>Exhibits II</u>, <u>III</u> and <u>IV</u> and containing a description of all Article 9 Collateral consisting of United States registered and applied for Patents, United States registered Trademarks (and Trademarks for which United States registration applications are pending) and United States registered Copyrights, respectively, have been delivered to the Collateral Agent for recording by the USPTO and the USCO pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder, as applicable, (for the benefit of the Secured Parties) in respect of all Article 9 Collateral consisting of registrations and applications for United States Patents, Trademarks and Copyrights.

(e)        None of the Grantors has filed or consented to (i) the filing of any financing statement or analogous document under the UCC or any other applicable Laws covering any Article 9 Collateral, (ii) any assignment in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with the USPTO or the USCO, or (iii) any assignment in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument

-12-

is still in effect, except, in each case, for Liens not prohibited pursuant to Section 7.02 of the Credit Agreement and assignments not prohibited by the Credit Agreement.

(f)    As of the date hereof, no Grantor has any Commercial Tort Claims having a value (as determined by the Grantor in good faith) in excess of $1,000,000, other than the Commercial Tort Claims listed on Schedule III.

(g)    To the extent required pursuant to Section 3.03(h), all of the deposit accounts of each Grantor are, and all cash and money of each Grantor is held in, Controlled Deposit Accounts or Exempt Accounts.  Unless otherwise permitted pursuant to Section 3.03(h), no Grantor has any securities accounts or otherwise owns or is entitled to any financial assets held in any securities account or securities entitlements other than Controlled Securities Accounts and financial assets or securities entitlements that are subject to a Controlled Securities Account or are Exempt Accounts.

Section 3.03    Covenants.

(a)    The Borrower agrees to promptly (and in any event within thirty (30) days of such event, or such later date as the Collateral Agent may agree in its reasonable discretion) notify the Collateral Agent of any change (i) in the legal name of any Grantor, (ii) in the identity or type of organization or corporate structure of any Grantor, (iii) in the jurisdiction of organization of any Grantor, (iv) in the location of any Grantor under the UCC or (v) in the organizational identification number of any Grantor, if any, but solely to the extent such organizational identification number is required to be set forth on financing statements under the UCC.  The Borrower shall take all actions reasonably satisfactory to the Collateral Agent to the extent necessary to maintain the security interests (and the priority thereof) of the Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

(b)    In addition, if, at any time after the Closing Date, a Grantor that is the record owner of any of the Intellectual Property included in the Article 9 Collateral changes its legal name, the Borrower and/or the applicable Grantor shall promptly (an in any event within ninety (90) days of such event, or such later date as the Collateral Agent may agree in its reasonable discretion), (i) file appropriate papers with the applicable governmental authorities to update the record owner's name for the applicable Intellectual Property applications and registrations; and (ii) notify the Collateral Agent of such filing and provide written evidence of such filing.

(c)    Each Grantor shall, at its own expense, take any and all commercially reasonable actions necessary to defend the Security Interest of the Collateral Agent in the Article 9 Collateral and the priority thereof against any Lien prohibited pursuant to Section 7.02 of the Credit Agreement; provided, that, nothing in this Agreement shall prevent any Grantor from discontinuing the operation or maintenance of any of its assets or properties if such discontinuance is (x) determined by such Grantor to be desirable in the conduct of its business and (y) permitted by the Credit Agreement.

(d)    Each Grantor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Collateral Agent may from time to time reasonably request and are consistent with the requirements of the Loan Documents to better assure, preserve, protect and perfect the Security Interest and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of the Security Interest and the filing of any financing statements or other documents in connection herewith or therewith.  If any amounts payable under or in connection with any of the Article 9 Collateral shall be or become evidenced by any promissory notes, other instruments or debt securities, such notes, instruments or debt securities shall be

delivered to the Collateral Agent to the extent required pursuant to Section 2.02. Without limiting the generality of the foregoing, each Grantor shall make, execute, endorse, acknowledge, file or refile and/or deliver to the Collateral Agent from time to time upon reasonable request by the Collateral Agent such confirmatory assignments, supplements, additional security agreements, control agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments as the Collateral Agent shall reasonably request and which are consistent with the requirements of the Loan Documents. Following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default, the Collateral Agent may institute and maintain, in its own name or in the name of any Grantor, such suits and proceedings as the Collateral Agent may be advised by counsel shall be necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Collateral. All of the foregoing shall be at the sole cost and expense of the Grantors.

(e)     At its option, the Collateral Agent may discharge past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances (other than with respect to any of the foregoing that are subject to dispute) at any time levied or placed on the Article 9 Collateral and prohibited pursuant to Section 7.02 of the Credit Agreement, and may pay for the maintenance and preservation of the Article 9 Collateral to the extent any Grantor fails to do so as required by the Credit Agreement or any other Loan Document and within a reasonable period of time after the Collateral Agent has requested that it do so, and each Grantor jointly and severally agrees to reimburse the Collateral Agent within ten (10) Business Days (or such later date as may be agreed to by the Collateral Agent in its sole discretion) after demand for any payment made or any reasonable expense incurred by the Collateral Agent pursuant to the foregoing authorization. Nothing in this paragraph shall be interpreted as excusing any Grantor from the performance of, or imposing any obligation on the Collateral Agent or any Secured Party to cure or perform, any covenants or other promises of any Grantor with respect to taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Loan Documents.

(f)     If the Grantors shall at any time become a beneficiary under a letter of credit now or hereafter issued in favor of such Grantor with a face value in excess of $1,000,000, such Grantor shall promptly notify the Collateral Agent thereof and, at the request of the Collateral Agent, such Grantor shall use commercially reasonable efforts to, pursuant to an agreement in form and substance reasonably satisfactory to the Collateral Agent, either (i) arrange for the issuer or any confirming bank of such letter of credit to consent to an assignment to the Collateral Agent of the proceeds of any drawing under the letter of credit or (ii) arrange for the Collateral Agent to become the transferee beneficiary of the letter of credit, with the Collateral Agent agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be paid to the applicable Grantor unless an the Secured Obligations have been accelerated after the occurrence and during the continuance of an Event of Default.

(g)     If the Grantors shall at any time hold or acquire any Commercial Tort Claims with a value reasonably estimated by such Grantor to exceed $1,000,000 for which this clause has not been satisfied and for which a complaint in a court of competent jurisdiction has been filed, such Grantor shall within the time periods set forth in Section 6.09 of the Credit Agreement notify the Collateral Agent thereof in a writing signed by such Grantor including a summary description of such claim and grant to the Collateral Agent, for the benefit of the Secured Parties, in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement.

(h)     *Account Covenants*.

(i)     Subject to Sections 6.09 and 6.11 of the Credit Agreement, as applicable, the Grantors shall cause (x) all deposit accounts constituting Collateral other than Exempt Accounts

to be subject at all times to a fully effective Deposit Account Control Agreement and (y) all securities accounts constituting Collateral other than Exempt Accounts to be subject at all times to a fully effective Securities Account Control Agreement.

(ii)    Subject to the time periods set forth in Section 6.09 and 6.11 of the Credit Agreement, following the creation or acquisition of any new deposit account or securities account, or any interest therein, by any Grantor (other than Exempt Accounts), such Grantor shall cause to be in full force and effect, prior to the deposit of any funds therein that would cause it not to be an Exempt Account or the crediting of any financial asset with respect to which any Grantor is an entitlement holder, as applicable, a Deposit Account Control Agreement or Securities Account Control Agreement, as applicable, duly executed by such Grantor, the Collateral Agent and the applicable Depositary Bank or Securities Intermediary, as applicable.

(iii)    Except as expressly permitted pursuant to this Agreement or the Credit Agreement, the Grantors shall cause all cash and Cash Equivalents and all securities entitlements to be maintained in Collateral Accounts or Exempt Accounts.  Prior to the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default, the Grantors may withdraw, or direct the disposition of, funds and other investments or financial assets held in the Collateral Accounts or Exempt Accounts.  Following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default, upon written notice to any Grantor, the Collateral Agent shall be permitted to (i) retain, or instruct the relevant Securities Intermediary or Depositary Bank to retain, all cash and investments held in any Collateral Account, (ii) liquidate or issue entitlement orders with respect to, or instruct the relevant Securities Intermediary or Depositary Bank to liquidate, any or all investments or financial assets held in any Collateral Account, (iii) issue a notice of exclusive control or other similar instructions with respect to any Collateral Account and instruct the Depositary Bank or Securities Intermediary to follow the instructions of the Collateral Agent, and (iv) withdraw any amounts held in any Collateral Account and apply such amounts in accordance with the terms of this Agreement.

(i)    In the event that the proceeds of any insurance claim are paid to any Grantor after the Collateral Agent has exercised its right to foreclose following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default, such proceeds shall be held in trust for the benefit of the Collateral Agent and immediately after receipt thereof shall be paid to the Collateral Agent for application in accordance with Section 4.02.

## ARTICLE IV

### Remedies

Section 4.01    Remedies Upon Default.  Following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right to exercise any and all rights afforded to a secured party with respect to the Secured Obligations, including the Guarantees, under the UCC or other applicable Law and also may (i) require each Grantor to, and each Grantor agrees that it will at its expense and upon request of the Collateral Agent promptly, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place and time to be designated by the Collateral Agent that is reasonably convenient to both parties; (ii) occupy any premises owned or, to the extent lawful and permitted, leased by any of the Grantors where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under Law, without obligation to such Grantor in respect of such occupation; provided that the Collateral Agent shall provide

the applicable Grantor with notice thereof prior to or promptly after such occupancy; (iii) exercise any and all rights and remedies of any of the Grantors under or in connection with the Collateral, or otherwise in respect of the Collateral; and (iv) subject to the mandatory requirements of applicable Law and the notice requirements described below, sell or otherwise dispose of all or any part of the Collateral securing the Secured Obligations at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate.  Each Grantor acknowledges and recognizes that (a) the Collateral Agent may be unable to effect a public sale of all or a part of the Collateral consisting of securities by reason of certain prohibitions contained in the Securities Act of 1933, 15 U.S.C. §77 or the securities laws of various states, but may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof, and (b) private sales made under the foregoing circumstances shall not, for the reason of such circumstances, be deemed to have been made in a commercially unreasonable manner.  Upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold.  The Collateral Agent shall be authorized at any such sale of securities (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing such securities for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the securities so sold.

In the event that the Collateral Agent elects to make any sale of the Collateral pursuant to the foregoing paragraph, the Collateral Agent shall give the applicable Grantors ten (10) days' written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9-611 of the UCC or its equivalent in other jurisdictions) of the Collateral Agent's intention to make such sale of Collateral.  Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange.  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice (if any) of such sale.  At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine.  The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given.  The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.  At any public (or, to the extent permitted by Law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase the Collateral or any part thereof offered for sale.  As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may, to the extent permitted by law, to the extent permitted by Law, proceed by a suit or suits at Law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver.

Section 4.02    Application of Proceeds.  After the exercise of remedies provided for in Section 8.02 of the Credit Agreement (or after the Loans have automatically become immediately due and

payable), the Collateral Agent shall promptly apply the proceeds of any collection or sale of Collateral, including any Collateral consisting of cash in accordance with Section 8.03 of the Credit Agreement.

## ARTICLE V

### Subordination

Section 5.01    Subordination.

(a)    Notwithstanding any provision of this Agreement to the contrary, all rights of the Grantors of indemnity, contribution or subrogation under applicable Law or otherwise, arising under this Agreement or the Guaranty Agreement, shall be fully subordinated to the payment in full in cash of the Secured Obligations.  No failure on the part of the Borrower or any Grantor to make the indemnity, contribution or subrogation payments required under applicable Law or otherwise shall in any respect limit the obligations and liabilities of any Grantor with respect to its obligations hereunder, and each Grantor shall remain liable for the full amount of the obligations of such Grantor hereunder.

(b)    If any amount shall erroneously be paid to the Borrower or any other Grantor on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such subordinated indebtedness of the Borrower or any other Grantor, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Collateral Agent to be credited against the payment of the Secured Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement and the other Loan Documents.

## ARTICLE VI

### Miscellaneous

Section 6.01    Notices.  All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 10.02 of the Credit Agreement.  All communications and notices hereunder to the Borrower or any other Grantor shall be given to it in care of the Borrower as provided in Section 10.02 of the Credit Agreement.

Section 6.02    Waivers; Amendment.

(a)    No failure or delay by any Secured Party in exercising any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege, or any abandonment or discontinuance of steps to enforce such rights, remedies, powers or privileges hereunder, preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges of the Secured Parties herein provided, and provided under each other Loan Document, are cumulative and are not exclusive of any rights, remedies, powers and privileges provided by Law.  No waiver of any provision of this Agreement or consent to any departure by any Grantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 6.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Secured Party may have had notice or knowledge of such Default at the time.

(b)    Except as otherwise provided in Section 6.11, neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in

-17-

writing entered into by the Collateral Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.01 of the Credit Agreement.

Section 6.03    Collateral Agent's Fees and Expenses; Indemnification.

(a)    The parties hereto agree that the Collateral Agent shall be entitled to reimbursement of its reasonable out-of-pocket expenses incurred hereunder and indemnity for its actions in connection herewith, in each case, as provided in, and subject to, Section 10.04 of the Credit Agreement.

(b)    Any such amounts payable as provided hereunder shall be additional Secured Obligations secured hereby and by the other Collateral Documents.

Section 6.04    Successors and Assigns.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 6.05    Survival of Agreement.    All covenants, agreements, representations and warranties made by the Grantors hereunder and in the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Secured Parties and shall survive the execution and delivery of the Loan Documents, the making of any Loans, regardless of any investigation made by or on its behalf and notwithstanding that any Secured Party may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect as long as this Agreement has not been terminated or released pursuant to Section 6.10 below.

Section 6.06    Counterparts; Effectiveness; Several Agreement.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.    Delivery by facsimile or other electronic communication of an executed counterpart (including portable document format (PDF)) of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.    This Agreement shall become effective as to any Grantor when a counterpart hereof executed on behalf of such Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon such Grantor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of such Grantor, the Collateral Agent and the other Secured Parties and their respective permitted successors and assigns, except that no Grantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as expressly contemplated by this Agreement or the Credit Agreement.    This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, restated, amended and restated, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

Section 6.07    Severability.    If any provision of this Agreement is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.    The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 6.08    Governing Law; Jurisdiction; Venue; Waiver of Jury Trial; Consent to Service of Process.

(a)    The terms of Section 10.13 of the Credit Agreement with respect to governing law, submission of jurisdiction, venue and waiver of jury trial are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

(b)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 6.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by Law.

Section 6.09    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 6.10    Termination or Release.

(a)    This Agreement, the Security Interest and all other security interests granted hereby shall terminate with respect to all Secured Obligations and any Liens arising therefrom shall be automatically released upon a Discharge of Senior Credit Obligations.

(b)    A Subsidiary Party shall automatically be released from its obligations hereunder and the Security Interest in the Collateral of such Subsidiary Party shall be automatically released upon the consummation of any transaction permitted by the Credit Agreement as a result of which such Subsidiary Party ceases to be a Subsidiary of NewCo or ceases to be a Guarantor.

(c)    Upon any sale, transfer or disposition by any Grantor of any Collateral that is permitted under the Credit Agreement (other than a sale, transfer or disposition to another Loan Party), or upon the effectiveness of any written consent to the release of the security interest granted hereby in any Collateral pursuant to Section 10.01 of the Credit Agreement or to the extent such Collateral is owned by a Grantor upon the release of such Grantor from its obligations hereunder or under the Guaranty Agreement, in each case, the security interest in such Collateral shall be automatically released.  The Collateral Agent shall enter into non-disturbance and similar agreement reasonably requested by any Grantor in connection with the licensing of intellectual property permitted pursuant to the terms of the Credit Agreement.

(d)    In connection with any termination or release pursuant to paragraph (a), (b) or (c) of this Section 6.10, the Collateral Agent shall execute and deliver to any Grantor, at such Grantor's expense, all documents that such Grantor shall reasonably request to evidence such termination or release and shall perform such other actions reasonably requested by such Grantor to effect such release, including delivery of certificates, securities and instruments.  Any execution and delivery of documents pursuant to this Section 6.10 shall be without recourse to or warranty by the Collateral Agent (except as to the fact that the Collateral Agent has not encumbered the released assets or any part thereof) and subject to the Collateral Agent's receipt of a certification by the Borrower and applicable Grantor stating that such transaction is in compliance with the Credit Agreement and the other Loan Documents and as to such other matters as the Collateral Agent may reasonably request.

Section 6.11    Additional Grantors.  Subject to the provisions of Section 6.09 of the Credit Agreement, the Grantors shall cause each Loan Party (including, for the avoidance of doubt, any Subsidiary that is no longer an Excluded Subsidiary or an Excluded Tax Subsidiary) which, from time to time, after the date hereof shall be required to pledge any assets to the Collateral Agent for the benefit of

the Secured Parties pursuant to the provisions of the Credit Agreement, to execute and deliver to the Collateral Agent (i) a joinder agreement in form and substance reasonably acceptable to the Collateral Agent and (ii) a Perfection Certificate, in each case, within the time periods specified in Section 6.09 of the Credit Agreement (or such later date as may be agreed to by the Collateral Agent in its sole discretion) after the date on which it was acquired, created or otherwise required to become a Grantor hereunder. Upon execution and delivery by the Collateral Agent and a Subsidiary of a supplement to this Agreement in form and substance reasonably satisfactory to the Collateral Agent, such Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein. The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

Section 6.12    Collateral Agent Appointed Attorney-in-Fact. Each Grantor hereby appoints the Collateral Agent (and all officers, employees or agents designated by the Collateral Agent) as such Grantor's true and lawful agent (and attorney-in-fact) of such Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof at any time following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default, which appointment is irrevocable (except as provided in Section 6.10) and coupled with an interest. Without limiting the generality of the foregoing, the Collateral Agent shall have the right, following the acceleration of the Secured Obligations after the occurrence and during the continuance of an Event of Default and upon notice by the Collateral Agent to the applicable Grantor of the Collateral Agent's intent to exercise such rights, with full power of substitution either in the Collateral Agent's name or in the name of such Grantor (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral or Mortgaged Property; (c) to sign the name of any Grantor on any invoice or bill of lading relating to any of the Collateral or Mortgaged Property; (d) to send verifications of accounts receivable to any Account Debtor; (e) to commence and prosecute any and all suits, actions or proceedings at Law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or Mortgaged Property or to enforce any rights in respect of any Collateral or Mortgaged Property; (f) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral or Mortgaged Property; (g) to notify, or to require any Grantor to notify, Account Debtors to make payment directly to the Collateral Agent; (h) to make, settle and adjust claims in respect of Article 9 Collateral or Mortgaged Property under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance; (i) to make all determinations and decisions with respect thereto; (j) to obtain or maintain the policies of insurance required by Section 6.05 of the Credit Agreement or paying any premium in whole or in part relating thereto; and (k) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral or Mortgaged Property, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral or Mortgaged Property for all purposes; *provided* that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or Mortgaged Property or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence, bad faith, or willful misconduct or that of any of their Affiliates, directors, officers,

employees, counsel, agents or attorneys-in-fact, in each case, as determined by a final non-appealable judgment of a court of competent jurisdiction. All sums disbursed by the Collateral Agent in connection with this paragraph, including reasonable and documented out-of-pocket attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable, within 10 days of demand (or such later date as may be agreed to by the Collateral Agent in its sole discretion), by the Grantors to the Collateral Agent and shall be additional Secured Obligations secured hereby.

Section 6.13    General Authority of the Collateral Agent. By acceptance of the benefits of this Agreement and any other Collateral Documents, each Secured Party (whether or not a signatory hereto) shall be deemed irrevocably (a) to consent to the appointment of the Collateral Agent as its agent hereunder and under such other Collateral Documents, (b) to confirm that the Collateral Agent shall have the authority to act as the exclusive agent of such Secured Party for the enforcement of any provisions of this Agreement and such other Collateral Documents against any Grantor, the exercise of remedies hereunder or thereunder and the giving or withholding of any consent or approval hereunder or thereunder relating to any Collateral or any Grantor's obligations with respect thereto, (c) to agree that it shall not take any action to enforce any provisions of this Agreement or any other Collateral Document against any Grantor, to exercise any remedy hereunder or thereunder or to give any consents or approvals hereunder or thereunder except as expressly provided in this Agreement or any other Collateral Document and (d) to agree to be bound by the terms of this Agreement and any other Collateral Documents.

Section 6.14    Reasonable Care. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not any Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

Section 6.15    Reinstatement. The obligations of the Grantors under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Secured Obligations is rescinded or must be otherwise restored by any holder of any of the Secured Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 6.16    Miscellaneous. The Collateral Agent shall not be deemed to have actual, constructive, direct or indirect notice or knowledge of the occurrence of any Event of Default unless and until the Collateral Agent shall have received a notice of Event of Default or a notice from the Grantor or the Secured Parties to the Collateral Agent in its capacity as Collateral Agent indicating that an Event of Default has occurred.

[Signature Pages Follow]

-21-

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

**AFINITI NEWCO HOLDINGS LLC**,
as a Grantor

By: _____
    Name:
    Title:

**VCP CAPITAL MARKETS, LLC**,
as the Collateral Agent

By: _____
    Name:
    Title:

Schedule I to
the Security Agreement

**SUBSIDIARY PARTIES**

| Name | Beneficial Owner | Jurisdiction of Formation | Guarantor |
|---|---|---|---|
| Afiniti AI Holdings LLC | Afiniti Newco Holdings LLC | Cayman Islands | Yes |
| Afiniti, Inc. | Afiniti Newco Holdings LLC | Delaware | Yes |

<div align="right">
Schedule II to<br>
the Security Agreement
</div>

**PLEDGED EQUITY AND PLEDGED DEBT**

**PLEDGED EQUITY**

| Company Name | Beneficial Owner | Class of Equity Interests | No. Shares / Interest | Certificate No. (if applicable) | Percentage Ownership | Percent Pledged |
|---|---|---|---|---|---|---|
| Afiniti AI Holdings LLC | Afiniti Newco Holdings LLC | Limited liability company interests | [ ● ] | [ ● ] | 100% | 100% |
| Afiniti, Inc. | Afiniti Newco Holdings LLC | Common shares | 2,000 | N/A | 100% | 100% |

**PLEDGED DEBT**

None.

Schedule III to
the Security Agreement

## COMMERCIAL TORT CLAIMS

None.

<div align="right">

Schedule IV to
the Security Agreement

</div>

## **INTELLECTUAL PROPERTY**

**<u>Patents</u>**

None.

**<u>Trademarks</u>**

None.

**<u>Copyright</u>**

None.

**<u>Domain Names</u>**

None.

**<u>Trade Names</u>**

None.

Exhibit I to the
Security Agreement

**[FORM OF]**

**<u>PERFECTION CERTIFICATE</u>**

[Provided under separate cover]

<div align="right">Exhibit II to the<br>Security Agreement</div>

<div align="center">

**[FORM OF]**

**<u>PATENT SECURITY AGREEMENT</u>**

</div>

       **Patent Security Agreement**, dated as of [_____], 20\_\_ (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Patent Security Agreement</u>"), by [_____] and [_____] (each, a "<u>Grantor</u>"), in favor of VCP CAPITAL MARKETS, LLC, in its capacity as collateral agent pursuant to the Security Agreement (in such capacity, the "<u>Collateral Agent</u>").

<div align="center">

W I T N E S S E T H:

</div>

       WHEREAS, the Grantor is party to that certain Security Agreement dated as of [    ], 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Security Agreement</u>"), by and among the Borrower, the other Grantors party thereto and the Collateral Agent, in favor of the Collateral Agent, pursuant to which the Grantor is required to execute and deliver to the Collateral Agent this Patent Security Agreement;

       NOW, THEREFORE, in consideration of the premises and to induce the Collateral Agent, for the benefit of the Secured Parties, to enter into the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and with the intent to be legally bound hereby, the Grantor hereby agrees with the Collateral Agent as follows:

       SECTION 1.   <u>Defined Terms</u>.  Unless otherwise defined herein, terms defined in the Credit Agreement or the Security Agreement and used herein have the respective meanings assigned thereto in the Credit Agreement or the Security Agreement, in each case, as applicable.

       SECTION 2.   <u>Grant of Security Interest in Patent Collateral</u>.  As security for the payment or performance, as the case may be, in full of the Secured Obligations, including the Guarantees, each Grantor hereby pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in, all right, title or interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest:

       (a)      all Patents of the Grantor listed on <u>Schedule I</u> attached hereto; and

       (b)      all products and Proceeds of any of the foregoing (together with <u>clause (a)</u>, collectively, the "<u>Patents</u>").

       SECTION 3.   <u>The Security Agreement</u>.  The security interests granted pursuant to this Patent Security Agreement are granted in conjunction with the security interests granted to the Collateral Agent pursuant to the Security Agreement, and the Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the security interests in the Patents made and granted hereby are more fully set forth in the Security Agreement.  In the event that any provision of this Patent Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 4.    Termination.    Upon the termination of the Security Agreement in accordance with, or as otherwise required pursuant to, Section 6.10 thereof, the Collateral Agent shall, at the expense of the Grantor, execute, acknowledge, and deliver to the Grantor an instrument in writing in recordable form releasing the liens on and security interests in the applicable Patents under this Patent Security Agreement and any other documents required to evidence the termination of the Collateral Agent's interests in the applicable Patents.

SECTION 5.    **GOVERNING LAW; JURISDICTION; VENUE; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS**.

(A)    **THE TERMS OF SECTION 10.13 OF THE CREDIT AGREEMENT WITH RESPECT TO GOVERNING LAW, SUBMISSION OF JURISDICTION, VENUE AND WAIVER OF JURY TRIAL ARE INCORPORATED HEREIN BY REFERENCE, *MUTATIS MUTANDIS*, AND THE PARTIES HERETO AGREE TO SUCH TERMS.**

(B)    **EACH PARTY TO THIS PATENT SECURITY AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 6.01 OF THE SECURITY AGREEMENT. NOTHING IN THIS PATENT SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS PATENT SECURITY AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.**

SECTION 6.    Waivers; Amendments; Modifications.    Neither this Patent Security Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.01 of the Credit Agreement and subject to Section 6.02 of the Security Agreement.

SECTION 7.    Notices; Communications.    All communications and notices under this Patent Security Agreement shall be in writing and given as provided in Section 6.01 of the Security Agreement.

SECTION 8.    Counterparts; Effectiveness.    This Patent Security Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Patent Security Agreement by signing and delivering to the other party hereto one or more counterparts.  Delivery by facsimile or other electronic communication of an executed counterpart (including portable document format (PDF)) of a signature page to this Patent Security Agreement shall be effective as delivery of an original executed counterpart of this Patent Security Agreement.  This Patent Security Agreement shall become effective as to the Grantor when a counterpart hereof executed on behalf of the Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon the Grantor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of the Grantor, the Collateral Agent and the other Secured Parties and their respective permitted successors and assigns, except that the Grantor shall not have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as expressly contemplated by the Security Agreement or the Credit Agreement.

[Signature Pages Follow]

[**GRANTOR**],
as a Grantor


By: _____
    Name:
    Title:

**VCP CAPITAL MARKETS, LLC**,
as the Collateral Agent


By: _____
    Name:
    Title:

**Schedule I**
**to**
**PATENT SECURITY AGREEMENT**
**UNITED STATES PATENTS AND PATENT APPLICATIONS**

**Patents:**

| OWNER | PATENT NUMBER | TITLE |
|---|---|---|
|  |  |  |

**Patent Applications:**

| OWNER | APPLICATION NUMBER | TITLE |
|---|---|---|
|  |  |  |

Exhibit III to the
Security Agreement

**[FORM OF]**

**TRADEMARK SECURITY AGREEMENT**

   **Trademark Security Agreement**, dated as of [_____], 20__ (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Trademark Security Agreement</u>"), by [_____] and [_____] (each, a "<u>Grantor</u>"), in favor of VCP CAPITAL MARKETS, LLC, in its capacity as collateral agent pursuant to the Credit Agreement (in such capacity, the "<u>Collateral Agent</u>").

W I T N E S S E T H:

   WHEREAS, the Grantor is party to that certain Security Agreement dated as of [    ], 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Security Agreement</u>"), by and among the Borrower, the other Grantors party thereto and the Collateral Agent, in favor of the Collateral Agent, pursuant to which the Grantor is required to execute and deliver to the Collateral Agent this Trademark Security Agreement;

   NOW, THEREFORE, in consideration of the premises and to induce the Collateral Agent, for the benefit of the Secured Parties, to enter into the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and with the intent to be legally bound hereby, the Grantor hereby agrees with the Collateral Agent as follows:

   SECTION 1. <u>Defined Terms</u>. Unless otherwise defined herein, terms defined in the Credit Agreement or the Security Agreement used herein have the respective meanings assigned thereto in the Credit Agreement or the Security Agreement, in each case, as applicable.

   SECTION 2. <u>Grant of Security Interest in Trademark Collateral</u>. As security for the payment or performance, as the case may be, in full of the Secured Obligations, including the Guarantees, each Grantor hereby pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in, all right, title or interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest:

    (a) all Trademarks of the Grantor listed on <u>Schedule I</u> attached hereto, including all goodwill associated therewith; and

    (b) all products and Proceeds of any of the foregoing (together with <u>clause (a)</u>, collectively, the "<u>Trademarks</u>").

   SECTION 3. <u>The Security Agreement</u>. The security interests granted pursuant to this Trademark Security Agreement are granted in conjunction with the security interests granted to the Collateral Agent pursuant to the Security Agreement, and the Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the security interests in the Trademarks made and granted hereby are more fully set forth in the Security Agreement.  In the event

that any provision of this Trademark Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 4.    Termination.    Upon the termination of the Security Agreement in accordance with, or otherwise required pursuant to, Section 6.10 thereof, the Collateral Agent shall, at the expense of the Grantor, execute, acknowledge, and deliver to the Grantor an instrument in writing in recordable form releasing the lien on and security interest in the applicable Trademarks under this Trademark Security Agreement and any other documents required to evidence the termination of the Collateral Agent's interest in the applicable Trademarks.

SECTION 5.    **GOVERNING LAW; JURISDICTION; VENUE; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS.**

(A)    **THE TERMS OF SECTION 10.13 OF THE CREDIT AGREEMENT WITH RESPECT TO GOVERNING LAW, SUBMISSION OF JURISDICTION, VENUE AND WAIVER OF JURY TRIAL ARE INCORPORATED HEREIN BY REFERENCE, *MUTATIS MUTANDIS*, AND THE PARTIES HERETO AGREE TO SUCH TERMS.**

(B)    **EACH PARTY TO THIS TRADEMARK SECURITY AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 6.01 OF THE SECURITY AGREEMENT. NOTHING IN THIS TRADEMARK SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS TRADEMARK SECURITY AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.**

SECTION 6.    Waivers; Amendments; Modifications.    Neither this Trademark Security Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.01 of the Credit Agreement and subject to Section 6.02 of the Security Agreement.

SECTION 7.    Notices; Communications.    All communications and notices under this Trademark Security Agreement shall be in writing and given as provided in Section 6.01 of the Security Agreement.

SECTION 8.    Counterparts; Effectiveness.    This Trademark Security Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Trademark Security Agreement by signing and delivering to the other party hereto one or more counterparts.    Delivery by facsimile or other electronic communication of an executed counterpart (including portable document format (PDF)) of a signature page to this Trademark Security Agreement shall be effective as delivery of an original executed counterpart of this Trademark Security Agreement. This Trademark Security Agreement shall become effective as to the Grantor when a counterpart hereof executed on behalf of the Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon the Grantor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of the Grantor, the Collateral Agent and the other Secured Parties and their respective permitted successors and assigns, except that the Grantor shall not have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as expressly contemplated by the Security Agreement or the Credit Agreement.

[Signature Pages Follow]

**[GRANTOR]**,
as a Grantor


By: _____
    Name:
    Title:

**VCP CAPITAL MARKETS, LLC**,
as the Collateral Agent


By: _____
    Name:
    Title:

**Schedule I**
**to**
**TRADEMARK SECURITY AGREEMENT**
**UNITED STATES TRADEMARK REGISTRATIONS AND APPLICATIONS**

**Trademark Registrations:**

| OWNER | REGISTRATION NUMBER | TRADEMARK |
|-------|---------------------|-----------|

**Trademark Applications:**

| OWNER | APPLICATION NUMBER | TRADEMARK |
|-------|--------------------|-----------|

<div align="right">Exhibit IV to the<br>Security Agreement</div>

**[FORM OF]**

## COPYRIGHT SECURITY AGREEMENT

**Copyright Security Agreement**, dated as of [_____], 20__ (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Copyright Security Agreement"), by [_____] and [_____] (each, a "Grantor"), in favor of VCP CAPITAL MARKETS, LLC, in its capacity as collateral agent pursuant to the Credit Agreement (in such capacity, the "Collateral Agent").

<div align="center">W I T N E S S E T H:</div>

WHEREAS, the Grantor is party to that certain Security Agreement dated as of [    ], 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), by and among the Borrower, the other Grantors party thereto and the Collateral Agent, in favor of the Collateral Agent, pursuant to which the Grantor is required to execute and deliver to the Collateral Agent this Copyright Security Agreement;

NOW, THEREFORE, in consideration of the premises and to induce the Collateral Agent, for the benefit of the Secured Parties, to enter into the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and with the intent to be legally bound hereby, the Grantor hereby agrees with the Collateral Agent as follows:

SECTION 1.    Defined Terms.  Unless otherwise defined herein, terms defined in the Credit Agreement or the Security Agreement and used herein have the respective meanings assigned thereto in the Credit Agreement or the Security Agreement, in each case, as applicable.

SECTION 2.    Grant of Security Interest in Copyright Collateral.  As security for the payment or performance, as the case may be, in full of the Secured Obligations, including the Guarantees, each Grantor hereby pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in, all right, title or interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest:

      (a)      all Copyrights of the Grantor listed on Schedule I attached hereto; and

      (b)      all products and Proceeds of the foregoing (together with clause (a), collectively, the "Copyrights").

SECTION 3.    The Security Agreement.  The security interests granted pursuant to this Copyright Security Agreement are granted in conjunction with the security interests granted to the Collateral Agent pursuant to the Security Agreement, and the Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the security interests in the Copyrights made and granted hereby are more fully set forth in the Security Agreement.  In the event that any provision of this Copyright Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 4.   <u>Termination</u>.  Upon termination of the Security Agreement in accordance with, or as otherwise required pursuant to, Section 6.10 thereof, the Collateral Agent shall, at the expense of the Grantor, execute, acknowledge, and deliver to the Grantor an instrument in writing in recordable form releasing the lien on and security interest in the applicable Copyrights under this Copyright Security Agreement and any other documents required to evidence the termination of the Collateral Agent's interest in the applicable Copyrights.

**SECTION 5.   GOVERNING LAW; JURISDICTION; VENUE; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS.**

**(A)   THE TERMS OF SECTION 10.13 OF THE CREDIT AGREEMENT WITH RESPECT TO GOVERNING LAW, SUBMISSION OF JURISDICTION, VENUE AND WAIVER OF JURY TRIAL ARE INCORPORATED HEREIN BY REFERENCE, *MUTATIS MUTANDIS*, AND THE PARTIES HERETO AGREE TO SUCH TERMS.**

**(B)   EACH PARTY TO THIS COPYRIGHT SECURITY AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 6.01 OF THE SECURITY AGREEMENT. NOTHING IN THIS COPYRIGHT SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS COPYRIGHT SECURITY AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.**

SECTION 6.   <u>Waivers; Amendments; Modifications</u>.  Neither this Copyright Security Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.01 of the Credit Agreement and subject to Section 6.02 of the Security Agreement.

SECTION 7.   <u>Notices; Communications</u>.  All communications and notices under this Copyright Security Agreement shall be in writing and given as provided in Section 6.01 of the Security Agreement.

SECTION 8.   <u>Counterparts; Effectiveness</u>.  This Copyright Security Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Copyright Security Agreement by signing and delivering to the other party hereto one or more counterparts.  Delivery by facsimile or other electronic communication of an executed counterpart (including portable document format (PDF)) of a signature page to this Copyright Security Agreement shall be effective as delivery of an original executed counterpart of this Copyright Security Agreement.  This Copyright Security Agreement shall become effective as to the Grantor when a counterpart hereof executed on behalf of the Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon the Grantor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of the Grantor, the Collateral Agent and the other Secured Parties and their respective permitted successors and assigns, except that the Grantor shall not have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as expressly contemplated by the Security Agreement or the Credit Agreement.

[Signature Pages Follow]

-2-

**[GRANTOR]**,
as a Grantor


By: _____
    Name:
    Title:

**VCP CAPITAL MARKETS, LLC**,
as the Collateral Agent


By: _____
    Name:
    Title:

**Schedule I**
**to**
**COPYRIGHT SECURITY AGREEMENT**
**UNITED STATES COPYRIGHT REGISTRATIONS**

| OWNER | REGISTRATION NUMBER | COPYRIGHT TITLE |
|-------|---------------------|-----------------|

*Agreed Form*

<u>GUARANTY SUPPLEMENT</u>

SUPPLEMENT, dated as of [•], 2024 (this "**Supplement**"), to the Guaranty, dated as of June 13, 2019 (as amended, restated, amended and restated, replaced, supplemented or otherwise modified from time to time, the "**Guaranty**"), by AFINITI, INC., a Delaware corporation (the "**Borrower**") and AFINITI, LTD., a Bermuda exempted company ("**Parent**"), the other Guarantors from time to time party thereto and VCP CAPITAL MARKETS, LLC, as Administrative Agent and Collateral Agent for the Finance Parties (in such capacities, the "**Administrative Agent**").

A.       Reference is made to the Term Loan Credit Agreement, dated as of June 13, 2019 (as amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of July 11, 2019, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4, 2020, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of November 17, 2020, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of December 29, 2020, that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of March 9, 2021, that certain Amendment No. 6 to Term Loan Credit Agreement, dated as of March 12, 2021, that certain Amendment No. 7 to Term Loan Credit Agreement, dated as of May 17, 2021, that certain Amendment No. 8 to Term Loan Credit Agreement, dated as of March 7, 2022, that certain Amendment No. 9 to Term Loan Credit Agreement, dated as of June 13, 2024, that certain Amendment No. 10  to Term Loan Credit Agreement, dated as of July 29, 2024, that certain Amendment No. 11 to Term Loan Credit Agreement, dated as of August 14, 2024, that certain Amendment No. 12 to Term Loan Credit Agreement, dated as of September 12, 2024, that certain Amendment No. 13 to Term Loan Credit Agreement dated as of [  ], 2024, and as may be further amended, restated, amended and restated, refinanced, extended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among the Borrower, Parent, (as succeeded by Afiniti Newco Holdings LLC, a Delaware limited liability company), the Administrative Agent, and the Lenders from time to time party thereto.

B.       Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement or the Guaranty, as applicable.

C.       The Guarantors have entered into the Guaranty in order to induce the Lenders to make Loans to the Borrower.  Section 5.10 of the Guaranty provides that additional Subsidiaries of Parent shall become Guarantors under the Guaranty by execution and delivery of an Accession Agreement.  This Supplement is the Accession Agreement referenced in Section 5.10 of the Guaranty.

D.       The undersigned Subsidiary (the "**New Subsidiary**") is executing this Supplement in accordance with the requirements of the Credit Agreement and the other Loan Documents to become a Guarantor under the Guaranty in order to induce the Lenders to make additional Loans and as consideration for Loans previously made.

Accordingly, in consideration of the foregoing and other benefits accruing to the New Subsidiary, the receipt and sufficiency of which are hereby acknowledged, the New Subsidiary hereby covenants and agrees with the Administrative Agent, for the benefit of the Finance Parties, as follows:

Section 1.    In accordance with Section 5.10 of the Guaranty, the New Subsidiary by its signature below becomes a Guarantor under the Guaranty with the same force and effect as if it was an original party thereto and originally named therein as a Guarantor.  The New Subsidiary hereby (a) agrees to all the terms and provisions of the Guaranty applicable to it as a Guarantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Guarantor thereunder are true and correct in all material respects on and as of the date hereof, *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date.  Each reference to a "Guarantor" in the Guaranty and the other Loan Documents shall be deemed to include the New Subsidiary as if originally named therein as a Guarantor.  The Guaranty is hereby incorporated herein by reference.

Section 2.    The New Subsidiary represents and warrants to the Administrative Agent and the other Finance Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except (i) as such enforceability may be limited by applicable bankruptcy, insolvency, examinership, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and (ii) that rights of acceleration and the availability of equitable remedies may be limited by equitable principles of general applicability (regardless of whether enforcement is sought by proceedings in equity or at law);

Section 3.    This Supplement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Supplement shall become effective when it shall have been executed by the New Subsidiary, the Administrative Agent and thereafter shall be binding upon and inure to the benefit of each Guarantor, the Administrative Agent, the other Finance Parties and their respective permitted successors and assigns.  Delivery of an executed counterpart of a signature page of this Supplement by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Supplement.

Section 4.    Except as expressly supplemented hereby, the Guaranty shall remain in full force and effect, subject to the termination of the Guaranty pursuant to Section 5.11 thereof.

Section 5.    The terms of Section 5.07 of the Guaranty with respect to submission to jurisdiction, venue, waiver of jury trial and consent to service of process are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

Section 6.    The terms of Section 5.08 of the Guaranty with respect to severability are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

Section 7.    All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the Guaranty.

Section 8.      The New Subsidiary agrees to reimburse the Administrative Agent for its reasonable and documented out-of-pocket expenses in connection with this Supplement as provided in Section 5.04 of the Guaranty.

Section 9.      THIS SUPPLEMENT AND THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

*[**Signature page follows**]*

**IN WITNESS WHEREOF**, the New Subsidiary and the Administrative Agent have duly executed this Supplement to the Guaranty as of the day and year first above written.

**AFINITI NEWCO HOLDINGS LLC**

By: _____

Name:

Title:

**VCP CAPITAL MARKETS, LLC**,
as Administrative Agent and Collateral Agent

By: _____
     Name:
     Title:  Its Duly Authorized Signatory

*Agreed Form*

## **Additional Obligor and/or Subordinated Creditor**

## **Joinder to Intercompany Subordination Agreement**

This JOINDER AGREEMENT, dated as of [•], 2024 (this "Joinder"), is delivered pursuant to the Intercompany Subordination Agreement, dated as of June 13, 2019 (as the same may from time to time be amended, restated, supplemented or otherwise modified, the "Intercompany Subordination Agreement"), among Afiniti, Inc., a Delaware corporation (the "Borrower"), Afiniti, Ltd., a Bermuda exempted company (the "Parent"), the other Obligors from time to time party thereto and the Administrative Agent.  All capitalized terms not defined herein shall have the meaning ascribed to them in the Intercompany Subordination Agreement.

Joinder in the Intercompany Subordination.  Each of the undersigned hereby agrees that on and after the date hereof, it shall be an "Obligor" and a "Subordinated Creditor" under and as defined in the Intercompany Subordination Agreement, hereby assumes and agrees to perform all of the obligations of an Obligor and a Subordinated Creditor thereunder and agrees that it shall comply with and be fully bound by the terms of the Intercompany Subordination Agreement as if it had been a signatory thereto as of the date thereof; provided that the representations and warranties made by the undersigned thereunder shall be deemed true and correct as of the date of this Joinder.

Unconditional Joinder.  Each of the undersigned acknowledges that its obligations as a party to this Joinder are unconditional and are not subject to the execution of one or more Joinders by other parties.  Each of the undersigned further agrees that it has joined and is fully obligated as an Obligor and a Subordinated Creditor under the Intercompany Subordination Agreement.

Incorporation by Reference.  All terms and conditions of the Intercompany Subordination Agreement are hereby incorporated by reference in this Joinder as if set forth in full.

IN WITNESS WHEREOF, each of the undersigned has duly executed and delivered this Joinder as of the day and year first above written.

**AFINITI NEWCO HOLDINGS LLC**

By: _____

Name:

Title:

**AFINITI AI HOLDINGS LLC**

By: _____
     Name:
     Title:

[Signature Page to Joinder to Intercompany Subordination Agreement]

*Agreed Form*

## GUARANTY SUPPLEMENT

SUPPLEMENT, dated as of [•], 2024 (this "**Supplement**"), to the Guaranty, dated as of June 13, 2019 (as amended, restated, amended and restated, replaced, supplemented or otherwise modified from time to time, the "**Guaranty**"), by AFINITI, INC., a Delaware corporation (the "**Borrower**") and AFINITI, LTD., a Bermuda exempted company ("**Parent**"), the other Guarantors from time to time party thereto and VCP CAPITAL MARKETS, LLC, as Administrative Agent and Collateral Agent for the Finance Parties (in such capacities, the "**Administrative Agent**").

A.      Reference is made to the Term Loan Credit Agreement, dated as of June 13, 2019 (as amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of July 11, 2019, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4, 2020, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of November 17, 2020, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of December 29, 2020, that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of March 9, 2021, that certain Amendment No. 6 to Term Loan Credit Agreement, dated as of March 12, 2021, that certain Amendment No. 7 to Term Loan Credit Agreement, dated as of May 17, 2021, that certain Amendment No. 8 to Term Loan Credit Agreement, dated as of March 7, 2022, that certain Amendment No. 9 to Term Loan Credit Agreement, dated as of June 13, 2024, that certain Amendment No. 10  to Term Loan Credit Agreement, dated as of July 29, 2024, that certain Amendment No. 11 to Term Loan Credit Agreement, dated as of August 14, 2024, that certain Amendment No. 12 to Term Loan Credit Agreement, dated as of September 12, 2024, that certain Amendment No. 13 to Term Loan Credit Agreement dated as of [  ], 2024,  and as may be further amended, restated, amended and restated, refinanced, extended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among the Borrower, Parent (as succeeded by Afiniti Newco Holdings LLC, a Delaware limited liability company), the Administrative Agent, and the Lenders from time to time party thereto.

B.      Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement or the Guaranty, as applicable.

C.      The Guarantors have entered into the Guaranty in order to induce the Lenders to make Loans to the Borrower.  Section 5.10 of the Guaranty provides that additional Subsidiaries of Parent shall become Guarantors under the Guaranty by execution and delivery of an Accession Agreement.  This Supplement is the Accession Agreement referenced in Section 5.10 of the Guaranty.

D.      The undersigned Subsidiary (the "**New Subsidiary**") is executing this Supplement in accordance with the requirements of the Credit Agreement and the other Loan Documents to become a Guarantor under the Guaranty in order to induce the Lenders to make additional Loans and as consideration for Loans previously made.

Accordingly, in consideration of the foregoing and other benefits accruing to the New Subsidiary, the receipt and sufficiency of which are hereby acknowledged, the New Subsidiary hereby covenants and agrees with the Administrative Agent, for the benefit of the Finance Parties, as follows:

1

Section 1.    In accordance with Section 5.10 of the Guaranty, the New Subsidiary by its signature below becomes a Guarantor under the Guaranty with the same force and effect as if it was an original party thereto and originally named therein as a Guarantor.  The New Subsidiary hereby (a) agrees to all the terms and provisions of the Guaranty applicable to it as a Guarantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Guarantor thereunder are true and correct in all material respects on and as of the date hereof, *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date.  Each reference to a "Guarantor" in the Guaranty and the other Loan Documents shall be deemed to include the New Subsidiary as if originally named therein as a Guarantor.  The Guaranty is hereby incorporated herein by reference.

Section 2.    The New Subsidiary represents and warrants to the Administrative Agent and the other Finance Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except (i) as such enforceability may be limited by applicable bankruptcy, insolvency, examinership, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and (ii) that rights of acceleration and the availability of equitable remedies may be limited by equitable principles of general applicability (regardless of whether enforcement is sought by proceedings in equity or at law);

Section 3.    This Supplement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Supplement shall become effective when it shall have been executed by the New Subsidiary, the Administrative Agent and thereafter shall be binding upon and inure to the benefit of each Guarantor, the Administrative Agent, the other Finance Parties and their respective permitted successors and assigns.  Delivery of an executed counterpart of a signature page of this Supplement by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Supplement.

Section 4.    Except as expressly supplemented hereby, the Guaranty shall remain in full force and effect, subject to the termination of the Guaranty pursuant to Section 5.11 thereof.

Section 5.    The terms of Section 5.07 of the Guaranty with respect to submission to jurisdiction, venue, waiver of jury trial and consent to service of process are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

Section 6.    The terms of Section 5.08 of the Guaranty with respect to severability are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

Section 7.    All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the Guaranty.

2

Section 8.        The New Subsidiary agrees to reimburse the Administrative Agent for its reasonable and documented out-of-pocket expenses in connection with this Supplement as provided in Section 5.04 of the Guaranty.

Section 9.        THIS SUPPLEMENT AND THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

**[*Signature page follows*]**

**IN WITNESS WHEREOF**, the New Subsidiary and the Administrative Agent have duly executed this Supplement to the Guaranty as of the day and year first above written.

**AFINITI AI HOLDINGS LLC**

By: _____
     Name:
     Title:

**VCP CAPITAL MARKETS, LLC**,
as Administrative Agent and Collateral Agent

By: _____
    Name:
    Title:  Its Duly Authorized Signatory

**Exhibit E**

**Intercreditor Agreement**

*Agreed Form*

**AGREEMENT AMONG LENDERS/INTERCREDITOR AGREEMENT**

**among**

**AFINITI, INC.,**

**as the Restructuring First Lien Borrower and Restructuring Second Lien US Borrower,**

**AFINITI NEWCO HOLDINGS LLC,**

**as NewCo and Restructuring Second Lien Co-Borrower,**

**the other Grantors from time to time party hereto,**

**VCP CAPITAL MARKETS, LLC,**

**as First Lien Representative for the Restructuring First Lien Term Loan Lenders and as Second Lien Representative for the Restructuring Second Lien Term Loan Lenders,**

**and**

**each additional Representative from time to time party hereto**

**dated as of [  ], 2024**

AGREEMENT AMONG LENDERS/INTERCREDITOR AGREEMENT, dated as of [ ], 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), among Afiniti, Inc., a Delaware corporation (the "Restructuring First Lien Borrower", "Restructuring Second Lien US Borrower" and collectively, the "Borrower"), Afiniti Newco Holdings LLC, a Delaware limited liability company ("NewCo" or "Restructuring Second Lien Co-Borrower"), the other Grantors from time to time party hereto, VCP Capital Markets, LLC, acting in its capacity as administrative agent and collateral agent under the Credit Agreement, as Representative for the Restructuring First Lien Term Loan Lenders (in such capacity and together with its permitted successors in such capacity, the "First Lien Representative"), VCP Capital Markets, LLC, acting in its capacity as administrative agent and collateral agent under the Credit Agreement, as Representative for the Restructuring Second Lien Term Loan Lenders (in such capacity and together with its permitted successors in such capacity, the "Second Lien Representative"), and each additional First Lien Representative and Second Lien Representative that from time to time becomes a party hereto pursuant to Section 8.09.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Designated First Lien Representative (for itself and on behalf of the Restructuring First Lien Term Loan Lenders), the Designated Second Lien Representative (for itself and on behalf of the Restructuring Second Lien Term Loan Lenders), each additional First Lien Representative (for itself and on behalf of the Additional First Lien Parties under the applicable Additional First Lien Debt Facility) and each additional Second Lien Representative (for itself and on behalf of the Additional Second Lien Parties under the applicable Additional Second Lien Debt Facility) agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.01    Certain Defined Terms.  Capitalized terms used but not otherwise defined herein have the meanings set forth in the Credit Agreement or, if defined in the UCC, the meanings specified therein. As used in this Agreement, the following terms have the meanings specified below:

"Additional First Lien Debt" means any Indebtedness that is incurred, issued or guaranteed by the Borrower and/or any other Grantor (other than Indebtedness constituting First Lien Obligations), which Indebtedness and Guarantees are secured by Liens on the Collateral (or a portion thereof) on a senior basis to the Liens securing the Second Lien Debt Obligations; provided, however, that (i) such Indebtedness is permitted to be incurred, secured and guaranteed on such basis by each First Lien Debt Document and Second Lien Debt Document in effect at the time of such incurrence and (ii) the Representative for the holders of such Indebtedness shall have become party to (A) this Agreement pursuant to, and by satisfying the conditions set forth in, Section 8.09 hereof and (B) the applicable First Lien Intercreditor Agreement pursuant to, and by satisfying the conditions set forth therein; provided, further, that, if such Indebtedness is secured by a Lien on the Collateral (or a portion thereof) having the same priority as the Liens securing the First Lien Obligations (but without regard to control of remedies) or that is junior in priority to the Liens securing the First Lien Obligations but senior in priority to the Liens securing the Second Lien Debt Obligations and will be the initial Additional First Lien Debt of either such type incurred or issued by the Borrower or any other Grantor after the Closing Date, then the borrower or issuer with respect to such Additional Senior Lien Debt, the First Lien Representative and the Representative for such Indebtedness shall have executed and delivered the applicable First Lien Intercreditor Agreement. Additional First Lien Debt shall include any Registered Equivalent Notes and Guarantees thereof by the Grantors issued in exchange therefor.

"Additional First Lien Debt Documents" means, with respect to any series, issue or class of Additional First Lien Debt, the promissory notes, credit agreements, loan agreements, note purchase

agreements, indentures, or other operative agreements evidencing or governing such Indebtedness or the Liens securing such Indebtedness, including the First Lien Collateral Documents (in each case, as amended, restated, amended and restated, Refinanced, supplemented or otherwise modified from time to time in a manner not in contravention of any provision of this Agreement).

"<u>Additional First Lien Debt Facility</u>" means each credit agreement, loan agreement, note purchase agreement, indenture or other governing agreement with respect to any Additional First Lien Debt.

"<u>Additional First Lien Debt Obligations</u>" means, with respect to any series, issue or class of Additional First Lien Debt, (a) all principal of, and premium and interest, fees, and expenses (including, without limitation, any interest, fees, or expenses which accrue after the commencement of any Insolvency or Liquidation Proceeding or which would accrue but for the operation of Bankruptcy Laws, whether or not allowed or allowable as a claim in any such proceeding) payable with respect to, such Additional First Lien Debt, (b) all other amounts payable to the related Additional Senior Secured Parties under the related Additional First Lien Debt Documents and (c) any renewals or extensions of the foregoing.

"<u>Additional First Lien Secured Parties</u>" means, with respect to any series, issue or class of Additional First Lien Debt, the holders of such Indebtedness or any other Additional First Lien Debt Obligation, the Representative with respect thereto, any trustee or agent therefor under any related Additional First Lien Debt Documents and the beneficiaries of each indemnification obligation undertaken by the Borrower or any Grantor under any related Additional First Lien Debt Documents.

"<u>Additional Second Lien Debt</u>" means any Indebtedness that is incurred, issued or guaranteed by the Borrower and/or any other Grantor (other than Indebtedness constituting Second Lien Debt Obligations), which Indebtedness and Guarantees are secured by Liens on the Collateral (or a portion thereof) on a junior basis to the Liens securing the First Lien Obligations; <u>provided</u>, <u>however</u>, that (i) such Indebtedness is permitted to be incurred, secured and guaranteed on such basis by each First Lien Debt Document and Second Lien Debt Document in effect at the time of such incurrence and (ii) the Representative for the holders of such Indebtedness shall have become party to (A) this Agreement pursuant to, and by satisfying the conditions set forth in, Section 8.09 hereof and (B) the applicable Second Lien Intercreditor Agreement pursuant to, and by satisfying the conditions set forth therein; <u>provided</u>, <u>further</u>, that, if such Indebtedness is secured by a Lien on the Collateral (or a portion thereof) having the same priority as the Liens securing the Second Lien Debt Obligations (but without regard to control of remedies, other than as provided by the terms of the applicable Second Lien Debt Documents) or that is junior in priority to the Liens securing the Second Lien Debt Obligations and will be the initial Additional Second Lien Debt of either such type incurred or issued by the Borrower or any other Grantor after the Closing Date, then the borrower or issuer with respect to such Additional Second Lien Debt, the Second Lien Representative and the Representative for the holders of such Indebtedness shall have executed and delivered the applicable Second Lien Intercreditor Agreement. Additional Second Lien Debt shall include any Registered Equivalent Notes and Guarantees thereof by the Grantors issued in exchange therefor.

"<u>Additional Second Lien Debt Documents</u>" means, with respect to any series, issue or class of Additional Second Lien Debt, the promissory notes, credit agreements, loan agreements, note purchase agreements, indentures or other operative agreements evidencing or governing such Indebtedness or the Liens securing such Indebtedness, including the Collateral Documents (in each case, as amended, restated, amended and restated, Refinanced, supplemented or otherwise modified from time to time in a manner not in contravention of any provision of this Agreement).

"<u>Additional Second Lien Debt Facility</u>" means each credit agreement, loan agreement, note purchase agreement, indenture or other governing agreement with respect to any Additional Second Lien Debt.

"<u>Additional Second Lien Debt Obligations</u>" means, with respect to any series, issue or class of Additional Second Lien Debt, (a) all principal of, and premium and interest, fees, and expenses (including, without limitation, any interest, fees, or expenses which accrue after the commencement of any Insolvency or Liquidation Proceeding or which would accrue but for the operation of Bankruptcy Laws, whether or not allowed or allowable as a claim in any such proceeding) payable with respect to, such Additional Second Lien Debt, (b) all other amounts payable to the related Additional Second Lien Secured Parties under the related Additional Second Lien Debt Documents and (c) any renewals or extensions of the foregoing.

"<u>Additional Second Lien Secured Parties</u>" means, with respect to any series, issue or class of Additional Second Lien Debt, the holders of such Indebtedness or any other Additional Second Lien Debt Obligation, the Representative with respect thereto, any trustee or agent therefor under any related Additional Second Lien Debt Documents and the beneficiaries of each indemnification obligation undertaken by the Borrower or any Grantor under any related Additional Second Lien Debt Documents.

"<u>Agreement</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Appropriation</u>" means the appropriation (or similar process) of the equity interests of a member of the Group (other than NewCo) by the Designated First Lien Representative or the Designated Second Lien Representative (if applicable) which is effected (to the extent permitted under the relevant First Lien Debt Documents and/or Second Lien Debt Documents and applicable law) by enforcement of any Lien over any Collateral.

"<u>Automatic Acceleration</u>" means the automatic acceleration of the First Lien Obligations or the Second Lien Obligations (as applicable) with respect to any Grantor pursuant to applicable law as a result of the commencement of any Insolvency or Liquidation Proceeding.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, as amended.

"<u>Bankruptcy Laws</u>" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, administration, rearrangement, judicial management, receivership, insolvency, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), or similar federal, state, or foreign debtor relief laws (including under any applicable corporate statute) of the United States or other applicable jurisdictions from time to time in effect.

"<u>Borrower</u>" means, collectively, (i) the Restructuring First Lien Borrower and (ii) the Restructuring Second Lien Borrower, and individually as the context requires.

"<u>Capital Stock</u>" means:

    (a)    in the case of a corporation, corporate stock;

    (b)    in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

    (c)    in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

    (d)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding

from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Class Debt" has the meaning assigned to such term in Section 8.09(a).

"Class Debt Parties" has the meaning assigned to such term in Section 8.09(a).

"Class Debt Representatives" has the meaning assigned to such term in Section 8.09(a).

"Closing Date" means the date hereof.

"Collateral" means the First Lien Collateral and the Second Lien Collateral.

"Collateral Agents" means the First Lien Representative and the Second Lien Representative.

"Collateral Documents" means the "Collateral Documents" (as defined in the Credit Agreement).

"Computer Software" means all software, programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, together with any and all maintenance rights, service rights, programming rights, hosting rights, test rights, improvement rights, renewal rights and indemnification rights and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing.

"control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "controlled" have meanings correlative thereto.

"Copyrights" means, with respect to any Grantor, all of such Grantor's right, title, and interest in and to the following: (a) all copyrights, rights and interests in such copyrights, works protectable by copyright, and copyright applications to register copyright, including, without limitation, copyrights in Computer Software, internet web sites and the content thereof, whether registered or unregistered; (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing throughout the world.

"Credit Agreement" means that certain Term Loan Credit Agreement, dated as of June 13, 2019 (as amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of July 11, 2019, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4, 2020, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of November 17, 2020, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of December 29, 2020, that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of March 9, 2021, that certain Amendment No. 6 to Term Loan Credit Agreement, dated as of March 12, 2021, that certain Amendment No. 7 to Term Loan Credit Agreement, dated as of May 17, 2021, that certain Amendment No. 8 to Term Loan Credit Agreement, dated as of March 7, 2022, that certain Amendment No. 9 to Term Loan Credit Agreement, dated as of June 13, 2024, that certain Amendment No. 10 to Term Loan Credit Agreement, dated as of July 29, 2024, that certain Amendment No. 11 to Term Loan Credit Agreement, dated as of August 14, 2024, that certain Amendment No. 12 to Term Loan Credit Agreement, dated as of [September 12], 2024 and that certain Amendment No. 13 to Term Loan Credit Agreement, dated as of the date hereof), among the Restructuring First Lien Borrower, Afiniti, Ltd., a Bermuda exempted company, the Restructuring

Second Lien Borrowers, the lenders from time to time party thereto, VCP Capital Markets, LLC, as administrative agent and collateral agent, and the other parties thereto, as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time in a manner not in contravention of any provision of this Agreement.

"Credit Documents" means the Credit Agreement and the other "Loan Documents" as defined in the Credit Agreement.

"Debt Document" means the First Lien Debt Documents and Second Lien Debt Documents.

"Debt Facility" means any First Lien Debt Facility and any Second Lien Debt Facility.

"Delegate" means any delegate, agent, attorney or co-trustee appointed by a Representative.

"Designated First Lien Representative" means (i) the First Lien Representative, so long as the First Lien Debt Facility under the First Lien Debt Documents is the only First Lien Debt Facility under this Agreement, and (ii) at any time when clause (i) does not apply, the "Applicable Authorized Representative" or similar term (as defined in the applicable First Lien Intercreditor Agreement) at such time.

"Designated Second Lien Representative" means (i) the Second Lien Representative, so long as the Second Lien Debt Facility under the Second Lien Debt Documents is the only Second Lien Debt Facility under this Agreement, and (ii) at any time when clause (i) does not apply, the "Applicable Authorized Representative" or similar term (as defined in the applicable Second Lien Intercreditor Agreement) at such time.

"DIP Financing" has the meaning assigned to such term in Section 6.01.

"Discharge of First Lien Obligations" means, except to the extent otherwise expressly provided in Section 5.06 and Section 6.04, the occurrence of both (i) with respect to the First Lien Credit Agreement Obligations, the Discharge of First Lien Credit Agreement Obligations, and (ii) with respect to all other First Lien Obligations:

        (a)      payment in full of all First Lien Obligations (other than any indemnification obligations for which no claim has been asserted and any other First Lien Obligations not required to be paid in full in order to have the Liens on all Collateral securing such First Lien Obligations to be released at such time in accordance with the applicable First Lien Debt Documents);

        (b)      termination or expiration of all commitments, if any, to extend credit that would constitute Senior Obligations; and

        (c)      termination of all letters of credit issued under the Senior Priority Debt Documents or providing cash collateral or backstop letters of credit on terms specified in the applicable Senior Priority Debt Documents or otherwise acceptable to the applicable Senior Priority Representative or issuing bank in an amount and in a manner specified in the applicable Senior Priority Debt Documents or otherwise reasonably satisfactory to the applicable Senior Priority Representative and issuing bank,

in each case, to the extent constituting First Lien Obligations

"<u>Discharge of First Lien Credit Agreement Obligations</u>" means, except to the extent otherwise expressly provided in Section 5.06 and Section 6.04,

       (a)      payment in full of all First Lien Credit Agreement Obligations (other than any indemnification obligations for which no claim has been asserted); and

       (b)      termination or expiration of all commitments, if any, to extend credit that would constitute First Lien Credit Agreement Obligations,

in each case, to the extent constituting First Lien Credit Agreement Obligations.

"<u>Discharge of Second Lien Debt Obligations</u>" means:

       (a)      payment in full of all Second Lien Debt Obligations (other than any indemnification obligations for which no claim has been asserted and any other Second Lien Debt Obligations not required to be paid in full in order to have the Liens on all Collateral securing such Second Lien Debt Obligations to be released at such time in accordance with the applicable Second Lien Debt Documents); and

       (b)      termination or expiration of all commitments, if any, to extend credit that would constitute Second Lien Debt Obligations.

"<u>Disposition</u>" means any conveyance, sale, lease, assignment, transfer, license or other disposition.

"<u>Enforcement Action</u>" means:

       (a)      any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Collateral held by it; or

       (b)      the taking of any steps to enforce or require the enforcement of any Collateral (including the crystallization of any floating charge forming part of the Collateral).

"<u>First Lien Acceleration Event</u>" means any Designated First Lien Representative exercising any of its rights under Section 8.02 of the Credit Agreement and/or an Automatic Acceleration or otherwise pursuant to the terms thereof.

"<u>First Lien Class Debt</u>" has the meaning assigned to such term in Section 8.09(a).

"<u>First Lien Class Debt Parties</u>" has the meaning assigned to such term in Section 8.09(a).

"<u>First Lien Class Debt Representative</u>" has the meaning assigned to such term in Section 8.09(a).

"<u>First Lien Collateral</u>" means any "Collateral" (or equivalent term) as defined in the Credit Agreement or any other First Lien Debt Document or any other assets of the Borrower or any other Grantor with respect to which a Lien is granted or purported to be granted pursuant to a First Lien Collateral Document as security for any Restructuring First Lien Term Loans.

"<u>First Lien Collateral Documents</u>" means the "Collateral Documents" as defined in the Credit Agreement and each of the security agreements and other instruments and documents executed and delivered by the Borrower or any other Grantor for purposes of providing collateral security for any First

Lien Obligation (in each case, as amended, restated, amended and restated, Refinanced, supplemented or otherwise modified from time to time in a manner not in contravention of any provision of this Agreement).

"First Lien Debt Documents" means (a) the Credit Documents and (b) any Additional First Lien Debt Documents.

"First Lien Debt Facilities" means the Credit Agreement and any Additional First Lien Debt Facilities.

"First Lien Intercreditor Agreement" means (i) with respect to any First Lien Debt Facility secured by a Lien on the Collateral (or a portion thereof) having the same priority as the Liens securing the First Lien Obligations (but without regard to control of remedies), an intercreditor agreement in the form attached as Exhibit L to the Credit Agreement and/or (ii) with respect to any First Lien Debt Facility secured by a Lien on the Collateral (or a portion thereof) that is junior in priority to the Liens securing the First Lien Obligations but senior in priority to the Liens securing the Second Lien Debt Obligations, a customary intercreditor agreement in form and substance reasonably acceptable to the First Lien Representative with respect to each First Lien Debt Facility in existence at the time such intercreditor agreement is entered into and the Borrower.

"First Lien Credit Agreement Obligations" means the "Restructuring First Lien Term Loans" as defined in the Credit Agreement.

"First Lien Obligations" means (i) the "Senior Credit Obligations" as defined in the Credit Agreement attributable to the "Restructuring First Lien Term Loans" as defined in the Credit Agreement and (ii) any Additional First Lien Debt Obligations.

"First Lien Representative" means (i) in the case of any First Lien Credit Agreement Obligations and the Restructuring First Lien Term Loan Lenders, VCP Capital Markets, LLC, on behalf of the Restructuring First Lien Term Loan Lenders and (ii) in the case of any Additional First Lien Debt Facility and the Additional First Lien Secured Parties thereunder, the trustee, administrative agent, collateral agent, security agent or similar agent under such Additional First Lien Debt Facility that is named as the Representative in respect of such Additional First Lien Debt Facility in the applicable Joinder Agreement.

"First Lien Secured Parties" means the Restructuring First Lien Term Loan Lenders and any Additional First Lien Secured Parties.

"Grantors" means the Borrower, NewCo and each Subsidiary of the Borrower that has granted a security interest pursuant to any Collateral Document to secure any Secured Obligations.

"Group" means, collectively, NewCo, the Borrower and each Subsidiary.

"Insolvency or Liquidation Proceeding" means:

(1)    any case commenced by or against the Borrower or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, arrangement (including under any applicable corporate statute), recapitalization or adjustment or marshalling of the assets or liabilities of the Borrower or any other Grantor, any receivership or assignment for the benefit of creditors relating to the Borrower or any other Grantor or any similar case or proceeding relative to the Borrower or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2)    any liquidation, dissolution, judicial management, marshalling of assets or liabilities or other winding up of or relating to the Borrower or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)    any other proceeding of any type or nature in which substantially all claims of creditors of the Borrower or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"Intellectual Property" means, with respect to any Grantor, all intellectual and similar property of every kind and nature now owned or hereafter acquired by such Grantor, including Patents, Copyrights, Trademarks and all related documentation and registrations and all additions, improvements or accessions to any of the foregoing.

"Intra-Group Lender" means each member of the Group which has made a loan available to, granted credit to or made any other financial arrangement having similar effect with another member of the Group and which is named on the signing pages as an Intra-Group Lender or which becomes a Party as an Intra-Group Lender in accordance with the terms of Section 8.22.

"Intra-Group Liabilities" means the Liabilities owed by any member of the Group to any of the Intra-Group Lenders.

"Joinder Agreement" means a supplement to this Agreement in the form of Annex II or Annex III hereof required to be delivered by a Representative to the Designated First Lien Representative or Designated Second Lien Representative, as the case may be, pursuant to Section 8.09 hereof in order to include an additional Debt Facility hereunder and to become the Representative hereunder for the First Lien Secured Parties or Second Lien Secured Parties, as the case may be, under such Debt Facility.

"Maximum DIP Amount" means the sum of (i) 110% of the aggregate principal amount of the First Lien Obligations then outstanding immediately prior to the consummation of any DIP Financing permitted hereunder *plus* the aggregate face amount of letters of credit outstanding as of the petition date, *plus* (ii) the aggregate face amount of letters of credit permitted to be outstanding pursuant to the Credit Agreement as in effect on the date hereof, *plus* (iii) the amount of any unpaid accrued interest, paid in kind amounts and premium on First Lien Credit Agreement Obligations or any Additional First Lien Debt Facilities in connection with any Refinancing, extension, renewal, restatement, refunding or replacement thereof, plus fees and expenses incurred in connection therewith.

"NewCo" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Non-Cash Consideration" means consideration in a form other than cash or cash equivalents.

"Officer's Certificate" has the meaning assigned to such term in Section 8.08.

"Patents" means, with respect to any Grantor, all of such Grantor's right, title, and interest in and to: (a) any and all patents, patent applications, utility models and statutory invention registrations; (b) all inventions or designs claimed or disclosed therein and all improvements thereto; (c) all reissues, divisions, continuations, renewals, extensions, and continuations-in-part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing throughout the world.

"<u>Person</u>" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"<u>Pledged or Controlled Collateral</u>" has the meaning assigned to such term in Section 5.05(a).

"<u>Proceeds</u>" means the proceeds of any sale, collection or other liquidation of Shared Collateral, any payment or distribution made in respect of Shared Collateral in an Insolvency or Liquidation Proceeding and any amounts received by any First Lien Representative or any First Lien Secured Party from a Second Lien Secured Party in respect of Shared Collateral pursuant to this Agreement, including all "proceeds," as such term is defined in the UCC.

"<u>Property</u>" of a member of the Group or of a Grantor means: (a) any asset of that member of the Group or of that Grantor; (b) any Subsidiary of that member of the Group or of that Grantor; and (c) any asset of any such Subsidiary.

"<u>Purchase Price</u>" has the meaning assigned to such term in <u>Section 5.07(b)</u>.

"<u>Recovery</u>" has the meaning assigned to such term in <u>Section 6.04</u>.

"<u>Refinance</u>" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, Borrower and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, loan agreement, note purchase agreement, indenture or other agreement, regardless of whether the principal amount of such refinancing indebtedness is the same, greater than, or less than the principal amount of the refinanced indebtedness. "<u>Refinanced</u>" and "<u>Refinancing</u>" have correlative meanings.

"<u>Registered Equivalent Notes</u>" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"<u>Representatives</u>" means the First Lien Representatives and the Second Lien Representatives.

"<u>Restructuring First Lien Borrower</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Restructuring First Lien Term Loan Lenders</u>" has the meaning assigned to such term in the Credit Agreement and shall include any permitted successor lenders as provided in Section 10.06 of the Credit Agreement.

"<u>Restructuring Second Lien Borrower</u>" means, collectively, (i) the Restructuring Second Lien US Borrower and (ii) the Restructuring Second Lien Co-Borrower.

"<u>Restructuring Second Lien Co-Borrower</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Restructuring Second Lien Term Loan Lenders" has the meaning assigned to such term in the Credit Agreement and shall include any successor Lenders as provided in Section 10.06 of the Credit Agreement.

"Restructuring Second Lien US Borrower" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Second Lien Acceleration Event" means any Designated Second Lien Representative exercising any of its rights under Section 8.02 of the Credit Agreement and/or an Automatic Acceleration or otherwise pursuant to the terms thereof.

"Second Lien Class Debt" has the meaning assigned to such term in Section 8.09(a).

"Second Lien Class Debt Parties" has the meaning assigned to such term in Section 8.09(a).

"Second Lien Class Debt Representative" has the meaning assigned to such term in Section 8.09(a).

"Second Lien Collateral" means any "Collateral" (or equivalent term) as defined in any Debt Documents or any other Second Lien Debt Document or any other assets of the Borrower or any other Grantor with respect to which a Lien is granted or purported to be granted pursuant to a Second Lien Collateral Document as security for any Second Lien Debt Obligations.

"Second Lien Collateral Documents" means the "Collateral Documents" as defined in the Credit Agreement and each of the security agreements and other instruments and documents executed and delivered by the Borrower or any other Grantor for purposes of providing collateral security for any Second Lien Debt Obligation (in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in a manner not in contravention of any provision of this Agreement).

"Second Lien Debt Documents" means (a) Credit Documents and (b) any Additional Second Lien Debt Documents.

"Second Lien Debt Facilities" means the Credit Agreement and any Additional Second Lien Debt Facilities.

"Second Lien Debt Obligations" means (i) the "Senior Credit Obligations" as defined in the Credit Agreement attributable the "Restructuring Second Lien Term Loans" as defined in the Credit Agreement and (ii) any Additional Second Lien Debt Obligations.

"Second Lien Enforcement Date" means, with respect to any Second Lien Representative, the date which is 180 days after the occurrence of both (i) an Event of Default (under and as defined in the Second Lien Debt Document for which such Second Lien Representative has been named as Representative) and (ii) the Designated First Lien Representative's and each other Representative's receipt of written notice from such Second Lien Representative that (x) such Second Lien Representative is the Designated Second Lien Representative and that an Event of Default (under and as defined in the Second Lien Debt Document for which such Second Lien Representative has been named as Representative) has occurred and is continuing and (y) the Second Lien Debt Obligations of the series, issue or class with respect to which such Second Lien Representative is the Second Lien Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Second Lien Debt Document; provided that the Second Lien Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time a First Lien Representative has commenced and is diligently pursuing any enforcement action with respect to a material portion of any

Shared Collateral or (2) at any time any Grantor which has granted a security interest in any Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"Second Lien Intercreditor Agreement" means (i) with respect to any Second Lien Debt Facility secured by a Lien on the Collateral (or a portion thereof) having the same priority as the Liens securing the Second Lien Debt Obligations (but without regard to control of remedies, other than as provided by the terms of the applicable Second Lien Debt Documents), a customary intercreditor agreement for such type of Second Lien Debt Facility in form and substance reasonably satisfactory to the Second Lien Representative with respect to each other Second Lien Debt Facility in existence at the time such intercreditor agreement is entered into and (ii) with respect to any Second Lien Debt Facility secured by a Lien on the Collateral (or a portion thereof) that is junior to the Liens securing the Second Lien Debt Obligations, a customary intercreditor agreement for such type of Second Lien Debt Facility in form and substance reasonably satisfactory to the Second Lien Representative with respect to each other Second Lien Debt Facility in existence at the time such intercreditor agreement is entered into.

"Second Lien" means the Liens on the Second Lien Collateral in favor of Second Lien Secured Parties under the Collateral Documents.

"Second Lien Representative" means (i) in the case of any Second Lien Credit Agreement Obligations and the Restructuring Second Lien Term Loan Lenders, VCP Capital Markets, LLC, on behalf of the Restructuring Second Lien Term Loan Lenders and (ii) in the case of any Additional Second Lien Debt Facility and the Additional Second Lien Secured Parties thereunder, the trustee, administrative agent, collateral agent, security agent or similar agent under such Additional Second Lien Debt Facility that is named as the Representative in respect of such Additional Second Lien Debt Facility in the applicable Joinder Agreement.

"Second Lien Secured Parties" means the Restructuring Second Lien Term Loan Lenders and any Additional Second Lien Secured Parties.

"Secured Obligations" means the First Lien Obligations and the Second Lien Debt Obligations.

"Secured Parties" means the First Lien Secured Parties and the Second Lien Secured Parties.

"Security Document" means the First Lien Debt Documents and the Second Lien Debt Documents.

"Senior Lien" means the Liens on the First Lien Collateral in favor of the First Lien Secured Parties under the Collateral Documents.

"Shared Collateral" means, at any time, Collateral in which the holders of First Lien Obligations under at least one First Lien Debt Facility (or their Representatives) and the holders of Second Lien Debt Obligations under at least one Second Lien Debt Facility (or their Representatives) hold a security interest at such time (or, in the case of the First Lien Debt Facilities, are deemed pursuant to Article 2 to hold a security interest). If, at any time, any portion of the First Lien Collateral under one or more First Lien Debt Facilities does not constitute Second Lien Collateral under one or more Second Lien Debt Facilities, then such portion of such First Lien Collateral shall constitute Shared Collateral only with respect to the Second Lien Debt Facilities for which it constitutes Second Lien Collateral and shall not constitute Shared Collateral for any Second Lien Debt Facility which does not have a security interest in such Collateral at such time.

"<u>Trademarks</u>" means, with respect to any Grantor, all of such Grantor's right, title, and interest in and to the following: (a) all trademarks, trademark applications, service marks, service mark applications, domain names, trade dress, logos, designs, slogans, trade names, business names, corporate names and other source identifiers, whether registered or unregistered and the goodwill of the business symbolized by the foregoing; (b) all licenses of the foregoing, whether as licensee or licensor; (c) all renewals of the foregoing; (d) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (f) all rights corresponding to any of the foregoing throughout the world.

"<u>Uniform Commercial Code</u>" or "<u>UCC</u>" means, unless otherwise specified, the Uniform Commercial Code as from time to time in effect in the State of New York.

Section 1.02    <u>Terms Generally</u>.  The rules of interpretation set forth in Sections 1.02 through 1.07, as applicable, of the Credit Agreement are incorporated herein *mutatis mutandis*.  Any reference herein to the payment or repayment in full of an obligation shall mean the payment in full in cash of such obligation, or in such other manner as may be approved in writing by the requisite holders or representatives in respect of such obligation.

## ARTICLE 2
## PRIORITIES AND AGREEMENTS WITH RESPECT TO SHARED COLLATERAL

Section 2.01    <u>Subordination</u>.  Notwithstanding the date, time, manner or order of filing or recordation of any document or instrument or grant, attachment or perfection of any Liens granted to any Second Lien Representative or any Second Lien Secured Parties on the Shared Collateral or of any Liens granted to any First Lien Representative or any other First Lien Secured Party on the Shared Collateral (or any actual or alleged defect in any of the foregoing) and notwithstanding any provision of the UCC, any applicable Law, any Second Lien Debt Document or any First Lien Debt Document or any other circumstance whatsoever, each Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt Facility, hereby agrees that:

(a)    any Lien on the Shared Collateral securing or purporting to secure any First Lien Obligations now or hereafter held by or on behalf of any First Lien Representative or any other First Lien Secured Party or other agent or trustee therefor, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall have priority over and be senior in all respects and prior to any Lien on the Shared Collateral securing or purporting to secure any Second Lien Debt Obligations;

(b)    any Lien on the Shared Collateral securing or purporting to secure any Second Lien Debt Obligations now or hereafter held by or on behalf of any Second Lien Representative, any Second Lien Secured Parties or any other agent or trustee therefor, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Shared Collateral securing or purporting to secure any First Lien Obligations;

All Liens on the Shared Collateral securing or purporting to secure any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Shared Collateral securing or purporting to secure any Second Lien Debt Obligations for all purposes, whether or not such Liens securing or purporting to secure any First Lien Debt Obligations are subordinated to any Lien securing any other obligation of the Borrower, any Grantor or any other Person or otherwise subordinated, voided, avoided, invalidated or lapsed. Notwithstanding the perfection of any Liens as of the Closing Date, the parties hereto

agree that the obligations secured by the perfected Lien that constitute First Lien Obligations will be deemed for all purposes to be first lien and remainder of obligations will be deemed second lien.

Section 2.02    Nature of Senior Lender Claims.  Each Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt Facility, acknowledges that the terms of the First Lien Debt Documents and the First Lien Obligations may be amended, restated, amended and restated, supplemented or otherwise modified, and the First Lien Obligations, or a portion thereof, may be Refinanced from time to time, and the aggregate amount of the First Lien Obligations may be increased, in each case, without notice to or consent by the Second Lien Representatives or the Second Lien Secured Parties and without affecting the provisions hereof, except as otherwise expressly set forth herein. The Lien priorities provided for in Section 2.01 shall not be altered or otherwise affected by any amendment, restatement, amendment and restatement, supplement or other modification, or any Refinancing, of either the First Lien Obligations or the Second Lien Debt Obligations, or any portion thereof. As between the Borrower and the other Grantors, on the one hand, and the Second Lien Secured Parties, on the other hand, the foregoing provisions will not limit or otherwise affect the obligations of the Borrower or any other Grantor contained in any Second Lien Debt Document with respect to the incurrence of additional First Lien Obligations.

Section 2.03    Prohibition on Contesting Liens.  (a) Each of the Second Lien Representatives, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, extent, perfection, priority or enforceability of any Lien securing any First Lien Obligations held (or purported to be held) by or on behalf of any First Lien Representative or any of the other First Lien Secured Parties or any other agent or trustee therefor in any First Lien Collateral or the allowability of any claims asserted with respect to any First Lien Obligations in any proceeding (including any Insolvency or Liquidation Proceeding) and (b) each First Lien Representative, for itself and on behalf of each First Lien Secured Party under its First Lien Debt Facility, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, extent, perfection, priority or enforceability of any Lien securing any Second Lien Debt Obligations held (or purported to be held) by or on behalf of any Second Lien Representative or any of the Second Lien Secured Parties in the Second Lien Collateral or the allowability of any claims asserted with respect to any Second Lien Debt Obligations in any proceeding (including any Insolvency or Liquidation Proceeding). Notwithstanding the foregoing, no provision in this Agreement shall be construed to prevent or impair the rights of any First Lien Representative to enforce this Agreement (including the priority of the Liens securing the First Lien Obligations as provided in Section 2.01) or any of the First Lien Debt Documents.

Section 2.04    No New Liens.  The parties hereto agree that, so long as the Discharge of First Lien Obligations has not occurred, (a) none of the Grantors shall grant any additional Liens on any asset or property of any Grantor to secure (x) any Second Lien Debt Obligation unless it has also granted, or concurrently therewith also grants, a Lien on such asset or property of such Grantor to secure the First Lien Obligations or (y) any First Lien Obligation unless it has also granted, or concurrently therewith also grants, a Lien on such asset or property of such Grantor to secure the Second Lien Debt Obligations; and (b) if any Second Lien Representative or any Second Lien Secured Party shall hold any Lien on any assets or property of any Grantor securing any Second Lien Debt Obligations that are not also subject to the Liens securing all First Lien Obligations under the First Lien Collateral Documents, such Second Lien Representative or Second Lien Secured Party (i) shall notify the Designated First Lien Representative promptly upon becoming aware thereof and, unless such Grantor shall promptly also grant a similar Lien on such assets or property to each First Lien Representative as security for the First Lien Obligations, shall assign such Lien to the Designated First Lien Representative as security for all First Lien Obligations for the benefit of the First Lien Secured Parties (but may retain a junior Lien on such assets or property subject to the terms

-13-

hereof) and (ii) until such assignment or such grant of a similar Lien to each First Lien Representative, shall be deemed to hold and have held such Lien for the benefit of each First Lien Representative and the other First Lien Secured Parties as security for the First Lien Obligations; <u>provided</u> that this provision will not be violated (i) with respect to any particular series of Additional First Lien Debt Obligations if the applicable trustee, administrative agent, collateral agent, security agent or similar agent under such Additional First Lien Debt Facility that is named as the Representative in respect of such Additional First Lien Debt Facility in the applicable Joinder Agreement is given a reasonable opportunity to accept a Lien on any asset or property and such trustee or agent expressly declines to accept a Lien on such asset or property or the Borrower states in writing that the First Lien Debt Documents in respect thereof prohibit such agent or trustee from accepting a Lien on such asset or property or (ii) with respect to any particular series of Additional Second Lien Debt Obligations if the applicable trustee, administrative agent, collateral agent, security agent or similar agent under such Additional Second Lien Debt Facility that is named as the Representative in respect of such Additional Second Lien Debt Facility in the applicable Joinder Agreement is given a reasonable opportunity to accept a Lien on any asset or property and such trustee or agent expressly declines to accept a Lien on such asset or property. To the extent that the provisions of the immediately preceding sentence are not complied with for any reason (i) without limiting any other right or remedy available to any First Lien Representative or any other First Lien Secured Party, each Second Lien Representative agrees, for itself and on behalf of the other Second Lien Secured Parties for which it has been named the Representative, that any amounts received by or distributed to any Second Lien Secured Party pursuant to or as a result of any Lien granted in contravention of this Section 2.04 shall be subject to Section 4.01 and Section 4.02 and/or (ii) without limiting any other right or remedy available to any Second Lien Representative or any other Second Lien Secured Party, each First Lien Representative agrees, for itself and on behalf of the other First Lien Secured Parties for which it has been named the Representative, that any amounts received by or distributed to any First Lien Secured Party pursuant to or as a result of any Lien granted in contravention of this Section 2.04 shall be subject to Section 4.01 and Section 4.02.

Section 2.05    <u>Perfection of Liens</u>.    Except for the limited agreements of the First Lien Representatives pursuant to Section 5.05 hereof, none of the First Lien Representatives or the First Lien Secured Parties shall be responsible for perfecting and maintaining the perfection of Liens with respect to the Shared Collateral for the benefit of the Second Lien Representatives or the Second Lien Secured Parties. The provisions of this Agreement are intended solely to govern the respective Lien priorities as between the First Lien Secured Parties and the Second Lien Secured Parties and shall not impose on the First Lien Representatives, the First Lien Secured Parties, the Second Lien Representatives, the Second Lien Secured Parties or any agent or trustee therefor any obligations in respect of the disposition of Proceeds of any Shared Collateral which would conflict with prior perfected claims therein in favor of any other Person or any order or decree of any court or Governmental Authority or any applicable Law.

Section 2.06    [Reserved].

<div align="center">

**ARTICLE 3**
**ENFORCEMENT**

</div>

Section 3.01    <u>Exercise of Remedies</u>.

(a)    So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, (i) neither any Second Lien Representative nor any Second Lien Secured Party will (x) exercise or seek to exercise any rights or remedies (including setoff) with respect to any Shared Collateral in respect of any Second Lien Debt Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object to any foreclosure proceeding or other action brought with respect to the Shared Collateral or any other First Lien Collateral by any First

Lien Representative or any First Lien Secured Party in respect of the First Lien Obligations, the exercise of any right by any First Lien Representative or any First Lien Secured Party (or any agent or sub-agent on their behalf) in respect of the First Lien Obligations under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any First Lien Representative or any First Lien Secured Party either is a party or may have rights as a third party beneficiary, or any other exercise by any such party of any rights and remedies relating to the Shared Collateral under the First Lien Debt Documents or otherwise in respect of the First Lien Collateral or the First Lien Obligations, or (z) object to the forbearance by the First Lien Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Shared Collateral in respect of First Lien Obligations and (ii) the Designated First Lien Representative shall have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Shared Collateral or any other First Lien Collateral without any consultation with or the consent of any Second Lien Representative or any Second Lien Secured Party; provided, however, that (A) in any Insolvency or Liquidation Proceeding commenced by or against the Borrower or any other Grantor, any Second Lien Representative may file a claim, proof of claim, or statement of interest with respect to the Second Lien Debt Obligations under its Second Lien Debt Facility in a manner that is not inconsistent with the terms and conditions of this Agreement, (B) any Second Lien Representative may take any action (not adverse to the prior Liens on the Shared Collateral securing the First Lien Obligations or the rights of the First Lien Representatives or the First Lien Secured Parties to exercise remedies in respect thereof) in order to create, prove, perfect, preserve or protect (but not enforce) its rights in, and perfection and priority of its Lien on, the Shared Collateral, (C) any Second Lien Representative and the Second Lien Secured Parties may exercise their rights and remedies as unsecured creditors, to the extent provided and subject to the restrictions contained in Section 5.04, (D) any Second Lien Representative may exercise the rights and remedies provided for in Section 6.03 and the Second Lien Secured Parties may file any responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance that is not permitted by this Agreement of the claims or Liens of the Second Lien Secured Parties or the avoidance of any Second Lien to the extent not inconsistent with the terms of this Agreement, (E) any Second Lien Secured Party may (subject to the provisions of Section 6.10(b)) vote on any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any Insolvency or Liquidation Proceeding that conforms to the terms and conditions of this Agreement, and (F) from and after the Second Lien Enforcement Date, the Designated Second Lien Representative (or such other Person, if any, as is so authorized under the applicable Second Lien Intercreditor Agreement) may exercise or seek to exercise any rights or remedies (including setoff) with respect to any Shared Collateral in respect of any Second Lien Debt Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), but only so long as (1) a First Lien Representative has not commenced and is not diligently pursuing any enforcement action with respect to a material portion of Shared Collateral or (2) any Grantor which has granted a security interest in any Shared Collateral is not then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding. In exercising rights and remedies with respect to the First Lien Collateral, the First Lien Representatives and the First Lien Secured Parties may enforce the provisions of the First Lien Debt Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Shared Collateral upon foreclosure, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code or any other applicable Law of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

      (b)      [Reserved.]

(c)        So long as the Discharge of First Lien Obligations has not occurred, except as expressly provided in the proviso to clause (ii) of Section 3.01(a) but subject to Section 4.01, each Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt Facility, agrees that it will not take or receive any Shared Collateral or any Proceeds of Shared Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any Shared Collateral in respect of Second Lien Debt Obligations or in connection with any Insolvency or Liquidation Proceeding. Without limiting the generality of the foregoing, unless and until the Discharge of First Lien Obligations has occurred, except as expressly provided in the proviso to clause (ii) of Section 3.01(a), the sole right of the Second Lien Representatives and the Second Lien Secured Parties with respect to the Shared Collateral is to hold a Lien on the Shared Collateral in respect of Second Lien Debt Obligations pursuant to the Second Lien Debt Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, after the Discharge of First Lien Obligations has occurred.

(d)        Subject to the proviso in clause (ii) of Section 3.01(a), (i) each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, agrees that neither such Second Lien Representative nor any such Second Lien Secured Party will take any action that would hinder any exercise of remedies undertaken by any First Lien Representative or any First Lien Secured Party with respect to the Shared Collateral under the First Lien Debt Documents, including any Disposition of the Shared Collateral, whether by foreclosure or otherwise, and (ii) each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, hereby waives any and all rights it or any such Second Lien Secured Party may have as a junior lien creditor or otherwise to object to the manner in which the First Lien Representatives or the First Lien Secured Parties seek to enforce or collect the First Lien Obligations or the Liens granted on any of the First Lien Collateral, regardless of whether any action or failure to act by or on behalf of any First Lien Representative or any other First Lien Secured Party is adverse to the interests of the Second Lien Secured Parties.

(e)        Each Second Lien Representative hereby acknowledges and agrees that no covenant, agreement or restriction contained in any Second Lien Debt Document shall be deemed to restrict in any way the rights and remedies of the First Lien Representatives or the First Lien Secured Parties with respect to the First Lien Collateral as set forth in this Agreement and the First Lien Debt Documents.

(f)        Until the Discharge of First Lien Obligations, except as expressly provided in the proviso in clause (ii) of Section 3.01(a), the Designated First Lien Representative shall have the exclusive right to exercise any right or remedy with respect to the Shared Collateral and shall have the exclusive right to determine and direct the time, method and place for exercising such right or remedy or conducting any proceeding with respect thereto. Following the Discharge of First Lien Obligations, the Designated Second Lien Representative (or any Person authorized by it) shall have the exclusive right to exercise any right or remedy with respect to the Collateral, and the Designated Second Lien Representative shall have the exclusive right to direct the time, method and place of exercising or conducting any proceeding for the exercise of any right or remedy available to the Second Lien Secured Parties with respect to the Collateral, or of exercising or directing the exercise of any trust or power conferred on the Second Lien Representatives, or for the taking of any other action authorized by the Second Lien Collateral Documents; provided, however, that nothing in this Section 3.01 shall impair the right of any Second Lien Representative or other agent or trustee acting on behalf of the Second Lien Secured Parties to take such actions with respect to the Collateral after the Discharge of First Lien Obligations as may be otherwise required or authorized pursuant to any intercreditor agreement governing the Second Lien Secured Parties or the Second Lien Debt Obligations.

Section 3.02    Cooperation. Subject to the proviso in clause (ii) of Section 3.01(a), each Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt

Facility, agrees that, unless and until the Discharge of First Lien Obligations has occurred, it will not commence, or join with any Person (other than the First Lien Secured Parties and the First Lien Representatives upon the request of the Designated First Lien Representative) in commencing, any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it in the Shared Collateral under any of the Second Lien Debt Documents or otherwise in respect of the Second Lien Debt Obligations.

Section 3.03    <u>Actions Upon Breach</u>.  Should any Second Lien Representative or any Second Lien Secured Party, contrary to this Agreement, in any way take, attempt to take or threaten to take any action with respect to the Shared Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement) or fail to take any action required by this Agreement, any First Lien Representative or other First Lien Secured Party (in its or their own name or in the name of the Borrower or any other Grantor) or the Borrower or any other Grantor may obtain relief against such Second Lien Representative or such Second Lien Secured Party by injunction, specific performance or other appropriate equitable relief. Each Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt Facility, hereby (i) agrees that the First Lien Secured Parties' damages from the actions of the Second Lien Representatives or any Second Lien Secured Party may at that time be difficult to ascertain and may be irreparable and waives any defense that the Borrower, any other Grantor, any First Lien Representative or the other First Lien Secured Parties cannot demonstrate damage or be made whole by the awarding of damages and (ii) irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by any First Lien Representative or any other First Lien Secured Party.

<div align="center">

**ARTICLE 4**
**PAYMENTS**

</div>

Section 4.01    <u>Application of Proceeds</u>. So long as the Discharge of First Lien Obligations has not occurred and regardless of whether an Insolvency or Liquidation Proceeding has been commenced, the Shared Collateral or Proceeds thereof received in connection with the sale or other disposition of, or collection on, such Shared Collateral upon the exercise of remedies or in connection with any Insolvency or Liquidation Proceeding shall be applied by the Designated First Lien Representative to the First Lien Obligations in such order as specified in the (and subject to the terms of the) relevant First Lien Debt Documents and, if applicable, the applicable First Lien Intercreditor Agreement(s), until the Discharge of First Lien Obligations has occurred. Upon the Discharge of First Lien Obligations, each applicable First Lien Representative shall deliver promptly to the Designated Second Lien Representative any Shared Collateral or Proceeds thereof held by it in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct (and subject to the other terms of this Agreement), to be applied by the Designated Second Lien Representative to the Second Lien Debt Obligations in such order as specified in the relevant Second Lien Debt Documents and if applicable, the applicable Second Lien Intercreditor Agreement(s), until the Discharge of the Second Lien Debt Obligations has occurred.

Section 4.02    <u>Payments Over</u>.  So long as the Discharge of First Lien Obligations has not occurred, any Shared Collateral or Proceeds thereof received by any Second Lien Representative or any Second Lien Secured Party in connection with the exercise of any right or remedy (including setoff) relating to the Shared Collateral, in connection with any Insolvency or Liquidation Proceeding or otherwise in contravention of this Agreement shall be segregated and held in trust for the benefit of and forthwith paid over to the Designated First Lien Representative for the benefit of the First Lien Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct (and subject to the other terms of this Agreement). The Designated First Lien Representative is hereby authorized to make any such endorsements as agent for each of the Second Lien Representatives or any such Second Lien Secured Party. This authorization is coupled with an interest and is irrevocable.

<div align="center">-17-</div>

**ARTICLE 5**
**OTHER AGREEMENTS**

Section 5.01        Releases.

(a)        Each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, agrees that, in the event of a Disposition of any specified item of Shared Collateral (including all or substantially all of the Capital Stock of any Subsidiary of Holdings) (i) in connection with the exercise of remedies in respect of Collateral by the Designated First Lien Representative or (ii) if not in connection with the exercise of remedies in respect of Collateral by the Designated First Lien Representative, so long as such Disposition is not prohibited by the terms of the Second Lien Debt Documents and the First Lien Debt Documents and, in the case of this clause (ii) other than in connection with the Discharge of First Lien Obligations, the Liens granted to the Second Lien Representatives and the Second Lien Secured Parties upon such Shared Collateral (but not on the Proceeds thereof that were not applied to the payment of First Lien Obligations) to secure Second Lien Debt Obligations shall terminate and be released, automatically and without any further action, concurrently with the termination and release of all Liens granted upon such Shared Collateral to secure First Lien Obligations. Upon notice to a Second Lien Representative stating that any such termination and release of Liens securing the First Lien Obligations has become effective (or shall become effective concurrently with such termination and release of the Liens granted to the Second Lien Secured Parties and the Second Lien Representatives) and any necessary or proper instruments of termination or release prepared by the Borrower or any other Grantor, such Second Lien Representative will promptly execute, deliver or acknowledge, at the Borrower's sole cost and expense and without any representation or warranty, such instruments to evidence such termination and release of the Liens. Nothing in this Section 5.01(a) will be deemed to (x) affect any agreement of a Second Lien Representative, for itself and on behalf of the Second Lien Secured Parties under its Second Lien Debt Facility, to release the Liens on the Second Lien Collateral as set forth in the relevant Second Lien Debt Documents or (y) except in the case of a Disposition in connection with the exercise of secured creditors' rights and remedies, require the release of Liens granted upon such Shared Collateral to secure Second Lien Debt Obligations if such Disposition is not permitted under the terms of the Second Lien Debt Documents.

(b)        Each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, hereby irrevocably constitutes and appoints the Designated First Lien Representative and any officer or agent of the Designated First Lien Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Second Lien Representative or such Second Lien Secured Party or in the Designated First Lien Representative's own name, from time to time in the Designated First Lien Representative's discretion, for the purpose of carrying out the terms of Section 5.01(a), to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of Section 5.01(a), including any termination statements, endorsements or other instruments of transfer or release.

(c)        Unless and until the Discharge of First Lien Obligations has occurred, each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, hereby consents to the application, whether prior to or after an event of default under any First Lien Debt Document, of Proceeds of Shared Collateral to the repayment of First Lien Obligations pursuant to the First Lien Debt Documents; provided that nothing in this Section 5.01(c) shall be construed to prevent or impair the rights of the Second Lien Representatives or the Second Lien Secured Parties to receive Proceeds in connection with the Second Lien Debt Obligations not otherwise in contravention of this Agreement.

(d)     Notwithstanding anything to the contrary in any Second Lien Collateral Document, in the event the terms of a First Lien Collateral Document and a Second Lien Collateral Document each require any Grantor to (i) make payment in respect of any item of Shared Collateral, (ii) deliver or afford control over any item of Shared Collateral to, or deposit any item of Shared Collateral with, (iii) register ownership of any item of Shared Collateral in the name of or make an assignment of ownership of any Shared Collateral or the rights thereunder to, (iv) cause any securities intermediary, commodities intermediary or other Person acting in a similar capacity to agree to comply, in respect of any item of Shared Collateral, with instructions or orders from, or to treat, in respect of any item of Shared Collateral, as the entitlement holder, (v) hold any item of Shared Collateral in trust for (to the extent such item of Shared Collateral cannot be held in trust for multiple parties under applicable Law), (vi) obtain the agreement of a bailee or other third party to hold any item of Shared Collateral for the benefit of or subject to the control of or, in respect of any item of Shared Collateral, to follow the instructions of, or (vii) obtain the agreement of a landlord with respect to access to leased premises where any item of Shared Collateral is located or waivers or subordination of rights with respect to any item of Shared Collateral in favor of, in any case, both the Designated First Lien Representative and any Second Lien Representative or Second Lien Secured Party, such Grantor may, until the applicable Discharge of First Lien Obligations has occurred, comply with such requirement under the Second Lien Collateral Document as it relates to such Shared Collateral by taking any of the actions set forth above only with respect to, or in favor of, the Designated First Lien Representative.

Section 5.02     Insurance and Condemnation Awards.  Unless and until the Discharge of First Lien Obligations has occurred, subject in each case to the rights of the Grantors under, and any limitations under, the First Lien Debt Documents, the Designated First Lien Representative and the First Lien Secured Parties shall have the sole and exclusive right (a) to adjust settlement for any insurance policy covering the Shared Collateral in the event of any loss thereunder and (b) to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral. Unless and until the Discharge of First Lien Obligations has occurred, and subject to the rights of the Grantors under, and any limitations under, the First Lien Debt Documents and the Second Lien Debt Documents, all proceeds of any such policy and any such award, if in respect of the Shared Collateral, shall be paid (i) first, prior to the occurrence of the Discharge of First Lien Obligations, to the Designated First Lien Representative for the benefit of First Lien Secured Parties pursuant to the terms of the First Lien Debt Documents and, if applicable, the applicable First Lien Intercreditor Agreement(s), (ii) second, after the occurrence of the Discharge of First Lien Obligations, to the Designated Second Lien Representative for the benefit of the Second Lien Secured Parties pursuant to the terms of the applicable Second Lien Debt Documents and, if applicable, the applicable Second Lien Intercreditor Agreement(s), (iii) and third, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. If any Second Lien Representative or any Second Lien Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the Designated First Lien Representative (or after the Discharge of First Lien Obligations, the Designated Second Lien Representative) to receive such amounts in accordance with the terms of Section 4.02.

Section 5.03     [Reserved].

Section 5.04     Rights As Unsecured Creditors.  The Second Lien Representatives and the Second Lien Secured Parties may exercise rights and remedies as unsecured creditors against the Borrower and any other Grantor in accordance with the terms of the Second Lien Debt Documents and applicable Law so long as such rights and remedies do not violate any express provision of this Agreement. Nothing in this Agreement shall prohibit the receipt by any Second Lien Representative or any Second Lien Secured Party of the required payments of principal, premium, interest, fees and other amounts due under the Second Lien Debt Documents so long as such receipt is not the direct or indirect result of the exercise by a Second Lien

Representative or any Second Lien Secured Party of rights or remedies as a secured creditor in respect of Shared Collateral. In the event any Second Lien Representative or any Second Lien Secured Party becomes a judgment Lien creditor in respect of Shared Collateral as a result of its enforcement of its rights as an unsecured creditor in respect of Second Lien Debt Obligations, such judgment Lien shall be subordinated to the Liens securing First Lien Obligations on the same basis as the other Liens securing the Second Lien Debt Obligations are so subordinated to such Liens securing First Lien Obligations under this Agreement. Nothing in this Agreement shall impair or otherwise adversely affect any rights or remedies the First Lien Representatives or the First Lien Secured Parties may have with respect to the First Lien Collateral.

Section 5.05    [Reserved].

Section 5.06    When Discharge of First Lien Obligations Deemed To Not Have Occurred.  If, at any time substantially concurrently with or after the Discharge of First Lien Obligations has occurred, the Borrower or any Subsidiary consummates any Refinancing or incurs any First Lien Obligations (other than in respect of the payment of indemnities surviving the Discharge of First Lien Obligations), then such Discharge of First Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of First Lien Obligations) and the applicable agreement governing such First Lien Obligations shall automatically be treated as a First Lien Debt Document for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Shared Collateral set forth herein and the agent, representative or trustee for the holders of such First Lien Obligations shall be the First Lien Representative for all purposes of this Agreement; provided that such First Lien Representative shall have become a party to this Agreement pursuant to Section 8.09.  Upon receipt of notice of such incurrence (including the identity of the new First Lien Representative), each Second Lien Representative (including the Designated Second Lien Representative) shall promptly (a) enter into such documents and agreements (at the expense of the Borrower), including amendments, supplements or modifications to this Agreement, as the Borrower or such new First Lien Representative shall reasonably request in writing in order to provide the new First Lien Representative the rights of a First Lien Representative contemplated hereby and (b) deliver to such First Lien Representative, to the extent that it is legally permitted to do so, all Shared Collateral, including all Proceeds thereof, held or controlled by such Second Lien Representative or any of its agents or bailees, including the transfer of possession and control, as applicable, of the Pledged or Controlled Collateral, together with any necessary endorsements and notices to depositary banks, securities intermediaries and commodities intermediaries, and assign to such First Lien Representative, to the extent that it is legally permitted to do so, its rights under any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to Shared Collateral.

Section 5.07    Purchase Right.

(a)    Without prejudice to the enforcement of any of the First Lien Secured Parties' remedies under the First Lien Debt Documents, under this Agreement, at law or in equity or otherwise, the First Lien Secured Parties agree at any time following the earliest to occur of (i) an acceleration of any of the First Lien Obligations in accordance with the terms of the applicable First Lien Debt Documents, (ii) a payment default under any First Lien Debt Document that has not been cured or waived by the applicable First Lien Secured Parties within sixty (60) days of the occurrence thereof or (iii) the commencement of any Insolvency or Liquidation Proceeding with respect to any Grantor (each, a "Purchase Event"), within thirty (30) days of the Purchase Event, one or more of the Second Lien Secured Parties may request, and the First Lien Secured Parties hereby offer the Second Lien Secured Parties the option to purchase the entire aggregate amount (but not less than the entirety) of outstanding First Lien Obligations (including unfunded commitments under any First Lien Debt Document that have not been terminated at such time) at the Purchase Price without warranty or representation or recourse except as provided in Section 5.07(d), on a

pro rata basis among the First Lien Secured Parties, which offer may be accepted by less than all of the Second Lien Secured Parties so long as all the accepting Second Lien Secured Parties shall when taken together purchase such entire aggregate amount as set forth above.

(b)    The "Purchase Price" will equal the sum of (1) the full amount of all First Lien Obligations then-outstanding and unpaid at par (including, without duplication, principal, accrued but unpaid interest and fees and any other unpaid amounts, including breakage costs and, in the case of any secured hedging obligations, the amount that would be payable by the relevant Grantor thereunder if such Grantor were to terminate the hedge agreement in respect thereof on the date of the purchase or, if not terminated, an amount determined by the relevant First Lien Secured Party to be necessary to collateralize its credit risk arising out of such agreement (not to exceed 103% thereof), but excluding any prepayment penalties or premiums), (2) the cash collateral to be furnished to the First Lien Secured Parties providing letters of credit under the First Lien Debt Documents in such amount (not to exceed 103% thereof) as such First Lien Secured Parties determine is reasonably necessary to secure such First Lien Secured Parties in connection with any such outstanding and undrawn letters of credit and (3) to the extent constituting First Lien Obligations, all accrued and unpaid fees, expenses and other amounts (including attorneys' fees and expenses) owed to the First Lien Secured Parties under or pursuant to the First Lien Debt Documents on the date of purchase.

(c)    One or more of the Second Lien Secured Parties shall exercise the purchase right within thirty (30) days of the applicable Purchase Event, and the parties shall endeavor to close promptly thereafter, but in any event within fifteen (15) Business Days of the request.  If the Second Lien Secured Parties (or any subset of them) exercise such purchase right, it shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Representative and the Second Lien Representative.  If none of the Second Lien Secured Parties exercise such right within thirty (30) days of the applicable Purchase Event, the First Lien Secured Parties shall have no further obligations pursuant to this Section 5.07 and may take any further actions in their sole discretion in accordance with the First Lien Debt Documents and this Agreement.

(d)    The purchase and sale of the First Lien Obligations under this Section 5.07 will be without recourse and without representation or warranty of any kind by the First Lien Secured Parties, except that the First Lien Secured Parties shall severally and not jointly represent and warrant to the Second Lien Secured Parties that on the date of such purchase, immediately before giving effect to the purchase:

(i)    the principal of and accrued and unpaid interest on the First Lien Obligations, and the fees and expenses thereof owed to the respective First Lien Secured Parties, are as stated in any assignment agreement prepared in connection with the purchase and sale of the First Lien Obligations; and

(ii)    each First Lien Secured Party owns the First Lien Obligations purported to be owned by it free and clear of any Liens (other than participation interests not prohibited by the First Lien Debt Documents, in which case the Purchase Price will be appropriately adjusted so that the Second Lien Secured Parties do not pay amounts represented by participation interests to the extent that the Second Lien Secured Parties expressly assume the obligations under such participation interests).

## ARTICLE 6
## INSOLVENCY OR LIQUIDATION PROCEEDINGS

Section 6.01    Financing and Sale Issues.  Until the Discharge of First Lien Obligations has occurred, if the Borrower or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding, then each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its

Second Lien Debt Facility, agrees that (A) if any First Lien Representative shall desire to consent (or not object) to the sale, use or lease of cash or other collateral or to consent (or not object) to the Borrower's or any other Grantor's obtaining financing under Section 363 or Section 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law ("DIP Financing"), it will raise no objection to and will not otherwise contest such sale, use or lease of such cash or other collateral or such DIP Financing and, except to the extent permitted by the proviso in clause (ii) of Section 3.01(a) and Section 6.03, will not request adequate protection or any other relief in connection therewith and, to the extent the Liens securing any First Lien Obligations are subordinated to or have the same priority as the Liens securing such DIP Financing, will subordinate (and will be deemed hereunder to have subordinated) its Liens in the Shared Collateral to (x) such DIP Financing (and all obligations relating thereto) on the same basis as the Liens securing the Second Lien Debt Obligations are so subordinated to Liens securing First Lien Obligations under this Agreement, (y) any "carve-out" for professional and United States Trustee fees agreed to by the First Lien Representatives, and (z) all adequate protection liens granted to the First Lien Secured Parties; provided that the sum of the aggregate principal amount of such DIP Financing, plus the aggregate principal amount of First Lien Obligations outstanding (after giving effect to any repayment or rollover of loans and/or letters of credit in connection with such DIP Financing), shall not exceed the Maximum DIP Amount, (B) it will raise no objection to and will not otherwise contest any motion for relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceedings or from any injunction against foreclosure or enforcement in respect of First Lien Obligations or the First Lien Collateral made by any First Lien Representative or any other First Lien Secured Party, (C) it will raise no objection to and will not otherwise contest any lawful exercise by any First Lien Secured Party of the right to credit bid First Lien Obligations at any foreclosure or other sale of First Lien Collateral, including pursuant to Section 363(k) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law or other applicable law, (D) it will raise no objection to and will not otherwise contest any other request for judicial relief made in any court by any First Lien Secured Party relating to the lawful enforcement of any Lien on First Lien Collateral, (E) it will raise no objection to and will not otherwise contest any election made by any First Lien Representative or any other First Lien Secured Party of the application of Section 1111(b) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law with respect to any of the Shared Collateral, and (F) it will raise no objection to and will not otherwise contest or oppose any Disposition (including pursuant to Section 363 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law) of assets of any Grantor for or to which any First Lien Representative has consented or not objected that provides, to the extent such Disposition is to be free and clear of Liens, that the Liens securing the First Lien Obligations and the Second Lien Debt Obligations will attach to the Proceeds of the sale on the same basis of priority as the Liens on the Shared Collateral securing the First Lien Obligations rank to the Liens on the Shared Collateral securing the Second Lien Debt Obligations pursuant to this Agreement; provided that the Second Lien Secured Parties are not deemed to have waived any rights to credit bid on the Shared Collateral in any such sale or disposition in accordance with Section 363(k) of the Bankruptcy Code (or any similar provision under any other applicable Bankruptcy Law), so long as any such credit bid provides for the payment in full of the First Lien Obligations. Each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, agrees that notice received three Business Days prior to the entry of an order approving any usage of cash or other collateral described in this Section 6.01 or approving any DIP Financing described in this Section 6.01 shall be adequate notice.

Section 6.02    Relief from the Automatic Stay.  Until the Discharge of First Lien Obligations has occurred, each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding or take any action in derogation thereof, in each case in respect of any Shared Collateral, without the prior written consent of the Designated First Lien Representative.

Section 6.03    Adequate Protection.  Each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, agrees that none of them shall object to, contest or support any other Person objecting to or contesting (a) any request by any First Lien Representative or any First Lien Secured Parties for adequate protection in any form, (b) any objection by any First Lien Representative or any First Lien Secured Parties to any motion, relief, action or proceeding based on any First Lien Representative's or First Lien Secured Party's claiming a lack of adequate protection or (c) the allowance and/or payment of pre- and/or post-petition interest, fees, expenses or other amounts of any First Lien Representative or any other First Lien Secured Party under Section 506(b) or 506(c) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law (as adequate protection or otherwise). Notwithstanding anything contained in this Section 6.03 or in Section 6.01, in any Insolvency or Liquidation Proceeding, (i) if the First Lien Secured Parties (or any subset thereof) are granted adequate protection in the form of a Lien on additional or replacement collateral and/or superpriority claims in connection with any DIP Financing or use of cash collateral under Section 363 or 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law, then each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, may seek or request adequate protection in the form of a Lien on such additional or replacement collateral and/or a superpriority claim (as applicable), which Lien and/or superpriority claim (as applicable) is subordinated to the Liens securing, and claims with respect to, all First Lien Obligations and such DIP Financing (and all obligations relating thereto) and any other Liens or claims granted to the First Lien Secured Parties as adequate protection, on the same basis as the other Liens securing, and claims with respect to, the Second Lien Debt Obligations are so subordinated to the Liens securing, and claims with respect to, First Lien Obligations under this Agreement; provided, however, that each Second Lien Representative shall have irrevocably agreed, pursuant to Section 1129(a)(9) of the Bankruptcy Code, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, in any stipulation and/or order granting such adequate protection, that such junior superpriority administrative expense claims may be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claims and (ii) in the event any Second Lien Representatives, for themselves and on behalf of the Second Lien Secured Parties under their Second Lien Debt Facilities, seek or request adequate protection and such adequate protection is granted in the form of a Lien on additional or replacement collateral and/or a superpriority claim, then such Second Lien Representatives, for themselves and on behalf of each Second Lien Secured Party under their Second Lien Debt Facilities, agree that each First Lien Representative shall also be entitled to seek without objection from any Second Lien Secured Party a senior Lien on such additional or replacement collateral as security and adequate protection for the First Lien Obligations and any such DIP Financing and/or a superpriority claim (as applicable) and that any Lien on such additional or replacement collateral securing the Second Lien Debt Obligations and/or superpriority claim (as applicable) shall be subordinated to the Liens on such collateral securing or providing adequate protection for, and claims with respect to, the First Lien Obligations and any such DIP Financing (and all obligations relating thereto) and any other Liens or claims granted to the First Lien Secured Parties as adequate protection on the same basis as the other Liens securing, and claims with respect to, the Second Lien Debt Obligations are so subordinated to such Liens securing, and claims with respect to, First Lien Obligations under this Agreement.  If any Second Lien Secured Party receives adequate protection in any form and the First Lien Secured Parties have not also received adequate protection in such form, such adequate protection shall be turned over to the Designated First Lien Representative pursuant to Section 4.02 of this Agreement.  Without limiting the generality of the foregoing, to the extent that the First Lien Secured Parties are granted adequate protection in the form of payments in the amount of current post-petition fees and expenses, and/or other cash payments, then the Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, shall not be prohibited from seeking adequate protection in the form of payments in the amount of current post-petition incurred fees and expenses, and/or other cash payments (as applicable), subject to the right of the First Lien Secured Parties to object to the reasonableness of the amounts of fees and expenses or other cash payments so sought by the Second Lien Secured Parties.

Section 6.04    <u>Preference Issues</u>.  If any First Lien Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of the Borrower or any other Grantor (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason (any such amount, a "<u>Recovery</u>"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the First Lien Obligations that are subject to such Recovery shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First Lien Secured Parties shall be entitled to the benefits of this Agreement until a Discharge of First Lien Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. Each Second Lien Representative, for itself and on behalf of each Second Lien Secured Party under its Second Lien Debt Facility, hereby agrees that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

Section 6.05    [Reserved].

Section 6.06    <u>No Waivers of Rights of First Lien Secured Parties</u>.  Nothing contained herein shall, except as expressly provided herein, prohibit or in any way limit any First Lien Representative or any other First Lien Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by any Second Lien Secured Party, including the seeking by any Second Lien Secured Party of adequate protection or the asserting by any Second Lien Secured Party of any of its rights and remedies under the Second Lien Debt Documents or otherwise.

Section 6.07    <u>Application</u>.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law, shall be effective before, during and after the commencement of any Insolvency or Liquidation Proceeding. The relative rights as to the Shared Collateral and Proceeds thereof shall continue after the commencement of any Insolvency or Liquidation Proceeding on the same basis as prior to the date of the petition therefor, subject to any court order approving the financing of, or use of cash collateral by, any Grantor. All references herein to any Grantor shall include such Grantor as a debtor-in-possession and any receiver or trustee for such Grantor.

Section 6.08    <u>Other Matters</u>.  To the extent that any Second Lien Representative or any Second Lien Secured Party has or acquires rights under Section 363 or Section 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law with respect to any of the Shared Collateral, then, except as otherwise permitted herein, such Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt Facility, agrees not to assert any such rights without the prior written consent of each First Lien Representative; <u>provided</u> that, if requested by any First Lien Representative, such Second Lien Representative shall timely exercise such rights in the manner requested by the First Lien Representatives (acting unanimously), including any rights to payments in respect of such rights.

Section 6.09    <u>506(c) Claims</u>.  Until the Discharge of First Lien Obligations has occurred, each Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt Facility, agrees that it will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law senior to or on a parity with the Liens securing the First Lien Obligations for costs or expenses of preserving or disposing of any Shared Collateral.

Section 6.10     Reorganization Securities; Voting.

(a)     If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed, confirmed, or adopted in an Insolvency or Liquidation Proceeding, on account of both the First Lien Obligations and the Second Lien Debt Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Debt Obligations are secured by Liens upon the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

(b)     No Second Lien Secured Party (whether in the capacity of a secured creditor or an unsecured creditor) shall propose, vote in favor of, or otherwise directly or indirectly support any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement that is inconsistent with the priorities or other provisions of this Agreement.

Section 6.11     Post-Petition Interest.

(a)     Neither any Second Lien Representative nor any other Second Lien Secured Party shall oppose or seek to challenge any claim by any First Lien Representative or any other First Lien Secured Party for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of claims for post-petition interest, fees, or expenses under Section 506(b) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law or otherwise.

(b)     No First Lien Representative nor any other First Lien Secured Party shall oppose or seek to challenge any claim by any Second Lien Representative or any other Second Lien Secured Party for allowance in any Insolvency or Liquidation Proceeding of Second Lien Debt Obligations consisting of claims for post-petition interest, fees, or expenses under Section 506(b) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law or otherwise, so long as the First Lien Secured Parties are receiving post-petition interest, fees, or expenses in at least the same form being requested by such Second Lien Representative or such other Second Lien Secured Party and then only to the extent of the value of the Lien of the Second Lien Representatives on behalf of the Second Lien Secured Parties on the Shared Collateral (after taking into account the First Lien Obligations).

## ARTICLE 7
## RELIANCE; ETC.

Section 7.01     Reliance.  The consent by the First Lien Secured Parties to the execution and delivery of the Second Lien Debt Documents to which the First Lien Secured Parties have consented and all loans and other extensions of credit made or deemed made on and after the date hereof by the First Lien Secured Parties to the Borrower or any Subsidiary shall be deemed to have been given and made in reliance upon this Agreement. Each Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt Facility, acknowledges that it and such Second Lien Secured Parties have, independently and without reliance on any First Lien Representative or other First Lien Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Second Lien Debt Documents to which they are party or by which they are bound, this Agreement and the transactions contemplated hereby and thereby, and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Debt Documents or this Agreement.

Section 7.02    No Warranties or Liability.  Each Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt Facility, acknowledges and agrees that neither any First Lien Representative nor any other First Lien Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the First Lien Debt Documents, the ownership of any Shared Collateral or the perfection or priority of any Liens thereon. The First Lien Secured Parties will be entitled to manage and supervise their respective loans and extensions of credit under the First Lien Debt Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate, and the First Lien Secured Parties may manage their loans and extensions of credit without regard to any rights or interests that the Second Lien Representatives and the Second Lien Secured Parties have in the Shared Collateral or otherwise, except as otherwise provided in this Agreement. Neither any First Lien Representative nor any other First Lien Secured Party shall have any duty to any Second Lien Representative or Second Lien Secured Party to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default or default under any agreement with the Borrower or any other Subsidiary (including the Second Lien Debt Documents), regardless of any knowledge thereof that they may have or be charged with. Except as expressly set forth in this Agreement, the First Lien Representatives, the First Lien Secured Parties, the Second Lien Representatives and the Second Lien Secured Parties have not otherwise made to each other, nor do they hereby make to each other, any warranties, express or implied, nor do they assume any liability to each other with respect to (a) the enforceability, validity, value or collectability of any of the First Lien Obligations, the Second Lien Debt Obligations or any guarantee or security which may have been granted to any of them in connection therewith, (b) any Grantor's title to or right to transfer any of the Shared Collateral or (c) any other matter except as expressly set forth in this Agreement.

Section 7.03    Obligations Unconditional.  All rights, interests, agreements and obligations of the First Lien Representatives, the First Lien Secured Parties, the Second Lien Representatives and the Second Lien Secured Parties hereunder shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any Debt Document;

(b)    any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Lien Obligations or Second Lien Debt Obligations, or any amendment or waiver or other modification, whether by course of conduct or otherwise, of the terms of the Credit Agreement or any other First Lien Debt Document or the terms of any Second Lien Debt Document;

(c)    any exchange of any security interest in any Shared Collateral or any other collateral or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Lien Obligations or Second Lien Debt Obligations or any guarantee thereof;

(d)    the commencement of any Insolvency or Liquidation Proceeding in respect of the Borrower or any other Grantor; or

(e)    any other circumstances that otherwise might constitute a defense available to, or a discharge of, (i) the Borrower or any other Grantor in respect of the First Lien Obligations (other than the Discharge of First Lien Obligations subject to Sections 5.06 and 6.04 hereof) or (ii) any Second Lien Representative or Second Lien Secured Party in respect of this Agreement.

# ARTICLE 8
## MISCELLANEOUS

Section 8.01    Conflicts.    Subject to Section 8.18, in the event of any conflict between the provisions of this Agreement and the provisions of any First Lien Debt Document or any Second Lien Debt Document, the provisions of this Agreement shall govern. Notwithstanding the foregoing, (a) the relative rights and obligations of the First Lien Representatives and the First Lien Secured Parties (as amongst themselves) with respect to any First Lien Collateral shall be governed by the terms of the First Intercreditor Agreements and in the event of any conflict between a First Lien Intercreditor Agreement and this Agreement, the provisions of such First Lien Intercreditor Agreement shall control as to the relative rights and obligations of the First Lien Representatives and the First Lien Secured Parties (as amongst themselves) with respect to any First Lien Collateral, and (b) the relative rights and obligations of the Second Lien Representatives and the Second Lien Secured Parties (as amongst themselves) with respect to any Second Lien Collateral shall be governed by the terms of the Second Lien Intercreditor Agreements and in the event of any conflict between a Second Lien Intercreditor Agreement and this Agreement, the provisions of such Second Lien Intercreditor Agreement shall control as to the relative rights and obligations of the Second Lien Representatives and the Second Lien Secured Parties (as amongst themselves) with respect to any Second Lien Collateral.

Section 8.02    Continuing Nature of This Agreement; Severability.    Subject to Section 6.04, this Agreement shall continue to be effective until the Discharge of First Lien Obligations shall have occurred. This is a continuing agreement of Lien subordination, and the First Lien Secured Parties may continue, at any time and without notice to the Second Lien Representatives or any Second Lien Secured Party, to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrower or any other Subsidiary constituting First Lien Obligations in reliance hereon. The terms of this Agreement shall survive and continue in full force and effect in any Insolvency or Liquidation Proceeding. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 8.03    Amendments; Waivers.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be in writing and permitted by paragraph (b) of this Section 8.03, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    This Agreement may be amended in writing signed by each Representative and the Borrower (in each case, acting in accordance with the documents governing the applicable Debt Facility). Any such amendment, supplement or waiver shall be in writing and shall be binding upon the First Lien Secured Parties and the Second Lien Secured Parties and their respective permitted successors and assigns. Notwithstanding the foregoing, the Borrower shall not have the right to consent to or approve any

amendment, modification or waiver of any provision of this Agreement except to the extent that such amendment, modification or waiver adds any obligation or adversely alters any existing right of the Borrower hereunder.

(c)    Notwithstanding the foregoing, without the consent of any Secured Party, any Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 8.09 and, upon such execution and delivery, such Representative and the Secured Parties and First Lien Obligations or Second Lien Debt Obligations of the Debt Facility for which such Representative is acting shall be subject to the terms hereof.

Section 8.04    Information Concerning Financial Condition of the Borrower and the Other Subsidiaries.    The First Lien Representatives, the First Lien Secured Parties, the Second Lien Representatives and the Second Lien Secured Parties shall each be responsible for keeping themselves informed of (a) the financial condition of the Borrower and the other Subsidiaries and all endorsers or guarantors of the First Lien Obligations or the Second Lien Debt Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations or the Second Lien Debt Obligations. The First Lien Representatives, the First Lien Secured Parties, the Second Lien Representatives and the Second Lien Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that any First Lien Representative, any First Lien Secured Party, any Second Lien Representative or any Second Lien Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it shall be under no obligation to (i) make, and the First Lien Representatives, the First Lien Secured Parties, the Second Lien Representatives and the Second Lien Secured Parties shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (ii) provide any additional information or to provide any such information on any subsequent occasion, (iii) undertake any investigation or (iv) disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

Section 8.05    Subrogation.    Each Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt Facility, hereby agrees not to assert any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred.

Section 8.06    Application of Payments.    Except as otherwise provided herein, all payments received by the First Lien Secured Parties may be applied, reversed and reapplied, in whole or in part, to such part of the First Lien Obligations as the First Lien Secured Parties, in their sole discretion, deem appropriate, consistent with the terms of the First Lien Debt Documents.  Except as otherwise provided herein, each Second Lien Representative, on behalf of itself and each Second Lien Secured Party under its Second Lien Debt Facility, assents to any such extension or postponement of the time of payment of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security that may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

Section 8.07    [Reserved].

Section 8.08    [Reserved].

Section 8.09    Additional Debt Facilities.

(a)     To the extent, but only to the extent, permitted by the provisions of the Credit Agreement, the Borrower or any other Grantor may incur or issue and sell one or more series or classes of Additional Second Lien Debt and one or more series or classes of Additional First Lien Debt. Any such additional class or series of Additional Second Lien Debt (the "Second Lien Class Debt") may be secured by a Lien on Shared Collateral that is junior in priority to any Lien on the Shared Collateral securing or purporting to secure any First Lien Obligations, in each case under and pursuant to the relevant Second Lien Collateral Documents for such Second Lien Class Debt, if and subject to the condition that the Representative of any such Second Lien Class Debt (each, a "Second Lien Class Debt Representative"), acting on behalf of the holders of such Second Lien Class Debt (such Representative and holders in respect of any Second Lien Class Debt being referred to as the "Second Lien Class Debt Parties"), becomes a party to this Agreement by satisfying conditions (i) through (iii), as applicable, set forth below in this Section 8.09(a), and Section 8.09(b). Any such additional class or series of First Lien Debt Facilities (the "First Lien Class Debt"; and the First Lien Class Debt and Second Lien Class Debt, collectively, the "Class Debt") may be secured by a Lien on Shared Collateral that is senior in priority to any Lien on the Shared Collateral securing or purporting to secure any Second Lien Debt Obligations, in each case under and pursuant to the First Lien Collateral Documents, if and subject to the condition that the Representative of any such First Lien Class Debt (each, a "First Lien Class Debt Representative"; and the First Lien Class Debt Representatives and Second Lien Class Debt Representatives, collectively, the "Class Debt Representatives"), acting on behalf of the holders of such First Lien Class Debt (such Representative and holders in respect of any such First Lien Class Debt being referred to as the "First Lien Class Debt Parties"; and the First Lien Class Debt Parties and Second Lien Class Debt Parties, collectively, the "Class Debt Parties"), becomes a party to this Agreement by satisfying the conditions set forth in clauses (i) through (iii), as applicable, set forth below in this Section 8.09(a), and Section 8.09(b). In order for a Class Debt Representative to become a party to this Agreement:

(i)     such Class Debt Representative shall have executed and delivered a Joinder Agreement substantially in the form of Annex II (if such Representative is a Second Lien Class Debt Representative) or Annex III (if such Representative is a First Lien Class Debt Representative) (with such changes as may be reasonably approved by the Designated First Lien Representative and such Class Debt Representative and, to the extent such changes increase the obligations or reduce the rights of a Grantor, by the Borrower) pursuant to which it becomes a Representative hereunder, and the Class Debt in respect of which such Class Debt Representative is the Representative and the related Class Debt Parties become subject hereto and bound hereby;

(ii)     the Borrower shall have delivered to the Designated First Lien Representative an Officer's Certificate stating that the conditions set forth in this Section 8.09 are satisfied with respect to such Class Debt and, if requested, true and complete copies of each of the Second Lien Debt Documents or First Lien Debt Documents, as applicable, relating to such Class Debt, certified as being true and correct by a Responsible Officer of the Borrower on behalf of the relevant Grantor and identifying the obligations to be designated as Additional First Lien Debt or Additional Second Lien Debt, as applicable, and certifying that such obligations are permitted to be incurred and secured by each of the applicable First Lien Debt Documents and Second Lien Debt Documents, or to the extent a consent is otherwise required to permit the incurrence of such Additional First Lien Debt or Additional Second Lien Debt under any applicable First Lien Debt Documents and Second Lien Debt Documents, the Grantors have obtained the requisite consent; and

(iii)     the Second Lien Debt Documents or First Lien Debt Documents, as applicable, relating to such Class Debt shall provide, or shall be amended on terms and conditions reasonably approved by the Designated First Lien Representative and such Class Debt Representative, that each Class Debt Party with respect to such Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Class Debt.

-29-

(b)     With respect to any Class Debt that is issued or incurred after the Closing Date, the Borrower and each of the other Grantors agrees that the Borrower will take, as applicable, such actions (if any) as may from time to time reasonably be requested by any First Lien Representative or any Second Lien Representative, and enter into such technical amendments, modifications and/or supplements to the then existing Collateral Documents (or execute and deliver such additional Collateral Documents) as may from time to time be reasonably requested by such Persons, to ensure that the Class Debt is secured by, and entitled to the benefits of, the relevant Collateral Documents relating to such Class Debt, and each Secured Party (by its acceptance of the benefits hereof) hereby agrees to, and authorizes each applicable First Lien Representative and each applicable Second Lien Representative, as the case may be, to enter into, any such technical amendments, modifications and/or supplements (and additional Collateral Documents).

Section 8.10    Consent to Jurisdiction; Waivers.  Each Representative, on behalf of itself and the Secured Parties of the Debt Facility for which it is acting, irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement and the Collateral Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York sitting in New York City in the borough of Manhattan, the courts of the United States District Court of the Southern District of New York, and appellate courts from any thereof;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same and agrees not to commence or support any such action or proceeding in any other jurisdiction;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Representative) at the address referred to in Section 8.11;

(d)     agrees that nothing herein shall affect the right of any other party hereto (or any Secured Party) to effect service of process in any other manner permitted by Law; and

(e)     waives, to the maximum extent not prohibited by Law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 8.10 any special, exemplary, punitive or consequential damages.

Section 8.11    Notices.  All notices, requests, demands and other communications provided for or permitted hereunder shall be in writing and shall be sent:

(i)     if to the Borrower or any other Grantor, to the Borrower, at its address at:

**Afiniti, Inc.**
1701 Pennsylvania Ave. NW
Suite 600
Washington, DC 20006
Attn: Chief Financial Officer with a copy to General Counsel
Fax: N/A
Email: legal@afiniti.com

AMERICAS/2024285726.11

with a copy (which shall not constitute notice) to:

**Latham & Watkins LLP**
1271 Avenue of the Americas
New York, NY 10020
Attention: Nicole Fanjul
Telephone: 1.212.906.1712
Email: nicole.fanjul@lw.com

and

**Latham & Watkins LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Attention: Jason Gott
Telephone: 1.312.876.7678
Email: jason.gott@lw.com

(ii)    if to the First Lien Representative, to it at:

**VCP Capital Markets, LLC**
Four Embarcadero Center, 20th Floor
San Francisco, CA 94111
Attention: David Flannery
Fax: 1.415.765.6666
Email: dflannery@vistacreditpartners.com

with a copy (which shall not constitute notice) to:

**Allen Overy Shearman Sterling US LLP**
599 Lexington Avenue
New York, NY 10022

Attention: Mark Shapiro
Telephone: 1.212.848.4668
Email: Mark.Shapiro@aoshearman.com

Attention: Frank Oliver
Telephone: 1.212.848.7652
Email: Frank.Oliver@aoshearman.com

(iii)    if to the Second Lien Representative, to it at:

**VCP Capital Markets, LLC**
Four Embarcadero Center, 20th Floor
San Francisco, CA 94111
Attention: David Flannery

AMERICAS/2024285726.11

Fax: 1.415.765.6666

Email: dflannery@vistacreditpartners.com

with a copy (which shall not constitute notice) to:

**Allen Overy Shearman Sterling US LLP**

599 Lexington Avenue

New York, NY 10022

Attention: Mark Shapiro

Telephone: 1.212.848.4668

Email: Mark.Shapiro@aoshearman.com

Attention: Frank Oliver

Telephone: 1.212.848.7652

Email: Frank.Oliver@aoshearman.com

(iv)      if to any other Representative, to it at the address specified by it in the Joinder Agreement delivered by it pursuant to Section 8.09.

Unless otherwise specifically provided herein, all notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 8.11 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 8.11.  Notices and other communications may also be delivered by email to the email address of a representative of the applicable Person provided from time to time by such Person.

Section 8.12    Further Assurances.  Each First Lien Representative, on behalf of itself and each First Lien Secured Party under the First Lien Debt Facility for which it is acting, each Second Lien Representative, on behalf of itself, and each Second Lien Secured Party under its Second Lien Debt Facility, agrees that it will take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the other parties hereto may reasonably request to effectuate the terms of, and the Lien priorities contemplated by, this Agreement.

Section 8.13    Governing Law; Waiver of Jury Trial.

(a)      THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)      EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

Section 8.14    Binding on Successors and Assigns.  This Agreement shall be binding upon the First Lien Representatives, the First Lien Secured Parties, the Second Lien Representatives, the Second Lien Secured Parties, the Borrower and their respective permitted successors and assigns.

-32-

Section 8.15    <u>Section Titles</u>.  The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

Section 8.16    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, including by means of facsimile or other electronic method, each of which shall be an original and all of which shall together constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 8.17    <u>Authorization</u>.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement. The First Lien Representative represents and warrants that this Agreement is binding upon the First Lien Secured Parties. The Second Lien Representative represents and warrants that this Agreement is binding upon the Second Lien Secured Parties.

Section 8.18    <u>No Third Party Beneficiaries; Successors and Assigns</u>.  The lien priorities set forth in this Agreement and the rights and benefits hereunder in respect of such lien priorities shall inure solely to the benefit of the First Lien Representatives, the First Lien Secured Parties, the Second Lien Representatives and the Second Lien Secured Parties, and their respective permitted successors and assigns, and no other Person (including the Grantors, or any trustee, receiver, debtor in possession or bankruptcy estate in a bankruptcy or like proceeding) shall have or be entitled to assert such rights; <u>provided</u>, <u>however</u>, that the Grantors will be entitled to assert such rights with respect to Sections 2.02, 2.07, 3.01(c), 5.01(a), 5.01(d), 5.02, 5.03(b), 5.05(f), 6.07, 8.03(b), 8.08, 8.09, 8.10, 8.11 8.13, and 8.18. Notwithstanding anything else in this Agreement, subject to Section 2.04 of this Agreement, no Grantor is required to provide any security interest in the assets or properties of such Grantor that constitute "<u>Excluded Property</u>" under any applicable Collateral Documents.

Section 8.19    <u>Effectiveness</u>.   This Agreement shall become effective when executed and delivered by the parties hereto.

Section 8.20    <u>Representative</u>.  It is understood and agreed that (a) the First Lien Representative is entering into this Agreement in its capacity as administrative agent and collateral agent under the Credit Agreement and the provisions of Article IX of the Credit Agreement applicable to the Administrative Agent (as defined therein) thereunder shall also apply to the First Lien Representative hereunder, (b) the Second Lien Representative is entering into this Agreement in its capacity as administrative agent and collateral agent under the Credit Agreement and the provisions of Article IX of the Credit Agreement applicable to the Administrative Agent (as defined therein) thereunder shall also apply to the Second Lien Representative hereunder and (c) each other Representative party hereto is entering into this Agreement in its capacity as trustee or agent for the secured parties referenced in the applicable Additional First Lien Debt Document or Additional Second Lien Debt Document (as applicable) and the corresponding exculpatory and liability-limiting provisions of such agreement applicable to such Representative thereunder shall also apply to such Representative hereunder.

Section 8.21    <u>Survival of Agreement</u>.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

Section 8.22    <u>Additional Grantors</u>. The Borrower hereby represents and warranties to the Representatives that NewCo, the Subsidiary Guarantors party hereto and the Borrower constitute the only

Grantors on the Closing Date.  The Borrower and NewCo hereby covenant and agree to cause each person which becomes a Grantor with respect to the Shared Collateral or an Intra-Group Lender following the execution of this Agreement to become a party hereto (in the capacity of a Grantor and/or Intra-Group Lender, as applicable) by duly executing and delivering a counterpart of the supplement hereto substantially in the form of Annex I hereof to each Representative.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**VCP CAPITAL MARKETS, LLC,**
as First Lien Representative


By: _____
Name:
Title:


By: _____
Name:
Title:

**VCP CAPITAL MARKETS, LLC,**
as Second Lien Representative

By: _____
Name:
Title:

**AFINITI, INC.,**
as the Borrower


By:  _____
Name:
Title:

**AFINITI NEWCO HOLDINGS LLC**,
as NewCo


By:  _____
Name:
Title:

**[●]**,
each as a Grantor


By:  _____
Name:
Title:

**ANNEX I**

[FORM OF] SUPPLEMENT NO. [●] (this "<u>Grantor Supplement</u>"), dated as of [       ], 20[  ], to the AGREEMENT AMONG LENDERS/INTERCREDITOR AGREEMENT, dated as of [ ], 2024 (the "<u>Agreement Among Lenders/Intercreditor Agreement</u>"), among Afiniti, Inc., a Delaware corporation (the "<u>Restructuring First Lien Borrower</u>", "<u>Restructuring Second Lien US Borrower</u>" and the "<u>Borrower</u>"), Afiniti Newco Holdings LLC, a Delaware limited liability company ("<u>NewCo</u>" or "<u>Restructuring Second Lien Co-Borrower</u>"), the other Grantors from time to time party hereto, VCP Capital Markets, LLC, acting in its capacity as administrative agent and collateral agent under the Credit Agreement, as Representative for the Restructuring First Lien Term Loan Lenders (in such capacity and together with its permitted successors in such capacity, the "<u>First Lien Representative</u>") and VCP Capital Markets, LLC, acting in its capacity as administrative agent and collateral agent under the Credit Agreement, as Representative for the Restructuring Second Lien Term Loan Lenders (in such capacity and together with its permitted successors in such capacity, the "<u>Second Lien Representative</u>") and each additional First Lien Representative and Second Lien Representative that from time to time becomes a party thereto pursuant to Section 8.09.

A.      Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement Among Lenders/Intercreditor Agreement.

B.      Pursuant to Section 8.22 of the Agreement Among Lenders/Intercreditor Agreement, each person that becomes a Grantor following the execution of the Agreement Among Lenders/Intercreditor Agreement is required to become a party to the Agreement Among Lenders/Intercreditor Agreement.  [___] has become a Grantor following the execution of the Agreement Among Lenders/Intercreditor Agreement and is referred to herein as the "<u>New Grantor.</u>"

Accordingly, the New Grantor agrees as follows:

SECTION 1.    The New Grantor hereby agrees to become party to the Agreement Among Lenders/Intercreditor Agreement as a Grantor thereunder for all purposes thereof on the terms set forth therein, and to be bound by the terms, conditions and provisions of Agreement Among Lenders/Intercreditor Agreement as fully as if the undersigned had executed and delivered the Agreement Among Lenders/Intercreditor Agreement as of the date thereof.  All references to any "Grantor" or the "Grantors" under the Agreement Among Lenders/Intercreditor Agreement shall, from and after the date hereof, be deemed to include the New Grantor.

SECTION 2.    The New Grantor hereby agrees, for the enforceable benefit of all existing and future Secured Parties that the undersigned is bound by the terms, conditions and provisions of the Agreement Among Lenders/Intercreditor Agreement.

SECTION 3.    Except as expressly supplemented hereby, the Agreement Among Lenders/Intercreditor Agreement shall remain in full force and effect.

SECTION 4.    THIS GRANTOR SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 5.    All communications and notices hereunder shall be in writing and given as provided in Section 8.11 of the Agreement Among Lenders/Intercreditor Agreement. All communications and notices hereunder to the New Grantor shall be given to it at the address set forth below its signature hereto.

SECTION 6.    The Borrower agrees to reimburse the Designated First Lien Representative for its reasonable and documented or invoiced out-of-pocket expenses in connection with

this Grantor Supplement, including the reasonable fees, other charges and disbursements of counsel for the Designated First Lien Representative.

[*SIGNATURE PAGES FOLLOW*]

IN WITNESS WHEREOF, the New Grantor has duly executed this Grantor Supplement to the Agreement Among Lenders/Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW GRANTOR],
as New Grantor,


By: _____
Name:
Title:

Address for notices: [        ]

[FORM OF] SUPPLEMENT NO. [●] (this "<u>Representative Supplement</u>"), dated as of [          ], 20[●], to the AGREEMENT AMONG LENDERS/INTERCREDITOR AGREEMENT, dated as of [   ], 2024 (the "<u>Agreement Among Lenders/Intercreditor Agreement</u>"), among Afiniti, Inc., a Delaware corporation (the "<u>Restructuring First Lien Borrower</u>", "<u>Restructuring Second Lien US Borrower</u>" and the "<u>Borrower</u>"), Afiniti Newco Holdings LLC, a Delaware limited liability company ("<u>NewCo</u>" or "<u>Restructuring Second Lien Co-Borrower</u>"), the other Grantors from time to time party hereto, VCP Capital Markets, LLC, acting in its capacity as administrative agent and collateral agent under the Credit Agreement, as Representative for the Restructuring First Lien Term Loan Lenders (in such capacity and together with its permitted successors in such capacity, the "<u>First Lien Representative</u>") and VCP Capital Markets, LLC, acting in its capacity as administrative agent and collateral agent under the Credit Agreement, as Representative for the Restructuring Second Lien Term Loan Lenders (in such capacity and together with its permitted successors in such capacity, the "<u>Second Lien Representative</u>") and each additional First Lien Representative and Second Lien Representative that from time to time becomes a party thereto pursuant to Section 8.09.

A.    Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement Among Lenders/Intercreditor Agreement.

B.    As a condition to the ability of the Borrower or any other Grantor to incur Second Lien Class Debt after the date of the Agreement Among Lenders/Intercreditor Agreement and to secure such Second Lien Class Debt with the Second Lien, in each case under and pursuant to the Second Lien Collateral Documents, the Second Lien Class Debt Representative in respect of such Second Lien Class Debt is required to become a Representative under, and such Second Lien Class Debt and the Second Lien Class Debt Parties in respect thereof are required to become subject to and bound by, the Agreement Among Lenders/Intercreditor Agreement. Section 8.09 of the Agreement Among Lenders/Intercreditor Agreement provides that such Second Lien Class Debt Representative may become a Representative under, and such Second Lien Class Debt and such Second Lien Class Debt Parties may become subject to and bound by, the Agreement Among Lenders/Intercreditor Agreement, pursuant to the execution and delivery by the Second Lien Class Debt Representative of an instrument in the form of this Representative Supplement and the satisfaction of the other conditions set forth in Section 8.09 of the Agreement Among Lenders/Intercreditor Agreement. The undersigned Second Lien Class Debt Representative (the "<u>New Representative</u>") is executing this Representative Supplement in accordance with the requirements of the Senior Lien Debt Documents and the Second Lien Debt Documents.

Accordingly, the New Representative agrees as follows:

SECTION 1.    In accordance with Section 8.09 of the Agreement Among Lenders/Intercreditor Agreement, the New Representative by its signature below becomes a Representative under, and the related Second Lien Class Debt and Second Lien Class Debt Parties become subject to and bound by, the Agreement Among Lenders/Intercreditor Agreement with the same force and effect as if the New Representative had originally been named therein as a Representative, and the New Representative, on behalf of itself and such Second Lien Class Debt Parties, hereby agrees to all the terms and provisions of the Agreement Among Lenders/Intercreditor Agreement applicable to it as a Second Lien Representative and to the Second Lien Class Debt Parties that it represents as Second Lien Secured Parties. Each reference to a "<u>Representative</u>" or "<u>Second Lien Representative</u>" in the Agreement Among Lenders/Intercreditor Agreement shall be deemed to include the New Representative. The Agreement Among Lenders/Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.    The New Representative represents and warrants to the Designated First Lien Representative and the other Secured Parties that (i) it has full power and authority to enter into this Representative Supplement, in its capacity as [agent] [trustee] under [describe debt facility], (ii) this

Representative Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of such Agreement and (iii) the Second Lien Debt Documents relating to such Second Lien Class Debt provide that, upon the New Representative's entry into this Agreement, the Second Lien Class Debt Parties in respect of such Second Lien Class Debt will be subject to and bound by the provisions of the Agreement Among Lenders/Intercreditor Agreement as Second Lien Secured Parties.

SECTION 3.    This Representative Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Representative Supplement shall become effective when the Designated Senior Representative shall have received a counterpart of this Representative Supplement that bears the signature of the New Representative. Delivery of an executed signature page to this Representative Supplement by facsimile transmission or other electronic method shall be effective as delivery of a manually signed counterpart of this Representative Supplement.

SECTION 4.    Except as expressly supplemented hereby, the Agreement Among Lenders/Intercreditor Agreement shall remain in full force and effect.

**SECTION 5.    THIS REPRESENTATIVE SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.    In case any one or more of the provisions contained in this Representative Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Agreement Among Lenders/Intercreditor Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 8.11 of the Agreement Among Lenders/Intercreditor Agreement. All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

SECTION 8.    The Borrower agree to reimburse each of the Designated First Lien Representative and the New Representative for its reasonable out-of-pocket expenses in connection with this Representative Supplement, including the reasonable fees, other charges and disbursements of counsel for the Designated First Lien Representative and the New Representative.

*[SIGNATURE PAGES FOLLOW]*

**ANNEX II**

IN WITNESS WHEREOF, the New Representative has duly executed this Representative Supplement to the Agreement Among Lenders/Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE],
as [   ] for the holders of [   ],

By:  _____
Name:
Title:

Address for notices:

_____
attention of: **_____**
Telecopy:  _____

**ANNEX II**

Acknowledged by:

**AFINITI, INC.,**
as the Borrower

By: _____
Name:
Title:

**AFINITI NEWCO HOLDINGS LLC,**
as NewCo

By: _____
Name:
Title:

[FORM OF] SUPPLEMENT NO. [●] (this "Representative Supplement"), dated as of [    ], 20[  ], to the AGREEMENT AMONG LENDERS/INTERCREDITOR AGREEMENT, dated as of [ ], 2024 (the "Agreement Among Lenders/Intercreditor Agreement"), among Afiniti, Inc., a Delaware corporation (the "Restructuring First Lien Borrower", "Restructuring Second Lien US Borrower" and the "Borrower"), Afiniti Newco Holdings LLC, a Delaware limited liability company ("NewCo" or "Restructuring Second Lien Co-Borrower"), the other Grantors from time to time party hereto, VCP Capital Markets, LLC, acting in its capacity as administrative agent and collateral agent under the Credit Agreement, as Representative for the Restructuring First Lien Term Loan Lenders (in such capacity and together with its permitted successors in such capacity, the "First Lien Representative") and VCP Capital Markets, LLC, acting in its capacity as administrative agent and collateral agent under the Credit Agreement, as Representative for the Restructuring Second Lien Term Loan Lenders (in such capacity and together with its permitted successors in such capacity, the "Second Lien Representative") and each additional First Lien Representative and Second Lien Representative that from time to time becomes a party thereto pursuant to Section 8.09.

A.    Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement Among Lenders/Intercreditor Agreement.

B.    As a condition to the ability of the Borrower or any other Grantor to incur First Lien Class Debt after the date of the Agreement Among Lenders/Intercreditor Agreement and to secure such First Lien Class Debt with the Senior Lien, in each case under and pursuant to the First Lien Collateral Documents, the First Lien Class Debt Representative in respect of such First Lien Class Debt is required to become a Representative under, and such First Lien Class Debt and the First Lien Class Debt Parties in respect thereof are required to become subject to and bound by, the Agreement Among Lenders/Intercreditor Agreement. Section 8.09 of the Agreement Among Lenders/Intercreditor Agreement provides that such First Lien Class Debt Representative may become a Representative under, and such First Lien Class Debt and such First Lien Class Debt Parties may become subject to and bound by, the Agreement Among Lenders/Intercreditor Agreement, pursuant to the execution and delivery by the First Lien Class Debt Representative of an instrument in the form of this Representative Supplement and the satisfaction of the other conditions set forth in Section 8.09 of the Agreement Among Lenders/Intercreditor Agreement. The undersigned First Lien Class Debt Representative (the "New Representative") is executing this Representative Supplement in accordance with the requirements of the First Lien Debt Documents and the Second Lien Debt Documents.

Accordingly, the New Representative agrees as follows:

SECTION 1.    In accordance with Section 8.09 of the Agreement Among Lenders/Intercreditor Agreement, the New Representative by its signature below becomes a Representative under, and the related First Lien Class Debt and First Lien Class Debt Parties become subject to and bound by, the Agreement Among Lenders/Intercreditor Agreement with the same force and effect as if the New Representative had originally been named therein as a Representative, and the New Representative, on behalf of itself and such First Lien Class Debt Parties, hereby agrees to all the terms and provisions of the Agreement Among Lenders/Intercreditor Agreement applicable to it as a First Lien Representative and to the First Lien Class Debt Parties that it represents as First Lien Secured Parties. Each reference to a "Representative" or "First Lien Representative" in the Agreement Among Lenders/Intercreditor Agreement shall be deemed to include the New Representative. The Agreement Among Lenders/Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.    The New Representative represents and warrants to the Designated First Lien Representative and the other Secured Parties that (i) it has full power and authority to enter into this Representative Supplement, in its capacity as [agent] [trustee] under [describe debt facility], (ii) this

Representative Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of such Agreement and (iii) the First Lien Debt Documents relating to such First Lien Class Debt provide that, upon the New Representative's entry into this Agreement, the First Lien Class Debt Parties in respect of such First Lien Class Debt will be subject to and bound by the provisions of the Agreement Among Lenders/Intercreditor Agreement as First Lien Secured Parties.

SECTION 3.    This Representative Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Representative Supplement shall become effective when the Designated First Lien Representative shall have received a counterpart of this Representative Supplement that bears the signature of the New Representative. Delivery of an executed signature page to this Representative Supplement by facsimile transmission or other electronic method shall be effective as delivery of a manually signed counterpart of this Representative Supplement.

SECTION 4.    Except as expressly supplemented hereby, the Agreement Among Lenders/Intercreditor Agreement shall remain in full force and effect.

**SECTION 5.    THIS REPRESENTATIVE SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.    In case any one or more of the provisions contained in this Representative Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Agreement Among Lenders/Intercreditor Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 8.11 of the Agreement Among Lenders/Intercreditor Agreement. All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

SECTION 8.    The Borrower agree to reimburse each of the Designated First Lien Representative and the New Representative for its reasonable out-of-pocket expenses in connection with this Representative Supplement, including the reasonable fees, other charges and disbursements of counsel for the Designated First Lien Representative and the New Representative.

*[SIGNATURE PAGES FOLLOW]*

**ANNEX II**

      IN WITNESS WHEREOF, the New Representative has duly executed this Representative Supplement to the Agreement Among Lenders/Intercreditor Agreement as of the day and year first above written.

<div style="margin-left:45%">

[NAME OF NEW REPRESENTATIVE],
as [    ] for the holders of [   ],

By:  _____
Name:
Title:

Address for notices:

_____
attention of: _____
Telecopy:  _____

</div>

Acknowledged by:

**AFINITI, INC.,**
as the Borrower


By: _____
Name:
Title:


**AFINITI NEWCO HOLDINGS LLC**,
as NewCo


By: _____
Name:
Title:

**Exhibit F**

**Newco LLC Agreement**

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF

AFINITI NEWCO HOLDINGS LLC

[●], 2024

# TABLE OF CONTENTS

Page

Article I Definitions ................................................................................................8

Article II General .....................................................................................................21

Section 2.1     Name of the Limited Liability Company ...................................21

Section 2.2     Office of the Limited Liability Company; Agent for Service of Process 21

Section 2.3     Organization and Continuation ...............................................21

Section 2.4     Purposes and Powers ................................................................22

Section 2.5     Members.....................................................................................22

Section 2.6     Liability of Members .................................................................23

Article III Units; Capital Contributions; Additional Financing ...............................23

Section 3.1     Units ...........................................................................................23

Section 3.2     Capital Accounts .......................................................................24

Section 3.3     Capital Contributions ................................................................24

Section 3.4     Contributions of Additional Capital ..........................................24

Section 3.5     Class A-1 Units ..........................................................................24

Section 3.6     Class A-2 Units ..........................................................................25

Section 3.7     Class B Units ..............................................................................25

Section 3.8     Class C Units ..............................................................................26

Section 3.9     Warrant Units .............................................................................26

Section 3.10    Holders of Units; Vesting..........................................................27

Section 3.11    Amendment to Schedule of Members .......................................27

Article IV Distributions ...........................................................................................27

Section 4.1     Distributions in General ............................................................27

Section 4.2     Distributions ..............................................................................27

Section 4.3     Tax Distributions........................................................................29

Section 4.4     Withholding and Taxes ..............................................................29

Section 4.5        Distribution of Assets in Kind ................................................................30

Article V Allocation of Net Profits and Net Losses ...................................................30

Section 5.1        Basic Allocations ...................................................................................30

Section 5.2        Regulatory Allocations ..........................................................................31

Section 5.3        Tax Allocations; U.S. Tax Treatment of Restructuring Second Lien Term
Loans and Equivalent Notes ..................................................................32

Section 5.4        Allocations Upon Transfer or Admission ...............................................32

Section 5.5        Timing of Allocations ............................................................................33

Section 5.6        Capital Accounts Upon Forfeiture of Units ...........................................33

Section 5.7        Adjustment Upon Exercise of Compensatory Options ...........................33

Section 5.8        Adjustment Upon Exercise of Non-compensatory Options ....................33

Article VI Member Voting ..........................................................................................34

Section 6.1        General Voting Rights ............................................................................34

Section 6.2        Quorum; Required Vote .........................................................................34

Section 6.3        Actions Requiring Class A Member Approval .......................................34

Section 6.4        Action by Written Consent .....................................................................34

Section 6.5        Meetings of the Members .......................................................................35

Article VII Management ..............................................................................................35

Section 7.1        General ...................................................................................................35

Section 7.2        Binding the Company .............................................................................35

Section 7.3        Directors .................................................................................................35

Section 7.4        Interpretation of Rights and Duties of Members and Directors ..............38

Section 7.5        Indemnification and Exculpation ...........................................................39

Section 7.6        Freedom of Action .................................................................................40

Section 7.7        Officers ...................................................................................................41

Section 7.8        Affiliate Transactions ............................................................................43

Section 7.9        Successor Indemnification .....................................................................43

3

Article VIII Fiscal Matters ........................................................................................... 43

    Section 8.1    Tax Reports ........................................................................ 43

    Section 8.2    Fiscal Year ......................................................................... 44

    Section 8.3    Partnership Representative ................................................. 44

    Section 8.4    Taxation as Partnership ...................................................... 45

    Section 8.5    Financial Reports ............................................................... 45

    Section 8.6    Confidentiality ................................................................... 46

    Section 8.7    Tax Forms ........................................................................... 47

    Section 8.8    Other Tax Matters ............................................................. 47

Article IX Transfers of Interests and Admission of Additional Members ................................ 47

    Section 9.1    General Restrictions on Transfer of Interests by Members ..................... 47

    Section 9.2    Drag-Along ......................................................................... 50

    Section 9.3    Drag-Along Conditions ...................................................... 52

    Section 9.4    Irrevocable Proxy and Power of Attorney ............................. 52

    Section 9.5    Tag-Along Right ................................................................. 53

    Section 9.6    VCP Right of First Refusal ................................................ 54

Article X Registration Rights ........................................................................................ 54

    Section 10.1    Demand Registration ......................................................... 54

    Section 10.2    Piggyback Registration ...................................................... 55

    Section 10.3    Shelf Registration .............................................................. 56

    Section 10.4    Obligations of the Company .............................................. 57

    Section 10.5    Furnish Information ........................................................... 59

    Section 10.6    Expenses of Registration ................................................... 59

    Section 10.7    Underwriting Requirements ............................................... 59

    Section 10.8    Delay of Registration ......................................................... 61

    Section 10.9    Indemnification .................................................................. 61

    Section 10.10    Reports Under Exchange Act ............................................ 64

Section 10.11    Limitations on Subsequent Registration Rights ........................................ 64

Section 10.12    Agreement to Lock-Up ............................................................. 65

Section 10.13    Termination of Registration Rights ............................................... 65

Article XI Dissolution; Liquidation; Conversion ...................................................... 65

Section 11.1    Events Causing Dissolution ....................................................... 65

Section 11.2    Procedures on Dissolution ........................................................ 66

Section 11.3    Distributions Upon Liquidation .................................................. 66

Section 11.4    Conversion to a Corporation ...................................................... 66

Article XII Pre-Emptive Rights ...................................................................... 68

Section 12.1    Pre-Emptive Rights ................................................................ 68

Section 12.2    Notice from the Company .......................................................... 68

Section 12.3    Secondary Purchase Right ......................................................... 68

Section 12.4    Sale by the Company .............................................................. 68

Section 12.5    Termination of Rights ............................................................ 68

Article XIII Representations and Warranties of Members; Release and Waiver .................... 69

Section 13.1    Representations and Warranties of Members .......................................... 69

Section 13.2    Release and Waiver ............................................................... 69

Article XIV General Provisions ...................................................................... 71

Section 14.1    Notices .......................................................................... 71

Section 14.2    Interpretation ................................................................... 72

Section 14.3    Binding Provisions ............................................................... 72

Section 14.4    Governing Law .................................................................... 72

Section 14.5    Consent to Jurisdiction .......................................................... 72

Section 14.6    Counterparts ..................................................................... 73

Section 14.7    Separability of Provisions ....................................................... 73

Section 14.8    Amendments ....................................................................... 73

Section 14.9    Specific Enforcement ............................................................. 74

5

Section 14.10    Remedies Cumulative...................................................................................74

Section 14.11    Third Party Beneficiaries...........................................................................74

Section 14.12    Entire Agreement .......................................................................................74

Section 14.13    Waiver of Partition .....................................................................................75

## SCHEDULES

Schedule of Members

Schedule 4.2(b)        Illustrative MOIC Calculation and Warrant Participation Threshold

AFINITI NEWCO HOLDINGS LLC

<u>AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING
AGREEMENT</u>

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY
OPERATING AGREEMENT of AFINITI NEWCO HOLDINGS LLC, a Delaware limited
liability company (the "<u>Company</u>"), dated as of [●], 2024 (the "<u>Agreement Date</u>"), is by and
among the Company and the Members (as defined below).

RECITALS

WHEREAS, the Company was formed as a limited liability company under the Act (as
defined below) by the filing on September 10, 2024 (the "<u>Filing Date</u>"), of a Certificate of
Formation of the Company in the Office of the Secretary of State of the State of Delaware
(such Certificate of Formation, as amended from time to time in accordance with the Act, the
"<u>Certificate</u>");

WHEREAS, Vista Credit GP Holdco, LLC, acting on behalf of the agent for the 2L
Lenders (as defined below) and as the sole member of the Company, entered into a Limited
Liability Company Operating Agreement for the Company dated as of September 10, 2024 (the
"<u>Prior LLC Agreement</u>");

WHEREAS, Afiniti, Ltd., a Bermuda exempted company (currently in provisional
liquidation) ("<u>Afiniti Parent</u>"), has obtained an order from the Supreme Court of Bermuda
sanctioning, among other things, the actions of the joint provisional liquidators in furtherance
of a debt restructuring transaction ("<u>Sanction Order</u>") between Afiniti Parent and certain of its
Subsidiaries and certain of their secured creditors;

WHEREAS, pursuant to the Sanction Order, among other things, (i) Afiniti Parent
transferred substantially all of its assets (including its shares or other equity interests in certain
directly owned subsidiaries, other than its shares in Afiniti, Inc., a Delaware corporation
("<u>Afiniti</u>"), and its shares or other equity interests in certain other directly owned subsidiaries)
to Afiniti AI Holdings LLC, a Cayman Islands limited liability company and a wholly-owned
subsidiary of Afiniti Parent ("<u>HoldCo</u>"), and (ii) Afiniti Parent transferred all of the shares of
HoldCo and all of the shares of Afiniti to the Company;

WHEREAS, the existing term loan credit agreement, dated as of June 13, 2019 (as
amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of July
11, 2019, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4,
2020, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of November
17, 2020, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of December
29, 2020, that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of March
9, 2021, that certain Amendment No. 6 to Term Loan Credit Agreement, dated as of March 12,
2021, that certain Amendment No. 7 to Term Loan Credit Agreement, dated as of May 17,
2021, that certain Amendment No. 8 to Term Loan Credit Agreement, dated as of March 7,
2022, that certain Amendment No. 9 to Term Loan Credit Agreement, dated as of June 13,
2024, that certain Amendment No. 10 to Term Loan Credit Agreement, dated as of July 29,
2024, that certain Amendment No. 11 to Term Loan Credit Agreement, dated as of August 14,
2024, and that certain Amendment No. 12 to Term Loan Credit Agreement, dated as of
September 12, 2024, the "<u>Prior Credit Agreement</u>"), among Afiniti, as borrower, Afiniti Parent,

as parent guarantor, the lenders from time to time party thereto, and VCP Capital Markets LLC, as administrative agent and collateral agent, was amended by that certain Amendment No. 13 to Term Loan Credit Agreement, dated as of [●], 2024, among Afiniti, the Company, as restructuring second lien co-borrower, the other guarantors party thereto, VCP Capital Markets LLC, as administrative agent and collateral agent, and each lender party thereto ("Amendment No. 13", and the Prior Credit Agreement, as amended by Amendment No. 13 and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement");

WHEREAS, Amendment No. 13 provides for, among other things, the amendment of the existing Term Loans (as defined in the Prior Credit Agreement) by causing the instruments set forth in clauses (a) and (b) to be issued in exchange for an equal reduction of the existing Term Loans under the Credit Agreement: (a) a new senior first lien secured tranche in the aggregate principal amount of [Two Hundred Twenty Five Million Dollars ($225,000,000), as such amount may be increased with respect to any accrued paid in kind interest] (the "Restructuring First Lien Term Loans") and (b) a junior second lien secured convertible tranche in the aggregate principal amount of [Two Hundred Ninety Eight Million Seven Hundred Forty Four Thousand Eight Hundred Fifty Nine Dollars and Seventy One Cents ($298,744,859.71), as such amount may be increased with respect to any accrued paid in kind interest][1] (the "Restructuring Second Lien Term Loans"), which Restructuring Second Lien Term Loans shall be convertible at the option of the 2L Lenders (as defined herein) into fully paid, non-assessable Class A-2 Units; and

WHEREAS, the parties hereby wish to amend and restate the Prior LLC Agreement to supersede the Prior LLC Agreement and to set out certain of their respective rights, obligations and duties with respect to the Company and its business, management and operations.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree that the Prior LLC Agreement is hereby amended and restated to read as follows:

ARTICLE I

DEFINITIONS

The following capitalized terms used in this Agreement shall have the respective meanings ascribed to them below:

"2L Director" has the meaning set forth in Section 7.3(a)(i).

"2L Lenders" means the lenders under the Restructuring Second Lien Term Loans.  For the avoidance of doubt, Backstop Parties and Rights Offering Subscribers shall not constitute 2L Lenders hereunder.

"Act" means the Delaware Limited Liability Company Act, as in effect at the time of the filing of the Certificate with the Office of the Secretary of State of the State of Delaware, and as thereafter amended from time to time.

---

[1]    **Note to Draft**: Subject to change based on the accrued and PIK interest  as of the actual Agreement Date.

"<u>Adjusted Capital Account</u>" means, for each Member, such Member's Capital Account balance increased by such Member's share of "minimum gain" and of "partner nonrecourse debt minimum gain" (as determined pursuant to Treasury Regulation Sections 1.704-2(g) and 1.704-2(i)(5), respectively).

"<u>Administrative Agent</u>" has the meaning set forth in the Credit Agreement.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person who or which, directly or indirectly, controls, is controlled by, or is under common control with such specified Person, including any partner, officer, director, member or employee of such Person.

"<u>Affiliate Transaction</u>" has the meaning set forth in <u>Section 7.8</u>.

"<u>Afiniti</u>" has the meaning set forth in the Recitals.

"<u>Afiniti Parent</u>" has the meaning set forth in the Recitals.

"<u>Agreement</u>" means this Amended and Restated Limited Liability Company Operating Agreement as it may be amended, supplemented and/or restated from time to time, in accordance with the terms hereof.

"<u>Agreement Date</u>" has the meaning set forth in the first paragraph of this Agreement.

"<u>Amendment No. 13</u>" has the meaning set forth in the Recitals.

"<u>Amendment No. 13 Effective Date</u>" has the meaning set forth in Amendment No. 13.

"<u>Asset Transfer</u>" has the meaning set forth in <u>Section 12.1</u>.

"<u>Available Pre-Emptive Securities</u>" has the meaning set forth in <u>Section 12.1</u>.

"<u>Backstop Commitment</u>" means the Backstop Parties' commitment (i) to purchase from the Company and Afiniti $15,000,000 aggregate principal amount of Restructuring Second Lien Term Loans, and (ii) to receive from the Company a number of Class A-1 Units equal to the number of Class A-2 Units issuable upon conversion of the Backstop Loans; *provided*, that in the event the amount subscribed for in the Rights Offering by Rights Offering Subscribers exceeds $10,000,000 aggregate principal amount of Restructuring Second Lien Term Loans, such Backstop Loans in excess of $10,000,000 aggregate principal amount shall be resold to Rights Offering Subscribers other than the Backstop Parties (or, in the event such Rights Offering Subscribers are not Eligible Assignees, such Backstop Loans shall be assigned to Afiniti and the Company for cancellation by the Administrative Agent and an equivalent principal amount of Equivalent Notes shall be issued by Afiniti and the Company to such Rights Offering Subscribers) along with a corresponding number of Class A-1 Units; and *provided*, *further*, that in no event shall the amount of Backstop Loans so resold to Rights Offering Subscribers or assigned to Afiniti and the Company exceed $5,000,000 aggregate principal amount.

"<u>Backstop Commitment Agreement</u>" means the Backstop Commitment Agreement, dated as of [●], 2024, among the Company, Afiniti and the Backstop Parties memorializing the Backstop Commitment.

"Backstop Loans" means the Restructuring Second Lien Term Loans purchased by the Backstop Parties pursuant to the Backstop Commitment Agreement (after giving effect to any resale of Restructuring Second Lien Term Loans (or assignment to Afiniti and the Company of Backstop Loans for cancellation by the Administrative Agent and issuance by Afiniti and the Company of an equivalent principal amount of Equivalent Notes) to Rights Offering Subscribers other than the Backstop Parties in the event the amount subscribed for in the Rights Offering by Rights Offering Subscribers exceeds $10,000,000 aggregate principal amount).

"Backstop Parties" means TRG and its Affiliates who are party to the Backstop Commitment Agreement, solely in their respective capacities as Backstop Parties under the Backstop Commitment Agreement.

"Backstop Units" means (i) the Class A-1 Units issued to the Backstop Parties pursuant to the Backstop Commitment Agreement and (ii) the Class A-2 Units issuable upon conversion of the Backstop Loans (after giving effect to any resale of Class A-1 Units and Restructuring Second Lien Term Loans (or assignment to Afiniti and the Company of Backstop Loans for cancellation by the Administrative Agent and issuance by Afiniti and the Company of an equivalent principal amount of Equivalent Notes) to Rights Offering Subscribers in the event the amount subscribed for in the Rights Offering by rights Offering Subscribers exceeds $10,000,000 aggregate principal amount).

"Blackout Commencement Notice" has the meaning set forth in Section 10.1(c).

"Blackout Termination Notice" has the meaning set forth in Section 10.1(c).

"Board" means the governing body of the Company designated as such and described in ARTICLE VII.

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York.

"Capital Account" means a separate account maintained for each Member and adjusted in accordance with Treasury Regulations under Code Section 704. To the extent consistent with such Treasury Regulations, the adjustments to such accounts shall include the following:

(i)     There shall be credited to each Member's Capital Account the amount of any cash (which shall not include imputed or actual interest on any deferred contributions) actually contributed by such Member to the capital of the Company, the fair market value (without regard to Code Section 7701(g)) of any property contributed by such Member to the capital of the Company net of any liabilities the Company is considered to assume or take subject to, the amount of any other liabilities of the Company assumed by the Member (other than any liabilities taken into account in reducing the fair market value of any property distributed to such Member), such Member's share of the Net Profits of the Company and of any items in the nature of income or gain separately allocated to the Members and any other item required to be credited to such Member's Capital Account for proper maintenance of capital accounts by the Treasury Regulations under Code Section 704(b).

(ii)     There shall be charged against each Member's Capital Account the amount of all cash distributions to such Member, the fair market value (without regard to Code Section 7701(g)) of any property distributed to such Member by the Company

10

net of liabilities that such Member is considered to assume or take subject to, the amount of any other liabilities of the Member assumed by the Company (other than any liabilities taken into account in reducing the fair market value of any property contributed by such Member), such Member's share of the Net Losses of the Company and of any items in the nature of loss or deduction separately allocated to the Members and any other item required to be debited to such Member's Capital Account for proper maintenance of capital accounts by the Treasury Regulations under Code Section 704(b).

(iii)     In the event any interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred interest.

"Carrying Value" means, with respect to any asset, the asset's adjusted basis for U.S. federal income tax purposes; *provided*, *however*, that (i) the initial Carrying Value of any asset contributed to the Company shall be adjusted to equal its gross fair market value at the time of its contribution, (ii) the Carrying Values of all assets held by the Company shall be adjusted to equal their respective gross fair market values (taking into account Code Section 7701(g) and Treasury Regulation Section 1.704-1(b)(2)(iv)(h) (relating to "non-compensatory options")) upon an election by the Company to revalue its property in accordance with Treasury Regulation Section 1.704- 1(b)(2)(iv)(f) or 1.704-1(b)(2)(iv)(s) or at such other times as may be allowed or required under applicable Treasury Regulations, (iii) the Carrying Values of all of the assets held by the Company shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), and (iv) the Carrying Value of any asset distributed (or deemed distributed) to any Member by the Company shall be adjusted to equal the gross fair market value (taking into account Code Section 7701(g)) of such asset on the date of distribution.  The Carrying Value of any asset whose Carrying Value was adjusted pursuant to the preceding sentence thereafter shall be adjusted in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

"Carveout Parties" has the meaning set forth in Section 7.3(a).

"CEO Director" has the meaning set forth in Section 7.3(a).

"Certificate" has the meaning set forth in the Recitals.

"Class A Member" means Members holding Class A Units with respect to such ownership of Class A Units.

"Class A Units" means the Class A-1 Units and Class A-2 Units, collectively.

"Class A-1 Units" means the "Class A-1" Units described in Section 3.1.

"Class A-2 Units" means the "Class A-2 Units" described in Section 3.1.

"Class B Majority" has the meaning set forth in Section 9.2(b)(ii).

"Class B Member" means Members holding Class B Units with respect to such ownership of Class B Units.

"Class B Units" means the "Class B Units" described in Section 3.1.

"Class C Member" means Members holding Class C Units with respect to such ownership of Class C Units.

"Class C Units" means the "Class C Units" described in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company Redomiciliation" has the meaning set forth in Section 2.3.

"Company Sale" means (in each case other than in an Incorporation or an IPO):

      (a)      a merger or consolidation in which

            (i)      the Company is a constituent party, or

            (ii)      a subsidiary of the Company is a constituent party and the Company issues shares or equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) of the Company pursuant to such merger or consolidation,

except, in each case, any such merger or consolidation involving the Company or a subsidiary in which the shares or equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares or equity interests that represent, immediately following such merger or consolidation, a majority, by voting power, of the equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) of (1) the surviving or resulting entity or (2) if the surviving or resulting entity is a wholly owned subsidiary of another entity immediately following such merger or consolidation, the parent entity of such surviving or resulting entity;

      (b)      the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole or the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of the Company if substantially all of the assets of the Company and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company; or

      (c)      (i) a single transaction or series of related transactions in which a Person, or a group of related Persons, acquires from Members Voting Units representing substantially all of the outstanding Voting Units, or (ii) an issuance of shares or equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) by the Company, in either case, under circumstances in which the holders of the voting power of outstanding equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) of the Company, immediately prior to such transaction, own less than 50% in voting power of the outstanding equity interests (excluding Class A-1 Units or other Equity Securities that

are not entitled to receive distributions) of the Company immediately following such transaction.

"Company Sale Process" has the meaning set forth in Section 9.2(b).

"Covered Persons" has the meaning set forth in Section 7.4.

"Credit Agreement" has the meaning set forth in the Recitals.

"Demand Request" has the meaning set forth in Section 10.1(a).

"DGCL" means the Delaware General Corporation Law, 8 Del. Code § 101 et seq., as the same may be amended from time to time.

"Director" means any individual designated to serve as a Director in accordance with the provisions of this Agreement, for so long as such individual continues to serve in such capacity.

"Drag-Along Holder" has the meaning set forth in Section 9.2(a)(i).

"Drag-Along Notice" has the meaning set forth in Section 9.2(a)(i).

"Drag-Along Sale" has the meaning set forth in Section 9.2.

"Eligible Assignee" has the meaning set forth in the Credit Agreement.

"Eligible Holders" means any holder that certifies that it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act); or (iii) a non-U.S. person under Regulation S under the Securities Act that is located outside of the U.S. (within the meaning of Regulation S under the Securities Act).

"Equity Securities" means all shares or equity interests of the Company, all securities convertible or exchangeable for shares or equity interests of the Company, and all options, warrants, and other rights to purchase or otherwise acquire from the Company such shares or equity interests, including any stock appreciation or similar rights, contractual or otherwise.

"Equivalent Notes" means promissory notes issued by Afiniti and the Company having terms substantially similar to the Restructuring Second Lien Term Loans issued to Rights Offering Subscribers who are not Eligible Assignees, which Equivalent Notes shall be convertible at the option of the Rights Offering Subscribers into fully paid, non-assessable Class A-2 Units; *provided, however*, that for every Equivalent Note issued in excess of $10,000,000 aggregate principal amount, an equivalent principal amount of Restructuring Second Lien Term Loans shall be assigned to Afiniti and the Company for cancellation by the Administrative Agent.

"Excepted Securities" means any securities issued (i) as a dividend or distribution on existing Units, (ii) by reason of a dividend, split-up, adjustment for merger or reorganization, (iii) as Class C Units to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to the MIP or any other plan, agreement or arrangement approved by the Board, (iv) upon the exercise of an outstanding option or warrant pursuant to the terms of such option or warrant, (v) upon the conversion of any outstanding convertible

13

security (including the Restructuring Second Lien Term Loans and Equivalent Notes) pursuant to the terms of such convertible security, (vi) to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board, (vii) to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board, (viii) as consideration in a bona fide business acquisition, (ix) as consideration pursuant to a joint venture, strategic alliance or other commercial relationship and that is not for the primary purpose of raising equity capital, (x) as part of an internal restructuring or reorganization which does not result in the issuance of any New Securities to any unaffiliated third party or change the ownership interest of any Member, (xi) in connection with an Incorporation, (xii) as part of an IPO, (xiii) to Rights Offering Subscribers in connection with the Rights Offering, or (xiv) as additional Class A-1 Units to the 2L Lenders as of immediately following the completion of the Rights Offering pursuant to Section 3.5(b), and in each case shall have a corresponding meaning with respect to equity securities of any Subsidiary of the Company.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Filing Date" has the meaning set forth in the Recitals.

"First Participation Threshold" has the meaning set forth in Section 4.2(b).

"GAAP" has the meaning set forth in Section 8.5(a).

"Governmental Authority" means any federal, national, state, foreign, provincial, local or other government or any governmental or regulatory authority, agency, bureau, board, commission, court, judicial or arbitral body, department, political subdivision, tribunal or other instrumentality thereof.

"Holder" means any Person owning or having the right to acquire Registrable Securities.

"Imputed Underpayment" has the meaning set forth in Section 8.3(b).

"Inbound Strategic Sale Transaction" has the meaning set forth in Section 9.2(a).

"Incorporation" means a transaction or series of related transactions the result of which is that the Company is converted into, or the successor or parent entity to the Company in such transaction(s) is, or an "Up-C" structure is implemented by the Company with, a corporation, whether by merger, unit or share exchange, statutory conversion or otherwise, and such corporation shall be the "Public Issuer".  In the event of an Incorporation, references to the Company shall be deemed to include, where applicable, the Public Issuer and references to the Board shall be deemed to be references to the Public Issuer's board of directors or such similar governing body, as the context may require.

"Indemnitee" has the meaning set forth in Section 7.5(a).

"Independent Director" has the meaning set forth in Section 7.3(a)(ii).

"Initial Contribution Amount" means, for each Member, an amount equal to the aggregate capital contributions made by such Member to the Company with respect of such

14

Member's Units as of the Agreement Date. The Initial Contribution Amount for each Member is set forth in the Schedule of Members. The Initial Contribution Amount for the Class A-2 Units issuable upon conversion of the Restructuring Second Lien Term Loans shall be $1.00; *provided*, that the Initial Contribution Amount for the Class A-2 Units issuable upon conversion of the principal amount of the Restructuring Second Lien Term Loans held by the 2L Lenders as of the Agreement Date shall be adjusted immediately following the completion of the Rights Offering pursuant to Section 3.6(b); *provided, further*, that the Initial Contribution Amount for the Class A-2 Units issuable upon conversion of any Restructuring Second Lien Term Loans shall be adjusted immediately prior to the conversion of such Restructuring Second Lien Term Loans pursuant to Section 3.6(c).

"Initiating Member" has the meaning set forth in Section 9.2.

"Investor Indemnitors" has the meaning set forth in Section 9.2.

"IPO" means the first underwritten public offering of the securities of the Company (or the Public Issuer) pursuant to an effective registration statement filed pursuant to the Securities Act.

"IPO Closing" has the meaning set forth in Section 10.1(a).

"Law" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any Governmental Authority.

"Liquidation Value Procedure" has the meaning set forth in Section 14.8(c).

"Losses" means, collectively, all losses, damages, liabilities, deficiencies, claims, interest, awards, judgment, penalties, costs and expenses (including reasonable attorneys' fees, costs and other out-of-pocket expenses incurred in investigating, preparing or defending the foregoing).

"Major Action" has the meaning set forth in Section 14.8(c).

"Major Investor" means any Member that, together with its Affiliates, holds Units representing at least one percent (1%) of the total issued and outstanding Voting Units.

"Member" shall refer severally to any Person named as a Member on the Schedule of Members as of the Agreement Date and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in such Person's capacity as a member of the Company. "Members" shall refer collectively to all such Persons in their capacities as Members.

"MIP" means the Company's management incentive plan to be approved by the Board following the Agreement Date, as amended from time to time, providing for the issuance pursuant to such plan of Class C Units representing fifteen percent (15%) of the issued and outstanding Units (including the Class C Units issuable pursuant to such plan and including the Warrant Units) at the time such plan is approved by the Board.

"MOIC" means, for any Restructuring Second Lien Term Loans repaid or prepaid (other than scheduled principal payments or repayment on the Maturity Date (as defined in the Credit Agreement)) or converted into Class A-2 Units, an amount equal to the aggregate

15

principal amount of such Restructuring Second Lien Term Loans outstanding as of the Amendment No. 13 Effective Date.

"Net Profits" and "Net Losses" mean the taxable income or loss, as the case may be, for a period as determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) computed with the following adjustments:

(i)     Items of gain, loss, and deduction (including depreciation, amortization or other cost recovery deductions) shall be computed based upon the Carrying Values of the Company's assets (in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(g) and/or 1.704-3(d)) rather than upon the assets' adjusted bases for U.S. federal income tax purposes;

(ii)     Any tax-exempt income received by the Company shall be included as an item of gross income;

(iii)     The amount of any adjustment to the Carrying Value of any Company asset pursuant to Code Section 734(b) or Section 743(b) that is required to be reflected in the Capital Accounts of the Members pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) shall be treated as an item of gain (if the adjustment is positive) or loss (if the adjustment is negative), and only such amount of the adjustment shall thereafter be taken into account in computing items of income and deduction;

(iv)     Any expenditure of the Company described in Code Section 705(a)(2)(B) (including any expenditures treated as being described in Section 705(a)(2)(B) pursuant to Treasury Regulations under Code Section 704(b)) shall be treated as a deductible expense;

(v)     The amount of items of income, gain, loss or deduction specially allocated to any Members pursuant to Section 5.2 shall not be included in the computation;

(vi)     The amount of any unrealized gain or unrealized loss attributable to an asset at the time it is distributed in kind to a Member (such gain or loss determined as if the Company had sold the asset at its fair market value (taking Code Section 7701(g) into account)) shall be included in the computation as an item of income or loss, respectively; and

(vii)     To the extent not already included under clause (iii) or (vi), the amount of any unrealized gain or unrealized loss with respect to the assets of the Company that is reflected in an adjustment to the Carrying Value of the Company's assets pursuant to clause (ii), (iii) or (iv) of the definition of "Carrying Value" shall be included in the computation as items of income or loss, respectively.

"New Securities" means any Units or securities or interests (including any obligation or evidence of indebtedness) exercisable, convertible or exchangeable into Units, or equity securities of any Subsidiary of the Company or securities or interests (including any obligation or evidence of indebtedness) exercisable, convertible or exchangeable into equity securities of any Subsidiary of the Company, in each case other than Excepted Securities.

16

"Non-Strategic Sale Transaction" has the meaning set forth in Section 9.2(b).

"Officer" has the meaning set forth in Section 7.7(a).

"Participating Member" has the meaning set forth in Section 9.5(b).

"Participation Threshold" means with respect to a Warrant Unit, either the First Participation Threshold or the Second Participation Threshold, as specified on the Schedule of Members with respect to such Warrant Unit, and with respect to a Class C Unit, the applicable participation threshold specified on the Schedule of Members with respect to such Class C Unit. If a Class C Unit is issued without a stated Participation Threshold, the Participation Threshold for such Class C Unit shall be the liquidation value of the Company at the time of grant of such Class C Unit.

"Person" means any individual, general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so permits.

"Permitted Persons" has the meaning set forth in Section 7.6.

"Permitted Transfer" means any (i) subject to Section 9.6 (if applicable), Transfer of Class A-2 Units to an existing Class A Member (other than one that became a Class A Member as a result of a Transfer pursuant to clause (ii)), (ii)  Transfer of Backstop Units (*provided,* that if such Backstop Units are Class A-1 Units such Transfer shall also be permitted pursuant to clause (vii) or (ix)) by a Backstop Party to a Class B Member that is not an Affiliate of such Backstop Party; *provided*, *however*, that a Backstop Unit may only be transferred once to a Class B Member pursuant to this clause (ii), and such Class B Member may thereafter only transfer such Backstop  Unit (subject to clause (ix), if applicable), to an existing Class A Member (other than one that became a Class A Member as a result of a Transfer pursuant to this clause (ii)), (iii) Transfer of Class B Units to an existing Class B Member, (iv) Transfer of Class C Units in accordance with the MIP or other plan or award agreement pursuant to which such Class C Units were issued, (v) Transfer of Class A-2 Units or Class B Units by a Member to one or more of its Affiliates, (vi) Transfer of Class A-2 Units or Class B Units to a Member's spouse and lineal descendants (whether natural or adopted), or any trust or other estate planning vehicle that is and at all times remains solely for the benefit of such Member's spouse and/or lineal descendants, (vii) Transfers of up to 5,000,000 in the aggregate of Backstop Units that are Class A-1 Units (along with a corresponding principal amount of Backstop Loans (or assignment to Afiniti and the Company of Backstop Loans for cancellation by the Administrative Agent and issuance by Afiniti and the Company of an equivalent principal amount of Equivalent Notes)) from Backstop Parties to Rights Offering Subscribers in the event the amount subscribed for in the Rights Offering by Rights Offering Subscribers exceeds $10,000,000 aggregate principal amount, (viii) Transfer of Warrant Units in accordance with Section 9.1(h), and (ix) Transfer of Class A-1 Units in accordance with Section 9.1(i).

"Piggyback Underwritten Offering" has the meaning set forth in Section 10.2(a).

"Pro Rata Share" means, as to any Voting Member, the ratio that the aggregate number of votes entitled to be cast with respect to the Voting Units held by such Voting Member bears to the aggregate number of votes entitled to be cast with respect to the Voting Units held by all Voting Members.

17

"Proceeding" has the meaning set forth in Section 7.5(b).

"Prior LLC Agreement" has the meaning set forth in the Recitals.

"Public Issuer" has the meaning set forth in the definition of "Incorporation."

"Purchase and Sale Agreement" has the meaning set forth in Section 9.5(c).

"Releasees" has the meaning set forth in Section 12.1.

"Releasing Party" has the meaning set forth in Section 12.1.

"Registrable Securities" means, to the extent held by a Member or its permitted transferee, (a) all Units of the Company, (b) all of the equity securities of a successor company, (c) all of the equity securities of any Subsidiary that constitutes more than 90% of the Company's (or a successor company's) assets or (d) all of the equity securities of any Public Issuer, if other than the Company. In the event of an Incorporation, the term "Registrable Securities" shall include capital stock of the Public Issuer that is issued or issuable in exchange for or in respect of Registrable Securities held by a Member prior to such Incorporation. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities when (w) a registration statement covering such securities has been declared effective by the SEC and such securities have been disposed of pursuant to such effective registration statement, (x) such securities are sold under circumstances in which all of the applicable conditions of SEC Rule 144 are met, (y) such securities are otherwise transferred and such securities may be resold without subsequent registration under the Securities Act, or (z) such securities have ceased to be outstanding.

"Restructuring" has the meaning set forth in Section 12.1.

"Restructuring First Lien Term Loans" has the meaning set forth in the Recitals.

"Restructuring Second Lien Term Loans" has the meaning set forth in the Recitals.

"Restructuring Support Agreement" has the meaning set forth in Section 12.1.

"Rights Offering" means the offering to be conducted by Afiniti and the Company following the Agreement Date to Eligible Holders of equity interests in Afiniti Parent as of the record date for such offering, whereby each such Eligible Holder will have the non-transferrable right to subscribe to (i) up to $25,000,000 aggregate principal amount of Restructuring Second Lien Term Loans (inclusive of $10,000,000 aggregate principal amount of the Backstop Commitment) (or, in the event such Eligible Holders are not Eligible Assignees, Equivalent Notes) and (ii) a number of Class A-1 Units equal to the number of Class A-2 Units issuable upon conversion of the Restructuring Second Lien Term Loans or Equivalent Notes subscribed for in such offering.

"Rights Offering Subscribers" means the Eligible Holders who purchase Restructuring Second Lien Term Loans or Equivalent Notes and Class A-1 Units through the Rights Offering.

"Rights Offering Units" means (i) the Class A-1 Units issued to Rights Offering Subscribers pursuant to the Rights Offering and (ii) the Class A-2 Units issuable upon conversion of the Restructuring Second Lien Term Loans or Equivalent Notes purchased by Rights Offering Subscribers pursuant to the Rights Offering (after giving effect to any purchase

18

of Class A-1 Units and Restructuring Second Lien Term Loans by (or assignment to Afiniti and the Company of Backstop Loans for cancellation by the Administrative Agent and issuance by Afiniti and the Company of an equivalent principal amount of Equivalent Notes to) Rights Offering Subscribers from the Backstop Parties in the event the amount subscribed for in the Rights Offering by Rights Offering Subscribers exceeds $10,000,000 aggregate principal amount).

"ROFR Notice" has the meaning set forth in Section 9.6.

"Sale Period" has the meaning set forth in Section 9.2(b)(ii).

"Sanction Order" has the meaning set forth in the Recitals.

"Schedule of Members" means the Schedule of Members of the Company as maintained by the Board on behalf of the Company.

"SEC" means the United States Securities and Exchange Commission.

"SEC Rule 144" means Rule 144 under the Securities Act.

"Second Participation Threshold" has the meaning set forth in Section 4.2(b).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Selling Expenses" means all underwriting discounts, selling commissions, and stock transfer taxes applicable to the sale of Registrable Securities, and fees and disbursements of counsel for any Holder, except for the fees and disbursements of the Selling Holder Counsel borne and paid by the Company as provided in Section 10.6.

"Selling Holder Counsel" has the meaning set forth in Section 10.6.

"Selling Member" has the meaning set forth in Section 9.5(a).

"Service Provider" means an employee, Officer, Director, consultant, advisor or other Person performing services for the Company or a subsidiary of the Company.

"Shelf Registration" has the meaning set forth in Section 10.3(a).

"Shelf Request" has the meaning set forth in Section 10.3(a).

"STA" has the meaning set forth in Section 12.1.

"Strategic Buyer" has the meaning set forth in Section 9.2(a).

"Subsidiary" means with respect to any Person, any corporation, joint venture, limited liability company, partnership, association or other business entity of which more than 50% of the total voting power of stock or other equity entitled to vote generally in the election of directors or managers or equivalent persons thereof is owned or controlled, directly or indirectly, by such Person.

"Target Balance" means, for each Member at any point in time, either (i) a positive amount equal to the net amount, if any, the Member would be entitled to receive or (ii) a negative amount equal to the net amount the Member would be required to pay or contribute to the Company or to any third party, assuming, in each case that (A) the Company sold all of its assets for an aggregate purchase price equal to their aggregate Carrying Value (assuming for this purpose only that the Carrying Value of any asset that secures a liability that is treated as "nonrecourse" for purposes of Treasury Regulation Section 1.1001-2 is no less than the amount of such liability that is allocated to such asset in accordance with Treasury Regulation Section 1.704-2(d)(2)); (B) all liabilities of the Company were paid in accordance with their terms from the amounts specified in clause (A) of this sentence; (C) any Member that was obligated to contribute any amount to the Company pursuant to this Agreement or otherwise (including the amount a Member would be obligated to pay to any third party pursuant to the terms of any liability or pursuant to any guaranty, indemnity or similar ancillary agreement or arrangement entered into in connection with any liability of the Company) contributed such amount to the Company; (D) all liabilities of the Company that were not completely repaid pursuant to clause (B) of this sentence were paid in accordance with their terms from the amounts specified in clause (C) of this sentence; and (E) the balance, if any, of any amounts held by the Company was distributed in accordance with Section 4.2 (treating any unvested Units as fully vested Units for this purpose).

"Tax Rate" means the highest combined marginal rate of U.S. federal, state and local income tax, plus the Medicare tax on net investment income imposed by Code Section 1411, if any, (as determined taking into account the deduction of state taxes against federal taxable income, if applicable, the character of the gain and the deduction pursuant to Code Section 199A) applicable to an individual or corporation resident in New York City, New York, whichever is higher, as determined by the Board in its reasonable discretion.  The same Tax Rate shall apply to each Member for purposes of determining any distributions made pursuant to Section 4.3.

"Taxable Income" means with respect to any taxable year, (i) the net taxable income or gain of the Company that was allocated to such Member pursuant to Article V (determined by taking into account any allocations pursuant to Code Section 704(c) and any adjustments pursuant to Code Section 734 or 743), minus (ii) the aggregate net taxable losses allocated to such Member pursuant to Article V for any previous taxable year, to the extent such amounts have not previously reduced taxable income for a previous taxable year pursuant to this clause (ii).

"Transfer" has the meaning set forth in Section 9.1(a).

"Transfer Notice" has the meaning set forth in Section 9.5(b).

"TRG" means The Resource Group International, Ltd.

"TRG Directors" has the meaning set forth in Section 7.3(a)(iii).

"Underwriting Representations" has the meaning set forth in Section 10.7(a).

"Unit" means a unit of limited liability company interest in the Company.

"VCP" means Vista Credit Partners, L.P., its Affiliates, related funds and managed accounts.

"Violation" means (a) any untrue statement or alleged untrue statement of a material fact contained in any registration statement of the Company, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (b) an omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading or (c) any violation or alleged violation by the indemnifying party (or any of its agents or Affiliates) of the Securities Act, the Exchange Act, any state securities Law, or any rule or regulation under the Securities Act, the Exchange Act, or any state securities Law.

"Voting Members" means Members holding Voting Units with respect to such ownership of Voting Units.

"Voting Units" means the Class A-1 Units, the Class A-2 Units and the Class B Units, collectively.

"Warrant Units" means the "Warrant Units" described in Section 3.1.

"Warrant Member" means Members holding Warrant Units with respect to such ownership of Warrant Units.

"Withholding Payment" has the meaning set forth in Section 4.4.

ARTICLE II

GENERAL

Section 2.1    Name of the Limited Liability Company.  The name of the Company is Afiniti Newco Holdings LLC.  The name of the Company may be changed at any time or from time to time by the Company, with the approval of the Board, without the consent or approval of the Members.

Section 2.2    Office of the Limited Liability Company; Agent for Service of Process. The Company's registered office in Delaware is at 1209 Orange Street in the City of Wilmington, Delaware 19801.  The name and address of the registered agent for service of process of the Company in Delaware is Corporation Trust Center.  The Company may from time to time have such other place or places of business within or without the State of Delaware as the Board may determine.

The Company may, with the approval of the Board, change its principal place of business, or establish additional places of business of the Company, as and when required by the Company's business and in furtherance of its purposes set forth in Section 2.4, and may appoint agents for service of process in all jurisdictions in which the Company shall conduct business.  The Company may, with the approval of the Board, change from time to time its registered agent for service of process, or the location of its registered office in Delaware, in each case pursuant to an amendment of the Certificate.

Section 2.3    Organization and Continuation.  The Company was formed on the Filing Date and shall continue in perpetuity unless dissolved and wound up in accordance with Article XI.  The Company shall cause to be filed such certificates and documents as may be necessary or appropriate to comply with the Act and any other applicable requirements for the organization, continuation and operation of a limited liability company in accordance with the

21

Laws of the State of Delaware and any other jurisdictions in which the Company shall conduct business, and shall continue to do so for so long as the Company conducts business therein. Emily Greenwood, as an "authorized person" within the meaning of the Act, has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware (such execution and filing being hereby approved and ratified). Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, such Person's powers as an "authorized person" ceased. Each Officer, acting alone, is hereby designated as an "authorized person" and is authorized to execute, deliver and file any certificates (and any amendments and/or restatements thereof) that are to be filed with the Secretary of State of the State of Delaware and any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business. Notwithstanding anything to the contrary herein, the Board may, in its discretion and without the approval or consent of the Members, (i) cause the Company to be transferred to or domesticated or continued in or otherwise redomiciled in any domestic or foreign jurisdiction other than the State of Delaware (a "Company Redomiciliation") and to make any tax election(s) in connection with such Company Redomiciliation that the Board deems required, necessary or advisable to make, and (ii) take any actions and prepare, execute and file any other documents, and cause the Company to take any actions and prepare and file any other documents, the Board deems required, necessary or advisable to effect, or otherwise in connection with, any such Company Redomiciliation; *provided*, that in no event may any such Company Redomiciliation materially and adversely affect the rights of a Member in a manner disproportionate to any adverse effect such Company Redomiciliation would have on such rights of other Members without the consent of Members holding outstanding Units representing a majority of the votes entitled to be cast with respect to the Units so adversely affected (calculated in accordance with Section 6.1).

Section 2.4    Purposes and Powers.  The Company may engage in any business or activity in which a limited liability company organized under the Laws of the State of Delaware may lawfully engage, and shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act (including the borrowing of money and the issuance of guarantees of indebtedness of other Persons).

Section 2.5    Members.  The name, number and class and series, if applicable, of Units held as of the Agreement Date, the Initial Contribution Amount (if any), the Capital Account balance as of the Agreement Date, the applicable Participation Thresholds with respect to Warrant Units and Class C Units and the business address of each Member are set forth on the Schedule of Members, which shall be maintained by the Company. Except as set forth in this Agreement or agreed by the Board, to the fullest extent permitted by applicable Law, no Member (other than VCP) shall be entitled to receive or review the Schedule of Members or any amendments thereto other than with respect to such Member. Additional or substituted Members may be admitted to the Company only with the approval of the Board and subject to the other provisions of this Agreement. No Member shall have any right or power to resign from the Company (except that a Member who no longer owns any Units shall thereby cease to be a Member and a Member shall cease to be a Member upon the occurrence of any of the events specified in Section 18-304 of the Act unless otherwise determined by the Board), and no Member shall be entitled to receive any distribution from the Company (pursuant to Section 18-604 of the Act or otherwise) upon or by reason of any purported resignation from the Company. Any additional Member admitted to the Company shall agree to be bound by the terms and conditions of this Agreement by executing a counterpart signature page hereto.

22

Section 2.6    <u>Liability of Members</u>.  The liability of the Members for the losses, debts and obligations of the Company shall be limited to their capital contributions, if any, except to the extent provided by applicable Law.  Without limiting the foregoing, (i) no Member, in his, her or its capacity as a Member, shall have any liability to restore any negative balance in his, her or its Capital Account, and (ii) to the fullest extent permitted by applicable Law, the failure of the Company to observe any formalities or the Board to exercise any requirements relating to the exercise of its powers or management of the Company's business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members or the Board for liabilities of the Company.

ARTICLE III

UNITS; CAPITAL CONTRIBUTIONS; ADDITIONAL FINANCING[2]

Section 3.1    <u>Units</u>.  All limited liability company interests in the Company shall be denominated in Units.  There shall initially be five classes of Units in the Company:  Class A-1 Units; Class A-2 Units; Class B Units; Class C Units; and Warrant Units.  The total number of Units that the Company shall have the authority to issue as of the Agreement Date is [●] Units, consisting of (i) [372,774,234] Class A-1 Units, [322,005,391] of which are issued and outstanding as of the Agreement Date, (ii) [372,774,234] Class A-2 Units, none of which are issued and outstanding as of the Agreement Date, (iii) [102,135,130] Class B Units, [81,708,104] of which are issued and outstanding as of the Agreement Date, (iv) [94,981,873][3] Class C Units, none of which are issued and outstanding as of the Agreement Date, and (v) [63,321,249][4] Warrant Units, none of which are issued and outstanding as of the Agreement Date.  The Units shall carry the rights, privileges, and burdens in the Company as outlined in this Agreement and, where applicable, the Act.  The Board may authorize the issuance of additional Units in its sole discretion and may amend this <u>Section 3.1</u>, without the consent of any other Person, to reflect such additional authorization.  The Board may reduce the number of authorized Units of any class of Units (not below the number of issued and outstanding Units of such Class at that time plus the number of Units of such Class issuable upon exercise, conversion or exchange of any issued and outstanding Equity Securities at that time) in its sole discretion and may amend this <u>Section 3.1</u>, without the consent of any other Person, to reflect such reduced authorization.  Any determination or calculation with respect to matters addressed in this <u>Article III</u>, including any determination, calculation, allocation or adjustment regarding Units, Capital Accounts or Initial Contribution Amounts, shall be determined by the Board in

---

[2]    **Note to Draft**:  All Unit amounts set forth in this <u>Article III</u> are illustrative based on an assumed October 31, 2024 Agreement Date and are subject to change based on the accrued and PIK interest as of the actual Agreement Date.

[3]    **Note to Draft**:  Authorized Class C Units to be based on 15% of fully diluted Units assuming the full $15M ($25M less $10M Backstop) is issued in the Rights Offering, which is the maximum size of the MIP.  The MIP will be equal to 15% of the issued and outstanding Units after completion of the Rights Offering.  If the Rights Offering is not fully subscribed, the Board can reduce the authorized Class C Units to equal the size of the MIP.

[4]    **Note to Draft**:  Authorized Warrant Units to be based on 10% of fully diluted Units assuming the full $15M ($25M less $10M Backstop) is issued in the Rights Offering, which is the maximum number of Warrant Units.  If the Rights Offering is not fully subscribed, the Board can reduce the authorized number of Warrant Units to equal 10% of fully diluted Units after the actual Rights Offering.

good faith, and any determinations made by the Board on such matters shall be final and binding on all Members.

Section 3.2    Capital Accounts.  For each Member (and each permitted assignee), the Company shall establish and maintain a separate Capital Account.  The Capital Account of each Member as of the Agreement Date is set forth on the Schedule of Members.

Section 3.3    Capital Contributions.

(a)    As of the Agreement Date, each Member shall be deemed to have contributed to the capital of the Company such Member's Initial Contribution Amount.

(b)    Except as otherwise provided in this Article III, no Member shall be obligated or permitted to contribute any additional capital to the Company without the consent of such Member and the approval of the Board.  No interest shall accrue on any contributions to the capital of the Company, and no Member shall have the right to withdraw or to be repaid any capital contributed by it or to receive any other payment in respect of its interest in the Company, including as a result of any purported resignation of such Member from the Company, except as specifically provided in this Agreement.

Section 3.4    Contributions of Additional Capital.

(a)    With the approval of the Board, and subject to the other provisions of this Agreement, a Member may contribute additional capital to the Company for any purpose related to the conduct of the business of the Company in exchange for Units.  Subject to the other provisions of this Agreement, any such contribution shall be made in an amount determined by the mutual agreement of the Company, with the approval of the Board and the contributing Member, against issuance to such Member of the number and class and series (if applicable) of Units approved by the Board.

(b)    The books and records of the Company (including the Schedule of Members) shall be adjusted to reflect any additional contributions to the capital of the Company made pursuant to this Section 3.4.

Section 3.5    Class A-1 Units.

(a)    The Class A-1 Units shall have the voting and other rights as set forth in this Agreement.  Class A-1 Units shall not be entitled to receive any distributions, including distributions upon liquidation, or participate in any redemptions or repurchases under this Agreement or otherwise without the prior written approval of Members holding a majority of each other class of Units outstanding at the time of such distribution, redemption or repurchase. Upon the conversion of a Restructuring Second Lien Term Loan or Equivalent Note pursuant to the Credit Agreement, one Class A-1 Unit held by the converting 2L Lender, Backstop Party or Rights Offering Subscriber shall be cancelled and extinguished for each Class A-2 Unit issued to the converting 2L Lender, Backstop Party or Rights Offering Subscriber.  Upon the repayment or prepayment of a Restructuring Second Lien Term Loan or Equivalent Note pursuant to the Credit Agreement, one Class A-1 Unit held by the 2L Lender, Backstop Party or Rights Offering Subscriber holding such repaid or prepaid Restructuring Second Lien Term Loan or Equivalent Note shall be cancelled and extinguished for each Class A-2 Unit that would otherwise have been issuable upon conversion of such repaid or prepaid Restructuring

Second Lien Term Loan or Equivalent Note immediately prior to such repayment or prepayment and the Company shall no longer have the authority to issue such Class A-2 Units.

(b)     Immediately following the completion of the Rights Offering, the 2L Lenders shall be issued a number of additional Class A-1 Units for no additional consideration such that (i) the total number of Class A-1 Units held by the 2L Lenders as of immediately following the completion of the Rights Offering represent the same percentage of the sum of (x) the total number of Class A-1 Units issued and outstanding as of immediately following the completion of the Rights Offering plus (y) the authorized number of Class B Units as (ii) the total number of Class A-1 Units held by the 2L Lenders as of the Agreement Date represented of the sum of (x) the total number of Class A-1 Units issued and outstanding as of the Agreement Date plus (y) the authorized number of Class B Units (treating any Class A-1 Units resold or issued to Rights Offering Subscribers in connection with any resale of Backstop Loans to Rights Offering Subscribers or assignment of Backstop Loans to Afiniti and the Company for cancellation by the Administrative Agent in connection with the Rights Offering as if they had not been Class A-1 Units issued and outstanding as of the Agreement Date).

Section 3.6     Class A-2 Units.

(a)     The Class A-2 Units shall have the voting, distribution, liquidation and other rights as set forth in this Agreement.

(b)     The Initial Contribution Amount for the Class A-2 Units issuable upon conversion of the Restructuring Second Lien Term Loans shall be $1.00.  The Initial Contribution Amount for the Class A-2 Units issuable upon conversion of the principal amount of Restructuring Second Lien Term Loans held by the 2L Lenders as of the Agreement Date shall be reduced as of immediately following the completion of the Rights Offering to an amount (calculated to the nearest one-hundredth of a cent) equal to the number of Class A-1 Units held by the 2L Lenders as of the Agreement Date, divided by the number of Class A-1 Units held by the 2L Lenders as of immediately following the completion of the Rights Offering after giving effect to the adjustment pursuant to Section 3.5(b).

(c)     Immediately prior to the conversion of any Restructuring Second Lien Term Loans, the Initial Contribution Amount for the Class A-2 Units issuable upon conversion of such Restructuring Second Lien Term Loans to be converted shall be increased to an amount (calculated to the nearest one-hundredth of a cent) equal to (i) such Initial Contribution Amount, multiplied by (ii) (x) the number of Class A-2 Units issuable upon conversion of such Restructuring Second Lien Term Loans to be converted, including any accrued and paid in kind interest thereon incurred after the Amendment No. 13 Effective Date, divided by (y) the number of Class A-2 Units issuable upon conversion of such Restructuring Second Lien Term Loans to be converted, excluding any accrued and paid in kind interest thereon incurred after the Amendment No. 13 Effective Date.

Section 3.7     Class B Units.  The Class B Units shall have the voting, distribution, liquidation and other rights as set forth in this Agreement.  As of the Agreement Date, forty percent (40%) of the authorized Class B Units ([40,854,052] Class B Units) have been issued to the Backstop Parties, and forty percent (40%) of the authorized Class B Units ([40,854,052] Class B Units) have been issued to Eligible Holders of preferred equity interests in Afiniti Parent ratably on the basis of their original preferred equity subscription amount (i.e., their total number of preferred shares or other equity interests in Afiniti Parent multiplied by the subscription price per share or interest).  The remaining twenty percent (20%) of the authorized

Class B Units ([20,427,026] Class B Units) will be issued to Rights Offering Subscribers in connection with the Rights Offering, allocated ratably on the basis of a ratio equal to four percent (4%) ([4,085,405.20] Class B Units) for every $5,000,000 aggregate principal amount of Restructuring Second Lien Term Loans subscribed for in the Rights Offerings, with any Class B Units not issued to Rights Offering Subscribers being issued to Eligible Holders of preferred equity interests in Afiniti Parent ratably on the basis of their original preferred equity subscription amount.

Section 3.8     Class C Units.

(a)     The Class C Units shall have the distribution, liquidation and other rights as set forth in this Agreement.  The Class C Units shall be non-voting.

(b)     Without limiting the foregoing, Class C Units may be issued to Service Providers of the Company for the purpose of attracting or retaining qualified individuals or otherwise providing compensation for services to the Company.  Such Class C Units may be issued by the Board pursuant to the MIP, or any other plan approved by the Board, or outside of any plan.  The Board may, in its discretion, increase the number of Class C Units reserved for issuance under any plan.  In the case of a Class C Unit that is issued to a Service Provider, it is intended that the issuance of such Class C Unit shall be characterized for U.S. federal income tax purposes as a "profits interest" within the meaning of Revenue Procedures 93-27 and 2001-43, unless otherwise determined by the Board.  However, to the extent any Class C Units fail to meet the definition of a "profits interest," neither the Company nor any other Member shall have any liability to the recipient of such Class C Units with respect to such failure.  If a Person acquires Class C Units in exchange for services, whether or not the Person also makes payment of property or cash for such Class C Units, the Company shall adjust the Carrying Value of the Company's assets pursuant to clause (ii) of the definition of Carrying Value, unless the Company determines that such adjustment is not required for such issuance of Class C Units.

Section 3.9     Warrant Units.

(a)     The Warrant Units shall have the distribution, liquidation and other rights as set forth in this Agreement.  The Warrant Units shall be non-voting.  Effective as of immediately following the completion of the Rights Offering, a number of Warrant Units representing ten percent (10%) of the issued and outstanding Units as of immediately following the completion of the Rights Offering (including the authorized number of Class C Units as if they had been outstanding and including the Warrant Units) shall be issued.  Forty percent (40%) of the Warrant Units to be issued shall be issued to the Backstop Parties, forty percent (40%) of the Warrant Units to be issued shall be issued to Eligible Holders of preferred equity interests in Afiniti Parent ratably on the basis of their original preferred equity subscription amount (i.e., their total number of preferred shares or other equity interests in Afiniti Parent multiplied by the subscription price per share or interest), and twenty percent (20%) of the Warrant Units to be issued shall be issued to Rights Offering Subscribers in connection with the Rights Offering, allocated ratably on the basis of a ratio equal to four percent (4%) for every $5,000,000 aggregate principal amount of Restructuring Second Lien Term Loans subscribed for in the Rights Offerings, with any Warrant Units not issued to Rights Offering Subscribers being issued to Eligible Holders of preferred equity interests in Afiniti Parent ratably on the basis of their original preferred equity subscription amount.

(b)      The Warrant Units shall expire and be cancelled and extinguished on the seventh (7th) anniversary of the Agreement Date without action of any Person.

(c)      In the event of a Company Sale or IPO in which the aggregate distributions made pursuant to Section 4.2 (or in the case of an IPO, determined to be made in such IPO in accordance with Section 4.2 pursuant to Section 11.4) to all Members is below the Participation Threshold for any Warrant Unit, such Warrant Unit shall expire and be cancelled and extinguished.

Section 3.10      Holders of Units; Vesting.  Units issued to a Member by the Company may be subject to forfeiture, vesting or other restrictions as set forth in a written agreement between the Company and such Member (which shall be approved by the Board).  Any such agreement may be executed on behalf of the Company by any Officer other than the Officer (if any) who is the Member with respect to such agreement.  Each Service Provider who acquires Units that are "substantially nonvested" within the meaning of Treasury Regulation Section 1.83-3(b) in exchange for services shall (i) make a timely election under Code Section 83(b) with respect to such Units, which election shall be the sole responsibility of such Service Provider, and (ii) provide a copy of such election, together with applicable mailing evidence, to the Company on or before the due date for the filing of such election.

Section 3.11      Amendment to Schedule of Members.  Subject to the other provisions of this Agreement, the Schedule of Members shall be amended from time to time to reflect any change in Unit holdings (or other information set forth on the Schedule of Members) pursuant to the terms of this Agreement, and any such amendment may be effected by any Officer, without approval of the Board or the Members.

ARTICLE IV

DISTRIBUTIONS

Section 4.1      Distributions in General.  Except as provided in Sections 4.3, 4.4 and 11.3(b), cash and property of the Company shall only be distributed to the Members, at such times and in such aggregate amounts as the Board may determine, in the manner set forth in this Article IV.  Notwithstanding any other provision of this Agreement, the Company shall not make a distribution on account of any Unit if such distribution would violate the Act or other applicable Law.  Any determination or calculation with respect to matters addressed in this Article IV, including any determination, calculation, allocation or adjustment regarding any distribution, MOIC or Participation Threshold, shall be determined by the Board in good faith, and any determinations made by the Board on such matters shall be final and binding on all Members.

Section 4.2      Distributions.

(a)      Subject to Sections 4.2(b), (d), (e), (e) and (f), any distributions (other than tax distributions pursuant to Section 4.3), redemptions or repurchases shall be made to or effected with the Class A-2 Members, Class B Members, Class C Members and Warrant Members pro rata in proportion to their holdings of the Class A-2 Units, Class B Units, Class C Units and Warrant Units, collectively.  Class A-1 Members shall not be entitled to receive any distributions, including distributions upon liquidation, or participate in any redemptions or repurchases with respect to Class A-1 Units under this Agreement or otherwise without the

prior written approval of Members holding a majority of each other class of Units outstanding at the time of such distribution, redemption or repurchase.

(b)    For purposes of this Section 4.2, a Warrant Unit shall only be entitled to receive distributions in connection with (i) a Company Sale, (ii) an IPO, (iii) the sale, lease, transfer, exclusive license or other disposition by the Company or any subsidiary of the Company of a material amount of assets outside the ordinary course of business, (iv) the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of the Company, or (v) the incurrence of indebtedness, and only such distributions shall be taken into account in determining whether the Participation Threshold has been satisfied for such Warrant Unit. Fifty percent (50%) of the Warrant Units shall have a Participation Threshold equal to (A) the MOIC multiplied by 2.0 minus (B) the aggregate amount of all interest payments, any premiums and any repayments or prepayment of principal, in each case, received in cash by the 2L Lenders in respect of such Restructuring Second Lien Term Loans, and in the case of any Restructuring Second Lien Term Loans converted into Class A-2 Units, all distributions received in cash in respect of the Class A-2 Units issued upon conversion of Restructuring Second Lien Term Loans, since the Amendment No. 13 Effective Date through and including the applicable date of calculation pursuant to the terms of this Agreement (the "First Participation Threshold"), and fifty percent (50%) of the Warrant Units shall have a Participation Threshold equal to (A) the MOIC multiplied by 2.5 minus (B) the aggregate amount of all interest payments, any premiums and any repayments or prepayment of principal, in each case, received in cash by the 2L Lenders in respect of such Restructuring Second Lien Term Loans, and in the case of any Restructuring Second Lien Term Loans converted into Class A-2 Units, all distributions received in cash in respect of the Class A-2 Units issued upon conversion of Restructuring Second Lien Term Loans, since the Amendment No. 13 Effective Date through and including the applicable date of calculation pursuant to the terms of this Agreement (the "Second Participation Threshold"). An illustrative example of the MOIC calculation and the First Participation Threshold and Second Participation Threshold is set forth on Schedule 4.2(b).

(c)    Class C Units issued pursuant to the MIP representing fifteen percent (15%) of the issued and outstanding Units (including the Class C Units issuable pursuant to the MIP that are not subject to the First Participation Threshold or the Second Participation Threshold but excluding the Class C Units issuable pursuant to the MIP that are subject to the First Participation Threshold or the Second Participation Threshold and excluding the Warrant Units (the "Base Class C Unit Amount")) shall have a Participation Threshold equal to the liquidation value of the Company at the time of grant of such Class C Units. Class C Units issued pursuant to the MIP representing seven and one-half percent (7.5%) of the amount by which the issued and outstanding Units (including all Class C Units issuable pursuant to the MIP and the Warrant Units) exceed the total Units calculated using Base Class C Unit Amount shall have a Participation Threshold equal to the First Participation Threshold. Class C Units issued pursuant to the MIP representing seven and one-half percent (7.5%) of the amount by which the issued and outstanding Units (including all Class C Units issuable pursuant to the MIP and the Warrant Units) exceed the total Units calculated using Base Class C Unit Amount shall have a Participation Threshold equal to the Second Participation Threshold. Each award of Class C Units pursuant to the MIP shall be allocated ratably across these three Participation Thresholds.

(d)    For purposes of this Section 4.2, a Unit that is a Class C Unit or a Warrant Unit (subject to Subsection (b) in the case of a Warrant Unit) shall only be treated as

entitled to participate in distributions if the aggregate distributions made pursuant to this Section 4.2 to all Members (and, in the case of Warrant Units, aggregate payments to 2L Lenders) after the Agreement Date equals or exceeds the Participation Threshold for such Unit, and thereafter such Unit shall participate only as to distributions in excess of such Participation Threshold.  If, as a result of a single distribution the amount in the preceding sentence would exceed the Participation Threshold with respect to a Unit, then the distribution shall be split into two or more distributions in a manner such that each Unit will be considered entitled to receive only the distribution or distributions made after its Participation Threshold is met.

(e)    Any distributions payable under this Section 4.2 with respect to outstanding Class C Units that are not vested shall be held by the Company and not distributed with respect to such Class C Units.  If such previously unvested Class C Units are vested at the time of a subsequent distribution, then, subject to Section 4.2(d) above, each such Class Unit shall then be entitled to all prior distributions that have been withheld with respect to such Class C Unit.

(f)    In the event of any Company Sale, any proceeds payable directly to the holders of Units shall be treated as subject to the distribution provisions of this Section 4.2 and the holders of Units shall receive such amounts that they would have been entitled to receive had such proceeds been distributed to the Members as provided in the foregoing provisions of this Section 4.2.  Each Member and other holder of Units, if any, agrees to take such actions as may be required, necessary or advisable to effect the intent of this Section 4.2.  In any of such events, if the consideration received by the Company or payable to the Members is other than cash, its value shall be deemed to be the fair market value as determined in good faith by the Board.

Section 4.3    Tax Distributions.

(a)    The Board may, so long as it in its sole discretion determines that the Company has sufficient funds, cause the Company to distribute to each Member (including a Member holding an outstanding Unit that is not vested) on or before March 31st of any year an amount equal to the excess, if any, of (A) the product of (i) the Taxable Income of the Member for the previous taxable year and (ii) the Tax Rate; over (B) the aggregate amount of distributions previously made to such Member pursuant to Section 4.2 during such taxable year (excluding any amounts treated as tax distributions for a previous taxable year); *provided*, *however*, that the Board shall not cause the Company to make any distributions pursuant to this Section 4.3 for any period during which any Restructuring Second Lien Term Loans or Equivalent Notes remain issued and outstanding.

(b)    Any distributions made pursuant to this Section 4.3 shall be treated as advances against, and shall reduce, on a dollar-for-dollar basis, the amount of, the next distribution(s) (other than distributions pursuant to this Section 4.3 for subsequent periods) or other proceeds that the Members otherwise would be entitled to receive pursuant to the terms of this Agreement, and shall be applied against any such future distributions or other allocated proceeds until all such advances have been repaid in full.

(c)    Neither the Company nor the Board shall have any liability to a Member for penalties arising from non-payment or incorrect estimates of such Member's tax distributions.

Section 4.4    Withholding and Taxes.

29

(a)     Notwithstanding anything to the contrary herein, to the extent that the Board reasonably determines that the Company is required, or elects pursuant to applicable Law, either (a) to pay tax (including estimated tax) on a Member's allocable share of the Company's items of income or gain, whether or not distributed, or (b) to withhold and pay over to the tax authorities any portion of (i) an allocation of an item of income, profit or gain made to a Member or (ii) a distribution otherwise distributable to a Member (including any withholding required by Code Section 1445 or Section 1446), the Company may pay over such tax or such withheld amount (in each case, a "<u>Withholding Payment</u>") to the tax authorities, and such amount shall be treated, in the discretion of the Board, as (i) a distribution to such Member at the time it is paid to the tax authorities (which distribution shall reduce the amount of distributions to which the Member would otherwise be entitled) or (ii) a demand loan to such Member, on such reasonable terms as the Board shall determine to be appropriate (which terms shall include the payment of interest by the Member on such loan).  Repayment of any such demand loan by the Member will not be considered a capital contribution for purposes of this Agreement.  Taxes withheld on amounts directly or indirectly payable to the Company and taxes otherwise paid by the Company (other than in the case where the amount of taxes paid by the Company is treated as a demand loan to the Member) shall be treated for purposes of this Agreement as distributed to the appropriate Members and paid by the appropriate Members to the relevant taxing jurisdiction.  In the event that the Company receives a refund of a Withholding Payment, the economic benefit of such refund shall be apportioned among the Members in a manner reasonably determined by the Board to offset the prior operation of this <u>Section 4.4(a)</u> in respect of such Withholding Payment.

(b)     The obligations of this <u>Section 4.4</u> shall survive the liquidation and dissolution of the Company and the Transfer, assignment or liquidation of a Member's interest in the Company.  If any Member ceases to be a Member, such Member shall keep the Company advised of its contact information until released in writing by the Company from such obligation.

Section 4.5     <u>Distribution of Assets in Kind</u>.  No Member shall have the right to require any distribution of any assets of the Company in kind.  If any assets of the Company are distributed in kind, such assets shall be distributed on the basis of their fair market value as determined in good faith by the Board.  Any Member entitled to any interest in such assets shall, unless otherwise determined by the Board, receive separate assets of the Company and not an interest as a tenant-in-common with other Members so entitled in any asset being distributed.

<center>ARTICLE V</center>

<center><u>ALLOCATION OF NET PROFITS AND NET LOSSES</u></center>

Section 5.1     <u>Basic Allocations</u>.

(a)     Except as provided in <u>Section 5.2</u>, which shall be applied prior to this <u>Section 5.1</u>, Net Profits and Net Losses of the Company for any fiscal period shall be allocated among the Members in such proportions and in such amounts as may be necessary so that following such allocations, the Adjusted Capital Account balance of each Member (as adjusted to reflect all required allocations pursuant to <u>Section 5.2</u> and all distributions made to such Member during the applicable fiscal period) equals such Member's then Target Balance.

<center>30</center>

(b)    If the amount of Net Profits or Net Losses allocable to the Members pursuant to Section 5.1(a) for a period is insufficient to allow the Adjusted Capital Account balance of each Member to equal such Member's Target Balance, such Net Profits or Net Losses shall be allocated among the Members in such a manner as to decrease the differences between the Members' respective Adjusted Capital Account balances and their respective Target Balances in proportion to such differences.

Section 5.2    Regulatory Allocations.  Notwithstanding the provisions of Section 5.1 above, the following allocations of Net Profits, Net Losses and items thereof shall be made in the following order of priority:

(a)    Items of income or gain (computed with the adjustments contained in paragraphs(i), (ii), (iii), (vi)and (vii) of the definition of "Net Profits and Net Losses") for any taxable period shall be allocated to the Members in the manner and to the minimum extent required by the "minimum gain chargeback" provisions of Treasury Regulation Section 1.704-2(f) and Treasury Regulation Section 1.704-2(i)(4).

(b)    All "nonrecourse deductions" (as defined in Treasury Regulation Section 1.704-2(b)(1)) of the Company for any taxable period shall be allocated to the Members in the same manner as Net Profits or Net Losses for such taxable period; *provided*, *however*, that nonrecourse deductions attributable to "partner nonrecourse debt" (as defined in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated to the Members in accordance with the provisions of Treasury Regulation Section 1.704-2(i)(1).

(c)    Items of income or gain (computed with the adjustments contained in paragraphs(i), (ii), (iii), (vi)and (vii) of the definition of "Net Profits and Net Losses") for any taxable period shall be allocated to the Members in the manner and to the extent required by the "qualified income offset" provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

(d)    In no event shall Net Losses of the Company be allocated to a Member if such allocation would cause or increase a negative balance in such Member's Capital Account (determined for purposes of this Section 5.2(d) only, by increasing the Member's Capital Account balance by the amount the Member is obligated to restore to the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) and the amount the Member is deemed obligated to restore to the Company pursuant to Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5)) and decreasing it by the amounts specified in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6)); provided, that if some but not all of the Members would have a negative Capital Account balance (so determined) as a consequence of allocations of Net Losses pursuant to Section 5.1, the limitations set forth in this Section 5.2(d) shall be applied by allocating Net Losses only to those Members who would not have a negative Capital Account balance as a consequence of receiving such an allocation of Net Losses (the allocation of such Net Losses among those Members to be in proportion to their adjusted Capital Accounts); provided, further, that if no other Member may receive an additional allocation of Net Losses pursuant to this Section 5.2(d), such additional Net Losses not allocated shall be allocated solely to those Members who bear the economic risks for such additional Net Losses within the meaning of Section 704(b) of the Code and the Treasury Regulations thereunder.

(e)    In the event a Member has a negative balance in such Member's Capital Account (determined, for purposes of this Section 5.2(e) only, by increasing the Member's Capital Account balance by the amount the Member is obligated to restore to the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) and the amount the Member is

deemed obligated to restore to the Company pursuant to Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5)) at the end of the fiscal period, such Member shall be specially allocated items of income or gain in the amount of such excess as quickly as possible; *provided*, that an allocation pursuant to this Section 5.2(e) shall be made only if and to the extent such Member would have a negative balance in its Capital Account (determined after taking into account the adjustments described in this Section 5.2(e)) after all other allocations provided in Section 5.1 and this Section 5.2 have been tentatively made.

(f)       Net Profits and Net Losses described in paragraph (iii) of the definition of "Net Profits and Net Losses" shall be allocated in a manner consistent with the manner that the adjustments to the Capital Accounts are required to be made pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m).

(g)       The indebtedness of the Company shall be allocated among the Members under Code Section 752 as determined by the Board in accordance with Code Section 752.

Section 5.3       Tax Allocations; U.S. Tax Treatment of Restructuring Second Lien Term Loans and Equivalent Notes.  Except as otherwise provided herein or as required by Code Section 704, for tax purposes, all items of income, gain, loss, deduction or credit shall be allocated to the Members in the same manner as are Net Profits and Net Losses; *provided*, *however*, that if the Carrying Value of any property of the Company differs from its adjusted basis for tax purposes, then items of income, gain, loss, deduction or credit related to such property for tax purposes shall be allocated among the Members so as to take account of the variation between the adjusted basis of the property for tax purposes and its Carrying Value in any manner provided for under Code Section 704(c) and the Treasury Regulations issued thereunder as determined by the Board in its discretion.  Allocations pursuant to this Section 5.3 are solely for purposes of federal, state and local income taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, distributions (other than tax distributions pursuant to Section 4.3) or other items of the Company pursuant to any other provision of the Agreement.  Notwithstanding anything to the contrary, for U.S. federal and other applicable income tax purposes and for purposes of allocating all items of income, gain, loss, deduction or credit for such purposes (including in the interpretation and application of Article III, Article IV and this Article V for such purposes), the Company shall treat (i) the beneficial owners of Restructuring Second Lien Term Loans and Equivalent Notes as Members, (ii) the Restructuring Second Lien Term Loans and Equivalent Notes as Units and as partnership interests in the Company, (iii) the amounts required to be paid to such Persons under the Restructuring Second Lien Term Loans and Equivalent Notes as amounts required to be distributed to such Members by the Company under Article IV or Section 11.3(b), as appropriate, and (iv) the amounts actually paid to such Persons under the Restructuring Second Lien Term Loans and Equivalent Notes as amounts actually distributed (under Article IV or Section 11.3(b), as appropriate) to such Members by the Company.  Accordingly, any conversion of all or any portion of the Restructuring Second Lien Term Loans into Class A-2 Units shall be treated as a transaction governed by Code Section 721(a) or otherwise as a tax-free recapitalization of the Company.

Section 5.4       Allocations Upon Transfer or Admission.  In the event that a Member acquires an interest in the Company either by Transfer from another Member or by acquisition from the Company, the Net Profits, Net Losses, gross income, nonrecourse deductions and items thereof attributable to the interest so Transferred or acquired shall be allocated among the Members based on a method chosen by the Board, in its discretion, which method shall

comply with Code Section 706 and shall be binding on all Members. For purposes of determining the date on which the Transfer or acquisition occurs for such purposes, the Company may make use of any convention allowable under Code Section 706(d). The Members hereby agree that any such method and convention chosen by the Board is made by "agreement of the partners" within the meaning of Treasury Regulation Section 1.704-6(f).

Section 5.5    Timing of Allocations. Allocations of Net Profits, Net Losses and other items of income, gain, loss and deduction pursuant to Section 5.1 and Section 5.2 shall be made for each fiscal year of the Company as of the end of such fiscal year; *provided*, *however*, that if the Carrying Values of the assets of the Company are adjusted pursuant to the definition of "Carrying Value," the date of such adjustment shall be considered to be the end of a fiscal year for purposes of computing and allocating such Net Profits, Net Losses and other items of income, gain, loss and deduction.

Section 5.6    Capital Accounts Upon Forfeiture of Units. In the event a Member's Units are subject to vesting restrictions and the Member forfeits all or a portion of such Units, the Board shall make such adjustments to allocation of Net Profits, Net Losses and the Capital Accounts of all Members as it may in good faith determine may be necessary to reflect the forfeiture of such Units, including to comply with the provisions of the Proposed Treasury Regulations pertaining to the treatment of "partnership equity for services" issued on May 24, 2005 or any successor provisions related thereto (if applicable). To the extent possible, such adjustments shall adjust the Capital Accounts of the Members so that, after such adjustments have been made, the Capital Account balances equal the amounts they would have been if the forfeiting Member had the reduced number of Units, and the other Members' respective interests in the Company were increased to the extent applicable, as of the date of formation of the Company (or such other date(s) as determined by the Board to be appropriate to give effect to the terms applicable to a Member on its admission to the Company) and to otherwise properly reflect the economic sharing arrangement associated with the forfeiture of such Units.

Section 5.7    Adjustment Upon Exercise of Compensatory Options. The Board shall make such adjustments to the Carrying Value of the Company's assets, allocation of Net Profits and Net Losses and Capital Accounts as it may in good faith determine may be necessary to comply with the provisions of the Proposed Treasury Regulations pertaining to the treatment of "partnership equity for services" issued on May 24, 2005 or any successor provisions relating thereto and to properly reflect the economic sharing arrangement associated with any "compensatory partnership options" as defined in such Proposed Regulation or successor authority.

Section 5.8    Adjustment Upon Exercise of Non-compensatory Options. If the Company issues Units or other securities that are treated as non-compensatory options, as defined in Treasury Regulation Section 1.721-2, the Board shall make such adjustments to the Carrying Value of the Company's assets, allocation of Net Profits and Net Losses, Capital Accounts and allocations of items for income tax purposes as it may in good faith determine may be necessary to comply with the provisions of the Treasury Regulations pertaining to the treatment of "non-compensatory options" issued on February 4, 2013 or any successor provisions relating thereto and to properly reflect the economic sharing arrangement associated with the non-compensatory options.

ARTICLE VI

MEMBER VOTING

Section 6.1    General Voting Rights.  On any matter presented to Members for their action or consideration at any meeting of Members (or by written consent of Members in lieu of meeting) (whether such approval is required under this Agreement or the Act or otherwise), except as provided in Section 6.3, each Member holding outstanding Class A Units shall be entitled to cast the number of votes equal to two times the number of whole Class A Units held by such Member as of the record date for determining Members entitled to vote on such matter, and each Member holding outstanding Class B Units shall be entitled to cast the number of votes equal to the number of whole Class B Units held by such Member as of the record date for determining Members entitled to vote on such matter.  No Member shall be entitled to vote on any matter with respect to the Class C Units or Warrant Units held by such Member.

Section 6.2    Quorum; Required Vote.  A quorum of any meeting of the Members shall require the presence in person or by proxy of the Class A Members holding a majority of the outstanding Class A Units.  Subject to Section 6.4, no action at any meeting may be taken by the Members unless the applicable quorum is present.  Except as provided in Section 6.3 and subject to Section 6.4, actions may be taken by the Members at any meeting at which a quorum is present with the affirmative vote of Members holding outstanding Units representing a majority of the votes entitled to be cast with respect to the Units entitled to vote on such matter (calculated in accordance with Section 6.1).

Section 6.3    Actions Requiring Class A Member Approval.    Notwithstanding anything herein to the contrary, without the prior written approval of the Class A Members holding a majority of the outstanding Class A Units, the Board shall not cause or permit the Company or any of its Subsidiaries to, and shall not cause or permit the Company or any of its Subsidiaries to enter into any commitment to, do any of the following (each, a "Major Action"):

(a)    a Company Sale;

(b)    an IPO (including any Incorporation in connection with such IPO);

(c)    any distributions to Members pursuant to Section 4.2;

(d)    the authorization and issuance of any new class or series of Units;

(e)    the redemption or repurchase of any Units from a Member; or

(f)    the voluntary dissolution and winding up of the Company pursuant to Article XI.

Section 6.4    Action by Written Consent.  Any action of the Members (including any consent, approval, vote or other action of the Members required or contemplated under or by this Agreement, the Act or otherwise), may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the Members required to approve such action under this Agreement.  Unless the consent of all Members entitled to vote has been obtained in writing, prompt notice of the taking of action by Members without a meeting pursuant to this Section 6.4 by less than unanimous written consent

34

shall be given to each of those Members entitled to vote who have not consented in writing following the effective date of such written consent.

Section 6.5    Meetings of the Members.  Meetings of the Members, including any special meeting, may be called by the Secretary of the Company, the Chief Executive Officer of the Company, the Board or VCP, in each case, from time to time.  Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purpose(s) for which the meeting is called, shall be delivered not fewer than ten (10) days and not more than thirty (30) days before the date of the meeting to each Member, by or at the direction of the Board or the authorized Person(s) calling the meeting, as the case may be.  The Members may hold meetings at the Company's principal office or at such other place as the Board or the authorized Person(s) calling the meeting may designate in the notice for such meeting, and any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

ARTICLE VII

MANAGEMENT

Section 7.1    General.  The Company shall be managed in accordance with the terms hereof.  The Board acting collectively as provided in this Agreement (but not any Director acting individually) is hereby designated as a "manager" of the Company within the meaning of Section 18-101(12) of the Act.  The business and affairs of the Company shall be managed by or under the direction of the Board, which shall have the right, power and authority to exercise all of the powers of the Company except as otherwise required by Law or this Agreement.  Decisions or actions relating to the Company that are made or approved by the Board (or, with respect to matters requiring a vote, approval or other action of the Members hereunder or pursuant to non-waivable provisions of applicable Law, by the Members) in accordance with this Agreement shall constitute decisions or actions by the Company.

Section 7.2    Binding the Company.  The signature of any Officer, or any other Person authorized by the Board, on any agreement, contract, instrument or other document shall be sufficient to bind the Company in respect thereof and conclusively evidence the authority of such Person and the Company with respect thereto, and no third party need look to any other evidence or require the joinder or consent of any other party.  Other than as set forth in this Section 7.2, no Member or other Person shall have the authority to bind the Company.

Section 7.3    Directors.

(a)    Number.  As of the Agreement Date, the Board shall consist of nine (9) Directors having one vote each.  Designations made pursuant to this Section 7.3 shall be evidenced by an instrument in writing signed by the designating party or parties and delivered to the Company.  Each designee shall hold office until his or her successor is duly designated and qualified or until his or her earlier resignation, removal or death.  The Directors as of the Agreement Date shall be designated as follows:

(i)    2L Directors.  Three (3) of the Directors shall be designated by the holders of a majority of the Class A Units (other than Backstop Units and

35

Rights Offering Units) (each, a "2L Director").  The 2L Directors shall initially be [●], [●] and [●].

   (ii) <u>Independent Directors</u>.  Three (3) of the Directors shall be independent of VCP and the Company (each, an "<u>Independent Director</u>").  The Independent Directors shall be designated by the holders of a majority of the Class A Units (other than Backstop Units and Rights Offering Units).  The Independent Directors shall initially be [●], [●] and [●].[5]  For the purpose of this <u>Section 7.3(a)(ii)</u>, with respect to any Independent Directors other than such initial Independent Directors, "independent" means a Person who, as of the date of such Person's designation or at any time during the three (3) years ended on such date, is or was not an officer, employee, director, manager of, and has not received compensation or remuneration for services in excess of $120,000 per year from, the Company, any Member or any of their respective Affiliates.

   (iii) <u>TRG Directors</u>.  Two (2) of the Directors shall be designated by TRG (each, a "<u>TRG Director</u>").  This right shall continue as long as the Backstop Parties and their Affiliates collectively hold, beneficially and of record, a number of Class A Units plus any Class B Units issued as consideration for any Backstop Units Transferred pursuant to clause (ii) of the definition of "Permitted Transfer" that is not less than 10,000,000 Units.  The TRG Directors shall initially be [●] and [●]. TRG shall deliver to the Company within forty-five (45) days after the end of each fiscal quarter a certificate setting forth the number of Class A Units held, beneficially and of record, by the Backstop Parties and their Affiliates and the number of Class B Units held, beneficially and of record, by the Backstop Parties and their Affiliates, that were issued as consideration for any Backstop Units Transferred pursuant to clause (ii) of the definition of "Permitted Transfer", in each case as of the last day of such fiscal quarter.

   (iv) <u>CEO Director</u>.  One (1) of the Directors shall be the individual then serving as the Chief Executive Officer of the Company (the "<u>CEO Director</u>").  The CEO Director shall initially be [●].  If the Company does not have a Chief Executive Officer, the office of the CEO Director shall be vacant.

   (b) <u>Resignation; Removal; Replacement</u>.  Directors may resign at any time. Directors (other than the CEO Director) may only be removed upon the written direction of Members having the requisite percentage of Units held by the class of Members that were permitted to designate such Director pursuant to this <u>Section 7.3</u>, effective upon the delivery of such written direction by the removing Member(s); *provided*, *however*, that the holders of a majority of the Class A Units (other than Backstop Units and Rights Offering Units) may remove the TRG Directors if (i) the Backstop Parties and their Affiliates no longer collectively hold, beneficially and of record, a number of Class A Units plus any Class B Units issued as consideration for any Backstop Units Transferred pursuant to clause (ii) of the definition of "Permitted Transfer", that is not less than 10.000.000 Units or (ii) TRG shall have failed to deliver the quarterly certification required pursuant to <u>Section 7.3(a)(ii)</u> within fifteen (15) days following receipt of written notice from the Company of the failure to deliver such certification

---

[5]   **<u>Note to Draft</u>**:  Initial Independent Directors to be identified by VCP prior to the Agreement Date.

pursuant to Section 7.3(a)(iii), and the holders of a majority of the Class A Units (other than Backstop Units and Rights Offering Units) shall have the power to designate individuals to fill the vacancies resulting from such removal.  In the event that any Director is removed or shall have resigned or is unable to serve, the parties who had the power to designate such Director pursuant to this Section 7.3 shall have the power to designate an individual to fill such vacancy. If the individual serving as CEO Director ceases to serve as the Chief Executive Officer of the Company for any reason, such individual shall immediately and without further action on the part of the Members cease to be the CEO Director and the individual then serving as the Chief Executive Officer of the Company shall automatically and without further action on the part of the Members become the CEO Director.

(c)    _Meetings of the Board_.  Regular meetings of the Board shall be held on such date and at such place and time as determined by a majority of the Directors then in office. Regular meetings of the Board shall be held on not less than five (5) days' notice to all Directors in writing, by telephone, by electronic transmission, by facsimile transmission or by any other reasonable means of communication (unless such notice is waived by each Director that did not receive such five (5) days' notice).  Special meetings of the Board may be called upon two (2) days' notice to all Directors in writing, by telephone, by electronic transmission, by facsimile transmission or by any other reasonable means of communication upon the request in writing of any Director (unless such notice is waived by each Director that did not receive such two (2) days' notice).  Notice of a meeting need not be given to any Director if a written waiver of notice, executed by such Director before or after the meeting, is filed with the records of the meeting, or to any Director who attends the meeting without protesting prior thereto, or at its commencement, the lack of notice.  A waiver of notice need not specify the purposes of the meeting.  No business shall be acted upon at a meeting that is not stated in the notice of the meeting.  Meetings of the Board may be held by conference telephone or other communications equipment by means of which all participating Directors can hear each other during the meeting.

(d)    _Quorum_.  No action may be taken at a meeting of the Board unless a quorum consisting of a majority of the Directors then in office are present, including at least two (2) 2L Directors.  If a quorum shall not be present at any meeting of the Board, the Directors present threat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Except as otherwise expressly provided in this Agreement, the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board.

(e)    _Action by Written Consent_.  Any action which may be taken by the Board under this Agreement may be taken without a meeting if consents in writing or electronic transmission setting forth the action so taken are signed or submitted by the number of Directors that would be necessary to authorize or take such action at a meeting at which all Directors were present and voted; _provided_ that each Director receives an advanced copy of a proposed written consent, together with any supporting materials, reasonably in advance of the execution of such written consent by the requisite number of Directors then in office.

(f)    _Voting Rights; Required Votes_.  Each Director shall be entitled to cast one vote with respect to any matter coming before the Board.  Any action required or permitted to be taken by the Board herein must be approved as provided herein, subject to Section 6.3. Any action of the Board that is not expressly addressed in this Agreement may be taken at a meeting or by written consent in accordance with this Section 7.3.  To the fullest extent permitted by applicable Law, any bankruptcy, insolvency, Chapter 11 or similar filing or

winding up action by the Company shall require the affirmative vote or consent of at least five (5) Directors, including at least two (2) Independent Directors.

(g)    Committees; Subsidiaries.  The Company shall cause each committee of the Board to include at least one TRG Director for as long as a TRG Director shall be serving on the Board, or at least one Independent Director if there is no TRG Director serving on the Board.  Unless prohibited by applicable Law, the Company shall cause the board of directors or similar governing body of each Subsidiary of the Company, and each committee of each such board or governing body, to include at least one TRG Director for as long as a TRG Director shall be serving on the Board, or at least one Independent Director if there is no TRG Director serving on the Board.

(h)    Conditions for Inbound Strategic Sale Transaction.  Notwithstanding an affirmative vote by the requisite number of Directors, the consummation of an Inbound Strategic Sale Transaction shall be conditioned on the Board first receiving a fairness opinion from a nationally recognized investment banking firm that is independent of VCP and the Company selected by a vote of a majority of the Directors then in office.

Section 7.4    Interpretation of Rights and Duties of Members and Directors.

The Members acknowledge and agree that, to the fullest extent permitted by Delaware Law and notwithstanding any duties otherwise existing at Law or in equity, (i) no Director, Member or any Member's owners or representatives (collectively, the "Covered Persons") shall have any duties (including any fiduciary duties) to the Company or the other Members other than the duty of loyalty (as modified by this Agreement) and those other duties (if any) expressly described herein; *provided*, the foregoing does not eliminate the implied contractual covenant of good faith and fair dealing, (ii) so long as a Covered Person acts in a manner consistent with the express provisions of this Agreement, such Covered Person shall not be in breach of any duties (including fiduciary duties) in respect of the Company or any other Member otherwise applicable under this Agreement or at law or in equity, and (iii) a Covered Person shall be entitled to make any decision and take or not take any action in their interests as a Member or creditor, or an Affiliate of a Member or creditor, of the Company, even if such decision, action or inaction is adverse to the interests of the Company or the other Members, and any decision made or action taken or not taken by a Covered Person in its interest as a Member or creditor, or an Affiliate of a Member or creditor, of the Company shall not constitute a breach of any duties (including fiduciary duties) in respect of the Company or any other Member otherwise applicable under this Agreement or at law or in equity.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of the Covered Persons otherwise existing at law or in equity, are agreed by the Members to replace fully and completely such other duties and liabilities of the Covered Persons.  Subject to the foregoing sentence but notwithstanding any other provision of this Agreement to the contrary or other applicable provision at law or in equity, to the fullest extent permitted by Delaware Law, whenever in this Agreement a Director or Member is permitted or required to make a decision or take or not take an action (x) in its or their "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking or not taking such actions, such Director, Member or Members or their owners or representatives shall be entitled to take into account its or their own interests (including their interests as a creditor or an Affiliate of a creditor of the Company) and the interests of its or their Affiliates, as well as the interests of the Members as a whole or (y) in "good faith" or under another expressed standard, a Director or Member shall act under such express standard and shall not be subject to any other or different standard.  Without limiting the generality of the foregoing, pursuant to

38

Section 18-1101 of the Act, the Covered Persons' duties to the other Members and the Company are hereby limited to those expressly provided in this Agreement.

Section 7.5    <u>Indemnification and Exculpation</u>.

(a)    No individual who is or was, or has agreed to become, a Member, Director or an Officer of the Company, or is or was serving, or has agreed to serve, at the request of the Company, as a director, officer, partner, manager or trustee of, or in a similar capacity with, a Subsidiary of the Company or any other corporation, partnership, another limited liability company, joint venture, trust or other enterprise (including any employee benefit plan) (each such individual being referred to hereafter as an "<u>Indemnitee</u>") shall be personally liable to the Company, any Member or any other Person bound by this Agreement for any loss, damage or claim that arises out of any action or inaction by such Indemnitee that such Indemnitee reasonably believed to be within the scope of the authority conferred on such Indemnitee, except that an Indemnitee shall be liable for any such loss, damage or claim if such Indemnitee so acted or omitted to act in violation of the applicable standards of conduct specified in <u>Section 7.4</u> or <u>Section 7.7</u> (or, to the extent such standards are not applicable to such Indemnitee, if such Indemnitee's actions or omissions constituted gross negligence or wilful misconduct). In performing his duties, each such Indemnitee shall be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports or statements (including financial statements) of the following other Persons or groups:  one or more officers or employees of the Company (or any Subsidiary of the Company), any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company (or any Subsidiary of the Company), the Directors, the Members or Officers; or any other Person who has been selected with reasonable care by or on behalf of the Company (or any Subsidiary of the Company), the Directors, the Members or Officers in each case as to matters which such relying Person reasonably believe to be within such other Person's relevant area of expertise or competence.

(b)    The Company shall, to the fullest extent permitted by Laws applicable to a limited liability company under the Laws of the State of Delaware, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment) indemnify each Indemnitee who was or is made a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (a "<u>Proceeding</u>"), or any appeal in such a proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of his or her status as an Indemnitee against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees and expenses) incurred by such Indemnitee in connection with such Proceeding. The right to indemnification conferred in this <u>Section 7.5</u> shall include the right to be paid or reimbursed by the Company or a Subsidiary, as applicable, for reasonable expenses (including reasonable attorneys' fees and expenses) in advance of the final disposition of the Proceeding and without any determination as to the ultimate entitlement to indemnification; *provided*, *however*, that in the event a court of competent jurisdiction finds in a final, binding and non-appealable decision that such Indemnitee is not entitled to indemnification pursuant to this <u>Section 7.5</u>, such Indemnitee shall reimburse the Company or a Subsidiary, as applicable, for any amounts received as advance payment or reimbursement for expenses. Indemnification under this <u>Section 7.5</u> shall continue

as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder for actions and omissions taken or not taken in such capacity.

(c)    The indemnification rights provided in this <u>Section 7.5</u>:  (i) shall not be deemed exclusive of any other rights to which an Indemnitee may be entitled under any Law, agreement or vote of Members or otherwise, and (ii) shall inure to the benefit of the heirs, executors and administrators of an Indemnitee.  The Company may, to the extent authorized from time to time by the Board, grant indemnification rights to other employees or agents of the Company or other individuals serving the Company and such rights may be equivalent to, or greater or less than, those set forth in this <u>Section 7.5</u>.  Any indemnification to be provided hereunder shall be provided although the individual to be indemnified is no longer a Director, Member or an Officer.

(d)    The right to indemnification conferred in this <u>Section 7.5</u> shall not be exclusive of any other right which any Person may have or hereafter acquire under any Law, vote of the Board or otherwise.  In addition, the Company hereby acknowledges that certain Directors and Officers affiliated with certain of the Members may have certain rights to indemnification, advancement of expenses and/or insurance provided by the Members or certain of their Affiliates (collectively, the "<u>Investor Indemnitors</u>").  The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to the Indemnitee are primary and any obligation of the Investor Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Indemnitee are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by the Indemnitee in accordance with this <u>Section 7.5</u> without regard to any rights the Indemnitee may have against the Investor Indemnitors and (iii) that it irrevocably waives, relinquishes and releases the Investor Indemnitors from any and all claims against the Investor Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Company further agrees that no advancement or payment by the Investor Indemnitors on behalf of the Indemnitee with respect to any claim for which the Indemnitee has sought indemnification from the Company shall affect the foregoing and the Investor Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Indemnitee against the Company.

Section 7.6    <u>Freedom of Action</u>.  Subject to the restrictions in this Agreement or pursuant to the terms of any employment agreement, each Member and its Affiliates, and their respective employees, officers, directors, stockholders, members, managers, trustees, general and limited partners, agents and representatives (including Directors) (the Members and each such other Person being hereinafter referred to, collectively, as the "<u>Permitted Persons</u>") may have other business interests (including interests as a creditor or an Affiliate of a creditor of the Company) and may engage in any business or trade, profession, employment or activity whatsoever (regardless of whether any such activity competes, directly or indirectly, with the Company's business or activities or is otherwise adverse to the interests of the Company or the other Members), for its own account, or in partnership with, or as an employee, officer, director, stockholder, member, manager, trustee, general or limited partner, agent or representative of, any other Person, and no Permitted Person shall be required to devote his, her or its entire time (business or otherwise), or any particular portion of its time (business or otherwise), to the business of the Company.  Neither the Company nor any Member, nor any Affiliate thereof, by virtue of this Agreement, shall have any rights in and to any such independent venture or the income or profits derived therefrom, regardless of whether or not such venture was initially presented to a Permitted Person as a direct or indirect result of its relationship with the

Company.  No Permitted Person shall have any obligation hereunder to present any business opportunity to the Company, even if the opportunity is one that the Company might reasonably have pursued or had the ability or desire to pursue, in each case, if granted the opportunity to do so, and no Permitted Person shall be liable to the Company or any Member (or any Affiliate thereof), by reason of the fact that the Permitted Person pursues or acquires such business opportunity, directs such business opportunity to another Person or fails to present such business opportunity, or information regarding such business opportunity, to the Company.

Section 7.7    Officers.

(a)    Appointment.  The Board may, from time to time as it deems advisable, appoint officers of the Company with such titles (including, but not limited to, Chief Executive Officer, President, Chief Financial Officer, Chief Operating Officer, Chief Legal Officer/General Counsel, Vice President, Secretary, and Treasurer) and such responsibilities as the Board shall from time to time determine (each, an "Officer").  No Officer need be a Director or a Member.  Any two or more offices may be held by the same individual.  The initial Officers as of the Agreement Date shall consist of the following titles and individuals:

| | |
|---|---|
| Chief Executive Officer | [●] |
| President | [●] |
| Chief Financial Officer | [●] |
| Chief Administrative Officer | [●] |
| Chief Legal Officer and General Counsel | [●] |

(b)    Duties, Rights and Authorization of Officers.  Those Officers with titles customarily used in corporations organized under the DGCL, in their respective capacities as such, shall, unless otherwise provided herein or determined by the Board, have the statutory and customary rights, powers, authority, duties and responsibilities (including fiduciary duties, other than the duty of loyalty) of officers with similar titles of a corporation organized and existing under the DGCL.  The Members and the Board hereby delegate to each Officer such rights, powers and authority with respect to the management of the business and affairs of the Company as may be necessary or advisable to effect the provisions of this Section 7.7(b).  The powers and duties of the Chief Executive Officer, President, Chief Financial Officer, Chief Operating Officer, Chief Legal Officer/General Counsel, Vice President, and Secretary of the Company shall be as provided below:

(i)    The Chief Executive Officer shall preside at all meetings of the Board and of the Members at which the Chief Executive Officer is present. The Chief Executive Officer shall have authority to execute, in the name and on behalf of the Company, contracts, bonds, mortgages, and other documents in connection with the business of the Company, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board to some other officer or agent of the Company.  The Chief Executive Officer may employ and discharge employees and agents of the Company, except such as shall be appointed by the Board, and the Chief Executive Officer may delegate these powers.

(ii)     The President shall, in the absence or disability of the Chief Executive Officer, perform the duties and exercise the powers of the Chief Executive Officer and shall perform such other duties and have such other powers as the Board or the Chief Executive Officer may from time to time prescribe.

(iii)     The Chief Financial Officer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Board. The Chief Financial Officer shall keep an account of any Units registered and transferred in such manner and subject to such regulations as the Board may prescribe. The Chief Financial Officer shall disburse the funds of the Company as may be ordered by the Board or the Chief Executive Officer, taking proper vouchers for such disbursements. The Chief Financial Officer shall have all such further powers and duties as generally are incident to the position of Chief Financial Officer or as may be assigned to the Chief Financial Officer by the Chief Executive Officer or the Board.

(iv)     The Chief Operating Officer shall be responsible for overseeing the operations of the Company under the supervision of the Chief Executive Officer and shall have all such further powers and duties as generally are incident to the position of Chief Operating Officer or as may be assigned to the Chief Operating Officer by the Chief Executive Officer or the Board.

(v)     The Chief Legal Officer/General Counsel shall be responsible for overseeing all legal affairs and compliance for the Company and shall have all such further powers and duties as generally are incident to the position of Chief Legal Officer/General Counsel or as may be assigned to the Chief Legal Officer/General Counsel by the Chief Executive Officer or the Board.

(vi)     Each Vice President shall have such powers and perform such duties as the Board or the Chief Executive Officer may from time to time prescribe. In the absence or inability to act of the President, unless the Chief Executive Officer or the Board otherwise specifies, the Vice President who has served in that capacity for the longest time and who shall be present and able to act, shall perform all the duties and may exercise any of the powers of the President.

(vii)     The Secretary shall attend all meetings of the Board and all meetings of the Members and record all the proceedings of the meetings of the Members and of the Board in a book to be kept for that purpose and shall perform like duties for each committee of the Board when required.

(c)     <u>Tenure</u>.  Except as otherwise provided by Law or by this Agreement, each Officer shall hold office until his or her death, resignation, removal or replacement by the Board, unless a different term is specified in this Agreement or the action of the Board appointing him.  Any Officer may resign by delivering his or her written resignation to the Board.  Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.  Any Officer may be removed or

replaced at any time, with or without cause, by the Board, except as otherwise provided in any employment agreement between such Officer and the Company or any Subsidiary of the Company that employs such individual (as an employee, consultant, or otherwise). Except as otherwise provided by this Agreement or as the Board may otherwise determine, no Officer who resigns or is removed or replaced shall have any right to any compensation as an Officer for any period following his or her resignation, removal or replacement, or, to the fullest extent permitted by applicable Law, any right to damages on account of such removal or replacement, whether his or her compensation be by the month or by the year or otherwise, unless such compensation is expressly provided in a duly authorized written agreement with the Company or an applicable Affiliate.

(d)     Vacancies.  The Board may fill any vacancy occurring in any office for any reason and may, in its discretion, leave unfilled for such period as it may determine any such other office.

(e)     Compensation.  Officers of the Company shall be entitled to such salaries, compensation or reimbursement as shall be fixed or allowed from time to time by the Board.

Section 7.8     Affiliate Transactions.  The Company and its Subsidiaries may not engage in business with, and may not enter into agreements, leases, financings, contracts or other arrangements for the furnishing to or by the Company or any of its Subsidiaries of capital, goods, services, technology or space with, any Member, Director or Officer of the Company, or an Affiliate of any Member, Director or Officer of the Company, and may not pay compensation in connection with such business, capital, goods, services, technology or space (any such agreement or transaction being an "Affiliate Transaction"), except such Affiliate Transactions that are (i) determined by a majority of the Independent Directors to be on an arm's-length basis and on terms that are no less favorable to the Company or the applicable Subsidiary than those which would be agreed to among unaffiliated Persons under similar arrangements, and (ii) approved by a majority of the Independent Directors. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, the Company or any of its Subsidiaries may engage in (a) Affiliate Transactions occurring after an event of default under the Credit Agreement, including any credit bidding transaction, sale transaction, insolvency proceeding or similar proceeding, or (b) Affiliate Transactions which are not material involving services provided by Vista Valuation Creation Team or any other Affiliates of VCP, which are entered into on an arm's-length basis and on terms that are no less favorable than those which would be agreed to among unaffiliated Persons under similar arrangements.

Section 7.9     Successor Indemnification.  If the Company or any of its successors or assignees consolidates with or merges into any other Person and is not the continuing, resulting or surviving corporation or entity of such consolidation or merger, then proper provision shall be made so that the successors and assignees of the Company assume the obligations of the Company with respect to indemnification of Directors and Officers as in effect immediately before such transaction, whether such obligations are contained in this Agreement, or elsewhere, as the case may be.

ARTICLE VIII
FISCAL MATTERS

Section 8.1     Tax Reports.  As soon as reasonably practicable, the Company shall furnish all Members with Schedules K-1 and such other information as may be needed to enable

the Members to file their U.S. federal income tax returns and any required state income tax returns. The Company shall prepare and furnish to the Members such financial and other reports regarding the Company's activities as the Board determines to be appropriate. The cost of all such reporting shall be paid by the Company as a Company expense.

Section 8.2   <u>Fiscal Year</u>. The fiscal year of the Company shall end on June 30 of each year. The taxable year of the Company shall be the same as its fiscal year except as otherwise required by applicable Law.

Section 8.3   <u>Partnership Representative</u>.

(a)   VCP shall designate the Company's "partnership representative" within the meaning of Code Section 6223 and the Treasury Regulations thereunder and, as applicable, the "designated individual" within the meaning of Treasury Regulation Section 301.6223-1 through whom the partnership representative shall act. Subject to the prior approval of the Board with respect to any material matters, the partnership representative shall have sole authority to act on behalf of the Company for purposes of subchapter C of Chapter 63 of the Code and any comparable provisions of state or local income tax Laws and shall serve as the Company's partnership representative until his, her or its resignation or until the designation of his, her or its successor, whichever occurs sooner.

(b)   To the extent that, as a result of a determination by a taxing authority or adjudicative body, there is any adjustment for the purposes of any tax Law to any items of income gain, loss, deduction or credit of the Company for any taxable period, the Company will use commercially reasonable efforts to cause the financial burden of any "imputed underpayment" (as determined under Code Section 6225 (or comparable provisions of state or local income tax Laws)) and associated interest, adjustments to tax and penalties (an "<u>Imputed Underpayment</u>") arising from a partnership-level adjustment that are imposed on the Company to be borne by the Members and former Members to whom such Imputed Underpayment relates, as determined by the partnership representative after consulting with the Company's accountants or other advisers, taking into account (x) any differences in the amount of taxes attributable to each Member (or such Member's direct or indirect equity-holders) because of such Member's status, tax rates, tax attributes nationality or other characteristics (or the status, tax rates, tax attributes, nationality or other characteristics of such Member's direct or indirect equity-holders, if applicable) and (y) such Member's filing of an amended return and payment of taxes in a manner that complies with Code Section 6225(c)(2). The portion of any Imputed Underpayment attributed to a former Member shall be treated as a Withholding Payment pursuant to <u>Section 4.4</u> with respect to such former Member. Each Member agrees to indemnify and hold harmless the Company and the partnership representative from and against any and all liability with respect to any Imputed Underpayment required on behalf of, or with respect to, such Member.

(c)   Each Member shall cooperate with the partnership representative and the Company to implement the provisions of this <u>Section 8.3</u>. Such cooperation shall include (i) taking such action as may be necessary or desirable (as determined by the partnership representative) to allow the Company to successfully elect pursuant to Code Section 6226 for any Imputed Underpayment to be taken into account by the Members rather than the Company; *provided*, that no Member shall be required to file an amended Tax return without such Member's consent, and (ii) facilitating an election to modify the amount of a Member's (or such Member's direct or indirect equity owners') share of any Imputed Underpayment in accordance with Code Section 6225(c). In the case of any Imputed Underpayment that the

44

Company does not to elect, pursuant to Code Section 6226, to be taken into account by the Members rather than the Company, if a Member has not failed to provide all information, certifications, statements and other documents reasonably requested by the Company or the partnership representative to facilitate such modification of such Imputed Underpayment, then the partnership representative shall take commercially reasonable efforts to cause such Member's share of such Imputed Underpayment to be reduced by filing IRS Form 8980. Each Member agrees to be bound by the decisions and elections made by the partnership representative in its capacity as such under and consistent with this <u>Section 8.3</u>.

(d)    The obligations of this <u>Section 8.3</u>, including a Member's indemnification obligations under <u>Section 8.3(b)</u>, shall survive the liquidation and dissolution of the Company and the Transfer, assignment or liquidation of a Member's interest in the Company.  If any Member ceases to be a Member, such Member shall keep the Company advised of its contact information until released in writing by the Company from such obligation.

Section 8.4    <u>Taxation as Partnership</u>.  At all times during which the Company has more than one Member, except as set forth in <u>Section 11.4</u>, (i) the Company intends to be treated and taxed as a partnership for U.S. federal, state and local tax purposes, (ii) the Members and the Company will make any necessary elections to achieve this result and refrain from making any elections that would have a contrary result, and (iii) no Member shall knowingly take (or shall knowingly cause or permit any of its Affiliates to take) any action that is inconsistent with the classification and taxation of the Company as a partnership for U.S. federal, state and local income tax purposes.

Section 8.5    <u>Financial Reports</u>.

(a)    Until the Company's obligations under this <u>Section 8.5(a)</u> are terminated pursuant to <u>Section 8.5(f)</u>, the Company will deliver to each Major Investor, as promptly as practicable, but in any event within one hundred eighty (180) days after the end of each fiscal year of the Company, a full set of annual unaudited consolidated financial statements of the Company, including a consolidated income statement and consolidated statement of cash flows for such fiscal year, a consolidated balance sheet of the Company as of the end of such fiscal year, and a statement of member's equity as of the end of such fiscal year.  Notwithstanding the foregoing, with respect to the fiscal year ending June 30, 2024, such financials described in the preceding sentence shall be due on [●], 2025[6].  The year-end financial statements must be prepared in accordance with United States generally accepted accounting principles ("<u>GAAP</u>").

(b)    Until the Company's obligations under this <u>Section 8.5(b)</u> are terminated pursuant to <u>Section 8.5(f)</u>, the Company will deliver to each Major Investor, as promptly as practicable, but in any event within sixty (60) days after the end of each fiscal quarter (other than the fourth fiscal quarter of each fiscal year), a full set of unaudited consolidated quarterly financial statements for the Company, as of the end of each of the first three (3) fiscal quarters of each fiscal year of the Company, including a consolidated balance sheet and a consolidated statement of income of the Company (except that such financial

---

[6]     **Note to Draft**: To insert the date that is one hundred eighty (180) days after the date Afiniti Parent commences a provisional liquidation proceeding in Bermuda.

statements may (i) be subject to normal year-end audit adjustments; and (ii) not contain all notes thereto that may be required in accordance with GAAP).

(c)     Until the Company's obligations under this <u>Section 8.5(c)</u> are terminated pursuant to <u>Section 8.5(f)</u>, in the event the Company prepares audited financial statements, the Company will deliver to each Major Investor, as promptly as practicable, but in any event within twenty (20) Business Days after the completion of such audited financial statements, a copy of such audited consolidated financial statements, including, to the extent prepared by the Company, a consolidated income statement and consolidated statement of cash flows for such fiscal year, a consolidated balance sheet of the Company as of the end of such fiscal year, and a statement of member's equity as of the end of such fiscal year, accompanied by an independent auditor's report issued by the independent accountant.

(d)     Until the Company's obligations under this <u>Section 8.5(d)</u> are terminated pursuant to <u>Section 8.5(f)</u>, the Company shall permit each Major Investor, at such Major Investor's expense, to visit and inspect the Company's properties, to examine its books of account and records and to discuss the Company's affairs, finances and accounts with its Officers, during normal business hours of the Company as may be requested by such Major Investor; *provided*, *however*, that the Company shall not be obligated pursuant to this <u>Section 8.5(d)</u> to provide access to any information that the Board reasonably and in good faith considers to be a trade secret or the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

(e)     Until the Company's obligations under this <u>Section 8.5(e)</u> are terminated pursuant to <u>Section 8.5(f)</u>, the Company will deliver to each Major Investor, promptly following written request, an up-to-date anonymous capitalization table for the Company.

(f)     The Company's obligations under <u>Section 8.5(a)</u>, <u>Section 8.5(b)</u>, <u>Section 8.5(c)</u>, <u>Section 8.5(d)</u> and <u>Section 8.5(e)</u> will terminate upon a Company Sale.

(g)     Notwithstanding anything to the contrary herein, no Member shall be entitled to receive any reports or other information pursuant to this <u>Section 8.5</u> if such Member is a direct competitor of the Company (as determined by the Board in its sole discretion).

Section 8.6     <u>Confidentiality</u>.  Each Member agrees that such Member will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor or make decisions with respect to its investment in the Company) any confidential information obtained from the Company (including notice of the Company's intention to file a registration statement), unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of a duty of confidentiality), (b) is or has been independently developed or conceived by such Member without use of the Company's confidential information, or (c) is or has been made known or disclosed to such Member on a non-confidential basis by a third party (other than by or through a Person known by such Member to be bound by a duty of confidentiality) before, or independently of, the disclosure thereof by, or on behalf of, the Company to such Member; *provided*, *however*, that a Member or its Affiliates may disclose confidential information obtained from the Company (i) to its attorneys, accountants, consultants, and other professionals that are bound by a duty of confidentiality that is substantially similar in scope to that set forth in this <u>Section 8.6</u> to the extent reasonably necessary to obtain their services in connection with monitoring its investment in the Company; (ii) to any prospective purchaser of any Equity Securities or indebtedness (including Restructuring First Lien Term Loans or Restructuring Second Lien

46

Term Loans) from such Member or Affiliate, if such prospective purchaser agrees to be bound by the provisions of this <u>Section 8.6</u>; (iii) to any Affiliate, partner, member, stockholder, or wholly owned subsidiary of such Member in the ordinary course of business, *provided* that such Member informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information; or (iv) as may otherwise be required by Law (and only to the extent so required), *provided* that, to the fullest extent permitted by applicable Law, such Member promptly notifies the Company in writing of such proposed disclosure and takes reasonable steps to minimize the extent of any such required disclosure and, if requested by the Company, cooperates in good faith with the Company (at the Company's expense) to obtain a protective order or other remedy in respect of such disclosure. Each Member further agrees that it will not, and will cause its controlled Affiliates not to, trade any securities on the basis of any material non-public information that relates to the Company or its securities and that is communicated to such Member or Affiliate by, or on behalf of, the Company pursuant to this Agreement.

Section 8.7    <u>Tax Forms</u>.  As of the date hereof, each Member has provided a duly completed and executed valid IRS Form W-9 or applicable IRS Form W-8 to the Company, and shall provide a new IRS Form W-9 or applicable IRS Form W-8 (or successor form) to the Company promptly upon learning that any form provided to the Company has become obsolete or incorrect in any material respect.  In case of any Transfer of any Equity Securities or the admission of a new Member pursuant to this Agreement, a Member shall provide a duly completed and executed valid IRS Form W-9 or applicable IRS Form W-8 (or successor form) to the Company prior to such Transfer or admission becoming effective and shall provide a new IRS Form W-9 or applicable IRS Form W-8 (or successor form) to the Company promptly upon learning that any form provided to the Company has become obsolete or incorrect in any material respect.

Section 8.8    <u>Other Tax Matters</u>.  The Company and each Member agree that unless determined otherwise by the Board in its reasonable discretion, the Company intends that it will not knowingly conduct any trade or business activities directly or indirectly through one or more pass-through entities and that HoldCo and Afiniti each be treated and taxed as an association taxable as a corporation for U.S. federal, state and local income tax purposes.

ARTICLE IX

<u>TRANSFERS OF INTERESTS AND ADMISSION OF ADDITIONAL MEMBERS</u>

Section 9.1    <u>General Restrictions on Transfer of Interests by Members</u>.

(a)    Except as otherwise provided in this Agreement,  a Member may not (i) sell, transfer or otherwise dispose of (collectively, a "<u>Transfer</u>"), (ii) pledge, encumber or hypothecate, or (iii) enter into any swap agreements or other derivative transactions involving, any part or all of his, her or its Equity Securities without the prior written consent of the Board in the Board's sole discretion; *provided*, *however*, that (x) any Transfer of Class A-2 Units or Class B Units approved by the Board may be only to an Eligible Holder, (y) notwithstanding anything herein to the contrary, a Member may make a Permitted Transfer in such Member's sole discretion upon prior written notice to the Company, and (z) following the IPO, a Member may Transfer his, her or its Equity Securities pursuant to SEC Rule 144 or,  subject to <u>Section 9.1(f)</u>, another exemption from registration under the Securities Act, or pursuant to an effective registration statement under the Securities Act without the prior written consent of the Board. Unless a transferee becomes a Member in accordance with the provisions of this <u>Article IX</u>, it

47

shall not be entitled to any of the rights granted to a Member hereunder, other than the right to receive all or part of the share of the Net Profits and Net Losses (and items thereof) and all distributions of cash or property to which its assignor would otherwise be entitled in respect of the interest assigned.

(b)     The Company and the Board shall be entitled to treat the record owner of any Equity Securities (or interest therein) as the absolute owner thereof in all respects, and shall incur no liability for distributions of cash or other property made in good faith to such owner until such time as a written assignment of such Equity Securities (or interest therein) has been received by and accepted by the Board and recorded on the books of the Company.  In no event shall any Equity Securities, or any interest therein, be Transferred to a minor or incompetent, and any such attempted Transfer shall be void and ineffectual and shall not bind the Company, the Board or the Members.

(c)     If a Member who is an individual dies, or a court of competent jurisdiction adjudges him or her to be incompetent to manage his or her person or his or her property, the Member's executor, administrator, guardian, conservator or other legal representative may exercise all of the Member's rights hereunder, but solely for the purpose of settling his or her estate or administering his or her property and in no event shall such executor, administrator, guardian, conservator or legal representative participate in any way in the conduct of the business of the Company, or in the making of any decision or the taking of any action provided for hereunder for any other purpose.  If a Member is a corporation, trust or other entity, and is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

(d)     Any Transfer, pledge, encumbrance or hypothecation of, swap or other derivative transaction involving, Equity Securities (or interest therein) in contravention of any of the provisions of this Agreement shall be null and void and ineffective to Transfer, pledge, encumber or hypothecate any interest in the Company, and shall not bind, or be recognized by or on the books of, the Company, and any purported transferee in such transaction shall not be or be treated as or deemed to be a Member (or assignee) for any purpose.  In the event any Member shall at any time Transfer, pledge, encumber or hypothecate, or enter into any swap agreements or other derivative transactions involving, any Equity Securities (or any interest therein) in contravention of any of the provisions of this Agreement, then each other Member shall, in addition to all rights and remedies at law and equity, be entitled to seek a decree or order restraining and enjoining such transaction, and the offending Member shall not plead in defense thereto that there would be an adequate remedy at law; it being expressly hereby acknowledged and agreed that damages at law would be an inadequate remedy for a breach or threatened breach of the provisions of this Agreement concerning such transactions.

(e)     In addition to any other provision in this Agreement, a transferee of a Unit, or any interest therein, shall be admitted as a Member and become entitled to all the rights of a Member if, and only if the transferee executes and delivers a counterpart signature page to this Agreement, any agreement with respect to the Transferred Units, if applicable, and such other instruments, in form and substance satisfactory to the Board, as may be necessary, appropriate or desirable to effect such substitution and to confirm the agreement of the transferee to be bound by the terms and provisions of this Agreement and the aforementioned agreements, if applicable.  The Company shall not be required to recognize any Transfer by any Member until the Company has received (i) either a copy of a nonforeign affidavit provided to the transferee by the transferor in accordance with Code Section 1446(f)(2) or evidence that any tax required to be deducted and withheld pursuant to Code Section 1446(f)(1) has been so

48

deducted and withheld and properly remitted and (ii) any required tax forms pursuant to <u>Section 8.7</u>. In addition to any other applicable terms and conditions contained in this Agreement, no Transfer shall be completed or effective for any purpose unless prior thereto the 2L Directors shall be satisfied in their reasonable judgment that: (i) such Transfer, when added to all other Transfers within the preceding twelve (12) months, would not result in any federal income tax consequences which may be materially adverse to the Company or the non-transferring Members; (ii) such Transfer shall not impose tax liability or tax reporting obligations on the Company or any Member thereof in any jurisdiction, whether domestic or foreign; and (iii) such Transfer would not cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the related Treasury Regulations.

(f)    In addition to any other restrictions on Transfer imposed by this Agreement, no Member may Transfer any Equity Securities (except pursuant to an effective registration statement under the Securities Act or to VCP pursuant to <u>Section 9.6</u>) if such Transfer would (i) require registration or qualification under the Securities Act or applicable state securities Laws and no exemption from registration or qualification thereunder is available at such time (in which case such Transfer shall not be prohibited under this clause (i) if (x) such Member shall deliver to the Company an opinion of counsel (reasonably acceptable in form and substance to the Company) that such Transfer would not require any such registration or qualification or (y) such Transfer is in compliance with SEC Rule 144), (ii) require the Company to register as an investment company or elect to be a "business development company" under the Investment Company Act of 1940, as amended, (iii) cause the Company to be classified as (A) an association taxable as a corporation or treated as other than a partnership for United States federal income tax purposes or any applicable state or local income tax purposes or (B) a "publicly traded partnership" within the meaning of Code Section 469(k) or 7704, or (iv) violate the terms of this Agreement. The Board may waive the opinion requirement of the foregoing clause (i) on advice of counsel acceptable to the Company (and will not unreasonably withhold or delay consent to the waiver of such opinion).

(g)    The certificates, if any, representing Equity Securities shall bear a legend in substantially the following form:

> "The securities represented by this certificate were originally issued on _____, 20__, have not been registered under the Securities Act of 1933, as amended (the "<u>Act</u>"), or the securities laws of any state, and such securities may not be sold or transferred except pursuant to an effective registration statement under the Act or an exemption from registration thereunder. The securities represented by this certificate are also subject to additional restrictions on transfer set forth in the Amended and Restated Limited Liability Company Operating Agreement of the issuer. A copy of such agreement may be obtained by the holder hereof at the issuer's principal place of business without charge."

The legend set forth above shall be removed from the certificates evidencing any Units which cease to be subject to any of the transfer restrictions contained in this Agreement.

(h)    In the event of any Transfer of Class B Units, a proportionate number of Warrant Units held by such holder of Class B Units shall be Transferred along with such Class

B Units.  Other than proportionate Transfers of Warrant Units along with Transfers of Class B Units, Warrants Units are not Transferrable.

(i)    In the event of any Transfer of Restructuring Second Lien Term Loans in accordance with the loan transfer provisions of the Credit Agreement, or any Transfer of Equivalent Notes in accordance with the loan transfer provisions of the Equivalent Notes, by a holder of Class A-1 Units, a number of Class A-1 Units equal to the number of Class A-2 Units issuable upon conversion of such transferred Restructuring Second Lien Term Loan or Equivalent Note shall be transferred along with such Restructuring Second Lien Term Loans or Equivalent Notes.  Other than proportionate Transfers of Class A-1 Units along with Transfers of Restructuring Second Lien Term Loans or Equivalent Notes, Class A-1 Units are not Transferrable.

Section 9.2    Drag-Along.  Notwithstanding anything else herein to the contrary, if VCP (the "Initiating Member") proposes to consummate any Company Sale (for purposes of this Article IX, a "Drag-Along Sale"), then each Member and the Initiating Member shall comply with the terms of this Section 9.2.

(a)    Inbound Strategic Sale Transaction.  In the event that the Initiating Member elects to consummate or cause the Company to consummate a Company Sale in response to an offer or proposal received from a third-party strategic buyer operating in any industry or line of business (a "Strategic Buyer" and such transaction, an "Inbound Strategic Sale Transaction"):

(i)    the Initiating Member or the Company shall deliver a written notice (a "Drag-Along Notice") to each Member (for purposes of this Article IX, the "Drag-Along Holders"), which shall include (1) the identity of the proposed buyer entity or the fact that such buyer is a Strategic Buyer, and (2) the fact that such proposed transaction constitutes an Inbound Strategic Sale Transaction, and (3) any other material terms and conditions of such proposed transaction; and

(ii)    each Drag-Along Holder hereby agrees to (1) vote all Units or Equity Securities owned or over which such Member otherwise exercises voting power as of the time of the record date for such Inbound Strategic Sale Transaction in favor of such Inbound Strategic Sale Transaction, if applicable, and refrain from voting against or asserting or exercising any dissenters' or appraisal rights under applicable Law at any time with respect to such Inbound Strategic Sale Transaction, (2) execute and deliver all such documents and instruments, including instruments of conveyance and transfer, any purchase agreement or merger agreement, any associated indemnity agreement or escrow agreement, any associated voting, support, or joinder agreement, and any consents, waivers, governmental filings, and any similar or related documents, and take all such other actions, as shall reasonably be required by the Initiating Member or the Company in order to expedite or complete such Inbound Strategic Sale Transaction, and (3) transfer all Units or Equity Securities held by such Member in such Inbound Strategic Sale Transaction.

(b)    Non-Strategic Sale Transaction or Company Sale Process.  In the event that the Initiating Member elects to consummate or cause the Company to consummate a Company Sale in response to an offer or proposal received from a third-party that is not a

Strategic Buyer (such transaction, a "Non-Strategic Sale Transaction") or solicit or cause the Company to solicit offers or proposals from any potential buyer for a Company Sale (such solicitation, a "Company Sale Process"):

(i)     the Initiating Member or the Company shall deliver a Drag-Along Notice to the Drag-Along Holders, which shall include (A) in the case of a Non-Strategic Sale Transaction, (1) the identity of the proposed buyer entity or the fact that such buyer is not a Strategic Buyer, (2) the fact that such proposed transaction constitutes a Non-Strategic Sale Transaction, (3) the price that such buyer has agreed or is offering or proposing to pay for the Equity Securities or the Company's assets, and (4) any other material terms and conditions of such proposed transaction, and (B) in the case of a Company Sale Process, (1) that the Initiating Member elects to solicit or cause the Company to solicit offers or proposals from any potential buyer for a Company Sale, and (2) any other material terms and conditions of such proposed transaction;

(ii)     in the case of a Non-Strategic Sale Transaction, if the holders of more than fifty percent (50%) of the of the Class B Units (the "Class B Majority") vote to oppose such Non-Strategic Sale Transaction, then the Class B Majority shall have the right to request that the Board engage an investment banking firm of national standing to conduct a separate sale and marketing process, which shall last no less than 3 months from the date of the Drag-Along Notice (the "Sale Period");

(iii)     in the case of a Company Sale Process, the Class B Majority shall have the right to request that the Board engage an investment banking firm of national standing to conduct such solicitation of offers or proposals, and that such solicitation shall last for the Sale Period;

(iv)     during the Sale Period, (1) the Company shall provide to any financing sources considering a bona fide acquisition proposal the same information provided to the prospective purchaser in the proposed Non-Strategic Sale Transaction or to prospective bidders in the Company Sale Process, subject to the same confidentiality restrictions, and (2) the Board shall be obligated to review and consider any bona fide acquisition proposals that the Board determines in good faith are likely to result in a transaction more favorable to the Members from a financial point of view (taking into account closing conditions and financing commitments) than the Non-Strategic Sale Transaction or other offers or proposals received in the Company Sale Process; and

(v)     Following the Sale Period, the Initiating Member shall be entitled to agree to enter or cause the Company to enter into any Company Sale approved by the Initiating Member and drag all Drag-Along Holders pursuant to the provisions of Section 9.2(a).

Notwithstanding the foregoing, in the event that the Restructuring Second Lien Term Loans shall be in default or any remedies have been commenced, or the Company shall become the subject of a bankruptcy, insolvency, Chapter 11 or similar filing or winding up action prior to the consummation of a Non-Strategic Sale Transaction or Company Sale Process, then the provisions set forth in Section 9.2(b) shall be inapplicable and a Drag-Along Notice may be

delivered and shall be enforceable with respect to any Company Sale as if such transaction were an Inbound Strategic Sale Transaction without satisfying any of the provisions set forth in Section 9.2(b).

Section 9.3    Drag-Along Conditions.    Notwithstanding the foregoing or anything else herein to the contrary, the obligations of each Member to vote in favor of and otherwise comply with the provisions of this Article IX in connection with a Drag-Along Sale pursuant to this Article IX are subject to the following conditions:  (i) such transaction does not impose greater duties or obligations on one Member over another without such Member's express written consent, (ii) no Member shall be required to execute any non-compete, non-solicit or other restrictive covenant in connection with such transaction, (iii) all Members shall participate in such transaction under the same terms and conditions as the Initiating Member, taking into account the respective rights, preferences and privileges of the Units or Equity Securities held by each such Member, (iv) upon the consummation of the Drag-Along Sale, each Member shall receive the same form of consideration and the same amount of consideration that such Member would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights of such class of Units pursuant to Section 4.2, unless an option as to the form and amount of consideration to be received is given (which shall be given to all Members) and selected by such Member; (v) any representation, warranty or indemnification obligations of any Member will be several and not joint, and (vi) any liability associated with any representation, warranty, indemnity, covenant or other agreement relating to or arising out of the transaction will be expressly limited to and in proportion to the net proceeds received by such Member in connection with such transaction (other than any liability associated with any representation, warranty, indemnity, covenant or other agreement relating to such Member's title to its Units or Equity Securities or ability to enter into, or the enforceability or due authorization of, any agreement executed by such Member in connection with such Drag-Along Sale).

Section 9.4    Irrevocable Proxy and Power of Attorney.    Each Member hereby constitutes and appoints as the proxy of such Member, and hereby grants a power of attorney to, VCP, with full power of substitution, with respect to the matters set forth in Section 9.2 and Section 9.3 of this Agreement, including votes regarding any Company Sale, and hereby authorizes VCP to represent and vote, if and only if such Member (i) fails to vote within five Business Days after request by the Initiating Member or the Company, (ii) is prohibited from voting due to sanctions or other applicable Laws, or (iii) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of this Agreement, all of such Member's Units or Equity Securities in favor of any Company Sale pursuant to and in accordance with the terms and provisions of Section 9.2 and Section 9.3 of this Agreement.  The power of attorney granted hereunder shall authorize VCP to execute and deliver any documentation required by Section 9.2 and Section 9.3 of this Agreement on behalf of any Member failing to do so within five Business Days after request by the Initiating Member or the Company.  Each of the proxy and power of attorney granted pursuant to this Section 9.4 is given in consideration of the agreements and covenants of the Company and the Members in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates pursuant to the terms hereof and shall survive and not be affected by the bankruptcy or incapacity of the principal.  Each Member hereby revokes any and all previous proxies or powers of attorney with respect to such Member's Units or Equity Securities and shall not hereafter, unless and until this Agreement terminates pursuant to its terms, purport to grant any other proxy or power of attorney with respect to any of such Member's Units or Equity

Securities, deposit any of such Member's Units or Equity Securities into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any Person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of such Member's Units or Equity Securities, in each case, with respect to any of the matters set forth herein.

Section 9.5    Tag-Along Right.

(a)    In the event that any Member holding Class A-2 Units or Class B Units (the "Selling Member") proposes to Transfer any of his, her or its Class A-2 Units or Class B Units (other than a Permitted Transfer and a Transfer to VCP pursuant to Section 9.6) and such proposed Transfer is permitted in accordance with Section 9.1, each other Member holding Class A-2 Units or Class B Units shall have the right, but not the obligation, to participate in such Transfer pursuant to the provisions of Section 9.5(b) under the same terms and conditions as the Selling Member and in an amount of Class A-2 Units or Class B Units determined by multiplying (i) the aggregate number of Class A-2 Units or Class B Units proposed to be sold by the Selling Member in the Transfer by (ii) a fraction, the numerator of which is the number of Class A-2 Units and Class B Units owned by such Member holding Class A-2 Units or Class B Units immediately before consummation of the Transfer and the denominator of which is the total number of Class A-2 Units and Class B Units owned, in the aggregate, by all Members holding Class A-2 Units or Class B Units immediately before consummation of the Transfer (including the number of Class A-2 Units and Class B Units held by the Selling Member).

(b)    If the Selling Member proposes to consummate a Transfer, the Selling Member shall provide a notice to each Member holding Class A Units or Class B Units in writing at least fifteen (15) days prior to the proposed Transfer, which notice shall include (i) the number of Class A-2 Units or Class B Units proposed to be sold in such Transfer, (ii) the bona fide consideration to be received for such Class A-2 Units or Class B Units by the Selling Member, (iii) the identity of the prospective purchaser, (iv) any other material terms and conditions of such proposed sale, and (v) the expected date of completion of the proposed sale (the "Transfer Notice"). Each Member holding Class A-2 Units or Class B Units shall have the right (subject to the right of the Selling Member to not proceed with and to cancel such transaction and the Selling Member's participation therein), but not the obligation, to sell his, her or its Class A-2 Units or Class B Units in such Transfer (up to the amount of Class A-2 Units or Class B Units determined in accordance with Section 9.5(a)) on the same terms and conditions (other than with respect to governance rights) applicable to the sale by the Selling Member, by providing notice to the Selling Member within ten (10) days following the date of the Transfer Notice. Each Member holding Class A-2 Units or Class B Units choosing to participate in a Transfer (each a "Participating Member") shall indicate the number of Class A-2 Units or Class B Units that such Participating Member wishes to sell under such Participating Member's right to participate. Each Member holding Class A-1 Units shall be entitled to convert Restructuring Second Lien Term Loans or Equivalent Notes held by such Member into Class A-2 Units conditioned upon the Class A-2 Units issuable upon such conversion being included in such Transfer.

(c)    Each Participating Member agrees that the terms and conditions of any Transfer in accordance with this Section 9.5 will be memorialized in, and governed by, a written purchase and sale agreement with the prospective purchaser (the "Purchase and Sale Agreement"), and each Participating Member further covenants and agrees to enter into such Purchase and Sale Agreement as a condition precedent to its right to include any of its Class A-2 Units or Class B Units in any such Transfer. In connection with any Transfer, each

Participating Member further covenants and agrees to deliver all documentation required by such Purchase and Sale Agreement and to deliver to any prospective purchaser any certificates or other documentation, properly endorsed for transfer, representing the Class A-2 Units or Class B Units being sold thereby.

Section 9.6   <u>VCP Right of First Refusal</u>.  In connection with any Transfer of Class A-2 Units (other than Backstop Units and Rights Offering Units), other than to an Affiliate of the transferring Class A Member, and before giving effect to <u>Section 9.5</u> (if applicable), (x) such transferring Class A Member shall provide written notice of such Transfer to the Administrative Agent ten Business Days prior to the expected completion of such Transfer and such written notice shall include the number of Class A-2 Units proposed to be Transferred, the cash purchase price of such Transfer and any other material terms with respect to such Transfer (the "<u>ROFR Notice</u>"), (y) following the receipt of such ROFR Notice the Administrative Agent shall within five Business Days provide written notice to VCP of such proposed Transfer with the same details as provided to the Administrative Agent in the ROFR Notice and (z) upon the receipt of such written notice from the Administrative Agent, VCP shall, at its sole option, have five Business Days to send to the Administrative Agent an irrevocable written notice of purchase with respect such Transfer on the same terms as set forth in the ROFR Notice and the Transfer shall be completed with VCP within a reasonable amount of time.

ARTICLE X

REGISTRATION RIGHTS

Section 10.1   <u>Demand Registration</u>.

(a)   Subject to <u>Sections 10.1(c)</u> and <u>10.1(d)</u>, if at any time after the six-month anniversary of the closing of an IPO (the "<u>IPO Closing</u>"), the Company receives a request from VCP to file a resale registration statement under the Securities Act with respect to at least 10% of the Registrable Securities held by VCP (or a lesser percent if the anticipated aggregate offering price, net of Selling Expenses, with respect to VCP's Registrable Securities proposed to be sold, would exceed $150,000,000) (a "<u>Demand Request</u>"), then the Company shall: (i) within five days after the date such request is given, give notice thereof to all Holders other than VCP pursuant to <u>Section 10.2</u> and follow the procedures contained therein; (ii) promptly after the expiration of the ten Business Day period referred to in <u>Section 10.2</u>, the Company will notify all selling Holders of the identities of the other selling Holders and the number of Registrable Securities requested to be included in the registration; and (iii) as soon as practicable, and in any event within 45 days after the date such request is given, file a resale registration statement under the Securities Act covering all Registrable Securities that VCP requested to be registered and any additional Registrable Securities requested to be included in such registration by any other Holders pursuant to <u>Section 10.2</u>, and in each case, subject to the limitations of <u>Section 10.7</u>.  To the extent the Shelf Registration is effective and available for resales, any Demand Request by VCP made pursuant to this <u>Section 10.1(a)</u> may require the requested offering to be made via a prospectus supplement to the Shelf Registration statement (as opposed to the filing of a new registration statement).

(b)   Registrations under this <u>Section 10.1</u> shall be on such appropriate registration form of the SEC for the disposition of such Registrable Securities in accordance with the intended method of disposition thereof, which form shall be selected by the Company with the approval of VCP.  Following a Demand Request, at any time prior to the

54

consummation of such registration, VCP may deliver notice to the Company revoking such Demand Request and the Company shall not consummate such registration.  The expenses of such withdrawn registration shall be borne by the Company or VCP in accordance with Section 10.6.

(c)    Notwithstanding the foregoing, if, in the good faith judgment of the Board, after consultation with external legal counsel, there occurs or exists any pending corporate development, filing with the SEC or any other event that makes it appropriate to defer taking action with respect to such filing, then the Company shall have the right to defer taking action with respect to such filing and shall furnish to Holders requesting a registration statement pursuant to this Section 10.1, within 30 days of receiving the Demand Request, a certificate (a "Blackout Commencement Notice") signed by the CEO of the Company of such deferral (without setting forth any material non-public information).  Upon the Board's determination that such deferral is no longer appropriate, the Company will send a notice (a "Blackout Termination Notice," and the period from, and including, the date the Company sends such Blackout Commencement Notice to, and including, the date the Company sends such Blackout Termination Notice, a "Blackout Period").  Notwithstanding anything to the contrary, no single Blackout Period can extend beyond ninety (90) calendar days, and the total number calendar days in all Blackout Periods cannot exceed an aggregate of ninety (90) calendar days in any period of twelve (12) full calendar months.

(d)    The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to this Section 10.1:

(i)    during the period beginning on the date that is 60 days before the Company's good faith estimate of the date of filing of, and ending on the date that is (A) 180 days after the effective date of an IPO or (B) 90 days after the effective date of any Company-initiated registration other than an IPO; provided, that the Company shall take reasonable preparatory steps during such period so that a registration statement can be filed as promptly as practicable after the expiration of such period; or

(ii)    if the Company has already effected three registrations pursuant to a request by VCP (excluding any Shelf Registrations).

(e)    A registration will not be deemed to be effected for purposes of this Section 10.1 until the applicable registration statement has become effective (unless VCP withdraws all of its Registrable Securities and the Company has performed its obligations hereunder in all material respects, in which case such registration will be deemed effected unless VCP pays all registration expenses in connection with such withdrawn registration); provided, however, that if an offering of Registrable Securities pursuant to a registration is either (i) withdrawn because of the occurrence of any stop order, injunction or other order or action of a Governmental Authority or court (other than because of a violation of applicable Law by VCP) or (ii) withdrawn because of any development affecting the Company, in either case before being in effect for more than 90 days, then such registration will be deemed not to have been effected unless at least 80% of the Registrable Securities included thereon have been sold or otherwise disposed of.

Section 10.2    Piggyback Registration.

55

(a)    If (but without any obligation to do so) the Company proposes to register the offer and sale of its equity securities under the Securities Act in connection with a public underwritten offering of such securities (other than a registration relating solely to (i) the sale of securities of participants in a Company equity incentive plan, (ii) a registration relating to a corporate reorganization or transaction under Rule 145 of the Securities Act, or (iii) a registration in which the only securities being registered are securities issuable upon conversion of debt securities that are also being registered) (a "Piggyback Underwritten Offering"), including pursuant to Section 10.1, the Company shall, at such time, promptly give each Holder written notice of such registration.  At the written request of each Holder given within ten Business Days after mailing of such notice by the Company, the Company shall, subject to the provisions of Section 10.7, use its reasonable best efforts to cause to be registered under the Securities Act all of the Registrable Securities that each such Holder requests to be registered. No registration initiated by the Company under this Section 10.2 shall relieve the Company of its obligations to effect a registration following a Demand Request to the extent required by Section 10.1.  Notwithstanding anything to the contrary, the Company will have the following rights with respect to each Piggyback Underwritten Offering: (i) to determine the timing for such Piggyback Underwritten Offering; (ii) to determine the structure of the offering; (iii) to negotiate any related underwriting agreement and its terms, including the amount of securities to be offered and sold by the Company or Persons other than Holders pursuant thereto and the offering price of, and underwriting discount for, such securities; *provided, however*, that the Holders whose Registrable Securities are included in such Piggyback Underwritten Offering will have the right negotiate in good faith all of their respective representations, warranties and covenants, and indemnification and contribution obligations, set forth in any such underwriting agreement; and (iv) to terminate such Piggyback Underwritten Offering in its sole discretion, provided that the Company will provide notice of any such termination to all Holders whose Registrable Securities were to be included in such Piggyback Underwritten Offering.

(b)    Right to Terminate Registration.  The Company shall have the right to terminate or withdraw any registration initiated by the Company under this Section 10.2 (as opposed to pursuant to Section 10.1) prior to the effectiveness of such registration whether or not any Holder has elected to include Registrable Securities in such registration.  The expenses of such withdrawn registration shall be borne by the Company in accordance with Section 10.6.

Section 10.3    Shelf Registration.

(a)    Subject to Section 10.1(c), at any time after the Company may file a "shelf" registration statement pursuant to Rule 415 under the Securities Act (the "Shelf Registration") on Form S-3 (or any successor form to Form S-3, or any similar short-form registration statement), upon receipt of a written request (the "Shelf Request") from Holders holding more than 5% of the then outstanding Registrable Securities that the Company file a Shelf Registration on Form S-3 (or any successor form to Form S-3, or any similar short-form registration statement), covering the resale of Registrable Securities, the reasonably anticipated gross proceeds from all resales covered thereunder of which would exceed $75,000,000, or a lesser amount if such lesser amount would represent all of a Holder's remaining Registrable Securities, the Company shall (i) within five Business Days of the receipt by the Company of such notice, give written notice of such proposed registration to all other holders of Registrable Securities, (ii) use its reasonable best efforts, consistent with the terms of this Agreement, to cause the Shelf Registration to be filed with the SEC as soon as practicable (but in no event later than 45 days of its receipt of the Shelf Request) and to include all Registrable Securities held by such requesting Holders to be registered on such form for the offering together with all

or such portion of the Registrable Securities of any other holder of Registrable Securities joining in such request as are specified in a written request received by the Company within ten Business Days after receipt of such written notice from the Company and (iii) use its reasonable best efforts, consistent with the terms of this Agreement, to cause such Shelf Registration to be declared effective by the SEC as soon as reasonably possible.  As soon as reasonably practicable after the IPO Closing, the Company will use its reasonable best efforts, consistent with the terms of this Agreement, to qualify for and remain eligible to use Form S-3 registration or a similar short-form registration.  The provisions of Section 10.4 shall be applicable to each Shelf Registration initiated under this Section 10.3 and any subsequent resale of Registrable Securities pursuant thereto; *provided*, that the gross proceeds therefrom equal at least $75,000,000.

(b)    The Company shall be liable for and pay all registration expenses in connection with each Shelf Registration, regardless of whether such Shelf Registration is effected, and the resale of any Registrable Securities pursuant to such Shelf Registration.

Section 10.4    Obligations of the Company.  Whenever required under this Article X to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)    prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such registration statement to become effective and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for a period of up to 120 days or, if earlier, until the distribution contemplated in the registration statement has been completed; *provided*, that such 120-day period shall be extended for a period of time equal to the period any Holder refrains from selling any securities included in such registration at the request of an underwriter; *provided*, *further*, that if such registration is a Shelf Registration, such 120-day period shall be extended for a period of time equal to three years;

(b)    prepare and file with the SEC such amendments and supplements to such registration statement, and the prospectus used in connection with such registration statement, and otherwise comply with the Securities Act in order to enable the disposition of all securities covered by such registration statement;

(c)    prior to filing a registration statement or prospectus or any amendment or supplement thereto, furnish to the selling Holders a copy of such document as proposed to be filed, and thereafter furnish to the selling Holders such number of copies of a prospectus, including a preliminary prospectus, as required by the Securities Act, and such other documents as the Holders may reasonably request in order to facilitate their disposition of their Registrable Securities;

(d)    promptly notify each selling Holder of any stop order issued or threatened by the SEC or any state securities commission and take all reasonable actions required to prevent the entry of such stop order or to remove it if entered;

(e)    use its commercially reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or blue sky Laws of such jurisdictions as shall be reasonably requested by the selling Holders, to cause such securities to be registered with or approved by such other governmental agencies or authorities

as may be necessary by virtue of the business and operations of the Company, and to do any and all other acts and things that may be reasonably necessary or advisable to enable each selling Holder to consummate the disposition of the Registrable Securities owned by such Holder; *provided*, that the Company shall not be required to qualify to do business or to file a general consent to service of process in any such states or jurisdictions, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(f)      in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the underwriter(s) of such offering;

(g)      use its commercially reasonable efforts to cause all such Registrable Securities covered by such registration statement to be listed on a national securities exchange or trading system and each securities exchange and trading system (if any) on which similar securities issued by the Company are then listed;

(h)      provide a transfer agent and registrar for all Registrable Securities registered pursuant to this Agreement and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(i)      promptly make available for inspection by the selling Holders any underwriter(s) participating in any disposition pursuant to such registration statement, and any attorney or accountant or other agent retained by any such underwriter(s) or selected by the selling Holders, all reasonably requested financial and other records, pertinent corporate documents, and properties of the Company, and cause the Company's Officers, managers, directors, employees, and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant, or agent, in each case, as necessary or advisable to verify the accuracy of the information in such registration statement and to conduct appropriate due diligence in connection therewith;

(j)      use reasonable efforts to cause appropriate Officers of the Company to (i) prepare and make presentations at any "road shows" and before analysts and rating agencies, as the case may be, (ii) take other reasonable actions to obtain ratings for any Registrable Securities and (iii) otherwise use their reasonable efforts to cooperate as requested by the underwriters in the offering, marketing or selling of the Registrable Securities;

(k)      cause to be furnished to each underwriter a signed counterpart, addressed to such underwriter, of (i) an opinion or opinions of counsel to the Company and (ii) a comfort letter or comfort letters from the Company's independent public accountants, each in customary form and covering such matters of the kind customarily covered by opinions or comfort letters, as the case may be, as holders of a majority of the Registrable Securities requested to be included in such registration or the managing underwriter for such registration reasonably requests;

(l)      promptly notify each Holder of Registrable Securities covered by a registration statement, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the occurrence of an event requiring the preparation of a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make

58

the statements therein not misleading, and promptly prepare and make available to each selling Holder and file with the SEC any such supplement or amendment;

(m)    notify each selling Holder, promptly after the Company receives notice thereof, of the time when such registration statement has been declared effective or a supplement to any prospectus forming a part of such registration statement has been filed; and

(n)    after such registration statement becomes effective, notify each selling Holder of any request by the SEC that the Company amend or supplement such registration statement or prospectus.

In addition, the Company shall ensure that, at all times after an IPO, its insider trading policy shall provide that the Company's officers, or directors and significant stockholders may implement a trading program under Rule 10b5-1 of the Exchange Act.

Section 10.5    Furnish Information.  It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Article X with respect to the Registrable Securities of any selling Holder that such Holder shall furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as is reasonably required to effect the registration of such Holder's Registrable Securities.

Section 10.6    Expenses of Registration.  All expenses (other than Selling Expenses) incurred in connection with registrations, filings, or qualifications pursuant to this Article X, including all registration, filing, and qualification fees; printers' and accounting fees; expenses incurred in connection with any road show and not paid for (or agreed to be paid for) by any underwriter(s) or other third parties participating in the registration; fees and disbursements of counsel for the Company; and the reasonable fees and disbursements of one counsel for the selling Holders (the "Selling Holder Counsel"), shall be borne and paid for by the Company; provided, however, that Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to Section 10.1 if the registration request is subsequently withdrawn at the request of VCP (in which case VCP shall bear such expenses pro rata based upon the number of Registrable Securities that were to be included in the withdrawn registration), unless VCP agrees to forfeit the right to one Demand Request pursuant to Section 10.1; provided, further, that if, at the time of either such withdrawal, the Holders shall have learned of a material adverse change in the condition, business, or prospects of the Company from that known to the Holders at the time of their request and have withdrawn the request with reasonable promptness after learning of such information, then the Holders shall not be required to pay any of such expenses and shall not forfeit their respective rights to registration.  All Selling Expenses relating to Registrable Securities registered pursuant to this Article X shall be borne and paid by the Holders pro rata on the basis of the number of Registrable Securities registered on their behalf.  In the case of any registrations, filings or qualifications (a) initiated by a Holder pursuant to Section 10.1, the Selling Holder Counsel shall be selected by the requesting Holder (but shall be engaged as counsel to all selling Holders) and (b) initiated by the Company pursuant to Section 10.2, the Selling Holder Counsel shall be selected by Holders of a majority of the Registrable Securities requested to be included in such registration (but shall be engaged as counsel to all selling Holders).

Section 10.7    Underwriting Requirements.

(a)   <u>Underwriting Representations</u>.  If, pursuant to <u>Section 10.1</u>, VCP intends to distribute the Registrable Securities covered by its request by means of an underwriting (including, if a Shelf Registration is available, by an underwritten resale under and pursuant to the Shelf Registration and otherwise in accordance with <u>Section 10.1</u>), it shall so advise the Company as a part of its request made pursuant to <u>Section 10.1</u>, and the Company shall include such information in the notice delivered pursuant to <u>Section 10.2</u>.  In the event of an underwritten offering, the right of any Holder to include such Holder's Registrable Securities in such registration pursuant to <u>Section 10.2</u> shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.  All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in <u>Section 10.4(e)</u>) enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting; *provided* that no Holder shall be required to make any representations or warranties, or provide any indemnity, in connection with any registration other than representations and warranties (and indemnities with respect thereto) (the "<u>Underwriting Representations</u>") as to (i) such Holder's ownership of his, her or its Registrable Securities to be transferred free and clear of all liens, claims and encumbrances, (ii) such Holder's power and authority to effect such transfer and (iii) such matters pertaining to compliance with securities Laws by such Holder as may be reasonably requested; *provided*, *further*, that if any Holder is required by such underwriter(s) to make any representations or warranties, or provide any indemnity in addition to the Underwriting Representations, and such Holder has elected to participate in such underwriting but refuses to make such representations or warranties or provide such indemnity, then such Holder's sole recourse shall be to not participate in such underwritten offering; *provided*, *further*, that the obligation of such Holder to indemnify pursuant to any such underwriting agreement shall be several, and not joint and several, among the Holders selling Registrable Securities and the liability of each such Holder will be in proportion thereto, and such liability will be limited to the net amount received by such Holder from the sale of his, her or its Registrable Securities pursuant to such registration.

(b)   <u>Cutback</u>.  In connection with any offering involving an underwriting of Registrable Securities pursuant to this <u>Article X</u>, the Company shall not be required to include any Holder's Registrable Securities in such underwriting unless such Holder accepts the terms of the underwriting as agreed upon between the Company and its underwriters (*provided*, that the scope of the indemnity contained in such underwriting agreement is not more extensive than the indemnity described in <u>Section 10.7(a)</u>), and then only in such quantity as the underwriters in their reasonable discretion determine will not jeopardize the success of the offering by the Company.  If the total number of Registrable Securities requested by Holders to be included in such offering exceeds the number of Registrable Securities to be sold (other than by the Company) that the underwriters in their reasonable discretion determine is compatible with the success of the offering, and as a result the underwriters advise the Company in writing that marketing factors require a limitation on the number of Registrable Securities to be underwritten, then the Company shall be required to include in the offering only that number of such Registrable Securities which the underwriters and the Company in their reasonable discretion determine will not jeopardize the success of the offering.  If the underwriters determine that less than all of the Registrable Securities requested to be registered can be included, then the following securities shall be included in the following order of priority:

(i)   if the registration is not pursuant to <u>Section 10.1</u>:

(A)    first, the securities to be sold by the Company;

(B)    second, the Registrable Securities requested to be included in such registration by each selling Holder pursuant to this Article X (or, if necessary, such Registrable Securities in proportion (as nearly as practicable) to the number of Registrable Securities requested to be included in such registration by such selling Holder or in such other proportions as shall mutually be agreed to by all such selling Holders); *provided*, *however*, that the number of Registrable Securities described in this clause (B) shall represent at least 20% of the total number of Registrable Securities included in such offering, unless such offering is the IPO, in which case the selling Holders may be excluded further if the underwriters make the determination described above; and

(C)    third, all other securities; or

(ii)    if the registration is pursuant to Section 10.1:

(A)    first, the Registrable Securities requested to be included in such registration by each selling Holder pursuant to this Article X (or, if necessary, such Registrable Securities in proportion (as nearly as practicable) to the number of Registrable Securities requested to be included in such registration by such selling Holder or in such other proportions as shall mutually be agreed to by all such Holders);

(B)    second, the securities to be sold by the Company;

(C)    third, all other securities.

(c)    To facilitate the allocation of Registrable Securities in accordance with the above provisions, the Company or the underwriters may round the number of Registrable Securities allocated to any Holder to the nearest 100 Registrable Securities.

(d)    Choice of Underwriter. In the case of any registrations, filings or qualifications, the underwriter shall be selected by the Board; *provided*, *however*, that in the case of any registrations, filings or qualifications initiated by a Holder pursuant to Section 10.2, the underwriter shall be selected by such Holder, subject to approval of the Board, such approval not to be unreasonably withheld or delayed.

Section 10.8    Delay of Registration. To the fullest extent permitted by applicable Law, no Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any registration pursuant to this Agreement as the result of any controversy that might arise with respect to the interpretation or implementation of this Article X.

Section 10.9    Indemnification. If any Registrable Securities are included in a registration statement under this Article X:

(a)    To the fullest extent permitted by applicable Law, the Company will indemnify and hold harmless each selling Holder, and the partners, members, managers, officers, directors, employees and stockholders of each such Holder; legal counsel and accountants for each such Holder; any underwriter (as defined in the Securities Act) for each such Holder; and each Person, if any, who controls such Holder or underwriter within the

meaning of the Securities Act or the Exchange Act, against any Losses to which they may become subject under the Securities Act, the Exchange Act, any state securities Laws or any rule or regulation under the Securities Act, insofar as such Losses (or actions in respect thereof) arise out of or are based upon any Violation, and the Company will pay to each such Holder, underwriter, controlling Person, or other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which any such Losses may result, as such expenses are incurred; *provided*, *however*, that the indemnity agreement contained in this <u>Section 10.9(a)</u> shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Company, which consent shall not be unreasonably withheld or delayed, nor shall the Company be liable to any Holder, underwriter, controlling Person, or other aforementioned Person for any Violations to the extent that they arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of such Holder, underwriter, controlling Person, or other aforementioned Person, as applicable, expressly for use in connection with such registration.

(b)      To the fullest extent permitted by applicable Law, each selling Holder, severally and not jointly, will indemnify and hold harmless the Company, and each of its Directors, each of its Officers who has signed the registration statement, each Person (if any), who controls the Company within the meaning of the Securities Act, legal counsel and accountants for the Company, any underwriter (as defined in the Securities Act), any other Holder selling securities in such registration statement, and any controlling Person of any such underwriter or other Holder, against any Losses that arise out of or are based upon (i) any Violations, but in each case only to the extent that such Losses arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of such selling Holder expressly for use in connection with such registration or (ii) the fact that a current copy of the prospectus (or an amended or supplemented prospectus, as the case may be) was not sent or given to the Person asserting the claim resulting in such Losses at or prior to the written confirmation of the sale of Registrable Securities to such Person if it is determined that it was the responsibility of such selling Holder to provide such Person with a current copy of the prospectus (or an amended or supplemented prospectus, as the case may be) and a current copy of the prospectus (or an amended or supplemented prospectus, as the case may be) was available to such selling Holder and would have cured the defect giving rise to such Losses; and each such selling Holder will pay to the Company and each other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which any such Losses may result, as such expenses are incurred; *provided*, *however*, that the indemnity agreement contained in this <u>Section 10.9(b)</u> shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld; and *provided*, *further*, that in no event shall the aggregate amounts payable by any Holder by way of indemnity or contribution under <u>Sections 10.9(b)</u> and <u>10.9(c)</u> exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of fraud or wilful misconduct by such Holder.

(c)      Promptly after receipt by an indemnified party under this <u>Section 10.9</u> of notice of the commencement of any action (including any governmental action) for which a party may be entitled to indemnification hereunder, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this <u>Section 10.9</u>, give the indemnifying party notice of the commencement thereof.  The indemnifying party shall have

the right to participate in such action and, to the extent the indemnifying party so desires, participate jointly with any other indemnifying party to which notice has been given, and to assume the defense thereof with counsel mutually satisfactory to the parties; *provided*, *however*, that an indemnified party (together with all other indemnified parties that may be represented without conflict by one counsel) shall have the right to retain one separate counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such action. The failure to give notice to the indemnifying party within a reasonable time of the commencement of any such action shall relieve such indemnifying party of liability to the indemnified party under this Section 10.9 only to the extent that such failure materially prejudices the indemnifying party's ability to defend such action. Without the prior written consent of the indemnified party, no indemnifying party shall effect any settlement of any pending or threatened proceeding in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement (i) includes a full and unconditional release of such indemnified party from all liability arising out of such proceeding, (ii) does not impose any equitable or other non-monetary remedies or obligations on the indemnified party, but involves solely the payment of money damages for which the indemnified party will be indemnified hereunder and (iii) does not involve a finding or admission of wrongdoing or any violation of Law.

(d) To provide for just and equitable contribution to joint liability under the Securities Act in any case in which either (i) any party otherwise entitled to indemnification hereunder makes a claim for indemnification pursuant to this Section 10.9 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case, notwithstanding the fact that this Section 10.9 provides for indemnification in such case, or (ii) contribution under the Securities Act may be required on the part of any party hereto for which indemnification is provided under this Section 10.9, then, and in each such case, such parties will contribute to the aggregate Losses to which they may be subject (after contribution from others) in such proportion as is appropriate to reflect the relative fault of each of the indemnifying party and the indemnified party in connection with the statements, omissions, or other actions that resulted in such Loss, as well as to reflect any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or allegedly untrue statement of a material fact, or the omission or alleged omission of a material fact, relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission; *provided*, *however*, that, in any such case, (x) no Holder will be required to contribute any amount in excess of the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder) pursuant to such registration statement, and (y) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation; and *provided*, *further*, that in no event shall a Holder's liability pursuant to this Section 10.9(d), when combined with the amounts paid or payable by such Holder pursuant to Section 10.9(b), exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of wilful misconduct or fraud by such Holder. Subject to the foregoing and as among the selling Holders, each selling Holder's obligation to

contribute pursuant to this Section 10.9(d) is several in the proportion that the proceeds of the offering received by such selling Holder bears to the total proceeds of the offering received by all such selling Holders, and not joint.

(e)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are more favorable to the Holder than the foregoing provisions, the provisions in the underwriting agreement shall control.

(f)     Unless otherwise superseded by an underwriting agreement entered into in connection with the underwritten public offering, the obligations of the Company and Holders under this Section 10.9 shall survive the completion of any offering of Registrable Securities in a registration under this Section 10.9, and otherwise shall survive the termination of this Agreement.

Section 10.10  Reports Under Exchange Act.  With a view to making available to the Holders the benefits of SEC Rule 144 and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company without registration or pursuant to a registration on Form S-3, the Company shall:

(a)     make and keep available adequate current public information, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the registration statement filed by the Company for the IPO;

(b)     use commercially reasonable efforts to file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after the Company has become subject to such reporting requirements); and

(c)     furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request:  (i) to the extent accurate, a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144 (at any time after 90 days after the IPO Closing), the Securities Act and the Exchange Act (at any time after the Company has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after the Company so qualifies); (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents filed by the Company with the SEC; and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC that permits the selling of any such securities without registration (at any time after the Company has become subject to the reporting requirements under the Securities Act or the Exchange Act) or pursuant to Form S-3 (at any time after the Company so qualifies to use such form).

Section 10.11  Limitations on Subsequent Registration Rights.  From and after the Agreement Date, the Company shall not, without the consent of the Members holding a majority of the outstanding Class A Units, enter into any agreement with any Holder or prospective Holder of any securities of the Company that (a) would allow such Holder or prospective Holder to include such securities in any registration unless, under the terms of such agreement, such Holder or prospective Holder may include such securities in any such registration only to the extent that the inclusion of such securities will not reduce the number of Registrable Securities of the Holders that are included or (b) would allow such Holder or

prospective Holder to initiate a demand for registration of any securities held by such Holder or prospective Holder; *provided*, *however*, that this limitation shall not apply to any of the rights afforded to any Person under this Agreement as a result of such Person's becoming a party to this Agreement after the Agreement Date.

Section 10.12  Agreement to Lock-Up.  Each Holder hereby agrees that it will not, without the prior written consent of any managing underwriter, during the period (the "Lock-Up Period") commencing on the date of the final prospectus relating to the IPO and ending on the date specified by the Company and any managing underwriter (such period not to exceed 180 days in the case of the IPO and such other period as may be reasonably requested by the Company or is customary in the case of other offerings), (a) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right, or warrant to purchase; or otherwise transfer or dispose of, directly or indirectly, any Units or any securities convertible into or exercisable or exchangeable (directly or indirectly) for Units held immediately before the effective date of the registration statement for such offering or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (a) or (b) above is to be settled by delivery of Units or other securities, in cash, or otherwise.  The underwriters in connection with such registration are intended third-party beneficiaries of this Section 10.12 and shall have the right, power, and authority to enforce the provisions hereof as though they were a party hereto.  Each Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with such registration that are consistent with this Section 10.12 or that are necessary to give further effect thereto.  The terms of any lock-up agreement entered into with the underwriters for an offering (including any exceptions therein) shall supersede any lock-up restrictions set forth in this Section 10.12 with respect to such offering; provided that in no event shall any Member not participating in such offering be required to enter any lock-up agreement that imposes on such Member a Lock-Up Period exceeding 180 days.  Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply pro rata to all Holders subject to such agreements, based on the number of shares subject to such agreements.

Section 10.13  Termination of Registration Rights.  The right of any Holder to request registration or inclusion of Registrable Securities in any registration shall terminate upon the earliest to occur of:

        (a)      a Company Sale;

        (b)      with respect to any particular Registerable Security, such Registrable Security becoming freely transferable without volume or manner-of-sale restrictions and without the requirement for the Company to be in compliance with the current public information requirement pursuant to SEC Rule 144; or

        (c)      the fifth anniversary of the IPO Closing.

## ARTICLE XI

## DISSOLUTION; LIQUIDATION; CONVERSION

Section 11.1  Events Causing Dissolution.  The Company shall be dissolved and its affairs wound up upon:

(a)     Board and Class A Member approval of the dissolution of the Company;

(b)     The time at which there are no Members, unless the Company is continued in accordance with the Act; or

(c)     The entry of a decree of judicial dissolution under Section 18-802 of the Act.

Except as provided in <u>Section 11.1(b)</u>, the Company shall not be dissolved upon the death, insanity, retirement, resignation, expulsion, bankruptcy, dissolution or occurrence of any other event which terminates the membership of a Member.

Section 11.2   <u>Procedures on Dissolution</u>.   Dissolution of the Company shall be effective on the day on which occurs the event giving rise to the dissolution, but the Company shall not terminate until the Certificate shall have been cancelled and the assets of the Company shall have previously been distributed as provided herein.  The Board or, if no Directors are then serving, a liquidator appointed with the consent of the Members holding a majority of the outstanding Class A Units, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this Agreement and cause the cancellation of the Certificate.

Section 11.3   <u>Distributions Upon Liquidation</u>.

(a)     The Company shall first satisfy its liabilities owing to creditors, whether by payment or making reasonable provision for payment thereof, which may include the Board or such liquidator setting up such reserves as the Board or such liquidator deems reasonably necessary for any contingent, conditional or unmatured liabilities or obligations of the Company.  Said reserves may be paid over by the Board or such liquidator to a bank, to be held in escrow for the purpose of paying any such contingent, conditional or unmatured liabilities or obligations and, at the expiration of such period as the Board or such liquidator may otherwise deem advisable, such reserves shall be distributed to the Members or their assigns in the manner set forth in paragraph (b) below.

(b)     After paying such liabilities and providing for such reserves, the Board or liquidator shall cause the remaining net assets of the Company to be distributed to and among the Members in accordance with <u>Section 4.2</u>.  In the event that any part of such net assets consists of notes or accounts receivable or other noncash assets, the Board or liquidator may take whatever steps it deems appropriate to convert such assets into cash or into any other form which would facilitate the distribution thereof.  If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of their fair market value net of any liabilities.  Any Member entitled to any interest in such assets shall, unless otherwise determined by the Board or liquidator, receive separate assets of the Company and not an interest as a tenant-in-common with other Members so entitled in any asset being distributed.

Section 11.4   <u>Conversion to a Corporation</u>.

(a)     Notwithstanding anything to the contrary set forth in this Agreement (but subject to <u>Section 6.3</u>), and without any need for consent or approval of any Member, the Board may, at any time upon not fewer than ten (10) days' prior written notice given to each Member, in connection with an IPO, cause the Company to consummate an Incorporation, if applicable, and cause the Company to convert into the Public Issuer by such means, subject to

66

Section 11.4(b) below, as the Board may reasonably select; *provided*, the Board shall use commercially reasonable efforts to ensure that such Incorporation is tax efficient to the Members.  The Board shall provide that upon such Incorporation, each Unit of each class and series and other Equity Securities shall be exchanged for, or otherwise converted into, shares of common stock of the Public Issuer (i)  having voting rights and powers and economic interest (including liquidation and dividend preferences and similar rights, but excluding any rights to distributions under Section 4.3 or otherwise specific to ownership of an interest in an entity treated as a partnership for U.S. federal income tax purposes) substantially equivalent in all material respects, to the extent determined by the Board in good faith to be reasonably practicable, to the voting rights and powers and economic interest (including liquidation and dividend preferences and similar rights, but excluding any rights to distributions under Section 4.3 or otherwise specific to ownership of an interest in an entity treated as a partnership for U.S. federal income tax purposes) of the Units of such class and series and other Equity Securities being so exchanged or otherwise converted and (ii) having such terms, conditions, obligations and liabilities set forth in this Agreement and such other terms, conditions, obligations and liabilities as are not less favorable than the terms of this Agreement and are, in the judgment of the Board, customarily present in corresponding or similar securities typically used in venture capital transactions.  In determining the number of shares of common stock of the Public Issuer that each Unit or other Equity Securities shall be exchanged for, or otherwise converted into, such shares of common stock shall be valued at the offering price per share of common stock of the Public Issuer sold in the IPO, and the fair market value of the Units or other Equity Securities shall be determined based upon the amount each such Unit or other Equity Securities would receive if the Company sold its assets for their fair market value as a going concern (determined based on the offering price per share of common stock of the Public Issuer in the IPO), paid its liabilities and distributed the proceeds in accordance with Section 4.2.  In the event of an IPO in which the aggregate distributions determined to be made in such IPO in accordance with Section 4.2 to all Members is below the Participation Threshold for any Warrant Unit, such Warrant Unit shall expire and be cancelled and extinguished in accordance with Section 3.9(c).  If a Member that is a United States person (within the meaning of Code Section 7701(a)(30)) at the time of the conversion (or who expects to become a United States person during the vesting period of the shares received in the conversion) receives shares in the conversion that are "substantially nonvested" within the meaning of Treasury Regulations Section 1.83-3(b), such Member shall make a timely and effective election under Code Section 83(b) in accordance with Treasury Regulations Section 1.83-2 with respect to the shares that it receives in the conversion (reporting the amount paid for the new shares received in the conversion as an amount that is equal to the fair market value of the new shares received in the conversion, solely for purposes of applying Code Section 83, but not for purposes of determining the adjusted basis of the new shares in the hands of such Member); *provided* that, (i) such election shall be the sole responsibility of such Member and (ii) such Member shall provide a copy of such election, together with proof of the mailing of such election, to the Company on or before the due date for the filing of such election.

(b)     By becoming parties to this Agreement, all Members consent to the conversion of their Units and other Equity Securities into securities in such Public Issuer in accordance with the terms set forth herein.  Consequently, subject to the requirements described in Section 11.4(a), each Member agrees to reasonably cooperate, and cause its Affiliates to reasonably cooperate, to take such actions and execute such documents as the Board may reasonably request, in order to consummate any proposed Incorporation.  In connection with any such Incorporation, but subject to this Section 11.4, the Company shall endeavor to treat all Members in a similar manner, adjusted for differences in their respective Units and the

powers, designations, preferences, rights, qualifications, limitations and restrictions of such Units as provided for in this Agreement.  To the fullest extent permitted by applicable Law and the rules of any applicable stock exchange, at or prior to any such Incorporation, the Members shall enter into a stockholders or similar agreement containing provisions substantially similar to those contained in this Agreement (other than those that expire under the terms of this Agreement or would be prohibited by applicable Law or the rules of the applicable stock exchange following an IPO).

<div align="center">ARTICLE XII</div>

<div align="center">PRE-EMPTIVE RIGHTS</div>

Section 12.1   Pre-Emptive Rights.   Each Voting Member shall have the right to purchase up to its Pro Rata Share of New Securities that the Company or any of its Subsidiaries, from time to time, proposes to sell and issue ("Available Pre-Emptive Securities").

Section 12.2   Notice from the Company.  The Company shall promptly provide notice to each Voting Member of the number of Available Pre-Emptive Securities.  Each Voting Member shall have ten Business Days from the date of receipt of any such notice to agree to purchase up to such Voting Member's Pro Rata Share of such Available Pre-Emptive Securities for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of Available Pre-Emptive Securities to be purchased.

Section 12.3   Secondary Purchase Right.  In the event any Voting Member fails to purchase its full Pro Rata Share of Available Pre-Emptive Securities, the Company shall notify each Voting Member who has elected to purchase such Voting Member's full Pro Rata Share of such Available Pre-Emptive Securities (each, a "Fully Participating Buyer") of any remaining unsubscribed portion of the Available Pre-Emptive Securities, and each Fully Participating Buyer shall have five Business Days from the date of receipt of any such notice to agree to purchase, in addition to the number of New Securities specified above, up to that portion of the remaining unsubscribed portion of the Available Pre-Emptive Securities which is equal to the ratio that the aggregate number of Voting Units held by such Fully Participating Buyer bears to the aggregate number of Voting Units held by all Fully Participating Buyers who wish to purchase such remaining unsubscribed portion of the Available Pre-Emptive Securities, by giving written notice to the Company and stating therein the quantity of Available Pre-Emptive Securities to be purchased.

Section 12.4   Sale by the Company.  In the event the Voting Members fail to exercise in full their pre-emptive rights set forth in this Article XII, the Company shall have ninety (90) days thereafter to sell or to cause the applicable Subsidiary to sell the Available Pre-Emptive Securities with respect to which the Voting Members' option was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the Company's notice. To the extent the Company or the applicable Subsidiary does not sell and issue all such Available Pre-Emptive Securities offered within such 90-day period, the Company or the applicable Subsidiary shall not thereafter issue or sell such unsold Available Pre-Emptive Securities without first again offering such Available Pre-Emptive Securities to the Major Class A Members in the manner provided above.

Section 12.5   Termination of Rights.  The terms, conditions and obligations set forth in this Article XII shall terminate upon the earlier to occur of (i) a Company Sale and (ii) immediately prior to the closing of an IPO.

ARTICLE XIII

REPRESENTATIONS AND WARRANTIES OF MEMBERS; RELEASE AND WAIVER

Section 13.1   Representations and Warranties of Members.  Each of the Persons who signs this Agreement as a Member (other than a Class C Member) on the signature page attached hereto hereby represents and warrants to the Company and to the other Members that such Person (A) is either (I) a qualified institutional buyer as defined in Rule 144A promulgated under the Securities Act, (II) not a U.S. person (as defined in Regulation S promulgated under the Securities Act) and outside the United States, or (III) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act), (B) acknowledges that the Units to be acquired by such Person will have been acquired for investment for such Person's own account, not as a nominee or agent, and not with a view to distribution or resale of any part thereof, and such Person has no present intention of selling, granting any participation in, or otherwise distributing the same, (C) does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person with respect to any Units to be acquired by such Person, (D) has not been formed for the specific purpose of acquiring any Units to be acquired by such Person, (E) understands that the Units to be acquired by such Person have not been, and are not contemplated to be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Person's representations as expressed herein, and that such Units will be "restricted securities" under applicable U.S. federal and state securities Laws and that, pursuant to these Laws, such Person must hold such Units indefinitely unless they are registered with the SEC and qualified by state authorities, or an exemption from such registration and qualification requirements is available, (F) understands that no public market now exists for any Units to be acquired by such Person, that no Person has made any assurances that a public market will ever exist for such Units, and that the Company will have no obligation to register or qualify such securities except as set forth in this Agreement, and (G) is not acquiring the Units to be acquired by such Person as a result of any advertisement, article, notice or other communication regarding such securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

Section 13.2   Release and Waiver.

(a)      Subject in all respects to Section 13.2(b), each of the Persons who signs this Agreement as a Class B Member or as a holder of Warrant Units or as a Rights Offering Subscriber on the signature page attached hereto (each, a "Releasing Party"), in consideration of the issuance of Class B Units or Warrant Units to such Releasing Party and/or allowing such Rights Offering Subscriber to participate in the Rights Offering, as applicable, to the fullest extent permitted by applicable Law, hereby irrevocably waives, releases, and discharges the Company, Afiniti, HoldCo, the Administrative Agent, in its capacity as administrative agent and collateral agent under the Credit Agreement, each 2L Lender, in its capacity as a lender under the Credit Agreement and as a Class A Member, Afiniti Parent and each of Afiniti Parent's current officers and directors as of the date of the Restructuring Support Agreement (as defined below) (unless such person was terminated for "cause" prior to the Agreement Date) and financial advisors, tax advisors, and legal advisors, and in the case of the Administrative Agent, the Company and the 2L Lenders, together with their Affiliates and their and their Affiliates' current and former respective officers, board directors, members,

69

managers, partners, employees, agents, representatives, owners, financial advisors, tax advisors, legal advisors, shareholders, and predecessors in interest (collectively, solely in such capacity, the "Releasees") from and against, any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which such Releasing Party has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against the Releasees with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Date relating to Afiniti Parent and each direct and indirect subsidiary of Afiniti Parent, including, for the avoidance of doubt, the guarantors under the Credit Agreement (including the transfer of substantially all of Afiniti Parent's assets and all of the issued and outstanding capital stock or other equity interests of all of Afiniti Parent's non-U.S. direct subsidiaries (other than the shares of Afiniti Parent's subsidiaries organized under the laws of Bermuda) to HoldCo, pursuant to the Stock and Asset Transfer Agreement, dated as of [●], 2024, between Afiniti Parent and HoldCo (the "Asset Transfer"), the Securities Transfer Agreement, dated as of [●], 2024 (the "STA"), between Afiniti Parent and the Company, the Credit Agreement (together with all other related documents, instruments, and agreements (including all Loan Documents (as defined in the Credit Agreement)), in each case as supplemented, amended, restated, or otherwise modified from time to time), the "Restructuring" (as defined in the Restructuring Support Agreement, dated September 17, 2024 (as modified, amended or supplemented from time to time in accordance with its terms, the "Restructuring Support Agreement")) and the other transactions contemplated by the Restructuring Support Agreement); *provided* (i) no Released Party shall be released from any act or omission that constitutes fraud, gross negligence, or willful misconduct and (ii) references to financial advisors, tax advisors and legal advisors in this Section 13.2(a) shall include only those that provided services in furtherance and support of the Asset Transfer, the STA, the Credit Agreement or the Restructuring or the other matters contemplated by the Restructuring Support Agreement including, for the avoidance of doubt, any services related to the foregoing; *provided*, *however*, that none of TRG, TRG Pakistan Ltd., Muhammad Ziaullah Khan Chishti, or any Affiliates of the foregoing, including any current or former directors thereof (the "Carveout Parties"), hereby waives, releases, or discharges any other claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which any such party has had, may have, or may hereafter have, on any ground whatsoever, against any of the other Carveout Parties.

(b)    Notwithstanding anything to the contrary in Section 13.2(a), this Section 13.2 shall not alter, waive or amend any of the rights or obligations (i) granted to or imposed upon any party to the Restructuring Support Agreement or any agreement or other document referred to in or entered into in connection with the Restructuring Support Agreement, including the Backstop Commitment Agreement, this Agreement or the Credit Agreement or (ii) of any party in connection with the enforcement of any rights or obligations arising under this Agreement.

(c)    Each Releasing Party, in its capacity as releasor hereunder, understands, acknowledges and agrees that this release is a full and final general release of all claims herein released that could have been asserted in any legal or equitable proceeding against the Releasees. Each Releasing Party, in its capacity as releasor hereunder, hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim purported to be released hereby (including the matters covered by above), or commencing, instituting or causing to be

commenced any action, suit or proceeding of any kind, against any Releasee, based upon any claim purported to be released by it, in its capacity as releasor hereunder, hereby (including the matters covered above). Each Releasing Party, in its capacity as releasor hereunder, further agrees that in the event it should bring a claim purported to be released by it seeking damages against any Releasee, this <u>Section 13.2</u> serve as a complete defense to such claims.

(d)     Each Releasing Party, in its capacity as releasor hereunder, hereby expressly waives any rights it may have with respect to unknown claims. In connection with such waiver and relinquishment, each such releasor acknowledges that it is aware that, after executing this Agreement, such entity or their attorneys or agents may discover claims or facts in addition to, or different from, those which they now know or believe exist with respect to the subject matter of this <u>Section 13.2</u> or such Releasing Party, in its capacity as releasor hereunder, but that it is such Releasing Party's intention hereby to fully, finally, and forever settle and release all of the claims, matters, disputes, differences, whether known or unknown, suspected or unsuspected, that arose on or prior to the Agreement Date and which arise out of or relate directly to any of the released matters. Each Releasing Party, in its capacity as releasor hereunder, hereby irrevocably and forever waives and relinquishes any and all rights or benefits that such Releasing Party has or may have had or in the future may have arising under California Civil Code Section 1542 or any analogous provision of law of any other jurisdiction with respect to the releases they have granted hereunder. Each such Releasing Party understands that California Civil Code Section 1542 provides that:

"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

(e)     Each Releasing Party represents and warrants to the Company that such Releasing Party has not prosecuted any "claims" (as defined in Section 101(5) of Chapter 15 of Title 11 of the United States Code) against Afiniti Parent, Afiniti, the Guarantors (as defined in the Credit Agreement) or any of their respective direct and indirect subsidiaries or Affiliates (other than filing any evidence of borrowed money by or funded indebtedness of Afiniti Parent in that certain Bermuda proceeding with respect to the appointment of light-touch provisional liquidators, or any application, petition or proceeding arising therein or connected thereto) or instructed or encouraged any other Person to do the same, and acknowledges and agrees that no Class B Units and Warrant Units shall be issued to such Releasing Party, and such Releasing Party shall not be included in the Rights Offering as a Rights Offering Subscriber, if this representation and warranty is not accurate.

(f)     Each Releasing Party hereby acknowledges and agrees that the issuance of Class B Units and Warrant Units to such Releasing Party and/or the inclusion of such Rights Offering Subscriber in the Rights Offering is being made freely and voluntarily by the Company in consideration of such release.

ARTICLE XIV

<u>GENERAL PROVISIONS</u>

Section 14.1   <u>Notices</u>.  Any and all notices under this Agreement shall be given in writing, and shall be effective (a) on the fourth Business Day after being sent by registered or certified mail, return receipt requested, postage prepaid, (b) on the first Business Day after

71

being sent by express mail or commercial overnight delivery service providing a receipt for delivery, (c) on the date of hand delivery, (d) when sent, if sent by electronic mail or facsimile during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next Business Day or (e) on the date actually received, if sent by any other method.  In order to be effective, all such notices shall be addressed, if to the Company at its principal place of business, and if to a Member or a Director at the last address of record on the Company's books.

Section 14.2  Interpretation.

(a)  The headings of the Sections and Subsections of this Agreement are inserted for convenience only and shall not constitute a part of or affect in any way the meaning or interpretation of this Agreement.

(b)  The words "include," "includes" and "including" when used in this Agreement shall be deemed in each case to be followed by the words "without limitation."  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires and references to Article, Section, Schedule, Annex and like references are references to this Agreement unless otherwise specified.  The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.  Any use of the word "party" or "parties" shall mean the party or parties hereto, unless the context otherwise requires.

Section 14.3  Binding Provisions.  Subject to the restrictions on Transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, legal representatives, successors and permitted assigns.

Section 14.4  Governing Law.  This Agreement and the legal relations among the parties in connection with this Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of Delaware, without regard to its conflict of laws rules.  For the avoidance doubt, the Restructuring Second Lien Term Loans and Equivalent Notes shall be governed by, and construed in accordance with, the Law of the State of New York and the tax treatment set forth in Section 5.3 shall not have any impact or effect on the security interests and liens granted by any of the Collateral Documents (as defined in the Credit Agreement).

Section 14.5  Consent to Jurisdiction.  Each Member hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Delaware or United States District Court for the District of Delaware for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby and agrees not to commence any action, suit or proceeding relating hereto except in such courts, and further agrees that service of any process, summons, notice or document by United States registered or certified mail shall be effective service of process for any action, suit or proceeding brought in any court.  Each of the parties hereto hereby irrevocably and unconditionally waives any objection to personal jurisdiction and the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby, in the courts of the State of Delaware or the United States District Court for the District of Delaware, and hereby further irrevocably and unconditionally waives and agrees not to plead

or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 14.6    Counterparts.  This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all of the parties have not signed the same counterpart.

Section 14.7    Separability of Provisions.  Each provision of this Agreement shall be considered separable.  To the extent that any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective under the Act (and, if the Act is subsequently amended or interpreted in such manner as to make effective any provision of this Agreement that was formerly rendered invalid, such provision shall automatically be considered to be valid from the effective date of such amendment or interpretation).

Section 14.8    Amendments.

(a)    Except as set forth in this Agreement, this Agreement may be modified, supplemented, amended or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively (to the fullest extent permitted by applicable Law) or prospectively) only by a written instrument executed by and delivered by the affirmative vote of (i) the Board and (ii) Members holding outstanding Units representing a majority of the votes entitled to be cast with respect to the outstanding Voting Units (calculated in accordance with Section 6.1); *provided*, *however*, that in no event may any such modification, supplement, amendment, termination or waiver adversely affect the rights of a Member in a manner disproportionate to any adverse effect such modification, supplement, amendment, termination or waiver would have on such rights of other Members without the consent of (i) Members holding outstanding Units representing a majority of the votes entitled to be cast with respect to the Units so adversely affected (calculated in accordance with Section 6.1); and (ii) Class B Members holding a majority of the Class B Units, if any of the provisions of this Agreement that expressly mention or otherwise expressly pertain to the Class B Units, the Warrant Units, or the respective Participation Thresholds for such Warrant Units are so adversely affected.

(b)    Notwithstanding anything herein to the contrary, the Board may amend or modify Article V of this Agreement and related defined terms if the Board is advised at any time by its legal counsel that the allocations of Net Profits and Net Losses and/or similar items provided for in Article V are unlikely to be respected for U.S. federal income tax purposes, either because of the promulgation and adoption of Treasury Regulations under Code Section 704 or other developments in applicable Law.  In making any such amendment or modification, the Board shall cause the Company to use its reasonable best efforts to effect as little change in the tax arrangements among the Members as the Board shall determine in its discretion to be necessary to provide for allocations of Net Profits and Net Losses and similar items to the Members which it believes will be respected for U.S. federal income tax purposes; *provided*, *however*, that any such modification shall be subject to the consent of VCP if such modification could disproportionately adversely affect VCP (or its direct or indirect owners) when compared to other holders of Units.  No such amendment or modification shall give rise to any claim or cause of action by any Member.

(c)    Notwithstanding anything herein to the contrary, the Board may amend this Agreement to add a provision that will allow the Company to qualify under any Treasury

Regulation, revenue procedure or other administrative pronouncement promulgated by the United States Treasury Department (including the Internal Revenue Service) (the "Liquidation Value Procedure") similar to that contained in Internal Revenue Service Notice 2005-43, 2005-24 I.R.B. 1, pursuant to which the Company may elect to determine the value of equity interests in the Company delivered to any Person in connection with services provided by such Person to the Company by reference to the amount the Person would receive if the Company sold all of its assets at their fair market values and liquidated. Such provision may (i) authorize and direct the Company to file any elections required by the Liquidation Value Procedure and (ii) require all Members to comply with the requirements of the Liquidation Value Procedure and will contain such other provisions as the Board may determine, after consultation with the Company's tax advisors, may be necessary to comply with the Liquidation Value Procedure. No such amendment or modification shall give rise to any claim or cause of action by any Member.

(d)      Notwithstanding anything herein to the contrary, the Board may amend this Agreement to add, modify or delete any one or more provisions hereof in connection with a Company Redomiciliation without the approval or consent of the Members; *provided*, *however*, that in no event may any such amendment adversely affect the rights of a Member in a manner disproportionate to any adverse effect such amendment would have on such rights of other Members without the consent of Members holding outstanding Units representing a majority of the votes entitled to be cast with respect to the Units so adversely affected (calculated in accordance with Section 6.1).

Section 14.9   Specific Enforcement.  The Company and each Member acknowledges and agrees that the Company and each Member will be irreparably damaged in the event any of the provisions of this Agreement are not performed by the parties in accordance with their specific terms or are otherwise breached. Accordingly, it is agreed that, to the fullest extent permitted by applicable Law, each of the Company and the Members shall be entitled to an injunction to prevent breaches of this Agreement, and to specific enforcement of this Agreement and its terms and provisions in any action instituted in any court of the United States or any state having subject matter jurisdiction. The Company and each Member agrees to use commercially reasonable efforts to cooperate in seeking and agreeing to an expedited schedule in any litigation seeking an injunction or order of specific performance.

Section 14.10   Remedies Cumulative.  All remedies, either under this Agreement or by Law or otherwise afforded to any party, shall be cumulative and not alternative.

Section 14.11   Third Party Beneficiaries.  Notwithstanding anything to the contrary herein, the provisions of this Agreement are not intended to be for the benefit of any creditor (other than a Member or a Director who, in such capacity, is a creditor) or other Person (other than a Member or a Director in his, her or its capacity as a Member or a Director) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members. Moreover, notwithstanding anything herein to the contrary (but subject to the following sentence), no such creditor or other Person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any Member or Director. Notwithstanding the foregoing, each Indemnitee shall be an intended third party beneficiary of this Agreement with respect to his or her rights as an Indemnitee.

Section 14.12   Entire Agreement.  This Agreement embodies the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes

all prior agreements and understandings relating to such subject matter, including the Prior LLC Agreement, and this Agreement shall constitute the limited liability company agreement of the Company for purposes of the Act.  The Members hereby agree that each Member and Director shall be entitled to rely on the provisions of this Agreement, and no Member or Director shall be liable to the Company or any other Member or Director for any action or refusal to act taken in good faith reliance on the terms of this Agreement.

Section 14.13 <u>Waiver of Partition</u>.  Each Member agrees that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company.  Accordingly, each Member agrees that, to the fullest extent permitted by applicable Law, he, she or it shall not, either directly or indirectly, seek judicial dissolution of the Company or take any action to require partition or appraisal of the Company or of any of the assets or properties of the Company, and notwithstanding anything herein to the contrary, each Member (and his, her or its successors and permitted assigns) accepts the provisions of this Agreement as his, her or its sole entitlement on termination, dissolution and/or liquidation of the Company and hereby irrevocably waives any and all right to maintain any action for judicial dissolution of the Company or partition or to compel any sale or other liquidation with respect to his, her or its interest, in or with respect to, any assets or properties of the Company.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**COMPANY**:

AFINITI NEWCO HOLDINGS LLC


By: _____
      Name:
      Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**MEMBERS**:

[_____]

By: _____
     Name:
     Title:

**Schedule of Members**

**Schedule 4.2(b)**
**Illustrative MOIC Calculation and Warrant Participation Threshold**

# **Exhibit G**

## **Stock and Asset Transfer Agreement**

*Agreed Form*

———————————

STOCK AND ASSET TRANSFER AGREEMENT[1]

———————————

Between

AFINITI, LTD. (in provisional liquidation)

and

the JOINT PROVISIONAL LIQUIDATORS

and

AFINITI AI HOLDINGS LLC

Dated as of [●], 2024

---

[1]    THIS DOCUMENT IS FOR DISCUSSION PURPOSES ONLY AND SHALL NOT CREATE A LEGALLY BINDING OR ENFORCEABLE OFFER OR AGREEMENT UNLESS AND UNTIL FULLY EXECUTED.

## TABLE OF CONTENTS

**Page**

### ARTICLE I

### DEFINITIONS

SECTION 1.01 Certain Defined Terms ........................................................................................2
SECTION 1.02 Definitions ...........................................................................................................9
SECTION 1.03 Interpretation and Rules of Construction ..........................................................10

### ARTICLE II

### PURCHASE AND SALE

SECTION 2.01 Transfer and Acquisition of the Shares ..............................................................11
SECTION 2.02 Transfer and Acquisition of Assets ...................................................................11
SECTION 2.03 Assumption and Exclusion of Liabilities ..........................................................15
SECTION 2.04 Consideration......................................................................................................17
SECTION 2.05 Closing.................................................................................................................17
SECTION 2.06 Closing Deliveries by Parent .............................................................................17
SECTION 2.07 Closing Deliveries by Holdco............................................................................18
SECTION 2.08 Assignment of Certain Transferred Assets........................................................18

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF PARENT

SECTION 3.01 Organization, Authority and Qualification of Parent .................................................19
SECTION 3.02 Ownership of Shares...........................................................................................19
SECTION 3.03 Organization, Authority and Qualification of the Acquired Companies...................19
SECTION 3.04 Capitalization of Transferred Companies; Acquired Subsidiaries ............................20
SECTION 3.05 No Conflict .........................................................................................................20
SECTION 3.06 Governmental Consents and Approvals ............................................................21
SECTION 3.07 Financial Information .........................................................................................21
SECTION 3.08 Absence of Undisclosed Material Liabilities .......................................................21
SECTION 3.09 Conduct in the Ordinary Course........................................................................21
SECTION 3.10 Litigation ............................................................................................................23
SECTION 3.11 Compliance with Laws; Permits.........................................................................23
SECTION 3.12 Environmental Matters .......................................................................................23
SECTION 3.13 Intellectual Property; Information Technology .......................................................23
SECTION 3.14 Data Privacy .......................................................................................................26
SECTION 3.15 Real Property ......................................................................................................27
SECTION 3.16 Assets; Sufficiency .............................................................................................27
SECTION 3.17 Employee Benefit Plans......................................................................................28
SECTION 3.18 Labor and Employment Matters .........................................................................30

i

SECTION 3.19 Taxes ................................................................................................30
SECTION 3.20 Material Contracts .............................................................................31
SECTION 3.21 Brokers ..............................................................................................33
SECTION 3.22 Disclaimer of Parent .........................................................................33

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF HOLDCO

SECTION 4.01 Organization and Authority of Holdco ...............................................34
SECTION 4.02 No Conflict .........................................................................................34
SECTION 4.03 Governmental Consents and Approvals ............................................35
SECTION 4.04 Investment Purpose ...........................................................................35
SECTION 4.05 Brokers ..............................................................................................35

## ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01 Third Party Consents ..........................................................................35
SECTION 5.02 IP Transfer .........................................................................................36
SECTION 5.03 Bulk Transfer Laws ...........................................................................38
SECTION 5.04 Business Assets and Liabilities .........................................................38
SECTION 5.05 No Successor Liability .......................................................................38
SECTION 5.06 Attorney-Client Privilege ..................................................................38
SECTION 5.07 IT Assets; Data Centers. ....................................................................39
SECTION 5.08 Survival ..............................................................................................39

## ARTICLE VI

## EMPLOYEE MATTERS

SECTION 6.01 Transferred Employees ........................................................................39
SECTION 6.02 Notices ...............................................................................................39
SECTION 6.03 No Third Party Beneficiaries .............................................................39

## ARTICLE VII

## TAX MATTERS

SECTION 7.01 Conveyance Taxes ...............................................................................40
SECTION 7.02 Miscellaneous ....................................................................................40

## ARTICLE VIII

## GENERAL PROVISIONS

SECTION 8.01 Expenses ..............................................................................................40

SECTION 8.02 Notices ........................................................................................................40
SECTION 8.03 Public Announcements .............................................................................42
SECTION 8.04 Severability ................................................................................................43
SECTION 8.05 Entire Agreement ......................................................................................43
SECTION 8.06 Assignment ................................................................................................43
SECTION 8.07 Amendment ...............................................................................................43
SECTION 8.08 Waiver .......................................................................................................43
SECTION 8.09 No Third Party Beneficiaries ..................................................................43
SECTION 8.10 Currency ....................................................................................................43
SECTION 8.11 Governing Law ..........................................................................................43
SECTION 8.12 Waiver of Jury Trial .................................................................................44
SECTION 8.13 Specific Performance ................................................................................44
SECTION 8.14 Counterparts ..............................................................................................44
SECTION 8.15 Liability of Provisional Liquidators .......................................................45
SECTION 8.16 Acknowledgments, Exclusions, Limitations and Agreements. .................46

EXHIBITS

| | |
|---|---|
| A-1 | Form of Assignment and Assumption Agreement (Holdco) |
| A-2 | Form of Assignment and Assumption Agreement (IP Purchaser) |
| B-1 | Form of Bill of Sale (Holdco) |
| B-2 | Form of Bill of Sale (IP Purchaser) |
| C-1 | Form of IP Assignment Agreement (Holdco) |
| C-2 | Form of IP Assignment Agreement (IP Purchaser) |
| D | Form of Loan Note Instrument |

SCHEDULES

| | |
|---|---|
| 1.01 | Parent's Knowledge |
| 2.02(a)(vii) | Assigned Contracts |
| 2.02(a)(xii) | Transferred Causes of Action |
| 2.02(a)(xvii) | Other Transferred Assets |
| 2.02(b)(vii) | Excluded Contracts |
| 2.02(b)(ix) | Other Excluded Assets |
| 2.03(a)(v) | Business Employee Liabilities |
| 2.03(a)(vi) | Excluded Accounts Payable Liabilities |
| 2.03(a)(ix) | Other Assumed Liabilities |
| 3.04 | Transferred Companies |
| 3.15(b) | Assignment of Leases |
| 5.01 | Third Party Consents |
| 5.07 | Certain Leases |
| 8.16 | Limitation of Provisional Liquidator Liability |

THIS STOCK AND ASSET TRANSFER AGREEMENT (this "Agreement"), dated as of [●], 2024, is made by and between

(1) Afiniti, Ltd., a Bermuda exempted company in provisional liquidation acting by its joint provisional liquidators, whose registered office is 19 Par-la-Ville Road, Third Floor, Hamilton, HM 11, Bermuda ("Parent"),

(2) Mike Morrison and Charles Thresh of Teneo (Bermuda) Ltd. (and including any successors appointed by the Bermuda Court, the "Provisional Liquidators"), acting jointly and severally, and

(3) Afiniti AI Holdings LLC, a Cayman Islands limited liability company and a wholly owned subsidiary of Parent ("Holdco"). Parent and Holdco are referred to herein as the "Parties".

WHEREAS, Parent owns the percentage of the issued and outstanding shares of capital stock or other equity interests set forth on Schedule 3.04 (the "Shares") of each of the non-U.S. direct subsidiaries of Parent set forth on Schedule 3.04 (each, a "Transferred Company");

WHEREAS, Parent is a holding company that owns, directly and indirectly, the Acquired Companies (as hereinafter defined);

WHEREAS, Parent, through the Acquired Companies, is engaged in the business of developing and providing proprietary enterprise behavioral pairing services that pair contact center customers and agents using data analytics and artificial intelligence to determine the optimal behavioral fits between callers and agents in order to drive business outcomes, and related infrastructure and professional services (the "Business");

WHEREAS, by an Order made by the Supreme Court of Bermuda on September [●], 2024, Parent is in provisional liquidation (the "Provisional Liquidation") under the supervision of the Supreme Court of Bermuda (the "Bermuda Court");

WHEREAS, Parent wishes to transfer to Holdco, and Holdco wishes to acquire from Parent, the Shares and the Transferred Assets (as hereinafter defined), and in connection therewith Holdco is willing to assume from Parent all of the Assumed Liabilities (as hereinafter defined), all upon the terms and subject to the conditions set forth herein; and

WHEREAS, upon an application made by the Provisional Liquidators on October [●], 2024, the Bermuda Court has approved and sanctioned *inter alia* Parent's entry into this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Parent and Holdco hereby agree as follows:

1

# ARTICLE I

# DEFINITIONS

SECTION 1.01 <u>Certain Defined Terms</u>.  For purposes of this Agreement:

"<u>Action</u>" means any action, suit, arbitration, litigation, formal investigation or proceeding before or by any Governmental Authority.

"<u>Acquired Companies</u>" means the Transferred Companies and the Acquired Subsidiaries.

"<u>Acquired Subsidiary</u>" means a Subsidiary of a Transferred Company.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"<u>Afiniti, Inc.</u>" means Afiniti, Inc., a Delaware corporation.

"<u>Agent</u>" means VCP Capital Markets LLC, in its capacity as administrative agent and collateral agent under the Credit Agreement.

"<u>Ancillary Agreements</u>" means the Assignments of Leases, the Bill of Sale, the Assignment and Assumption Agreement to be entered into by the Parties and the IP Assignment Agreement to be entered into by the Parties.

"<u>Assigned Leases</u>" means the leases relating to the Assigned Leased Real Property described on <u>Schedule 3.15(b)</u>, which shall be assigned at the Closing by Parent to Holdco.

"<u>Assignment of Lease</u>" means each Assignment of Lease to be executed by Parent at the Closing with respect to each Assigned Lease.

"<u>Assignment and Assumption Agreement</u>" means the Assignment and Assumption Agreement to be executed by Holdco and Parent at the Closing, substantially in the form of <u>Exhibit A-1</u>, or by the IP Purchaser and Holdco following the Closing, substantially in the form of <u>Exhibit A-2</u>.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Benefit Plan</u>" means any "employee benefit plan" (as defined in Section 3(3) of ERISA), whether written or unwritten and whether or not subject to ERISA, all bonus, stock option, stock purchase, restricted stock, restricted stock unit, phantom stock, stock appreciation right, incentive, deferred compensation, performance award, retiree medical or life insurance, supplemental retirement, severance or other material benefit plans, programs or arrangements, and all employment, termination, severance, change of control, retention or other contracts or

2

agreements with or for the benefit of any current or former employee or independent contractor or any dependent or beneficiary thereof.

"Bermuda Proceeding" has the meaning set forth in the Restructuring Support Agreement.

"Bill of Sale" means the Bill of Sale to be executed by Holdco and Parent at the Closing, substantially in the form of Exhibit B-1, or by the IP Purchaser and Holdco following the Closing, substantially in the form of Exhibit B-2.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York.

"Business Employee" means any current or former (a) employee of an Acquired Company or (b) employee of Parent who provides all or substantially all of his or her services to the Business.

"Business Intellectual Property" means the Owned Intellectual Property, Transferred Intellectual Property and all Intellectual Property licensed to Parent pursuant to a Transferred IP Agreement or to an Acquired Company pursuant to a Company IP Agreement.

"Business IT Assets" means all (a) Transferred IT Assets, (b) IT Assets owned by any of the Acquired Companies and (c) IT Assets licensed to Parent pursuant to a Contract included in the Transferred Assets or licensed to an Acquired Company.

"Cash" means cash and cash equivalents (including marketable securities and short-term investments).

"Chapter 15 Case" has the meaning set forth in the Restructuring Support Agreement.

"Code" means the Internal Revenue Code of 1986, as amended through the date hereof.

"Company IP Agreements" means all (a) Contracts that license or otherwise grant a permission to use Intellectual Property of an Acquired Company to any Person and (b) Contracts that license or otherwise grant a permission to use Intellectual Property of any Person to an Acquired Company.

"Company Plan" means a Benefit Plan sponsored or maintained by the Acquired Companies, or in the case of a Benefit Plan that is a Contract, to which an Acquired Company is a party.

"Contract" means any contract, agreement, license, sublicense, lease, sublease, commitment, or sales or purchase order.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the

possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Conveyance Taxes" means all sales, documentary, use, value added, transfer, stamp, stock transfer, registration, and real property transfer or gains and similar Taxes.

"Credit Agreement" means the existing term loan credit agreement, dated as of June 13, 2019 (as amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of July 11, 2019, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4, 2020, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of November 17, 2020, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of December 29, 2020, that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of March 9, 2021, that certain Amendment No. 6 to Term Loan Credit Agreement, dated as of March 12, 2021, that certain Amendment No. 7 to Term Loan Credit Agreement, dated as of May 17, 2021, that certain Amendment No. 8 to Term Loan Credit Agreement, dated as of March 7, 2022, that certain Amendment No. 9 to Term Loan Credit Agreement, dated as of June 13, 2024, that certain Amendment No. 10 to Term Loan Credit Agreement, dated as of July 29, 2024, that certain Amendment No. 11 to Term Loan Credit Agreement, dated as of August 14, 2024, that certain Amendment No. 12 to Term Loan Credit Agreement, dated as of September 12, 2024), among Afiniti, as borrower, Parent, as parent guarantor, the lenders from time to time party thereto, and the Agent, as amended by that certain Amendment No. 13 to Term Loan Credit Agreement, dated as of [●], 2024, among Afiniti, Newco, as restructuring second lien co-borrower, the other guarantor parties thereto, and the Agent, as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Disclosure Schedule" means the Disclosure Schedule attached hereto, dated as of the date hereof, delivered by Parent to Holdco in connection with this Agreement.

"Encumbrance" means any security interest, pledge, hypothecation, charge, mortgage, lien, license or encumbrance.

"Enforceability Exceptions" means (a) any applicable bankruptcy, insolvency (including Laws relating to fraudulent transfers), reorganization, moratorium or other similar Laws affecting creditors' rights generally and (b) general principles of equity (regardless of whether considered in a proceeding at law or in equity).

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, consent decree or judgment, in each case in effect as of the date hereof, relating to pollution or protection of the environment.

"Environmental Permits" means any permit, approval, identification number, license and other authorization required under or issued pursuant to any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended through the date hereof.

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs.

"Governmental Authority" means any federal, national, state, local or other government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Indebtedness" means, as of any time, without duplication, as applied to any Person:  (a) the principal of and accrued and unpaid interest in respect of (i) indebtedness of such Person for money borrowed or indebtedness issued or incurred in substitution or exchange for indebtedness for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments the payment of which such Person is responsible or liable; (b) all obligations of such Person (i) under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities), (ii) under any interest rate, currency, commodity or other hedging, swap, forward or option agreement, (iii) under any performance bond, banker's acceptance or letter of credit, but only to the extent drawn or called prior to the Closing and (iv) for all capitalized lease obligations as determined in accordance with GAAP; (c) all obligations of the type referred to in clauses (a) and (b) of any Person the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (d) for clauses (a) through (c), any termination fees, prepayment penalties, change of control, "breakage" cost or similar payments (but excluding, for the avoidance of doubt, any cash collateral required in respect of any performance bond, banker's acceptance or letter of credit) associated with the repayments of the items set forth in clauses (a) through (c) on the Closing Date to the extent paid on the Closing Date.

"Intellectual Property" means all intellectual property in any jurisdiction throughout the world, including the following: (a) patents and patent applications, (b) Trademarks;  (c) copyrights, including copyrights in software;  (d) registrations and applications for registration of any of the foregoing under subclauses (a) – (c) of this definition; (e) trade secrets and rights in know how, formulae, methods, techniques, processes, and confidential and proprietary information; and (f) all rights in any of the foregoing provided by international conventions and treaties, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto, including all rights of priority and renewals, all claims for damages and injunctive or other relief for past, present and future infringement, dilution, misappropriation, unlawful imitation or other violation, misuse, conflict or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages or injunctive or other relief.

"Intent-to-Use Trademark Application" means any intent-to-use Trademark application filed in the United States Patent and Trademark Office for which a "statement of use" or an "amendment to allege use" has not yet been filed and accepted.

"IP Assignment Agreement" means the Intellectual Property Assignment Agreement to be executed by Holdco and Parent at the Closing, substantially in the form of Exhibit C-1, or by the IP Purchaser and Holdco following the Closing, substantially in the form of Exhibit C-2.

"IRS" means the Internal Revenue Service of the United States.

"IT Assets" means Software, computers, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment.

"JPL Party" means the Provisional Liquidators, their present firms, directors, partners, and employees and any legal entity or partnership affiliated with the Provisional Liquidators using the name "Teneo", and the directors, partners, employees, shareholders and officers of any such entity or partnership.

"Law" means any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Leased Real Property" means (a) the real property leased by Parent, as tenant, that is Related to the Business (the "Assigned Leased Real Property"), all of which is described on Schedule 3.15(b), and (b) the real property leased by the Acquired Companies, in each case, as tenant, and in the case of (a) and (b), together with all buildings and other structures, facilities or improvements currently or hereafter located thereon (and fixtures attached or appurtenant thereto), as the case may be, and all easements, licenses, rights and appurtenances relating to the foregoing.

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including those arising under any Law, Action or Governmental Order and those arising under any Contract.

"Material Adverse Effect" means any event, circumstance, change, effect, development or condition that, individually or considered together with all other events, circumstances, changes, effects, developments and conditions, has had or would reasonably be expected to have a material adverse effect on (i) the business, results of operations, assets or financial condition of the Business, taken as a whole; (ii) the ability of the Parties to perform their obligations under this Agreement; or (iii) the ability of Parent to consummate the Restructuring, but, in each case, the commencement and existence of the Bermuda Proceeding or the Chapter 15 Case, and any event, circumstance, or condition directly in relation thereto (including the litigation and/or determination of any matters arising therein) shall not be deemed to constitute or be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect.

6

"Open Source Software" means all Software that is distributed as "free software," "open source software," "shareware" or under a similar licensing or distribution model, including Software licensed, provided, or distributed under any open source license, including any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Foundation (as promulgated by the Free Software Foundation) or any Software that contains or is derived from any such Software.

"ordinary course of business" or any similar expression means in the ordinary course of the applicable Person's business consistent with past practice, taking into account the fact that insolvency proceedings, or preparation therefor, have commenced.

"Owned Intellectual Property" means all Intellectual Property owned by an Acquired Company.

"Parent's Knowledge", "Knowledge of Parent" or similar terms used in this Agreement mean the actual knowledge of the Persons listed in Schedule 1.01 as of the date of this Agreement.

"Parent Plan" means a Benefit Plan sponsored or maintained by Parent, or in the case of a Benefit Plan that is a Contract, to which Parent is a party (other than a Company Plan).

"Permitted Encumbrances" means "Permitted Encumbrances" and "Permitted Liens", in each case, as defined in the Credit Agreement.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Personal Data" means any information that identifies an individual Person, including any information that is defined as "personal data", "personally identifiable information", "personal information", "protected health information" or "sensitive personal information" under any applicable Law.

"Provisional Liquidation Expense" means any amounts properly payable as an expense of the provisional liquidation of Parent.

"Real Property" means all land, buildings, improvements and fixtures erected thereon and all appurtenances related thereto.

"Recognition Motion" means the motion to be filed with the Bankruptcy Court in the Chapter 15 Case seeking (i) recognition of the Bermuda Proceeding and the Restructuring and (ii) recognition of the Sanction Order and enforcement of its terms.

"Recognition Order" means an order approving the Recognition Motion.

"Registered" means issued by, registered or filed with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"<u>Regulations</u>" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

"<u>Related to the Business</u>" means used or held for use by Parent in, or related to, or arising from, the Business.

"<u>Restructuring</u>" means a restructuring transaction as set forth in the non-binding term sheet attached to the Restructuring Support Agreement, executed on September 17, 2024, by and among Parent, Afiniti, Inc., the guarantors listed on Schedule 1 attached thereto, the Agent, and the lenders from time to time party thereto (including any schedules, annexes and exhibits attached thereto, each as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and the terms of the Restructuring Support Agreement) (the "<u>Restructuring Support Agreement</u>"), and as modified by and as more fully set forth in the Restructuring Support Agreement and in the Definitive Documents (as defined therein).

"<u>Sanction</u>" means individually or collectively, as the context requires, the approval, authorization, confirmation, consent, and/or endorsement of the Restructuring by the Bermuda Court.

"<u>Sanction Order</u>" means an order of the Bermuda Court that, among other things, approves the actions of the Provisional Liquidators in furtherance of the Restructuring.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Software</u>" means software, computer programs, computer applications and code, including source code and object code, and all documentation relating to any of the foregoing.

"<u>Subsidiary</u>" means, with respect to a party hereto, any corporation, partnership, limited liability company or other entity, whether incorporated or unincorporated, of which (a) such party or any other Subsidiary of such party is a managing member or general partner; (b) at least a majority of the securities or other equity interests having by their terms ordinary voting power to elect a majority of the directors or others performing similar functions with respect to such entity is directly or indirectly owned or controlled by such party or by any one or more of such party's Subsidiaries, or by such party and one or more of its Subsidiaries; or (c) at least a majority of the equity securities or other equity interests is directly or indirectly owned or controlled by such party or by any one or more of such party's Subsidiaries, or by such party and one or more of its Subsidiaries.

"<u>Tax</u>" or "<u>Taxes</u>" means any and all taxes of any kind, as well as other similar duties or levies (together with any and all interest, penalties, and additions to tax imposed with respect thereto), imposed by any Taxing Authority.

"<u>Taxing Authority</u>" means any Governmental Authority that is responsible for the administration or imposition of any Tax (including any Conveyance Tax).

"Tax Returns" means any and all returns, reports and forms (including elections, claims for refund, declarations, amendments, schedules, information returns and statements, and schedules and attachments thereto) filed or required to be filed with a Taxing Authority with respect to Taxes.

"Trademarks" means trademarks, service marks, trade names, trade dress, domain names and any other identifier of source or origin, together with the goodwill associated therewith.

"Transferred Intellectual Property" means any Intellectual Property owned by Parent and Related to the Business.

"Transferred IP Agreements" means all (i) Contracts that are Related to the Business that license or otherwise grant a permission to use Intellectual Property of Parent to any Person, and (ii) Contracts that are Related to the Business that license or otherwise grant a permission to use Intellectual Property of any Person to Parent.

"WARN ACT" means the Worker Adjustment and Retraining Notification Act of 1988, as amended through the date hereof.

SECTION 1.02 Definitions.   The following terms have the meanings set forth in the Sections set forth below:

| Definition | Location |
|---|---|
| "Acquired Company Assets" | 3.16(a) |
| "Agreement" | Preamble |
| "AI Tools" | 3.13(j) |
| "Assets" | 3.16(a) |
| "Assigned Contracts" | 2.02(a)(vii) |
| "Assumed Liabilities" | 2.03(a) |
| "Assumed IP Liabilities" | 5.02(b) |
| "Bermuda Court" | Recitals |
| "Business" | Recitals |
| "Business Registered Intellectual Property" | 3.13(a) |
| "Business Software" | 3.13(i) |
| "Closing" | 2.05 |
| "Closing Date" | 2.05 |
| "Data Protection Requirements" | 3.14(a) |
| "Excluded Assets" | 2.02(b) |
| "Excluded Bermuda Subsidiaries" | 2.03(b)(vii) |
| "Excluded Liabilities" | 2.03(b) |
| "Financial Statements" | 3.07 |
| "Holdco" | Preamble |
| "IP Proceeds" | 2.02(a)(ix) |
| "IP Purchaser" | 5.02(a) |
| "Loan Note Instrument" | 5.02(d) |

"Material Contracts" ........................................................ 3.20(a)
"Newco" ......................................................................... 7.02(a)
"Parent" .......................................................................... Preamble
"Parties" ......................................................................... Preamble
"Permits" ........................................................................ 3.11
"Pre-Closing Privileges" ................................................ 2.02(a)(xv)
"Privileged Materials" ................................................... 2.02(a)(xv)
"Provisional Liquidation" .............................................. Recitals
"Provisional Liquidators" .............................................. Preamble
"Restructuring Support Agreement" ............................... 1.01
"Retained Cash" ............................................................. 2.03(b)(i)
"Shares" ......................................................................... Recitals
"Subsequent Transfer" ................................................... 7.02(b)
"Transferred Assets" ...................................................... 2.02(a)
"Transferred Company" .................................................. Recitals
"Transferred IP Assets" .................................................. 5.02(a)
"Transferred IT Assets" .................................................. 2.02(a)(vi)
"Transferred Employee" ................................................. 6.01
"Transferred Records" .................................................... 2.02(a)(xiv)

SECTION 1.03 Interpretation and Rules of Construction.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)    the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement; the term "as of the date hereof", when used in this Agreement, means as of the date of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)    references to a Person are also to its successors and permitted assigns;

10

(h)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day, the period shall end on the immediately following Business Day; and

(i)     the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01 Transfer and Acquisition of the Shares.

(a)     Upon the terms and subject to the conditions of this Agreement, at the Closing, Parent shall assign, transfer, convey and deliver to Holdco, and Holdco shall acquire from Parent, all of Parent's right, title, and interest in and to the Shares.  The transfer of the Shares shall be free and clear of all Encumbrances other than (i) those arising under applicable securities Laws or (ii) those created by the Agent, including any and all claims pursuant to any successor liability or successor-in-interest theory.

SECTION 2.02 Transfer and Acquisition of Assets.

(a)     Upon the terms and subject to the conditions of this Agreement, at the Closing, Parent shall assign, transfer, convey and deliver to Holdco, and Holdco shall acquire from Parent, all of Parent's right, title and interest in and to the following assets (the "Transferred Assets"):

(i)     all Cash of Parent in excess of the Retained Cash;

(ii)     all bank accounts and lockboxes of Parent used in the Business;

(iii)     all accounts receivable and other claims for money or other obligations (including such receivables and claims owed by an Acquired Company) due to Parent and Related to the Business, other than that certain loan receivable or any other intercompany receivables owed by Afiniti, Inc. to Parent, which shall be assigned to Newco in the Subsequent Transfer;

(iv)     all pre-paid expenses, deposits (including security deposits), advances, prepayments, prepaid assets and refunds of Parent and Related to the Business;

(v)     all of Parent's right, title and interest in and to the furniture, supplies and office equipment located at any of the Leased Real Properties relating to the Assigned Leases;

(vi)     all of Parent's right, title and interest in and to the personal computers and laptops for the Transferred Employees, any other IT Assets

11

Related to the Business (the "Transferred IT Assets") and all other tangible personal property Related to the Business;

(vii)    subject to Section 5.01, all rights of Parent under any Contracts listed or described on Schedule 2.02(a)(vii)[2] (the "Assigned Contracts");

(viii)    subject to Section 5.01, all rights of Parent under the Transferred IP Agreements;

(ix)    (A) all of Parent's right, title and interest in and to the Transferred Intellectual Property, and (B) all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and any supporting obligations (collectively, the "IP Proceeds"), relating to any Transferred Intellectual Property;

(x)    all Permits, including the Permits set forth on Section 3.11 of the Disclosure Schedule (in each case to the extent transferable without the consent of any Governmental Authority);

(xi)    all rights under warranties, indemnities, and all similar rights against third parties to the extent Related to the Business, any Transferred Assets or the Assumed Liabilities; provided, however, that Transferred Assets shall not include (and the Excluded Assets shall include) any claims and causes of action against any third party arising under Contract or applicable Law under Contracts that are not Assigned Contracts, even if such claims or causes of action arise from Contracts Related to the Business;

(xii)    all causes of action, claims, demands, rights and privileges against third parties, whether liquidated or unliquidated, fixed or contingent, choate or inchoate that relate to events, breaches or violations (whether sounding in tort or not) occurring on or prior to the Closing Date which are Related to the Business or which relate to any Transferred Assets or the Assumed Liabilities, including causes of action, claims, demands, rights and privileges which Parent may have under any insurance contracts or policies insuring the Business, any Transferred Assets or the Assumed Liabilities, and including that cause of action, claim, demand, right and privilege listed or described on Schedule 2.02(a)(xii)[3];

(xiii)    all Company Plan assets held by Parent;

(xiv)    all books of account and copies of all Tax Returns (and supporting workpapers and other records) in Parent's possession or control, invoices, shipping records, supplier lists, correspondence and other documents, records and files of Parent and, in each case, Related to the Business or involving or related to

---

[2]    **Note to Draft**:  Final list of Assigned Contracts to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

[3]    **Note to Draft**: Schedule to consist of the US Trade Secret Action identified on Schedule 3.10.

the Transferred Employees, the Transferred Assets (including involving or related to the Transferred IT Assets) or the Assumed Liabilities, including all editorial, sales, promotion, market research, readership research, sales media kits, royalty and other files Related to the Business or involving or related to the Transferred Employees, the Transferred Assets or the Assumed Liabilities (the "Transferred Records"); provided that Parent may redact any information from such Transferred Records not Related to the Business or involving or related to the Transferred Employees, the Transferred Assets or the Assumed Liabilities prior to the delivery of such Transferred Records to Holdco and may retain a copy of any Transferred Records relating to Tax, accounting or legal matters or otherwise required to be retained pursuant to applicable Law;

(xv)    any and all attorney-client privileges, work product protections, mediation privileges, common-interest privileges, expectations of client confidences or any other similar privileges or protections of Parent or any Acquired Company or any of its applicable directors and officers to the extent related to Parent, the Business any Acquired Company or any Transferred Assets prior to the closing of the transactions contemplated herein (the "Pre-Closing Privileges") and all books and records and other documents of Parent or any Acquired Company containing any advice or communication that is subject to any Pre-Closing Privilege (collectively, the "Privileged Materials");

(xvi)    any and all rights pursuant to any settlement agreements;

(xvii) any other right, property or asset of Parent that is listed or described on Schedule 2.02(a)(xvii); and

(xviii) any other right, property or asset of Parent not specifically identified as an Excluded Asset in clauses (i) through (ix) of Section 2.02(b) that is designated by Holdco in writing prior to the Closing.

(b)    Notwithstanding anything in Section 2.02(a) to the contrary, Parent shall not convey, assign, transfer or deliver, or cause to be conveyed, assigned, transferred or delivered, to Holdco, and Holdco shall not acquire, and the Transferred Assets shall not include, Parent's right, title and interest to any assets of Parent not expressly included in the Transferred Assets or pursuant to the sale, transfer and delivery of the Shares subject to the terms of this Agreement (the "Excluded Assets"), including:

(i)    all Cash of Parent in an amount necessary to satisfy the Excluded Liabilities approved in writing by the Agent for payment prior to Closing (the "Retained Cash")[4];

---

[4]    **Note to Draft**:  Amount of cash to be retained by Parent to satisfy Excluded Liabilities and liquidate Parent (and local advisory costs related thereto) to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

(ii)    all rights of Parent under that certain loan receivable or any other intercompany receivables owed by Afiniti, Inc. to Parent, which shall be assigned to Newco in the Subsequent Transfer;

(iii)    the company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of Parent, as well as any other records or materials relating to Parent and not Related to the Business or involving or related to the Transferred Employees, the Transferred Assets or the Assumed Liabilities;

(iv)    all current and prior insurance policies of Parent, including current and prior director and officer insurance policies of Parent, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and all rights to receive refunds of premiums paid with respect thereto, which shall be assigned to Newco or one or more Subsidiaries designated by Newco in the Subsequent Transfer;

(v)    all claims, defenses, causes of action, choses in action, rights of recovery for reimbursement, contribution, refunds, indemnity or other similar payment recoverable by Parent from or against any third party to the extent relating to any other Excluded Asset or any Excluded Liability; provided that if Holdco or any Acquired Company becomes subject to any Action or Liability in respect of any Excluded Asset or Excluded Liability following the Closing, all claims, defenses, causes of action, choses in action, rights of recovery for reimbursement, contribution, refunds, indemnity or other similar payment recoverable by Parent from or against any third party to the extent relating to such Excluded Asset or Excluded Liability shall be transferred to Holdco as Transferred Assets;

(vi)    all of the issued and outstanding shares of capital stock of AFCF, Ltd., a Bermuda exempted company limited by shares, and Afiniti Holdco, Ltd., a Bermuda exempted company limited by shares (collectively, the "Excluded Bermuda Subsidiaries") and of Afiniti, Inc.;

(vii)    all rights of Parent under any Contract to which Parent is a party that (A) is not an Assigned Contract or (B) is an Assigned Contract but is not assignable pursuant to the terms thereof or as a matter of applicable Law, and specifically those Contracts listed on Schedule 2.02(b)(vii);

(viii)    all Parent Plans and assets thereof; and

(ix)    any other right, property or asset that is listed or described on Schedule 2.02(b)(ix).

(c)    The transfer of title to the Transferred Assets shall be free and clear of all Encumbrances other than those of the Agent, including any and all claims pursuant to any successor liability or successor-in-interest theory.

SECTION 2.03 <u>Assumption and Exclusion of Liabilities</u>.

(a)    Holdco shall assume no Liabilities of Parent, except the Liabilities expressly set forth in this <u>Section 2.03(a)</u> (collectively, the "<u>Assumed Liabilities</u>"), which Holdco shall, on the terms and subject to the conditions of this Agreement, assume at the Closing, and thereafter pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto:

(i)    all Liabilities arising from or in respect of the ownership or use of any Transferred Asset after the Closing;

(ii)    all Liabilities of Parent arising under the Assigned Contracts and the Transferred IP Agreements;

(iii)    all Liabilities of Parent arising under the Assigned Leases;

(iv)    all Liabilities arising from the employment of the Transferred Employees after the Closing;

(v)    all Liabilities set forth on <u>Schedule 2.03(a)(v)</u> for severance, termination and other payments to Business Employees;

(vi)    all accounts payable of Parent incurred in the ordinary course of business to suppliers and vendors of goods and services and outstanding as of the Closing Date, excluding (i) any intercompany payables owed by Parent to an Acquired Company or any other Subsidiary of Parent, and (ii) any accounts payable listed on <u>Schedule 2.03(a)(vi)</u>[5];

(vii)    all purchase orders for goods or services incurred in the ordinary course of business prior to the Closing;

(viii)    all Taxes to the extent relating to the ownership or use of the Transferred Assets or the operation of the Business after the Closing; and

(ix)    all other Liabilities set forth on <u>Schedule 2.03(a)(ix)</u>.[6]

(b)    Except as specifically set forth in <u>Section 2.03(a)</u>, Holdco will not assume or be liable for any Liabilities of Parent of any nature whatsoever, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise (other than the Assumed Liabilities), including the following (other than the Assumed Liabilities) (collectively, the "<u>Excluded Liabilities</u>"):

---

[5]    **Note to Draft**: To include fees to directors, Wilmer fees and other specified excluded AP to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

[6]    **Note to Draft**: Final list of Other Assumed Liabilities to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

(i)      all Liabilities to the extent relating to the Excluded Assets;

(ii)     all Liabilities of Parent arising under any Contract to which Parent is a party that is not an Assigned Contract, including under any indemnification agreements with any current or former director or officer of Parent;

(iii)    all Liabilities arising from or in respect of any Transferred Asset or the operation of the Business arising prior to the Closing and not expressly assumed pursuant to this Agreement;

(iv)    all accounts payable not assumed pursuant to Section 2.03(a)(vi); and all purchase orders not assumed pursuant to Section 2.03(a)(vii);

(v)     all intercompany payables, liabilities and obligations owed by Parent to an Acquired Company or any other Subsidiary of Parent;

(vi)    all Indebtedness of Parent;

(vii)   all Liabilities arising from or in respect of any Action, whether or not relating to or arising from the conduct of the Business, pending or threatened against the Business or the Transferred Assets, including any indemnity obligations related to such Liabilities;

(viii)  all Liabilities with respect to Parent Plans;

(ix)    all Liabilities with respect to employees of Parent (except with respect to Liabilities arising from the employment of the Transferred Employees arising after the Closing or as set forth on Schedule 2.03(a)(v)), including all Liabilities in respect of transaction bonus and retention bonus agreements and in respect of employment-related claims, including allegations of wrongful termination, discrimination, workplace harassment and retaliation;

(x)     Parent's obligations under this Agreement and each Ancillary Agreement;

(xi)    any Liabilities to any equity holder of Parent or arising from or in respect of any equity interests of Parent or the right to acquire or the issuance of any equity interests of Parent;

(xii)   all other Liabilities set forth on Schedule 2.03(b)(xii); and

(xiii)  any other Liabilities of Parent not expressly assumed by Holdco pursuant to Section 2.03(a) above.[7]

---

[7]    **Note to Draft**:  Final list of Other Excluded Liabilities to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

The Parties acknowledge that the agreements contained in this <u>Section 2.03(b)</u> are an integral part of the transactions contemplated by this Agreement and that Holdco would not have entered into this Agreement if it had been required to assume any of the Liabilities of Parent that are Excluded Liabilities.

SECTION 2.04 <u>Consideration</u>.   In consideration for Parent entering into this Agreement and the Ancillary Agreements with Holdco and consummating the transactions contemplated hereby and thereby, including the sale of the Shares and the Transferred Assets to Holdco, Holdco shall issue to Parent [___] additional membership interests of Holdco and shall assume the Assumed Liabilities.

SECTION 2.05 <u>Closing</u>.  Subject to the terms and conditions of this Agreement and subject to the satisfaction (or waiver) of the conditions precedent set forth in and pursuant to the terms of Section 15 of the Restructuring Support Agreement, other than those conditions that are to be satisfied (or waived) on the Closing Date, the transfer and acquisition of the Shares and the Transferred Assets and the assumption of the Assumed Liabilities and the other transactions contemplated by this Agreement shall take place at a closing (the "<u>Closing</u>") to be held remotely via the exchange of documents and signatures on the date hereof (the day on which the Closing takes place being the "<u>Closing Date</u>").

SECTION 2.06 <u>Closing Deliveries by Parent</u>.  At the Closing, Parent shall deliver or cause to be delivered to Holdco:

(a)    evidence of the transfer, reasonably satisfactory to Holdco, of the Shares to Holdco;

(b)    a duly executed counterpart to the Bill of Sale to be entered into between Holdco and Parent substantially in the form of <u>Exhibit B-1</u>;

(c)    a duly executed counterpart to the Assignment and Assumption Agreement to be entered into between Holdco and Parent substantially in the form of <u>Exhibit A-1</u>;

(d)    a duly executed counterpart to each Assignment of Lease;

(e)    a duly executed counterpart to the IP Assignment Agreement to be entered into between Holdco and Parent substantially in the form of <u>Exhibit C-1</u>;

(f)    evidence of a Sanction Order from the Bermuda Court;

(g)    evidence of entry of the Recognition Order by the Bankruptcy Court; and

(h)    all such other documents, agreements, instruments, writings and certificates as Holdco may reasonably request as are necessary for Parent to satisfy its obligations hereunder.

SECTION 2.07 <u>Closing Deliveries by Holdco</u>.    At the Closing, Holdco shall deliver or cause to be delivered to Parent:

(a)    evidence of the issuance, reasonably satisfactory to Parent, of the issuance to Parent of [____] additional membership interests of Holdco;

(b)    a duly executed counterpart to the Bill of Sale;

(c)    a duly executed counterpart to the Assignment and Assumption Agreement to be entered into between Holdco and Parent substantially in the form of <u>Exhibit A-1</u>;

(d)    a duly executed counterpart to each Assignment of Lease;

(e)    a duly executed counterpart to the IP Assignment Agreement to be entered into between Holdco and Parent substantially in the form of <u>Exhibit C-1</u>; and

(f)    all such other documents, agreements, instruments, writings and certificates as Parent may reasonably request as are necessary for Holdco to satisfy its obligations hereunder.

SECTION 2.08 <u>Assignment of Certain Transferred Assets</u>.    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the consent, approval or authorization of a third party, would constitute a breach or other contravention thereof or would in any way adversely affect the rights of Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, thereto or thereunder. If any such consent, approval or authorization is not obtained prior to the Closing Date, or if an attempted transfer or assignment thereof would be ineffective or would adversely affect the rights of Parent thereto or thereunder so that Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, would not in fact receive all such rights following the Closing, Parent and Holdco shall, or, following the transactions contemplated by <u>Section 5.02</u>, Holdco shall cause the IP Purchaser to, other than with respect to consents, approvals and authorizations subject to <u>Section 5.01</u>, cooperate in a mutually agreeable arrangement under which Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, would obtain the benefits and assume the obligations and bear the economic burdens associated with such Transferred Asset in accordance with this Agreement, or under which Parent would enforce for the benefit of Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, at Holdco's or the IP Purchaser's, as applicable, cost and expense, any and all of its rights against a third party associated with such Transferred Asset, and Parent would promptly pay to Holdco or the IP Purchaser, as applicable, all monies received by it in respect of any such Transferred Asset.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF PARENT

Parent hereby represents and warrants to Holdco as of the date hereof, subject to such exceptions as are disclosed in the Disclosure Schedule, as follows:

SECTION 3.01 <u>Organization, Authority and Qualification of Parent</u>.  Parent is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to enter into this Agreement and each Ancillary Agreement to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, and the Provisional Liquidators have the corporate power and authority, subject to the Sanction Order, to execute and deliver, and Parent has the power to perform, this Agreement and each Ancillary Agreement and to consummate the transactions contemplated hereby and thereby.  Parent is duly licensed or qualified to do business and is in good standing (to the extent such concepts are recognized under applicable Law) in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing (x) would not have a Material Adverse Effect or (y) would not be reasonably expected to prevent or materially delay the ability of Parent to perform its obligations under this Agreement or any of the Ancillary Agreements to which it is a party.  The execution and delivery of this Agreement and each Ancillary Agreement to which it is a party by Parent, the performance by Parent of its obligations hereunder and thereunder and the consummation by Parent of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Parent.  This Agreement has been, and upon their execution each of the Ancillary Agreements to which it is a party shall have been, duly executed and delivered by Parent, and (assuming due authorization, execution and delivery by Holdco) this Agreement constitutes, and upon their execution each of the Ancillary Agreements to which it is a party shall constitute, legal, valid and binding obligations of Parent, enforceable against Parent in accordance with their respective terms, subject to the Enforceability Exceptions.

SECTION 3.02 <u>Ownership of Shares</u>.  The Shares are owned of record and beneficially by Parent free and clear of all Encumbrances (other than Permitted Encumbrances). Upon the Closing, Holdco will own all of the Shares free and clear of all Encumbrances (other than Permitted Encumbrances).  Parent has no direct Subsidiaries other than the Transferred Companies, Afiniti, Inc. and the Excluded Bermuda Subsidiaries.

SECTION 3.03 <u>Organization, Authority and Qualification of the Acquired Companies</u>.  Each of the Acquired Companies is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted.  Each of the Acquired Companies is duly licensed or qualified to do business and is in good standing (to the extent such concepts are recognized under applicable Law) in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary,

except to the extent that the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect.

SECTION 3.04 <u>Capitalization of Transferred Companies; Acquired Subsidiaries</u>.

(a)    <u>Schedule 3.04</u> sets forth, for each Transferred Company, (i) its jurisdiction of formation, (ii) the number and type of issued equity interests, and (iii) the holders of such equity interests. All of the Shares are validly issued, fully paid and nonassessable and were not issued in violation of any preemptive rights. The Shares, and in the case of Transferred Companies that are not wholly owned by Parent, the equity interests of such Transferred Companies owned by another Transferred Company as reflected on <u>Schedule 3.04</u>, constitute all of the issued and outstanding equity interests of the Transferred Companies. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Shares or the equity interests of the Transferred Companies owned by another Transferred Company or obligating either Parent or any Transferred Companies to issue or sell any shares of capital stock of, or any other equity interest in, any Transferred Company.

(b)    <u>Section 3.04(b)</u> of the Disclosure Schedule sets forth, for each Acquired Subsidiary, (i) its jurisdiction of formation, (ii) the number and type of issued equity interests, and (iii) the holders of such equity interests. All equity interests in the Acquired Subsidiaries are owned, directly or indirectly, by a Transferred Company free and clear of all Encumbrances, have been duly authorized and validly issued, and none of such equity interests has been issued in violation of any preemptive rights. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the equity interest in any Acquired Subsidiary or obligating Parent, any Transferred Company or any Acquired Subsidiary to issue or sell any equity interest in any of the Acquired Subsidiaries.

SECTION 3.05 <u>No Conflict</u>. Assuming the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in <u>Section 3.06</u>, the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is a party by Parent do not and will not (a) violate, conflict with, or result in the breach of any provision of the Governing Documents of Parent or any of the Acquired Companies, (b) violate any Law or Governmental Order applicable to Parent or any of the Acquired Companies in any material respect, (c) except as set forth on <u>Section 3.05(c)</u> of the Disclosure Schedule, violate, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, acceleration or cancellation of, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on the Shares or any of the Transferred Assets pursuant to any Material Contract to which Parent or any Acquired Company is a party or by which any of the Transferred Assets or the Shares or businesses of the Acquired Companies is bound or affected in any material respect, or (d) exceed or fall outside of the powers or authority of the Provisional Liquidators; except, with respect to clause (c) for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, reasonably be expected to materially impact the operation of the Business.

SECTION 3.06 <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance of this Agreement by Parent and each Ancillary Agreement to which it is a party does not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Authority, except (a) as described in <u>Section 3.06</u> of the Disclosure Schedule, or (b) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not reasonably be expected to materially impact the operation of the Business.

SECTION 3.07 <u>Financial Information</u>.

(a)    True and complete copies of (i) the unaudited balance sheet of the Business as of June 30, 2024 and the related unaudited statements of income and cash flows of the Business for the twelve months then-ended, and (ii) the audited balance sheet of the Business as of June 30, 2023, June 30, 2022 and June 30, 2021, and the related audited statements of income and cash flows of the Business for the fiscal years then-ended (collectively, the "<u>Financial Statements</u>") have been made available by Parent to Holdco.

(b)    The Financial Statements (i) were prepared in accordance with the books of account and other financial records of Parent (except as may be indicated in the notes thereto), (ii) present fairly in all material respects the financial condition and results of operations of the Business as of the dates thereof or for the periods covered thereby and (iii) were prepared in accordance with GAAP applied on a basis consistent with the past practices of Parent (except for the absence of footnotes in unaudited interim financial statements).

SECTION 3.08 <u>Absence of Undisclosed Material Liabilities</u>.  As of the date hereof, the Business does not have any Liabilities of a nature required to be reflected on a balance sheet prepared in accordance with GAAP, other than Liabilities (a) reflected or reserved against on the Financial Statements (including the notes thereto), (b) set forth in the Disclosure Schedule or (c) incurred since June 30, 2024 in the ordinary course of business of the Business.

SECTION 3.09 <u>Conduct in the Ordinary Course</u>.  Since December 31, 2023 and through the date hereof, except as described in <u>Section 3.09</u> of the Disclosure Schedule or as required by applicable Law or the terms of any Contract, the Acquired Companies and, to the extent Related to the Business, Parent have not:

(a)    (i) issued or sold any capital stock, notes, bonds or other securities of the Acquired Companies (or any option, warrant or right to acquire the same), (ii) redeemed any of the capital stock of the Acquired Companies, or (iii) declared, made or paid any dividends or distributions to the holders of capital stock of the Acquired Companies;

(b)    except as would not be material to the operation of the Business, sold, leased, transferred, licensed or otherwise disposed of (other than the sale of inventory or the grant of non-exclusive licenses in connection therewith, in the ordinary course consistent with past practice), or abandoned, permitted to lapse or failed to maintain, or permitted or allowed to be subjected to any Encumbrance (other than Permitted Encumbrances), any of the Assets (whether tangible or intangible) or any other asset or property of the Business that would

constitute a Transferred Asset or an Acquired Company Asset but for the conduct described in this clause;

(c)     amended or restated the Governing Documents of any of the Acquired Companies;

(d)     incurred any Indebtedness (other than any Indebtedness between any Acquired Company and any other Acquired Company);

(e)     delayed payment of any account payable or other Liability of the Business beyond its due date or the date when such Liability would have been paid in the ordinary course of business consistent with past practice;

(f)     except with respect to the current and prior director and officer insurance policies of Parent, entered into, extended, materially amended, cancelled or terminated any Material Contract or any agreement which, if entered into prior to the date hereof, would be a Material Contract other than customer or supplier contracts in the ordinary course of business consistent with past practice or in connection with obtaining a required consent as contemplated hereto that does not require a Party or an Acquired Company to pay any remuneration or commit to pay any remuneration to any Person to which a Party or Acquired Company is not contractually obligated to pay pursuant to a separate contractual obligation with such Person;

(g)     (A) except for the compensation figures indicated on Section 3.18(a) of the Disclosure Schedule (which shall not be required to indicate changes to such figures between December 31, 2023 and the date of such schedule), granted or agreed to grant or paid or agreed to pay, directly or indirectly, any material increase or material new commitments and with respect to the wages, salary, bonus, commissions, retirement benefits, transaction bonus, retention bonus, severance, tax gross-up or equalization or other compensation or benefits of, or grant any equity-based compensation to, any Business Employee or independent contractor, (B) enter into, adopt or establish any new material Parent Plan or any new material Company Plan or collective bargaining agreement or (C) transferred or otherwise altered or amended any Benefit Plan such that it became a Company Plan;

(h)     changed any method of accounting or accounting practice or policy used by Parent (in each case, Related to the Business) or any of the Acquired Companies, other than such changes required by GAAP;

(i)     paid or discharged, entered into any settlement with respect to, or waived or compromised, any Action;

(j)     transferred or assigned any asset from an Acquired Company to Parent, transferred or assigned any Liability from Parent to an Acquired Company, or otherwise caused an Acquired Company to assume any Liability of Parent;

(k)     made any material Tax election inconsistent with past practice or changed or revoked any material Tax election, changed any material Tax accounting method, filed any material amended Tax Return, settled or compromised any audit or other proceeding relating to a material amount of Tax, entered into any closing agreement, extended the statute of limitations

period for the assessment or collection of any Tax, or surrendered any right to claim a material Tax refund; or

(l)       agreed to take any of the actions specified in this Section 3.09, except as contemplated by this Agreement and the Ancillary Agreements.

SECTION 3.10 Litigation.  As of the date hereof, there is no Action by or against (a) any of the Acquired Companies or (b) Parent to the extent Related to the Business, in each case pending before any Governmental Authority that would be material to the Business.

SECTION 3.11 Compliance with Laws; Permits.  Except as would not be material to the Business, Parent and the Acquired Companies have conducted within the prior two year period and continue to conduct the Business in accordance with all Laws and Governmental Orders applicable to Parent and Acquired Companies with respect to the Business and none of Parent or the Acquired Companies is in violation of any such Law or Governmental Order. Parent and the Acquired Companies hold all licenses, permits, authorizations, orders and approvals from, and have made all filings, applications and registrations with, each Governmental Authority (collectively, the "Permits") necessary for the operation of the Business as it is conducted as of the date hereof in all material respects.  Parent and the Acquired Companies have conducted and continue to conduct the Business pursuant to and in compliance in all material respects with the terms of all such Permits.  Section 3.11 of the Disclosure Schedule sets forth each Permit material to the operation of the Business as it is conducted as of the date hereof.

SECTION 3.12 Environmental Matters.  Except as would not have a Material Adverse Effect, (a) Parent, to the extent Related to the Business, and the Acquired Companies are in compliance with all applicable Environmental Laws and have obtained and are in compliance with all Environmental Permits, and (b) there are no written claims pursuant to any Environmental Law pending or, to Parent's Knowledge, threatened, against Parent, to the extent Related to the Business, or the Acquired Companies.

SECTION 3.13 Intellectual Property; Information Technology.

(a)       Section 3.13(a) of the Disclosure Schedule sets forth a true and complete list of all Registered Owned Intellectual Property and Registered Transferred Intellectual Property (collectively, the "Business Registered Intellectual Property") as of the date of this Agreement, such list specifying for each item of Intellectual Property, as applicable, the jurisdictions in which such item has been registered or registrations for such item have been applied for, owner(s), application or registration date, application or registration number and status, and, for domain names, the applicable domain name registrar.  Each item of Business Registered Intellectual Property is subsisting, and, to the Knowledge of Parent, valid and enforceable.  With respect to each item of Registered Owned Intellectual Property, an Acquired Company is the exclusive owner of such Intellectual Property, free and clear of any Encumbrances (other than Permitted Encumbrances).  With respect to each item of Registered Transferred Intellectual Property, Parent is the exclusive owner of such Intellectual Property, free and clear of any Encumbrances (other than Permitted Encumbrances).

23

(b)     The Business Intellectual Property constitutes all Intellectual Property, owned or licensed, or purported to be owned or licensed, by Parent and the Acquired Companies that is necessary and sufficient to enable Holdco and the Acquired Companies, immediately following the Closing, to conduct the Business substantially in the same manner as conducted by Parent and the Acquired Companies as of immediately prior to the Closing.  Subject to receipt of any necessary third party consents and approvals set forth on Section 3.06 of the Disclosure Schedule, immediately after the Closing, the Acquired Companies and Holdco, taken collectively, will own or have the valid right to use in the operation of the Business all of the Business Intellectual Property, and to receive all IP Proceeds related thereto, on terms and conditions the same in all material respects as those in effect prior to the Closing.  Except as would not be material to the Business, within the two years prior to the date hereof, none of Parent or the Acquired Companies has received any written claim from any Person challenging its rights in, ownership of, or the validity or enforceability of, the Owned Intellectual Property, or the Transferred Intellectual Property or any of the IP Proceeds related to either of the foregoing.

(c)     To the Knowledge of Parent, except as would not be material to the Business, no Person is engaging in any activity that infringes, misappropriates or otherwise violates, or in the two years prior to the date hereof has infringed, misappropriated or otherwise violated, any Owned Intellectual Property or Transferred Intellectual Property. Except as would not be material to the Business, neither the conduct of the Business nor the operation of the Acquired Companies infringes, misappropriates or otherwise violates, or has in the two years prior to the date hereof infringed, misappropriated or otherwise violated, the Intellectual Property of any Person.  In the two years prior to the date hereof, none of Parent or the Acquired Companies has received any written notice alleging that the conduct of the Business or the operation of the Acquired Companies has infringed, misappropriated or otherwise violated the Intellectual Property of any Person.

(d)     As of the date of this Agreement, there is no Action initiated by any other Person pending or, to the Knowledge of Parent, threatened in writing against Parent or the Acquired Companies concerning the matters described in Section 3.13(c); provided that any Action that has been initiated but with respect to which process or other comparable notice has not been served on or delivered to such parties shall be deemed to be "threatened" rather than "pending."

(e)     To the Knowledge of Parent, except as would not be material to the Business, (i) Parent and the Acquired Companies have used commercially reasonable efforts (including efforts to enter into written, valid and binding confidentiality and nondisclosure agreements with all founders, officers, employees, consultants and contractors of such entity with access to any trade secrets), unless such Persons are otherwise subject to legal or enforceable ethical obligations to maintain the confidentiality of such trade secrets) to protect and maintain the confidentiality of, and proprietary rights in, all the trade secrets and other material confidential information, including source code in Software, that is, in each case, part of the Business Intellectual Property or the other Transferred Assets or Acquired Company Assets, and, (ii) to the Knowledge of Parent, there has been no unauthorized access to or use or disclosure of any of the foregoing.

(f)       No current or former founder, officer, employee, consultant or contractor of an Acquired Company or Parent holds any right, title or interest, in whole or in part, in or to any Owned Intellectual Property, Transferred Intellectual Property, or IP Proceeds related to either of the foregoing other than a non-exclusive license to use such Intellectual Property for the purpose of performing services for or on behalf of the Business. Other than Parent, Afiniti, Inc. and its Subsidiaries or any other Acquired Company, no Person has any rights in or to the IP Proceeds related to the Transferred Intellectual Property or the Owned Intellectual Property. Except as would not be material to the Business, each current and former officer, employee, consultant and contractor of an Acquired Company, and each current and former officer, employee, consultant and contractor of Parent, to the extent such Person developed or created Intellectual Property by or on behalf of the Business, or otherwise within the scope of the engagement of such Person with the Acquired Company or Parent, and Related to the Business, has executed a written agreement with an Acquired Company or Parent, as applicable, that validly assigns to such entity all right, title and interest in such Intellectual Property, except to the extent ownership of such Intellectual Property is vested in Parent or the Acquired Company by operation of Law. To the Knowledge of Parent, none of the parties to the agreements that are subject to the previous sentence are in material breach thereof.

(g)       Except as would not be material to the Business, the Business IT Assets (i) operate and perform and have been maintained, in each case, in accordance with their documentation and functional specifications and otherwise as required for the conduct of the Business as currently conducted and as currently proposed to be conducted; (ii) have not malfunctioned or failed in any respect (including in a way that has resulted in a disruption to the Business); and (iii) do not contain any viruses, worms, Trojan horse, bugs, faults, vulnerabilities or any other code designed or intended to (A) significantly disrupt or adversely affect the functionality of the Business IT Assets or (B) assist any Person to access any Business IT Assets without authorization.  Except as would not be material to the Business, to the Knowledge of Parent, there has been no unauthorized access to, or unauthorized use, modification, deletion, disclosure, or other misuse of, any Business IT Assets (or information stored or contained therein or transmitted thereby). The Acquired Companies and, with respect to the Business, Parent, take and have taken all commercially reasonable steps to protect and preserve the confidentiality, integrity and security of the Business IT Assets (and all confidential information stored or contained therein or transmitted thereby, including such information of third parties that is held in connection with the Business).

(h)       The Business IT Assets constitute all IT Assets necessary and sufficient to enable Holdco and the Acquired Companies, immediately following the Closing, to conduct the Business substantially in the same manner as conducted by Parent and the Acquired Companies as of immediately prior to the Closing.  Subject to receipt of necessary third party consents and approvals set forth on <u>Section 3.06</u> of the Disclosure Schedule, immediately after the Closing, the Acquired Companies and Holdco will own or have the valid right to use in the operation of the Business all of the Business IT Assets, on terms and conditions the same in all material respects as those in effect prior to the Closing.

(i)       Neither the Acquired Companies nor the Business are in material breach of any terms or conditions of any relevant licenses of Open Source Software.  No Software included in the Owned Intellectual Property or Transferred Intellectual Property and used or held

for use in connection with the Business ("Business Software") incorporates, is integrated with, or links to any Open Source Software in such a manner that, taking into account the current conduct of the Acquired Companies and the Business, requires the distribution of any material proprietary source code for any Business Software under the terms of a license to such Open Source Software.  None of Parent or the Acquired Companies has received any such written claim from any Person.  No source code of any Business Software has been disclosed to any Person, other than to employees or service providers of Parent or an Acquired Company in the ordinary course of the Business for the purpose of conducting the Business, and none of the source code for any Business Software is subject to any escrow or other disclosure obligations.

(j)     The Acquired Companies have and, with respect to the Business, Parent, has used commercially reasonable efforts to (i) ensure that all AI Tools are used in compliance with the applicable license terms, consents, agreements and Laws in all material respects; (ii) not include Personal Data, trade secrets or material confidential or proprietary information in the Transferred Intellectual Property or Owned Intellectual Property, or such similar information that is owned by any third Person that is under any obligation of confidentiality by the Acquired Companies or Parent, in any prompts or inputs into any AI Tools, except in cases where such AI Tools do not use such information, prompts or inputs (other than in aggregated and anonymized form) to train the machine learning or algorithm of such tools or improve the services related to such tools; and (iii) not use AI Tools to develop any material Business Intellectual Property that the Acquired Companies or Parent intends to maintain as proprietary in a manner that would materially affect the Acquired Companies' or Parent's ownership or rights therein. For purposes thereof, "AI Tools" means generative artificial intelligence technology or similar tools capable of automatically producing various types of content (such as source code, text, images, audio and synthetic data) based on user-supplied prompts.

SECTION 3.14 Data Privacy.

(a)     The Acquired Companies and, with respect to the Business, Parent (i) are in material compliance in all respects with all applicable Laws as well as material applicable contractual obligations binding on the Acquired Companies or Parent, as applicable, and external policies, in each case to the extent relating to privacy, data protection and the collection, retention, protection, transfer, use and processing of Personal Data ("Data Protection Requirements") and (ii) have maintained commercially reasonable policies, procedures, and security safeguards (including organizational, physical, administrative and technical safeguards) regarding data privacy and security designed to protect Personal Data, controlled by or on behalf of the Acquired Companies or, with respect to the Business, Parent against loss, damage, unauthorized access, unauthorized use, breaches, and cybersecurity incidents.

(b)     To the Knowledge of Parent, there has been no material loss of, damage to, unauthorized access to, or unauthorized use, or misuse of, any personal information in the possession or control of Parent Related to the Business and the Acquired Companies. Neither the Acquired Companies, nor, with respect to the Business, Parent has (i) been subject to any actual, pending, or, to the Knowledge of Parent, threatened investigations, notices or requests from any Governmental Authority in relation to their data processing or cybersecurity activities or (ii) received any actual, pending, or, to the Knowledge of Parent, threatened written claims from any Person or Governmental Authorities alleging breach of any Data Protection Requirement.  The

processing of Personal Data relating to the Business is carried out, in all material respects, in accordance with all Data Protection Requirements and, where applicable, with appropriate safeguards for such transfer. To the Knowledge of Parent, the execution, delivery and performance by Parent of this Agreement and the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement by Parent will not violate any Data Protection Requirements.

SECTION 3.15 Real Property.

(a)      Parent does not own any Real Property Related to the Business.

(b)      Section 3.15(b) of the Disclosure Schedule sets forth the street address of each Leased Real Property and the identity of the lessor, lessee and current occupant (if different from lessee) of each Leased Real Property.  Assuming good fee title vested in the applicable lessor, to Parent's Knowledge, such lessee has a valid and binding leasehold or servitude interest in each Leased Real Property, free and clear of all Encumbrances other than Permitted Encumbrances.

(c)      There has not been any sublease or assignment entered into by Parent or any of the Acquired Companies in respect of the leases relating to the Leased Real Property.

SECTION 3.16 Assets; Sufficiency.

(a)      Each of the Acquired Companies owns, leases, licenses or has the legal right to use all the material properties and assets of such Acquired Company reflected on each of the Financial Statements or acquired since the date of the Financial Statements (collectively, the "Acquired Company Assets" and, together with the Transferred Assets, the "Assets"), except for any Acquired Company Assets that have been sold or otherwise disposed of since the date of such Financial Statement and disclosed on Section 3.09 of the Disclosure Schedule.  Parent owns, leases, licenses or has the legal right to use all the Transferred Assets reflected on each of the Financial Statements or acquired since the date of the Financial Statements, except for any Transferred Assets that have been sold or otherwise disposed of since the date of such Financial Statement and disclosed on Section 3.09 of the Disclosure Schedule.  The Assets are not subject to any Encumbrances other than Permitted Encumbrances.  Following the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement, subject to receipt of necessary third party consents and approvals, including those set forth on Section 3.06 of the Disclosure Schedule, Holdco or an Acquired Company will own, with good and valid title, or lease, under valid and subsisting leases, or have legal right or license to use, or otherwise acquire, the Assets, free and clear of any Encumbrances, other than Permitted Encumbrances.

(b)      The Assets are adequate in all material respects to conduct the Business as currently conducted; provided, however, that nothing in this Section 3.16(b) shall be deemed to constitute a representation or warranty as to the adequacy of the amounts of working capital (or the availability of the same) or as to the sufficiency of any assets of the type included in the definition "Excluded Assets".

SECTION 3.17 <u>Employee Benefit Plans</u>.

(a)    <u>Plans and Plan Documents</u>.  <u>Section 3.17(a)</u> of the Disclosure Schedule correctly and completely lists the material Parent Plans and the material Company Plans and identifies each as either a Parent Plan or a Company Plan.  With respect to each material Parent Plan and material Company Plan that is in writing, Parent has made available to Holdco a current, true and complete copy of such Parent Plan and Company Plan and all amendments thereto (or, to the extent no such copy exists, an accurate description).  No Parent Plan or Company Plan provides benefits to any individual who is not a Business Employee or current or former independent contractor of Parent or an Acquired Company or the dependents or other beneficiaries of a Business Employee or such an independent contractor.

(b)    <u>Plan Compliance</u>.  Each Parent Plan and Company Plan is and has been operated in all material respects in accordance with its terms and the requirements of all applicable Laws and has been properly approved by Parent or an Acquired Company, as applicable.  Each of Parent and the Acquired Companies, as applicable, has performed in all material respects the obligations required to be performed by it under, is not in material default under or in material violation of, and Parent has no Knowledge of, any material default or violation by any party to, any Parent Plan or Company Plan.  No Action is pending or threatened with respect to any Parent Plan or Company Plan (other than claims for benefits in the ordinary course).

(c)    <u>Qualification of Certain Plans</u>.  Each Parent Plan and Company Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS with respect to the most recent applicable determination letter filing period or has timely applied to the IRS for such a letter or is the subject of a favorable IRS opinion or advisory letter.

(d)    <u>Pension Plans</u>.  Neither Parent nor any of the Acquired Companies (nor any predecessor of any such entity) sponsors, maintains, administers or contributes to, or has any obligation or liability with respect to, or has in the past six years sponsored, maintained or contributed to, or had any obligation or liability with respect to, (i) any "employee pension benefit plan" that is subject to Title IV of ERISA, (ii) any "multiemployer plan", as defined in Section 3(37) of ERISA, (iii) any "multiple employer plan" as described in Section 413(c) of the Code or (iv) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA).

(e)    <u>Section 409A</u>.  No Business Employee is entitled to receive any Tax gross-up, indemnity or reimbursement from Parent or the Acquired Companies for any Tax incurred by such Business Employee, including under Section 409A or Section 4999 of the Code. Each Parent Plan and Company Plan, and any award thereunder, that is or forms part of a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code is in a form and has been operated and administered in compliance with all applicable requirements of Section 409A of the Code in all material respects.

(f)    <u>Post-Employment Health and Life Insurance Benefits</u>.  Neither Parent nor any of the Acquired Companies has any current or anticipated material liability in respect of, and

28

no Parent Plan or Company Plan provides or promises, any post-employment, health or life insurance benefits to any current or former Business Employee except (i) as required under Section 4980B of the Code or any other Law, (ii) in connection with severance benefits, or (iii) through the end of the month in which a termination of employment occurs.

(g)     Transaction Payments; Section 280G.    Neither the execution of this Agreement nor the consummation of the transactions contemplated under this Agreement shall (either alone or in conjunction with the termination of employment or service of any Business Employee following, or in connection with, the transactions contemplated hereby): (i) entitle any Person to severance pay or benefits or any increase in severance pay or benefits upon any termination of employment or service; accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, or increase the amount payable or trigger any other obligation pursuant to, any Parent Plan or Company Plan; or (ii) limit or restrict the right of the Acquired Companies or Holdco to merge, amend or terminate any Company Plan. The consummation of the transactions contemplated by this Agreement will not cause any amounts payable under the Company Plans or Parent Plans to fail to be deductible for U.S. federal income tax purposes by virtue of Section 280G of the Code.

(h)     No Undisclosed Plans.    Neither Parent nor any Acquired Company has any commitment (i) to create, incur liability with respect to or cause to exist any other material compensation, benefit, fringe benefit or other plan, program, arrangement or agreement or to enter into any material contract or agreement to provide compensation or benefits to any individual, in each case other than as required by the terms of Parent Plans and the Company Plans as in effect as of the date hereof or (ii) to materially modify, change or terminate any material Parent Plan or materially modify, change or terminate any material Company Plan, other than a modification, change or termination required by applicable Law.

(i)     Non-U.S. Plans.    With respect to each Parent Plan and Company Plan that is maintained outside of the United States or that provides benefits outside of the United States: (i) the fair market value of the assets of each funded Parent Plan and Company Plan, the liability of each insurer for any Parent Plan and Company Plan funded through insurance or the book reserve established for any Parent Plan and Company Plan, together with any accrued contributions, is sufficient in all material respects to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Parent Plan and Company Plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such Parent Plan and Company Plan, and no transaction contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit obligations; (ii) from and after the Closing, the Acquired Companies shall receive the full benefit of any such funds, accruals or reserves under each Company Plan; and (iii) each Parent Plan and Company Plan required to be registered with applicable Governmental Authority has been registered and has been maintained in good standing in all material respects.

(j)     Indemnification Agreements.    No Acquired Company is a party to any Benefit Plan or Contract that would require such Acquired Company to provide any indemnification, contribution, advancement or reimbursement of expenses or similar rights to any current or former director or officer of Parent with respect to such Person's role at Parent.

SECTION 3.18 <u>Labor and Employment Matters</u>.

(a)    <u>Business Employees</u>.  <u>Section 3.18(a)</u> of the Disclosure Schedule contains a list effective as of not more than five (5) days prior to the date hereof of all of the current Business Employees by name, title, years of service, location, employing entity and annual base cash compensation (including annual base salary and annual target bonus), except to the extent that such information may not be disclosed under applicable data privacy and protection Laws.

(b)    <u>Collective Bargaining</u>.  There are no collective bargaining agreements that cover any of the Business Employees to which Parent or any Acquired Company is a party, and there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit relating to any Business Employee.  There is no strike, work stoppage or lockout pending, or threatened, by or with respect to any Business Employees.

(c)    <u>Compliance with Laws</u>.  Parent and the Acquired Companies are and have been in compliance in all material respects with all Laws related to the employment of labor, including those related to wages, hours, worker classification, occupational safety and health and collective bargaining.  No Liability for termination notice or severance has been incurred with respect to any Business Employees under the WARN Act prior to the date hereof.  No Action is pending or threatened with respect to any Business Employee.  Except as set forth in <u>Section 3.18(c)</u> of the Disclosure Schedule, no notice with respect to the transactions contemplated hereby is required to be provided to any Business Employee for any purpose.

(d)    <u>Complaints of Sexual Harassment</u>.  Except as disclosed to counsel for the Agent in writing prior to the date of the Restructuring Support Agreement, there is no, and for the past six years, there has not been any, litigation pending or threatened against Parent or any Acquired Company, in each case, involving allegations of sexual harassment, sex-based discrimination or sexual misconduct.  Parent and the Acquired Companies have taken appropriate action with respect to any allegations of sex-based discrimination, sexual harassment, sexual misconduct or breach of any policy of Parent or the Acquired Companies relating to the foregoing, in each case (i) involving any current or former officer or director in relation to his or her work at Parent or the Acquired Companies and (ii) in accordance with any written policies related thereto.

SECTION 3.19 <u>Taxes</u>.

(a)    <u>Tax Returns</u>.  All income and other material Tax Returns required to have been filed with respect to the Acquired Companies and the Transferred Assets have been timely filed (taking into account any extension of time to file granted or obtained) and such Tax Returns have been true, correct and complete in all material respects.  All income and other material Taxes of the Acquired Companies (whether or not shown on any Tax Return as owing) have been paid or will be timely paid.

(b)    <u>Tax Audits</u>.  No examination or audit of any Tax Return of any of the Acquired Companies by any Taxing Authority is currently in progress, and to the Knowledge of Parent, no such examination or audit has been threatened in writing.

(c)     <u>Tax Allocation Agreements</u>.  None of the Acquired Companies is a party to any Tax allocation or Tax sharing agreement (other than an agreement the principal subject matter of which is not Taxes) with any Person (other than Parent and other than any such agreement solely between or among the Acquired Companies), and after the Closing Date, none of the Acquired Companies will be bound by any such agreement or similar arrangement entered into prior to the Closing Date or will have any unsatisfied liability thereunder for any amounts due in respect of periods prior to the Closing Date.

(d)     <u>Consolidated Groups</u>.  None of the Acquired Companies (i) has been a member of a consolidated, combined, unitary, or affiliated Tax group (other than a group each of the members of which is an Acquired Company) or (ii) has any actual or potential liability for Taxes of another Person (other than other Acquired Companies) by reason of having been a member of a consolidated, combined, unitary, or affiliated Tax group, by operation of Law, as a transferee or successor, or by contract.

(e)     <u>Waiver of Statute of Limitations</u>.  None of the Acquired Companies has (i) waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to any material Tax assessment or deficiency or (ii) made or entered into any material consent or agreement as to Taxes that will remain in effect following the Closing Date.

(f)     <u>Section 355</u>.  Within the past 2 years, none of the Acquired Companies has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under Section 355(a) of the Code (or any other similar provision of state, local, or foreign Law).

(g)     <u>Encumbrances</u>.  There are no Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the Transferred Assets or any of the Acquired Company Assets.

(h)     <u>Listed Transactions, etc.</u>  Neither Parent nor any of the Acquired Companies have: (i) participated in any "listed transaction" as defined in Section 6707A(c)(2) of the Code or the Regulations promulgated thereunder (or any similar provision of state, local or non-U.S. Law), (ii) consummated or participated in any transaction which was or is a "tax shelter" transaction, as defined in Section 6662 or Section 6111 of the Code or the Regulations promulgated thereunder (or any similar provision of state, local or non-U.S. Law), or (iii) participated or engaged in any other transaction that is subject to similar disclosure requirements pursuant to a corresponding or similar provision of state, local or non-U.S. Tax Law.

SECTION 3.20 <u>Material Contracts</u>.

(a)     <u>Section 3.20(a)</u> of the Disclosure Schedule sets forth each of the following Contracts (other than Parent Plans and Company Plans) to which (i) an Acquired Company is a party or (ii) Parent is a party (but only to the extent such Contract is Related to the Business and, subject to obtaining the consents set forth in <u>Section 3.20(b)</u> of the Disclosure Schedule, would be transferred to Holdco hereunder), in each case of clauses (i) and (ii), in effect as of the date of this Agreement (such Contracts being "<u>Material Contracts</u>"):

(i)      any Contract for the purchase of materials, supplies, goods, services, equipment or other assets (other than purchase orders) providing for annual payments in excess of $750,000 and is not cancelable without penalty or further payment and without more than 120 days' notice;

(ii)     any Contract concerning the establishment or operation of a corporate or commercial partnership or joint venture (other than any Contract related to any Excluded Assets);

(iii)    all Contracts restricting the right of Parent or any of the Acquired Companies to compete with any Person;

(iv)    any Contract entered into within the one-year period prior to the date hereof relating to the acquisition or disposition (whether by merger, sale of stock, sale of assets or otherwise) of any material business, corporation, partnership, association, joint venture or other business organization, or any division, operating unit or product line of the Business with respect to which there remains outstanding obligations on the part of Parent or any Acquired Company;

(v)     all Company IP Agreements, other than, (A) in the case of Contracts granting a license to use Intellectual Property of any Person to an Acquired Company, (1) agreements with employees or independent contractors entered into in the ordinary course of business, (2) Open Source Software licenses and Software licenses that govern the use of non-customized Software that is commercially available to the public generally, (3) licenses that are implied by or incidental to the sale or purchase of products or services in the ordinary course of business, (4) confidentiality or non-disclosure agreements entered into in the ordinary course of business, (5) any agreement between or among Afiniti, Inc. or any of its Subsidiaries on one hand and any of the Acquired Companies on the other hand, and (6) any agreement between or among Parent, the Excluded Bermuda Subsidiaries or any Subsidiary of the Excluded Bermuda Subsidiaries on one hand and Afiniti, Inc. or any of its Subsidiaries or any Acquired Company on the other hand, and, (B) in the case of Contracts granting a license to use the Owned Intellectual Property to any Person, (1) confidentiality or non-disclosure agreements entered into in the ordinary course of business, (2) agreements with employees or contractors, entered into in the ordinary course of business, (3) non-exclusive licenses in customer agreements entered into in the ordinary course of business, and (4) non-exclusive licenses granted to receive the benefit of services from third party service providers entered into in the ordinary course of business;

(vi)    all Transferred IP Agreements, other than, (A) in the case of Contracts granting a license to use Intellectual Property of any Person to an Acquired Company, (1) agreements with employees or independent contractors entered into in the ordinary course of business, (2) Open Source Software licenses and Software licenses that govern the use of non-customized Software that is commercially available to the public generally, (3) licenses that are implied by or incidental to the sale or purchase of products or services in the ordinary course of

business, and (4) confidentiality or non-disclosure agreements entered into in the ordinary course of business, and, (B) in the case of Contracts granting a license to use the Owned Intellectual Property to any Person, (1) confidentiality or non-disclosure agreements entered into in the ordinary course of business, (2) agreements with employees or contractors, entered into in the ordinary course of business, (3) non-exclusive licenses in customer agreements entered into in the ordinary course of business, and (4) non-exclusive licenses granted to receive the benefit of services from third party service providers entered into in the ordinary course of business;

(vii)    all Contracts relating to Indebtedness of any of the Acquired Companies;

(viii)    all Contracts with any Governmental Authority involving total annual payments in excess of $750,000; and

(ix)    all other Contracts that are material to the Business taken as a whole.

(b)    Each Material Contract (i) is valid and binding on Parent or the Acquired Company, as applicable, party thereto, and, to the Knowledge of Parent, the counterparties thereto, and is in full force and effect and (ii) upon consummation of the transactions contemplated by this Agreement, except to the extent that any consents set forth in Section 3.05(c) of the Disclosure Schedule are not obtained, shall continue in full force and effect in accordance with its terms as of the date hereof.  Parent or the Acquired Company, as applicable, party thereto is not in material breach of, or material default under, any Material Contract to which it is a party and, as of the date hereof, to the Knowledge of Parent, no counterparty thereto is in material breach of, or material default under, any Material Contract.

SECTION 3.21 Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or the Ancillary Agreements based upon arrangements made by or on behalf of Parent or any Acquired Company.

SECTION 3.22 Disclaimer of Parent.  EXCEPT AS SET FORTH IN THIS ARTICLE III, THE TRANSFERRED ASSETS ARE BEING SOLD ON AN "AS IS" BASIS AS OF THE CLOSING IN THEIR CONDITION AS OF CLOSING WITH "ALL FAULTS" AND NONE OF PARENT OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PROVISIONAL LIQUIDATORS) MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE ACQUIRED COMPANIES, THE BUSINESS, THE SHARES, ANY OF THE ASSETS OR ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING WITH RESPECT TO (I) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, (II) THE OPERATION OF THE BUSINESS BY HOLDCO AFTER THE CLOSING, (III) THE PROBABLE SUCCESS OR PROFITABILITY OF THE BUSINESS AFTER THE CLOSING, (IV) ANY FINANCIAL

PROJECTION OR FORECAST RELATING TO PARENT OR THE BUSINESS, (V) ANY OTHER INFORMATION MADE AVAILABLE TO HOLDCO, ITS AFFILIATES AND ITS AND THEIR RESPECTIVE REPRESENTATIVES, OR (VI) AS TO ANY OTHER MATTER OR THING. ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED.   NONE OF PARENT OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PROVISIONAL LIQUIDATORS) WILL HAVE OR BE SUBJECT TO ANY LIABILITY OR INDEMNIFICATION OBLIGATION TO HOLDCO OR TO ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO HOLDCO, ITS AFFILIATES OR REPRESENTATIVES OF, OR HOLDCO'S USE OF, ANY INFORMATION RELATING TO THE BUSINESS AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO HOLDCO, WHETHER ORALLY OR IN WRITING, IN CERTAIN "DATA ROOMS," MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF HOLDCO OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF HOLDCO

Holdco hereby represents and warrants to Parent as follows:

SECTION 4.01 Organization and Authority of Holdco.  Holdco is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to enter into this Agreement and each Ancillary Agreement to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Holdco is duly licensed or qualified to do business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not materially and adversely affect the ability of Holdco to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and each Ancillary Agreement to which it is a party.  The execution and delivery by Holdco of this Agreement and each Ancillary Agreement to which it is a party, the performance by Holdco of its obligations hereunder and thereunder and the consummation by Holdco of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Holdco.  This Agreement has been, and upon their execution each Ancillary Agreement to which Holdco is a party shall have been, duly executed and delivered by Holdco, and (assuming due authorization, execution and delivery by Parent) this Agreement constitutes, and upon their execution each Ancillary Agreement to which Holdco is a party shall constitute, legal, valid and binding obligations of Holdco, enforceable against Holdco in accordance with their respective terms, subject to the Enforceability Exceptions.

SECTION 4.02 No Conflict.  Assuming the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in Section 4.03,

the execution, delivery and performance by Holdco of this Agreement and the Ancillary Agreements to which it is a party do not and will not (a) violate or result in the breach of any provision of its organizational documents, (b) violate any Law or Governmental Order applicable to Holdco or its respective assets, properties or businesses or (c) result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, permit, franchise or other instrument or arrangement to which Holdco is a party, except, in the case of clauses (b) and (c), as would not materially and adversely affect the ability of Holdco to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is a party.

SECTION 4.03 <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance by Holdco of this Agreement and each Ancillary Agreement to which Holdco is a party do not and will not require any consent, approval, authorization or other order of, action by, filing with, or notification to, any Governmental Authority, except (a) as described in <u>Section 4.03</u> of the Disclosure Schedule, or (b) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by Holdco of the transactions contemplated by this Agreement and each Ancillary Agreement to which Holdco is a party.

SECTION 4.04 <u>Investment Purpose</u>.  Holdco is acquiring the Shares solely for the purpose of investment and not with a view to, or for offer or sale in connection with, any distribution thereof other than in compliance with all applicable Laws, including United States federal securities laws.  Holdco agrees that the Shares may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and any applicable state or foreign securities Laws, except pursuant to an exemption from such registration under the Securities Act and such Laws.  Holdco is able to bear the economic risk of holding the Shares for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

SECTION 4.05 <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Holdco.


# ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01 <u>Third Party Consents</u>.

(a)      Holdco and Parent shall use commercially reasonable efforts to obtain the consents, approvals and authorizations set forth on <u>Schedule 5.01</u>; <u>provided</u> that no Party or Acquired Company shall be required to compensate any third party, commence or participate in

litigation or offer or grant any accommodation (financial or otherwise) to any third party to obtain any such consent or approval; provided, further, (i) that the obtaining of any such consents shall not be deemed to be conditions to the obligations of the Parties to consummate the transactions contemplated hereby and (ii) in no event shall any Party or Acquired Company be obligated to pay any remuneration or commit to pay any remuneration to any Person to which a Party or Acquired Company is not contractually obligated to pay pursuant to a separate contractual obligation with such Person in connection therewith.

(b)    Notwithstanding anything to the contrary in this Agreement, if any Transferred Asset or Assumed Liability is not able to be transferred to Holdco or, following the transactions contemplated by Section 5.02, the IP Purchaser, as applicable, except with the consent of any third party and such consent has not been obtained by the Closing Date, (i) the transfer of such Transferred Asset or Assumed Liability shall not be effective as of the Closing Date, but rather such Transferred Asset or Assumed Liability shall be transferred to Holdco or, following the transactions contemplated by Section 5.02, the IP Purchaser, as applicable, only upon such time as such consent has been obtained, (ii) each Party shall, and shall cause its Affiliates to, use reasonable best efforts and cooperate with the other Party to obtain such consent as soon as practicable after the Closing Date, and (iii) to the extent permitted under any relevant underlying Contract, Parent shall deliver or remit to Holdco or, following the transactions contemplated by Section 5.02, the IP Purchaser, as applicable, all economic benefit of such Transferred Asset or Assumed Liability and Holdco shall perform the obligations relating to such Transferred Asset or Assumed Liability until such time as such Transferred Asset or Assumed Liability may be assigned to Holdco or, following the transactions contemplated by Section 5.02, the IP Purchaser, as applicable, pursuant to the foregoing clause (i).

SECTION 5.02 IP Transfer.

(a)    Immediately following the Closing and prior to the Subsequent Transfer, Holdco shall, and Parent shall cause Holdco to, assign, transfer, convey and deliver to Afiniti AI Limited, an Irish private limited company (the "IP Purchaser"), and Holdco shall cause the IP Purchaser to acquire from Holdco, all of Holdco's right, title and interest in and to the following assets (the "Transferred IP Assets"):

(i)    all rights of Holdco under the Transferred IP Agreements and under the Assigned Contracts listed or described on Part 2 of Schedule 2.02(a)(vii) under the heading "Other Transferred Agreements";

(ii)    all of Holdco's right, title and interest in and to the Transferred Intellectual Property (but excluding Intent-to-Use Trademark Applications), if any; and

(iii)    all accounts receivable and other claims for money or other obligations (including such receivables and claims owed by an Acquired Company) due to Holdco related to the Transferred Intellectual Property, all IP Proceeds relating to such Transferred Intellectual Property and the Transferred IP Agreements.

(b)     Immediately following the Closing, the IP Purchaser shall, and Holdco and Parent shall cause the IP Purchaser to, assume, and thereafter pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto (collectively, the "Assumed IP Liabilities"):

(i)     all Liabilities arising from or in respect of any Transferred Intellectual Property and all IP Proceeds relating to such Transferred Intellectual Property, arising after the Closing; and

(ii)     all Liabilities of Holdco arising under the Transferred IP Agreements and under the Assigned Contracts listed or described on Part 2 of Schedule 2.02(a)(vii) under the heading "Other Transferred Agreements" assumed by the IP Purchaser.

(c)     To effect the foregoing transactions, Holdco and the IP Purchaser shall execute and deliver duly executed counterparts to the IP Assignment Agreement to be entered into between the IP Purchaser and Holdco substantially in the form of Exhibit C-2, the Assignment and Assumption Agreement to be entered into between the IP Purchaser and Holdco substantially in the form of Exhibit A-2 and the Bill of Sale to be entered into between the IP Purchaser and Holdco substantially in the form of Exhibit B-2, effecting the assignment and assumption by the IP Purchaser of the Transferred IP Agreements and the Assigned Contracts listed or described on Part 2 of Schedule 2.02(a)(vii) under the heading "Other Transferred Agreements" and the Assumed IP Liabilities.

(d)     In consideration for Holdco transferring, conveying and delivering the Transferred IP Assets to IP Purchaser, the IP Purchaser shall issue to Holdco a promissory note (the "Loan Note Instrument"), substantially in the form of Exhibit D in the amount set forth therein.

(e)     As part of the consideration for the Loan Note Instrument, upon the filing and acceptance of a "statement of use" or an "amendment to allege us" with respect to any Intent-to-Use Trademark Application, Holdco shall assign such Trademark application and the underlying Trademark to IP Purchaser, and IP Purchaser shall assume all Liabilities arising therefrom or in respect thereof arising after the Closing. To effect the foregoing, Parent, Holdco and IP Purchaser shall comply with the obligations set forth in this Section 5.02 with respect to such Trademark (as if such Trademark were Transferred Intellectual Property).

(f)     Parent and Holdco shall, and Holdco shall cause the IP Purchaser to, cooperate in good faith in making any necessary filings with Governmental Authorities to effectuate and reflect the transfer of the Transferred Intellectual Property and all IP Proceeds relating to such Transferred Intellectual Property from Parent to Holdco contemplated by Section 2.02(a)(ix) and the transfer of the Transferred Intellectual Property and all IP Proceeds relating to such Transferred Intellectual Property from Holdco to the IP Purchaser contemplated by Section 5.02(a)(ii).

SECTION 5.03 <u>Bulk Transfer Laws</u>.    Holdco hereby waives compliance by Parent with any applicable bulk sale or bulk transfer laws of any jurisdiction in connection with the sale and transfer of the Transferred Assets to Holdco.

SECTION 5.04 <u>Business Assets and Liabilities</u>.

(a)    If, after the Closing Date, Parent receives any funds that are the property of Holdco or its Affiliates, Parent shall remit any such funds promptly to Holdco or such Affiliate.    If, after the Closing Date, Holdco or its Affiliates receive any funds that are the property of Parent, Holdco shall, or shall cause the applicable Affiliate to, remit any such funds promptly to Parent.

(b)    If, after the Closing Date, Parent or Holdco identifies any Transferred Asset that was not previously assigned or otherwise transferred by Parent to Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, then Parent shall promptly assign and transfer the applicable Transferred Asset to Holdco or, following the transactions contemplated by <u>Section 5.02</u>, the IP Purchaser, as applicable, for no additional consideration, subject to the terms and conditions of this Agreement.

(c)    If, after the Closing Date, Parent or Holdco identifies any Excluded Asset that was transferred to Holdco on or after the Closing Date, Holdco shall promptly assign and transfer such Excluded Asset to Parent for no consideration.

SECTION 5.05 <u>No Successor Liability</u>. Holdco shall not be deemed, as a result of any action taken in connection with the transfer or disposition of any assets transferred pursuant hereto, to: (1) be a successor (or other similarly situated party) to Parent, other than with respect to the Assumed Liabilities and any obligations arising under the Assigned Contracts from and after the Closing Date as expressly set forth in this Agreement; or (2) have, de facto or otherwise, merged with or into Parent.    Holdco is not acquiring or assuming any liability, warranty or other obligations of Parent, except as expressly set forth herein.

SECTION 5.06 <u>Attorney-Client Privilege</u>.  Parent intends to transfer, and shall not assert, any Pre-Closing Privileges after the Closing, it being the intention of the parties hereto that all rights to such Pre-Closing Privileges, and all rights to waive or otherwise control such Pre-Closing Privileges, shall be transferred to Holdco, and shall not remain with or be used by Parent. Notwithstanding the foregoing, in the event that a dispute arises between Parent on the one hand and a third party other than Holdco on the other, Parent shall assert the Pre-Closing Privileges on behalf of Holdco to prevent disclosure of the Privileged Materials to such third party; provided, however, that such privilege may be waived only with the prior written consent of Holdco.

SECTION 5.07 <u>IT Assets; Data Centers</u>. Following the date hereof, Parent shall not terminate the lease agreements set forth on <u>Section 5.07</u> of the Disclosure Schedule[8] without the prior written consent of Holdco (such consent not to be unreasonably withheld, conditioned or delayed), in order to allow for the timely removal of certain Transferred Assets from such locations.

SECTION 5.08 <u>Survival</u>.  None of the representations or warranties set forth in this Agreement or any Ancillary Agreement hereto shall survive the Closing.  No Party or any of its respective Affiliates shall have any Liability with respect to any representation or warranty from and after the time that such representation or warranty ceases to survive hereunder (<u>provided</u> that the foregoing shall not limit any for claim of fraud).

# ARTICLE VI

# EMPLOYEE MATTERS

SECTION 6.01 <u>Transferred Employees</u>.  In the case of an individual who is a current Business Employee as of immediately prior to Closing and is not then employed by an Acquired Company (each, a "<u>Transferred Employee</u>"), prior to the Closing Date, Holdco or Parent shall cause the transfer of the employment of such Business Employees to Holdco or an Acquired Company, or as otherwise agreed between the Parties, effective immediately prior to the Closing; <u>provided</u> that Holdco shall not assume any Liabilities with respect to the employment of such Transferred Employees by Parent prior to the Closing (including any Liabilities in respect of transaction bonus and retention bonus agreements), and shall not be required to assume any Contract between Parent and any Transferred Employee.

SECTION 6.02 <u>Notices</u>.  Parent and Holdco and their respective Affiliates shall cooperate in good faith to determine whether any information, consultation and notification may be required under any worker notification Laws applicable to any Business Employees or employee representative bodies (if any) arising in connection with the transactions contemplated by this Agreement and shall honor their respective obligations resulting therefrom.  Parent shall retain or assume all obligations and Liabilities for the provision of notice or payment in lieu of notice or any applicable penalties with respect to Business Employees who were employed by Parent under such worker notification Laws arising as a result of actions taken by Parent on or prior to the Closing.

SECTION 6.03 <u>No Third Party Beneficiaries</u>.  Nothing expressed or implied in this Agreement confers upon any of the Business Employees or any other Person any additional rights or remedies, including any additional right to employment, or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement. Notwithstanding anything herein to the contrary, no provision of this Agreement is intended to, or does, constitute the establishment or adoption of, or amendment to, any Benefit Plan of Parent, an Acquired Company or Holdco, and no person participating in any such Benefit Plan maintained by Parent, an Acquired Company or Holdco shall have any claim or cause of action,

---

[8]        <u>**Note to Draft**</u>: To include the data center lease and office lease in Bermuda.

under ERISA or otherwise, in respect of any provision of this Agreement as it relates to any such Benefit Plan or otherwise.

## ARTICLE VII

## TAX MATTERS

SECTION 7.01 Conveyance Taxes.  Parent shall be liable for, shall hold Holdco and the Acquired Companies harmless against, and agrees to pay any and all Conveyance Taxes, including value added Taxes, that may be imposed upon, or payable or collectible or incurred in connection with this Agreement and the transactions contemplated hereby.  Holdco and Parent agree to cooperate in the execution and delivery of all instruments and certificates necessary to enable Holdco to comply with any pre-Closing filing requirements, including value added Tax invoices.

SECTION 7.02 Miscellaneous.

(a)    For purposes of this Article VII, all references to Holdco, Parent, Affiliates and the Acquired Companies shall include successors.

(b)    Notwithstanding any provision in this Agreement to the contrary, the covenants and agreements of the Parties contained in this Article VII shall survive the Closing and shall remain in full force until the earlier to occur of (i) the expiration of the applicable statutes of limitations for the Taxes in question (taking into account any extensions or waivers thereof) and (ii) the completion of the liquidation of Parent.

For U.S. federal, and applicable state and local, income tax purposes, the transactions contemplated by this Agreement, taken together with the contemplated transfer of the issued and outstanding shares of capital stock or other equity interests in Holdco to Afiniti Newco Holdings LLC ("Newco"), which is an Affiliate of VCP Capital Markets LLC, after the Closing on the Closing Date (the "Subsequent Transfer"), shall be treated as a purchase and sale of the Shares and the Transferred Assets described in Section 1001 of the Code, except as otherwise required by applicable Law.

## ARTICLE VIII

## GENERAL PROVISIONS

SECTION 8.01 Expenses.  Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

SECTION 8.02 Notices.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return

receipt requested), or by email (upon confirmation of receipt) to the respective Parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

(a)      if to Parent:

Afiniti, Ltd. (in provisional liquidation)
1701 Pennsylvania Ave. NW, Suite 600
Washington, DC 20006
Attention:   Sam Logan (sam.logan@afiniti.com)
            legal@afiniti.com

and

Afiniti, Ltd. (in provisional liquidation)
Teneo (Bermuda) Ltd.
19 Par-la-Ville Road,
Third Floor, Hamilton,
HM 11, Bermuda
Attention:  Mike Morrison (mike.morrison@teneo.com)
            Charles Thresh (charles.thresh@teneo.com)

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:   George Davis (george.davis@lw.com)
            David Hammerman (david.hammerman@lw.com)
            Meghana Vunnamadala (meghana.vunnamadala@lw.com)

and

Latham & Watkins LLP
330 North Wabash, Suite 2800
Chicago, IL 60611
Attention:  Jason Gott (jason.gott@lw.com)
            Jonathan Gordon (jonathan.gordon@lw.com)

(b)      if to Holdco:

Afiniti AI Holdings LLC
c/o Afiniti, Ltd.
1701 Pennsylvania Ave. NW, Suite 600
Washington, DC 20006
Attention:   Sam Logan (sam.logan@afiniti.com)
            legal@afiniti.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:   George Davis (george.davis@lw.com)
                    David Hammerman (david.hammerman@lw.com)
                    Meghana Vunnamadala (meghana.vunnamadala@lw.com)

and

Latham & Watkins LLP
330 North Wabash, Suite 2800
Chicago, IL 60611
Attention:  Jason Gott (jason.gott@lw.com)
                    Jonathan Gordon (jonathan.gordon@lw.com)

(c)        and in each case a copy (which shall not constitute notice) shall be sent to:

Afiniti Newco Holdings LLC
c/o VCP CAPITAL MARKETS, LLC
Four Embarcadero Center, 20th Floor
San Francisco, CA 94111
Attention:   David Flannery (dflannery@vistacreditpartners.com)

and

Allen Overy Shearman Sterling US LLP
599 Lexington Avenue
New York, NY  10022
Attention:  Mark Shapiro (Mark.Shapiro@AOShearman.com)
                    Michael Dorf (MDorf@AOShearman.com)
                    Frank Oliver (Frank.Oliver@AOShearman.com)


        SECTION 8.03 <u>Public Announcements</u>.  Neither Party shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated by this Agreement or otherwise communicate with any news media without the prior written consent of the other Party unless otherwise required by Law or applicable stock exchange regulation, and, to the extent practicable, the Parties shall cooperate as to the timing and contents of any such press release, public announcement or communication; <u>provided</u>, <u>however</u>, that the prior written consent of the other Party shall not be required hereunder with respect to any press release, public announcement or communication that is substantially similar to a press release, public announcement or communication previously issued with the prior written consent of such other Party.

SECTION 8.04 <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

SECTION 8.05 <u>Entire Agreement</u>.  This Agreement and the Ancillary Agreements constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, between Parent and Holdco with respect to the subject matter hereof and thereof.

SECTION 8.06 <u>Assignment</u>.  This Agreement may not be assigned by operation of law or otherwise without the express written consent of Parent and Holdco (which consent may be granted or withheld in the sole discretion of Parent or Holdco), as the case may be.

SECTION 8.07 <u>Amendment</u>.  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, Parent and Holdco or (b) by a waiver in accordance with <u>Section 8.08</u>.

SECTION 8.08 <u>Waiver</u>.  Either Party may (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered or made available by the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of either Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

SECTION 8.09 <u>No Third Party Beneficiaries</u>.  Save in respect of the limitation of the liability of the Provisional Liquidators under <u>Section 8.15</u>, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

SECTION 8.10 <u>Currency</u>.  Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

SECTION 8.11 <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  All Actions arising out of or

relating to this Agreement shall be heard and determined exclusively in any New York federal court sitting in the Borough of Manhattan of The City of New York; provided, however, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of The City of New York.   Consistent with the preceding sentence, each of the Parties hereby (a) submits to the exclusive jurisdiction of any federal or state court sitting in the Borough of Manhattan of The City of New York for the purpose of any Action arising out of or relating to this Agreement brought by either Party; (b) agrees that service of process will be validly effected by sending notice in accordance with Section 8.02; and (c) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above named courts.

SECTION 8.12 Waiver of Jury Trial.   EACH OF THE PARTIES HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.   EACH OF THE PARTIES HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.12.

SECTION 8.13 Specific Performance.   The Parties acknowledge and agree that the Parties will be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached and that any non-performance or breach of this Agreement by any Party could not be adequately compensated by monetary damages alone and that the Parties would not have any adequate remedy at law.   Accordingly, in addition to any other right or remedy to which any Party may be entitled, at law or in equity (including monetary damages), such Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to seek temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement without posting any bond or other undertaking.   Without limiting the generality of the foregoing, the Parties agree that Parent shall be entitled to enforce specifically Holdco's obligation to consummate the transactions contemplated by this Agreement (including the obligation to consummate the Closing).   The Parties agree that they will not contest the appropriateness of specific performance as a remedy.

SECTION 8.14 Counterparts.   This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in

"pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

SECTION 8.15 <u>Liability of Provisional Liquidators</u>.

(a)     The Provisional Liquidators were appointed by the Bermuda Court to manage Parent's affairs, business, and properties as agents and without personal liability. Additionally, neither the Provisional Liquidators, nor any agent, advisor, representative, Affiliate, employee, partner, servant, trustee, attorney, or other person acting on behalf of, or otherwise related to or affiliated with the Provisional Liquidators shall have any personal liability (save in respect of fraud or dishonesty) directly or indirectly, under or in connection with: (i) this Agreement or the Ancillary Agreements or by virtue of, this Agreement or the Ancillary Agreements or any agreement made or entered into under or pursuant to the provisions of this Agreement; (ii) in relation to any related matter or claim howsoever, whenever, and wherever arising, and whether such claim be formulated in contract, restitution, tort or by reference to any other remedy or right, and in whatever jurisdiction or forum; (iii) by reason of their acting in the capacity as agents of Parent; (iv) whether or not acting as agents of Parent, by reason of their acting in the name and on behalf of Parent; (v) in respect of any transfer or assignment made pursuant to this Agreement; or (vi) any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

(b)     The Provisional Liquidators have entered into this Agreement in their personal capacities solely for the purpose of obtaining the benefit of the provisions in their favor.

(c)     Neither the Provisional Liquidators nor their firm, staff, agents or employees shall be liable in respect of any deed or document executed with a view to, or for the purpose of putting this Agreement into effect, whether or not such deed or document so provides in its terms and the Provisional Liquidators shall be entitled at any time to have any such deeds or documents amended at any time to include an exclusion of personal liability on the terms as set out in <u>Section 8.15(a)</u>.

(d)     Any instrument or deed of transfer in respect of the transfer of the Shares and the Transferred Assets provided by Parent to Holdco shall contain no new liabilities on the part of Holdco and shall include a complete exclusion of personal liability on the part of the Provisional Liquidators.

(e)     The Provisional Liquidators' obligations under this Agreement shall absolutely cease upon termination of their appointment or vacation of their office as provisional liquidators of Parent.

SECTION 8.16 <u>Acknowledgments, Exclusions, Limitations and Agreements</u>. It is agreed that, other than in the case of fraud or dishonesty, the acknowledgements, exclusions, limitations and agreements which are set out in <u>Schedule 8.16</u> to this Agreement shall take effect as if set out in full in this clause and take effect in favor of the Provisional Liquidators, and subject to <u>Section 8.15(e)</u>, shall remain in full force and effect after Closing.

*[Remainder of Page Intentionally Left Blank.]*

IN WITNESS WHEREOF, Parent, the Provisional Liquidators, acting as agents without personal liability, and Holdco have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

PARENT:

AFINITI, LTD., a Bermuda exempted company in provisional liquidation acting by its joint provisional liquidators Mike Morrison and Charles Thresh of Teneo (Bermuda) Ltd.

By: _____

      Name:

      Title:

PROVISIONAL LIQUIDATORS by [●], one of the joint Provisional Liquidators, signing without personal liability

By: _____

      Name:

      Title:

HOLDCO:

AFINITI AI HOLDINGS LLC

By: _____

      Name:

      Title:

<u>Exhibit A-1</u>

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT (HOLDCO)

Exhibit A-2

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT (IP PURCHASER)

Exhibit B-1

FORM OF BILL OF SALE (HOLDCO)

<u>Exhibit B-2</u>

FORM OF BILL OF SALE (IP PURCHASER)

<u>Exhibit C-1</u>

FORM OF IP ASSIGNMENT AGREEMENT (HOLDCO)

Exhibit C-2

FORM OF IP ASSIGNMENT AGREEMENT (IP PURCHASER)

Exhibit D

FORM OF LOAN NOTE INSTRUMENT

**Schedule 8.16**

**Acknowledgements, Exclusions, Limitations and Agreements as regards to the Provisional Liquidator**

1.      Holdco agrees that the terms and conditions of this Agreement and the exclusions and limitations contained in it are fair and reasonable having regard to the following:

   a.  that this is a sale by a company in provisional liquidation in circumstances where the Provisional Liquidators' knowledge of the Shares and Transferred Assets is necessarily limited and it is usual that no representations and warranties are given by or on behalf of the Provisional Liquidators in their capacities as provisional liquidators (other than that the Provisional Liquidators warrant that they have the power to sell the Shares and Transferred Assets for and on behalf of Parent);

   b.  Parent is in provisional liquidation and faces the constraints of selling necessarily imposed on it in that circumstance;

   c.  that it has relied solely on the basis of the representations, warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in <u>Section 8.15</u>) and on the opinions of itself and its professional advisers concerning the Shares and Transferred Assets and their quality, condition, description, fitness and/or suitability for any purpose;

   d.  that it has agreed to purchase the Shares and Transferred Assets for a consideration which takes into account the risk to Holdco represented by the Parties' belief that the said exclusions and limitations are or would be recognized by the courts; and

   e.  that it and its representatives and advisers have been given every opportunity to examine and inspect all relevant documents relating to the Shares and Transferred Assets and is aware of the need to rely on such opportunity by reason of the absence of warranties by or on behalf of the Provisional Liquidators in their capacities as provisional liquidators (other than that the Provisional Liquidators warrant that they have the power to sell the Shares and Transferred Assets for and on behalf of Parent).

2.      Holdco acknowledges that it has entered into this Agreement solely on the basis of the representations, warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in <u>Section 8.15</u>), and it has not entered into this Agreement on the basis of or in reliance upon any representations, agreements, statements, warranties or replies to specific enquiries (whether oral or written) made or given or alleged to have been made or given by the Provisional Liquidators in their capacities as provisional liquidators or their representatives (whether that party is a Party to this Agreement or not, other than Parent) at any time (other than that the Provisional Liquidators warrant that

they have the power to sell the Shares and Transferred Assets for and on behalf of Parent).

3.      Notwithstanding any other provision of this Agreement, the Provisional Liquidators shall be required to reimburse Holdco for any liability discharged by Holdco where that liability constitutes a provable debt in Parent's provisional liquidation. Nothing in this Agreement shall require the Provisional Liquidators to discharge a liability as a Provisional Liquidation Expense that would otherwise be an unsecured claim in Parent's provisional liquidation. Any claim of Holdco, or of any Person claiming through Holdco, against the assets of Parent shall not take effect otherwise than as an unsecured claim, nor shall any claim against the Provisional Liquidators be considered a Provisional Liquidation Expense.

4.      The exclusions in this Schedule shall:

   a.   not limit the covenants and agreements of Parent in this Agreement, including the representations and warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in Section 8.15);

   b.    operate as waivers of any claims against the Provisional Liquidators in tort and restitution as well as under the law of contract or under applicable legislation or regulations;

   c.   continue notwithstanding completion of this Agreement in whole or in part;

   d.   continue notwithstanding the Provisional Liquidators ceasing to act as provisional liquidators of Parent; and

   e.   be in addition to any relief available to the Provisional Liquidators.

5.      Nothing in this Agreement shall:

   a.   operate to restrict or affect in any way any right of the Provisional Liquidators to cease to act as provisional liquidators of Parent; or

   b.   require the Provisional Liquidators to discharge in whole or in part any liability of Parent outstanding at the time of the Provisional Liquidators' appointment as provisional liquidators of Parent or which would not otherwise be payable as a Provisional Liquidation Expense.

6.      Holdco hereby agrees and accepts that:

   a.   any claim surviving after the Closing Date against any JPL Party, or any of them or their firms or their partners, employees, agents, advisers or representatives shall, in any event and in addition to the above exclusions of liability of the Provisional Liquidators, be irrevocably waived unless made in writing by notice to Parent or the JPL Party, as appropriate, not later than the date on which the

Provisional Liquidators cease to hold office as provisional liquidators of Parent; and

b.  without prejudice to all and any other provision of this Agreement, any claim of it, or of any Person claiming through, under or in relation to it, shall not in any circumstances exceed the consideration payable hereunder.

**<u>Exhibit H</u>**

**Securities Transfer Agreement**

*Agreed Form*

_____

SECURITIES TRANSFER AGREEMENT[1]

_____

Between

AFINITI, LTD. (in provisional liquidation)

and

the JOINT PROVISIONAL LIQUIDATORS

and

AFINITI NEWCO HOLDINGS LLC

Dated as of [●], 2024

---

[1] THIS DOCUMENT IS FOR DISCUSSION PURPOSES ONLY AND SHALL NOT CREATE A LEGALLY BINDING OR ENFORCEABLE OFFER OR AGREEMENT UNLESS AND UNTIL FULLY EXECUTED.

## TABLE OF CONTENTS

**Page**

ARTICLE I

DEFINITIONS

SECTION 1.01 Certain Defined Terms.................................................................2
SECTION 1.02 Definitions.................................................................................9
SECTION 1.03 Interpretation and Rules of Construction.............................10

ARTICLE II

PURCHASE AND SALE

SECTION 2.01 Transfer and Acquisition of the Securities and Insurance Policies;
    Assignment of Intercompany Receivables.......................................11
SECTION 2.02 Consideration...........................................................................11
SECTION 2.03 Closing.....................................................................................11
SECTION 2.04 Closing Deliveries by Parent..................................................12
SECTION 2.05 Closing Deliveries by Newco..................................................12

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF PARENT

SECTION 3.01 Organization, Authority and Qualification of Parent............13
SECTION 3.02 Ownership of the Securities....................................................14
SECTION 3.03 Organization, Authority and Qualification of the Acquired Companies...........14
SECTION 3.04 Capitalization of Transferred Companies; Acquired Subsidiaries..................14
SECTION 3.05 No Conflict...............................................................................15
SECTION 3.06 Governmental Consents and Approvals.................................15
SECTION 3.07 Financial Information...............................................................15
SECTION 3.08 Absence of Undisclosed Material Liabilities.........................16
SECTION 3.09 Conduct in the Ordinary Course...........................................16
SECTION 3.10 Litigation..................................................................................17
SECTION 3.11 Compliance with Laws; Permits............................................17
SECTION 3.12 Environmental Matters...........................................................17
SECTION 3.13 Intellectual Property; Information Technology......................18
SECTION 3.14 Data Privacy............................................................................20
SECTION 3.15 Real Property...........................................................................21
SECTION 3.16 Assets; Sufficiency.................................................................21
SECTION 3.17 Employee Benefit Plans..........................................................22
SECTION 3.18 Labor and Employment Matters.............................................24
SECTION 3.19 Taxes........................................................................................24
SECTION 3.20 Material Contracts...................................................................25

i

SECTION 3.21 Intercompany Receivables ............................................................26
SECTION 3.22 Brokers ........................................................................................27
SECTION 3.23 Disclaimer of Parent ....................................................................27

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF NEWCO

SECTION 4.01 Organization and Authority of Newco ...........................................27
SECTION 4.02 No Conflict ...................................................................................28
SECTION 4.03 Governmental Consents and Approvals.........................................28
SECTION 4.04 Investment Purpose ......................................................................28
SECTION 4.05 Brokers ........................................................................................29
SECTION 4.06 Independent Investigation; Parent's Representations .......................29

## ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01 Third Party Consents.....................................................................29
SECTION 5.02 Wrong Pockets .............................................................................29
SECTION 5.03 Restrictive Covenants ...................................................................29
SECTION 5.04 Release from Parent Credit Support Instruments.............................30
SECTION 5.05 "Afiniti" Name .............................................................................30
SECTION 5.06 No Successor Liability ..................................................................31
SECTION 5.07 Survival .......................................................................................31

## ARTICLE VI

## EMPLOYEE MATTERS

SECTION 6.01 Notices .........................................................................................31
SECTION 6.02 No Third Party Beneficiaries ........................................................31

## ARTICLE VII

## TAX MATTERS

SECTION 7.01 Conveyance Taxes ........................................................................31
SECTION 7.02 Miscellaneous...............................................................................32

## ARTICLE VIII

## GENERAL PROVISIONS

SECTION 8.01 Expenses.......................................................................................32
SECTION 8.02 Notices .........................................................................................32
SECTION 8.03 Public Announcements .................................................................33

SECTION 8.04 Severability ........................................................................................34
SECTION 8.05 Entire Agreement ..............................................................................34
SECTION 8.06 Assignment.........................................................................................34
SECTION 8.07 Amendment.........................................................................................34
SECTION 8.08 Waiver.................................................................................................34
SECTION 8.09 No Third Party Beneficiaries ............................................................34
SECTION 8.10 Currency.............................................................................................35
SECTION 8.11 Governing Law ..................................................................................35
SECTION 8.12 Waiver of Jury Trial...........................................................................35
SECTION 8.13 Specific Performance .........................................................................35
SECTION 8.14 Counterparts .......................................................................................36
SECTION 8.15 Liability of Provisional Liquidators..................................................36
SECTION 8.16 Acknowledgments, Exclusions, Limitations and Agreements...........36

EXHIBITS

A                Assumption Agreement

B                Release of Guarantor

C                Bermuda Deed of Release

D                Release of Claims Agreement


SCHEDULES

1.01            Parent's Knowledge

5.01            Third Party Consents

8.16            Limitation of Provisional Liquidator Liability

THIS SECURITIES TRANSFER AGREEMENT (this "Agreement"), dated as of [●], 2024, is made by and between

(1) Afiniti, Ltd., a Bermuda exempted company in provisional liquidation acting by its joint provisional liquidators, whose registered office is 19 Par-la-Ville Road, Third Floor, Hamilton, HM 11, Bermuda ("Parent"),

(2) Mike Morrison and Charles Thresh of Teneo (Bermuda) Ltd. (and including any successors appointed by the Bermuda Court, the "Provisional Liquidators"), acting jointly and severally, and

(3) Afiniti Newco Holdings LLC, a Delaware limited liability company ("Newco"). Parent and Newco are referred to herein as the "Parties".

WHEREAS, Parent owns (i) all of the issued and outstanding shares of capital stock (the "Company Shares") of Afiniti, Inc., a Delaware corporation and a wholly owned subsidiary of Parent (the "Company"), and (ii) all of the issued and outstanding membership interests (the "Holdco Interests" and, together with the Company Shares and the intercompany receivable owed to Parent by the Company, if any, the "Securities") of Afiniti AI Holdings LLC, a Cayman Islands limited liability company and a wholly owned subsidiary of Parent ("Holdco");

WHEREAS, Parent is a holding company that owns, directly and indirectly, the Acquired Companies (as hereinafter defined);

WHEREAS, Parent, through the Acquired Companies, is engaged in the business of developing and providing proprietary enterprise behavioral pairing services that pair contact center customers and agents using data analytics and artificial intelligence to determine the optimal behavioral fits between callers and agents in order to drive business outcomes, and related infrastructure and professional services (the "Business");

WHEREAS, by an Order made by the Supreme Court of Bermuda on September [●] 2024, Parent is in provisional liquidation (the "Provisional Liquidation") under the supervision of the Supreme Court of Bermuda (the "Bermuda Court");

WHEREAS, Parent has completed the transfer of substantially all of its assets and all of the issued and outstanding capital stock or other equity interests of all of its non-U.S. direct subsidiaries (other than the shares of Parent's subsidiaries organized under the laws of Bermuda) to Holdco, pursuant to the Stock and Asset Transfer Agreement (as hereinafter defined) (the "Asset Transfer");

WHEREAS, as of immediately prior to the Closing the sole member of Newco is Vista Credit GP Holdco, LLC, an Affiliate of and acting on behalf of VCP Capital Markets, LLC (the "Agent"), the administrative agent and collateral agent under the Credit Agreement (as hereinafter defined);

1

WHEREAS, upon an application made by the Provisional Liquidators on October [●] 2024, the Bermuda Court has approved and sanctioned *inter alia* Parent's entry into this Agreement; and

WHEREAS, Parent wishes to transfer to Newco, and Newco wishes to acquire from Parent, the Securities, all upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Parent and Newco hereby agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01 <u>Certain Defined Terms</u>.  For purposes of this Agreement:

"<u>Action</u>" means any action, suit, arbitration, litigation, formal investigation or proceeding before or by any Governmental Authority.

"<u>Acquired Companies</u>" means the Transferred Companies and the Acquired Subsidiaries.

"<u>Acquired Subsidiary</u>" means a Subsidiary of a Transferred Company.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"<u>Ancillary Agreements</u>" means the Assumption Agreement, the Release of Guarantor, the Bermuda Deed of Release and the Release of Claims Agreement.

"<u>Assumption Agreement</u>" means the Assumption Agreement to be executed by Newco and Parent at the Closing, substantially in the form of <u>Exhibit A</u>.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Benefit Plan</u>" means any "employee benefit plan" (as defined in Section 3(3) of ERISA), whether written or unwritten and whether or not subject to ERISA, all bonus, stock option, stock purchase, restricted stock, restricted stock unit, phantom stock, stock appreciation right, incentive, deferred compensation, performance award, retiree medical or life insurance, supplemental retirement, severance or other material benefit plans, programs or arrangements, and all employment, termination, severance, change of control, retention or other contracts or agreements with or for the benefit of any current or former employee or independent contractor or any dependent or beneficiary thereof.

2

"Bermuda Debenture" means the Bermuda law debenture, dated as of June 13, 2019, by Parent and the Agent, in favor of the Agent in its capacity as administrative agent under the Credit Agreement, as the same may be modified, amended, or supplemented from time to time.

"Bermuda Deed of Release" means the Deed of Release to be executed by Parent and the Agent at the Closing, substantially in the form of Exhibit C.

"Bermuda Proceeding" has the meaning set forth in the Restructuring Support Agreement.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York.

"Business Employee" means any current or former employee of an Acquired Company.

"Business Intellectual Property" means the Owned Intellectual Property and all Intellectual Property licensed to an Acquired Company pursuant to a Company IP Agreement.

"Business IT Assets" means all (a) IT Assets owned by any of the Acquired Companies and (b) IT Assets licensed to an Acquired Company.

"Chapter 15 Case" has the meaning set forth in the Restructuring Support Agreement.

"Code" means the Internal Revenue Code of 1986, as amended through the date hereof.

"Company IP Agreements" means all (a) Contracts that license or otherwise grant a permission to use Intellectual Property of an Acquired Company to any Person and (b) Contracts that license or otherwise grant a permission to use Intellectual Property of any Person to an Acquired Company.

"Company Plan" means a Benefit Plan sponsored or maintained by the Acquired Companies, or in the case of a Benefit Plan that is a Contract, to which an Acquired Company is a party.

"Contract" means any contract, agreement, license, sublicense, lease, sublease, commitment, or sales or purchase order.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Conveyance Taxes" means all sales, documentary, use, value added, transfer, stamp, stock transfer, registration, and real property transfer or gains and similar Taxes.

"Credit Agreement" means the existing term loan credit agreement, dated as of June 13, 2019 (as amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of July 11, 2019, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of May 4, 2020, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of November 17, 2020, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of December 29, 2020, that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of March 9, 2021, that certain Amendment No. 6 to Term Loan Credit Agreement, dated as of March 12, 2021, that certain Amendment No. 7 to Term Loan Credit Agreement, dated as of May 17, 2021, that certain Amendment No. 8 to Term Loan Credit Agreement, dated as of March 7, 2022, that certain Amendment No. 9 to Term Loan Credit Agreement, dated as of June 13, 2024, that certain Amendment No. 10 to Term Loan Credit Agreement, dated as of July 29, 2024, that certain Amendment No. 11 to Term Loan Credit Agreement, dated as of August 14, 2024, that certain Amendment No. 12 to Term Loan Credit Agreement, dated as of September 12, 2024), among the Company, as borrower, Parent, as parent guarantor, the lenders from time to time party thereto, and the Agent, as amended by that certain Amendment No. 13 to Term Loan Credit Agreement, dated as of [●], 2024, among the Company, Afiniti Newco Holdings LLC, as restructuring second lien co-borrower, the other guarantor parties thereto, and the Agent, as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Disclosure Schedule" means the Disclosure Schedule attached hereto, dated as of the date hereof, delivered by Parent to Newco in connection with this Agreement.

"Encumbrance" means any security interest, pledge, hypothecation, charge, mortgage, lien, license or encumbrance.

"Enforceability Exceptions" means (a) any applicable bankruptcy, insolvency (including Laws relating to fraudulent transfers), reorganization, moratorium or other similar Laws affecting creditors' rights generally and (b) general principles of equity (regardless of whether considered in a proceeding at law or in equity).

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, consent decree or judgment, in each case in effect as of the date hereof, relating to pollution or protection of the environment.

"Environmental Permits" means any permit, approval, identification number, license and other authorization required under or issued pursuant to any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended through the date hereof.

"Excluded Bermuda Subsidiaries" means AFCF, Ltd., a Bermuda exempted company limited by shares, and Afiniti Holdco, Ltd., a Bermuda exempted company limited by shares.

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs.

"Governmental Authority" means any federal, national, state, local or other government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Guaranty" means the Guaranty, dated as of June 13, 2019, by Parent, the Company and the subsidiary guarantors party thereto in favor of the Agent, in its capacity as administrative agent under the Credit Agreement, as the same may be modified, amended, or supplemented from time to time.

"Indebtedness" means, as of any time, without duplication, as applied to any Person: (a) the principal of and accrued and unpaid interest in respect of (i) indebtedness of such Person for money borrowed or indebtedness issued or incurred in substitution or exchange for indebtedness for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments the payment of which such Person is responsible or liable; (b) all obligations of such Person (i) under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities), (ii) under any interest rate, currency, commodity or other hedging, swap, forward or option agreement, (iii) under any performance bond, banker's acceptance or letter of credit, but only to the extent drawn or called prior to the Closing and (iv) for all capitalized lease obligations as determined in accordance with GAAP; (c) all obligations of the type referred to in clauses (a) and (b) of any Person the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (d) for clauses (a) through (c), any termination fees, prepayment penalties, change of control, "breakage" cost or similar payments (but excluding, for the avoidance of doubt, any cash collateral required in respect of any performance bond, banker's acceptance or letter of credit) associated with the repayments of the items set forth in clauses (a) through (c) on the Closing Date to the extent paid on the Closing Date.

"Insurance Policies" means all current and prior insurance policies of Parent that are identified in writing by Parent prior to the date of this Agreement, excluding current and prior director and officer insurance policies, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and all rights to receive refunds of premiums paid with respect thereto.

"Intellectual Property" means all intellectual property in any jurisdiction throughout the world, including the following: (a) patents and patent applications, (b) Trademarks; (c) copyrights, including copyrights in software; (d) registrations and applications for registration of any of the foregoing under subclauses (a) – (c) of this definition; (e) trade

secrets and rights in know how, formulae, methods, techniques, processes, and confidential and proprietary information; and (f) all rights in any of the foregoing provided by international conventions and treaties, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto, including all rights of priority and renewals, all claims for damages and injunctive or other relief for past, present and future infringement, dilution, misappropriation, unlawful imitation or other violation, misuse, conflict or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages or injunctive or other relief.

"Intercompany Agreements" means any Contract, or arrangement or commitment, including any credit or funding agreement, facility or other arrangement, receivable, payable, claim, demand, right, loan, in each case, between or among Parent, the Excluded Bermuda Subsidiaries or any Subsidiary of the Excluded Bermuda Subsidiaries on one hand and the Company or any Acquired Company, on the other hand, excluding the Stock and Asset Purchase Agreement.

"IP Proceeds" means, collectively, all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and any supporting obligations relating to any Intellectual Property.

"IRS" means the Internal Revenue Service of the United States.

"IT Assets" means Software, computers, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment, and all documentation associated with the foregoing.

"JPL Party" means the Provisional Liquidators, their present firms, directors, partners, and employees and any legal entity or partnership affiliated with the Provisional Liquidators using the name "Teneo", and the directors, partners, employees, shareholders and officers of any such entity or partnership.

"Law" means any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Leased Real Property" means the real property leased by the Acquired Companies as tenant, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon (and fixtures attached or appurtenant thereto), as the case may be, and all easements, licenses, rights and appurtenances relating to the foregoing.

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including those arising under any Law, Action or Governmental Order and those arising under any Contract.

"Material Adverse Effect" means any event, circumstance, change, effect, development or condition that, individually or considered together with all other events, circumstances, changes, effects, developments and conditions, has had or would reasonably be

expected to have a material adverse effect on (i) the business, results of operations, assets or financial condition of the Business, taken as a whole; (ii) the ability of the Parties to perform their obligations under this Agreement; or (iii) the ability of Parent to consummate the Restructuring, but, in each case, the commencement and existence of the Bermuda Proceeding or the Chapter 15 Case, and any event, circumstance, or condition directly in relation thereto (including the litigation and/or determination of any matters arising therein) shall not be deemed to constitute or be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect.

"Open Source Software" means all Software that is distributed as "free software," "open source software," "shareware" or under a similar licensing or distribution model, including Software licensed, provided, or distributed under any open source license, including any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Foundation (as promulgated by the Free Software Foundation) or any Software that contains or is derived from any such Software.

"ordinary course of business" or any similar expression means in the ordinary course of the applicable Person's business consistent with past practice, taking into account the fact that insolvency proceedings, or preparation therefor, have commenced.

"Owned Intellectual Property" means all Intellectual Property owned by an Acquired Company.

"Parent Credit Support Instruments" means any guaranty, any keepwell, bonding arrangements, net worth maintenance agreement, letter of credit, reimbursement obligation, letter of comfort or other instrument imposing any obligations on Parent with respect to the Acquired Companies or otherwise for the benefit of the Acquired Companies.

"Parent's Knowledge", "Knowledge of Parent" or similar terms used in this Agreement mean the actual knowledge of the Persons listed in Schedule 1.01 as of the date of this Agreement.

"Parent Plan" means a Benefit Plan sponsored or maintained by Parent, or in the case of a Benefit Plan that is a Contract, to which Parent is a party (other than Company Plan).

"Permitted Encumbrances" means "Permitted Encumbrances" and "Permitted Liens", in each case, as defined in the Credit Agreement.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Personal Data" means any information that identifies an individual Person, including, any information that is defined as "personal data", "personally identifiable information", "personal information", "protected health information" or "sensitive personal information" under any applicable Law.

"Provisional Liquidation Expense" means any amounts properly payable as an expense of the provisional liquidation of Parent.

"Real Property" means all land, buildings, improvements and fixtures erected thereon and all appurtenances related thereto.

"Recognition Motion" means the motion to be filed with the Bankruptcy Court in the Chapter 15 Case seeking (i) recognition of the Bermuda Proceeding and the Restructuring and (ii) recognition of the Sanction Order and enforcement of its terms.

"Recognition Order" means an order approving the Recognition Motion.

"Registered" means issued by, registered or filed with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"Regulations" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

"Related to the Business" means used or held for use by Parent in, or related to, or arising from, the Business.

"Release of Claims Agreement" means the Release of Claims Agreement to be executed by Parent, the Lenders, the Company, the guarantors party to the Credit Agreement, and the Agent at the Closing, substantially in the form of Exhibit D.

"Release of Guarantor" means the Release of Guarantor to be executed by Parent and the Agent at the Closing, substantially in the form of Exhibit B.

"Restructuring" means a restructuring transaction as set forth in the non-binding term sheet attached to the Restructuring Support Agreement, executed on September 17, 2024, by and among Parent, the Company, the guarantors listed on Schedule 1 attached thereto, the Agent, and the lenders from time to time party thereto (including any schedules, annexes and exhibits attached thereto, each as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and the terms of the Restructuring Support Agreement) (the "Restructuring Support Agreement"), and as modified by and as more fully set forth in the Restructuring Support Agreement and in the Definitive Documents (as defined therein).

"Sanction" means individually or collectively, as the context requires, the approval, authorization, confirmation, consent, and/or endorsement of the Restructuring by the Bermuda Court.

"Sanction Order" means an order of the Bermuda Court that, among other things, approves the actions of the Provisional Liquidators in furtherance of the Restructuring.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Software" means software, computer programs, computer applications and code, including source code and object code, and all documentation relating to any of the foregoing.

"Stock and Asset Transfer Agreement" means the Stock and Asset Transfer Agreement, dated as of [●], 2024, between Parent and Holdco.

"Subsidiary" means, with respect to a party hereto, any corporation, partnership, limited liability company or other entity, whether incorporated or unincorporated, of which (a) such party or any other Subsidiary of such party is a managing member or general partner; (b) at least a majority of the securities or other equity interests having by their terms ordinary voting power to elect a majority of the directors or others performing similar functions with respect to such entity is directly or indirectly owned or controlled by such party or by any one or more of such party's Subsidiaries, or by such party and one or more of its Subsidiaries or (c) at least a majority of the equity securities or other equity interests is directly or indirectly owned or controlled by such party or by any one or more of such party's Subsidiaries, or by such party and one or more of its Subsidiaries.

"Tax" or "Taxes" means any and all taxes of any kind, as well as other similar duties or levies (together with any and all interest, penalties, and additions to tax imposed with respect thereto), imposed by any Taxing Authority.

"Taxing Authority" means any Governmental Authority that is responsible for the administration or imposition of any Tax (including any Conveyance Tax).

"Tax Returns" means any and all returns, reports and forms (including elections, claims for refund, declarations, amendments, schedules, information returns and statements, and schedules and attachments thereto) filed or required to be filed with a Taxing Authority with respect to Taxes.

"Trademarks" means trademarks, service marks, trade names, trade dress, domain names and any other identifier of source or origin, together with the goodwill associated therewith.

"Transferred Companies" means the Company and Holdco.

"WARN ACT" means the Worker Adjustment and Retraining Notification Act of 1988, as amended through the date hereof.

SECTION 1.02 Definitions.   The following terms have the meanings set forth in the Sections set forth below:

| Definition | Location |
|---|---|
| "Acquired Company Assets" | 3.16(a) |
| "Afiniti Marks" | 5.05 |
| "Agent" | Recitals |
| "Agreement" | Preamble |
| "AI Tools" | 3.13(j) |

"Asset Transfer" ................................................................ Recitals
"Bermuda Court" ............................................................... Recitals
"Business" ......................................................................... Recitals
"Business Software" .......................................................... 3.13(i)
"Closing" ........................................................................... 2.03
"Closing Date" ................................................................... 2.03
"Company" ........................................................................ Recitals
"Company Shares" ............................................................. Recitals
"Data Protection Requirements" ........................................ 3.14(a)
"Financial Statements" ...................................................... 3.07
"Holdco" ............................................................................ Preamble
"Holdco Interests" ............................................................. Recitals
"IP Transfer" ...................................................................... Recitals
"Lenders" ........................................................................... 2.02
"Material Contracts" .......................................................... 3.20(a)
"Newco" .............................................................................. Preamble
"Newco Group" ................................................................. 5.04
"Parent" .............................................................................. Preamble
"Parties" ............................................................................. Preamble
"Permits" ............................................................................ 3.11
"Provisional Liquidation" ................................................. Recitals
"Provisional Liquidators" ................................................. Recitals
"Securities" ........................................................................ Recitals

SECTION 1.03 <u>Interpretation and Rules of Construction</u>.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)    the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement; the term "as of the date hereof", when used in this Agreement, means as of the date of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)     the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)     references to a Person are also to its successors and permitted assigns;

(h)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day, the period shall end on the immediately following Business Day; and

(i)     the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01 <u>Transfer and Acquisition of the Securities and Insurance Policies;</u> <u>Assignment of Intercompany Receivables</u>.  Upon the terms and subject to the conditions of this Agreement, at the Closing, (a) Parent shall assign, transfer, convey and deliver to Newco, and Newco shall acquire from Parent, all of Parent's right, title and interest in and to the Securities, (b) Parent shall assign, transfer, convey and deliver to Newco or a Subsidiary designated by Newco, and Newco shall, or shall cause such Subsidiary designated by Newco to, acquire from Parent, all of Parent's right, title and interest in and to the Insurance Policies, and (c) Parent shall assign all of its rights under (i) that certain loan receivable owed by the Company to Parent, and (ii) any other intercompany receivables owed by the Company to Parent, to Newco, and Newco shall assume all such rights.  The transfer of the Securities shall be free and clear of all Encumbrances other than (A) those arising under applicable securities Laws or (B) those of the Agent, including any and all claims pursuant to any successor liability or successor-in-interest theory.

SECTION 2.02 <u>Consideration</u>.  In consideration for Parent entering into this Agreement and the Ancillary Agreements with Newco and consummating the transactions contemplated hereby and thereby, the consideration for the Securities shall be the release by the Agent, an Affiliate of the Sole Member, in its capacity as administrative agent under the Credit Agreement, on behalf of the lenders under the Credit Agreement (collectively, the "<u>Lenders</u>"), of any and all liabilities and other obligations of Parent under the Guaranty and the Bermuda Debenture.

SECTION 2.03 <u>Closing</u>.  Subject to the terms and conditions of this Agreement and subject to the satisfaction (or waiver) of the conditions precedent set forth in and pursuant to the terms of Section 15 of the Restructuring Support Agreement, other than those conditions that are to be satisfied (or waived) on the Closing Date, the transfer and acquisition of the Securities and the other transactions contemplated by this Agreement shall take place at a closing (the "<u>Closing</u>") to be held remotely via the exchange of documents and signatures on the date hereof (the day on which the Closing takes place being the "<u>Closing Date</u>").

SECTION 2.04 <u>Closing Deliveries by Parent</u>.  At the Closing, Parent shall deliver or cause to be delivered to Newco:

(a)  evidence of the transfer, reasonably satisfactory to Newco, of the Securities to Newco;

(b)  a duly executed counterpart to the Assumption Agreement substantially in the form of <u>Exhibit A</u>;

(c)  a duly executed counterpart to the Release of Guarantor substantially in the form of <u>Exhibit B</u>;

(d)  a duly executed counterpart to the Bermuda Deed of Release substantially in the form of <u>Exhibit C</u>;

(e)  duly executed counterparts to the Release of Claims Agreement, duly executed by Parent, the Company and the guarantors party to the Credit Agreement substantially in the form of <u>Exhibit D</u>;

(f)  a certificate of the Company, dated as of the Closing Date, complying with the provisions of Treasury Regulations Section 1.1445-2(c)(3) accompanied by a notice to be provided to the U.S. Internal Revenue Service in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2);

(g)  evidence of the termination, reasonably satisfactory to Newco, of each of the Intercompany Agreements, except for those Intercompany Agreements set forth on <u>Section 2.04(g)</u> of the Disclosure Schedule;

(h)  evidence of the completion of the Closing of the Asset Transfer followed by the IP Transfer, each in form and substance reasonably satisfactory to Newco;

(i)  all endorsements and other documentation required by the applicable insurance carriers or brokers under the Insurance Policies to reflect the transfer by Parent to Newco or the applicable Subsidiary of such Insurance Policies;

(j)  all such other documents, agreements, instruments, writings and certificates as Newco may reasonably request as are necessary for Parent to satisfy its obligations hereunder;

(k)  evidence of a Sanction Order from the Bermuda Court; and

(l)  evidence of entry of the Recognition Order by the Bankruptcy Court.

SECTION 2.05 <u>Closing Deliveries by Newco</u>.  At the Closing, Newco shall deliver or cause to be delivered to Parent:

(a)  a duly executed counterpart to the Assumption Agreement substantially in the form of <u>Exhibit A</u>;

(b)     a counterpart to the Release of Guarantor, duly executed by the Agent, in its capacity as administrative agent under the Credit Agreement, on behalf of the Lenders substantially in the form of Exhibit B;

(c)     a counterpart to the Bermuda Deed of Release, duly executed by the Agent, in its capacity as chargee under the Bermuda Debenture substantially in the form of Exhibit C;

(d)     counterparts to the Release of Claims Agreement, duly executed by the Agent, in its capacity as administrative agent under the Credit Agreement, and by the Lenders substantially in the form of Exhibit D;

(e)     all endorsements and other documentation required by the applicable insurance carriers or brokers under the Insurance Policies to reflect the transfer by Parent to Newco or the applicable Subsidiary of such Insurance Policies; and

(f)     all such other documents, agreements, instruments, writings and certificates as Parent may reasonably request as are necessary for Newco to satisfy its obligations hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF PARENT

Parent hereby represents and warrants to Newco as of the date hereof, subject to such exceptions as are disclosed in the Disclosure Schedule, as follows:

SECTION 3.01 Organization, Authority and Qualification of Parent.  Parent is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to enter into this Agreement and each Ancillary Agreement to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, and the Provisional Liquidators have the corporate power and authority, subject to the Sanction Order, to execute and deliver, and Parent has the power to perform, this Agreement and each Ancillary Agreement and to consummate the transactions contemplated hereby and thereby.  Parent is duly licensed or qualified to do business and is in good standing (to the extent such concepts are recognized under applicable Law) in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing (x) would not have a Material Adverse Effect or (y) would not be reasonably expected to prevent or materially delay the ability of Parent to perform its obligations under this Agreement or any of the Ancillary Agreements to which it is a party.  The execution and delivery of this Agreement and each Ancillary Agreement to which it is a party by Parent, the performance by Parent of its obligations hereunder and thereunder and the consummation by Parent of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Parent.  This Agreement has been, and upon their execution each of the Ancillary Agreements to which it is a party shall have been, duly executed and delivered by Parent, and (assuming due authorization, execution and

delivery by Newco) this Agreement constitutes, and upon their execution each of the Ancillary Agreements to which it is a party shall constitute, legal, valid and binding obligations of Parent, enforceable against Parent in accordance with their respective terms, subject to the Enforceability Exceptions.

SECTION 3.02 <u>Ownership of the Securities</u>.  The Securities are owned of record and beneficially by Parent free and clear of all Encumbrances (other than Permitted Encumbrances).  Upon the Closing, Newco will own all of the Securities free and clear of all Encumbrances, other than Encumbrances created by Newco or as may result from any facts or circumstances relating solely to Newco or its Affiliates.

SECTION 3.03 <u>Organization, Authority and Qualification of the Acquired Companies</u>.  Each of the Acquired Companies is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted.  Each of the Acquired Companies is duly licensed or qualified to do business and is in good standing (to the extent such concepts are recognized under applicable Law) in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect.

SECTION 3.04 <u>Capitalization of Transferred Companies; Acquired Subsidiaries</u>.

(a)    The authorized capital stock of the Company consists of [●] shares of common stock, $[●] par value per share.  All of the Company Shares are validly issued, fully paid and nonassessable and were not issued in violation of any preemptive rights.  The Company Shares constitute all of the issued and outstanding capital stock of the Company. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Company Shares or obligating either Parent or the Company to issue or sell any shares of capital stock of, or any other equity interest in, the Company.

(b)    All of the Holdco Interests are validly issued, fully paid and nonassessable and were not issued in violation of any preemptive rights.  The Holdco Interests constitute all of the issued and outstanding membership interests of Holdco. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Holdco Interests or obligating either Parent or Holdco to issue or sell any membership interests of, or any other equity interest in, Holdco.

(c)    Parent has no direct Subsidiaries other than the Transferred Companies and subsidiaries organized under the laws of Bermuda.  <u>Section 3.04(c)</u> of the Disclosure Schedule sets forth, for each Acquired Subsidiary, (i) its jurisdiction of formation, (ii) the number and type of issued equity interests, and (iii) the holders of such equity interests.  All equity interests in the Acquired Subsidiaries are owned, directly or indirectly, by a Transferred Company free and clear of all Encumbrances, have been duly authorized and validly issued, and none of such equity interests has been issued in violation of any preemptive rights.  There are no

options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the equity interest in any Acquired Subsidiary or obligating Parent, any Transferred Company or any Acquired Subsidiary to issue or sell any equity interest in any of the Acquired Subsidiaries.

SECTION 3.05 <u>No Conflict</u>.  Assuming the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in <u>Section 3.06</u>, the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is a party by Parent do not and will not (a) violate, conflict with, or result in the breach of any provision of the Governing Documents of Parent or any of the Acquired Companies, (b) violate any Law or Governmental Order applicable to Parent or any of the Acquired Companies in any material respect (c) except as set forth on <u>Section 3.05(c)</u> of the Disclosure Schedule, violate, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, acceleration or cancellation of, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on the Securities or any of the Acquired Company Assets pursuant to any Material Contract to which Parent or any Acquired Company is a party or by which any of the Securities, the Acquired Company Assets or the businesses of the Acquired Companies is bound or affected in any material respect, or (d) exceed or fall outside of the powers or authority of the Provisional Liquidators; except, with respect to clause (c) for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, reasonably be expected to materially impact the operation of the Business.

SECTION 3.06 <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance of this Agreement by Parent and each Ancillary Agreement to which it is a party does not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Authority, except (a) as described in <u>Section 3.06</u> of the Disclosure Schedule, or (b) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not reasonably be expected to materially impact the operation of the Business.

SECTION 3.07 <u>Financial Information</u>.

(a)      True and complete copies of (i) the unaudited balance sheet of the Business as of June 30, 2024 and the related unaudited statements of income and cash flows of the Business for the twelve months then-ended, and (ii) the audited balance sheet of the Business as of June 30, 2023, June 30, 2022 and June 30, 2021, and the related audited statements of income and cash flows of the Business for the fiscal years then-ended (collectively, the "<u>Financial Statements</u>") have been made available by Parent to Newco.

(b)      The Financial Statements (i) were prepared in accordance with the books of account and other financial records of Parent (except as may be indicated in the notes thereto), (ii) present fairly in all material respects the financial condition and results of operations of the Business as of the dates thereof or for the periods covered thereby and (iii) were prepared in accordance with GAAP applied on a basis consistent with the past practices of Parent (except for the absence of footnotes in unaudited interim financial statements).

15

SECTION 3.08 <u>Absence of Undisclosed Material Liabilities</u>.  As of the date hereof, the Business does not have any Liabilities of a nature required to be reflected on a balance sheet prepared in accordance with GAAP, other than Liabilities (a) reflected or reserved against on the Financial Statements (including the notes thereto), (b) set forth in the Disclosure Schedule or (c) incurred since June 30, 2024 in the ordinary course of business of the Business.

SECTION 3.09 <u>Conduct in the Ordinary Course</u>.  Since December 31, 2023 and through the date hereof, except as described in <u>Section 3.09</u> of the Disclosure Schedule or as required by applicable Law or the terms of any Contract, the Acquired Companies and, to the extent Related to the Business, Parent have not:

(a)    (i) issued or sold any capital stock, notes, bonds or other securities of the Acquired Companies (or any option, warrant or other right to acquire the same), (ii) redeemed any of the capital stock of the Acquired Companies, or (iii) declared, made or paid any dividends or distributions to the holders of capital stock of the Acquired Companies;

(b)    except as would not be material to the operation of the Business, sold, leased, transferred, licensed or otherwise disposed of (other than the sale of inventory or the grant of non-exclusive licenses in connection therewith, in the ordinary course consistent with past practice), or abandoned, permitted to lapse or failed to maintain, or permitted or allowed to be subjected to any Encumbrance (other than Permitted Encumbrances), any Acquired Company Asset (whether tangible or intangible) or any other asset or property of the Business that would constitute an Acquired Company Asset but for the conduct described in this clause;

(c)    amended or restated the Governing Documents of any of the Acquired Companies;

(d)    incurred any Indebtedness (other than any Indebtedness between any Acquired Company and any other Acquired Company);

(e)    delayed payment of any account payable or other Liability of the Business beyond its due date or the date when such Liability would have been paid in the ordinary course of business consistent with past practice;

(f)    except with respect to the current and prior director and officer insurance policies of Parent, entered into, extended, materially amended, cancelled or terminated any Material Contract or any agreement which, if entered into prior to the date hereof, would be a Material Contract other than customer or supplier contracts in the ordinary course of business consistent with past practice or in connection with obtaining a required consent as contemplated hereto that does not require a Party or an Acquired Company to pay any remuneration or commit to pay any remuneration to any Person to which a Party or Acquired Company is not contractually obligated to pay pursuant to a separate contractual obligation with such Person;

(g)    (A) except for the compensation figures indicated on <u>Section 3.18(a)</u> of the Disclosure Schedule (which shall not be required to indicate changes to such figures between December 31, 2023 and the date of such schedule), granted or agreed to grant or paid or agreed to pay, directly or indirectly, any material increase or material new commitments with respect to the wages, salary, bonus, commissions, retirement benefits, transaction bonus, retention bonus,

severance, tax gross-up or equalization or other compensation or benefits of, or grant any equity-based compensation to, any Business Employee or independent contractor, (B) enter into, adopt or establish any new material Parent Plan or any new material Company Plan or collective bargaining agreement or (C) transferred or otherwise altered or amended any Benefit Plan such that it became a Company Plan;

(h)     changed any method of accounting or accounting practice or policy used by Parent (in each case, Related to the Business) or any of the Acquired Companies, other than such changes required by GAAP;

(i)     paid or discharged, entered into any settlement with respect to, or waived or compromised, any Action;

(j)     transferred or assigned any asset from an Acquired Company to Parent, transferred or assigned any Liability from Parent to an Acquired Company, or otherwise caused an Acquired Company to assume any Liability of Parent;

(k)     made any material Tax election inconsistent with past practice or changed or revoked any material Tax election, changed any material Tax accounting method, filed any material amended Tax Return, settled or compromised any audit or other proceeding relating to a material amount of Tax, entered into any closing agreement, extended the statute of limitations period for the assessment or collection of any Tax, or surrendered any right to claim a material Tax refund; or

(l)     agreed to take any of the actions specified in this Section 3.09, except as contemplated by this Agreement and the Ancillary Agreements.

SECTION 3.10 Litigation.   As of the date hereof, there is no Action by or against any of the Acquired Companies pending before any Governmental Authority that would be material to the Acquired Companies when taken as a whole.

SECTION 3.11 Compliance with Laws; Permits.   Except as would not be material to the Business, Parent and the Acquired Companies have conducted within the prior two year period and continue to conduct the Business in accordance with all Laws and Governmental Orders applicable to Parent and Acquired Companies with respect to the Business and none of Parent or the Acquired Companies is in violation of any such Law or Governmental Order. Parent and the Acquired Companies hold all licenses, permits, authorizations, orders and approvals from, and have made all filings, applications and registrations with, each Governmental Authority (collectively, the "Permits") necessary for the operation of the Business as it is conducted as of the date hereof in all material respects.   Parent and the Acquired Companies have conducted and continue to conduct the Business pursuant to and in compliance in all material respects with the terms of all such Permits.   Section 3.11 of the Disclosure Schedule sets forth each Permit material to the operation of the Business as it is conducted as of the date hereof.

SECTION 3.12 Environmental Matters.   Except as would not have a Material Adverse Effect, (a) Parent, to the extent Related to the Business, and the Acquired Companies are in compliance with all applicable Environmental Laws and have obtained and are in

compliance with all Environmental Permits, and (b) there are no written claims pursuant to any Environmental Law pending or, to Parent's Knowledge, threatened, against Parent, to the extent Related to the Business, or the Acquired Companies.

SECTION 3.13 Intellectual Property; Information Technology.

(a)    Section 3.13(a) of the Disclosure Schedule sets forth a true and complete list of all Registered Owned Intellectual Property as of the date of this Agreement, such list specifying for each item of Intellectual Property, as applicable, the jurisdictions in which such item has been registered or registrations for such item have been applied for, owner(s), application or registration date, application or registration number and status, and, for domain names, the applicable domain name registrar.  Each item of Registered Owned Intellectual Property is subsisting, and, to the Knowledge of Parent, valid and enforceable.  With respect to each item of Registered Owned Intellectual Property, an Acquired Company is the exclusive owner of such Intellectual Property, free and clear of any Encumbrances (other than Permitted Encumbrances).

(b)    The Business Intellectual Property constitutes all Intellectual Property owned or licensed, or purported to be owned or licensed, by Parent and the Acquired Companies that is necessary and sufficient to enable Newco and the Acquired Companies, immediately following the Closing, to conduct the Business substantially in the same manner as conducted by Parent and the Acquired Companies as of immediately prior to the Closing. Subject to receipt of any necessary third party consents and approvals set forth on Section 3.06 of the Disclosure Schedule, immediately after the Closing, the Acquired Companies and Newco, taken collectively, will own or have the valid right to use in the operation of the Business all of the Business Intellectual Property, and to receive all IP Proceeds related thereto, on terms and conditions the same in all material respects as those in effect prior to the Closing.  Except as would not be material to the Business, within the two years prior to the date hereof, none of Parent or the Acquired Companies has received any written claim from any Person challenging its rights in, ownership of, or the validity or enforceability of, the Business Intellectual Property or any of the IP Proceeds related thereto.

(c)    To the Knowledge of Parent, except as would not be material to the Business, no Person is engaging in any activity that infringes, misappropriates or otherwise violates, or in the two years prior to the date hereof has infringed, misappropriated or otherwise violated, any Owned Intellectual Property.  Except as would not be material to the Business, neither the conduct of the Business nor the operation of the Acquired Companies infringes, misappropriates or otherwise violates, or has in the two years prior to the date hereof infringed, misappropriated or otherwise violated, the Intellectual Property of any Person.  In the two years prior to the date hereof, none of Parent or the Acquired Companies has received any written notice alleging that the conduct of the Business or the operation of the Acquired Companies has infringed, misappropriated or otherwise violated the Intellectual Property of any Person.

(d)    As of the date of this Agreement, there is no Action initiated by any other Person pending or, to the Knowledge of Parent, threatened in writing against Parent or the Acquired Companies concerning the matters described in Section 3.13(c); provided that any Action that has been initiated but with respect to which process or other comparable notice has

18

not been served on or delivered to such parties shall be deemed to be "threatened" rather than "pending."

(e)     To the Knowledge of Parent, except as would not be material to the Business, (i) Parent and the Acquired Companies have used commercially reasonable efforts (including efforts to enter into written, valid and binding confidentiality and nondisclosure agreements with all founders, officers, employees, consultants and contractors of such entity with access to any trade secrets), unless such Persons are otherwise subject to legal or enforceable ethical obligations to maintain the confidentiality of such trade secrets to protect and maintain the confidentiality of, and proprietary rights in, all the trade secrets and other material confidential information, including source code in Software, that is, in each case, part of the Business Intellectual Property or the other Acquired Company Assets, and (ii) to the Knowledge of Parent, there has been no unauthorized access to or use or disclosure of any of the foregoing.

(f)     No current or former founder, officer, employee, consultant or contractor of an Acquired Company or Parent holds any right, title or interest, in whole or in part, in or to any Owned Intellectual Property, or IP Proceeds related thereto, other than a non-exclusive license to use such Intellectual Property for the purpose of performing services for or on behalf of the Business. Other than Parent or an Acquired Company, no Person has any rights in or to the IP Proceeds related to the Owned Intellectual Property.  Except as would not be material to the Business, each current and former officer, employee, consultant and contractor of an Acquired Company, and each current and former officer, employee, consultant and contractor of Parent, to the extent such Person developed or created Intellectual Property by or on behalf of the Business, or otherwise within the scope of the engagement of such Person with the Acquired Company or Parent, and Related to the Business, has executed a written agreement with an Acquired Company or Parent, as applicable, that validly assigns to such entity all right, title and interest in such Intellectual Property, except to the extent ownership of such Intellectual Property is vested in Parent or the Acquired Company by operation of Law.  To the Knowledge of Parent, none of the parties to the agreements that are subject to the previous sentence are in material breach thereof.

(g)     Except as would not be material to the Business, the Business IT Assets (i) operate and perform and have been maintained, in each case, in accordance with their documentation and functional specifications and otherwise as required for the conduct of the Business as currently conducted and as currently proposed to be conducted; (ii) have not malfunctioned or failed in any respect (including in a way that has resulted in a disruption to the Business); and (iii) do not contain any viruses, worms, Trojan horse, bugs, faults, vulnerabilities or any other code designed or intended to (A) significantly disrupt or adversely affect the functionality of the Business IT Assets or (B) assist any Person to access any Business IT Assets without authorization.  Except as would not be material to the Business, to the Knowledge of Parent, there has been no unauthorized access to, or unauthorized use, modification, deletion, disclosure, or other misuse of, any Business IT Assets (or information stored or contained therein or transmitted thereby). The Acquired Companies and, with respect to the Business, Parent, take and have taken all commercially reasonable steps to protect and preserve the confidentiality, integrity and security of the Business IT Assets (and all confidential information stored or contained therein or transmitted thereby, including such information of third parties that is held in connection with the Business).

19

(h)     The Business IT Assets constitute all IT Assets necessary and sufficient to enable Newco and the Acquired Companies, immediately following the Closing, to conduct the Business substantially in the same manner as conducted by Parent and the Acquired Companies as of immediately prior to the Closing.  Subject to receipt of necessary third party consents and approvals set forth on <u>Section 3.06</u> of the Disclosure Schedule, immediately after the Closing, the Acquired Companies and Newco will own or have the valid right to use in the operation of the Business all of the Business IT Assets, on terms and conditions the same in all material respects as those in effect prior to the Closing.

(i)     Neither the Acquired Companies nor the Business are in material breach of any terms or conditions of any relevant licenses of Open Source Software.  No Software included in the Owned Intellectual Property and used or held for use in connection with the Business ("<u>Business Software</u>") incorporates, is integrated with, or links to any Open Source Software in such a manner that, taking into account the current conduct of the Acquired Companies and the Business, requires the distribution of any material proprietary source code for any Business Software under the terms of a license to such Open Source Software.  None of Parent or the Acquired Companies has received any such written claim from any Person.  No source code of any Business Software has been disclosed to any Person, other than to employees or service providers of Parent or an Acquired Company in the ordinary course of the Business for the purpose of conducting the Business, and none of the source code for any Business Software is subject to any escrow or other disclosure obligations.

(j)     The Acquired Companies have and, with respect to the Business, Parent has used commercially reasonable efforts to (i) ensure that all AI Tools are used in compliance with the applicable license terms, consents, agreements and Laws in all material respects; (ii) not include Personal Data, trade secrets or material confidential or proprietary information in the Owned Intellectual Property, or such similar information that is owned by any third Person that is under any obligation of confidentiality by the Acquired Companies or Parent, in any prompts or inputs into any AI Tools, except in cases where such AI Tools do not use such information, prompts or inputs (other than in aggregated and anonymized form) to train the machine learning or algorithm of such tools or improve the services related to such tools; and (iii) not use AI Tools to develop any material Business Intellectual Property that the Acquired Companies or Parent intends to maintain as proprietary in a manner that would materially affect the Acquired Companies' or Parent's ownership or rights therein.  For purposes thereof, "<u>AI Tools</u>" means generative artificial intelligence technology or similar tools capable of automatically producing various types of content (such as source code, text, images, audio and synthetic data) based on user-supplied prompts.

SECTION 3.14 <u>Data Privacy</u>.

(a)     The Acquired Companies and, with respect to the Business, Parent (i) are in material compliance in all respects with all applicable Laws as well as material applicable contractual obligations binding on the Acquired Companies or Parent, as applicable, and external policies, in each case to the extent relating to privacy, data protection and the collection, retention, protection, transfer, use and processing of Personal Data ("<u>Data Protection Requirements</u>") and (ii) have maintained commercially reasonable policies, procedures, and security safeguards (including organizational, physical, administrative and technical safeguards)

regarding data privacy and security designed to protect Personal Data, controlled by or on behalf of the Acquired Companies or, with respect to the Business, Parent against loss, damage, unauthorized access, unauthorized use, breaches, and cybersecurity incidents.

(b)    To the Knowledge of Parent, there has been no material loss of, damage to, unauthorized access to, or unauthorized use, or misuse of, any personal information in the possession or control of Parent Related to the Business and the Acquired Companies.  Neither the Acquired Companies, nor, with respect to the Business, Parent has (i) been subject to any actual, pending, or, to the Knowledge of Parent, threatened investigations, notices or requests from any Governmental Authority in relation to their data processing or cybersecurity activities or (ii) received any actual, pending, or, to the Knowledge of Parent, threatened written claims from any Person or Governmental Authorities alleging breach of any Data Protection Requirement.  The processing of Personal Data relating to the Business is carried out, in all material respects, in accordance with all Data Protection Requirements and, where applicable, with appropriate safeguards for such transfer.  To the Knowledge of Parent, the execution, delivery and performance by Parent of this Agreement and the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement by Parent will not violate any Data Protection Requirements.

SECTION 3.15 Real Property.

(a)    The Acquired Companies do not own any Real Property.

(b)    Section 3.15(b) of the Disclosure Schedule sets forth the street address of each Leased Real Property and the identity of the lessor, lessee and current occupant (if different from lessee) of each Leased Real Property.  Assuming good fee title vested in the applicable lessor, to Parent's Knowledge, such lessee has a valid and binding leasehold or servitude interest in each Leased Real Property, free and clear of all Encumbrances other than Permitted Encumbrances.

(c)    There has not been any sublease or assignment entered into by Parent or any of the Acquired Companies in respect of the leases relating to the Leased Real Property.

SECTION 3.16 Assets; Sufficiency.

(a)    Each of the Acquired Companies owns, leases, licenses or has the legal right to use all the material properties and assets of such Acquired Company reflected on each of the Financial Statements or acquired since the date of the Financial Statements (collectively, the "Acquired Company Assets"), except for any Acquired Company Assets that have been sold or otherwise disposed of since the date of such Financial Statement and disclosed on Section 3.09 of the Disclosure Schedule.  Parent owns, leases, licenses or has the legal right to use all the Acquired Company Assets, except for any Acquired Company Assets that have been sold or otherwise disposed of since the date of such Financial Statement and disclosed on Section 3.09 of the Disclosure Schedule.  The Acquired Company Assets are not subject to any Encumbrances other than Permitted Encumbrances.  Following the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement, subject to receipt of necessary third party consents and approvals, including

21

those set forth on Section 3.06 of the Disclosure Schedule, Newco or an Acquired Company will own, with good and valid title, or lease, under valid and subsisting leases, or have legal right or license to use, or otherwise acquire, the Acquired Company Assets, free and clear of any Encumbrances, other than Permitted Encumbrances.

(b)     The Acquired Company Assets are adequate in all material respects to conduct the Business as currently conducted; provided, however, that nothing in this Section 3.16(b) shall be deemed to constitute a representation or warranty as to the adequacy of the amounts of working capital (or the availability of the same) of the Acquired Companies.

SECTION 3.17 Employee Benefit Plans.

(a)     Plans and Plan Documents.   Section 3.17(a) of the Disclosure Schedule correctly and completely lists the material Parent Plans and the material Company Plans and identifies each as either a Parent Plan or a Company Plan.  With respect to each material Parent Plan and material Company Plan that is in writing, Parent has made available to Newco a current, true and complete copy of such Parent Plan and Company Plan and all amendments thereto (or, to the extent no such copy exists, an accurate description).  No Parent Plan or Company Plan provides benefits to any individual who is not a Business Employee or current or former independent contractor of Parent or an Acquired Company or the dependents or other beneficiaries of a Business Employee or such an independent contractor.

(b)     Plan Compliance.  Each Parent Plan and Company Plan is and has been operated in all material respects in accordance with its terms and the requirements of all applicable Laws and has been properly approved by Parent or an Acquired Company, as applicable.  Each of Parent and the Acquired Companies, as applicable, has performed in all material respects the obligations required to be performed by it under, is not in material default under or in material violation of, and Parent has no Knowledge of, any material default or violation by any party to, any Parent Plan or Company Plan.  No Action is pending or threatened with respect to any Parent Plan or Company Plan (other than claims for benefits in the ordinary course).

(c)     Qualification of Certain Plans.  Each Parent Plan and Company Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS with respect to the most recent applicable determination letter filing period or has timely applied to the IRS for such a letter or is the subject of a favorable IRS opinion or advisory letter.

(d)     Pension Plans.  Neither Parent nor any of the Acquired Companies (nor any predecessor of any such entity) sponsors, maintains, administers or contributes to, or has any obligation or liability with respect to, or has in the past six years sponsored, maintained or contributed to, or had any obligation or liability with respect to, (i) any "employee pension benefit plan" that is subject to Title IV of ERISA, (ii) any "multiemployer plan", as defined in Section 3(37) of ERISA, (iii) any "multiple employer plan" as described in Section 413(c) of the Code or (iv) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA).

(e)     Section 409A.    No Business Employee is entitled to receive any Tax gross-up, indemnity or reimbursement from Parent or the Acquired Companies for any Tax incurred by such Business Employee, including under Section 409A or Section 4999 of the Code. Each Parent Plan and Company Plan, and any award thereunder, that is or forms part of a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code is in a form and has been operated and administered in compliance with all applicable requirements of Section 409A of the Code in all material respects.

(f)     Post-Employment Health and Life Insurance Benefits.    Neither Parent nor any of the Acquired Companies has any current or anticipated material liability in respect of, and no Parent Plan or Company Plan provides or promises, any post-employment, health or life insurance benefits to any current or former Business Employee except (i) as required under Section 4980B of the Code or any other Law, (ii) in connection with severance benefits, or (iii) through the end of the month in which a termination of employment occurs.

(g)     Transaction Payments; Section 280G.    Neither the execution of this Agreement nor the consummation of the transactions contemplated under this Agreement shall (either alone or in conjunction with the termination of employment or service of any Business Employee following, or in connection with, the transactions contemplated hereby): (i) entitle any Person to severance pay or benefits or any increase in severance pay or benefits upon any termination of employment or service; accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, or increase the amount payable or trigger any other obligation pursuant to, any Parent Plan or Company Plan; or (ii) limit or restrict the right of the Acquired Companies or Newco to merge, amend or terminate any Company Plan. The consummation of the transactions contemplated by this Agreement will not cause any amounts payable under the Company Plans or Parent Plans to fail to be deductible for U.S. federal income tax purposes by virtue of Section 280G of the Code.

(h)     No Undisclosed Plans.    Neither Parent nor any Acquired Company has any commitment (i) to create, incur liability with respect to or cause to exist any other material compensation, benefit, fringe benefit or other plan, program, arrangement or agreement or to enter into any material contract or agreement to provide compensation or benefits to any individual, in each case other than as required by the terms of Parent Plans and the Company Plans as in effect as of the date hereof or (ii) to materially modify, change or terminate any material Parent Plan or materially modify, change or terminate any material Company Plan, other than a modification, change or termination required by applicable Law.

(i)     Non-U.S. Plans.    With respect to each Parent Plan and Company Plan that is maintained outside of the United States or that provides benefits outside of the United States: (i) the fair market value of the assets of each funded Parent Plan and Company Plan, the liability of each insurer for any Parent Plan and Company Plan funded through insurance or the book reserve established for any Parent Plan and Company Plan, together with any accrued contributions, is sufficient in all material respects to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Parent Plan and Company Plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such Parent Plan and Company Plan, and no transaction contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit

obligations; (ii) from and after the Closing, the Acquired Companies shall receive the full benefit of any such funds, accruals or reserves under each Company Plan; and (iii) each Parent Plan and Company Plan required to be registered with applicable Governmental Authority has been registered and has been maintained in good standing in all material respects.

(j)    Indemnification Agreements.  No Acquired Company is a party to any Benefit Plan or Contract that would require such Acquired Company to provide any indemnification, contribution, advancement or reimbursement of expenses or similar rights to any current or former director or officer of Parent with respect to such Person's role at Parent.

SECTION 3.18 Labor and Employment Matters.

(a)    Business Employees.  Section 3.18(a) of the Disclosure Schedule contains a list effective as of not more than five (5) days prior to the date hereof of all of the current Business Employees by name, title, years of service, location, employing entity and annual base cash compensation (including annual base salary and annual target bonus), except to the extent that such information may not be disclosed under applicable data privacy and protection Laws.

(b)    Collective Bargaining.  There are no collective bargaining agreements that cover any of the Business Employees to which Parent or any Acquired Company is a party, and there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit relating to any Business Employee.  There is no strike, work stoppage or lockout pending, or threatened, by or with respect to any Business Employees.

(c)    Compliance with Laws.  Parent and the Acquired Companies are and have been in compliance in all material respects with all Laws related to the employment of labor, including those related to wages, hours, worker classification, occupational safety and health and collective bargaining.  No Liability for termination notice or severance has been incurred with respect to any Business Employees under the WARN Act prior to the date hereof. No Action is pending or threatened with respect to any Business Employee.  Except as set forth in Section 3.18(c) of the Disclosure Schedule, no notice with respect to the transactions contemplated hereby is required to be provided to any Business Employee for any purpose.

(d)    Complaints of Sexual Harassment.  Except as disclosed to counsel for the Agent in writing prior to the date of the Restructuring Support Agreement, there is no, and for the past six years, there has not been any, litigation pending or threatened against Parent or any Acquired Company, in each case, involving allegations of sexual harassment, sex-based discrimination or sexual misconduct. Parent and the Acquired Companies have taken appropriate action with respect to any allegations of sex-based discrimination, sexual harassment, sexual misconduct or breach of any policy of Parent or the Acquired Companies relating to the foregoing, in each case (i) involving any current or former officer or director in relation to his or her work at Parent or the Acquired Companies and (ii) in accordance with any written policies related thereto.

SECTION 3.19 Taxes.

(a)    Tax Returns.  All income and other material Tax Returns required to have been filed with respect to the Acquired Companies have been timely filed (taking into account

any extension of time to file granted or obtained) and such Tax Returns have been true, correct and complete in all material respects.  All income and other material Taxes of the Acquired Companies (whether or not shown on any Tax Return as owing) have been paid or will be timely paid.

(b)    Tax Audits.  No examination or audit of any Tax Return of any of the Acquired Companies by any Taxing Authority is currently in progress, and to the Knowledge of Parent, no such examination or audit has been threatened in writing.

(c)    Tax Allocation Agreements.  None of the Acquired Companies is a party to any Tax allocation or Tax sharing agreement (other than an agreement the principal subject matter of which is not Taxes) with any Person (other than Parent and other than any such agreement solely between or among the Acquired Companies), and after the Closing Date, none of the Acquired Companies will be bound by any such agreement or similar arrangement entered into prior to the Closing Date or will have any unsatisfied liability thereunder for any amounts due in respect of periods prior to the Closing Date.

(d)    Consolidated Groups.  None of the Acquired Companies (i) has been a member of a consolidated, combined, unitary, or affiliated Tax group (other than a group each of the members of which is an Acquired Company) or (ii) has any actual or potential liability for Taxes of another Person (other than other Acquired Companies) by reason of having been a member of a consolidated, combined, unitary, or affiliated Tax group, by operation of Law, as a transferee or successor, or by contract.

(e)    Waiver of Statute of Limitations.  None of the Acquired Companies has (i) waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to any material Tax assessment or deficiency or (ii) made or entered into any material consent or agreement as to Taxes that will remain in effect following the Closing Date.

(f)    Section 355.  Within the past 2 years, none of the Acquired Companies has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under Section 355(a) of the Code (or any other similar provision of state, local, or foreign Law).

(g)    Encumbrances.  There are no Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the Acquired Company Assets.

(h)    Listed Transactions, etc.  Neither Parent nor any of the Acquired Companies have: (i) participated in any "listed transaction" as defined in Section 6707A(c)(2) of the Code or the Regulations promulgated thereunder (or any similar provision of state, local or non-U.S. Law), (ii) consummated or participated in any transaction which was or is a "tax shelter" transaction, as defined in Section 6662 or Section 6111 of the Code or the Regulations promulgated thereunder (or any similar provision of state, local or non-U.S. Law), or (iii) participated or engaged in any other transaction that is subject to similar disclosure requirements pursuant to a corresponding or similar provision of state, local or non-U.S. Tax Law.

SECTION 3.20 Material Contracts.

(a)    Section 3.20(a) of the Disclosure Schedule sets forth each of the following Contracts (other than Parent Plans and Company Plans) to which an Acquired Company is a party (but only to the extent such Contract is Related to the Business), in effect as of the date of this Agreement (such Contracts being "Material Contracts"):

(i)    any Contract for the purchase of materials, supplies, goods, services, equipment or other assets (other than purchase orders) providing for annual payments in excess of $750,000 and is not cancelable without penalty or further payment and without more than 120 days' notice;

(ii)    any Contract concerning the establishment or operation of a corporate or commercial partnership or joint venture;

(iii)    all Contracts restricting the right of Parent or any of the Acquired Companies to compete with any Person;

(iv)    any Contract entered into within the one-year period prior to the date hereof relating to the acquisition or disposition (whether by merger, sale of stock, sale of assets or otherwise) of any material business, corporation, partnership, association, joint venture or other business organization, or any division, operating unit or product line of the Business with respect to which there remains outstanding obligations on the part of Parent or any Acquired Company;

(v)    all Company IP Agreements;

(vi)    all Contracts relating to Indebtedness of any of the Acquired Companies;

(vii)    all Contracts with any Governmental Authority involving total annual payments in excess of $750,000; and

(viii)    all other Contracts (other than Intercompany Agreements) that are material to the Business taken as a whole.

(b)    Each Material Contract (i) is valid and binding on Parent or the Acquired Company, as applicable, party thereto, and, to the Knowledge of Parent, the counterparties thereto, and is in full force and effect and (ii) upon consummation of the transactions contemplated by this Agreement, except to the extent that any consents set forth in Section 3.05(c) of the Disclosure Schedule are not obtained, shall continue in full force and effect in accordance with its terms as of the date hereof.  Parent or the Acquired Company, as applicable, party thereto is not in material breach of, or material default under, any Material Contract to which it is a party and, as of the date hereof, to the Knowledge of Parent, no counterparty thereto is in material breach of, or material default under, any Material Contract.

SECTION 3.21 Intercompany Receivables.  As of five (5) days before the date hereof, (i) the principal and accrued and unpaid interest under that certain loan receivable owed by the Company to Parent is $[•], and (ii) the principal and accrued and unpaid interest under any other intercompany receivables from the Company to Parent is $[•]; *provided, however*, that the

only change to such balances between such date and the date of this Agreement shall be the accrual of interest in the ordinary course of business.

SECTION 3.22 <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or the Ancillary Agreements based upon arrangements made by or on behalf of Parent or any Acquired Company.

SECTION 3.23 <u>Disclaimer of Parent</u>.  NONE OF PARENT OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PROVISIONAL LIQUIDATORS) MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE ACQUIRED COMPANIES, THE BUSINESS, THE SECURITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING WITH RESPECT TO (I) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, (II) THE OPERATION OF THE BUSINESS BY NEWCO AFTER THE CLOSING, (III) THE PROBABLE SUCCESS OR PROFITABILITY OF THE BUSINESS AFTER THE CLOSING, (IV) ANY FINANCIAL PROJECTION OR FORECAST RELATING TO PARENT OR THE BUSINESS, (V) ANY OTHER INFORMATION MADE AVAILABLE TO NEWCO, ITS AFFILIATES AND ITS AND THEIR RESPECTIVE REPRESENTATIVES, OR (VI) AS TO ANY OTHER MATTER OR THING. ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED.  NONE OF PARENT OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PROVISIONAL LIQUIDATORS) WILL HAVE OR BE SUBJECT TO ANY LIABILITY OR INDEMNIFICATION OBLIGATION TO NEWCO OR TO ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO NEWCO, ITS AFFILIATES OR REPRESENTATIVES OF, OR NEWCO'S USE OF, ANY INFORMATION RELATING TO THE BUSINESS AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO NEWCO, WHETHER ORALLY OR IN WRITING, IN CERTAIN "DATA ROOMS," MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF NEWCO OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF NEWCO

Newco hereby represents and warrants to Parent as follows:

SECTION 4.01 <u>Organization and Authority of Newco</u>.  Newco is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to enter into this Agreement and each Ancillary Agreement to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Newco is duly licensed or qualified to do

business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not materially and adversely affect the ability of Newco to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and each Ancillary Agreement to which it is a party.  The execution and delivery by Newco of this Agreement and each Ancillary Agreement to which it is a party, the performance by Newco of its obligations hereunder and thereunder and the consummation by Newco of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Newco.  This Agreement has been, and upon their execution each Ancillary Agreement to which Newco is a party shall have been, duly executed and delivered by Newco, and (assuming due authorization, execution and delivery by Parent) this Agreement constitutes, and upon their execution each Ancillary Agreement to which Newco is a party shall constitute, legal, valid and binding obligations of Newco, enforceable against Newco in accordance with their respective terms, subject to the Enforceability Exceptions.

SECTION 4.02 <u>No Conflict</u>.  Assuming the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in <u>Section 4.03</u>, the execution, delivery and performance by Newco of this Agreement and the Ancillary Agreements to which it is a party do not and will not (a) violate or result in the breach of any provision of its organizational documents, (b) violate any Law or Governmental Order applicable to Newco or its respective assets, properties or businesses or (c) result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, permit, franchise or other instrument or arrangement to which Newco is a party, except, in the case of clauses (b) and (c), as would not materially and adversely affect the ability of Newco to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is a party.

SECTION 4.03 <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance by Newco of this Agreement and each Ancillary Agreement to which Newco is a party do not and will not require any consent, approval, authorization or other order of, action by, filing with, or notification to, any Governmental Authority, except (a) as described in <u>Section 4.03</u> of the Disclosure Schedule, or (b) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by Newco of the transactions contemplated by this Agreement and each Ancillary Agreement to which Newco is a party.

SECTION 4.04 <u>Investment Purpose</u>.  Newco is acquiring the Securities solely for the purpose of investment and not with a view to, or for offer or sale in connection with, any distribution thereof other than in compliance with all applicable Laws, including United States federal securities laws.  Newco agrees that the Securities may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and any applicable state or foreign securities Laws, except pursuant to an exemption from

such registration under the Securities Act and such Laws.  Newco is able to bear the economic risk of holding the Securities for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

SECTION 4.05 <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Newco.

SECTION 4.06 <u>Independent Investigation; Parent's Representations</u>. Newco has conducted its own independent investigation, review and analysis of the business, operations, assets (including Contracts), liabilities, results of operations, financial condition, technology and prospects of the Business, which investigation, review and analysis was undertaken by Newco and its Affiliates and representatives. In entering into this Agreement, Newco acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of Parent or its representatives (except the specific representations and warranties of Parent set forth in <u>Article III</u>). Newco hereby agrees and acknowledges that other than the representations and warranties made in <u>Article III</u>, none of Parent or any of its officers, directors, employees or representatives make or have made any representation or warranty, express or implied, at law or in equity, with respect to the Securities, the Acquired Company Assets or the Business.

## ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01 <u>Third Party Consents</u>. Newco and Parent shall use commercially reasonable efforts to obtain the consents, approvals and authorizations set forth on <u>Schedule 5.01</u>; <u>provided</u> that no Party or Acquired Company shall be required to compensate any third party, commence or participate in litigation or offer or grant any accommodation (financial or otherwise) to any third party to obtain any such consent or approval; <u>provided</u>, <u>further</u>, (i) that the obtaining of any such consents shall not be deemed to be conditions to the obligations of the Parties to consummate the transactions contemplated hereby and (ii) in no event shall any Party or Acquired Company be obligated to pay any remuneration or commit to pay any remuneration to any Person to which a Party or Acquired Company is not contractually obligated to pay pursuant to a separate contractual obligation with such Person in connection therewith.

SECTION 5.02 <u>Wrong Pockets</u>.  If, after the Closing Date, Parent receives any funds that are the property of Newco or its Affiliates, Parent shall remit any such funds promptly to Newco or such Affiliate.  If, after the Closing Date, Newco or its Affiliates receive any funds that are the property of Parent, Newco shall, or shall cause the applicable Affiliate to, remit any such funds promptly to Parent.

SECTION 5.03 <u>Restrictive Covenants</u>.

(a)  <u>Employee Non-Solicit</u>.  During the period commencing on the Closing Date and ending on the earlier to occur of the first anniversary of the Closing Date and the

completion of the liquidation of Parent, Parent shall not, directly or indirectly, solicit any employees of the Business to leave the employ of Newco or its Affiliates.

(b)    Non-Competition.  During the period commencing on the Closing Date and ending on the earlier to occur of the second anniversary of the Closing Date and the completion of the liquidation of Parent, without the express prior written consent of Newco, Parent agrees not to, directly or indirectly, own, control, manage, operate or participate in, any business or entity that engages in the Business.

SECTION 5.04 Release from Parent Credit Support Instruments.  At or prior to the Closing, Newco shall, and shall cause its Affiliates (collectively, the "Newco Group") to, take or cause to be taken all actions necessary to secure the unconditional release of Parent from Parent Credit Support Instruments, including effecting such release by providing guarantees or other credit support, and Newco shall, and shall cause its Affiliates to, be substituted in all respects therefor, so that the applicable member of Newco Group shall be solely responsible for the obligations of such Parent Credit Support Instruments; provided, however, that any such release or substitution must be effected pursuant to documentation reasonably satisfactory in form and substance to Parent.  Without limiting Newco's undertaking in the foregoing sentence, to the extent that Parent has performance obligations under any Parent Credit Support Instrument after the Closing, (a) Newco shall not permit any member of Newco Group (including the Acquired Companies) to renew or extend the term of, increase its obligations under, or transfer to a third party, any such Parent Credit Support Instrument, and (b) Newco shall, or shall cause a member of Newco Group to, (i) perform such obligations on behalf of Parent and (ii) otherwise take such action as requested by Parent so as to put Parent in the same position as if Newco, or such member of Newco Group, had performed or was performing such obligations.  All costs and expenses incurred in connection with the release or substitution of Parent Credit Support Instruments shall be borne by Newco.  In the event that any Parent Credit Support Instrument has not been terminated and that Parent has not been released as of the Closing Date, Parent shall be permitted to terminate such Parent Credit Support Instrument as promptly as practicable; provided that such termination does not result in termination or a material change to the Contract to which such Parent Credit Support Instrument applies, except in connection with the end of any primary or renewal term of any such Contract or Parent Credit Support Instrument.  From and after the Closing, Newco shall indemnify Parent for any and all Losses arising from, or relating to, Parent Credit Support Instruments.

SECTION 5.05 "Afiniti" Name.  Parent shall (i) except as permitted in this paragraph, from and after Closing, cease and discontinue any and all trademark uses of the word "Afiniti" and any name that is a variation or derivative of, or confusingly similar to, the word "Afiniti" (the foregoing, the "Afiniti Marks"); and (ii) within one hundred and twenty (120) days after Closing or such longer period as needed to complete the wind down and liquidation of Parent, change the name of Parent to a name that does not include any of the Afiniti Marks make all necessary filings, and cause all applicable Governmental Authorities, to change all applications, registrations and filings, including corporate names, fictitious name filings, "doing business as" filings, seals and certificates of Parent, such that they will not include any of the Afiniti Marks.  Parent shall be permitted, for a period of one hundred and twenty (120) days after Closing or such longer period as needed to complete the wind down and liquidation of Parent, to use the Afiniti Marks solely as Parent's corporate name in connection with filings with a

Governmental Authority, including Tax filings and court filings, in each case, in connection with the liquidation of Parent; provided, that, for the avoidance of doubt, Parent shall not use the Afiniti Marks for any trademark uses including conduct as a trade or business or granting licenses or other permissions to use to any third parties.

SECTION 5.06 <u>No Successor Liability</u>. Newco shall not be deemed, as a result of any action taken in connection with the transfer or disposition of any assets transferred pursuant hereto, to: (1) be a successor (or other similarly situated party) to Parent from and after the Closing Date as expressly set forth in this Agreement; or (2) have, de facto or otherwise, merged with or into Parent.  Newco is not acquiring or assuming any liability, warranty or other obligations of Parent, except as expressly set forth herein.

SECTION 5.07 <u>Survival</u>. None of the representations or warranties set forth in this Agreement or any Ancillary Agreement hereto shall survive the Closing. No Party or any of its respective Affiliates shall have any Liability with respect to any representation or warranty from and after the time that such representation or warranty ceases to survive hereunder (provided that the foregoing shall not limit any for claim of fraud).

## ARTICLE VI

## EMPLOYEE MATTERS

SECTION 6.01 <u>Notices</u>.  Parent and Newco and their respective Affiliates shall cooperate in good faith to determine whether any information, consultation and notification may be required under any worker notification Laws applicable to any Business Employees or employee representative bodies (if any) arising in connection with the transactions contemplated by this Agreement and shall honor their respective obligations resulting therefrom.

SECTION 6.02 <u>No Third Party Beneficiaries</u>.  Nothing expressed or implied in this Agreement confers upon any of the Business Employees or any other Person any additional rights or remedies, including any additional right to employment, or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement. Notwithstanding anything herein to the contrary, no provision of this Agreement is intended to, or does, constitute the establishment or adoption of, or amendment to, any Benefit Plan of Parent, an Acquired Company or Newco, and no person participating in any such Benefit Plan maintained by Parent, an Acquired Company or Newco shall have any claim or cause of action, under ERISA or otherwise, in respect of any provision of this Agreement as it relates to any such Benefit Plan or otherwise.

## ARTICLE VII

## TAX MATTERS

SECTION 7.01 <u>Conveyance Taxes</u>.  Parent shall be liable for, shall hold Newco and the Acquired Companies harmless against, and agrees to pay any and all Conveyance Taxes, including value added Taxes, that may be imposed upon, or payable or collectible or incurred in

connection with this Agreement and the transactions contemplated hereby. Newco and Parent agree to cooperate in the execution and delivery of all instruments and certificates necessary to enable Newco to comply with any pre-Closing filing requirements, including value added Tax invoices.

SECTION 7.02 Miscellaneous.

(a)    For purposes of this Article VII, all references to Newco, Parent, Affiliates and the Acquired Companies shall include successors.

(b)    Notwithstanding any provision in this Agreement to the contrary, the covenants and agreements of the Parties contained in this Article VII shall survive the Closing and shall remain in full force until the earlier to occur of (i) the expiration of the applicable statutes of limitations for the Taxes in question (taking into account any extensions or waivers thereof) and (ii) the completion of the liquidation of Parent.

## ARTICLE VIII

## GENERAL PROVISIONS

SECTION 8.01 Expenses.    Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

SECTION 8.02 Notices.    All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return receipt requested), or by email (upon confirmation of receipt) to the respective Parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

(a)    if to Parent:

Afiniti, Ltd. (in provisional liquidation)
1701 Pennsylvania Ave. NW,
Suite 600 Washington, DC 20006
Attention:   Sam Logan (sam.logan@afiniti.com)
                    legal@afiniti.com

and

Afiniti Ltd. (in provisional liquidation)
Teneo (Bermuda) Ltd.
19 Par-la-Ville Road,
Third Floor, Hamilton,

HM 11, Bermuda
Attention:  Mike Morrison (mike.morrison@teneo.com)
            Charles Thresh (charles.thresh@teneo.com)


with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:   George Davis (george.davis@lw.com)
             David Hammerman (david.hammerman@lw.com)
             Meghana Vunnamadala (meghana.vunnamadala@lw.com)

and

Latham & Watkins LLP
330 North Wabash, Suite 2800
Chicago, IL 60611
Attention:  Jason Gott (jason.gott@lw.com)
            Jonathan Gordon (jonathan.gordon@lw.com)

(b)      if to Newco:

Afiniti Newco Holdings LLC
c/o VCP CAPITAL MARKETS, LLC
Four Embarcadero Center, 20th Floor
San Francisco, CA 94111
Attention: David Flannery (dflannery@vistacreditpartners.com)

with a copy (which shall not constitute notice) to:

Allen Overy Shearman Sterling US LLP
599 Lexington Avenue
New York, NY  10022
Attention:   Mark Shapiro (Mark.Shapiro@AOShearman.com)
             Michael Dorf (MDorf@AOShearman.com)
             Frank Oliver (Frank.Oliver@AOShearman.com)


SECTION 8.03 Public Announcements.  Neither Party shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated by this Agreement or otherwise communicate with any news media without the prior written consent of the other Party unless otherwise required by Law or applicable stock exchange regulation, and, to the extent practicable, the Parties shall cooperate as to the timing

and contents of any such press release, public announcement or communication; provided, however, that the prior written consent of the other Party shall not be required hereunder with respect to any press release, public announcement or communication that is substantially similar to a press release, public announcement or communication previously issued with the prior written consent of such other Party.

SECTION 8.04 Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

SECTION 8.05 Entire Agreement.  This Agreement, the Stock and Asset Transfer Agreement and the Ancillary Agreements constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, between Parent and Newco with respect to the subject matter hereof and thereof.

SECTION 8.06 Assignment.  This Agreement may not be assigned by operation of law or otherwise without the express written consent of Parent and Newco (which consent may be granted or withheld in the sole discretion of Parent or Newco), as the case may be.

SECTION 8.07 Amendment.  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, Parent and Newco or (b) by a waiver in accordance with Section 8.08.

SECTION 8.08 Waiver.  Either Party may (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered or made available by the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of either Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

SECTION 8.09 No Third Party Beneficiaries.  Save in respect of the limitation of the liability of the Provisional Liquidators under Section 8.15, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

SECTION 8.10 <u>Currency</u>.    Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

SECTION 8.11 <u>Governing Law</u>.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any New York federal court sitting in the Borough of Manhattan of The City of New York; <u>provided</u>, <u>however</u>, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of The City of New York.    Consistent with the preceding sentence, each of the Parties hereby (a) submits to the exclusive jurisdiction of any federal or state court sitting in the Borough of Manhattan of The City of New York for the purpose of any Action arising out of or relating to this Agreement brought by either Party; (b) agrees that service of process will be validly effected by sending notice in accordance with <u>Section 8.02</u>; and (c) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above named courts.

SECTION 8.12 <u>Waiver of Jury Trial</u>.    EACH OF THE PARTIES HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.    EACH OF THE PARTIES HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.12</u>.

SECTION 8.13 <u>Specific Performance</u>.  The Parties acknowledge and agree that the Parties will be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached and that any non-performance or breach of this Agreement by any Party could not be adequately compensated by monetary damages alone and that the Parties would not have any adequate remedy at law.  Accordingly, in addition to any other right or remedy to which any Party may be entitled, at law or in equity (including monetary damages), such Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to seek temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement without posting any bond or other undertaking.  Without limiting the generality of the foregoing, the Parties agree that Parent shall be entitled to enforce specifically Newco's obligation to consummate the transactions contemplated by this Agreement (including the

obligation to consummate the Closing).  The Parties agree that they will not contest the appropriateness of specific performance as a remedy.

SECTION 8.14 <u>Counterparts</u>.  This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in "pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

SECTION 8.15 <u>Liability of Provisional Liquidators</u>.

(a)     The Provisional Liquidators were appointed by the Bermuda Court to manage Parent's affairs, business, and properties as agents and without personal liability. Additionally, neither the Provisional Liquidators, nor any agent, advisor, representative, Affiliate, employee, partner, servant, trustee, attorney, or other person acting on behalf of, or otherwise related to or affiliated with the Provisional Liquidators shall have any personal liability (save in respect of fraud or dishonesty) directly or indirectly, under or in connection with: (i) this Agreement or the Ancillary Agreements or by virtue of, this Agreement or the Ancillary Agreements or any agreement made or entered into under or pursuant to the provisions of this Agreement; (ii) in relation to any related matter or claim howsoever, whenever, and wherever arising, and whether such claim be formulated in contract, restitution, tort or by reference to any other remedy or right, and in whatever jurisdiction or forum; (iii) by reason of their acting in the capacity as agents of Parent; (iv) whether or not acting as agents of Parent, by reason of their acting in the name and on behalf of Parent; (v) in respect of any transfer or assignment made pursuant to this Agreement; or (vi) any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

(b)     The Provisional Liquidators have entered into this Agreement in their personal capacities solely for the purpose of obtaining the benefit of the provisions in their favor.

(c)     Neither the Provisional Liquidators nor their firm, staff, agents or employees shall be liable in respect of any deed or document executed with a view to, or for the purpose of putting this Agreement into effect, whether or not such deed or document so provides in its terms and the Provisional Liquidators shall be entitled at any time to have any such deeds or documents amended at any time to include an exclusion of personal liability on the terms as set out in <u>Section 8.15(a)</u>.

(d)     Any instrument or deed of transfer in respect of the transfer of the Securities provided by Parent to Newco shall contain no new liabilities on the part of Newco and shall include a complete exclusion of personal liability on the part of the Provisional Liquidators.

(e)     The Provisional Liquidators' obligations under this Agreement shall absolutely cease upon termination of their appointment or vacation of their office as provisional liquidators of Parent.

SECTION 8.16 <u>Acknowledgments, Exclusions, Limitations and Agreements</u>. It is agreed that, other than in the case of fraud or dishonesty, the acknowledgements, exclusions, limitations and agreements which are set out in <u>Schedule 8.16</u> to this Agreement shall take effect

as if set out in full in this clause and take effect in favor of the Provisional Liquidators and subject to <u>Section 8.15(e)</u>, shall remain in full force and effect after Closing.

*[Remainder of Page Intentionally Left Blank.]*

       IN WITNESS WHEREOF, Parent, the Provisional Liquidators, acting as agents without personal liability, and Newco have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

PARENT:

AFINITI, LTD., a Bermuda exempted company in provisional liquidation acting by its joint provisional liquidators Mike Morrison and Charles Thresh of Teneo (Bermuda) Ltd.

By: _____

     Name:

     Title:

PROVISIONAL LIQUIDATORS by [●], one of the joint Provisional Liquidators, signing without personal liability

By: _____

     Name:

     Title:

NEWCO:

AFINITI NEWCO HOLDINGS LLC

By: _____

     Name:

     Title:

<u>Exhibit A</u>

FORM OF ASSUMPTION AGREEMENT

<u>Exhibit B</u>

FORM OF RELEASE OF GUARANTOR

Exhibit C

FORM OF BERMUDA DEED OF RELEASE

<u>Exhibit D</u>

FORM OF RELEASE OF CLAIMS AGREEMENT

*Agreed Form*

## <u>RELEASE OF CLAIMS AGREEMENT</u>

This Release of Claims Agreement (this "<u>Agreement</u>") is entered into as of [●], 2024, by and among (i) the parties listed as "Lenders" on the signature pages hereto (the "<u>Lenders</u>") solely in their capacity as lenders under the Term Loan Credit Agreement, dated as of June 13, 2019 (as amended, modified, supplemented from time to time, the "<u>Credit Agreement</u>"); (ii) Afiniti, Ltd. (the "<u>Company</u>"); (iii) each direct and indirect subsidiary of the Company, including, for the avoidance of doubt, the guarantors under the Credit Agreement (other than the Company) (each, a "<u>Company Subsidiary</u>," and collectively, the "<u>Company Subsidiaries</u>" and, together with the Company, the "<u>Companies</u>"); (iv) VCP Capital Markets, LLC, solely in its capacity as administrative agent and collateral agent under the Credit Agreement (the "<u>Term Loan Agent</u>"); (v) each officer or manager of the Company set forth on <u>Schedule 1</u> hereto (each, an "<u>Officer</u>" and, collectively, the "<u>Officers</u>"); (vi) each director of the board of the Company set forth on <u>Schedule 2</u> hereto (each, a "<u>Parent Director</u>" and, collectively, the "<u>Parent Directors</u>"); and (vii) Michael Morrison and Charles Thresh, each of Teneo (Bermuda) Ltd., in their capacity as joint provisional liquidators of the Company (and including any successors appointed by the Bermuda Court, the "<u>Joint Provisional Liquidators</u>"), on behalf of themselves as joint provisional liquidators and, to the extent applicable, the Company (in provisional liquidation).  Each of the Lenders, Companies, Term Loan Agent, Officers, and Parent Directors is referred to herein as a "<u>Party</u>," and collectively, the "<u>Parties</u>."  Capitalized terms not otherwise defined herein shall have the meanings given to them in the Restructuring Support Agreement, dated September 17, 2024 (as modified, amended or supplemented from time to time in accordance with its terms, the "<u>RSA</u>").  The "<u>RSA Effective Date</u>" shall mean the date that the RSA becomes effective pursuant to its terms and conditions.

WHEREAS, by an Order made by the Supreme Court of Bermuda on September [●] 2024, the Company was in provisional liquidation under the supervision of the Supreme Court of Bermuda (the "<u>Bermuda Court</u>");

WHEREAS, concurrently with the execution of this Agreement, certain of the Parties, among others, are entering into various definitive documents pursuant to which such Parties, and others, will consummate a restructuring transaction through, among other things, the following: (i) a proceeding in the Supreme Court of Bermuda with respect to the appointment of light-touch provisional liquidators for the Company and the approval of transfers by the Company pursuant to (a) the Stock and Asset Transfer Agreement and (b) the Securities Transfer Agreement, all of which were sanctioned by the Supreme Court of Bermuda; (ii) a recognition proceeding under chapter 15 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware; and (iii) the entry into and/or amendment of certain debt documents, all on the terms set forth in the RSA (collectively, along with all other related acts, events, and documents, the "<u>Restructuring</u>"); and

WHEREAS, as a condition precedent to the closing of the Restructuring, the Parties have agreed to exchange the releases and enter into such further agreements on the terms set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants, obligations, and releases set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     This Agreement shall become effective (the "Agreement Effective Date") when each of the following conditions have occurred: (i) this Agreement has been executed by all of the Parties; (ii) a copy of the fully-executed Agreement has been delivered to each of the Parties, provided that delivery to the Term Loan Agent shall constitute delivery to the Lenders, and provided further, that, the failure of any individual officer or board director of the Company to sign this Agreement shall not affect the Agreement's validity as to each other Party but this Agreement shall not be effective as to such officer or board director of the Company until such officer or board director signs this Agreement; (iii) all conditions to Closing set forth in the RSA and all Definitive Documents have been satisfied or waived in accordance with their terms; and (iv) the Closing Date has occurred.  This Agreement may be executed in counterparts, with electronic signatures being deemed originals.

2.     For purposes of this Agreement, the term "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, provided that the foregoing shall exclude all present and former common and preferred shareholders of the Company; and the term "Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

3.     Subject in all respects to Section 9 below, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Closing Date, the Companies hereby irrevocably waive, release, and discharge Afiniti Newco Holdings LLC ("Newco"), Afiniti AI Holdings LLC ("HoldCo"), the Term Loan Agent, and each Lender, in each case, together with their Affiliates and their and their Affiliates' respective officers, board directors, members, managers, partners, employees, agents, representatives, owners, financial advisors, legal advisors, shareholders, and predecessors in interest, solely in such capacities (collectively, the "Lender Releasees") from and against, any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action the Companies have, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against the Lender Releasees with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies; provided that references to financial advisors, tax advisors, and legal advisors in this Section 3 shall include only those that provided services in furtherance and support of the Restructuring, including, for the avoidance of doubt, any services related to the Definitive Documents and RSA.

4.     Subject in all respects to Sections 9 and 10 below, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Agreement Effective Date,

          a.    the Company hereby irrevocably waives, releases, and discharges the Company Subsidiaries, in each case, together with (i) their respective officers, board

2

directors, members, managers, partners, employees, solely in such capacities and solely if such Person was serving in such capacity on the RSA Effective Date (and not terminated for cause by any of the Companies prior to the Agreement Effective Date)*, and* (ii) their respective financial advisors, tax advisors, and legal advisors (the "Subsidiary Releasees") from and against, any and all claims, charges, claims for relief, demands, suits, actions, proceedings or causes of action which the Company has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against the Subsidiary Releasees with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies; and

    b.   each Company Subsidiary hereby irrevocably waives, releases, and discharges (i) its officers, board directors, members, managers, and partners, solely in such capacities and solely if such Person was serving in such capacity on the RSA Effective Date (or such former board directors as set forth on Schedule 3 with respect to an applicable Company Subsidiary, in their capacities as such) (and not terminated for cause by any of the Companies prior to the Agreement Effective Date)*, and* (ii) its financial advisors, tax advisors, and legal advisors from and against, any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which the Company Subsidiary has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against such Persons with respect to any action or inaction of such Person on or prior to the Agreement Effective Date taken in good faith relating to the Restructuring; and

provided that references to financial advisors, tax advisors, and legal advisors in this Section 4 shall include only those that provided services in furtherance and support of the Restructuring, including, for the avoidance of doubt, any services related to the Definitive Documents and RSA.

    5.    Subject in all respects to Sections 6, 9 and 10, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Agreement Effective Date, the Companies, the Lenders, and the Term Loan Agent (collectively, the "Party Releasors"), hereby irrevocably waive, release, and discharge (i) each Parent Director that is in office as of the RSA Effective Date and (ii) the Company's financial advisors, tax advisors, and legal advisors, in each case from and against any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which each Party Releasor has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against each Parent Director, with respect to any event, matter, claim, occurrence,

damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies; provided that (i) no Parent Director shall be released from (a) any act or omission that constitutes fraud, gross negligence, or willful misconduct; (b) unless otherwise agreed to by the applicable Parties in writing (x) money borrowed from or owed to any of the Companies as set forth in any of the books and records of the Companies, or (y) any obligations owed by such Parent Director to the Companies pursuant to any agreement with the Companies prior to the Closing Date; and (ii) each such Parent Director has provided a mutual release to each of the Party Releasors and Lender Releasees through the Agreement Effective Date as set forth in Section 6 hereof as a signatory to this Agreement; provided further that references to financial advisors, tax advisors, and legal advisors in this Section 5 shall include only those that provided services in furtherance and support of the Restructuring, including, for the avoidance of doubt, any services related to the Definitive Documents and RSA.

6.      Subject in all respects to Sections 5 and 9, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Closing Date, each Parent Director hereby irrevocably waives, releases, and discharges the Party Releasors and the Lender Releasees, from and against any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which each Parent Director has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against each Party Releasor and Lender Releasee, with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies; provided no Party Releasor or Lender Releasee shall be released from any act or omission that constitutes fraud, gross negligence, or willful misconduct. Except as otherwise expressly agreed to in writing between the applicable parties after the date of this Agreement, this Agreement shall not alter, waive or amend (i) any of the rights or obligations of the Company to pay each Parent Director monthly board director fees (in amounts consistent with ordinary course and past practices and prorated for any partial month served prior to the Agreement Effective Date) that are accrued and unpaid as of the Agreement Effective Date; (ii) any rights of each Parent Director to seek and receive payment from or indemnification against any of the Company's insurance carriers or any rights as beneficiaries of any of the Company's insurance policies in existence at any time, including without limitation, any policies that the Company shall have terminated or placed into "run-off" (collectively, the "Policies"); and (iii) any rights of each Parent Director to seek and receive payment from or indemnification against Newco pursuant to any indemnification agreements entered into between Newco and such Parent Director.

7.      Subject in all respects to Sections 8, 9 and 10, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Agreement Effective Date, the Company, Lenders, and Term Loan Agent hereby irrevocably waive, release, and discharge each Officer that is employed by the Company as of the RSA Effective Date, from and against any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which the Company, Lenders, and Term Loan Agent has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or

4

unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against such Officer, with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies; provided that such Officer (i) shall have provided a mutual release to the Company, the Lenders, and the Term Loan Agent through the Agreement Effective Date as set forth in Section [8] hereof as a signatory to this Agreement; and (ii) shall not be released from (A) any act or omission that constitutes fraud, gross negligence, or willful misconduct, (B) money borrowed from or owed to any of the Companies as set forth in its books and records, or (C) any obligations owed by the Officer to any of the Companies pursuant to a written agreement prior to the Closing Date.

8.      Subject in all respects to Sections 7 and 9, in connection with, and as part of the consideration for, the Restructuring, to the fullest extent permitted by applicable law, as of the Agreement Effective Date, each Officer hereby irrevocably waives, releases, and discharges the Company, the Lenders, the Term Loan Agent, and the Lender Releasees from and against any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which such Officer has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against the Company, Lenders, Term Loan Agent, and Lender Releasees with respect to any event, matter, claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Effective Date relating to the Companies.  Except as otherwise expressly agreed to in writing between the applicable parties after the date of this Agreement, this Agreement shall not alter, waive or amend (i) any of the rights or obligations of the Officer under any employment agreements with any of the Companies; (ii) any rights of each Officer to seek and receive payment from or indemnification against any of the Company's insurance carriers or any rights as beneficiaries of any of the Company's insurance policies in existence at any time, including without limitation, any policies that the Company shall have terminated or placed into "run-off" (collectively, the "Policies"); and (iii) any rights of each Officer to seek and receive payment from or indemnification against Newco pursuant to any indemnification agreements entered into between Newco and such Officer.

9.      Notwithstanding anything to the contrary herein, this Agreement shall not alter, waive or amend (i) any of the rights or obligations granted to or imposed upon any party to the RSA or any agreement or other document referred to in or entered into in connection with the RSA, including the Backstop Commitment Agreement, the Newco LLC Agreement, the Securities Transfer Agreement, the Stock and Asset Transfer Agreement, the Amendment or any other Term Loan Credit Documents (including all Term Loan Indebtedness) or any other Definitive Document or (ii) the ability of any Party to enforce any rights or obligations arising under this Agreement; provided that (i) no board director, officer, manager, manager, partner, or employee of any of the Companies shall be released hereunder (a) for any act or omission that constitutes fraud, gross negligence, or willful misconduct; (b) unless otherwise agreed to by the applicable Parties in writing, (x) money borrowed from or owed to any of the Companies as set forth in the books and records of any of the Companies or (y) any obligations owed by such director, officer or employee to any of the Companies pursuant to written agreement; and (ii) to the extent any loans, promissory notes or other obligations of any board director, officer or employee to any of the Companies

constitute assets of the Company or any Company Subsidiary, this Agreement does not release such loans, promissory notes or other obligations or any liens or other encumbrances in favor of the Term Loan Agent or Lenders.

10.     Notwithstanding anything to the contrary in this Agreement or any Definitive Document, no release shall be provided to any officer, board director or employee of the Companies that has been terminated with Cause (as defined in any employment or service agreement with the applicable board director, officer or employee) by any of the Companies prior to the Closing Date.  For the avoidance of doubt, this Agreement does not alter the ability of any Party or Company Subsidiary to terminate any person for cause or the consequences of such a termination (including the forfeiture of any rights to severance payments or benefits), nor does it waive any rights of a Company Subsidiary to bring a claim with respect to an officer's or board director's conduct that is not related to the Restructuring or with respect to an employee's conduct (excluding officers) for any reason.  Further, notwithstanding anything to the contrary in this Agreement, none of the releases provided in this Agreement shall extend to (i) TRG Pakistan Ltd. ("TRGP"), including any current and former directors of TRGP solely in their capacities as directors of TRGP, or (ii) Muhammad Ziaullah Khan Chishti, Qinhe (Hainan) Intelligent Technology Ltd., Isbei Ltd., Isbei (Hainan) Technology Co., Ltd., Isbei AI (Private) Ltd., or Sarah Pobereskin.

11.     Each releasor hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), understands, acknowledges and agrees that, subject to the exceptions set forth herein, the releases set forth herein are full and final general releases of all claims herein released as specified herein that could have been asserted in any legal or equitable proceeding against the applicable Person getting specific releases as specifically set forth herein.  Each releasor hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim purported to be released hereby as to the Person getting specific releases from such releasor (including the matters covered by above), or commencing, instituting or causing to be commenced any action, suit or proceeding of any kind, against any the Person the releasor specifically released hereunder, based upon any claim purported to be released by it, in its capacity as releasor hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), hereby (including the matters covered above).  Each releasor hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), further agrees that in the event it should bring a claim purported to be released by it seeking damages against any such applicable releasee, this Agreement shall serve as a complete defense to such claims.

12.     Each Person providing a release hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), subject to the exceptions set forth in this Agreement, hereby expressly waives any rights it may have with respect to unknown claims.  In connection with such waiver and relinquishment, each such releasor acknowledges that it is aware that, after executing this Agreement, such entity or their attorneys or agents may discover claims or facts in addition to, or different from, those which they now know or believe exist with respect to the subject matter of this Agreement (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have

agreed to release), but that it is such Person's intention hereby to fully, finally, and forever settle and release all of the claims, matters, disputes, differences, whether known or unknown, suspected or unsuspected, that arose on or prior to the date of this Agreement and which arise out of or relate directly to any of the released matters. Each Person providing a release hereunder (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release), subject to the exceptions set forth above, hereby irrevocably and forever waives and relinquishes any and all rights or benefits that such Person has or may have had or in the future may have arising under California Civil Code section 1542 ("Section 1542") or any analogous provision of law of any other jurisdiction with respect to the releases they have granted hereunder. Each such releasor (but solely as to the releases such releasor has specifically provided hereunder to the specific Persons they have agreed to release) understands that Section 1542 provides that:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

13.    Each of the Companies acknowledges and agrees that (i) the transfer of all of the issued and outstanding shares of capital stock of Borrower and (ii) all of the issued and outstanding membership interests of HoldCo from the Company to Newco pursuant to the Securities Transfer Agreement was made voluntarily by the Company for the consideration specified in the Securities Transfer Agreement.

14.    The Joint Provisional Liquidators act as agents for the Company and neither they nor their firm, staff, agents, employees or representatives shall incur any personal liability in any circumstances whatsoever (i) under, or by virtue of, this Agreement; (ii) in relation to any related matter or claim howsoever, whenever, and wherever arising, and whether such claim be formulated in contract, restitution, tort or by reference to any other remedy or right, and in whatever jurisdiction or forum; (iii) by reason of their acting in the capacity as agents of the Company; (iv) whether or not acting as agents of the Company, by reason of their acting in the name and on behalf of the Company; or (v) in respect of any transfer, assignment or other documents made or entered into and delivered pursuant to this Agreement.

15.    The Joint Provisional Liquidators have entered into this Agreement in their personal capacities solely for the purpose of obtaining the benefit of the provisions in their favor.

16.    Neither the Joint Provisional Liquidators nor their firm, staff, agents or employees shall be liable in respect of any deed or document executed with a view to, or for the purpose of putting this Agreement into effect, whether or not such deed or document so provides in its terms.

17.    The Joint Provisional Liquidators' obligations under this Agreement shall absolutely cease upon termination of their appointment or vacation of their office as joint provisional liquidators, or subsequently as permanent liquidators, of the Company; *provided* that, the foregoing shall not affect or otherwise impair any other Parties' agreements by or among each other as provided herein.

18.    This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes any other oral or written agreements between such Person regarding the subject matter hereof; provided, that, for the avoidance of doubt, nothing herein shall impact that certain Release of Guarantor effective as of the date hereof, that certain Deed of Release effective as of the date hereof, or any separate release agreement entered into in connection with the Term Loan Documents or the Newco LLC Agreement.

19.    Each Party represents and warrants that (i) it has all requisite power and authority to enter into this Agreement and (ii) it has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each such Party and constitutes the legal, valid and binding agreement of each such Party, enforceable in accordance with its terms. The terms of this Agreement have been negotiated in good faith by the parties hereto.  The provisions of this Agreement shall not be construed adverse to any party as "drafter" in the event of a contention of ambiguity in this Agreement, and the Parties hereto waive any statute or rule of law to such effect.

20.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  The use of "include" or "including" is without limitation, whether stated or not.  The term "or" is not necessarily exclusive.

21.    This Agreement is for the sole benefit of the Parties hereto, the Joint Provisional Liquidators, and their respective permitted assigns and nothing herein expressed or implied, shall give or be construed to give any person, other than such Persons signatory hereto and such permitted assigns, any legal or equitable rights hereunder; provided, that any Person receiving a release hereunder shall be an express third-party beneficiary of this Agreement with full rights of enforcement as if a Person signatory hereto.

22.    None of the terms or provisions of this Agreement may be amended, supplemented, or otherwise modified except by a written instrument executed by each affected releasing Party and each affected released Party with respect to such waiver, release, or discharge, in each instance, as applicable.  No waiver or amendment of any of the terms or provisions of this Agreement shall be binding against any Party hereto that is affected by such waiver or amendment unless such waiver or amendment is in a writing signed by such Party.

23.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  All actions, suits, arbitrations, litigations, formal investigations or proceeding before or by any governmental authority (collectively, "Actions") arising out of or relating to this Agreement shall be heard and determined exclusively in any New York federal court sitting in the Borough of Manhattan of The City of New York; provided, however, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of The City of New York.  Consistent with the preceding sentence, each of the Parties hereby (a) submits to the exclusive jurisdiction of any federal or state court sitting in the Borough of Manhattan of The City of New York for the purpose of any Action arising out of or relating to this Agreement brought by either Party; (b) agrees that service of process on any Party will be validly effected by

8

sending notice to the address(es) of such Party or Parties set forth on the signature pages hereto; (c) irrevocably waives, and agrees not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above named courts; and (d) WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUCH CLAIM, SUIT, ACTION OR PROCEEDING.

[*Signature Pages for the Companies, Lenders, Term Loan Agent, Officers, and Parent Directors Omitted*]

### **Schedule 1**

**Officers**

1.  Hassan Afzal – Chief Executive Officer

2.  Thomas Inskip – President

3.  J. Michael Myshrall – Chief Financial Officer

4.  Samuel E. Logan, Jr. – Chief Legal Officer, Assistant Secretary

5.  Rebecca Clare Vernon – Deputy General Counsel, Assistant Secretary

6.  John Birrer – Chief Administrative Officer, Chief People Officer

**<u>Schedule 2</u>**

**Parent Directors**

1. Hassan Afzal

2. Hasnain Aslam

3. Jose Maria Aznar

4. Martha Bejar

5. Lawrence Babbio, Jr.

6. Mohammed Khaishgi

7. John Leone

8. Abdul Hafeez Shaikh

9. John Snow

## **Schedule 3**

**Afiniti AI Limited**

1. Gareth O'Neill (Afiniti AI Limited)

2. Tom Inskip (Afiniti AI Limited)

3. Sam Logan (Afiniti AI Limited)

**Schedule 8.16**

**Acknowledgements, Exclusions, Limitations and Agreements as regards to the Provisional Liquidator**

1.      Newco agrees that the terms and conditions of this Agreement and the exclusions and limitations contained in it are fair and reasonable having regard to the following:

   a.   that this is a sale by a company in provisional liquidation in circumstances where the Provisional Liquidators' knowledge of the Securities is necessarily limited and it is usual that no representations and warranties are given by or on behalf of the Provisional Liquidators in their capacities as provisional liquidators (other than that the Provisional Liquidators warrant that they have the power to sell the Securities for and on behalf of Parent);

   b.   Parent is in provisional liquidation and faces the constraints of selling necessarily imposed on it in that circumstance;

   c.   that it has relied solely on the basis of the representations, warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in Section 8.15) and on the opinions of itself and its professional advisers concerning the Securities and their quality, condition, description, fitness and/or suitability for any purpose;

   d.   that it has agreed to purchase the Securities for a consideration which takes into account the risk to Newco represented by the Parties' belief that the said exclusions and limitations are or would be recognized by the courts; and

   e.   that it and its representatives and advisers have been given every opportunity to examine and inspect all relevant documents relating to the Securities and is aware of the need to rely on such opportunity by reason of the absence of warranties by or on behalf of the Provisional Liquidators in their capacities as provisional liquidators (other than that the Provisional Liquidators warrant that they have the power to sell the Securities for and on behalf of Parent).

2.      Newco acknowledges that it has entered into this Agreement solely on the basis of the representations, warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in Section 8.15), and it has not entered into this Agreement on the basis of or in reliance upon any representations, agreements, statements, warranties or replies to specific enquiries (whether oral or written) made or given or alleged to have been made or given by the Provisional Liquidators in their capacities as provisional liquidators or their representatives (whether that party is a Party to this Agreement or not, other than Parent) at any time (other than that the Provisional Liquidators warrant that they have the power to sell the Securities for and on behalf of Parent).

3.    Notwithstanding any other provision of this Agreement, the Provisional Liquidators shall be required to reimburse Newco for any liability discharged by Newco where that liability constitutes a provable debt in Parent's provisional liquidation. Nothing in this Agreement shall require the Provisional Liquidators to discharge a liability as a Provisional Liquidation Expense that would otherwise be an unsecured claim in Parent's provisional liquidation. Any claim of Newco, or of any Person claiming through Newco, against the assets of Parent shall not take effect otherwise than as an unsecured claim, nor shall any claim against the Provisional Liquidators be considered a Provisional Liquidation Expense.

4.    The exclusions in this Schedule shall:

    a.  not limit the covenants and agreements of Parent in this Agreement, including the representations and warranties of Parent in Article III of this Agreement (for which the Provisional Liquidators shall have no personal liability (save in respect of fraud or dishonesty) as provided in <u>Section 8.15</u>);

    b.  operate as waivers of any claims against the Provisional Liquidators in tort and restitution as well as under the law of contract or under applicable legislation or regulations;

    c.  continue notwithstanding completion of this Agreement in whole or in part;

    d.  continue notwithstanding the Provisional Liquidators ceasing to act as provisional liquidators of Parent; and

    e.  be in addition to any relief available to the Provisional Liquidators.

5.    Nothing in this Agreement shall:

    a.  operate to restrict or affect in any way any right of the Provisional Liquidators to cease to act as provisional liquidators of Parent; or

    b.  require the Provisional Liquidators to discharge in whole or in part any liability of Parent outstanding at the time of the Provisional Liquidators' appointment as provisional liquidators of Parent or which would not otherwise be payable as a Provisional Liquidation Expense.

6.    Newco hereby agrees and accepts that:

    a.  any claim surviving after the Closing Date against any JPL Party, or any of them or their firms or their partners, employees, agents, advisers or representatives shall, in any event and in addition to the above exclusions of liability of the Provisional Liquidators, be irrevocably waived unless made in writing by notice to Parent or the JPL Party, as appropriate, not later than the date on which the Provisional Liquidators cease to hold office as provisional liquidators of Parent; and

b.  without prejudice to all and any other provision of this Agreement, any claim of it, or of any Person claiming through, under or in relation to it, shall not in any circumstances exceed the consideration payable hereunder.

# **Exhibit I**

**Backstop Commitment Agreement**

*Execution Version*

BACKSTOP COMMITMENT AGREEMENT

AMONG

AFINITI, INC.,

AFINITI NEWCO HOLDINGS LLC

AND

THE BACKSTOP PARTIES PARTY HERETO

Dated as of September 17, 2024

# TABLE OF CONTENTS

Page

Article I DEFINITIONS ................................................................................................... 3
   Section 1.1  Definitions ........................................................................................ 3
   Section 1.2  Additional Defined Terms................................................................. 7
   Section 1.3  Construction ..................................................................................... 8
Article II BACKSTOP COMMITMENT ......................................................................... 9
   Section 2.1  Backstop Commitment ..................................................................... 9
   Section 2.2  Consideration for Backstop Commitment......................................... 10
   Section 2.3  Backstop Party Default..................................................................... 10
   Section 2.4  Backstop Escrow Account Funding .................................................. 10
   Section 2.5  Closing ............................................................................................ 11
   Section 2.6  Rights Offering................................................................................. 12
Article III REPRESENTATIONS AND WARRANTIES OF THE COMPANY...................... 13
   Section 3.1  Organization and Qualification ........................................................ 13
   Section 3.2  Corporate Power and Authority ....................................................... 14
   Section 3.3  Execution and Delivery; Enforceability........................................... 14
   Section 3.4  No Conflict ...................................................................................... 14
   Section 3.5  Consents and Approvals................................................................... 15
   Section 3.6  Arm's Length ................................................................................... 15
   Section 3.7  No Other Representations or Warranties ............................................ 15
Article IV REPRESENTATIONS AND WARRANTIES OF NEWCO ................................... 16
   Section 4.1  Organization and Qualification ........................................................ 16
   Section 4.2  Corporate Power and Authority ....................................................... 16
   Section 4.3  Execution and Delivery; Enforceability........................................... 16
   Section 4.4  Authorized and Issued Share Capital ............................................... 16
   Section 4.5  No Conflict ...................................................................................... 17
   Section 4.6  Consents and Approvals................................................................... 17
   Section 4.7  Arm's Length ................................................................................... 18
   Section 4.8  No Other Representations or Warranties ............................................ 18
Article V REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP PARTIES ...... 18
   Section 5.1  Incorporation ................................................................................... 18
   Section 5.2  Corporate Power and Authority ....................................................... 18
   Section 5.3  Execution and Delivery.................................................................... 19

Section 5.4    No Conflict ............................................................................................... 19

Section 5.5    Consents and Approvals ................................................................................ 19

Section 5.6    No Registration; Purchasing Intent; Sophistication. ..................................... 19

Section 5.7    No Broker's Fees ......................................................................................... 20

Section 5.8    Sufficiency of Funds .................................................................................... 20

Section 5.9    Proceedings ................................................................................................. 20

Section 5.10   Arm's Length .............................................................................................. 20

Article VI ADDITIONAL COVENANTS ...................................................................... 20

Section 6.1    Financial Information ................................................................................... 20

Section 6.2    Commercially Reasonable Efforts ................................................................ 21

Section 6.3    No Integration; No General Solicitation ....................................................... 21

Section 6.4    Transfer Restrictions .................................................................................... 21

Section 6.5    Restructuring Support .................................................................................. 21

Article VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES ................................. 23

Section 7.1    Conditions to the Obligation of the Backstop Parties ..................................... 23

Section 7.2    Waiver of Conditions to Obligation of Backstop Parties ................................. 24

Section 7.3    Conditions to the Obligation of the Company and NewCo ............................. 24

Article VIII TERMINATION ........................................................................................ 25

Section 8.1    Termination Rights ....................................................................................... 25

Article IX GENERAL PROVISIONS ............................................................................ 26

Section 9.1    Notices ........................................................................................................ 26

Section 9.2    Assignment; Third Party Beneficiaries ......................................................... 27

Section 9.3    Entire Agreement ......................................................................................... 28

Section 9.4    Governing Law; Venue ................................................................................ 28

Section 9.5    Waiver of Jury Trial ..................................................................................... 28

Section 9.6    Counterparts ................................................................................................ 28

Section 9.7    Waivers and Amendments; Rights Cumulative .............................................. 28

Section 9.8    Headings ...................................................................................................... 29

Section 9.9    Specific Performance .................................................................................... 29

Section 9.10   Damages ...................................................................................................... 29

Section 9.11   No Reliance .................................................................................................. 29

Section 9.12   Publicity ...................................................................................................... 30

2

SCHEDULES AND EXHIBITS

Schedule 1      Backstop Commitment Percentage


Exhibit A       Settlement Agreement

## BACKSTOP COMMITMENT AGREEMENT

THIS BACKSTOP COMMITMENT AGREEMENT (this "**Agreement**"), dated as of September 17, 2024, is made by and among Afiniti, Inc., a Delaware corporation (the "**Company**"), and Afiniti Newco Holdings LLC, a Delaware limited liability company ("**NewCo**"), on the one hand, and The Resource Group International, Ltd., a Bermuda exempted company, and its Affiliates who become a party to this Agreement between the date hereof and the Closing by executing and delivering to the Parties a counterpart signature to this Agreement (each such entity with a commitment set forth on Schedule 1, as it may be amended, a "**Backstop Party**" and collectively, the "**Backstop Parties**"), on the other hand. The Company, NewCo and the Backstop Parties are referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**".

## RECITALS

WHEREAS, substantially concurrent with the execution and delivery of this Agreement, Afiniti, Ltd., a Bermuda exempted company ("**Parent**"), the Company, the guarantors listed on Schedule 1 attached thereto, VCP Capital Markets, LLC, in its capacity as administrative agent and collateral agent (solely in such capacities, the "**Agent**") under the Existing Credit Agreement (as hereinafter defined), and the lenders from time to time party thereto are entering into a Restructuring Support Agreement, dated as of September 17, 2024 (together with all exhibits, schedules, annexes and attachments thereto, as may be amended, supplemented or otherwise modified from time to time, the "**Restructuring Support Agreement**"), which provides for a restructuring transaction (the "**Restructuring**"), as more fully set forth in the Restructuring Support Agreement, which shall be consummated through, among other things, (i) a Bermuda proceeding with respect to the appointment of light-touch provisional liquidators and the approval of transfers by Parent pursuant to (a) the Share and Asset Transfer Agreement (as hereinafter defined) and (b) the Securities Transfer Agreement (as hereinafter defined) (together with any application, petition or proceeding arising therein or connected thereto, the "**Bermuda Proceeding**") in the Supreme Court of Bermuda (the "**Bermuda Court**"); (ii) a recognition proceeding under chapter 15 of title 11 of the United States Code (the "**Bankruptcy Code**") (together with any application, petition or proceeding arising therein or connected thereto, the "**Chapter 15 Case**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"); and (iii) the entry into and/or amendment of certain debt documents, all on the terms set forth in the Restructuring Support Agreement;

WHEREAS, the existing Term Loan Credit Agreement, dated as of June 13, 2019, among the Company, as borrower, Parent, as parent guarantor, the Agent, and each lender from time to time party thereto (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "**Existing Credit Agreement**"), will be amended and restated in connection with the Restructuring by an amendment (the "**Restructuring Amendment**"; and the Existing Credit Agreement as so amended and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**") to provide for, among other things, the amendment of the existing Term Loans (as defined in the Existing Credit Agreement) by causing the instruments set forth in clauses (a) and (b) to be issued in exchange for an equal reduction of the existing Term Loans under the Credit Agreement: (a) a new senior first lien secured tranche in the aggregate principal amount of Two Hundred Twenty

Five Million Dollars ($225,000,000), as such amount may be increased with respect to any accrued paid in kind interest and (b) a junior second lien secured convertible tranche in the aggregate principal amount of Two Hundred Ninety Eight Million Seven Hundred Forty Four Thousand Eight Hundred Fifty Nine Dollars and Seventy One Cents ($298,744,859.71), as such amount may be increased with respect to any accrued paid in kind interest (the "**Restructuring Second Lien Term Loans**"), which Restructuring Second Lien Term Loans shall be convertible at the option of the lenders of the Restructuring Second Lien Term Loans into fully paid, non-assessable Class A-2 Units of NewCo ("**Class A-2 Units**");

WHEREAS, subject to the terms and conditions contained in this Agreement, the Backstop Parties have agreed (x) to purchase from the Company and NewCo Fifteen Million ($15,000,000) aggregate principal amount of Restructuring Second Lien Term Loans (the "**Backstop Loans**") at the Closing (as hereinafter defined), and (y) to receive from NewCo a number of Class A-1 Units of NewCo ("**Class A-1 Units**") equal to the number of Class A-2 Units issuable upon conversion of the Backstop Loans (the "**Backstop Class A-1 Units**" and the "**Backstop Class A-2 Units**", respectively, and together, the "**Backstop Units**" and, together with the Backstop Loans, the "**Backstop Securities**"); *provided*, that in the event the amount subscribed for in the Rights Offering (as hereinafter defined) by Rights Offering Subscribers (as hereinafter defined) exceeds $10,000,000 aggregate principal amount of Restructuring Second Lien Term Loans, such Backstop Loans in excess of $10,000,000 aggregate principal amount shall be resold to Rights Offering Subscribers (or, in the event such Rights Offering Subscribers are not Eligible Assignees, such Backstop Loans shall be assigned to the Company and NewCo for cancellation by the Agent and an equivalent principal amount of Equivalent Notes shall be issued by the Company and NewCo to such Rights Offering Subscribers) along with a corresponding number of Class A-1 Units; and *provided*, *further*, that in no event shall the amount of Backstop Loans so resold to Rights Offering Subscribers or assigned to the Company and NewCo exceed $5,000,000 aggregate principal amount; and

WHEREAS, pursuant to this Agreement, after the Closing, the Company and NewCo will conduct an offering (the "**Rights Offering**") to Eligible Holders (as hereinafter defined) of equity interests of Parent as of the record date for such offering (including the Backstop Parties that are Eligible Holders, subject to Section 2.6(b)(i)), whereby each such Eligible Holder will have the non-transferrable right to subscribe to (i) up to Twenty Five Million Dollars ($25,000,000) aggregate principal amount of Restructuring Second Lien Term Loans (inclusive of $10,000,000 aggregate principal amount of the Backstop Commitment) (or, in the event such Eligible Holders are not Eligible Assignees, Equivalent Notes) in minimum increments of $1,000,000 aggregate principal amount of Restructuring Second Lien Term Loans (except as provided in Section 2.6(b)(ii)) and (ii) a number of Class A-1 Units equal to the number of Class A-2 Units issuable upon conversion of the Restructuring Second Lien Term Loans or Equivalent Notes subscribed for in the Rights Offering.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the Parties hereby agrees as follows:

# ARTICLE I

# DEFINITIONS

Section 1.1 <u>Definitions</u>.    Except as otherwise expressly provided in this Agreement, or unless the context otherwise requires, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made; <u>provided</u> that no Backstop Party shall be deemed an Affiliate of the Company or NewCo.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person.

"**Available Securities**" means the Backstop Securities that any Defaulting Backstop Party fails to purchase as a result of a Backstop Party Default by such Defaulting Backstop Party.

"**Backstop Commitment Percentage**" means, with respect to each Backstop Party, the percentage set forth opposite such Backstop Party's name under the column titled "<u>Backstop Commitment Percentage</u>" on <u>Schedule 1</u> (as it may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement).

"**Backstop Party Default**" means the failure by any Backstop Party to deliver the Aggregate Purchase Price for such Backstop Party's Backstop Commitment to the Backstop Escrow Account on or before the Escrow Funding Date pursuant to <u>Section 2.4</u>.

"**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in United States Bankruptcy Rule 9006(a)), on which commercial banks are open for commercial business with the public in New York City, New York.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code. Except where otherwise provided in context, "Claim" refers to a claim against the Company.

"**Company Material Adverse Effect**" means any event, circumstance or condition that has had or could reasonably be expected to have a materially adverse effect on (i) the business, assets, results of operations, prospects or financial condition of the Company Group, taken as a whole; (ii) the ability of the Company to perform its obligations under this Agreement; or (iii) the ability of the Company to consummate the Restructuring, but, in each case, the commencement and existence of the Bermuda Proceeding or the Chapter 15 Case, and any event, circumstance, or condition directly in relation thereto (including, but not limited to, the litigation and/or determination of any matters arising therein) shall not be deemed to constitute or be taken into account in determining whether there has been a Company Material Adverse Effect.

3

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral.

"**Defaulting Backstop Party**" means, at any time, any Backstop Party that caused a Backstop Party Default that is continuing at such time.

"**Effective Date**" means the date on which the closing of the Restructuring occurs pursuant to the Restructuring Support Agreement, including that (i) the amendments to the Term Loan Credit Documents (as defined in the Restructuring Support Agreement) necessary with respect to the New Exit Loans (as defined in the Restructuring Support Agreement) have become effective; (ii) the transactions and transfers under the Stock and Asset Transfer Agreement and the Securities Transfer Agreement shall have been completed; (iii) the Release of Claims Agreement (as defined in the Restructuring Support Agreement) shall be in the form attached to the Securities Transfer Agreement as an exhibit as of the Effective Date of the Restructuring Support Agreement and shall have been executed by the Companies (as defined in the Release of Claims Agreement) and shall be effective in accordance with its terms; (iv) the Indemnity Agreement (as defined in the Restructuring Support Agreement) shall be in the form attached to the Restructuring Support Agreement as an exhibit as of the Effective Date of the Restructuring Support Agreement and shall have been executed by NewCo; and (v) the Settlement Agreement shall be in the form attached to this Backstop Agreement and shall have been executed by the Company (as defined in the Settlement Agreement).

"**Eligible Assignee**" has the meaning set forth in the Credit Agreement.

"**Eligible Holder**" means any holder of equity interests in Parent that certifies that it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act); or (iii) a non-U.S. person under Regulation S under the Securities Act that is located outside of the U.S. (within the meaning of Regulation S under the Securities Act).

"**Equivalent Notes**" means, promissory notes issued by the Company and NewCo having terms substantially similar to the Restructuring Second Lien Term Loans issued to Rights Offering Subscribers who are not Eligible Assignees, which Equivalent Notes shall be convertible at the option of the Rights Offering Subscribers into fully paid, non-assessable Class A-2 Units; provided, however, that for every Equivalent Note issued in excess of $10,000,000 aggregate principal amount, an equivalent principal amount of Restructuring Second Lien Term Loans shall be assigned to the Company and NewCo for cancellation by the Agent in accordance with Section 2.6(b).

"**Equity Securities**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, units, and any other equity, ownership, or profits interests of any Person, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, units, or other equity,

ownership, or profits interests of any Person (in each case, whether or not arising under or in connection with any employment agreement).

"**Final Order**" means, as applicable, an order or judgment of a court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided, however that the possibility that a motion under Rule 60 of the United States Federal Rules of Civil Procedure or any comparable rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

"**Governmental Authority**" means any domestic, national, foreign or supranational court or other judicial authority or governmental, administrative, arbitral or regulatory body, department, agency, commission, bureau or other authority (including any industry or other self-regulating body.

"**HoldCo**" means Afiniti AI Holdings LLC, a limited liability company to be organized under the laws of the Cayman Islands, which (i) will be formed by Parent prior to the commencement of the Bermuda Proceeding and will be a wholly owned direct subsidiary of Parent, and (ii) following the Closing will be a wholly owned direct subsidiary of NewCo.

"**Interest**" means an equity interest, including the common stock, preferred stock, limited liability company interests, partnership interests, and any other equity, ownership, beneficial or profits interests of the Company or its Affiliates, and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, partnership interests, or other equity, ownership, beneficial or profits interests of the Company or its Affiliates, and any equity appreciation right, phantom unit, profit appreciation right or participation right with respect to any of the foregoing (whether or not arising under or in connection with any employment agreement), in each case other than any equity Interests in NewCo.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, judgment, treaty, or convention in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Authority of competent jurisdiction (including the Bankruptcy Court and the Bermuda Court).

"**Lien**" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title or other restrictions of a similar kind.

"**NewCo LLC Agreement**" means the amended and restated limited liability company agreement of NewCo as of the Closing date, which shall be in substantially the form attached to the Restructuring Support Agreement as Exhibit F as of the date of execution thereof.

"**NewCo Material Adverse Effect**" means any event, circumstance or condition that has had or could reasonably be expected to have a materially adverse effect on (i) the business, assets, results of operations, prospects or financial condition of NewCo; or (ii) the ability of NewCo to perform its obligations under this Agreement.

"**New Units**" shall mean the Class A-1 Units and Class A-2 Units issued by NewCo on the Effective Date in accordance with this Agreement and the Restructuring.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Authority or arbitrator.

"**Outside Date**" means November 30, 2024; *provided*, that any extension of the "Outside Date" under and as defined in the Restructuring Support Agreement shall likewise extend the Outside Date under this Agreement; *provided, however*, that any extension of the Outside Date beyond December 31, 2024 shall require the consent of the Requisite Backstop Parties.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, association, trust, Governmental Authority or other entity or organization.

"**Purchase Price**" means, in the case of an individual Backstop Party, 100% of the principal amount of the Restructuring Second Lien Term Loans to be purchased by such Backstop Party.

"**Recognition Motion**" means the motion to be filed with the Bankruptcy Court in the Chapter 15 Case seeking (i) recognition of the Bermuda Proceeding and the Restructuring and (ii) recognition of the Sanction Order and enforcement of its terms.

"**Recognition Order**" means an order of the Bankruptcy Court approving the Recognition Motion.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"**Requisite Backstop Parties**" means, collectively, the Backstop Parties (excluding any Defaulting Backstop Parties) holding at least 50.01% of the aggregate Backstop Commitment Percentages of the Backstop Parties (excluding any Defaulting Backstop Parties).

"**Restructuring Term Sheet**" means the Restructuring Term Sheet attached as Exhibit B to the Restructuring Support Agreement.

"**Rights Offering Securities**" means the Restructuring Second Lien Term Loans or Equivalent Notes and Class A-1 Units offered in the Rights Offering.

6

"**Rights Offering Subscribers**" means those Eligible Holders (including any Backstop Parties that are Eligible Holders, subject to Section 2.6(b)(i)) who duly subscribe for Rights Offering Securities in accordance with the Rights Offering.

"**Sanction Order**" means an order of the Bermuda Court that, among other things, approves the actions of the joint provisional liquidators in furtherance of the Restructuring.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Securities Transfer Agreement**" means that certain Securities Transfer Agreement to be entered into by and between Parent and NewCo in substantially the form attached to the Restructuring Support Agreement as Exhibit G.

"**Stock and Asset Transfer Agreement**" means that certain Stock and Asset Transfer Agreement to be entered into by and between Parent and HoldCo in substantially the form attached to the Restructuring Support Agreement as Exhibit H.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary), (i) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (ii) has the power to elect a majority of the board of directors or similar governing body or (iii) has the power to direct the business and policies.

"**Taxes**" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Authority, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, share capital, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other mandatory governmental charges of any kind whatsoever paid to a Governmental Authority (whether payable directly or by withholding and whether or not requiring the filing of a Tax return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.

"**Transfer**" has the meaning set forth in the Restructuring Support Agreement.

"**Unregistered Securities**" means any New Units issued in reliance on the exemption provided by Section 4(a)(2) under the Securities Act or another available exemption.

Section 1.2   Additional Defined Terms.  In addition to the terms defined in Section 1.1, additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated in the table below.

| Defined Term | Section |
|---|---|
| Agent | Recitals |
| Agreement | Preamble |
| Aggregate Purchase Price | 2.4(a) |

7

| Defined Term | Section |
|---|---|
| Backstop Commitment | 2.1 |
| Backstop Class A-1 Units | Recitals |
| Backstop Class A-2 Units | Recitals |
| Backstop Escrow Account | 2.4(a) |
| Backstop Loans | Recitals |
| Backstop Notice | 2.4(a) |
| Backstop Party | Preamble |
| Backstop Party Replacement | 2.3(a) |
| Backstop Party Replacement Period | 2.3(a) |
| Backstop Securities | Recitals |
| Backstop Units | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bermuda Court | Recitals |
| Bermuda Proceeding | Recitals |
| Chapter 15 Case | Recitals |
| Class A-1 Units | Recitals |
| Class A-2 Units | Recitals |
| Closing | 2.5(a) |
| Closing Date | 2.5(a) |
| Company | Preamble |
| Company Group | 3.1 |
| Credit Agreement | Recitals |
| Escrow Funding Date | 2.4(b) |
| Existing Credit Agreement | Recitals |
| Financial Reports | 6.1 |
| NewCo | Preamble |
| Parent | Recitals |
| Party | Preamble |
| Replacing Backstop Parties | 2.3(a) |
| Restructuring | Recitals |
| Restructuring Amendment | Recitals |
| Restructuring Second Lien Term Loans | Recitals |
| Restructuring Support Agreement | Recitals |
| Rights Offering | Recitals |
| Rights Offering Notice | 2.4(a) |
| Subscription Period | 2.6(a) |
| Transaction Agreements | 3.2(a) |

Section 1.3    Construction.    In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)     the descriptive headings of the Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(c)     references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (.pdf), facsimile transmission or comparable means of communication;

(d)     words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(e)     the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(f)     the term this "Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(g)     "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(h)     the term "or" is not necessarily exclusive;

(i)     references to "day" or "days" are to calendar days;

(j)     references to "the date hereof" means as of the date of this Agreement;

(k)     unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder in effect on the date of this Agreement; and

(l)     references to "dollars" or "$" are to United States of America dollars.

**ARTICLE II**

**BACKSTOP COMMITMENT**

Section 2.1  <u>Backstop Commitment</u>.  On and subject to the terms and conditions hereof, each Backstop Party agrees, severally and not jointly, (x) to purchase from the Company and NewCo, and the Company and NewCo agree to sell and issue to such Backstop Party, on the Closing Date for the applicable Purchase Price, the principal amount of Backstop Loans equal to such Backstop Party's Backstop Commitment Percentage of the aggregate principal amount of Backstop Loans, and (y) to receive from NewCo, and NewCo agrees to issue to such Backstop Party on the Closing Date for no additional consideration, a number of Backstop Class A-1 Units equal to the number of Backstop Class A-2 Units issuable upon conversion of the Backstop Loans

9

purchased by such Backstop Party (such obligation to purchase the Backstop Loans and to receive the Backstop Class A-1 Units, the "**Backstop Commitment**").

Section 2.2  Consideration for Backstop Commitment.  As consideration for entering into this Agreement and providing the Backstop Commitment, at the Closing, upon the entry by the Backstop Parties into the NewCo LLC Agreement NewCo shall issue to the Backstop Parties in the aggregate, forty percent (40%) of the authorized NewCo Class B Units and forty percent (40%) of the authorized Warrant Units of NewCo, which Class B Units of NewCo and Warrant Units of NewCo shall be allocated pro rata between the Backstop Parties.

Section 2.3  Backstop Party Default.

(a)  Upon the occurrence of a Backstop Party Default, the Backstop Parties (other than any Defaulting Backstop Party) shall have the right, but shall not be obligated to, within five (5) Business Days after receipt of written notice from NewCo to the Backstop Parties of such Backstop Party Default (which notice shall be given promptly following the occurrence of such Backstop Party Default) (such five (5) Business Day period, the "**Backstop Party Replacement Period**"), to make arrangements for one or more of the Backstop Parties (excluding any Defaulting Backstop Party) to purchase all or any portion of the Available Securities (such purchase, a "**Backstop Party Replacement**") on the terms and subject to the conditions set forth in this Agreement and in such amounts based upon the applicable Backstop Commitment Percentage of any such electing Backstop Party or as may otherwise be agreed upon by the Backstop Parties electing to purchase all or any portion of the Available Securities (such Backstop Parties, the "**Replacing Backstop Parties**"). Any such Available Securities purchased by a Replacing Backstop Party shall be included in the determination of the Backstop Securities of such Replacing Backstop Party for all purposes hereunder.

(b)  Except as contemplated by Section 2.3(a), nothing in this Agreement shall be deemed to require a Backstop Party to purchase more than its Backstop Commitment Percentage (as calculated pursuant to Section 2.4(a)) of the Backstop Securities.

(c)  For the avoidance of doubt, subject to Section 9.10, no provision of this Agreement shall relieve any Defaulting Backstop Party from liability hereunder in connection with such Defaulting Backstop Party's Backstop Party Default.

Section 2.4  Backstop Escrow Account Funding.

(a)  At least five (5) Business Days prior to Closing, after reasonable consultation with the Company as to the form and contents thereof, NewCo shall deliver to each Backstop Party a written notice (the "**Backstop Notice**") setting forth (i) the amount of Backstop Securities (based upon such Backstop Party's Backstop Commitment Percentage) to be purchased by such Backstop Party and the Purchase Price therefor (the "**Aggregate Purchase Price**"); and (ii) the escrow account to which such Backstop Party shall deliver and pay the Aggregate Purchase Price (the "**Backstop Escrow Account**").  NewCo shall promptly provide any written backup, information and documentation relating to the information contained in the Backstop Notice as any Backstop Party may reasonably request.

10

(b)      At least two (2) Business Days prior to the Closing (such second (2nd Business Day, the "**Escrow Funding Date**"), each Backstop Party shall pay by wire transfer in immediately available funds in U.S. dollars into the Backstop Escrow Account in satisfaction of such Backstop Party's Backstop Commitment, the Aggregate Purchase Price.  The Backstop Escrow Account shall be established with an escrow agent satisfactory to the Company, the Requisite Backstop Parties and NewCo pursuant to an escrow agreement in form and substance reasonably satisfactory to the Company, the Requisite Backstop Parties and NewCo. The funds held in the Backstop Escrow Account shall be distributed to the Company and/or NewCo, as directed by NewCo, at the time of the Closing, or returned to each Backstop Party upon the termination of this Agreement, in each case, inclusive of any interest accrued thereon, if any.

Section 2.5   Closing.

(a)      Subject to Article VII, unless otherwise mutually agreed in writing between the Company, NewCo and the Requisite Backstop Parties, the closing of the Backstop Commitment (the "**Closing**") shall be held remotely via the exchange of documents and signatures on the date on which all of the conditions set forth in Article VII shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).  The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**".

(b)      At the Closing, the funds held in the Backstop Escrow Account shall be released and utilized to consummate the purchase by the Backstop Parties of the Backstop Loans and the other transactions contemplated hereby in accordance with this Agreement.

(c)      At the Closing, (i) each of the Backstop Parties shall execute and deliver to NewCo counterpart signature pages to the NewCo LLC Agreement, and shall execute and deliver to the Company, NewCo and the Agent counterpart signature pages to the Restructuring Amendment, and (ii) NewCo shall execute and deliver to each of the Backstop Parties counterpart signature pages to the NewCo LLC Agreement, and the Company and NewCo shall execute and deliver to each of the Backstop Parties and the Agent counterpart signature pages to the Restructuring Amendment and each other document related to the Restructuring Second Lien Term Loans required to be entered in to at the Closing pursuant the Credit Agreement.

(d)      At the Closing, issuance of the Backstop Loans will be made by the Company and issuance of the Backstop Class A-1 Units will be made by NewCo, in each case, to the account of each Backstop Party (or to such other accounts as any Backstop Party may designate in accordance with this Agreement) against payment of the Aggregate Purchase Price for the Backstop Securities of such Backstop Party. Unless a Backstop Party requests delivery of a physical unit certificate, the entry of the Backstop Units to be delivered pursuant to this Section 2.5(d) into the account of a Backstop Party pursuant to NewCo's book entry procedures and delivery to such Backstop Party of an account statement reflecting the book entry of such Backstop Units shall be deemed delivery of such Backstop Units for purposes of this Agreement.  All Backstop Units will be delivered with all issue, stamp, transfer, sales and use, or similar Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by NewCo.

11

(e)    The Backstop Securities shall be issued only upon the release of funds to the Company from the Backstop Escrow Account at the Closing.  In the event that the Closing does not occur for any reason, the Backstop Securities shall not be issued to the Backstop Parties.

Section 2.6    Rights Offering.

(a)    On and subject to the terms and conditions hereof, the Company and NewCo shall commence the Rights Offering as soon as practicable following the Closing, and in no event more than thirty (30) days following the Closing.  The Rights Offering shall remain open for a period of not less than ten (10) days and not more than twenty (20) days (or such longer period as may be required by applicable Law) following the commencement date of the Rights Offering (such period, the "**Subscription Period**").

(b)    In the event that, following the expiration of the Subscription Period, the Rights Offering Subscribers have subscribed for an amount that exceeds $10,000,000 aggregate principal amount of Restructuring Second Lien Term Loans, then the excess amount shall be treated as follows:

(i)    The amount subscribed for in the Rights Offering by the Backstop Parties shall not exceed ten million dollars ($10,000,000) aggregate principal amount of Restructuring Second Lien Term Loans.

(ii)    If the amount subscribed for in the Rights Offering is more than fifteen million dollars ($15,000,000) aggregate principal amount of Restructuring Second Lien Term Loans, then the amount of Rights Offering Securities subscribed for by each Rights Offering Subscriber shall be reduced to equal such Rights Offering Subscriber's pro rata portion of fifteen million dollars ($15,000,000) aggregate principal amount of Restructuring Second Lien Term Loans, based on its pro rata portion of the Rights Offering Securities subscribed for in the Rights Offering, without regard to the minimum increments of $1,000,000 aggregate principal amount of Restructuring Second Lien Term Loans specified above (which minimum increments shall cease to be applicable following any such reduction pursuant to this paragraph).

(iii)    If the amount subscribed for in the Rights Offering is more than ten million dollars ($10,000,000) aggregate principal amount of Restructuring Second Lien Term Loans but less than or equal to fifteen million dollars ($15,000,000) aggregate principal amount of Restructuring Second Lien Term Loans, including after giving effect to clause (ii) above, then the Backstop Parties, or any Affiliate of any Backstop Party that then holds the Restructuring Second Lien Term Loans, shall resell to the Rights Offering Subscribers other than the Backstop Parties Backstop Loans with an aggregate principal amount equal to the amount of such excess for which such Rights Offering Subscribers other than the Backstop Parties have subscribed instead of the Company and NewCo issuing Restructuring Second Lien Term Loans to such Rights Offering Subscribers in such amount (or, in the event such Rights Offering Subscribers are not Eligible Assignees, such Backstop Loans shall be assigned to the Company and NewCo for cancellation by the Agent

12

and an equivalent principal amount of Equivalent Notes shall be issued by the Company and NewCo to such Rights Offering Subscribers), and the Backstop Parties, or any Affiliate of any Backstop Party that then holds the Restructuring Second Lien Term Loans, shall transfer to such Rights Offering Subscribers a number of Backstop Class A-1 Units equal to the number of Backstop Class A-2 Units issuable upon conversion of the Backstop Loans so resold or the Equivalent Notes so issued to such Rights Offering Subscribers, instead of NewCo issuing such amount of Class A-1 Units to such Rights Offering Subscribers.

(iv)    In connection with any resale of Backstop Loans to the Rights Offering Subscribers or assignment of Backstop Loans to the Company and NewCo by the Backstop Parties or any Affiliate of any Backstop Party that then holds the Restructuring Second Lien Term Loans pursuant to this <u>Section 2.6(b)</u>, the Backstop Parties, or any such Affiliate of any Backstop Party that then holds the Restructuring Second Lien Term Loans, shall receive a purchase price from such Rights Offering Subscribers or the Company and NewCo, as applicable, equal to 100% of the Purchase Price paid by the Backstop Parties, or any such Affiliate, for the Backstop Loans to be resold to the applicable Rights Offering Subscribers or assigned to the Company and NewCo, as the case may be, plus any accrued interest, fees and other amounts payable to the Backstop Parties, or any Affiliate of any Backstop Party that then holds the Restructuring Second Lien Term Loans, through the date of resale or assignment under the Credit Agreement.

(c)    The Company and NewCo may, in their sole discretion, elect to defer the closing and settlement of subscriptions pursuant to the Rights Offering until the first Interest Payment Date (as defined in the Credit Agreement) to occur after the end of the Subscription Period.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to the Backstop Parties (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 3.1    <u>Organization and Qualification</u>.    The Company and each other Subsidiary of Parent (other than the Subsidiaries of Parent organized under the laws of Bermuda and the Subsidiaries of such entities) (collectively, the "**Company Group**") is a legal entity duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of its respective jurisdiction of incorporation or organization (except where the failure to be in good standing, or the equivalent, would not constitute a Company Material Adverse Effect) and has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently conducted except where the failure to have such power and authority would not constitute a Company Material Adverse Effect.    Each member of the Company Group is duly qualified or licensed to do business and is in good standing (or the equivalent thereof) under the Laws of each other jurisdiction in which it owns, leases or operates properties or conducts any

business, in each case except to the extent that the failure to be so qualified or licensed or be in good standing does not constitute a Company Material Adverse Effect.

Section 3.2    <u>Corporate Power and Authority</u>.

(a)    The Company has the requisite corporate power and authority to enter into, execute and deliver this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder.  The execution and delivery of this Agreement by the Company and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on behalf of the Company, and no other corporate proceedings on the part of the Company are or will be necessary to authorize this Agreement or to consummate the transactions contemplated hereby.

(b)    Each member of the Company Group has the requisite power and authority, subject to the Sanction Order, to enter into, execute and deliver the Restructuring Support Agreement and all agreements to which it will be a party as contemplated by the Restructuring Support Agreement (all such agreements, collectively, the "**Transaction Agreements**"), to consummate the transactions contemplated therein and to perform its obligations thereunder. Subject to the receipt of the Sanction Order, the execution and delivery of each of the Transaction Agreements to which such Company Group member is a party and the consummation of the transactions contemplated thereby have been duly authorized by all requisite action on behalf of each member of the Company Group, and no other proceedings on the part of any member of the Company Group are or will be necessary to authorize any of the Transaction Agreements or to consummate the transactions contemplated thereby.

Section 3.3    <u>Execution and Delivery; Enforceability</u>.  This Agreement has been duly executed and delivered by the Company, and subject to the entry of the Sanction Order, each Transaction Agreement has been or will be duly executed and delivered by each Company Group member party to such Transaction Agreement.  Assuming this Agreement has been duly authorized, executed and delivered by the Backstop Parties and NewCo, and each of the Transaction Agreements has been duly authorized, executed and delivered by each party thereto other than the Company Group members party thereto, each of the obligations hereunder and under each Transaction Agreement to which a Company Group member is a party will constitute the valid and binding obligations of the Company or the Company Group members party thereto, enforceable against the Company Group members party thereto in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity.

Section 3.4    <u>No Conflict</u>.  Assuming the consents described in <u>Section 3.5</u> are obtained and other than as may arise as a result of the Restructuring, the execution and delivery by the Company and the Company Group members, as applicable, of this Agreement, the Restructuring Support Agreement and the other Transaction Agreements, the compliance by the Company and the Company Group members, as applicable, with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to

14

the extent specified in the Restructuring Support Agreement, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under, any Contract to which the Company or a member of the Company Group will be bound as of the Closing Date after giving effect to the Restructuring Support Agreement or to which any of the property or assets of the Company Group will be subject as of the Closing Date after giving effect to the Restructuring Support Agreement, (b) will not result in any violation of the provisions of any of the organization documents of the Company or any member of the Company Group and (c) will not result in any material violation of any Law or Order applicable to the Company, the Company Group or any of their properties, except, in each case described in clause (a), for such conflicts, breaches, modifications, violations or Liens that would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.5 <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Authority having jurisdiction over the Company, any member of the Company Group or any of their properties is required for the execution and delivery by the Company or a Company Group member, as applicable, of this Agreement, the Restructuring Support Agreement and the other Transaction Agreements, the compliance by the Company and any Company Group members, as applicable, with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (including compliance by NewCo and each Backstop Party with its obligations hereunder and thereunder), except for (a) the granting of the Sanction Order, (b) entry of the Recognition Order by the Bankruptcy Court, (c) any antitrust, competition or foreign direct investment filings or approvals required pursuant to the Restructuring Support Agreement, (d) the filing with the relevant local Governmental Authority of the NewCo LLC Agreement, and the filing of any other corporate documents with applicable state and local filing agencies applicable to NewCo, and (e) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" laws in connection with the purchase of the Backstop Securities by the Backstop Parties and the issuance of the Rights Offering Securities.

Section 3.6 <u>Arm's Length</u>.  The Company acknowledges and agrees that (a) each of the Backstop Parties is acting solely in the capacity of an arm's length contractual counterparty to the Company and NewCo with respect to the transactions contemplated hereby (including in connection with determining the terms of the Backstop Commitment and the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company and (b) no Backstop Party is advising the Company as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 3.7 <u>No Other Representations or Warranties</u>.  Except for the representations and warranties of the Company contained in this <u>Article III</u>, and except for any other agreement entered into between the Company and the Backstop Parties contemplated hereby, neither the Company nor any other Person makes any express or implied representations or warranties regarding the Company, and the Company hereby disclaims any such representation or warranty with respect to the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF NEWCO

NewCo hereby represents and warrants to the Backstop Parties (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 4.1    <u>Organization and Qualification</u>.    NewCo is a legal entity duly organized, validly existing and in good standing under the Laws of the state of Delaware (except where the failure to be in good standing would not constitute a NewCo Material Adverse Effect) and has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently conducted except where the failure to have such authority would not constitute a NewCo Material Adverse Effect.  NewCo is duly qualified or licensed to do business and is in good standing (or the equivalent thereof) under the Laws of each other jurisdiction in which it owns, leases or operates properties or conducts any business, in each case, except to the extent that the failure to be so qualified or licensed or be in good standing does not constitute a NewCo Material Adverse Effect.

Section 4.2    <u>Corporate Power and Authority</u>.

(a)    NewCo has the requisite corporate power and authority to enter into, execute and deliver this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder.  The execution and delivery of this Agreement by NewCo and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on behalf of NewCo, and no other corporate proceedings on the part of NewCo are or will be necessary to authorize this Agreement or to consummate the transactions contemplated hereby.

Section 4.3    <u>Execution and Delivery; Enforceability</u>.    This Agreement has been duly executed and delivered by NewCo, and subject the entry of the Sanction Order, each Transaction Agreement to which NewCo is a party has been or will be duly executed and delivered by NewCo.  Assuming this Agreement has been duly authorized, executed and delivered by the Backstop Parties and the Company, and each of the Transaction Agreements to which it is a party has been duly authorized, executed and delivered by each party thereto other than NewCo, each of the obligations hereunder and under each Transaction Agreement to which NewCo is a party will constitute the valid and binding obligations of NewCo, enforceable against NewCo in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity.

Section 4.4    <u>Authorized and Issued Share Capital</u>.

(a)    On the Closing Date, NewCo will have sufficient authorized but unissued New Units, and other Equity Securities as applicable, to meet its obligations to deliver the New Units or other Equity Securities to be delivered pursuant to this Agreement, the Rights Offering and the Restructuring Support Agreement, including the New Units to be issued in connection with

16

the Rights Offering or otherwise delivered pursuant to this Agreement and any New Units or other Equity Securities to be issued in connection with the management incentive plan of NewCo.

(b)     The New Units and other Equity Securities, as applicable, to be issued pursuant to the Restructuring Support Agreement, including the New Units to be issued in connection with the Rights Offering, will, when issued and delivered on the Closing Date, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, Liens (other than transfer restrictions imposed by applicable Law), preemptive rights, subscription and similar rights.

(c)     Except as contemplated by the Restructuring Support Agreement and the Restructuring Term Sheet, as of the Closing Date, no share capital or other Equity Securities or voting interest in NewCo will have been issued, reserved for issuance or outstanding.

(d)     Except as described in this Section 4.4 and except for the rights set forth in the Restructuring Support Agreement and other Transaction Agreements, as of the Closing Date, NewCo will not be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, contract, arrangement or undertaking (including any preemptive right) that (i) obligates NewCo to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any share capital of, or other equity or voting interests in, NewCo or any security convertible or exercisable for or exchangeable into any share capital of, or other equity or voting interest in, NewCo, (ii) obligates NewCo to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (iii) restricts the transfer of any share capital of NewCo or (iv) relates to the voting of any share capital of NewCo.

Section 4.5   No Conflict.   Assuming the consents described in Section 4.6 are obtained and other than as may arise as a result of the Restructuring, the execution and delivery by NewCo of this Agreement, the Restructuring Support Agreement and the other Transaction Agreements to which it is a party, the compliance by NewCo with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Restructuring Support Agreement, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under, any Contract to which NewCo will be bound as of the Closing Date after giving effect to the Restructuring Support Agreement or to which any of the property or assets of NewCo will be subject as of the Closing Date after giving effect to the Restructuring Support Agreement, (b) will not result in any violation of the provisions of any of the organization documents of NewCo and (c) will not result in any material violation of any Law or Order applicable to NewCo or any of its properties, except, in each case described in clause (a), for such conflicts, breaches, modifications, violations or Liens that would not reasonably be expected to have, individually or in the aggregate, a NewCo Material Adverse Effect.

Section 4.6   Consents and Approvals.   No consent, approval, authorization, order, registration or qualification of or with any Governmental Authority having jurisdiction over NewCo or any of its properties is required for the execution and delivery by NewCo of this

Agreement, the Restructuring Support Agreement and the other Transaction Agreements to which it is a party, the compliance by NewCo with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (including compliance by the Company and each Backstop Party with its obligations hereunder and thereunder), except for (a) the granting of the Sanction Order, (b) entry of the Recognition Order by the Bankruptcy Court, (c) any antitrust, competition or foreign direct investment filings or approvals required pursuant to the Restructuring Support Agreement, (d) the filing with the relevant local Governmental Authority of the NewCo LLC Agreement, and the filing of any other corporate documents with applicable state and local filing agencies applicable to NewCo, and (e) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" laws in connection with the purchase of the Backstop Securities by the Backstop Parties and the issuance of the Rights Offering Securities.

Section 4.7  Arm's Length.  NewCo acknowledges and agrees that (a) each of the Backstop Parties is acting solely in the capacity of an arm's length contractual counterparty to NewCo with respect to the transactions contemplated hereby (including in connection with determining the terms of the Backstop Commitment and the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, NewCo and (b) no Backstop Party is advising NewCo as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 4.8  No Other Representations or Warranties.  Except for the representations and warranties of the Company and NewCo contained in this Article IV, and except for any other agreement entered into between NewCo and the Backstop Parties contemplated hereby, neither NewCo nor any other Person makes any express or implied representations or warranties regarding NewCo, and NewCo hereby disclaims any such representation or warranty with respect to the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP PARTIES

Each Backstop Party represents and warrants as to itself only (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 5.1  Incorporation.  To the extent applicable, such Backstop Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the laws of its jurisdiction of incorporation or organization.

Section 5.2  Corporate Power and Authority.  To the extent applicable, such Backstop Party has the requisite corporate, limited partnership or limited liability company power and authority to enter into, execute and deliver this Agreement and each other Transaction Agreements to which such Backstop Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary corporate, limited partnership or limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement and the other Transaction Agreements.

18

Section 5.3   <u>Execution and Delivery</u>.  This Agreement and each other Transaction Agreement to which such Backstop Party is a party has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Backstop Party and when executed and delivered, will constitute the valid and binding obligations of such Backstop Party, enforceable against such Backstop Party in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity.

Section 5.4   <u>No Conflict</u>.  Assuming that the consents referred to in <u>Section 5.5</u> are obtained, the execution and delivery by such Backstop Party of this Agreement and, to the extent applicable, the other Transaction Agreements, the compliance by such Backstop Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Backstop Party is a party or by which such Backstop Party is bound or to which any of the properties or assets of such Backstop Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Backstop Party and (c) will not result in any material violation of any Law or Order applicable to such Backstop Party or any of its properties, except, in each of the cases described in clauses (a), (b) and (c), for any conflict, breach, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on such Backstop Party's performance of its obligations under this Agreement.

Section 5.5   <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Authority having jurisdiction over such Backstop Party or any of its properties is required for the execution and delivery by such Backstop Party of this Agreement and, to the extent applicable, the Transaction Agreements, the compliance by such Backstop Party with all of the provisions hereof and thereof and the consummation of the transactions (including the purchase by such Backstop Party of its Backstop Commitment Percentage of the Backstop Securities) contemplated herein and therein, except any consent, approval, authorization, order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on such Backstop Party's performance of its obligations under this Agreement.

Section 5.6   <u>No Registration; Purchasing Intent; Sophistication.</u>  Each of the Backstop Parties hereby represents and warrants to the Company that such Person (a) is either (i) a qualified institutional buyer as defined in Rule 144A promulgated under the Securities Act, (ii) not a U.S. person (as defined in Regulation S promulgated under the Securities Act) and outside the United States, or (iii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act), (b) acknowledges that the Backstop Securities to be acquired by such Person will have been acquired for investment for such Person's own account, not as a nominee or agent, and not with a view to distribution or resale of any part thereof, and such Person has no present intention of selling, granting any participation in, or otherwise distributing the same, (c) does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person with respect to any

19

Backstop Securities to be acquired by such Person, (d) has not been formed for the specific purpose of acquiring any Backstop Securities to be acquired by such Person, (e) understands that the Backstop Securities to be acquired by such Person have not been, and are not contemplated to be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Person's representations as expressed herein, and that such Backstop Securities will be "restricted securities" under applicable U.S. federal and state securities Laws and that, pursuant to these Laws, such Person must hold such Backstop Securities indefinitely unless they are registered with the SEC and qualified by state authorities, or an exemption from such registration and qualification requirements is available, (f) understands that no public market now exists for any Backstop Securities to be acquired by such Person, that no Person has made any assurances that a public market will ever exist for such Backstop Securities, and that the Company will have no obligation to register or qualify such securities except as set forth in this Agreement, and (g) is not acquiring the Backstop Securities to be acquired by such Person as a result of any advertisement, article, notice or other communication regarding such securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

Section 5.7   No Broker's Fees.  Such Backstop Party is not a party to any Contract with any Person (other than this agreement) that would give rise to a valid claim against the Company or NewCo, for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Backstop Securities.

Section 5.8   Sufficiency of Funds.  Such Backstop Party has, and such Backstop Party on the Effective Date will have, sufficient immediately available funds to make and complete the payment of the aggregate Purchase Price for its Backstop Commitment Percentage of the Backstop Securities.

Section 5.9   Proceedings.  As of the date hereof, there are no proceedings pending or threatened to which such Backstop Party is a party or to which any property of such Backstop Party is the subject that would reasonably be expected to prevent, materially delay or materially impair the ability of such Backstop Party to consummate the transactions contemplated hereby.

Section 5.10   Arm's Length.  Each Backstop Party acknowledges and agrees that (a) the Company and NewCo are acting solely in the capacity of an arm's length contractual counterparties to such Backstop Party with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and (b) neither the Company nor NewCo is advising such Backstop Party as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

## ARTICLE VI

## ADDITIONAL COVENANTS

Section 6.1   Financial Information.  At all times prior to the Closing Date, the Company shall deliver to counsel to each Backstop Party and to each Backstop Party that so requests, subject to appropriate assurance of confidential treatment, all material statements and

reports (excluding any compliance certificates, but including any reports delivered with any compliance certificates) the Company is required to deliver, and actually delivers, pursuant to any credit agreement, indenture or similar agreement or instrument to which the Company is or any of its Subsidiaries is party (as in effect on the date hereof) (the "**Financial Reports**").

Section 6.2  <u>Commercially Reasonable Efforts</u>.  Without in any way limiting any other respective obligation of the Company and NewCo or any Backstop Party in this Agreement, the Company and NewCo shall use (and shall cause their Subsidiaries to use), and each Backstop Party shall use, commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement.

Section 6.3  <u>No Integration; No General Solicitation</u>.  None of the Company, NewCo nor any of their affiliates (as defined in Rule 501(b) of Regulation D promulgated under the Securities Act) will, directly or through any agent, sell, offer for sale, solicit offers to buy or otherwise negotiate in respect of, any security (as defined in the Securities Act), that is or will be integrated with the sale of the Unregistered Securities, the Rights Offering and this Agreement in a manner that would require registration under the Securities Act of the Unregistered Securities to be issued by the Company or NewCo on the Effective Date.  None of the Company, NewCo or any of its affiliates or any other Person acting on its or their behalf will solicit offers for, or offer or sell, any Unregistered Securities by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D promulgated under the Securities Act or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act.

Section 6.4  <u>Transfer Restrictions</u>.  The Backstop Parties acknowledge and agree that the Backstop Securities shall be subject to the terms and conditions of the Credit Agreement and the NewCo LLC Agreement, as applicable, including, for the avoidance of doubt, the restrictions on transfers of (a) the Restructuring Second Lien Term Loans set forth in the Credit Agreement, and (b) the Class A-1 Units set forth in the NewCo LLC Agreement.

Section 6.5  <u>Restructuring Support</u>.  For so long as this Agreement has not been validly terminated by the Company, and except as agreed in writing (which may be an e-mail) by the Agent, the Backstop Parties agree that:

(a)  that they shall use commercially reasonable efforts to support the Restructuring, and not to object to or otherwise oppose or interfere with (or instruct or encourage any other Person to interfere with or oppose), any hearing before the Bermuda Court or the Bankruptcy Court in connection with the implementation of the Restructuring in the Bermuda Proceeding and the Chapter 15 Case;

(b)  they shall take such commercially reasonable actions as may be reasonably necessary to support, implement, and consummate the Backstop Commitment and satisfy any conditions thereto, in accordance with this Agreement;

(c)  they shall not (or instruct or encourage any other Person so) solicit, support, encourage, propose, file, or take any action to initiate or implement any reorganization, merger,

consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of all or any material portion of assets, financing (debt or equity), scheme, plan proposal, recapitalization, or restructuring of the Company (other than the Restructuring) or any other transaction of similar effect, or that would preclude or delay the Restructuring with respect to the Company, other than at the request, or with the consent, of the Company and the Agent;

(d)      if any Backstop Party receives an unsolicited proposal or expression of interest with respect to any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of all or any material portion of assets, financing (debt or equity), scheme, plan proposal, recapitalization, or restructuring of the Company (other than the Restructuring) or any other transaction of similar effect, or that would preclude or delay the Restructuring, promptly after the receipt of such proposal or expression of interest, but in any event within 48 hours of receipt, to notify the Company, Latham & Watkins LLP, the Agent and Allen Overy Shearman Sterling US LLP of the receipt thereof, with such notice to include the material terms thereof, including the identity of any Person or group of Persons involved;

(e)      they shall use commercially reasonable efforts to the extent necessary, to promptly cooperate with the Company and the Agent and provide all necessary information that may be required by a Governmental Authority for the purpose of any antitrust, competition, foreign direct investment or other regulatory approval required pursuant to the Restructuring Support Agreement or is necessary to respond to questions raised by such Governmental Authorities;

(f)      they shall not Transfer any equity interests or any Claims owned or held against the Company without first notifying the Company and the Agent in writing at least three (3) Business Days prior to the consummation of such Transfer.  If any Backstop Party acquires any additional equity interests in the Company or any other Claims against or equity interests in the Company, each Backstop Party agrees that any such additional equity interests or such other Claims and equity interests shall automatically and immediately be deemed subject to this Section 6.5(f).

(g)      Nothing in this Section 6.5 shall prohibit any Backstop Party from (i) appearing as a party-in-interest in any matter arising in the Bermuda Proceeding or Chapter 15 Case or any other proceeding relating to the Company; (ii) exercising or enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or contesting whether any matter, fact or thing is a breach of, or is inconsistent with, this Agreement; (iii) effecting a transfer or purchasing, selling, or entering into transactions with respect to Claims or Interests, subject to compliance with Section 6.5(f) above; (iv) asserting or raising any right, remedy or objection not prohibited under or inconsistent with this Agreement in connection with the Restructuring; (v) taking any action that is required by applicable Law or declining to take any action that is prohibited by applicable Law; (vi) retaining the benefit of any applicable legal professional privilege; (vii) making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like; (viii) taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence or priority of its Claims against or Interests in the Company (including the filing of a proof of claim or interest against the Company); or (ix) consulting with the Company, any lenders to the Company or other parties in interest in the Bermuda Proceeding or Chapter 15 Case.  Except as expressly provided in this Agreement, nothing contained herein shall constitute a waiver or

22

amendment of any term or provision of any agreement, instrument or document that gives rise to the Backstop Parties' Claims and Interests.  Other than as expressly set forth in this Agreement, nothing in this Section 6.5 shall require any Backstop Party to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in material expenses, liabilities or other obligations to such Backstop Party.

## ARTICLE VII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1    Conditions to the Obligation of the Backstop Parties.  The obligations of each Backstop Party to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with Section 7.2) the satisfaction of the following conditions:

(a)    Final Orders.  The Bermuda Court shall have granted the Sanction Order and, unless waived pursuant to the Restructuring Support Agreement, such Order shall have become a Final Order and shall not have been the subject of any application for leave to appeal within 14 days of the date of such Order being entered or shall otherwise be non-appealable.  The Bankruptcy Court shall have entered the Recognition Order and such Order shall have become a Final Order.

(b)    Effective Date.  The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Restructuring Support Agreement, the Sanction Order and the Recognition Order.

(c)    Conditions to the Restructuring Support Agreement.  The conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the Closing) set forth in the Restructuring Support Agreement shall have been satisfied or waived in accordance with the terms of the Restructuring Support Agreement.

(d)    Form of Credit Agreement and NewCo LLC Agreement.  The Restructuring Amendment and the Credit Agreement shall be in substantially the form attached to the Restructuring Support Agreement as Exhibit C as of the date of execution thereof.  The NewCo LLC Agreement shall be in substantially the form attached to the Restructuring Support Agreement as Exhibit F as of the date of execution thereof.

(e)    No Legal Impediment to Issuance.  No Law or Order shall have been enacted, adopted or issued by any Governmental Authority that prohibits the implementation of the Restructuring or the transactions contemplated by this Agreement.

(f)    Representations and Warranties.  The representations and warranties of the Company and of NewCo contained in this Agreement shall be true and correct in all material respects at and as of the date hereof and the Closing Date with the same effect as if made on and

as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(g)     Covenants.  The Company and NewCo shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (unless waived pursuant to such other document) that contemplate, by their terms, performance or compliance prior to or at the Closing Date.

(h)     Company Material Adverse Effect.  From the date hereof to the Closing Date, there shall not have occurred, and there shall not exist, any event, change, effect, occurrence, development, circumstance or change of fact occurring or existing that constitutes a Company Material Adverse Effect.

(i)     NewCo Material Adverse Effect.  From the date hereof to the Closing Date, there shall not have occurred, and there shall not exist, any event, change, effect, occurrence, development, circumstance or change of fact occurring or existing that constitutes a NewCo Material Adverse Effect.

(j)     Officer's Certificate.  The Backstop Parties shall have received on and as of the Closing Date a certificate of each of the Company and NewCo, as applicable (executed by its respective chief executive officer or chief financial officer) confirming that the applicable conditions set forth in Sections 7.1(f), (g), (h), and (i) have been satisfied.

(k)     PIK Upfront Fee.  Concurrently with the Closing, each of the Backstop Parties shall have received from the Company and NewCo an upfront fee in kind in the form of Restructuring Second Lien Term Loans representing 4.00% of the Backstop Loans purchased by such Backstop Party, which will take the form of original issue discount if the other Restructuring Second Lien Term Loans issued to the lenders at Closing have taken such upfront fee as original issue discount.

Section 7.2   Waiver of Conditions to Obligation of Backstop Parties.  All or any of the conditions set forth in Section 7.1 may only be waived in whole or in part with respect to all Backstop Parties by a written instrument executed by the Requisite Backstop Parties in their sole discretion and if so waived, all Backstop Parties shall be bound by such waiver.

Section 7.3   Conditions to the Obligation of the Company and NewCo.  The obligation of the Company and NewCo to consummate the transactions contemplated hereby with any Backstop Party is subject to (unless waived by the Company and NewCo) the satisfaction of each of the following conditions:

(a)     Final Orders.  The Bermuda Court shall have granted the Sanction Order and, unless waived pursuant to the Restructuring Support Agreement, such Order shall have become a Final Order and shall not have been the subject of any application for leave to appeal within 14 days of the date of such Order being entered or shall otherwise be non-appealable.  The Bankruptcy Court shall have entered the Recognition Order and such Order shall have become a Final Order.

(b)    Effective Date.  The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Restructuring Support Agreement, the Sanction Order and the Recognition Order.

(c)    Conditions to the Restructuring Support Agreement.  The conditions to the occurrence of the Effective Date as set forth in the Restructuring Support Agreement shall have been satisfied or waived in accordance with the terms of the Restructuring Support Agreement.

(d)    No Legal Impediment to Issuance.  No Law or Order shall have been enacted, adopted or issued by any Governmental Authority that prohibits the implementation of the Restructuring Support Agreement or the transactions contemplated by this Agreement.

(e)    Representations and Warranties.  The representations and warranties of each Backstop Party contained in this Agreement shall be true and correct in all material respects at and as of the date hereof and the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(f)    Covenants.  The Backstop Parties shall have performed and complied, in all material respects, with all of their covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (unless waived pursuant to such other document) that contemplate, by their terms, performance or compliance prior to or at the Closing Date.

## ARTICLE VIII

## TERMINATION

Section 8.1  Termination Rights.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)    by mutual written consent of the Company, NewCo and the Requisite Backstop Parties.

(b)    by the Company, NewCo or the Requisite Backstop Parties if:

(i)    the Closing Date has not occurred by the Outside Date; provided, however that no party hereto shall have the right to terminate this Agreement pursuant to this Section 8.1(b)(i) if the failure of the Closing to occur on or before the Outside Date was primarily caused by such party; or

(ii)    the Restructuring Support Agreement has been terminated.

# ARTICLE IX

# GENERAL PROVISIONS

Section 9.1 <u>Notices</u>.    All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return receipt requested), or by email (upon confirmation of receipt) to the respective Parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 9.1</u>):

(a)    If to the Company:

Afiniti, Inc.
1701 Pennsylvania Ave. NW
Suite 600 Washington, DC 20006
Attention:  Sam Logan
E-mail:    sam.logan@afiniti.com; legal@afiniti.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York 10020
Attention:  George Davis, David Hammerman, Meghana Vunnamadala
E-mail:    george.davis@lw.com; david.hammerman@lw.com;
           meghana.vunnamadala@lw.com

*and*

Latham & Watkins LLP
330 North Wabash, Suite 2800
Chicago, IL 60611
Attention:  Jason Gott; Jonathan Gordon
Email:    jason.gott@lw.com; jonathan.gordon@lw.com

(b)    If to NewCo:

Afiniti NewCo Holdings LLC

c/o VCP CAPITAL MARKETS, LLC
Four Embarcadero Center, 20th Floor
San Francisco, CA 94111
Attention: David Flannery
Email:      dflannery@vistacreditpartners.com

with a copy (which shall not constitute notice) to:

Allen Overy Shearman Sterling US LLP
599 Lexington Avenue
New York, NY 10022
Attention: Mark Shapiro; Frank Oliver; Michael Dorf
Email: mark.shapiro@aoshearman.com; frank.oliver@aoshearman.com;
mdorf@aoshearman.com

(c)      if to a Backstop Party or transferee thereof, to the address set forth such Backstop Party's signature page or such transferee's joinder signature page, with, in the case of a Backstop Party, a copy (which shall not constitute notice) to:

The Resource Group International Limited, c/o TRG Holdings LLC
1717 Pennsylvania Avenue, Suite 825
Washington DC 20006

Attention: Legal department
E-mail: mohammed.khaishgi@trgworld.com; pat.costello@trgworld.com

with a copy (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: Lisa M. Schweitzer; Adam Fleisher
E-mail: lschweitzer@cgsh.com; afleisher@cgsh.com

Section 9.2    Assignment; Third Party Beneficiaries.   Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise), other than by any Backstop Party to one or more of its Affiliates, without the prior written consent of the Company, NewCo and the Backstop Parties, and any purported assignment in violation of this Section 9.2 shall be void *ab initio*.   No such assignment shall relieve the assigning Party of any of its obligations hereunder unless the non-assigning Parties enter into a novation releasing the assigning Party of its obligations under this Agreement.   This Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person other than the Parties any rights or remedies under this Agreement.

Section 9.3    Entire Agreement.

(a)    This Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Agreement) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties and the Restructuring Support Agreement will continue in full force and effect in accordance with their terms.

Section 9.4    Governing Law; Venue.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any New York federal court sitting in the Borough of Manhattan of The City of New York; provided, however, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of The City of New York.  Consistent with the preceding sentence, each of the Parties hereby (a) submits to the exclusive jurisdiction of any federal or state court sitting in the Borough of Manhattan of The City of New York for the purpose of any Action arising out of or relating to this Agreement brought by either Party; (b) agrees that service of process will be validly effected by sending notice in accordance with Section 9.1; and (c) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above named courts.

Section 9.5    Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 9.6    Counterparts.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 9.7    Waivers and Amendments; Rights Cumulative.  This Agreement may be amended, restated, modified, or changed only by a written instrument signed by the Company, NewCo and the Requisite Backstop Parties; provided that each Backstop Party's prior written consent shall be required for any amendment that would have the effect of: (a) modifying such Backstop Party's Backstop Commitment Percentage or Backstop Commitment Percentage; (b) increasing the Purchase Price to be paid in respect of the Backstop Securities; (c) extending the Outside Date (except for any extension of the Outside Date under the Restructuring Support Agreement); or (d) otherwise disproportionately and materially adversely affecting such Backstop Party; provided that the sole remedy for any Backstop Party that does not consent to any of the

matters referred to in clauses (b) or (c) above shall be that such Backstop Party shall have the right to terminate its Backstop Commitment as to itself only. The terms and conditions of this Agreement (other than the conditions set forth in Sections 7.1 and 7.3, the waiver of which shall be governed solely by Article VII) may be waived (x) by the Company and NewCo only by a written instrument executed by the Company and NewCo and (y) by the Requisite Backstop Parties only by a written instrument executed by all of the Requisite Backstop Parties. No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. Except as otherwise provided in this Agreement, the rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any Party otherwise may have at law or in equity.

Section 9.8    Headings. The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 9.9    Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

Section 9.10    Damages. Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits; *provided* that in all events, a Party will be liable for direct damages and any other reasonably foreseeable damage that is recoverable under applicable contract law.

Section 9.11    No Reliance. No Backstop Party or any of its Related Parties shall have any duties or obligations to the other Backstop Parties in respect of this Agreement, the Restructuring or the transactions contemplated hereby or thereby, except those expressly set forth herein. Without limiting the generality of the foregoing, (a) no Backstop Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Backstop Parties, (b) no Backstop Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Backstop Party, (c) (i) no Backstop Party or any of its Related Parties shall have any duty to the other Backstop Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Backstop Parties any information relating to the Company or NewCo that may have been communicated to or obtained by such Backstop Party or any of its Affiliates in any capacity and (ii) no Backstop Party may rely, and confirms that it has not relied, on any due diligence investigation that any other Backstop Party or any Person acting on behalf of such other Backstop Party may have conducted with respect to the Company, NewCo or any of their Affiliates or any of their respective securities and (d) each Backstop Party acknowledges that no other Backstop

Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Backstop Securities.

Section 9.12    Publicity.    At all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Company, NewCo and the Backstop Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement.

[*Signature Pages Omitted*]

**Schedule 1**

**Backstop Commitment Percentage**

| **Backstop Party** | **Allocation** |
|---|---|
| The Resource Group International, Ltd. | **100%** |

## <u>Exhibit A</u>

**Settlement Agreement**

[RESERVED]

## <u>Exhibit J</u>

**Initial Cash Flow Forecast**

**Afiniti, Ltd.**
**Consolidated 13-week Cash Forecast**
*(in thousands $USD)*

| Week # | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Forecast | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 9/6/24 | 9/13/24 | 9/20/24 | 9/30/24 | 10/11/24 | 10/18/24 | 10/25/24 | 10/31/24 | 11/8/24 | 11/15/24 | 11/22/24 | 11/30/24 | 12/6/24 | 12/13/24 | | |
| | *Actual* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | | |

**Customer Collections**
Redacted

**Total Client Collections**

Factored Invoices (net)
Refinancing Inflows
**Total Inflows**

Payroll & Taxes
Bonus Payments
Commission Payments
Severance Payments
**Payroll Outflows**

Payments (excl transaction)
Deferred AP Catch-up
Vista Debt Interest

**Advisors**
Latham & Watkins
Conyers
Young Conaway
A&L Goodbody
Teneo
Moelis & Company
Smith Goffman Partners (GLC)
Deloitte Tax
Charles River Associates
Sitrick & Company
A&O Shearman
Appleby
Akin Gump Strauss Hauer & Feld
Kirkland & Ellis
Richards Layton & Finger
Walkers
Kroll

**Transaction Bonuses**
Transaction Payouts        -        -
Retention Payments         -        -
**Other**
Litigation Expense Estimate    -    -
D&O Insurance
**Total Refinancing Expenses**
**Total Outflows**

**Opening Cash Balance**
(+) Total Inflows
(-) Total Outflows
**Closing Cash Balance**
(+) Available Factoring
**Proforma Liquidity**
(-) Inaccessable
**Proforma Available Liquidity**

**Notes:**
(1) Forecast period slightly longer than 13 weeks because fourth week includes remaining days at end of month to align with month-end balances
(2) Closing cash balance includes less accesible and restricted cash of approximately $[___] which is difficult to access
(3) Cash balances spread across [__] countries and several banks (majority JP Morgan)
(4) Assumes transaction closes mid-November and Q3 interest is PIK'd under new 1L/2L facility and not payable in cash
(5) Client collection assumptions include [___]
(6) Payroll forecast updated to reflect reductions; severance and retention estimates included (timing still subject to change)

## Exhibit K

**Form Indemnity Agreement**

## Exhibit K

### Indemnity Agreement

This Indemnity Agreement is entered into as of [ ● ], 2024 by and among (i) Afiniti Newco Holdings LLC ("Newco"), (ii) those officers of Afiniti, Ltd. ("Parent") set forth on Schedule 1 hereto (the "Officers"), and (iii) those directors of Parent set forth on Schedule 2 hereto (the "Directors" and together with Newco and Officers, the "Parties"). All capitalized terms used but not defined in Indemnity Agreement have the respective meanings given to them in the Restructuring Support Agreement, dated September [__], 2024 (as modified, amended or supplemented from time to time in accordance with its terms, the "RSA").[1]

1. Effectiveness. This Indemnity Agreement shall be effective as of the Closing Date and is conditioned in all respect on (x) the occurrence of the Closing and execution and delivery of this Agreement by Newco and (y) (i) the insurance policies set forth on Schedule 3 being in full force and effect as of the RSA Effective Date (as hereafter defined) (collectively, the "Original Policies") and being in full force and effect as of the Closing Date and (ii) excess follow form insurance policies being bound and fully paid for in form and substance acceptable to the Term Loan Agent on or before the date the Supreme Court of Bermuda holds a hearing with respect to the appointment of provisional liquidators of the Parent and being in full force and effect as of the Closing Date (the "Excess Follow Form Policy"), and together with the Original Policies, the "Policies") (the date of the occurrence of (x) and (y)(i) and y(ii) being hereinafter referred to as the "Indemnity Effective Date"). Should either (x) or (y) not occur for any reason, this Indemnity Agreement and all provisions hereof shall be *void ab initio* and shall have no further force or effect.

2. Indemnitees. This Indemnity Agreement is for the express benefit of the Officers and Directors holding such positions as of the date the RSA becomes effective pursuant to its terms and conditions (the "RSA Effective Date"); provided, however, that any officer who is terminated for "cause" (as defined in any employment or service agreement with the applicable director or officer, or in the event not defined in such agreement, then as defined in the agreement of such officer's supervisor) on or before the Closing Date shall immediately and in all respects forfeit any and all protections pursuant to this Indemnity Agreement and shall no longer be a beneficiary of this Indemnity Agreement. For the purposes of this Indemnity Agreement, "Indemnitee" means each Officer and Director who is a beneficiary pursuant to the immediately preceding sentence.

3. Secondary Indemnification Protection with Respect to the Restructuring. Effective as of the Indemnity Effective Date, Newco shall indemnify each Indemnitee to the fullest extent permitted by law (as such may be amended from time to time), with respect to all actions and inactions taken or not taken by an Indemnitee on or prior to the Closing Date in connection with the implementation of the Restructuring and provided that such actions or inactions would otherwise have been covered by any of the Policies. Newco will only indemnify the Indemnitee for claims that are approved and covered by any of the Policies in accordance with the terms and conditions of such Policies, and only after the Indemnitee has exhausted all possible

---

[1] Capitalized terms herein that are not defined shall have the respective meanings ascribed to such terms in the RSA.

coverage for indemnification, advancement of expenses, or insurance from all of the Policies. If the Indemnitee fails to exhaust their rights to indemnification, advancement of expenses, or insurance from each of the Policies, they shall not be indemnified under this Indemnity Agreement. If the issuer of the Policies determines that a claim is not covered under the Policies, such claim shall not be indemnified under this Indemnity Agreement, unless otherwise determined by the issuer of the Policies or required to be covered by a final order of a court of competent jurisdiction. Notwithstanding the foregoing stated limitations of the scope of this indemnification, if all coverage under the Policies have been exhausted such that the Policies will no longer cover any claim, such claim will nevertheless be covered by this Indemnity Agreement if, and only if, any of the Policies would have covered such claim. The determination as to whether all insurance coverage (including, for the avoidance of doubt, the Excess Follow Form Policies) under the Policies has been exhausted shall be made by Newco in good faith after consultation with its insurance brokers and outside counsel. To the extent an Indemnitee recovers any proceeds from sources other than Newco, such Indemnitee shall remit such proceeds to Newco to the extent necessary to reimburse Newco for any indemnification or advancement made to such Indemnitee.

For the avoidance of doubt, and without limitation, any exclusions applicable to all of the Policies shall be incorporated into this Indemnity Agreement as exclusions for the purposes of this indemnification, such that if no coverage is or would be available under any of the Policies, no indemnification is owed hereunder. Further, this indemnity shall only be as broad as the coverage provided under the Policies in respect of the types of expenses and costs covered, including attorneys' fees. Notwithstanding anything to the contrary, nothing in the prior sentences of this Section 3 shall be a limitation on the amount an Indemnitee can recover from Newco.

4. <u>Bridge Expense Coverage</u>.  Following the Closing Date, Newco will advance up to $1,000,000 (one million dollars) in the aggregate (the "<u>Bridge Expense Coverage</u>") to the Indemnitees with respect to legal fees and expenses (whether related to the implementation of the Restructuring or otherwise) that would otherwise have been covered by the Policies in accordance with their terms and conditions without regard to or application of any retention requirement of up to $150,000 (one hundred and fifty thousand dollars) in the applicable Policies. Any request for advancement of such expenses must be made by an Indemnitee in writing setting forth with specificity the details of the expense and including such statement or statements to reasonably evidence the expense has or will imminently be incurred by the Indemnitee. As a condition precedent to the advancement of this Bridge Expense Coverage, the notice must also include or be accompanied by a written undertaking by or on behalf of Indemnitee to repay any expenses advanced (other than any amounts that are not reimbursable by any Policies as a result of the retention). Any advances by Newco pursuant to this Section 4 shall also be reimbursed by the Indemnitee to the extent that any third party or other insurance ultimately covers such expenses. Notwithstanding anything to the contrary contained in this Section 4, in no case shall Newco be obligated to advance more than $1,000,000 (one million dollars) in the aggregate for all requests made for advancement under this Paragraph 4 regardless of the number of individuals or the amount that shall be requested for such advances. After all of the conditions set forth in this Section 4 are satisfied, Newco shall promptly advance such reasonable and documented expenses of the requesting Indemnitee.

5. <u>Exception to Rights</u>.  Notwithstanding any provision in this Indemnity Agreement, Newco shall not be obligated to pay any indemnity obligation or advancement in connection with any claim made against an Indemnitee: (i) for which payment has actually been made to or on behalf of such Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; (ii) for which Indemnitee has not first sought indemnification and advancement from the Policies, and Newco shall have the right, in its sole discretion, to require documentation or other evidence from the Indemnitee that demonstrates, to the reasonable satisfaction of Newco, that the Indemnitee has fulfilled their obligations in this Indemnity Agreement to first seek indemnification, advancement of expenses, and insurance from the Policies; (iii) in respect of any event occurring after the Closing Date (provided that this clause (iii) does not limit or affect the availability of indemnity or advancement under this Agreement to the extent, but only to the extent, such a claim is in respect of any event occurring before or on the Closing Date); or (iv) in connection with any proceeding (or any part of any proceeding) initiated by such Indemnitee, including any proceeding (or any part of any proceeding) initiated by such Indemnitee against Newco or its affiliates or any of its or their directors, officers or employees or against other Indemnitees, unless the proceeding is one to enforce such Indemnitee's rights under this Indemnity Agreement or any other indemnification, advancement or exculpation rights to which Indemnitee may at any time be entitled under applicable Law or any agreement.

6. <u>Insurance</u>.  Newco shall have the power to purchase and maintain insurance, at its expense, to the fullest extent permitted by Law, as such may be amended from time to time. Without limiting the generality of the foregoing, Newco shall have the power to purchase and maintain insurance on behalf of any Person who is or was or has agreed to become a director, officer, employee or agent of Newco, or who is serving, was serving, or has agreed to serve at the request of Newco as a director, officer, trustee, general partner, managing member, fiduciary, employee or agent of any other Person, against any liability asserted against such Person and incurred by such Person on such Person's behalf in such capacity, or arising out of such Person's status as such, whether or not Newco would have the power to indemnify such Person against such liability.

7. <u>Miscellaneous</u>.

    a. This Indemnity Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes any other oral or written agreements between such Person regarding the subject matter hereof; <u>provided</u>, that, for the avoidance of doubt, nothing herein shall impact that certain Release of Guarantor effective as of the date hereof.

    b. Each Party represents and warrants that (i) it has all requisite power and authority to enter into this Indemnity Agreement and (ii) it has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each such Party and constitutes the legal, valid and binding agreement of each such Party, enforceable in accordance with its terms.  The terms of this Indemnity Agreement have been negotiated in good faith by the parties hereto.  The provisions of this Indemnity Agreement shall not be construed adverse to any party

as "drafter" in the event of a contention of ambiguity in this Indemnity Agreement, and the Parties hereto waive any statute or rule of law to such effect.

c.  Any term or provision of this Indemnity Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. The use of "include" or "including" is without limitation, whether stated or not. The term "or" is not necessarily exclusive.

d.  This Indemnity Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein expressed or implied, shall give or be construed to give any person, other than such Persons signatory hereto and such permitted assigns, any legal or equitable rights hereunder.

e.  None of the terms or provisions of this Indemnity Agreement may be amended, supplemented, or otherwise modified except by a written instrument executed by each indemnifying Party and each indemnified Party with respect to such indemnification. No waiver or amendment of any of the terms or provisions of this Indemnity Agreement shall be binding against any Party hereto unless such waiver is in a writing signed by such Party.

f.  This Indemnity Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. All actions, suits, arbitrations, litigations, formal investigations or proceeding before or by any governmental authority (collectively, "Actions") arising out of or relating to this Indemnity Agreement shall be heard and determined exclusively in any New York federal court sitting in the Borough of Manhattan of The City of New York; *provided, however*, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of The City of New York. Consistent with the preceding sentence, each of the Parties hereby (a) submits to the exclusive jurisdiction of any federal or state court sitting in the Borough of Manhattan of The City of New York for the purpose of any Action arising out of or relating to this Indemnity Agreement brought by either Party; (b) agrees that service of process on any Party will be validly effected by sending notice to the address(es) of such Party or Parties set forth on the signature pages hereto; (c) irrevocably waives, and agrees not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Indemnity Agreement or the transactions contemplated by this Indemnity Agreement may not be enforced in or by any of the above named courts; and (d) WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUCH CLAIM, SUIT, ACTION OR PROCEEDING.

**IN WITNESS WHEREOF**, the Parties have caused this Indemnity Agreement to be executed by their respective duly authorized signatories effective as of the date first set forth above.

[PARTY]

By: _____

    Name:

    Title:

<u>Notice Address</u>:

Attention:

Email:

6

## **Schedule 1**

### **Officers**

1.  Hassan Afzal – Chief Executive Officer

2.  Thomas Inskip – President

3.  J. Michael Myshrall – Chief Financial Officer

4.  Samuel E. Logan, Jr. – Chief Legal Officer, Assistant Secretary

5.  Rebecca Clare Vernon – Deputy General Counsel, Assistant Secretary

6.  John Birrer – Chief Administrative Officer, Chief People Officer

**<u>Schedule 2</u>**

**Directors**

1. Hassan Afzal

2. Hasnain Aslam

3. Jose Maria Aznar

4. Martha Bejar

5. Lawrence Babbio, Jr.

6. Mohammed Khaishgi

7. John Leone

8. Abdul Hafeez Shaikh

9. John Snow

**Schedule 3**

Insurance Policies

- ACE American Insurance Company, a Chubb company, Policy No. DOX G70846275 004 (as amended, supplemented, or renewed), Afiniti, Inc.

- Fair American Insurance and Reinsurance Company, Policy No. MLX-1000952-03 (as amended, supplemented, or renewed), issued to Afiniti, Inc.

- U.S. Specialty Insurance Company, Policy No. 14-MGU-23-A57920 (as amended, supplemented, or renewed), issued to Afiniti, Ltd.

- Allied World Specialty Insurance Company, Policy No. 0312-6683 (as amended, supplemented, or renewed), issued to Afiniti, Ltd.

- Federal Insurance Company, Policy No. 8260-6153 (as amended, supplemented, or renewed), issued to Afiniti, Ltd.

- Chubb, Policy No. IEDRNA19294 (as amended, supplemented, or renewed), issued to Afiniti AI Limited

## **SCHEDULE 1**

Afiniti Europe Technologies Limited
Afiniti AI Limited
AETL

**<u>SCHEDULE 2</u>**

The Company is evaluating and, subject to the written consent of the Term Loan Agent, may execute upon, measures to reduce costs of maintaining its existing IP portfolio, including the following:

- Abandoning pending patent applications for lower-value inventions or lower-value jurisdictions

- Abandoning issued patents for lower-value inventions or lower-value jurisdictions by letting annuities or maintenance fee payments lapse

- File new patent and trademark applications in fewer jurisdictions

- Delay payment to law firms and other vendors servicing IP portfolio

- Delay filing applications to register trademarks

## SCHEDULE 3

The Company may:

- Honor wage, salary, and benefit obligations (excluding bonuses or incentives, tax gross-up or equalization, or granting any equity based compensation or benefits, or any other compensation-based payment that is variable or discretionary) under any existing employment or similar contract between an employee or independent contractor and the Company; *provided* that, if the Company is obligated to make a payment under such a contract that is not authorized by this Agreement, the Company shall provide not less than 10 Business Days' prior notice to, and obtain the consent of, the Term Loan Agent before making any such payment

- Except as otherwise expressly agreed to in writing by an applicable Afiniti board member and the Company, with the consent of the Term Loan Agent, or the Term Loan Agent, pay earned but unpaid Afiniti board director fees at Closing (in amounts consistent with ordinary course and past practices and prorated for any partial month served prior to the Closing Date)

- Extend maturity of existing promissory notes, subject to the prior written consent of the Term Loan Agent

- Make severance and statutory notice payments to terminated employees pursuant to 2024 reduction in force that occurred prior to the Agreement Effective Date

- Pay retention bonuses to and enter into retention agreements with non-executive key employees as agreed to in writing with the Term Loan Agent prior to such payment

- Subject to the Chief Transformation Officer's or the Term Loan Agent's prior written approval, execute Ben Evans employment agreement for Chief Partnerships Officer role

- Subject to the Chief Transformation Officer's or the Term Loan Agent's prior written approval, hire for all non-executive officer roles and the Chief Information Security Officer role currently posted on Afiniti website

- Subject to the Chief Transformation Officer's or the Term Loan Agent's prior written approval, make inflation-based and/or promotion-based salary adjustments to non-executive employees in relation to FY24 performance review process, consistent with budgeted amounts included in the FY25 budget

***Execution Version***

**AMENDMENT NO. 1 TO RESTRUCTURING SUPPORT AGREEMENT**

**October 2, 2024**

This AMENDMENT NO. 1 TO RESTRUCTURING SUPPORT AGREEMENT (this "***Amendment***"), dated as of October 2, 2024, is entered into by and among the following parties: (i) Afiniti, Ltd. ("***Afiniti***"); (ii) Afiniti, Inc. (the "***Borrower***"); (iii) Afiniti Europe Technologies Limited, Afiniti AI Limited, and AETL (collectively with Afiniti and the Borrower, the "***Company Parties***"); and (iv) the Term Loan Agent and the undersigned Term Loan Lenders (together, the "***Supporting Parties***" and, together with the "***Company Parties***," the "***Parties***").

WHEREAS, the Parties entered into the Restructuring Support Agreement, dated as of September 17, 2024 (the "**RSA**"), and desire to amend the terms of the RSA as set forth herein;

NOW, THEREFORE, each of the Parties hereby agrees as follows:

1. Effective as of the date hereof, the RSA is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~**stricken text**~~) and to add the double-underlined text (indicated textually in the same manner as the following example: **double-underlined text**) as set forth in the pages of the RSA attached as Annex A hereto.

2. Effective as of the date hereof, the following exhibits to the RSA are hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~**stricken text**~~) and to add the double-underlined text (indicated textually in the same manner as the following example: **double-underlined text**) as set forth in the attached changed pages only of such RSA exhibits:

| **RSA Exhibit** | **Amendment Annex** |
|---|---|
| Exhibit C (Credit Agreement Amendment) | Annex B |
| Exhibit F (Newco LLC Agreement) | Annex C |
| Exhibit G (Stock and Asset Transfer Agreement) | Annex D |
| Exhibit H (Securities Transfer Agreement) | Annex E |
| Exhibit I (Backstop Agreement) | Annex F |

3. Except as expressly and specifically amended hereby, all terms and provisions of the RSA are and shall remain in full force and effect.

4. The provisions contained in Sections 17, 19–29, and 31 of the RSA are hereby incorporated by reference into this Amendment, *mutatis mutandis*, and made a part of this Amendment as if set forth fully herein.

[*Signature pages omitted*]

**<u>Annex A</u>**

"***Claim***" means any claim, as defined in section 101(5) of the Bankruptcy Code. Except where otherwise provided in context, "Claim" refers to such a claim against the Company.

"***Class A-1 Units***" has the meaning set forth in the Newco LLC Agreement.

"***Class A-2 Units***" has the meaning set forth in the Newco LLC Agreement.

"***Class B Units***" has the meaning set forth in the Newco LLC Agreement.

"***Closing***" means the closing of the Restructuring, including the amendments to the Term Loan Credit Documents necessary with respect to the New Exit Loans becoming effective and all other conditions precedent to the Closing Date having been satisfied or waived in accordance with the terms hereof.

"***Closing Date***" means the date on which the Closing occurs.

"***Conveyance Taxes***" means all sales, documentary, use, value added, transfer, stamp, stock transfer, registration and similar Taxes.

"***Definitive Documents***" means, with respect to the Restructuring, all material documents (including any related Bankruptcy Court or Bermuda Court or other judicial or regulatory orders, agreements, schedules, pleadings, motions, filings, or exhibits) that are contemplated by this Agreement or that are otherwise necessary or desirable to implement the Restructuring, including (as applicable), in substantially the form attached hereto, subject to Section 4(a) below, including: (i) the Amendment attached hereto as **Exhibit C**; (ii) any other material documents related to the New Exit Loans, including the security documents, guarantees and any related agreements attached hereto as **Exhibit D** and the agreement among lenders / intercreditor agreement attached hereto as **Exhibit E**; (iii) the Newco LLC Agreement, attached hereto as **Exhibit F**; (iv) the Securities Transfer Agreement, attached hereto as **Exhibit G**, and any agreement attached thereto (when attached); (v) the Stock and Asset Transfer Agreement, attached hereto as **Exhibit H**, and any agreement attached thereto (when attached); (vi) the Backstop Commitment Agreement, attached hereto as **Exhibit I**, and any agreement attached thereto as an annex; (vii) the Indemnity Agreement, attached hereto as **Exhibit K**; (viii) the Sanction Order; (ix) the Recognition Motion; and (x) the Recognition Order.

"***Eligible Assignees***" has the meaning set forth in the Term Loan Credit Agreement.

"***Eligible Holder***" means any holder of equity interests in Afiniti that certifies that it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act); ~~or~~ (iii) a non-U.S. person under Regulation S under the Securities Act that is located outside of the U.S. (within the meaning of Regulation S under the Securities Act)**; or (iv) an accredited investor (as defined in Rule 501(a)(5) under the Securities Act)**.

"***Equivalent Notes***" means promissory notes issued by Afiniti, Inc. and Newco having terms substantially similar to the 2L Convertible Tranche loans issued to Rights Offering Subscribers who are not Eligible Assignees, which Equivalent Notes shall be convertible at the option of the Rights Offering Subscribers into fully paid, non-assessable Class A-2 Units of the

3.      **Foreign Proceedings.**  Where the provisions of this Agreement, the Term Sheet, and the Restructuring refer or apply to (a) the Chapter 15 Case, the Bankruptcy Court, or events, circumstances, or procedures in the United States (the "*US Process*") or (b) the Bermuda Proceeding, the Bermuda Court, or events, circumstances, or procedures in Bermuda (the "*Bermuda Process*"), those provisions relating to one process shall be deemed to apply or refer equally to the other process (the "*Other Process*") (and if necessary and applicable, this Agreement will be deemed to include corresponding provisions relating to the Other Process) to ensure that the rights and obligations of the Parties under this Agreement apply equally to the US Process and the Bermuda Process, to the fullest extent necessary in order to implement the Restructuring in accordance with the terms, spirit, and intent of this Agreement and the Term Sheet.

4.      **Definitive Documents; Forbearance; Waiver; Rights Offering; Issuance of Interests; Indemnities**

a.      Definitive Documents.

(i)      Each of the Definitive Documents (as they may be modified, amended, or supplemented in accordance with this Agreement) shall be consistent with this Agreement and, except as expressly set forth in a Definitive Document, otherwise acceptable to Afiniti and the Required Supporting Parties.  Each Definitive Document (as each may be amended, modified or supplemented in accordance with this Agreement) is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Definitive Documents.  For the avoidance of doubt, the Sanction Order and the Recognition Order must be acceptable in all respects to the Required Supporting Parties.

(ii)      Notwithstanding anything to the contrary herein, (x) the Term Loan Agent (on behalf of the Term Loan Lenders), Afiniti, and Newco may add any and all exhibits and schedules to the Securities Transfer Agreement to the extent mutually agreed among the parties except as otherwise provided in the form of such agreement attached hereto as Exhibit H, and (y) the Term Loan Agent (on behalf of the Term Loan Lenders), Afiniti and HoldCo may add any and all exhibits and schedules to and the Stock and Asset Transfer Agreement to the extent mutually agreed among the parties except as otherwise provided in the form of such agreement attached hereto as Exhibit G, in each case, **except as otherwise provided in the form of such agreement,** no later than ~~the date on which the application to the Bermuda Court seeking Sanction is filed,~~**11:59 p.m. (Eastern Time) on October 1, 2024,** and Afiniti and Newco, or Afiniti and HoldCo, as applicable, shall add such exhibits and schedules as so directed by the Term Loan Agent.  Notwithstanding the foregoing, prior to Closing, the Term Loan Agent (on behalf of the Term Loan Lenders) may, in its sole discretion, (A) direct the removal or addition of any agreement from the list of transferred agreements set forth on such exhibits or the schedules to the Stock and Asset Transfer Agreement, direct the removal or addition of any right, property or asset to the list of transferred assets under the Stock and Asset Transferred Agreement in accordance with the terms of the Stock and Asset Transfer Agreement, direct the removal or addition of any assumed or excluded liability from the list of assumed or

the disclosure of such information (or as much of it as reasonably possible) in a manner that does not result in a violation of attorney-client privilege; and

(C) as the case may be, sign joint filings to be submitted pursuant Foreign Investment Laws;

(ix)    not (or instruct, encourage or cooperate with any other Person to) seek or solicit, support, encourage, propose, file (or instruct or direct their respective Representatives to seek or solicit, support, encourage, propose or file), or engage in any discussions or negotiations with respect to any Prohibited Transaction other than as set forth in Section 11 hereof;

(x)    achieve each of the following milestones (the "*Milestones*") on or before each of the following dates:

(A) commencement of the Bermuda Proceeding by filing a winding up petition and an application to appoint provisional liquidators on or before September 19, 2024;

(B) obtaining of an order from the Bermuda Court appointing provisional liquidators on or before September 20, 2024 (or the soonest date thereafter that is convenient to the Bermuda Court);

(C) filing of an application to obtain Sanction of the Restructuring by the Bermuda Court on or before ~~September 24~~October 2, 2024;

(D) obtaining of the Sanction Order on or before October 25, 2024 (or the soonest date thereafter that is convenient to the Bermuda Court);

(E) filing of the Recognition Motion in the Chapter 15 Case on or before October 29, 2024;

(F) obtaining entry of the Recognition Order by the Bankruptcy Court on or before November 25, 2024; and

(G) occurrence of the Closing no later than the Outside Date.

(xi)    use commercially reasonable efforts to work with the Required Supporting Parties in good faith to optimize the tax structure and efficiency of the Restructuring;

(xii)    timely file a formal objection, in form and substance acceptable to the Required Supporting Parties, to any motion or other pleading filed with the Bankruptcy Court or the Bermuda Court by a third party seeking the entry of an order or ruling of the

## Annex B

*Agreed Form*

---

## AMENDMENT NO. 13 TO TERM LOAN CREDIT AGREEMENT

dated as of

[  ], 2024,

among

AFINITI, LTD. (in provisional liquidation),
as Parent,

MICHAEL MORRISON AND CHARLES THRESH,
as Joint Provisional Liquidators of AFINITI, LTD.

AFINITI, INC.,
as Borrower,

AFINITI NEWCO HOLDINGS LLC,
as NewCo,

the Guarantors party hereto,

the Lenders party hereto

and

VCP CAPITAL MARKETS, LLC,
as Administrative Agent and Collateral Agent

---

5.      **Post-Closing Covenant.** On the Amendment No. 13 Effective Date, or such longer period as the Administrative Agent shall agree in its reasonable discretion, the Borrower shall deliver, or cause to be delivered, to the Administrative Agent, (i) the register of mortgages and charges of HoldCo noting the entry into the English Share Charge, the Irish Share Charge and the Cayman Islands Debenture by HoldCo, (ii) the register of security interests over limited liability company interests of HoldCo noting the security granted by the Cayman Islands LLC Security Agreement ~~and~~, (iii) on or before ~~October 31~~November 30, 2024, the Administrative Agent will have received satisfactory evidence that the annual returns for the financial year 2022 (January 1, 2022 – December 31, 2022) of the Original Irish Loan Party are up to date[2]~~.~~; and (iv) as soon as reasonably practicable after December 31, 2024 the Administrative Agent will have received satisfactory evidence that the annual returns for the financial year 2023 (January 1, 2023 – June 30, 2024) of the Original Irish Loan Party are up to date.

6.      **Acknowledgement of Rights; Release of Claims.**    Each Loan Party hereby acknowledges that: (a) it has no defenses, claims or set-offs to the enforcement by any Lender or the Administrative Agent of Loan Parties' liabilities, obligations and agreements on the date hereof; (b) to its knowledge, each Lender and the Administrative Agent has fully performed all undertakings and obligations owed to it as of the date hereof; and (c) except to the limited extent expressly set forth in this Agreement, no Lender or Administrative Agent waives, diminishes or limits any term or condition contained in the Credit Agreement or any of the other Loan Documents. Each Loan Party hereby waives, releases, remises and forever discharges the Lenders and the Administrative Agent, their agents, employees, officers, directors, predecessors, attorneys and all others acting or purporting to act on behalf of or at the direction of the Lenders and Administrative Agent ("Releases") from any and all claims, suits, actions, investigations, proceedings or demands, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law of any kind or character, known or unknown, which the Borrower or any other Loan Party ever had or now has against the any of the Releasees which relates, directly or indirectly, to the Loans or the Loan Documents or any acts or omissions of the Releasees in respect of the Loans or the Loan Documents and arising from any event occurring on or prior to the Amendment No. 13 Effective Date.  Without limiting the generality of the foregoing, each Loan Party waives and affirmatively agrees not to contest: (a) the right of the Administrative Agent and each Lender to exercise its rights and remedies under the Credit Agreement, this Agreement or the other Loan Documents, or (b) any provision of this Agreement.

---

[2] ~~NTD: Subject to further discussion.~~

**<u>Annex C</u>**

Afiniti and the Company for cancellation by the Administrative Agent and an equivalent principal amount of Equivalent Notes shall be issued by Afiniti and the Company to such Rights Offering Subscribers) along with a corresponding number of Class A-1 Units; and *provided*, *further*, that in no event shall the amount of Backstop Loans so resold to Rights Offering Subscribers or assigned to Afiniti and the Company exceed $5,000,000 aggregate principal amount.

"Backstop Commitment Agreement" means the Backstop Commitment Agreement, dated as of [●]September 17, 2024, among the Company, Afiniti and the Backstop Parties memorializing the Backstop Commitment (as modified, amended or supplemented from time to time in accordance with its terms).

"Backstop Loans" means the Restructuring Second Lien Term Loans purchased by the Backstop Parties pursuant to the Backstop Commitment Agreement (after giving effect to any resale of Restructuring Second Lien Term Loans (or assignment to Afiniti and the Company of Backstop Loans for cancellation by the Administrative Agent and issuance by Afiniti and the Company of an equivalent principal amount of Equivalent Notes) to Rights Offering Subscribers other than the Backstop Parties in the event the amount subscribed for in the Rights Offering by Rights Offering Subscribers exceeds $10,000,000 aggregate principal amount).

"Backstop Parties" means TRG and its Affiliates who are party to the Backstop Commitment Agreement, solely in their respective capacities as Backstop Parties under the Backstop Commitment Agreement.

"Backstop Units" means (i) the Class A-1 Units issued to the Backstop Parties pursuant to the Backstop Commitment Agreement and (ii) the Class A-2 Units issuable upon conversion of the Backstop Loans (after giving effect to any resale of Class A-1 Units and Restructuring Second Lien Term Loans (or assignment to Afiniti and the Company of Backstop Loans for cancellation by the Administrative Agent and issuance by Afiniti and the Company of an equivalent principal amount of Equivalent Notes) to Rights Offering Subscribers in the event the amount subscribed for in the Rights Offering by rights Offering Subscribers exceeds $10,000,000 aggregate principal amount).

"Blackout Commencement Notice" has the meaning set forth in Section 10.1(c).

"Blackout Termination Notice" has the meaning set forth in Section 10.1(c).

"Board" means the governing body of the Company designated as such and described in ARTICLE VII.

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York.

"Capital Account" means a separate account maintained for each Member and adjusted in accordance with Treasury Regulations under Code Section 704. To the extent consistent with such Treasury Regulations, the adjustments to such accounts shall include the following:

"Carveout Parties" has the meaning set forth in Section 7.3(a).

"CEO Director" has the meaning set forth in Section 7.3(a).

"Certificate" has the meaning set forth in the Recitals.

"Class A Member" means Members holding Class A Units with respect to such ownership of Class A Units.

"Class A Units" means the Class A-1 Units and Class A-2 Units, collectively.

"Class A-1 Units" means the "Class A-1" Units described in Section 3.1.

"Class A-2 Units" means the "Class A-2 Units" described in Section 3.1.

"Class B Majority" has the meaning set forth in Section 9.2(b)(ii).

"Class B Member" means Members holding Class B Units with respect to such ownership of Class B Units.

"Class B Units" means the "Class B Units" described in Section 3.1.

"Class C Member" means Members holding Class C Units with respect to such ownership of Class C Units.

"Class C Units" means the "Class C Units" described in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company Covered Person" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1).

"Company Redomiciliation" has the meaning set forth in Section 2.3.

"Company Sale" means (in each case other than in an Incorporation or an IPO):

    (a)    a merger or consolidation in which

        (i)    the Company is a constituent party, or

        (ii)    a subsidiary of the Company is a constituent party and the Company issues shares or equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) of the Company pursuant to such merger or consolidation,

except, in each case, any such merger or consolidation involving the Company or a subsidiary in which the shares or equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) of the Company

outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares or equity interests that represent, immediately following such merger or consolidation, a majority, by voting power, of the equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) of (1) the surviving or resulting entity or (2) if the surviving or resulting entity is a wholly owned subsidiary of another entity immediately following such merger or consolidation, the parent entity of such surviving or resulting entity;

(b)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole or the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of the Company if substantially all of the assets of the Company and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company; or

(c)    (i) a single transaction or series of related transactions in which a Person, or a group of related Persons, acquires from Members Voting Units representing substantially all of the outstanding Voting Units, or (ii) an issuance of shares or equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) by the Company, in either case, under circumstances in which the holders of the voting power of outstanding equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) of the Company, immediately prior to such transaction, own less than 50% in voting power of the outstanding equity interests (excluding Class A-1 Units or other Equity Securities that are not entitled to receive distributions) of the Company immediately following such transaction.

"Company Sale Process" has the meaning set forth in Section 9.2(b).

"Covered Persons" has the meaning set forth in Section 7.4.

"Credit Agreement" has the meaning set forth in the Recitals.

"Demand Request" has the meaning set forth in Section 10.1(a).

"DGCL" means the Delaware General Corporation Law, 8 Del. Code § 101 et seq., as the same may be amended from time to time.

"Director" means any individual designated to serve as a Director in accordance with the provisions of this Agreement, for so long as such individual continues to serve in such capacity.

"Disqualified Designee" has the meaning set forth in Section 7.3(i).

"Disqualification Event" has the meaning set forth in Section 10.14.

"<u>Drag-Along Holder</u>" has the meaning set forth in <u>Section 9.2(a)(i)</u>.

"<u>Drag-Along Notice</u>" has the meaning set forth in <u>Section 9.2(a)(i)</u>.

"<u>Drag-Along Sale</u>" has the meaning set forth in <u>Section 9.2</u>.

"<u>Eligible Assignee</u>" has the meaning set forth in the Credit Agreement.

"<u>Eligible Holders</u>" means any holder that certifies that it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act); ~~or~~ (iii) a non-U.S. person under Regulation S under the Securities Act that is located outside of the U.S. (within the meaning of Regulation S under the Securities Act); or (iv) an accredited investor (as defined in Rule 501(a)(5) under the Securities Act).

"<u>Equity Securities</u>" means all shares or equity interests of the Company, all securities convertible or exchangeable for shares or equity interests of the Company, and all options, warrants, and other rights to purchase or otherwise acquire from the Company such shares or equity interests, including any stock appreciation or similar rights, contractual or otherwise.

"<u>Equivalent Notes</u>" means promissory notes issued by Afiniti and the Company having terms substantially similar to the Restructuring Second Lien Term Loans issued to Rights Offering Subscribers who are not Eligible Assignees, which Equivalent Notes shall be convertible at the option of the Rights Offering Subscribers into fully paid, non-assessable Class A-2 Units; *provided, however*, that for every Equivalent Note issued in excess of $10,000,000 aggregate principal amount, an equivalent principal amount of Restructuring Second Lien Term Loans shall be assigned to Afiniti and the Company for cancellation by the Administrative Agent.

"<u>Excepted Securities</u>" means any securities issued (i) as a dividend or distribution on existing Units, (ii) by reason of a dividend, split-up, adjustment for merger or reorganization, (iii) as Class C Units to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to the MIP or any other plan, agreement or arrangement approved by the Board, (iv) upon the exercise of an outstanding option or warrant pursuant to the terms of such option or warrant, (v) upon the conversion of any outstanding convertible security (including the Restructuring Second Lien Term Loans and Equivalent Notes) pursuant to the terms of such convertible security, (vi) to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board, (vii) to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board, (viii) as consideration in a bona fide business acquisition, (ix) as consideration pursuant to a joint venture, strategic alliance or other commercial relationship and that is not for the primary purpose of raising equity capital, (x) as part of an internal restructuring or reorganization which does not result in the issuance of any New Securities to any unaffiliated third party or change the ownership interest of any Member, (xi) in connection with an Incorporation, (xii) as part of an IPO, (xiii) to Rights Offering Subscribers in connection with the Rights Offering, or (xiv) as additional Class A-1 Units to the 2L Lenders as of immediately

"Rights Offering Subscribers" means the Eligible Holders who purchase Restructuring Second Lien Term Loans or Equivalent Notes and Class A-1 Units through the Rights Offering.

"Rights Offering Units" means (i) the Class A-1 Units issued to Rights Offering Subscribers pursuant to the Rights Offering and (ii) the Class A-2 Units issuable upon conversion of the Restructuring Second Lien Term Loans or Equivalent Notes purchased by Rights Offering Subscribers pursuant to the Rights Offering (after giving effect to any purchase of Class A-1 Units and Restructuring Second Lien Term Loans by (or assignment to Afiniti and the Company of Backstop Loans for cancellation by the Administrative Agent and issuance by Afiniti and the Company of an equivalent principal amount of Equivalent Notes to) Rights Offering Subscribers from the Backstop Parties in the event the amount subscribed for in the Rights Offering by Rights Offering Subscribers exceeds $10,000,000 aggregate principal amount).

"ROFR Notice" has the meaning set forth in Section 9.6.

"Rule 506(d) Related Party" means, with respect to any Person, any other Person that is a beneficial owner of such first Person's securities for purposes of Rule 506(d) under the Securities Act.

"Sale Period" has the meaning set forth in Section 9.2(b)(ii).

"Sanction Order" has the meaning set forth in the Recitals.

"Schedule of Members" means the Schedule of Members of the Company as maintained by the Board on behalf of the Company.

"SEC" means the United States Securities and Exchange Commission.

"SEC Rule 144" means Rule 144 under the Securities Act.

"Second Participation Threshold" has the meaning set forth in Section 4.2(b).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Selling Expenses" means all underwriting discounts, selling commissions, and stock transfer taxes applicable to the sale of Registrable Securities, and fees and disbursements of counsel for any Holder, except for the fees and disbursements of the Selling Holder Counsel borne and paid by the Company as provided in Section 10.6.

"Selling Holder Counsel" has the meaning set forth in Section 10.6.

"Selling Member" has the meaning set forth in Section 9.5(a).

"Service Provider" means an employee, Officer, Director, consultant, advisor or other Person performing services for the Company or a subsidiary of the Company.

meeting.  Meetings of the Board may be held by conference telephone or other communications equipment by means of which all participating Directors can hear each other during the meeting.

(d)    <u>Quorum</u>.  No action may be taken at a meeting of the Board unless a quorum consisting of a majority of the Directors then in office are present, including at least two (2) 2L Directors.  If a quorum shall not be present at any meeting of the Board, the Directors present threat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Except as otherwise expressly provided in this Agreement, the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board.

(e)    <u>Action by Written Consent</u>.  Any action which may be taken by the Board under this Agreement may be taken without a meeting if consents in writing or electronic transmission setting forth the action so taken are signed or submitted by the number of Directors that would be necessary to authorize or take such action at a meeting at which all Directors were present and voted; *provided* that each Director receives an advanced copy of a proposed written consent, together with any supporting materials, reasonably in advance of the execution of such written consent by the requisite number of Directors then in office.

(f)    <u>Voting Rights; Required Votes</u>.  Each Director shall be entitled to cast one vote with respect to any matter coming before the Board.  Any action required or permitted to be taken by the Board herein must be approved as provided herein, subject to <u>Section 6.3</u>.  Any action of the Board that is not expressly addressed in this Agreement may be taken at a meeting or by written consent in accordance with this <u>Section 7.3</u>.  To the fullest extent permitted by applicable Law, any bankruptcy, insolvency, Chapter 11 or similar filing or winding up action by the Company shall require the affirmative vote or consent of at least five (5) Directors, including at least two (2) Independent Directors.

(g)    <u>Committees; Subsidiaries</u>.  The Company shall cause each committee of the Board to include at least one TRG Director for as long as a TRG Director shall be serving on the Board, or at least one Independent Director if there is no TRG Director serving on the Board. Unless prohibited by applicable Law, the Company shall cause the board of directors or similar governing body of each Subsidiary of the Company, and each committee of each such board or governing body, to include at least one TRG Director for as long as a TRG Director shall be serving on the Board, or at least one Independent Director if there is no TRG Director serving on the Board.

(h)    <u>Conditions for Inbound Strategic Sale Transaction</u>.  Notwithstanding an affirmative vote by the requisite number of Directors, the consummation of an Inbound Strategic Sale Transaction shall be conditioned on the Board first receiving a fairness opinion from a nationally recognized investment banking firm that is independent of VCP and the Company selected by a vote of a majority of the Directors then in office.

(i)    <u>Without limiting the representations and warranties of each Member with the right to designate or participate in the designation of an individual for election to the Board as a Director set forth in Section 13.1, each Member with the right to designate or participate in the designation of an individual for election to the Board as a Director hereby covenants and</u>

agrees (i) not to designate or participate in the designation of any Director designee who, to such Member's knowledge, is a Director designee to whom any Disqualification Event is applicable, except for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act is applicable (a "Disqualified Designee"), (ii) to exercise reasonable care to determine whether any Director designee designated by such Member is a Disqualified Designee, (iii) that in the event such Member becomes aware that any individual previously designated for election to the Board as a Director by any such Member is or has become a Disqualified Designee, such Member shall as promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement designee who is not a Disqualified Designee, and (iv) that if it or any of or any of its Rule 506(d) Related Parties becomes subject to a Disqualification Event at any date after the Agreement Date, or if any of the information provided to the Company in connection with the matters set forth herein becomes untrue at any time, such Member shall promptly (a) notify the Company thereof in writing, (b) provide the Company with all information reasonably requested by the Company so that the Company may make the determination required by Rule 506(d) under the Securities Act and any other applicable laws and regulations, and (c) use its best efforts to coordinate with the Company and provide documentation as reasonably requested by the Company related to any such Disqualification Event, and implement such remedies as may be directed by the Company to address the Member's changed circumstances such that the changed circumstances will not affect in any way the Company's ongoing or future reliance on the private placement provisions of Rule 506 under the Securities Act.

Section 7.4    Interpretation of Rights and Duties of Members and Directors.

The Members acknowledge and agree that, to the fullest extent permitted by Delaware Law and notwithstanding any duties otherwise existing at Law or in equity, (i) no Director, Member or any Member's owners or representatives (collectively, the "Covered Persons") shall have any duties (including any fiduciary duties) to the Company or the other Members other than the duty of loyalty (as modified by this Agreement) and those other duties (if any) expressly described herein; *provided*, the foregoing does not eliminate the implied contractual covenant of good faith and fair dealing, (ii) so long as a Covered Person acts in a manner consistent with the express provisions of this Agreement, such Covered Person shall not be in breach of any duties (including fiduciary duties) in respect of the Company or any other Member otherwise applicable under this Agreement or at law or in equity, and (iii) a Covered Person shall be entitled to make any decision and take or not take any action in their interests as a Member or creditor, or an Affiliate of a Member or creditor, of the Company, even if such decision, action or inaction is adverse to the interests of the Company or the other Members, and any decision made or action taken or not taken by a Covered Person in its interest as a Member or creditor, or an Affiliate of a Member or creditor, of the Company shall not constitute a breach of any duties (including fiduciary duties) in respect of the Company or any other Member otherwise applicable under this Agreement or at law or in equity.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of the Covered Persons otherwise existing at law or in equity, are agreed by the Members to replace fully and completely such other duties and liabilities of the Covered Persons.  Subject to the foregoing sentence but notwithstanding any other provision of this Agreement to the contrary or other applicable provision at law or in equity, to the fullest extent permitted by Delaware Law, whenever in this Agreement a Director or Member is permitted or required to make a decision or take or not take

Section 10.12 <u>Agreement to Lock-Up</u>.  Each Holder hereby agrees that it will not, without the prior written consent of any managing underwriter, during the period (the "<u>Lock-Up Period</u>") commencing on the date of the final prospectus relating to the IPO and ending on the date specified by the Company and any managing underwriter (such period not to exceed 180 days in the case of the IPO and such other period as may be reasonably requested by the Company or is customary in the case of other offerings), (a) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right, or warrant to purchase; or otherwise transfer or dispose of, directly or indirectly, any Units or any securities convertible into or exercisable or exchangeable (directly or indirectly) for Units held immediately before the effective date of the registration statement for such offering or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in <u>clause (a)</u> or <u>(b)</u> above is to be settled by delivery of Units or other securities, in cash, or otherwise.  The underwriters in connection with such registration are intended third-party beneficiaries of this <u>Section 10.12</u> and shall have the right, power, and authority to enforce the provisions hereof as though they were a party hereto.  Each Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with such registration that are consistent with this <u>Section 10.12</u> or that are necessary to give further effect thereto.  The terms of any lock-up agreement entered into with the underwriters for an offering (including any exceptions therein) shall supersede any lock-up restrictions set forth in this <u>Section 10.12</u> with respect to such offering; provided that in no event shall any Member not participating in such offering be required to enter any lock-up agreement that imposes on such Member a Lock-Up Period exceeding 180 days.  Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply pro rata to all Holders subject to such agreements, based on the number of shares subject to such agreements.

Section 10.13 <u>Termination of Registration Rights</u>.  The right of any Holder to request registration or inclusion of Registrable Securities in any registration shall terminate upon the earliest to occur of:

(a)     a Company Sale;

(b)     with respect to any particular Registerable Security, such Registrable Security becoming freely transferable without volume or manner-of-sale restrictions and without the requirement for the Company to be in compliance with the current public information requirement pursuant to SEC Rule 144; or

(c)     the fifth anniversary of the IPO Closing.

Section 10.14  <u>Bad Actor Matters</u>.  The Company hereby represents and warrants to the Members that none of the Company, or to the Company's knowledge, any Company Covered Person, is subject to the "bad actor" disqualifications set forth in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "Disqualification Event"), except for a Disqualification Event as to which Rule 506(d)(2)(ii)-(iv) or (d)(3) under the Securities Act is applicable. The Company shall include in the Rights Offering and furnish to each Eligible Holder a reasonable time prior to its purchase of Equity Securities a description in writing of any matters that would have triggered a

Disqualification Event with respect to the Company or, to the Company's knowledge, any Company Covered Person specified in this Section 10.14.

ARTICLE XI

DISSOLUTION; LIQUIDATION; CONVERSION

Section 11.1    Events Causing Dissolution.    The Company shall be dissolved and its affairs wound up upon:

(a)    Board and Class A Member approval of the dissolution of the Company;

(b)    The time at which there are no Members, unless the Company is continued in accordance with the Act; or

(c)    The entry of a decree of judicial dissolution under Section 18-802 of the Act.

Except as provided in Section 11.1(b), the Company shall not be dissolved upon the death, insanity, retirement, resignation, expulsion, bankruptcy, dissolution or occurrence of any other event which terminates the membership of a Member.

Section 11.2    Procedures on Dissolution.    Dissolution of the Company shall be effective on the day on which occurs the event giving rise to the dissolution, but the Company shall not terminate until the Certificate shall have been cancelled and the assets of the Company shall have previously been distributed as provided herein.    The Board or, if no Directors are then serving, a liquidator appointed with the consent of the Members holding a majority of the outstanding Class A Units, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this Agreement and cause the cancellation of the Certificate.

Section 11.3    Distributions Upon Liquidation.

(a)    The Company shall first satisfy its liabilities owing to creditors, whether by payment or making reasonable provision for payment thereof, which may include the Board or such liquidator setting up such reserves as the Board or such liquidator deems reasonably necessary for any contingent, conditional or unmatured liabilities or obligations of the Company. Said reserves may be paid over by the Board or such liquidator to a bank, to be held in escrow for the purpose of paying any such contingent, conditional or unmatured liabilities or obligations and, at the expiration of such period as the Board or such liquidator may otherwise deem advisable, such reserves shall be distributed to the Members or their assigns in the manner set forth in paragraph (b) below.

(b)    After paying such liabilities and providing for such reserves, the Board or liquidator shall cause the remaining net assets of the Company to be distributed to and among the Members in accordance with Section 4.2.    In the event that any part of such net assets consists of notes or accounts receivable or other noncash assets, the Board or liquidator may take whatever steps it deems appropriate to convert such assets into cash or into any other form which

71

the aggregate number of Voting Units held by all Fully Participating Buyers who wish to purchase such remaining unsubscribed portion of the Available Pre-Emptive Securities, by giving written notice to the Company and stating therein the quantity of Available Pre-Emptive Securities to be purchased.

Section 12.4    <u>Sale by the Company</u>.  In the event the Voting Members fail to exercise in full their pre-emptive rights set forth in this <u>Article XII</u>, the Company shall have ninety (90) days thereafter to sell or to cause the applicable Subsidiary to sell the Available Pre-Emptive Securities with respect to which the Voting Members' option was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the Company's notice. To the extent the Company or the applicable Subsidiary does not sell and issue all such Available Pre-Emptive Securities offered within such 90-day period, the Company or the applicable Subsidiary shall not thereafter issue or sell such unsold Available Pre-Emptive Securities without first again offering such Available Pre-Emptive Securities to the Major Class A Members in the manner provided above.

Section 12.5    <u>Termination of Rights</u>.  The terms, conditions and obligations set forth in this <u>Article XII</u> shall terminate upon the earlier to occur of (i) a Company Sale and (ii) immediately prior to the closing of an IPO.

<div align="center">ARTICLE XIII</div>

<div align="center"><u>REPRESENTATIONS AND WARRANTIES OF MEMBERS; RELEASE AND WAIVER</u></div>

Section 13.1    <u>Representations and Warranties of Members</u>.  Each of the Persons who signs this Agreement as a Member (other than a Class C Member) on the signature page attached hereto hereby represents and warrants to the Company and to the other Members that such Person (A) is either (I) a qualified institutional buyer as defined in Rule 144A promulgated under the Securities Act, (II) not a U.S. person (as defined in Regulation S promulgated under the Securities Act) and outside the United States, ~~or~~ (III) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) or (IV) an accredited investor (as defined in Rule 501(a)(5) under the Securities Act), (B) acknowledges that the Units to be acquired by such Person will have been acquired for investment for such Person's own account, not as a nominee or agent, and not with a view to distribution or resale of any part thereof, and such Person has no present intention of selling, granting any participation in, or otherwise distributing the same, (C) does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person with respect to any Units to be acquired by such Person, (D) has not been formed for the specific purpose of acquiring any Units to be acquired by such Person, (E) understands that the Units to be acquired by such Person have not been, and are not contemplated to be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Person's representations as expressed herein, and that such Units will be "restricted securities" under applicable U.S. federal and state securities Laws and that, pursuant to these Laws, such Person must hold such Units indefinitely unless they are registered with the SEC and qualified by state authorities, or an exemption from such registration and qualification requirements is available, (F) understands that no public market

now exists for any Units to be acquired by such Person, that no Person has made any assurances that a public market will ever exist for such Units, and that the Company will have no obligation to register or qualify such securities except as set forth in this Agreement, and (G) is not acquiring the Units to be acquired by such Person as a result of any advertisement, article, notice or other communication regarding such securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.  In addition, each Member with the right to designate or participate in the designation of an individual for election to the Board as a Director pursuant to Section 7.3 hereby represents and warrants to the Company and to the other Members that (i) such Member has exercised reasonable care to determine whether any Disqualification Event is applicable to such Member, any Director designee designated by such Member pursuant to this Agreement or any of such Member's Rule 506(d) Related Parties and (ii) no Disqualification Event is applicable to such Member, any Director designated by such Member pursuant to this Agreement or, to such Member's knowledge, any of such Member's Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act is applicable.  Notwithstanding anything to the contrary in this Agreement, each Member makes no representation regarding any Person that may be deemed to be a beneficial owner of the Company's voting Equity Securities held by such Member solely by virtue of that Person being or becoming a party to (x) this Agreement, as may be subsequently amended, or (y) any other contract or written agreement to which the Company and such Member are parties regarding (1) the voting power, which includes the power to vote or to direct the voting of, such security; and/or (2) the investment power, which includes the power to dispose, or to direct the disposition of, such security.

Section 13.2    <u>Release and Waiver</u>.

(a)    Subject in all respects to <u>Section 13.2(b)</u>, each of the Persons who signs this Agreement as a Class B Member or as a holder of Warrant Units or as a Rights Offering Subscriber on the signature page attached hereto (each, a "<u>Releasing Party</u>"), in consideration of the issuance of Class B Units or Warrant Units to such Releasing Party and/or allowing such Rights Offering Subscriber to participate in the Rights Offering, as applicable, to the fullest extent permitted by applicable Law, hereby irrevocably waives, releases, and discharges the Company, Afiniti, HoldCo, the Administrative Agent, in its capacity as administrative agent and collateral agent under the Credit Agreement, each 2L Lender, in its capacity as a lender under the Credit Agreement and as a Class A Member, Afiniti Parent and each of Afiniti Parent's current officers and directors as of the date of the Restructuring Support Agreement (as defined below) (unless such person was terminated for "cause" prior to the Agreement Date) and financial advisors, tax advisors, and legal advisors, and in the case of the Administrative Agent, the Company and the 2L Lenders, together with their Affiliates and their and their Affiliates' current and former respective officers, board directors, members, managers, partners, employees, agents, representatives, owners, financial advisors, tax advisors, legal advisors, shareholders, and predecessors in interest  (collectively, solely in such capacity, the "<u>Releasees</u>") from and against, any and all claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which such Releasing Party has, had, or may hereafter have, on any ground whatsoever, at common law, in equity, or under any contract, agreement, statute, rule, regulation, or order or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against the Releasees with respect to any event, matter,

claim, occurrence, damage, liability, obligation or injury arising out of, related to, or associated with any event or action (or failure to take any action) on or prior to the Agreement Date relating to Afiniti Parent and each direct and indirect subsidiary of Afiniti Parent, including, for the avoidance of doubt, the guarantors under the Credit Agreement (including the transfer of substantially all of Afiniti Parent's assets and all of the issued and outstanding capital stock or other equity interests of all of Afiniti Parent's non-U.S. direct subsidiaries (other than the shares of Afiniti Parent's subsidiaries organized under the laws of Bermuda) to HoldCo, pursuant to the Stock and Asset Transfer Agreement, dated as of [●], 2024, between Afiniti Parent and HoldCo (the "Asset Transfer"), the Securities Transfer Agreement, dated as of [●], 2024 (the "STA"), between Afiniti Parent and the Company, the Credit Agreement (together with all other related documents, instruments, and agreements (including all Loan Documents (as defined in the Credit Agreement)), in each case as supplemented, amended, restated, or otherwise modified from time to time), the "Restructuring" (as defined in the Restructuring Support Agreement, dated September [●]17, 2024 (as modified, amended or supplemented from time to time in accordance with its terms, the "Restructuring Support Agreement")) and the other transactions contemplated by the Restructuring Support Agreement); *provided* (i) no Released Party shall be released from any act or omission that constitutes fraud, gross negligence, or willful misconduct and (ii) references to financial advisors, tax advisors and legal advisors in this Section 13.2(a) shall include only those that provided services in furtherance and support of the Asset Transfer, the STA, the Credit Agreement or the Restructuring or the other matters contemplated by the Restructuring Support Agreement including, for the avoidance of doubt, any services related to the foregoing; *provided*, *however*, that none of TRG, TRG Pakistan Ltd., Muhammad Ziaullah Khan Chishti, or any Affiliates of the foregoing, including any current or former directors thereof (the "Carveout Parties"), hereby waives, releases, or discharges any other claims, charges, claims for relief, demands, suits, actions, proceedings, or causes of action which any such party has had, may have, or may hereafter have, on any ground whatsoever, against any of the other Carveout Parties.

(b)    Notwithstanding anything to the contrary in Section 13.2(a), this Section 13.2 shall not alter, waive or amend any of the rights or obligations (i) granted to or imposed upon any party to the Restructuring Support Agreement or any agreement or other document referred to in or entered into in connection with the Restructuring Support Agreement, including the Backstop Commitment Agreement, this Agreement or the Credit Agreement or (ii) of any party in connection with the enforcement of any rights or obligations arising under this Agreement.

(c)    Each Releasing Party, in its capacity as releasor hereunder, understands, acknowledges and agrees that this release is a full and final general release of all claims herein released that could have been asserted in any legal or equitable proceeding against the Releasees. Each Releasing Party, in its capacity as releasor hereunder, hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim purported to be released hereby (including the matters covered by above), or commencing, instituting or causing to be commenced any action, suit or proceeding of any kind, against any Releasee, based upon any claim purported to be released by it, in its capacity as releasor hereunder, hereby (including the matters covered above). Each Releasing Party, in its capacity as releasor hereunder, further

**<u>Annex D</u>**

EXHIBITS

A-1            Form of Assignment and Assumption Agreement (Holdco)

A-2            Form of Assignment and Assumption Agreement (IP Purchaser)

B-1            Form of Bill of Sale (Holdco)

B-2            Form of Bill of Sale (IP Purchaser)

C-1            Form of IP Assignment Agreement (Holdco)

C-2            Form of IP Assignment Agreement (IP Purchaser)

D              Form of Loan Note Instrument

SCHEDULES

1.01            ~~Parent's Knowledge~~

2.02(a)(vii)       Assigned Contracts

2.02(a)(xii)       Transferred Causes of Action

2.02(a)(xvii)      Other Transferred Assets

2.02(b)(vii)       Excluded Contracts

2.02(b)(ix)        Other Excluded Assets

2.03(a)(v)         Business Employee Liabilities

2.03(a)(vi)        Excluded Accounts Payable Liabilities

2.03(a)(ix)        Other Assumed Liabilities

8.16            Limitation of Provisional Liquidator Liability

DISCLOSURE SCHEDULES

1.01            Parent's Knowledge

3.04            Transferred Companies

3.15(b)         Assignment of Leases

THIS STOCK AND ASSET TRANSFER AGREEMENT (this "Agreement"), dated as of [●], 2024, is made by and between

(1) Afiniti, Ltd., a Bermuda exempted company in provisional liquidation acting by its joint provisional liquidators, whose registered office is 19 Par-la-Ville Road, Third Floor, Hamilton, HM 11, Bermuda ("Parent"),

(2) Mike Morrison and Charles Thresh of Teneo (Bermuda) Ltd. (and including any successors appointed by the Bermuda Court, the "Provisional Liquidators"), acting jointly and severally, and

(3) Afiniti AI Holdings LLC, a Cayman Islands limited liability company and a wholly owned subsidiary of Parent ("Holdco"). Parent and Holdco are referred to herein as the "Parties".

WHEREAS, Parent owns the percentage of the issued and outstanding shares of capital stock or other equity interests set forth on ~~Schedule~~ Section 3.04 of the Disclosure Schedule (the "Shares") of each of the non-U.S. direct subsidiaries of Parent set forth on ~~Schedule~~ Section 3.04 of the Disclosure Schedule (each, a "Transferred Company");

WHEREAS, Parent is a holding company that owns, directly and indirectly, the Acquired Companies (as hereinafter defined);

WHEREAS, Parent, through the Acquired Companies, is engaged in the business of developing and providing proprietary enterprise behavioral pairing services that pair contact center customers and agents using data analytics and artificial intelligence to determine the optimal behavioral fits between callers and agents in order to drive business outcomes, and related infrastructure and professional services (the "Business");

WHEREAS, by an Order made by the Supreme Court of Bermuda on September [●], 2024, Parent is in provisional liquidation (the "Provisional Liquidation") under the supervision of the Supreme Court of Bermuda (the "Bermuda Court");

WHEREAS, Parent wishes to transfer to Holdco, and Holdco wishes to acquire from Parent, the Shares and the Transferred Assets (as hereinafter defined), and in connection therewith Holdco is willing to assume from Parent all of the Assumed Liabilities (as hereinafter defined), all upon the terms and subject to the conditions set forth herein; and

WHEREAS, upon an application made by the Provisional Liquidators on October [●], 2024, the Bermuda Court has approved and sanctioned *inter alia* Parent's entry into this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Parent and Holdco hereby agree as follows:

1

(including the litigation and/or determination of any matters arising therein) shall not be deemed to constitute or be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect.

"Open Source Software" means all Software that is distributed as "free software," "open source software," "shareware" or under a similar licensing or distribution model, including Software licensed, provided, or distributed under any open source license, including any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Foundation (as promulgated by the Free Software Foundation) or any Software that contains or is derived from any such Software.

"ordinary course of business" or any similar expression means in the ordinary course of the applicable Person's business consistent with past practice, taking into account the fact that insolvency proceedings, or preparation therefor, have commenced.

"Owned Intellectual Property" means all Intellectual Property owned by an Acquired Company.

"Parent's Knowledge", "Knowledge of Parent" or similar terms used in this Agreement mean the actual knowledge of the Persons listed in ~~Schedule~~Section 1.01 of the Disclosure Schedule as of the date of this Agreement.

"Parent Plan" means a Benefit Plan sponsored or maintained by Parent, or in the case of a Benefit Plan that is a Contract, to which Parent is a party (other than a Company Plan).

"Permitted Encumbrances" means "Permitted Encumbrances" and "Permitted Liens", in each case, as defined in the Credit Agreement.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Personal Data" means any information that identifies an individual Person, including any information that is defined as "personal data", "personally identifiable information", "personal information", "protected health information" or "sensitive personal information" under any applicable Law.

"Provisional Liquidation Expense" means any amounts properly payable as an expense of the provisional liquidation of Parent.

"Real Property" means all land, buildings, improvements and fixtures erected thereon and all appurtenances related thereto.

"Recognition Motion" means the motion to be filed with the Bankruptcy Court in the Chapter 15 Case seeking (i) recognition of the Bermuda Proceeding and the Restructuring and (ii) recognition of the Sanction Order and enforcement of its terms.

"Recognition Order" means an order approving the Recognition Motion.

"Registered" means issued by, registered or filed with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"Regulations" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

"Related to the Business" means used or held for use by Parent in, or related to, or arising from, the Business.

"Restructuring" means a restructuring transaction as set forth in the non-binding term sheet attached to the Restructuring Support Agreement, executed on September 17, 2024, by and among Parent, Afiniti, Inc., the guarantors listed on Schedule 1 attached thereto, the Agent, and the lenders from time to time party thereto (including any schedules, annexes and exhibits attached thereto, each as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and the terms of the Restructuring Support Agreement) (as amended from time to time, the "Restructuring Support Agreement"), and as modified by and as more fully set forth in the Restructuring Support Agreement and in the Definitive Documents (as defined therein).

"Sanction" means individually or collectively, as the context requires, the approval, authorization, confirmation, consent, and/or endorsement of the Restructuring by the Bermuda Court.

"Sanction Order" means an order of the Bermuda Court that, among other things, approves the actions of the Provisional Liquidators in furtherance of the Restructuring.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Software" means software, computer programs, computer applications and code, including source code and object code, and all documentation relating to any of the foregoing.

"Subsidiary" means, with respect to a party hereto, any corporation, partnership, limited liability company or other entity, whether incorporated or unincorporated, of which (a) such party or any other Subsidiary of such party is a managing member or general partner; (b) at least a majority of the securities or other equity interests having by their terms ordinary voting power to elect a majority of the directors or others performing similar functions with respect to such entity is directly or indirectly owned or controlled by such party or by any one or more of such party's Subsidiaries, or by such party and one or more of its Subsidiaries; or (c) at least a majority of the equity securities or other equity interests is directly or indirectly owned or controlled by such party or by any one or more of such party's Subsidiaries, or by such party and one or more of its Subsidiaries.

Assets or the Assumed Liabilities, and including that cause of action, claim, demand, right and privilege listed or described on Schedule 2.02(a)(xii)[3];

(xiii)    all Company Plan assets held by Parent;

(xiv)    all books of account and copies of all Tax Returns (and supporting workpapers and other records) in Parent's possession or control, invoices, shipping records, supplier lists, correspondence and other documents, records and files of Parent and, in each case, Related to the Business or involving or related to the Transferred Employees, the Transferred Assets (including involving or related to the Transferred IT Assets) or the Assumed Liabilities, including all editorial, sales, promotion, market research, readership research, sales media kits, royalty and other files Related to the Business or involving or related to the Transferred Employees, the Transferred Assets or the Assumed Liabilities (the "Transferred Records"); provided that Parent may redact any information from such Transferred Records not Related to the Business or involving or related to the Transferred Employees, the Transferred Assets or the Assumed Liabilities prior to the delivery of such Transferred Records to Holdco and may retain a copy of any Transferred Records relating to Tax, accounting or legal matters or otherwise required to be retained pursuant to applicable Law;

(xv)    any and all attorney-client privileges, work product protections, mediation privileges, common-interest privileges, expectations of client confidences or any other similar privileges or protections of Parent or any Acquired Company or any of its applicable directors and officers to the extent related to Parent, the Business any Acquired Company or any Transferred Assets prior to the closing of the transactions contemplated herein (the "Pre-Closing Privileges") and all books and records and other documents of Parent or any Acquired Company containing any advice or communication that is subject to any Pre-Closing Privilege (collectively, the "Privileged Materials");

(xvi)    any and all rights pursuant to any settlement agreements;

(xvii)    any other right, property or asset of Parent that is listed or described on Schedule 2.02(a)(xvii); and

(xviii)    any other right, property or asset of Parent not specifically identified as an Excluded Asset in clauses (i) through (ix) of Section 2.02(b) that is designated by Holdco in writing prior to the Closing.

(b)    Notwithstanding anything in Section 2.02(a) to the contrary, Parent shall not convey, assign, transfer or deliver, or cause to be conveyed, assigned, transferred or delivered, to Holdco, and Holdco shall not acquire, and the Transferred Assets shall not include, Parent's right, title and interest to any assets of Parent not expressly included in the Transferred

---

[3]    **Note to Draft**: Schedule to consist of the US Trade Secret Action identified on Schedule 3.10.

Assets or pursuant to the sale, transfer and delivery of the Shares subject to the terms of this Agreement (the "Excluded Assets"), including:

(i)    all Cash of Parent in ~~an~~the amount ~~necessary~~set forth in Schedule 2.02(b)(ix) to be used to satisfy ~~the~~ Excluded Liabilities ~~approved in writing by the Agent for payment prior to Closing~~ (the "Retained Cash")[4];

(ii)    all rights of Parent under that certain loan receivable or any other intercompany receivables owed by Afiniti, Inc. to Parent, which shall be assigned to Newco in the Subsequent Transfer;

(iii)    the company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of Parent, as well as any other records or materials relating to Parent and not Related to the Business or involving or related to the Transferred Employees, the Transferred Assets or the Assumed Liabilities;

(iv)    all current and prior insurance policies of Parent, including current and prior director and officer insurance policies of Parent, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and all rights to receive refunds of premiums paid with respect thereto, which shall be assigned to Newco or one or more Subsidiaries designated by Newco in the Subsequent Transfer, except those set forth in Schedule Section 2.02(a)(vii);

(v)    all claims, defenses, causes of action, choses in action, rights of recovery for reimbursement, contribution, refunds, indemnity or other similar payment recoverable by Parent from or against any third party to the extent relating to any other Excluded Asset or any Excluded Liability; provided that if Holdco or any Acquired Company becomes subject to any Action or Liability in respect of any Excluded Asset or Excluded Liability following the Closing, all claims, defenses, causes of action, choses in action, rights of recovery for reimbursement, contribution, refunds, indemnity or other similar payment recoverable by Parent from or against any third party to the extent relating to such Excluded Asset or Excluded Liability shall be transferred to Holdco as Transferred Assets;

(vi)    all of the issued and outstanding shares of capital stock of AFCF, Ltd., a Bermuda exempted company limited by shares, and Afiniti Holdco, Ltd., a Bermuda exempted company limited by shares (collectively, the "Excluded Bermuda Subsidiaries") and of Afiniti, Inc.;

---

[4]    **Note to Draft**: Amount of cash to be retained by Parent to satisfy Excluded Liabilities and liquidate Parent (and local advisory costs related thereto) to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

(vii)    all rights of Parent under any Contract to which Parent is a party that (A) is not an Assigned Contract or (B) is an Assigned Contract but is not assignable pursuant to the terms thereof or as a matter of applicable Law, and specifically those Contracts listed on Schedule 2.02(b)(vii);[3]

(viii)    all Parent Plans and assets thereof; and

(ix)    any other right, property or asset that is listed or described on Schedule 2.02(b)(ix).[4]

(c)    The transfer of title to the Transferred Assets shall be free and clear of all Encumbrances other than those of the Agent, including any and all claims pursuant to any successor liability or successor-in-interest theory.

SECTION 2.03 Assumption and Exclusion of Liabilities.

(a)    Holdco shall assume no Liabilities of Parent, except the Liabilities expressly set forth in this Section 2.03(a) (collectively, the "Assumed Liabilities"), which Holdco shall, on the terms and subject to the conditions of this Agreement, assume at the Closing, and thereafter pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto:

(i)    all Liabilities arising from or in respect of the ownership or use of any Transferred Asset after the Closing;

(ii)    all Liabilities of Parent arising under the Assigned Contracts and the Transferred IP Agreements;

(iii)    all Liabilities of Parent arising under the Assigned Leases;

(iv)    all Liabilities arising from the employment of the Transferred Employees after the Closing;

(v)    all Liabilities set forth on Schedule 2.03(a)(v) for severance, termination and other payments to Business Employees;

(vi)    all accounts payable of Parent incurred in the ordinary course of business to suppliers and vendors of goods and services and outstanding as of the Closing Date, excluding (i) any intercompany payables owed by Parent to an Acquired Company or any other Subsidiary of Parent, and (ii) any accounts payable listed on Schedule 2.03(a)(vi)[5];

---

[3]    **Note to Draft**:  Final list of Excluded Contracts to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

[4]    **Note to Draft**:  Final list of Other Excluded Assets to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

[5]    **Note to Draft**: To include ~~fees to directors, Wilmer fees and~~ other specified excluded AP to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the

(vii)    all purchase orders for goods or services incurred in the ordinary course of business prior to the Closing, excluding any purchase orders listed on Schedule Section 2.03(a)(vii);

(viii)    all Taxes to the extent relating to the ownership or use of the Transferred Assets or the operation of the Business after the Closing; and

(ix)    all other Liabilities set forth on Schedule 2.03(a)(ix).[6]

(b)    Except as specifically set forth in Section 2.03(a), Holdco will not assume or be liable for any Liabilities of Parent of any nature whatsoever, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise (other than the Assumed Liabilities), including the following (other than the Assumed Liabilities) (collectively, the "Excluded Liabilities"):

(i)    all Liabilities to the extent relating to the Excluded Assets;

(ii)    all Liabilities of Parent arising under any Contract to which Parent is a party that is not an Assigned Contract, including under any indemnification agreements with any current or former director or officer of Parent;

(iii)    all Liabilities arising from or in respect of any Transferred Asset or the operation of the Business arising prior to the Closing and not expressly assumed pursuant to this Agreement;

(iv)    all accounts payable not assumed pursuant to Section 2.03(a)(vi); and all purchase orders not assumed pursuant to Section 2.03(a)(vii);

(v)    all intercompany payables, liabilities and obligations owed by Parent to an Acquired Company or any other Subsidiary of Parent;

(vi)    all Indebtedness of Parent;

(vii)    all Liabilities arising from or in respect of any Action, whether or not relating to or arising from the conduct of the Business, pending or threatened against the Business or the Transferred Assets, including any indemnity obligations related to such Liabilities;

(viii)    all Liabilities with respect to Parent Plans;

(ix)    all Liabilities with respect to employees of Parent (except with respect to Liabilities arising from the employment of the Transferred Employees

---

prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

[6]    **Note to Draft**: Final list of Other Assumed Liabilities to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

arising after the Closing or as set forth on <u>Schedule 2.03(a)(v)</u>), including all Liabilities in respect of transaction bonus and retention bonus agreements and in respect of employment-related claims, including allegations of wrongful termination, discrimination, workplace harassment and retaliation;

(x)     Parent's obligations under this Agreement and each Ancillary Agreement;

(xi)     any Liabilities to any equity holder of Parent or arising from or in respect of any equity interests of Parent or the right to acquire or the issuance of any equity interests of Parent;

(xii)     all other Liabilities set forth on <u>Schedule 2.03(b)(xii)</u>[7]; and

(xiii)     any other Liabilities of Parent not expressly assumed by Holdco pursuant to <u>Section 2.03(a)</u> above.[7]

The Parties acknowledge that the agreements contained in this <u>Section 2.03(b)</u> are an integral part of the transactions contemplated by this Agreement and that Holdco would not have entered into this Agreement if it had been required to assume any of the Liabilities of Parent that are Excluded Liabilities.

SECTION 2.04 <u>Consideration</u>.   In consideration for Parent entering into this Agreement and the Ancillary Agreements with Holdco and consummating the transactions contemplated hereby and thereby, including the sale of the Shares and the Transferred Assets to Holdco, Holdco shall issue to Parent [___] additional membership interests of Holdco and shall assume the Assumed Liabilities.

SECTION 2.05 <u>Closing</u>.  Subject to the terms and conditions of this Agreement and subject to the satisfaction (or waiver) of the conditions precedent set forth in and pursuant to the terms of Section 15 of the Restructuring Support Agreement, other than those conditions that are to be satisfied (or waived) on the Closing Date, the transfer and acquisition of the Shares and the Transferred Assets and the assumption of the Assumed Liabilities and the other transactions contemplated by this Agreement shall take place at a closing (the "<u>Closing</u>") to be held remotely via the exchange of documents and signatures on the date hereof (the day on which the Closing takes place being the "<u>Closing Date</u>").

SECTION 2.06 <u>Closing Deliveries by Parent</u>.  At the Closing, Parent shall deliver or cause to be delivered to Holdco:

---

[7]    **Note to Draft**:  Final list of Other Excluded Liabilities to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.

~~[7]    **Note to Draft**:  Final list of Other Excluded Liabilities to be determined prior to the signing of the final Agreement and to be attached to the final Agreement to be signed by the Parties.~~

been, duly executed and delivered by Parent, and (assuming due authorization, execution and delivery by Holdco) this Agreement constitutes, and upon their execution each of the Ancillary Agreements to which it is a party shall constitute, legal, valid and binding obligations of Parent, enforceable against Parent in accordance with their respective terms, subject to the Enforceability Exceptions.

SECTION 3.02 <u>Ownership of Shares</u>.    The Shares are owned of record and beneficially by Parent free and clear of all Encumbrances (other than Permitted Encumbrances). Upon the Closing, Holdco will own all of the Shares free and clear of all Encumbrances (other than Permitted Encumbrances).  Parent has no direct Subsidiaries other than the Transferred Companies, Afiniti, Inc. and the Excluded Bermuda Subsidiaries.

SECTION 3.03 <u>Organization, Authority and Qualification of the Acquired Companies</u>.  Each of the Acquired Companies is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted.  Each of the Acquired Companies is duly licensed or qualified to do business and is in good standing (to the extent such concepts are recognized under applicable Law) in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect.

SECTION 3.04 <u>Capitalization of Transferred Companies; Acquired Subsidiaries</u>.

(a)    ~~Schedule~~Section 3.04(a) of the Disclosure Schedule sets forth, for each Transferred Company, (i) its jurisdiction of formation, (ii) the number and type of issued equity interests, and (iii) the holders of such equity interests.  All of the Shares are validly issued, fully paid and nonassessable and were not issued in violation of any preemptive rights.  The Shares, and in the case of Transferred Companies that are not wholly owned by Parent, the equity interests of such Transferred Companies owned by another Transferred Company as reflected on ~~Schedule~~Section 3.04(a) of the Disclosure Schedule, constitute all of the issued and outstanding equity interests of the Transferred Companies. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Shares or the equity interests of the Transferred Companies owned by another Transferred Company or obligating either Parent or any Transferred Companies to issue or sell any shares of capital stock of, or any other equity interest in, any Transferred Company.

(b)    <u>Section 3.04(b)</u> of the Disclosure Schedule sets forth, for each Acquired Subsidiary, (i) its jurisdiction of formation, (ii) the number and type of issued equity interests, and (iii) the holders of such equity interests.  All equity interests in the Acquired Subsidiaries are owned, directly or indirectly, by a Transferred Company free and clear of all Encumbrances, have been duly authorized and validly issued, and none of such equity interests has been issued in violation of any preemptive rights.  There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the equity interest in any

20

to pay, directly or indirectly, any material increase or material new commitments ~~and~~ with respect to the wages, salary, bonus, commissions, retirement benefits, transaction bonus, retention bonus, severance, tax gross-up or equalization or other compensation or benefits of, or grant any equity-based compensation to, any Business Employee or independent contractor, in each case, except in the ordinary course of business and disclosed in another Section of the Disclosure Schedule, (B) enter into, adopt or establish any new material Parent Plan or any new material Company Plan or collective bargaining agreement or (C) transferred or otherwise altered or amended any Benefit Plan such that it became a Company Plan;

(h)     changed any method of accounting or accounting practice or policy used by Parent (in each case, Related to the Business) or any of the Acquired Companies, other than such changes required by GAAP;

(i)     paid or discharged, entered into any settlement with respect to, or waived or compromised, any Action;

(j)     transferred or assigned any asset from an Acquired Company to Parent, transferred or assigned any Liability from Parent to an Acquired Company, or otherwise caused an Acquired Company to assume any Liability of Parent;

(k)     made any material Tax election inconsistent with past practice or changed or revoked any material Tax election, changed any material Tax accounting method, filed any material amended Tax Return, settled or compromised any audit or other proceeding relating to a material amount of Tax, entered into any closing agreement, extended the statute of limitations period for the assessment or collection of any Tax, or surrendered any right to claim a material Tax refund; or

(l)     agreed to take any of the actions specified in this Section 3.09, except as contemplated by this Agreement and the Ancillary Agreements.

SECTION 3.10 Litigation.  As of the date hereof, there is no Action by or against (a) any of the Acquired Companies or (b) Parent to the extent Related to the Business, in each case pending before any Governmental Authority that would be material to the Business.

SECTION 3.11 Compliance with Laws; Permits.  Except as would not be material to the Business, Parent and the Acquired Companies have conducted within the prior two year period and continue to conduct the Business in accordance with all Laws and Governmental Orders applicable to Parent and Acquired Companies with respect to the Business and none of Parent or the Acquired Companies is in violation of any such Law or Governmental Order.  Parent and the Acquired Companies hold all licenses, permits, authorizations, orders and approvals from, and have made all filings, applications and registrations with, each Governmental Authority (collectively, the "Permits") necessary for the operation of the Business as it is conducted as of the date hereof in all material respects.  Parent and the Acquired Companies have conducted and continue to conduct the Business pursuant to and in compliance in all material respects with the terms of all such

respect to any Business Employees under the WARN Act prior to the date hereof.  No Action is pending or threatened with respect to any Business Employee.  Except as set forth in <u>Section 3.18(c)</u> of the Disclosure Schedule, no notice with respect to the transactions contemplated hereby is required to be provided to any Business Employee for any purpose.

(d)    <u>Complaints of Sexual Harassment</u>.  Except as disclosed to counsel for the Agent in writing prior to the date ~~of the Restructuring Support Agreement~~<u>hereof</u>, there is no, and for the past six years, there has not been any, litigation pending or threatened against Parent or any Acquired Company, in each case, involving allegations of sexual harassment, sex-based discrimination or sexual misconduct.  Parent and the Acquired Companies have taken appropriate action with respect to any allegations of sex-based discrimination, sexual harassment, sexual misconduct or breach of any policy of Parent or the Acquired Companies relating to the foregoing, in each case (i) involving any current or former officer or director in relation to his or her work at Parent or the Acquired Companies and (ii) in accordance with any written policies related thereto.

SECTION 3.19 <u>Taxes</u>.

(a)    <u>Tax Returns</u>.  All income and other material Tax Returns required to have been filed with respect to the Acquired Companies and the Transferred Assets have been timely filed (taking into account any extension of time to file granted or obtained) and such Tax Returns have been true, correct and complete in all material respects.  All income and other material Taxes of the Acquired Companies (whether or not shown on any Tax Return as owing) have been paid or will be timely paid.

(b)    <u>Tax Audits</u>.  No examination or audit of any Tax Return of any of the Acquired Companies by any Taxing Authority is currently in progress, and to the Knowledge of Parent, no such examination or audit has been threatened in writing.

(c)    <u>Tax Allocation Agreements</u>.  None of the Acquired Companies is a party to any Tax allocation or Tax sharing agreement (other than an agreement the principal subject matter of which is not Taxes) with any Person (other than Parent and other than any such agreement solely between or among the Acquired Companies), and after the Closing Date, none of the Acquired Companies will be bound by any such agreement or similar arrangement entered into prior to the Closing Date or will have any unsatisfied liability thereunder for any amounts due in respect of periods prior to the Closing Date.

(d)    <u>Consolidated Groups</u>.  None of the Acquired Companies (i) has been a member of a consolidated, combined, unitary, or affiliated Tax group (other than a group each of the members of which is an Acquired Company) or (ii) has any actual or potential liability for Taxes of another Person (other than other Acquired Companies) by reason of having been a member of a consolidated, combined, unitary, or affiliated Tax group, by operation of Law, as a transferee or successor, or by contract.

(e)    <u>Waiver of Statute of Limitations</u>.  None of the Acquired Companies has (i) waived any statute of limitations in respect of material Taxes or agreed to any extension of

carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is a party.

SECTION 4.03 <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance by Holdco of this Agreement and each Ancillary Agreement to which Holdco is a party do not and will not require any consent, approval, authorization or other order of, action by, filing with, or notification to, any Governmental Authority, except (a) as described in <u>Section 4.03</u> of the Disclosure Schedule, or (b) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by Holdco of the transactions contemplated by this Agreement and  each Ancillary Agreement to which Holdco is a party.

SECTION 4.04 <u>Investment Purpose</u>.  Holdco is acquiring the Shares solely for the purpose of investment and not with a view to, or for offer or sale in connection with, any distribution thereof other than in compliance with all applicable Laws, including United States federal securities laws.  Holdco agrees that the Shares may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and any applicable state or foreign securities Laws, except pursuant to an exemption from such registration under the Securities Act and such Laws.  Holdco is able to bear the economic risk of holding the Shares for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

SECTION 4.05 <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Holdco.

## ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01 <u>Third Party Consents</u>.

(a)    Holdco and Parent shall use commercially reasonable efforts to obtain the consents, approvals and authorizations set forth on ~~Schedule~~<u>Section 5.01 of the Disclosure Schedule</u>; <u>provided</u> that no Party or Acquired Company shall be required to compensate any third party, commence or participate in litigation or offer or grant any accommodation (financial or otherwise) to any third party to obtain any such consent or approval; <u>provided</u>, <u>further</u>, (i) that the obtaining of any such consents shall not be deemed to be conditions to the obligations of the Parties to consummate the transactions contemplated hereby and (ii) in no event shall any Party or Acquired Company be obligated to pay any remuneration or commit to pay any remuneration to any Person to which a Party or Acquired Company is not contractually obligated to pay pursuant to a separate contractual obligation with such Person in connection therewith.

**Annex E**

## **TABLE OF CONTENTS**

**Page**

ARTICLE I

DEFINITIONS

SECTION 1.01 Certain Defined Terms .................................................................. 2
SECTION 1.02 Definitions ................................................................................... 9
SECTION 1.03 Interpretation and Rules of Construction .................................... 10

ARTICLE II

PURCHASE AND SALE

SECTION 2.01 Transfer and Acquisition of the Securities and Insurance Policies;
            Assignment of Intercompany Receivables ................................... 11
SECTION 2.02 Consideration ............................................................................. 11
SECTION 2.03 Closing ...................................................................................... 11
SECTION 2.04 Closing Deliveries by Parent ................................................. 11 12
SECTION 2.05 Closing Deliveries by Newco ................................................ 12 13

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF PARENT

SECTION 3.01 Organization, Authority and Qualification of Parent ................... 13
SECTION 3.02 Ownership of the Securities ........................................................ 14
SECTION 3.03 Organization, Authority and Qualification of the Acquired Companies ... 14
SECTION 3.04 Capitalization of Transferred Companies; Acquired Subsidiaries .. 14
SECTION 3.05 No Conflict ................................................................................ 15
SECTION 3.06 Governmental Consents and Approvals ...................................... 15
SECTION 3.07 Financial Information ................................................................. 15
SECTION 3.08 Absence of Undisclosed Material Liabilities ........................ 15 16
SECTION 3.09 Conduct in the Ordinary Course ................................................ 16
SECTION 3.10 Litigation ................................................................................... 17
SECTION 3.11 Compliance with Laws; Permits ................................................ 17
SECTION 3.12 Environmental Matters ............................................................. 18
SECTION 3.13 Intellectual Property; Information Technology ........................... 18
SECTION 3.14 Data Privacy ......................................................................... 20 21
SECTION 3.15 Real Property ............................................................................. 21
SECTION 3.16 Assets; Sufficiency ................................................................... 21
SECTION 3.17 Employee Benefit Plans ............................................................ 22
SECTION 3.18 Labor and Employment Matters ................................................ 24
SECTION 3.19 Taxes ........................................................................................ 25
SECTION 3.20 Material Contracts ..................................................................... 26

SECTION 3.21 Intercompany Receivables ........................................................... 27
SECTION 3.22 Brokers .......................................................................................... 27
SECTION 3.23 Bad Actor Matters ....................................................................... 27
SECTION 3.233.24 Disclaimer of Parent ............................................................. 27

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF NEWCO

SECTION 4.01 Organization and Authority of Newco .......................................... 28
SECTION 4.02 No Conflict .................................................................................... 28
SECTION 4.03 Governmental Consents and Approvals ...................................... 2829
SECTION 4.04 Investment Purpose ...................................................................... 29
SECTION 4.05 Brokers .......................................................................................... 29
SECTION 4.06 Independent Investigation; Parent's Representations ................. 29

ARTICLE V

ADDITIONAL AGREEMENTS

SECTION 5.01 Third Party Consents ..................................................................... 29
SECTION 5.02 Wrong Pockets ............................................................................. 30
SECTION 5.03 Restrictive Covenants .................................................................. 30
SECTION 5.04 Release from Parent Credit Support Instruments ........................ 30
SECTION 5.05 "Afiniti" Name ............................................................................. 3031
SECTION 5.06 No Successor Liability .................................................................. 31
SECTION 5.07 Survival .......................................................................................... 31

ARTICLE VI

EMPLOYEE MATTERS

SECTION 6.01 Notices ........................................................................................... 31
SECTION 6.02 No Third Party Beneficiaries ....................................................... 3132

ARTICLE VII

TAX MATTERS

SECTION 7.01 Conveyance Taxes ......................................................................... 32
SECTION 7.02 Miscellaneous ............................................................................... 32

ARTICLE VIII

GENERAL PROVISIONS

SECTION 8.01 Expenses ........................................................................................ 32
SECTION 8.02 Notices ........................................................................................... 32

SECTION 8.03 Public Announcements ........................................................... 34
SECTION 8.04 Severability .......................................................................... 34
SECTION 8.05 Entire Agreement ................................................................. 34
SECTION 8.06 Assignment .......................................................................... 34
SECTION 8.07 Amendment .......................................................................... 34
SECTION 8.08 Waiver .............................................................................. ~~34~~35
SECTION 8.09 No Third Party Beneficiaries ................................................. 35
SECTION 8.10 Currency .............................................................................. 35
SECTION 8.11 Governing Law ..................................................................... 35
SECTION 8.12 Waiver of Jury Trial .............................................................. 35
SECTION 8.13 Specific Performance ........................................................ ~~35~~36
SECTION 8.14 Counterparts ......................................................................... 36
SECTION 8.15 Liability of Provisional Liquidators ........................................ 36
SECTION 8.16 Acknowledgments, Exclusions, Limitations and Agreements ........... 37

"Material Adverse Effect" means any event, circumstance, change, effect, development or condition that, individually or considered together with all other events, circumstances, changes, effects, developments and conditions, has had or would reasonably be expected to have a material adverse effect on (i) the business, results of operations, assets or financial condition of the Business, taken as a whole; (ii) the ability of the Parties to perform their obligations under this Agreement; or (iii) the ability of Parent to consummate the Restructuring, but, in each case, the commencement and existence of the Bermuda Proceeding or the Chapter 15 Case, and any event, circumstance, or condition directly in relation thereto (including the litigation and/or determination of any matters arising therein) shall not be deemed to constitute or be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect.

"Open Source Software" means all Software that is distributed as "free software," "open source software," "shareware" or under a similar licensing or distribution model, including Software licensed, provided, or distributed under any open source license, including any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Foundation (as promulgated by the Free Software Foundation) or any Software that contains or is derived from any such Software.

"ordinary course of business" or any similar expression means in the ordinary course of the applicable Person's business consistent with past practice, taking into account the fact that insolvency proceedings, or preparation therefor, have commenced.

"Owned Intellectual Property" means all Intellectual Property owned by an Acquired Company.

"Parent Covered Person" means, with respect to Parent as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1).

"Parent Credit Support Instruments" means any guaranty, any keepwell, bonding arrangements, net worth maintenance agreement, letter of credit, reimbursement obligation, letter of comfort or other instrument imposing any obligations on Parent with respect to the Acquired Companies or otherwise for the benefit of the Acquired Companies.

"Parent's Knowledge", "Knowledge of Parent" or similar terms used in this Agreement mean the actual knowledge of the Persons listed in Schedule 1.01 as of the date of this Agreement.

"Parent Plan" means a Benefit Plan sponsored or maintained by Parent, or in the case of a Benefit Plan that is a Contract, to which Parent is a party (other than a Company Plan).

"Permitted Encumbrances" means "Permitted Encumbrances" and "Permitted Liens", in each case, as defined in the Credit Agreement.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate

SECTION 1.02 <u>Definitions</u>.   The following terms have the meanings set forth in the Sections set forth below:

| <u>Definition</u> | <u>Location</u> |
| --- | --- |
| "Acquired Company Assets" | 3.16(a) |
| "Afiniti Marks" | 5.05 |
| "Agent" | Recitals |
| "Agreement" | Preamble |
| "AI Tools" | 3.13(j) |
| "Asset Transfer" | Recitals |
| "Bermuda Court" | Recitals |
| "Business" | Recitals |
| "Business Software" | 3.13(i) |
| "Closing" | 2.03 |
| "Closing Date" | 2.03 |
| "Company" | Recitals |
| "Company Shares" | Recitals |
| "Data Protection Requirements" | 3.14(a) |
| "Disqualification Event" | 3.23 |
| "Financial Statements" | 3.07 |
| "Holdco" | Preamble |
| "Holdco Interests" | Recitals |
| "IP Transfer" | Recitals |
| "Lenders" | 2.02 |
| "Material Contracts" | 3.20(a) |
| "Newco" | Preamble |
| "Newco Group" | 5.04 |
| "Parent" | Preamble |
| "Parties" | Preamble |
| "Permits" | 3.11 |
| "Provisional Liquidation" | Recitals |
| "Provisional Liquidators" | Recitals |
| "Securities" | Recitals |

SECTION 1.03 <u>Interpretation and Rules of Construction</u>.   In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)     when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)     the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

SECTION 3.10 <u>Litigation</u>.   As of the date hereof, there is no Action by or against any of the Acquired Companies pending before any Governmental Authority that would be material to the Acquired Companies when taken as a whole.

SECTION 3.11 <u>Compliance with Laws; Permits</u>.  Except as would not be material to the Business, Parent and the Acquired Companies have conducted within the prior two year period and continue to conduct the Business in accordance with all Laws and Governmental Orders applicable to Parent and Acquired Companies with respect to the Business and none of Parent or the Acquired Companies is in violation of any such Law or Governmental Order.  Parent and the Acquired Companies hold all licenses, permits, authorizations, orders and approvals from, and have made all filings, applications and registrations with, each Governmental Authority (collectively, the "<u>Permits</u>") necessary for the operation of the Business as it is conducted as of the date hereof in all material respects.  Parent and the Acquired Companies have conducted and continue to conduct the Business pursuant to and in compliance in all material respects with the terms of all such Permits.  <u>Section 3.11</u> of the Disclosure Schedule sets forth each Permit material to the operation of the Business as it is conducted as of the date hereof.

SECTION 3.12 <u>Environmental Matters</u>.   Except as would not have a Material Adverse Effect, (a) Parent, to the extent Related to the Business, and the Acquired Companies are in compliance with all applicable Environmental Laws and have obtained and are in compliance with all Environmental Permits, and (b) there are no written claims pursuant to any Environmental Law pending or, to Parent's Knowledge, threatened, against Parent, to the extent Related to the Business, or the Acquired Companies.

SECTION 3.13 <u>Intellectual Property; Information Technology</u>.

(a)    <u>Section 3.13(a)</u> of the Disclosure Schedule sets forth a true and complete list of all Registered Owned Intellectual Property as of the date of this Agreement, such list specifying for each item of Intellectual Property, as applicable, the jurisdictions in which such item has been registered or registrations for such item have been applied for, owner(s), application or registration date, application or registration number and status, and, for domain names, the applicable domain name registrar.  Each item of Registered Owned Intellectual Property is subsisting, and, to the Knowledge of Parent, valid and enforceable.  With respect to each item of Registered Owned Intellectual Property, an Acquired Company is the exclusive owner of such Intellectual Property, free and clear of any Encumbrances (other than Permitted Encumbrances).

(b)    The Business Intellectual Property constitutes all Intellectual Property owned or licensed, or purported to be owned or licensed, by Parent and the Acquired Companies that is necessary and sufficient to enable Newco and the Acquired Companies, immediately following the Closing, to conduct the Business substantially in the same manner as conducted by Parent and the Acquired Companies as of immediately prior to the Closing. Subject to receipt of any necessary third party consents and approvals set forth on <u>Section 3.06</u> of the Disclosure Schedule, immediately after the Closing, the Acquired Companies and Newco, taken collectively, will own or have the valid right to use in the operation of the Business all of the Business Intellectual Property, and to receive all IP Proceeds related thereto, on terms and

division, operating unit or product line of the Business with respect to which there remains outstanding obligations on the part of Parent or any Acquired Company;

(v)      all Company IP Agreements;

(vi)     all Contracts relating to Indebtedness of any of the Acquired Companies;

(vii)    all Contracts with any Governmental Authority involving total annual payments in excess of $750,000; and

(viii)   all other Contracts (other than Intercompany Agreements) that are material to the Business taken as a whole.

(b)      Each Material Contract (i) is valid and binding on Parent or the Acquired Company, as applicable, party thereto, and, to the Knowledge of Parent, the counterparties thereto, and is in full force and effect and (ii) upon consummation of the transactions contemplated by this Agreement, except to the extent that any consents set forth in <u>Section 3.05(c)</u> of the Disclosure Schedule are not obtained, shall continue in full force and effect in accordance with its terms as of the date hereof.  Parent or the Acquired Company, as applicable, party thereto is not in material breach of, or material default under, any Material Contract to which it is a party and, as of the date hereof, to the Knowledge of Parent, no counterparty thereto is in material breach of, or material default under, any Material Contract.

SECTION 3.21 <u>Intercompany Receivables</u>.  As of five (5) days before the date hereof, (i) the principal and accrued and unpaid interest under that certain loan receivable owed by the Company to Parent is $[•], and (ii) the principal and accrued and unpaid interest under any other intercompany receivables from the Company to Parent is $[•]; *provided, however*, that the only change to such balances between such date and the date of this Agreement shall be the accrual of interest in the ordinary course of business.

SECTION 3.22 <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or the Ancillary Agreements based upon arrangements made by or on behalf of Parent or any Acquired Company.

SECTION 3.23   <u>Bad Actor Matters</u>.  None of Parent, or to Parent's knowledge, any Parent Covered Person, is subject to the "bad actor" disqualifications set forth in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "Disqualification Event"), except for a Disqualification Event as to which Rule 506(d)(2)(ii)-(iv) or (d)(3) under the Securities Act is applicable.

SECTION 3.24 ~~SECTION 3.23~~ <u>Disclaimer of Parent</u>.  NONE OF PARENT OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PROVISIONAL LIQUIDATORS) MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE ACQUIRED COMPANIES, THE BUSINESS, THE SECURITIES OR THE

**<u>Annex F</u>**

*Execution Version*

AMENDMENT NO. 1 TO

BACKSTOP COMMITMENT AGREEMENT

AMONG

AFINITI, INC.,

AFINITI NEWCO HOLDINGS LLC

AND

THE BACKSTOP PARTIES PARTY HERETO

Dated as of October 2, 2024

**AMENDMENT NO. 1 TO BACKSTOP COMMITMENT AGREEMENT**

THIS AMENDMENT NO. 1 TO BACKSTOP COMMITMENT AGREEMENT (this "**Amendment**"), dated as of October 2, 2024, is made by and among Afiniti, Inc., a Delaware corporation (the "**Company**"), and Afiniti Newco Holdings LLC, a Delaware limited liability company ("**NewCo**"), on the one hand, and The Resource Group International, Ltd., a Bermuda exempted company (the "**Backstop Party**"), on the other hand. The Company, NewCo and the Backstop Party are referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**".

WHEREAS, the Parties entered into the Backstop Commitment Agreement, dated as of September 17, 2024 (the "**Backstop Agreement**"), and desire to amend the terms of the Backstop Agreement as set forth herein;

NOW, THEREFORE, each of the Parties hereby agrees as follows:

1. Effective as of the date hereof, the definition of "Eligible Holder" in the Backstop Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: **double-underlined text**) as follows:

   "**Eligible Holder**" means any holder of equity interests in Parent that certifies that it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act); ~~or~~ (iii) a non-U.S. person under Regulation S under the Securities Act that is located outside of the U.S. (within the meaning of Regulation S under the Securities Act)**; or (iv) an accredited investor (as defined in Rule 501(a)(5) under the Securities Act)**.

2. Except as expressly and specifically amended hereby, all terms and provisions of the Backstop Agreement are and shall remain in full force and effect.

3. The provisions contained in Article IX (General Provisions) of the Backstop Agreement are hereby incorporated by reference into this Amendment, *mutatis mutandis*, and made a part of this Amendment as if set forth fully herein.

[*Signature Pages Omitted*]

## Exhibit 3

**Winding-Up Petition**

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING UP)

2024: No. 265



**IN THE MATTER OF A COMPANY.**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

### PETITION

---

**THIS HUMBLE PETITION** of Afiniti Ltd. ("**Company**") whose registered office is at Crawford House, 50 Cedar Avenue, Hamilton HM11 Bermuda **showeth as follows:**

1.  The Company was incorporated in Bermuda under the Companies Act 1981 ("**Act**") as an exempt company limited by shares on 12 October 2011 under its original name, Satmap International Holding, Ltd.

2.  The Company's registered office is at Crawford House, 50 Cedar Avenue, Hamilton. The authorised share capital of the Company is $12,000 which is divided into (i) 120,000,000 common shares of par value US$0.00001 each, (ii) 10,000,000 Class A preference shares of par value US$0.00001 each; (iii) 16,297,761 Class B preference shares of par value US$0.00001 each; (iv) 10,702,239 Class C preference shares of par value of par value US$0.00001 each, (v) 3,000,000 Class D preference shares of par value of par value US$0.00001 each and (vi) 6,000,000 Class E preference shares of par value US$0.00001 each.

3.  The Company also has four classes of preferred equity, being series A, B, C and E.

4.    The issued share capital is as follows:

| Category | Number Outstanding |
|---|---|
| Common Shares | 24,699,310 |
| Class A Preference Shares | 5,180,031 |
| Class B Preference Shares | 1,595,593 |
| Class C Preference Shares | 9,767,592 |
| Class D Preference Shares | 0 (redeemed) |
| Class E Preference Shares | 1,919,792 |

Assets of the Company

5.    The Company's primary asset is its various wholly owned direct and indirect subsidiary operating entities (collectively, the "**Companies**"), which together operate the business. The operating subsidiaries of the Companies are a leading provider of applied predictive artificial intelligence. The main product offering is a patented technology for use in customer service contact centres that optimally pairs customers with contact centre agents based on machine learning based algorithms that seek to predict optimal outcomes. The technology is used globally in the healthcare, telecommunications, travel, hospitality, insurance, and banking industries and across multiple customer experience channels.

6.    The value of the Company, based on a going-concern valuation of the business, is approximately $275 million to $350 million.

<u>Liabilities</u>

7.   The Company and its US operating subsidiary, Afiniti, Inc., are parties to a first-lien secured credit agreement dated 13 June 2019 (as amended, the "**Credit Agreement**"). The Company guaranteed repayment of all sums loaned under the Credit Agreement and granted fixed and floating security for the same over substantially all of its assets. The lenders under the Credit Agreement are a syndicate of lenders ("**Secured Lenders**").

8.   Afiniti, Inc. borrowed the initial term loan under the Credit Agreement in the aggregate principal amount of US$125.0 million (the "**First Term Loan**"). Pursuant to an amendment to the Credit Agreement, Afiniti, Inc. borrowed an additional incremental amount of US$25.0 million in May 2020 (together with the First Term Loan, the "**Initial Term Loans**"). Pursuant to various amendments to the Credit Agreement executed between November 2020 and March 2022, Afiniti, Inc. borrowed additional term loans in the combined principal amount of US$306.25 million (collectively, the "**Incremental Term Loans**" and, together with the Initial Term Loans, the "**Term Loans**").

9.   The Term Loans' total balance (including any interest paid in kind) is US$**508,744,859.71** summarized as follows:

| Credit Agreement | Original Maturity Date | Principal Balance |
|---|---|---|
| 2019 Credit Agreement | 13 June 2024 | US$125,000,000 |
| May 2020 Amendment | 13 June 2024 | US$25,000,000 |
| November 2020 Amendment | 17 November 2025 | US$100,000,000 |
| December 2020 Amendment | 17 November 2025 | US$50,000,000 |
| March 2021 Amendments | 17 November 2025 | US$40,000,000 |

2.   LEGAL - 24991271.1

| | | |
|---|---|---|
| May 2021 Amendment | 17 November 2025 | US$75,000,000 |
| March 2022 Amendment | 7 March 2027 | US$41,250,000 |
| **Total Principal Balance** | | **US$456,250,000** |
| **Total Interest Paid In Kind (08 July 24)** | | **US$52,494,859.71** |
| **Total Funded Debt Obligations** | | **US$ 508,744,859.71** |

10.    In addition to the Term Loans, the Company has the following material liabilities:

   a.   Trade payable/accrued liabilities    US$ 18.2m

   b.   ASC 842 Lease Liabilities    US$ 9.69m

   c.   Liberty Equipment Financing    US$ 8.8m

   d.   Partnership Fee    US$ 4.1m

   e.   Wingspire Equipment Financing    US$ 2.3m

   f.   Deferred Tax Liability    US$ 1.87m

   g.   Deferred Revenue    US$ 1.72m

   h.   Related Party Payable    US$ 1.71

   i.   Other liabilities    US$ 7.52m

11.    The Company's liabilities therefore total approximately US$564 million.

<u>Attempts to Resolve Financial Difficulties</u>

12.    On 29 January 2023, the Board formed a transaction committee to (i) assist the Board in fulfilling its responsibilities relating to the Company's long-term strategic plan and strategies, (ii) oversee the review and evaluation of any potential strategic transactions, (iii) if deemed desirable, oversee the negotiation of the terms and conditions of one or more strategic

transactions on behalf of the Company, and (iv) recommend any appropriate strategic transaction to the Board for review and approval.

13. The Company explored a number of strategic transactions with the aim of repaying in full the Initial Term Loans. Chief amongst these transactions was a refinancing of part or all of the Term Loans by one or more new lenders in the form of new senior or subordinated debt. In November 2023 the Company engaged an investment bank to run a process to solicit interest in refinancing proposals, or, as an alternative, some other form of strategic transaction such as a further equity raise. The Company did not receive any complete proposals for an equity or subordinated debt financing and so was unable to repay the Initial Term Loans in full.

14. The Company began discussing with the Secured Lenders possible solutions to address the upcoming 13 June 2024 maturity of the Initial Term Loans. The discussions with the Secured Lenders resulted in an agreed restructuring term sheet dated 7 June 2024.  In connection therewith, the Secured Lenders under the Initial Term Loans extended the 13 June 2024 maturity date to 29 July 2024 pursuant to Amendment No. 9 to the Credit Agreement and again to 12 September 2024 pursuant to Amendment No. 10 to the Credit Agreement. Shortly prior to filing, the Company and Secured Lenders executed Amendment No. 12 to the Credit Agreement which extended the maturity date of the Company's guarantee to the date of filing this Petition.

15. The Company and the Secured Lenders utilized the time provided by the maturity extensions to continue negotiations toward an agreed restructuring path. The negotiations culminated in the Company and Secured Lenders entering into a Restructuring Support Agreement dated 17 September 2024 (the "**RSA**"), which governs the Company's proposed restructuring (the "**Proposed Restructuring**").

16.   The Proposed Restructuring contemplates a transaction in which the Company transfers substantially all of its assets to a new company that will be majority owned by the Secured Lenders in exchange for the Company being released from its guarantee of the Term Loans. The net result of this transaction, if effected, is that ownership of the Companies would be transferred to a new company controlled by the Secured Lenders.

17.   It is a condition of the Proposed Restructuring that it be implemented following the appointment of provisional liquidators with limited powers for restructuring purposes and that the JPLs seek Court sanction to enable any stakeholders who wish to do so to be able to address the Court on the Proposed Restructuring.

Insolvency

18.   The Company is unable to pay the Initial Term Loans by their stated maturity.

19.   Further, the liabilities of the Company significantly outweigh the value of the assets. The Company is therefore balance sheet insolvent.

20.   The Company is currently insolvent in that it is unable to pay its debts as they fall due.

21.   The board of directors of the Company determined that it would be in the best interests of the Company and its stakeholders to place the Company into provisional liquidation under the provisions of Part XIII of the Companies Act 1981 by presenting this petition seeking to wind up the Company, and to seek the immediate appointment of liquidators in order to preserve and realise the value of the assets.

22.   On 13 September 2024 the Board of the Company resolved to present this petition to commence these proceedings.

6

2.   LEGAL - 24991271.1

**YOUR PETITIONER HUMBLY PRAYS THAT:**

1. The Company be wound up by this Honourable Court under the provisions of the Companies Act 1981.

2. Michael Morrison and Charles Thresh of Teneo (Bermuda) Ltd be appointed as joint provisional liquidators of the Company.

3. The period for convening the first meetings of creditor and contributories be extended for six months.

DATED this 18 day of September 2024

**Conyers Dill & Pearman**
Attorneys for the Company

THE ABOVE PETITION having been presented to this Court on _Wednes_day the 18 day of _September_ 2024 it is ordered that this Petition shall be heard before the Court sitting on _Fri_day, the 1 day of _November_ 2024 at 9:30 o'clock in the _fore_ noon.

DATED this 18 day of _September_ 2024

_for_ the REGISTRAR

**IN THE SUPREME COURT OF BERMUDA**

**COMPANIES (WINDING UP)**

**COMMERCIAL COURT**

**2024: No.** 265

**IN THE MATTER OF A COMPANY**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**PETITION**

---





**CONYERS DILL & PEARMAN LIMITED**
**Barristers & Attorneys**
**Clarendon House**
**2 Church Street, Hamilton**
**BERMUDA**

**RXW/gm/401937/24991271**

**<u>Exhibit 4</u>**

**JPL Appointment Order**

**IN THE SUPREME COURT OF BERMUDA**

**COMPANIES (WINDING UP)**

**COMMERCIAL COURT**

**2024: No.** *265*

**IN THE MATTER OF A COMPANY**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**ORDER**

---

**UPON HEARING COUNSEL** for Afiniti Ltd. (the "**Company**")

**AND UPON READING** the Petition filed herein and the Affidavit of Mohammed Khaishgi dated 18 September 2024

**IT IS HEREBY ORDERED** as follows:

1.      That Michael Morrison and Charles Thresh of Teneo (Bermuda) Ltd. are hereby appointed joint provisional liquidators ("**JPLs**") of the Company with the following powers:

      (a)      to review the financial position of the Company;

      (b)      to monitor the continuation of the business of the Company by the existing board of directors of the Company (the "**Board**");

      (c)      to consult with the creditors of the Company in determining the most appropriate manner to realise value for the benefit of the creditors;

      (d)      to take such steps as they deem appropriate to sell, transfer and/or with respect to the disposition of the assets of the Company;

(e)    to take such steps as they deem appropriate with respect to any settlements, compromises or arrangements (including seeking such sanction as the JPLs may consider necessary or desirable in the circumstances);

(f)    to sign off on and execute agreements (including any documents to facilitate the any sale or transfer), pleadings, or any other document (with such court sanction as the JPLs may consider appropriate in the circumstances) on behalf of the Company;

(g)    if deemed necessary and/or appropriate by the JPLs, to apply to any foreign court (wherever situated) for recognition of their appointment or in connection with any other proceedings to take advantage of any insolvency or bankruptcy protections that such foreign law, procedures or proceedings may provide to the Company. Without prejudice to the foregoing, the Company acting through the Board shall be the Company's authorised foreign representative for the purpose of the UNCITRAL Model Law and Chapter 15, Title 11 of the United States Code;

(h)    the JPLs shall be entitled to receive advance materials, receive advance notice of, and, at the expense of the Company, attend all Board meetings and such meetings of management as the JPLs request and shall be consulted prior to:

(i)    the sale, transfer, or other disposition of any business, operation, subsidiary, division or other significant asset of the Company;

(ii)    the incurrence of indebtedness or borrowing of money, whether pursuant to agreements with suppliers or pursuant to loan arrangements with financing institutions, and the granting of security in respect of the same, and the guaranteeing of such indebtedness or borrowings of affiliates;

(iii)    the Board seeking leave to continue or take any steps in any proceedings to which the Company is a party.

(i)    to provide a written report to this Court from time to time and as this Court may otherwise request;

(j)    to retain and employ barristers, attorneys, and solicitors, and such other agents and professional persons as the JPLs deems fit, in Bermuda and elsewhere as the

JPLs deems appropriate for the purpose of advising and assisting in the execution of their powers;

(k)   to render and pay invoices out of the assets of the Company for the JPLs' own remuneration at their usual and customary rates (and this shall include all costs, charges and expenses of their attorneys and all other agents, managers, accountants and other persons that the JPLs may employ), subject to such arrangements as agreed or as may be agreed with the Company (or with the approval of the Court) in the context of the overall restructuring process;

(l)   if deemed necessary, and in the interests of the creditors of the Company, to seek the assistance of any other courts as may be considered appropriate;

(m)   to set up, maintain, and control bank accounts (whether jointly with the Company or otherwise) at any bank or financial institutions situated in Bermuda or elsewhere as appropriate, in their own names or in the name of the Company, and accept deposits into and pay monies into such accounts for the purpose of meeting the payment of the fees and expenses of the JPLs, including all costs, charges and expenses of their attorneys and all other agents, managers, accountants and other persons that the JPLs may employ, in each case, subject to the appropriate procedures being agreed with the Company (acting reasonably) as to how fees shall be determined;

(n)   subject to the Company's power at 1(g) above to act as the Company's authorised foreign representative for the purposes stated therein, to seek recognition of the provisional liquidation or the appointment of the JPLs in any jurisdiction the JPLs consider necessary, or both, together which such other relief the JPLs may consider necessary for the proper exercise of their functions within those jurisdictions and to make applications to the court(s) of such jurisdiction for that purpose; and

(o)   to do all things incidental to the exercise of the foregoing powers.

2.   Payments in the ordinary course of business and payments to professional advisors of the Company, the JPLs, and Secured Lenders (as defined in the Petition and including Allen Overy Shearman Sterling US LLP, Appleby (Bermuda) Limited, Akin Gump Strauss Hauer

Feld, LLP and Kirkland & Ellis LLP) and any related fees, disbursements and other charges of other counsel, including local counsel, consultants and service companies, shall not be avoided by virtue of section 166 of the Companies Act 1981. No other payments or dispositions of the Company's property shall be made or effected without the direct or indirect approval of the JPLs but no such payment or other disposition made or effected by or with the authority or approval of the JPLs in carrying out their duties and functions and in the exercise of their powers under this Order shall be avoided by virtue of the provisions of section 166 of the Companies Act 1981.

3.   In the event that a winding-up order is made against the Company, any fees and expenses of the JPLs, including all costs, charges and expenses of their attorneys and all other agents, managers, accountants, and other persons the JPLs may employ, which are payable in accordance with the terms of the orders which may be made by this Court, and which are outstanding at the date of the winding-up order, shall be treated as fees and expenses properly incurred in preserving, realising or getting in the assets of the Company for the purposes of Rule 140 of the Companies (Winding-Up) Rules 1982.

4.   Save as are specifically set out herein:

(a)   the JPLs shall be responsible for the realisation of the value of the Company's assets but shall have no general or additional powers or duties with respect to the day to day running of the Company;

(b)   prior to any winding-up order being made, the JPLs shall have no duties with respect to the books and records of the Company, although they may receive from the Board such Company books and records as they may request; and

(c)   save for those powers granted to the JPLs by this order, and the Protocol Agreement agreed to as between the Company, its Authorised Managers (as defined therein), and the JPLs, the Board shall continue to manage the Company's affairs in all respects and exercise the powers conferred upon it by the Company's Memorandum of Association and Bye-laws, provided always that, should the JPLs consider at any time that the Board is not acting in the best interests of the Company and its creditors, the JPLs shall have the power to report same to this Court and seek such directions from this Court as appropriate.

5.      Leave is hereby granted pursuant to section 167(4) of the Companies Act 1981 to permit case 2024: 112 to proceed.

6.      The Company shall provide the JPLs with such information as the JPLs deem necessary to properly to discharge their functions under this Order and as an officer of this Court.

7.      The JPLs shall be at liberty to submit to the Registrar of the Supreme Court of Bermuda bills of costs for taxation for all costs, charges, and expenses of those persons or firms employed by them, with such taxation to be on an attorney and own client basis with respect to attorneys and on an equivalent basis for all managers, accountants, and other persons.

8.      The powers of the JPLs may be exercised jointly and severally.

9.      The JPLs shall not be required to give security for their appointment.

10.     The Petitioner's costs of this application shall be taxed and paid out of the assets of the Company on a solicitor and own client basis.

Dated this    19    day of September 2024

_____
CHIEF JUSTICE/PUISNE JUDGE

**IN THE SUPREME COURT OF BERMUDA**

**COMPANIES (WINDING UP)**

**COMMERCIAL COURT**

**2024: No.** 265

**IN THE MATTER OF A COMPANY**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**ORDER**

---



**CONYERS DILL & PEARMAN LIMITED**
**Barristers & Attorneys**
**Clarendon House**
**2 Church Street, Hamilton**
**BERMUDA**

**RXW/gm/401937/25003675**



## Exhibit 5

**Proposed Sanction Order**

**IN THE SUPREME COURT OF BERMUDA**

**(COMMERCIAL COURT)**

**COMPANIES (WINDING UP)**

**2024: No. 265**

**IN THE MATTER OF AFINITI, LTD. (JOINT PROVISIONAL LIQUIDATORS APPOINTED FOR RESTRUCTURING PURPOSES)**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**DRAFT ORDER**

---

**UPON** the application by Charles Thresh and Michael Morrison of Teneo (Bermuda) Ltd., acting as the joint provisional liquidators (the "**JPLs**") of Afiniti, Ltd. (joint provisional liquidators appointed for restructuring purposes) (the "**Company**"), by *inter partes* summons filed on 25 September 2024 (the "**Sanction Application**")

**AND UPON READING** the Affidavit of Charles Thresh sworn on 25 September 2024 and the exhibits thereto ("**Thresh 1**") sworn on behalf of the JPLs

**AND UPON HEARING** Counsel for the JPLs, Counsel for the Company and Counsel for VCP Capital Markets, LLC, in its capacity as collateral agent and administrative agent (the "**Term Loan Agent**") under a Term Loan Credit Agreement, dated 13 June 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Afiniti, Inc., the Company, the other guarantors party thereto, the Term Loan Agent and each lender from time to time party thereto (the "**Secured Lenders**")

**AND WHEREAS** the Company granted under a Debenture dated 13 June 2019 (the "**Debenture**") to the Term Loan Agent, for the Secured Lenders under the Credit Agreement, a fixed and floating charge over substantially all of its assets

**AND WHEREAS** the Company is in financial distress and insolvent, as set out in Thresh 1, and (a) the Company and (b) the Term Loan Agent and the Secured Lenders (the Term Loan Agent and Secured Lenders together, the "**Secured Parties**") have agreed a compromise or

arrangement in the form of a restructuring to be structured and implemented as part of the Transactions (as defined below), and in aid of the same the Company has entered, together with Afiniti, Inc. and their respective subsidiaries, and the Secured Parties, into a Restructuring Support Agreement dated 17 September 2024 (as amended, modified or supplemented, the "**RSA**")

**AND WHEREAS** the proposed restructuring will include several integrated transactions (together, representing the restructuring, the "**Transactions**"), which are more fully defined at paragraph 4 of Thresh 1, as part of the broader proposed restructuring, as defined and explained in detail in paragraph 34 of Thresh 1

**AND UPON** the Court being satisfied that, in facilitating the Transactions, the JPLs will not be acting in breach of their duties

**AND BY CONSENT** of the Company and the Secured Parties

**IT IS HEREBY ORDERED** that:

1. The JPLs' entry into the Transactions is sanctioned and approved pursuant to sections 175(1)(e) and 175(2)(a) of the Companies Act 1981.

2. Pursuant to section 176(3) of the Companies Act 1981, the JPLs are authorised to undertake all necessary steps and actions in furtherance of the Transactions.

3. In relation to paragraph 1 of this Order, the transaction documents in substantially the same form as referred to and set out in Schedule "A" annexed to this Order are approved and the disposition and transfer of any and all assets pursuant to and in accordance with the SATA and STA shall be free and clear of all liens, claims, charges and other encumbrances (including, without limitation, under any contract, corporate document, or applicable Bermuda law) of any kind or nature whatsoever to the extent the Court has jurisdiction over such assets, and no such lien, claim, charge or encumbrance may be asserted against either Holdco or Newco or any of their respective assets to the full extent of Bermuda law.

4. For the avoidance of doubt, no steps required or undertaken, or both, to implement the Transactions shall be avoided by virtue of section 166 of the Companies Act 1981.

5.      The JPLs' and the Company's costs of this application shall be paid out of the assets of the Company as fees and expenses properly incurred in preserving, realizing or getting in the assets under Rule 140 of the Companies (Winding-Up) Rules 1982.

**DATED** this        day of                2024

_____
**The Hon. Chief Justice/Puisne Judge**

**IN THE SUPREME COURT OF BERMUDA**

**(COMMERCIAL COURT)**

**COMPANIES (WINDING UP)**

**2024: No. 265**

**IN THE MATTER OF AFINITI, LTD. IN PROVISIONSAL LIQUIDATION FOR RESTRUCTURING PURPOSES)**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**ORDER**

---



**Walkers (Bermuda) Limited**
**Park Place**
**55 Par-La-Ville Road**
**Third Floor**
**Hamilton HM 11**
**Bermuda**
**Tel: 441 242 1500**
**Ref: KT/SW/DL/A04375**

## SCHEDULE A
## TRANSACTION DOCUMENTS

6.    The Stock and Asset Transfer Agreement by and between the Company and Holdco (as defined therein) and in substantially the form exhibited to <u>Exhibit CT-1</u> of Thresh 1 (the **"SATA"**), including without limitation:

    (a)    the disposition and transfer of the assets, including, without limitation, the intellectual property assets of the Company to Afiniti AI Holdings, LLC, a Cayman Islands limited liability company and wholly owned subsidiary of the Company (**"Holdco"**), and the assumption and assignment and/or transfer of the specified contracts of the Company to Holdco; and

    (b)    the disposition and transfer, immediately thereafter, of the rights, title, and interests in the Transferred IP Assets (as defined in the SATA) from Holdco to Afiniti AI Limited, an Irish private limited company (**"IP Purchaser"**), and the assumption by IP Purchaser of Assumed IP Liabilities (as defined in the SATA), in each case pursuant to, and in accordance with, the terms of the SATA.

7.    The Securities Transfer Agreement (the **"STA"**) between the Company and Afiniti Newco Holdings, LLC, a Delaware limited liability company (**"Newco"**), an entity formed and controlled by an affiliate of the Term Loan Agent, in substantially the form exhibited to <u>Exhibit CT-1</u> of Thresh 1, including without limitation, the disposition and transfer of all of the issued and outstanding shares of capital stock of Afiniti, Inc., a Delaware corporation (the **"USCo Shares"**), and all of the issued and outstanding membership interests of Holdco (the **"Holdco Interests"** and, together with the USCo Shares, the **"Securities"**) as part of the compromise of the Company's primary obligation under its guarantee of the liabilities owed to the Secured Lenders under the Credit Agreement.

8.    The release of claims, matters, disputes, and differences, whether known or unknown, suspected or unsuspected, in the manner and to the extent provided in the Release of Claims Agreement, exhibited to <u>Exhibit CT-1</u> of Thresh 1.

9.    The Amended Credit Agreement, being an amendment of the Credit Agreement dated 13 June 2019, among the Company, Afiniti, Inc., as borrower, the guarantors party thereto, the Term Loan Agent, and each lender from time to time party thereto (as may be

amended, restated, amended and restated, supplemented or otherwise modified from time to time), exhibited to <u>Exhibit CT-1</u> of Thresh 1, and related documents.

30969265.8.M7796.A04375