## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| Afiniti, Ltd.,[1] | Case No. 24-12539 (LSS) |
| Debtor in a Foreign Proceeding. | |

### DECLARATION OF RHYS WILLIAMS
### IN SUPPORT OF VERIFIED PETITION AND MOTION UNDER CHAPTER 15
### FOR (I) RECOGNITION OF A FOREIGN MAIN PROCEEDING, (II) RECOGNITION
### OF JPL APPOINTMENT ORDER, (III) RECOGNITION OF
### SANCTION ORDER, (IV) APPROVAL OF FREE AND CLEAR
### TRANSFER OF ASSETS, (V) APPROVAL OF THE PROCEDURE GOVERNING
### THE CLOSING OF THIS CHAPTER 15 CASE, AND (VI) RELATED RELIEF

I, Rhys Williams, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

### INTRODUCTION

1.      I am a Barrister and Attorney duly-admitted to practice in Bermuda and a Director of the Bermuda law firm Conyers Dill & Pearman Limited ("**Conyers**") located at Clarendon House, 2 Church Street, Hamilton HM 11, Bermuda. Conyers acts as special Bermuda counsel to Afiniti Ltd., an exempted company with limited liability incorporated under the laws of Bermuda (the "**Debtor**" or the "**Company**").

2.      I am over the age of eighteen.  Except as otherwise indicated, all facts set forth in this declaration (this "**Declaration**") are based upon my personal knowledge, my opinion based upon my experience and knowledge of the Debtor and my review of relevant documents or information supplied to me.

---

[1]  The Debtor's registration number is 45859. The location of the Debtor's registered office is Crawford House, 50 Cedar Avenue, Hamilton, Pembroke, HM 11, Bermuda.

3.      If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4.      I submit this declaration in support of the Foreign Representative's Recognition Motion.[2]

5.      This Declaration comprises matters that are statements of my view of Bermuda law or statements of fact.  Where the matters stated in this Declaration are statements regarding Bermuda law, such statements represent my view of Bermuda law as a Barrister admitted and authorized to practice in Bermuda.  Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true.  Where the matters stated in this Declaration that are statements of fact are not within my personal knowledge, they are true to the best of my knowledge, information and belief.

6.      In preparing this Declaration, I have reviewed the declaration of Christian Luthi dated 22 October 2024 filed in these proceedings [D.I. 6].  I agree and adopt the statements of Bermuda law set out in Mr. Luthi's Declaration at paragraphs 9 – 30.

## PERSONAL BACKGROUND AND QUALIFICATIONS

7.      I am a director in Conyers' Litigation & Restructuring Department with expertise in commercial litigation, insolvency and corporate restructurings.  I hold a Master of Laws from the London School of Economics and Political Science at the University of London.  I was called to the Bar of England and Wales in 2007. I joined Conyers in March 2015 and was called to the Bermuda Bar in 2016. I am a member in good standing of the Bermuda Bar Association.

---

[2] Capitalized terms used herein but not otherwise defined shall have the meaning given to them in the *Foreign Representative's Supplemental Briefing Regarding Status and In Support of Recognition Motion* dated 26 November 2024 [D.I. 37].

8.      I practice in commercial litigation generally, and have appeared in the Bermuda Supreme Court, Bermuda Court of Appeal and Privy Council. I have particular experience in matters related to Bermuda insolvency law.  I have advised companies, creditors, and liquidators on a large number of winding-up proceedings, insolvent restructurings and multinational reorganizations. I was counsel in many of the major cross-border restructurings including Noble, Weatherford, Digicel, Markel CATCo and Seadrill. I also appeared in many of the major winding up cases including Northstar, Omnia, PB Life & Annuity Co, PDV Insurance Co, Titan Petrochemicals, Skyfame and China Oceanwide.

9.      I am a Fellow of INSOL International, a member of the Insolvency Lawyers Association and a member of the Bermuda branch of the Restructuring and Insolvency Specialists Association.

10.      I confirm that I consider that I have the requisite qualifications and expertise to express my opinions on the issues I have been asked to consider under Bermuda law.

## MR. CHISHTI'S APPLICATIONS

11.      On 20 November 2024, the Supreme Court of Bermuda ("**Bermuda Court**") issued a ruling sanctioning the Debtor's proposed restructuring ("**Ruling**") and entered a corresponding order on 22 November 2024 ("**Sanction Order**").  On 22 November 2024, Mr. Chishti stated in a letter to the Bermuda Court that he intended to urgently seek leave to appeal the Ruling ("**Leave Application**") and stay the Sanction Order pending determination of the appeal ("**Stay Application**" and together with the Leave Application, the "**Applications**").  Mr. Chishti indicated that he would file the Leave and Stay Applications on 25 November 2024.  However, as of the date of this Declaration no such application has been filed.  Instead, on 25 November 2024, Mr. Chishti applied for an interim injunction restraining the Company and the JPLs from, inter alia,

taking any steps or seeking any orders "which would complete or close the Transactions and the Proposed Restructuring" and/or preclude Mr. Chishti from advancing the Leave Application "until the Leave Application is finally determined".

12.     On 26 November 2024, the Court heard Mr. Chishti's *ex-parte* application for an injunction and on the same day dismissed that application. *See* D.I. 39, 42.

13.     This Declaration sets out the legal principles the Bermuda Court would likely consider in adjudicating the Applications.

<u>**LEAVE TO APPEAL**</u>

14.     The Sanction Order is in the nature of an interlocutory order. *Nigel Hamilton-Smith et al* v *Alexander Fundora, HCVAP* 2010/031, Eastern Caribbean Court of Appeal (31 August 2010), at 11 - 17. Under Bermuda law, there is no appeal as of right against an interlocutory order. A party aggrieved by an interlocutory order must obtain leave to appeal from the Supreme Court or the Court of Appeal within 14 days of the date of the order.  Court of Appeal Act 1964, Section 12; Rules of the Court of Appeal, Order 2, Rule 3(3).   If Mr. Chishti pursues the Leave Application, he bears the burden of demonstrating the appeal has a "real prospect of success" or that there is "some other compelling reason" for the appeal to be heard.     *Wang et al* v *Grand View Private Trust Company Limited* [2021] CA (Bda) 6 Civ at 53.

15.     In this context, "real" means that the prospect of success must be realistic rather than fanciful. *Id*.  The Court will not grant leave on a point of law "unless the judge considers that there is a realistic prospect of the Court of Appeal coming to a different conclusion on a point of law which will materially affect the outcome of the case". *Id*.  The Court will not ordinarily grant leave to appeal on a finding of primary fact but there may be exceptional circumstances where the question on appeal is whether the lower court drew the correct inferences. *Id.*

16.     In exceptional circumstances, the Court may grant leave on the basis that there are "compelling" reasons where, for example, the appeal raises a novel question of law of general principle or where the appeal raises an important question on which further argument and an appellate decision would benefit the public.  *See, e.g., Deutsche Bank AG (London Branch)* v *Central Bank of Venezuela* [2022] EWHC 2702 (Comm) (granting leave where the issue on appeal raised on a novel legal question on the operation of a foreign apex court and the decision, which concerned Venezuela's gold reserves, would have a considerable impact on the people of Venezuela); *see also Wang* at 54 – 55.

17.     A Court will not generally grant leave to appeal where the appeal is academic because there is no longer a live dispute between the parties.  In *Hutcheson* v *Popdog Ltd*, the English Court of Appeal held that an appeal should not be allowed to proceed where there are no longer any real issues in the proceedings between the parties. Before an appeal which is academic is allowed to proceed (i) the Court must be satisfied that the appeal would raise a point of general importance, (ii) the respondent to the appeal must agree to it proceeding, or at least be completely indemnified on costs and not otherwise inappropriately prejudiced, and (iii) the Court must be satisfied that both sides of the argument will be fully and properly ventilated.  [2011] EWCA Civ 1580.

18.     Importantly, even if the Court grants leave to appeal an interlocutory order it does not automatically stay the order.  As the Bermuda Court of Appeal held in *Hong Kong and Shanghai Banking* v *Newocean Energy* "unless the appeal court or the lower court orders otherwise, an appeal shall not operate as a stay of any order or decision of the lower court".  [2021] CA (Bda) 214 Civ at 26.  An appellant must specifically apply for a stay of execution pending

appeal, which the Court has discretion to grant or refuse. The principles governing stays pending appeals are set out in the following section.

19.     While much depends on Court availability and the urgency and complexity of the matter, in my experience one may reasonably expect it to take 4 – 6 weeks for an application for leave to appeal to be heard before the judge at first instance. If leave is refused, it may be possible to secure a hearing before a single Justice of the Court of Appeal approximately 2 – 4 weeks thereafter. If leave is granted, the hearing of an appeal may take place approximately 4 – 6 months thereafter.

## STAY PENDING APPEAL

20.     As indicated above, Mr. Chishti has not applied for a stay pending appeal. If Mr. Chishti pursues the Stay Application, he faces an exceptionally high burden:   "a stay is the exception rather than the rule". *Id. cited with approval in Darrel* v *Frisby* [2023] CA (Bda) 31 Civ at 18.

21.     The starting point is that a successful claimant should not be prevented from enforcing an order even though an appeal is pending. *Shanghai Banking* at 26. As such, the Bermuda Court will not grant a stay unless the applicant establishes (i) "solid grounds" for granting a stay, and (ii) the balance of injustice weighs in favour of granting the stay. *Id.* On the first limb, the applicant must adduce cogent evidence of a "real risk of injustice" (*i.e.,* irremediable harm) if the order is enforced to justify a stay. Even if the applicant succeeds in establish solid grounds, the Court must then undertake a balancing exercise weighing the risks of injustice to each side if a stay is or is not granted. *Id.* The court has a broad discretion to consider the relative risks of injustice to either party. While there is no exhaustive list of such factors, the Court will typically

consider the risk of the appeal being stifled if a stay is refused and the risk of the respondent being

unable to execute the order if a stay is granted and the appeal fails. *Id.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 26th day of November 2024

in Hamilton, Bermuda

/s/ Rhys Williams

Rhys Williams

CONYERS DILL & PEARMAN

Clarendon House, 2 Church Street

Hamilton HM 11

Bermuda

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Afiniti, Ltd.,[1] | Case No. 24-12539 (LSS) |
| Debtor in a Foreign Proceeding. | |

**INDEX OF AUTHORITIES**

**CITED IN DECLARATION OF RHYS WILLIAMS**
**IN SUPPORT OF VERIFIED PETITION AND MOTION UNDER CHAPTER 15**
**FOR (I) RECOGNITION OF A FOREIGN MAIN PROCEEDING, (II) RECOGNITION**
**OF JPL APPOINTMENT ORDER, (III) RECOGNITION OF**
**SANCTION ORDER, (IV) APPROVAL OF FREE AND CLEAR**
**TRANSFER OF ASSETS, (V) APPROVAL OF THE PROCEDURE GOVERNING**
**THE CLOSING OF THIS CHAPTER 15 CASE, AND (VI) RELATED RELIEF**

| Tab | Authority |
|---|---|
| | **STATUTES** |
| 1. | Court of Appeal Act 1964, Section 12 |
| | **COURT RULES** |
| 2. | The Rules of the Court of Appeal 1965, Order 2/3, Rule (3)(1) |
| | **CASES** |
| 3. | Nigel Hamilton-Smith et al v Alexander Fundora, HCVAP 2010/031, Eastern Caribbean Court of Appeal (31 August 2010) |
| 4. | Wang et al v Grand View Private Trust Company Limited [2021] CA (Bda) 6 Civ |
| 5. | Deutsche Bank AG (London Branch) v Central Bank of Venezuela [2022] EWHC 2702 (Comm) |
| 6. | Hutcheson v Popdog Ltd [2011] EWCA Civ 1580 |
| 7. | Hong Kong and Shanghai Banking v Newocean Energy [2021] CA (Bda) 21 Civ |

---

[1] The Debtor's registration number is 45859. The location of the Debtor's registered office is Crawford House, 50 Cedar Avenue, Hamilton, Pembroke, HM 11, Bermuda.

| 8. | Darrel v Frisby [2023] CA (Bda) 31 Civ |
|----|----------------------------------------|

(e)    for the time within which any appeal and any document relating to the appeal may be lodged, for the extension of such time and the conditions upon which such extension may be allowed;

(f)    for the consequences which may follow upon the failure of any party to comply with any of the Rules of Court, as to time or otherwise;

(g)    for the stay of execution pending the determination of an appeal and the conditions, as to security or otherwise, which may be imposed in any order staying

(h)    for the abandonment of an appeal and for the circumstances in which an appeal shall be deemed to have been abandoned;

(i)    for regulating the fees payable to barristers and attorneys engaged in an appeal at the instance of the Court of Appeal, and the fees payable to witnesses;

(j)    for the scales of costs and the taxation of costs.

(2)    Section 6 of the Statutory Instruments Act 1977 shall not apply to any rules made under this section.

## 10    Remuneration of Justices of Appeal

The President and Justices of Appeal shall be entitled to receive out of the funds appropriated by the Legislature for the purpose such sums as the Governor may determine in respect of—

(a)    a retaining fee and fees for sitting as a member of the Court of Appeal;

(b)    fees for work preparatory to the hearing of an appeal;

(c)    fees for the preparation or drafting of a judgment;

(d)    out of pocket expenses for board and accommodation while in Bermuda as a member of the Court of Appeal;

(e)    travelling expenses to and from Bermuda:

Provided that—

(i)    this section shall not apply to any person who is the holder of a pensionable office in and ordinarily resident in Bermuda; and

(ii)    any person who is ordinarily resident in Bermuda shall not be entitled to receive any of the expenses specified in paragraphs (d) or (e) of this section.

## 11    Effect of judgment or order

Any judgment or other order given or made by the Court of Appeal shall have the full force and effect of a judgment or order given or made by the Supreme Court.

## PART II - CIVIL JURISDICTION

## 12    Appeals from Supreme Court

(1)    Subject to subsections (2) and (3) and any Rules, any person aggrieved by a judgment of the Supreme Court in any civil cause or matter, (including matrimonial causes), whether final or interlocutory, or whether in its original or appellate jurisdiction, may appeal to the Court of Appeal; and any such appeal is hereinafter referred to as a "civil appeal".

(2)    No appeal shall lie to the Court of appeal—

(a)    against the decision in respect of any interlocutory matter; or

(b)      against an order for costs,

except with leave of the Supreme Court or of the Court of Appeal.

(3)      In respect of matrimonial causes, no appeal shall lie from a decree absolute for the dissolution or nullity of marriage or a final order for the dissolution or nullity of marriage where the person against whom such decree or order is made has had the time and opportunity to appeal from the decree nisi prior to its being made absolute or the conditional order prior to its being made final and has not appealed from the decree nisi or the conditional order.

*[Section 12 subsection (3) repealed and substituted by 2022:4 effective 13 March 2023]*

## 13      Determination of civil appeals

Upon the hearing of a civil appeal the Court may allow the appeal in whole or in part or may dismiss the appeal in whole or in part or may remit the case to the Supreme Court to be retried in whole or in part and may make such other order as the Court may consider just.

## 14      Interlocutory matter; single Justice of Appeal

To the extent prescribed by Rules the powers of the Court of Appeal to hear and determine any interlocutory matter may be exercised by any Justice of Appeal in the same manner as they may be exercised by the Court of Appeal and subject to the same provisions:

Provided that every order made by a Justice of Appeal in pursuance of this section may, on application by the aggrieved party and subject to any Rules, be discharged or varied by the Court of Appeal.

## 15      Procedure for civil appeal

Subject to any Rules, all civil appeals shall be by way of re-hearing and no writ of error or other formal proceeding other than as may be required by this Act or Rules shall be necessary.

### PART III - CRIMINAL JURISDICTION

## 16      Criminal appeals

Subject to section 17 and any Rules, any person aggrieved by a judgment of the Supreme Court in any criminal proceeding, whether in its original or appellate jurisdiction, may appeal to the Court of Appeal; and any such appeal is hereinafter referred to as a "criminal appeal",

## 17      Right of appeal

(1)      A person convicted on indictment, or a person convicted by a court of summary jurisdiction and whose appeal to the Supreme Court under the Criminal Appeal Act 1952, has not been allowed, may appeal to the Court of Appeal—

(a)      against his conviction in the Supreme Court, or in any other case, against the decision of the Supreme Court, upon any ground of appeal involving a question of law alone; and

(b)      with the leave of the Court of Appeal or upon the certificate of the Supreme Court that it is a fit case for appeal against conviction, upon any ground of appeal which involves a question of fact alone, or a question of mixed law and fact or on any ground which appears to the Court to be a sufficient ground of appeal; and

(c)      with the leave of the Court of Appeal, against the sentence passed on his conviction, unless the sentence is one fixed by law; and

(d)      against the refusal of the Supreme Court or a Judge thereof to release an appellant from custody under section 20 or against the conditions attached to such release.

2

(a)    by or with the leave of the court, at any time;

(b)    without such leave, by supplementary notice served upon each of the parties upon whom the notice to be amended was served, not later than seven days before the first day of the sitting of the Court at which the appeal is set down for hearing.

## 2/3    Application for leave to appeal

3(1)    Where an appeal lies only by leave of the Court or of the Supreme Court, any application to either Court shall be made by notice of motion ex parte in the first instance and the following provisions shall apply:

(a)    where the application is made to the Supreme Court, the notice of motion shall be filed with the Registrar of that Court not late than fourteen days after the date of the decision of the Supreme Court;

(b)    if the application is refused by the Supreme Court and the intending appellant desires to apply to the Court for leave to appeal, he shall file his notice of motion with the Registrar not later than seven days after such refusal;

(c)    unless the application (whether to the Court or to the Supreme Court) is dismissed or it appears to the Court to which the application is made that undue hardship would be caused by an adjournment, that Court shall adjourn the application and give directions for the service of notice thereof upon the party or parties affected;

(d)    if leave to appeal is granted by the Supreme Court, the appellant shall file a notice of appeal;

(e)    where leave to appeal is granted by the Court, the time, prescribed by Rule 2 of this Order, within which notice of appeal must be filed shall run from the date when such leave is granted.

(2)    Every notice of motion filed in pursuance of paragraph (1) of this Rule shall set out the grounds of the application and shall be accompanied by an affidavit in support thereof and by a statement of the grounds of the intended appeal formulated in accordance with Rule 2 of this Order.

## 2/4    Time

4(1)    An appeal shall be deemed to have been brought when the notice of appeal has been filed in the Registry of the Supreme Court.

(2)    Every application for an enlargement of time within which to appeal shall be supported by an affidavit setting forth good and substantial reasons for the failure to appeal within the prescribed period, and by grounds of appeal which *prima facie* show good cause why the appeal should be heard. When time is so enlarged a copy of the order granting such enlargement shall be annexed to the notice of appeal.

(3)    An application for enlargement of time within which to appeal may be heard and determined by a single Judge; but, if the Judge refuses an application made under this provision, the party aggrieved by such refusal shall be entitled to have the application heard and determined by the Court.

## 2/5    Notice of appeal, on whom served

5(1)    The Registrar of the Supreme Court shall, after the notice of appeal has been filed, cause to be served a true copy thereof upon each of the parties mentioned in the notice of appeal. It shall not be necessary to serve any party not directly affected:

Provided that the Court may, of its own motion, or on the application of any person claiming to be affected, direct notice to be served on all or any parties to the action or other proceeding or upon any person not

3

ANTIGUA AND BARBUDA

IN THE COURT OF APPEAL

HCVAP 2010/031

> In the Matter of Stanford International Bank Limited (In LIQUIDATION)
>
> And in the Matter of International Business Corporations Act, Cap 222 of the Revised Laws of Antigua and Barbuda
>
> And in the Matter of an Application for the REMOVAL OF THE LIQUIDATORS

BETWEEN:

[1] NIGEL HAMILTON-SMITH
[2] PETER WASTELL
(Joint Liquidators)

Appellants/Applicants

and

ALEXANDER M. FUNDORA

Respondent/Applicant

**Before:**
   The Hon. Mde. Ola Mae Edwards                    Justice of Appeal

**Appearances:**
   Mr. Kendrickson Kentish instructed by Mr. Daniel Hennif
   for the appellants
   Mr. Anthony Astaphan, SC leading Mr. Craig Christopher
   and Ms. Nicolette Doherty instructed by Martin Kenny & Co.
   represented by Mr. Malcolm Arthurs for the respondent
   Ms. Jasmine Wade watching for the Financial Services
   Regulating Commission

_____
2010: August 26, 31.
_____

_Notice of appeal – Whether order final or interlocutory – Whether leave to appeal required – Application to strike out notice of appeal – Removal of Liquidators – The International Business Corporations Act, Cap. 222 of the Laws of Antigua and Barbuda, Revised Edition_

*1992 as amended ("IBC Act") s.304 – Eastern Caribbean Supreme Court Act, Cap 143, Laws of Antigua and Barbuda, Revised Edition (1992) s. 31(2), s. 11,  – How the Court exercises its jurisdiction in insolvency and winding up proceedings – English Insolvency Act 1986, s. 172 – English Insolvency Rules 1986, Rules 4.119, 4.120, 7.47, 7.49 – UK Practice Direction; Insolvency Proceedings – English Civil Procedure Rules, Part 52.4*

An order was made in the High Court inter alia to remove the appellants as joint liquidators of Stanford International Bank ("SIB") for several reasons including the fact that they failed to act in the best interest of the estate and/or creditors. The court ordered that the present Liquidators of SIB will continue to conduct the liquidation in the interest of the creditors until such time as the replacement is appointed by the High Court. The appellants appealed this decision. The respondent has applied to strike out the notice of appeal on the grounds that the order of the High Court is interlocutory and therefore leave is required to appeal. A second application for a stay of execution of the judgment and all other proceedings pending the appeal was filed. The appellants question whether the English Insolvency Rules 1986 and the Eastern Caribbean Supreme Court Civil Procedure Rules 2000 are applicable in relation to this appeal.

**Held:**  granting the application to strike out the Notice of Appeal; dismissing the applications for extension of time, relief from sanction and stay of execution; costs to the respondent to be agreed, if not then assessed;

1.  the judgment and order of Thomas J which removed the appellants as the joint liquidators for "SIB" are interlocutory in nature and consequently leave to appeal is required. The Court of Appeal therefore lacks jurisdiction to exercise appellate review without leave to appeal being granted to the appellants;

    **TSJ Engineering Consulting Ltd. v Al Rashid Petroleum Investment Company**; Virgin Islands Civil Appeal No. 13 of 2010 (27th July 2010), followed; **Oliver McDonna v Benjamin Richardson** Anguilla Civil Appeal No. 3 of 2005 (29th June 2007), and **Nam Tai Electronics, Inc v David Hague and Another** Virgin Islands Civil Appeal No. 12 of 2003 (26th April 2004) applied.

2.  the Application of the respondent Alexander Fundora filed on 29th July 2010 is granted and the Notice of Appeal filed on 6th July 2010 without the leave of the Court is a nullity and is struck out with costs to the respondent;

3.  by virtue of rule 2.2(3)(b) of **CPR 2000** these Rules do not apply to insolvency (including winding up of companies) proceedings.  In the absence of special provisions in the **Eastern Caribbean Supreme Court Act** Cap. 143 of Antigua and Barbuda or rules of court regulating the practice and procedure in relation to an appeal from a High Court decision to remove a liquidator from office in winding up or liquidation proceedings section 31(2) of the **Eastern Caribbean Supreme Court Act** Cap. 143 of Antigua and Barbuda empowers the court to apply any relevant Rules of the Supreme Court in England which regulate appeals in winding up or liquidation proceedings which can be used in Antigua and Barbuda. Therefore the **English Insolvency Rules 1986** and any relevant Practice

Directions which regulate appeals to the Court of Appeal from the High Court in England are applicable and may be modified and adapted to conform with the provisions of the **International Business Corporations Act** and the **Supreme Court Act of Antigua and Barbuda**;

4.   the appellants' application filed on 30th July 2010 for the multiple orders stated therein is dismissed with costs to the respondent Alexander Fundora;

5.   the costs to the respondent are to be agreed on by the parties and where not agreed to be assessed by the court.

## JUDGMENT

[1]    **EDWARDS, J.A.:**   There are 2 applications before me following the Notice of Appeal filed on 6th July 2010 by the appellants against the Court's decision to remove them from office as joint liquidators of Stanford International Bank Limited ("SIB").  The first application which was filed by Mr. Fundora on 29th July 2010 is to strike out the Notice of Appeal on grounds that the judgment of Thomas J is interlocutory, and leave is required to appeal the judge's decision.  The second application which was filed on 30th July 2010 by the appellants is for a stay of the execution of the judgment of Thomas J and all further proceedings pending the hearing and determination of the appeal; and for the appeal to be expedited.  Alternatively, that the appellants be granted relief from sanction, and an extension of time to apply for leave to appeal.

[2]    It appears that the appellants had filed a previous application on 17th June 2010 for a stay of execution pending appeal, which Harris J adjourned in the High Court without a date, pending the determination of the application to strike out the Notice of Appeal by the Court of Appeal.  Apart from the written submissions that were filed by the parties in support of their applications, I heard oral arguments from Senior Counsel Mr. Astaphan, Mr. Kentish and Mr. Christopher at the teleconference hearing by a single judge on 26th August 2010, and reserved judgment.

**The Procedural Background**

[3]     The judgment was delivered on 8th June 2010 after Thomas J in a contested hearing heard the application of Mr. Fundora to remove the joint liquidators/appellants upon several grounds for cause, including that the appellants have failed to act in the best interest of the estate and/or the creditors. The learned judge made an order which included the following terms:

> "1. – 7.  …
>
> 8.      After consideration of all the circumstances and the law the Court considers it appropriate that the Liquidators should be removed.
>
> 9.      Mr. Marcus Wide is or has the semblance of the Applicant's preferred liquidator which is prohibited by law.  Accordingly the Applicant [Mr. Fundora] must within thirty days of the date of this order re-submit to the Court the names of Marcus Wide together with at least two other suitably qualified and experienced insolvency practitioners in order that a further determination may be made as to the replacement.
>
> 10.     The present Liquidators of SIB will continue to conduct the liquidation in the interest of the creditors until such time as the replacement is appointed by this Court.
>
> 11.     The Applicant is entitled to his costs to be assessed under Part 65.11 of CPR 2000, if not agreed.  Such assessment must take place at the end of those proceedings."

[4]     The application to remove the appellants was brought under section 304 of the **International Business Corporations Act**[1] which states:

> "**In connection with the dissolution or the liquidation and dissolution of a corporation,** the court may, if it is satisfied that the corporation is able to pay or adequately provide for the discharge of all its obligations, make any order it thinks fit, including, without limiting the generality of the foregoing,
> >       (a)  an order to liquidate;
> >       (b)  an order appointing a liquidator, with or without bonding, fixing his remuneration  and **replacing a liquidator**;
> >       (c)  to (o) …" (My emphasis)

---

[1] Cap. 222 of the Laws of Antigua and Barbuda Revised Edition 1992 as amended.

[5]    The appellants were on 19th February 2009 appointed Receiver-Managers of the SIB by the Financial Services Regulating Commission ("FSRC") pursuant to section 287 of the **International Business Corporations Act** ("**IBC Act**").  On 15th April 2009 the appellants were appointed joint liquidators of SIB by the High Court upon the application of the FSRC.

[6]    It is trite law that the appellants on being appointed official liquidators by the court, are officers of the court who function, subject to the supervision of the court, in accordance with their defined statutory duties and powers in sections 307 to 311 of the **IBC Act** and other relevant law and principles.  It is a basic concept of the law governing liquidation that the court may remove a liquidator and appoint another if there is "cause shown" by the applicant for his removal.  It is not normally necessary to demonstrate personal misconduct or unfitness for this purpose. It will be enough if the liquidator fails to display sufficient vigour in the discharge of his duties. In determining whether due cause has been shown for the removal of a liquidator, the guiding principle is that "the Court is satisfied on the evidence before [it] that it is against the interest of the liquidation, …that a particular person should be made liquidator, then the Court has power to remove the present liquidator, and of course then to appoint some other person in his place."[2]   "… [T]he due cause is to be measured by reference to the real, substantial, honest interests of the liquidation and to the purpose for which the liquidator is appointed.  Of course, fair play to the liquidator himself is not to be left out of sight, but the measure of due cause is the substantial and real interest of the liquidation."[3]

[7]    There is no statutory provision in the **IBC Act** as to who may make the application for removal of a liquidator.  It has been held by the Privy Council in **Deloitte & Touche A.G. v Johnson and Another**[4] that the applicant should be a person who "has a legitimate interest in the relief sought… the court will not remove a liquidator of an insolvent company on the application of a contributory who is not

---

[2] Principles laid down in Re Adam Eyton Ltd. (1887) 36 Ch D. 299 Per Cotton LJ at page 304
[3] Op cit. at page 306 Per Bowen LJ.
[4] [1999] 1 W.L.R. 1605, at  page 1611

also a creditor…  The only persons who could have any legitimate interest of their own in having the liquidators removed from office as liquidators are the persons entitled to participate in the ultimate distribution of the company's assets, that is to say the creditors."  The learned judge found that Mr. Fundora is a creditor of SIB and therefore had a legitimate interest in having the appellants removed.

[8]    In their written submissions, Counsel for Mr. Fundora emphasised that his application to remove the appellants was made within the existing winding up proceedings of Stanford International Bank Ltd. and was not brought as an original proceeding.  Learned Counsel Mr. Kentish countered, relying on the underlined and emboldened statement in the following contextual quotation of Vaughan Williams LJ in **In re Herbert Reeves & Co**[5]:

> "The question which is raised upon a summons of this sort is the question whether there is a right to the delivery of the bill and to taxation, and that question is finally decided one way or the other whatever order is made upon the summons. If the order is, as the order of Kekewich J. is, that the summons stand dismissed, there is once and for all a final determination that the client has no right to relief under the Solicitors Acts in the nature of delivery of a bill and taxation.  If, on the other hand, an order is made for the delivery of a bill of taxation, that finally disposes of the matter on the summons on the other possibility; and once and for all it is decided that the client is, in the circumstances before the Court, entitled to an order for delivery and taxation. It is suggested that, in the last alternative I have put the order is not final, because after the order there will be taxation, and a certificate, and possibly a review of the taxation. <u>But it is really plain that the mere fact that there may be inquiries to be carried out after the order or after the judgment has been delivered does not prevent the order or the judgment from being a final order or a final judgment.</u> **After you have got an order for winding up a company, there are obviously enormous quantities of questions which may be raised…"** (Mr. Kentish's emphasis)

[9]    The application to strike out raises 2 questions: (1) whether the decision of Thomas J is a final judgment or an interlocutory judgment on applying "the

---

[5] [1902] 1 Ch D. 29 (CA) at page 31: while considering  whether the order made dismissing the originating summons of Mr. B which requested an order for the delivery of a bill of costs by Solicitors in all matters wherein they had been concerned for him.

application test" and "the order test"[6]; and (2) whether the **English Insolvency Rules 1986** are applicable in relation to this appeal.

**Is the Judgment and Order Interlocutory or Final?**

[10]    Section 31(2) of the **Eastern Caribbean Supreme Court Act** Cap. 143[7] ("**the Court Act**") provides:

> "No appeal shall lie under this section -
>
> (a) - (f) ...
>
> (g)    without the leave of the Judge or of the Court of Appeal from any interlocutory judgment or any interlocutory order given or made by a Judge except –
>
> > (i)    where the liberty of the subject or the custody of infants is concerned;
> >
> > (ii)    where an injunction or the appointment of a receiver is granted or refused;
> >
> > (iii)    in the case of a decree nisi in a matrimonial cause or a judgment or order in an admiralty action determining liability;
> >
> > (iv)    in such other cases, to be prescribed, as are in the opinion of the authority having power to make rules of court of the nature of final decisions."

[11]    In the absence of a statutory definition as to what is an interlocutory judgment or an interlocutory order, it is well established in a plethora of decisions that our courts apply the "application test" to determine whether or not the order or decision is interlocutory. The observations of Vaughan Williams LJ in **Herbert Reeves** reflect our preferred approach.  The "application test" looks at the outcomes that

---

[6]  Applied by Sir Dennis Byron C.J. in Pirate Cove Resorts Ltd and another v Euphemia Stephens and Others: Civ. App. No.11 of 2002 St. Vincent & the Grenadines at para. 9; and explained by Rawlins J.A. (as he then was) in Nevis Island Administration v La Copproprete du Navire et al:  Civ. App. No 07 of 2005: St Christopher & Nevis at paras 15-16.  SEE ALSO The Caribbean Civil Court Practice  by David Di Mambro: notes at 31.6:  "...if the determination of the application could have yielded a result that did not finally determine the matter in litigation then the order is to be regarded as interlocutory in nature"

[7]  Laws of Antigua and Barbuda Revised Edition (1992) as amended

were possible on the application.  The test is whether a decision on the application had it been decided in favour of the appellant or the respondent would have brought an end to the proceedings.[8]   A final order must generally be one which ends the litigation and leaves nothing for the court to do but execute the judgment. In other words, the final order must conclusively determine the substantive rights of the parties.  His Lordship Chief Justice Rawlins quite recently expanded on the test in **TSJ Engineering Consulting Ltd. v Al Rashid Petroleum Investment Company**[9] where he stated:

> "A determination whether an order is final or interlocutory is made by our courts on the "application test".  An order or judgment is final if it would be determinative of the issues that arise in the claim, whichever way the application is decided. If the issues of liability on the claim are finally determined whether the outcome on an application is in favour of either party to the claim, the order would be final. The order would however be interlocutory, for example, if a ruling on the application in favour of the claimant would determine the issues of liability in favour of the claimant whereas a ruling in favour of the defendant would re-open the issue of liability for continued litigation. In determining whether an order is final or interlocutory, the court should consider the nature of the application and order and the circumstances that gave rise to them."

[12]    Apart from looking at the possible outcomes on the application when applying the "application test", it is important also to consider the form of the proceedings in which the application is brought.   Vaughan Williams LJ found this significant where he observed further that "people may regard a summons for an order for the delivery of a bill of costs and taxation as a summons the ultimate end of which is, not to ascertain whether or not there is a liability to deliver a bill and have it taxed, but as a summons initiated for the purpose of ascertaining the quantum of money which the client is liable to pay to the solicitor, or which the solicitor may have to pay the client.  The proceeding may be so regarded but it is not so here, <u>and the form of the proceedings itself shows</u> that as things stand one must regard the object of the summons as being to ascertain whether or not there was a liability to deliver a bill of costs and have it taxed." (My emphasis.)

---

[8] Barrow JA in Oliver McDonna v Benjamin Richardson  Civ App No. 3 of 2005 (Anguilla)
[9] Civ. App No. 13 of 2010 (BVI)

[13]     Mr. Kentish's submissions on this issue was as follows:   The substantive lis between Mr. Fundora and the Liquidators is whether the liquidators should be removed from office.   The application to remove them was made and determined after the Court had already made the winding up order for SIB.  Mr. Fundora's original application for SIB to be wound up was rejected by the High Court and he was not a party to the successful liquidation application by the FSRC pursuant to which SIB was wound up and the liquidators were appointed.  The only issue in dispute between the parties before the High Court at the hearing of the application to remove the appellants was whether the appellants should be removed from office.  This issue having been finally determined (with the alternative decisions available to the court on the application being to either remove or not to remove them, both of which would be determinative) the subject order is a final order and leave to appeal was not required.

[14]     Having carefully considered these submissions of learned counsel Mr. Kentish, in my opinion the fact that Mr. Fundora was not a party to the successful liquidation application of FSRC is irrelevant when considering the nature of the proceedings in which the application was made for the removal of the appellants. We are dealing here with liquidation proceedings authorised by the relevant provisions of the **IBC Act**.   Mr. Fundora was able to make the application because as a creditor he had a legitimate interest in the estate and assets of SIB; and the court had the power to make an order replacing the appellants under section 304(b) of the **IBC Act** in the interest of the liquidation. As a creditor, Mr. Fundora's application in relation to the appellants under section 304(b) of the **IBC Act,** was not that of an adversarial claimant with a cause of action or claim of right or a substantive legal right.  Neither do the appellants as joint liquidators and officers of the court under the **IBC Act,** have any statutory claim of right, or any substantive legal right or vested interest to continue in that office as joint liquidators.

[15]     The court undoubtedly, determined the application for the removal order because it was "**In connection with the liquidation and dissolution of a corporation**" i.e. SIB, as required by section 304. The application for the removal of the appellants

12

was clearly an application in the liquidation proceedings, unlike the situation in **Herbert Reeves** where the summons was an original proceeding. The learned judge Thomas J, was not considering the personal and private rights of the parties. The judge was obliged to answer the broad question: whether he was satisfied that it is for the better conduct of the liquidation, or it is for the general advantage of those persons having a legitimate interest in the estate and assets of SIB that the appellants be removed and a new liquidator be appointed.

[16]     By no stretch of the imagination does the removal of the appellants resolve the winding up of SIB within the larger liquidation proceedings.  The rights of Mr. Fundora in the substantive winding up issue have not been disposed of as between SIB and its creditors.  The order is not a final order where it has not brought to an end the issues between SIB and Mr. Fundora.  Had the application been decided in favour of the appellants, such a decision would not be dispositive of the winding up proceedings in connection with SIB either.   In **Nam Tai Electronics, Inc v David Hague and Another**[10]  the Court of Appeal considered whether a summons seeking a number of orders and declarations filed by the official liquidators was interlocutory.  At Paragraph 8 of the judgment Gordon JA held that:  "The summons was by its nature interlocutory in that what it sought would not have finally disposed of the winding up which was the substantive action, of which the summons formed only part."

[17]     For all of the foregoing reasons I would hold that the judgment and order of Thomas J which removed the appellants as the joint liquidators for SIB are interlocutory in nature and the Court of Appeal lacks jurisdiction to exercise appellate review without leave to appeal being granted to the appellants.

### The Appeal Procedure for Winding Up Orders Under the IBC Act

[18]     There are no statutory provisions or rules which specifically or specially speak to the practice and procedure for appealing an order made pursuant to section 304 of

---

[10] Civ App No. 12 of 2003 (BVI)

the **IBC Act**.  Section 351(2) of the **IBC Act** provides that "The court may make such regulations and rules of court as it considers necessary for the better administration of Part IV [i.e. sections 284 to 315 which deal with winding up Corporations]."  No such rules have been made.

[19]     Section 31(2) of the **Eastern Caribbean Supreme Court Act** Cap. 143[11]  states that:

> "The jurisdiction of the Court of Appeal so far as it concerns practice and procedure in relation to appeals from the High Court shall be exercised in accordance with the provisions of this Act and rules of court and **where no special provisions are contained in this Act or rules of court such jurisdiction so far as concerns practice and procedure in relation to appeals from the High Court shall be exercised as nearly as may be in conformity with the law and practice for the time being in force in England –**
>
> > (a)  in relation to criminal matters, in the Court of Appeal (Criminal Division);
> >
> > (b)  **in relation to civil matters in the Court of Appeal (Civil Division).**  (My emphasis)

[20]     Senior Counsel, Mr. Astaphan urged the Court to invoke section 31(2) of the **Court Act** and apply it to the circumstances of this appeal when considering the application to strike out the Notice of Appeal. Mr Astaphan reminded the Court that the equivalent provision to section 31(2) in the **Court Act of St Kitts and Nevis** was invoked by Barrow JA in **Christenbury Eye Center v First Fidelity Trust Limited**[12] to apply the English CPR 52.3 when considering whether to review a failed application for leave to appeal.

[21]     In **Hugh C. Marshall Snr and Antigua Aggregates Limited and Others**[13] Singh JA in his lead judgment made certain relevant observations concerning a company's winding up petition in Antigua. He said at paragraphs 15 and 16 as follows:

---

[11] Laws of Antigua and Barbuda Revised Edition (1992) as amended
[12] Civil Appeal No. 14 of 2007 (St Christopher and Nevis)  delivered 19th November 2008
[13] Antigua and Barbuda Civ. App. No. 23 of 1999 at paras 15-16

"[15]    It is accepted that there are no local rules guiding the presentation of a company's winding-up petition in Antigua. It is also accepted that Antigua needed to look to the English Rules for such guidance.  Power to do so, is given by section 11 of the **Eastern Caribbean Supreme Court Act Cap 143** which states that –

'The jurisdiction vested in the High Court in Civil proceedings, and in Probate, Divorce and Matrimonial causes, shall be exercised in accordance with the provisions of this Act and any other law in operation in Antigua and Barbuda and rules of court, and where no special provision is therein **contained such jurisdiction shall be exercised as nearly as may be in conformity with the law and practice administered for the time being in the High Court of Justice in England**.'

[16]    This provision did not mandate a total and slavish acceptance of the English Rules. It suggests that the jurisdiction should be exercised **as nearly as may** be, in conformity with the law and practice for the time being administered in the High Court of England. This, in my view, suggests, that only those rules, that could with convenience be used in Antigua should be adopted." (Justice of Appeal Singh's emphasis).

[22]    I adopt that statement of Singh JA and apply it to section 31(2) of the **Court Act** for the following reasons. The power to make rules regulating the practice and procedure of the Court of Appeal and the High Court is conferred by section 17 of the **West Indies Associated States Supreme Court Order 1967** which empowers the Chief Justice and two other judges of the Supreme Court to do so. Section 351(2) of the **IBC Act** empowers the Supreme Court's rule making authority to make rules for the specified purpose of the better administration of the winding up of corporations under the **IBC Act**.  In the absence of such special rules, concerning practice and procedure, in relation to appeals from the High Court, where the Court of Appeal is exercising its jurisdiction in winding up or liquidation proceedings under the **IBC Act** and section 31 of the **Court Act** for Antigua and Barbuda; the Court is empowered by section 31(2) of the **Court Act** to apply any relevant Rules of the Supreme Court in England which regulate appeals in winding up or liquidation proceedings which can be conveniently used in Antigua and Barbuda.

[23]     Mr. Kentish submitted that despite the statements of Singh JA in **Marshall v Antigua Aggregates** the **English Insolvency Rules** are not relevant to the issue concerning whether or not leave is required to appeal the judgment and order of Thomas J.   Mr. Kentish also submitted that there was no lacuna in the laws of Antigua and Barbuda because section 31 of the **Court Act** sets out the circumstances when leave is required and it would be contradictory to the clear wording of section 31 of the **Court Act** and section 11 as well, to apply the **English Insolvency Rules 1986** to this matter.

[24]     Mr. Kentish's submissions in my view have overlooked the fact that the provision stipulating the circumstances when leave is required, does not prescribe any specified practice and procedure for obtaining such leave when it is required.  It is Part 62 of the **Civil Procedure Rules 2000** which regulate the circumstances for obtaining leave to appeal generally[14]; and Mr. Kentish was quick in pointing out that CPR 2.3(b) states that the Rules in **CPR 2000** do not apply to insolvency (winding up of companies) proceedings. Moreover, section 351(2) of the **IBC Act** empowers the Court to make such Rules for the exercise of its jurisdiction in insolvency (winding up) proceedings. The question therefore is:  Without such Rules how is the Court to exercise its jurisdiction in insolvency and winding up proceedings? Statements of Lord Diplock in **Garthwaite v Garthwaite**[15] concerning the statutory jurisdiction of the Court may be helpful in appreciating this apparent dilemma. Lord Diplock explained:

> "In its narrow and strict sense the "jurisdiction" of a validly constituted Court connotes the limits which are imposed upon its power to hear and determine issues between persons seeking to avail themselves of its powers by reference (1) to the subject matter of the issue or (2) to the persons between whom the issue is joined or (3) to the kind of relief sought or to any combination of these powers.  In its wider sense it embraces also the settled practice of the Court as to the way in which it will exercise its power to hear and determine issues which fall within its "jurisdiction" (in the strict sense) or as to the circumstances in which it will grant a particular kind of relief which it has "jurisdiction" (in the strict

---

[14]   The Court of Appeal Rules 1968 as amended contain no rules which apply to winding up of companies.
[15] (1964) P. 356 at page 387

sense) to grant, including its settled practice to refuse to exercise such powers, or to grant such relief in particular circumstances."

[25]     It is because of this lacuna that the relevant **English Insolvency Rules 1986** and any relevant Practice Directions which regulate appeals to the Court of Appeal from the High Court in England are presently applicable to the instant appeal in my view, and those Rules where applicable should be modified and adapted to conform with the provisions of the **IBC Act** and the **Court Act of Antigua and Barbuda** and the peculiar circumstances of the case as far as possible if necessary.

**The English Insolvency Rules 1986 as amended for Removal of a Liquidator**

[26]     Part 4 Rules 4.119 and 4.120 regulate the Courts powers to remove a liquidator from office pursuant to section 172 of the **Insolvency Act 1986**. Rule 7.47 deals with Appeals and reviews of court orders in corporate insolvency. Rule 7.47(2) states:

> "Appeals in civil matters in proceedings under Parts 1 to 4 of the Rules lie as follows –
> > (a) to a single judge of the High Court when the decision appealed against is made by the county court or the registrar;
>
> > (b) to the Civil Division of the Court of Appeal from a decision of a single judge of the High Court."

[27]     Rule 7.49A deals with procedure on appeal and states as follows:

> "(1) An appeal against a first instance may only be brought with either the permission of the court which made the decision or the permission of the court which has jurisdiction to hear the appeal.
>
> (2) An appellant must file an appellant's notice (within the meaning of CPR Part 52) within 21 days after the date of the decision of the court that the appellant wishes to appeal.
>
> (3) The procedure set out in CPR Part 52 applies to any appeal to which this Chapter applies."

[28]    The Practice Direction – Insolvency Proceedings paragraph 17.3 states:

"(1) Section 55 of **the Access to Justice Act 1999** has amended s 375(2) of the Act and Insolvency Rules 7.47(2) and 7.48(2) so that an appeal from a decision of a Judge of the High Court made on a first appeal lies, with the permission of the Court of Appeal, to the Court of Appeal.

(2) An appeal from a Judge of the High Court in insolvency proceeding which is not a decision of a first appeal lies with the permission of the judge or the Court of Appeal to the Court of Appeal (See CPR Part 52 rule 3).

(3) The procedure and practice for appeals from a decision of a Judge of the High Court in insolvency proceedings (whether made on a first appeal or not) are also governed by Insolvency Rule 7.49 which imports the procedure and practice of the Court of Appeal as stated in Paragraph 17.2(2)."

[29]    Practice Direction Paragraph 17.2(2) states:

"The procedure and practice for a first appeal are governed by Insolvency Rule 7.49 which imports the procedure and practice of the Court of Appeal.  The procedure and practice of the Court of Appeal is governed by CPR Part 52 and Practice Direction 52 which are subject to the provisions of the Act, the Insolvency Rules and the Practice Direction: See CPR Part 52 rule 1(4)."

[30]    Part 52.4 of the English CPR which deals with the Appellant's Notice states:

"(1) Where the appellant seeks permission from the appeal court it must be requested in the appellant's notice.

(2) The appellant must file the appellant's notice at the appeal court within -
    (a) such period as may be directed by the lower court (which may be longer or shorter than the period referred to in sub-paragraph (b); or
    (b) where the court makes no such direction, 21 days after the date of the decision of the lower court that the appellant wishes to appeal.

(3) Unless the appeal court orders otherwise, an appellant's notice must be served on each respondent –
    (a) as soon as practicable; and
    (b) in any event not later than 7 days, after it is filed.

[31]     It would seem therefore from these reproduced English Rules and Practice Direction that an appeal against the decision of Thomas J which removed the joint liquidators from office lay with the permission of Thomas J or the Court of Appeal. Where permission to appeal was not obtained from Thomas J, that court, could also give them directions as to within what period they were to file their Notice of Appeal. In the absence of such directions from Thomas J, the appellants were obliged to file their Notice of Appeal within 21 days from the date of the judge's decision. In such a Notice of Appeal the appellants would request permission to appeal. Counsel for Mr. Fundora submitted that where the **English Insolvency Rules** refer back to the **English CPR** Part 52, our Court ought to apply Part 62 of our **CPR 2000**. I accept that submission wholeheartedly. This would be consistent with section 31 of the **Court Act** in my view.  It would also avoid the anomaly that results from seeking permission in a Notice of Appeal, rather than in an application as we know it, as is prescribed in Part 62.2 of our **CPR 2000**.

[32]     However, had such a notice of appeal been filed by the appellants with a request for permission to appeal within the requisite time, this court would be placed in a position to give case management directions as to how the matter should proceed. I am of the view that such a Notice of Appeal should thereafter proceed in keeping with the Part 62 of our **Civil Procedure Rules 2000** which governs the practice and procedure in our Court of Appeal for interlocutory appeals, notwithstanding CPR 2.2(3)(b).  Unfortunately, this is not the case. Despite being aware quite early, of the respondent's contention that Thomas J's judgment was an interlocutory judgment, the solicitors for the appellants took an inflexible posture that the judgment was final, and no leave was required. Consequently, the Notice of Appeal filed by the appellants is a nullity and must be struck out.

**The Application for Relief from Sanction and Extension of Time to Seek Leave to Appeal**

[33]     Mr. Kentish invited the Court to exercise its inherent jurisdiction and extend the time for the appellants to file their application for leave to appeal. He relied on one

of our leading authorities before the advent of **CPR 2000**: **Simon v Henry & Joseph**[16].  Mr. Kentish also submitted that because Thomas J's judgment and order arose from liquidation proceedings, the Court should not apply Part 26.8[17] of **CPR 2000** which establishes the criteria for granting relief from sanction as **CPR 2000** does not apply to insolvency and winding up of companies proceedings.  He submitted that the **English CPR** rule 3.9[18] which deals with relief from sanction is applicable, and he commended its application in **Sayers v Clarke Walker** (a firm)[19] as the approach to be followed by this court.

[34]     These submissions cannot clear the hurdle which exists where a notice of appeal has been filed without leave.  Barrow JA in **Frampton v Pinnard**[20]; **Oliver McDonna v Benjamin Richardson**[21]; and **Craig Reeves and Platinum Trading Management Limited**[22] has pellucidly explained repeatedly that although no sanction was expressly imposed for failure to apply for leave to appeal in time there was nonetheless a sanction that attached to non-compliance with the time limit, i.e. the applicant applying for an extension of time is not permitted thereafter

---

[16] Antigua and Barbuda Civil Appeal No 1 of 1995   (Unreported judgment). Singh JA applied the 4 factors to be taken into account in determining an application for extension of time under the old rules O3 R5 to appeal: (1) the length of the delay; (2) the reasons for the delay; (3) the chances of the success of the appeal if the extension is granted; and (4) the degree of prejudice to the respondent if the application is granted.

[17] See CPR 2000 Rule "26.8 (1) An application for relief from any sanction imposed for a failure to comply with any rule, order or direction must be - made promptly; and supported by evidence on affidavit. (2) The Court may grant relief only if it is satisfied that - (a) the failure to comply was not intentional; (b) there is a good explanation for the failure; and (c) the party in default has generally complied with all other relevant rules, practice directions, orders and directions. (3) In considering whether to grant relief, the court must have regard to: (a) the effect which the granting of relief or not would have on each party; (b) the interests of the administration of justice; (c) whether the failure to comply has been or can be remedied within a reasonable time."

[18] See English CPR 3.9 :" (1) On an application for relief from any sanction imposed for a failure to comply with any rule, practice direction or court order the court will consider all the circumstances including –(a) the interests of the administration of justice; (b) whether the application for relief has been made promptly:(c) whether the failure to comply was intentional:(d) whether there is a good explanation for the failure:(e) the extent to which the party in default has complied with other rules, practice directions, court orders and any relevant pre action protocol[(GL)]:(f) whether the failure to comply was caused by the party or his legal representative; (g) whether the trial date or the likely trial date can still be met if relief is granted; (h) the effect which the failure to comply had on each party; and (i) the effect which the granting of relief would have on each party. (2) An application for relief must be supported by evidence."

[19] [2002] EWCA Civ. 645 (14th May 2002)

[20] Dominica Civ. App No. 15 of 2005 (Unreported Judgment) delivered 3rd April 2006

[21] See Footnote 8

[22] St. Christopher and Nevis Civil Appeal No. HCVAP 2007/022 (Unreported Judgment) delivered 25th February 2008

to apply for leave to appeal.  Barrow JA also stated in **Craig Reeves** that "a clearer expression of the sanction is that an intending appellant in that position loses the opportunity to appeal".  In **Oliver McDonna** Barrow JA referred to the statutory equivalent in Anguilla of section 31(2) of the **Court Act** of Antigua and Barbuda and explained further, that where the right to appeal exists, an appeal filed out of time is an irregularity which the court has the jurisdiction to cure by extending the time to appeal; but where statute mandates that a litigant must obtain leave to appeal, the litigant's failure to obtain leave to appeal leaves him debarred by the language (in the instant case) of section 31(2) of the **Court Act of Antigua and Barbuda**.  A Notice of Appeal filed without leave is a nullity and cannot be cured or retrospectively validated or revived by the subsequent granting of leave.

[35]    Consequently, it is not necessary to determine the applications for extension of time, relief from sanction, and stay of execution of the judgment of Thomas J on their merits.  To do so would be an academic exercise.  These applications must be dismissed with costs to the respondent Alexander Fundora.

[36]    The result of the 2 applications is in terms of the following order:

ORDER

(1)  The Application of the respondent Alexander Fundora filed on 29th July 2010 is granted and the Notice of Appeal filed on 6th July 2010 without the leave of the Court is a nullity and is struck out with costs to the respondent.

(2)  The appellants' application filed on 30th July 2010 for the multiple orders stated therein is dismissed with costs to the respondent Alexander Fundora.

(3)  The costs to the respondent are to be agreed on by the parties and where not agreed to be assessed by the court.

Ola Mae Edwards
Justice of Appeal

21



# The Court of Appeal for Bermuda

### CIVIL APPEAL No. 4 of 2021

**B E T W E E N:**

**WANG, VEN-JIAO (Tony Wang)**
**(as joint administrator of the Bermudian estate of YT Wang)**
<u>**Applicant / 8th Defendant**</u>

**and**

**WONG, WEN-YOUNG (Winston Wong)**
<u>**Plaintiff**</u>

**GRAND VIEW PRIVATE TRUST COMPANY LIMITED**
<u>**1st Respondent / 1st Defendant**</u>

**TRANSGLOBE PRIVATE TRUST COMPANY LIMITED**
<u>**2nd Respondent / 2nd Defendant**</u>

**VANTURA PRIVATE TRUST COMPANY LIMITED**
<u>**3rd Respondent / 3rd Defendant**</u>

**UNIVERSAL LINK PRIVATE TRUST COMPANY LIMITED**
<u>**4th Respondent / 4th Defendant**</u>

**THE ESTATE OF HUNG WEN-HSIUNG, DECEASED**
<u>**5th Respondent / 5th Defendant**</u>

**OCEAN VIEW PRIVATE TRUST COMPANY LIMITED**
<u>**6th Respondent / 6th Defendant**</u>

**WANG, RUEY-HWA (Susan Wang)**
<u>**7th Respondent /7th Defendant**</u>

**WANG, HSUEH-MIN (Jennifer Wang)**
**(as joint administrator of the Bermudian estate of YT Wang)**
<u>**8th Respondent /9th Defendant**</u>

1

22

| **Before:** | **Clarke, President** |
| | **Kay, JA** |
| | **Subair Williams, JA** |

| **Appearances:** | Mr. Dominic Dowley QC of Counsel and Mrs. Fozeia Rana-Fahy, MJM Limited for the Appellant |
| | |
| | Mr. Shephen Midwinter QC of Counsel and Mr. Paul Smith, Conyers Dill & Pearman Limited for the Respondents |

| **Date of Hearing:** | **02 June 2021** |
| **Date of Judgment:** | **11 June 2021** |

### JUDGMENT

*Application for leave to appeal against trial judge's refusal of application to call hearsay evidence alleging professional misconduct in the taking of a witness proof – Whether a prima facie case of iniquity has been established as an exception to legal professional privilege - Legal Principles on Witness Preparation – Difference between Witness Training and Witness Coaching – The rule on Interrogatories RSC O. 26*

**Subair Williams, JA**

### INTRODUCTION

1    This is an application for leave to appeal which arises out of a mid-trial interlocutory application from the main action. By a summons dated 29 January 2021, the Applicant

("Tony") applied to Kawaley AJ for permission to rely on hearsay evidence of his wife's report of her conversation with a witness for the PTC Respondents regarding the pressure he felt during the taking of his witness proof. Under that same summons an application was also made for interrogatories seeking information about the presence of any other persons during the taking of the witness proofs for the other Respondent witnesses.

2    Having found that the application engaged issues of legal professional privilege and that the evidence had not established a prima facie case of iniquitous conduct as an exception to the privilege rule, the learned trial judge refused the whole of the summons application. Dissatisfied with paragraphs 24 to 48 of Kawaley AJ's 22 March Ruling, on 23 March 2021 Tony applied for leave to appeal by way of an *ex parte* Notice of Motion pursuant to Order II of the Rules of the Court of Appeal. The application was promptly refused on the papers for the reasons outlined in Kawaley AJ's 29 March 2021 Ruling.

3    This brings us to the present application for leave to appeal by Notice of Motion under Order II, Rule 3. Having considered the written and oral arguments eloquently made by Counsel for both the Applicant and the Respondents, I now give my reasons for finding that this application for leave to appeal should be refused.

**THE BACKGROUND**

4    Without having made any factual findings on the plethora of disputed issues, this Court broadly narrated the background to these proceedings in *Grand View Private Trust Company Ltd v Wong; Wang intervening* [2020] Bda LR 29 and *Tony Wang v Grand View PTC et al* [2021] CA (Bda) 3 Civ, 12 April 2021.

5    The statements made by Tony's wife, Mrs. Lin Chien Hui ("Alice") in her 28 January 2021 witness statement are the fuel for this round of litigation. Tony wishes to rely on Alice's evidence of statements made to her by Dr. Chun Chieh Wang ("Dr. Wang")

3

during the course of her telephone conversation with him on 21 January 2021. Dr. Wang's evidence is of some relevance to the disputed mental state of Wang, Yung Tsai ("Mr. YT Wang") on 31 October 2012 when, on the Respondents' case, he signed a Power of Attorney empowering his eldest son William W.Y. Wong ("William") to handle all of his personal financial affairs. That being said, the Respondents do not propose to rely on Dr. Wang's evidence as part of their expert evidence of Mr. YT Wang's mental capacity on 31 October 2012.

6    Ms. Chang Li-Yu ("Attorney Chang") states in her witness statement of 15 September 2020 [9-11] that she attended Mr. YT Wang's hospital room at Chang Gung Memorial Hospital ("CGMH") on 31 October 2012 when she formally witnessed him affix his signature to the impugned instrument. In addition, she contends that Dr. Wang was also present with other nurses in the hospital room on that fateful day when he confirmed his opinion that Mr. YT Wang was '*compos mentis and in a good mental state*'.

7    Corroborating parts of Attorney Chang's summary of what occurred in Mr. YT Wang's hospital room on 31 October 2012, Dr. Wang provided a witness statement dated 31 December 2020 wherein he said, *inter alia,* that Mr. YT Wang *"was in good condition on that day"*:

"***B. EVENTS ON 31 OCTOBER 2012***

*8. As I stated above, I have reviewed the witness statements of Attorney Yeh and Attorney Chang. That review has helped me to recall the date on which the events described below took place. I recall that on 31 October 2012, as a matter of routine practice, I arrived at YT Wang's hospital room at 7-ish a.m... Apart from having meetings with the medical team, I also checked the physical condition of YT Wang. I remember that Ms Li-Chu Yang (then Vice President of the Nursing Department of Linkou Chang Gung Memorial Hospital, hereinafter referred to as [(]**"Ms Yang"**) informed me that later on she would bring Mr Roger Hsiu-Hsiung Yang (**"Mr Yang"**)*

4

*and two attorneys to visit YT Wang. I therefore checked and confirmed YT Wang's condition and make sure that it was appropriate for him to meet the visitors.*

*9. YT Wang's hospital room was very spacious. On the other side of the hospital room was a sofa area for receiving family members and visitors. The adjacent room was a doctor's working room, which also served as a preparation room for the medical team.*

*10. 31 October 2012 was a Wednesday. I had at the time fixed cardiology out-patient clinic sections on Wednesday mornings, so I did not stay for very long in YT Wang's hospital room.*

*11. However, I recall that sometime after 8-ish a.m. on 31 October 2012, Ms Yang brought Mr Yang and two attorneys to visit YT Wang. One of the lawyers, Attorney Yeh, happened to be my cardiology patient. As I did not know in advance about any relationship between Attorney Yeh and YT Wang (including the Formosa Plastics Group and the Wang Family), when I met Attorney Yeh at the hospital room, both of us were very surprised. Therefore, I am certain that I met Attorney Yeh in YT Wang's hospital room on that day and exchanged greetings with him briefly.*

*12. I recall that the two attorneys asked me about YT Wang's condition and I told them that YT Wang was in good condition on that day.*

*13. I then went to the adjacent doctor's preparation room. I left shortly after because of my outpatient clinic section in that morning. Therefore, I knew nothing about what they discussed in the hospital room afterwards.*"

8    Alice, however, described her more recent contact with Dr. Wang in her witness statement as follows:

"…

*3. I graduated from the school of dentistry at the Kaohsiung Medical University in 1993. I got to know Dr Chun-Chieh Wang (**"Dr Wang"**) years before he was appointed as my father-in-law's co-leading physician. Dr Wang was (and still is) the doctor of various members of my family.*

*4. Before I spoke to him on 21 January 2021 (and as a result of discussions with Tony) I was aware that Dr Wang had given a witness statement on behalf of the main defendants in this case, and I had read a copy of that witness statement in Chinese.*

*5. On 21 January 2021 at 6:04pm, I received a text message on my mobile phone from Dr Wang asking whether I was available for a call. In response to that message. I called Dr Wang at 6:42pm. Dr Wang told me that he had concerns about my brother's health conditions.*

*6. After we had discussed concerns about my brother, I raised with Dr Wang my disappointment about his witness statement in support of the main defendants who are against my husband in the claim. Dr Wang then explained to me how his statement was prepared and his recollection of certain matters covered by his witness statement.*

*7. He told me that Yang, Hsiu-Hsiung ("Roger Yang") and Lin Yao ("Angela Lin") were both present at the meeting at which his witness statement was prepared. At that meeting Roger Yang told Dr Wang that him providing a witness statement "[Chinese writing]". (I believe that this translates into English as "was the Chairman's intention"). I understood the reference to the "Chairman" to be to William Wong. Dr Wang said to me the following phrase in Chinese "[Chinese writing]". I believe that the English translation is "I know that the Chairman must have instructed. So I cannot refuse".*

*8. Dr Wang said that they both kept on telling him to include things in his witness statement that he did not wish to include because they did not correspond with his recollection. He told me in Chinese that "[Chinese writing]" (which I believe*

6

27

*translates into English as "they [Roger Yang and Angela Lin] kept talking, and honestly, I felt that my memory seemed to be guided [by what they were telling him]". In addition, he said that he felt that he was being "directed" (in English) to include in his statement certain matters which he did not specifically recall and that he felt "[Chinese writing]" (which I believe translates into English as "brainwashed" ) by what was being repeatedly suggested to him by Roger Yang and Angela Lin. I clearly recall the English word "directed" being used in our conversation. I should note that it is common for Taiwanese people to use English words occasionally in conversations spoken in Chinese.*

*9. Dr Wang told me that he did not specifically recall a female lawyer being present on 31 October 2012. However, he said that it was repeatedly suggested to him by Roger Yang and Angela Lin that a female lawyer, Attorney Chang, was present. Dr Wang said he felt that they were trying to influence him so that he would agree that Attorney Chang was present with Attorney Yeh. However, Dr Wang refused to include that statement because he did not specifically recall that there was a female lawyer present and he had no knowledge of who Attorney Chang was until they told him.*

*I 0. He also said that Roger Yang and Angela Lin had asked him to state in his witness statement something about "having clear consciousness" "[Chinese writing]". I understood this to be reference to the mental state of my father-in-law. However, Dr Wang said he refused to include that statement because he did not feel able to give any positive evidence about it.*

*11. I want to make clear that I am very concerned not to cause any difficulties for Dr Wang who is a senior doctor at the Chang Gung Memorial Hospital. However, I feel strongly that the Court should know the true position.*"

9    Keen to rely on this evidence at trial, Tony filed his 29 January 2021 hearsay notice and summons application praying for an order in the following terms:

"*1. The Eighth Defendant shall have permission to rely at trial upon the first witness statement of Lin Chien-Hui dated 28 January 2021.*

*2. The Eighth Defendant shall have permission to rely at trial upon the hearsay notice dated 29 January 2021 in respect of statements made by Dr Chun-Chieh Wang.*

*3. Pursuant to RSC 26/1 and/or the inherent jurisdiction of the Court, an attorney at Conyers Dill and Pearman shall, by 4pm on 12 February 2021, file and serve on the Eighth Defendant an affidavit which answers the interrogatories set out at paragraph 44 of the nineteenth affidavit of Timothy Molton dated 29 January 2021. …*"

10  The interrogatories are stated under paragraph 44 of Mr. Molton's nineteenth affidavit. The portion of the interrogatories with which we are concerned is as follows:

"*The Interrogatories*

*44. For present purposes, and taking into account the impending trial, Tony simply seeks an order requiring a Conyers attorney to answer the following interrogatories:*

*44.1. Were Roger Yang or any other of the PTCs' witnesses (the "Attending Witness") present when evidence was being taken from any of the PTCs' witnesses (the "Subject Witness") in addition to Dr Wang?*

*44.2. If so, please identify:*

*44.2.1. The name(s) of each such Subject Witness.*

*44.2.2. In respect of each such Subject Witness, the name(s) of each Attending Witness in attendance and the dates on which they were in attendance.*

11  The Respondents filed evidence from Ms. Yao Lin (otherwise known as Angela Y. Lin) ("Ms. Lin") and Ms. Tzu-Min Huang (otherwise known as Sienna Huang) ("Ms.

Huang") in opposition to Tony's 29 January 2021 summons. Ms. Lin is a partner in the Litigation and Dispute Resolution Department of the law firm Lee and Li ("Lee and Li") which is instructed together with Conyers Dill & Pearman ("CDP") by the PTC Respondents. Ms. Huang is a Senior Attorney at Lee and Li.

12  Ms. Lin deposed in her affidavit evidence sworn on 19 February 2021 that she was directly involved in obtaining Dr. Wang's witness statement and that she believed that process to be protected by litigation privilege. Describing her professional record as 'unblemished', she stated that she has practised law for more than 25 years and that she has never before been the subject of allegations of the nature described in Alice's witness statement.

13  Having outlined a summary of the ethical rules which guide her ordinary practice in taking witness proofs, Ms. Lin provided the following account of her interaction with Dr. Wang [13-21]:

"*13. On 26 November 2020, I, along with a senior attorney at Lee and Li by the name of Tzu-Min Huang (**"Miss Huang"**), met with Dr Wang at Chang Gung Memorial Hospital (**"the 26 November Meeting"**). Mr Yang had arranged that meeting at the request of the Trustees' legal team and he accompanied us. Towards the end of the meeting, he indicated that he might be prepared to provide a witness statement and that he was willing to discuss the matter further with me.*

*14. Following the 26 November Meeting, I spoke to Dr Wang on the telephone on more than one occasion to discuss what he might be in a position to say in a witness statement. Neither Mr Yang nor Miss Huang participated in those conversations.*

*15. After Dr Wang had approved the Witness Statement, it was signed by him and submitted as evidence in these proceedings. I note that neither Mr Molton nor Alice Wang suggests that the Witness Statement, which was provided by Dr Wang in his native Chinese, contains any misleading or inaccurate statements. Dr Wang is a highly*

9

*educated person who understood the importance of accuracy in preparing the Witness Statement. I believe that the Witness Statement is true and accurate.*

*16. Alice Wang's witness statement describes what she says Dr Wang told her about the process by which he was persuaded to submit a witness statement in these proceedings. Without waiving privilege, I wish to explain briefly why her account is inaccurate.*

*17. All of my discussions with Dr Wang were conducted in a professional and respectful way. It is true that Mr Yang was present at the 26 November Meeting. There was nothing sinister or untoward about this, Mr Yang had arranged the meeting so his presence was neither surprising nor intimidating. Mr Yang is a polite and respectful person.*

*18. I am entirely satisfied that nothing that was said at the meeting with Dr Wang (by Mr Yang, Miss Huang or me) or in any of my subsequent discussions with Dr Wang which could be regarded as involving the exertion of pressure on Dr Wang.*

*19. In her witness statement (at paragraph 7), Alice Wang refers to various things that Dr Wang is said to have told her about the 26 November Meeting, In particular, she says that, at that meeting, Mr Yang told Dr Wang that it was the intention of William Wong, the Chairman of FPG, that Dr Wang should provide a statement and that William Wong "must have instructed" Dr Wang to give evidence. I am not entirely clear what she is suggesting. However, I am certain that nothing to this effect was said to Dr Wang, whether by Roger Yang, Miss Huang or myself, at the 26 November Meeting or during any of the conversations between myself and Dr Wang. During those discussions, nothing was said which could be regarded as involving the exertion of pressure on Dr Wang.*

*20. There are two other incorrect suggestions in Alice Wang's witness statement:*

10

*(a) Alice Wang suggests that an attempt was made to put pressure on Dr Wang to give evidence that he did not actually recall about Attorney Chang's presence at the 31 October Meeting. I obviously do not know what Dr Wang actually said to Alice Wang about my conversations with him regarding Attorney Chang. I would expect Dr Wang to remember being asked detailed questions by me about many things, since it was part of my role to understand what he could, and could not, remember. Nothing in my questioning, however, could be regarded as pressuring him to give false or inaccurate evidence; and*

*(b) Alice Wang also gives the misleading impression that I tried to put pressure on Dr Wang to provide evidence concerning YT Wang's mental state which Dr Wang did not believe to be true. This is not correct. Dr Wang expressly approved the language and contents of the Witness Statement by signing it.*

*21. In summary, I believe, based on all my dealings with him, that Dr Wang genuinely believed the contents of the Witness Statement to be accurate and nothing in Alice Wong's witness statement causes me to change that belief.*"

14    Ms. Lin's account of the 26 November 2020 meeting with Dr. Wang was supported by Ms. Huang's affidavit evidence of 19 February 2021 wherein she said [11-13]:

"*11. My clear recollection is that the conversation during the Meeting was respectful and professional and that the meeting was conducted in a manner in which I would expect a meeting with a prospective witness to be conducted. In particular, nothing was said or done which might have amounted to the exertion of improper pressure on Dr Wang.*

*12. I understand from Attorney Lin that she had one or more telephone conversations with Dr Wang following the Meeting. I did not participate in any of those conversations.*

11

*13. On 31 December 2020, I met with Dr Wang at Chang Gung Memorial Hospital to provide him with the final version of his proposed witness statement, the accuracy of which I understood he had already confirmed to Attorney Lin. He signed the witness statement in my presence*."

15    Having assessed all of this evidence, Kawaley AJ found that the evidence did not establish a *prima facie* case of iniquitous conduct. The learned trial judge provided the following reasoning in his 22 March Ruling:

"*Has a prima facie case of iniquitous conduct been made out?*

*40. Alice's hearsay evidence, taken at its highest without considering the evidence of Ms Lin, supports the following potential findings relevant to Tony's application:*

*(a) Mr Yang, another witness, was present when Dr Wang was interviewed in connection with his Witness Statement;*

*(b) Dr Wang felt pressured to provide a statement as a result of being told by Roger Yang that the Chairman had instructed that this should occur;*

*(c) Dr Wang felt pressured by Angela Lin and Roger Yang to confirm facts he did not recall;*

*(d) Dr Wang did not succumb to this perceived pressure and signed a Witness Statement the contents of which he was satisfied with; and*

*(e) Dr Wang was not sufficiently concerned about the pressure to which he was subjected to either withdraw his Witness Statement or to make some form of personal complaint about the way he was treated. Indeed, he only raised the issue when talking to Alice about medical matters and seeking to assuage her disappointment that Dr Wang was a witness for her husband Tony's adversaries.*

41. *This evidence, standing by itself, clearly supports potential findings that the Trustees' Taiwanese lawyers acted improperly by pressurizing Dr Wang to give evidence and by seeking to influence the content of his evidence by feeding him the recollections of Roger Yang, another witness. Even if it was unchallenged, and this Court was unable to regard as trivial a mere attempt to procure favourable (and possibly false) evidence, I would nonetheless conclude that what occurred was insufficient to result in privilege being lost.*

42. *It must be acknowledged that Alice's evidence on its face raises serious allegations of impropriety which come close to supporting a finding that iniquitous conduct has occurred. In my judgment the fact that the central truth of Dr Wang's Witness Statement is not impeached, combined with the context in which he made his complaints, are pivotal considerations. The misconduct which Alice's evidence suggests occurred would not, on balance, raise sufficiently powerful public policy concerns to displace the countervailing constitutional and public policy imperatives underpinning legal professional privilege. As this evidence was challenged in several important respects, this step in the analysis is only a preliminary one.*

43. *It is not disputed that Mr Yang was present and I have found that the desired Bermudian practice is that, when a witness' evidence is being taken, other witnesses should not participate in the process in a manner likely to contaminate the interviewee's evidence. However, this is not a mandatory statutory or common law requirement. And as Quentin Loh J observed in Compania de Navegacion Palomar SA v Ernest Ferdinand de la Sal [2017] SGHC 14, "the matter is obviously one of degree and very fact sensitive". It is disputed that Dr Wang was pressured to provide a statement or pressured to include in his statement anything which was not true. Ms Lin's evidence, viewed in isolation, supports the following findings:*

(a) *Roger Yang was only present at a preliminary meeting with Dr Wang at the Hospital when preliminary inquiries were made about whether the doctor could give helpful evidence. This was because he had arranged the meeting;*

13

<span style="color:red">34</span>

(b) *Dr Wang was not in any way pressured to provide a statement by the lawyer or by Mr Yang;*

(c) *Dr Wang was not in any way pressured to alter the contents of his evidence by the lawyer or Mr Yang;*

(d) *Dr Wang was asked questions designed to ascertain what he could remember (implicitly, these questions were likely based on what Roger Yang or other witnesses had already said) and made no commitment to give evidence at the initial meeting; and*

(e) *Dr Wang was substantively interviewed later, by Angela Lin alone, by telephone. Only then did he agree to provide a statement. He only signed the Witness Statement in a form that he was happy with.*

*44. Having regard to Angela Lin's evidence, standing by itself, I would obviously find that no material impropriety occurred. It was perhaps technically improper (from a Bermudian perspective) to involve Mr Yang in the initial meeting with Dr Wang, because there was a risk of Dr Wang's evidence being contaminated by Mr Yang's recollection of what occurred in 2012. Being asked whether he recalled certain facts by a lawyer is different to being asked whether you recall certain facts by, or in the presence of, another witness to the same events. However, I would find that no substantive impropriety occurred because Dr Wang was admittedly (according to Alice's report of his complaints) not actually pressured to include matters in his Witness Statement which he did not recall. Nor was he, according to Ms Lin, pressured to give evidence.*

*45. On any view of the evidence, therefore, I would find that privilege has not been lost due to iniquitous conduct. Looking at the evidence overall, and if it was necessary to resolve the significant conflicts between Alice's account of Dr Wang's complaints*

14

*and Angela Lin's account of how the Witness Statement was obtained, I would reach the following conclusions:*

(a) *no improper pressure was applied to Dr Wang to give a statement at the initial Hospital meeting, because he was afforded an opportunity (which he took) to consider his position;*

(b) *I see no reason to reject Ms Lin's evidence that, from her perspective, no improper pressure was applied to obtain Dr Wang's cooperation. As Mr Howard QC submitted, lawyers are entitled to apply some 'pressure' in seeking to obtain evidence to advance their clients' case. The mere fact that Dr Wang may have subjectively felt pressured does not mean that objectively speaking, undue pressure was applied;*

(c) *I see no reason to reject Ms Lin's evidence that Dr Wang was not pressured to give, in effect, false evidence. It is inherently improbable that a senior lawyer in good standing would commit such grave professional misconduct in relation to a senior cardiac specialist at the potential witness' own place of employment. It is more inherently likely that the questions put to Dr Wang were advanced at the preliminary meeting to inform an initial decision as to whether to ask him to give evidence, as Ms Lin deposes. It is entirely plausible that Dr Wang, assuming Alice's evidence to be true, may have misconstrued the purpose of the questions;*

(d) *overall I would attach little weight to Alice's evidence of Dr Wang's complaints because:*

(1) *the best possible evidence would be the direct evidence of the doctor himself;*

15

>    *(2) the context in which the complaints were made create serious doubts as to whether they were to a material extent exaggerated to assuage the upset wife of a party he decided to give evidence against; and*
>
>    *(3) by her own account, Dr Wang provided a truthful Witness Statement, and was not influenced by any suggestions which were put to him in any event.*

16    Kawaley AJ further held that there was no proper basis upon which Tony could be entitled to an order for interrogatories or to leave to cross-examine other witnesses on their witness proof process since to do so would necessitate piercing the veil of legal professional privilege.

### APPLICATION FOR LEAVE TO APPEAL

**Tony's Proposed Grounds of Appeal:**

17    On 29 March 2021 Kawaley AJ refused leave for Tony to appeal on the grounds set out in his draft Notice of Appeal. Those grounds of appeal are pleaded as follows:

*"Ground 1*
**The Learned Judge erred in concluding that the PTCs' conduct was not "iniquitous".**

*The Learned Judge fairly acknowledged that he was "not at all familiar" with the "legal principles which regulate the process of obtaining proofs of evidence from witnesses in civil proceedings". It is respectfully submitted that the Learned Judge was led into error in respect of those principles by the PTCs' submissions.*

<u>Ground 2</u>

**The Learned Judge applied the incorrect test.**

*As the Learned Judge correctly concluded, Alice's evidence was entirely credible on its face. Moreover, on the two critical matters which it addressed, her evidence was not contradicted in terms. In those circumstances, the Court was bound to conclude that a prima facie case of iniquity had been established.*

*The Learned Judge was led into error by seeking to resolve at an interlocutory stage perceived conflicts in the evidence in circumstances where there was in fact no conflict on the critical issues. The Learned Judge's analysis – in which he sought to "resolve" perceived conflicts between evidence – was seriously flawed. The Learned Judge's three reasons for attaching "little weight to Alice's evidence" were also seriously flawed and could not properly have been relied upon as reasons for dismissing the Application.*

<u>Ground 3</u>

**The Learned Judge was wrong to preclude further investigation into the procedure for the taking of witness evidence (the "Disputed Procedure").**

*Having wrongly concluded that the Disputed Procedure was not materially improper and that it did not engage the iniquity exception, the Learned Judge further erred in refusing to allow Tony to make any further enquiries at trial as to "evidence collecting activities of the Trustees' legal team" (including the extent to which the Disputed Procedure was adopted more widely by the PTCs).*

<u>Ground 4</u>

**The Learned Judge was wrong to preclude Tony from relying upon Alice's evidence and the statements made to her by Dr Wang.**

17

*The PTCs cannot claim privilege in respect of the matters set out in Alice's witness statement. More fundamentally, however, confidentiality in the subject matter of Alice's witness statement has been lost in circumstances where Alice's witness statement has been expressly referred to by Tony, the PTCs and the Learned Judge in open court and reference to it was going to be (and has now been) made in a public judgment (the Ruling). In those circumstances, there is no conceivable basis for preventing Tony from relying upon Alice's evidence – which is of obvious importance to the substantive issues – at trial*."

18    By way of relief, Tony seeks to have Kawaley AJ's decision set aside and in substitution of that decision he invited this Court to make an order permitting him to rely on his hearsay notice and Alice's statement at trial. Additionally, Tony appealed to this Court for an order compelling the Respondents to serve affidavit evidence in answer to the interrogatories.

19    In Kawaley AJ's 29 March 2021 Ruling on Tony's *Ex Parte* Motion for leave to appeal he concluded [16]:

"*Tony's proposed appeal is against a very decisive interlocutory decision that no prima facie case of iniquitous conduct has been made out and that there is no justification for exploring the peripherally relevant issues raised by his wife's Alice's evidence at trial. I find that the appeal has no realistic prospect of success and the ex parte application for leave to appeal should be dismissed*."

### **Analysis and Findings on Tony's Application for Leave to Appeal**:

20    Counsel for both sides relied on authorities from England, Singapore and New South Wales, Australia for assistance on the relevant law. Mr. Dowley QC's overarching position was that an assessment as to whether there was a *prima facie* case of iniquity required the Court to  look only at the quality of the evidence from the Applicant i.e. Alice's statement. He argued that any interlocutory finding for or against the

18

application to rely on Alice's evidence should be achieved without settling conflicting evidence on the issue.

21    Contending that there was a *prima facie* case of iniquity shown on Alice's witness statement, Mr. Dowley QC characterised the conduct of the Lee & Li lawyers as impermissible witness coaching. Going further than that, Mr. Dowley QC submitted that the mere presence of Roger Yang during the preliminary 22 November 2020 meeting at CGMH constituted iniquitous conduct.

22    On the subject of the interrogatories, Mr. Dowley QC argued that the fact of the presence of any other witness during the witness proofing process is not in and of itself privileged. Thus, on Tony's case, he is entitled to success on this application whether or not he fails on his grounds on iniquity. Mr. Dowley QC also put forth the argument that the questions asked under the interrogatories are questions which could be asked during cross-examination, in any event.

<u>The Law on Witness Preparation and Witness Proofing</u>

23    Mr. Dowley QC directed us to a 28 May 2021 trial transcript of Mr. Wilson QC's cross-examination of Ms. Susan Wang where he sought to explore the process by which her evidence might have been prepared. Mr. Mark Howard QC for the PTC Respondents robustly objected on the grounds of legal professional privilege stating; "…*I have never, in all my years at the Bar, ever come across people asking questions about a process by which somebody is proofed. It is fundamentally wrong*." Mr. Howard QC indicated that it was open to Mr. Wilson QC to ask whether a witness had attended witness preparation sessions in the form of witness training. But, he contended, an answer in the negative would bring an end to that line of questioning. However, Mr. Wilson QC maintained that his line of questioning was legitimate, citing the English High Court's decision in *Ultraframe (UK) Ltd v Gary Fielding et al* [2005] EWHC 1638 (Ch). Making good his submission, Mr. Wilson QC distinguished a cross-

19

examination about the process of witness preparation from a cross-examination on the proofing process, contending that only the latter was impermissible.

24    Mr. Dowley QC suggested that there is some lingering tension between Mr. Howard QC's trial objections on the scope of allowable cross-examination and Mr. Midwinter QC's concessions before this Court where it is stated in Appellant's written submissions [63-64]:

"*63. For the avoidance of any doubt, the Trustees do not contend (and do not believe that the Judge intended to suggest) that anything in the Ruling prevents Tony's counsel from asking any witness during cross-examination, including Mr Yang, questions of the kind which uninspired counsel often ask witnesses about the circumstances in which their statements were prepared without trespassing on privilege, such as:*

*(1) Whether the witness discussed his or her evidence with other witnesses, or had sight of draft statements or proofs of other witnesses, before signing his or her statement (and if so what form those discussions took);*

*(2) (As part of the above) whether any other witnesses were present at meetings at which the witness's evidence was recorded or discussed;*

*(3) Whether the witness was put under pressure by anyone to give untrue evidence (and if so what form that pressure took); and/or*

*(4) Whether the witness has, in the event, given any untrue evidence in the sworn statement(s) to the Court.*

*64. The Trustees accept those are questions of a sort usually allowed in cross-examination, and they will not object if Tony wishes to ask them. Whether further questions by Tony in that vein are objectionable will be for the Judge to assess at the time they are put. It would be neither helpful nor productive for either the Trustees or*

*this Court to attempt to dictate in advance or in the abstract the appropriate scope of cross-examination which the experienced trial judge should allow*."

25   From where I sit, I see no immediate cause for disapproval of Mr. Midwinter's sculpture of questions on what may ordinarily be put to a witness at trial. In *Thanki on The Law of Privilege* (Third Edition) ("*Thanki*") the authors helpfully distinguish between 'communications' to which privilege applies and 'underlying facts' which are, generally speaking, fair game in the course of cross-examination [3.12-3.13]:

"*3.12*

*(1) Communications*

*Litigation privilege applies to 'communications' rather than to the facts so communicated. Oral communications are therefore just as capable of attracting privilege as written communications (although in practice it may be hard for an opposing party ever to know of the existence of oral communications).*

*3.13*

*Facts*

*Facts which are conveyed in communications subject to litigation privilege are not privileged.* [Foot note 33 not quoted] *For example, while communications between a third party witness and a lawyer about what transpired at a particular meeting may be privileged, the actual underlying/acts-will not be. Hence the witness would be obliged to answer questions about what occurred at the meeting if they are summoned to give evidence for the other party, which the other party could do because, '[i]n the time honoured aphorism, there is no property in a witness'.* [Foot note 34 not quoted]. *Were this to be otherwise, material facts could effectively be concealed from the court by the simple expedient of recording them in a document created for the purposes of litigation. The only facts which are privileged are those facts the knowledge of which is derived by the client or the lawyer solely from privileged communications between each other, ie the subject of legal advice privilege.* [Foot note 35 not quoted]"

21

42

26    The general scope of permissible cross-examination on the circumstances in which statements are prepared is arguably beyond the scope of this appeal. However, it is necessary for us to address the legal principles which draw a dark marker between 'witness training' and 'witness coaching'. For assistance on this area of the law, we were referred to the judgment of the Singapore High Court in *Compania de Navegacion Palomar SA v Ernest Ferdinand de la Sal* [2017] SGHC 14, per Quentin Loh J [272-273]:

"*The law on witness coaching*

*272 In my view, and this is something basic that every advocate worth his salt knows, witness familiarisation is perfectly legitimate. Except for a few lucky individuals, our memories are not infallible and dim with age. Generally speaking, the further one goes back in time, the older the witness is, the more inaccurate his recall will be. This means it is permissible to take the witness through his AEIC and then to assist his recollection of the facts by referring him to the key documents so that he is able to refresh his memory from these documents and their contents. That is also why the drafting of an AEIC is such an important exercise and it is the solicitor's duty to ensure that what goes into that AEIC, or any affidavit for that matter, is the witness's own "uncontaminated evidence" (see R v Momodou [2005] 2 All ER 571 at [62] ("Momodou")). Lawyers should never put words into the witness's mouth and should refrain from language that is not that of the witness. Neither should they put in events or matters that the deponent cannot recall. Time and again we see words and elegant phrases that a particular witness deposes to in his affidavits, but when cross-examination ensues, it is obvious that the words and language used are not familiar to the witness. The lawyer then exposes his client and his client's witnesses to confusion and great uncertainty in the hands of a competent cross-examiner, all of which is to the detriment of his client's case. This also happens when two or more witnesses use exactly the same words as each other in describing an event or a fact so that when one affidavit is found to be untrue or not quite true, it affects the credibility of the other deponents…*

22

43

*273 What is equally clear is that witness "coaching" is not permissible. Guidance and familiarisation by reference to documents becomes coaching when it seeks to supplement or supplant the witnesses' true recollection with another version of events. This includes giving advice to a witness to move away from his original answer to one which favours his case or the person calling him as a witness. It is also wrong to allow witnesses to collaborate on their answers so as to provide a version that is favourable to a party's case instead of relying on their honest recollection of what actually happened.*"

27    Mr. Dowley QC relied on a Practice Note from the English Court of Appeal in *R v Momodou (Practice Note)* [2005] 1 W.L.R. 3442 where Judge LJ described the distinction between 'witness training' or 'witness coaching' and 'witness familiarisation' as a 'dramatic' one [61]. Be that as it may, there has been some  debate as to whether the narrative in *R v Momodou* on the inherent risks of witness training applies to civil proceedings since the reasoning provided in *R v Momodou* was customised to fit criminal proceedings in which there is a general prohibition on witness training and witness coaching. However, the Singapore High Court in *Compania de Navegacion Palomar SA v Ernest Ferdinand de la Sal*  found the passages warning against witness training in *R v Momodou* to be relevant and applicable to civil proceedings [275]:

"*275 Judge LJ's guidance was of course given in the context of a criminal case. The extent to which the guidance in Momodou should apply in a civil case, and in particular, a complex civil case such as the present, was answered in Ultraframe (UK) Ltd v Gary Fielding and others [2005] EWHC 1638 (Ch) ("Ultraframe"). Lewison J considered the application of Momodou in civil cases and gave the following view (at [25]):*

*There are, of course, significant differences between civil and criminal procedure. Not least, in civil cases evidence in chief generally takes the form of a pre-prepared witness statement, whereas in criminal cases it is elicited by (non-leading) question*

23

44

*and answer; and in civil cases witnesses are normally permitted to sit in court while other witnesses are giving evidence, whereas in criminal trials this does not happen until the witness has given his own evidence; and even then it is unusual. In criminal cases witnesses do not see each other's statements or depositions; whereas in civil cases it is common for witnesses to see and respond to the statements of other witnesses. Nevertheless, the principle that a witness' evidence should be his honest and independent recollection, expressed in his own words, remains at the heart of civil litigation too. In the light of the disappearance of oral evidence in chief from civil cases, it may be thought that the importance of the witness's own independent recollection in giving his evidence under cross-examination is all the greater. [emphasis added]*

*276 However, Lewison J ultimately held that it was unnecessary on the facts before him to decide on the permissible limits of witness familiarisation in civil cases. He was of the view that that question raised very difficult issues which must be the subject of wide consultation before any conclusions could be reached (at [31]).*

*277 Indeed, whether and to what extent the principles in Momodou apply in civil cases is currently the matter of some debate in the United Kingdom (see Charles Hollander QC, Documentary Evidence (Thomson Reuters, 12th Ed, 2015) at para 29-10). In fact, Hollander QC goes further to question the desirability of extending Momodou to civil cases on the basis that these principles are not applied in practice and it would be unrealistic to apply these principles to witnesses in civil cases. He contends that group discussion of key issues is inevitable, and if handled responsibly, can actually improve the quality of the witness' evidence rather than detract from it (at para 29-09 and 29-10).*

*278 With respect, I am not sure I entirely agree with that view. The core principles of Momodou are integral to the adversarial process in the reception of evidence leading to the finding of facts in civil proceedings and I do not think it unrealistic to apply them to civil cases; on the contrary I think they equally should apply (see Ultraframe*

24

*at [25] cited above). What I can agree with is that with more complex civil cases, some group discussion early on in evidence gathering is inevitable but it always depends on the integrity of the lawyers to ensure it is handled responsibly and to remind potential witnesses of the dangers of coming to a common advantageous view when that is not the recollection of some of them. A good example occurs when the chief executive, who is a witness, insists on a version and his subordinates all fall in line, whether it is the truth or not. When the chain of consistency is broken at the weakest link, or one of the witnesses has an attack of conscience, the edifice collapses spectacularly. So the experienced lawyer knows that he does not take the chief executive's proof of evidence in front of the chief executive's subordinates*."

28      While I would cautiously resist an absolute application of the reasoning in *R v Momodou* on witness training to civil proceedings, I accept that each case ultimately turns on its own particular facts as observed by Quentin Loh J, in *Compania de Navegacion Palomar SA v Ernest Ferdinand de la Sal* [283]:

"*283 The extent to which witnesses in a civil case may properly discuss their evidence with one another or the solicitors of the party that had called them as witnesses before it amounts to impermissible preparation has not been directly addressed by the Singapore courts. In my judgment, the matter is obviously one of degree and very fact sensitive and I should not lay down any hard and fast rules other than to adopt the principles espoused in the English and Australian authorities referred to above. I accept that the line between witness coaching and training and permissible witness familiarisation can be a very fine one, but that should not prevent a court from making that call and sort the wheat from the chaff. Even though that may be a judgment call, I think there must be very few and rare cases indeed where one can say the line has disappeared. Few will argue with the principle that a witness' evidence should be his honest and independent recollection, expressed in his own words. This remains at the heart of civil litigation (see Ultraframe at [25]). If, like in Day v Perisher Blue, it became apparent that the intention of the witnesses discussing their evidence amongst themselves was to ensure that they would all "speak with one voice" such that their*

25

<span style="color:red">46</span>

*evidence best served one party's case, then the court is entitled to find that the credibility of the witnesses have suffered as a result. In my view, this must be correct in principle and in law*."

29    The judgment of New South Wales Court of Appeal in *Day v Perisher Blue* [2005] NSWCA 110 was tendered to us as a clear example of impermissible witness coaching. In that case Honour Judge Patten, sitting as the judge of first instance, dismissed Mr. Darrel Justin Day's personal injury claim against his then employer, Perisher Blue Pty Ltd. ("Perisher Blue"). On the facts, Mr. Day was struck by a skier in the course of his employment as he was loading skiers onto a J-Bar. His case was that this was caused by a breach of duty on the part of Perisher Blue.

30    On appeal, the Court was concerned with whether the trial judge erred in accepting the evidence of witnesses for Perisher Blue after it had emerged that those witnesses had conferenced with one another about their intended evidence prior to the trial. The Court of Appeal was also made aware of a pre-trial letter from Perisher Blue's lawyers which had surfaced during the Plaintiff's cross-examination of one of the defence witnesses. The letter, which is fully quoted in the Court of Appeal's judgment, was addressed to the defendant and copied to other witnesses, setting out a witness-by-witness summary of the evidence expected at trial. Additionally, the letter contained advice on what would be required of those witnesses to achieve Court-readiness.

31    This is the background to the following two grounds of appeal relied on by Mr. Day before the New South Wales Court of Appeal:

"*5. His Honour, insofar as he relied on the evidence of the respondent's witnesses erred, given the improper coaching of those witnesses.*

*6. His Honour failed to give reasons or sufficient reasons for rejecting the appellant's submission as to the unreliability of the respondent's witnesses, given the coaching of those witnesses.*"

26

<span style="color:red">47</span>

32      On my assessment of *Day v Perisher Blue Pty Ltd* the Court of Appeal were focused more on the iniquitous intention and purpose of the witness conferencing rather than the mere fact of any occurrence of witness training. It is evident from the below portion of the judgment of Sheller JA [30] that the Court of Appeal concluded that the law firm's real intention behind the collective conferencing with Perisher Blue's witnesses was to influence the witnesses into speaking of one accord, whether or not that was consistent with their true recollection:

"*30 It has long been regarded as proper practice for legal practitioners to take proofs of evidence from lay witnesses separately and to encourage such witnesses not to discuss their evidence with others and particularly not with other potential witnesses. For various reasons, witnesses do not always abide by those instructions and their credibility suffers accordingly. In the present case, it is hard to see that the intention of the teleconference with witnesses discussing amongst themselves the evidence that they would give was for any reason other than to ensure, so far as possible, that in giving evidence the defendant's witnesses would all speak with one voice about the events that occurred. Thus, the evidence of one about a particular matter which was in fact true might be overborne by what that witness heard several others say which, as it happened, was not true. This seriously undermines the process by which evidence is taken. What was done was improper. The process adopted was more concerned with ensuring that all the witnesses gave evidence which would best serve their employer's case. This realisation makes particularly sinister the precept in the Witness Protocols for Court Cases and Arbitration Hearings, "Not about facts about credibility".*"

33      In allowing the appeal and ordering a retrial, the Court of Appeal judgment held [35]:

"*35 I regard what happened here as of sufficient seriousness prima facie for the papers to be sent to the Legal Services Commissioner. While I accept that it is arguable that the various witnesses' credibility could have survived the attack made upon it in reliance on the solicitors' letter and the teleconference, the trial Judge's failure to*

27

<span style="color:red">48</span>

*deal with these submissions leads to the conclusion that in the result his Honour failed to have regard to critical evidence. Accordingly the verdict and judgment must be set aside and a new trial ordered; compare Mifsud v Campbell (1991) 21 NSWLR 725 at 728.*"

34    *Day v Perisher Blue Pty Ltd* highlights the importance and profound responsibility given to practising members of the legal profession in their preparation and proofing of witnesses. It follows that where that professional responsibility is used for a fraudulent or iniquitous purpose, the protection of privilege must be lost.

35    In my judgment, none of the authorities cited before us lend support to Mr. Dowley QC's pinnacle submission that the mere presence of any other witness during the witness proofing or preparation process automatically constitutes iniquitous conduct. In each case, the Court will first assess all of the evidence of the relevant facts and circumstances and then draw reasonable inferences on the underlying purpose or intention behind the impugned conduct.

Assessing whether the Evidence establishes a *Prima Facie* Case of Iniquity

36    Advancing Tony's second ground of appeal, Mr. Dowley QC submitted that the learned judge erred in his attempt to resolve perceived conflicts on the evidence at an interlocutory stage. Mr. Dowley QC contended that the exercise of identifying whether there was *prima facie* case of iniquity did not require the judge to settle any competing evidence.

37    What is seemingly ignored by this argument is that any analysis as to whether a *prima facie* case of iniquity has been shown calls for an assessment of the totality of the written evidence before the Court. How otherwise might such a task be properly discharged? It could not reasonably be suggested that the learned judge ought to have ignored the evidence of Ms. Lin and Ms. Huang any more than the evidence from Alice.

38    However, I do accept that it could fairly be said that the learned judge, perhaps unwittingly, flirted with a misapprehension that Alice's evidence, taken in isolation, did not give rise to a *prima facie* case of iniquity. In his 22 March 2021 Ruling he set out a preliminary analysis as follows :

> "*41. This evidence, **standing by itself**, clearly supports potential findings that the Trustees' Taiwanese lawyers acted improperly by pressurizing Dr Wang to give evidence and by seeking to influence the content of his evidence by feeding him the recollections of Roger Yang, another witness. **Even if it was unchallenged, and this Court was unable to regard as trivial a mere attempt to procure favourable (and possibly false) evidence,** I would nonetheless conclude that what occurred was insufficient to result in privilege being lost.* [Bold font added for my emphasis]*
>
> *42. It must be acknowledged that Alice's evidence on its face raises serious allegations of impropriety which come close to supporting a finding that iniquitous conduct has occurred. In my judgment the fact that the central truth of Dr Wang's Witness Statement is not impeached, combined with the context in which he made his complaints, are pivotal considerations. The misconduct which Alice's evidence suggests occurred would not, on balance, raise sufficiently powerful public policy concerns to displace the countervailing constitutional and public policy imperatives underpinning legal professional privilege. As this evidence was challenged in several important respects, this step in the analysis is only a preliminary one.*"

39    It seems that the judge took the view that if you look at Alice's evidence by itself and without any other evidence (including, presumably, that of Dr Wang himself) there was improper pressure, in the form of an " *attempt to procure favourable (and possibly false) evidence"* and that this could not be regarded as trivial. However, it is not wholly clear whether the judge meant that, notwithstanding that improper pressure, there was no iniquity because Dr. Wang did not in fact succumb to any improper pressure exerted on him. If that was what he meant, I would not agree with him. The attorneys would not rescue themselves from a charge of iniquity merely because their improper attempts failed.

29

50

40    But I suspect that what  the judge meant was that, in the light of (a) what Dr Wang told Alice, *videlicet*, that he **felt** pressured (although he also said "*that they both kept telling him to include things in his witness statement that he did not wish to include*"); (b) the context in which he spoke to Alice, namely to respond to her complaint that he had signed a statement which was unhelpful to Tony; and (c) that in the end he did not sign anything with which he did not agree, there was no improper pressure, rather than an understandable feeling of discomfort by a witness when matters were put to him for consideration. Such an analysis would not, itself, be based on Alice's statement **alone** and is difficult to square with the first sentence of paragraph 8 of Alice's statement.

41    Haddon-Cave J, sitting in the Family Division of the English High Court, explained the iniquity exception to the rule of legal professional privilege in *Z v Z* [2017] 4 WLR 84. He said [14]:

*The fraud or "iniquity" exception*
"*14 There is, however, a "fraud" exception. The following statements of principle are pertinent: (1) Where legal advice is sought or given for the purpose of effecting fraud or "iniquity", it is not privileged (per Schiemann LJ in Barclays Bank, at p 1249, who noted that the use of the word "iniquity" in this context stemmed from Bingham LJ in Ventouris (supra)). (2) The "fraud" exception is not confined to cases of criminal fraud or cases of civil fraud in the narrow sense, but is used in a relatively wide sense (per Munby J in C v C, at para 35 citing Schiemann LJ in Barclays Bank, at p 1249). (3) The court must be satisfied in every case that what is prima facie proved really is dishonest, and not merely disreputable or a failure to maintain good ethical standards. Each case depends on its own facts (per Goff LJ in Gamlem Chemicals Co (UK) Ltd v Rochem Ltd (unreported) 7 December 1979—cited by Schiemann LJ in Barclays Bank, at p 1249). (4) In any given case, the court must weigh the important considerations of public policy on which legal professional privilege is founded and the gravity of the charge of fraud on the other. The court must be slow to deprive a defendant of the important protection of legal professional privilege on an interlocutory application*

*(per Vinelott J in Derby & Co Ltd v Weldon (No 7) [1990] WLR 1156, 1173). (5) Each case depends on its own facts (per Goff LJ in Gamlen (supra)).*"

42    Citing *Z v Z* in his own Ruling of 5 August 2020 (Ruling on Specific Discovery Application) Kawaley AJ provided a detailed outline of the legal principles governing what he described as the "fraud exception". The balancing exercise to be struck between guarding the public's interest in legal advice being protected by privilege and the public's interest in unveiling fraudulent or iniquitous conduct was adroitly simplified by Kawaley AJ as follows [75]:

"*In my judgment there is clearly only one concept, which involves balancing two competing public interests. On the one hand there is the public interest in legal advice being privileged; and on the other hand, there is the public interest in permitting privilege being used to shield fraudulent or other seriously wrongful misconduct. It is self-evident that in order to avoid diluting the public policy underpinning privilege, the circumstances in which the "fraud exception" will apply must themselves be exceptional…*"

43    In *Buttes Gas and Oil Co v. Hammer (No 3)* [1981] QB 223 at page 246, Lord Denning MR said:

"*No privilege can be invoked so as to cover up fraud or iniquity. But this principle must not be carried too far. No person faced with an allegation of fraud could safely ask for legal advice. To do away with the privilege at the discovery stage there must be strong evidence of fraud such that the court can say: 'This is such an obvious fraud that he should not be allowed to shelter behind the cloak of privilege.'*"

44    The appearance of competing characterisations of what is required for a "*prima facie*" case is potentially illusionary. In the usage of terms such as "strong" and "obvious" when describing the quality of evidence required, the real driving force is directed to ensuring two matters: first, that the evidence is properly assessed so that privilege is

31

<span style="color:red">52</span>

not overborne on the basis of scantily clad allegations of fraud or iniquity or evidence which is impressive only when viewed in isolation from the opposing evidence; and, second, that, when properly assessed, the evidence provides a sufficiently cogent foundation for holding that any claim to privilege is to be defeated, on an interlocutory basis, by reason of what can properly be regarded as iniquity.

<u>Whether the Evidence in fact established a *Prima Facie* Case of Iniquity</u>

45    I have found no basis for criticism of Kawaley AJ's consideration of both Alice's evidence and that of Ms. Lin and Ms. Huang in the context of all of the other evidence before him. His evaluation of that evidence is unimpeachable as it was measured and reasonable. For these reasons, I find that we have no cause to interfere with the learned trial judge's findings that a *prima facie* case of iniquitous conduct was not established.

Ground 3
The Learned Judge was wrong to preclude further investigation into the procedure for the taking of witness evidence (the "Disputed Procedure").

46    Since the judge was not, in my view, wrong to conclude that there was no *prima facie* evidence of iniquity, there is no basis for the complaint that he was wrong to preclude further investigation into "the Disputed Procedure", i.e. what the Applicant said had happened in the case of Dr Wang. Further, in the light of the position taken by the Respondents, there will be on objection to questioning of the limited nature indicated in paragraph 24 above.

Ground 4
The Learned Judge was wrong to preclude Tony from relying upon Alice's evidence and the statements made to her by Dr Wang.

47    The Applicant makes this complaint on an assertion that any confidentiality relating to these statements has now been lost. As to that, it seems to me that, the judge, having

32

<span style="color:red">53</span>

decided that no *prima facie* case of iniquity had been established, was fully entitled to decide, on a case management basis, that the evidence of Alice should not be used.

<u>The Application for Interrogatories</u>

48    Mr. Dowley QC considered Tony's application for interrogatories to be independently meritorious, irrespective of the Court's findings on the iniquity grounds. He submitted that the application should be granted as the subject of the questioning does not trespass on legal privilege territory and would be admissible under cross-examination.

49    The relevant procedural rules governing an application for interrogatories is under Order 26 Rule 1 of the Rules of the Supreme Court which provides:

"*26/1 Discovery by interrogatories*
*1  (1) A party to any cause or matter may apply to the Court for an order—*
    *(a) giving him leave to serve on any other party interrogatories relating to any matter in question between the applicant and that other party in the cause or matter, and*

    *(b) requiring that other party to answer the interrogatories on affidavit within such period as may be specified in the order.*

    *(2) A copy of the proposed interrogatories must be served with the summons, or the notice under Order 25, rule 7, by which the application for such leave is made.*

    *(3) On the hearing of an application under this rule, the Court shall give leave as to such only of the interrogatories as it considers necessary either for disposing fairly of the cause or matter or for saving costs; and in deciding whether to give leave the Court shall take into account any offer made by the party to be interrogated to give particulars or to make admissions or to produce documents relating to any matter in question.*

*(4) A proposed interrogatory which does not relate to such a matter as is mentioned in paragraph (1) shall be disallowed notwithstanding that it might be admissible in oral cross-examination of a witness.*"

50   RSC O.26 requires a Court to grant leave on an application for interrogatories only to such extent as is necessary to fairly dispose of the action. The questions proposed by the application call for information about the presence of persons during the witness proofing process. This could only be perceived as an attempt to poke behind the Court's decision for the protection of privilege to remain undisturbed by the rejected allegations of iniquitous conduct. In this case, the judge properly found that the evidence was not sufficiently probative of iniquitous conduct on the part of Ms. Lin. This leaves Tony with no foundation for asserting that the information sought is needed to fairly dispose of the matter.

51   In my judgment, Mr. Midwinter QC's objection that this application is, or is the beginning of, a peripheral attack on the Court's finding against iniquitous conduct has real force for the reasons outlined by the learned judge in both his 22 March and 29 March Rulings. In addition, it seems to me entirely open to the judge to decline, as he did, to order interrogatories, for case management reasons.

### Whether Leave to Appeal should be granted

52    It is well-established law that an applicant will not be given permission to appeal in cases where there is neither a realistic prospect of success nor an issue of public importance.   The authors of the 1999 White Book Order provide the below commentary [59/14/18]:

"*Circumstances in which leave will be granted- The general test which the Court applies in deciding whether or not to grant leave to appeal is this: leave will normally be granted unless the grounds of appeal have no realistic prospects of success (Smith*

*v Cosworth Casting Processes Ltd (Practice Note) [1997] 1 WLR 1538; [1997] 4 ALL E.R. 840, CA). The Court of Appeal may also grant leave if the question is one of general principle, decided for the first time (Ex p. Gilchrist, Re Armstrong (1886) 17 Q.B.D. 521, per Lord Esher M.R. t 528) or a question of importance upon which further argument and a decision of the Court of Appeal would be to the public advantage (see per Bankes L.J., in Bubkle v. Holmes [1926] 2 K.B. 125 at 127).*"

53      This formulation of the test  was endorsed by a 1999 English Court of Appeal Practice Direction which was referred to in <u>*Bank of Credit & Commerce International SA v Ali, Husain and Zafar*</u> [2001] EWCA Civ 636 [para 39]:

*"The relevant test for granting leave to appeal are* [sic] *set out in the Practice Direction (Court of Appeal Civil Division) [1999] 1 WLR 1027.  The general test, and the test on points of law, are as follows:*

> *"2.8.1 . .The general rule applied by the Court of Appeal, and thus the relevant basis for first instance courts deciding whether to grant permission, is that permission will be given unless an appeal would have no real prospect of success.  A fanciful prospect is insufficient. Permission may also be given in exceptional circumstances even though the case has no real prospect of success if there is an issue which, in the public interest, should be examined by the Court of Appeal. . . .*
>
> *2.9.1 Permission should not be granted [on a point of law] unless the judge considers that there is a realistic prospect of the Court of Appeal coming to a different conclusion on a point of law which will materially affect the outcome of the case. . ."*

35

*Permission to appeal is not usually given on the Judge's findings of primary fact but may be given in appropriate cases where the question is whether the Judge drew the correct inferences (Practice Direction, paragraph 2.10.1).*"

54    It was not suggested before us that the grounds of appeal imported issues of public importance. So, the question of leave to appeal is contingent on whether the grounds of appeal have any realistic prospect of success. Of course, Tony's prospect of success is not an exercise of estimation for this Court as we have had the benefit of hearing the parties' full submissions on the proposed grounds of appeal.

55    Having considered the evidence and the submissions from both parties, we have found that there is no such prospect of success. Accordingly, leave to appeal should be refused.

**CONCLUSION**

56    For all of these reasons, I find that Tony's application for leave to appeal should be refused.

57    Nothing in this judgment is intended to preclude Tony from filing and relying on a hearsay notice in respect of Alice's report of Dr. Wang's statement that he did not specifically recall the presence of a female lawyer at CGMH on 31 October 2012. Such reliance involves no breach of privilege.

58    I would invite Counsel for Tony to draw up an order to give effect to this Ruling. Subject to any submissions that may be made within 21 days in writing, the Respondents shall have their costs here and below.

**KAY, JA**

59    I agree.

**CLARKE, P**

60    I agree.

C.S. 9 J. Clarke

_____

**CLARKE, P**

Maurice King

_____

**KAY, JA**

_____

**SUBAIR WILLIAMS, JA**

37

Neutral Citation Number: [2022] EWHC 2702 (Comm)

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**KING'S BENCH DIVISION**
**COMMERCIAL COURT**
**IN THE MATTER OF SECTION 44 OF THE ARBITRATION ACT 1996**
**AND IN THE MATTER OF SECTION 37 OF THE SENIOR COURTS ACT 1981**

Rolls Building
Fetter Lane
London,
EC4A 1NL

**12 September 2022**

**Before** :

**MRS JUSTICE COCKERILL**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **DEUTSCHE BANK AG (LONDON BRANCH)** | **Claimant** |

**- and -**

| | |
|---|---|
| **CENTRAL BANK OF VENEZUELA** | **Defendant** |

**-and-**

| | |
|---|---|
| **RECEIVERS** | **Receivers** |

And between:

| | |
|---|---|
| **BANCO CENTRAL DE VENEZUELA** | **Claimant** |

**-and-**

<span style="color:red">59</span>

**THE GOVERNOR & COMPANY OF THE BANK OF ENGLAND**

<u>**Defendant**</u>

**-and-**

**(1) THE "MADURO BOARD"**

**(2) THE "GUAIDÓ BOARD"**

<u>**Stakeholder Claimants**</u>

- - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Andrew Fulton KC and Mark Tushingham** (instructed by **Arnold & Porter Kaye Scholer (UK) LLP**) for the **GUAIDÓ BOARD**
**Richard Lissack KC, Vaughan Lowe KC, Brian Dye, Jonathan Miller, Daniel Edmonds and Jacob Turner** (instructed by **Zaiwalla & Co**) for the **MADURO BOARD**

Hearing on documents
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

<span style="color:red">60</span>

**Mrs Justice Cockerill:**

1.  There are two issues to be decided on the documents: Permission to appeal and costs.

2.  The Maduro Board has sought permission to appeal, both on the basis of "some other compelling reason" and the more conventional "real prospect of success" basis. This application has been opposed by the Guaidó Board.

3.  The Guaidó Board has sought orders that the Maduro Board pay the Guaidó Board's costs of the Remitted Issue and the Preliminary Issues in CL-2019-000303 and CL-2020-000304, to be subject to detailed assessment, if not agreed; and that the Maduro Board make an interim payment on account of the Guaidó Board's costs in the total amount of £2.4 million.

4.  The Maduro Board's response is that:

    i)    I have no jurisdiction in respect of the costs of the Preliminary Issues;

    ii)   The correct order in respect of the Remitted Issue is an issue based order;

    iii)  On that basis it is not appropriate to order any payment on account.

**PERMISSION TO APPEAL**

5.  I can deal with this relatively briefly. While I am grateful for the Guaidó Board's careful and focussed submissions, the question of permission is really one which lies between the Court and the applicant. I had considered the question of permission at the time of completing the judgment and had formed the view that this was (unusually) a case for the grant of permission on the "some other compelling reason" basis.

6.  I take first, however, the question of real prospect of success. This is because (i) a negative conclusion on this should give me pause for thought on the "some other compelling reason" question and (ii) it has the potential to impact interim payment.

7.  I conclude that this is not a case where I would grant permission on the basis of real prospect of success. I do not consider there is a real prospect of success. The way the arguments work structurally is that the Maduro Board had to win all of Issues 2-4; loss of any one issue was fatal to its case. I have found that it lost all of Issues 2, 3 and 4A. Accordingly winning one issue on appeal would not suffice.

8.  The issues are all ones on which I reached clear conclusions, and the result was reached by a fairly clear margin. Specifically:

    i)    Issue 2: the Maduro Board's case involved a considerable expansion of the existing common law position. Even taking a more cautious approach on the authorities (in particular *Air Foyle*) than was urged by the Guaidó Board, the Maduro Board argument fell considerably short of justifying such a step. The approach of the other authorities compels the conclusion that even

in the Court of Appeal the prospect of achieving such a significant expansion is fanciful;

ii)    Issue 3: This is the argument which comes closest to establishing real prospect of success because of the nuance in the Supreme Court's judgment. While the second part of the appeal on this point is an appeal on fact it is the type of factual appeal which the Court of Appeal will be more inclined to consider, as being as well placed as the first instance judge. Had this ground stood alone I might well have concluded that it was just the right side of the line.

iii)    In the case of Issue 4A, the margin was particularly large and the permission submissions are not compelling. The main plank of the argument is an appeal on fact relating to available remedy which concerns the type of finding (evaluation of live evidence) which the Court of Appeal will rarely disturb; and a proper basis for such an appeal is not really attempted. Even were the Court of Appeal prepared to go some way on this point another outcome is unlikely given the very clear (uncontested) breach of the rules of natural justice.

I would therefore consider the "real prospect of success" hurdle not to be surmounted in two cases, and to be marginal in the remaining case. Accordingly the chances of any appeal affecting outcome are, in my assessment, highly fanciful.

9.    In normal circumstances this would conclude the argument on permission. It is unusual for a first instance court to grant permission on the "some other compelling reason" basis; normally such considerations are best left with the Court of Appeal. But this case is the exception which proves the rule. I am entirely confident that if I did not grant permission, the Court of Appeal would do so on this basis.

10.    This is a case which can rightly be called unique. It concerns a claim with a very significant value, even in the context of the Commercial Court. It concerns a significant proportion of the gold reserves of a large foreign state. The first round of issues raised by that dispute have already engaged the Supreme Court. The consideration of the case thus far has been expedited because the consequences of the decision have the potential to affect all the citizens of Venezuela. The issues which I have had to decide are, in their consideration of the operation of a foreign apex court, effectively unprecedented. The public-international backdrop is not static. While I have taken a very clear view on the issues which I have found dispositive, the issues are ones where the law is either novel or little ventilated and the case plainly falls within the category of raising points of importance in the development of the substantive law.

11.    Thus, while I have given careful thought to the slightly anomalous situation of giving permission on an appeal which I consider to be well below the merits hurdle, particularly given the delay which any appeal would involve, I consider that permission to appeal should be given in this case.

## COSTS

## Costs of the Preliminary Issues

12. On this first issue, the Maduro Board's submissions have a superficial attraction. They point out the history of the costs orders, which is this:

   i)   Teare J awarded the Guaidó Board the whole of its costs of the Preliminary Issues, including the trial before him;

   ii)  The Court of Appeal overturned Teare J on both Recognition and Justiciability and ordered the Guaidó Board to pay the whole of the Maduro Board's costs in the Court of Appeal. The Court of Appeal ordered that the Guaidó Board and the Maduro Board should each bear their own costs of the hearing of the Preliminary Issues below and of the Consequentials Hearing on 24 July 2020 .

   iii) In their costs submissions to the Supreme Court dated 17 January 2022, the Guaidó Board requested that: *"The costs order made in favour of the Guaidó Board at first instance by Teare J at paragraph 2 of his Order dated 24 July 2020 should be restored."*

   iv)  The Supreme Court did not order that the costs orders made by Mr Justice Teare be restored; and did not order (as the Guaidó Board had sought in its draft) that *"the Court of Appeal's order dated 6 October 2020…is set aside"*.

   v)   The issue of the costs before Mr Justice Teare was not explicitly remitted to the Commercial Court by the Supreme Court. It does not form any part of the Remitted Issue as defined at paragraph 6 of the Order of Mr Justice Foxton dated 4 February 2022 (the "Foxton Order").

13. However this ignores some critical background. In the Supreme Court the Maduro Board responded to the Guaidó Board's submission by itself submitting that: *"[t]he eventual winner of the case still remains to be determined: the Guaidó Board's preliminary issues have not been determinative. The Supreme Court should make no order as to costs or, alternatively, make an order of costs in the case."*

14. The outcome appears to follow from that submission. There was no express provision in respect of costs – but that in a sense flows from the Maduro Board's own submission. It was its case that costs should not be dealt with by the Supreme Court because the result would depend on the outcome of this phase of the process.

15. That outcome – that costs of the Preliminary Issues as well as the Remitted –Issues are for this Court (subject to appeal on the Remitted Issues) is entirely logical:

   i)   The consequence of the remittal pursuant to the Supreme Court's prior (and separate) Order was that the Commercial Court was again seised of "the proceedings";

ii)   The reason for that was that the answer to the Remitted Issues was necessary to reach an outcome on the Preliminary Issues;

iii)   The Supreme Court Judgment was a complete vindication for the Guaidó Board on Recognition and a partial victory on Justiciability, which victories one would expect to see reflected in costs at some point; and

iv)   It would be illogical for a costs order imposed by the Court of Appeal, which (i) was predicated on its decision being determinative (ii) was predicated on a view of the law which has been both overtaken and criticised, to stand.

**Costs of the Remitted Issue**

*16.*   On this issue the Maduro Board submits that this is the relatively unusual case where an issue based costs order is appropriate. That is because although the Guaidó Board successfully resisted recognition of the STJ Judgments, the Guaidó Board lost on Issue 4B, the independence and impartiality of the STJ and that this was an issue which occupied an inordinate amount of preparation time on the part of the Maduro Board in order to deal with the allegations raised – in part because of the sheer volume of hearsay material relied upon by the Guaidó Board, and because of the *"unfocused manner in which the material was deployed"*.

17.   In respect of the requirement under CPR 44.2(7) that the court consider, before making an issue based order, whether it is practicable to make an order under CPR 44.2(6)(a) or (6)(c) instead, the Maduro Board submitted that neither alternative course (paying a proportion of the other party's costs, or costs from or until a certain date only) would work fairness in the circumstances of this case. This is because neither alternative properly compensates the Maduro Board for the very substantial costs properly incurred on an issue on which they succeeded.

18.   Unsurprisingly the Guaidó Board contended that there should be no issue based costs order, and that costs should follow the event.

19.   The Guaidó Board's central riposte to the Maduro Board case is that those costs were only incurred because of the Maduro Board's unreasonable refusal to accept the correctness of the Guaidó Board's position on Issues 2, 3, and 4A, each of which was independently fatal to the Maduro Board's attempts to have any of the STJ Judgments recognised. Further it contends that there are aspects of the Maduro Board's conduct which can properly be criticised. Such conduct would justify rejecting any reduction urged by the Maduro Board and awarding the Guaidó Board's costs in full, including a failure to face up to the problem of Issue 4A, reference to irrelevant material and late provision of information as to the case being run on the facts.

20.   I am as always alive to the indications in the rules and in the authorities that the starting point should be for costs to follow the event and that first instance judges should be alert to resist the tendency to routinely move away from that position, which deprives the default rule of its primacy (see in particular *Fox v Foundation Piling* [2011] 6 Costs LR 961 at [62] per Jackson LJ).

21.    Nonetheless this is a case where I consider that:

    i)    the issue was lost, albeit, for reasons which I gave at [245] of the judgment, my reasoning was brief; and

    ii)    there must be some reflection of the loss of Issue 4B in the costs order which I make.

22.    This is in essence because, as I indicated in [245] of the judgment *"[a]lthough some way down the batting order, it was an issue which has dominated the parties' preparation for trial, with lengthy pleadings/submissions exchanged on both sides."*.

23.    The reference to "lengthy" is actually a considerable understatement:

    i)    Annexes 1 to 3 to the Guaidó Board's Reply dated 11 March 2022 (which plead the Guaidó Board's case on impartiality and independence) are, at 24 pages, over twice the length of the Guaidó Board's Re-Amended Statement of Case.

    ii)    The Guaidó Board's Hearsay Notice setting out documents relating to Issue 4B was 14 pages long with 126 references to passages within 60 separate documents.

    iii)    The reports and other materials relied upon by the Guaidó Board in support of Issue 4B came to some 2,240 pages, almost the entirety of the factual material relied upon by the Guaidó Board at trial.

24.    Before passing on to consider the best way to reflect this loss, I pause to note the authorities upon which the Maduro Board relied. They have reminded me via *Summit Property Limited v Pitmans* [2001] EWCA Civ 2020, and *Johnsey Estates (1990) Limited v Secretary of State for the Environment* [2001] EWCA Civ 6535 that the power to make an issue based costs orders was seen as an important change under the CPR to be exercised even when there was no unreasonableness in pursuing a point in order to discourage the *"no stone unturned"* or as the White Book puts it "*kitchen sink*" approach to litigation.

25.    The Maduro Board has also reminded me via *F & C Alternative Investments Ltd v Barthelemy (No 3)* (CA) [2012] EWCA Civ 843; [2013] 1 WLR 548 that there is no requirement of exceptionality for the imposition of an issue based costs order.

26.    I note in particular the quote from the judgment of Arnold J in *Hospira UK Ltd v Novartis AG* [2013] EWHC 886 (Pat) at  [2]:

    "The principles to be applied in these circumstances are familiar subject to one small qualification. The court generally approaches the matter by asking itself three questions: first, who has won; secondly, has the winning party lost on an issue which is suitably circumscribed so as to deprive that party of the costs of that

issue; and thirdly, are the circumstances (as it is sometimes put) suitably exceptional to justify the making of a costs order on that issue against the party that has won overall."

27.    This is a case which on its face engages the appropriate criteria for the making of an issue based costs order. The Maduro Board has won this issue thought it lost most of the others. The issue is a relatively circumscribed (in the sense of discrete) one; it is not a case like so many which are seen in the Commercial Court, where the lost issue is so enmeshed with the won issues that making an issue based costs order would merely result in satellite litigation, and further unnecessary costs and effort.

28.    This trial began life as a short preliminary issue. It was about the enforceability of the STJ Judgments. It was put thus in the Foxton Order:

"Whether, and if so to what extent, the Maduro Board may rely on judgments of the Venezuelan Supreme Tribunal of Justice ("STJ") to which recognition or effect should be given by courts in this jurisdiction in accordance with domestic rules of private international law and the public policy of the forum."

29.    It is plain from the Supreme Court's judgment that they saw the remittal as pertaining to "quashing decisions" and "one voice". The argument on independence and impartiality emerged in the Guaidó Board's reply of 11 March 2022.

30.    That issue did, as I have noted, change the evidential complexion of the case. It also had a significant effect on its presentation. Orally Mr Fulton KC did not shy away from the submission that the case was *"about the Maduro regime"*. Further although my analysis placed it as a subsidiary issue the Guaidó Board itself placed the issue front and centre of its submissions. In opening the case in writing the Guaidó Board placed this point at the forefront thus:

"6. During earlier phases of the litigation, the Maduro Board sought to marginalise the strong language used, including by HMG, to condemn the "illegitimate", "kleptocratic" and "brutal" Maduro regime. The Maduro Board also now say at [13] of its Appendix 1 that this is not what the case is now about. However, the political background in Venezuela is of considerable importance to the Remitted Issue…

7. Here, the widespread nature of the allegations of political interference of an "insidious" kind and the evidence of the Maduro regime's brutal repression of dissent and assault upon the rule of law are important aspects of the inquiry into the likelihood of the STJ having been able to deliver "robust and balanced justice". When it comes to assessing the STJ's impartiality and independence, the Court must therefore ask itself: have the Judges of the STJ shown "courage and steadfastness of a high order"? Or does their track record point instead to complicity in Mr Maduro's autocratic political agenda?..."

31.    Yet it was not, analytically, a first or even second rank point, as the judgment demonstrates. So far as concerns the Guaidó Board's submission that the other issues should have been conceded, this is an argument which really flies in the face of the issue based costs order jurisdiction. Much of the justification advanced for the Guaidó Board's submission lies in the strength of the natural justice argument (ie that it was wrong of the Maduro Board not to conceded the point, or the factual bases for the point). The problem is if that argument was so unanswerable it would follow that Issue 4B was the more unnecessary to be advanced.

32.    The Guaidó Board would say that Issue 4B had to be taken because of the Maduro Board's failure to engage with the factual basis for Issue 4A, and that until it was known that there was no answer to the notice points (or at least what answer was made), Issue 4A could not be said to be unanswerable. However while I have a degree of sympathy with the argument that the Maduro Board should have engaged earlier with effectively pleading to the facts, the assessment of the facts where the facts are known to both parties (as they were in relation to the process underlying the key judgments) need not depend on such steps.

33.    Nor am I attracted by the Guaidó Board's submission that it *"remained concerned that the Maduro Board might belatedly produce some evidence of publication of the proceedings or of notification having been sent"*. This argument is not a strong one, particularly in circumstances where the concern is not said to be that a genuine notification might have been produced but rather that *the Maduro Board regime, already accused of improperly procuring the STJ Judgments in the first place, might cause such evidence to be fabricated to facilitate the recognition of those judgments*." If the notifications feared were false they would be unlikely to affect the outcome on Issue 4A, as their genuineness could and would have been challenged.

34.    Further, while I accept the difficulties of taking the optimum decisions in the context of expedited trial timetables, I had concerns (which I reflected both in argument from the opening of the case and in the judgment) as to the extent of the material deployed (and hence of the costs incurred) in relation to issue 4B in circumstances where there was a lot of evidence, but not of the best quality and very limited time to deal with it. That is only reinforced by the Guaidó Board's submission in this context that if it had really been focussing on this point:

> "…it would have: (i) elevated that to its main argument; (ii) adduced additional expert evidence on Venezuelan law (e.g. as to the perversity of the STJ's repeated decisions to hold the entire NA in "contempt"); (iii) taken every possible step to secure the attendance of factual witnesses (e.g. former STJ judges Christian Zerpa and Carmen Porras); (iv) sought a longer trial accordingly."

35.    This resonates not just with the authorities on issue based costs orders but also with the point made by Foxton J in *PJSC National Bank Trust v Mints and others* [2022] EWHC 1132 (Comm) and reiterated in the Commercial Court's Practice Note of 30 March 2022 as to points taken which consume a significant amount of the parties and Court's resources but which can never realistically produce a result:

> "The Judges of the Court would also urge parties - in the interests of proportionate litigation - to give careful consideration to the number of points which are run, whether peripheral points will realistically lead anywhere if the primary points fail …"

36.   The main question therefore is whether this is a case for an issue based costs order or for a percentage reduction. Frequently the court will follow the line of least resistance via CPR 44.2(6)(a) or (6)(c). However, as has been noted elsewhere, a percentage reduction is not a perfect solution – it is inevitably something of a blunt instrument. Further one faces the unattractive prospect of, having concluded that the tax judge could not sensibly "break out" one issue, conducting a brutalist approximation via page and line counts of submissions and transcripts, which are inevitably inaccurate (because of the iceberg nature of preparation) and will themselves in significant pieces of litigation turn into major generators of costs. This is a point noted with characteristic wisdom by Mann J in *Sycamore Bidco Ltd v Breslin and Dawson* [2013] EWHC 583 (Ch); [2013] 4 Costs LO 572, at [28]:

> "Assessing the court time involved in the various issues is a quasi-scientific way of starting on the activity, but it is less than wholly satisfactory because it is not necessarily a guide as to the pre-trial costs which, in this case, would be very significant. As more than one judge has said, the exercise has to be a broad brush one. Quasi-scientific exercises such as that carried out by the parties in relation to the trial timetable are only a starting point…"

37.   Here I am satisfied that there is a sufficient "reason based on justice" for making a form of issue based costs order. This issue was a marginal issue with a very high cost implication. It need not have been taken at all. Further the independence defence itself, even if it were to have been pursued could, as I have noted, have been advanced with less exhaustive evidence and very possibly with fewer heads of argument. In this case the point in issue is not so enmeshed that breaking it out will result in confusion. Rather when I come to consider whether a percentage reduction is appropriate I am faced with the problem that assessing the appropriate percentage would be no more than a guess – a concern which is reinforced by the very different percentages urged on me as the parties' respective fallback arguments (£657,000 i.e 100% of the Maduro Board's costs/no more than 10%). Indeed, this is one of the probably quite unusual cases where an issue based approach will be easier than settling on an appropriate percentage. It is thus more practicable to make an issue based order than a percentage, and therefore more just.

38.   I accept that is it not an entirely distinct issue; there is a degree of crossover into some of the other points (particularly Issue 4A) but that crossover is very limited indeed, and such background as was necessary to pray in aid for those purposes could have been obtained without the extensive evidential base which was adopted for the purposes of the independence defence. In truth the main crossover relied on is one of background/prejudice which was not relevant to the central issues.

39.    Therefore I conclude that this is a case for an issue based costs order. The crossover element which would inevitably have been incurred and the "conduct" issues can be reflected by making the order one whereby the Guaidó Board does not recover its costs of this issue, but does not result in payment by it of the Maduro Board's costs of the issue.

**Interim Payment**

40.    In the light of the preceding determinations, the question of interim payment becomes relevant. On this the Guaidó Board sought an interim payment of £2.4 million, derived from two components:

   i)    An interim payment in respect of the Guaidó Board's costs of the trial of the Remitted Issue which came to a total of c. US$1.9m / £1.6m. The Guaidó Board seeks an interim payment on account of 50% of those costs, namely £800,000.

   ii)    An interim payment in respect of the Guaidó Board's costs of the Preliminary Issues which came to a total of c. US$3.8m / £3.2m. Again, the Guaidó Board seeks an interim payment on account of 50% of those costs, namely £1.6m.

41.    The Maduro Board resists an interim payment inter alia on the basis that:

   i)    The Maduro Board, as the paying party, will not likely be able to recover any sums in the event of overpayment;

   ii)    There are strong prospects of success on appeal;

   iii)    The question of who will be the ultimate winner or loser at the end of the proceedings as a whole is not known;

   iv)    Any liability to pay costs has already been satisfied because (i) there is only one BCV or (ii) its lawyers' fees have been paid from BCV funds in New York.

42.    If an interim payment is ordered the Maduro Board makes a variety of points on quantum.

43.    On these issues I am not persuaded that this is a case where the usual position as to interim payment should be diverged from. Specifically:

   i)    Overpayment is unlikely;

   ii)    There are not strong prospects of success on appeal, for the reasons I have already given;

   iii)    It is hard to see how, at this point, the Maduro Board could be the ultimate winner;

Deutsche Bank v Venezuela (Permission and Costs)

iv)     The satisfaction argument is not convincing. Both parts effectively rerun arguments dismissed by the Supreme Court.

44.    In the light of the conclusions above, it would seem that the question of interim payment on the Remitted Issue will have to be further considered. However I can now make an order for interim payment in respect of the Preliminary Issues. The level of the fee earners charging rates do justify a reduction beyond the usual range of percentages. However big and important this litigation, in the light of the new Guideline rates an uplift which effectively doubles most of the rates is unlikely to be regarded as justifiable. I therefore order an interim payment of 45% (ie £1.44 million) in relation to the costs of the Preliminary Issues.

Neutral Citation Number: [2011] EWCA Civ 1580
IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
The Hon Mr Justice Eady
HQ09X00298

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 19/12/2011

Before:

**THE MASTER OF THE ROLLS**
**LORD JUSTICE ETHERTON**
and
**LORD JUSTICE GROSS**
- - - - - - - - - - - - - - - - - - - -
Between:

| | |
|---|---|
| **CHRISTOPHER HUTCHESON (formerly known as WER)** | **Appellant** |
| - and - | |
| **POPDOG LIMITED (formerly known as REW)** | **Respondent** |
| - and – | |
| **NEWS GROUP NEWSPAPERS LIMITED** | **Additional party** |

- - - - - - - - - - - - - - - - - - - -
(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No: 020 7404 1400, Fax No: 020 7404 1424
Official Shorthand Writers to the Court)
- - - - - - - - - - - - - - - - - - - -

**Hugh Tomlinson QC** (instructed by **Schillings**) for the **Appellant**
**Respondent unrepresented**
**Adrienne Page QC** (instructed by Farrer & Co) for the **Additional party**

Hearing date: 7th December 2011
- - - - - - - - - - - - - - - - - - - -
Judgment
As Approved by the Court

Crown copyright©

71

**The Master of the Rolls:**

1.    This is an application for permission to appeal against a decision of Mr Justice Eady given on 17th November 2010, which I directed should come before a three-judge court.

*The  background to this application*

2.    In January 2009, Mr Christopher Hutcheson issued proceedings, in anonymised form as WER v. REW, against Popdog Ltd, seeking to restrain Popdog from publishing or communicating certain information, relating to his private life ('the Information').  In the same month, Sir Charles Gray, sitting as an additional judge of the Queen's Bench Division, granted Mr Hutcheson an interim injunction ('the Interim Injunction') restraining Popdog from communicating the Information, whose content was summarised in a confidential schedule to the order, 'until after the conclusion of the trial of this claim or further order of this court in the meantime'.

3.    Shortly thereafter, Mr Hutcheson and Popdog reached a compromise whereby they agreed, in effect, that the Interim Injunction would continue for the foreseeable future, and that Mr Hutcheson's claim against Popdog would not otherwise proceed.

4.    Some time during 2010, News Group Newspapers Limited ("NGN") wished to publish the Information, and, in November 2010, they applied to the court to set aside the Interim Injunction. That application ('the Application') came before Eady J on 16 November, and, on the following day, he gave a judgment ('the first judgment').

5.    As Eady J mentioned in that judgment, a party who has notice of an interim injunction is at risk of being in contempt of court if he does something which effectively flouts or undermines the injunction – see, for instance, *Attorney-General v Times Newspapers Limited* [1992] 1 AC 191, 223-224 and see also *Attorney-General v Punch Ltd* [2003] 1 AC 1046, 1066. This principle, sometimes known as 'the *Spycatcher* principle' (see *Attorney-General v Newspaper Publishing plc* [1988] Ch 333, 375 and 380), is well-established. However, Gray J decided in *Jockey Club v. Buffham* [2003] QB 462, paras 23-27, that, if and when a final injunction is granted in favour of a claimant, any interim injunction is discharged and replaced by the final injunction, and that a third party, even one who has notice of the final injunction, is not at risk of being in contempt of court if he acts inconsistently with the injunction.

6.    In the first judgment, Eady J explained that, in his view, the effect of Mr Hutcheson and Popdog having settled their differences in the way I have summarised was that Mr Hutcheson was "sitting on an interim injunction as though it gave the permanence and security of a final injunction … but the drawback of a final injunction is that it cannot bite on third parties…. There is no ring to hold." In those circumstances, he held, NGN's application to set aside the Interim Injunction represented "an unnecessarily circuitous route", because the appropriate analysis was that the Interim Injunction had, in practice, ceased to be interim in nature once Mr Hutcheson and Popdog made their agreement, and had therefore ceased to bind third parties such as NGN. Although the Judge refused Mr Hutcheson permission to appeal against that decision, he granted interim relief to ensure that the Information was not published until the question of an appeal had been determined. He also reserved the costs of the Application.

<span style="color:red">72</span>

7.    As a result of this decision ('the first decision'), Mr Hutcheson immediately issued fresh proceedings against NGN (and certain other newspaper publishers), under the title KGM v. News Group Newspapers Limited, seeking an order restraining them from publishing the Information, and he immediately applied for an interim injunction to restrain publication pending trial. That application came on before Eady J on 17 November 2010, and he gave judgment ('the second judgment') on 1 December 2010, in which he decided ('the second decision') that, balancing the freedom of expression and freedom of the press relied on by NGN against Mr Hutcheson's right to privacy and not to be harassed, and taking into account section 12 of the Human Rights Act 1998, he should reject the application. Accordingly, NGN (and other newspaper publishers) were free to publish the Information, but, although he refused Mr Hutcheson permission to appeal, Eady J again gave him a protective order pending his attempt to appeal that decision. He also decided to award NGN its costs against Mr Hutcheson of both the Application and the action which he effectively disposed of on 1 December.

*The issues between the parties on this application*

8.    Mr Hutcheson then applied for permission to appeal against the first decision and the second decision. He obtained permission to appeal against the second decision, but, on 19 July 2011, his appeal was dismissed – *Hutcheson v. Newspapers Limited* [2011] EWCA Civ 808.

9.    The application for permission to appeal against the first decision was effectively stayed by agreement until the parties knew the outcome of the appeal against the second decision. Now that that appeal has been decided, Mr Hutcheson maintains his application for permission to appeal against the first decision. Having heard argument as to whether he should be granted such permission, we indicated that we would refuse it, and give our reasons later.

10.    The primary ground upon which NGN resisted Mr Hutcheson being granted permission to appeal against the first decision was that the outcome of the appeal would be academic as between the parties. Even if the court were to conclude that Eady J ought not to have concluded that NGN was free to publish the information, despite the existence of the Interim Injunction, NGN would still be free to publish information because of the second decision (now upheld by this court) that the Article 10 rights of NGN should prevail over the Article 8 rights of Mr Hutcheson. As Miss Page QC, who appeared for NGN on this application, contended, an appellate court is very reluctant to hear an appeal when there is no subsisting live dispute between the parties.

11.    On behalf of Mr Hutcheson, Mr Tomlinson QC raised two arguments as to why this court should nevertheless hear the projected appeal against the first decision. His first argument was that, even if the appeal is academic as between the parties, it would raise two points which are sufficiently important to justify an appeal being allowed to proceed. His second argument was that the projected appeal would not in fact be academic, because, if the first decision was reversed, the order for costs made in relation to the Application would be varied. I shall consider those arguments in the same order as that in which they were advanced.

*The argument that the projected appeal is academic*

12.   The mere fact that a projected appeal may raise a point, or more than one point, of significance does not mean that it should be allowed to proceed, where there are no longer any real issues in the proceedings as between the parties. In *Gawler v. Raettig* [2007] EWCA Civ 1560, 2007 WL 5116827, the Court of Appeal refused permission to appeal on the ground that the issue it would raise was academic as between the parties. In his judgment, Sir Anthony Clarke MR gave helpful guidance as to the correct approach in such cases. He said at [2007] EWCA Civ 1560, para 36 that, before an appeal could proceed in those circumstances, the court must be satisfied that it would be in the public interest for the projected appeal to proceed, but he added that it would be "a very rare event, especially where the rights and duties to be considered are private and not public". Nonetheless, in the following paragraph, he emphasised that all must "depend upon the facts of the particular case" and that he did not "intend to be too prescriptive".

13.   We were referred to two recent cases in this court where the appeal proceeded even though the point was academic between the parties, but in both cases it is clear that the parties other than the appellant were keen, or at least agreeable, for the appeal to proceed – see *Bowman v. Fels (Bar Council and Others intervening)* [2005] EWCA Civ 226, [2005] 1 WLR 3083, para 10, and *Rolls-Royce plc v. Unite Union* [2009] EWCA Civ 387, [2010] 1 WLR 318, para 31. And I note that, even though the respondent was content in the latter case for the appeal to proceed, Wall LJ did not find it "easy" to decide whether to allow the appeal to proceed – [2010] 1 WLR 318, para 32.

14.   In the present case, NGN did not wish the projected appeal to proceed. Furthermore, NGN would be out of pocket if the appeal proceeded, because they would have to pay their own costs, and Mr Hutcheson's base costs and his ATE premium. It is true that Mr Hutcheson offered NGN an agreement that there should be no order for costs whatever the outcome of the appeal, but that would mean that NGN would be out of pocket to the extent of their own costs of the appeal whatever the outcome.

15.   Both the cases and general principle seem to suggest that, save in exceptional circumstances, three requirements have to be satisfied before an appeal, which is academic as between the parties, may (and I mean 'may') be allowed to proceed: (i) the court is satisfied that the appeal would raise a point of some general importance; (ii) the respondent to the appeal agrees to it proceeding, or is at least completely indemnified on costs and is not otherwise inappropriately prejudiced; (iii) the court is satisfied that both sides of the argument will be fully and properly ventilated.

16.   I accept that there would be a real prospect of requirement (i) being met if this appeal went ahead. The projected appeal would, I accept, potentially raise at least one issue of general importance, although I do not regard it as a foregone conclusion that either of the two points which have been identified would necessarily be determined on the projected appeal. In that connection, the two issues Mr Tomlinson contended would have to be considered on the projected appeal were first, the Judge's view that the Interim Injunction ceased to have interim effect once Mr Hutcheson and Popdog had effectively settled their differences, and, secondly, the correctness of the decision in *Jockey Club* [2003] QB 462.

17.   In relation to the first issue, Mr Tomlinson argued that it cannot be right that an interim injunction ceases to bind third parties once there is an agreement between the

<span style="color:red">74</span>

parties to the action, but that is not, and may never be, known to third parties; his primary case was that, at least in general, so long as the court has not discharged an interim injunction, it continues to have effect not merely as between the parties to the proceedings, but also on third parties. As to the second issue, Mr Tomlinson said that *Jockey Club* [2003] QB 462 was wrongly decided, and that third parties are as effectively bound by a final injunction as they are by an interim injunction.

18.     The first issue should now only be of limited relevance, following the publication of the Practice Guidance: Interim Non-Disclosure Orders (reflecting the views expressed in paras 2.25 and 2.32-2.36 of the Report of the Committee on Super-injunctions (Super-Injunctions, Anonymised Injunctions and Open Justice), on 20 May 2011). I have in mind especially para 36 of the Practice Guidance, which requires a party, who has an interim injunction restraining publication of information, to keep any affected non-party informed of developments in the case, and paras 37-41, which require active case management of such a case. However, I accept that there will be interim injunctions in respect of which, either because they were decided before the Practice Direction was issued or because something has gone wrong, the principle invoked by Eady J in the first judgment might be thought to apply. Accordingly, it seems to me that there is some force in the argument that the first point is of some, albeit limited, general significance.

19.     As to the second issue, namely whether *Jockey Club* [2003] QB 462 was rightly decided, I think it is hard to argue against the proposition that that is a point of general significance, and should be decided by this court at some stage. However, it is not entirely clear, at least on the present state of the argument and evidence, how important the point may be in practice. The fact that *Jockey Club* [2003] QB 462 has not been challenged in this court despite having been decided some nine years ago might fairly be said to cast some doubt on the importance of the point.

20.     Further, if Mr Hutcheson's projected appeal proceeded, it may well be that the Court of Appeal would not consider it necessary to determine either issue in order to dispose of the appeal. In my view, it is quite possible that the court would simply hold that, even if the Judge had been wrong in his reasoning, the Application would have succeeded, because, where parties to litigation had settled it on terms that an interim injunction remained on foot, the injunction should be discharged by the court, at least insofar as a third party was concerned, unless it could be justified as against that third party. On that basis, in the light of the second judgment (upheld in this court), there would be a strong argument for saying that the order for costs was correct, and there would be no need to consider the issues in order to resolve any appeal on costs.

21.     Requirement (ii) is plainly not satisfied. Requirement (iii) appears likely to be satisfied, in that I presume that Miss Page would appear for NGN if there were an appeal.

22.     In these circumstances, I do not consider that it would be right to grant permission to appeal, at least if this were purely an academic appeal.

*The argument that the projected appeal could affect the costs order below*

23.     That leaves the argument that an appeal would not be academic because, if this court disagreed with the reasoning of Eady J in the first judgment, that would result in a

<span style="color:red">75</span>

more favourable outcome as far as the costs of the Application are concerned. I have several concerns about this. The first is that it is not clear how much money is involved. Mr Tomlinson suggests it might be as much as £45,000, but, on the very limited information available, it seems certain that it would be substantially less than that.

24.    Secondly, it is by no means clear that Eady J awarded NGN its costs of the Application simply as a result of his reasoning in the first judgment. After all, he reserved those costs following the first judgment, and it was only following the second judgment, in which he had decided that the Information should not be protected, that he made the order for costs in favour of NGN. It seems to me quite possible that it was because of the conclusion reached in the second judgment that he decided to order Mr Hutcheson to pay NGN's costs of the Application. There is no record of the parties' argument or the Judge's reasoning on this issue, and it would be for Mr Hutcheson, as applicant for permission to appeal, to make good his implied contention that the reason why he had to pay NGN's costs of the Application was because of the first judgment, and not because of the second judgment.

25.    Thirdly, I consider that it is probable that, even if Mr Hutcheson's projected appeal succeeded, this court would not, in any event, think it right to reverse the Judge's order for costs in relation to the Application. What was at stake in the war between Mr Hutcheson and NGN was whether NGN could publish the Information, and, after NGN won the first battle in this war, in the form of the first judgment, Mr Hutcheson joined battle again by issuing a claim direct against NGN, and he also lost that battle, in the form of the second judgment (upheld on appeal). It therefore seems to me that there is a powerful argument for saying that, even if it disagreed with the Judge's reasons for holding that    NGN was entitled to publish the Information, notwithstanding the Interim Injunction, this court could very well nonetheless hold that the order for costs made by the Judge should stand. In other words, even if the court on the projected appeal decided that the Judge's reasons in the first judgment were wrong, it would nonetheless decide that his decision was right, and therefore that the order for costs which he made should stand.

*Concluding remarks*

26.    In these circumstances, I reach these conclusions:

i)    Subject to the issue relating to the costs of the Application, the projected appeal would be academic as between the parties, and I would refuse permission to appeal, because of the combination of two factors, namely, (a) although the two issues which it is said would be raised on the projected appeal are significant, they are not of outstanding public importance, and anyway might not actually be determined on the projected appeal, and (b) NGN opposes the grant of permission to appeal and would be significantly out of pocket on costs if the appeal went ahead;

ii)    The prospect of the order that Mr Hutcheson pay the costs of the Application being varied, even if the projected appeal were to succeed, is, at best from Mr Hutcheson's point of view, very uncertain, and it would therefore be a disproportionate reason for permitting an appeal to proceed;

iii)    Accordingly, I would refuse permission to appeal;

iv)    It would be wrong to end this judgment without making the following points:

a)    It cannot be safely assumed that the Judge's conclusion that, notwithstanding the fact that the court had not varied or discharged the Interim Injunction, publication of the Information by NGN would not represent a breach of the *Spycatcher* principle because of the terms of settlement between Mr Hutcheson and NGN, would be approved by this court;

b)    Similarly it cannot be safely assumed that the conclusion in *Jockey Club* [2003] QB 462, that the the *Spycatcher* principle does not apply to final injunctions but only applies to interim injunctions, would be approved by this court;

c)    The history of these proceedings demonstrates the importance of adhering to the terms of Practice Guidance relating to Interim Non-Disclosure Orders.

27.    Because this judgment may conceivably contain guidance on the issue of academic appeals or on the issues which would have been raised if permission to appeal had been granted, it may be cited in court.

**Lord Justice Etherton:**

28.    I agree.

**Lord Justice Gross:**

29.    I also agree.



Neutral Citation Number: [2021] CA (Bda) 21 Civ

Case No: Civ/2022/11

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE SUPREME COURT OF BERMUDA SITTING IN ITS**
**ORIGINAL CIVIL/COMMERCIAL JURISDICTION**
**THE HON. MR. JUSTICE MUSSENDEN**
**CASE NUMBER 2021: No. 338**

Dame Lois Browne-Evans Building
Hamilton, Bermuda HM 12

Date: 18/11/2022

**Before:**

**THE PRESIDENT, SIR CHRISTOPER CLARKE**
**JUSTICE OF APPEAL GEOFFREY BELL**
**JUSTICE OF APPEAL ANTHONY SMELLIE**
- - - - - - - - - - - - - - - - - - - -
**IN THE MATTER OF NEWOCEAN ENERGY HOLDINGS LIMITED**
**AND IN THE MATTEROF THE COMPANIES ACT 1981**

**Between:**

**THE HONG KONG AND SHANGHAI BANKING CORPORATION LIMITED**

**Appellant**

**- and -**

**NEWOCEAN ENERGY HOLDINGS LIMITED**

**Respondent**

Keith Robinson, Carey Olsen Bermuda Limited, for the Respondent

Kevin Taylor, Walkers (Bermuda) Limited for the Appellant

Hearing date(s): 14 November 2022
- - - - - - - - - - - - - - - - - - - -
**APPROVED REASONS**

78

**CLARKE P:**

1.  On **Tuesday 26 July 2022** we allowed the appeal of the Hong Kong and Shanghai Banking Corporation ("HSBC" or "the Petitioner") from the decision of Mussenden J, dated 31 May 2022 (leave to appeal having been granted by the judge on 1 June 2022), and ordered that the Respondent, NewOcean Energy Holdings Ltd ("NewOcean" or "the Company"), a Bermuda company, should be wound up and that the joint provisional liquidators should continue as provisional liquidators with the powers granted pursuant to section 175 of the *Companies Act 1981*, which powers were not to be limited by section 170 (3) of the *Companies Act*, such that the  Amended Light Touch Order was no longer to be in effect. The winding up order was made in relation to a petition filed by HSBC on 22 October 2021.

2.  On **30 September 2022** we gave detailed reasons for the decision ("the Reasons") that we had made at the end of July.

3.  The Company, acting through Mr Shum, its executive director, now seeks leave to appeal to the Judicial Committee of the Privy Council from our decision and a stay of the order which we made, pending the final determination by the Privy Council of the appeal.

*Leave to appeal*

4.  The Company contends that it is entitled to appeal as of right. As to that, section 2 of the *Appeals Act 1911* provides that an appeal shall lie:

    "(*a*) *as of right, from any final judgment of the Court, where the matter in dispute on the appeal amounts to or is of the value of $12,000 or upwards or where the appeal involves, directly or indirectly, some claim or question to or respecting property or some civil right amounting to or of the value of $12,000 or upward*;"

    If an appeal lies as of right it would only be proper to refuse leave if the putative appeal was devoid of merit and bound to fail, or if the appeal was an abuse of process. That is not the case here.

5.  I do not accept that the Company's putative appeal is from a decision of this Court where either "*the matter in dispute on the appeal amounts to or is of the value of $12,000 or upwards*" or where the appeal "*involves directly or indirectly some claim or question to or respecting property or some civil right amounting to or of the value of $12,000 or upward*".

6.  The application of this section was considered by this Court in *Sturgeon Asia Central Balanced Fund Ltd v Capital Partner Securities Co Ltd* Civil Appeal No 14 of 2017, in which this Court determined that the participating shareholders in a fund were entitled to vote to terminate the fund and have a Company wound up on the just and equitable grounds. The Court, which had been provided with a bundle of some 50 authorities on the question, held that there was in that case no appeal as of right under section 2 (a). In the lead judgement Baker P observed, echoing the words of Lord Hodge in the Privy Council case of *A v R* (5 March 2018) that the provision for a right of appeal if the amount in dispute amounted to or was of the value of $12,000 was "*anachronistic*" and should be "*restrictively rather than liberally applied"*. He also observed, *inter alia*, that:

     (a)   the money realised in the liquidation of the Company was not "*the amount of the matter in dispute*" nor was it "*the amount of a claim or question relating to property*"

     (b)   the economic consequences of the Court's winding up order were indirect and/or too remote

7.    The value of the debts owed by the Company to its bank creditors, of whom the Petitioner is one, amounts to some $ 770.6 million.  And the Petition debt is over US $ 70 million and HK $ 5.4 million.  But those debts were not the matter in dispute on the appeal. The Petition debt was not disputed and nothing decided by this Court or the Privy Council will determine whether or not it exists or in what amount. The appeal did not determine a claim to property or a question respecting property. Nor did it determine the existence or otherwise of some civil right. What was in dispute on the appeal was to whether the Supreme Court had erred in the exercise of its discretion in further adjourning the winding up proceedings, and continuing the Amended Light Touch Order, and not ordering the immediate winding up of the Company.

8.    Mr Keith Robinson for the Company submits that the appeal involves directly or, at the lowest, indirectly some claim or question to or respecting property amounting to or of the value of more than $12,000, the question being whether or not the Court was right to grant a winding up order in relation to the Petition debt. I do not accept that this submission is well founded. The section is to be narrowly construed and it must, in my view, be held to apply if, but not unless, there is a claim in respect of some property to which the would-be appellant is, or claims to be entitled, or some question in respect of that property. No such question arises. The Petitioner's entitlement to the only relevant property – its chose in action against the Company – is not in question. A contrary conclusion would not constitute the application of a strict construction; would not, as it seems to me, be consistent with *Sturgeon*; and, if correct, would appear to mean that, in relation to all windings-up where the Petition debt exceeded $12,000, there was an appeal as of right.

9.    The 1911 Act also provides that an appeal to the Privy Council may lie:

> "(c)   *at the discretion of the Court, from any other judgment of the Court, whether final or interlocutory, if in the opinion of the Court, the question involved in the appeal is one which, by reason of its great general or public importance, or otherwise, ought to be submitted to Her Majesty in Council for decision*."

10.   It is apparent from the authorities – such as *Imran Siddiqui v Athene* [2019] BN 2020 CA 2 - that it is necessary for a would-be appellant who relies on the "*great general or public importance*" provision to show that there is a dispute as to the applicable principle[s] of law rather than a dispute as the applicability of settled principles of law to the facts of the case.

11.   In *Imran Siddiqui* Smellie JA cited, inter alia, the judgment of the British Virgin Islands Court of Appeal in *Renaissance Ventures Ltd v Comodo Holdings* [2018] ECSC J 1008-3:

> "*Where there is no dispute on the applicable principles of law underlying the question which the appellant wishes to pursue on his or her appeal, a question of great general public importance does not ordinarily arise, especially where the principle of law is settled either by the highest appellate court or by longevity of application. Where the principle is one established by this Court but is either unsettled, in the sense that there are differing views or conflicting dicta, or there*

*are some genuine uncertainties surrounding the principle itself, or if it is considered to be far-reaching in its effect, or given to harsh consequences or for some other good reason would benefit from consideration at the final appellate level, this court would be minded to seek the guidance of their Lordships' Board. Where, however, the real question on the proposed appeal is the way this court has applied settled and clear law to the particular facts of the case, or whether a judicial discretion was properly exercised, leave will ordinarily not be granted on this ground. In such a case, the question on the proposed appeal may be of great importance to the aggrieved applicant, but it would not for that reason alone be a question of great general or public importance.*"

12. Mr Robinson further submits that, according to his research, there have been 25 reported Bermuda Supreme Court cases in the last 10 years that have concerned Hong Kong provisional liquidations (which I take to mean, provisional liquidations in relation to companies carrying on business in Hong Kong). None of them have been successfully appealed to the Court of Appeal for Bermuda or to the Privy Council. There is a lack of judicial guidance on provisional liquidations in Bermuda from the highest court which has left uncertainty as to, *inter alia*, the appellate Court's ability to use its discretion in the context of a provisional liquidation to order a winding up. This, he submits, has given rise to conflicting views, genuine uncertainty and likely harsh consequences that will affect the interests of the Company's creditors. Further the increasing regularity with which Hong Kong provisional liquidations are appearing in front of the Bermuda courts reinforces the point that it is of general public importance that Bermuda's highest appellate court should opine on this subject and bring clarity to this important area of law.

13. This is said to be of particular importance to the Company which is a public listed Company with around 48% of its stock held by the general public. The Group has over US$ 1 billion worth of assets and was operating one of the major LPG and oil terminals in the Southern China region. There were continuing negotiations in respect of asset sales in terms of hundreds of millions of US$s. The Company's 30 bank lenders were major local and international banks. The Group has over 950 employees in Hong Kong and China whose livelihood depends on the continuing survival of the Group. The question whether the Company should face an immediate winding up order is, it is submitted, clearly a matter of public importance and not a private matter.

14. Mr Kevin Taylor for HSBC submits that there is, in truth, no issue of great general or public importance. The question of whether this Court was correct to overrule the judge and order the immediate winding- up of the Company fell within the ambit of judicial discretion. The case concerned the application of settled legal principles in the area of Bermuda insolvency law and their application to the facts of the case. There is no novel issue of law.

15. He also referred us to what was said by Lord Bingham in the context of an application for leave to appeal to the House of Lords in v *Secretary of State for Trade and Industry ex parte Eastway* [2000] 1 WLR 2222, at 2228:

"*In its role as a Supreme Court the House must necessarily concentrate its attention on a relatively small number of cases recognised as raising legal questions of general public importance. It cannot seek to correct errors in the application of certain law, even where such are shown to exist.*"

16. Thus, Mr Taylor submits, even if the Court was persuaded that there was an error in its application of the relevant principles, this would be an insufficient basis for the grant of leave to appeal. Further, if, contrary to that submission, the Company was able to demonstrate that there was some ground of general importance, the Court still retains a discretion and should be slow to grant leave. In the English Supreme Court decision of *Uprichard v Scottish Minister* [2013] UKSC 21, Lord Reed said at [59] that:

> "*Appeals against any order or judgement of the Court of Appeal in England and Wales or in Northern Ireland can be brought only with the permission of the Court of Appeal or of this court.* **In practice, the Court of Appeal normally refuses permission so as to enable an appeal panel of this court to select, from the applications before it for permission to appeal, the cases raising the most important issues**". [Emphasis added].

17. Further in *Sturgeon* Baker P, when considering the "*or otherwise*" provision observed:

> "*Whilst there is authority to indicate that the words or otherwise are not to be read with the previous provision in the subsection, it is also clear not only from the wording of the section, but also from a number of Commonwealth cases that the threshold is a high one, and that there must be truly exceptional circumstances to justify this court in granting leave. In the circumstances therefore, for my part, I would refuse leave. I would do so having said that there were a number of very troubling issues in this case that this Court decided and were resolved in the judgement of my Lord Justice of Appeal Clarke. But, none of those issues seem to me to cross the threshold of carrying a sufficient interest, beyond the interests of the parties, to justify this court in granting leave to appeal. It seems to me that the Privy Council, like the Supreme Court, much prefer to decide which cases they will they wish to take on appeal, and in my judgment that matter is better left to them to decide.*"

18. The Company has in its submissions and in a number of affirmations set out, at some length, the respects in which it contends that the Court was in serious error. No useful purpose would be gained by going through those points at length, let alone responding to them. In essence they are that the Court:

(i)    wrongly substituted its discretion for that of the judge;

(ii)   failed to take into account how close the Company was to disposing of its assets at a price which meant that all or most of its debts would be paid;

(iii)  ignored or paid little heed to (a) the time inevitably required to secure a disposition of so substantial a body of assets; (b) the need for the proposed sales to be close to completion before a restructuring proposal could be properly considered; and (c) to the prospect of the value of its assets being reduced to a fraction if the liquidation proceeded; and

(iv)   paid too much attention to the need for 75% of the creditors to agree with the proposals (and the fact that some 66% supported the winding up) in circumstances where the creditors were either ignorant of the nature and extent of the progress which had been made (or of Mr Selvia's affidavit) or had been misled by the JPLs, and had not been made aware of the Company's explanations for what it was said to have done wrong

(v)    gave insufficient weight to the efforts of the Company to cooperate with the JPLs and to provide information; see [41] of Mr Shum's second affirmation.

19.   I would accept that these contentions are arguable. But it does not seem to me that an appeal to the Board would raise any question of great general or public importance, as opposed to a question of great importance to the Company and its shareholders and creditors. The judgment considered a substantial number of well-known authorities and sought to apply them. Mr Robinson submits that those authorities were not cases decided in the context of the availability of a "light touch" provisional liquidation, and that the Privy Council should have the opportunity to consider whether they are applicable without qualification where there is in place a light touch order with a view to restructuring and, in particular, whether or not the creditors, in that context, do have an entitlement as between them and the Company, to a winding up order *ex debito justitiae*, and whether or not the views of a substantial majority should be afforded the significance which this Court attached to them.

20    I am not persuaded that this submission takes the case out of the category of one where what is, in essence, in issue is whether the judgment of the Supreme Court was a valid exercise of a statutory discretion.  Further, in my view, the question of whether or not an appeal should be entertained by the Board on the basis suggested by Mr Robinson or otherwise is very much something that, in a case such as this, the Board should decide.

21.   Accordingly, I would decline to grant leave on this basis, also.

**Stay**

22.   Since I would refuse leave, it follows that the only basis upon which the case could be taken to the Board would be if the Board were minded, itself to give leave. In the nature of things, and having regard to the size of the material that has been provided to us, an application for leave is not likely to be capable of swift determination by the Board, unless the Board were persuaded that it should accelerate its procedure.

24.   The present case is not one where a plaintiff has obtained, or has been denied, a judgment for a debt. What was sought, and has been granted, is the collective remedy afforded by a winding up order.  In relation to such cases HSBC relies on the dicta of Plowman J in *Re A and BC Chewing Gum* Ltd [1975] 1 WLR 59 where he said:

> "*It [i.e. the relevant section of the Companies Act 1948] says I can grant a stay on proof to my satisfaction that the proceedings ought to be stayed. But then there is the question of practice, and as a matter of practice a stay is never granted...But there are very good reasons for the practice of never ordering a stay, and they are these: as soon as a winding up order has been made the Official Receiver has to ascertain first of all the assets as at the date of the order; secondly, the assets at the date of the presentation of the petition, having regard to the possible repercussions of section 227 of the Act of 1948 ; and thirdly the liabilities of the Company at the date of the order, so that he can find out who the preferential creditors are, and also the unsecured creditors.*
>
> *Supposing there is an appeal and the winding up order is ultimately affirmed by the Court of Appeal, and there has been a stay, his ability to discover all these things is very seriously hampered; it makes it very difficult for him, possibly a year later, to ascertain what the position was at different times a year previously. But if the business is being carried on at a profit, as I understand this business now is, no*

*additional harm is done by refusing a stay … Of course if the business can only be carried on at a loss- it should not be carried on at all."*

25.    Whilst the considerations to which Plowman J referred are potentially relevant, I do not accept that in a liquidation case a stay should never be granted; nor, indeed, that that remains the position in England. If that were so, the discretion given to the Court would, in reality, be non-existent.

26.    In *Aabar Block SARL v Maud* [2016] EWHC 1319 (Ch) Snowden J (as he then was) set out the law on stays of judgments and orders in the following terms:

> *22. The principles applicable on an application for a stay pending appeal were helpfully summarised by Mr Justice Eder in Otkritie International Investment Management Limited & Ors v Urumov (aka George Urumov) & Ors [2014] EWHC 755 (Comm) at paragraph 22. Mr Justice Eder stated:*
>
> *"As summarised by the claimants, the applicable principles are as follows:*
>
> *1. First, unless the appeal court or the lower court orders otherwise, an appeal shall not operate as a stay of any order or decision of the lower court: CPR 52.7 .*
>
> *2. Second, the correct starting point is that a successful claimant is not to be prevented from enforcing his judgment even though an appeal is pending: Winchester Cigarette Machinery Ltd v Payne And Another unreported 10 December 1993 per Ralph Gibson LJ.*
>
> *3. Third, as stated in DEFRA v Georgina Downs [2009] EWCA Civ 257 at paragraphs 8 to 9, per Sullivan LJ (emphasis supplied):*
>
> > *'A stay is the exception rather than the rule, <u>solid grounds</u> have to be put forward by the party seeking a stay and, if such grounds are established, then the court will undertake a <u>balancing exercise</u> , weighing the risks of injustice to each side if a stay is or is not granted.*
> >
> > *It is fair to say that those reasons are normally of some form of <u>irremediable harm</u> if no stay is granted because, for example, the appellant will be deported to a country where he alleges he will suffer persecution or torture or because a threatened strike will occur or because some other form of damage which will be done which is irremediable …'*
>
> *4. Fourth, the sorts of questions to be asked when undertaking the "balancing exercise" are set out in Hammond Suddard Solicitors v Agrichem International Holdings Ltd. [2001] EWCA Civ 2065 at paragraph 22 per Clarke LJ (emphasis supplied):*
>
> > *'By CPR rule 52.7 , unless the appeal court or the lower court orders otherwise, an appeal does not operate as a stay of execution of the orders of the lower court. It follows that the court has a discretion*

> *whether or not to grant a stay. Whether the court should exercise its discretion to grant a stay will depend upon all the circumstances of the case, but the essential question is whether there is a risk of injustice to one or other or both parties if it grants or refuses a stay. <u>In particular, if a stay is refused, what are the risks of the appeal being stifled? If a stay is granted and the appeal fails, what are the risks the respondent will be unable to enforce the judgment? On the other hand if a stay is refused and the appeal succeeds and the judgment is enforced in the meantime, what are the risks of the appellant being able to recover any monies paid from the respondent?</u>*'

> *5.  Finally, the normal rule is for no stay to be granted, but where the justice of that approach is in doubt, the answer may depend on the perceived strength of the appeal: Leicester Circuits Ltd v Coates Brothers [2002] EWCA Civ 474 at paragraph 13, per Potter LJ."*

27    In the course of his judgment he observed, in the context of an application to stay a bankruptcy order pending the determination of an application for permission to appeal, that, in that case, there was no urgent need to get in or secure the assets of the estate or to identify creditors or to obtain information from Mr Maud.  There was only one asset of Mr Maud which was capable of being realised which was his shareholding in a Company called Ramblers.  He then said:

> "[34] *It is, however, the risk of irreparable harm to Mr Maud's interests in those shares if a bankruptcy order is made, that in my judgement provides solid grounds for Mr Maud seeking a stay pending appeal. It is not disputed that if a bankruptcy order is made without a stay, the provisions of article 12 (i) (b) of Ramblas' articles will be irreversibly triggered. Those articles provide that in the event that a shareholder loses the right to dispose of his property in any manner whatsoever (which would be the case if a bankruptcy order was made and not stayed), his shares must be offered to the other shareholders. That compulsory process under the articles cannot be halted once initiated."*

27.    In the result Snowden J was satisfied that, if he did not order a stay until the appeal could be heard, Mr Maud would suffer the irremediable prejudice of being forced to offer his shares in Ramblers for sale which would, of itself, deprive him of his property, and would be something that could not be undone if the appeal were to succeed. He also found that the petitioners would suffer no counterbalancing prejudice if the order was stayed for a short period. He therefore granted a stay until after the determination of the application for permission to appeal and, if permission was granted, the determination of the appeal.

28.    In *Aabar* Snowden J also referred to the dictum of Potter LJ in *Leicester Circuits Ltd v Coates Brothers* [2002] EWCA Civ 474 at [13]:

> "*The proper approach is to make the order which best accords with the interests of justice. Where there is a risk upon one party or another, whichever order is made, the court has to balance the alternatives to decide which is less likely to cause injustice. The normal rule is for no stay but where the justice of that approach is in doubt, the answer may depend on the perceived strength of the appeal.*"

29. A stay of a winding up petition was also granted in *Re Dollar Land (Feltham) Ltd* [1995] BCC 40; and in *Fullsun International Holdings Group Company Ltd* [2022] SC (Bda) O 43 Com. In the latter case the petitioner had failed to establish that it would derive any benefit from the winding up; the adjournment had the support of 72% by value of the unsecured creditors and it was likely that another 23% were of the same view.  The judge (Mussenden J) also derived assistance from *McPherson and Keay on the Law of Company Liquidation* (Sweet & Maxwell, 5th Ed) where it stated that 'a '*good reason'* to adjourn is '*that winding up will deprive creditors of the benefit of a proposed compromise, or will endanger a scheme for reconstruction*.''

30.  In the light of those authorities it is apparent that we should consider the potential consequences if, on the one hand:

    (a)    a stay is granted but any appeal is unsuccessful either because the Privy Council failed to give leave or because, after leave was given the appeal failed: and, on the other hand:

    (b)    a stay is refused and an appeal is successful.

32. As to the former, HSBC submits that it is important and desirable for the liquidation of the Company to proceed because, having regard to the uncertainty of the Company's financial status and the conduct of the Company's displaced board, there is no basis to suggest that the interests of the creditors can be adequately safeguarded if a stay is granted and management of the Company is returned to the control of its directors.

33  The Court should, it is submitted, take into account a number of factors which are detailed in the reasons including the following:

    (a)    the Company owes to HSBC an undisputed debt (as it does to the other bank creditors);

    (b)    the Company's executive directors (other than Mr Shum) have resigned as have the auditors;

    (c)    the Company's major bank creditors did not support the prior restructuring efforts in 2020 and 2021;

    (d)    the Company's auditors disclaimed their opinion on the 2021 accounts

    (e)    on 27 October 2021 the Company announced that it had relocated its headquarters from Hong Kong to mainland China, which included relocating its books and records. As a result, the JPLs, even as at the date of their Third Report to the Supreme Court on 5 July 2022, do not appear to have had access to all the book and records of the Company;

    (f)    the Company deliberately breached the Light Touch Order by failing to inform the JPLs, HSBC and the Supreme Court that a winding up petition had been filed in Hong Kong on 12 April 2022 by Kuwait Petroleum Corporation, a trade creditor, in circumstances where the Company had refused to disclose the identity of its trade creditors to the JPLs. The Company appeared to be seeking to obscure the extent of the debts owed to its creditors;

    (g)    the Company dissipated its assets by way of the two share pledges referred to at [38] – 45] of the Reasons without reference to the JPLs;

    (h)    the Company failed to publish its 2021 Annual Results by the requisite deadline as a result of which trading in its share on the HKSE was suspended on 1 April 2022 and remains suspended; those results have still not been published.

(i)　　the Company failed to provide the JPLs with the necessary financial information to consider the viability of any restructuring proposal and whether it was in the best interests of the creditors.

34.　HSBC submits that, in the light of the above, a stay would be potentially damaging to the interests of the creditors, including itself, and that this damage could not be offset by a reversion to the Light Touch Order in circumstances where the former management had (a) withheld and obscured key information and developments from the JPLs; and (b) was in a position to procure the dissipation of assets with the JPLs[1] being powerless to prevent that.

35.　HSBC further submits that the contention that in the absence of a stay application the appeal will be rendered nugatory and that the execution of the winding up order will bring terrible adverse economic consequences for the Company should be rejected.

36.　The matters relied on by HSBC in the preceding paragraphs have been supplemented by a very recent report to this Court from the JPLs, received by the Court in the last week of October 2022. The Report is a very substantial work, 45 pages in length with over 900 pages of annexures.  The Executive Summary includes the following statements:

(i)　　The main challenge to the winding up of the Company is that the Company is merely a holding entity: its value lies within the assets and businesses held through indirect holdings. The Group structure is complex, as it operates through various layers of entities across several jurisdictions. The JPLs have found that jurisdictions such as the PRC where a significant portion of the Group's assets and businesses are located do not recognise foreign orders automatically and hence, it is critical to seek recognition in multiple foreign jurisdictions in order to assert effective control. Section 5 of the Report reveals that the JPLs had not been granted voluntary access to the underlying businesses and assets. They have successfully assumed control of the Company's wholly owned subsidiary, Super Deal, a Seychellois company, by replacing its board of directors with persons nominated by the JPLs and are progressing the change of directors of various BVI entities directly held by Super Deal. Section 8 of the Report reveals that the Company currently holds over 110 known (indirect) subsidiaries across 9 jurisdictions.

(ii)　　Since the appointment of the JPLs, the directors and officers of the Company have failed to cooperate with the JPLs and denied the JPLs access to critical books and records of the Company and relevant personnel in the Group. The JPLs attempted to visit the Company's office in the PRC and were denied access. There has been no material information provided to the JPLs since the last batch of information that was provided to the JPLs during the Company's restructuring. Information about the Group's current financial status and substantive details of its asset holdings remain outstanding. Mr Shum, as the only current executive director of the Company, completed a statement of affairs. However, the JPLs consider Mr Shum's statements to be incomplete and lacking substantiation. No value was attached to the assets listed on Mr Shum's statements and no details were provided to support the makeup of the liabilities of the Company. Further detail is contained in sections 5 (Progress of the Liquidation), 6 (Outstanding Information to Date), and 7 (Statement of Affairs) of the Report.

---

[1] Although the JPLs have become Liquidators I propose, for the sake of convenience, to continue to use the JPL description.

87

(iii)      The JPLs have pursued their own investigations and during the limited time available the Group has been undergoing an undisclosed and unsanctioned reorganisation process. The JPLs found transfers of shareholdings within the Group, pledging of assets and transfers of rights attached to assets which have never been publicly disclosed. These transactions ("the Transactions") have a significant impact on the economic value of the Company and thereby the potential recovery for the benefit of unsecured creditors of the Company. The chain of these transactions commenced prior to and during the Company's attempts to restructure its debts; even while the appointment of the JPLs was ongoing. The latest Transaction the JPLs have uncovered occurred in August 2022. Details are set out in section 8 and Annexure G.

Included in section 8 is reference to the fact that on 8 June 2022 NewOcean Energy (Zhuhai) Company Limited had (as appeared from a notice of that date published by the Zhuhai Natural Resources Bureau (ZNRB)) applied to transfer the coastal rights of the LPG Deep Sea Terminal to a company – Zhuhai Shangyang Enterprises Limited, which appears to be outside the Group. Further the JPLs had understood from an officer of the ZNRB that coastal LPG facilities must have valid coastal rights before they can operate and that the Terminal together will all relevant rights attached to it were currently subject to transfer outside the Group which was expected to complete in November 2022: section 8.1.

We were told that the outgoing board of the Company has no knowledge of this supposed transfer of the LPG Asset. Mr Robinson also told us that the coastal rights transfer was to take place in accordance with the lease referred to at [43] pf the Reasons.  But the nature of the link between the transfer and the rental agreement is wholly unclear and there is no evidence before us which addresses what is contained in section 8.1 of the Report.

The section refers to other apparent transfers of substantial assets outside the Group: e.g. the Transactions referred to at sections 8.2; 8.5; 8.6; 8.10; and 8.11. There appear also to have been, after the making of the winding up order, increases in the share capital of three subsidiaries the effect of which may have been to dilute the Company's ultimate ownership of the relevant company.

(iv)      It would appear from the Transactions that have already taken place that the Company has no desire to restructure its debts with creditors of the Company and are potentially placing its core businesses and assets (including the LPG Deep-Sea Terminal, the Oil Products Storage Terminal, the Zhuhai Commercial Property Complex and various vessels) out of the reach of the JPLs. These actions harm the prospects of recovery for the creditors in the winding up. In Section 10 of the Report the JPLs record that:

> "*Both before and after the Bermuda Winding Up order, the Group has been brazenly divesting itself of assets, over which the Company is the ultimate beneficial owner. The value of the company as observed from the Transactions (detailed in section 8 of this Report) may have severely diminished and it is particularly concerning the company chose to not publicly disclose any of these Transactions whilst it appeared to attempt to restructure the debts of the company in a Court-supervised restructuring. The actions already undertaken by the Company and within the Group would appear to cause detriment to the position of creditors of the Company. We*

*consider that many of these Transactions as a matter of Bermudian law, may
be voidable."*

(v)    it is apparent the JPLs will not receive any assistance or cooperation from the
Company's officers whilst the appeals process is ongoing. However, it is the duty of the
JPs to fulfil their obligations while they remain in office. The JPLs consider that they
will have to resort to other means within their powers to determine their steps going
forward in dealing with the Transactions that they have already identified. Two of the
JPLs are now also appointed liquidators of the Company in Hong Kong which is
beneficial given the assets and the offices of the Company are located in the PRC and
Hong Kong. The JPLs continue to enjoy the support of creditors who on 12 October 22
2022 voted unanimously for the JPLs to remain in office as permanent liquidators. The
minutes of the meeting of creditors record that 20 creditors with US $ 715,21.849.18 in
value of claims on the Company voted in favour of an application being made to the
Supreme Court for the appointment of three individuals as permanent liquidators. This
was 100% in number and 100% in value of all creditors present personally or by proxy
and voting on the resolution.

37.    In section 5 of the Report the Liquidators state that they have not been provided with any access
to the current financial data of the Company and its operating subsidiaries and state that there
has been no cooperation or any direct communication with any officer of the Company or
management personnel within the Group. The JPLs have made clear that they adopt a neutral
position as to whether permission to appeal should be given but expressed the opinion that:

"*a stay of execution will delay the JPLs' urgent action to attempt to preserve assets
on behalf of the creditors. The JPLs consider that the Group has now unequivocally
demonstrated its intent to frustrate the Bermuda Winding Up Order to the detriment
of the Company's creditors."*

38    In his second affirmation in these proceedings Mr Shum, who had only had about 12 hours to
consider the Report, made clear that he found the Report extremely biased and unsatisfactory,
and, in particular, the criticisms of himself personally which had never been put to him for a
response, of which he gave examples. The allegations that the Group had been undergoing an
undisclosed reorganisation process and had put assets beyond the reach of the JPLs was firmly
rejected. The vast majority of the alleged transactions were said to have already been addressed
and considered by the lower court in Shum 4 and Shum 6 and in no way concealed from the
JPLs or the Bermuda Court and the others had never been put to the Outgoing Board for a
response/ it was also, he said, completely untrue to say that the JPLs would not receive any
assistance or cooperation from the Company's officers whilst the appeal process was ongoing.
Whilst he addressed a number of specific items he did not deal with the apparent intended
disposal of the LPG Asset to an entity outside the Group.

**The contentions of the Company**

39.    As to the position if a stay is refused, the Company (through Mr Shum, contends that a stay
should be granted because the likely effect of a stay not being granted will be to cause
irreparable damage to the Company as a result of a significant loss of the potential value at
which the Company will be able to sell its assets, such that any appeal will be rendered
nugatory. Granting a stay will be less likely to cause injustice because it preserves the
opportunity to make a significant recovery for the Company's creditors as the Company will

not lose the significant value that the PRC licences represent and prospective buyers will not be deterred from making a purchase.  The Company is not seeking to secure the dismissal of the winding-up petition so that it can resume trading in a normal manner. What it seeks is a further short adjournment of the petition in order to pursue a sale process that would maximise the recovery value of certain assets to the benefit of its creditors in circumstances where, it contends, many of its creditors and the court have been materially misled so as to mask the late stages in negotiations for onward sales that the Company has reached.

40.   We have before us for this application a number of documents which were in existence when we heard the application in July but which were not then placed before us by either side or by the JPLs. These are:

  (i)    the 3rd Report of the JPLs to the Supreme Court;
  (ii)   the 1st affirmation of David Selvia of 6 July 2022 before the Supreme Court;
  (iii)  the 9th Affirmation of Mr Shum Siu Hung of 8 July 2022 before the Supreme Court;
  (iv)   the draft restructuring proposal which Mussenden J had required the Company to provide to the JPLs within 14 days of the 8 July hearing and which were provided to them on 22 July 2022.

We have also been provided with two very substantial affirmations from Mr Shum of 4 August and 25 October 2022. It is not easy to summarise the material set out in these documents.  In essence what is said or submitted is as follows.

41.   First, execution of the winding up order will lead to substantial irreversible and irreparable harm to the creditors of the Company with significant adverse consequences for potential investors in the assets of the Group. This is for four reasons:

  (i)    the execution of the order will wipe out the enterprise value of the Company upon the PRC operational licences being revoked and the value of the Group's assets once depleted could not be recovered;
  (ii)   the Company's efforts in negotiating with potential investors to sell its core assets, which are currently at an advanced stage, will be wasted if the execution of the order is not stayed. Cathay Capital one of the potential investors of the LPG assets has made it clear that it would not invest in those assets if the company were wound-up. Thus the prospect of realising up to US $ 736 million in the next quarter (which translates to recovery of 71% - 94% of what is owed to the bank creditors) will be irretrievably lost and the sales opportunities are unlikely to be repeated. The $ 736 million is the product of $ 450 million for the LPG Assets and $ 286 million for the Zhuhai Complex.
  (iii)  the liquidation of the Company will affect the Group's ability to perform the statutory safety and disaster prevention functions at the LPG and Oil Terminal, hence posing safety and disaster prevention risks due to flammable goods that are handled and stored there;
  (iv)   the Company will be unable to receive substantial monies due and payable to the Group, thus causing an unnecessary loss to the general unsecured creditors

The occurrence of these risks would, it is said, render the appeal nugatory.

42.   As to (i) above, first, the listing status of the company on the HKSE will be revoked upon a
winding up and once revoked cannot be reinstated. As to that it appears that trading has been
suspended. But the listing status has not been revoked. Second, the value of the Group's Oil
Terminal would be wiped out because the operational licences of the terminal will likely be
revoked upon the winding up of the company.

43.   As to that the Company has very substantial "LPG Assets" in Zhuhai, consisting of a very large
LPG storage terminal, 9 LPG bottling plants and 3 three auto-gas filling stations and their
supplementary infrastructures. Their estimated market value is said to be around US $450
million. The Company also has a 79.2% interest in a deep-sea Oil Storage Terminal which is
estimated to be worth no less than US $80 million. The value of these assets is highly dependent
on their normal operation which is subject to the Group maintaining all necessary licences
including but not limited to (1) Port Operation Licence; (2) Port Dangerous Goods Operation
Attached Certificate; (3) Gas Cylinder Filling Permit; (4) Gas Operation Licence; and (5)
Dangerous Chemical Business Licences.

44.   According to a PRC legal opinion these licences will face a material risk of cancellation by the
competent government authorities. If the necessary operational licences are revoked the value
of the LPG assets and the Oil Storage Terminal will be wiped out because once the licences
are revoked it is impossible for the Group to reinstate them. Accordingly, it is said, the Group
will suffer irreparable and irreversible damage of US 530 million as a result of the execution
of the winding up order. If the order is stayed the company will retain ownership of the various
licences and will be permitted to continue operations for its LPG business units and retain the
professional technical and safety management personnel critical to managing these assets,
thereby allowing the Company to continue meeting the conditions required for the issuance
and retention of its various licences.

45.   As to (ii) the relevant sale negotiations had by 4 August 2022 progressed to advanced stages
with potential completion in Q3 and Q4 of 2022. The Company was looking to receive binding
offers from potential investors in Q3/4 of 2022, complete the sale in Q4 of 2022, and receive
proceeds of the sale of up to US $ 736 million in December 2022 and February 2023.

46.   Mr Shum's first affirmation recorded that the Company continued to work closely with Cathay
Capital in relation to the sale of the LPG assets for approximately US $450 million and referred
to the affirmation of 8 July 2022 of Mr David Selvia, managing director of Cathay Capital,
which informed the Supreme Court that Cathay Capital was on track towards completion of
the sale in Q4 2022, and had conducted initial due diligence. Mr Shum recorded that Cathay
Capital would no longer purchase the LPG assets if the Company was wound up as the valuable
government approvals and licences required to operate those assets would be revoked
automatically by the winding up order. (This contention goes well beyond the "material risk"
position identified in the PRC legal opinion which the Company obtained). But, if the Court
granted a stay of execution which allowed sufficient time for Cathay to proceed it was willing
to continue with the sale negotiations with the Company, the JPLs and the interested creditors.
This is recorded in a powerful letter from Cathay Capital dated 2 August 2022 in which Mr
Selvia made plain, in terms, that Cathay Capital was not interested in acquiring the LPG
business under any liquidation scenario, saying;

> "*The underlying principle is simple: in this highly supervised sector life is too short
> to heap regulatory headaches on top of an already complex situation*" ...

The Hong Kong and Shanghai Banking Corporation v
NewOcean Energy Holdings Limited

> "To expect that a fire sale in a liquidation context will realise value is both naïve and foolish and betrays a profound misunderstanding of the asset. Calamity will ensue, the universe of buyers will further shrink and the value realisable by creditors will further reduce"

Mr Selvia had confirmed that in his affirmation, saying that a full liquidation would render Cathay's interest "moot", saying:

> "I have no interest in dealing with any situation where the relevant supervisory authorities might seek [to] review, revoke or otherwise modify any licences affiliated with NOE's LPG business units - given the geostrategic nature of NOE's Zhuhai terminal, a smooth transition is critical."

47. In relation to the Zhuhai Commercial Complex, it had been valued for the Company by Savills Real Estate Valuating Ltd in November 2021 at RMB 1.8 billion, i.e. approximately US $ 286 million. Mr Shum referred to the Letter of Intent of 21 December 2021 between the Company and Beijing Tianxi, and the agreement of 16 February 2022, referred to at [41] of the Reasons, and said that Beijing Tianxi was expected to complete the due diligence process by the end of August 2022, enter into binding term sheets for the sale of the Complex by November 2022 with a target completion date of February 2023. The execution of the winding -up order would terminate those negotiations, which were at an advanced stage, thereby wasting the Outgoing Board's efforts. Further, Mr Shum observed, once the due diligence stalls or investors lose interest it is difficult to impossible to resume or restart negotiations even if the Company succeeds on appeal. The costs and time expended by potential investors in deliberating the business and conducting due diligence will also be wasted.

48. In relation to the Complex Mr Shum's 9th Affirmation reported that the due diligence process conducted by Beijing Tianxi was expected to be completed by the end of August 2022 and an agreed term sheet was expected in October 2022, subject to the JPLs' review and final approval.

49. Accordingly, the Company was working towards confirming binding term sheets (a) in relation to the sale of the LPG Assets by the end of Q3 2022, with sales to be completed in Q4 2022 and (b) in relation to the Complex by October 2022. The completion of the sale of those two assets was projected to generate liquidity to pay off 95% of the Company's bank creditors. The affirmation also reported on progress in relation to other potential investors –including CITC AMC in relation to the LPG Assets and HF Group and Infinity Group in relation to the Group's assets.

50. The affirmation expressed the view that, with the information provided to them, the JPLs were in a position to assess the sale negotiations and expressed the belief that they should come to the same conclusion as the Company that the proposed sale of the LPG Assets and the Complex would generate up to $ 726 million, which would be paid to the Company's creditors. The affirmation recorded that the Company was conducting a review of the RFA with a view to further discussions with the creditors and the JPLs and narrowing the differences which prevented agreement on the original scheme in 2020. The affirmation set out details of the proposed mechanism for the sale proceeds to flow to the Company, the proposed Conditions Precedent to a Restructuring Effective Date and a proposed post-restructuring monitoring procedure.

51. The effects of a winding up, it was submitted, would be that the Company would lose out on the opportunity to receive proceeds of US $ 736 million which equals 95% of the outstanding bank debts. The completion of the sales would be hugely beneficial to the creditors because, based on a liquidation analysis of the Company conducted on 2 December 2020 by Duff Phelps the conclusion was that the potential recovery for creditors in a liquidation scenario was between 17% and 31% (not taking into account the potential licence revocation consequence in the PRC) and, in case of a liquidators' fire sale the expected recovery and the timeline of recovery would be much prolonged.

52. The Draft Restructuring Proposal was a substantial document setting out the progress of the negotiations in respect of the sale of the LPG assets and the Complex and their contemplated disposal for up to US $ 736 million and the manner in which the proceeds of sale were to be distributed to creditors.

53 This account is to be compared with the altogether more downbeat executive summary of the 3rd JPL Report to the Supreme Court of 5 July 2022 which included the following:

> "*The JPLs, having now met with the Company's financial advisers and potential investors, have been left underwhelmed by the progress and preliminary nature of the discussions in respect of the asset disposal and/or restructuring initiatives. There are no binding offers, term sheets issued or due diligence conducted by the parties that the JPLs have spoken to. The JPLs have also attempted to arrange with K & K direct meetings with key management personnel of the Company but as the time of this report no such meeting has taken place.*
>
> *The JPLs therefore remain of the view that relevant and critical information concerning the affairs of the Group, which would enable the JPLs to fulfil their duties under the Appointment Order remains outstanding. It appears to the JPLs that the Company does not have a "live" restructuring proposal at the time of the report and the JPLs do not have sufficient information to assist with the review or formulation of a restructuring proposal. The Company has not yet notified the JPLs of any intended timeline within which they propose to settle the creditors' claims, the percentage of these claims that they intend to settle and the extent to which the creditors' rights may need to be varied in order to implement a potential debt restructuring. Accordingly, it is the JPLs view that there remain only limited prospects of a restructuring being successfully implemented for the company, if the status quo is maintained.*"

In the light of the information in Mr Shum's affirmations before this Court, that Report, or some of it, appears to have been overtaken by events.

54. As to (iii), the Group employs over 950 full-time staff, most of whom are in the PRC. The company also maintains a team of around 115 employees in the PRC for safety and technical support of the Group's operations. The cessation of operations would impair the Group's ability to meet its statutory obligations under PRC industrial safety and disaster prevention laws. The Group had been reminded to comply with statutory regulations by the Emergency Management Bureau of Zhuhai City which highlighted the importance of its role in ensuring production safety by maintaining staff management stability and implementing various security measures despite the crisis faced by the Group. If the order was not stayed the Company would no longer be able to maintain around 115 members of staff critical to the statutory safety and disaster

prevention functions of the sea terminal, dangerous chemical depot and the production and logistic infrastructure located in Gaolan Harbour, Zhuhai.  This will significantly increase the risk of an industrial accident, violation of relevant laws and regulations, significant financial penalties imposed by government authorities and claims by third party users of the Oil Storage Terminal and LPG stations.

55.    As to (iv) it is said that the revocation of business licences and the cessation of business operations would be detrimental to the Company's overall cash position. The Company has substantial monies due and payable from its customers for daily operations which it would likely be unable to recover without a stay of execution.

56.    Mr Shum also produced details as to how the Company had provided the JPLs with cash flow projections for the year ended 31 December 2022 which showed a positive closing bank balance. In order to boost cash flow while the Company formulated its restructuring plan the Company had leased out its Zhuhai Terminal and refined products storage facility. The LPG bottling plants and auto- gas stations also continue to be operated and brought in positive cash flow.

57.    Mr Shum submitted that there can be no prejudice to the Petitioner in making an order for a stay of execution pending appeal because, so he claimed, the Company is and  was all material times balance sheet solvent (in this respect he relied on figures for the period ending 30 June 2021) ,and because the assets of the company were preserved under the terms of the Light Touch Order, under which all payments or dispositions of the Company's property or its subsidiaries outside the ordinary course of business could not be made without the direct or indirect approval of the JPLs.

58.    I have set out the rival submissions at length because it is apparent that each side says that they will be severely prejudiced if the order that they seek is not made and the other side scarcely prejudiced at all.

**Analysis**

59.    There are in my view a number of critical considerations. The first is that it is apparent that the relationship between the liquidators and Mr Shum is dysfunctional. There are, of course, factual issues as to what has or has not happened which it is not possible for us finally to resolve on an interlocutory basis, but the repeated complaint by the liquidators that they are not being assisted (indeed the reverse), with specific examples, seems to me to be of considerable force. The Report attached a substantial document – Annexure D - which records the information which is wholly or partially missing. Mr Shun has given no details of the value of the assets of the Company for the purpose of the Statement of Affairs (see section 7 of the Report). It is not apparent to me that he is really prepared to work with the liquidators. This want of cooperation, or worse, is reflected in what I said at [29] – [30] of the Reasons, in the matters contained therein summarised at paragraph 33 above, and in the contents of the First Report to the Supreme Court summarised at [47] of the Reasons. Although there was some improvement in the relationship by 8 July, since then, matters appear to have reverted to the situation of functional deadlock which the JPLs foresaw in the First Report. Mr Robinson submitted that a functioning relationship could be restored, under the guidance, where necessary, of the judge, and on the restoration of the Light Touch Order the Board would be able to lead the negotiations for the disposal of the critical assets. In my judgment, the history of events, and the matters set out in the JPLs' report to this Court do not inspire confidence that that is so,

60    Second, it is apparent that any value of the Company depends on the value it derives (or can derive) from a very large number of direct and, more importantly, indirect subsidiaries.  This is apparent from a perusal of the "simplified" asset structure which appears at page 31 of the Report.  Thus, to take but one example, the company which owns the LPG terminal is owned by a BVI company, which is owned by a Samoan company, which is owned by a BVI company (Sound HK), which is owned by a Seychellois company (Super Deal). The latter company appears to have been introduced into the chain on 26 August 2021, for an unknown purpose, and without the liquidators (or the Court) being informed of it until June 2022.

61.    In order to realise the assets of the Company and derive value from the subsidiaries in the Group the liquidators are going to have to conduct an exercise, upon which they have already embarked, which involves, *inter alia*, changing the composition of the boards of the relevant companies and securing recognition of the status of the liquidators in the PRC and elsewhere. This is a process which may well take some time and should not be held up by a stay, especially because of the risk that subsidiaries in the Group or interests in them may be disposed of before the liquidators can gain control. This appears already to be happening in relation to, *inter alia* the company owning the LPG Asset. If allowed to take place this could have the result that nothing was obtained for the Company from the realisation of the asset in question. Mr Robinson told us that the transfer of the coastal rights was part of some other (unidentified) transaction but we have no explanation from Mr Shum as to what is going on. Staying the liquidation and restoring the Light Touch Order, the maintenance of which requires, as I said in the Reasons [130], "*complete transparency and cooperation from the Company"*, neither of which is apparent, does not seem to me likely to provide the protection needed.

62    Next it remains relevant to consider the fact that the existing "current proposal", which has, in one shape of form, been around for over two years, without coming to fruition, is one that requires the consent of 75% of the bank creditors. It is apparent that they remain, in large measure, in favour of the liquidation. By March 2022 64.8% of the bank creditors supported it. At the First Creditors Meeting bank creditors representing US $ 744.9 million out of some $ 786 million voted to have the liquidators confirmed by the Bermuda Court and a committee of inspection appointed. Although liquidation had been ordered by this Court by then, the fact that so many voted in favour of confirmation, shows an almost universal view that there should be a liquidation.

63    These considerations, and in particular the strong recommendation of the independent liquidators who are officers of the court, causes me to conclude that we should refuse a stay. I also take into account that, whilst it is obviously a matter for the Board, it seems to me somewhat unlikely that they will be minded to grant leave.

64    I have not ignored the powerful points made by the Company in support of the contention that a liquidation will produce irreversible value destruction and that the long term managers of the PRC subsidiaries would be treated more favourably than the JPLs or those taking control of the subsidiaries on their behalf. As to that, I entertain some scepticism as to whether these catastrophising forecasts are entirely well founded. There is no doubt a material risk of cancellation of the relevant licences in relation to the LPG Assets, although the tenor of the legal opinion provided to the Company appears to be that the risk is that there will be uncertainty in the operation and management of the relevant companies or that important personnel may resign, which may lead to a revocation of the licenses. But it is not apparent that our order has led to that being threatened or intimated, or that things have happened which

make that likely, or that any of the staff of the subsidiaries have left it; and it does not seem to me impossible for the liquidators to negotiate with the Chinese authorities to the extent necessary and to take steps with a view to ensuring the continuance of the business of the subsidiaries of the Company pending a disposition of those companies.

65    As to negotiations for asset disposal, I accept that there is a difference between negotiating with a company which is under the direction of accomplished executives with expertise and with a company which is under the control of liquidators. But, again, I find it difficult to accept that the liquidators will be unable to procure the sale of the relevant subsidiary companies at a respectable price. Further, I bear in mind that those who are clamouring for liquidation, and who will be the entities most likely to suffer from value destruction (and possible the only ones likely to suffer) are sophisticated bank creditors who can form their own judgment as to benefit and risk, and who are concerned, as are the Liquidators, that assets may disappear from the Liquidators grasp and that assets disposals should be under the Liquidators' control.

66    For these reasons I would decline to grant a stay.

**Kay JA:**

67    I agree.

**Bell JA:**

68    I agree.

Neutral Citation Number: [2023] CA (Bda) 31 Civ



Civil Appeal No. 98 of 2022

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE SUPREME COURT OF BERMUDA SITTING IN ITS**
**ORIGINAL CIVIL JURISDICTION**
**THE HON. CHIEF JUSTICE**
**CASE NUMBER 2020: No. 031**

Date: 23 January 2024

Before:

**PRESIDENT, SIR CHRISTOPHER CLARKE**
**JUSTICE OF APPEAL SIR ANTHONY SMELLIE**
**and**
**JUSTICE OF APPEAL DAME ELIZABETH GLOSTER**

- - - - - - - - - - - - - - - - - - - - -
Between:

**HAROLD JOSEPH DARRELL**

Appellant

- and -

(1)   **RACHELLE FRISBY**
(2)    **JOHN JOHNSTON**

Respondents

Mr. Harold Darrell, Appellant in Person
Mr. Jonathan O'Mahony of Conyers, Dill and Pearman, for the Respondent

**Hearing dates: 22, 23 June and 9 August 2023**
**Date of Judgment: 23 January 2024**
- - - - - - - - - - - - - - - - - - - - -

**APPROVED JUDGMENT**

97

*Harold Joseph Darrell v Rachelle Frisby et.el*

**GLOSTER, J.A.:**

**Introduction**

1.    By his Notice of Appeal dated 19 January 2023 Mr Harold Joseph Darrell ("Mr Darrell" or "the Appellant") sought to appeal the ruling of Wolffe J dated 30 December 2022 in which the judge (i) dismissed the Appellant's application to stay his bankruptcy; (ii) dismissed his application to stay the possession proceedings brought in the bankruptcy until the Court determined an application by him to set aside a consent judgment dated 24 September 2015 in the matter of *Joseph Wakefield (as the Executor of the Willcocks Trust) v Harold Joseph Darrell - No 106 of 2-15*; and (iii) granted the Respondents, the Trustees in bankruptcy of the Appellant ("the Trustees" or "the Respondents"), an order for possession of 12 Cedar Avenue Hamilton Bermuda ("the Property").   On 27 January 2023 the Supreme Court issued its actual order for possession of the Property dated 27 January 2023 ("the Possession Order") and refused the Appellant's application for a stay. Subsequently, on 31 March 2023, the Supreme Court refused a second application for a stay of the Possession Order.

2.    Pursuant to Rule 2/37 of the Rules of the Court of Appeal of Bermuda, and by an application made by Amended Notice of Motion dated 16 May 2023 ("the First Stay Application"), Mr Darrell renewed his application for a stay before the Court of Appeal. He applied to this Court for a stay of execution pending the Appeal of: (i) the Possession Order, and (ii) the Supreme Court's subsequent order for possession of the Property dated 31 March 2023, which stayed the order for possession of the Property for three months until 15 June 2023, with a direction that the Applicant vacate the Property by 5 PM on 15 June 2023, with possession of the property to take place on 16 June 2023.

3.    That application came on for hearing before the Court of Appeal on 22 June 2023. The Court heard submissions from the Appellant as a litigant in person, who was assisted by his McKenzie Friend, Mr. Jaymo Durham, and from Counsel for the Trustees, Mr. Jonathan O'Mahony, of Conyers Dill & Pearman ("Conyers"), attorneys. By its order for directions dated 23 June 2023 ("the 23 June 2023 Order"), this Court refused the First Stay Application. In addition, the Court ordered:

"2.     There is to be a final stay of the order for possession for a further 28 days, until 5 PM on 21st July 2023 to afford the Applicant a final opportunity to move himself, his mother, his siblings and any other occupants of the Property out of the Property.

3.     The Applicant is hereby ordered to vacate the property by 5 PM on 21st July 2023.

4.     The Writ of Possession shall be executed on 22nd July 2023.

5.     As directed during the hearing of the application on 22nd June 2023, the Applicant is to file with the Court within seven days of today a copy of his affidavit dated March 2023 originally filed in support of his application to the Supreme Court made on 31st March 2023 for a stay of execution, which this Court was informed reflected some, or all, of the facts and matters stated by or on behalf of the Applicant to this Court on 22nd June 2023.

6.     The Respondents' costs shall be costs in the bankruptcy."

4.     Subsequently, by summons dated 21 July 2023 ("the Second Stay Application") Mr Darrell applied for a further stay of execution of the Possession Order which was due to be executed on 22 July 2023 pursuant to the 23 June 2023 Order. That application came on for hearing before this Court (sitting remotely) on 9 August 2023, when Mr Darrell, with the permission of the Court, was assisted by Mr Gordon Ricky Woolridge Jr. as Mr Darrell's McKenzie Friend and Mr. O'Mahony again appeared on behalf of the Trustees.

5.     Having heard the parties, this Court dismissed the Second Stay Application and, in addition, by a directions order dated 9 August 2023 ("the 9 August 2023 Order"), ordered as follows:

"2.     The Applicant [i.e. the Appellant] is hereby required to vacate the Property by 5pm on 23 August 2023.

3.     The Writ of Possession dated 1 March 2023 shall be executed on 24 August 2023.

4.     The Respondents' costs shall be costs in the bankruptcy.

5.     The Applicant is precluded from making any further application for a stay of execution of the Possession Order unless all the following pre-conditions are met:

(i)     there has been a change of circumstances from those prevailing as at the date of this order;

(ii)    the Applicant has, prior to making any such further application, made an application in writing to the Court of Appeal for Bermuda ex parte on notice to the Respondents for permission to make such an application in sufficient time to enable the 3rd condition below to be satisfied; and

(iii)   the application for permission has been granted by the Court of Appeal on the papers not less than 5 days before the date of execution of the Possession Order."

6.      This judgment, which is the judgment of the Court, sets out the reasons why this Court made the 23 June 2023 Order and the 9 August 2023 Order, thereby refusing the Appellant's application for a stay of possession pending appeal.

**Summary of the relevant factual background**

7.      The following summary is to a certain extent taken from the Trustees' skeleton argument dated 21 June 2023, as supplemented by further information received by the Court in the form of comments/submissions by Mr Darrell and/or Mr Durham and other documents produced by the respective parties.

8.      On 10 November 2017 a receiving order was made against Mr. Darrell on a bankruptcy petition presented by Mr. Joseph Wakefield, a judgment creditor, who had obtained judgment against Mr. Darrell on 24 September 2015 ("the Wakefield Judgment"). Mr. Darrell did not file his statement of affairs as required by section 15 of the Bankruptcy Act 1989, and, on 18 December 2018, he was declared bankrupt ("the Bankruptcy Order").

9.      The Official Receiver was initially appointed trustee in bankruptcy. On 14 February 2019 the Trustees were appointed in place of the Official Receiver. On the commencement of the bankruptcy the Property vested initially in the Official Receiver and, subsequently, in the Trustees on their appointment. As a result of the Bankruptcy Order, Mr. Darrell had no legal right to occupy the Property enforceable against the Trustees. As against Mr. Darrell, the Trustees had a clear right to possession and the right to sell the property.

10. On 24 June 2019, the Trustees wrote to each of the units at the Property asking for information as to any tenant and the details of any tenancy. The Trustees did not receive any response to their letters. More recently, Mr. Darrell has asserted that the units at the Property are all occupied by his family members. Not one of them responded to the Trustees' letter. Accordingly, on 24 January 2020 the Trustees filed possession proceedings in relation to the Property.

11. The Trustees wrote to Mr. Darrell on numerous occasions requesting information about his assets and liabilities. They sought to meet with Mr. Darrell. Until January 2023, Mr Darrell refused to comply with the Trustees' demand for him to provide a statement of affairs or to comply with his statutory obligations to provide information to the Trustees. In the Ruling Wolffe J accepted the Trustees' evidence that Mr. Darrell had also failed to comply with his statutory obligations under section 26 of the Bankruptcy Act 1989.

12. Mr. Darrell's asserted basis for refusing to provide his statement of affairs was that Conyers, the attorneys advising the Trustees, were conflicted. The reality was that Mr. Darrell had refused to provide his statement of affairs long before Conyers were engaged, and this had led to the making of the Bankruptcy Order. In any event, in August 2022 the Supreme Court dismissed Mr. Darrell's application to enjoin Conyers from being engaged by the Trustees. However, Mr. Darrell still did not provide a statement of affairs until 25 January 2023. The Trustees contend that the statement was deficient at best and, at worst, wilfully misleading.

13. By his Notice of Appeal dated 23 January 2023 Mr Darrell sought the following relief:

> "i.     That the Order of the Court below be discharged; and
>
> ii.    That all of the Bankruptcy Proceedings be stayed pending
> - The production of the Statement of Affairs;
> - The outcome of the Willcocks case; and
> - The determination of the Appellant's Application to set aside the judgment that gave rise to this bankruptcy.
>
> iii.   That the costs of this Appeal and of the application in the Court below be provided for."

14. By his Amended Notice of Motion dated 16 May 2023 applying for a stay of execution of the order for possession, Mr Darrell stated that the grounds of his application were:

"1.    That the Applicant has an Appeal to this Honourable Court that is pending to be heard before the full court. The Appeal is said to be likely to be heard in the November session but the Supreme Court has given this Applicant until 15 June 2023 to advance his appeal that he filed on 19 January 2023.

2.    That the only known creditor's judgment that has led to the bankruptcy of this Appellant has the inherent risk of being set aside on the basis that the judgment was obtained by dishonesty against the Appellant.

3.    That the matter that shall determine the validity of the judgment is being heard in or about May 2023 before the Hon. Chief Justice *GEOFFREY LYNN WILLCOCKS -v- (1) JOSEPH E. WAKWEFIELD* [sic] *AND (2) WAKEFIELD QUIN LIMITED.*

4.    That this Appellant is making an Application to join the above-named matter as an interested Party.

5.    That should the judgment be set aside, there are no other claims in the bankruptcy and the said bankruptcy shall be dismissed.

6.    That should the judgment be set aside, there shall be a claim for significant damages owed to this Appellant who is a leading businessman in this community."

15.    In Mr Darrell's submissions in support of a stay dated 16 March 2023 ("Mr Darrell's 16 March Submissions"), which apparently were not before Wolffe J in March 2023, and in his affidavit sworn on 16 June 2023 ("Mr Darrell's 16 June Affidavit"), Mr Darrell relied on two further grounds to support the First Stay Application to this Court, namely:

i.    "the grave medical circumstances relating to Mr Darrell's mother, who is an occupant of the Property", which Mr Darrell submitted amounted to an exceptional circumstance with reference to the case of *Grant v Baker* [2016] EWHC 1782 (Ch); and informed the Court in its exercise of its powers under section 98 of the Bankruptcy Act (see Mr Darrell's 16 March submissions, paragraph 5);

ii.    the fact that no creditors had come forward, that none has been identified by the Trustees and if the Trustees had identified other creditors the Trustees would have had to call a meeting under section 14(2) of the Act; it was therefore

impossible to ascertain what was in the interests of the purported creditors (see Mr Darrell's 16 March submissions, paragraph 6).

16. In addition to Mr Darrell's 16 June affidavit and Mr Darrell's 16 March submissions, in relation to the First Stay Application the Court was referred to and read:

    i.    Mr Darrell's affidavit dated 27 March 2023 in support of his application for a stay of execution ("Mr Darrell's 27 March Affidavit");

    ii.    the affidavit of John Johnston, one of the Trustees, dated 20 June 2023 ("Mr Johnston's First Affidavit");

    iii.    the Trustees' skeleton argument dated 21 June 2023.

17. In addition to the above evidence, in relation to the Second Stay Application the Court was referred to and read:

    i.    Mr Darrell's affidavit dated 21 July 2023 ("Mr Darrell's 21 July Affidavit");

    ii.    Mr Darrell's affidavit dated 7 August 2023 ("Mr Darrell's 7 August Affidavit");

    iii.    Mr Johnston's affidavit dated 7 August 2023 ("Mr Johnston's Second Affidavit");

    iv.    a skeleton argument filed on behalf of Mr Darrell dated 9 August 2023.

**The correct legal approach to the granting of a stay of execution of an order pending appeal**

18. The correct legal approach to the granting of a stay of execution of an order pending appeal is set out in the President's judgment in the recent Court of Appeal of Bermuda case of *Hong Kong and Shanghai Banking v Newocean Energy* [2021] CA (Bda) 214 Civ at [26] as follows:

> "In *Aabar Block SARL v Maud* [2016] EWHC 1319 (Ch) Snowden J (as he then was) set out the law on stays of judgments and orders in the following terms:
>
> 22.    *The principles applicable on an application for a stay pending appeal were helpfully summarised by Mr Justice Eder in Otkritie*

*International Investment Management Ltd & Ors v Urumov & Ors [2014] EWHC 755 (Comm) at paragraph 22. Mr Justice Eder stated:*

*"As summarised by the claimants, the applicable principles are as follows:*

"1.    *First, unless the appeal court or the lower court orders otherwise, an appeal shall not operate as a stay of any order or decision of the lower court: CPR r 52.7.*

2.    *Second, the correct starting point is that a successful claimant is not to be prevented from enforcing his judgment even though an appeal is pending: Winchester Cigarette Machinery Ltd v Payne, CA Unrep, 10 December 1993, per Ralph Gibson LJ.*

3.    *Third, as stated in DEFRA v Downs [2009] EWCA Civ 257 at [8]-[9], per Sullivan LJ (emphasis supplied):*

> *'...A stay is the exception rather than the rule, <u>solid grounds</u> have to be put forward by the party seeking a stay, and, if such grounds are established, then the court will undertake a <u>balancing exercise</u> weighing the risks of injustice to each side if a stay is or is not granted.*
>
> *It is fair to say that those reasons are normally of some form of <u>irremediable harm</u> if no stay is granted because, for example, the appellant will be deported to a country where he alleges he will suffer persecution or torture, or because a threatened strike will occur or because some other form of damage will be done which is irremediable. It is unusual to grant a stay to prevent the kind of temporary inconvenience that any appellant is bound to face because he has to live, at least temporarily, with the consequences of an unfavourable judgment which he wishes to challenge in the Court of Appeal. So what is the basis on which a stay is sought in the present case?'*

4.    *Fourth, the sorts of questions to be asked when undertaking the 'balancing exercise' are set out in Hammond Suddard Solicitors v Agrichem International Holdings Ltd [2001] EWCA Civ 2065 at §22, per Clarke LJ (emphasis supplied):*

> *'By CPR rule 52.7, unless the appeal court or the lower court orders otherwise, an appeal does not operate as a stay of execution of the orders of the*

> *lower court. It follows that the court has a discretion whether or not to grant a stay. Whether the court should exercise its discretion to grant a stay will depend upon all the circumstances of the case, but the essential question is whether there is a risk of injustice to one or other or both parties if it grants or refuses a stay. In particular, if a stay is refused what are the risks of the appeal being stifled? If a stay is granted and the appeal fails, what are the risks that the respondent will be unable to enforce the judgment? On the other hand, if a stay is refused and the appeal succeeds, and the judgment is enforced in the meantime, what are the risks of the appellant being able to recover any monies paid from the respondent?'*

> 5.    *Finally, the normal rule is for no stay to be granted, but where the justice of that approach is in doubt, the answer may depend on the perceived strength of the appeal: Leicester Circuits Ltd v Coates Brothers pie [2002] EWCA Civ 474 at§ 13, per Potter LJ."*

19.    This approach was followed by Hargun CJ in *Ivanishvili v Credit Suisse* [2022] SC (Bda) 56 Civ5. In his judgment at [48 – 50], the Chief Justice emphasised that the assessment as to whether a stay is to be granted involves a two-stage process. First the appellant must establish solid grounds. Then, if it does so, the Court will undertake a balancing exercise weighing the risk to each side. Reference should also be made to the Chief Justice's comments at [49] where he said:

> "In *Contract Facilities v Rees* [2003] EWCA Civ 465 at [10], the Court of Appeal quoted from the *Hammond Suddards v Agrichem* judgment referred to by Eder J (above) as follows: "*On the question as to whether there might be a stifling of the appeal, again a further paragraph of Agrichem is material. That is paragraph 18. All I need to quote from that paragraph is that the court made it clear that where somebody seeks to stay orders what they need to do is: '... produce cogent evidence that there is a real risk of injustice if enforcement is allowed to take place pending appeal.'* "[My emphasis.]

20.    This Court adopts the approach set out in these authorities.

**The Ruling**

21.    The Ruling was published in December 2022 (giving the Trustees possession) and was formally handed down in January 2023.

22.     The reasons which Wolffe J gave in allowing the Trustees' application for an order for possession of the Property and rejecting Mr Darrell's application for a stay of possession were as follows:

> "18.    In her supporting First Affidavit sworn on the 13th January 2020, and with reference to the above background, Ms. Rachelle Frisby (one of the Plaintiffs and trustees in bankruptcy), states the following:
>
> -        Since the appointment of the Plaintiffs as trustees in bankruptcy on the 14th February 2019 the Defendant has not engaged with the Plaintiffs in good faith and that he has failed to meet his obligations under section 26 of the Act. In particular, the Defendant has failed or refused: to attend meetings of the creditors (the Defendant did attend the first meeting with the Plaintiffs on the 31st March 2019 but thereafter failed to attend scheduled meetings); to submit to examination and give such information as required; to give an inventory of his property; to give a list of creditors and debtor; to assist in the realization of his property and distribution of the proceeds among his creditors; or of course, to deliver up the Property.
>
> -        The Defendant has failed to provide a statement of affairs or provide any further information regarding his other assets and liabilities despite repeated requests to do so.
>
> 19.     Ms. Frisby punctuates the contents of her affidavit by expressing that the creditors are desirous of having the Property sold as soon as possible as currently there is no prospect of the Defendant ever satisfying his debts. Further, Ms. Frisby says, the dilatory and uncooperative conduct of the Defendant increasingly closes the door to any opportunity to maximize the value of the Property so that the creditors may be fully paid that which is owed to them by the Defendant.
>
> 20.     In response to the Plaintiffs' application for possession of his property the Defendant chose not to file an affidavit contesting any of the contents of Ms. Frisby's First Affidavit. This may be a well thought out strategy on the part of the Defendant to keep his cards close to his chest or it may be a deliberate attempt to not capitulate to the mandated directions of the Plaintiffs. Whatever may be the Defendant's intention, the end result is that the Defendant provides no or little answer as to why he has not met with the Plaintiffs, or provided a list of all his assets and liabilities, or provided an inventory of his property, or given a list of all his creditors and debtors, or assisted the Plaintiffs in realizing and distributing the proceeds of his property, or not delivered up the Property. All of which he is

obligated to do under section 26 of the Act and which is necessary for the Plaintiffs to fulfil their duties to the creditors under the Act.

21.    In the absence of the Defendant providing the Court with sustainable and legitimate reasons as to why he did not fulfil his section 26 obligations, or even make an application under section 35 of the Act to annul his adjudication as a bankrupt, I am compelled to accept the evidence of Ms. Frisby and find that the Defendant has failed or refused to comply with section 26 of the Act in the manner stated by Ms. Frisby in her First Affidavit. I accordingly find that the Defendant has exhibited an unexplained stubborn reluctance to cooperate with his statutory obligations.  The question now for me to determine is whether I should grant the Plaintiffs' application for possession of the Property.

22.    Taking into consideration the uncooperative stance adopted by the Defendant from the 10th November 2017 when the Receiving Order was made (a period of over five (5) years), as well as the financial plight surely endured by the Defendant's creditors over that period of time, I cannot reach any other conclusion but to grant possession of the Property to the Plaintiffs so that they may comply with their statutory duty to sell the Property and distribute the proceeds in satisfaction of the Defendant's debts (this may involve the termination of any leasehold agreements held in respect of the Property - *In re Sharpe (A Bankrupt), Ex parte Trustee of the Bankrupt's Property v. The Bankrupt and Another* 1 WLR 219).

23.    Had the Defendant taken some definitive steps to meet with the Plaintiffs and fulfil his section 26 obligations there may have been an alternative plan executed by him and the Plaintiffs to satisfy the creditors, and this plan may not have involved the selling of the Property. Or, if the Defendant has family members still residing in the Property, then it may have been possible for one or all of them to purchase the Property thereby leaving the family members in occupation (as was suggested to be a possible solution in *Louise Brittain (The Trustee of the Property of the Bankrupt) and Hamid Dehdashti Haghighat and another* (20091 EWHC 90 (Ch)). Unfortunately, it would appear that given the conduct of the Defendant over the past five (5) years that any prospect of the Plaintiffs and the Defendant reaching an amicable agreement to satisfy the Defendant's debts without resorting to the Property being sold seems to be irretrievably bleak. However, hope springs eternal and if what Mr. Durham says is correct i.e. that the Defendant may have other assets from which his creditors may be paid, then maybe the Property may not have to be sold.

24.    For the avoidance of doubt, I do not accept as viable excuses that the Defendant did not submit his statement of affairs because (i) he was extremely concerned to learn on the 31st March 2019 that the Plaintiffs were represented by Mr. Williams who is a lawyer with Conyers Ltd. ("Conyers") which has represented HSBC in proceedings brought against and by him; or (ii) that he has been embroiled in litigation against the Government of Bermuda. Firstly, from at least 10th November 2017 when the Receiving Order was made and certainly from the 18th December 2018 when Assistant Justice Kesseram strongly commented on the Defendant's failure or refusal to provide a statement of affairs, it would have been clear to the Defendant that he must provide his statement of affairs. So the Defendant's obligation to provide his statement of affairs would have predated him discovering that Conyers represented the Plaintiffs.

25.    Secondly, it is difficult for me to see how any other litigation which the Defendant had with the Bermuda Government or HSBC would to any degree have justifiably stalled the Defendant's obligations under section 26 of the Act. Whether or not the Bermuda Government interfered with the Defendant's complaint to the Human Rights Commission would not have affected any insolvency which the Defendant may have had and it would have unlikely affected the Defendant being declared a bankrupt. Therefore, the Defendant was, and still is, compelled to produce his statement of affairs and his "knee jerk reaction" (Mr. Durham's terminology) to not comply with section 26 of the Act may have been ill- advised.

26.    Mr. Williams invites me to hold the Defendant in contempt of court pursuant to section 26(4) of the Act for his failure to comply with section 26 of the Act. I decline to do so at this time as I will give the Defendant a final opportunity to comply with his section 26 obligations in a reasonable time frame set by the Plaintiffs. Should the Defendant continue to be obstinate then holding him in contempt of court will most likely be an inescapable decision for me to arrive at. Having said this, I am in no way whatsoever suggesting that the delivering up or selling of the Property should await the Defendant providing his statement of affairs. The Plaintiffs should proceed with fulfilling their statutory obligations with convenient speed so that the Defendant's creditors may be paid from the proceeds of the sale of the Property. One would think that with the prospects of the Property being sold hovering over the Defendant's head that this would spur the Defendant into action of not only providing his statement of affairs but to also do all that is required to ensure that his debts are satisfied without the Property being sold."

23.    It is relevant to note that no argument was put forward before Wolffe J in the Supreme Court in August 2022 that there should be no order for possession of the Property because of the circumstances relating to Mr Darrell's mother. Accordingly, Wolffe J did not address any such reasons in the Ruling.

24.    The Provost Marshall gave a date for the enforcement of the Writ of Possession of 4 April 2023. On 30 March 2023 Mr Darrell filed a last minute application for a stay of execution of the Writ. At the hearing Mr Darrell also applied for recusal of the Judge. Both the recusal application and the application for a stay were dismissed.

25.    It is also relevant to note that, in support of his application for a stay of the Writ of Possession before Wolffe J, Mr Darrell filed a 41 page affidavit (namely, Mr Darrell's 27 March Affidavit as defined above) with over 100 pages of exhibits. None of that evidence referred to the situation of Mr Darrell's mother. It appears that, at the hearing of the stay application on 31 March 2023, Mr Woolridge, on behalf of Mr Darrell, without reference to any evidence, informed the Court that Mr Darrell needed more time to find accommodation for his elderly and infirm mother. Notwithstanding the absence of any evidence in the evidence filed in support of the application, Wolffe J stayed the possession order until 15 June 2023 but directed that the possession order was to be enforced on 16 June 2023, thereby giving Mr Darrell almost a further three months to find his mother alternative accommodation.

**Discussion and determination**

*Absence of solid grounds supported by cogent evidence that there is a real risk of injustice if enforcement is allowed to take place pending appeal*

26.    Having heard from Mr Durham on behalf of Mr Darrell, and from Mr Darrell himself, we were not satisfied either at the hearing on 23 June 2023, or at the subsequent hearing on 9 August 2023, that Mr Darrell had established solid grounds supported by cogent evidence that there was a real, or indeed any, risk of injustice if enforcement were allowed to take place pending appeal. Our reasons may be summarised as follows.

*The circumstances surrounding Mr Darrell's elderly mother's occupation of the Property*

27.   We assume, without deciding, that this Court has power, whether under section 81 of the Bankruptcy Act 1989, in the exercise of its discretion whether to grant a stay of execution of an order, or otherwise, to take into account the circumstances surrounding Mr Darrell's elderly mother's occupation of the Property in deciding whether to grant a stay of the order for possession. The Court is prepared to assume, without deciding, that the type of considerations identified in the English case of *Grant v Baker* [2016] EWHC 1782 (Ch) by Henderson J in relation to the postponement of a sale of a property in a bankrupt estate might be applicable in the present case. However, it rejects Mr Darrell's reliance upon a "priority" argument by reference to section 98 of the Bermuda Bankruptcy Act 1989. Section 98 is concerned with priority of debts payable in the bankruptcy and is not concerned with the Court's discretion to allow occupants of a bankrupt's property an extension of time before execution.

28.   In Mr Darrell's affidavit dated 16 June 2023 he stated as follows in relation to the circumstances of his mother's occupation of the Property:

> "Exceptional Circumstances Point:
>
> 55.   As previously mentioned in these proceedings, the court should consider that my mother, who is in her 96-year of age, continues to reside on the property in the lower south apartment.
>
> 56.   Currently, my mother suffers from cardiac and liver-related diseases, which have recently impaired her mobility and quality of life. This year she has been taken to the hospital on at least six occasions and has been hospitalised for the better of three months.
>
> 57.   As a result of her ailments, she has around-the-clock caregiver requirements. From 9 a.m. to 5 p.m., a caregiver attends to her at home. From 5 p.m. until the following morning, my two brothers and I take turns looking out for her.
>
> 58.   I have installed a remote lighting system next to my mother's bed so that she can contact any of us in an emergency. As such, her apartment has been renovated to meet her needs, and the family environment of the homestead adequately compensates for her needs between 5 p.m. and 9 a.m. In contrast, a caregiver employed for the same period would be excessively expensive.
>
> 59.   My mother has resided in the homestead for the past 40 years, and her familiar surroundings and family provide great comfort and have sustained a good quality of life for her. In this regard,

> the court should exercise its discretion to stay the possession order and eviction until my mother's death, particularly given that Mr Wakefield is before the Court answering fraud charges initiated by the Wilcocks estate."

29.   We heard reiterated in oral submission that Mr Darrell's mother is very frail and requires carers; that she lives in a separate unit at the Property; and that Mr Darrell, and his two brothers, both of whom are aged 65 and above, and live in other units in the Property, apparently share with Mr Darrell the care, and expenses relating to the care, of their mother. But we did not receive any medical evidence on either occasion to support the asserted medical condition of Mr Darrell's mother. Nonetheless, we are prepared to accept that her circumstances are indeed as set out in Mr Darrell's affidavit.

30.   We did not consider that the circumstances surrounding the mother's age, health and care justified any further suspension of the order for possession of the Property in the context of Mr Darrell's bankruptcy. The reality is that Mr Darrell has known for many months, if not years, that he faced an order for possession of the Property. Despite this, as the Ruling made clear, he has failed to cooperate in any way with the Trustees or to discharge his obligations in the bankruptcy. Nor, it seems, has he attempted to make any suitable alternative provisions for his mother, whether with the assistance of his brothers, or otherwise. A summary of the chronology is as follows:

   a.   The Trustees were provided with the title deeds to the Property by the Official Receiver shortly after their appointment.

   b.   On 24 June 2019 the Trustees wrote to each of the (5) units at the Property requesting that the occupants provide details of any tenancy; but there was no response. Mr Darrell refused at that stage to provide any details about the occupants and, if so, whether there was any rental income. It appears that there was no such income.

   c.   The Trustees were therefore realistically left with no choice but to seek a possession order; proceedings were issued on 24 January 2020. Mr Darrell has therefore known that the Trustees were attempting to gain possession of the Property for some 3.5 years.

d.     The Ruling was published in December 2022 (giving the Trustees possession) and was formally handed down in January 2023. The Provost Marshall gave a date for the enforcement of the Writ of Possession of 4 April 2023. At the last moment, on 30 March 2023, Mr Darrell filed an application for a stay of execution of the Writ. At the hearing Mr Darrell also applied for recusal of the Judge. Both the recusal application and the application for a stay were dismissed.

e.     In support of his application for a stay of the Writ, Mr Darrell filed a 41 page affidavit with over 100 pages of exhibits. At the hearing of the stay application on 31 March 2023 Mr Woolridge, without reference to any evidence, informed the Court that Mr Darrell needed more time to find accommodation for his elderly and infirm mother. Despite the absence of any evidence in the extensive evidence filed in support, Wolffe J stayed the possession order until 15 June 2023 but directed that the possession order was to be enforced on 16 June 2023, thereby giving Mr Darrell almost a further 3 months (on top of the 3 already given) to find his mother alternative accommodation.

31.    As Mr O'Mahony for the Trustees submitted:

a.     Mr Darrell has known of the possession proceedings for 3.5 years and (if he is to be believed) has failed to find suitable accommodation for his mother in that time.

b.     The possession order was made in December 2022 and Mr Darrell has had 6 months since then to find suitable accommodation for his mother in that time.

c.     The Supreme Court had no evidence before it in March 2023 of Mr Darrell's mother's medical condition, despite his having filed a 41 page affidavit with over 100 pages of exhibits. That remained the case at the hearing before the Court of Appeal in June 2023: Mr Darrell's 16 June 2023 affidavit in support of his application for a stay pending appeal contained no evidence of his mother's condition.

d.     That remained the position in August 2023 when this Court heard Mr Darrell's further application for a stay.

e.    In anticipation that Mr. Darrell would attempt to further delay execution of the possession order, on 8 June 2023 the Trustees wrote to Mr. Darrell (copying his former attorneys, Amicus Law), requesting certain information about Mr. Darrell's mother. This letter was not answered.

32.    In addition, this Court received no, or no adequate, evidence from Mr Darrell:

a.    as to who exactly lives in the property;

b.    what are the rental contribution arrangements to meet the outgoings on the property;

c.    the income or capital means which are available to Mr Darrell's mother to provide for her care and accommodation; in particular, as to Mr Darrell's brothers' resources or those of other members of the family to assist with her care and accommodation;

d.    the availability of alternative accommodation for his mother, or as to steps that had been taken to identify or secure such accommodation;

e.    the availability of any state facilities to provide for her care in accommodation.

33.    Accordingly, this Court concluded that there was no sufficient, let alone cogent, evidence to support Mr Darrell's application for a stay on the grounds of his mother's circumstances. Her circumstances, given the context and chronology of the present case, do not amount to exceptional circumstances such as to justify either any further, let alone a lengthy or permanent, stay of the possession order. The type of considerations identified by Henderson J in *Grant v Baker supra* simply do not apply.

34.    Even if it were relevant to consider the balance of injustice, we consider that the risk of injustice to Mr Darrell's creditors, in the circumstances far exceeds the risk of injustice to Mr Darrell, or indeed his mother.

*No realistic grounds to support any entitlement to set aside the judgment underlying the bankruptcy*

35.    Mr Darrell and/or Mr Durham on his behalf contended before us that the only known creditor's judgment that had led to the bankruptcy, namely the Wakefield Judgment,

was likely to be set aside as the judgment had been obtained by dishonesty. Mr Darrell
and Mr Durham submitted that Mr Darrell was making an application to join the case
entitled *Geoffrey Willcocks v Joseph Wakefield and Wakefield Quin* (Claim No.417 of
2021) ("the Willcocks Proceedings") and that, given the facts arising in that case, the
Wakefield Judgment and consequently his bankruptcy will in due course be set aside.
In fact, in or about October 2022, Hargun CJ refused Mr Darrell's application to join
the Willcocks Proceedings as a party. Notwithstanding this, Mr Darrell contends that
the facts relating to the Willcocks proceedings support his submission that the
Wakefield Judgment will in due course be set aside.

36.     In the Court's judgment, the evidence shows no realistic likelihood that the Wakefield
        Judgment will be set aside.

37.     In summary the facts underlying the Wakefield Judgment are that Mr Joseph Wakefield
        filed proceedings against Mr Darrell in 2015 (Claim No.160 of 2015) arising from Mr
        Darrell's failure to repay a loan made by Mr Wakefield, as executor of the estate of a
        Mr Peter Willcocks, to Mr Darrell for $427,259.47 in October 2010. On 24 September
        2015 Mr Wakefield and Mr Darrell agreed a consent order by which Mr Wakefield was
        given judgment for this sum and the order was signed by Hellman J. The consent order
        was signed when Mr Darrell was represented by counsel and following a hearing when
        Mr Darrell admitted that the debt was due and owing as claimed; this was recorded in
        the recital to the order. It was this judgment that led ultimately to Mr Darrell's
        bankruptcy.

38.     Mr Darrell now claims that this judgment will be set aside in the Willcocks Proceedings,
        which is a claim by Geoffrey Willcocks against Joseph Wakefield, as first defendant,
        and Wakefield Quin as second defendant.

39.     Mr Darrell's initial case was that the Wakefield Judgment as against him was liable to
        be set aside because Mr. Wakefield was not the executor of the Willcocks Estate and
        so did not have standing to bring the proceedings against Mr Darrell. However, the
        Trustees gave evidence on the appeal to the effect that they had been provided with a
        copy of the grant of probate dated 30 June 2006 showing that Mr Wakefield had been
        properly appointed as executor. Moreover, the judgment of Chief Justice Hargun dated
        11 October 2022 on a strike out application in the Willcocks Proceedings - *Willcocks v*

*(1) Wakefield and (2) Wakefield Quinn* [2022] SC (Bda) 76 at [2] ("the Willcocks Judgment") demonstrates that that is indeed the case.

40.    Mr Darrell then sought to claim that the Wakefield Judgment was fraudulent as Mr Wakefield ceased to be executor and trustee of the will of Mr Willcocks' late father when he retired as senior partner of Wakefield Quin. Mr Darrell claimed that this meant that Mr Wakefield did not have the authority to lend him the money at the relevant time.

41.    Again, that argument has no realistic chance of success. On the First Defendant's application in the Willcocks Proceedings to strike out the claim, Hargun CJ rejected the argument that Mr Wakefield ceased to be an executor and trustee when he retired as a senior partner of Wakefield Quin. He held that Mr Wakefield had never been formally removed as executor and had never renounced his position as executor; see [61] – [64] of the Willcocks Judgment.

42.    In addition, Mr Darrell claimed that the Memorandum of Deposit of Deeds form ("MOOD") signed by Mr Darrell in 2011 to secure the loan from Mr Wakefield was fraudulent. This was the form that was submitted to the Registrar General to register the Memorandum of Deposit executed by Mr Darrell in May 2011. As Hargun CJ makes clear at [25] – [27] of the Willcocks Judgment, the latter was nothing more than an agreement by Mr Darrell (with Mr Wakefield) to enter into a future mortgage once he received the title deeds to the Property from the bank. The fact that, taken at their highest, Mr Darrell's allegations about the MOOD might make the mortgage (as opposed to the underlying loan) unenforceable, is absolutely no basis for assuming that the Wakefield Judgment is liable to be set aside.

43.    Furthermore, Hargun CJ's judgment makes clear that Mr Willcocks' claim will not determine the validity of the consent judgment against Mr Darrell. Rather the claim is for damages for breach of fiduciary duty by Mr Wakefield (as trustee and executor of the will of Mr Willcocks' late father).

44.    Further and in any event once the bankruptcy order was granted, Mr Darrell no longer has *locus standi* to attack the Wakefield Judgment: he can only do so through his trustees either by consent or as a result of an order of the Court: *Heath v Tang* [1993] 1 WLR 1421. In *Royal Bank of Scotland v Farley* [1996] BPIR 638 CA the English Court of Appeal held that a bankrupt had no standing to set aside a judgment obtained in

default and therefore could not apply to annul the bankruptcy order. Had we considered that there was any *prima facie* merit in Mr Darrell's submissions in relation to the Wakefield Judgment, we might have disregarded this procedural point since any procedural defect arising out of the status of a bankrupt could, technically at least, in appropriate circumstances have been cured by an order of the Court. However, since we do not regard the point as having any merit, the lack of standing is another hurdle to Mr Darrell's claim.

45.  Accordingly, this Court concluded that there was no sufficient, let alone cogent, evidence to support Mr Darrell's First Application for a stay on the basis that the underlying judgment upon which the bankruptcy was based was liable to be set aside.

46.  Even if it were relevant to consider the balance of injustice, we consider that the risk of injustice to Mr Darrell's creditors, in the circumstances far exceeds the risk of injustice to Mr Darrell, or indeed his mother.

*The alleged absence of creditors other than the Willcocks Trust in respect of the Wakefield Judgment and Mr Darrell's alleged claims against the Human Rights Commission and others*

47.  Mr Darrell alleged that the fact that no other creditors had come forward and that none had been identified by the Trustees provided another reason in support of his application for a stay of the Possession Order. He submitted that if the Trustees had identified other creditors the Trustees would have had to call a meeting under section 14(2) of the Bankruptcy Act and accordingly it was impossible to ascertain what was in the interests of the purported creditors in the sale of the Property.

48.  The evidence belied this allegation. Not only did Mr Darrell's own statement of affairs set out a number of other creditors apart from the Willcocks Trust, but in addition there was extensive evidence from the Trustees to the effect that Clarien Bank was indeed owed in excess of $3 million by Mr Darrell in respect of a judgment debt (the veracity of which we do not need to decide for present purposes and so do not decide). Mr Darrell's allegations that he had various unformulated and speculative claims against the Human Rights Commission, the Bank of Bermuda, the Office of the Ombudsman and others arising out of alleged discriminatory conduct over many years went nowhere near to supporting his further argument that this Court should perform some sort of

notional set off against the Clarien Bank debt and the Wakefield Judgment and regard Mr Darrell as a solvent individual for the purposes of the two stay applications.

49.    In any event these allegations were of little relevance, if any, to the exercise of this Court's discretion to grant a stay of execution. Apart from the absence of any cogent evidence on Mr Darrell's part to support these allegations - and his 7 August Affidavit was inadequate in this respect – the allegations provided no support for an argument that the balance of injustice weighed in his favour.

*Conclusion in relation to the First Stay Application and the Second Stay Application in relation to the above grounds*

50.    Accordingly, this Court concluded that there was no sufficient, let alone cogent, evidence to support Mr Darrell's First Stay Application or his Second Stay Application on any of the grounds discussed above, whether taken singly or cumulatively. Nor did such evidence as there was go any way to support a conclusion that the risk of injustice to Mr Darrell exceeded the risk of potential injustice to Mr Darrell's creditors, if a stay of the Possession Order were not granted.

*Additional ground relied upon in relation to the Second Stay Application*

51.    In his 21 July Affidavit, entitled "Affidavit to support the urgent application for leave to file an action for breach of fiduciary duty against the trustees in bankruptcy under section 81 of the Bankruptcy Act 1989", Mr Darrell sought leave of the Bankruptcy Court to file an action for breach of fiduciary duty against the Trustees. This affidavit was also deployed as part of Mr Darrell's Second Stay Application (see paragraph 10 ibid). In that affidavit, Mr Darrell complained on various grounds about the Trustees' conduct of the sale of the Property, which he informed the Court that his son, Michael Darrell ("MJ"), was attempting to purchase. Mr Darrell complained *inter alia* that the Trustees:

a.    were demanding too high a price for the Property which at $800,000 (with $80,000 non-returnable deposit) was well over the valuation which MJ had received by way of an informal appraisal;

b.  had required acceptance of the offer to sell at such price in an unreasonably short timeframe;

c.  had imposed unreasonable stipulations on the purchase by way of anti-money-laundering (AML) and know your customer (KYC) requirements;

d.  had imposed unreasonable requirements in relation to the demonstration of the availability of finance to fund the purchase;

e.  had failed to obtain, and to provide to MJ as buyer, a structural assessment and valuation of the Property despite alleged issues with the roof and termite infestation.

52.  In his second affidavit, Mr Johnston addressed these complaints and exhibited the relevant correspondence. He stated that on 28 June 2023 Ms Angelita Dill of AAA wrote to Conyers indicating that MJ wished to buy the Property. In addition, the Trustees were contacted by Marshall Diel & Myers ("MDM") who said that they were acting for an anonymous lender who claimed to be willing to lend MJ the funds necessary to buy the Property. Following this, between 28 June 2023 and 21 July 2023, the Trustees entered into correspondence with AAA and MDM to see whether a sale might be effected. Mr Johnston further stated that no sale came about due to the refusal by the anonymous lender to provide adequate KYC/AML information and details of its source of funding, and the refusal by MJ to accept the Trustees' offer for sale of the Property at the market price.

53.  It was only on 7 August 2023 that Mr Darrell duly filed in this Court the exhibits to his 21 July Affidavit which identified the name and the terms of the offer of the proposed funder.

54.  Having considered the correspondence and heard the respective submissions of counsel for the Trustees, Mr Darrell and Mr Woolridge, the Court concluded that it had no reason to suppose that the Trustees were acting unreasonably and/or in breach of their fiduciary duties by failing to consider, or accept, an offer for purchase which would be in the interests of the bankrupt and the creditors. The Court concluded that, on the basis of the valuation advice which they had received, the Trustees were entitled to take the view that they could achieve a better price than that which was being offered by MJ.

They were also entitled, given the history of their dealings with Mr Darrell, to require satisfactory information about the terms of financing so as to reassure themselves that the funds would indeed be available, not merely to meet payment of the deposit but also the balance of the purchase price. They were not obliged to provide a valuation or a structural survey to a proposed purchaser. It was for them as professionals to decide how to conduct the negotiations for the sale of the property. It would not, in the Court's view, have been surprising for the Trustees to have regarded the email exchanges as indicating stalling and prevarication on the part of the proposed purchaser.

55.    In the Court's judgment, the negotiations as evidenced in the relevant email exchanges provide no basis for the Court's intervention in the conduct of the sale of the Property by the Trustees, by means of a stay of execution of the Possession Order or otherwise.

*Disposition*

56.    For the above reasons this Court refused Mr Darrell's First and Second Stay Applications and made the 23 June 2023 Order and the 9 August 2023 Order.


**CLARKE, P:**


**SMELLIE, JA:**